No. _____

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE CITY OF LOS ANGELES

---

CITY OF LOS ANGELES,

*Petitioner,*

v.

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

*Respondent*,

LA ALLIANCE FOR HUMAN RIGHTS ET AL.,

*Real Parties in Interest.*

---

From the United States District Court
for the Central District of California
Case No. 2:20-cv-02291 | The Honorable David O. Carter

## APPENDIX TO PETITION FOR A WRIT OF MANDAMUS AND EMERGENCY MOTION FOR IMMEDIATE STAY UNDER CIRCUIT RULE 27-3 (VOLUME 1 OF 7)

Hydee Feldstein Soto
Valerie Flores
Arlene N. Hoang
Jessica Mariani
CITY ATTORNEY'S OFFICE
200 North Main Street
City Hall East, 6th Floor
Los Angeles, CA 90012
213.978.7508

Theane D. Evangelis
Marcellus McRae
Bradley J. Hamburger
Daniel R. Adler
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197
213.229.7000
tevangelis@gibsondunn.com

*Counsel for Petitioner City of Los Angeles*

Carol A. Sobel (SBN 84483)
**LAW OFFICE OF CAROL A. SOBEL**
725 Arizona Ave.
Santa Monica, California 90401
Tel:  (310) 393-3055
Email: carolsobel@aol.com

Shayla R. Myers (SBN 264054)
**LEGAL AID FOUNDATION
OF LOS ANGELES**
7000 S. Broadway
Los Angeles, CA 90003
Tel: (213) 640-3983
Email: smyers@lafla.org

Catherine Sweetser (SBN 271142)
**SCHONBRUN SEPLOW HARRIS
& HOFFMAN, LLP**
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Tel:  (310) 396-0731
Email: catherine.sdshhh@gmail.com

*Attorneys for Proposed Intervenors*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

|  |  |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br>　　　　　　　Plaintiff(s),<br><br>　　　vs.<br><br>City of Los Angeles, et. al.<br>　　　　　　　Defendant(s). | CASE NO. 20-CV-02291-DOC-KES<br><br>Hon. David O. Carter<br>Courtroom 1<br><br>PROPOSED INTERVENORS' EX PARTE APPLICATION FOR INTERVENTION AND APPEARANCE AT MARCH 19, 2020 CONFERENCE<br><br>Date: None<br>Time: None<br>Ctrm: 1<br><br>Complaint Filed:  March 10, 2020 |

1

PROPOSED INTERVENOR'S EX PARTE APPLICATION TO INTERVENE

1

TO ALL ATTORNEYS OF RECORD, pursuant to Fed. R. Civ. Pro. Proc. 65 and Local Civil Rule 65-1, Proposed Intervenors CANGRESS dba Los Angles Community Action Network ("LA CAN") and Los Angeles Catholic Worker file this ex parte application to allow LA CAN and LACW to intervene, pursuant to Federal Rule of Civil Procedure 24(a)(2) and 24(b) in this action and/or intervene at the conference currently set for March 19, 2020 at 10:00 a.m. in Courtroom 1 of the United States District Court in Santa Ana, California before the Honorable David O. Carter.

Absent the requested relief on an ex parte basis, LA CAN and LACW will suffer irreparable harm. The March 19 conference is likely to deal with matters that directly and adversely impact LA CAN and LACW, including matters that could directly interfere with the continued enforcement of the settlement in *Mitchell v. City of Los Angeles*, Case No. 16-cv-01750 SJO JPR.

Counsel for LA CAN and LA Catholic Worker advised Counsel for Plaintiff and the County of Los Angeles by email on March 17, 2020 and March 18, 2020 respectively of the intention to move ex parte for intervenor status. Attorneys for the City, Scott Marcus, was advised via telephone on March 17, 2020. There is no indication of their positions to date, regarding the ex parte application.

This ex parte application is based on the Complaint, the Memorandum of Points and Authorities below, the Request for Judicial Notice and corresponding Exhibits, Notice of Related Case, the argument of counsel, and such further evidence as the Court may consider regarding this Application.

//

//

//

//

2

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

2

Pursuant to Local Civil Rule 7-19, Plaintiff provides the following information:

Elizabeth A. Mitchell
Spertus, Landes & Umhofer LLP
617 W. 7th Street, Suite 200
Los Angeles, California 90012
T: (213) 205-6520
E: emitchell@spertuslaw.com

Mary Wickham
Los Angeles County Counsel
Kenneth Hahn Hall of Administration
500 West Temple Street #648
Angeles, California 90017
T: (213) 974-1833
E: mwickham@counsel.lacounty.gov

Scott Marcus
Office of the City Attorney, City of Los Angeles
200 N. Main Street
City Hall East, Rm. 800
Los Angeles, California 90012
T: (213) 978-8100
E: scott.marcus@lacity.com

Dated: March 18, 2020          Respectfully submitted,
                               Legal Aid Foundation of Los Angeles

                               _____/s/ Shayla Myers_____
                               Attorneys for Proposed Intervenors

3

---

**Proposed Intervenor's Memorandum of Points and Authorities**
**ISO Motion to Intervene**

3

## Table of Contents

I.   INTRODUCTION ......................................................................................1

II.  BACKGROUND ......................................................................................2

a.   Proposed Intervenors .....................................................................2

b.   Factual And Procedural Background ..............................................3

III. **PROPOSED INTERVENORS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT** ...........................................................................5

a.   Proposed Intervenors have a Significant Protectable Interest in This Litigation .................................................................................6

b.   A Decision in this Action May Impair Intervenors' Ability to Protect their Interests ....................................................................7

c.   The Request is Timely ...................................................................8

d.   Existing Parties May Not Represent Proposed Intervenors' Interests .............9

IV.  **LA CAN AND LACW SHOULD BE ALLOWED PERMISSIVE INTERVENTION** ..................................................................................12

**Proposed Intervenor's Memorandum of Points and Authorities**
**ISO Motion to Intervene**

## TABLE OF AUTHORITIES

**Federal Cases**

*Arakaki v. Cayetano* 324 F.3d 1078 (9th Cir. 2003)...................................................15

*Bond v. Utreras*, 585 F.3d 1061 (7th Cir. 2009) ......................................................19

*Citizens for Balanced Use v. Mont.Wilderness Ass'n*, 647 F.3d 893
(9th Cir. 2011) ...................................................................................................14, 17

*Coal. of Arizona/New Mexico Cnties for Stable Economic Growth*
 F.3d 837, 844–45 (10th Cir. 1996)......................................................................15, 16

*County of Fresno v. Andrus,* 622 F.2d 436 (9th Cir.1980) ......................................17

*Donnelly v. Glickman*, 159 F.3d 405 (9th Cir. 1998)................................................11

*Garcia v. City of Los Angeles*, 2:19-cv-06182-DSF-PLA ......................................16

*GOJO Indus., Inc. v. Barough*, ("*GOJO*"),
2018 WL 5880829, at *3 (C.D. Cal. Apr. 2, 2018)...................................................19

*Idaho Farm Bureau Fed. v. Babbit*, 58 F.3d 1392 (9th Cir. 1995)...................13, 15

*In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 536 F.3d 980
(9th Cir. 2008) .......................................................................................................12

*Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006),
*vacated*, 505 F.3d 1006 (9th Cir. 2007) ................................................................16

*Lavan v. City of Los Angeles*, 2:11-cv-02874-PSG-AJW (filed April 5, 2011) .......9

*Lavan v. City of Los Angeles*, 797 F.Supp.2d 1005 (C.D. Cal. 2011).................9, 13

*Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012)...........................10, 16

*Los Angeles Catholic Worker et al. v. Los Angeles Downtown Industrial District,*
  *et al,* CV14-7344 PSG (AJWx). .........................................................................10

*Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019) ...........................................17

*Mitchell v. City of Los Angeles*, 16-CV-01760-SJO (JPR) .........................7, 8, 9, 10

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

*Orange County Catholic Worker, et al. v. County of Orange*,

  18-CV-00155-DOC-JDE ("OCCW"). ...............................................................18

*Providence Baptist Church v. Hillandale Comm. Ltd.*, 425 F.3d 309

(6th Cir.2005) .........................................................................................................19

*Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525 (1983) ........................................14

*Smith v. Los Angeles Unified School District*, 830 F.3d 843 (9th Cir. 2016) .........12

*Sw. Ctf. for Biological Diversity v. Berg*, 268 F.3d 810 (9th Cir.)..........................13

*Trbovich v. United Mine Workers of America*, 404 U.S. 528 (1972) .....................15

*Venegas v. Skaggs*, 867 F.2d 527, 529 (9th Cir. 1989), *aff'd sub nom. Venegas v.*

  *Mitchell*, 495 U.S. 82 (1990) .................................................................................18

*Wash. State Building & Construction Trades v. Spellman*, 684 F.2d 627

(9th Cir. 982), .........................................................................................................13

### Statutes

### Rules

Fed. R. Civ. Proc. 24 ..............................................................................10, 12, 17

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

iv

**Proposed Intervenor's Memorandum of Points and Authorities**
**ISO Motion to Intervene**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This current action, brought by the Los Angeles Alliance for Human Rights ("LA Alliance") an unincorporated association made up primarily of business owners in Downtown Los Angeles, seeks to have this court issue orders to compel the City and County of Los Angeles to take actions regarding homelessness that could greatly impact the rights of homeless people throughout the City and County, and in particular, the rights of people who currently have no other option but to live outside. And yet, there are currently no homeless people who are unsheltered in the case.

Even worse, Plaintiffs' lawsuit seeks both implicitly and explicitly to collaterally attack the settlement in another case, *Mitchell v. City of Los Angeles*, 16-CV-01760-SJO (JPR), which was a lawsuit brought by four homeless individuals and Proposed Intervenors, Los Angeles Catholic Worker ("LACW") and Cangress, dba Los Angeles Community Action Network ("LA CAN"), (collectively, "Proposed Intervenors") against the City of Los Angeles ("City") in 2016 to protect the constitutional rights of unhoused people in Skid Row.  That case ended in a settlement that the parties signed in June 2019, which aims to protect unhoused residents of Skid Row from continuing violations of their civil rights, including by 1) creating protocols to ensure that unhoused people's belongings are not seized and thrown away as part of daily street cleanings in Skid Row; 2) establishing minimum standards for notice and storage of belongings so people can retrieve those belongings if they are taken to storage following an arrest or as part of a cleanup; and 3) establishing additional standards to ensure the City can address issues related to ADA access, access to buildings, and other issues related to the public rights of way, without violating unhoused people's rights (an issue that is all the more critical to LA CAN and LA Catholic worker, since many of their members and clients, as well as the individual plaintiffs in *Mitchell* have significant disabilities).

1

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

The Plaintiffs in this case previously attempted to intervene in *Mitchell v. City of Los Angeles* to invalidate the settlement. They bring this separate lawsuit to do what they could not do in *Mitchell*—use the Court to compel the City and County to take actions that could contravene unhoused residents' constitutional rights. Proposed Intervenors have a right to intervene in this litigation to protect both their interests in the *Mitchell* settlement and to ensure that the interests of their members and are not threatened as well.

## II. BACKGROUND

### a. Proposed Intervenors

Proposed Intervenor LA CAN is a grassroots, non-profit organization that has operated in Skid Row and throughout Los Angeles for approximately two decades. The primary purpose of the organization is to organize and empower community residents to work collectively to address systemic poverty and oppression in the community. For example, in 2016, LA CAN was a supporter of Measure HHH and since then, has spent considerable resources working to ensure accountability in the spending of Measure HHH funds, including threatening litigation in 2016 to prevent the expenditure of funds on projects that were not authorized by the proposition.

Since its founding in 1999, LA CAN has been the only member-driven organization in Skid Row whose goal is to protect the rights and prevent the further disenfranchisement of homeless and poor people in Los Angeles. More than 800 low-income residents of Skid Row are involved with LA CAN. Many of its members are houseless and unsheltered each night on the streets of Los Angeles. LA CAN moves to intervene in this lawsuit on its own behalf and on behalf of its members who are unsheltered in Skid Row and throughout Los Angeles.

Proposed Intervenor Los Angeles Catholic Worker, ("LACW"), founded in 1970, is an unincorporated lay Catholic community of women and men that operate a free soup kitchen, hospitality house for the homeless, hospice care for the dying and by-monthly newspaper. Nicknamed the "Hippie Kitchen," the facility is located on

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

the Northeast corner of 6th Street and Gladys Avenue in Skid Row. LACW provides full meals to the community three times a week. In furtherance of its mission, the Hippie Kitchen associates to provide other services, including access to dental care, over-the-counter medications, podiatry services, toiletries and other personal items. In furtherance of its mission, for the past several years, the Hippie Kitchen has purchased shopping carts to provide them to unsheltered homeless persons to store and move their personal belongings.

Both LA CAN and LACW were plaintiffs in *Mitchell v. City of Los Angeles*, along with four homeless individuals who lived on the streets in Skid Row, were arrested for incredibly minor quality of life offenses or subjected to street cleanings, and had all of their belongings seized and destroyed or otherwise stored in a location that was completely inaccessible to them. The individual plaintiffs in the action, Carl Mitchell, Judy Coleman, and Salvador Roque, [1] assigned their rights to enforce the settlement to LA CAN and LACW. Therefore, Proposed Intervenors bring this motion to intervene on behalf of themselves, the members of LA CAN, and the individual plaintiffs in *Mitchell*.

### b. Factual And Procedural Background

As this Court well knows, and as the Plaintiffs spell out in their complaint, the issue of the rights of homeless individuals in Southern California has been the subject considerable litigation for decades, and most relevant here, for the past 10 years.

In 2011, the City of Los Angeles was sued by eight unhoused individuals related to the destruction of their belongings in Skid Row. *Lavan v. City of Los Angeles*, 2:11-cv-02874-PSG-AJW (filed April 5, 2011). The resulting Preliminary Injunction issued by Judge Gutierrez, enjoined the City of Los Angeles from seizing and destroying individuals' belongings. *See Lavan v. City of Los Angeles*, 797 F.Supp.2d 1005 (C.D. Cal. 2011). The City appealed the injunction to the Ninth

---

[1] Michael Escobedo, the fourth individual plaintiff, passed away during the pendency of the litigation.

3

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

Circuit, which upheld the injunction. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1033 (9th Cir. 2012).

Shortly after the Ninth Circuit upheld the injunction, Proposed Intervenors LA CAN and LA Catholic Worker, along with four unsheltered residents on Skid Row, sued the Central City East Association and the Downtown Industrial District Business Improvement District,[2] as well as the City of Los Angeles, alleging that the City and Business Improvement District were colluding to deprive unhoused residents of their constitutional rights. *See Los Angeles Catholic Worker et al. v. Los Angeles Downtown Industrial District, et al,* CV14-7344 PSG (AJWx). Specifically, Plaintiffs alleged that Defendant City of Los Angeles ("City") provided law enforcement support and coordination to LADID to assist them in seizing and destroying property, despite the Court's preliminary injunction in *Lavan* to stop these illegal practices. *See* Proposed Intervenor's Request for Judicial Notice ("RJN"), ¶1, Exh. A.

After three years of litigation, the parties entered into a settlement agreement, which among other things, prevented the City of Los Angeles from continuing to collude with the Central City East Association to violate unhoused people's rights. The Los Angeles Police Department was required to issue a special order expressly instructing LAPD officers not to collude with BID employees to take and destroy individuals' belongings, in violation of the injunction issued in *Lavan*. *Id.* The settlement remains in effect and the U.S. District Court retains jurisdiction to enforce the agreement. *Id.*

In 2016, four more homeless individuals and the Proposed Intervenors filed *Mitchell v. City of Los Angeles*, which yet again challenged the City's practice of seizing and either destroying homeless people's belongings, or storing seized belongings in a way that was completely inaccessible to Plaintiffs. After the Court granted yet another preliminary injunction against the City of Los Angeles, the

---

4

parties entered into significant negotiations and finally reached a tentative settlement. The approval of the settlement was incredibly contentious, resulting in what was certainly a significant debate amongst the City Council members during a three hour closed session and ultimately, an instruction to the City Attorney to settle the case.

Before the settlement was finalized, the Plaintiffs in this lawsuit, then operating under the name DTLA Alliance for Human Rights,[3] indicated their intention to intervene in the litigation before the lawsuit was dismissed. The group inexplicably failed to do so, and the settlement was finally approved. Thereafter, the Court retained jurisdiction to enforce the settlement, and the Court dismissed the case. (*See* RJN, ¶2, Exhibit B). Thereafter, the group filed a motion to intervene, which was denied as untimely. LA Alliance filed a notice of appeal, but dropped the appeal before filing any briefs. Instead, on the day the group dismissed its appeal, they filed this instant lawsuit, making the same allegations as those outlined in Plaintiffs' Motion to Intervene and as discussed below, seeking in part to invalidate the settlement agreement in *Mitchell*.

## III. PROPOSED INTERVENORS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT

Federal Rules of Civil Procedure 24(a) provides that a party "who claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest" must be allowed to intervene in a case "unless existing parties adequately represent that interest." Fed. R. of Civ. Proc. 24(a)(2).

To be granted intervention as a matter of right, Proposed Intervenors must demonstrate that 1) they have a "significant protectable interest" relating to the matter that is the subject of the action; 2) a decision in the action may, as a practical matter, impair or impede Proposed Intervenors' ability to protect its interest; 3) the request to intervene is timely; and 4) the existing parties may not adequately

---

[3] *See* https://www.la-alliance.org/press.

5

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

12

represent proposed Intervenors' interest. *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998). "Though the applicant bears the burden of establishing these elements, we have repeatedly instructed that 'the requirements for intervention are [to be] broadly interpreted in favor of intervention.'" *Smith v. Los Angeles Unified School District*, 830 F.3d 843, 853 (9th Cir. 2016). Proposed Intervenors easily satisfy each of these prongs.

### a. Proposed Intervenors have a Significant Protectable Interest in This Litigation

Proposed Intervenors have a significant protectable interest in this litigation. Rule 24(a) does not require that the protectable interest at stake in the litigation be a specific legal or equitable interest. "The 'interest' test is not a clear-cut or bright-line rule, because no specific legal or equitable interest need be established. Instead, the 'interest' test directs courts to make a practical, threshold inquiry, and is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process. *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 536 F.3d 980, 984–85 (9th Cir. 2008)( quoting *S. Cal. Edison Co. v. Lynch,* 307 F.3d 794, 802 (9th Cir.2002).

Proposed Intervenors have a legally protectable interest in the settlement in *Mitchell v. City of Los Angeles*, which Plaintiffs explicitly and implicitly challenge in this lawsuit. Plaintiffs allege in the seventh cause of action that the settlement in *Mitchell* was a project under CEQA, for which an environmental review was required. *See* Comp. ¶ 165. The eleventh cause of action challenges the settlement on due process and equal protection grounds, namely that the settlement distinguished between Skid Row and the rest of the City without a rational reason for doing so. In addition to those causes of action that explicitly mention the *Mitchell* settlement, other causes of action, including the first, third through fourth, and seventh causes of action for negligence, nuisance, and violations of substantive due process, relate to conditions in Skid Row that Plaintiffs allege throughout the

6

---

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

13

complaint were caused by the *Mitchell* injunction and settlement. *See e.g.*, Comp. ¶¶ 30, 37, 48; Comp. Pg. 47. [4]

### b. A Decision in this Action May Impair Intervenors' Ability to Protect their Interests

To satisfy the second prong of the test for intervention as a matter of right, Plaintiffs must show that "the disposition of this case will, as a practical matter, affect" the interest at stake. *California ex rel Lockyer v. U.S.*, 450 F.3d 436, 442 (9th Cir. 2006). Again, as with all of the factors, the proposed intervenors "need not demonstrate that their interest would be impaired in a legal sense, only that their interest 'would be substantially affected in a practical sense." *Sw. Ctf. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir.) (quoting Fed. R. Civ. P. 24, Advisory Committee Notes).

Here, the remedy sought by the Plaintiffs could have the effect of undermining or even invalidating Proposed Intervenors' settlement with the City of Los Angeles. Indeed, Plaintiffs are seeking to do so here, just Plaintiffs explicitly sought to do when they moved to intervene in the *Mitchell*, and they intended to object to and ultimately aimed to invalidate the settlement. This is a more than sufficient showing for intervention. *See e.g., Idaho Farm Bureau Fed. v. Babbit*, 58 F.3d 1392, 1398 (1995) (decision in another case that could result in a legal decision undermining the result of another case is sufficient showing of impairment to support intervention). In

---

[4] Proposed Intervenors also have legally protected interests stemming from advocacy to pass and subsequently to protect the integrity of Measure HHH, *see Washington State Building & Construction Trades v. Spellman*, 684 F.2d 627 (9th Cir. 982), as well as on behalf of their members, who have a protectable interest to be free from increased enforcement and the violation of their constitutional rights. Although less concrete than the right to protect their settlement, Courts have recognized these as sufficient interests to support intervention, particularly where, as here, there is no other representation of unsheltered homeless people in Los Angeles, who are most likely to be impacted by any proposed remedies in this case.

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

addition, however, the settlement could also result in orders related to the expenditures of Measure HHH funds and changes in the allocation of resources, as well as the increased criminalization and enforcement of laws against LA CAN's members. All of these potential outcomes, contemplated by the sweeping complaint filed by Plaintiffs, could impact Proposed Intervenors' rights. *See Sagebrush Rebellion, Inc. v. Watt,* 713 F.2d 525, 526-27 (1983) (finding a right to intervene when an adverse decision in the suit would impair the intervenor's interest in the preservation of birds and their habitats); *Washington State Building & Construction Trades v. Spellman*, 684 F.2d 627 (9th Cir. 982) (public interest group entitled as a matter of right to intervene in an action challenging the legality of a measure which it had supported).  There is more than enough potential to impair LA CAN and LACW's rights, that they should be allowed to intervene in this case.

### c.  The Request is Timely

There should be no dispute that Proposed Intervenors' motion is timely. A motion made "at an early stage of the proceedings" will generally satisfy the timeliness requirement. *See Citizens for Balanced Use v. Mont.Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).   In fact, Proposed Intervenors could hardly have moved faster to intervene.  This case was filed on March 10, 2020, only eight days before Proposed Intervenors move to intervene, before even Defendants have appeared in this case.  Proposed Intervenors moved ex parte, in order to intervene before the first hearing in this case, which has been set for just three days after this Court accepted the transfer of the case, in order to address emergency issues related to the Coronavirus.  Proposed Intervenors' motion is therefore timely.  *See Idaho Farm Bureau Fed. v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (intervention timely when applicant moved to intervene prior to hearing on a preliminary injunction motion, before any hearings or rulings on substantive matters).

//

//

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

### d. Existing Parties May Not Represent Proposed Intervenors' Interests

Finally, the parties in this case simply cannot adequately represent the Proposed Intervenors' interests.  Whether  another  party's representation of Applicants' interests is adequate depends on: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect." *Arakaki v. Cayetano,* 324 F.3d 1078, 1086 (9th Cir. 2003).   The burden to show that a party's interests may not be adequately represented is minor:  "The requirement of the Rule is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal.  *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 (1972).

When the government is a party, the standard to demonstrate that the proposed intervenor's interest are not adequately represented has sometimes been held to be higher. *See e.g., Arakaki,* 324 F.3d at 1086.  However, where as here, the government is antagonistic to the proposed intervenors or proposed intervenors have a discrete and particularized interest, the higher standard does not apply. *See Coal. of Arizona/New Mexico Counties for Stable Economic Growth v. Dept. of Interior*, 100 F.3d 837, 844–45 (10th Cir. 1996) ("An applicant may fulfill this burden by showing collusion between the representative and an opposing party, that the representative has an interest adverse to the applicant, or that the representative failed in fulfilling his duty to represent the applicant's interest."); *see also Idaho Farm Bureau Fed*., 58 F.3d at 1398 (9th Cir. 1995) (government agency unlikely to make strong arguments in support of its actions because it took those actions largely to fulfill a settlement agreement).

In this case, none of the parties can adequately represent Proposed Intervenors'

**Proposed Intervenor's Memorandum of Points and Authorities**
**ISO Motion to Intervene**

16

interests. First, with regards to the City, LA CAN and LACW have been directly adverse to the City in two lawsuits directly related to the issues in this case.[5]  In the first lawsuit, *LA Catholic Worker v. LADID*, Plaintiffs accused the City of colluding with the Central City East Association and the Los Angeles Downtown Industrial District, which is the business improvement district in Skid Row.  Although CCEA is not technically a plaintiff in this case, LA Alliance is intimately intertwined with CCEA.[6]  *See Coalition of Arizona/New Mexico Cnties for Stable Economic Growth* 100 F.3d at 844–45.  With regards to the actions to undermine the Mitchell settlement, even though the parties reached a stipulated settlement, the settlement came only after a hotly contested Preliminary Injunction, in which the City sought to overturn the injunction.  And as Plaintiffs note in their complaint, the City of Los Angeles continues to strenuously fight to prevent the protections secured in the *Mitchell* settlement from being implemented City-wide.  *See Garcia v. City of Los Angeles*, 2:19-cv-06182-DSF-PLA.  Therefore, "there is reason to doubt that the

---

[5] To say nothing of the numerous other cases in which the City has been adverse to houseless residents who have brought suit to protect their civil rights, but which the Proposed Intervenors were not plaintiffs, including most notably, *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007) and *Lavan*, 693 F.3d 1022, 1033 (9th Cir. 2012).  *See also Garcia v. City of Los Angeles*, 2:19-cv-06182-DSF-PLA.

[6] Four of CCEA/LADID's eleven board members appear in the pleadings in this case.  See http://www.centralcityeast.org/about (last accessed on March 18, 2020), including Mark Shinbane, the chair of CCEA, Compl. p. 46; Larry Rausch, the past chair of CCEA and current member of the board, Comp., p. 48; Bob Smiland, who serves on the CCEA and LADID Board, and Andrew Bales, who is also on the CCEA board and runs the Union Rescue Mission, which employs or houses a number of the individuals involved in the litigation, see e.g., Charles Malow, who lives at the Union Rescue Mission, Comp. ¶ 97. In addition the group is chaired by Don Steir, the "longtime general counsel of the Central City East Association."  *See* LA Alliance, "Frequently Asked Questions," available at https://www.la-alliance.org/faqs; *see also* LA Alliance Go Fund Me Fundraising Account, https://www.gofundme.com/f/la-alliance-for-human-rights.

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

[City] would fully protect the interests" of the Proposed Intervenors, and instead would seek to undermine the *Mitchell* settlement. *County of Fresno v. Andrus,* 622 F.2d 436, 439 (9th Cir.1980); *see also Citizens for Balanced Use,* 647 F.3d 893, 900 (9th Cir. 2011); *Idaho Farm Bureau Fed.*, 58 F.3d at 1398.

Nor can Proposed Intervenors rely on any of the parties in the case to make the same arguments Proposed Intervenors will make. Although much of the arguments and remedies ostensibly sought by Plaintiffs could or in some instances, must rely on *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019). But all of the parties have demonstrated hostility towards or a desire to overturn it. *See* RJN, ¶ 4, Brief Amicus Curiae of City of Los Angeles; RJN, ¶ 5, Brief for Amici Curiae California State Association of Counties and 33 California Counties and Cities; RJN, ¶ 6, Brief of Amicus Curiae International Downtown Association, California Downtown Association, Central City East Association of Los Angeles, Hollywood Property, Owners' Alliance, Historic Business Improvement District, Property Owners Association, and Downtown Property Owner/ Association in Support of Petitioner. This alone is sufficient to demonstrate the parties will not adequately protect Proposed Intervenors.

Finally, "[t]he 'most important factor' in assessing the adequacy of representation is 'how the interest compares with the interests of existing parties.'" *Citizens for Balanced Use,* 647 F.3d at 898 (quoting *Arakaki*, 324 F.3d at 1086). In this case, the LA Alliance brings a sweeping lawsuit to address homelessness in Los Angeles, including purporting to seek an affirmative right to shelter for individuals who are currently have no other option but to sleep on the sidewalks in Los Angeles. Yet not a single identified member of its organization or individual plaintiff is currently unsheltered. In contrast, the LA CAN seeks to intervene on behalf of its members, many of whom are homeless, and both LACW and LA CAN seek to protect the interests of individual plaintiffs in *Mitchell* who assigned their rights to enforce the settlement to LACW and LA CAN, and therefore, the Proposed

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

**18**

Intervenors seek to protect their interests as well.[7] The interests of unhoused residents are distinct from the business owners in Skid Row, many of whom represent an organization that has been sued for violating unhoused people's rights, and the interests of the City and County of Los Angeles, both of which have been sued for the same reason.

Plaintiffs easily show they have a protectable interest that could be affected by the resolution in this case, that they were timely in seeking to intervene, and that none of the parties can protect their interests. As such, Proposed Intervenors are entitled to intervene as a matter of right.

## IV. LA CAN AND LACW SHOULD BE ALLOWED PERMISSIVE INTERVENTION

Even if Proposed Intervenors were not entitled to intervene as a matter of right, they should be allowed to intervene under the Court's authority pursuant to Rule 24(b), which allows permissive intervention when "an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(1)(B).[8] Permissive intervention is in the "broad discretion of the trial court."

---

[7] On March 17, 2020, this Court granted intervention to Orange County Catholic Worker, the lead plaintiff in *Orange County Catholic Worker, et al. v. County of Orange*, 18-CV-00155-DOC-JDE ("OCCW"). Intervenor sought to intervene based on Plaintiffs' representations regarding the effect of this litigation on the consent decree issued by this Court. OCCW represents the interests unhoused residents in Orange County and seek to protect their consent decree in a related action. While this perspective is critically important to this litigation and OCCW complements the perspectives and interests of LACW and LA CAN, their interests are distinct from those of Proposed Intervenors, who operate in and whose members live in Skid Row and throughout Los Angeles.

[8] The other factors for permissive intervention are 1) the intervention is timely, which Proposed Intervenors easily demonstrate, *see supra* Section 3(c), and 2) the standing to assert the interests claimed. *GOJO*, 2018 WL 5880829, at *3. While the applicant must show that the court has jurisdiction, *Venegas v. Skaggs*, 867 F.2d 527, 529 (9th Cir. 1989), *aff'd sub nom. Venegas v. Mitchell*, 495 U.S. 82 (1990), there is no need to independently prove standing. The court has the

12

---

*GOJO Indus., Inc. v. Barough*, ("*GOJO*"), No. SACV171382DOCJDEX, 2018 WL 5880829, at *3 (C.D. Cal. Apr. 2, 2018). LACAN and LACW represent important interests in this case that are otherwise not represented and as such, should be allowed to permissively intervene.

The Plaintiffs' argument raises many common questions of fact with the *Mitchell* case, as discussed above. They allege that requiring due process for property in Skid Row causes "health and safety risks". Compl. ¶¶ 29-30. They also discuss at length how the *Mitchell* settlement purportedly caused those risks.

One of the factors to be considered by the court is whether "whether [the] part[y] seeking intervention will significantly contribute to full development of the underlying factual issues." *GOJO*, 2018 WL 5880829, at *9 (C.D. Cal. Apr. 2, 2018). As noted above, none of the parties currently in the case, include any individual who is currently unsheltered in Los Angeles. On the other hand, LA CAN and LACW have members and clients who live on the streets. These perspectives are critical to a case that seeks as broad of remedies as Plaintiffs purport to seek, it is unimaginable how the case could go forward without the participation of an organization that includes unsheltered homeless individuals amongst its members. Moreover, organizers and staff of LA CAN and LACW monitor what is happening on the streets, not just in Skid Row, but throughout Los Angeles. For example, the complaint alleges that the encampment under the overpass at Venice and the 405 is

---

discretion to permit LACAN and LACW to intervene at this point in the lawsuit regardless of whether they have standing. *Bond v. Utreras*, 585 F.3d 1061, 1070 (7th Cir. 2009); *Providence Baptist Church v. Hillandale Comm. Ltd.,* 425 F.3d 309, 315 (6th Cir.2005). Notwithstanding that it is unnecessary, Plaintiffs LACAN and LACW both would have independent grounds for jurisdiction because LACAN is a membership organization with unhoused members and LACW diverts its resources when its unhoused guests and neighbors are treated unlawfully or criminalized by the City. LACW expends resources it could be using to feed the homeless to monitor the situation regarding property seizure. Thus, both proposed intervenors have standing.

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

blocking the sidewalk.  LA CAN has organizers and members that regularly visit that encampment and are familiar with the conditions there.  The sweeps and property seizures at the overpass at Venice and the 405 divert LA CAN's resources; yet this lawsuit is alleging the need for increased sweeps and enforcement. Complaint at 177.

Similarly, LA CAN, as mentioned above, has unhoused members that reside on Skid Row and would be impacted by increased sweeps and enforcement. Not only are their interests affected, their participation will aid the court in determining the factual context of the litigation and in proving or disproving the parties' statements about accessibility and state-created danger.  It will also aid the court to hear from un-sheltered individuals, as the only unhoused individual represented by Plaintiffs was sheltered prior to the lawsuit beginning.

At this stage of the litigation, the court has the discretion to allow LA CAN and LACW to intervene in the lawsuit as permissive intervenors.

Dated: March 18, 2020                     Respectfully submitted,
                                          Legal Aid Foundation of Los Angeles

                                          _____/s/ Shayla Myers_____
                                          Attorneys for Proposed Intervenors


                                          Schonbrun Seplow Harris & Hoffman LLP

                                          _____/s/Catherine Sweetser_____
                                          Attorneys for Proposed Intervenors


                                          Law Office of Carol A. Sobel

                                          _____/s/ Carol A. Sobel_____
                                          Attorneys for Proposed Intervenor

14

**Proposed Intervenor's Memorandum of Points and Authorities
ISO Motion to Intervene**

15

---

**Proposed Intervenor's Memorandum of Points and Authorities**
**ISO Motion to Intervene**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

|  |  |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br>　　　　　Plaintiff(s),<br><br>　　　vs.<br><br>City of Los Angeles, et. al.<br>　　　　　Defendant(s). | ) CASE NO. 20-02291-DOC<br>)<br>) Hon. David O. Carter<br>) Courtroom 1<br>)<br>)<br>) ORDER GRANTING INTERVENORS'<br>) EX PARTE APPLICATION TO<br>) INTERVENE AS OF RIGHT<br>)<br>)<br>) Complaint Filed:  March 10, 2020<br>)<br>)<br>)<br>) |

1

---

ORDER GRANTING EX PARTE APPLICATION TO INTERVENE

23

Pursuant to Federal Rule of Procedure 24, Plaintiffs LA CAN and LACW have moved to intervene as of right or, in the alternative, for permissive intervention in this case.

Proposed Intervenor LA CAN is a grassroots, non-profit organization that has operated in Skid Row and throughout Los Angeles for approximately two decades. The primary purpose of the organization is to organize and empower community residents to work collectively to address systemic poverty and oppression in the community. For example, in 2016, LA CAN was a supporter of Measure HHH and since then, has spent considerable resources working to ensure accountability in the spending of Measure HHH funds, including threatening litigation in 2016 to prevent the expenditure of funds on projects that were not authorized by the proposition. LA CAN is a membership organization with unhoused members who are currently unsheltered on the streets of Los Angeles. LA CAN moves to intervene in this lawsuit on its own behalf and on behalf of its members who are unsheltered in Skid Row and throughout Los Angeles.

Proposed Intervenor Los Angeles Catholic Worker, ("LACW"), founded in 1970, is an unincorporated lay Catholic community of women and men that operate a free soup kitchen, hospitality house for the homeless, hospice care for the dying and by-monthly newspaper. In furtherance of its mission, the Hippie Kitchen provides food and other services, including access to dental care, over-the-counter medications, podiatry services, toiletries and other personal items, including shopping carts.

Both LA CAN and LACW were plaintiffs in *Mitchell v. City of Los Angeles*, along with four homeless individuals who lived on the streets in Skid Row, and who were arrested for incredibly minor quality of life offenses or subjected to street cleanings, and had all of their belongings seized and destroyed or otherwise stored in a location that was completely inaccessible to them. The individual plaintiffs in the action assigned their rights to enforce the settlement to LA CAN and LACW.

ORDER GRANTING EX PARTE APPLICATION TO INTERVENE

24

In *Mitchell v. City of Los Angeles*, the parties entered into significant negotiations and finally reached a tentative settlement. The Court retained jurisdiction to enforce the settlement, and the Court dismissed the case. After the settlement was finalized, the Plaintiffs in this case, then operating under the name Downtown Alliance for Human Rights, filed a motion to intervene, which was denied as untimely. The Plaintiffs filed a notice of appeal, but subsequently dismissed that appeal and simultaneously filed this instant lawsuit, making the same allegations as those outlined in Plaintiffs' Motion to Intervene and as discussed below, seeking in part to invalidate the settlement agreement in *Mitchell*.

## I.     PROPOSED INTERVENORS ARE ENTITLED TO INTERVENE AS A MATTER OF RIGHT

Federal Rules of Civil Procedure 24(a) provides that a party "who claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest" must be allowed to intervene in a case "unless existing parties adequately represent that interest." Fed. R. of Civ. Proc. 24(a)(2).

To be granted intervention as a matter of right, Proposed Intervenors must demonstrate that 1) they have a "significant protectable interest" relating to the matter that is the subject of the action; 2) a decision in the action may, as a practical matter, impair or impede Proposed Intervenors' ability to protect its interest; 3) the request to intervene is timely; and 4) the existing parties may not adequately represent proposed Intervenors' interest. *Donnelly v. Glickman*, 159 F.3d 405, 409 (9th Cir. 1998). "Though the applicant bears the burden of establishing these elements, we have repeatedly instructed that 'the requirements for intervention are [to be] broadly interpreted in favor of intervention.'" *Smith v. Los Angeles Unified School District*, 830 F.3d 843, 853 (9th Cir. 2016). Proposed Intervenors easily satisfy each of these prongs.

Proposed Intervenors have a significant protectable interest in this litigation. Rule 24(a) does not require that the protectable interest at stake in the litigation be a

3

ORDER GRANTING EX PARTE APPLICATION TO INTERVENE

25

specific legal or equitable interest. *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 536 F.3d 980, 984–85 (9ᵗʰ Cir. 2008)( quoting *S. Cal. Edison Co. v. Lynch,* 307 F.3d 794, 802 (9th Cir.2002).  Proposed Intervenors have a legally protectable interest in the settlement in *Mitchell v. City of Los Angeles*, which Plaintiffs explicitly and implicitly challenge in this lawsuit.  Plaintiffs allege in the seventh cause of action that the settlement in *Mitchell* was a project under CEQA, for which an environmental review was required.  *See* Comp., ¶ 165.  The eleventh cause of action challenges the settlement on due process and equal protection grounds, namely that the settlement distinguished between Skid Row and the rest of the City without a rational reason for doing so.  In addition to those causes of action that explicitly mention the *Mitchell* settlement, other causes of action, including the first, third through fourth, and seventh causes of action for negligence, nuisance, and violations of substantive due process, relate to conditions in Skid Row that Plaintiffs allege throughout the complaint were caused by the *Mitchell* injunction and settlement*.   See e.g.*, Comp., ¶¶ 30, 37, 48; Comp., Pg. 47. [1]

To satisfy the second prong of the test for intervention as a matter of right, Proposed Intervenors must show that "the disposition of this case will, as a practical matter, affect" the interest at stake. *California ex rel Lockyer v. U.S.*, 450 F.3d 436, 442 (9ᵗʰ Cir. 2006).  Again, as with all of the factors, the proposed intervenors "need not demonstrate that their interest would be impaired in a legal sense, only that their

---

[1] Proposed Intervenors also have legally protected interests stemming from advocacy to pass and subsequently to protect the integrity of Measure HHH, *see Washington State Building & Construction Trades v. Spellman*, 684 F.2d 627 (9th Cir. 982), as well as on behalf of their members, who have a protectable interest to be free from increased enforcement and the violation of their constitutional rights. Although less concrete than the right to protect their settlement, Courts have recognized these as sufficient interests to support intervention, particularly where, as here, there is no other representation of unsheltered homeless people in Los Angeles, who are most likely to be impacted by any proposed remedies in this case.

4

---

ORDER GRANTING EX PARTE APPLICATION TO INTERVENE

interest 'would be substantially affected in a practical sense." *Sw. Ctf. for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir.) (quoting Fed. R. Civ. P. 24, Advisory Committee Notes).

Here, the remedy sought by the Plaintiffs could have the effect of undermining or even invalidating Proposed Intervenors' settlement with the City of Los Angeles. Indeed, Plaintiffs are seeking to do so here, just Plaintiffs explicitly sought to do when they moved to intervene in the *Mitchell*, and they intended to object to and ultimately aimed to invalidate the settlement. This is a more than sufficient showing for intervention. *See e.g., Idaho Farm Bureau Fed. v. Babbit*, 58 F.3d 1392, 1398 (1995) (decision in another case that could result in a legal decision undermining the result of another case is sufficient showing of impairment to support intervention). In addition, however, the settlement could also result in orders related to the expenditures of Measure HHH funds and changes in the allocation of resources, as well as the increased criminalization and enforcement of laws against LA CAN's members. All of these potential outcomes, contemplated by the sweeping complaint filed by Plaintiffs, could impact Proposed Intervenors' rights.

Third, as the City of Los Angeles has not yet answered, the request is timely. A request made "at an early stage of the proceedings" will generally satisfy the timeliness requirement. *See Citizens for Balanced Use v. Mont.Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).

Finally, the parties in this case have distinct interests to those of the Proposed Intervenors and cannot adequately represent the Proposed Intervenors' interests. *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 (1972). Proposed Intervenors are the only party that represent the interests of unhoused persons. Proposed Intervenors easily show they have a protectable interest that could be affected by the resolution in this case, that they were timely in seeking to intervene, and that none of the parties can protect their interests. As such, Proposed Intervenors are entitled to intervene as a matter of right.

<div align="center">5</div>

---

<div align="center">ORDER GRANTING EX PARTE APPLICATION TO INTERVENE</div>

## II. LA CAN AND LACW SHOULD BE ALLOWED PERMISSIVE INTERVENTION

In the alternative, this court finds that the Proposed Intervenors have also met the requirements of Rule 24(b), which allows permissive intervention when "an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(1)(B). Permissive intervention is in the "broad discretion of the trial court." *GOJO Indus., Inc. v. Barough*, ("*GOJO*"), No. SACV171382DOCJDEX, 2018 WL 5880829, at *3 (C.D. Cal. Apr. 2, 2018). LACAN and LACW represent important interests in this case that are otherwise not represented and as such, should be allowed to permissively intervene.

As noted above, none of the parties currently in the case, include any individual who is currently unsheltered in Los Angeles. On the other hand, LA CAN and LACW have members and clients who live on the streets. Moreover, organizers and staff of LA CAN and LACW monitor what is happening on the streets, not just in Skid Row, but throughout Los Angeles. For example, the complaint alleges that the encampment under the overpass at Venice and the 405 is blocking the sidewalk. LA CAN has organizers and members that regularly visit that encampment and are familiar with the conditions there. The sweeps and property seizures at the overpass at Venice and the 405 divert LA CAN's resources; yet this lawsuit is alleging the need for increased sweeps and enforcement. Complaint at 177.

Similarly, LA CAN, as mentioned above, has unhoused members that reside on Skid Row and would be impacted by increased sweeps and enforcement. Not only are their interests affected, their participation will aid the court in determining the factual context of the litigation and in proving or disproving the parties' statements about accessibility and state-created danger. It will also aid the court to hear from un-sheltered individuals, as the only unhoused individual who is a Plaintiff became sheltered prior to the lawsuit beginning.

The Court finds that LA CAN and LACW have meet the standard for

6

ORDER GRANTING EX PARTE APPLICATION TO INTERVENE

28

intervention as of right, as this litigation has significant potential to impact the settlement reached in the *Mitchell* case.  It is so ORDERED.

Dated: March __18__, 2020

_David O. Carter_

_____

The Honorable David O. Carter
United States District Judge

ORDER GRANTING EX PARTE APPLICATION TO INTERVENE

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC-(KESx)                    Date:  April 20, 2021

Title: LA ALLIANCE FOR HUMAN RIGHTS, et al. v. CITY OF LOS ANGELES, et
    al.

PRESENT:   THE HONORABLE DAVID O. CARTER, JUDGE

|  |  |
|---|---|
| Kelly Davis | Not Present |
| Courtroom Clerk | Court Reporter |
| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
| None Present | None Present |

**PROCEEDINGS: (IN CHAMBERS ORDER)**

See attachment for complete details.

MINUTES FORM 11                                    Initials of Deputy Clerk: kd

30

**TABLE OF CONTENTS**

I.  INTRODUCTION ....................................................................................................................2

    A.  RACE .............................................................................................................................3
        i.   Historical Context ...................................................................................................4
        ii.  Organized Abandonment in Housing .....................................................................20
    B.  PUBLIC STATEMENTS ON HOMELESSNESS ........................................................32
    C.  EMERGENCY POWERS FOR AN EMERGENCY SITUATION ...............................37
    D.  GOVERNMENT INACTION .......................................................................................40
    E.  HEALTH AND SAFETY IMPACTS ...........................................................................51
    F.  GENDER ........................................................................................................................62

II. DISCUSSION ......................................................................................................................66

    A.  THE LIKELIHOOD OF SUCCESS ON THE MERITS SUPPORTS PRELIMINARY RELIEF .................67
        i.   Constitutional grounds............................................................................................67
        ii.  State law grounds ....................................................................................................86
        iii. Americans With Disabilities Act ............................................................................90
    B.  IRREPARABLE INJURY .............................................................................................92
    C.  BALANCE OF EQUITIES............................................................................................92
    D.  PUBLIC INTEREST .....................................................................................................92
    E.  HEARING ......................................................................................................................94

III. AVAILABILITY OF EQUITABLE REMEDIES ............................................................95

    A.  FACTUAL BASIS FOR IMMEDIATE RELIEF .........................................................95
    B.  EQUITABLE POWER TO ISSUE RELIEF .................................................................96
        i.   Constitutional Violations Provide Grounds for Equitable Relief............................98
        ii.  Statutory Violations Provide Grounds for the Court to Issue Equitable Relief.......100
        iii. The Plata Case Guides This Court's Exercise of its Broad Equitable Authority.....101
        iv.  Courts' Equitable Authority in the Face of Government Budgetary Concerns.........104

IV. CONCLUSION: A WAY FORWARD .............................................................................105

V.  PROVISIONS OF THE PRELIMINARY INJUNCTION................................................105

## I.     INTRODUCTION

In the ebb of afternoon sunlight, young Americans looked at their former compatriots as adversaries as they advanced towards them. Young teenagers carried battle flags to rally upon in the chaos that would soon ensue. There is nothing free about freedom. It is borne from immense pain, suffering, and sacrifice. Our country has struggled since the Emancipation Proclamation to right the evil of slavery. One hundred and fifty-eight years ago, at the site of the bloodiest battle of the Civil War, Abraham Lincoln made a short and profound speech, exemplifying an unshakable moral commitment to end the abomination of slavery despite the terrible sacrifice of life.

> Now we are engaged in a great civil war, testing whether that nation or any nation so conceived and so dedicated, can long endure. We are met on a great battlefield of that war. We have come to dedicate a portion of that field as a final resting place for those who here gave their lives that that nation might live. . . .

> It is for us the living, rather, to be dedicated here to the unfinished work which they who fought here have thus far so nobly advanced. It is rather for us to be dedicated to the great task remaining before us— that from these honored dead we take increased devotion to that cause for which they gave the last full measure of devotion—that we here highly resolve that these dead shall not have died in vain—that this nation, under God, shall have a new birth of freedom—and that government, of the people, by the people, for the people, shall not perish from the earth.

The Civil War brought a formal end to the institution of slavery, but a century and a half after the Gettysburg Address, the "unfinished work" of which President Lincoln spoke remains woefully unfinished.

Here in Los Angeles, how did racism become embedded in the policies and structures of our new city? What if there was a conscious effort, a deliberate intent, a cowardice of inaction? Through redlining, containment, eminent domain, exclusionary zoning, and gentrification—designed to segregate and disenfranchise

2

32

communities of color—the City and County of Los Angeles created a legacy of entrenched structural racism. As shown most clearly in the present crisis of homelessness, the effects of structural racism continue to threaten the lives of people of color in Los Angeles.

Today, people of color, and Black people in particular, are vastly overrepresented in Los Angeles's homeless population. While Black people comprise only eight percent of Los Angeles's population, they make up 42% of its homeless population.[1] As of January 2020, the Los Angeles Homeless Services Authority reported that 21,509 Black people were without permanent housing in Los Angeles (LAHSA).[2] The current inaction on the part of the City and County of Los Angeles has allowed the harms of their racist legacy to continue unabated, leaving Black people—and especially Black women—effectively abandoned on the streets. Such governmental inertia has affected not only Black Angelenos, not only homeless Angelenos, but all Angelenos—of every race, gender identity, and social class. Virtually every citizen of Los Angeles has borne the impacts of the City and County's continued failure to meaningfully confront the crisis of homelessness. The time has come to redress these wrongs and finish another measure of our nation's unfinished work.

## A. RACE

"I want to be very clear," said Heidi Marston, Director of the Los Angeles Homeless Services Authority, "homelessness is a byproduct of racism. We continue to see that Black people are overrepresented in our homeless population, and that Black African Americans are four times more likely to become homeless than their white counterparts."[3] A LAHSA report published in December of 2018 confirmed the Director's opinion, stating: "The impact of institutional and structural racism in education, criminal justice, housing, employment health care,

---

[1] Jugal K. Patel et al., *Black, Homeless and Burdened by L.A.'s Legacy of Racism*, N.Y. TIMES (Dec. 22, 2019), https://www.nytimes.com/interactive/2019/12/22/us/los-angeles-homeless-black-residents.html.
[2] Gale Holland, *Racism is the Reason Black People are Disproportionately Homeless in L.A., Report Shows*, L.A. TIMES (June 12, 2020), https://www.latimes.com/california/story/2020-06-12/racism-making-more-black-people-la-homeless.
[3] Gina Pollack, *Garcetti: LA Has Made Progress On Homelessness Issue, Despite Increasing Numbers*, LAIST (June 12, 2020), https://laist.com/latest/post/20200612/garcetti-gives-updates-on-coronavirus-and-protests-in-losangeles.

3

and access to opportunities cannot be denied: homelessness is a by-product of racism in America."[4]

The numbers squarely support LAHSA's findings. As mentioned previously, Black Angelenos are vastly overrepresented in the homeless population.[5] From 2016 to 2017, the city saw a 22% increase in the number of unhoused Black Angelenos.[6] Yet, in the same period, the number of white Angelenos experiencing homelessness decreased by 7%.[7] Further, racism in Los Angeles is far from simply black and white—Latinos make up at least 35% of the homeless population, a figure that likely undercounts the number of Latinos homeless.[8] The effects of decades-long structural and institutional racism resulting in unhoused populations has reached an apex that must be addressed.

### i.     Historical Context

According to the LAHSA, "Black people have been historically and systematically precluded from housing opportunities, including through redlining, exclusionary zoning, and other forms of discrimination codified by federal, state, and local law. While laws have changed, the effects of these previous policies are still pervasive."[9]

*Early Twentieth Century*

In the first half of the twentieth century, migrant workers were drawn to Los Angeles for seasonal industries and cheap lodging available in Los Angeles'

---

[4] L.A. HOMELESS SERVS. AUTH., REPORT AND RECOMMENDATIONS OF THE AD HOC COMMITTEE ON BLACK PEOPLE EXPERIENCING HOMELESSNESS 5 (2018), https://www.lahsa.org/documents?id=2823-report-and-recommendations-of-the-ad-hoc-committee-on-black-people-experiencing-homelessness [hereinafter LAHSA REPORT]; The report was published by a committee comprised of homeless and civil rights advocates, mental health service providers, representatives of city and county housing agencies, and staff representatives of elected offices, including the offices of Los Angeles Mayor Eric Garcetti, Los Angeles City Councilmember Marqueece Harris-Dawson, and Los Angeles County Supervisors Mark Ridley-Thomas and Sheila Kuehl.

[5] Patel et al, *supra* note 1.

[6] LAHSA REPORT, *supra* note 4, at 9.

[7] *Id*.

[8] Latinos are more likely to live outside of traditional homeless spaces, rely heavily on social networks, and use public services less often relative to other racial or ethnic groups. Melissa Chinchilla & Sonya Gabrielian, *Stemming the Rise of Latinx Homelessness: Lessons from Los Angeles County*, J. SOC. DISTRESS & THE HOMELESS (2019).

[9] LAHSA Report, *supra* note 4, at 7.

4

downtown neighborhood known today as "Skid Row."[10] Residents of Skid Row lived in inexpensive apartments, hotels, and lodging houses while homeless individuals unable to afford such housing sought areas outside of Skid Row where they could build permanent accommodations on undeveloped land.[11]

In 1910, the Housing Commission of the City of Los Angeles reported that nearly ten thousand individuals of over thirty nationalities resided in "house courts," a collection of wooden structures occupying a single lot.[12] The Commission deemed these courts to be threats to public health and abolished, demolished, or vacated nearly 200 courts between 1910 and 1913—leaving a racially and ethnically diverse group of Angelenos no option but to live in tents and abandoned train cars.[13]

The Great Depression exacerbated the lack of affordable housing among racially and ethnically diverse communities.[14] Communities of color were disproportionately impacted by employment cuts as compared to their white counterparts.[15] Unemployment for white Angelenos reached a high of 25% in 1933, whereas unemployment among Black Angelenos during the same period peaked at twice that rate.[16] This was a result of a racially segmented economy which largely restricted Black workers to service employment and unskilled manual labor—both industries that were curtailed by businesses and households to survive the Depression.[17]

Widespread unemployment during the depression overlapped with a steep increase in rents in segregated housing markets.[18] By 1930, state-enforced racially-restrictive covenants throughout Los Angeles prevented Black Angelenos from residing in all but a select few areas, thereby reducing the housing available and resulting, not surprisingly, in a sharp increase in rents in those areas.[19] The scarcity

---

[10] KIRSTEN MOORE SHEELEY ET AL., UCLA LUSKIN CTR. FOR HIST. AND POL'Y, THE MAKING OF A CRISIS: A HISTORY OF HOMELESSNESS IN LOS ANGELES (2021), https://luskincenter.history.ucla.edu/wp-content/uploads/sites/66/2021/01/LCHP-The-Making-of-A-Crisis-Report.pdf [hereinafter LUSKIN REPORT].
[11] Id.
[12] Id. at 8.
[13] Id.
[14] Id. at 9.
[15] Id.
[16] Id.
[17] Id.
[18] Id. at 10.
[19] Id.

5

of housing available to communities of color left many without alternatives, driving up the number of unhoused.

In 1928, Los Angeles city created the Municipal Service Bureau for Homeless Men in Skid Row ("the Service Bureau") to assist homeless men in Los Angeles by connecting them with philanthropic organizations that provided food and lodging.[20] But aid from such organizations was distributed selectively along racial lines.[21] Black Angelenos were limited to relief from Black community-operated and community-funded institutions.[22] The Service Bureau relied on organizations such as the Colored YMCA and YWCA, the Eastside Mothers' Home, and the Sojourner Truth Home, while organizations such as the "white" YWCA openly denied any assistance to homeless Black girls.[23] While other cities across the nation had established their own publicly operated shelters, Los Angeles instead relied on this segregated system to provide services.[24]

*Redlining*

In 1933, Congress formed the Home Owners' Loan Corporation ("HOLC") to curtail the foreclosure crisis driven by the Great Depression. [25] Congress hoped to help homeowners facing default on their mortgages, or those who otherwise would not be able to afford houses.[26] The HOLC was developed as a solution: a state-sponsored lending program that could issue mortgages.[27]

However, this access to homeownership was not extended equally. The HOLC reinforced racial segregation and diverted investment from minority neighborhoods by creating color-coded "residential safety maps" that indicated risk

---

[20] *Id*. at 11.
[21] *Id*. at 12.
[22] *Id.*
[23] *Id*.
[24] *Id*. at 14. The city's intentional division of aid by racial lines is further evidenced by Los Angeles Commissioners' recommendations in 1931 in which they advised the Council to allocate separate pools of funding for (1) the homeless care of males and (2) "colored" homeless boys.
[25] Bruce Mitchell PhD. And Juan Franco, *HOLC "Redlining" Maps: The Persistent Structure of Segregation and Economic Inequality*, NATIONAL COMMUNITY REINVESTMENT COALITION, https://ncrc.org/wp-content/uploads/dlm_uploads/2018/02/NCRC-Research-HOLC-10.pdf
[26] Alejandra Borunda, *Racist Housing Policies Have Created Some Oppressively Hot Neighborhoods*, NATIONAL GEOGRAPHIC (Sept. 2, 2020), https://www.nationalgeographic.com/science/article/racist-housing-policies-created-some-oppressively-hot-neighborhoods
[27] *Id.*

6

levels for long-term real estate investment. Known today as "redlining," the safety maps categorized neighborhoods as "best," "still desirable," "declining," or "hazardous." Neighborhoods were categorized based on "favorable" and "detrimental" factors, such as the "threat of infiltration of foreign-born, negro, or lower grade population." Black and immigrant neighborhoods were repeatedly rated "hazardous" and outlined in red—creating a "state-sponsored system of segregation."[28] The rating system was widely used by HOLC, as well as private lending institutions, who denied residents in "redlined" neighborhoods access to loans or capital investment. The Federal Housing Administration ("FHA"), established in 1934, accelerated segregation by refusing to insure mortgages in and near Black neighborhoods.[29] The FHA even subsidized builders to construct entire subdivisions for white communities, so long as the homes were not sold to Black people.[30]

People living in redlined neighborhoods were restricted from these federally backed avenues of credit for decades.[31] This cycle of disinvestment blocked communities of color from the accumulation of intergenerational wealth that flowed in white neighborhoods due to government supported financial security in home ownership in areas with steady growth in property value.[32]

Federal housing policies by the HOLC and the FHA have created a lasting wealth gap. By the time the Fair Housing Act outlawed racial discrimination in housing in 1968, suburban homes had grown substantially in value.[33] Whereas white families enjoyed this growth in equity as financial security, Black families were blocked from this growth from the beginning.[34]

While a Black person today earns on average 60% of what their white counterpart earns, Black American wealth is only about five percent of white American wealth.[35] Decades of depressed property values stemming from

---

[28] RICHARD ROTHSTEIN, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA 64 (2017); Terry Gross, *A 'Forgotten History' of How the U.S. Government Segregated America*, NPR, (May 3, 2017), https://www.npr.org/2017/05/03/526655831/a-forgotten-history-of-how-the-u-s-government-segregated-america.

[29] ROTHSTEIN, *supra* note 28, at 64.

[30] *Id*. at 64–65.

[31] Terry Gross, *A 'Forgotten History' of How the U.S. Government Segregated America*, NPR, (May 3, 2017), https://www.npr.org/2017/05/03/526655831/a-forgotten-history-of-how-the-u-s-government-segregated-america.

[32] *Id*.

[33] *Id*.

[34] *Id*.

[35] *Id*.

HOLC's "hazardous" labeling paved the way for present-day gentrification: it allowed white homeowners with growing equity to purchase devalued property in formerly redlined neighborhoods.[36]

The effects of these housing policies have consequences beyond a wealth gap. White Americans developed financial stability, and thus safety nets, that Black Americans were excluded from. Areas previously deemed "hazardous" remain segregated with larger Black and Latino populations, higher rates of poverty, lower life expectancy and substandard health outcomes stemming from structural disinvestment.[37] All of these factors shape Los Angeles housing insecurity in the Black community today.

*Post-World War II*

After World War II, policies relating to redlining, racial covenants, and public bank lending continued to exacerbate the growing racial wealth gap.[38] Los Angeles's "urban renewal" plans further entrenched systemic barriers to Black population's access to housing.[39] Data from the Los Angeles County Department of Charities in the 1950s show that despite Black men comprising only 5.2% of the county's adult male population, they comprised 17.45% of applicants seeking relief, and of the Black applicants, nearly 60% lacked shelter.[40] The very plans aimed to "renew" communities destroyed existing neighborhoods where communities of color resided.[41]

Single-room-occupancy hotels (SROs) provided a home to tenants who could only afford to pay rent by the month or by the week.[42] The low-cost temporary lodging was especially helpful for individuals on pensions, Social Security, or welfare programs who could not afford costs associated with long-term rental units, which normally required a security deposit and rent for the first

---

[36] MITCHELL & FRANCO, *supra* note 25.

[37] *Id.*

[38] *Id.* at 20.

[39] LUSKIN REPORT, *supra* note 10, at 21.

[40] *Id.* at 22.

[41] *Id.* at 21.

[42] Frederick M. Muir, *Bradley Proposes Skid Row Hotel Demolition*, L.A. TIMES (Mar. 10, 1989), https://www.latimes.com/archives/la-xpm-1989-03-10-me-1106-story.html.

and last month.[43] But as pressure rose to develop commercial viability of Downtown Los Angeles in the 1950s and 1960s, Los Angeles City began condemning SRO hotel buildings for falling below building code standards and ordered upgrades or demolition.[44] Consequently, the number of SRO hotel rooms in Skid Row was halved—dropping from 15,000 to 7,500 in under a decade.[45]  The widespread demolition of SROs further decreased availability of extremely low-cost housing and displaced tenants to the street.[46]

Racial barriers to quality housing created disparate outcomes among Black and white people of the same economic class.[47] In 1970, Black Angelenos receiving welfare were twice as likely to identify housing as their "primary problem" as compared to their white and Latino/a counterparts.[48]

*Highways*

Los Angeles' highway infrastructure was built as and remains a driver of racial inequality.[49] Deborah Archer, national board president of the American Civil Liberties Union, writes: "The benefits and burdens of our transportation system—highways, roads, bridges, sidewalks, and public transit—have been planned, developed, and sustained to pull resources from Black communities that are subsequently deployed and invested to the benefit of predominantly white communities and their residents."[50]

Highways have long been utilized to segregate communities of color. Historian Richard Rothstein points as an example to the "Underwriting Manual" of the Federal Housing Administration, which recommended highways as a mechanism to separate Black neighborhoods from white neighborhoods.[51]

---

[43] *Id*.

[44] Benjamin Schneider, *CityLab University: Understanding Homelessness in America*, BLOOMBERG CITYLAB (July 6, 2020), https://www.bloomberg.com/news/features/2020-07-06/why-is-homelessness-such-a-problem-in-u-s-cities.

[45] JENNIFER WOLCH ET AL., ENDING HOMELESSNESS IN LOS ANGELES (2007), http://www.ced.berkeley.edu/downloads/pubs/faculty/wolch_2007_ending-homelessness-los-angeles.pdf.

[46] Benjamin Schneider, *CityLab University: Understanding Homelessness in America*, BLOOMBERG CITYLAB (July 6, 2020), https://www.bloomberg.com/news/features/2020-07-06/why-is-homelessness-such-a-problem-in-u-s-cities.

[47] LUSKIN REPORT, *supra* note 10.

[48] *Id*.

[49] Deborah N. Archer, *Transportation Policy and the Underdevelopment of Black Communities*, 106 IOWA L. REV. (forthcoming 2021).

[50] *Id*. at *3.

[51] ROTHSTEIN, *supra* note 28, at 65–66.

In 1910, 36% of Black people in Los Angeles were homeowners, a notable percentage compared against 2.4% in New York City.[52] Racially diverse neighborhoods, such as Watts and Boyle Heights, flourished alongside the Red Car transit system, which connected Los Angeles through unsegregated means. [53] But Los Angeles swiftly undertook segregation efforts as its population grew from 320,000 in 1910 to 1.2 million in 1930. [54] As its Black population increased by tens of thousands, Los Angeles utilized racially restrictive covenants, redlining, and eminent domain to racially segregate neighborhoods. [55] An uptick in Ku Klux Klan violence further targeted Black families who resided in majority white neighborhoods—including widespread cross burnings, bombings, and drive-by shootings. [56] In Manhattan Beach, Los Angeles County employed eminent domain to take property from Black families and turn the land into a whites-only park. [57]

Yet, construction of the Los Angeles freeway was most effective in displacing Black families on a large scale. [58] Communities of color lacked political representation to defend against their neighborhoods being razed to make space for the freeway. In 1972, a plaintiff's attorney for a lawsuit opposing construction of the I-105 Freeway voiced how politicians faced less opposition from communities of color: "You'll recall, prior to this time, there was a proposed . . . east/west freeway north of the [I-105 Freeway], the Beverly Hills Freeway. That was defeated and eliminated from the map . . . the difference between the political clout of Beverly Hills and Watts, Willowbrook, Lynwood, Downey and Hawthorne is considerable . . . this was kind of a course of least resistance from Caltrans' perspective."[59] As stated, white communities such as Beverly Hills had the political willpower to derail highway construction through their neighborhoods. [60] Only 61% of Los Angeles' planned freeway network was constructed as a

---

[52] Matthew Fleischer, *Opinion: Want to Tear Down Insidious Monuments to Racism and Segregation? Bulldoze L.A. Freeways*, L.A. TIMES (June 24, 2020), https://www.latimes.com/opinion/story/2020-06-24/bulldoze-la-freeways-racism-monument.

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] Joseph Di Mento et al, *Court Intervention, The Consent Decree, and The Century Freeway* II–37 (U.C. Transp. Ctr., Working Paper No. 381, 1991).

[60] *Id.*

consequence.[61] One of the most striking visualizations of the political willpower white communities had in successfully thwarting highway construction is in South Pasadena, where a glaring gap lies between Interstate 710 and State Route 710.[62]



*Fig. 1: The gap in Route 710*

Los Angeles employed eminent domain, the process by which governments seize private property for public use with payment of compensation, to seize more than 6,000 dwellings located in the freeway's path.[63] Devalued neighborhoods comprised mostly of communities of color were more cost-effective tracts of land for Los Angeles to acquire through eminent domain compared to majority white neighborhoods. Restricted to a limited number of neighborhoods allowing communities of color, non-white freeway evictees were forced to find housing in

---

[61] Matthew Fleischer, *Opinion: Want to Tear Down Insidious Monuments to Racism and Segregation? Bulldoze L.A. Freeways*, L.A. TIMES (June 24, 2020), https://www.latimes.com/opinion/story/2020-06-24/bulldoze-la-freeways-racism-monument.

[62] *Id*.

[63] Ray Hebert, *Century Freeway—When It's Born, An Era Will Die*, L.A. TIMES (June 22, 1986), https://www.latimes.com/archives/la-xpm-1986-06-22-me-20619-story.html.

already condensed, segregated areas of South and East Los Angeles, away from job centers and beset with freeway pollution.[64]

"Race frequently explains which communities receive the benefits of our transportation system and infrastructure and which communities were forced to host the burdens," writes Archer. [65] Today, the legacy of racially motivated freeway construction burdens Los Angeles communities of color not only economically, but physically. Hazardous vehicle-related pollutants (e.g., diesel exhaust) are highly concentrated near major roadways, inducing respiratory ailments and mortality in high-traffic neighborhoods.[66] Because of the direct exposure to vehicle pollution, children in these communities face higher rates of asthma and cognitive decline.[67]

The fracturing of communities of color in Los Angeles and the subsequent overcrowding of neighborhoods open to Black families meant that city renewal plans impeded Black families from sharing in post-war white intergenerational wealth accumulation flowing from home ownership in neighborhoods with fixed growths in property values.[68] Overpopulation created a housing shortage that necessitated families to rent rather than purchase homes.[69] This cycle increased rental value, pushing out low-income families and resulting in housing insecurity for those who could not afford the higher rents. [70] Between 1970 and 1980, census data shows that the number of nonrelatives per household doubled in Compton, Florence-Graham, East Los Angeles, and other Black and Latino/a communities.[71] That number would double once more over the next decade.[72]

Despite Black Angelenos representing a disproportionate share of those experiencing unemployment and poverty in the city, a disproportionate share of

---

[64] Matthew Fleischer, *Opinion: Want to Tear Down Insidious Monuments to Racism and Segregation? Bulldoze L.A. Freeways*, L.A. TIMES (June 24, 2020), https://www.latimes.com/opinion/story/2020-06-24/bulldoze-la-freeways-racism-monument.

[65] Noel King, *A Brief History of How Racism Shaped Interstate Highways*, NPR (Apr. 7, 2021), https://www.npr.org/2021/04/07/984784455/a-brief-history-of-how-racism-shaped-interstate-highways.

[66] Douglas Houston et al., *Structural Disparities of Urban Traffic in Southern California: Implications for Vehicle-Related Air Pollution Exposure in Minority and High-Poverty Neighborhoods*, 26 J. Urb. Affs. 565, 565 (2004).

[67] Sarah Gibbens, *Air Pollution Robs Us of Our Smarts and Our Lungs*, NAT'L GEOGRAPHIC (Aug. 31, 2018), https://www.nationalgeographic.com/environment/article/news-air-quality-brain-cognitive-function.

[68] LUSKIN REPORT, *supra* note 10, at 22.

[69] Richard Rothstein, *Op-Ed: Why Los Angeles Is Still a Segregated City After All These Years*, L.A. TIMES (Aug. 2017), https://www.latimes.com/opinion/op-ed/la-oe-rothstein-segregated-housing-20170820-story.html.

[70] *Id*.

[71] LUSKIN REPORT, *supra* note 10, at 29.

[72] *Id*.

public and private services assisting the homeless continued to cater to older white individuals.[73] Indeed, the white male population continued to receive far more that its proportional share of homeless aid through the 1970s.[74]

*Containment Zone*

The city was content with misery as long as it was unseen. In 1976, the homeless population became spatially concentrated in the fifty-square-block "containment zone" of Skid Row.

Developers and businesses urged the City to adopt a "silver book" plan in 1972.[75] The plan sought to raze Skid Row and wholly transform the existing neighborhood by 1990.[76] Skid Row stakeholders raised concerns that razing Skid Row would disperse the homeless population and negatively affect downtown business.[77] The City, won over by this sentiment, instead adopted the alternative "Blue Book Plan," which sought to "contain" homeless people to maintain the pristineness of the business district. [78] The plan adopted a fifty-block "physical containment" zone designed to contain and perpetuate poverty. Text of the 1976 plan assuaged the city's fears that Skid Row would halt downtown revitalization plans by expanding further and deterring booming investment in Los Angeles' downtown:

> When the Skid Row resident enters the buffer, the psychological comfort of the familiar Skid Row environment will be lost; he will feel foreign and will not be inclined to travel far from the area of containment.

The containment zone became a place where the homeless, discharged patients with mental disabilities, and parolees came—or in some instances, were bussed and dropped—to find services. General Dogon, a Skid Row community organizer, describes the containment as a "warehouse zone"—"a warehouse is

---

[73] *Id*. at 23.
[74] *Id*.
[75] LUSKIN REPORT, *supra* note 10, at 26.
[76] *Id*.
[77] *Id*. at 27.
[78] *Id*.

13

43

where you store shit. So the idea was to push all of Los Angeles's unfavorable citizens into one area."[79] "Main Street is the dividing line between the haves and have-nots," says General Dogon, "you've got homeless people sleeping on one side of the street, and the loft buildings on the other side of the street." [80] Pete White, executive director and founder of the Los Angeles Community Action Network (LA CAN) described Skid Row as "a place borne out of the outgrowth of redlining, segregation, deindustrialization, the war on drugs, more aptly put, the war on black people, the war on the black community."[81]

Police force kept the homeless isolated, enhancing and embedding poverty within the 50-block area. The Los Angeles Police Department (LAPD) set up physical buffers to reduce movement past the Skid Row border and enforce containment.[82] Flood lights demarcated the border, disincentivizing homeless from straying outside the containment area.[83]

The City and advocates' containment policy entrenched poverty and fostered the three most unsafe neighborhoods in the nation today.[84] According to Forbes, "[t]he most dangerous neighborhood in America is in Los Angeles," two square blocks in the northern half of Skid Row.[85] The second most dangerous neighborhood within American borders is intertwined with the southern edge of Skid Row.[86] Finally, the nation's third most dangerous neighborhood is the southern half of Skid Row.[87]

"Skid Row is on the bottom of the totem pole of life here in America and is commonly known as the homeless capital of America. Whether someone has been here three hours or three decades, the subconscious thought processes are one in

---

[79] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.
[80] *Id*.
[81] Dkt. 218 at 86.
[82] LUSKIN REPORT, *supra* note 10, at 28.
[83] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.
[84] Laura Begley Bloom, *Crime in America: Study Reveals the 10 Most Unsafe Neighborhoods*, FORBES (Jan. 28, 2021), https://www.forbes.com/sites/laurabegleybloom/2021/01/28/the-10-most-dangerous-neighborhoods-in-america-its-not-where-you-think/?sh=6b61d13f341f.
[85] *Id.*
[86] *Id*.
[87] *Id*.

the same—to survive," says General Jeff Page, a prominent activist and community organizer of Skid Row.[88]

The containment policy—enacted to enable and contain poverty out of sight and out of mind—succeeded. "Los Angeles Police Department and the major non-profits both have a stranglehold on our community" says General Jeff.[89] There is "[n]o funding for 'positive programming,' which means every day there's *nothing* positive to do, so quite obviously negative things will happen and soon thereafter, handcuffs or a ride in the back of either an ambulance or a hearse."[90]

As the unhoused population exploded during the 1980s due to the crack epidemic, so too did the City's vigorous criminalization policies. By demarcating Skid Row as a concentration for rehabilitation services, the City created a centralized place where police could make sweeping arrests for minor drug offenses or crimes based on poverty (e.g. resting or sleeping on the sidewalk). The ensuing cycle of incarceration and homelessness—disproportionately targeting Black communities—has continued for decades.

In 2007, Los Angeles Police Department Chief William J. Bratton enacted the "broken windows" policing policy.[91] Under Chief Bratton's "Safer Cities Initiative," a task force of 50 officers entered Skid Row issuing citations and making arrests for infractions such as jaywalking, prostitution and littering.[92] The program ended shortly after a Los Angeles Police Department officer fatally shot a homeless person of color on Skid Row in 2015. "On skid row, the windows already were broken," Los Angeles City Attorney Feuer said, "we have a much deeper and more profound situation to deal with."[93]

City officials contend that they denounce "criminalizing" homelessness.[94] But data tells a different story. In 2011, 1 in 10 arrests citywide were of homeless

---

[88] Bianca Barragan, *General Jeff's Neighborhood Guide to LA's Skid Row*, CURBED LOS ANGELES (Apr. 12, 2016), https://la.curbed.com/2016/4/12/11405274/los-angeles-skid-row-neighborhood-guide.
[89] *Id.*
[90] *Id.*
[91] Gale Holland, *L.A. Leaders Are Crafting New Plan to Help Homeless on Skid Row*, L.A. TIMES (July 15, 2014), https://www.latimes.com/local/la-me-skid-row-police-20140716-story.html.
[92] *Id.*
[93] *Id.*
[94] *Id.* ("Our success will lie in taking a more progressive approach," said LAPD Capt. John McMahon).

people; in 2016, it was 1 in 6.[95] The Los Angeles Times reported that "Officers made 14,000 arrests of homeless people in the city in 2016, a 31% increase over 2011." [96] The rise occurred despite LAPD arrests decreasing by 15% that year. [97] "Two-thirds of those arrested were black or Latino, and the top five charges were for nonviolent or minor offenses."[98] Cloaked as less punitive, such measures entrench longstanding and systemic criminalization affecting Los Angeles' most vulnerable. Tickets fining $100 add up to as much as $300 once court fees are applied. [99]  When tickets pile up, police arrest homeless people and put them in jail for failure to pay.[100] The result is a revolving door of debt and housing insecurity where a history of arrests bar individuals from housing and sustainable jobs. In a listening session conducted by LAHSA, a participant contributed "[i]f you are a Black Male, you are going to jail. If you are here on Skid Row and you are on this sidewalk, they are going to make obstacles for you."[101]

Today, redevelopment interests continue to threaten the preservation of Skid Row. Abutting Skid Row are thriving neighborhoods—namely the Arts District and Little Tokyo District. As these districts edge closer to the boundaries of containment, police presence within Skid Row grows stronger.[102] The devalued downtown property incentivizes luxury housing developers and businesses to advocate the city to rezone and divest from affordable housing and services. "Our collective voice is drowned out by numerous 'established voices' who dominate each and every conversation about a community they don't even live in," recounts General Jeff.[103] Another Skid Row resident, Craig R., remarked "they're planning on making billions of dollars on pushing us out, squeezing us out, or kicking us

---

[95] Gale Holland & Christine Zhang, *Huge Increase in Arrests of Homeless in L.A.—But Mostly for Minor Offenses*, L.A. TIMES (Feb. 4, 2018), https://www.latimes.com/local/politics/la-me-homeless-arrests-20180204-story.html.
[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] LAHSA REPORT, supra note 4, at 24.
[102] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.
[103] Bianca Barragan, *General Jeff's Neighborhood Guide to LA's Skid Row*, CURBED LOS ANGELES (Apr. 12, 2016), https://la.curbed.com/2016/4/12/11405274/los-angeles-skid-row-neighborhood-guide.

out, meaning us the poor people, the disadvantaged people, the homeless, plus the residents of the neighborhood."[104]

For too long, Black individuals have not had an opportunity to share with the City and County the ways that structural racism in policy affects them. On April 7th 2020, at a status conference for the present case, General Jeff said, "[W]hen I look at Skid Row, the majority of the Skid Row population are African-American. You know, when we look at the homelessness in terms of Council Districts 8, 9, 10, . . . we can see that . . . there's . . . a strong African-American presence . . . and so there's significant issues because there's a racial undertone to this matter."[105] "We, more importantly, want to thank you," General Jeff continued, "for giving a voice to we, the people of Skid Row and of homelessness, because there's always been [] a long-standing issue of we, the people, not being able to have a seat at the decision-making table."[106] In a listening session conducted by Los Angeles County and reported by LAHSA, a Black Woman in West Adams echoed General Jeff's sentiment: "Sitting across the table of someone that looks like you, and at the very least can understand what it is like to experience the world the way you experience it, makes a huge difference. It opens you up to be more willing to support care. Until we get people that look like us in these positions, we are not going [to] be able [to] access it. It [is] not going to seem like something that is safe."[107] As the unhoused population grows, it has spilled out of the containment zone. "This may be the key to understanding homeless policy in Los Angeles over the last forty years: nothing happened until homelessness spilled over the boundaries of the 'containment' area and became visible and present in neighborhoods region-wide."[108]

*COVID-19*

The COVID-19 pandemic presented an unprecedented need for health measures and infectious disease control.[109] Governor Gavin Newsom directed an

---

[104] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.
[105] Dkt. 165 at 174.
[106] Dkt. 165 at 171.
[107] LAHSA REPORT, *supra* note 4, at 34.
[108] LUSKIN REPORT, *supra* note 10, at 56.
[109] *Id*. at 59.

initiative titled "Project Roomkey" in April 2020 to house 15,000 homeless Californians in hotel and motel rooms to protect unhoused individuals during the pandemic.[110] But a May report to the Board of Supervisors detailed that Project Roomkey rooms have been disproportionately made available to white homeless Angelenos—exacerbating the risks to a Black population that already disproportionately bears the harmful effects of the City and County's failure to address homelessness.[111] Between 365,000 and 495,000 households in Los Angeles County face imminent risk of eviction, most of whom are lower-income people of color, in particular Black Angelenos.[112] In Los Angeles County, homeless individuals are 50% more likely to die if they contract COVID-19, escalating the need for equal—if not increased—access to services. [113]

*Modern Implications*

The 2018 LAHSA report concluded that "racial bias [continues to] affect every aspect of a Black person's life, and it is impossible to untangle the pervasive effects of institutional racism from other system failures that together cause a person to experience homelessness."[114]

"People in our community are houseless because of structural and institutional racism and gender inequality," said Monique Nowell, spokesperson for the Downtown Women's Action Coalition.[115] In a listening session conducted by LAHSA, a participant voiced the same: "[s]tructural racism is the issue here. Los Angeles doesn't acknowledge this. How can we have the conversation if we don't acknowledge we live in a racist Los Angeles?"[116]

Recent events have focused our attention on the existence of systemic racism in the City and County of Los Angeles. Nearly a century after seizing a Black family's oceanfront resort, the County of Los Angeles is reckoning with its racist

---

[110] *Id.*

[111] *Id.* at 60.

[112] *Id.* at ii.

[113] Benjamin Oreskes & Doug Smith, *L.A.'s Homeless Residents Are 50% More Likely to Die if They Get COVID. Now They're A Vaccine Priority*, L.A. TIMES (Mar. 12, 2021), https://www.latimes.com/homeless-housing/story/2021-03-12/la-homeless-50-percent-more-likely-die-covid.

[114] LAHSA REPORT, *supra* note 4, at 9.

[115] Dkt. 218 at 86.

[116] LAHSA REPORT, *supra* note 4, at 20.

employment of eminent domain. In 1912, a Black Angeleno named Willa Bruce purchased the first of two ocean lots in what would soon become the city of Manhattan Beach. Willa and her husband developed an oceanfront resort, which provided Black families with a lodge, café, and dance hall.[117] The resort was the first of its kind at a time when segregation often limited the access Black people had to the surf.[118] As more Black families purchased nearby property by the water, a Black community formed.[119] "They were pioneers. They came to California, bought property, enjoyed the beach, made money," remarked historian and author Alison Rose Jefferson.[120] But white neighbors grew hostile to the expansion of Black land ownership in the neighborhood. Black families found their tires slashed and the Ku Klux Klan purportedly set fire to a Black-owned home by lighting a mattress under its main deck.[121] Nearby Los Angeles Neighborhoods experienced similar violent hostility—Santa Monica was referred to as the "Inkwell" and a Black-owned Pacific Beach Club was torched the day before it was scheduled to open.[122]

By 1924, County officials had condemned and seized over two dozen Manhattan Beach properties through eminent domain, citing urgent need for a public park. [123] The Manhattan Beach "leaders used eminent domain to strip the couple of the land — as well as property belonging to several other Black families—in a move that, historical record shows, had racist motivations."[124] The Bruce family and three other Black families sued County officials on the basis of

---

[117] Rosanna Xia, *Manhattan Beach Was Once Home to Black Beachgoers, But the City Ran Them out. Now It Faces A Reckoning*, L.A. TIMES (Aug. 2, 2020), https://www.latimes.com/california/story/2020-08-02/bruces-beach-manhattan-beach.

[118] Hayley Munguia, *Property Transfer Could Be U.S. First*, ORANGE COUNTY REG. (Apr. 10, 2021), https://ocregister-ca-app.newsmemory.com/?publink=1681edced_1345d0e.

[119] Rosanna Xia, *Manhattan Beach Was Once Home to Black Beachgoers, But the City Ran Them out. Now It Faces A Reckoning*, L.A. TIMES (Aug. 2, 2020), https://www.latimes.com/california/story/2020-08-02/bruces-beach-manhattan-beach.

[120] *Id.*

[121] *Id*.

[122] *Id*.

[123] Nancy Dillon, *Southern California City Wrongfully Seized Beach Resort from Black Family in 1924. Now County Wants to Return It*, N.Y. DAILY NEWS (Apr. 9, 2021), https://www.nydailynews.com/news/national/ny-los-angeles-county-plans-to-return-beach-land-to-black-family-after-century-20210409-hsnpkp4hv5erlhgmj3ynswgbc4-story.html.

[124] Hayley Munguia, *Property Transfer Could Be U.S. First*, ORANGE COUNTY REG. (Apr. 10, 2021), https://ocregister-ca-app.newsmemory.com/?publink=1681edced_1345d0e.

19

racial prejudice.[125] The County ultimately paid them an amount far less than the property value and the Bruces were unable to purchase oceanfront land elsewhere.[126] After leaving the property vacant for decades, the County then turned the land into a whites-only park.[127]

Ninety-seven years later, Los Angeles County responded to its role in pushing out an entire Black community from Manhattan Beach, where Black residents today make up less than one percent of the population.[128] "I'm going to do whatever I can to right this wrong," said Los Angeles County Supervisor Janice Hahn, apologizing to the Bruce family and agreeing that the land should be returned.[129] "There's no doubt that this was such an injustice that was inflicted — not just on Charles and Willa Bruce, but generations of their descendants who almost certainly would be millionaires had they been allowed to keep that beachfront property."[130]

### ii.     Organized Abandonment in Housing

The term "affordable housing" encompasses the government's total effort to provide housing through public-private partnerships specifically designed to serve those who cannot afford market rents. In 1990, a federal law named the "National Affordable Housing Act" formalized "affordable housing" to mean privately owned, publicly subsidized housing.[131] "Public housing," alternatively, refers to housing wholly owned and administered by the government. The redevelopment of public housing to affordable housing has fixed reliance on private developers to prioritize the most vulnerable groups facing housing insecurity when building

---

[125] Rosanna Xia, *Manhattan Beach Was Once Home to Black Beachgoers, But the City Ran Them out. Now It Faces A Reckoning*, L.A. TIMES (Aug. 2, 2020), https://www.latimes.com/california/story/2020-08-02/bruces-beach-manhattan-beach.

[126] *Id.*

[127] Matthew Fleischer, *Opinion: Want to Tear Down Insidious Monuments to Racism and Segregation? Bulldoze L.A. Freeways*, L.A. TIMES (June 24, 2020), https://www.latimes.com/opinion/story/2020-06-24/bulldoze-la-freeways-racism-monument.

[128] Rosanna Xia, *A Tale of Two Reckonings: How Should Manhattan Beach Atone for Its Racist Past?*, L.A. TIMES (Mar. 28, 2021), https://www.latimes.com/california/story/2021-03-28/how-should-manhattan-beach-atone-racist-past.

[129] *Id.*

[130] *Id.*

[131] Tracy Jeanne Rosenthal, *The Enduring Fiction of Affordable Housing*, NEW REPUBLIC (Apr. 2, 2021), https://newrepublic.com/article/161806/affordable-housing-public-housing-rent-los-angeles.

20

properties. Los Angeles is facing rising housing insecurity, demanding a critical evaluation of how affordable housing serves—or rather, fails to serve—our communities when compared to public housing.

*30 Years of "Affordability"*

The affordable housing public-private partnership model began in 1959, when the federal government offered below market interest rates to private developers to incentivize development of rental housing for individuals who could not afford housing at market rates but earned too much to qualify for public housing.[132] The partnership was at first limited to nonprofit developers, but for-profit builders lobbied for inclusion and drafted new programs with one percent effective interest rates, profit structures riddled with loopholes, and exit strategies.[133]

The exit strategies and profit structures are exemplified in one of the first apartments created under the affordable housing model—Concord Apartments in Pasadena, California.[134] Three years after purchasing the apartments, the owner of the building prepaid the subsidized mortgage, doubled tenants' rents, and moved to auction the building at a substantial profit.[135] Over 150 elderly tenants of the Concord Apartments filed suit against the owner to contest the increased rent and halt the sale, and eventually, the city of Pasadena purchased the land, ultimately safeguarding housing security and long-term affordability for the residents and stymieing the efforts of the for-profit developer.[136]

A 1973 report sponsored by the Department of Housing and Urban Development cited sweeping critiques of incentive schemes: "Private enterprise was 'getting rich' at the expense of low- and moderate-income families… The subsidies offered were not sufficient and did not aid the families who most needed them."[137] Despite these critiques, the Nixon administration issued a moratorium on public housing construction, entrenching the nation's reliance on private

---

[132] *Id.*
[133] *Id.*
[134] *Id.*
[135] *Id.*
[136] *Id.*
[137] *Id.*

21

developers to provide affordable housing opportunities.[138] The following year, the Nixon administration distributed block grants for states to administer their own incentive programs—thereby reducing federal authority and increasing reliance on private developers.[139]

The Tax Reform Act of 1986 developed a tax credit system that is still in use today to incentivize private developers to build affordable housing.[140] The Low-Income Housing Tax Credit ("LIHTC") provides tax credits to developers to subsidize the acquisition, construction, and rehabilitation of affordable rental housing for low- and moderate-income tenants, so long as the developer agrees to income-targeted rents on a percentage of the apartments for 30 years.[141] "This is one of the most urgent problems with Affordable Housing: It expires[.]" writes Tracy Jeanne Rosenthal of the New Republic.[142] Indeed, affordability requirements have begun to expire on units created at the program's inception in 1987—creating housing insecurity for hundreds of thousands of families across the United States who cannot afford to pay market-rate rents.

Despite understanding the loopholes built into the affordable housing model from as early as 1988, national housing policy in 2021 remains reliant on the same private-public structure.

Nearly 9,000 units in Los Angeles bound by affordable housing covenants house up to 20,000 Angelenos in L.A. County and will expire within the next eight years.[143] Los Angeles City Councilmember Gil Cedillo noted that number of soon-to-expire covenants "wipes out whatever gains we make" in housing efforts.[144] Indeed, landlords across Los Angeles who hold property in areas with high or rising rents are not incentivized to maintain stabilized rents, meaning that upon expiration of the housing covenants, landlords will evict the tenants the program was meant to house.

---

[138] *Id.*
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] *Id.*
[144] Anna Scott, *Thousands of Angelenos Will Have Fewer Affordable Housing Options As 'Covenants' Will Expire*, KCRW (Apr. 12, 2021), https://www.kcrw.com/news/shows/greater-la/affordable-housing-manhattan-beach-restitution-oc/rent-covenants-expiring-la.

*Accessible Housing*

Housing created under the affordable housing model is scarcely affordable for the average low-income renter. Thresholds of "affordable" rent are determined by a U.S. Department of Housing and Urban Development ("HUD") calculation of Area Median Income ("AMI")—meaning that rents are determined by the wealth of an entire county, rather than neighborhoods where housing is located. [145] In Los Angeles, a person making up to $63,100 a year, 80% of the AMI, will qualify as "low income."[146] Landlords in affordable housing complexes are thus more amenable to renting to tenants who fall within the higher tiers of "low income" eligibility so that the rents sustain the mortgage payments and loans, leaving those earning far less with little opportunity to obtain affordable housing.

Despite the fact that one quarter of the nation's tenant households—nearly 11 million tenants—qualify as "extremely low income," the overwhelming majority of affordable housing programs target higher income thresholds.[147] This bias entrenches structural racism within affordable housing because it excludes "extremely low income" tenants, who are disproportionately people of color.[148] The affordable housing model therefore perpetuates patterns of gentrification by pricing affordable housing in poorer neighborhoods at the higher threshold of eligibility standards, incentivizing an influx of higher-earning individuals and pushing out community residents who cannot meet the higher bracket affordable rent. Just as Angelenos of color were pushed out of their communities in the twentieth century due to redlining, exclusionary zoning, and eminent domain, the same structural eviction occurs today as the County and City prioritize affordable housing with 30-year covenants that target higher earning individuals over sustainable public housing initiatives for the most vulnerable in "extremely low income" brackets.

A Los Angeles resident who lives in an affordable housing unit set to expire soon called attention to a newly constructed Affordable Housing building in her community: "Affordable for who? I don't get how these politicians, how these

---

[145] *Id.*
[146] *Id.*
[147] *Id.*
[148] *Id.*

people in power could say what is affordable is if [they're] not living in our situation, if [they're] not walking in our shoes." [149]

In addition to the building-based subsidies that landlords receive, many tenants also receive Section 8 vouchers.[150] Section 8 housing vouchers were created under the Housing and Community Development Act of 1978 to assist eligible low- and moderate-income families to rent housing in the private market. HUD's residency data reports that nearly 40% of LIHTC housing tenants receive Section 8 vouchers—though LIHTC itself costs $10.9 billion in tax revenue each year. [151]

Households receiving a Section 8 voucher pay 30% of their income as rent, the rest is subsidized by the Housing Authority and reimbursed by HUD. But access to Section 8 vouchers is scarce—the vouchers only serve one quarter of qualifying individuals. In fact, waitlists for Section 8 or the few remaining public housing units span more than ten years. [152]  Tamara Meek, interviewed by the Los Angeles Times in 2017, first applied for a Section 8 housing voucher in 2004 when Los Angeles housing officials opened the waiting list to obtain the federal subsidy.[153] In the 13 years she waited for a housing voucher, she made temporary arrangements, such as sleeping on blankets in the back of a friend's kitchen. [154] During that time, Meek did not receive any subsidy, only a place on the waiting list alongside 300,000 applicants. [155] Federal input has not kept pace with rising poverty levels, and as a result, Section 8 vouchers mostly became available when someone relinquished theirs, most often because of their death. [156] In 2017, Los Angeles reopened the Section 8 housing list for the first time in 13 years—with an expected 600,000 individuals to apply. [157] Securing a place on the waiting list is not just based on income, but luck. A lottery system will determine which 20,000 of

---

[149] *Id.*

[150] *Id.*

[151] *Id.*

[152] Tracy Jeanne Rosenthal, *The Enduring Fiction of Affordable Housing*, NEW REPUBLIC (Apr. 2, 2021), https://newrepublic.com/article/161806/affordable-housing-public-housing-rent-los-angeles.

[153] Doug Smith, *Up to 600,000 Expected to Apply When L.A. Reopens Section 8 Housing List This Month After 13 Years*, L.A. TIMES (Oct. 1, 2017), https://www.latimes.com/local/lanow/la-me-ln-section-8-waiting-list-20170922-htmlstory.html.

[154] *Id*.

[155] *Id*.

[156] *Id*.

[157] *Id*.

the hundreds of thousands to apply will be added to the Section 8 waiting list. [158] And still, a coveted place on the waiting list entails an indeterminable wait. [159] In 2017, Douglas Guthrie, President and CEO of the Housing Authority of the City of Los Angeles, called attention to how the lack of access to the waiting list "expose[s] the tremendous need there is in Los Angeles for affordable housing."[160] Yet four years later, access remains out of reach.

The Housing Authority of Los Angeles County operates independently from the City and maintains a wait list for Section 8 housing that last opened in 2009, with 40,000 individuals as of 2017. [161] Leonardo Vilchis, cofounder of the L.A. Tenants Union, states that rather than turning to innovative solutions, reliance on the for-profit designed affordable housing model leaves us to "negotiate the terms of the community's defeat." [162] The homeless deaths resulting from housing insecurity is the "body count" of "relationships administered under the institution of private property," notes University of California, Los Angeles Professor Marques Vestal. [163]

The National Low Income Housing Coalition ("NLIHC") concluded in its 2021 annual report that low-income renters in the U.S. face a shortage of nearly seven million affordable and available rental homes.[164] For every 100 extremely low-income renter households in 2019, only 37 affordable homes are available. [165] The rising number of unhoused citizens is quickly outpacing the amount of truly affordable housing. [166] In response, the report cites the need for substantial and sustained investment in public housing and an expansion of the Housing Choice Voucher program to eligible households, among other measures. [167]

The existing data demonstrates how bipartisan policy to divest from public housing and invest in affordable housing has structurally burdened communities of

---

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Id.*

[162] Tracy Jeanne Rosenthal, *The Enduring Fiction of Affordable Housing*, NEW REPUBLIC (Apr. 2, 2021), https://newrepublic.com/article/161806/affordable-housing-public-housing-rent-los-angeles.

[163] *Id.*

[164] Nat'l Low Income Hous. Coal., *NLIHC Releases 2021 Edition of The Gap, Finding Extremely Low-Income Renters Face Shortage of 7 Million Affordable and Available Homes* (Mar. 22, 2021), https://nlihc.org/resource/nlihc-releases-2021-edition-gap-finding-extremely-low-income-renters-face-shortage-7.

[165] *Id.*

[166] *Id.*

[167] *Id.*

25

color, while catering to households at the upper tier of the AMI category who are disproportionately white. Indeed, twenty five percent of all renter-households in the U.S., accounting for 10.8 million households, fall under the "extremely low income" threshold. [168] 7.6 million of those households devote more than half of their incomes on rent and utilities. [169] By incentivizing developers to invest in affordable housing directed to individuals with higher incomes, there is a severe shortage of housing for the lowest-income renters. [170] People of color are disproportionately affected by the shortage. The American Community Survey ("ACS") reported that nationally, 20% of Black households, 18% of American Indian or Alaska Native households, 14% of Latino households, and 10% of Asian households are extremely low-income renters. [171] By comparison, six percent of white non-Latino households are extremely low-income renters. [172]

The economic and public health crisis caused by COVID-19 has made a desperate situation worse for low-income renters. In 2019, 54% of Black renters contributed more than half of their income to housing and utilities. That number has grown as COVID-19 economic and employment recovery remains slowest for communities of color, in particular women of color.[173] According to the Bureau of Labor Statistics unemployment data, the unemployment rate for Black women aged 20 and over is one-fourth higher than the national average of all Americans in that same age group, and for Latinas, the rate is nearly 50% higher than the national average. [174] Yet the housing policies of Los Angeles County and City exacerbate these structural inequalities by investing in affordable housing designed for a limited period of 30 years and targeting the higher tiers of eligible residents—leaving those in the lowest tier of eligibility with scarce options.[175]

In some instances, housing discrimination in Los Angeles County is directed explicitly at Black people. In 2013, an investigation by the Civil Rights Division of the U.S. Department of Justice uncovered a pattern or practice of discriminatory

---

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Id.*

[172] *Id.*

[173] Caroline Modarressy-Tehrani, *Women of Color Hardest Hit By Pandemic Joblessness*, NBC NEWS (Aug. 1, 2020), https://www.nbcnews.com/news/us-news/women-color-hardest-hit-pandemic-joblessness-n1235585.

[174] *Id.*

[175] Indeed, with apologies to Sir Winston Churchill, from the perspective of those living on the streets of Los Angeles, it may seem that never have so many spent so much for such little benefit for so few.

practices against Black Angelenos by a Los Angeles County Sheriff's Department station.[176] In particular, the investigation found that Los Angeles County Sheriff deputies discriminated against Black Angelenos "by making housing unavailable, altering the terms and conditions of housing, and coercing, intimidating, and interfering with their housing rights, in violation of the Fair Housing Act (FHA)."[177]

*Housing Element*

The County and City have the means and infrastructure to create truly affordable housing. A state-mandated plan called the "Housing Element," due by October, is one way that Los Angeles leaders can achieve immediate and sustainable change.[178] In 1969, the California legislature mandated that all cities and counties assess the state of housing availability and adopt a housing plan every 7–8 years to meet the housing needs of every economic sector of the community.[179] The plan, known as the "housing-element law," serves as a blueprint for how the city or county will develop land use and housing.[180] According to the California Department of Housing and Community Development, "California's housing-element law acknowledges that, in order for the private market to adequately address the housing needs and demand of Californians, local governments must adopt plans and regulatory systems that provide opportunities for (and do not unduly constrain), housing development."[181] The goals of the housing element are to ensure each jurisdiction is adjusting its policies to meet the rising housing needs of the community—in particular, by ensuring housing construction, reducing homelessness, and protecting tenants from displacement.

---

[176] Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Just., to Sheriff Leroy D. Baca, L.A. Cty. Sheriff's Dep't (June 28, 2013), https://knock-la.com/wp-content/uploads/2021/03/DOJ-Findings-Letter-LASD-in-Antelope-Valley-June-28-2013.pdf.

[177] *Id.* at 5.

[178] Times Editorial Board, *Editorial: L.A. Can Begin to Solve its Affordable Housing Crisis in 2021*, L.A. TIMES (Feb. 28, 2021), https://www.latimes.com/opinion/story/2021-02-28/los-angeles-housing-element.

[179] *Regional Housing Needs Allocation and Housing Elements*, CAL. DEP'T OF HOUS. & CMTY. DEV., https://www.hcd.ca.gov/community-development/housing-element/index.shtml (last visited Apr. 19, 2021).

[180] *Id.*

[181] *Id.*

The housing element law requires cities and counties to identify and assess adequate sites for housing in order to "affirmatively further fair housing."[182] An affirmative approach to fair housing under the law mandates several areas of analysis. Each locality must include "[a]n analysis of available federal, state, and local data and knowledge to identify integration and segregation patterns and trends, racially or ethnically concentrated areas of poverty, disparities in access to opportunity, and disproportionate housing needs within the jurisdiction, including displacement risk."[183] The analysis must contemplate plans to foster and maintain compliance with civil rights and fair housing laws and envision ways to replace segregated residential patterns with integrated and balance patterns.[184] Once issues are identified, an assessment of contributing factors is required, alongside the jurisdiction's housing priorities and goals.[185] Cities and counties must identify metrics and milestones to determine what fair housing results will be achieved.[186] Jurisdictions can implement plans by incentivizing new affordable housing and community revitalization, as well as initiatives to preserve existing affordable housing and protecting existing residents from displacement.[187]

Cities and counties must also create an inventory of land "suitable and available for residential development" throughout the community, including "vacant sites and sites having realistic and demonstrated potential for redevelopment during the planning period to meet the locality's housing need for a designated income level."[188] Sites range from permanent housing units to interim shelters, such as rental units, factory-built housing, affordable accessory dwelling units (ADUs), mobile homes, and emergency shelters.[189] In particular, the law requires an analysis of governmental and nongovernmental constraints on maintenance, improvement, or development of housing, and the local efforts to remove such constraints.[190] Currently, 75% of the city's residential property is

---

[182] CAL. GOV'T CODE § 65583.
[183] *Id.*
[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.*
[190] *Id.*

28

58

zoned for single-family zones.[191]  Without major rezoning initiatives, Los Angeles will continue to lack the infrastructure to meet the homelessness crisis and stem growing housing insecurity.[192]

In the 2013 Housing Element, the City laid out four goals. First, the City planned to create "a City where housing production and preservation result in an adequate supply of ownership and rental housing that is safe, healthy and affordable to people of all income levels, races, ages, and suitable for their various needs."[193] Second, the City aimed to provide "a City in which housing helps to create safe, livable and sustainable neighborhoods."[194] Third, the City set out to build "a City where there are housing opportunities for all without discrimination" and fourth, "a City committed to ending and preventing homelessness."[195] But in spite of these goals, Black Angelenos face barriers to homeownership and renting affordable housing units; disease runs rampant in garbage-ridden streets; and homelessness rates and homelessness deaths are at an all-time high. In short, nonfulfillment of the Housing Element goals has exacerbated the housing shortage crisis.

In February 2021, the Los Angeles Times Editorial Board ("Times Editorial Board") said that Los Angeles leaders are "clinging to development patterns born out of racist housing policies from the last century that perpetuate segregation and inequality today."[196] The Times Editorial Board noted that the longstanding resistance against density and development has impeded leaders' ability to create sufficient housing to meet the needs of its citizens.[197] Indeed, cities across California, such as Sacramento and Berkeley, are revising zoning laws in response to the housing crisis to permit apartments on land previously zoned only for single family residences.[198]  Los Angeles City Council President Nury Martinez has

---

[191] Times Editorial Board, *Editorial: L.A. Can Begin to Solve Its Affordable Housing Crisis in 2021*, L.A. TIMES (Feb. 28, 2021), https://www.latimes.com/opinion/story/2021-02-28/los-angeles-housing-element.
[192] *Id.*
[193] L.A. DEP'T OF CITY PLANNING, HOUSING ELEMENT 2013–2021 (2013), https://planning.lacity.org/odocument/883be4c9-392f-46e5-996b-b734274da37d/Housing_Element_2013_-_2021_.pdf.
[194] *Id.*
[195] *Id.*
[196] Times Editorial Board, *Editorial: L.A. Can Begin to Solve Its Affordable Housing Crisis in 2021*, L.A. TIMES (Feb. 28, 2021), https://www.latimes.com/opinion/story/2021-02-28/los-angeles-housing-element.
[197] *Id.*
[198] *Id.*

proposed including a measure on the upcoming ballot that would similarly update zoning rules. The proposed ballot states:

> The outdated zoning code [also] prevents the city from meeting the pressing and urgent demands it is faced with. The city has a critical lack of housing for all income levels, however the zoning code prevents new housing from being built in much of the city particularly in job and transit rich communities. An updated code will better allow the city to house its homeless population, take advantage of transit investments, and meet our state mandated Regional Housing Needs Assessment (RHNA) target of over 450,000 new homes by 2029.[199]

In October, Los Angeles must submit its updated Housing Element plan. It must identify land or properties that may be developed for 455,000 new units of housing, including 185,000 units for lower-income tenants. "Given the huge increase in units that L.A. needs to plan for," noted the Times Editorial Board, "the decisions leaders make this year on where to put these new homes will shape how the city grows over the coming decade—and determine whether Los Angeles can become a less segregated, more affordable and sustainable city."[200] The Housing Element plan presents a pivotal opportunity for the City and County to curtail structural racism by affirmatively promoting fair housing, as required under the law. But if new affordable housing is only concentrated in low-income communities where current zoning permits more dense structures, the City and County will not meet their responsibility to affirmatively promote fair housing. The Times Editorial Board challenged city officials to act to deconstruct structural racism in housing policy: "For the first time, Housing Element plans have to analyze housing inequality and try to reduce segregation and lack of opportunities in Black, Latino and lower-income communities. That means cities have to zone for more affordable housing in high-opportunity communities that have lots of jobs, good schools, transit stops, parks and other amenities. And if a city is going to put affordable housing developments in low-income communities, there has to

---

[199] Motion, Land Use Reform – Zoning Ballot Measure (Aug. 19, 2020), http://clkrep.lacity.org/onlinedocs/2020/20-1042_mot_08-19-2020.pdf.

[200] Times Editorial Board, *Editorial: L.A. Can Begin to Solve Its Affordable Housing Crisis in 2021*, L.A. TIMES (Feb. 28, 2021), https://www.latimes.com/opinion/story/2021-02-28/los-angeles-housing-element.

be an accompanying investment in infrastructure, schools and services that help lift up those neighborhoods." [201]

A report by a coalition of housing, social justice, and environmental groups found that nearly half of newly constructed units in Los Angeles between 2012 to 2019 were in lower-income communities. [202] Yet 90% of the new construction during that period is unaffordable to working-class tenants in Los Angeles. [203] By concentrating new housing initiatives in lower-income communities, older buildings are razed and replaced by higher cost units, further decreasing the availability of affordable living for tenants in those communities and driving gentrification. [204] The Times Editorial Board advocated for city officials to change the course of housing scarcity in Los Angeles through its upcoming Housing Element plan:

> The Housing Element is the means by which L.A. leaders can enact more equitable development policies. The City Council and Garcetti could direct new development toward affluent, high-opportunity communities that have been traditionally closed to denser, more affordable housing. They could allow small apartment buildings, townhomes and bungalow courts in single-family neighborhoods. They could adopt tenant protections and discourage redevelopment of rent-stabilized apartments. They could incentivize developers to include more affordable units in their new buildings. They could streamline permitting so it's easier and cheaper to build much-needed homes for all income levels. It shouldn't take state intervention to force L.A. to do what's desperately needed.[205]

With rising housing insecurity and an increasing death rate of unhoused persons on the streets of Los Angeles, never has there been so urgent of a need to utilize the Housing Element to restructure and reform the housing needs of our citizens.

---

[201] *Id.*
[202] *Id.*
[203] *Id.*
[204] *Id.*
[205] *Id.*

31

## B. PUBLIC STATEMENTS ON HOMELESSNESS

California Governor Gavin Newsom has recognized the housing crisis that has left hundreds of thousands of Californians on the streets. In his State of the State address to the California Legislature on February 19, 2020, Governor Newsom acknowledged that homelessness was a problem that had been growing for decades and was neglected or consciously set aside by past administrations. His words were a call to emergency action and an effort to provide the necessary resources to stop the loss of life and correct the inhumane conditions existing in the deprivation of humanity in homeless communities in California, thereby ensuring an acceptable quality of life for all. In Governor Newsom's words:

> Let's call it what it is, a disgrace, that the richest state in the richest nation— succeeding across so many sectors—is failing to properly house, heal, and humanely treat so many of its own people. Every day, the California Dream is dimmed by the wrenching reality of families, children and seniors living unfed on a concrete bed. Military veterans who wore the uniform of our country in a foreign land, abandoned here at home. LGBTQ youth fleeing abuse and rejection from their families and communities. Faces of despair. Failed by our country's leaders and our nation's institutions. As Californians, we pride ourselves on our unwavering sense of compassion and justice for humankind—but there's nothing compassionate about allowing fellow Californians to live on the streets, huddled in cars or makeshift encampments. And there's nothing just about sidewalks and street corners that aren't safe and clean for everybody. The problem has persisted for decades—caused by massive failures in our mental health system and disinvestment in our social safety net—exacerbated by widening income inequality and California's housing shortage. The hard truth is we ignored the problem. We turned away when it wasn't our sister, our brother, our neighbor, our friend. And when it was a loved one, help wasn't there. Most of us experienced homelessness as a pang of guilt, not a call to action. . . . It became normalized. Concentrated in skid rows and tent cities in big urban centers. Now it's no longer isolated. In fact, some of the most troubling increases have occurred in rural areas, in small towns, and remote parts of our state. No place is immune. No person untouched. And too often no one

32

wants to take responsibility. I've even heard local officials proclaim in public: it's not my problem. Servants of the public too busy pointing fingers to step up and help? That's shameful. The State of California can no longer treat homelessness and housing insecurity as someone else's problem, buried below other priorities which are easier to win or better suited for soundbites.[206]

Governor Newsom has turned his words into actions. In January 2019, the State of California sued the city of Huntington Beach for failing to comply with state housing laws in place to ensure the availability of affordable housing.[207] Later that year, $650 million in state funds were released directly to cities to address homelessness across the state.[208] Included in the state's 2020–21 budget was a 28-page overview of the Governor's homelessness plan.[209] At the beginning of the pandemic, in March 2020, an additional $150 million was directed to cities to protect Californians experiencing homelessness from COVID-19[210] and exempted the construction industry from his statewide stay-at-home order in recognition of the urgent need for housing projects to continue.[211] As an interim emergency response to the homelessness crisis, Governor Newsom also ordered the deployment of travel trailers to provide temporary housing for families experiencing homelessness.[212]

---

[206] Gov. Gavin Newsom, State of the State Address (Feb. 19, 2020), https://www.gov.ca.gov/2020/02/19/governor-newsom-delivers-state-of-the-state-address-on-homelessness/.

[207] Liam Dillon, *After Huntington Beach Lawsuit, Newsom Warns Cities He'll Continue Housing Law Crackdown*, L.A. TIMES (Feb. 19, 2019), https://www.latimes.com/politics/la-pol-ca-gavin-newsom-housing-cities-summit-20190219-story.html.

[208] Nicole Hayden, *Tired of Waiting for Federal Go-Ahead, California Gov. Newsom Releases Homeless Funding to Counties, Cities*, DESERT SUN (Dec. 4, 2019), https://www.desertsun.com/story/news/2019/12/04/california-gov-newsom-releases-homeless-funding-counties-and-cities/2610314001/.

[209] GABRIEL PETEK, LEGIS. ANALYST'S OFF., THE 2020–21 BUDGET: THE GOVERNOR'S HOMELESSNESS PLAN (2020), https://lao.ca.gov/Publications/Report/4152.

[210] *Governor Newsom Takes Emergency Actions & Authorizes $150 Million in Funding to Protect Homeless Californians from COVID-19*, OFF. OF GOV. GAVIN NEWSOM (Mar. 18, 2020), https://www.gov.ca.gov/2020/03/18/governor-newsom-takes-emergency-actions-authorizes-150-million-in-funding-to-protect-homeless-californians-from-covid-19/.

[211] Andrew Khouri, *As California Shelters at Home from Coronavirus, Construction of Housing Goes On*, L.A. TIMES (Mar. 21, 2020), https://www.latimes.com/homeless-housing/story/2020-03-21/coronavirus-construction-california-stay-at-home.

[212] *First Wave of Travel Trailers Delivered to South Los Angeles as Part of Emergency State Action on Homelessness*, OFF. OF GOV. GAVIN NEWSOM (Feb. 13, 2020), https://www.gov.ca.gov/2020/02/13/first-wave-of-travel-trailers-delivered-to-south-los-angeles-as-part-of-emergency-state-action-on-homelessness/.

In April 2020, the Governor set an initial goal of securing 15,000 rooms statewide through Project Roomkey, a program that deploys vacant motel rooms to serve as safe shelters for homeless individuals during the COVID-19 pandemic.[213] In November 2020, an additional $62 million of state funds were committed to counties across the state to continue providing shelter to Project Roomkey participants.[214] And in July 2020, Governor Newsom announced the availability of $600 million in funding for Project Homekey, an initiative to convert hotels, motels, vacant apartment buildings, and other properties into permanent, long-term housing for people experiencing or at risk of homelessness.[215] By the end of 2020, Project Homekey had consumed $846 million in state funds to purchase and subsidize 6,029 housing units statewide.[216]

But despite these state-led efforts, at least 1,383 people experiencing homelessness died on the streets of Los Angeles County in 2020, a figure that likely underestimates the true death toll.[217] As a direct result of local government inaction and inertia in the face of a rapidly escalating crisis, 165 homeless people died in January 2021 alone—a 75.5% increase compared to January 2020.[218] Each day, while the City and County of Los Angeles stand by, allowing bureaucracy to upstage the needs of their constituents, five more people experiencing homelessness die in Los Angeles County.[219] For years, "many efforts to build

---

[213] *At Newly Converted Motel, Governor Newsom Launches Project Roomkey: A First-in-the-Nation Initiative to Secure Hotel & Motel Rooms to Protect Homeless Individuals from COVID-19*, OFF. OF GOV. GAVIN NEWSOM (Apr. 3, 2020), https://www.gov.ca.gov/2020/04/03/at-newly-converted-motel-governor-newsom-launches-project-roomkey-a-first-in-the-nation-initiative-to-secure-hotel-motel-rooms-to-protect-homeless-individuals-from-covid-19/; Marisa Kendall, *How California Used COVID to Create Housing. A Top Newsom Adviser Weighs In*, MERCURY NEWS (Mar. 21, 2021), https://www.mercurynews.com/2021/03/21/how-california-used-covid-to-create-housing-a-top-newsom-adviser-weighs-in/.

[214] *Governor Newsom Announces Emergency Allocation of $62 Million to Local Governments to Protect People Living in Project Roomkey Hotels*, OFF. OF GOV. GAVIN NEWSOM (Nov. 16, 2020), https://www.gov.ca.gov/2020/11/16/governor-newsom-announces-emergency-allocation-of-62-million-to-local-governments-to-protect-people-living-in-project-roomkey-hotels/.

[215] *Governor Newsom Announces Release of $147 Million in Fourth Round of Homekey Awards*, OFF. OF GOV. GAVIN NEWSOM (Oct. 9, 2020), https://www.gov.ca.gov/2020/10/09/governor-newsom-announces-release-of-147-million-in-fourth-round-of-homekey-awards/.

[216] *Governor Newsom Announces Major Homekey Milestone: All 94 Sites Closing Escrow Ahead of Deadline*, OFF. OF GOV. GAVIN NEWSOM (Dec. 29, 2020), https://www.gov.ca.gov/2020/12/29/governor-newsom-announces-major-homekey-milestone-all-94-sites-closing-escrow-ahead-of-deadline/.

[217] Dkt. 241-1 at 1.

[218] *Id.*

[219] *Id.*

34

housing have been stymied by resistance at the local level — mayors, supervisors and their constituents."[220] This must stop now.

L.A.'s homeless population has been steadily increasing, according to data produced by LAHSA. In 2020, LAHSA reported a 12.7% increase in the rate of people experiencing homelessness in Los Angeles County and a 16.1% increase in the homelessness rate in the City of Los Angeles compared to 2019.[221] The COVID-19 pandemic has only exacerbated L.A.'s homelessness crisis. A recent report by the Economic Roundtable projects that the homelessness rate among working age adults in L.A. will increase by 86% by 2023 due to pandemic-related job losses.[222]

Throughout his nearly eight years as Mayor of Los Angeles, Eric Garcetti has publicly acknowledged the crisis created by the rising rates of homelessness in his city.

In his 2017 State of the City address, Mayor Garcetti said:

In the last year, we campaigned for historic investments … and we won. Now, armed with the people of Los Angeles behind us, and new resources to propel us, it's time to deliver historic change. . . . I remember a time when homelessness was mostly concentrated in Skid Row. Today, there are people without shelter in just about every neighborhood. I am outraged when there are Angelenos who can't escape the cold rain. Horrified when someone who has worn our country's uniform is begging for change on the corner. I recently talked with a friend who told me her children have grown up seeing the tents in our communities — they think it's just a normal part of Los Angeles. . . . We can't accept that. We won't. . . . But the problem persists. That's why we wrote Measure HHH. That's why we fought hard to pass Measure H … so we could generate $355 million dollars a year to expand mental health, substance abuse, and employment services across the County—getting people off the streets, on track, and into homes of their very own. And thanks to the voters who passed it, we're going to more than

---

[220] Thomas Fuller, *California Governor Declares Homeless Crisis 'A Disgrace,'* N.Y. TIMES (Feb. 19, 2020), https://www.nytimes.com/2020/02/19/us/california-homeless.html.
[221] Dkt. 241-1 at 1.
[222] Dkt. 239 at 1 n.2.

triple our production of permanent supportive housing in the next two years.[223]

In his 2018 State of the City address, Mayor Garcetti said:

And people don't want to go to the other side of the city to sleep in it. Now that Measure H dollars are flowing, we can finally bring relief to people where they are. It's time for tents to come down in our neighborhoods. . . . This week, thanks to this City Council, we will put in place an emergency shelter crisis declaration — so that we can build shelters across L.A. as quickly as possible.[224]

And in 2019, Mayor Garcetti said:

Fighting homelessness is not for the faint of heart. This is tough work. And like you, I'm frustrated with any encampment on any sidewalk in our city. Too many of us still see tents in our neighborhoods … or a man sleeping on our corner who still hasn't gotten the help he needs. And I'm impatient … tired of how long it's taking to make a real dent in this crisis. But I am not, and we are not, turning away from this — we're pushing forward. And based on the evidence … the money that's been invested ... the new hires that have just been made … the time we've dedicated — I know that things will turn around. . . . So, yes: Some days I'm frustrated. But I'm passionate about this. There's no issue I work on more deeply than homelessness … and I can tell you this: we will get there. We will get there. . . . But I am here to tell you that in this coming year, we will start seeing a difference on our sidewalks and in our communities. We have nearly $5 billion dollars to spend on our work. . . . I see homelessness … public safety … equity … infrastructure … and so many other issues through the eyes of my 7-year-old daughter, Maya. What does Los Angeles look like to children in her generation now, as they're growing up? And how will it look when they're grown up, and starting their own families?[225]

---

[223] Eric Garcetti, Mayor of L.A., State of the City (Apr. 19, 2017), https://www.lamayor.org/state-city-2017.
[224] Eric Garcetti, Mayor of L.A., State of the City (Apr. 16, 2018), https://www.lamayor.org/SOTC2018.
[225] Eric Garcetti, Mayor of L.A., State of the City (Apr. 17, 2019), https://www.lamayor.org/state-city-2019.

And finally, in 2020, Mayor Garcetti averred that he had "called for a FEMA-level response to our homelessness crisis almost two years ago, and it took this virus to finally get the federal funding to begin to make it happen."[226] Despite acknowledgements by City and County officials, promises to the citizens of Los Angeles regarding the homelessness crisis have been made and broken year after year. Los Angeles City and County have never taken the most powerful step: declaring this an emergency.[227]

### C. EMERGENCY POWERS FOR AN EMERGENCY SITUATION

Los Angeles City Charter Sec. 231 and Los Angeles Administrative Code Sec. 8.22

> empower the Mayor of the City of Los Angeles to proclaim the existence or threatened existence of a local emergency when an occurrence which by reason of its magnitude is or is likely to become beyond the control of the normal services, personnel, equipment, and facilities of the regularly constituted branches and departments of the City government.[228]

To this day, Mayor Garcetti has not employed the emergency powers given to him by the City Charter despite overwhelming evidence that the magnitude of the homelessness crisis is "beyond the control of the normal services" of the City government. An emergency declaration under the City Charter would give the Mayor the power to "promulgate, issue and enforce rules, regulations, orders and directives which the [Mayor] considers necessary for the protection of life and property."[229] These rules would be effective immediately upon their issuance, allowing Mayor Garcetti to bypass the bureaucracy and eliminate the inefficiencies

---

[226] Eric Garcetti, Mayor of L.A., State of the City (Apr. 19, 2020), https://www.lamayor.org/SOTC2020.

[227] A "FEMA-level response" is not an emergency declaration. An emergency declaration allows the city to bypass bureaucracy. *See infra* Section C. Emergency Powers for an Emergency Situation.

[228] Dkt. 205 at 3.

[229] L.A. Charter, Sec. 8.29.

that currently stifle progress on homelessness—still, the Mayor has not acted, while other localities have.[230]

The City also has a second avenue for leveraging its emergency powers, but there, too, there seems to be a crisis on inaction. California State Government Code 8698–8698.2 gives counties and cities broad powers to declare a shelter crisis and provide emergency shelter and housing to the homeless during the duration of the state of emergency.[231] In 2015, Mayor Garcetti and Los Angeles City Council members introduced a motion to declare a state of emergency on homelessness "as it relates to a shelter crisis," but the motion was never acted upon.[232] The motion called L.A.'s homelessness crisis "unprecedented and growing" and said that the City was "facing a state of emergency," requiring "immediate action" and "immediate relief"—"extraordinary steps must be taken to make it build and locate a broad range of housing options; including temporary housing options, emergency shelters, and safe and legal parking areas for individuals who may live in their vehicles." [233] It further declared that "the City of Los Angeles should take full advantage of its emergency authority to provide and incentivize shelter to those whose lives and health are at risk by living on the streets." [234]

Commenting on the lack of movement eight weeks after the 2015 motion was first introduced, the Los Angeles Times Editorial Board wrote, "this whole process has been more of a turgid civics debate than an urgent response to a desperate situation."[235] Despite the City's acknowledgment that it had "willing partners at every level" and that the emergency "require[d] strong and immediate action by the city of Los Angeles," [236] the Times continued, "the supposed state of emergency proclaimed almost two months ago is looking increasingly look like a

---

[230] Other locales— including Portland, Oregon; Seattle and King County, Washington; and Hawaii—have declared states of emergency related to rising homelessness. Commenting on the decision to declare a state of emergency in his county, King County, Washington Executive Dow Constantine said, "[t]he persistent and growing phenomenon of homelessness—here and nationwide—is a human-made crisis, just as devastating to thousands as a flood or fire." J.B. Wogan, *Why Governments Declare a Homeless State of Emergency*, GOVERNING (Nov. 10, 2015), https://www.governing.com/archive/gov-when-cities-declare-a-homeless-state-of-emergency.html.

[231] Motion, State of Emergency – Homelessness and Poverty Housing (Sept. 22, 2015) [hereinafter 2015 Motion].

[232] Times Editorial Board, *Editorial: What Happened to L.A.'s State of Emergency on Homelessness?*, L.A. TIMES (Nov. 17, 2015), https://www.latimes.com/opinion/editorials/la-ed-1117-homeless-emergency-20151117-story.html.

[233] 2015 Motion, *supra* note 231.

[234] *Id*.

[235] Times Editorial Board, *Editorial: What Happened to L.A.'s State of Emergency on Homelessness?*, L.A. TIMES (Nov. 17, 2015), https://www.latimes.com/opinion/editorials/la-ed-1117-homeless-emergency-20151117-story.html.

[236] 2015 Motion, *supra* note 231.

farce and a waste of time" and concluded, "enough with the hype and the mere pretense of urgency."[237]

In the intervening years, the City eventually went on to declare a shelter crisis under the state code, but the shelter crisis declaration has proven to be nothing more than empty words.[238] Homeless individuals continue to die in record numbers; the homeless population continues to grow; and government inertia continues to plague already insufficient relief efforts. Six years after the words were written, the Times Editorial Board's proclamation that the shelter crisis declaration was a "farce and a waste of time" continue to ring true. It is clear that Mayor Garcetti can draw on his power to declare a local emergency under the Los Angeles City Charter in order to make progress towards solving the homelessness crisis.

In a September 2019 editorial in the Los Angeles Daily News, Los Angeles City Councilmember Joe Buscaino called on the California governor to declare a state of emergency on homelessness, writing: "In our response to the homelessness crisis, the city, the county, and the state are obeying every speed limit and stopping at every red light…. We need to give our dedicated civil servants the ability to respond to this emergency Code 3, just like cops and firefighters, and bypass the normal rules that add precious days, weeks, and months to contracting and construction timelines." [239] While the City has tried to shift responsibility onto the state for declaring an emergency, the real power remains with the Mayor and the City Council.

The global community has recognized the shameful plight of the richest state in one of the richest countries in the world while it languishes in indecision. UN Special Rapporteur on Extreme Poverty and Human Rights Philip Alston has called out Los Angeles for lagging behind other American cities in tackling homelessness.[240] Specifically addressing his visit to Skid Row and the attitudes of public authorities in Los Angeles, the Special Rapporteur wrote that "[r]ather than responding to homeless persons as affronts to the senses and to their

---

[237] Times Editorial Board, *Editorial: What Happened to L.A.'s State of Emergency on Homelessness?*, L.A. TIMES (Nov. 17, 2015), https://www.latimes.com/opinion/editorials/la-ed-1117-homeless-emergency-20151117-story.html.
[238] L.A., CAL. ORDINANCE 185,490.
[239] Joe Buscaino, *It's Time to Declare a State of Emergency on Homelessness*, L.A. DAILY NEWS (Sept. 24, 2019), https://www.dailynews.com/2019/09/24/its-time-to-declare-a-state-of-emergency-on-homelessness-joe-buscaino/.
[240] Gale Holland, *U.N. Monitor Says L.A. Lags Behind Other Cities in Attacking Homelessness*, L.A. TIMES (Dec. 5, 2017), https://www.latimes.com/local/lanow/la-me-ln-un-monitor-skid-row-20171215-story.html.

neighborhoods, citizens and local authorities should see in their presence a tragic indictment of community and government policies."[241] The Special Rapporteur continued, commenting on the people he met in Skid Row who were "barely surviving" and concluding that "[h]omelessness on this scale is far from inevitable."[242] Leilani Farha, UN Special Rapporteur on Housing, also remarked that the homelessness crisis makes "you almost forget you're in Los Angeles."[243] The New York Times has reported that "[n]early half of all unsheltered people in the United States live in California, though the state accounts for just 12% of the U.S. population."

Still, calls for action have been met only with a persistent failure to muster political will, resulting in an abdication of the government's duty to protect its constituents.

## D. GOVERNMENT INACTION

Elected officials at both the state and local level have long been aware of L.A.'s urgent homelessness crisis. In recent court filings, the County of Los Angeles called homelessness "an extraordinarily complex problem that demands a multi-faceted approach and active, sustained collaboration" among government officials.[244] The City of Los Angeles acknowledged that the "crisis of homeless is among the great challenges facing our region"[245] In a 2019 interview, Mayor Garcetti referred to homelessness as "the humanitarian crisis of our lives,"[246] a characterization echoed by Hilda Solis, chair of the County Board of Supervisors, in 2020.[247] Heidi Marston, Executive Director of the Los Angeles Homeless

---

[241] *Statement on Visit to the USA, by Professor Philip Alston, United Nations Special Rapporteur on Extreme Poverty and Human Rights*, U.N. HUM. RTS. OFF. OF THE HIGH COMM'R (Dec. 15, 2017), https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=22533.

[242] *Id.*

[243] Charles David, *UN Housing Official Shocked by L.A.'s Homelessness*, CAPITAL & MAIN (Jan. 25, 2018), https://capitalandmain.com/united-nations-housing-official-shocked-los-angeles-homelessness-0125.

[244] Dkt. 235 at 6.

[245] Dkt. 242 at 1.

[246] *LA Mayor Eric Garcetti Calls Homelessness The 'Humanitarian Crisis Of Our Lives'*, NPR (Sept. 21, 2019), https://www.npr.org/2019/09/21/763073646/l-a-mayor-eric-garcetti-calls-homelessness-the-humanitarian-crisis-of-our-lives.

[247] *Innovative and Rapid Construction of Housing to Alleviate Homelessness to Launch at Former Jail Site*, HILDA SOLIS (Sept. 29, 2020), https://hildalsolis.org/innovative-and-rapid-construction-of-housing-to-alleviate-homelessness-to-launch-at-former-jail-site/.

Services Authority, has called homelessness "an emergency on our streets . . . [requiring] an emergency response."[248] And yet, City and County officials are content to pay soundbite lip service instead of declaring an emergency and taking steps to correct the problems that plague their communities.

California's homeless population has steadily risen since 2007.[249] The sharpest increase took place over the last two years, marking a 24.3% increase from 2018 to 2020.[250] A March 2021 federal report shows that California's homeless population increased by nearly seven percent in early 2020 to an estimated 161,548—months before COVID-19 emerged and the subsequent economic crisis hit the state.[251] Despite frequent acknowledgments of the emergency nature of homelessness in LA, City and County efforts to address the problem continue to be mired in corruption and plagued by a lack of transparency.

### i. No Functionality - Corruption, Bureaucracy, and Inadequacy

In February 2021, at the Los Angeles Business Council's Mayoral Housing, Transportation and Jobs Summit, city officials spoke about the inadequacy of current efforts to combat homelessness. City Councilmember Mike Bonin declared, "let's just be absolutely candid here—there's almost nobody in the city of Los Angeles, housed or unhoused, who would give what's happening in Los Angeles [anything] other than a failing grade."[252] Bonin further suggested that the structure of L.A.'s government was "not designed for a crisis of this proportion."[253] Fellow Councilmember Kevin de León continued, "By any objective measurement, the current status quo is dysfunctional, it's highly disjointed, the systems are completely misaligned."[254]

---

[248] Rob Hayes, *LA Homelessness Authority Calls for Government to Treat Homelessness Crisis with Same Urgency as Natural Disaster*, ABC7 (Feb. 19, 2020), https://abc7.com/los-angeles-homeless-services-agency-lahsa-homelessness-in-california/5945026/.

[249] Chris Nichols, *California's Homeless Population Rose 7% To 161,000 Ahead Of The Pandemic, New Report Finds*, CAPRADIO (Mar. 19, 2021), https://www.capradio.org/articles/2021/03/19/californias-homeless-population-rose-7-to-161000-ahead-of-the-pandemic-new-report-finds/.

[250] *Id.*

[251] *Id.*

[252] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.

[253] *Id.*

[254] *Id.*

The disconnect between politicians' public statements about the severity of this crisis and the actual efforts made to fund effective solutions is growing. Recent investigations into City-funded housing projects for the homeless demonstrate that a lack of government oversight has allowed the proliferation of corruption. In at least two separate instances with two different developers, reports indicate that developers of taxpayer-funded affordable housing projects have purchased properties before turning around and reselling those properties to themselves at higher prices in order to artificially inflate their project budgets and, in turn, the amount of public money that they receive. In the case of a partly renovated motel in L.A.'s Westlake neighborhood, developers were able to increase the project's budget by $8 million through this process of reselling.[255] According to reporting by KCRW, "most of the more than $30 million pumped into the renovation of this rundown motel has gone to its former owners, who, right before the sale, were sued by public interest attorneys for illegally evicting tenants."[256] In another case near Koreatown, a similar reselling process was used by a different developer to artificially inflate the budget by $6 million.[257]

These cases, of which there are almost certainly more to be discovered, indicate that the city has turned a blind eye to corruption as money is being siphoned off from funds that taxpayers voted to allocate to the homeless population.

The improper relationship between City Hall and real estate developers is neither isolated nor new. The FBI has been investigating possible corruption in City Hall since 2017, a probe that has led to the prosecution of real estate consultants, political fundraisers, and even, most notably, former Councilmember Jose Huizar, whose council district included Skid Row.[258] In June 2020, Huizar was arrested by federal agents for using his position to cover up illegal activities

---

[255] Anna Scott, *How a City-Funded Homeless Housing Project Became a Sink Hole for Public Money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/news/shows/greater-la/hhh-motel-george-gascon/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la.

[256] *Id.*

[257] *Id.*

[258] David Zahniser, Emily Alpert Reyes, & Joel Rubin, *L.A. City Councilman Jose Huizar charged in federal corruption probe*, L.A. TIMES (June 23, 2020) https://www.latimes.com/california/story/2020-06-23/jose-huizar-arrest-corruption-city-hall-fbi-investigation; Donna Evans, *$3.7 Million Plan Proposed to Clean Up Skid Row*, DT NEWS (Apr. 8, 2014) http://www.ladowntownnews.com/news/3-7-million-plan-proposed-to-clean-up-skid-row/article_e25e730a-bf51-11e3-ac54-0019bb2963f4.html.

such as accepting bribes from real estate developers,[259] and the Los Angeles Times has reported that "[i]nvestigators said Huizar reduced the amount of affordable housing required inside the development after receiving key financial benefits…."[260] The FBI investigation and subsequent arrests, indictments, and prosecutions makes clear that corruption inside City Hall is directly linked to the lack of affordable housing in the City and, by extension, the homelessness crisis.

At the February 2021 Mayoral Summit, Councilmember Mark Ridley-Thomas said, "We have to be smarter, we have to work harder, and we have to run a lot faster . . . If in fact we expect to make a difference over the next five years, it will require that which is conspicuously absent in this environment—and that is leadership . . . collective leadership."[261] Recognizing the purely symbolic nature of the collaboration between City Hall and the Board of Supervisors, Councilmember Ridley-Thomas continued, "we are overdue in terms of getting our act together."[262] Councilmember Ridley-Thomas' words echo an article on homelessness in the Los Angeles Times more than 30 years ago. In 1985, the Times wrote: "It is time for leadership from both the mayor's office and the county Board of Supervisors to pull all the players together in one room and lock the door until they have assigned tasks to start finding land and money for shelters, with deadlines for doing so. . ."[263]

### ii.   No Accountability - Missed Targets and Suspended Deadlines

---

[259] Libby Denkmann, *Timeline: Follow The FBI's Sweeping LA City Hall Corruption Investigation Through The Years*, LAIST (May 18, 2020), https://laist.com/2020/05/18/los-angeles-city-hall-fbi-corruption-investigation-timeline-englander-huizar.php.

[260] David Zahniser, *Downtown Developer Will Pay $1.2 Million in L.A. City Hall Corruption Case*, L.A. TIMES (Jan. 7, 2021), https://www.latimes.com/california/story/2021-01-07/downtown-developer-will-pay-1-2-million-in-l-a-city-hall-corruption-case.

[261] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.

[262] *Id*.

[263] *Help the Homeless*, L.A. TIMES (Jan. 8, 1985), https://www.latimes.com/archives/la-xpm-1985-01-08-me-7426-story.html.

Four years ago, Los Angeles voters passed Proposition HHH, a $1.2 billion bond to fund housing projects aimed at the city's homeless population.[264] After three years of missed deadlines, the first HHH project, providing just 62 housing units, opened in January 2020.[265] At the project's unveiling, the Mayor announced, "This year, we will see an opening of one of these about every three weeks. My calculations, next year it might be every two weeks or less."[266] Over a year later, just seven projects containing 489 total units, had been completed.[267] By then, the City was four years into a ten-year project, but progress lagged far behind projections.

"Where has this money gone?" asked Anna Scott of National Public Radio member station KCRW.[268] The initial public campaign for Proposition HHH planned for 10,000 housing units to be completed in 10 years, promising significant relief to the City's unhoused population. However, progress continues to lag behind promises. At the current rate, it will take nearly 30 years to build enough housing for over 66,000 people currently experiencing homelessness—an estimate that doesn't even account for the fact that the homelessness rate is growing exponentially every year.[269] Moreover, while the average cost of a custom home in L.A. starts at $350,000, more than 28% of Proposition HHH units in construction exceed $600,000 per unit.[270]

Ron Miller, Executive Secretary of the Los Angeles/Orange Counties Building and Construction Trades Council, was a major proponent of Proposition HHH, but recently questioned in a letter to Los Angeles City Attorney Mike Feuer why action has not been taken to quell the "abuses that seem to be occurring under HHH."[271] Miller referenced reports "alleging everything from fake not-for-profits

---

[264] Doug Smith, *It Took Three Years of Blown Deadlines, But L.A. Opens Its First Homeless Housing Project*, L.A. TIMES (Jan. 7, 2020), https://www.latimes.com/california/story/2020-01-07/homeless-housing-project-proposition-hhh-bond-measure.

[265] *Id.*

[266] *Id.*

[267] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/?fbclid=IwAR1-8puudDizHhoHVpYCVef_qsxHPEjFGmMKohY8yhzpycX-fGiIXKphao8.

[268] Anna Scott, *How a City-Funded Homeless Housing Project Became a Sink Hole for Public Money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/news/shows/greater-la/hhh-motel-george-gascon/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la.

[269] Dkt. 239 at 23.

[270] *Id.*

[271] Letter from Ron Miller, Exec. Sec'y, L.A./Orange Cntys. Bldg. & Constr. Trades Council, to Mike Feuer, L.A. City Att'y (Dec. 17, 2020) [hereinafter Miller Letter].

to contractors with zero employees and multi-million dollar development fees, and lucrative guaranteed managements fees that support zero-risk development." [272] Miller asked City Attorney Feuer why "there has been virtually no general call to action to publicly disclose and discuss the amount of money that is being made by developers or needed background investigation on entities applying for HHH funding."[273] Even beyond the damage it's done to the homeless community and those facing housing insecurity, these issues are also hurting the construction community.

Los Angeles City Controller Ron Galperin has also highlighted the problems undergirding HHH projects. In an article for the Los Angeles Daily News on March 14, 2021, Galperin wrote:

> What's the problem with HHH? The projects are too expensive and too slow to make a meaningful difference for people living on our streets. As of this month, 489 bond-funded units are ready for occupancy and most others won't be finished until 2023, 2024 or later. While Los Angeles someday will see thousands of new units, it will be nowhere near enough to keep pace with the crisis in our neighborhoods.[274]

Examining the causes of the excessive delays and skyrocketing costs that have plagued HHH projects to date, Galperin went on:

> Spools of red tape and excessive development costs contributed to this mess. As Los Angeles Controller, the HHH ballot language mandates my office to audit the program's finances yearly, and the City Charter allows us to examine its performance. We found in 2019 and 2020 that the high cost of building permanent supportive housing had slowed HHH to a crawl. Having to cobble together money from multiple funding sources and a serpentine permitting process made it so that developers couldn't get their projects approved quickly. Instead of churning out units at $350,000 each as

---

[272] *Id.*

[273] *Id.*

[274] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/?fbclid=IwAR1-8puudDizHhoHVpYCVef_qsxHPEjFGmMKohY8yhzpycX-fGiIXKphao8.

45

originally predicted, the average per unit cost is now $531,000 — with some eclipsing $700,000. . . . If the City worked harder to bring costs down, it could use more money to fund additional housing units and extend HHH's reach.[275]

Further, even though Governor Newsom specifically exempted construction work from his statewide stay-at-home orders, Mayor Garcetti ordered "all benchmarks and deadlines pertaining to current HHH projects [to be] indefinitely suspended" as of April 2020.[276] Without these deadlines, Los Angeles residents have no way to hold the City accountable for its promises to create sustainable solutions to homelessness. And this complete lack of accountability has consequences—in the four years since Proposition HHH was passed, 5,814 homeless people have died on the streets of Los Angeles.[277] Homeless deaths have increased to at least five deaths per day, and while the homeless have perished on our streets, only 489 housing units have been produced in the four years of HHH funding.

Proposition HHH provided funds to be used in three types of housing: 1) supportive housing for homeless individuals where health and other services would be provided, 2) temporary shelters and facilities, and 3) affordable housing.[278] Nevertheless, the City "unilaterally decided to spend the vast majority of the funding on supportive housing," allocating only five percent of the total Proposition HHH budget to interim shelter and facilities projects.[279] The deadly decision to prioritize long-term housing at the expense of committing funds to interim shelters has caused few to be housed while tens of thousands of people are left in the street. This allocation of resources has significantly benefited a relative few and sentenced the vast majority of our homeless population to living under circumstances that are clearly unacceptable in a civilized society. This decision also caused the quality of life for all residents of the City and County to deteriorate at an alarming rate.

City Controller Galperin recently called for a "pandemic pivot" in his recent Los Angeles Daily News Article:

---

[275] *Id.*
[276] Dkt. 265 at 23.
[277] *Id.*
[278] Dkt. 239 at 21.
[279] *Id.*

Money set aside for questionable or excessively expensive projects should be reallocated to less costly and time-consuming plans. Until recently, there had been little openness to such ideas at City Hall, but two of L.A.'s newest Councilmembers have embraced my office's recommendations. They want the City to scrutinize troubled projects to see if a greater share of HHH funds can be used to build housing faster and cheaper. Building more interim housing to address immediate needs, and expanding the use of cheaper, faster permanent housing solutions to achieve long-term goals — like motel conversions and prefabricated and modular units — can and should be done through HHH. It's time for the City to do a pandemic pivot. The residents of Los Angeles, unhoused and housed, deserve a more flexible approach to homeless housing — one that gets people off the streets today and creates an even greater number of supportive units in the days to come.[280]

In a further effort to exacerbate this crisis, the City also announced in March 2021 that it would ramp down Project Roomkey, Governor Newsom's program to converted unused hotel rooms into temporary shelters for unhoused people during the COVID-19 pandemic.[281] Just a month earlier, in February 2021, the Los Angeles Business Council, representing 500 L.A. businesses and civic leaders, had urged the City to expand Project Roomkey to include 15,000 hotel rooms.[282] "Opportunities like this don't come along often. We must take full advantage of it," the Los Angeles Business Council (LABC) wrote to Mayor Garcetti.[283] "Thus, we urge you to act fast to explore options for renting vastly more hotel and motel

---

[280] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/?fbclid=IwAR1-8puudDizHhoHVpYCVef_qsxHPEjFGmMKohY8yhzpycX-fGiIXKphao8.

[281] Elizabeth Chou, Expanding Project Roomkey to Shelter Homeless Angelenos 'Unfeasible,' LA County Officials Say, L.A. DAILY NEWS (Mar. 8, 2021), https://www.dailynews.com/2021/03/08/expanding-project-roomkey-to-shelter-homeless-angelenos-unfeasible-la-county-officials-say/; Benjamin Oreskes & Dakota Smith, *L.A. County Won't Expand Program to Shelter Homeless People in Hotels*, L.A. TIMES (Mar. 5, 2021), https://www.latimes.com/homeless-housing/story/2021-03-05/l-a-county-wont-expand-program-to-shelter-homeless-people-in-hotels.

[282] *L.A. Business Council Calls for Significant Expansion of Project Roomkey for Homeless*, L.A. DAILY NEWS (Feb. 20, 2021), https://www.dailynews.com/2021/02/20/l-a-business-council-calls-for-significant-expansion-of-project-roomkey-for-homeless/.

[283] *LABC Leaders Call on Mayor Garcetti and City Council to Pursue 15,000 Room Goal for Project Roomkey*, LABC (Feb. 19, 2021), https://labusinesscouncil.org/labc-leaders-call-on-mayor-garcetti-and-city-council-to-pursue-15000-room-goal-for-project-roomkey/.

rooms and bringing our unhoused Angelenos safely indoors."[284] City Attorney Mike Feuer also called himself a "strong supporter of the LABC's proposal today that there be 15,000 new beds under Project Roomkey."[285]

While the City cited budget constraints as the key factor in its decision, according to the Los Angeles Times, "local, state and federal officials say the city hasn't requested reimbursement from the Federal Emergency Management Agency (FEMA) for portions of the estimated $59 million it has spent on Project Roomkey" to date.[286] Shayla Myers, an attorney for the Legal Aid Foundation of Los Angeles has said, "there is federal money on the table—the literal FEMA response the mayor has been begging for, and yet the City has found excuse after excuse not to take advantage of it."[287] Mary Leslie, president of the Los Angeles Business Council, called the City's failure to apply for reimbursement despite their purported budget constraints "disturbing and inexcusable" and stated that the City's inaction is "costing the most vulnerable people their lives."[288] While under the Trump administration, the federal government reimbursed only 75% of costs under Project Roomkey, the Biden administration recently increased the reimbursement rate to 100%.[289]

In justifying the delayed reimbursement applications, City Administrative Officer Rich Llewellyn said, "essentially our billing department needs more assistance to get the money back."[290] In response, the Los Angeles Business Council said that "if it's really a matter of filling out paperwork, the LABC is perfectly willing to organize an army of volunteers to go down to City Hall."[291] With only 42% of local hotel rooms occupied on any given day, the City could use the FEMA reimbursement money to shelter tens of thousands of at-risk people living on the streets of L.A.[292]

---

[284] *Id.*

[285] *Id.*

[286] Benjamin Oreskes & Dakota Smith, *L.A. Is Entitled to Federal Aid to Put Homeless People in Hotels. It Hasn't Asked for Any Yet*, L.A. TIMES (Mar. 3, 2021), https://www.latimes.com/homeless-housing/story/2021-03-03/la-slow-submit-fema-aid-paperwork-homeless-hotels.

[287] *Id.*

[288] *Id.*

[289] *Id.*

[290] *Id.*

[291] *Id.*

[292] Adam Mahoney, *Occupy Hotel Rooms: Inside LA's New Push to Solve Homelessness*, GRIST (Mar. 10, 2021), https://grist.org/justice/fema-project-roomkey-homelessness-los-angeles/.

"Quite frankly, . . . our treasury usually has a balance of around 10-ish billion dollars," stated Los Angeles City Controller Ron Galperin on April 15, 2021. "There are ways that we can front the money for something," Galperin continued. Critiquing the standstill based on budget shortfalls, Galperin said "the point that I've made repeatedly to others in the City is that if the issue is cash flow . . . we can solve that cash flow issue. That should not be the impediment."[293]

### iii.    No Plan for the Future

In his 2020 State of the State address, California Governor Gavin Newsom declared, "the State of California can no longer treat homelessness and housing insecurity as someone else's problem, buried below other priorities which are easier to win or better suited for soundbites."[294] The Governor's efforts to address homelessness include deploying emergency mobile housing trailers for homeless families, securing FEMA reimbursement for Project Roomkey, and making available state property for homelessness solutions. Still, despite these efforts by the State to provide aid to the City and County, 165 homeless persons died in January 2021.[295] In February 2021, at least another 105 homeless people died in Los Angeles County.[296] A minimum of 270 homeless people have died in 2021—a 49% increase compared to this same time in 2020.[297] At a recent Court hearing in City Hall, General Jeff Page, a leading activist and Skid Row resident said, "[W]hen we think of City Hall, where we are right now, it's on the northwest corner of 1st and Main. The most northern corner of Skid Row is 3rd and Main, which is two blocks from here. And so, you know, we can actually look out the window and see homelessness out of every single direction—north, south, east, and west—of the building."[298]

---

[293] People's City Council – Los Angeles (@PplsCityCouncil), Twitter (Apr. 15, 2021, 6:33 PM), https://twitter.com/pplscitycouncil/status/1382869701852729348?s=21.

[294] Gov. Gavin Newsom, State of the State Address (Feb. 19, 2020), https://www.gov.ca.gov/2020/02/19/governor-newsom-delivers-state-of-the-state-address-on-homelessness/.

[295] Ethan Ward, *They Were Homeless, Now They're Dead*, CROSSTOWN (Feb. 10, 2021) https://xtown.la/2021/02/10/homeless-deaths-los-angeles/.

[296] Rev. Andy Bales (@abales), TWITTER (Mar. 8, 2021, 7:36 PM), https://twitter.com/abales/status/1369130010884198400.

[297] *Id*.

[298] Dkt. 165 at 172–73.

Despite Governor Newsom's warning against deprioritizing homelessness and the clear evidence of an exponentially growing crisis in Los Angeles, City Councilmember Mark Ridley-Thomas criticized City inaction at the February 2021 Mayoral Summit, saying, "the issue of homelessness is of insufficient importance to the decision makers in this region. Therefore, we have this languishing set of circumstances where we chase our tails, day in and day out, claiming that we're doing things."[299] Councilmember de Leon agreed: "We need a real plan—a north star."[300] He later continued, "There is a dissonance, there is a disconnection with the governmental rhetoric and what is happening on our streets every single day in Los Angeles."[301] While Defendants tout their commitment to "build 10,000 permanent supportive housing units" through Proposition HHH, the ongoing delays with Proposition HHH projects, failure to apply for FEMA funding, and ramp down of Project Roomkey demonstrate that the City and County lack the political courage to confront the fierce urgency of now, just when the citizens need solutions the most. With no clear plan of how to move forward, fellow Councilmember Mike Bonin echoed Ridley-Thomas: "The only way we can respond to this is . . . we need the Court's help."[302] Panel moderator Miguel Santana concluded: "I'm hoping that five years from now we're not having this conversation. I don't know about you, but I'm kind of tired of having it. But something tells me we are."[303]

On March 11, 2021, President Biden signed a historic $1.9 trillion COVID-19 relief bill that provided direct funding to states and cities. The City of Los Angeles was expected to receive $1.35 billion of that money, with $1.9 billion going to the County as a whole, leaving Mayor Garcetti "ecstatic."[304] Michael Weinstein, President of the AIDS Healthcare Foundation, commented on the potential uses of that money, saying "the federal money coming to Los Angeles presents a tremendous opportunity for L.A. to finally and meaningfully end our

---

[299] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.
[300] *Id*.
[301] *Id*.
[302] *Id*.
[303] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.
[304] David Zahniser, Dakota Smith & Julia Wick, *L.A. Expects to Receive $1.35 Billion from the Relief bBll. Garcetti Is 'Ecstatic'*, L.A. TIMES (Mar. 10, 2021), https://www.latimes.com/california/story/2021-03-10/federal-relief-cities-states-could-end-los-angeles-city-budget-crisis.

homeless crisis. However, we need Mayor Garcetti and the Council to act deliberately—and swiftly—to end the crisis here once and for all."[305] In June 2020, even before the influx of funding through Biden's COVID-19 relief bill, Heidi Marston, Executive Director of the Los Angeles Homeless Services Authority said: "We set the goal of rehousing 15,000 people, because that's the estimated number of people experiencing homelessness who are 65 or older, or who have an underlying health condition, making them highly susceptible to hospitalization or death should they contract COVID-19. This is about saving lives. We are not backing away from that number. We know how to house them. We need the resources from the city, county, state and federal government to do it."[306] Now, Los Angeles has the resources to rehouse 15,000 vulnerable people through Project Roomkey—instead, the City and County continue to abdicate their responsibility to protect their citizens.

## E.  HEALTH AND SAFETY IMPACTS

### i.      Fires

It isn't just the unhoused community that feels the effects of this persistent government inaction. Rather, inertia has created a public safety crisis that touches the lives of every citizen of Los Angeles while the government remains indifferent amidst rising chaos. Firefighters of the Los Angeles Fire Department "are stunned by their own department's records, which show thousands more fires in 2020 than 2019, including more arsons and fires linked to homelessness."[307] The problem is growing worse. Fires are breaking out with distressing frequency, threatening both housed and unhoused populations. In 2020, fires related to homelessness increased

---

[305] Ged Kenslea, Homelessness: *AHF Tells City 'No More Excuses!' as L.A. Gets $1.35B in COVID Relief*, BUSINESSWIRE (Mar. 20, 2021), https://www.businesswire.com/news/home/20210320005012/en/Homelessness-AHF-Tells-City-%E2%80%98No-More-Excuses%21%E2%80%99-as-L.A.-Gets-1.35B-in-COVID-Relief.

[306] Doug Smith & Benjamin Oreskes, *As Efforts Collapse to Place Homeless in Hotels, L.A. Officials Propose New, $800-Million Plan*, L.A. TIMES (June 23, 2020), https://www.latimes.com/homeless-housing/story/2020-06-23/as-efforts-collapse-to-place-homeless-in-hotels-l-a-officials-propose-new-800-million-plan.

[307] Eric Leonard, *LAFD Reports a Staggering Rise in the Number of Fires, Outpacing Any Year in Recent Memory*, NBC L.A. (Oct. 9, 2020), https://www.nbclosangeles.com/investigations/fires-spike-45-in-city-of-los-angeles-data-shows/2442013/.

by 82% compared to 2019.[308] That figure is on pace to rise in 2021.[309] Particularly disturbing are records related to deliberately set fires affecting homeless individuals—which increased by 90% in 2020.[310] The fires stem from homeless-on-homeless violence, targeted attacks from outsiders, and fires individuals light to stay warm inside their tent.[311] In addition to the rise in deaths and injury, the fire destroys the temporary shelter unhoused individuals have, often sweeping up with it documents necessary to apply for housing and services.[312]

Adding a more personal angle to these facts and figures, Freddie, an unhoused Angeleno whose tent was destroyed by a targeted explosion in Echo Park, said: "I know it's not directed toward me as an individual," said Freddie, "but it is directed toward me as a homeless person."[313] As he read in his tent one Sunday evening, the last two sounds Freddie heard before the explosion were the roar of a car engine followed by a resounding boom that filled his tent with smoke and razed his shelter.[314] Taking stock of what remained of his tent, Freddie questioned whether there would be a larger police response or public outcry had the same attack been taken against a housed Angeleno.[315] "Why am I less of a person?" he asked.[316]

### ii.    Increased Risk of Homeless Deaths

Unhoused persons who live on overpasses, underpasses, and along freeways are dying of transportation-related injuries and the public health risks inherent in living near freeways. A report by Los Angeles County shows that transportation-related injuries are the *third* most common cause of death among unhoused

---

[308] *More Than Half of Fires in LA at Start of 2021 Related to Homeless Encampments*, NBC L.A. (Jan. 14, 2021), https://www.nbclosangeles.com/on-air/ore-than-half-of-fires-in-la-at-start-of-2021-related-to-homeless-encampments/2506553/.

[309] James Queally, *Firecrackers. Molotov Cocktails. Fire Attacks Have Shaken L.A.'s Homeless Community*, L.A. TIMES (Oct. 18, 2019), https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[310] Eric Leonard, *LAFD Reports a Staggering Rise in the Number of Fires, Outpacing Any Year in Recent Memory*, NBC L.A. (Oct. 9, 2020), https://www.nbclosangeles.com/investigations/fires-spike-45-in-city-of-los-angeles-data-shows/2442013/.

[311] James Queally, *Firecrackers. Molotov Cocktails. Fire Attacks Have Shaken L.A.'s Homeless Community*, L.A. TIMES (Oct. 18, 2019), https://www.latimes.com/california/story/2019-10-18/homeless-population-attacks-fire.

[312] *Id.*

[313] *Id.*

[314] *Id.*

[315] *Id.*

[316] *Id.*

Angelenos.[317] In Los Angeles, a homeless individual is 11 times more likely to die from being struck by a vehicle or train than a housed individual is.[318] Many others die each year after falling from overpasses.

Encampments near freeways are "environmentally hazardous," says Gary Blasi, civil rights attorney and Professor of Law at University of California, Los Angeles.[319] In fact, diesel soot and other carcinogens in vehicle exhaust increase the risk of cancer;[320] chronic exposure also raises the risk of pre-term births, asthma, strokes, and reduced lung function;[321] and chronic exposure to microscopic air pollutants in vehicle exhaust are key contributors to deaths from heart disease among people living near traffic.[322]

The Los Angeles County report concluded: "Put simply, being homeless in LA County is becoming increasingly deadly."[323] Unhoused Angelenos near freeways are exposed to toxic pollution and a high probability of "hazardous waste concentrations of lead."[324] Areas within 300 yards of freeways are particularly vulnerable to the effects of pollution.[325]

---

[317] CTR. FOR HEALTH IMPACT EVALUATION, CTY. OF L.A. PUB. HEALTH, RECENT TRENDS IN MORTALITY RATES AND CAUSES OF DEATH AMONG PEOPLE EXPERIENCING HOMELESSNESS IN LOS ANGELES COUNTY (2019), http://www.publichealth.lacounty.gov/chie/reports/HomelessMortality_CHIEBrief_Final.pdf [hereinafter CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS].

[318] *Id.*

[319] HILARY MALSON & GARY BLASI, UCLA LUSKIN INST. ON INEQ. & DEMOCRACY, FOR THE CRISIS YET TO COME: TEMPORARY SETTLEMENTS IN THE ERA OF EVICTIONS (2020).

[320] Tony Barboza & Jon Schleuss, *L.A. Keeps Building Near Freeways, Even Though Living There Makes People Sick*, L.A. TIMES (Mar. 2, 2017), https://www.latimes.com/projects/la-me-freeway-pollution/.

[321] Tony Barboza, *Freeway Pollution Travels Farther Than We Thought. Here's How to Protect Yourself*, L.A. TIMES (Dec. 30, 2017), https://www.latimes.com/local/california/la-me-freeway-pollution-what-you-can-do-20171230-htmlstory.html.

[322] Tony Barboza, *California Scientists Link Tiny Particles in Car Exhaust to Heart Disease*, L.A. TIMES (Feb. 25, 2015), https://www.latimes.com/local/lanow/la-tiny-pollutants-linked-to-heart-disease-deaths-20150225-story.html.

[323] CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS, *supra* note 317.

[324] Dkt. 103-1 at 3.

[325] Ryan Carter, *Who Is Hit Hardest by Coronavirus in LA County? The Answer Is in the Air*, UCLA Study Says, L.A. DAILY NEWS (Apr. 15, 2021), https://www.dailynews.com/2021/04/15/who-is-hit-hardest-by-coronavirus-in-la-county-the-answer-is-in-the-air-ucla-study-says/



Around the 710 Freeway, each day the air is polluted by as many as 40,000 vehicles—many of which are heavy-duty semi trucks.[326] "All of these areas tend to have larger populations of Latinx and Black residents," said Dr. Michael Jerrett, a professor of environmental health sciences at UCLA's Fielding School of Public Health.[327] Dr. Jerrett led a study, alongside University of California, Berkeley and University of California, Merced, investigating why neighborhoods in Los Angeles County with the highest levels of pollution saw large spikes in COVID-19 deaths.[328] The study indicated that nitrogen dioxide in air pollution may raise the risk of COVID-19 infections and ultimately, deaths.[329]

The increase in record temperatures and high winds has also increased the risk of hypothermia among unhoused populations. According to the Center for

---

[326] *Id.*
[327] *Id.*
[328] *Id.*
[329] *Id.*

Disease Control, underlying health conditions, such as malnutrition or cardiovascular disease, in combination with lack of housing puts those experiencing homelessness at a higher risk of dying from hypothermia.[330] Contracting hypothermia is particularly risky when the temperature drops more than ten degrees in one day—a common occurrence in Los Angeles.[331] Since 2016, the Los Angeles County Medical Examiner-Coroner recorded more deaths of homeless individuals due to hypothermia than in New York and San Francisco, combined.[332] The lack of available housing for unhoused individuals leaves them no choice but to suffer the cold rains. In January of 2018, a 44-year-old man endured the rain outside of a business for two days until someone called 911.[333] The man was rushed to the hospital with a body temperature of 80.6 degrees—15 degrees less than the 95 degree benchmark necessitating hypothermia treatment.[334] The man did not survive.[335] Glenn Oura, a U.S. Air Force veteran who was formerly homeless, recalled sleeping outside in the bushes during a cold rainstorm, "I thought, 'if I die from hypothermia, how long will it take someone to find me?'"[336]

### iii.    Mental Health

Unintentional drug or alcohol overdose is the second leading cause of death among unhoused Angelenos.[337] Yet the current infrastructure lacks the necessary substance abuse and mental health support required to reduce these deaths. A substance use disorder is a mental disorder affecting a person's brain and behavior, leading to an individual's inability to control their use of substances such as legal or illegal drugs, alcohol, or medications.[338] According to the National Institute of Mental Health, approximately half of individuals who experience a substance use

---

[330] *Hypothermia-Related Deaths --- United States, 1999--2002 and 2005*, CTRS. FOR DISEASE CONTROL & PREVENTION (Mar. 17, 2006), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5510a5.htm.

[331] Gale Holland, *L.A. Has Great Weather, Yet More Homeless Die of the Cold Here Than in New York*, L.A. TIMES (Feb. 17, 2019), https://www.latimes.com/local/lanow/la-me-homeless-hypothermia-20190217-story.html.

[332] *Id.*

[333] *Id.*

[334] *Id.*

[335] *Id.*

[336] *Id.*

[337] CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS, *supra* note 317.

[338] *Substance Use and Co-Occurring Mental Disorders*, NAT'L INST. OF MENTAL HEALTH, https://www.nimh.nih.gov/health/topics/substance-use-and-mental-health/index.shtml (last revised Mar. 2021).

disorder during their lives also experience a co-occurring mental disorder and vice versa.[339] Thus, a comprehensive approach of care to mental health is critical.

The Los Angeles Homeless Services Authority estimates that 25% of all homeless adults in Los Angeles County have a serious mental illness that likely perpetuates their homelessness.[340] District Attorney of Los Angeles County George Gascón stated that "[t]he band-aid approach of incarcerating this population continues to be ineffective, extremely expensive, and it disproportionately impacts communities of color. Beyond the conditions on our streets, the clearest sign of the failure of this approach is the L.A. County Jail, which has the dubious distinction of doubling as the nation's largest mental health institution."[341]

On January 22, 2019, the Los Angeles County Board of Supervisors adopted a motion to address the shortage of mental health hospital beds in the County. In the motion, the Board cited research by mental health experts that concluded that the "minimum number of beds required to appropriately meet the need is 50 public mental health beds per 100,000 individuals. In Los Angeles County, there are only 22.7 beds per 100,000 individuals; and California has only 17.05 beds per 100,000 individuals."[342] The motion directed the Department of Mental Health to conduct assessments and draft a plan to increase the number of mental health beds, with a report due back to the Board in 120 days.

On October 29, 2019, the Department of Mental Health returned a report highlighting the persistent shortcomings of the County's mental health services. The 138-page report details the multitude of ways in which the County has failed to meet the mental health needs of its constituents. Drafters of the report conducted Service Area Advisory Committee (SAAC) meetings in which participants underscored the numerous service gaps and challenges. The SAAC meetings revealed "significant gaps in inpatient treatment beds, residential beds, shelter beds and respite homes across all ages," including an "estimate of 3,000 additional

[339] *Id.*

[340] JONATHAN E. SHERIN, DIR., CTY. OF L.A., DEP'T OF MENTAL HEALTH, ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS: BOARD OF SUPERVISORS MOTION RESPONSE 18 (2019), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf [hereinafter COUNTY MENTAL HEALTH BED REPORT].

[341] *George Gascon's Plan to Address LA County's Behavioral Health Crisis and Its Nexus to Homelessness*, GEORGE GASCON (Feb. 17, 2020), https://www.georgegascon.org/campaign-news/george-gascons-plan-to-address-la-countys-behavioral-health-crisis-and-its-nexus-to-homelessness/.

[342] Motion, Addressing the Shortage of Mental Health Hospital Beds (Jan. 22, 2019), http://file.lacounty.gov/SDSInter/bos/supdocs/131546.pdf.

56

**86**

subacute beds needed."[343] This bed scarcity "result[s] in people being discharged to the street and perpetuating homelessness."[344] In some parts of the County, there is only one psychiatric inpatient provider, and countywide there are no children's inpatient psychiatric beds.[345] The report described access to care as "one of the biggest issues" and stated that any plan for improving access to care should address basic needs, including "food, shelter, [and] transportation."[346] Available services for people of color were also "disproportionately limited compared to services for the white population."[347]

The report also commented on the "even more limited treatment available for people with [substance use disorder, or 'SUD']." A "lack of equality between [mental health, or 'MH'] and SUD treatment" and "long delays in accessing inpatient care" is leaving homeless individuals across the County with scarce access to medically necessary treatment for substance abuse disorders. The report found that "because there are not enough beds and not enough transportation services, people go untreated."[348] Department of Public Health Substance Abuse Prevention and Control Division (SAPC) providers are also seeing gaps and challenges in service provision. In particular, "there is a need for services for clients who are dually diagnosed;" "gaps in the availability of…high-intensity residential treatment…and…medically monitored inpatient withdrawal management beds;" and "an insufficient number of beds in the detoxification level of care and residential withdrawal management."[349] The report concluded that "there is a disconnection between MH and SUD systems of care," and "there is a need for more collaboration with MH providers."[350]

The report found that "the availability of services does not seem to match the level of need in the service areas. There are services, but to access care you have to 'win the lottery,' have a chronic level of need that requires hospitalization, or become incarcerated. Mild cases become severe while people are trying to connect to care." Even when individuals are able to access one of the few mental health

---

[343] COUNTY MENTAL HEALTH BED REPORT, *supra* note 340, at 27, 94.
[344] *Id*. at 94.
[345] *Id*.
[346] *Id*. at 95.
[347] *Id*. at 98.
[348] *Id*. at 95–96.
[349] *Id*. at 100.
[350] *Id*.

57

87

beds across the County, "hospitals discharge too quickly in a triage mode," which is "one of the chief contributors to repeat hospitalizations and insufficient recovery."[351] A pattern has emerged of people being "discharged from hospitals with serious to severe medical/physical health needs without a discharge plan and referrals to recuperative care."[352] Linking back to housing, the report also found that "the community needs housing with supportive services or residential treatment…to address this problem."[353] The report further underscored what critics of the County have been saying for decades, which is that "gaps in coordination and communication between agencies…[are forcing patients to] navigate the service delivery system on their own."[354]

### iv.    Public Health Impacts

As the number of unhoused persons living on the streets rises, so too does the spread of diseases unique to densely populated areas such as Skid Row.[355] Reverend Andrew Bales, CEO of the nonprofit homeless shelter and recovery program Union Rescue Mission (URM), lost part of his leg in 2014 after he came into contact with a flesh-eating disease in Skid Row.[356] Reverend Bales was volunteering there when a blister on his foot came into contact with human waste—at the time, there were only nine toilets for the 2,500 people living in the 50 square block area.[357] One week later, he had a 104-degree fever and his foot was covered in blood blisters.[358] His doctors soon determined it was necessary to remove his leg from his knee down. [359] "[T]he flesh-eating disease . . . consists of E-Coli, strep and staph," remarked Reverend Bales, "I've seen it in other people on the streets. I've seen people with a black thumb, losing a leg." [360]

---

[351] *Id*.

[352] *Id*. at 97.

[353] *Id*.

[354] *Id*.

[355] Audrey Conklin, *Meet Rev. Andy Bales — the Man Who Lost a Leg Serving the Victims of LA's Homeless Crisis*, THE STREAM (June 27, 2019), https://stream.org/meet-rev-andy-bales-the-man-who-lost-a-leg-serving-the-victims-of-las-homeless-crisis/.

[356] *Id*.

[357] *Id*.

[358] *Id*.

[359] *Id*.

[360] *Id*.

Skid Row bathrooms have long been stripped from residents at the whims of political will.[361] In 1992, the City installed dozens of portable toilets in Skid Row, but Mayor Tom Bradley soon halted funding. [362] An activist then coordinated six outdoor latrines for Christmas—only to have them hauled away by the mayor. [363] In 1994, the new Mayor Riordan put in two dozen portable toilets. [364]  Only four years later, six were removed following protests. [365]  Allegations of prostitution and drug use arose in 2006, prompting the City and then Mayor Villaraigosa to remove the remaining six toilets. [366]  In 2012 and 2013, County officials warned of an immediate public health threat—moving the City to open nighttime access to mission bathrooms and install temporary bathrooms in Skid Row parks. [367]  But the available facilities fell overwhelmingly short of the recommendation to avoid a public health crisis. [368]  In fact, a 2017 community audit concluded that bathroom access in Skid Row fell below U.N. standards for Syrian refugee camps. [369]  Following the audit, Mayor Garcetti installed six toilets and eight showers. [370]  In 2019, when an estimated 36,000 homeless people lived across the city of LA, there were only 31 available city-operated public toilets—an average of more than 1,000 people sharing one toilet.[371]

Mayor Garcetti acknowledged the lack of toilets is and historically has been a crisis in Los Angeles, saying, "[w]e simultaneously have to clean up streets, clean up this crap, and build housing . . . And if I had the money to do all three, we wouldn't be in this place." [372] Even acknowledging the problem, the City did not commit to allocate money for public toilets in its upcoming city budget. [373] NBC

---

[361] Gale Holland, *L.A. Adds More Public Toilets as Homeless Crisis Grows*, L.A. TIMES (Dec. 5, 2017), https://www.latimes.com/local/lanow/la-me-skid-row-toilets-20171204-story.html.
[362] *Id*.
[363] *Id*.
[364] *Id*.
[365] *Id*.
[366] *Id*.
[367] *Id*.
[368] *Id*.
[369] *Id*.
[370] *Id*.
[371] Times Editorial Board, Editorial: Why on Earth Is It So Hard to Put Out Toilets for L.A.'s Homeless?, L.A. TIMES (June 18, 2019), https://www.latimes.com/opinion/editorials/la-ed-homeless-public-toilets-20190618-story.html.
[372] Joel Grover & Amy Corral, *Homeless People Are Without Toilets and Going in the Streets. We Asked the Mayor of LA Why*, NBC L.A. (Feb. 19, 2020), https://www.nbclosangeles.com/investigations/homeless-people-are-without-toilets-and-going-in-the-streets-we-asked-the-mayor-of-la-why/2311759/.
[373] *Id*.

News further reported that "the City hauls away the mobile toilets at night, leaving the homeless no choice but to go on the streets." [374] If the homeless had access to shelter and housing, the lack of available public toilets would not be at issue.

There are many examples of uncommon diseases plaguing Skid Row—namely, hepatitis A, tuberculosis, typhus, and typhoid fever. [375] Our sister city of San Diego has seen firsthand the grave consequences of ignoring the pressing public health crisis that rampant homelessness creates and perpetuates. From 2016 to 2018, an outbreak of hepatitis A that cost the city more than $12 million, sickened nearly 600 San Diego residents and killed at least 20.[376] As part of its efforts to contain the outbreak, the city and county governments put up temporary shelters for the homeless.[377] Advocates such as Bob McElroy, who headed one of the organizations operating the new shelters, directly linked the outbreak with homelessness, saying "[t]he reality is, if you've got a place for people to be safe and have access to health care, you're just not going to have the kinds of sanitation issues you have with tent cities lining the streets."[378] Los Angeles City and County must take immediate action to avoid a similar outbreak in our streets.

Dr. Susan Partovi, a medical director for the non-profit Homeless Health Care Los Angeles, stated that the risk of disease is not because of the homeless individuals themselves, but because of the conditions they are forced to live in.[379] She pointed to a 2018 outbreak of typhus, which enters the bloodstream through fleas, ticks, or lice, as one key example of conditions fostering deadly disease.[380]  The risks are exacerbated by the short supply of bathrooms and drinking water.[381]

---

[374] *Id*.

[375] Chris Woodyard, *As Homeless Are Suffering, Risk of Hepatitis, Typhus and Other Diseases Is Growing*, USA TODAY (Jun. 18, 2019), https://www.usatoday.com/story/news/nation/2019/06/18/homeless-homelessness-disease-outbreaks-hepatitis-public-health/1437242001/.

[376] *San Diego Hepatis A Outbreak Ends After 2 Years*, ASSOCIATED PRESS (Oct. 30, 2018), https://apnews.com/article/cc40b8c476ef469ebdc2228772176b03.

[377] *Id*.

[378] *Id*.

[379] *Skid Row Doctor Says Health Risk Fear Over Homeless Isn't What it Seems*, NBC L.A. (Oct. 1, 2019), https://www.nbclosangeles.com/news/local/streets-of-shame/skid-row-doctor-homeless-help-disease-typhus/179055/.

[380] *Id*.

[381] Chris Woodyard, *As Homeless Are Suffering, Risk of Hepatitis, Typhus and Other Diseases Is Growing*, USA TODAY (Jun. 18, 2019), https://www.usatoday.com/story/news/nation/2019/06/18/homeless-homelessness-disease-outbreaks-hepatitis-public-health/1437242001/.

Homeless individuals are not the only ones facing increased risk of contracting disease. In October of 2018, the Los Angeles County Department of Public Health declared an outbreak of typhus, citing Skid Row as a high-risk area for the disease. [382] Shortly after, a Los Angeles Police Department employee assigned to Skid Row became infected by Typhoid fever, and two other employees showed symptoms.[383] Elizabeth Greenwood, a Los Angeles deputy city attorney, then contracted typhus from a flea bite in her City Hall East office.[384] At a City Council meeting in February 2019, Councilmember Joe Buscaino said, "[r]ats are emblematic of how we lost control over the homeless trash and encampment issue. If we can't protect the greatest symbol of our own democracy—our own City Hall, if we can't protect our own staff from a medieval disease, then we should pack up and go home."[385]

The severity of the health hazards facing homeless communities underscores the need for prompt action by the County and City. "[W]e have 23,000 people who are living on our sidewalks and outside every day," stated Shayla Myers, attorney for the Legal Aid Foundation, "that constitutes a true and devastating public health emergency."[386]

### v. Patient Dumping

Over the past two decades, Los Angeles hospitals have paid substantial civil penalties for "patient dumping" mentally disabled homeless individuals in Skid Row.[387] Videos of mentally ill patients in hospital gowns dropped at Skid Row incited outrage. [388] For instance, in 2009, College Hospital paid $1.6 million to settle a case in which 150 psychiatric hospital patients were released to Skid Row

---

[382] LA Public Health (@lapublichealth), TWITTER (Oct. 4, 2018, 10:01 AM), https://twitter.com/lapublichealth/status/1047894399730872321.

[383] Chris Woodyard, *As Homeless Are Suffering, Risk of Hepatitis, Typhus and Other Diseases Is Growing*, USA TODAY (Jun. 18, 2019), https://www.usatoday.com/story/news/nation/2019/06/18/homeless-homelessness-disease-outbreaks-hepatitis-public-health/1437242001/.

[384] Samuel Braslow, *How the Homeless Ended Up Being Blamed for Typhus*, L.A. MAG. (Feb. 12, 2019), https://www.lamag.com/citythinkblog/typhus-los-angeles-homeless/.

[385] *Id*.

[386] *Id*.

[387] Joseph Serna & Richard Winton, *Hospital Accused of Dumping Patient in L.A.'s Skid Row to Pay $500,000*, L.A. TIMES (May 29, 2014), https://www.latimes.com/local/lanow/la-me-ln-sun-valley-patient-dumping-to-pay-20140529-story.html.

[388] *Id*.

over the course of two years.[389] In 2014, a van from the southern Los Angeles Tri-City Regional Medical Center, now Gardens Regional Hospital, drove over 20 miles to drop a 38-year old woman off in Skid Row.[390] The woman was left wearing a hospital gown with a note stating an 800 number and the definition of schizophrenia.[391] Such examples build upon a long history of "dumping" patients on the street, where it is nearly impossible to follow a treatment plan and increases a patient's likelihood of falling ill again or, as is frequently the case, die.

The City and County's inaction prompted the legislature to intervene. In 2019, California Governor Jerry Brown signed SB 1152.[392] The legislation requires hospitals to make sleeping arrangements for homeless patients with the goal of providing a handoff between the hospital and a homeless shelter.[393]  Despite their clear recognition that patients were being dumped by the curbside, Los Angeles historically turned a blind eye to the plight of the city's most vulnerable until the State passed SB 1152.

## F. GENDER

While many of the health and safety impacts of the homelessness crisis in Los Angeles cut across various identities, impacting all Angelenos, it is important to highlight the unique impact that homelessness has on women. The current service provision model is failing to meet the specific needs of women, particularly unaccompanied women (meaning women who are not unhoused as part of a family unit), who comprise a fast-growing subgroup of the City's homeless population. According to LAHSA's 2020 Greater Los Angeles Homeless Count, 65% of women experiencing homelessness are unaccompanied, and 80% of all unaccompanied women are unsheltered. While federal, state, and local agencies have diligently worked to address the needs of other subgroups—including veterans, families, and youth—unaccompanied women are rarely identified as a

---

[389] Jon Regardie, *The Ugly History of Downtown Patient 'Dumping'*, DT News (July 9, 2018), http://www.ladowntownnews.com/news/the-ugly-history-of-downtown-patient-dumping/article_05fa6cea-8165-11e8-96aa-dbaced2025ed.html.

[390] Justin Klockzo, *Hospitals Are Dumping Mentally Ill Patients in Los Angeles' Skid Row*, VICE (June 21, 2016), https://www.vice.com/en/article/yvezpv/hospitals-are-dumping-mentally-ill-patients-in-los-angeles-skid-row.

[391] *Id.*

[392] Matt Tinoco, *LA County Hospitals Were Told To Stop 'Dumping' Homeless Patients, But Their Options Are Limited*, LAIST (Sept. 6, 2019), https://laist.com/2019/09/06/los-angeles-homeless-hospital-dumping-law-1152.php.

[393] *Id.*

subpopulation, resulting in a dearth of research on their needs and experiences.
Becky Dennison, Executive Director of Venice Community Housing, has said,
"there's not been any approach [by officials] that identifies, let alone prioritizes,
gender," and Anne Miskey, CEO of the Downtown Women's Center, has said that
most shelters are designed for men.

### i.    Rising Rates of Homelessness Among Women

According to LAHSA's Great Los Angeles Homeless Count, the number of
women experiencing homelessness in the City increased 25% between 2019 and
2020. Further, the number of unhoused women has more than doubled since 2013,
outpacing the increase among men in the same time period. These numbers are
likely to be exacerbated by the COVID-19 pandemic, which has hit women-
dominated industries like retail and hospitality particularly hard. According to the
Bureau of Labor Statistics, the pandemic had caused 865,000 women to drop out of
the labor force as of September 2020—a rate four times higher than the
corresponding rate for men. With these increases, it is clear that the growing trend
in the number of women living in the streets is unlikely to reverse any time soon,
underscoring the pressing need for women-oriented solutions now. In 2020, the
percentage of women aged 62 and up living in Skid Row increased by 20%.[394]
Among homeless women, women of color are significantly overrepresented,
demonstrating the intersection of gender and structural racism. While Black
women make up only nine percent of the total female population in LA, they are
more than 30% of all unhoused women. As the Downtown Women's Action
Coalition reported in its 2020 Women's Needs Assessment, "structural racism [is]
the main driver" of Black women's overrepresentation in Skid Row.[395] Looking at
death rates, Black women are similarly overrepresented, comprising 30% of all
unhoused women who died on the streets of L.A. in 2019. Latinas make up 31% of
the homeless female population, and white women make up just 22% of the

---

[394] DOWNTOWN WOMEN'S ACTION COAL. 2020 WOMEN'S NEEDS ASSESSMENT: A MESSAGE OF LOVE BY THE
WOMEN OF SKID ROW 4 (2020), https://cangress.org/wp-
content/uploads/2020/08/1596804237326_WOMEN%E2%80%99S-NEEDS-ASSESSMENT-final-layout-.pdf
[hereinafter DWAC NEEDS ASSESSMENT].
[395] *Id.*

homeless female population.[396] Other marginalized identities are likewise
overrepresented in the homeless community—while LGBT people make up only
about five percent of the U.S. population overall, they make up 12% of Skid Row's
homeless population.[397] The DWAC 2020 Women's Needs Assessment
highlighted that "[t]here are no services for trans women in Skid Row."[398]

### ii.    Intersection of Gender-Based Violence and Homelessness

Domestic violence (DV), intimate partner violence (IPV), and sexual assault
are all significant drivers of homelessness, as well as frequent consequences of
living as an unhoused, unaccompanied woman on the streets of Los Angeles.
Among women over the age of 25 experiencing homeless, the USC Price Center
found that over half had experienced domestic or intimate partner violence, with
rates higher among the unsheltered population compared to the sheltered
population.[399] The Downtown Women's Center has also found that, in the past
twelve months, more than 36% of homeless women experienced DV/IPV, and 27%
experienced sexual assault.[400]

In a focus group on domestic violence and housing conducted by the
Downtown Women's Center, one woman who currently resides in a domestic
violence shelter felt that if she "wasn't beat up enough or [her] story wasn't good
enough," she wouldn't be let into the shelter.[401] Other interviewees echoed that
sentiment, saying "[i]f you don't have the bruises or bloody face, they're not going
to believe you. If you don't have those, you're on your own."[402] Women living in
shelters further detailed the stress of providers threatening to call the Department
of Children and Family Services and have the women's children taken away, as a
means of forcing the women into compliance with shelter rules.[403] While shelter

---

[396] USC PRICE CTR. FOR SOC. INNOVATION, CITY OF LOS ANGELES WOMEN'S HOUSING GAP ANALYSIS 5 (2019),
https://www.downtownwomenscenter.org/wp-content/uploads/2019/12/Womens-Housing-Gaps-Analysis_Final.pdf
[hereinafter USC PRICE REPORT].

[397] DWAC NEEDS ASSESSMENT, *supra* note 394, at 9.

[398] *Id.*

[399] USC PRICE REPORT, *supra* note 396, at 1.

[400] Leonora Camner, *The Housing Crisis Is a Women's Issue*, ABUNDANT HOUSING L.A. (Mar. 11, 2020),
https://abundanthousingla.org/the-housing-crisis-is-a-womens-issue/.

[401] Downtown Women's Ctr., Domestic Violence and Homeless Services Coalition: Focus Groups Report 11 (2018),
https://www.downtownwomenscenter.org/wp-content/uploads/2018/06/DVHSC-Focus-Group-Report.pdf.

[402] *Id.* at 13.

[403] *Id.* at 12.

expulsion might be a reasonable remedy for rules violation, expulsion and baseless family separation are two disparate forms of discipline.

The Downtown Women's Center has estimated that there are 2,435 more unsheltered individual women experiencing homeless than there are existing emergency shelter beds in programs that serve individual women. With demand for shelter outpacing supply, and with shelters being often inhospitable places for women even when they are available, it is no surprise that the number of unaccompanied women living in the streets continues to grow.

But life on the street as a woman is uniquely dangerous. A 2016 survey by the Downtown Women's Action Coalition found that nearly half of women living in Skid Row had been attacked in the previous 12 months.[404] A member of the Coalition reported "so many stories of the knife coming through the tent and ripping it open" and "women at the bus stop circled by men like sharks."[405] Of the women living in Skid Row, more than 60% are over the age of 50, a particularly vulnerable group considering that unhoused women have a lifespan that is, on average, nearly 35 years less than their housed counterparts.[406] Further, homeless individuals generally have a physiological age that is 10–20 years older than their actual age as a result of premature aging due to prolonged stress.[407]

The stories of unhoused unaccompanied women highlight the dire need for increased funding and tailored solutions to meet their needs. Discussing her life on the street with the Los Angeles Times, one woman reported the changes she tried to make to her physical appearance after being subjected to multiple violent attacks that left her with broken ribs and black eyes: "At the time, I had blonde hair down to the middle of my back. I cut my hair really short and started wearing clothes that looked like guys' clothes. I had to look like I'm a guy for my own safety."[408] Another woman echoed the first: "I have to watch over me, and it's hard. I have to watch my back in everything."[409] In a February 1, 2021 letter to Mayor Eric Garcetti, the Downtown Women's Action Coalition wrote: "Our community has been abandoned and left to die."[410]

---

[404] Gale Holland, *Attacked, Abused and Often Forgotten: Women Now Make Up 1 in 3 Homeless People in L.A. County*, L.A. TIMES (Oct. 28, 2016), https://www.latimes.com/projects/la-me-homeless-women/.

[405] *Id.*

[406] Dkt. 231 at 2; DWAC NEEDS ASSESSMENT, *supra* note 394, at 4.

[407] DWAC NEEDS ASSESSMENT, *supra* note 394, at 8.

[408] *Id.*

[409] *Id.*

[410] *An Open Letter to Mayor Garcetti*, LACAN (Feb. 1, 2021), https://cangress.org/dearmayorgarcetti/.

## II.    DISCUSSION

This Court cannot idly bear witness to preventable deaths. This ever-worsening public health and safety emergency demands immediate, life-saving action. The City and County of Los Angeles have shown themselves to be unable or unwilling to devise effective solutions to L.A.'s homelessness crisis. For the reasons discussed below, the Court must now do so.[411]

A district court may order injunctive relief on its own motion and is not restricted to ordering the relief requested by a party. *Armstrong v. Brown*, 768 F.3d 975, 980 (9th Cir. 2014) (citing *Clement v. Cal. Dep't of Corr.*, 364 F.3d 1148, 1150 (9th Cir. 2004)). A preliminary injunction is an "extraordinary remedy," requiring courts to balance competing claims on a case-by-case basis, with "particular regard for the public consequences" of issuing an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

For a court to issue a preliminary injunction, it must find that (1) there is a likelihood of success on the merits; (2) absent preliminary relief, irreparable harm is likely; (3) the balance of equities tips in favor of preliminary relief; and (4) an injunction is in the public interest. *See Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20). Alternatively, an injunction can also be justified if there are "serious questions going to the merits" and the balance of hardships "tips sharply" in favor of injunction relief, "assuming the other two elements of the *Winter* test are met." *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). A "serious question" exists when there is "a fair chance of success on the merits." *See Sierra On-Line, Inc. v. Phx. Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). The Ninth Circuit follows a "sliding scale" approach to the four preliminary injunction elements, such that "a stronger showing of one element may offset a weaker showing of another," as long as "irreparable harm is *likely*." *See Doe v. Kelly*, 878 F.3d 710, 719 (9th Cir. 2017) (quoting *Cottrell*, 632 F.3d at 1131).

---

[411] The Court notes that Defendants have filed numerous objections to factual assertions in Plaintiffs' Motion. See Dkt. 271. As the present order does not rely on any of the information to which Defendants object, the Court need not rule on the objections.

66

96

## A. THE LIKELIHOOD OF SUCCESS ON THE MERITS SUPPORTS PRELIMINARY RELIEF

The threshold inquiry is whether plaintiffs have established a likelihood of success on the merits. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Where plaintiffs seek a mandatory injunction, the plaintiffs must "establish that the law and facts *clearly favor* [their] position, not simply that [they] are likely to succeed." *Id*. Relief is treated as a mandatory injunction when it "orders a responsible party to 'take action.'" *Id*. (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir.2009)*).

### i.      Constitutional grounds

*Brown v. Board of Education*

Throughout history, the legislative, executive, and judicial branches of our government have taken it upon themselves to remedy racial discrimination. These affirmative actions and equitable remedies arose from a recognition of the racism-entrenched in this country's history and its enduring legacy through the present day.

In the seminal case of *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971), the Supreme Court held that if the racially disparate impacts of a previous Equal Protection Clause violation persisted, the violating party had a responsibility of eradicating those impacts. Dealing with the desegregation of schools, the Court in *Swann* held that schools have not only the responsibility to desegregate, but also the responsibility to integrate. *Swann*, 402 U.S. at 15. The *Swann* decision came after *Brown v. Board of Education of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483 (1954) ("*Brown I*"), supplemented sub nom. *Brown v. Board of Education of Topeka, Kan.*, 349 U.S. 294 (1955) ("*Brown II*"), in which the Supreme Court addressed the impacts of the "separate but equal" laws. The Court discussed how "separate but equal" treatment culminated in "a feeling of inferiority as to [the Black students'] status in the community that may affect their hearts and minds in a way unlikely to ever be undone," and found that racial segregation in public schools is unconstitutional, even if segregated schools are otherwise equal in quality. *Brown*, 347 U.S. at 494–95.

The *Brown* Court ordered schools to desegregate "with all deliberate speed." *Brown II*, 349 U.S. at 301. In many school districts, however, a racial imbalance in student populations continued to exist despite desegregation. Beginning with *Swann*, the Court's line of post-*Brown* cases held that schools were responsible for remedying racial imbalance, even when such imbalance resulted from the selection of students based on geographic proximity to the school rather than racial segregation. *See Swann*, 402 U.S. 1. The Court found that this was necessary to ensure that schools would be properly integrated and that all students would receive equal educational opportunities, regardless of their race. *Id.*

*Swann* and its progeny further established that "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann*, 402 U.S. at 15. Indeed, as early as *Brown II*, the Supreme Court ruled that district courts have the power to order structural changes in school systems to integrate schools, such as "ordering the immediate admission of plaintiffs to schools previously attended only by white children." 349 U.S. at 300–01; *see also Swann,* 402 U.S. at 31 (affirming a district court's injunction requiring school board to implement plan to desegregate school district); *MillikenBradley*, 433 U.S. 267, 269 (1977) (upholding the equitable powers of a district court, as part of a desegregation decree, to "order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of de jure segregation"). The Court further found that "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation. " *United States v. Fordice*, 505 U.S. 717, 727–28 (1992). Similarly, the Supreme Court has recognized the equitable power of federal courts to order structural changes to remedy violations of unconstitutional due process. *See, e.g.*, *Hutto*, 437 U.S. at 683 (approving a district court's orders to change various prison practices and policies to remedy constitutional violations).

The above cases arose out of a recognition of a history entrenched in racial discrimination, the persistent present-day impacts of such discrimination, and a pressing need to remediate such impacts. In front of this Court today is a history similar to, and deeply intertwined with, the circumstances that gave rise to the above cases. The Court today addresses decades of racial discrimination that have

68

**98**

culminated in a Los Angeles homelessness crisis with a significant loss of life and deprivation of humanity—peaking at 1,383 deaths just last year.[412]

"I want to be very clear that homelessness is a byproduct of racism," stated LAHSA's Heidi Marston.[413] Racial discrimination and homelessness are interconnected issues going back decades into the history of Los Angeles. Beginning with the City of Los Angeles's decision to raze houses, resulting in an increased number homeless low-income people of color in the 1910s, continuing through state enforcement of racially restrictive covenants throughout Los Angeles in the 1930s, and postwar policies related to redlining, racial covenants, and public bank lending—over a century of racist policies have disproportionately impacted L.A.'s unhoused Black population.[414] "We continue to see that Black people are overrepresented in our homeless population, and that Black African Americans are four times more likely to become homeless than their white counterparts."[415]

The City and County's actions have been, and remain, critical drivers of racial discrimination. In 1976, the homeless population became spatially concentrated in the fifty-square-block "containment zone" of Skid Row. The containment zone became a place where the homeless, discharged patients with mental disabilities, and parolees came—or in some instances, were bussed and dropped—to find services. General Dogon, a Skid Row community organizer, describes the containment as a "warehouse zone": "a warehouse is where you store shit. So the idea was to push all of Los Angeles's unfavorable citizens into one area."[416] "Main Street is the dividing line between the haves and have-nots," says General Dogon, where "you've got homeless people sleeping on one side of the street, and the loft buildings on the other side of the street."[417]

---

[412] Ethan Ward, *They Were Homeless, Now They're Dead*, CROSSTOWN (Feb. 10, 2021), https://xtown.la/2021/02/10/homeless-deaths-los-angeles/#:~:text=1%20deaths%20were%20no%20outliers,Department%20of%20Medical%20Examiner%2DCoroner.

[413] Gina Pollack, *Garcetti: LA Has Made Progress On Homelessness Issue, Despite Increasing Numbers*, LAIST (June 12, 2020, 7:57), https://laist.com/latest/post/20200612/garcetti-gives-updates-on-coronavirus-and-protests-in-losangeles.

[414] LUSKIN REPORT, *supra* note 10, at 7–20.

[415] *Id.*

[416] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

[417] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

Police kept the homeless isolated, deepening and entrenching poverty within the 50-block area. The Los Angeles Police Department set up physical buffers to reduce movement past the Skid Row border and enforce containment.[418] Flood lights demarcated the border, disincentivizing the homeless from straying outside the containment area.[419]

Separately, in 2007, Los Angeles Police Department Chief William J. Bratton enacted a "broken windows" policing policy.[420] Under Chief Bratton's "Safer Cities Initiative", a task force of 50 officers entered Skid Row, issuing citations and making arrests for infractions such as jaywalking, prostitution, and littering. [421] The program ended shortly after a Los Angeles Police Department officer fatally shot a homeless person of color on Skid Row in 2015. "On Skid Row, the windows already were broken," Los Angeles City Attorney Feuer said, "we have a much deeper and more profound situation to deal with."[422]

In recent years, the City has attempted to address its homelessness crisis, but has been woefully inadequate in doing so. Four years ago, Los Angeles voters passed Proposition HHH, a $1.2 billion bond to fund housing projects aimed at the City's homeless population.[423] After three years of missed and suspended deadlines, the first HHH project, providing 62 housing units, opened in January 2020. *Id*. At the project's unveiling, the Mayor announced, "[t]his year, we will see an opening of one of these about every three weeks. My calculations, next year it might be every two weeks or less." Over a year later, only seven projects, containing just 489 total units, have been completed.[424]

Furthermore, investigations into City-funded housing projects for the homeless demonstrate that a lack of government oversight has allowed the proliferation of corruption. The City, worse yet, has turned a blind eye to this

---

[418] LUSKIN REPORT, *supra* note 10, at 28.

[419] *The Containment Plan*, 99% INVISIBLE (JAN. 10, 2017), https://99percentinvisible.org/episode/the-containment-plan/.

[420] Gale Holland, *L.A. Leaders Are Crafting New Plan to Help Homeless on Skid Row*, L.A. TIMES (July 15, 2014), https://www.latimes.com/local/la-me-skid-row-police-20140716-story.html.

[421] *Id*.

[422] *Id*.

[423] Doug Smith, *It Took Three Years of Blown Deadlines, But L.A. Opens Its First Homeless Housing Project*, L.A. TIMES (Jan. 7, 2020), https://www.latimes.com/california/story/2020-01-07/homeless-housing-project-proposition-hhh-bond-measure.

[424] Ron Galperin, *It's Time for Los Angeles to Pivot on HHH: Ron Galperin*, L.A. DAILY NEWS (Mar. 14, 2021), https://www.dailynews.com/2021/03/14/its-time-for-los-angeles-to-pivot-on-hhh-ron-galperin/?fbclid=IwAR1-8puudDizHhoHVpYCVef_qsxHPEjFGmMKohY8yhzpycX-fGiIXKphao8.

corruption; funds that taxpayers voted to allocate to the homeless population are being siphoned away to line the pockets of corrupt individuals while the City sits by idly.[425] As the County espoused in its opposition, "the County spends hundreds of millions of dollars each year to provide housing and services." Dkt. 270 at 7. But where has that money gone and what has it achieved?

The 2018 LAHSA report concluded that "racial bias [continues to] affect[] every aspect of a Black person's life, and it is impossible to untangle the pervasive effects of institutional racism from other system failures that together cause a person to experience homelessness."[426] Systemic inequity continues to disproportionately affect access to housing among communities of color. LAHSA reported, based on the 2017 Homeless Count, that the prevalence of Black people among the homeless population was highest in South Los Angeles and Metro Los Angeles, including Skid Row, where 68% and 49% of the homeless population identified as Black, respectively.[427]

Such disparities have long been recognized as severe constitutional violations—violations so corrosive to human life and dignity as to justify the sweeping exercise of a federal district court's equitable powers. Based on the Court's findings of these historical constitutional violations, a persisting legacy of racially disparate impacts—including a rising number of deaths, and the City and County's knowing failure to adequately address the issue despite numerous opportunities and resources to do so, this Court is pressed to grant an affirmative injunction ordering the City and County to actively remedy its homelessness crisis.

*State-Created Danger Doctrine*

While "the Fourteenth Amendment…generally does not confer any affirmative right to governmental aid," *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989); *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011), the Supreme Court in *DeShaney* created an exception that imposes a duty to act when the government has created the dangerous conditions. *DeShaney*, 489 U.S. at 198–202. Interpreting the state-created danger exception, the Ninth Circuit has held that a state has a duty to act "when the state affirmatively places

---

[425] *See supra* notes 254–260.
[426] LAHSA REPORT, *supra* note 4, at 20.
[427] *Id*. at 15.

71

101

the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger.'" *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir.1996); *Wood v. Ostrander*, 879 F.2d 583, 588 (9th Cir. 1989) (holding that deliberate indifference in the exercise of government power is within the Fourteenth Amendment's "purpose of redressing abuses of power by state officials").

The first requirement under the state-created danger exception is an affirmative act by the state that creates or perpetuates dangerous circumstances. Here, there are no shortage of affirmative steps that the City and County have taken that have created or worsened the discriminatory homelessness regime that plagues Los Angeles today. Throughout most of the 20th century, the City and County of Los Angeles aggressively pursued an agenda of redlining and enforcing racially restrictive covenants that constrained the housing market for Black residents. When it came to the Black homeless community, the City of Los Angeles created the Municipal Service Bureau for Homeless Men in Skid Row, which allowed its partner philanthropic organizations to distribute aid selectively along racial lines. In a 2018 report, LAHSA concluded that "racial bias [continues to] affect every aspect of a Black person's life, and *it is impossible to untangle the pervasive effects of institutional racism from other system failures that together cause a person to experience homelessness*."[428] LAHSA itself has drawn a direct link between the discriminatory policies the state pursued in the past and the present disparate impact of that intentional discrimination against Black Angelenos. While this Court acknowledges that "disparate impact…is generally insufficient by itself to form the basis of a constitutional violation," this history of structural racism, spanning over a century, demonstrates that L.A.'s homelessness crisis, and in particular the impact of this crisis on the Black community, is a state-created disaster. Dkt. 269 at 34.

The relevant inquiry here is whether "state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). In effect, this amounts to a "but for" test—we ask, but for a certain action by the state, would the plaintiff still be exposed to the same danger? While Defendants contend that "there is no causal connection" between the City and County's actions and the position that the homeless community finds itself in, the Court finds that there is little question that

---

[428] LAHSA Report, *supra* note 4, at 20 (emphasis added).

72

102

*but for* discriminatory policies, like redlining, that prevented Black residents from purchasing property and building intergenerational wealth, the Black community would be in a significantly different position today. Dkt. 269 at 8. Even apart from racially discriminatory policies, state actions—such as creating the containment zone that deteriorated into Skid Row as we know it today—have led to the entrenchment of poverty and contributed to the present homelessness crisis.

Even if this Court ignored the entire history of conscious decisions by the government that led to the creation of Skid Row and the rampant depravity before us today, there is still incontrovertible evidence that the danger of living on the streets—which led to 1,383 deaths last year alone—is state-made. The strongest evidence for a state-made danger is the deliberate, political choice to pursue the development of long-term supportive housing at the expense of interim shelters to get people off the streets in the near-term. As Plaintiffs pointed out in their brief, Proposition HHH—the $1.2 billion ballot initiative to create 10,000 housing units for the homeless—provided funding that could be used either for long-term supportive housing or for temporary shelters. Dkt 239 at 21. Nevertheless, the City and County "unilaterally" decided to focus on housing at the expense of shelter, even knowing that massive development delays were likely while people died in the streets. Over the four years since HHH's passage, a mere 489 housing units have been built, while over 5,000 people lost their lives in the streets due to a lack of shelter. The vast majority of those deaths were preventable. Defendants argue that "Plaintiffs have not established that any City official affirmatively placed Plaintiffs in danger they would otherwise not have been in," but pursuing housing at the expense of shelter, suspending HHH deadlines (and thereby evading accountability), and ramping down Project Roomkey despite the availability of federal funds to support it were all political choices that created this crisis. Without these choices, the death rate among L.A.'s homeless population would not be growing exponentially.

The second requirement under the state-created danger exception is the existence of a "known or obvious danger." "Deliberate indifference cases are by their nature highly fact-specific." *Patel*, 648 F.3d at 975. And the facts could not be clearer here. In 2020, 1,383 homeless people died on the streets of Los Angeles, and an estimated five more die each day. Homeless *women* in particular have shared horrific stories of attacks and assaults that have forced them to alter their appearances and conceal their femininity in order to survive. The average lifespan

73

103

of a homeless person in L.A. County is 51 years, compared to 73 years among the general population.[429]

There is no question that homelessness presents a grave danger to human life, and there is no question that this danger is known to the decisionmakers with the power to end this senseless loss of life. In a 2019 interview, Mayor Garcetti referred to homelessness as "the humanitarian crisis of our lives,"[430] a characterization echoed by Hilda Solis, chair of the County Board of Supervisors, in 2020.[431] Heidi Marston, Executive Director of LAHSA, has called homelessness "an emergency on our streets . . . [requiring] an emergency response."[432] City Councilmember Mike Bonin said at the Los Angeles Business Council's February 2021 Mayoral Housing, Transportation, and Jobs Summit that "there's almost nobody in the city of Los Angeles, housed or unhoused, who would give what's happening in Los Angeles [anything] other than a failing grade," and fellow Councilmember Kevin de León called the situation "dysfunctional" and "highly disjointed."[433] Neither the City nor the County of Los Angeles can deny their awareness of the unspeakable dangers homeless individuals face within their jurisdiction, or the gross inadequacy of current efforts to address that reality.

The final requirement under the state-created danger doctrine is that the state act with deliberate indifference to the danger. Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty. v. Brown*, 520 U.S. 397, 410, (1997). The Ninth Circuit has held that the deliberate indifference standard is met when the Plaintiff proves that:

(1) there was an objectively substantial risk of harm; (2) the [state] was subjectively aware of facts from which an inference could be drawn that a

---

[429] CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS, *supra* note 317, at 5.

[430] *LA Mayor Eric Garcetti Calls Homelessness The 'Humanitarian Crisis Of Our Lives'*, NPR (Sept. 21, 2019), https://www.npr.org/2019/09/21/763073646/l-a-mayor-eric-garcetti-calls-homelessness-the-humanitarian-crisis-of-our-lives.

[431] *Innovative and Rapid Construction of Housing to Alleviate Homelessness to Launch at Former Jail Site*, HILDA SOLIS (Sept. 29, 2020), https://hildalsolis.org/innovative-and-rapid-construction-of-housing-to-alleviate-homelessness-to-launch-at-former-jail-site/.

[432] Rob Hayes, *LA Homelessness Authority Calls for Government to Treat Homelessness Crisis with Same Urgency as Natural Disaster*, ABC7 (Feb. 19, 2020), https://abc7.com/los-angeles-homeless-services-agency-lahsa-homelessness-in-california/5945026/.

[433] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.

substantial risk of serious harm existed; and (3) the [state] either actually drew that inference or a reasonable official would have been compelled to draw that inference. *Momox-Caselis v. Donohue*, 987 F.3d 835, 845 (9th Cir. 2021).

The first element, an objectively substantial risk of harm, is well-established and discussed above. The second and third elements, the state's subjective awareness of facts demonstrating danger and an inference that those facts would likely cause the danger, is likewise established above. The only question remaining is whether the government has "disregarded" the consequences of the long-standing policies that have perpetuated structural racism and the ways in which present corruption and a lack of coordination have led to an exponentially growing death rate. At the Los Angeles Business Council's Mayoral Summit, City Councilmember Mark Ridley-Thomas said "we have to be smarter, we have to work harder, and we have to run a lot faster. . ."[434] The inadequacy of governmental action in response to the life threatening conditions in the homeless communities is not new—in a 1985 Los Angeles Times article, the Times wrote: "It is time for leadership from both the mayor's office and the county Board of Supervisors to pull all the players together in one room and lock the door until they have assigned tasks to start finding land and money for shelters, with deadlines for doing so. . . ," underscoring the decades long inaction by the City and County in the face of tens of thousands of deaths.[435]

The Court therefore finds a strong likelihood that the City and County of Los Angeles are liable under the state-created danger doctrine, and that the law and facts clearly favor such a finding.

*Special Relationship Exception*

A second theory creating an affirmative duty under *DeShaney*—the special relationship exception—is also applicable. In addition to the exception for state-created danger discussed above, the Supreme Court in *DeShaney* created a second exception that imposed an affirmative duty to act when a state "takes a person into

---

[434] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.

[435] *Help the Homeless*, L.A. TIMES (Jan. 8, 1985), https://www.latimes.com/archives/la-xpm-1985-01-08-me-7426-story.html.

its custody and holds him there against his will." *DeShaney*, 489 U.S. at 199–200. "The types of custody triggering the exception are 'incarceration, institutionalization, or *other similar restraint of personal liberty*.'" *Patel*, 648 F.3d at 973 (citing *DeShaney*, 489 U.S. at 200) (emphasis added). The state's constitutional duty arises "from the limitation which [the State] has imposed on his freedom." The inquiry turns on whether Los Angeles's lengthy history of discriminatory policies, aimed at containing homeless people in Skid Row, restrains the personal liberty of L.A.'s homeless population to such an extent as to trigger the state's affirmative duty to act under the Fourteenth Amendment. The Court finds this strongly likely to be the case. With the inception of the containment policy, enforced by the use of floodlights, physical barriers, and policing, the City effectively created such "restraints of personal liberty" as to establish a special relationship between the homeless population and the state, imposing an affirmative duty on the state to act to protect the rights of the homeless. The City is therefore likely to be liable for failing to meet the affirmative duty created by its restraint of the local homeless population.

The Court therefore finds a strong likelihood that Plaintiffs can succeed on a claim under the state-created danger doctrine, and that the law and facts clearly favor Plaintiffs' claims.

*Equal Protection – Severe Inaction Theory*

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution proscribes state action that discriminates against a suspect class.[436] The Supreme Court has instructed lower courts to examine state action on a case-by-case basis, "sifting facts and weighing circumstances [so that] the nonobvious involvement of the State…[can] be attributed its true significance." *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961). As a guiding principle in cases scrutinizing state action, it is important to remember that the state action doctrine does not center around mere causation—instead, it is a way of recognizing and assigning *responsibility* for discriminatory conduct. "A state is responsible for the equal protection of its citizens, and allowing structural injustice

---

[436] U.S. Const. amend. XIV.

76

106

to continue is action for which the state is responsible."[437] Finally, contrasting the Equal Protection Clause with the other two clauses in the Fourteenth Amendment, constitutional law scholars have argued that "the Equal Protection Clause…is more difficult to classify as imposing solely a negative prohibition upon the state governments."[438]

There are several provisions of the Constitution that create affirmative duties. For example, the Fourth Amendment creates an affirmative duty on the part of the government to obtain a warrant before a search or arrest, and the Fifth Amendment places an affirmative duty on police with regard to the privilege against self-incrimination.[439] Indeed, *Marbury v. Madison*, one of the most seminal cases in American constitutional history, turns on how government inaction can violate an underlying affirmative duty to act.[440] In the context of the Fourteenth Amendment Equal Protection Clause, even a textualist reading supports the imposition of an affirmative duty to act. Where the Amendment reads, "nor shall any state…deny to any person within its jurisdiction the equal protection of the laws" the double negative implication of "not deny" can be literally interpreted to mean "to provide," rendering state inaction constitutionally impermissible.[441] Further, there is also an intratextual argument wherein the phrasing of the Equal Protection Clause ("[N]or shall any state…deny to any person within its jurisdiction the equal protection of the laws.") is contrasted with the phrasing of the Fourteenth Amendment Privileges and Immunities Clause ("No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States…."). [442] Indeed, shortly after the adoption of the Fourteenth Amendment, in 1870, Senator John Poole said in a congressional hearing, "[T]o say that [the state] shall not deny to any person the equal protection of the law it seems to me opens up a different branch of the subject. It shall not deny by acts of omissions…." [443] Constitutional law scholars have long opined that

---

[437] David M. Howard, *Rethinking State Inaction: An In-Depth Look at the State Action Doctrine in State and Lower Federal Courts*, 16 CONN. PUB. INTEREST L.J. 221, 255 (2017).

[438] Wilson R. Huhn, *The State Action Doctrine and the Principle of Democratic Choice*, 34 HOFSTRA L. REV. 1379, 1402 (2006).

[439] Erwin Chemerinsky, *Government Duty to Protect: Post-*DeShaney *Developments*, 19 TOURO L. REV. 679, 683 (2003).

[440] Marbury v. Madison, 5 U.S. 137 (1803).

[441] Howard, *supra* note 437, at 272–273.

[442] Huhn, *supra* note 438, at 1402–03.

[443] *Id*. at 1403.

"there is an affirmative obligation on the government to not only to [sic] treat citizens equally, but to protect its citizens from private violations of law that undermine[] their right to equality, even noting that failing to provide equal protection can come easily from inaction or from action."[444]

While it is not universally appropriate to imply an affirmative duty within the context of the Fourteenth Amendment, the Supreme Court in *United States v. Fordice* observed that *Brown v. Board of Education* mandated an "*affirmative duty* [on the state] to dismantle its prior dual education system." *United States v. Fordice*, 505 U.S. 717, 727–28 (1992) (emphasis added). The Court went on to say that "a State *does not discharge its constitutional obligations* until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation." *Id.* (emphasis added). In *Brown*, the analysis centered around the value of attending integrated schools. Here, Black people, and Black women in particular, are *dying* at exponentially higher rates than their white counterparts, and these disparate death rates can be directly traced to a history of structural racism and discrimination. As outlined above, and as evidenced both by statements from City Council members and the 1985 Los Angeles Times article detailing the lack of coordination between the County and the City, the Defendants have allowed themselves to become paralyzed, failing to muster the moral courage and political will to serve their homeless population. When state inaction has become so egregious, and the state so nonfunctional, as to create a death rate for Black people so disproportionate to their racial composition in the general population, the Court can only reach one conclusion—state inaction has become state action that is strongly likely in violation of the Equal Protection Clause.

The Court acknowledges that this conclusion advances equal protection jurisprudence, but it is wholly consistent with and flows naturally from analogous federal statutes, rulemakings, and executive actions. In 2015, the Obama administration promulgated a rule that required those city, state, and local entities who received federal funds for housing initiatives to "affirmatively further" the purposes of the Fair Housing Act.[445] The rule instructed these jurisdictions to "assess their concentrations…of disadvantaged populations and identify goals to

---

[444] *See* Howard, *supra* note 437.
[445] Rothstein, *supra* note 28, at 200.

remedy segregated conditions."[446] If the state can be burdened by an affirmative duty to protect a statutorily created right, why should it not be burdened by an affirmative duty to protect a right provided for in the Constitution—the "supreme Law of the Land"?[447] The Supreme Court has commented that the Equal Protection Clause is an "essential part of the concept of a government of laws and not men," noting that it "is at the heart of Lincoln's vision of 'government of the people, by the people, [and] for the people.'" *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667–68 (1966). Espousing the importance of the Fourteenth Amendment, the Court said "the words of the amendment . . . contain a necessary implication of a positive immunity, or right, . . . the right to exemption from unfriendly legislation . . . exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race." *In re Slaughter-House Cases*, 1873, 16 Wall. 36, 67—72, 21 L.Ed. 394; see also *State of Virginia v. Rives*, 1879, 100 U.S. 313, 318, 25 L.Ed. 667; *Ex parte Virginia*, 1879, 100 U.S. 339, 344—345, 25 L.Ed. 676. If the right to equal protection is so essential to American society and constitutional thought, then the law simply cannot permit the state to idly stand by and watch as its Black residents die at a disproportionate rate—especially when the state's political history of discrimination has led directly to the present crisis.

*Substantive Due Process*

The Court also finds that current City and County policies compound and perpetuate structural racism, threatening the integrity of Black families in Los Angeles and forcing a disproportionate number of Black families to go unhoused. Such structures of discrimination likely offend the Due Process Clause of the Fourteenth Amendment.

The Fourteenth Amendment provides, in relevant part, that no state "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause guarantees not only procedural protections, but also substantive rights, thereby "barring certain government actions regardless of the fairness of the procedures used to implement them."

---

[446] *Id.*

[447] U.S. Const. art. VI, cl. 2.

*Daniels v. Williams*, 474 U.S. 327, 331 (1986). Substantive due process accordingly "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147 F.3d 867, 870 (9th Cir. 1988) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). The "shocks the conscience" standard is not subject to a rigid list of established elements. *See County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998 ("Rules of due process are not . . . subject to mechanical application in unfamiliar territory.") On the contrary, "an investigation into substantive due process involves an appraisal of the totality of the circumstances rather than a formalistic examination of fixed elements." *Squadrito,* 152 F.3d 564, 570 (7th Cir. 1998).

As to whether substantive due process applies to the particular circumstances alleged, the "threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n. 8. The "touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974), and the "exercise of power without any reasonable justification in the service of a legitimate governmental objective," *Lewis*, 523, U.S. at 846. The due process guarantee bars governmental conduct that violates the "decencies of civilized conduct," *Rochin v. California*, 342 U.S. 165, 173 (1952) interferes with rights "'implicit in the concept of ordered liberty[,]'" *id*. at 169, 72 S.Ct. 205 (quoting *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937)), or is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency[.]" *Breithaumpt v. Abram*, 352 U.S. 432, 435 (1957). Accordingly, substantive due process protects against government power arbitrarily and oppressively exercised. *Daniels*, 474 U.S. at 331.

Finally, although the government is generally "not liable for its omissions," *Martinez v. City of Clovis*, 943 F.3d 1260, 1270–71 (9th Cir. 2019), a government is required to act when it has "affirmatively place[d]" its citizens "in danger by acting with deliberate indifference to a known or obvious danger," *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971–72 (9th Cir. 2011) (citations omitted).

Here, the question is whether the conduct attributed to the City and County violates unhoused families' substantive due process right to family integrity. It has long been settled that the liberty interest identified in the Fifth Amendment

provides a right to family integrity or to familial association. *See* U.S. Const. amend. V (stating no person shall "be deprived of life, liberty, or property, without due process of law."); *Quilloin v. Walcott*, 434 U.S. 246, 255, (1978) (stating "the relationship between parent and child is constitutionally protected."). Indeed, "[t]he liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Court. *Troxel v. Granville*, 530 U.S. 57, 65, (2000); *see also Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established.").

In *Ms. L. v. U.S. Immigr. & Customs Enf't*, 302 F. Supp. 3d 1149 (S.D. 2018), a California district court issued a class-wide injunction requiring the government to reunite minor children with their parents. There, the court found that the government had violated the parent-class-members' right to family integrity under the Due Process Clause by separating parents from their children at the U.S.-Mexico border for no legitimate governmental objective.[448] The district court cited to *Quilloin*, where the Supreme Court held that "[w]e have little doubt that the Due Process Clause would be offended if a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness . . . ." 434 U.S. at 255, 98 S.Ct. 549.

In a similar case, *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs En't*, 319 F. Supp. 3d 491, 500–01 (D.D.C. 2018), a district court granted a preliminary injunction against the government, preventing it from separating families. There, the district court held that "substantial governmental burdens on family integrity are subject to strict scrutiny review, and they survive only if the burden is narrowly tailored to serve a compelling state interest." *Id.* (citing *Goings v. Court Servs. & Offender Supervision Agency*, 786 F.Supp.2d 48, 70 (D.D.C. 2011) (granting preliminary injunction where plaintiff's substantive due process claim premised on no-contact order prohibiting communication with his children likely would not survive strict scrutiny review); *see also Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d at 702 (holding that the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests . . . including the

---

[448] *Id.*

rights to . . . direct the education and upbringing of one's children" (internal quotation marks and citations omitted)); *Franz v. United States*, 707 F.2d 582, 602 (D.C. Cir. 1983). The district court further explained that the government must make at least some showing of parental unfitness to establish a compelling governmental interest in violating the plaintiff's right to family integrity. *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 501.

The facts in our case are comparable to the separations of parent and child in *Ms. L*, 302 F. Supp. 3d 1149 (S.D. Cal. 2018), *Quilloin*, 434 U.S. 246 (1978), and *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d 491 (D.D.C. 2018). In those cases, district courts found that the government violated the parents' substantive due process right when the government, as here, separated families for no legitimate governmental reason. The government can proffer no reason for its policies that have led to the separation of children from their parents.

Here, the City and County's discriminatory conduct has threatened the family integrity of the Black unhoused.[449] A disproportionate number of Black unhoused families directly stems from decades of systemic racism intended to segregate and disenfranchise the Black community. Indeed, as noted by the Los Angeles Homeless Services Authority, "Black people have been historically and systematically precluded from housing opportunities, including through redlining, exclusionary zoning, and other forms of discrimination codified by federal, state, and local law."[450] Despite acknowledgements of structural racism, the City and County perpetuate the devastating negative impact of such policies by compounding their effects.

The data squarely supports a finding that the city's current policies continue to drive homelessness in Black communities. As previously indicated, despite comprising only eight percent of the Los Angeles general population, Black Angelenos made up 42% of the homeless population.[451] "Homelessness is a byproduct of racism," said Heidi Marston, Director of LAHSA, "we continue to see that Black people are overrepresented in our homeless population, and that Black African Americans are four times more likely to become homeless than their

---

[450] LAHSA REPORT, *supra* note 4, at 7.
[451] *Id.* at 9.

82

112

white counterparts."[452] Applied to the family context, this reality presents even graver consequences: the inability to safely protect one's child. Data from LAHSA's 2020 Greater Los Angeles Homeless Count shows that 5,988 Black persons are experiencing homelessness as part of family units.[453] This figure is more than *five times* the 952 white persons experiencing homelessness as part of family units.[454]

As mentioned above, City and County policies enacted against Black communities—in particular, redlining, eminent domain, and exclusionary zoning—removed and deprived Black families from their land, creating surges of housing insecurity over the past century.[455] However, while the number of unhoused Black individuals rises, the number of white unhoused individuals has decreased—demonstrating that current policies are compounding the explicitly racialized policies of the twentieth century.[456] In fact, the city's own data revealed this: between 2016 and 2017, the number of unhoused Black Angelenos increased by 22%, while the number of unhoused white Angelenos decreased by seven percent in the same time frame. [457] Yet the city remains deliberately indifferent to the rising number of Black Angelenos in danger.

The reality of the COVID-19 pandemic presents even graver consequences for unhoused Black families: the inability to protect one's child from infectious disease. Councilwoman Nury Martinez and Councilmember Mark Ridley-Thomas reported that "[m]ore than 269,000 K-12 students [are] currently experiencing, or on the brink of homelessness across California, enough to fill Dodger Stadium five times over. This is the picture of homelessness in Los Angeles today—a crisis that has been allowed to fester for decades, and has greatly worsened due to COVID-19."[458] Councilwoman Martinez and Councilmember Ridley-Thomas continued

---

[452] Gina Pollack, *Garcetti: LA Has Made Progress On Homelessness Issue, Despite Increasing Numbers*, LAIST (June 12, 2020), https://laist.com/latest/post/20200612/garcetti-gives-updates-on-coronavirus-and-protests-in-losangeles.

[453] *HC2020 Family Households*, L.A. HOMELESS SERVS. AUTH. (Nov. 6, 2020), https://www.lahsa.org/documents?id=4978-hc2020-family-households.

[454] *Id*.

[455] LUSKIN REPORT, *supra* note 10, at 20.

[456] LAHSA REPORT, *supra* note 4, at 9.

[457] *Id*.

[458] Nury Martinez & Mark Ridley-Thomas, *Fighting COVID-19 Means Fighting the Cycle of Homelessness*, L.A. SENTINEL (Mar. 25, 2021), https://lasentinel.net/fighting-covid-19-means-fighting-the-cycle-of-homelessness.html.

that "the virus hits low-income communities and communities of color particularly hard, forcing many into homelessness at shocking rates."[459]

To protect unhoused individuals during the pandemic, Governor Gavin Newsom directed an initiative in April 2020 titled "Project Roomkey" to house 15,000 homeless unhoused Californians in hotel and motel rooms.[460] But a May 2020 report to the Board of Supervisors detailed that Project Roomkey rooms have been disproportionately extended to white homeless Angelenos—exacerbating the risks to unhoused Black families that already disproportionately bear the harmful effects of the city and county's failure to address homelessness. *Id*. at 60. In fact, COVID-19 mortality rates are higher for Black and Latino/a populations compared to mortality rates for white populations in California, escalating the need for equal—if not increased—access to services. *See id*. at 61.[461]

Most recently, the city's indefinite suspension of "all benchmarks and deadlines pertaining to current HHH projects" as of April 2020 further entrenched the marginalization of communities of color by abandoning once again the City's most vulnerable at the peak of a global crisis. Only 489 of the 10,000 promised housing units have been produced in the four years of HHH funding, leaving on the streets 1,255 unhoused Black individuals who are part of family units.[462] Such policies have become a vehicle for the continued subordination of communities of color. As Black families face housing insecurity at disproportionate rates, the risk of family separation increases.

In many instances, homeless children are separated from their parents and placed in foster care systems, where separation increases the mental trauma suffered by parent and child. Traumatic family separation affects the development of both cerebral activity and other organ systems.[463] This results in anxiety, post-traumatic stress disorder, and has been shown to lead to higher rates of poverty and food insecurity.[464] Unhoused Black families are thus punished not only by a lack of

---

[459] *Id*.

[460] LAHSA REPORT, *supra* note 4, at 9.

[461] "African Americans and Latinx account for 66 percent of COVID cases among people experiencing homelessness and 72 percent of the deaths as a result of COVID." Dkt 241-1 at 11.

[462] *See HC2020 Family Households,* L.A. HOMELESS SERVS. AUTH. (Nov. 6, 2020), https://www.lahsa.org/documents?id=4978-hc2020-family-households.

[463] Laura Santhanam, *How the Toxic Stress of Family Separation Can Harm a Child*, PBS (June 18, 2018), https://www.pbs.org/newshour/health/how-the-toxic-stress-of-family-separation-can-harm-a-child.

[464] *Id*.

affordable housing, but by the infliction of psychological and emotional trauma. The potential for lifelong trauma suffered by both the parent and child cannot be overstated.

Furthermore, Black children make up about seven percent of Los Angeles County's youth population, but about 24% of the children who receive services from the Los Angeles County Department of Children and Family Services (DCFS).[465] The lack of stability stemming from family separation and a lack of resources drives many children in foster care to fall behind their peers in educational settings and increases the risk of lasting behavioral issues. [466] The Alliance for Children's Rights reported that by the third grade, 80% of children in foster care have repeated a grade; only five percent of them are proficient in math; 75% of young women in foster care report at least one pregnancy by age 21 compared to only one third of their peers who are not in foster care; half of young men aging out of foster care have become fathers by the age of 21 compared to 19% of their peers who were not in foster care; nearly half of all children in foster care have learning disabilities or delays; only 58% of young people in foster care graduate from high school; only three percent graduate from college; and half of all young adults who age out of foster care end up homeless or incarcerated. [467] These traumas of family separation "shock[s] the conscience" and do not comport "with rights implicit in the concept of ordered liberty." *United States v. Salerno*, 481 U.S. 739, 746 (1987).

Los Angeles's homelessness crisis has created a cyclical pattern in which Black families are disproportionately uprooted from their community and separated upon experiencing homelessness, driving Black children into the Los Angeles foster care system. The cycle must end. The Due Process Clause does not permit such governmental misconduct causing Black families to disproportionately face homelessness and family separation.

It is clear to the Court that the Due Process Clause does not allow this kind of governmental misconduct. The Court is confident that this limited right to family integrity amongst unhoused Black families is "implicit in the concept of ordered liberty." *See Nunez*, 147 F.3d at 870. As the Supreme Court has held, rights arise not only from "ancient sources," but also "from a better informed

---

[465] *Id.*
[466] *Id.*

85

understanding of how constitutional imperatives define a liberty that remains urgent in our own era." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015). The severe disparity between treatment of Black unhoused families compared to white unhoused families—to say nothing of the public health risks illuminated by the ongoing COVID-19 pandemic—present just such an urgent crisis and better inform the constitutional understanding of ordered liberty.

This practice of disrupting unhoused Black families' constitutional right to family integrity by compounding structural racism in present day policies is sufficient to find Plaintiffs have a likelihood of success on their due process claim. A practice of this sort implemented in this manner is likely to be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Lewis*, 523 U.S. at 847 n.8, interferes with rights "'implicit in the concept of ordered liberty[,]'" *Rochin v. Cal.*, 342 U.S. 165, 169 (1952) (quoting *Palko v. State of Conn.*, 302 U.S. 319, 325 (1937)), and is so "'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957).

### ii. State law grounds

The California Welfare and Institutions Code provides as follows:

> Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

Cal. Welf. & Inst. Code § 17000 (West 2020). This provision is intended "to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed." *Id.* § 10000. Such aid and services shall be "provided promptly and humanely, with due regard for the preservation of family life," and on a non-discriminatory basis. *Id.* Courts have interpreted § 17000 as imposing requirements to both provide

"general assistance" and "subsistence medical care to the indigent." *Hunt v. Super. Ct.*, 21 Cal 4th 984, 1011–13 (1999); Dkt. 265 at 26.

The court in *Scates v. Rydingsword* interpreted § 17000 to mean that municipalities had discretion in determining which services to provide to homeless individuals. *Scates v. Rydingsword*, 229 Cal. App. 3d 1085, 1099 (1991). Defendants similarly argue that, in this case, "the County has *discretion* to determine how to discharge its obligations." Dkt. 270 at 22. The court in *Tailfeather v. Bd. of Supervisors*, however, held that medical care must, at a minimum, be "at a level which does not lead to unnecessary suffering or endanger life and health." *Tailfeather v. Bd. of Supervisors*, 48 Cal. App. 4th 1223, 1240 (1996). Given the epidemic levels of homelessness in the City and County of Los Angeles, it is clear that the City and County have failed to meet this duty. As LAHSA Executive Director Heidi Marston has stated, "housing is healthcare." Dkt. 265 at 27. The empirical evidence bears out the truth of this soundbite; there is a clear link between living on the street and experiencing adverse health outcomes. L.A.'s homeless population is dying in record numbers. Rare diseases run rampant in Skid Row, risking overflow into the rest of Los Angeles. Older individuals, especially older women, who are more at risk and in need of health services, are overrepresented on the streets of LA. The County has clearly failed to meet its minimum obligations under § 17000 to provide life-preserving, medically necessary services to the homeless.

Even outside of its inaction and inertia on the housing and shelter front, the County has also failed to meet its minimal duties to provide direct medical care that is "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain." Cal. Welf. & Inst. Code § 14059.5(a). By the County's own admission, the current 22.7 mental health beds available per 100,000 individuals across the County comes nowhere close to the 50 public mental health beds per 100,000 individuals that leading mental health experts say is necessary to minimally meet the needs of the population. Dkt. 265 at 9. The 138-page report that the Department of Mental Health returned in January 2019 extensively documented the numerous gaps between community needs and available services, specifically highlighting the severity of the access problem when it came to mental health and detoxification beds. In December 2020, a year after the report was published, the Department of Mental Health produced a follow-on analysis that showed that while a pilot program sought to procure 500

87

117

beds across a two-year program, only 156 new beds were created in the first year.[468] The County, even as it recognizes the severity of the problems with its current service provision model, appears to be unwilling or unable to fulfill both the goals it sets for itself and the statutory minimums of § 17000.

The Court further finds the City of Los Angeles is likewise likely liable for violations of § 17000. For the last thirty-five years, there have been calls for the City and County of Los Angeles to work together to address the crisis of homelessness.[469] Twenty-five years ago, the California Supreme Court in *Tobe* found that these provisions of the Welfare and Institutions Code do not apply to cities *within* counties. *See Tobe v. City of Santa Ana*, 9 Cal. 4th 1069, 1104 n.18 (1995). However, in the intervening decades, the institutional and financial landscape in this area has changed drastically in ways that neither the California Legislature nor the California Supreme Court could have reasonably foreseen, and the joint ventures long called for have taken robust form. As numerous programs and funding arrangements demonstrate, the formal jurisdictional divide between cities and counties under § 17000 has been substantially blurred, especially in the context of relieving homelessness. Consider the following examples:

In 2021, the City of Los Angeles contributed over $327 million to the Los Angeles Housing Services Authority ("LAHSA").[470] This past year, Governor Newsom and California's legislature pioneered Project Roomkey, which made $150 million in emergency COVID-19 aid for the homeless available directly to local governments such as the City of Los Angeles.[471] Project Roomkey allowed state and local governments to receive up to 75% cost-share reimbursement from

---

[468] JONATHAN E. SHERIN, DEP'T OF MENTAL HEALTH, ONE YEAR PROGRESS REPORT ON THE MOTION, "ADDRESSING THE SHORTAGE OF MENTAL HEALTH HOSPITAL BEDS II, (ITEM 9, AGENDA OF DECEMBER 3, 2019)" 2 (2020), http://file.lacounty.gov/SDSInter/bos/supdocs/132696.pdf.

[469] "City and county governments traditionally have been wary of crossing jurisdictional lines, but this problem begs for the attention of both. The county has responsibility for welfare questions, and the city oversees many building and safety aspects involved in sheltering the homeless. It is time for leadership from both the mayor's office and the county Board of Supervisors . . . to start finding land and money for shelters, with set deadlines for doing so." *Help the Homeless*, L.A. TIMES (Jan. 8, 1985), https://www.latimes.com/archives/la-xpm-1985-01-08-me-7426-story.html.

[470] *State of Homelessness Presentation*, L.A. Homeless Servs. Auth. (2021), https://www.lahsa.org/documents?id=5196-state-of-homelessness-presentation.pdf.

[471] *At Newly Converted Motel, Governor Newsom Launches Project Roomkey: A First-in-the-Nation Initiative to Secure Hotel & Motel Rooms to Protect Homeless Individuals from COVID-19*, OFF. OF GOV. GAVIN NEWSOM (Apr. 3, 2020), https://www.gov.ca.gov/2020/04/03/at-newly-converted-motel-governor-newsom-launches-project-roomkey-a-first-in-the-nation-initiative-to-secure-hotel-motel-rooms-to-protect-homeless-individuals-from-covid-19/.

the Federal Emergency Management Agency ("FEMA") for hotel and motel rooms, including wraparound supports such as meals, security and custodial services.[472] In January, 2021, President Biden issued an executive order directing FEMA to raise that cost-share reimbursement to 100%.[473] Further, Project Roomkey tasked local governments like the City of Los Angeles with providing behavioral and health care services, identifying shelter or encampment residents for hotel isolation placements, and even transporting homeless people.[474]

In 2020, the U.S. Department of Housing and Urban Development ("HUD") allocated a total of $3.96 billion across Rounds 1 and 2 of the CARES Act Emergency Solutions Grant ("ESG").[475] ESG funds are to be used to "prepare for, and respond to the coronavirus pandemic (COVID-19) among individuals and families who are homeless or receiving homeless assistance."[476]  Across both rounds of ESG funding, the County of Los Angeles was allocated $69,050,943. At the same time, the City of Los Angeles was allocated more than double that amount - $183,598,812.[477]

As part of the Homeless Emergency Aid Program ("HEAP"), the City of Los Angeles was allocated $85,013,607.[478] LAHSA was further allocated another $81,000,000. At the direction of the City Council, the $85 million was directed to several initiatives, including $45 million to bridge housing; $20 million to Skid Row services, including temporary crisis and bridge housing, storage, hygiene programs, and reentry services for formerly incarcerated individuals; $11 million

---

[472] *Id.*

[473] Memorandum from Fesia A. Davenport on Project Roomkey Extensions and Expansion with 100% FEMA Reimbursement (Item No. 2, Agenda of February 9, 2021) (Mar. 2, 2021), http://file.lacounty.gov/SDSInter/bos/bc/1103505_3-2-21PRKExtension_Expansionwith100_FEMAReimbursement.pdf.

[474] *At Newly Converted Motel, Governor Newsom Launches Project Roomkey: A First-in-the-Nation Initiative to Secure Hotel & Motel Rooms to Protect Homeless Individuals from COVID-19*, OFF. OF GOV. GAVIN NEWSOM (Apr. 3, 2020), https://www.gov.ca.gov/2020/04/03/at-newly-converted-motel-governor-newsom-launches-project-roomkey-a-first-in-the-nation-initiative-to-secure-hotel-motel-rooms-to-protect-homeless-individuals-from-covid-19/.

[475] CARES Act Emergency Solutions Grant (ESG) Round 2 Funding Under COVID-19 Supplemental Appropriations (June 2020), https://www.hud.gov/sites/dfiles/CPD/documents/ESG_CARES_Act_Round_2_Allocation_Methodology_rev.pdf.

[476] *ESG-CV Award Letters Distributed*, HUD EXCHANGE (Apr. 7, 2020), https://www.hudexchange.info/news/esg-cv-award-letters-distributed/.

[477] CARES Act Emergency Solutions Grant (ESG) Round 2 Funding Under COVID-19 Supplemental Appropriations 5–7 (June 2020), https://www.hud.gov/sites/dfiles/CPD/documents/ESG_CARES_Act_Round_2_Allocation_Methodology_rev.pdf.

[478] Cal. Homeless Coordinating & Financing Council, SB 850 Overview 11, https://www.bcsh.ca.gov/hcfc/documents/hcfc_heap_powerpoint.pdf.

to general funding "to support homeless prevention and diversion programs, general homeless services, voluntary storage programs, emergency response, and hygiene services"; and $4 million "to invest in services for homeless youth or youth at risk of being homeless."[479]

In April 2021, HUD Secretary Marcia Fudge announced nearly $5 billion in new grants to state and local governments nationwide through the American Rescue Plan.[480] That funding is to be used for "rental assistance, the development of affordable housing and other services to help people experiencing or on the verge of homelessness."[481] Of that $5 billion, $99.9 million will flow directly to the City of Los Angeles, while another $32.6 million will flow to the County.[482]

It is well-established that the City receives funds directly from the state and federal government to be used for homeless initiatives. Further, it is clear that the City, on many occasions, has decided to use vast swaths of those funds to provide services to the homeless. Simply put, under the aegis of local, state, and federal initiatives, the City and County together have become jointly responsible for fulfilling the mandate of § 17000, at least as it pertains to confronting the crisis of homelessness. Therefore, the Court finds that the most reasonable interpretation of § 17000—the interpretation most in step with modern partnerships and funding arrangements between the City and County—is that it applies not only to counties alone, but to cities and counties when they undertake a joint venture directed to the goals of § 17000, such as a coordinated effort to alleviate homelessness in their jurisdictions. Thus, the Court finds that Plaintiffs are likely to succeed on the merits of a claim under Cal. Welf. & Inst. Code § 17000 both against the City and the County.

### iii.    Americans With Disabilities Act

Plaintiffs are also likely to succeed on the merits of a claim under the Americans with Disabilities Act (ADA). The ADA requires that individuals with disabilities be afforded "the full and equal enjoyment of the goods, services,

---

[479] *Putting New Resources to Work*, ERIC GARCETTI, https://www.lamayor.org/HEAP (last visited Apr. 20, 2021).
[480] Tracy Jan, *How Biden Stimulus Bill Will Target Homelessness*, WASH. POST (Apr. 8, 2021), https://www.washingtonpost.com/us-policy/2021/04/08/homeless-hud-marcia-fudge/.
[481] *Id*.
[482] American Rescue Plan Act HOME Supplemental Allocations, https://www.hud.gov/sites/dfiles/CPD/documents/HOME-ARP.pdf.

facilities, privileges, advantages, or accommodations of any place of public accommodation…" 42 U.S.C. § 12182(a). Public entities are required to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part." 28 C.F.R. § 35.133(a) (2011). Put differently, the ADA imposes an affirmative burden on public entities, such as the City and County of Los Angeles, to "make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination." *Fry v. Napoleon Comm. Schs.*, 137 S. Ct. 743, 749 (2017) (quoting 28 C.F.R. § 35.130(b)(7) (2016)).

Because of the City and County's persistent inaction and inertia in creating shelter for the homeless, thousands of homeless individuals have erected tents that obstruct city sidewalks. To satisfy the ADA, public sidewalks must have at least 36 inches of passable sidewalk, and the City and County are responsible for ensuring that this requirement is met. 36 C.F.R. § 1191, app. D. § 403.5.1 (2014); *Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1093 (C.D. Cal. 2013). Hundreds of city sidewalks, not only in Skid Row but across the City and County of Los Angeles, fail to meet the minimum requirements of the ADA due to the creation of homeless encampments. Again, it must be emphasized that these encampments— and the resulting ADA violations—are the outcome of decades of active policy choices and deliberate indifference on the part of the City and County. The Court thus finds that Plaintiffs are likely to succeed on an ADA claim under this theory.[483]

---

[483] Plaintiffs also present a second theory of liability under the ADA, which is that the City has violated the ADA by placing homeless individuals in "dangerous conditions where they are very likely to be harmed." Dkt. 265 at 34. Plaintiffs argue that the containment policy "deliberately placed substance abusers in an area replete with the illegal trafficking of dangerous and addictive drugs." Dkt. 265 at 35. To establish an ADA violation, a plaintiff must show that "1) she is a qualified individual with a disability; 2) she was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and 3) such exclusion or discrimination was by reason of her disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). Mental illness and addiction constitute disabilities within the bounds of the ADA. 42 U.S.C. § 12102; *Crumbaker v. McLean County, Ky.*, 37 F. App'x 784, 785 (6th Cir. 2002) ("A person addicted to illegal drugs is considered disabled within the meaning of the ADA if the drug addiction 'substantially limits one or more of the major life activities' of that person."). While the Court is sympathetic to Plaintiffs' argument that the City has created dangerous conditions in Skid Row for those suffering from mental illness or addiction, these actions do not constitute exclusion or discrimination with regard to public services as required to find an ADA violation. Thus, the Court finds that Plaintiffs are unlikely to succeed on an ADA claim under this theory.

Accordingly, the Court finds a sufficient likelihood of success on the merits of the state law grounds, and holds that the facts and law clearly warrant a preliminary injunction.

## B. IRREPARABLE INJURY

Turning to the next factor, Plaintiffs must show they are "'likely to suffer irreparable harm in the absence of preliminary relief.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). "It is well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Id.* (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted).

No harm could be more grave or irreparable than the loss of life. In 2020, 1,383 homeless people died on the streets of Los Angeles, and an estimated five more die each day. Furthermore, as explained above, Plaintiffs have demonstrated the likelihood of a deprivation of their constitutional rights, and thus they have satisfied this factor.

## C. BALANCE OF EQUITIES

Turning to the third factor, "[t]o obtain a preliminary injunction, a plaintiff must also demonstrate that 'the balance of equities tips in his favor.'" *Hernandez*, 872 F.3d at 995 (quoting *Winter*, 555 U.S. at 20). As with irreparable injury, when a plaintiff establishes "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

Again, as explained above, Plaintiffs have demonstrated the likelihood of a deprivation of their constitutional rights, and thus they have satisfied this factor.

## D. PUBLIC INTEREST

The fourth and final factor for consideration is the public interest. *See Hernandez*, 872 F.3d at 996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)) ("When, as here, 'the impact of an injunction reaches beyond

the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.'") To obtain the requested relief, "Plaintiffs must demonstrate that the public interest favors granting the injunction 'in light of [its] likely consequences,' i.e., 'consequences [that are not] too remote, insubstantial, or speculative and [are] supported by evidence.'" *Id.* (quoting *Stormans*, 586 F.3d at 1139). "'Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.'" *Id.* (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

As discussed above, Plaintiffs have demonstrated the likelihood of a violation of their constitutional rights, and thus have satisfied this factor.

Furthermore, the current state of the homelessness crisis in Los Angeles begs intervention. The City argues that granting this preliminary injunction would not be in the public's interest because it would "usurp the discretionary policy making decisions of the City's elected officials and impose mandatory duties." Dkt. 269 at 32. The Intervenors similarly state in their opposition that "Plaintiffs fail to put forth any argument, let alone evidence to meet its burden of showing that such a dramatic encroachment into the provenance of the City and the County is warranted, let alone why such a broad injunction is in the public interest." Dkt. 275 at 12. The Court, however, seeks to ensure accountability, and promote action where there has been historic inaction, by issuing a practical flexibility in its remedy. The City's inaction has had a deep, disparate, and deadly impact on the citizens of Los Angeles. And no public interest is more paramount than protecting the lives of our citizens.

Nor does the Court find reason to withhold a preliminary injunction in light of Mayor Garcetti's newly announced spending plan.[484]  For one thing, the plurality of this budget will be drawn from funds allocated under Proposition HHH, which are already designated for homelessness relief. And as the Los Angeles Times notes, the City's efforts to combat homelessness have repeatedly fallen short of their stated goals.[485] For example, despite receiving state and federal funding for Project Roomkey, the City and County never managed to contract for

---

[484] *See* Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.
[485] *Id.*

93

even a third of the promised 15,000 hotel and motel rooms. After reaching a peak of 4177 operational rooms in August 2020, the program has steadily withered: as of April 12, 2021, only 2079 rooms were operational, 1693 of which were occupied—just over ten percent of the capacity originally promised. In spite of abundant funding drawn from local, state, and federal budgets, the City and County fell far short of their stated goal. This embarrassing performance does not inspire confidence, to say the least, in the City's new budget. From mishandling Project Roomkey to sinking $1.2 billion into the ever-delinquent Proposition HHH, Los Angeles has documented a long history of plans or budgets that have fallen short, year after year, as the homelessness crisis worsens.

The Court, therefore, finds no reason to believe that the City's new budget will be in any way adequate to meet the crisis of homelessness or overcome decades of intentional racism and deliberate indifference. For years—too many years—the homelessness epidemic in Los Angeles has only continued to worsen under the auspices of admirable intentions and impressive budgets. In the Court's view, this latest budget is no different.

Finally, as explained in our discussion of *Brown* and its progeny, constitutional violations as grave as those in front of the Court today give rise to "a district court's equitable powers to remedy past wrongs." *See Swann*, 402 U.S. at 15.

### E. HEARING

Finally, the Court acknowledges that it may appear unusual to issue a preliminary injunction without a hearing on the motion. In the Ninth Circuit, however, "there is no presumption that the issuance of a preliminary injunction requires an evidentiary hearing"; instead, the decision to hold a hearing is left to the sound discretion of the district court. *Softketeers, Inc. v. Regal W. Corp.*, 788 F. App'x 468, 469 (9th Cir. 2019) (citing *Int'l Molders' & Allied Workers' Loc. Union v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986)); *see also Nelson*, 799 F.2d at 555 (noting that the text of Rule 65(a) does not impose "a purely technical rule" requiring an evidentiary hearing on a preliminary injunction). "[I]f the facts are simple and little time would be taken, a court may be required to hold an evidentiary hearing on a motion for injunction." *State of Or.*, 913 F.2d 576, 582 (9th Cir. 1990) *cert. denied sub nom. Makah Indian Tribe v. United States,* 501 U.S.

94

124

1250, (1991). However, the Ninth Circuit has emphasized the lack of presumption in favor of evidentiary hearings "especially if the facts are complicated." *Id.*

The Court finds that no hearing is necessary at this juncture. While Defendants contend that "the evidentiary record is insufficient to support the drastic equitable relief [Plaintiffs] request," for over a year now, the Court has repeatedly held hearings in this case, allowing the parties, intervenors, and community representatives to voice their concerns, present evidence, and argue. Dkt. 269 at 13. In practical terms, the Court has already held 12 evidentiary hearings, and this preliminary injunction is rooted in the extensive factual record developed through these hearings. After numerous hearings and careful review of the motion and opposition, the Court finds it appropriate—in accordance with the emergency conditions of homelessness in Los Angeles—to grant preliminary injunctive relief without an additional hearing. To do so is consistent with Ninth Circuit precedent, the text and spirit of Rule 65, and the urgent need for relief this case presents.

## III.   AVAILABILITY OF EQUITABLE REMEDIES

### A. FACTUAL BASIS FOR IMMEDIATE RELIEF

Los Angeles is indisputably facing a homelessness crisis that merits immediate, emergency action. Los Angeles Mayor Eric Garcetti has called the homelessness crisis "the humanitarian crisis of our lives"[486] and has "called for a FEMA-level response to our homelessness crisis," drawing a comparison to the aftermath of the 1906 Great San Francisco Earthquake, which displaced more than 200,000 Californians.[487] He acknowledged the urgency of the situation, demanding that we "must respond like it's an earthquake – and do more, faster."[488] LAHSA

---

[486] *LA Mayor Eric Garcetti Calls Homelessness The 'Humanitarian Crisis Of Our Lives'*, NPR (Sept. 21, 2019), https://www.npr.org/2019/09/21/763073646/l-a-mayor-eric-garcetti-calls-homelessness-the-humanitarian-crisis-of-our-lives.

[487] Eric Garcetti, Mayor of L.A., State of the City (Apr. 19, 2020), https://www.lamayor.org/SOTC2020; *Rising to the Challenge: Helping Homeless Angelenos*, ERIC GARCETTI (June 11, 2019), https://www.lamayor.org/rising-challenge-helping-homeless-angelenos.

[488] Mayor Eric Garcetti (@MayorOfLA), FACEBOOK (June 12, 2019), https://www.facebook.com/MayorOfLA/posts/10157299485724806?comment_id=10157306801444806&reply_comment_id=10157308404509806.

Executive Director, Heidi Marston, has similarly recognized that "[w]e have an emergency on our streets and we need an emergency response."[489]

And as mentioned above, L.A. government officials have acknowledged that racism has impacted homelessness. "I want to be very clear that homelessness is a byproduct of racism," stated LAHSA's Heidi Marston.[490] "We continue to see that Black people are overrepresented in our homeless population, and that Black African Americans are four times more likely to become homeless than their white counterparts."[491] As of January 2020, LAHSA reported that 21,509 Black people were without permanent housing in LA—a number that has likely increased as a result of the pandemic given COVID-19's significant impact on communities of color.[492]

Despite frequent acknowledgments of the emergency nature of homelessness in L.A.—an emergency borne unequally across racial lines—City and County efforts to address the problem have been wholly inadequate. Indeed, in the year since this litigation began, there has been a 32% increase in the number of homeless deaths compared to the previous year.[493] 713 homeless people died between March and July 2020 alone – more than double the number of units of housing built under Proposition HHH in the 4 years since it was passed.[494] Because the City and County have repeatedly failed to do so, the Court now finds it necessary, in the proper exercise of its equitable powers, to craft an immediate response to this unconscionable humanitarian crisis.

## B.  EQUITABLE POWER TO ISSUE RELIEF

---

[489] Rob Hayes, *LA Homelessness Authority Calls for Government to Treat Homelessness Crisis with Same Urgency as Natural Disaster*, ABC7 (Feb. 19, 2020), https://abc7.com/los-angeles-homeless-services-agency-lahsa-homelessness-in-california/5945026/.

[490] Gina Pollack, *Garcetti: LA Has Made Progress On Homelessness Issue, Despite Increasing Numbers*, LAIST (June 12, 2020), https://laist.com/latest/post/20200612/garcetti-gives-updates-on-coronavirus-and-protests-in-losangeles.

[491] *Id.*

[492] Gale Holland, Racism is the Reason Black People Are Disproportionately Homeless in L.A., Report Shows, L.A. TIMES (June 12, 2020), https://www.latimes.com/california/story/2020-06-12/racism-making-more-black-people-la-homeless.

[493] Jessica Goodheart, *Homeless Deaths in Los Angeles Rose by More than 30% in 2020*, CAPITAL & MAIN (Feb. 2, 2021), https://capitalandmain.com/homeless-deaths-in-los-angeles-rose-by-more-than-30-percent-in-2020-0202.

[494] CTR. FOR HEALTH IMPACT EVALUATION, RECENT TRENDS, *supra* note 317.

Under Article III of the Constitution, "[t]he judicial Power" of the federal courts "shall extend to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States[.]" U.S. Const., art. III, § 2.

While Defendants argue that "Article III precludes the Court from dictating how the City exercises its discretionary decision-making or spending to address issues arising out of homelessness," Dkt. 269 at 10, after a court identifies a right and a corresponding violation, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971). "In fashioning and effectuating the decrees, the courts will be guided by equitable principles." *Brown v. Bd. of Educ. of Topeka, Kans.*, 349 U.S. 294, 300 (1955). "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Id.* As such, district courts have broad discretion to create comprehensive relief that addresses "each element contributing to the violation" at issue. *Hutto v. Finney*, 437 U.S. 678, 687 & n.9 (1978). The Court's equitable powers allow it to tailor relief to different circumstances, regardless of any procedural complexity. *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow.").

A court may employ equitable powers as a means of enforcement to compel defendants to take certain steps to ensure compliance with constitutional mandates. *See Brown II*, 349 U.S. at 301 (instructing the district courts "to take such proceedings and enter such orders and decrees consistent with this opinion as are necessary and proper to admit to public schools on a racially nondiscriminatory basis with all deliberate speed the parties to these cases"); *see also United States v. Fordice*, 505 U.S. 717, 727–28 (1992) (noting that *Brown v. Board of Education* and its progeny mandate an "affirmative duty to dismantle its prior dual education system," and that "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation"). A district court is not bound by a plaintiff's prayer for relief and has broad discretion to determine a flexible remedy that balances the competing interests at stake. *See Brown v. Plata*, 563 U.S. 493, 538 (2011); *Lemon*, 411 U.S. at 200–01 (plurality op.).

97

127

The equitable powers of federal courts encompass injunctions that affect the rights of parties not before the court. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) (noting that a district court, "in exercising its equity powers," may enjoin conduct "outside its territorial jurisdiction") (citations omitted). In *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), the Supreme Court, addressing the validity of nationwide class relief, analyzed the principle of "complete relief," stating that nationwide classes are not "inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." 442 U.S. at 702. "Nationwide relief here is necessary to provide complete relief to the plaintiffs for the 'violation established.'" *District of Columbia v. U.S. Dep't of Agric.* 444 F. Supp. 3d 1, 49 (D.D.C. 2020) (citing *Califano*, 442 U.S. at 702); *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) ("[A]n injunction is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—*if such breadth is necessary to give prevailing parties the relief to which they are entitled*.").

As discussed below, courts often use these broad equitable powers to remedy constitutional and statutory violations by local governments. Notably, the Ninth Circuit has specifically upheld equitable relief in the context of equal protection and due process violations, in addition to statutory violations of the Americans with Disabilities Act and California Welfare and Institutions § 17000.

### i.    Constitutional Violations Provide Grounds for Equitable Relief

Courts have imposed structural equitable relief in order to remedy constitutional violations. *See Sierra Club v. Trump*, 963 F.3d 874, 888 (9th Cir. 2020) ("Certain provisions of the Constitution give rise to equitable causes of action. Such causes of action are most plainly available with respect to provisions conferring individual rights, such as the Establishment Clause or the Free Exercise Clause."); *see also Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 399 (1992) (Stevens, J. dissenting) ("When a district court determines, after a contested trial, that a state institution is guilty of a serious and persistent violation of the Federal Constitution, it typically fashions a remedy that is more intrusive than a simple order directing the defendants to cease and desist from their illegal conduct. A

district court has a duty to command a remedy that is effective, and it enjoys the broad equitable authority necessary to fulfill this obligation" (citations omitted).). Certainly, "the nature and scope of the remedy are to be determined by the violation." *Gilmore v. California*, 220 F.3d 987, 1005 (9th Cir. 2000). "But where [] a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition that offends the Constitution.'" *Id*. (citation omitted).

The Supreme Court has established the clear authority of courts to issue mandatory injunctions that remedy constitutional violations, including equal protection violations, caused by state and local governmental agencies. In *Brown*, the Supreme Court ruled that courts had the power to order structural changes in school systems to desegregate schools, such as "ordering the immediate admission of plaintiffs to schools previously attended only by white children." *Brown II*, 349 U.S. at 300–01; *see also Swann,* 402 U.S. at 31 (affirming a district court's injunction requiring school board to implement plan to desegregate school district); *Milliken v. Bradley*, 433 U.S. 267, 269 (1977) (upholding the equitable powers of a district court, as part of a desegregation decree, to "order compensatory or remedial educational programs for schoolchildren who have been subjected to past acts of de jure segregation."). Similarly, the Supreme Court has recognized the equitable power of federal courts to order structural changes to remedy violations of unconstitutional due process. *See, e.g., Hutto*, 437 U.S. at 683 (approving a district court's orders to change various prison practices and policies to remedy constitutional violations).

In *Roman v. Wolf*, the Ninth Circuit affirmed in part the district court's issuance of a preliminary injunction that imposed a moratorium on an immigration and customs enforcement ("ICE") facility's receipt of new detainees, requiring specific sanitation measures, and ordering a reduction in the facility's population in light of the Covid-19 pandemic. 977 F.3d 935, 942 (9th Cir. 2020). The Ninth Circuit reasoned that "the district court had broad equitable authority to grant provisional relief to remedy a likely constitutional violation." *Id*. at 939. The circuit court continued that "[c]ourts have long recognized the existence of an implied cause of action through which plaintiffs may seek equitable relief to remedy a constitutional violation," and "the district court's power to grant injunctive relief included the authority to order a reduction in population, if necessary to remedy a constitutional violation." *Id*. at 941–42. That is, district

99

**129**

courts have the flexibility to order measures that they determine necessary to "bring the conditions to a constitutionally adequate level." *Id*. at 945–46. Further, in "time-sensitive circumstances, the district court's authority to issue relief encompassed the authority to grant provisional relief 'to bring an ongoing violation to an immediate halt.'" *Id*. at 942 (citing *Hutto*, 437 U.S. at 687 n.9). The Ninth Circuit recognized that the district court made detailed factual findings to support the preliminary injunction and noted in approval that the district court left particular details to the government's discretion, such as how to achieve the requisite population reduction and which detainees to release, deport, or transfer. *Id*. at 939.

### ii.    Statutory Violations Provide Grounds for the Court to Issue Equitable Relief

The power of district courts to compel government action also encompasses the redress of statutory violations. *See Armstrong v. Davis,* 275 F.3d 849, 870 (9th Cir. 2001), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005) (stating that "[s]ystem-wide [injunctive] relief is required if the injury is the result of violations of a statute . . . that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs), or if the unlawful policies or practices affect such a broad range of plaintiffs that an overhaul of the system is the only feasible manner in which to address the class's injury.").

For example, in *Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004), patients asserted an ADA claim against defendants including Los Angeles County, and sought a preliminary injunction seeking to bar the County from closing a rehabilitation center without providing plaintiffs with necessary medical and rehabilitative services elsewhere. The district court granted an injunction that barred the County from closing said rehabilitation center or reducing medical services until the County could guarantee that plaintiffs would receive comparable services from other healthcare providers in Los Angeles County. *Id.* at 993. In its deliberation, the district court considered the County's concerns of financial hardship, but was not persuaded of the County's claim that closing the center would save the County $58.6 million annually. *Id.* at 994. In affirming the district court, the Ninth Circuit held that "The district court did not abuse its discretion in

concluding that plaintiffs would suffer greater hardship absent preliminary relief
than the County would suffer because of the injunction." *Id*. at 998–99. The Ninth
Circuit noted that "the injunction does not mandate that the County keep [the
rehabilitation center] open at any cost; rather, it requires the County to somehow,
somewhere, continue to offer the services currently provided . . ." *Id.* at 999.  The
circuit court emphasized that when "[f]aced with [] a conflict between financial
concerns and preventable human suffering, [the Ninth Circuit has] little difficulty
concluding that the balance of hardships tips decidedly in plaintiffs' favor." *Id.*
(*citing Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

In addition to remedying violations of federal statutes, district courts may
also issue equitable relief to remedy to violations of state statutes. In *Harris v.
Board of Supervisors*, a group of patients also sued the County to prevent its
reduction of medical care at a hospital and closure of the same rehabilitation center
in *Roddle*. 366 F.3d 754, 757 (9th Cir. 2004). The patients there brought their
claims based on the California Welfare and Institutions Code §§ 10000, 17000 and
17001. *Id*. at 764. The district court issued a preliminary injunction, and the Ninth
Circuit affirmed. *Id.* "A lack of funds is no defense to a county's obligation to
provide statutorily required benefits." *Id.* (citing *Cooke v. Superior Court*, 213 Cal.
App. 3d 401, 413–14 (1989)).

### iii.  The *Plata* Case Guides This Court's Exercise of its Broad Equitable Authority

The Supreme Court's decision in *Brown v. Plata* upheld district courts'
authority to use their equitable powers when necessary to address constitutional
violations even where those powers shape local government's authority and
impacts their budget. 563 U.S. 493 (2011).

*The Supreme Court in Brown v. Plata Recognized That Courts May Act Even If
Their Orders Have a Budgetary Impact on Local Government*

In *Plata*, two consolidated class actions resulted in an order requiring
California to drastically reduce its prison population. *See id.* In the first case, a
district court found that Eighth Amendment rights had been violated when
prisoners with serious mental disorders alleged inadequate mental health care due

<div align="center">101</div>

<div align="right">**131**</div>

to prison overcrowding. *Id.* at 506–07. In the second case, the State stipulated to a remedial injunction when prisoners with serious medical conditions brought similar claims. *Id.* at 507–08. When the State failed to comply with that injunction, the district court appointed a receiver to oversee remedial efforts. *Id.* Upon request from both groups of plaintiffs, a three-judge panel convened under the Prisoner Litigation Reform Act ("PLRA"), and the cases were consolidated. The panel entered a remedial order mandating a reduction of the State's prison population to 137.5% of design capacity within two years, when the prisons held "nearly double" their capacity at the time of trail. *Id.* at 501. Governor Brown appealed.

The Supreme Court affirmed the panel's ruling, holding that the PLRA authorizes "the relief afforded in this case and that the court-mandated population limit is necessary to remedy the violation of prisoners' constitutional rights." *Id.* at 502. The Court emphasized that "the law and the Constitution demand recognition of certain [] rights. . . . If government fails to fulfill [its] obligation, the courts have a responsibility to remedy the resulting [] violation." *Id*. at 510-11. In response to the State's concerns that the district court's order limited the State's authority to run its prisons, the Court noted that "[w]hile the order does in some respects shape or control the State's authority in the realm of prison administration, it does so in a manner that leaves much to the State's discretion . . . The order's limited scope is necessary to remedy a constitutional violation." *Id.* at 553. Accordingly, if a district court finds an ongoing Constitutional violation, it is obligated to impose a remedy, while budgetary and capacity concerns can be adequately addressed by the court by giving the party sufficient discretion in how to remedy the violation.

*The District Court Decisions Underlying the Plata Opinion Are Analogous to the Circumstances of This Case and Provide Support for Broad Judicial Relief*

The second case later consolidated in *Brown v. Plata* was originally filed in the Northern District in 2001. *Plata v. Schwarzenegger* ("*Schwarzenegger I*"), No. C01-1351 TEH, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005). There, plaintiffs claimed that the State of California was providing constitutionally inadequate medical care at its state prisons. *Id.* at *1. Defendants agreed multiple times to take certain steps to address issues, first in a consent decree and then a stipulated order. *Id.* at *1–2. But, like the instant defendants, the State failed to take the necessary

102

action, "enact[ing] only very limited and piece-meal measures, with no prospect
for system-wide reform or restructuring." *Id*. at \*26.

Following an evidentiary hearing, the court found that the defendants had
"fail[ed] to provide constitutionally adequate medical care" which "caused the
plaintiffs extreme harm." *Id.* at \*3. The court then issued an order, establishing a
Receivership to take control of the medical delivery system of the prison system
from the defendants. *Id.* at \*2.

The *Schwarzenegger I* court recognized that the case "present[ed] a textbook
example of how majoritarian political institutions sometimes fail to muster the will
to protect a disenfranchised, stigmatized, and unpopular subgroup of the
population." *Id.* at 32. The court emphasized:

> "This failure of political will, combined with a massive escalation in the rate
> of incarceration over the past few decades, has led to a serious and chronic
> abnegation of State responsibility for the basic medical needs of prisoners.
> This is a case where "the failure of the political bodies is so egregious and
> the demands for protection of constitutional rights [is] so importunate that
> there is no practical alternative to federal court intervention."

*Id.* (citation omitted). The *Schwarzenegger I* court reiterated the Ninth Circuit
principle that, "where federal constitutional rights have been traduced, principles
of restraint, including comity, separation of powers and pragmatic caution
dissolve." *Id.* at 24 (quoting *Stone v. City and County of San Francisco,* 968 F.2d
850, 861 (9th Cir.1992).

The court expanded the equitable remedy from *Schwarzenegger I* in a
subsequent case, directing the State of California "to transfer $250 million to the
Receiver in furtherance of the Receiver's work to remedy the undisputed and
ongoing constitutional inadequacies in the delivery of medical care in California's
prisons." *Plata v. Schwarzenegger* ("*Schwarzenegger II*"), No. C01-1351 TEH,
2008 WL 4847080, at \*1 (N.D. Cal. Nov. 7, 2008). As discussed below, the
*Schwarzenegger II* court found that the defendant's arguments of budgetary
concerns could not "outweigh the human suffering and preventable and possibly
preventable deaths that will occur" if the defendants were granted a stay. *Id.* at \*5.

103

133

### iv.    Courts' Equitable Authority in the Face of Government Budgetary Concerns

There are financial considerations inherent to any equitable relief requiring action from a governmental entity; however, federal courts have an obligation to enforce the Constitution and the laws of its United States. In *Watson v. City of Memphis*, the Supreme Court observed that despite the city's argument that ordered desegregation may require unbudgeted funding, the "vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them." 373 U.S. 526, 537 (1963).

The Ninth Circuit has also addressed the weight of budgetary concerns in the context of equitable relief. In *Lopez*, the Ninth Circuit affirmed a district court order requiring the restoration of disability benefits to a substantial number of social security recipients. *Lopez*, 713 F.2d at 1432. The circuit court concluded that "physical and emotional suffering shown by plaintiffs . . . is far more compelling than the possibility of some administrative inconvenience or monetary loss to the government. . ." *Lopez*, 713 F.2d at 1437; *see also Rodde*, 357 F.3d at 999 (when "[f]aced with[ ] a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor") (citing *Lopez*); *Harris*, 366 F.3d at 764–65 ("[a] lack of funds is no defense to a county's obligation to provide statutorily required benefits") (citing *Cooke*, 213 Cal. App. 3d at 413–14).

The court may also weigh certain circumstances against alleged financial consequences. In *Schwarzenegger II*, the court found that government arguments regarding financial hardship due to the court's injunction were "less compelling" when funding had already been allocated to the issue targeted by the court's order. *Schwarzenegger II*, 2008 WL 4847080, at *5. In *Rodde*, the Ninth Circuit affirmed a preliminary injunction barring a county from closing a hospital. *Rodde*, 357 F.3d 988. The circuit court considered how much the alleged $58.6 million annual cost of relief was offset by the savings caused by the relief, which would avoid costs caused by displaced patients seeking treatment elsewhere. *Rodde* 357 F.3d at 999 (9th Cir. 2004). The Ninth Circuit concluded that, "while it is unclear just how much financial hardship the district court's injunction creates for the County, it is apparent that the cost is lower than the County contends." *Id*.

104

134

## IV.    CONCLUSION: A WAY FORWARD

The devotion that Abraham Lincoln called for has not been met here.

For decades in Los Angeles, the desperation of its citizens has been met with a yawn. Each day, newspaper headlines bring forth different cities and communities calling for action. Meanwhile, politicians measure success by how much money they have raised to combat homelessness. Service providers with clipboards endlessly approach homeless individuals with services and promises to return, yet are unable to provide sufficient shelter or housing. Bureaucrats create statistics trumpeting their efficiency and success to the public. But none of this has led to accountability or solutions. As Councilmember Mark Ridley-Thomas remarked, "the issue of homelessness is of insufficient importance to the decision makers of this region. Therefore, we have this languishing set of circumstances where we chase our tails day in and day out claiming that we're doing things."[495]

There can be no defense to the indefensible. For all the declarations of success that we are fed, citizens themselves see the heartbreaking misery of the homeless and the degradation of their City and County. Los Angeles has lost its parks, beaches, schools, sidewalks, and highway systems due to the inaction of City and County officials who have left our homeless citizens with no other place to turn. All of the rhetoric, promises, plans, and budgeting cannot obscure the shameful reality of this crisis—that year after year, there are more homeless Angelenos, and year after year, more homeless Angelenos die on the streets.

Like Abraham Lincoln's call to action in his Gettysburg address, it is for us "to be dedicated here to the unfinished work which they who fought here have thus far nobly advanced." Let us pick up that flag, and have the courage of those who fought so long ago, to act so that we can become a better nation and people.

## V.    PROVISIONS OF THE PRELIMINARY INJUNCTION

In an attempt to balance the interim nature of a preliminary injunction with the emergency conditions created by the homelessness crisis, the Court hereby ORDERS the following:

---

[495] Los Angeles Business Council, *LABC's 19th Annual Mayoral Housing, Transportation and Jobs Summit*, YOUTUBE (Feb. 19, 2021), https://www.youtube.com/watch?v=KsO8j0hz588.

1. Accountability

    a. Pursuant to the Mayor's announcement[496] of a "justice budget"[497] on Monday, April 19, 2021, the Court ORDERS that $1 billion, as represented by Mayor Garcetti, will be placed in escrow forthwith, with funding streams accounted for and reported to the Court within 7 days.

    b. Within 90 days, conduct an audit of all funds received from local, state, and federal entities intended to aid the City and/or County of Los Angeles in solving or alleviating the problem of homelessness, including, but not limited to, Proposition HHH funds, MHSA funds, Measure H funds, and emergency relief from the state and federal government, including the American Rescue Plan and the Cares Act.

    c. Within 90 days, conduct investigations and prepare a report on all developers that are currently receiving funds from Proposition HHH; propose revised procedures for evaluating future applicants for Proposition HHH funds that would limit the possibility of funds being misused or wasted.

    d. Within 30 days, the County shall conduct an audit of any funds committed to mental health (MH) and substance use disorder (SUD) treatment.

All above audits and background investigations must be completed by independent auditors and investigators, respectively. Parties are ORDERED to meet with Special Monitor/Master Michele Martinez within 10 days to receive her input regarding independent auditors and investigators.

2. Action

    *a. City- and County-Wide Actions*

---

[496] Benjamin Oreskes & David Zahniser, *L.A. Plans Nearly $1 Billion in Spending to Address Homelessness Under Garcetti Plan*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/homeless-housing/story/2021-04-19/los-angeles-will-increase-budget-for-addressing-homelessness.

[497] David Zahniser, Dakota Smith & Emily Alpert Reyes, *Garcetti Seeks to Stem Poverty, Boost Social Justice in Vision for L.A.'s Recovery*, L.A. TIMES (Apr. 19, 2021), https://www.latimes.com/california/story/2021-04-19/garcetti-los-angeles-state-of-the-city.

i.   Within 30 days, City Controller Ron Galperin shall oversee the creation of a report on all land potentially available within each district for housing and sheltering the homeless of each district. The homeless have been left no other place to turn to but our beaches, parks, libraries, and sidewalks, and it is pivotal that they no longer rely on spaces that enhance quality of life for all citizens.

ii.   The Court ORDERS the cessation of sales, transfers by lease or covenant, of the over 14,000 City properties pending the report by the Controller Ron Galperin to the Court, and all similarly situated properties held by the County pending the report by the County counsel.

iii.   Within 30 days, the Los Angeles City Council Homelessness and Poverty Committee shall report back to the Court with specific actions to address 1) structural barriers (including but not limited to redlining, highway construction, eminent domain, and health exposure) that cause a disproportionate number of people of color to experience homelessness or housing insecurity; 2) solutions to the problem of extremely low income individuals being foreclosed from the affordable housing market in favor of higher-income individuals; and 3) the possibility of rezoning to accommodate more R3 (multi-family) zoning. The Committee is ordered to invite local non-governmental stakeholders (such as the NAACP, the Downtown Women's Action Coalition, and any additional groups that the Committee deems would be beneficial in this process) to participate in the production of the report.

iv.   Mayor Garcetti, the Los Angeles City Council, and Hilda Solis, Chair of the County Board of Supervisors, shall submit a report to the Court by April 27, 2021 at 8:00 a.m. to explain why an emergency declaration has not been issued.

v.   Within 30 days, the City and County shall prepare a report on the status of Projects Homekey and Roomkey, with a specific

107

**137**

    focus on the geographic and racial distribution of project sites and beneficiaries.

vi. Within 30 days, with regard to MH and SUD beds, the County shall report to the Court on the progress towards establishing the 1,508 new sub-acute beds to accommodate the needs of the non-jail population and an additional 1,418 new sub-acute beds to accommodate those with substance abuse disorders being diverted from jails.

b. *Actions Specific to Skid Row*

i. Within no more than 90 days (i.e., on or before July 19, 2021), the City and County must offer and if accepted provide shelter or housing immediately to all unaccompanied women and children living in Skid Row; within 120 days (i.e., on or before August 18, 2021) to all families living in Skid Row; and within 180 days (i.e., on or before October 18, 2021) to the general population living in Skid Row. Skid Row, originally defined as the area between 3rd and 7th and Main to Alameda, will be extended to the surrounding area, defined as 2nd to 8th and Spring to Alameda. The City and County shall consult with the Skid Row Advisory Council to identify the number of unaccompanied women who are willing to move to shelters.

ii. The County shall, no later than within 90 days (i.e., on or before July 19, 2021), offer and if accepted provide to all individuals within Skid Row who are in need of special placement through the Department of Mental Health or Department of Public Health appropriate emergency, interim, or permanent housing and treatment services. The County shall work with providers to build meaningful relationships with homeless individuals to ensure that these individuals are fully informed of their options for services, housing, and shelter. Within ten days (i.e., on or before April 30, 2021), the County shall provide to the Court a list of providers who are already

<div align="center">108</div>

<div align="right">**138**</div>

established in the area and who will be working in tandem with the County on these efforts.

iii. The County shall provide, or fund third parties to provide, support services to all homeless residents who accept the offer of housing. County and City shall evenly split the cost of providing operational services.

iv. The City and County shall prepare a plan that ensures the uplifting and enhancement of Skid Row without involuntarily displacing current residents to other parts of the City or County. Moving forward, the City and County are encouraged to develop a hyper-local approach with community-based organizations throughout each district, including the Skid Row Advisory Council.

c. *Other Actions*

i. After adequate shelter is offered, the Court will let stand any constitutional ordinance consistent with the holdings of *Boise* and *Mitchell*.

ii. The Court shall appoint a Special Monitor/Master, Michele Martinez, at the City and County's expense to assist with the implementation of this order and to resolve disputes among the parties or other interested parties. The City and County shall meet and confer with Special Monitor/Master Michele Martinez within three days to agree upon reasonable compensation.

SPERTUS, LANDES & UMHOFER, LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
617 W. 7th Street, Suite 200
Los Angeles, California 90017
Telephone: (213) 205-6520
Facsimile: (213) 205-6521
Email: mumhofer@spertuslaw.com
Email: emitchell@spertuslaw.com

*Attorneys for Plaintiffs*

MICHAEL N. FEUER, City Attorney (SBN 111529)
SCOTT MARCUS, Chief Assistant City Attorney (SBN 184980)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
RYAN SALSIG, Deputy City Attorney (SBN 250830)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-4681
Facsimile: 213-978-7011
Email: Scott.Marcus@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, *et al.*,<br><br>Defendants. | CASE NO. 2:20-CV-02291-DOC-KES<br><br>Assigned to Judge David O. Carter<br><br>***AMENDED* FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY [Fed. R. Civ. P. 41(a)(2)]** |

*AMENDED FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF*
*DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY*

**140**

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

On March 10, 2020, Plaintiff LA Alliance for Human Rights, *et al.* filed the above-captioned against the City of Los Angeles ("City") and the County of Los Angeles ("County") [ECF No. 1]. On November 1, 2021, Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karen Pinsky, Charles Malow, Charles van Scoy, George Frem, Gary Whitter, and Leandro Suarez (collectively "Plaintiffs") filed a First Amended and Supplemental Complaint against the City and the County ("FASC") [ECF No. 361].

In the FASC, Plaintiffs alleged thirteen separate claims for relief concerning the City and County's handling of the homelessness crisis, and contended the City and County violated, among other things, the Due Process and Equal Protection Clauses of the United State Constitution, the State Created Danger doctrine, state and federal disability laws, were negligent, created nuisances, and engaged in inverse condemnation and takings of real property. *Id.* The City and County each separately filed a motion to dismiss the FASC [ECF No. 369, 370], which were taken under submission on January 24, 2022, and all parties were Ordered to participate in a mediation [ECF Nos. 388, 391].

Following extensive discussions and multiple mediation sessions, Plaintiffs[1] and the City reached a settlement resolving the disputed claims in this Action as to the City only. A copy of the executed Settlement Agreement between Plaintiffs and the City ("Settlement Agreement") is attached hereto as Exhibit 1, the terms of which are expressly incorporated herein by reference.

NOW THEREFORE, pursuant to Federal Rule of Civil Procedure 41(a)(2), and good cause appearing therefore, the Court HEREBY ORDERS AND DECREES the following:

1.    The Court expressly incorporates all of the terms of the Settlement Agreement, attached as Exhibit 1, into this Order.

---

[1] Plaintiff Gary Whitter is not participating in this agreement.

2

*AMENDED FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY*

**141**

2.       The Court expressly retains exclusive jurisdiction for a period of five (5) years from the date of this Order to enforce the Settlement Agreement, and to resolve any future disputes regarding interpretation, performance, or enforcement of the Agreement.  See *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994); *Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir. 1998).

3.       Except as expressly provided otherwise in the Settlement Agreement, Plaintiffs and the City shall bear their own fees and costs in this Action.

4.       Plaintiffs' claims against the City only, as alleged in the First Amended and Supplemental Complaint are hereby dismissed with prejudice as to the City only. This Action shall proceed against the County and no claims alleged by Plaintiff Gary Whitter are dismissed by this Order.

IT IS SO ORDERED.

Dated: May ___ 2022                        _____

                                                           Hon. David O. Carter,
                                                           United States District Judge

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

3

*AMENDED FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY*

APPROVED AS TO FORM.

DATED:  May 24, 2022          Respectfully submitted,


                             */s/ Elizabeth A. Mitchell*
                             SPERTUS, LANDES & UMHOFER, LLP
                             Matthew Donald Umhofer
                             Elizabeth A. Mitchell
                             *Attorneys for Plaintiffs*


DATED:  May 24, 2022          MICHAEL N. FEUER, City Attorney
                             SCOTT MARCUS, Chief Assistant City Attorney
                             ARLENE N. HOANG, Deputy City Attorney
                             JESSICA MARIANI, Deputy City Attorney
                             RYAN SALSIG, Deputy City Attorney


                             By: */s/ Scott Marcus*_____
                             Scott Marcus, Chief Assistant City Attorney
                             Counsel for Defendant City of Los Angeles

Pursuant to L.R. 5-4.3.4(a)(2)(i), all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

4

*AMENDED FULLY EXECUTED [PROPOSED] STIPULATED ORDER OF DISMISSAL AS TO DEFENDANT CITY OF LOS ANGELES ONLY*

143

# Exhibit 1

**144**

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

# SETTLEMENT AGREEMENT

This Settlement Agreement is entered into by and between the following Parties:

1)      Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, Charles Van Scoy, George Frem, and Leandro Suarez ("Plaintiffs"); and

2)      Defendant City of Los Angeles ("City").

## RECITALS

WHEREAS, Plaintiffs filed a Complaint on March 10, 2020 in the Central District of California, Case No. Case 2:20-cv-02291-DOC-KES (the "Action") naming the City and the County of Los Angeles (the "County") as co-defendants in fourteen separate claims, including three that allege violations of 42 U.S.C. § 1983, concerning the City and County's handling of the homelessness crisis, and contended the City and County violated, among other things, the Due Process and Equal Protection Clauses of the United State Constitution, the State Created Danger doctrine, state and federal disability laws, were negligent, created or maintained nuisances, and engaged in inverse condemnation and takings of real property;

WHEREAS, the City expressly denies all claims alleged in the Action (and did so via a motion to dismiss), and further denies that the City and any of its officers, employees, or agents violated any laws, committed any wrongful acts or omissions, or are liable to the Plaintiffs as alleged in the Action;

WHEREAS, on April 20, 2021, the District Court entered a preliminary injunction against the City and County, ordering, among other things, the City to escrow $1 billion, cease any sales, transfers or leases of City-owned properties, shelter all residents of Skid Row, and prepare numerous audits and reports;

WHEREAS, on October 15, 2021, the United States Court of Appeals for the Ninth Circuit vacated the injunction issued by the District Court;

WHEREAS, on November 1, 2021, Plaintiffs filed a First Amended and Supplemental Complaint, the allegations and claims within which the City also expressly denies, and has filed a motion to dismiss them;

WHEREAS, the Plaintiffs and the City desire to fully and finally compromise and settle all claims arising out of or relating to all matters alleged or that could have been alleged in the Action with respect to the Parties, without any admission of fault, liability, or wrongdoing, in the interests of avoiding the additional expense and the inherent uncertainties of protracted litigation upon the terms and conditions set forth in this Agreement; and

WHEREAS, the purpose of this Agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles, and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles.

<div align="center">**TERMS**</div>

**1.    Definitions**

1.1.    <u>Agreement</u>.  The term "Agreement" as used herein shall refer to this Settlement Agreement and all associated documents, including all necessary orders and stipulations referred to herein.

1.2.    <u>LAHSA</u>.  "LAHSA" as used herein shall mean and refer to the Los Angeles Homeless Services Authority.

1.3.    <u>PEH</u>.  "PEH" as used herein shall mean persons experiencing homelessness.

1.4.    <u>City Shelter Appropriate</u>.   The term "City Shelter Appropriate" as used herein shall include any PEH within the City whom the City can reasonably assist, meaning the individual:

(A)    does not have a severe mental illness, and/or

<div align="center">2

SETTLEMENT AGREEMENT</div>

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

(B)     is not chronically homeless and has

(i)     a substance use disorder, or

(ii)     a chronic physical illness or disability requiring the need for professional medical care and support,

such that the individual (a) is unable to perform activities of daily living, including bathing, dressing, grooming, toileting, transferring between bed and chair, and feeding oneself, and/or (b) lacks medical and/or mental health care decision-making capacity, and/or (c) is a danger to themselves or others.

PEH who meet the definition of City Shelter Appropriate are typically, but not always, those with low- or medium-acuity needs according to accepted industry standards, including, but not limited to, through the use of an assessment tool, such as the Vulnerability Index-Service Prioritization Decision Assistance Tool (VI-SPDAT) or other similar assessment tool such as the CES Survey Packet or Next Step Tool as evaluated by a qualified outreach or clinical staff member.

The City will use its best efforts to engage the appropriate County entity, including, but not limited to, the Department of Mental Health (DMH), Department of Health Services (DHS), Department of Public Social Services (DPSS), or Department of Public Health (DPH), for intervention, treatment, services, and/or housing as appropriate for PEH who are not City Shelter Appropriate.

Moreover, the fact that an individual meets the criteria of "high acuity" according to accepted industry standards, has a severe mental illness, substance use disorder, chronic physical illness or disability, or otherwise is not included in the definition of City Shelter Appropriate, will not preclude the City from making an offer of shelter or housing to that individual if the City can reasonably assist that individual.

1.5. <u>Parties</u>. The word "Parties" as used herein shall refer only to the parties to this Agreement, specifically the City of Los Angeles and Plaintiffs. The word "Parties" shall not refer to any individual or entity that is not a party to this agreement. The County of Los Angeles and Intervenors are not Parties to this Agreement at this time, but may be added with written consent from the Parties.

1.6. <u>Required Number</u>. The term "Required Number" as used herein is the number of housing or shelter solutions which is equal to the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH in the City based on LAHSA's 2022 Point in Time (PIT) Count.[1]

## 2. **Term and Continuing Jurisdiction**

The Parties agree that the duration of the Agreement shall be five (5) years, during which point the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement. The obligations of the Parties in the remaining sections of this Agreement, and the releases contained herein, shall become effective and operative on the date(s) on which the respective Order approving this Agreement and dismissing the Action ("Order") is fully executed and entered by the Court, and shall be contingent upon the Court's executing and entry of the Order. The Parties acknowledge that the Court may, in its sole discretion, appoint one or more Special Masters to assist the Court in overseeing and enforcing this Agreement. If the Order is not executed and entered, this Agreement shall not become operative, and this litigation shall continue as if the proposed Agreement and its terms never existed.

---

[1] LAHSA's 2022 PIT Count is still in progress. Once the 2022 PIT Count is confirmed by LAHSA and released, Defendant City will calculate the number of housing and shelter solutions needed to accommodate 60% of unsheltered City Shelter Appropriate PEH in the City and submit a report setting forth the Required Number under Section 2 and Milestones and Deadlines under Section 4. The Parties may submit a revised Agreement that includes the specific Required Number and Milestones and Deadlines.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

4
SETTLEMENT AGREEMENT

148

**3.**    **Housing and Shelter for City Shelter Appropriate Individuals**

3.1.    The City agrees to create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH within the City based on LAHSA's 2022 Point in Time count.

3.2.    Subject to Constitutional requirements and legal mandates, the City may choose, at its sole discretion, any housing or shelter solution, including but not limited to tiny homes, shared housing, purchased or master-leased apartments, hotels/motels, or other buildings, congregate shelters, permanent supportive housing, rental assistance/rapid rehousing, family reunification, sprung structures or tents, safe parking, safe sleeping/camping, affordable housing, and interim housing (including A Bridge Home beds), as long as the Milestones are met.  The housing or shelter solutions may be government- and/or privately-funded as long as each offer is adequate for the individual. Accommodations shall be made for those who qualify as disabled under the Americans with Disabilities Act.

3.3.    City agrees to implement an approach of equitably distributing housing and shelter solutions throughout the City.  The Required Number and 60% threshold is the minimum required by the Agreement, and the City is encouraged to and may provide (at its sole discretion) incentives and/or benefits for Council Districts that create more housing or shelter solutions beyond those required to accommodate 60% of the City Shelter Appropriate PEH in their district.

**4.**    **Street Engagement**

4.1.    City will continue to offer shelter or housing to City Shelter Appropriate PEH within the City and enforce public space regulations and health and safety laws consistent with its own protocol (Street Engagement Strategy)

5
SETTLEMENT AGREEMENT

**149**

and constitutional requirements.  No enforcement of public space regulations shall be taken against any individual unless that individual has first been offered an opportunity for housing or shelter or to relocate consistent with applicable laws.  City reserves the right, in its sole discretion, to revise or amend its Street Engagement Strategy, Los Angeles Municipal Code 41.18, or any similar ordinance, regulation, or protocol consistent with applicable constitutional requirements and is consistent with and meets the requirements of terms of this Agreement.

    4.2.    Council District-wide Engagement

Once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in a Council District as determined by the Required Number, the City, in its sole discretion, may implement and enforce public space regulations and ordinances within that entire Council District as to those individuals who refuse an offer of shelter or housing and/or decline to move to an alternative location where they may legally reside.  The City must provide notice to the Plaintiffs of its intention to implement and enforce District-wide.  If a Party to this Agreement files a written objection with the Court (or Special Master, if one is appointed by the Court for this purpose) within five court days of the notice, the Court (or Special Master) shall schedule a status conference to take place within court two days, or as soon as is practicable, to resolve the objection.  If no objection is filed, or if the Court (or Special Master) resolves the objection in favor of the City, City may implement and enforce public space regulations and ordinances throughout that District consistent with this Agreement.  Even after the City creates adequate and appropriate housing and shelter opportunities for 60% of unsheltered City Shelter Appropriate PEH in a Council District, no enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

6

SETTLEMENT AGREEMENT

**150**

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

shelter or housing and/or to relocate to an alternative location consistent with applicable laws and this Agreement, except for time/manner/place regulations (such as LAMC 41.18 or similar ordinances) which may be enforced immediately and without such notice at any time.

4.3.    City-wide Engagement

Once there are sufficient shelter or housing solutions to accommodate 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number, the City, in its sole discretion, may implement and enforce public space regulations and ordinances throughout the City as to individuals who decline an offer of shelter or housing and/or decline to move to an alternative location where they may legally reside.  The City must provide notice to the Plaintiffs of its intention to implement and enforce City-wide.  If any Party to this Agreement files a written objection with the Court (or Special Master, if one is appointed by the Court for this purpose) within five court days of the notice, the Court (or Special Master) shall schedule a status conference to take place within two court days, or as soon as is practicable, to resolve the objection. If no objection is filed, or if the Court (or Special Master) resolves the objection in favor of City, City may implement and enforce public space regulations and ordinances throughout the City, consistent with this Agreement.  Even after the City creates adequate and appropriate housing and shelter opportunities for 60% of the number of unsheltered City Shelter Appropriate PEH within the City, no enforcement action shall be taken against any individual suspected of violating a public space regulation or ordinance unless that individual has first been offered adequate and appropriate shelter or housing and/or to relocate to an alternative location consistent with applicable laws and this Agreement, except for time/manner/place regulations (such as LAMC 41.18 or similar ordinances) which may be enforced immediately and without such notice at any time.

7

SETTLEMENT AGREEMENT

151

4.4.    Nothing in this Agreement shall prohibit or prevent the City from enforcing laws otherwise applicable in the City that are not inconsistent with this Agreement.

## 5.    Milestones and Deadlines

5.1.    Within 30 days from the date information from the 2022 PIT Count is confirmed by LAHSA and released, the City will calculate the Required Number and provide its calculation with the Plaintiffs.  The Parties agree to meet and confer in good faith to resolve any objections to the calculation of the Required Number raised by Plaintiffs.  Any objection that cannot be resolved by the Parties may be heard by the Court if necessary.

5.2.    Thereafter the City will create plans and develop milestones and deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number; (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and (iv) the City's plan for encampment engagement, cleaning, and reduction in the City.  The City will provide the plans, milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary.  The City will provide a report setting forth the milestones and deadlines.  The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines.

## 6.    Street Engagement Dispute Resolution Process

The Parties agree to design, in conjunction with the Court and/or Special Master, a dispute resolution process for individuals who are subject to the City's

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

Street Engagement Strategy in connection with the City's performance of this Agreement, pursuant to paragraph 4.

**7.      Status Updates**

7.1.    The City will provide quarterly status updates to the Court regarding its progress with this Agreement, including the number of housing or shelter opportunities created or otherwise obtained, the number of beds or opportunities offered, and the number of beds or opportunities currently available in each Council District.  The City will work with LAHSA to include in the quarterly status updates, to the extent possible: the number of PEH engaged, the number of PEH who have accepted offers of shelter or housing, the number of PEH who have rejected offers of shelter or housing and why offers were rejected, and the number of encampments in each Council District.

7.2.    The Parties will engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement. The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding, if needed.

**8.      Funding**

8.1.    Funding of housing and shelter opportunities created by the City shall be at the City's sole discretion.  The City agrees to: (i) Petition county, state, and federal government for additional funding, as may be available; (ii) Consider expediting public/private partnerships that utilize private capital and which require no up-front costs to the City; and (iii) Consider other possible funding mechanisms to pay for future housing or shelter, facilities, and services solutions for PEH.

8.2.    In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

9

SETTLEMENT AGREEMENT

153

by the Mayor of Los Angeles and the Los Angeles City Council under the authority vested in them by the Los Angeles City Charter and Los Angeles Administrative Code (or other applicable ordinances, resolutions, or laws), the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

**9.      County Obligations**

The Parties agree that Defendant County of Los Angeles, who is not a party to this Agreement, is obligated to provide certain services to all PEH in the County, including PEH located within the City.  The Parties agree to cooperate in ensuring the County meets its obligations to provide adequate services to PEH within the City, and in fostering County-developed or County-funded housing, shelters, and treatment services for PEH who are not City Shelter Appropriate.  These County responsibilities include, but are not limited to:

- Funding and providing wrap-around and supportive services[2] for PEH in housing or shelter established by the City.  Supportive services funded and provided by the County will include, but not be limited to, Department of Mental Health, Department of Health Services, Department of Public Health, and Department of Public Social Services, for intervention, services, and housing, as appropriate;

- Providing housing and treatment services for all unsheltered PEH within the City who are not City Shelter Appropriate;

- Providing and funding the Intensive Case Management Services (ICMS) and integrated health services necessary to ensure appropriate

---

[2] "Supportive services" as used herein refers to mental health and substance use disorder treatment, and other services, including mainstream services, which are traditionally funded by the County of Los Angeles.  City agrees to ensure each project will include case management, housing placement services, and homelessness reduction assistance or will work with appropriate agencies to do so.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

medical, mental health, substance use, and other services and treatment for permanent supportive units financed by the City;

- Requiring that permanent supportive housing (PSH) placements into units within City limits will prioritize PEH that are homeless in the City first (consistent with applicable constitutional and statutory laws), including units funded and operated by the County if they are within City limits;

- Increasing to at least 34 (from 22; numbers based on what is currently required and could be subject to change after the 2022 PIT Count results are released and analyzed) the number of Multi-Disciplinary Teams (MDTs) dedicated to conducting outreach exclusively in the City, allocating at least 1 team per Council District, coordinated by the City's outreach staff in the Office of the City Administrative Officer (CAO) and/or the Unified Homelessness Response Center (UHRC);

- Increasing to at least 10 (from 5.5; numbers based on what is currently required and could be subject to change after the 2022 PIT Count results are released and analyzed) the number of Homeless Outreach and Mobile Engagement (HOME) teams dedicated to conducting outreach exclusively in the City, allocating at least 1 team per two Council Districts, coordinated by the CAO and/or UHRC;

- Requiring outreach teams (including the increased number of teams referenced above) have direct access to sufficient County-funded licensed and unlicensed high service need beds necessary to provide housing and treatment services for PEH in the City, and require that these beds will either be exclusively for use by, or prioritize use by, PEH in the City.  In order to effectuate this access, the County will, in collaboration with LAHSA, County departments, and other relevant agencies and partners, establish a centralized, County-wide bed

11

SETTLEMENT AGREEMENT

155

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

management system that is inclusive of all types of shelter, housing, and care beds, and which will identify specific, available, and appropriate high service need beds for PEH in the City;

- Requiring a minimum of 50 mental health beds per 100,000 people in the County, or more as necessary to ensure access to inpatient treatment for PEH in the City and to prevent mentally ill individuals from falling into homelessness due to lack of available inpatient treatment;

- Increasing the number of high acuity public health (SUD/detox/drug rehabilitation) beds to specified level, and priority access for PEH regardless of the availability of insurance coverage;

- Providing City-directed outreach teams with direct access to Department of Mental Health, Department of Health Services, Department of Public Social Services, and Department of Public Health during outreach and other Street Engagement Strategy activities;

- Identify and make available sufficient County-owned land to other County jurisdictions, including City, for homeless housing on a $1 per year lease and allowing by right development; and

- Securing County commitment to prevention of inflow of new PEH in the City of Los Angeles, including commitment to registering individuals for SSI and Social Security, and other local (e.g., General Relief), state, and federal entitlement programs.

**10.** **<u>Affordable Housing</u>**

The Parties agree to cooperate to identify and reduce barriers to building more affordable housing.

**11.** **<u>No Third Party Beneficiaries</u>**

Notwithstanding anything in this Agreement to the contrary, there are no intended third-party beneficiaries that may assert rights or defenses under this Agreement, except the Parties to this Agreement.

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

## 12. Modification By Judicial Action

If a court issues an order or judgment regarding the constitutionality of, or the City's ability to enforce, any law, code, ordinance, or regulation governing public spaces in the City (including but not limited to LAMC § 41.18), or any other part of this Agreement, and that order or judgment conflicts with or is inconsistent with any part of the terms of this Agreement, the Parties agree that the conflicting or inconsistent part(s) of this Agreement shall no longer be in effect, but all other terms of this Agreement that are not inconsistent with the order or judgment shall still remain in effect.  In the event a Party asserts that an order or judgment conflicts with or is inconsistent with a part of this Agreement, the Party shall notify the other Parties in writing.  If the Parties disagree as to whether a conflict or inconsistency exists, the question of whether a conflict or inconsistency exists shall be resolved according to Section 24 of this Agreement.

## 13. Releases and Waiver of California Civil Code Section 1542

13.1.  The undersigned Plaintiffs to this Agreement, each on behalf of themselves, and their respective heirs, spouses, trustees, successors, assigns, agents, representatives, attorneys, employees, officers, directors, shareholders, members, managers, principals, partners, insurers, and predecessors do hereby forever release, acquit, and discharge the City and all of its boards, bureaus, departments, elected and appointed officials, administrators, officers, agents, employees, and all persons that acted on behalf of the City (collectively the "City Released Parties") from any and all claims, demands, actions, causes of action, suits, covenants, settlements, contracts, agreements, and liabilities for personal injuries, property damage, loss, cost or expense of every nature whatsoever, whether known or unknown, contingent or otherwise, at law or in equity, and whether or not expected to exist which the undersigned Plaintiffs to this Agreement had, have, or may have against the City Released Parties, and each of them, that arise out of or are related to the Action, and any allegations, events,

transactions or occurrences that were alleged or that could have been alleged therein (the "City Released Claims").

Nothing in this release and waiver is intended to include Plaintiffs' claims against the County, including for attorneys' fees, which Plaintiffs will continue to litigate against the County to judgment or settlement consistent with the terms of this Agreement.

13.2.  Plaintiffs acknowledge that they are familiar with the provisions of California Civil Code section 1542 and, except as otherwise provided herein, expressly waive and relinquish any and all rights or benefits that they may have under said section to the fullest extent permitted by law concerning any matters relating to the Parties' Actions.

California Civil Code section 1542 states:

> **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

Plaintiffs declare that they understand the full nature, extent and import of section 1542 of the California Civil Code and have been so advised by their attorneys.

13.3.  Plaintiffs warrant and represent that they have made no assignment, and will make no assignment, of any claim, chose in action, right of action, or any right, of any kind whatsoever, within the scope of the City Released Claims, and that no other person or entity of any kind had or has any interest in any of the demands, obligations, actions, causes of action, debts, liabilities, rights, contracts, damages, attorneys' fees, costs, expenses, losses, or claims within the scope of the City Released Claims.

14

SETTLEMENT AGREEMENT

158

**14.**     **Dismissal of the Action**

Upon approval of this Agreement by the City Council and Mayor, which approvals are required for this Agreement to be final and binding, and after execution of this Agreement by all Parties and their respective counsel, Plaintiffs and the City shall jointly file a Stipulated Order of Dismissal, to which this Agreement will be attached as Exhibit 1.  At the conclusion of the Court's retained jurisdiction, subject to the City's compliance, Plaintiffs will take all additional actions and file all additional documents to effectuate dismissal of the Action as to the City with prejudice, if necessary.

**15.**     **Settlement Payments and Attorneys' Fees**

This City shall pay a total amount of $1,800,000, which shall be inclusive of all claims for damages, attorneys' fees, and/or costs claimed by Plaintiffs in the action.[3]  Such payment shall be made to the Spertus, Landes, & Umhofer, LLP, attorney-client trust account for distribution by Spertus, Landes, & Umhofer, LLP, as approved by Plaintiffs.  The Parties agree that nothing in this Agreement, including the City's payment of $1,800,000, will affect the Plaintiffs' right to pursue all damages, costs, and attorney's fees from the County or any other party other than the City.  Should the County ever seek contribution from the City for fees, costs, or damages awarded against the County through the date on which the order as entered, such contribution claims are solely between the City and the County and do not affect the terms of this Agreement nor involve Plaintiffs in any manner.  Plaintiffs agree not to oppose any motion by the City for a good faith settlement determination from the Court that may extinguish the County's potential claims for contribution from the City.

_____

[3] Plaintiff Gary Whitter is not participating in this Agreement.  LA Alliance for Human Rights agrees to indemnify the City against any damages, attorneys' fees, and/or costs incurred by the City in the event Plaintiff Whitter pursues his claims against the City.

15

SETTLEMENT AGREEMENT

**159**

<div style="writing-mode: vertical">Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711</div>

**16.**      **Non-Admission of Liability**

By entering into this Agreement, the City does not admit any liability, and explicitly denies any liability or wrongdoing of any kind arising out of or relating to any of the claims alleged in the Action.  Nothing herein constitutes an admission by the Parties as to any interpretation of laws, or as to the merits, validity, or accuracy of any of the claims or legal contentions made or which could be made in the Action.  Plaintiffs and the City have entered into this Agreement solely to avoid the time, expense, and risk of litigation.  The Parties agree that an express condition of this settlement is that there has been no finding of liability on the merits, and that this settlement and any document related to this settlement, including this Agreement and Order, and the confidential negotiations leading up to this settlement, shall be inadmissible in evidence and shall not be used for any purpose in this or any other proceeding except in an action or proceeding to approve, interpret, implement, or enforce the Agreement.

**17.**      **Knowing and Voluntary Agreement**

This Agreement is an important legal document that has been voluntarily and knowingly executed by the Parties.  The Parties, and each of them, specifically represent that, prior to signing this Agreement, (a) they have each been provided a reasonable period of time within which to consider whether to accept this Agreement, (b) they have each carefully read and fully understand all of the provisions of this Agreement, and (c) they are voluntarily, knowingly, and without coercion entering into this Agreement based upon their own judgment. Plaintiffs, and each of them, further specifically represent that, prior to signing this Agreement, they have conferred with counsel of their choice to the extent desired concerning the legal effect of this Agreement, and that the legal effect of this Agreement has been adequately explained to them.

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

16
SETTLEMENT AGREEMENT

**18.** **Entire Agreement; No Other Reliance**

This Agreement constitutes the entire agreement between the Plaintiffs and the City regarding the subject matter discussed hereof and supersedes any and all other agreements, understandings, negotiations, or discussions, either oral or in writing, express or implied, between or among the Parties relating to the subject matter hereof. The Parties acknowledge that no representations, inducements, promises, agreements, or warranties, oral or otherwise, have been made by them, or anyone acting on their behalf, which are not embodied in the Agreement, that they have not executed this Agreement in reliance on any such representation, inducement, promise, agreement, or warranty, and that no representation, inducement, promise, agreement, or warranty not contained in this Agreement including, but not limited to, any purported supplements, modifications, waivers, or terminations of this Agreement, shall be valid or binding, unless executed in writing by all of the Parties to this Agreement. Any alteration, change, or modification of or to this Agreement shall be made by written instrument executed by each party hereto in order to become effective.

**19.** **Warranty of Authority**

Each individual or entity that executes this Agreement represents and warrants, in his, her, or its personal capacity, that he, she, or it is duly authorized and empowered to enter into this Agreement on behalf of the party it purports to represent.

**20.** **Counterparts**

This Agreement may be executed in multiple counterparts, each of which shall be considered an original but all of which shall constitute one agreement.

**21.** **Representation by Counsel and Understanding**

The Parties acknowledge that each of them has been represented in the settlement of the matter by its own counsel and represent that each of them has received independent legal advice from their respective attorneys and has been

Spertus, Landes & Umhofer, LLP
1990 SOUTH BUNDY DR., SUITE 705
LOS ANGELES, CA 90025
TELEPHONE 310-826-4700; FACSIMILE 310-826-4711

17

SETTLEMENT AGREEMENT

**161**

fully advised of the nature of the Agreement and the possible rights and obligations released herein. Defendant City acknowledges it has the power and right to enter into, agree, and comply with this Agreement. The rule of construction that any ambiguities are to be resolved against the drafting part shall not be employed in the interpretation of the Agreement. The Parties further acknowledge that each of them has carefully read and fully understands all of the provisions of the Agreement, and that each of them is voluntarily entering into the Agreement.

## 22. No Waiver of Terms of Agreement

The failure to insist upon compliance with any term, covenant or condition contained in the Agreement shall not be deemed a waiver of that term, covenant or condition, nor shall any waiver or relinquishment of any right or power contained in the Agreement at any one time or more times be deemed a waiver or relinquishment of any right or power at any other time or times.

## 23. Governing Law

This Agreement shall be construed in accordance with the laws of the State of California.

## 24. Duty to Meet and Confer

If a dispute arises between the Plaintiffs and the City regarding the interpretation, performance, or enforcement of this Agreement, the Party raising the dispute shall provide written notice of the dispute to all other Parties, and all Parties agree to meet and confer within a reasonable time in a good faith effort to resolve any dispute. In the event that the Parties are unable to resolve the dispute within a reasonable time after the meeting, Plaintiffs or the City may, pursuant to the Order, submit the matter to the Court for review and decision.

DATED: **5/19/2022**          By: _____
                              Don Steier, Chairman, for Plaintiff
                              LA Alliance for Human Rights

SETTLEMENT AGREEMENT

**162**

DATED:_05-19-2022_____        _____
                                  Plaintiff Joseph Burk

DATED:_____        _____
                           Plaintiff George Frem

DATED:_____        _____
                           Plaintiff Wenzial Jarrell

DATED:_____        _____
                           Plaintiff Charles Malow

DATED:_____        _____
                           Plaintiff Karyn Pinsky

DATED:_____        _____
                           Plaintiff Leandro Suarez

DATED:_____        _____
                           Plaintiff Harry Tashdjian

DATED:_____        _____
                           Plaintiff Charles Van Scoy

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

19
SETTLEMENT AGREEMENT

163

DATED:_____          _____
                                Plaintiff Joseph Burk

DATED: 5/19/22          _____
                                Plaintiff George Frem

DATED:_____          _____
                                Plaintiff Wenzial Jarrell

DATED:_____          _____
                                Plaintiff Charles Malow

DATED:_____          _____
                                Plaintiff Karyn Pinsky

DATED:_____          _____
                                Plaintiff Leandro Suarez

DATED:_____          _____
                                Plaintiff Harry Tashdjian

DATED:_____          _____
                                Plaintiff Charles Van Scoy

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700 Facsimile 310-826-4711

19

164

DATED:_____          _____

Plaintiff Joseph Burk

DATED:_____          _____

Plaintiff George Frem

DATED: 05-19-22          *Wenzial Jarrell*_____

Plaintiff Wenzial Jarrell

DATED:_____          _____

Plaintiff Charles Malow

DATED: 05-19-22          _____

Plaintiff Karyn Pinsky

DATED:_____          _____

Plaintiff Leandro Suarez

DATED:_____          _____

Plaintiff Harry Tashdjian

DATED:_____          _____

Plaintiff Charles Van Scoy

19

SETTLEMENT AGREEMENT

165

DATED:_____          _____

Plaintiff Joseph Burk

DATED:_____          _____

Plaintiff George Frem

DATED:_____          _____

Plaintiff Wenzial Jarrell

DATED: 5/23/2022               _____

Plaintiff Charles Malow

DATED:_____          _____

Plaintiff Karyn Pinsky

DATED: 23 MAY 2022             _____

Plaintiff Leandro Suarez

DATED: 05-23-22                _____

Plaintiff Harry Tashdjian

DATED: 5/23/22                 _____

Plaintiff Charles Van Scoy

19

SETTLEMENT AGREEMENT

**166**

DATED:  May 19, 2022          MATTHEW W. SZABO

By: _____

City Administrative Officer, City of Los Angeles

**Approved as to Form**:

DATED:  May 19, 2022          SPERTUS, LANDES & UMHOFER, LLP

By: _____

Elizabeth A. Mitchell
Counsel for Plaintiffs LA Alliance for Human
Rights, et al.

DATED:  May 19, 2022          MICHAEL N. FEUER, City Attorney

By: *Scott Marcus*
_____

Scott Marcus, Chief Assistant City Attorney
Counsel for Defendant City of Los Angeles

Spertus, Landes & Umhofer, LLP
1990 South Bundy Dr., Suite 705
Los Angeles, CA 90025
Telephone 310-826-4700; Facsimile 310-826-4711

20
SETTLEMENT AGREEMENT

167

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS ET AL., | Case No. LA CV 20-02291-DOC-KES |
| Plaintiff, | |
| vs. | ORDER APPROVING STIPULATED |
| | DISMISSAL AND PROPOSED |
| CITY OF LOS ANGELES ET AL., | SETTLEMENT [421] |
| Defendants. | |

-1-

**168**

On May 19, 2022, Defendant City of Los Angeles ("City") and Plaintiffs LA Alliance for Human Rights, Joseph Burk, Harry Tashdjian, Wenzial Jarrell, Karyn Pinsky, Charles Malow, Charles Van Scoy, George Frem, and Leandro Suarez (collectively "Plaintiffs") filed a Stipulated Order of Dismissal and Exhibit 1, their Settlement Agreement (Dkt. 421). In their Stipulated Order, the parties informed the Court that they had reached a Settlement subject to the Court's approval of the terms; and dismissal with prejudice as to Defendant City of Los Angeles. The parties have requested that the Court retain jurisdiction to enforce the terms of the Settlement Agreement for a period of five years.

The parties have been aggressively litigating this case for over two years. In the process, they have generated a voluminous record comprised of several pre-trial hearings, orders, and a preliminary injunction. In the first year of litigation, the parties participated in multiple mediation sessions, including on June 12, 2020 (Dkt. 133); June 25, 2020 (Dkt. 141); September 10, 2020 (Dkt. 170); September 24, 2020 (Dkt. 179); and October 8, 2020 (Dkt. 184). These sessions resulted in a partial Memorandum of Understanding between the City and County of Los Angeles, with the City committing to create 6,700 beds in 18 months to prioritize sheltering unhoused people living by highways (Dkts. 136, 138). Just this year, the parties went to mediation sessions on February 15 (Dkt. 388), February 16 (Dkt. 394), February 22 (Dkt. 395), March 1 (Dkt. 397), and March 29, 2022 (Dkt. 401).

The agreement before the Court was not achieved in haste—it was the result of long and deliberate good-faith negotiations. In fact, the City and Plaintiffs have worked diligently to expand the barebones framework articulated in their Preliminary Settlement Agreement (Dkt. 408) to a more fleshed-out plan to partially combat homelessness in Los Angeles.

The Settlement Agreement creates a structure and enforcement mechanism for the City to create a substantial number of new beds for people experiencing homelessness. While this Agreement is not a solution to homelessness, it is a concrete step toward improving the lives of our neighbors who are currently suffering on the streets.

Procedurally, the Settlement Agreement does not affect the rights or obligations of non-settling parties or non-parties. As the City confirmed in its Reply, "nothing in the Court's order

169

affects any rights of the County or the Intervenors," and it does not prejudice the rights of other non-parties with respect to future challenges to City ordinances or suits on related issues. *See* City Reply (Dkt. 438) at 5. In particular, the Section titled, "County Obligations" imposes no responsibilities on the County of Los Angeles because they are not party to this Agreement—as the City notes, "[t]hese agreements are nothing more than Plaintiffs and the City's expressions of (a) their beliefs concerning the County, and (b) their intent to cooperate regarding their opined County's obligations." *Id.* at 7. In addition, the Settlement Agreement does not affect the parties' obligations under state or federal law, including state or federal disability law.

Having reviewed the Settlement Agreement and the parties' briefing, the Court finds that the Settlement Agreement is fair, reasonable, and adequate. Accordingly, the Court now approves the Settlement Agreement executed by the parties and attached as Exhibit 1, which is now incorporated in full into the Court's Order as though fully set forth herein. The Court shall retain jurisdiction for a period of five years to enforce the terms of the Settlement Agreement. Per the parties' agreement, the Court appoints Special Master Michele Martinez as the Monitor of the Settlement Agreement to assist the Court in overseeing and enforcing this Agreement.

Plaintiffs' claims against the City only, as alleged in the First Amended and Supplemental Complaint, are hereby dismissed with prejudice as to the City only, subject to the Court's retention of jurisdiction as set forth in Exhibit 1. This Action shall proceed against the County and no claims alleged by Plaintiff Gary Whitter are dismissed by this Order. Except as expressly provided otherwise in the Settlement Agreement, Plaintiffs and the City shall bear their own fees and costs in this Action.

The Clerk shall serve this minute order on the parties.

DATED: June 14, 2022

*David O. Carter*

_____

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE

UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, *et al.*,<br><br>Defendants. | Case No. 2:20-CV-02291-DOC-KES<br><br>Assigned to Judge David O. Carter<br><br>**DECLARATION OF ELIZABETH A. MITCHELL IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS**<br><br>Before:  Hon. David O. Carter<br>Courtroom: 10A<br>Hearing Date:  March 4, 2024<br>Hearing Time:  8:30 p.m. |

I, Elizabeth A. Mitchell, hereby declare as follows:

1.      I am an attorney at the law firm of Umhofer, Mitchell & King LLP, and I represent Plaintiffs LA Alliance for Human Rights, Joseph Burk, George Frem, Wenzial Jarrell, Charles Malow, Karyn Pinsky, and Harry Tashdjian ("Plaintiffs") in this action. Except for those that are stated upon information and belief, I have personal knowledge of the facts set forth herein, and if called and sworn as a witness, I could and would testify competently thereto.

2.      The Plaintiffs and the City consummated the settlement agreement on May 19, 2022.  After several months of initial delay by Los Angeles Homeless Services Authority (LAHSA), the City finally calculated the "Required Number"—that is, the total number of beds it must provide under the Agreement based on the point-in-time count—on October 6, 2022, and provided it to Plaintiffs.  Attached hereto as **Exhibit A** is a true and accurate copy of the Required Number calculation provided by the City of Los Angeles.

3.      After another month of delay, on November 11, 2022, the City emailed me its proposed plans, milestones, and deadlines for beds—"creation of shelter and housing solutions" under Sections 5.2(i) and 5.2(iii). Settlement Agreement, p. 8.  But the City made no effort to provide plans, milestones, and deadlines for encampments— "engagement, cleaning, and reduction" of encampments in each Council District or Citywide pursuant to 5.2(ii) and 5.2(iv). Attached hereto as **Exhibit B** is a true and correct copy of the documents that were emailed to me which purported to comply with Section 5.2: the Potential Project List (page 1) and the Roadmap-Alliance Milestones (page 2).

3.      Believing—incorrectly—that the City was acting in good faith under a new mayor who had made bold and sweeping campaign promises concerning homelessness, my clients decided to wait to bring this issue to the Court's attention until after a January 17, 2023, hearing on the County settlement, at which the new

1

*DECLARATION OF ELIZABETH A. MITCHELL ISO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND FOR SANCTIONS*

mayor would appear and discuss her new plans.  I emailed the City letting them know that I would delay comment until after the January 17, 2023 hearing.

4.    The City did not update its encampment milestones and deadlines after the January 17 hearing.  On January 30, 2023, I emailed Scott Marcus from the City Attorney's Office to meet and confer about the city's failure to provide deadlines in violation of Section 5.2(ii) and (iv), and Plaintiff's concerns about the adequacy of the City's housing and shelter plans under Section 5.2 (i) and (iii).  Attached hereto as **Exhibit C** is a true and correct copy of the letter I drafted to City on January 8, 2024 identifying the various relevant dates during the entire 14 months of the City's willful noncompliance.[1]

5.    After several delays caused by City (and city attorney) schedules, I finally met with the City (represented by Scott Marcus, David Michaelson, and Mercedes Marquez) along with Alliance representatives Daniel Conway and Paul Webster, on March 8 and again March 15, 2023 to discuss the City's non-compliance with the Agreement.  On March 15, 2023, the City—through then-Chief Housing and Homelessness Officer Mercedes Marquez—claimed that the City had significant plans intended to come into compliance with Section 5.2(ii) and (iv).  Specifically, Marquez assured us that the City had already put out an RFQ (Request For Quote or Request for Qualification) for service/outreach providers, would be "fully staffed" with an assigned service/outreach provider for each district by July 1, 2023, and would "have each district fully assessed" (which was described as identifying the numbers of unsheltered PEH, plus a description of the needs of various groups, including an estimate of the number of individuals with serious mental illness and substance use disorder, in each district) by September 30, 2023.  Ms. Marquez promised that once that effort was

---

[1] While this letter summarizes the process, each date is associated with voluminous e-mails relevant to this analysis.  However, the City asked me to keep the communications confidential, and only submit the more recent letters.  Plaintiffs defer to the Court on whether the e-mails themselves are necessary to the court's resolution of this motion, and will produce said emails upon request.

2

*DECLARATION OF ELIZABETH A. MITCHELL ISO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND FOR SANCTIONS*

complete, the City would then provide the Alliance its proposed encampment milestones and deadlines by October 1, 2023.

6.    I summarized the meeting in an email thereafter, directed to Scott Marcus, Mercedes Marquez, and David Michaelson:

> In our last meeting we talked about the RFQ that the City has put out for a list of qualified service/outreach providers, and that the City expects to be fully staffed with the District's chosen providers by July 1 . . . . We also discussed that the City could commit to having each district fully assessed and get us a list of proposed milestones and deadlines within 3 months thereafter (October 1).

7.    Relying upon the promises of the new mayor's representative, and extending a good faith opportunity to a new administration, my clients agreed to the extension.  Mr. Marcus, on behalf of the City, confirmed the request for extension and the City's need to provide encampment deadlines by October 1, 2023.

8.    The City blew that deadline as well.  Two days after October 1, the City emailed me its "Encampment Engagement, Cleaning, and Resolution" proposal … that contained no proposed deadlines or milestones at all. Attached hereto as **Exhibit D** is a true and correct copy of the "Encampment Engagement, Cleaning, and Resolution" proposal sent to me on October 3, 2023.

9.    With the City in clear violation of the agreement and subsequent promises made, Daniel Conway, Paul Webster, and I met with the City (Scott Marcus, David Michaelson, and Mercedes Marquez) about the City's violation of the agreement during which Ms. Marquez confessed that the City never hired preferred service/outreach providers for encampment reduction in each district, had not had each district assessed, and had instead done nothing towards these commitments.  This was the third instance of the City refusing to comply with Section 5.2 (ii) and (iv).

10.    Unable to bring the City into compliance, the Alliance brought the City's violation of Section 5.2 to the attention of Michele Martinez, appointed monitor to

*DECLARATION OF ELIZABETH A. MITCHELL ISO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND FOR SANCTIONS*

oversee the City/Alliance settlement agreement.  Attached hereto as **Exhibit E** is a true and correct copy of an email I sent to Ms. Martinez dated October 19, 2023 regarding the City's noncompliance.

11.    After a Zoom meeting with the parties, Ms. Martinez asked the parties to again meet and try to come up with a plan that would satisfy both parties.  The parties then met to discuss the issue on November 8, 2023; at that meeting the City proposed its first 5.2 commitment: a single encampment resolution per month for the entire city. The City claimed no more could be done because there was insufficient bed capacity. The Alliance informed the City that a lack of bed capacity necessarily meant that the bed-creation plans the City had provided under Section 5.2 (i) and (iii) were insufficient if the City couldn't increase its milestones sufficiently to address the severe crisis on the street.

12.    On November 29, 2023, the City submitted an updated Encampment Engagement, Cleaning, and Reduction plan to the court and counsel—and still, it did not comply with Section 5.2.  The City proposed to resolve "at least two tent and makeshift shelter encampments and at least three RV encampments involving at least 100 individuals" per month for the first six months of 2024, and thereafter "aim[]" to increase to "three tent and makeshift shelter encampments and four RV encampments involving at least 150 individuals" per month for the second half of 2024.  Attached hereto as **Exhibit F** is a true and correct copy of the updated Encampment Engagement and Resolution plan submitted by the City on November 29, 2023.

13.    There were two major problems with this proposal. *First,* the City's proposal was still facially non-compliant with Section 5.2 because it ignored the requirement that the City propose milestones and deadlines for "encampment … reduction in each district." (Settlement Agreement, p. 8 (emphasis added.)  This was the fourth instance of the City refusing to comply with Section 5.2 (ii). *Second,* the City's proposed "plan" was plainly insufficient—at a rate of 1,800 individuals,

4

*DECLARATION OF ELIZABETH A. MITCHELL ISO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND FOR SANCTIONS*

citywide, per year, the City would not meaningfully reduce the numbers of the 32,680 unsheltered persons experiencing homelessness in Los Angeles.

14. Still unable to move the City into compliance or obtain a City commitment that matched the scale of the crisis, the Alliance <u>again</u> requested that the Court resolve the matter. The court set a hearing date for resolution of this dispute for December 14, 2023. As the hearing approached, the City made a series of proposals that culminated in a commitment of 9,782 resolutions,[2] encompassing tents, makeshift shelters, RVs, vans, and cars over a five year period (including the entire agreement). The City then committed to submitting the new numbers in writing to the court and Plaintiffs by the end of the month. The City did not, however, comply with Section 5.2(ii)'s requirement of establishing district-by-district encampment milestones.

15. On December 29, 2023, the City unilaterally increased its proposed encampment reduction commitment to "a minimum of 12,000 tents, makeshift shelters, cars, vans, and RVs over the term of the settlement agreement . . ."—an increase from the previously agreed-to 9,782 resolutions. Attached hereto as **Exhibit G** is a true and correct copy of the Revised Encampment Reduction Milestones submitted on December 29, 2023. The City imposed no conditions on this 12,000-encampment reduction number—it did not condition the 12,000 on anything from the Plaintiffs and did not suggest that the 12,000 was contingent upon the Plaintiffs giving up the district-by-district demands of Section 5.2(ii). But still, the City did not provide district-by-district encampment reduction numbers as required by Section 5.2(ii)—this was the fifth instance of the City's failure to comply.

17. On January 4, 2024, the Alliance, represented by Paul Webster, Matthew Umhofer, and Elizabeth Mitchell, met with the City, represented by Mayor Karen Bass, Chief Housing and Homelessness Officer Lourdes Castro Ramirez, Chief

_____

[2] Because the word "encampment" was difficult to define, the City and Alliance used LAHSA metrics for tents, makeshift shelters, cars, vans, and RVs. LAHSA CVRTM conversion factors (Aug. 15, 2022), https://www.lahsa.org/documents?id=6533-cvrtm-summary-by-geography.

5

*DECLARATION OF ELIZABETH A. MITCHELL ISO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND FOR SANCTIONS*

Administrative Officer Matthew Szabo, Counsel to the Mayor David Michaelson, and Chief Assistant City Attorney Scott Marcus.  At this meeting, the parties discussed mutual goals, and the mayor and staff explained their focus on citywide efforts.  No council member was present.  During that meeting, the City withdrew its unconditional commitment to 12,000 encampment reductions and attempted to revise the history of the negotiations by suggesting the 12,000 number was conditioned on an Alliance agreement to abandon the district-by-district requirements of Section 5.2(ii).  The City then declared that if the Alliance insisted on district-by-district numbers as required by Section 5.2(ii), the City would only commit to 5,300 encampment resolutions.[3]  The Alliance explained—as it had for the entire prior year—that the district-specific numbers were required under the settlement agreement and were necessary for accountability.  No agreement was reached at this meeting.

18.     Two days later, on January 6, 2024, the City (David Michaelson) emailed counsel for the Alliance stating, for the first time "The City . . . will update the encampment reduction goal to 9,800 . . . and provide district by district milestones."  The City then provided, for the first time—and 14 months after it was required to— proposed milestones and deadlines for each district throughout the City.  Attached hereto as **Exhibit H** is a true and correct copy of the district-by-district milestone schedule submitted by Mr. Michaelson on January 6, 2024.

19.     The Alliance began assessing these new district-by-district numbers, and learned that they were not the product of any consultation with the City Council members who represent those districts.  These were not real district-by-district numbers that reflected the needs and agreement of each district representative in the City.  This was the sixth violation of Section 5.2(ii).

---

[3] The 5300 number came from an original proposal from the Alliance prior to the December 14 hearing, which was the result of a mistaken view of the relevant encampment numbers.  Recognizing the mistake, the Alliance immediately withdrew that number and informed the City of withdrawal, which culminated in the agreement to 9,782.

6

*DECLARATION OF ELIZABETH A. MITCHELL ISO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND FOR SANCTIONS*

In response to the City's continued failure to provide vetted and agreed-to district-by-district encampment reduction numbers,[4] the Alliance sent a written demand seeking: (i) a return to the 12,000 resolution commitment or 9,800 within a 4-year period (ending in June, 2026) rather than 5, (ii) quarterly reporting, (iii) specific plans for egregiously ignored areas of Skid Row and Avenue 45, and (iv) monetary sanctions as a consequence for the City's willful noncompliance with the Settlement Agreement and to deter future similar violations. (Exhibit C.)  The City responded by offering 9,800 resolutions within 4 years (by June, 2026), and quarterly reporting, but refusing to provide specific plans for designated encampments and refusing to pay any sanctions amount.  Attached hereto as **Exhibit I** is a true and correct copy of the letter sent by Scott Marcus agreement to 9,800 resolutions within 4 years.

20.    I am informed that on January 31, 2024, the City Council considered and approved the 9,800 resolutions by June, 2026.  On February 1, 2024 I was finally provided the district-specific milestones and deadlines, attached hereto as **Exhibit J.**

21.    I am aware of the City's claim that it moved 21,000 + unsheltered individuals into temporary shelter in 2023.  These are not real numbers but instead constitute "touches" meaning every time a person is moved into interim shelter from the street, from one shelter to another shelter, or leaves a shelter and returns to the same or different shelter, those are all counted as LAHSA statistics.  Therefore when LAHSA reported to the City that 21,000+ people had been moved into interim shelter,

---

[4] Specifically:
(i)    refusing to provide any numbers at all,
(ii)    promising a significant evaluation effort with meaningful numbers with apparently no intention to ever fulfill that promise and no communication during that period about any changed plans,
(iii)    *still* refusing to provide any numbers or commitment at all,
(iv)    providing only minimal efforts and apparently misleading the news media about successes,
(v)    committing to numbers the morning of the hearing and again in writing to the court, then withdrawing and changing the terms of the commitment and thereby negotiating with human lives, and
(vi)    re-committing to 9,800 (slightly up from 9,782 that had been agreed-to on December 14, 2023 but still lower than the number previously committed to on December 29, 2023.)

7

*DECLARATION OF ELIZABETH A. MITCHELL ISO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND FOR SANCTIONS*

that is not an accurate statement because many, many people are being double- or triple-counted. At the January 4, 2024 meeting with the City, Lourdes Castro Ramirez acknowledged this same problem and agreed that the City needed better data to avoid double- and triple-counting in the future.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on February 7, 2024 at Los Angeles, California.

*/s/ Elizabeth A. Mitchell*
Elizabeth A. Mitchell

*DECLARATION OF ELIZABETH A. MITCHELL ISO MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND FOR SANCTIONS*

# Exhibit A

## City Shelter Appropriate Tracker - 2022 Point in Time Count

As of 10/4/2022

| Council District | 2022 Homeless Point in Time Count Data | | | # of Unsheltered PEH Minus SMI | 60% of Unsheltered PEH Minus SMI |
|:---:|:---:|:---:|:---:|:---:|:---:|
| | # of Unsheltered PEH | # of Seriously Mentally Ill (SMI) | Percent SMI | | |
| 1 | 2,570 | 731 | 28.44% | 1,839 | 1,103 |
| 2 | 1,128 | 404 | 35.82% | 724 | 434 |
| 3 | 970 | 169 | 17.42% | 801 | 481 |
| 4 | 887 | 221 | 24.92% | 666 | 400 |
| 5 | 787 | 264 | 33.55% | 523 | 314 |
| 6 | 1,590 | 373 | 23.46% | 1,217 | 730 |
| 7 | 1,484 | 183 | 12.33% | 1,301 | 781 |
| 8 | 1,334 | 377 | 28.26% | 957 | 574 |
| 9 | 2,943 | 437 | 14.85% | 2,506 | 1,504 |
| 10 | 1,348 | 361 | 26.78% | 987 | 592 |
| 11 | 1,704 | 481 | 28.23% | 1,223 | 734 |
| 12 | 964 | 260 | 26.97% | 704 | 422 |
| 13 | 2,310 | 600 | 25.97% | 1,710 | 1,026 |
| 14 | 6,523 | 1,726 | 26.46% | 4,797 | 2,878 |
| 15 | 1,916 | 364 | 19.00% | 1,552 | 931 |
| Total | 28,458 | 6,951 | 24.43% | 21,507 | 12,904 |

Draft

# Exhibit B

**182**

Alliance - Potential Project List

As of 11/9/2022

| CD | Intervention Type | Project Type | Address / Location | Ready for Occupancy Date | STATUS | Total Units | PSH/Interim Units |
|---|---|---|---|---|---|---|---|
| 6 | PSH | Homekey 1 | Panorama Inn 8209 Sepulveda Blvd. | 09/30/2025 | - | 90 | 90 |
| 15 | PSH | Homekey 1 | Travelodge 18600 Normandie Ave. | 06/30/2024 | - | 40 | 40 |
| 6 | IH | Homekey 1 | Woodman 9120 Woodman Ave. | 10/01/2023 | - | 148 | 148 |
| 7 | PSH | Homekey 2 | 10150 Hillhaven | 12/20/2022 | - | 34 | 33 |
| 14 | PSH | Homekey 2 | 1044 Soto | 03/12/2023 | - | 85 | 84 |
| 6 | PSH | Homekey 2 | 14949 Roscoe | 01/15/2023 | - | 29 | 28 |
| 8 | PSH | Homekey 2 | 1654 W Florence | 05/01/2023 | - | 128 | 126 |
| 15 | PSH | Homekey 2 | 18602 Vermont | 06/01/2023 | - | 136 | 134 |
| 12 | PSH | Homekey 2 | 19325 Londelius | 06/01/2023 | - | 117 | 115 |
| 3 | PSH | Homekey 2 | 20205 Ventura | 06/01/2023 | - | 146 | 144 |
| 3 | PSH | Homekey 2 | 21121 Vanowen | 05/01/2023 | - | 101 | 99 |
| 13 | PSH | Homekey 2 | 2812 Temple/ 916 Alvarado | 06/01/2023 | - | 69 | 67 |
| 15 | PSH | Homekey 2 | 5050 Pico | 11/30/2022 | - | 79 | 78 |
| 8 | PSH | Homekey 2 | 6521 Brynhurst | 11/14/2022 | - | 41 | 40 |
| 11 | PSH | Homekey 2 | 6531 S Sepulveda | 06/01/2023 | - | 133 | 131 |
| 1 | PSH | Homekey 2 | 740 Alvarado | 11/15/2022 | - | 80 | 79 |
| 6 | PSH | Homekey 2 | 7639 Van Nuys | 04/01/2023 | - | 35 | 34 |
| 4 | PSH | Homekey 2 | BLVD Hotel 2010 N. Highland | 07/01/2023 | - | 62 | 61 |
| TBD | PSH | Homekey 3 Sites | TBD | 06/01/2024 | - | 300 | 300 |
| 4 | IH | Interim Housing | Highland Gardens | 11/08/2022 | - | 143 | 143 |
| 14 | IH | Interim Housing (Pallet) | 850 Mission St. & Jesse | 02/01/2023 | - | 74 (114) | 74 |
| 6 | IH | Interim Housing (Pallet) | 9710 San Fernando Rd. | 12/01/2022 | - | 83 (161) | 83 |
| 1 | IH | Interim Housing (Pallet) | Northeast New Beginnings Community (Cypress Park) 499 San Fernando | 03/15/2023 | - | 65 (130) | 65 |
| 1 | PSH | Non-Prop HHH | 619 Westlake (fka Westlake 619) 619 S WESTLAKE AVE  Los Angeles, CA 90057 | 05/15/2023 | - | 78 | 39 |
| 13 | PSH | Non-Prop HHH | Alvarado Kent Apartments 707 N ALVARADO ST CA 90026 | 09/01/2024 | - | 80 | 40 |
| 6 | PSH | Non-Prop HHH | Corazon del Valle 14545 W LANARK ST CA 91402 | 10/23/2023 | - | 90 | 49 |
| 14 | PSH | Non-Prop HHH | Crocker (Umeya) Apartments 411 S TOWNE AVE CA 90013 | 10/01/2025 | - | 173 | 87 |

Exhibit B
Page 10

As of 11/9/2022

| CD | Intervention Type | Project Type | Address / Location | Ready for Occupancy Date | STATUS | Total Units | PSH/Interim Units |
|---|---|---|---|---|---|---|---|
| 14 | PSH | Non-Prop HHH | First Street North- B (Go For Broke- S 9p) 128 N JUDGE JOHN AISO ST CA 90012 | 01/01/2025 | - | 65 | 16 |
| 14 | PSH | Non-Prop HHH | First Street North-A (Go For Broke Apt N-4p) 200 N JUDGE JOHN AISO ST CA 90012 | 12/01/2024 | - | 176 | 44 |
| 15 | PSH | Non-Prop HHH | Jordan Downs Area H2B (Bridge) 2254 E 97TH ST CA 90002 | 01/01/2026 | - | 119 | 30 |
| 9 | PSH | Non-Prop HHH | La Prensa Libre - 4% 210 E WASHINGTON BLVD Los Angeles, CA 90015 | 03/20/2023 | - | 63 | 25 |
| 14 | PSH | Non-Prop HHH | LAMP Lodge 660 S STANFORD AVE Los Angeles, CA 90021 | 11/16/2022 | - | 82 | 81 |
| 13 | PSH | Non-Prop HHH | Locke Lofts 316 N JUANITA AVE CA 90004 | 01/01/2026 | - | 150 | 145 |
| 6 | PSH | Non-Prop HHH | Luna Vista Apartments 8767 N PARTHENIA PL 1-73 CA 91343 | 03/31/2024 | - | 73 | 36 |
| 1 | PSH | Non-Prop HHH | Miramar Gold 1434 W MIRAMAR ST CA 90026 | 10/01/2024 | - | 94 | 47 |
| 13 | PSH | Non-Prop HHH | Orange and DeLongpre Apartments 6914 W DE LONGPRE AVE HOLLYWOOD, CA 90028 | 12/01/2023 | - | 98 | 96 |
| 3 | PSH | Non-Prop HHH | Palm Vista Apartments 20116 W SHERMAN WAY Winnetka, CA 91306 | 07/01/2023 | - | 91 | 44 |
| 9 | PSH | Non-Prop HHH | Parkview Affordable Housing 4020 S COMPTON AVE CA 90011 | 02/01/2024 | - | 127 | 31 |
| 10 | PSH | Non-Prop HHH | PATH Villas Montclair/Gramercy(Recap-Site 2 of 2) 3317 W WASHINGTON BLVD Los Angeles, CA 90018 | 10/22/2022 | - | 17 | 16 |
| 11 | PSH | Non-Prop HHH | Red Tail Crossing (FKA Kite Crossing) 8333 S AIRPORT BLVD CA 90045 | 11/01/2024 | - | 40 | 102 |
| 10 | PSH | Non-Prop HHH | The Arlington 3322 W WASHINGTON BLVD CA 90018 | 03/06/2024 | - | 20 | 20 |
| 1 | PSH | Non-Prop HHH | Third Thyme 1435 W 3RD ST CA 90017 | 03/01/2025 | - | 104 | 52 |
| 11 | PSH | Non-Prop HHH | Venice Dell (fka Reese Davidson Comm-Ph I-West) 2102 S PACIFIC AVE CA 90291 | 10/31/2024 | - | 63 | 31 |
| 8 | PSH | Non-Prop HHH | Vermont Manchester Family Transit Priority Project 8500 S VERMONT AVE CA 90044 | 05/01/2025 | - | 118 | 45 |
| 6 | PSH | Non-Prop HHH | Vista Terrace 8134 N VAN NUYS BLVD CA 91402 | 01/01/2026 | - | 102 | 24 |

As of 11/9/2022

| CD | Intervention Type | Project Type | Address / Location | Ready for Occupancy Date | STATUS | Total Units | PSH/Interim Units |
|----|-------------------|--------------|--------------------|--------------------------|--------|-------------|-------------------|
| 1 | PSH | Non-Prop HHH | West Third Apartments<br>1900 W 3RD ST  Los Angeles, CA 90057 | 12/01/2022 | - | 137 | 136 |
| 5 | PSH | Prop HHH | 11010 Santa Monica<br>11010 W SANTA MONICA BLVD  Los Angeles, CA 90025 | 11/30/2022 | - | 51 | 50 |
| 2 | PSH | Prop HHH | 11604 Vanowen (fka The Mahalia)<br>11604 VANOWEN ST  LOS ANGELES, CA 91605 | 10/25/2022 | - | 49 | 48 |
| 3 | PSH | Prop HHH | 18722 Sherman Way, L.P.<br>18722 W SHERMAN WAY CA 91335 | 08/31/2025 | - | 64 | 63 |
| 12 | PSH | Prop HHH | 21300 Devonshire<br>21300 W DEVONSHIRE ST CA 91311 | 08/31/2025 | - | 100 | 99 |
| 9 | PSH | Prop HHH | 4507 Main St.<br>4505 S MAIN ST  Los Angeles, CA 90037 | 04/29/2024 | - | 61 | 31 |
| 14 | PSH | Prop HHH | 6th and San Julian<br>401 E 6TH ST  Los Angeles, CA 90014 | 02/28/2023 | - | 94 | 93 |
| 14 | PSH | Prop HHH | 803 E. 5th St<br>803 E 5TH ST  Los Angeles, CA 90013 | 10/30/2023 | - | 95 | 94 |
| 10 | PSH | Prop HHH | Adams Terrace<br>4314 W ADAMS BLVD  Los Angeles, CA 90018 | 11/03/2022 | - | 48 | 21 |
| 10 | PSH | Prop HHH | Amani Apartments (fka Pico)<br>4200 W PICO BLVD  Los Angeles, CA 90019 | 11/29/2022 | - | 54 | 53 |
| 13 | PSH | Prop HHH | Ambrose (fka 1615 Montana St.)<br>1611 W MONTANA ST  Los Angeles, CA 90026 | 01/15/2023 | - | 64 | 63 |
| 8 | PSH | Prop HHH | Ambrosia Apartments<br>800 W 85TH ST  Los Angeles, CA 90044 | 12/31/2024 | - | 90 | 80 |
| 8 | PSH | Prop HHH | Asante Apartments<br>11001 S BROADWAY  Los Angeles, CA 90061 | 06/30/2023 | - | 55 | 54 |
| 15 | PSH | Prop HHH | Avalon 1355<br>1355 N AVALON BLVD CA 90744 | 02/09/2024 | - | 54 | 53 |
| 15 | PSH | Prop HHH | Beacon Landing (fka Beacon PSH)<br>319 N BEACON ST  SAN PEDRO, CA 90731 | 06/30/2023 | - | 89 | 88 |
| 10 | PSH | Prop HHH | Berendo Sage<br>1035 S BERENDO ST  LOS ANGELES, CA 90006 | 11/08/2022 | - | 42 | 21 |
| 9 | PSH | Prop HHH | Broadway Apartments<br>301 W 49TH ST 1-30  LOS ANGELES, CA 90037 | 12/01/2022 | - | 35 | 34 |
| 1 | PSH | Prop HHH | Bryson II<br>2721 WILSHIRE BLVD  LOS ANGELES, CA 90057 | 04/03/2023 | - | 64 | 33 |

Exhibit B<br>Page 12

Alliance - Potential Project List

As of 11/9/2022

| CD | Intervention Type | Project Type | Address / Location | Ready for Occupancy Date | STATUS | Total Units | PSH/Interim Units |
|----|----|----|----|----|----|----|----|
| 11 | PSH | Prop HHH | Building 205<br>11301 WILSHIRE BLVD  Los Angeles, CA 90073 | 12/01/2022 | - | 68 | 67 |
| 11 | PSH | Prop HHH | Building 208<br>11301 WILSHIRE BLVD  #208  LOS ANGELES, CA 90073 | 01/07/2023 | - | 54 | 53 |
| 9 | PSH | Prop HHH | Central Apartments<br>2106 S CENTRAL AVE  Los Angeles, CA 90011 | 07/26/2024 | - | 57 | 56 |
| 14 | PSH | Prop HHH | Chavez Gardens (fka Chavez and Fickett)<br>338 N MATHEWS ST  Los Angeles, CA 90033 | 12/31/2025 | - | 60 | 30 |
| 14 | PSH | Prop HHH | Colorado East<br>2451 W COLORADO BLVD  Los Angeles, CA 90041 | 12/31/2022 | - | 41 | 20 |
| 2 | PSH | Prop HHH | Confianza<br>14142 W VANOWEN ST  VAN NUYS, CA 91405 | 10/31/2024 | - | 64 | 63 |
| 8 | PSH | Prop HHH | Depot at Hyde Park<br>6527 S CRENSHAW BLVD  Los Angeles, CA 90043 | 12/31/2022 | - | 43 | 33 |
| 1 | PSH | Prop HHH | Firmin Court<br>418 N FIRMIN ST  Los Angeles, CA 90026 | 11/30/2022 | - | 64 | 45 |
| 1 | PSH | Prop HHH | Grandview Apartments<br>714 S GRAND VIEW ST  Los Angeles, CA 90057 | 05/19/2025 | - | 100 | 54 |
| 14 | PSH | Prop HHH | Hope on 6th<br>576 W 6TH ST  SAN PEDRO, CA 90731 | 12/31/2025 | - | 49 | 31 |
| 9 | PSH | Prop HHH | Hope on Broadway<br>5138 S BROADWAY  Los Angeles, CA 90037 | 10/25/2022 | - | 49 | 48 |
| 8 | PSH | Prop HHH | Hope on Hyde Park - MP/TOC/PSH<br>6501 S CRENSHAW BLVD  Los Angeles, CA 90043 | 01/30/2023 | - | 98 | 97 |
| 1 | PSH | Prop HHH | Ingraham Villa Apartments<br>1218 INGRAHAM ST  LOS ANGELES, CA 90017 | 12/15/2022 | - | 121 | 90 |
| 8 | PSH | Prop HHH | Isla de Los Angeles<br>283 W IMPERIAL HWY  Los Angeles, CA 90061 | 12/14/2022 | - | 54 | 53 |
| 14 | PSH | Prop HHH | La Guadalupe (fka First and Boyle)<br>100 S BOYLE AVE  Los Angeles, CA 90033 | 08/30/2024 | - | 44 | 43 |
| 14 | PSH | Prop HHH | La Veranda<br>2420 E CESAR E CHAVEZ AVE  Los Angeles, CA 90033 | 08/01/2023 | - | 77 | 38 |
| 15 | PSH | Prop HHH | Lagoon (fka PSH 3)<br>728 N LAGOON AVE  Wilmington, CA 90744 | 10/15/2025 | - | 35 | 34 |
| 14 | PSH | Prop HHH | Lorena Plaza<br>3401 E 1ST ST  Los Angeles, CA 90063 | 12/15/2023 | - | 49 | 32 |

Alliance - Potential Project List

As of 11/9/2022

| CD | Intervention Type | Project Type | Address / Location | Ready for Occupancy Date | STATUS | Total Units | PSH/Interim Units |
|---|---|---|---|---|---|---|---|
| 14 | PSH | Prop HHH | Los Lirios Apartments 119 S SOTO ST Los Angeles, CA 90033 | 09/01/2023 | - | 64 | 20 |
| 12 | PSH | Prop HHH | Lumina (fka Topanga Apartments) 10243 N TOPANGA CANYON BLVD Chatsworth, CA 91311 | 12/31/2023 | - | 55 | 54 |
| 9 | PSH | Prop HHH | Main Street Apartments 5501 S MAIN ST Los Angeles, CA 90037 | 09/01/2023 | - | 57 | 56 |
| 9 | PSH | Prop HHH | Marcella Gardens (68th & Main St.) 6722 S MAIN ST Los Angeles, CA 90003 | 12/31/2022 | - | 60 | 59 |
| 10 | PSH | Prop HHH | Mariposa Lily 1055 S MARIPOSA AVE Los Angeles, CA 90006 | 03/03/2023 | - | 41 | 20 |
| 10 | PSH | Prop HHH | McDaniel House (fka South Harvard) 1049 1/2 S HARVARD BLVD Los Angeles, CA 90006 | 09/01/2023 | - | 47 | 46 |
| 13 | PSH | Prop HHH | Montecito II Senior Housing 6668 W FRANKLIN AVE HOLLYWOOD, CA 90028 | 11/30/2024 | - | 64 | 32 |
| 13 | PSH | Prop HHH | Montesquieu Manor 316 N JUANITA AVE CA 90004 | 09/01/2023 | - | 53 | 20 |
| 6 | PSH | Prop HHH | My Angel (fka The Angel) 8547 N SEPULVEDA BLVD North Hills, CA 91343 | 03/07/2024 | - | 54 | 53 |
| 10 | PSH | Prop HHH | New Hampshire PSH 701 S NEW HAMPSHIRE AVE Los Angeles, CA 90005 | 08/25/2025 | - | 95 | 93 |
| 2 | PSH | Prop HHH | NoHo 5050 5050 N BAKMAN AVE North Hollywood, CA 91601 | 02/01/2024 | - | 40 | 32 |
| 8 | PSH | Prop HHH | Normandie 84 8401 S NORMANDIE AVE Los Angeles, CA 90044 | 12/31/2025 | - | 42 | 34 |
| 1 | PSH | Prop HHH | Oak Apartments (fka 2745-2759 Francis Ave) 2745 W FRANCIS AVE Los Angeles, CA 90005 | 04/15/2024 | - | 64 | 63 |
| 6 | PSH | Prop HHH | Oatsie's Place (fka Sherman Way) 16015 W SHERMAN WAY VAN NUYS, CA 91406 | 04/01/2023 | - | 46 | 45 |
| 13 | PSH | Prop HHH | PATH Villas Hollywood 5627 W FERNWOOD AVE HOLLYWOOD, CA 90028 | 11/10/2022 | - | 60 | 59 |
| 5 | PSH | Prop HHH | Pointe on La Brea 849 N LA BREA AVE CA 90038 | 07/07/2023 | - | 50 | 49 |
| 3 | PSH | Prop HHH | Reseda Theater Senior Housing (Canby Woods West) 7221 N CANBY AVE Reseda, CA 91335 | 11/30/2022 | - | 26 | 13 |
| 8 | PSH | Prop HHH | RETHINK Housing 62nd (fka 1408 W. 62nd Street) 1408 W 62ND ST Los Angeles, CA 90047 | 08/31/2025 | - | 27 | 26 |

Page 5

**Exhibit B
Page 14**

187

Alliance - Potential Project List

As of 11/9/2022

| CD | Intervention Type | Project Type | Address / Location | Ready for Occupancy Date | STATUS | Total Units | PSH/Interim Units |
|---|---|---|---|---|---|---|---|
| 9 | PSH | Prop HHH | RETHINK Housing Figueroa<br>5900 S FIGUEROA ST  Los Angeles, CA 90003 | 08/31/2025 | - | 42 | 41 |
| 13 | PSH | Prop HHH | RETHINK Housing Westlake<br>405 N WESTLAKE AVE  Los Angeles, CA 90026 | 08/31/2025 | - | 19 | 18 |
| 13 | PSH | Prop HHH | Rousseau Residences<br>316 N JUANITA AVE  Los Angeles, CA 90004 | 03/07/2024 | - | 52 | 51 |
| 9 | PSH | Prop HHH | Ruth Teague Homes (fka 67th & Main)<br>6706 S MAIN ST  Los Angeles, CA 90003 | 03/01/2023 | - | 52 | 26 |
| 15 | PSH | Prop HHH | SagePointe (fka Deepwater)<br>1435 N EUBANK AVE  LOS ANGELES, CA 90744 | 01/04/2024 | - | 56 | 55 |
| 13 | PSH | Prop HHH | Santa Monica & Vermont Apartments (Phases 1 & 2)<br>4718 W SANTA MONICA BLVD  Los Angeles, CA 90029 | 02/07/2024 | - | 187 | 94 |
| 10 | PSH | Prop HHH | Serenity (fka 923-937 Kenmore Ave)<br>923 S KENMORE AVE  Los Angeles, CA 90006 | 02/15/2023 | - | 75 | 74 |
| 4 | PSH | Prop HHH | Sherman Oaks Senior Housing<br>14536 W BURBANK BLVD  VAN NUYS, CA 91411 | 05/17/2023 | - | 55 | 54 |
| 7 | PSH | Prop HHH | Silva Crossing (fka Link at Sylmar)<br>12667 SAN FERNANDO ROAD  Sylmar, CA 91342 | 10/11/2022 | - | 56 | 55 |
| 8 | PSH | Prop HHH | SOLA at 87th<br>8707 S WESTERN AVE  Los Angeles, CA 90047 | 12/31/2025 | - | 160 | 51 |
| 10 | PSH | Prop HHH | Solaris Apartments (fka 1141-1145 Crenshaw Blvd)<br>1141 S CRENSHAW BLVD  Los Angeles, CA 90019 | 07/07/2023 | - | 43 | 42 |
| 8 | PSH | Prop HHH | Southside Seniors<br>1655 W MANCHESTER AVE  Los Angeles, CA 90047 | 07/06/2024 | - | 50 | 36 |
| 2 | PSH | Prop HHH | Studio 6 Motel (fka Sherman Way Apts Preservation)<br>13561 W SHERMAN WAY 1-58  Van Nuys, CA 91405 | 04/15/2026 | - | 56 | 55 |
| 7 | PSH | Prop HHH | Summit View Apartments<br>11800 W KAGEL CANYON ST  Sylmar, CA 91342 | 12/15/2022 | - | 49 | 48 |
| 2 | PSH | Prop HHH | Sun Commons<br>6329 N CLYBOURN AVE  North Hollywood, CA 91606 | 01/19/2023 | - | 103 | 51 |
| 6 | PSH | Prop HHH | Sun King Apartments<br>9190 N TELFAIR AVE  LOS ANGELES, CA 91352 | 05/18/2023 | - | 26 | 25 |
| 6 | PSH | Prop HHH | Talisa (fka 9502 Van Nuys Blvd)<br>9502 N VAN NUYS BLVD  Panorama City, CA 91402 | 01/01/2023 | - | 49 | 48 |
| 11 | PSH | Prop HHH | Thatcher Yard Housing<br>3233 S THATCHER AVE  Marina Del Rey, CA 90292 | 07/31/2024 | - | 98 | 39 |

188

**Exhibit B**
**Page 15**

Alliance - Potential Project List

As of 11/9/2022

| CD | Intervention Type | Project Type | Address / Location | Ready for Occupancy Date | STATUS | Total Units | PSH/Interim Units |
|---|---|---|---|---|---|---|---|
| 15 | PSH | Prop HHH | The Banning (aka 841 N Banning)<br>841 N BANNING BLVD  Wilmington, CA 90744 | 12/20/2023 | - | 64 | 58 |
| 14 | PSH | Prop HHH | The Brine Residential<br>3016 N NORTH MAIN ST  Los Angeles, CA 90031 | 11/15/2023 | - | 97 | 49 |
| 11 | PSH | Prop HHH | The Iris (fka Barry Apartments)<br>2444 S BARRY AVE CA 90064 | 03/07/2024 | - | 61 | 34 |
| 11 | PSH | Prop HHH | The Journey (FKA Lincoln Apartments)<br>2467 S LINCOLN BLVD  Venice, CA 90291 | 03/07/2024 | - | 40 | 39 |
| 1 | PSH | Prop HHH | The Lake House (fka Westlake Housing)<br>437 S WESTLAKE AVE  Los Angeles, CA 90057 | 09/01/2023 | - | 63 | 62 |
| 6 | PSH | Prop HHH | The Main<br>15302 W RAYEN ST  North Hills, CA 91343 | 07/15/2026 | - | 64 | 33 |
| 6 | PSH | Prop HHH | The Palm Tree Motel (fka Sepulveda Apts Pres.)<br>8428 N SEPULVEDA BLVD  North Hills, CA 91343 | 07/15/2026 | - | 76 | 75 |
| 1 | PSH | Prop HHH | The Quincy (fka 2652 Pico)<br>2652 W PICO BLVD  Los Angeles, CA 90006 | 11/04/2023 | - | 54 | 53 |
| 6 | PSH | Prop HHH | The Rigby<br>15314 W RAYEN ST  North Hills, CA 91343 | 12/31/2025 | - | 64 | 33 |
| 13 | PSH | Prop HHH | The Wilcox (fka 4906-4926 Santa Monica)<br>4912 W SANTA MONICA BLVD  Los Angeles, CA 90029 | 11/04/2023 | - | 62 | 61 |
| 11 | PSH | Prop HHH | VA Building 207<br>11301 WILSHIRE BLVD  #207 Los Angeles, CA 90025 | 01/31/2023 | - | 60 | 59 |
| 10 | PSH | Prop HHH | Vermont Corridor Apartments (fka 433 Vermont Apts)<br>433 S VERMONT AVE  Los Angeles, CA 90020 | 12/15/2022 | - | 72 | 36 |
| 8 | PSH | Prop HHH | Vermont Manchester Senior<br>8400 S VERMONT AVE  Los Angeles, CA 90044 | 06/01/2024 | - | 62 | 45 |
| 13 | PSH | Prop HHH | Voltaire Villas (Enlightenment Plaza Ph III)<br>316 N JUANITA AVE  Los Angeles, CA 90004 | 07/06/2024 | - | 72 | 71 |
| 10 | PSH | Prop HHH | Washington Arts Collective<br>4615 W WASHINGTON BLVD  Los Angeles, CA 90016 | 11/10/2023 | - | 56 | 20 |
| 15 | PSH | Prop HHH | Watts Works<br>9500 S COMPTON AVE  Los Angeles, CA 90002 | 11/30/2022 | - | 25 | 24 |
| 14 | PSH | Prop HHH | Weingart Tower 1B - HHH PSH<br>554 S SAN PEDRO ST  Los Angeles, CA 90013 | 05/15/2024 | - | 104 | 83 |
| 14 | PSH | Prop HHH | Weingart Tower A-134 (fkaWeingart Tower HHH PSH1A)<br>555 S CROCKER ST CA 90013 | 12/31/2023 | - | 134 | 133 |

189

**Exhibit B**
**Page 16**

As of 11/9/2022

| CD | Intervention Type | Project Type | Address / Location | Ready for Occupancy Date | STATUS | Total Units | PSH/Interim Units |
|---|---|---|---|---|---|---|---|
| 14 | PSH | Prop HHH | Weingart Tower A-144 Lower (fkaWeingart TowerII1A) 555 S CROCKER ST CA 90013 | 12/31/2023 | - | 144 | 142 |
| 15 | PSH | Prop HHH | West Anaheim PSH (fka PSH 5) 828 W ANAHEIM ST  Wilmington, CA 90744 | 10/25/2025 | - | 50 | 49 |
| 8 | PSH | Prop HHH | West Terrace (fka Silver Star II) 6576 S WEST BLVD  LOS ANGELES, CA 90043 | 12/15/2022 | - | 64 | 56 |
| 15 | PSH | Prop HHH | Western Landing 25820 S WESTERN AVE CA 90710 | 11/04/2024 | - | 81 | 80 |
| 14 | PSH | Prop HHH | Whittier HHH (fka Whittier PSH) 3554 E WHITTIER BLVD  Los Angeles, CA 90023 | 10/01/2023 | - | 64 | 63 |
| 3 | Other | Rapid Rehousing/Shared Housing | Scattered Sites - SHARE! | 06/30/2023 | - | 30 | 30 |

**Exhibit B**
**Page 17**

**ROADMAP    ALLIANCE MILE TONES**

| Roadmap Interventions — Open and Occupiable (1) | Council District | As of: 11/9/2022 | FY 2022-23 Q1 | Q2 | Q3 | Q4 | FY Total | FY 2023-24 Q1 | Q2 | Q3 | Q4 | FY Total | FY 2024-25 Q1 | Q2 | Q3 | Q4 | FY Total | FY 2025-26 Q1 | Q2 | Q3 | Q4 | FY Total | FY 2026-27 Q1 | Q2 | Q3 | Q4 | FY Total | Overall Total | Goal | Current Delta |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,461 | All CDs | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 106 | 1 | - | 0 | 350 | 65 | 72 | 487 | 62 | 53 | 0 | 63 | 178 | 0 | 47 | 52 | 54 | 153 | 0 | 0 | 0 | 142 | 142 | 0 | 0 | 0 | 143 | 143 | 1,103 | 1,103 | -285 |
| | | Interim Housing | 0 | 0 | 65 | 0 | 65 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 65 | | |
| | | Permanent Housing | 0 | 350 | 0 | 72 | 422 | 62 | 53 | 0 | 63 | 178 | 0 | 47 | 52 | 54 | 153 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 753 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 610 | 2 | - | 0 | 48 | 51 | 0 | 99 | 0 | 0 | 32 | 0 | 32 | 0 | 63 | 0 | 0 | 63 | 0 | 0 | 0 | 147 | 147 | 0 | 0 | 0 | 93 | 93 | 434 | 434 | -185 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 48 | 51 | 0 | 99 | 0 | 0 | 32 | 0 | 32 | 0 | 63 | 0 | 0 | 63 | 0 | 0 | 0 | 55 | 55 | 0 | 0 | 0 | 0 | 0 | 249 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 274 | 3 | - | 0 | 13 | 0 | 273 | 286 | 44 | 0 | 0 | 0 | 44 | 0 | 0 | 0 | 0 | 0 | 63 | 0 | 0 | 44 | 107 | 0 | 0 | 0 | 44 | 44 | 481 | 481 | -88 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 13 | 0 | 243 | 256 | 44 | 0 | 0 | 0 | 44 | 0 | 0 | 0 | 0 | 0 | 63 | 0 | 0 | 0 | 63 | 0 | 0 | 0 | 0 | 0 | 363 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 30 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30 | | |
| 287 | 4 | - | 0 | 143 | 0 | 54 | 197 | 61 | 0 | 0 | 0 | 61 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | 21 | 21 | 0 | 0 | 0 | 21 | 21 | 400 | 400 | -142 |
| | | Interim Housing | 0 | 143 | 0 | 0 | 143 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 143 | | |
| | | Permanent Housing | 0 | 0 | 0 | 54 | 54 | 61 | 0 | 0 | 0 | 61 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 115 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 81 | 5 | - | 0 | 50 | 0 | 0 | 50 | 49 | 0 | 0 | 0 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 107 | 107 | 0 | 0 | 0 | 108 | 108 | 314 | 314 | -215 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 50 | 0 | 0 | 50 | 49 | 0 | 0 | 0 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 99 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 609 | 6 | - | 0 | 83 | 76 | 104 | 263 | 0 | 197 | 89 | 0 | 286 | 0 | 0 | 0 | 0 | 0 | 90 | 33 | 24 | 0 | 147 | 108 | 0 | 0 | 0 | 108 | 804 | 730 | 74 |
| | | Interim Housing | 0 | 83 | 0 | 0 | 83 | 0 | 148 | 0 | 0 | 148 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 231 | | |
| | | Permanent Housing | 0 | 0 | 76 | 104 | 180 | 0 | 49 | 89 | 0 | 138 | 0 | 0 | 0 | 0 | 0 | 90 | 33 | 24 | 0 | 147 | 108 | 0 | 0 | 0 | 108 | 573 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 86 | 7 | - | 0 | 136 | 0 | 0 | 136 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 322 | 322 | 0 | 0 | 0 | 323 | 323 | 781 | 781 | -645 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 136 | 0 | 0 | 136 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 136 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 82 | 8 | - | 0 | 182 | 97 | 180 | 459 | 0 | 0 | 0 | 45 | 45 | 36 | 80 | 0 | 45 | 161 | 26 | 85 | 0 | 0 | 111 | 0 | 0 | 0 | 0 | 0 | 776 | 574 | 202 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 182 | 97 | 180 | 459 | 0 | 0 | 0 | 45 | 45 | 36 | 80 | 0 | 45 | 161 | 26 | 85 | 0 | 0 | 111 | 0 | 0 | 0 | 0 | 0 | 776 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 420 | 9 | - | 0 | 141 | 51 | 0 | 192 | 56 | 0 | 31 | 31 | 118 | 56 | 0 | 0 | 100 | 156 | 41 | 0 | 0 | 498 | 539 | 0 | 0 | 0 | 499 | 499 | 1,504 | 1,504 | -1,097 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 141 | 51 | 0 | 192 | 56 | 0 | 31 | 31 | 118 | 56 | 0 | 0 | 0 | 56 | 41 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 | 0 | 407 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 160 | 10 | - | 0 | 147 | 94 | 0 | 241 | 88 | 20 | 20 | 0 | 128 | 0 | 0 | 0 | 0 | 0 | 93 | 0 | 0 | 65 | 158 | 0 | 0 | 0 | 65 | 65 | 592 | 592 | -130 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 147 | 94 | 0 | 241 | 88 | 20 | 20 | 0 | 128 | 0 | 0 | 0 | 0 | 0 | 93 | 0 | 0 | 0 | 93 | 0 | 0 | 0 | 0 | 0 | 462 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 136 | 11 | - | 0 | 67 | 112 | 131 | 310 | 0 | 0 | 73 | 0 | 73 | 39 | 133 | 0 | 0 | 172 | 0 | 0 | 0 | 89 | 89 | 0 | 0 | 0 | 90 | 90 | 734 | 734 | -179 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 67 | 112 | 131 | 310 | 0 | 0 | 73 | 0 | 73 | 39 | 133 | 0 | 0 | 172 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 555 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 202 | 12 | - | 0 | 0 | 0 | 115 | 115 | 0 | 54 | 0 | 0 | 54 | 0 | 0 | 0 | 100 | 100 | 99 | 0 | 0 | 27 | 126 | 0 | 0 | 0 | 27 | 27 | 422 | 422 | -154 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 0 | 0 | 115 | 115 | 0 | 54 | 0 | 0 | 54 | 0 | 0 | 0 | 0 | 0 | 99 | 0 | 0 | 0 | 99 | 0 | 0 | 0 | 0 | 0 | 268 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 355 | 13 | - | 0 | 59 | 63 | 67 | 189 | 20 | 157 | 145 | 0 | 322 | 111 | 32 | 0 | 0 | 143 | 18 | 0 | 145 | 104 | 267 | 0 | 0 | 0 | 105 | 105 | 1,026 | 1,026 | -209 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 59 | 63 | 67 | 189 | 20 | 157 | 145 | 0 | 322 | 111 | 32 | 0 | 0 | 143 | 18 | 0 | 145 | 0 | 163 | 0 | 0 | 0 | 0 | 0 | 817 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 1,360 | 14 | - | 0 | 101 | 251 | 0 | 352 | 58 | 513 | 0 | 83 | 654 | 43 | 44 | 16 | 0 | 103 | 0 | 148 | 0 | 810 | 958 | 0 | 0 | 0 | 811 | 811 | 2,878 | 2,878 | -1,621 |
| | | Interim Housing | 0 | 0 | 74 | 0 | 74 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 74 | | |
| | | Permanent Housing | 0 | 101 | 177 | 0 | 278 | 58 | 513 | 0 | 83 | 654 | 43 | 44 | 16 | 0 | 103 | 0 | 148 | 0 | 0 | 148 | 0 | 0 | 0 | 0 | 0 | 1183 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 277 | 15 | - | 0 | 102 | 0 | 222 | 324 | 0 | 58 | 108 | 40 | 206 | 0 | 80 | 0 | 0 | 80 | 0 | 83 | 30 | 104 | 217 | 0 | 0 | 0 | 104 | 104 | 931 | 931 | -208 |
| | | Interim Housing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| | | Permanent Housing | 0 | 102 | 0 | 222 | 324 | 0 | 58 | 108 | 40 | 206 | 0 | 80 | 0 | 0 | 80 | 0 | 83 | 30 | 0 | 113 | 0 | 0 | 0 | 0 | 0 | 723 | | |
| | | Other Interventions (2) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 6,506 | Totals | | 0 | 1,622 | 860 | 1,218 | 3,700 | 438 | 1,052 | 498 | 262 | 2,250 | 285 | 479 | 68 | 399 | 1,231 | 430 | 349 | 199 | 2,480 | 3,458 | 108 | 0 | 0 | 2,433 | 2,541 | 13,180 | 12,904 | -5,158 |

(1) Number reported under "All CDs" represents the point-in-time number of Rapid Rehousing/Shared Housing slots in use as of 9/30/2022 out of 2,000 slots funded by the City under the Roadmap agreement

(2) Other Interventions may include rental assistance/rapid rehousing; family reunification; safe parking; safe sleeping/camping

**Exhibit B**

**Page 181**

# Exhibit C

**192**



767 S. Alameda St.          p (213) 394-7979
Suite 270                   f (213) 529-1027
Los Angeles, CA 90021       umklaw.com

January 8, 2024

**VIA EMAIL**

David Michaelson
david.michaelson@lacity.org
Scott Marcus
scott.marcus@lacity.org
200 N. Spring Street
Los Angeles, CA 90012

**VIA EMAIL**

Re:     Alliance Milestones and Encampment Reduction

Dear David and Scott:

This letter responds to your emails sent January 6, 2024 and January 7, 2024 wherein the City is offering to agree to an Encampment Reduction Milestones and Deadlines plan to reduce encampments by 9,800 by June, 2027.  We appreciate the City's movement and commitment to help both individuals suffering on the street and the community impacted by this crisis.

However, my clients are beyond frustrated with the City's delay and broken promises on this issue.  Below is a recitation of relevant dates and communications to illustrate the basis of their frustration:

- **May 19, 2022**: The settlement with the Alliance was finalized.  Section 5.2 (ii) and (iv) of the agreement requires "plans and . . . milestones and deadlines" for "The City's plan for encampment engagement, cleaning, and reduction in each Council District" as well as "in the [entire] City."
- **September 8, 2022**: LAHSA released 2022 PIT count, three months later than expected.
- **November 11, 2022**: The City sent its updated housing and shelter plan pursuant to 5.2(i) and (iii), but no encampment reduction milestones or deadlines pursuant to (ii) and (iv).  As a courtesy, due to the turnover in administration and councilmember seats, the Alliance agreed to wait until after the January 17, 2023 status conference set by the court to raise this issue.
- **January 30, 2023**: I sent an email to the City Attorney's office again raising the issue of failure to provide milestones and deadlines for encampment engagement, cleaning, and reduction, and the City's declination to satisfy this requirement.  Thereafter we began meeting-and-conferring on this issue prior to the Alliance raising the issue with the judge.
- **March 28, 2023**:  I sent an email to Scott Marcus, David Michaelson, and Mercedes Marquez summarizing our meeting earlier that month, at which not only Scott, David, and Mercedes attended, but also one or more individuals from the CAO's office:

**Exhibit C**
**Page 193**

In our last meeting we talked about the RFQ that the City has put out for a list of qualified service/outreach providers, and that the City expects to be fully staffed with the District's chosen providers by July 1 (please correct me if I got the verbiage wrong). We also discussed that the City could commit to having each district fully assessed and get us a list of proposed milestones and deadlines within 3 months thereafter (October 1).

- **May 8, 2023**: After a series of non-responses and delays by the City, the Alliance finally received affirmation from the City that by October 1, 2023, each council district would be fully assessed and deadlines and milestones would be submitted for each district.

- **October 3, 2023**: We received the City's "Encampment Engagement, Cleaning, and Resolution" proposal (Exhibit 1) which contained <u>zero</u> proposed deadlines and milestones—not even citywide, much less per district.

- **October 3, 2023-November 21, 2023**: We again began a process of meeting-and-conferring to resolve this issue prior to bringing it to the court's attention. We could not reach agreement.

- **November 29, 2023**: The City submitted its revised "Encampment Engagement, Cleaning, and Resolution Plans and Milestones" (Exhibit 2) to the court, committing to resolving "at least two tent and makeshift shelter encampments and at least three RV encampments involving at least 100 individuals" and thereafter increase to "at least three tent and makeshift shelter encampments and four RV encampments involving at least 150 individuals."

- **December 13, 2023** (Day before hearing set before Judge Carter): City contacted the Alliance and agreed to "the 5,300 number you proposed."

- **December 14, 2023**: I sent the City (including Scott Marcus, David Maelson, and Lourdes Castro Ramirez) notifying it that the 5,327 number previously used was a typographical error, and the number intended was 9,789. Scott Marcus responded, correcting my math to 9,782, and then stated "[a]ssuming we can agree on graduated numbers, we can make that work." There was no mention of this number being a citywide number and ignoring district-by-district milestones and deadlines.

- **December 14, 2023**: We appeared in court for a dispute resolution conference for this issue. Present for the Alliance was myself, Matthew Umhofer, and Paul Webster. Present for the City was, among others, Scott Marcus, David Michaelson, Lourdes Castro Ramirez, and Matthew Szabo. We met separately with Judge David Carter, and both notified him that we reached an agreement on 9,782. He asked us to submit the updated deadlines and milestones by December 29, 2023.

- **December 19, 2023:** We were asked by the City (Scott Marcus and David Michaelson) for a 3-week extension and agreed on the condition that it would include district-by-district milestones and that there would be a penalty to the City ($250,000/week) for any further delay beyond January 19.

**Exhibit C**
**Page 20**

- **December 26, 2023:** City (David Michaelson) indicated it did not need the continuance and "will send the revised milestones before the end of the month." The Alliance took this to mean that district milestones would still be forthcoming.
- **December 29, 2023:** City sent its third revised "Encampment Reduction Milestones" to the court, and to the Alliance (Exhibit 3). Therein the City committed to reducing "a minimum of 12,000 tents, makeshift shelters, cars, vans, and RVs over the term of the settlement agreement." There were no district milestones or deadlines included, but instead described the mayor's new "citywide approach" and "request[ed] that the LA Alliance give the City's current administration the opportunity to focus on the citywide approach and, therefore, not insist that the City project district by district milestones." The 12,000 commitment was not contingent on abiding by the mayor's citywide approach.
- **January 4, 2023:** The Alliance (represented by Matthew Umhofer, Paul Webster, and myself) met with the City (specifically, among others, Mayor Bass, Lourdes Castro Ramirez, Matthew Szabo, David Michaelson, and Scott Marcus). The City presented its citywide plan and urged the Alliance to accept the citywide approach rather than insisting on district-by-district milestones as contained in the agreement. Importantly, the City denied any agreement to 12,000, or even 9,782, encampment reductions. The City contended both of those numbers were only ever contingent on the Alliance accepting the mayor's new citywide approach despite that term never having been communicated previously. The City then informed the Alliance that it only agreed to 5,300 (a number which the Alliance never agreed to) if it insisted on district-by-district, but that the City would agree to 12,000 if the Alliance would accept its citywide approach. While the meeting was overall pleasant, this became a significant concern for the Alliance.
- **January 6, 2023**: The City (David Michaelson) sent an email to the Alliance (me) indicating that it would agree to 9,800 and provide district milestones and deadlines; the City sent a second email January 7, 2023 with a document presumed to be agreed-to by both parties and submitted to the Court.

Given the consistent delay, unfulfilled agreements, and total denial of other agreements, my client has no faith in the ability or willingness of the City of Los Angeles to comply with the proposed milestones and deadlines moving forward. The Alliance has been more than amenable and forgiving over the last 16 months:
- Not demanding immediate milestones and plans after the 2022 PIT count was released.
- Agreeing to delay raising the lack of encampment reduction milestones and deadlines until after the January, 2023 status conference.
- Accommodating City schedules and following up on unreturned communications, resulting in weeks-to-months of delay at every step.
- Providing a seven-month continuance to allow the City to engage in what the City promised to be a full evaluation of each district with district-by-district milestones and deadlines to follow. During that time window, apparently none of this evaluation was done but at no point was the Alliance contacted about this.

**Exhibit C**
**Page 21195**

January 8, 2024
Page **4** of **4**

- Waiting for three months to bring this to the Court for final resolution.

Unfortunately, it has become clear by a recitation of the last 14 months that the City continues to disregard its obligations in this case, and without consequences will continue to do so.
Therefore, the Alliance will agree to refrain from seeking court intervention and accompanying sanctions on the following terms:

- A reduction of 12,000 encampments (i.e. tents, makeshift shelters, cars, and RVs) by the end of this agreement, June 30, 2027[1] or a reduction of 9,800 encampments (i.e. tents, makeshift shelters, cars, and RVs) by June 30, 2026.
- Reporting of district metrics and progress in meeting the milestones and deadlines every six month with additional informal quarterly progress reports to Alliance staff.
- A specific encampment reduction plan for the 50-block radius of downtown known as "Skid Row" and the smaller but violent encampments in Highly Park along North Carlota Blvd and the 110 freeway near Avenue 45 and Sycamore Grove Park.
- A $1,000,000 payment to the Alliance as consequence for aforementioned bad faith actions, in the form of sanction, damages, and/or a non-profit grant for the purposes of continued policy work and engagement of other Los Angeles County cities, or any other description the City wants to use.[2]

We agree on moving quickly on this, and look forward to hearing from you by no later than end of day Wednesday, January 10, 2024.

Sincerely,

Elizabeth A. Mitchell

---

[1] Once we get the 12,000 encampment number, we would need to review the proposed per-district numbers to assess whether the numbers as to each district are appropriate.

[2] The Alliance has never sought damages from the City and has stood ready to celebrate with the City at every step. Unfortunately, that offer of friendship has been interpreted as unwillingness to push the City as needed. Should the Alliance be required to seek Court intervention, the Alliance will ask for $50,000 for each week of delay between November 21, 2022 and today.

**Exhibit C**
**Page 22196**

# Exhibit 1

Exhibit C-1
Page 231197

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

The City has a multi-pronged approach to addressing homelessness. This includes encampment engagement, cleaning, and connection to services and housing. This approach is centered on moving unsheltered individuals from encampments to interim housing to permanent, stable and supportive housing. The City uses multiple resources in coordination with the County to engage in outreach through Homeless Engagement Teams funded through LAHSA, City Intervention/Outreach teams, multidisciplinary teams, and street medicine teams. This comprehensive approach allows the City to address the needs of people experiencing homelessness in a holistic way.

## Homeless Engagement Teams (HETs): General, CARE, and CARE+

The primary focus of the HETs is to undertake targeted engagement efforts that focus on moving unsheltered residents experiencing homelessness into crisis, bridge and/or permanent housing utilizing a housing-first orientation with minimum eligibility criteria. The City currently funds 41 two-person outreach teams through LAHSA:

- 15 teams are focused on supporting CARE+ operations for each Council District;
- 13 teams are dedicated to provide outreach services for CARE citywide;
- 10 general outreach teams are deployed to targeted areas identified based on priorities from Council offices, the general public, and service requests from lahop.org; and
- 3 teams are assigned to specific geographic locations that cover Hollywood, the area surrounding City Hall, and the Broadway/110 corridor.

*Homeless Engagement Teams (Operation Healthy Streets)*

Two teams are linked with the CARE+ team in the Skid Row area. The teams consist of three dedicated outreach workers and one additional outreach worker leveraged from a general LAHSA HET outreach team. The team provides outreach services and support as LASAN provides clean ups and regular sanitation services through CARE+ operations. The teams also assist in providing outreach and notification prior to cleaning of a specific area.

*Skid Row Homeless Engagement Teams*

The Skid Row HETs provide two two-person teams assigned to the Skid Row area for street engagement. Skid Row HETs are displayed within the Skid Row area that include at least one bilingual HET staff member. These additional teams are meant to expand

1

**Exhibit C-1**
**Page 24198**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

the existing capacity of outreach in the Skid Row area of the C3 and MDT and other outreach efforts happening within the area.

*Homeless Engagement Team (C3 Partnership)*

The C3 (City + County + Community) is a partnership designed to systematically engage people living on the streets of Skid Row and help them regain their health and housing stability. This outreach team provides street engagement, immediate access to needed resources including but not limited to: interim housing, urgent care, primary care, mental health and substance abuse services, and expenditure linkage to permanent supportive housing services.

*Roadmap Outreach Teams*

To support the City's Homelessness Roadmap efforts,15 outreach teams are provided across the City, one per Council District. These teams are focused on encampments and people experiencing homelessness within five hundred (500) feet of all freeway overpasses, underpasses, on-ramps, and off-ramps. These teams work closely with relevant City partners to prioritize their targeted population for new housing interventions being funded through the City's Homelessness Roadmap. Similar to the Homeless Engagement Teams, the Roadmap Outreach Teams prioritize linking targeted engagement efforts into new and existing Crisis, Bridge and / or Permanent Housing units.

The following activities are associated with all City-funded HET and Roadmap teams:

- Proactive outreach including:
    - Completion of Assessments, IH housing placements, document collection & support, resource & referrals, connection to mainstream benefits
- Coordination with Council Offices for selection of prioritized encampments and deployment of outreach teams
- Housing Navigation Activities
    - Completion of housing and subsidy applications
    - Identify suitable permanent housing choices for clients, such as Section 8 subsidized housing, Shelter Plus Care, VASH, permanent supportive housing, inexpensive and market rate homes, Shared Housing, and other housing possibilities.
- Document Readiness (collection of ID's and Social Security cards for unsheltered PEH)
- Winter Shelter response

2

Exhibit C-1
Page 25199

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

- ○ Operate helpline and triage for elected offices and outreach to support PEH with motel vouchers during periods of activation ( largely supported by R&R and HET)
- Streamlined coordination with Veterans Administration - verification of eligibility & connection to benefits and housing resources
- Respond to LAHOP (Homeless Outreach Portal) requests
- Respond to urgent requests from elected offices and City departments.
- Direct access to DPSS for client documentation & support
- Oversight of Outreach Coordination & direct access to specialized outreach teams (MDT/HOME)
- LAPD Response
- Client Transportation
- Resource identification
- Weekly Care Coordination
- Support Interim Housing (IH) with challenging clients (especially during site demobilization)
- Support with Connect Days, Housing Fairs
- Encampment resolutions
- Vehicle Dwelling Operations
- Support providers/ R&R with outreach and consistent connection to motel vouchered clients and families (Family Solution Center clients mostly)
- Emergency & Natural Disaster Response: (Approximately 2-3 monthly, increased needs of support during:
  - ○ Weather, Fires, High Heat, Excessive Rain, Flood Warnings along LA River, Basins & Washes (All Flood Channels)
  - ○ Other Emergencies - Building Fires, Support for Undocumented PEH, Participant in the coordination of care and triaging for migrant busses (including short term lodging & transportation)

*City Intervention/Outreach Teams*

In Fiscal Year (FY) 2023-24 the City has funded 13 intervention teams to be trained and deployed in support of encampment resolution. The City's approach is detailed in the "Encampment Resolution" section below.

*Multi-Disciplinary Teams (MDTs)*

The City currently funds multi-disciplinary teams in six Council districts (one team per Council district). These teams provide specialized outreach that combines medical,

3

Exhibit C-1
Page 200

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Encampment Engagement, Cleaning, and Resolution**

mental health, substance abuse, and lived-experience to have a comprehensive, integrated approach to outreach.

*Street Medicine Program*

The City also funds the USC Street Medicine Program delivers full service primary care on the street, which includes treatment for acute and chronic disease, preventative medicine, treatment for psychiatric conditions, and substance use disorders.

*Crisis and Incident Response through Community-Led Engagement (CIRCLE)*

CIRCLE is an unarmed 9-1-1 diversion program that deploys trained civilian teams to address non-urgent calls related to individuals experiencing homelessness and follow-up support to connect individuals to services. CIRCLE aims to disrupt the reciprocal relationship between homelessness and the criminal justice system by addressing non-violent incidents related to unhoused individuals and creating positive outcomes through connections to services. The program has five operating areas: Hollywood, Downtown, Venice, Northeast Valley, and South LA. Each area has a 24/7 Response Team that consists of a supervisor and outreach worker with lived experience. The work of the Response Teams in each area is supported by a mental health counselor and an outreach team that conducts follow-up engagement and case management five days a week. CIRCLE teams are equipped with vehicles and supplies, including water, snacks, clothing, and Narcan to reverse opioid overdoses.

*Vehicle Dwelling Operations*

In response to the lifting of the City's Parking Enforcement Moratorium, the Office of the City Administrative Officer (CAO), along with all relevant partners, worked to create a comprehensive approach to address Vehicle Dwellings and connect people experiencing vehicular homelessness to appropriate resources and to ensure the health and safety of our public streets.

Council offices contact the CAO's Regional Outreach Coordinator (ROC) team with vehicle dwelling priority locations. The ROC will request LADOT, LAPD, WPD, LASAN to assess the vehicles at the location and report back on any violations which may require immediate attention. The ROC schedules a meeting with all partners to discuss the location and determine next steps.

Between May 2022 and September 2023, a total of 167 Vehicle Dwelling Operations have been completed, and 49 persons experiencing homelessness have been housed.

4

**Exhibit C-1**
**Page 27201**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

*Encampment Cleaning: CARE and CARE+ Teams*

The Comprehensive Cleaning and Rapid Engagement (CARE/CARE+) teams conduct citywide encampment clean-ups along with trash, litter/debris, and health hazard and/or safety hazard removal on the City's public rights-of-way. The primary mission of the CARE and CARE+ teams is to deliver services to the individuals experiencing homelessness within their service areas. These services are deployed in coordination with other supportive outreach services provided by the City. 15 LAHSA HET teams are focused on supporting CARE+ operations for each Council District, and 13 teams are dedicated to provide outreach services for CARE citywide. In addition, two teams are linked with the CARE+ team in the Skid Row area. .

CARE teams seek L.A.M.C. 56.11 compliance and provide spot cleaning services; health hazard and/or safety hazard identification, documentation, and removal; and trash, litter, and debris removal. These teams provide day-to-day maintenance to achieve safe and clean public rights-of-way. CARE+ teams provide full comprehensive cleanings including the identification, documentation, and removal of line-of-sight health and/or safety hazards; the removal of trash, litter, and debris; and the power washing of public rights-of-way to ensure fully sanitized areas for public safety.

 CARE/CARE+ teams are deployed across three main assignments:

- A Bridge Home Special Enforcement Cleaning Zones (ABH SECZs).
  CARE+ services are provided to each ABH SECZ once per week, and CARE services are provided to each ABH SECZ twice per week.
- Focused Service Zones (FSZ):
  FSZs are specific high-need regions that require consistent, recurring, and dedicated services.These include the following:
    - Operation Healthy Streets (OHS) Skid Row. CARE+ services are provided daily, Monday through Friday. This area is divided into zones that receive services once every two weeks on a rotating schedule.
    - Operation Healthy Streets (OHS) Ocean Front Walk in Venice Beach. CARE+ services are provided once per week.
    - Grand Ave/110 Fwy Corridor (Grand Ave). CARE+ services are provided five days per week.
- Citywide CARE+ Services:
  In each Council District, CARE+ services are provided twice per week and CARE services are provided approximately three times per week. Locations are determined by Council District staff. Note that there may be additional CARE+

**Exhibit C-1**
**Page 28202**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Encampment Engagement, Cleaning, and Resolution**

operations in each Council District if there is one or more A Bridge Home Special Enforcement Cleaning Zones or Focused Service Zones.

**Encampment Resolution**

The City uses the following general process for encampment resolution

*Selection*

Encampments are identified for potential resolution through several avenues:

1. Council Office priorities
2. Encampments identified by the City's Field Intervention Teams
3. Notification by stakeholders in the community – churches, community organizations, schools, businesses, and residents may identify an encampment

Encampment prioritization is evaluated based on the availability of housing resources and the severity of the encampment.

Housing availability: In order to resolve an encampment, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services.

Severity of the encampment: The City takes several data points into account to evaluate encampments, including data from 311 calls as well as emergency requests for police, fire, or medical service.

*Approach to Engagement*

The City's Field Intervention Teams conduct outreach across the City. A large part of this engagement work is to mobilize existing outreach, including:

● Service provider outreach teams
● LAHSA Homeless Engagement Teams (HET)
● Street Medicine engagement teams (if applicable)
● Council Office designated homelessness outreach teams (if applicable)

In preparing for an encampment resolution operation, the Field Intervention Teams work with various outreach teams to collectively engage in case conferencing and coordination to ensure a complete picture of the historical knowledge and context of the

6

**Exhibit C-1**
**Page 203**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

area and the people experiencing homelessness (PEH) living there.  The teams work to create a unified list so that support is inclusive of the entire footprint of the encampment.

The County's involvement is one of a valued collaborator. The County provides services through its departments, including the Department of Mental Health, the Department of Health Services, and the Department of Public Social Services. They assist with the coordination of multidisciplinary teams to support the wide range of acuity amongst PEH in the encampment. Additionally, when the City prepares to resolve an encampment on adjacent City/County property, the County will activate further County departments that can support the operation.

Service Providers are not only instrumental to effective outreach and engagement, but are also the providers of case management as participants are housed. Prior to an encampment resolution, a contracted provider will activate their outreach and multidisciplinary teams if they have one (not all Service Providers have a multidisciplinary team, which is an important point for County support). Once a participant is in interim housing, service providers are tasked with case management, meal provision, document readiness, and sometimes housing navigation (sometimes additional providers are brought in for this).

City departments, including the Department of Transportation (DOT), Los Angeles Department of Sanitation (LASAN), and the Los Angeles Police Department (LAPD), are also important partners in the successful realization of encampment resolution operations.

DOT provides buses to transport participants from the encampment to their interim housing. They also coordinate parking enforcement to assist with road closures to ensure a safe street for encampment residents and the teams in the field.

LASAN documents voluntary surrender of any belongings not going to the interim housing site, inspects for biohazards, clears all surrendered belongings, and power-washes the area (see CARE/CARE+ section above).

While the City's trauma-informed approach means LAPD is not actively engaging in outreach, LAPD personnel are always fully briefed and on standby in the area to assist in any cases of violence or criminal activity. LAPD acts as a protective layer to ensure the safety of the PEH in the encampments as well as the safety of the teams in the field.

Exhibit C-1
Page 30204

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Encampment Engagement, Cleaning, and Resolution**

*Goals and Milestones*

From December 20, 2022 through September 26, 2023, encampment resolutions have occurred at 26 locations and over 1,600 people have been brought into interim housing from the streets. The City's overarching goal is a Citywide approach, addressing encampments through lenses of equity and need across Council Districts.

General goals for encampment engagement, cleaning, and reduction include:

- Reduce the loss of life of people experiencing homelessness across the City
- Increase access to mental health and substance abuse treatment (provided by County) for those living in encampments
- Eliminate street encampments, including RV encampments
- Promote long term housing stability for people experiencing homelessness
- Enhance the safety and hygiene of neighborhoods for all residents, businesses and neighbors

*Additional Information*

The City continues to work with the federal and state government and apply for homelessness funding (including encampment resolution grants). In addition, the City has been working with LAHSA who has now developed a dashboard and report on Los Angeles City Housing and Homeless Engagement which provides detailed homeless and housing data across the City and by Council District.

**Exhibit C-1**
**Page 31205**

# Exhibit 2

Exhibit C-2
Page 32206

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution Plans & Milestones

Paragraph 5.2. of the Settlement Agreement requires the City to create plans and develop milestones and deadlines for the City's plan for encampment engagement, cleaning, and reduction in each Council District and the City.

The parties agree that these milestones should focus on high-level outcomes and accomplishing the collective goal of reducing homelessness on the City's streets and sidewalks. The milestones are intended to provide plans and deadlines to determine progress in the City's efforts in reducing the number of encampments and addressing homelessness in general.

## ENGAGEMENT

The City has a multi-pronged approach to addressing homelessness that focuses on connecting people to services and housing. This approach is centered on moving unsheltered individuals from encampments to interim housing to permanent, stable and supportive housing. The City uses multiple resources in coordination with the County to engage in outreach through Homeless Engagement Teams funded through LAHSA, City Intervention/Outreach teams, multidisciplinary teams, and street medicine teams. This comprehensive approach allows the City to address the needs of people experiencing homelessness in a holistic way.

The City's overarching goal is a Citywide approach, addressing encampments[1] through lenses of equity and need across Council Districts. Encampment engagement occurs constantly throughout the City. The City will engage with a single encampment for several weeks before it can be resolved. This long engagement period allows service providers to develop relationships and trust with the residents. It also allows the City time to line up all of the necessary services (City, County, private, etc.). As these resources increase, so will the City's ability to conduct encampment engagement and reduction.

### Homeless Engagement Teams (HETs): General, CARE, and CARE+

The primary focus of the HETs is to undertake targeted engagement efforts that focus on moving unsheltered residents experiencing homelessness into crisis, bridge and/or permanent housing utilizing a housing-first orientation with minimum eligibility criteria.

---

[1] LAHSA considers an "encampment" to be 5 or more PEH and 3 or more shelters (tents, makeshifts, or vehicles) within a 300-foot radius or physical boundaries defined by an encampment resolution effort.

1

**Exhibit C-2**
**Page 3207**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Encampment Engagement, Cleaning, and Resolution Plans & Milestones**

The City currently funds 41 two-person outreach teams through LAHSA:

- 15 teams are focused on supporting CARE+ operations in each Council District;
- 13 teams are dedicated to provide outreach services for CARE citywide;
- 10 teams are deployed to targeted areas identified based on priorities from Council offices, the general public, and service requests from lahop.org; and
- 3 teams are assigned to Hollywood, the area surrounding City Hall, and the Broadway/110 corridor.

*Homeless Engagement Teams (Operation Healthy Streets)*

Two teams are linked with the CARE+ team in the Skid Row area. The teams consist of three dedicated outreach workers and one additional outreach worker leveraged from a general LAHSA HET outreach team. The team provides outreach services and support as LASAN provides clean ups and regular sanitation services through CARE+ operations. The teams also assist in providing outreach and notification prior to cleaning of a specific area.

*Skid Row Homeless Engagement Teams*

The Skid Row HETs provide two two-person teams assigned to the Skid Row area for street engagement. Skid Row HETs are displayed within the Skid Row area that include at least one bilingual HET staff member. These additional teams are meant to expand the existing capacity of outreach in the Skid Row area of the C3 and MDT and other outreach efforts happening within the area.

*Homeless Engagement Team (C3 Partnership)*

The C3 (City + County + Community) is a partnership designed to systematically engage people living on the streets of Skid Row and help them regain their health and housing stability. This outreach team provides street engagement, immediate access to needed resources including but not limited to: interim housing, urgent care, primary care, mental health and substance abuse services, and expenditure linkage to permanent supportive housing services.

*Roadmap Outreach Teams*

To support the City's Homelessness Roadmap efforts, 15 outreach teams are provided across the City, one per Council District. These teams are focused on encampments and people experiencing homelessness within five hundred (500) feet of all freeway overpasses, underpasses, on-ramps, and off-ramps. These teams work closely with

**Exhibit C-2**
**Page 34208**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution Plans & Milestones

relevant City partners to prioritize their targeted population for new housing interventions being funded through the City's Homelessness Roadmap. Similar to the Homeless Engagement Teams, the Roadmap Outreach Teams prioritize linking targeted engagement efforts into new and existing Crisis, Bridge and / or Permanent Housing units.

### *City Intervention/Outreach Teams*

In Fiscal Year (FY) 2023-24 the City has funded 13 intervention teams to be trained and deployed in support of encampment resolution. The City's approach is detailed in the "Encampment Resolution" section below.

### *Multi-Disciplinary Teams (MDTs)*

The City currently funds multi-disciplinary teams in six Council districts (one team per Council district). These teams provide specialized outreach that combines medical, mental health, substance abuse, and lived-experience to have a comprehensive, integrated approach to outreach.

### *Street Medicine Program*

The City also funds the USC Street Medicine Program delivers full service primary care on the street, which includes treatment for acute and chronic disease, preventative medicine, treatment for psychiatric conditions, and substance use disorders.

### *Crisis and Incident Response through Community-Led Engagement (CIRCLE)*

CIRCLE is an unarmed 9-1-1 diversion program that deploys trained civilian teams to address non-urgent calls related to individuals experiencing homelessness and follow-up support to connect individuals to services. CIRCLE aims to disrupt the reciprocal relationship between homelessness and the criminal justice system by addressing non-violent incidents related to unhoused individuals and creating positive outcomes through connections to services. The program has five operating areas: Hollywood, Downtown, Venice, Northeast Valley, and South LA. Each area has a 24/7 Response Team that consists of a supervisor and outreach worker with lived experience. The work of the Response Teams in each area is supported by a mental health counselor and an outreach team that conducts follow-up engagement and case management five days a week. CIRCLE teams are equipped with vehicles and supplies, including water, snacks, clothing, and Narcan to reverse opioid overdoses.

**Exhibit C-2**

**Page 35209**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

### Encampment Engagement, Cleaning, and Resolution Plans & Milestones

*Vehicle Dwelling Operations*

In response to the lifting of the City's Parking Enforcement Moratorium, the Office of the City Administrative Officer (CAO), along with all relevant partners, worked to create a comprehensive approach to address Vehicle Dwellings and connect people experiencing vehicular homelessness to appropriate resources and to ensure the health and safety of our public streets.

Council offices contact the CAO's Regional Outreach Coordinator (ROC) team with vehicle dwelling priority locations. The ROC will request LADOT, LAPD, WPD, LASAN to assess the vehicles at the location and report back on any violations which may require immediate attention. The ROC schedules a meeting with all partners to discuss the location and determine next steps.

Between May 2022 and September 2023, a total of 167 Vehicle Dwelling Operations have been completed, and 49 persons experiencing homelessness have been housed.

### CLEANING

The Comprehensive Cleaning and Rapid Engagement (CARE/CARE+) teams conduct citywide encampment clean-ups along with trash, litter/debris, and health hazard and/or safety hazard removal on the City's public rights-of-way. The primary mission of the CARE and CARE+ teams is to deliver services to the individuals experiencing homelessness within their service areas. These services are deployed in coordination with other supportive outreach services provided by the City. 15 LAHSA HET teams are focused on supporting CARE+ operations for each Council District, and 13 teams are dedicated to provide outreach services for CARE citywide. In addition, two teams are linked with the CARE+ team in the Skid Row area.

The City publishes a daily schedule of CARE and CARE+ cleanings.  The City's current milestones for cleaning are to conduct 2 encampment cleanings each week in each Council District (*i.e.* 30 encampment cleanings each week).  The City plans to increase that milestone to 5 encampment cleanings each week in each Council District by the end of FY 24-25.

CARE teams seek L.A.M.C. 56.11 compliance and provide spot cleaning services; health hazard and/or safety hazard identification, documentation, and removal; and trash, litter, and debris removal. These teams provide day-to-day maintenance to achieve safe and clean public rights-of-way. CARE+ teams provide full comprehensive cleanings including the identification, documentation, and removal of line-of-sight health

<div align="center">4</div>

**Exhibit C-2**

**Page 36210**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution Plans & Milestones

and/or safety hazards; the removal of trash, litter, and debris; and the power washing of public rights-of-way to ensure fully sanitized areas for public safety.

CARE/CARE+ teams are deployed across three main assignments:

- A Bridge Home Special Enforcement Cleaning Zones (ABH SECZs).
  CARE+ services are provided to each ABH SECZ once per week, and CARE services are provided to each ABH SECZ twice per week.
- Focused Service Zones (FSZ):
  FSZs are specific high-need regions that require consistent, recurring, and dedicated services. These include the following:
  - Operation Healthy Streets (OHS) Skid Row. CARE+ services are provided daily, Monday through Friday. This area is divided into zones that receive services once every two weeks on a rotating schedule.
  - Operation Healthy Streets (OHS) Ocean Front Walk in Venice Beach. CARE+ services are provided once per week.
  - Grand Ave/110 Fwy Corridor (Grand Ave). CARE+ services are provided five days per week.
- Citywide CARE+ Services:
  In each Council District, CARE+ services are provided twice per week and CARE services are provided approximately three times per week. Locations are determined by Council District staff. Note that there may be additional CARE+ operations in each Council District if there is one or more A Bridge Home Special Enforcement Cleaning Zones or Focused Service Zones.

## RESOLUTION

The City's overarching goal is a Citywide approach, addressing encampments through lenses of equity and need across Council Districts. The parties recognize the best metric is to view resolutions in six-month periods, because some months may involve more resolutions while other months may be more focused on preparation for resolutions. The City is providing the below milestones for resolutions through the end of 2024. Importantly, the City aims to accomplish more resolutions and, thus, these are meant to be baseline numbers. Before the end of 2024, the City will reevaluate how best to increase the number of resolutions based on available City, County, State, and Federal resources.

For each month during the six month period from January through June 2024, the City aims to resolve at least two tent and makeshift shelter encampments and at least three

5

**Exhibit C-2**
**Page 37211**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

### Encampment Engagement, Cleaning, and Resolution Plans & Milestones

RV encampments involving at least 100 individuals. Starting July 1, 2024, and through December 31, 2024, the City aims each month to resolve at least three tent and makeshift shelter encampments and four RV encampments involving at least 150 individuals.

The City uses the following general process for encampment resolution

*Selection*

Encampments are identified for potential resolution through several avenues:

1. Council Office priorities
2. Encampments identified by the City's Field Intervention Teams
3. Notification by stakeholders in the community – churches, community organizations, schools, businesses, and residents may identify an encampment

Encampment prioritization is evaluated based on the availability of housing resources and the severity of the encampment.

> Housing availability: In order to resolve an encampment, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services.

> Severity of the encampment: The City takes several data points into account to evaluate encampments, including data from 311 calls as well as emergency requests for police, fire, or medical service.

*Approach to Engagement*

The City's Field Intervention Teams conduct outreach across the City. A large part of this engagement work is to mobilize existing outreach, including:

● Service provider outreach teams
● LAHSA Homeless Engagement Teams (HET)
● Street Medicine engagement teams (if applicable)
● Council Office designated homelessness outreach teams (if applicable)

In preparing for an encampment resolution operation, the Field Intervention Teams work with various outreach teams to collectively engage in case conferencing and coordination to ensure a complete picture of the historical knowledge and context of the

6

**Exhibit C-2**
**Page 38212**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

### Encampment Engagement, Cleaning, and Resolution Plans & Milestones

area and the people experiencing homelessness (PEH) living there. The teams work to create a unified list so that support is inclusive of the entire footprint of the encampment.

The County's involvement is one of a valued collaborator. The County provides services through its departments, including the Department of Mental Health, the Department of Health Services, and the Department of Public Social Services. They assist with the coordination of multidisciplinary teams to support the wide range of acuity amongst PEH in the encampment. Additionally, when the City prepares to resolve an encampment on adjacent City/County property, the County will activate further County departments that can support the operation.

Service Providers are not only instrumental to effective outreach and engagement, but are also the providers of case management as participants are housed. Prior to an encampment resolution, a contracted provider will activate their outreach and multidisciplinary teams if they have one (not all Service Providers have a multidisciplinary team, which is an important point for County support). Once a participant is in interim housing, service providers are tasked with case management, meal provision, document readiness, and sometimes housing navigation (sometimes additional providers are brought in for this).

City departments, including the Department of Transportation (DOT), Los Angeles Department of Sanitation (LASAN), and the Los Angeles Police Department (LAPD), are also important partners in the successful realization of encampment resolution operations.

DOT provides buses to transport participants from the encampment to their interim housing. They also coordinate parking enforcement to assist with road closures to ensure a safe street for encampment residents and the teams in the field.

LASAN documents voluntary surrender of any belongings not going to the interim housing site, inspects for biohazards, clears all surrendered belongings, and power-washes the area (see CARE/CARE+ section above).

While the City's trauma-informed approach means LAPD is not actively engaging in outreach, LAPD personnel are always fully briefed and on standby in the area to assist in any cases of violence or criminal activity. LAPD acts as a protective layer to ensure the safety of the PEH in the encampments as well as the safety of the teams in the field.

General goals for encampment engagement, cleaning, and reduction include:

**Exhibit C-2**
**Page 39**213

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Encampment Engagement, Cleaning, and Resolution Plans & Milestones**

- Reduce the loss of life of people experiencing homelessness across the City
- Increase access to mental health and substance abuse treatment (provided by County) for those living in encampments
- Eliminate street encampments, including RV encampments
- Promote long term housing stability for people experiencing homelessness
- Enhance the safety and hygiene of neighborhoods for all residents, businesses and neighbors

*Additional Information*

The City continues to work with the federal and state government and apply for homelessness funding (including encampment resolution grants). In addition, the City has been working with LAHSA who has now developed a dashboard and report on Los Angeles City Housing and Homeless Engagement which provides detailed homeless and housing data across the City and by Council District.

**Exhibit C-2**
**Page 40214**

# Exhibit 3

Exhibit C-3
Page 41215

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Revised Encampment Reduction Milestones**

I.        Introduction

The City of Los Angeles submits this revised encampment reduction milestones to supplement its earlier submission.  The City is increasing its commitment to reduce a minimum of 12,000 tents, makeshift shelters, cars, vans, and RVs over the term of the settlement agreement, which is more than twice the 5,328 reductions originally proposed by the LA Alliance.  Every six months, the City aims to reduce no less than 1,200 tents, makeshift shelters, cars, vans, and RVs and will work to provide interim shelter for every unsheltered individual, even though the settlement agreement does not obligate the City to provide interim housing.  The City's ultimate goal is to provide permanent supportive housing for the unsheltered individuals assisted off the streets.  Biannually, the City will provide LA Alliance with the overall number of encampment reductions accomplished from the previous six months citywide and broken down by Council district.

This past year, the City of Los Angeles, under Mayor Karen Bass' leadership, has proven there is a better way to urgently address the homelessness crisis, by applying a citywide focus to offering unsheltered individuals interim shelter, housing, and services, and not relying on district by district approaches or threats of enforcement of criminal laws.  Much of the success this past year is attributable to the new Mayor working with the City Council, which itself had changed in significant ways since the settlement was signed.  The Mayor and City Council locked arms together and with City partners including the County of Los Angeles and the Los Angeles Homeless Services Authority (LAHSA).  The 2023 citywide approach demonstrated that success will come from increased resources applied in close collaboration with the Mayor, City Council, and City partners.

The Mayor signaled the City's pivot away from the district-centric approach to a more equitable and citywide approach on December 12, 2022, when on her first day in office she declared a citywide homelessness emergency.  Immediately upon declaring the emergency and throughout 2023, the Mayor, working with the City Council and individual councilmembers, cleared some of the City's most intractable encampments.  Thirty four large encampments throughout all 15 Council districts were resolved in 2023.[1]  With cooperation among Council districts, interim housing was found even if it was not in the same district where the encampment was located.  This citywide approach with cooperation among districts was not typical prior to 2023.  Balkanization among the districts made it harder to address the City's homelessness crisis effectively.

---

[1] Attached is a map showing the location of the 32 encampment reductions completed as of November 30, 2023, as part of the Mayor's Inside Safe program.  They are in every Council district spread across the City, and reflect the collaboration among City Hall stakeholders and the City's partners in tackling the homelessness crisis.

1

**Exhibit C-3**
**Page 4216**

The 2022 settlement agreement included the district by district approach, which allowed individual districts the opportunity to increase enforcement against encampments upon creating shelter or housing for 60% of the district's unsheltered "City Shelter Appropriate" homeless population.  For those districts with fewer unsheltered individuals, relatively little shelter or housing would need to be built to achieve the 60% threshold.  Moreover, allowing districts that achieve the 60% threshold to increase enforcement against the unsheltered individuals remaining in the district risks pushing those unsheltered individuals into adjacent districts. Unsheltered individuals will likely migrate to districts that have historically borne the brunt of the City's homeless crisis, including Skid Row[2] and districts in South Los Angeles and parts of the San Fernando Valley.  These districts have suffered from long established patterns of economic and residential segregation and disinvestment that has led to an overconcentration of considerably large numbers of unsheltered individuals in those communities.  Without employing a citywide strategy, the City's current administration is concerned about perpetuating this unequal application of resources and opportunities and exacerbating the CIty's racial and poverty divides.

The settlement's requirement for the City to break down its citywide encampment reduction by individual districts is a vestige of the district by district approach.  The City requests that the LA Alliance give the City's current administration the opportunity to focus on the citywide approach and, therefore, not insist that the City project district by district milestones.

II.     Background

In May of 2022, the Court approved the settlement agreement between the City and the LA Alliance, which included a City obligation to provide milestones and deadlines citywide and for each Council district for: 1. "the creation of shelter and housing"; and 2. "encampment engagement, cleaning, and reduction".  The City satisfied the first milestone when it submitted to the LA Alliance last year the five year plan to create 12,915 units of shelter and housing.  The City submitted the second set of milestones last month, which included a commitment to reduce tent, makeshift shelter, cars and RV encampments that would result in approximately 1,500 unsheltered individuals being helped off the street.  LA Alliance objected to the City's encampment reduction milestone claiming it was insufficient and did not break down the number of encampment reductions by each of the 15 Council districts.

In an effort to resolve the dispute, the Court met with both parties on December 14, 2023. Shortly before the Court meeting, the City and Alliance discussed the City committing to reduce 9,800 tents, makeshift shelters, cars and RV over the term of the settlement agreement, but the City continued to express concern with breaking down the number district by district.  The Court gave the City until December 29, 2023, to submit its revised milestone for encampment reduction.

_____

[2] The City is joining the County in creating a Skid Row action plan, another example of how the County and City are working collaboratively and focusing on areas of the City with significant need.  The City also purchased the Mayfair hotel, which will provide additional interim housing in the downtown area.

2

Exhibit C-3
Page 43217

III.     City Increases its Encampment Reduction to 12,000 Unsheltered Individuals

The City's increased milestone to reduce no fewer than 12,000 tents, makeshift shelters, cars, vans, and RVs off public spaces during the term of the settlement agreement more than doubles the 5,300 reductions originally sought by LA Alliance.  This should be welcome news to the LA Alliance.

The City will continue to focus encampment reductions based on citywide needs and the needs of the City's unsheltered population.  Every six months, the City aims to reduce no less than 1,200 tents, makeshift shelters, cars, vans, and RVs and will work to provide interim housing for every unsheltered individual, even though providing interim shelter is not required under the settlement agreement.  Every six months, the City will provide LA Alliance the overall number of encampment reductions accomplished during the previous six months citywide and broken down by Council district.

The City's ultimate goal is to provide permanent supportive and affordable housing for the unsheltered individuals assisted off the streets.  To speed up the creation of affordable housing, the Mayor's Executive Directive 1 (ED1) has already accelerated the review of more than 9,000 affordable housing units.  ED 1 has cut through red tape at City Hall – what used to take six to nine months to get permits now only takes an average of 45 days.  The number of applications to the Department of City Planning with affordable housing units has also increased by 85% compared with 2022, from 6,500 to 12,000 units overall - both ED1 and non-ED1 units.  In total, 119 affordable housing projects have qualified for ED1 with the Department of City Planning and 59 project cases have received entitlements (60 are currently under review).  In 2024, 27 City-financed supportive housing projects with 1,916 units are expected to open.  Although not specific to reducing encampments, the expedited creation of affordable and supportive housing is critical to the City's goal of moving unsheltered individuals from interim to permanent housing.

The City also continues to ensure that HHH funds deliver the results expected and lead to more affordable housing developments.  As of December 2023, nearly all HHH funds have been obligated with $1.12 billion of the $1.2 billion General Obligation (GO) Bond.  There are currently 132 total projects in the HHH pipeline, with 8,714 total units as follows:

- 65 projects with 3,945 units built, open, and offering housing
- 43 projects with 2,908 units under construction
- 24 projects with 1,861 units in predevelopment

IV.     Projections of Encampment Reductions District by District is Not Consistent with the City's Current Approach to Tackle the Homelessness Crisis

Although the LA Alliance should be pleased with the City's commitment to reduce encampments by no less than 12,000 citywide, the City anticipates LA Alliance might still seek to have the City provide encampment reduction projections in each of the 15 Council districts.

3

**Exhibit C-3**
**Page 44218**

The City does not dispute that the settlement agreement requires district by district milestones. But the City's approach to tackling the homelessness crisis has changed dramatically since the settlement agreement was signed.  A district by district focus reflected the City's past balkanized approach to addressing homelessness, including some districts relying on the use of criminal enforcement to clear public spaces of encampments.  At the time of the settlement, the City wanted the ability for individual Council districts to increase enforcement against encampments in a district that created shelter or housing beds for 60% of the district's unsheltered City Shelter Appropriate homeless population using the 2022 Point in Time (PIT) Count.  But such a district by district approach perpetuates the City's old, fractured way of addressing homelessness.  It incentivizes Council districts with fewer unsheltered individuals to create just enough shelter and interim housing to reach a 60% threshold.  Importantly, this risks a migration of the City's unsheltered population from those districts to districts that historically have borne the weight of the homelessness crisis, including Skid Row and districts in South Los Angeles and parts of the San Fernando Valley.  This does nothing to address - and indeed exacerbates - the long history of economic and residential segregation along with disinvestment in certain areas of our city. This has led to an overconcentration of considerably large numbers of unsheltered individuals in those communities.  Without a citywide strategy that is less focused on district by district milestones, the current City administration is concerned about perpetuating this unequal application of resources and opportunities to the detriment of certain neighborhoods, particularly those with larger concentrations of racial and ethnic minorities.

IV.      The City has Followed a Different and More Effective and Equitable Path to Tackle the Homelessness Crisis

Last December - nine months after the settlement agreement was executed - Mayor Bass, on her first day in Office, declared the first of its kind City homelessness emergency and locked arms with the new City Council and other partners, including the County of Los Angeles and LAHSA.  This brought a new urgency and collaboration to the homelessness crisis.  These stakeholders focused on citywide solutions that moved away from the district-centric approach of the past.  This collaboration helped instill goodwill among the stakeholders and brought substantial increases in funding.  The new shared commitment allowed the City to break down barriers that in the past made tackling the homelessness crisis less effective.  An example of this new approach was the launch of the innovative Inside Safe program, which offered unsheltered individuals living in street encampments throughout the City the opportunity to move inside into interim housing and receive needed services.  The first year of the program brought inside over 2,000 unsheltered individuals living in some of the most intractable encampments spread among all of the Council districts.  Inside Safe debunked the myth that most unsheltered individuals do not want to leave the streets.  The vast majority of unsheltered individuals living in 34 large street encampments came inside in 2023.

Inside Safe showed the promise that lies ahead if the City continues to work collaboratively citywide.  As part of Inside Safe, Council districts work with the Mayor and other City partners to identify encampments for resolution.  Inside Safe promotes cooperation among Council districts where, for example, insufficient interim housing is not available in the district where an

4

**Exhibit C-3**
**Page 45219**

encampment is located, other districts have helped arrange interim housing in their district.  This is an important feature of Inside Safe and a reflection of the City's new citywide approach.  It allows the City and its partners to consider multiple factors in the placement decision, including what is best for the individual, the availability of housing, and addressing historic inequities in housing practices in the City.

Therefore, the City urges LA Alliance to join the City in its new approach to tackle the homelessness crisis by embracing the City's commitment to reduce no less than 12,000 individual tents, makeshift shelters, cars, vans, and RVs and to allow the City to depart from its past, inefficient, and often inequitable district by district focus.

5

**Exhibit C-3**
**Page 46220**

# Exhibit D

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

The City has a multi-pronged approach to addressing homelessness. This includes encampment engagement, cleaning, and connection to services and housing. This approach is centered on moving unsheltered individuals from encampments to interim housing to permanent, stable and supportive housing. The City uses multiple resources in coordination with the County to engage in outreach through Homeless Engagement Teams funded through LAHSA, City Intervention/Outreach teams, multidisciplinary teams, and street medicine teams. This comprehensive approach allows the City to address the needs of people experiencing homelessness in a holistic way.

## Homeless Engagement Teams (HETs): General, CARE, and CARE+

The primary focus of the HETs is to undertake targeted engagement efforts that focus on moving unsheltered residents experiencing homelessness into crisis, bridge and/or permanent housing utilizing a housing-first orientation with minimum eligibility criteria. The City currently funds 41 two-person outreach teams through LAHSA:

- 15 teams are focused on supporting CARE+ operations for each Council District;
- 13 teams are dedicated to provide outreach services for CARE citywide;
- 10 general outreach teams are deployed to targeted areas identified based on priorities from Council offices, the general public, and service requests from lahop.org; and
- 3 teams are assigned to specific geographic locations that cover Hollywood, the area surrounding City Hall, and the Broadway/110 corridor.

### Homeless Engagement Teams (Operation Healthy Streets)

Two teams are linked with the CARE+ team in the Skid Row area. The teams consist of three dedicated outreach workers and one additional outreach worker leveraged from a general LAHSA HET outreach team. The team provides outreach services and support as LASAN provides clean ups and regular sanitation services through CARE+ operations. The teams also assist in providing outreach and notification prior to cleaning of a specific area.

### Skid Row Homeless Engagement Teams

The Skid Row HETs provide two two-person teams assigned to the Skid Row area for street engagement. Skid Row HETs are displayed within the Skid Row area that include at least one bilingual HET staff member. These additional teams are meant to expand

1

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

### Encampment Engagement, Cleaning, and Resolution

the existing capacity of outreach in the Skid Row area of the C3 and MDT and other outreach efforts happening within the area.

### *Homeless Engagement Team (C3 Partnership)*

The C3 (City + County + Community) is a partnership designed to systematically engage people living on the streets of Skid Row and help them regain their health and housing stability. This outreach team provides street engagement, immediate access to needed resources including but not limited to: interim housing, urgent care, primary care, mental health and substance abuse services, and expenditure linkage to permanent supportive housing services.

### *Roadmap Outreach Teams*

To support the City's Homelessness Roadmap efforts,15 outreach teams are provided across the City, one per Council District. These teams are focused on encampments and people experiencing homelessness within five hundred (500) feet of all freeway overpasses, underpasses, on-ramps, and off-ramps. These teams work closely with relevant City partners to prioritize their targeted population for new housing interventions being funded through the City's Homelessness Roadmap. Similar to the Homeless Engagement Teams, the Roadmap Outreach Teams prioritize linking targeted engagement efforts into new and existing Crisis, Bridge and / or Permanent Housing units.

The following activities are associated with all City-funded HET and Roadmap teams:

- Proactive outreach including:
  - Completion of Assessments, IH housing placements, document collection & support, resource & referrals, connection to mainstream benefits
- Coordination with Council Offices for selection of prioritized encampments and deployment of outreach teams
- Housing Navigation Activities
  - Completion of housing and subsidy applications
  - Identify suitable permanent housing choices for clients, such as Section 8 subsidized housing, Shelter Plus Care, VASH, permanent supportive housing, inexpensive and market rate homes, Shared Housing, and other housing possibilities.
- Document Readiness (collection of ID's and Social Security cards for unsheltered PEH)
- Winter Shelter response

2

Exhibit D

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

- ○ Operate helpline and triage for elected offices and outreach to support PEH with motel vouchers during periods of activation ( largely supported by R&R and HET)
- Streamlined coordination with Veterans Administration - verification of eligibility & connection to benefits and housing resources
- Respond to LAHOP (Homeless Outreach Portal) requests
- Respond to urgent requests from elected offices and City departments.
- Direct access to DPSS for client documentation & support
- Oversight of Outreach Coordination & direct access to specialized outreach teams (MDT/HOME)
- LAPD Response
- Client Transportation
- Resource identification
- Weekly Care Coordination
- Support Interim Housing (IH) with challenging clients (especially during site demobilization)
- Support with Connect Days, Housing Fairs
- Encampment resolutions
- Vehicle Dwelling Operations
- Support providers/ R&R with outreach and consistent connection to motel vouchered clients and families (Family Solution Center clients mostly)
- Emergency & Natural Disaster Response: (Approximately 2-3 monthly, increased needs of support during:
  - ○ Weather, Fires, High Heat, Excessive Rain, Flood Warnings along LA River, Basins & Washes (All Flood Channels)
  - ○ Other Emergencies - Building Fires, Support for Undocumented PEH, Participant in the coordination of care and triaging for migrant busses (including short term lodging & transportation)

*City Intervention/Outreach Teams*

In Fiscal Year (FY) 2023-24 the City has funded 13 intervention teams to be trained and deployed in support of encampment resolution. The City's approach is detailed in the "Encampment Resolution" section below.

*Multi-Disciplinary Teams (MDTs)*

The City currently funds multi-disciplinary teams in six Council districts (one team per Council district). These teams provide specialized outreach that combines medical,

**Exhibit D**
**Page 49224**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

mental health, substance abuse, and lived-experience to have a comprehensive, integrated approach to outreach.

### *Street Medicine Program*

The City also funds the USC Street Medicine Program delivers full service primary care on the street, which includes treatment for acute and chronic disease, preventative medicine, treatment for psychiatric conditions, and substance use disorders.

### *Crisis and Incident Response through Community-Led Engagement (CIRCLE)*

CIRCLE is an unarmed 9-1-1 diversion program that deploys trained civilian teams to address non-urgent calls related to individuals experiencing homelessness and follow-up support to connect individuals to services. CIRCLE aims to disrupt the reciprocal relationship between homelessness and the criminal justice system by addressing non-violent incidents related to unhoused individuals and creating positive outcomes through connections to services. The program has five operating areas: Hollywood, Downtown, Venice, Northeast Valley, and South LA. Each area has a 24/7 Response Team that consists of a supervisor and outreach worker with lived experience. The work of the Response Teams in each area is supported by a mental health counselor and an outreach team that conducts follow-up engagement and case management five days a week. CIRCLE teams are equipped with vehicles and supplies, including water, snacks, clothing, and Narcan to reverse opioid overdoses.

### *Vehicle Dwelling Operations*

In response to the lifting of the City's Parking Enforcement Moratorium, the Office of the City Administrative Officer (CAO), along with all relevant partners, worked to create a comprehensive approach to address Vehicle Dwellings and connect people experiencing vehicular homelessness to appropriate resources and to ensure the health and safety of our public streets.

Council offices contact the CAO's Regional Outreach Coordinator (ROC) team with vehicle dwelling priority locations. The ROC will request LADOT, LAPD, WPD, LASAN to assess the vehicles at the location and report back on any violations which may require immediate attention. The ROC schedules a meeting with all partners to discuss the location and determine next steps.

Between May 2022 and September 2023, a total of 167 Vehicle Dwelling Operations have been completed, and 49 persons experiencing homelessness have been housed.

4

Exhibit D
Page 50225

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Encampment Engagement, Cleaning, and Resolution**

*Encampment Cleaning: CARE and CARE+ Teams*

The Comprehensive Cleaning and Rapid Engagement (CARE/CARE+) teams conduct citywide encampment clean-ups along with trash, litter/debris, and health hazard and/or safety hazard removal on the City's public rights-of-way. The primary mission of the CARE and CARE+ teams is to deliver services to the individuals experiencing homelessness within their service areas. These services are deployed in coordination with other supportive outreach services provided by the City. 15 LAHSA HET teams are focused on supporting CARE+ operations for each Council District, and 13 teams are dedicated to provide outreach services for CARE citywide. In addition, two teams are linked with the CARE+ team in the Skid Row area. .

CARE teams seek L.A.M.C. 56.11 compliance and provide spot cleaning services; health hazard and/or safety hazard identification, documentation, and removal; and trash, litter, and debris removal. These teams provide day-to-day maintenance to achieve safe and clean public rights-of-way. CARE+ teams provide full comprehensive cleanings including the identification, documentation, and removal of line-of-sight health and/or safety hazards; the removal of trash, litter, and debris; and the power washing of public rights-of-way to ensure fully sanitized areas for public safety.

CARE/CARE+ teams are deployed across three main assignments:

- A Bridge Home Special Enforcement Cleaning Zones (ABH SECZs).
  CARE+ services are provided to each ABH SECZ once per week, and CARE services are provided to each ABH SECZ twice per week.
- Focused Service Zones (FSZ):
  FSZs are specific high-need regions that require consistent, recurring, and dedicated services.These include the following:
  - Operation Healthy Streets (OHS) Skid Row. CARE+ services are provided daily, Monday through Friday. This area is divided into zones that receive services once every two weeks on a rotating schedule.
  - Operation Healthy Streets (OHS) Ocean Front Walk in Venice Beach. CARE+ services are provided once per week.
  - Grand Ave/110 Fwy Corridor (Grand Ave). CARE+ services are provided five days per week.
- Citywide CARE+ Services:
  In each Council District, CARE+ services are provided twice per week and CARE services are provided approximately three times per week. Locations are determined by Council District staff. Note that there may be additional CARE+

Exhibit D
Page 51226

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

### Encampment Engagement, Cleaning, and Resolution

operations in each Council District if there is one or more A Bridge Home Special Enforcement Cleaning Zones or Focused Service Zones.

### Encampment Resolution

The City uses the following general process for encampment resolution

*Selection*

Encampments are identified for potential resolution through several avenues:

1. Council Office priorities
2. Encampments identified by the City's Field Intervention Teams
3. Notification by stakeholders in the community – churches, community organizations, schools, businesses, and residents may identify an encampment

Encampment prioritization is evaluated based on the availability of housing resources and the severity of the encampment.

Housing availability: In order to resolve an encampment, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services.

Severity of the encampment: The City takes several data points into account to evaluate encampments, including data from 311 calls as well as emergency requests for police, fire, or medical service.

*Approach to Engagement*

The City's Field Intervention Teams conduct outreach across the City. A large part of this engagement work is to mobilize existing outreach, including:

- Service provider outreach teams
- LAHSA Homeless Engagement Teams (HET)
- Street Medicine engagement teams (if applicable)
- Council Office designated homelessness outreach teams (if applicable)

In preparing for an encampment resolution operation, the Field Intervention Teams work with various outreach teams to collectively engage in case conferencing and coordination to ensure a complete picture of the historical knowledge and context of the

6

**Exhibit D**
**Page 52227**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

area and the people experiencing homelessness (PEH) living there. The teams work to create a unified list so that support is inclusive of the entire footprint of the encampment.

The County's involvement is one of a valued collaborator. The County provides services through its departments, including the Department of Mental Health, the Department of Health Services, and the Department of Public Social Services. They assist with the coordination of multidisciplinary teams to support the wide range of acuity amongst PEH in the encampment. Additionally, when the City prepares to resolve an encampment on adjacent City/County property, the County will activate further County departments that can support the operation.

Service Providers are not only instrumental to effective outreach and engagement, but are also the providers of case management as participants are housed. Prior to an encampment resolution, a contracted provider will activate their outreach and multidisciplinary teams if they have one (not all Service Providers have a multidisciplinary team, which is an important point for County support). Once a participant is in interim housing, service providers are tasked with case management, meal provision, document readiness, and sometimes housing navigation (sometimes additional providers are brought in for this).

City departments, including the Department of Transportation (DOT), Los Angeles Department of Sanitation (LASAN), and the Los Angeles Police Department (LAPD), are also important partners in the successful realization of encampment resolution operations.

DOT provides buses to transport participants from the encampment to their interim housing. They also coordinate parking enforcement to assist with road closures to ensure a safe street for encampment residents and the teams in the field.

LASAN documents voluntary surrender of any belongings not going to the interim housing site, inspects for biohazards, clears all surrendered belongings, and power-washes the area (see CARE/CARE+ section above).

While the City's trauma-informed approach means LAPD is not actively engaging in outreach, LAPD personnel are always fully briefed and on standby in the area to assist in any cases of violence or criminal activity. LAPD acts as a protective layer to ensure the safety of the PEH in the encampments as well as the safety of the teams in the field.

Exhibit D
Page 53228

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution

*Goals and Milestones*

From December 20, 2022 through September 26, 2023, encampment resolutions have occurred at 26 locations and over 1,600 people have been brought into interim housing from the streets. The City's overarching goal is a Citywide approach, addressing encampments through lenses of equity and need across Council Districts.

General goals for encampment engagement, cleaning, and reduction include:

- Reduce the loss of life of people experiencing homelessness across the City
- Increase access to mental health and substance abuse treatment (provided by County) for those living in encampments
- Eliminate street encampments, including RV encampments
- Promote long term housing stability for people experiencing homelessness
- Enhance the safety and hygiene of neighborhoods for all residents, businesses and neighbors

*Additional Information*

The City continues to work with the federal and state government and apply for homelessness funding (including encampment resolution grants). In addition, the City has been working with LAHSA who has now developed a dashboard and report on Los Angeles City Housing and Homeless Engagement which provides detailed homeless and housing data across the City and by Council District.

8

# Exhibit E

| | |
|---|---|
| **From:** | Elizabeth Mitchell |
| **To:** | Michele |
| **Cc:** | Scott Marcus; Arlene Hoang; David Michaelson; Jessica Mariani; Matthew Umhofer; daniel@conwaystrategies.com; pwebster@la-alliance.org; mercedes.marquez@lacity.org |
| **Subject:** | LA Alliance - Dispute |
| **Date:** | Thursday, October 19, 2023 12:40:00 PM |
| **Attachments:** | image001.png [426-1] FE Stipulated Order re Dismissal.pdf LA Alliance Encampment Engagement Cleaning and Reduction (10-3-23) (002).pdf |

Dear Michele:

We write to you to notify you of a dispute regarding the City of Los Angeles' violation of the Settlement Agreement (attached at 426-1), Specifically Section 5.2 which requires:

> 5.2. [After providing the calculation of the Required Number after release of the 2022 PIT count called for by Section 5.1]
> the City will create plans and develop milestones and
> deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH
> in each Council District as determined by the Required Number; (ii) the City's
> plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as
> determined by the Required Number; and (iv) the City's plan for encampment
> engagement, cleaning, and reduction in the City. The City will provide the plans,
> milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work
> together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary. The City will provide a report setting forth the milestones and deadlines. The Parties agree the City will promptly employ its best efforts to
> comply with established plans, milestones, and deadlines.

Unfortunately, we have never received any milestones and deadlines.

By way of background, earlier this year the Alliance began the meet-and-confer process with the City about their lack of milestones and deadlines, and we were asked to wait until the end of Q3 (October 1, 2023). The reason was because the City put out an RFQ for a list of qualified service/outreach providers, with the intention of hiring service and outreach providers in each district, which were to be fully staffed in each district by July 1. Thereafter the providers would conduct a full assessment of each district and be able to provide that accurate assessment

Exhibit E
Page 55231

along with milestones and deadlines by October 1, 2023.  Because of the delays
caused by 1) the late 2022 PIT count release, 2) the change in administration, and
3) the difficulty with LAHSA, we agreed to this delay because it was a sensical
approach and ultimately our goal is to see success, not punishment of the City for
the sake of punishment.

However what we ultimately received from the City on October 3, 2023 has no
milestones or deadlines.  Instead the document contains general descriptions of
what the City is currently doing and has done over the last 10 months which is
patently insufficient and in violation of the agreement on its face.  Please see
attached document (as LA Alliance Encampment Engagement Cleaning and
Reduction 10-3-23).

The parties met and conferred last Friday, October 16, 2023.  The City suggested
there may be other documents that they may be able to share under a protective
order (which we remain open to), but will not have an answer for me about such
documents until next Friday, October 27, 2023.  My clients cannot wait until next
Friday and have waited long enough.  We have exhausted good faith efforts to
resolve this dispute and are now at an impasse.

The Agreement provides that the parties will submit the issue to the Court, but
the Agreement also provides that the Court may appoint a special master to
assist the Court in overseeing and enforcing this Agreement and you have been
appointed.  Please advise how you would like us to proceed—I suggest first a
meeting with you and all parties (or separately), or we could submit it directly on
the public docket.

Thank you,
Liz



**ELIZABETH A. MITCHELL**
*Partner*

elizabeth@umklaw.com
Office: (213) 394-7979
www.umklaw.com

Nothing in this communication is intended to convey tax-related advice.  This message may contain confidential
and privileged information.  If it has been sent to you in error, please reply to advise the sender of the error and
then immediately delete this message.  Thank you.

**Exhibit E**
**Page 56232**

# Exhibit F

233

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution Plans & Milestones

Paragraph 5.2. of the Settlement Agreement requires the City to create plans and develop milestones and deadlines for the City's plan for encampment engagement, cleaning, and reduction in each Council District and the City.

The parties agree that these milestones should focus on high-level outcomes and accomplishing the collective goal of reducing homelessness on the City's streets and sidewalks.  The milestones are intended to provide plans and deadlines to determine progress in the City's efforts in reducing the number of encampments and addressing homelessness in general.

## ENGAGEMENT

The City has a multi-pronged approach to addressing homelessness that focuses on connecting people to services and housing.  This approach is centered on moving unsheltered individuals from encampments to interim housing to permanent, stable and supportive housing.  The City uses multiple resources in coordination with the County to engage in outreach through Homeless Engagement Teams funded through LAHSA, City Intervention/Outreach teams, multidisciplinary teams, and street medicine teams. This comprehensive approach allows the City to address the needs of people experiencing homelessness in a holistic way.

The City's overarching goal is a Citywide approach, addressing encampments[1] through lenses of equity and need across Council Districts.  Encampment engagement occurs constantly throughout the City.  The City will engage with a single encampment for several weeks before it can be resolved.  This long engagement period allows service providers to develop relationships and trust with the residents.  It also allows the City time to line up all of the necessary services (City, County, private, etc.).  As these resources increase, so will the City's ability to conduct encampment engagement and reduction.

### Homeless Engagement Teams (HETs): General, CARE, and CARE+

The primary focus of the HETs is to undertake targeted engagement efforts that focus on moving unsheltered residents experiencing homelessness into crisis, bridge and/or permanent housing utilizing a housing-first orientation with minimum eligibility criteria.

---

[1] LAHSA considers an "encampment" to be 5 or more PEH and 3 or more shelters (tents, makeshifts, or vehicles) within a 300-foot radius or physical boundaries defined by an encampment resolution effort.

**Exhibit F**
**Page 57234**

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Encampment Engagement, Cleaning, and Resolution Plans & Milestones**

The City currently funds 41 two-person outreach teams through LAHSA:

- 15 teams are focused on supporting CARE+ operations in each Council District;
- 13 teams are dedicated to provide outreach services for CARE citywide;
- 10 teams are deployed to targeted areas identified based on priorities from Council offices, the general public, and service requests from lahop.org; and
- 3 teams are assigned to Hollywood, the area surrounding City Hall, and the Broadway/110 corridor.

*Homeless Engagement Teams (Operation Healthy Streets)*

Two teams are linked with the CARE+ team in the Skid Row area. The teams consist of three dedicated outreach workers and one additional outreach worker leveraged from a general LAHSA HET outreach team. The team provides outreach services and support as LASAN provides clean ups and regular sanitation services through CARE+ operations. The teams also assist in providing outreach and notification prior to cleaning of a specific area.

*Skid Row Homeless Engagement Teams*

The Skid Row HETs provide two two-person teams assigned to the Skid Row area for street engagement. Skid Row HETs are displayed within the Skid Row area that include at least one bilingual HET staff member. These additional teams are meant to expand the existing capacity of outreach in the Skid Row area of the C3 and MDT and other outreach efforts happening within the area.

*Homeless Engagement Team (C3 Partnership)*

The C3 (City + County + Community) is a partnership designed to systematically engage people living on the streets of Skid Row and help them regain their health and housing stability. This outreach team provides street engagement, immediate access to needed resources including but not limited to: interim housing, urgent care, primary care, mental health and substance abuse services, and expenditure linkage to permanent supportive housing services.

*Roadmap Outreach Teams*

To support the City's Homelessness Roadmap efforts, 15 outreach teams are provided across the City, one per Council District. These teams are focused on encampments and people experiencing homelessness within five hundred (500) feet of all freeway overpasses, underpasses, on-ramps, and off-ramps. These teams work closely with

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

## Encampment Engagement, Cleaning, and Resolution Plans & Milestones

relevant City partners to prioritize their targeted population for new housing interventions being funded through the City's Homelessness Roadmap. Similar to the Homeless Engagement Teams, the Roadmap Outreach Teams prioritize linking targeted engagement efforts into new and existing Crisis, Bridge and / or Permanent Housing units.

### *City Intervention/Outreach Teams*

In Fiscal Year (FY) 2023-24 the City has funded 13 intervention teams to be trained and deployed in support of encampment resolution. The City's approach is detailed in the "Encampment Resolution" section below.

### *Multi-Disciplinary Teams (MDTs)*

The City currently funds multi-disciplinary teams in six Council districts (one team per Council district). These teams provide specialized outreach that combines medical, mental health, substance abuse, and lived-experience to have a comprehensive, integrated approach to outreach.

### *Street Medicine Program*

The City also funds the USC Street Medicine Program delivers full service primary care on the street, which includes treatment for acute and chronic disease, preventative medicine, treatment for psychiatric conditions, and substance use disorders.

### *Crisis and Incident Response through Community-Led Engagement (CIRCLE)*

CIRCLE is an unarmed 9-1-1 diversion program that deploys trained civilian teams to address non-urgent calls related to individuals experiencing homelessness and follow-up support to connect individuals to services. CIRCLE aims to disrupt the reciprocal relationship between homelessness and the criminal justice system by addressing non-violent incidents related to unhoused individuals and creating positive outcomes through connections to services. The program has five operating areas: Hollywood, Downtown, Venice, Northeast Valley, and South LA. Each area has a 24/7 Response Team that consists of a supervisor and outreach worker with lived experience. The work of the Response Teams in each area is supported by a mental health counselor and an outreach team that conducts follow-up engagement and case management five days a week. CIRCLE teams are equipped with vehicles and supplies, including water, snacks, clothing, and Narcan to reverse opioid overdoses.

3

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

Encampment Engagement, Cleaning, and Resolution Plans & Milestones

*Vehicle Dwelling Operations*

In response to the lifting of the City's Parking Enforcement Moratorium, the Office of the City Administrative Officer (CAO), along with all relevant partners, worked to create a comprehensive approach to address Vehicle Dwellings and connect people experiencing vehicular homelessness to appropriate resources and to ensure the health and safety of our public streets.

Council offices contact the CAO's Regional Outreach Coordinator (ROC) team with vehicle dwelling priority locations. The ROC will request LADOT, LAPD, WPD, LASAN to assess the vehicles at the location and report back on any violations which may require immediate attention. The ROC schedules a meeting with all partners to discuss the location and determine next steps.

Between May 2022 and September 2023, a total of 167 Vehicle Dwelling Operations have been completed, and 49 persons experiencing homelessness have been housed.

## CLEANING

The Comprehensive Cleaning and Rapid Engagement (CARE/CARE+) teams conduct citywide encampment clean-ups along with trash, litter/debris, and health hazard and/or safety hazard removal on the City's public rights-of-way. The primary mission of the CARE and CARE+ teams is to deliver services to the individuals experiencing homelessness within their service areas. These services are deployed in coordination with other supportive outreach services provided by the City. 15 LAHSA HET teams are focused on supporting CARE+ operations for each Council District, and 13 teams are dedicated to provide outreach services for CARE citywide. In addition, two teams are linked with the CARE+ team in the Skid Row area.

The City publishes a daily schedule of CARE and CARE+ cleanings.  The City's current milestones for cleaning are to conduct 2 encampment cleanings each week in each Council District (*i.e.* 30 encampment cleanings each week).  The City plans to increase that milestone to 5 encampment cleanings each week in each Council District by the end of FY 24-25.

CARE teams seek L.A.M.C. 56.11 compliance and provide spot cleaning services; health hazard and/or safety hazard identification, documentation, and removal; and trash, litter, and debris removal. These teams provide day-to-day maintenance to achieve safe and clean public rights-of-way. CARE+ teams provide full comprehensive cleanings including the identification, documentation, and removal of line-of-sight health

4

Exhibit F
Page 60237

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

### Encampment Engagement, Cleaning, and Resolution Plans & Milestones

and/or safety hazards; the removal of trash, litter, and debris; and the power washing of public rights-of-way to ensure fully sanitized areas for public safety.

CARE/CARE+ teams are deployed across three main assignments:

- A Bridge Home Special Enforcement Cleaning Zones (ABH SECZs). CARE+ services are provided to each ABH SECZ once per week, and CARE services are provided to each ABH SECZ twice per week.
- Focused Service Zones (FSZ):
  FSZs are specific high-need regions that require consistent, recurring, and dedicated services. These include the following:
  - Operation Healthy Streets (OHS) Skid Row. CARE+ services are provided daily, Monday through Friday. This area is divided into zones that receive services once every two weeks on a rotating schedule.
  - Operation Healthy Streets (OHS) Ocean Front Walk in Venice Beach. CARE+ services are provided once per week.
  - Grand Ave/110 Fwy Corridor (Grand Ave). CARE+ services are provided five days per week.
- Citywide CARE+ Services:
  In each Council District, CARE+ services are provided twice per week and CARE services are provided approximately three times per week. Locations are determined by Council District staff. Note that there may be additional CARE+ operations in each Council District if there is one or more A Bridge Home Special Enforcement Cleaning Zones or Focused Service Zones.

### RESOLUTION

The City's overarching goal is a Citywide approach, addressing encampments through lenses of equity and need across Council Districts.  The parties recognize the best metric is to view resolutions in six-month periods, because some months may involve more resolutions while other months may be more focused on preparation for resolutions.  The City is providing the below milestones for resolutions through the end of 2024.  Importantly, the City aims to accomplish more resolutions and, thus, these are meant to be baseline numbers.  Before the end of 2024, the City will reevaluate how best to increase the number of resolutions based on available City, County, State, and Federal resources.

For each month during the six month period from January through June 2024, the City aims to resolve at least two tent and makeshift shelter encampments and at least three

5

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Encampment Engagement, Cleaning, and Resolution Plans & Milestones**

RV encampments involving at least 100 individuals.  Starting July 1, 2024, and through December 31, 2024, the City aims each month to resolve at least three tent and makeshift shelter encampments and four RV encampments involving at least 150 individuals.

The City uses the following general process for encampment resolution

*Selection*

Encampments are identified for potential resolution through several avenues:

1.  Council Office priorities
2.  Encampments identified by the City's Field Intervention Teams
3.  Notification by stakeholders in the community – churches, community organizations, schools, businesses, and residents may identify an encampment

Encampment prioritization is evaluated based on the availability of housing resources and the severity of the encampment.

Housing availability: In order to resolve an encampment, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services.

Severity of the encampment: The City takes several data points into account to evaluate encampments, including data from 311 calls as well as emergency requests for police, fire, or medical service.

*Approach to Engagement*

The City's Field Intervention Teams conduct outreach across the City. A large part of this engagement work is to mobilize existing outreach, including:

●  Service provider outreach teams
●  LAHSA Homeless Engagement Teams (HET)
●  Street Medicine engagement teams (if applicable)
●  Council Office designated homelessness outreach teams (if applicable)

In preparing for an encampment resolution operation, the Field Intervention Teams work with various outreach teams to collectively engage in case conferencing and coordination to ensure a complete picture of the historical knowledge and context of the

6

## Encampment Engagement, Cleaning, and Resolution Plans & Milestones

area and the people experiencing homelessness (PEH) living there.  The teams work to create a unified list so that support is inclusive of the entire footprint of the encampment.

The County's involvement is one of a valued collaborator. The County provides services through its departments, including the Department of Mental Health, the Department of Health Services, and the Department of Public Social Services. They assist with the coordination of multidisciplinary teams to support the wide range of acuity amongst PEH in the encampment. Additionally, when the City prepares to resolve an encampment on adjacent City/County property, the County will activate further County departments that can support the operation.

Service Providers are not only instrumental to effective outreach and engagement, but are also the providers of case management as participants are housed. Prior to an encampment resolution, a contracted provider will activate their outreach and multidisciplinary teams if they have one (not all Service Providers have a multidisciplinary team, which is an important point for County support). Once a participant is in interim housing, service providers are tasked with case management, meal provision, document readiness, and sometimes housing navigation (sometimes additional providers are brought in for this).

City departments, including the Department of Transportation (DOT), Los Angeles Department of Sanitation (LASAN), and the Los Angeles Police Department (LAPD), are also important partners in the successful realization of encampment resolution operations.

DOT provides buses to transport participants from the encampment to their interim housing. They also coordinate parking enforcement to assist with road closures to ensure a safe street for encampment residents and the teams in the field.

LASAN documents voluntary surrender of any belongings not going to the interim housing site, inspects for biohazards, clears all surrendered belongings, and power-washes the area (see CARE/CARE+ section above).

While the City's trauma-informed approach means LAPD is not actively engaging in outreach, LAPD personnel are always fully briefed and on standby in the area to assist in any cases of violence or criminal activity. LAPD acts as a protective layer to ensure the safety of the PEH in the encampments as well as the safety of the teams in the field.

General goals for encampment engagement, cleaning, and reduction include:

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

<u>Encampment Engagement, Cleaning, and Resolution Plans & Milestones</u>

- Reduce the loss of life of people experiencing homelessness across the City
- Increase access to mental health and substance abuse treatment (provided by County) for those living in encampments
- Eliminate street encampments, including RV encampments
- Promote long term housing stability for people experiencing homelessness
- Enhance the safety and hygiene of neighborhoods for all residents, businesses and neighbors

*Additional Information*

The City continues to work with the federal and state government and apply for homelessness funding (including encampment resolution grants). In addition, the City has been working with LAHSA who has now developed a dashboard and report on Los Angeles City Housing and Homeless Engagement which provides detailed homeless and housing data across the City and by Council District.

8

**Exhibit F**
**Page 64241**

# Exhibit G

*LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC*

**Revised Encampment Reduction Milestones**

I.        Introduction

The City of Los Angeles submits this revised encampment reduction milestones to supplement its earlier submission.  The City is increasing its commitment to reduce a minimum of 12,000 tents, makeshift shelters, cars, vans, and RVs over the term of the settlement agreement, which is more than twice the 5,328 reductions originally proposed by the LA Alliance.  Every six months, the City aims to reduce no less than 1,200 tents, makeshift shelters, cars, vans, and RVs and will work to provide interim shelter for every unsheltered individual, even though the settlement agreement does not obligate the City to provide interim housing.  The City's ultimate goal is to provide permanent supportive housing for the unsheltered individuals assisted off the streets.  Biannually, the City will provide LA Alliance with the overall number of encampment reductions accomplished from the previous six months citywide and broken down by Council district.

This past year, the City of Los Angeles, under Mayor Karen Bass' leadership, has proven there is a better way to urgently address the homelessness crisis, by applying a citywide focus to offering unsheltered individuals interim shelter, housing, and services, and not relying on district by district approaches or threats of enforcement of criminal laws.  Much of the success this past year is attributable to the new Mayor working with the City Council, which itself had changed in significant ways since the settlement was signed.  The Mayor and City Council locked arms together and with City partners including the County of Los Angeles and the Los Angeles Homeless Services Authority (LAHSA).  The 2023 citywide approach demonstrated that success will come from increased resources applied in close collaboration with the Mayor, City Council, and City partners.

The Mayor signaled the City's pivot away from the district-centric approach to a more equitable and citywide approach on December 12, 2022, when on her first day in office she declared a citywide homelessness emergency.  Immediately upon declaring the emergency and throughout 2023, the Mayor, working with the City Council and individual councilmembers, cleared some of the City's most intractable encampments.  Thirty four large encampments throughout all 15 Council districts were resolved in 2023.[1]  With cooperation among Council districts, interim housing was found even if it was not in the same district where the encampment was located.  This citywide approach with cooperation among districts was not typical prior to 2023.  Balkanization among the districts made it harder to address the City's homelessness crisis effectively.

_____

[1] Attached is a map showing the location of the 32 encampment reductions completed as of November 30, 2023, as part of the Mayor's Inside Safe program.  They are in every Council district spread across the City, and reflect the collaboration among City Hall stakeholders and the City's partners in tackling the homelessness crisis.

1

The 2022 settlement agreement included the district by district approach, which allowed individual districts the opportunity to increase enforcement against encampments upon creating shelter or housing for 60% of the district's unsheltered "City Shelter Appropriate" homeless population.  For those districts with fewer unsheltered individuals, relatively little shelter or housing would need to be built to achieve the 60% threshold.  Moreover, allowing districts that achieve the 60% threshold to increase enforcement against the unsheltered individuals remaining in the district risks pushing those unsheltered individuals into adjacent districts.  Unsheltered individuals will likely migrate to districts that have historically borne the brunt of the City's homeless crisis, including Skid Row[2] and districts in South Los Angeles and parts of the San Fernando Valley.  These districts have suffered from long established patterns of economic and residential segregation and disinvestment that has led to an overconcentration of considerably large numbers of unsheltered individuals in those communities.  Without employing a citywide strategy, the City's current administration is concerned about perpetuating this unequal application of resources and opportunities and exacerbating the CIty's racial and poverty divides.

The settlement's requirement for the City to break down its citywide encampment reduction by individual districts is a vestige of the district by district approach.  The City requests that the LA Alliance give the City's current administration the opportunity to focus on the citywide approach and, therefore, not insist that the City project district by district milestones.

II.      Background

In May of 2022, the Court approved the settlement agreement between the City and the LA Alliance, which included a City obligation to provide milestones and deadlines citywide and for each Council district for: 1. "the creation of shelter and housing"; and 2. "encampment engagement, cleaning, and reduction".  The City satisfied the first milestone when it submitted to the LA Alliance last year the five year plan to create 12,915 units of shelter and housing. That first milestone was not disputed.  The City submitted the second set of milestones last month, which included a commitment to reduce tent, makeshift shelter, cars and RV encampments that would result in approximately 1,500 unsheltered individuals being helped off the street.  LA Alliance objected to the City's encampment reduction milestone claiming it was insufficient and did not break down the number of encampment reductions by each of the 15 Council districts.

In an effort to resolve the dispute, the Court met with both parties on December 14, 2023. Shortly before the Court meeting, the City and Alliance discussed the City committing to reduce 9,800 tents, makeshift shelters, cars and RV over the term of the settlement agreement, but the City continued to express concern with breaking down the number district by district.  The Court gave the City until December 29, 2023, to submit its revised milestone for encampment reduction.

_____

[2] The City is joining the County in creating a Skid Row action plan, another example of how the County and City are working collaboratively and focusing on areas of the City with significant need.  The City also purchased the Mayfair hotel, which will provide additional interim housing in the downtown area.

2

III.     City Increases its Encampment Reduction to 12,000 Unsheltered Individuals

The City's increased milestone to reduce no fewer than 12,000 tents, makeshift shelters, cars, vans, and RVs off public spaces during the term of the settlement agreement more than doubles the 5,300 reductions originally sought by LA Alliance.  This should be welcome news to the LA Alliance.

The City will continue to focus encampment reductions based on citywide needs and the needs of the City's unsheltered population.  Every six months, the City aims to reduce no less than 1,200 tents, makeshift shelters, cars, vans, and RVs and will work to provide interim housing for every unsheltered individual, even though providing interim shelter is not required under the settlement agreement.  Every six months, the City will provide LA Alliance the overall number of encampment reductions accomplished during the previous six months citywide and broken down by Council district.

The City's ultimate goal is to provide permanent supportive and affordable housing for the unsheltered individuals assisted off the streets.  To speed up the creation of affordable housing, the Mayor's Executive Directive 1 (ED1) has already accelerated the review of more than 9,000 affordable housing units.  ED 1 has cut through red tape at City Hall – what used to take six to nine months to get permits now only takes an average of 45 days.  The number of applications to the Department of City Planning with affordable housing units has also increased by 85% compared with 2022, from 6,500 to 12,000 units overall - both ED1 and non-ED1 units.  In total, 119 affordable housing projects have qualified for ED1 with the Department of City Planning and 59 project cases have received entitlements (60 are currently under review).  In 2024, 27 City-financed supportive housing projects with 1,916 units are expected to open.  Although not specific to reducing encampments, the expedited creation of affordable and supportive housing is critical to the City's goal of moving unsheltered individuals from interim to permanent housing.

The City also continues to ensure that HHH funds deliver the results expected and lead to more affordable housing developments.  As of December 2023, nearly all HHH funds have been obligated with $1.12 billion of the $1.2 billion General Obligation (GO) Bond.  There are currently 132 total projects in the HHH pipeline, with 8,714 total units as follows:

- 65 projects with 3,945 units built, open, and offering housing
- 43 projects with 2,908 units under construction
- 24 projects with 1,861 units in predevelopment

IV.     Projections of Encampment Reductions District by District is Not Consistent with the City's Current Approach to Tackle the Homelessness Crisis

Although the LA Alliance should be pleased with the City's commitment to reduce encampments by no less than 12,000 citywide, the City anticipates LA Alliance might still seek to have the City provide encampment reduction projections in each of the 15 Council districts.

3

**Exhibit G**
**Page 67245**

The City does not dispute that the settlement agreement requires district by district milestones. But the City's approach to tackling the homelessness crisis has changed dramatically since the settlement agreement was signed. A district by district focus reflected the City's past balkanized approach to addressing homelessness, including some districts relying on the use of criminal enforcement to clear public spaces of encampments. At the time of the settlement, the City wanted the ability for individual Council districts to increase enforcement against encampments in a district that created shelter or housing beds for 60% of the district's unsheltered City Shelter Appropriate homeless population using the 2022 Point in Time (PIT) Count. But such a district by district approach perpetuates the City's old, fractured way of addressing homelessness. It incentivizes Council districts with fewer unsheltered individuals to create just enough shelter and interim housing to reach a 60% threshold. Importantly, this risks a migration of the City's unsheltered population from those districts to districts that historically have borne the weight of the homelessness crisis, including Skid Row and districts in South Los Angeles and parts of the San Fernando Valley. This does nothing to address - and indeed exacerbates - the long history of economic and residential segregation along with disinvestment in certain areas of our city. This has led to an overconcentration of considerably large numbers of unsheltered individuals in those communities. Without a citywide strategy that is less focused on district by district milestones, the current City administration is concerned about perpetuating this unequal application of resources and opportunities to the detriment of certain neighborhoods, particularly those with larger concentrations of racial and ethnic minorities.

IV.    The City has Followed a Different and More Effective and Equitable Path to Tackle the Homelessness Crisis

Last December - nine months after the settlement agreement was executed - Mayor Bass, on her first day in Office, declared the first of its kind City homelessness emergency and locked arms with the new City Council and other partners, including the County of Los Angeles and LAHSA. This brought a new urgency and collaboration to the homelessness crisis. These stakeholders focused on citywide solutions that moved away from the district-centric approach of the past. This collaboration helped instill goodwill among the stakeholders and brought substantial increases in funding. The new shared commitment allowed the City to break down barriers that in the past made tackling the homelessness crisis less effective. An example of this new approach was the launch of the innovative Inside Safe program, which offered unsheltered individuals living in street encampments throughout the City the opportunity to move inside into interim housing and receive needed services. The first year of the program brought inside over 2,000 unsheltered individuals living in some of the most intractable encampments spread among all of the Council districts. Inside Safe debunked the myth that most unsheltered individuals do not want to leave the streets. The vast majority of unsheltered individuals living in 34 large street encampments came inside in 2023.

Inside Safe showed the promise that lies ahead if the City continues to work collaboratively citywide. As part of Inside Safe, Council districts work with the Mayor and other City partners to identify encampments for resolution. Inside Safe promotes cooperation among Council districts

4

where, for example, insufficient interim housing is not available in the district where an encampment is located, other districts have helped arrange interim housing in their district. This is an important feature of Inside Safe and a reflection of the City's new citywide approach. It allows the City and its partners to consider multiple factors in the placement decision, including what is best for the individual, the availability of housing, and addressing historic inequities in housing practices in the City.

Therefore, the City urges LA Alliance to join the City in its new approach to tackle the homelessness crisis by embracing the City's commitment to reduce no less than 12,000 individual tents, makeshift shelters, cars, vans, and RVs and to allow the City to depart from its past, inefficient, and often inequitable district by district focus.

5

# Exhibit H

| Time Period | Citywide Milestone Period | Citywide Aggregate Milestone | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 | CD 8 | CD 9 | CD 10 | CD 11 | CD 12 | CD 13 | CD 14 | CD 15 | Total by CD | Aggregate by CD Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jun - Dec 22 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Jan - Jun 23 | 800 | 800 | 72 | 32 | 27 | 25 | 22 | 45 | 42 | 38 | 83 | 38 | 48 | 27 | 65 | 182 | 54 | 800 | 800 |
| July - Dec 23 | 1,125 | 1,125 | 102 | 45 | 38 | 35 | 31 | 63 | 59 | 53 | 116 | 53 | 67 | 38 | 91 | 258 | 76 | 1,125 | 1,925 |
| Jan - June 24 | 1,125 | 1,125 | 102 | 45 | 38 | 35 | 31 | 63 | 59 | 53 | 116 | 53 | 67 | 38 | 91 | 258 | 76 | 1,125 | 3,050 |
| July - Dec 24 | 1,125 | 1,125 | 102 | 45 | 38 | 35 | 31 | 63 | 59 | 53 | 116 | 53 | 67 | 38 | 91 | 258 | 76 | 1,125 | 4,175 |
| Jan - June 25 | 1,125 | 1,125 | 102 | 45 | 38 | 35 | 31 | 63 | 59 | 53 | 116 | 53 | 67 | 38 | 91 | 258 | 76 | 1,125 | 5,300 |
| July - Dec 25 | 1,125 | 1,125 | 102 | 45 | 38 | 35 | 31 | 63 | 59 | 53 | 116 | 53 | 67 | 38 | 91 | 258 | 76 | 1,125 | 6,425 |
| Jan - June 26 | 1,125 | 1,125 | 102 | 45 | 38 | 35 | 31 | 63 | 59 | 53 | 116 | 53 | 67 | 38 | 91 | 258 | 76 | 1,125 | 7,550 |
| July - Dec 26 | 1,125 | 1,125 | 102 | 45 | 38 | 35 | 31 | 63 | 59 | 53 | 116 | 53 | 67 | 38 | 91 | 258 | 76 | 1,125 | 8,675 |
| Jan - June 27 | 1,125 | 1,125 | 102 | 45 | 38 | 35 | 31 | 63 | 59 | 53 | 116 | 53 | 67 | 38 | 91 | 258 | 76 | 1,125 | 9,800 |
| **Totals:** | **9,800** | **9,800** | 888 | 392 | 331 | 305 | 270 | 549 | 514 | 462 | 1,011 | 462 | 584 | 331 | 793 | 2,246 | 662 | 9,800 | |

**Exhibit H**
**Page 70**

# Exhibit I



## Office of the Los Angeles City Attorney
### Hydee Feldstein Soto

January 10, 2024

Elizabeth A. Mitchell
UMHOFER, MITCHELL & KING LLP
767 S. Alameda Street, Suite 270
Los Angeles, CA 90021

Re:  Alliance Milestones and Encampment Reduction

Dear Liz:

This letter responds to your January 8, 2024 letter to David Michaelson, Counsel to Mayor Karen Bass, and Scott Marcus, Chief Assistant City Attorney, concerning the Encampment Reduction Milestones in the Settlement Agreement between your client, Alliance, and the City of Los Angeles.

We were surprised by the tone and content of your letter as it is inconsistent with the 90+ minute meeting hosted by the Mayor last week.  As Alliance knows, and was discussed in depth at last week's meeting, the actual work done by the City to reduce encampments citywide has been more successful than any period of time prior to the 2022 settlement agreement being executed.  Thousands of our unsheltered neighbors left the streets and came inside.  Therefore, even though the City's obligation to provide encampment reduction milestones is late, the actual work in reducing encampments has been ongoing and successful.  Of course much more needs to be done and will be done.

The City appreciates your clients' frustration with the length of time it has taken to resolve this issue.  However, your recitation of the facts is not entirely accurate, which may account for some of your clients' frustration.

**Exhibit I
Page 71251**

January 10, 2024
Page 2

For example:

- The confusion over the aggregate number of encampment milestone reductions began when you proposed the number to be 5,327. You then called it a "typo" and ballooned the number to more than double, and ultimately reduced it to 9,782 to account for only City Shelter Appropriate people experiencing homelessness. The discussion that led to the 9,782 number was in the context of the City's previous proposal of only City-wide milestones, not district-by-district milestones.
- In response to the City's request for a 3-week extension, Alliance demanded the City agree to: (1) no less than 9,782 encampment reductions over the five years; (2) including district-by-district milestones and deadlines; (3) a meeting with Mayor Bass prior to January 19; and (4) a $250,000 per week penalty for every week or partial week of delay beyond January 19. The City's December 26 email expressly declined to accept the conditions and the City timely provided the revised milestones on December 29. In addition, the Mayor met with Alliance on January 4.
- The milestones proposed by the City before January 6 were clearly, if not expressly, City-wide milestones, and therefore did not include any district-by-district milestones. This is consistent with the "citywide approach" that the City had taken on every proposed milestone up until January 6.
- Based on all of the communications listed above, it is clear that the City and Alliance were negotiating towards, but had yet to agree on, a mutually-acceptable set of encampment reduction milestones.

Given the history of the negotiations, Alliance's reaction to the City's January 6 proposal is misplaced, because the proposal is exactly as demanded by Alliance: <u>9,800 reductions over five years with projections in each Council District</u>. Again, the City acknowledges its responsibility for the delays during this negotiation process, but your assertion that Alliance has "no faith" in the City's ability or willingness to comply with its proposal is illogical given the City agreed to Alliance's number and district projections, and because of the City's past year of success doing the <u>actual work</u> to reduce encampments and bring people inside. Indeed, last year the City reduced encampments in greater numbers than ever before.

That said, the City remains committed to resolving this issue, and in that spirit, makes this final proposal:

- The City will agree to reduce 9,800 tents, makeshift shelters, cars, and RVs by June 30, 2026, based on revised district-by-district milestones;
- The City will provide quarterly reporting of district-by-district and City-wide metrics and progress in meeting the milestones.

**Exhibit I
Page 72252**

January 10, 2024
Page 3


The settlement agreement does not require the City to provide an encampment reduction milestone specific to Skid Row or any other individual encampments.  Finally, payment of punitive damages to Alliance is unwarranted.  The City will continue to focus its resources on achieving our mutual goals as set forth in the Settlement Agreement.

Please let us know how Alliance would like to proceed.

Sincerely,

*Scott Marcus*

Scott Marcus
Chief Assistant City Attorney


cc:      David Michaelson, Office of the Mayor


Exhibit I
Page 73253

254

# Exhibit J

Case 2:20-cv-02291-DOC-KES  Document 668  Filed 02/07/24  Page 85 of 85  Page ID #:20046

Case 2:20-cv-02291-DOC-KES  Document 656-7  Filed 02/07/24  Page 256 of 260  Page

**LA Alliance Milestone Goals**

| Time Period | Citywide Milestone Period | Citywide Aggregate Milestone | CD 1 | CD 2 | CD 3 | CD 4 | CD 5 | CD 6 | CD 7 | CD 8 | CD 9 | CD 10 | CD 11 | CD 12 | CD 13 | CD 14 | CD 15 | Total by CD | Aggregate by CD Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| July - Dec 22 | 800 | 800 | 71 | 31 | 24 | 24 | 23 | 45 | 42 | 38 | 83 | 40 | 48 | 27 | 66 | 184 | 54 | 800 | 800 |
| Jan - Jun 23 | 1,000 | 1,800 | 88 | 38 | 30 | 30 | 29 | 56 | 52 | 47 | 103 | 50 | 60 | 33 | 82 | 235 | 67 | 1,000 | 1,800 |
| July - Dec 23 | 1,000 | 2,800 | 88 | 38 | 30 | 30 | 29 | 56 | 52 | 47 | 103 | 50 | 60 | 33 | 82 | 235 | 67 | 1,000 | 2,800 |
| Jan - June 24 | 1,250 | 4,050 | 110 | 48 | 37 | 38 | 37 | 70 | 65 | 59 | 129 | 62 | 75 | 41 | 102 | 293 | 84 | 1,250 | 4,050 |
| July - Dec 24 | 1,250 | 5,300 | 110 | 48 | 37 | 38 | 37 | 70 | 65 | 59 | 129 | 62 | 75 | 41 | 102 | 293 | 84 | 1,250 | 5,300 |
| Jan - June 25 | 1,500 | 6,800 | 132 | 57 | 44 | 45 | 44 | 84 | 78 | 70 | 155 | 75 | 90 | 50 | 123 | 352 | 101 | 1,500 | 6,800 |
| July - Dec 25 | 1,500 | 8,300 | 132 | 57 | 44 | 45 | 44 | 84 | 78 | 70 | 155 | 75 | 90 | 50 | 123 | 352 | 101 | 1,500 | 8,300 |
| Jan - June 26 | 1,500 | 9,800 | 132 | 57 | 44 | 45 | 44 | 84 | 78 | 70 | 155 | 75 | 90 | 50 | 123 | 352 | 101 | 1,500 | 9,800 |
| Totals: | 9,800 | 9,800 | 863 | 374 | 290 | 295 | 287 | 549 | 510 | 460 | 1,012 | 489 | 588 | 325 | 803 | 2,296 | 659 | 9,800 | |

**Exhibit J**
**Page 74**

HYDEE FELDSTEIN SOTO, City Attorney (SBN 106866)
DENISE C. MILLS, Chief Deputy City Attorney (SBN 191992)
SCOTT MARCUS, Chief Assistant City Attorney (SBN 184980)
ARLENE N. HOANG, Deputy City Attorney (SBN 193395)
JESSICA MARIANI, Deputy City Attorney (SBN 280748)
200 North Main Street, City Hall East, 7th Floor
Los Angeles, California 90012
Telephone: 213-978-6952
Facsimile: 213-978-7011
Email:  Scott.Marcus@lacity.org

Attorneys for Defendant
CITY OF LOS ANGELES

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. CV 20-02291 DOC (KES)<br><br>**JOINT STIPULATION TO RESOLVE MOTION FOR ORDER RE: SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS**<br><br>Date:   April 4, 2024<br>Time:  9:00 a.m.<br>Courtroom:  1<br><br>**Hon. David O. Carter**<br>**United States District Judge** |

Plaintiffs LA Alliance for Human Rights and Defendant City of Los Angeles (collectively, the "Parties") respectfully submit the following stipulation to resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions [Dkt. No. 706].

The Parties further stipulate to the following facts:

1.    LA Alliance, represented by Elizabeth Mitchell and Daniel Conway, met with the City, represented by Scott Marcus, David Michaelson, and Mercedes Marquez, on March 8 and again March 15, 2023 to discuss the City's encampment milestones.  On March 15, 2023, the City—through then-Chief Housing and Homelessness Officer Mercedes Marquez—stated that the City had plans intended to come into compliance with Section 5.2(ii) and (iv).  Specifically, Chief Marquez stated that the City had already put out an RFQ (Request for Qualification) for service/outreach providers, expected to be "fully staffed" with an assigned service/outreach provider for each district by July 1, 2023, and planned to "have each district fully assessed" (which was described as identifying the numbers of unsheltered PEH, plus a description of the needs of various groups, including an estimate of the number of individuals with serious mental illness and substance use disorder, in each district) by September 30, 2023.  Ms. Marquez promised that once that effort was complete, the City would then provide the LA Alliance its proposed encampment milestones and deadlines by October 1, 2023.

2.    Elizabeth Mitchell summarized the meeting in an email thereafter, directed to Scott Marcus, Mercedes Marquez, and David Michaelson:

> In our last meeting we talked about the RFQ that the City has put out for a list of qualified service/outreach providers, and that the City expects to be fully staffed with the District's chosen providers by July 1 . . . . We also discussed that the City could commit to having each district fully assessed and get us a list of proposed milestones and deadlines within 3 months thereafter (October 1).

1

3. Relying upon the promises of the new mayor's representative, and extending a good faith opportunity to a new administration, LA Alliance agreed to the extension. Mr. Marcus, on behalf of the City, confirmed the request for extension and agreed the City would provide district-specific encampment milestones by October 1, 2023.

4. Although the City did issue the RFQ in January 2023 and received proposals by March 2023, the City did not finalize the RFQ process. The City did not have each district fully assessed to help establish appropriate milestones as the City had committed to on March 15, 2023. Nor did the City inform the LA Alliance or its counsel when the RFQ plan changed. Two days after October 1, the City emailed its "Encampment Engagement, Cleaning, and Resolution" proposal that did not contain any proposed district by district deadlines or milestones at all.

5. The parties further met and conferred on the encampment milestones on October 13, 2023, at which time the City informed LA Alliance, for the first time, that the City did not complete the RFQ process, never hired preferred service/outreach providers for encampment reduction in each district, and had not had each district assessed.

6. LA Alliance brought the City's non-compliance with Section 5.2 (ii) and (iv) to the attention of Special Master Martinez on October 19, 2023. Special Master Martinez ordered the parties to continue to meet and confer, which they did. Still unable to agree on encampment milestones required under the Agreement, LA Alliance requested the Court resolve the matter. The Court convened the parties on December 14, 2023, at which time the City expressed interest in adopting LA Alliance's milestone number of 9,782. The Court requested that the City provide revised milestones by December 29, 2023. The City proposed milestones of 12,000 encampment reductions on December 29, 2023, but did not include milestones broken down district-by-district.

7. The parties met again on January 4, 2024, this time with the Mayor, the Mayor's Chief of Staff, Chief Castro Ramirez, Chief Administrative Officer Szabo, and

JOINT STIPULATION TO RESOLVE MOTION FOR ORDER
RE: SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS

others present.  Two days after this meeting, the City proposed encampment milestones of 9,800 (agreeing to and rounding up from LA Alliance's proposed number of 9,782) over the 5 year term of the Agreement, and included breakdowns of the milestones district by district.  In response, LA Alliance requested the City agree to 12,000 encampment reductions over 5 years or 9,800 reductions over 4 years, address specific encampments (Skid Row and Ave. 45), and to pay sanctions of $1 million.  On January 10, 2024, the City agreed to LA Alliance's demand for 9,800 encampment reductions—including district-by-district milestones—over 4 years, and rejected LA Alliance's other demands.

8.      The 9,800 encampment reduction plan and milestones were presented to the City Council on January 31, 2024, which approved them without delay.  On February 1, 2024, the milestones and deadlines agreed to on January 10, 2024, were sent to Plaintiffs' counsel.

Based on the foregoing facts, the Parties agree to resolve the Motion, subject to City Council approval, by stipulating that:

A.      The City agrees to pay for the Court-ordered audit [Dkt. Nos. 698, 700];

B.      The Parties agree to meet at least once a month to discuss any issues concerning the City's progress under the terms of the Settlement Agreement [Dkt. No. 421];

C.      The City agrees to pay the LA Alliance's fees and costs; and

D.      The Parties respectfully request the Court hold the hearing on the Motion in abeyance until the next scheduled hearing date when the Parties report back to the Court the City Council's action on this matter.

DATED: April 4, 2024

By: /s/ *Scott Marcus*
Scott Marcus, Chief Assistant City Attorney
Counsel for Defendant City of Los Angeles

By: /s/ *Elizabeth Mitchell*
Elizabeth Mitchell,
Counsel for Plaintiff LA Alliance for Human Rights