No. _____

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE CITY OF LOS ANGELES

CITY OF LOS ANGELES,

*Petitioner,*

v.

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

*Respondent,*

LA ALLIANCE FOR HUMAN RIGHTS ET AL.,

*Real Parties in Interest.*

From the United States District Court
for the Central District of California
Case No. 2:20-cv-02291 | The Honorable David O. Carter

## APPENDIX TO PETITION FOR A WRIT OF MANDAMUS AND EMERGENCY MOTION FOR IMMEDIATE STAY UNDER CIRCUIT RULE 27-3 (VOLUME 2 OF 7)

Hydee Feldstein Soto
Valerie Flores
Arlene N. Hoang
Jessica Mariani
CITY ATTORNEY'S OFFICE
200 North Main Street
City Hall East, 6th Floor
Los Angeles, CA 90012
213.978.7508

Theane D. Evangelis
Marcellus McRae
Bradley J. Hamburger
Daniel R. Adler
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197
213.229.7000
tevangelis@gibsondunn.com

*Counsel for Petitioner City of Los Angeles*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | CASE NO: 2:20-CV-02291-DOC-KES |
| Plaintiffs, | CIVIL |
| vs. | Los Angeles, California |
| | Thursday, June 6, 2024 |
| CITY OF LOS ANGELES, ET AL., | (1:39 p.m. to 3:26 p.m.) |
| Defendants. | |

STATUS CONFERENCE RE MOU

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**                     CONTINUED ON PAGE 2

For Plaintiffs:              ELIZABETH A. MITCHELL, ESQ.
                             Umhofer Mitchell & King
                             767 S. Alameda Street, Suite 270
                             Los Angeles, CA 90021
                             213-394-7979

For Defendants:              JENNIFER M. HASHMALL, ESQ.
                             Miller Barondess, LLP
                             1999 Avenue of the Stars, Suite 1000
                             Los Angeles, CA 90067
                             310-552-4400

Court Reporter:              Recorded; CourtSmart

Courtroom Deputy:            Karlen Dubon

Transcribed by:              Exceptional Reporting Services, Inc.
                             P.O. Box 8365
                             Corpus Christi, TX 78468
                             361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES FOR:          (CONTINUED)


Defendants:              LAUREN M. BRODY, ESQ.
                         Miller Barondess, LLP
                         1999 Avenue of the Stars, Suite 1000
                         Los Angeles, CA 90067
                         310-552-4400

                         ARLENE N. HOANG, ESQ.
                         JESSICA MARIANI, ESQ.
                         Los Angeles City Attorney's Office
                         200 N. Main Street, Room 675
                         Los Angeles, CA 90012
                         213-978-6952

                         VALERIE FLORES, ESQ.

Intervenor:              SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983


Also present:            PAUL WEBSTER
                         CA Controller

                         SPECIAL MASTER MICHELE MARTINEZ

                         KENNETH MEJIA

                         ANTHONY PEREZ

                         MATT SZABO

                         CHRISTIE SWISS

                         DR. VA LECIA ADAMS KELLUM

**3**

**Los Angeles, California; Thursday, June 6, 2024; 1:39 p.m.**

--oOo--

THE COURT:  I apologize for the lateness.  We had a judges' meeting and it went forever.  So we're back on the record with my apologies.

All right.  For the City and the County, have you been able to discuss these remaining issues?

MS. HASHMALL:  Your Honor, I think we were asked to put our appearances back on the record for the afternoon session.  So I figure I'll start.  Mira --

THE COURT:  I couldn't hear you.  I'm sorry.

MS. HASHMALL:  We've been asked to put our appearances back on the record for the --

THE COURT:  Oh, we have?

THE CLERK:  Yes.

THE COURT:  Oh, because we have a different court reporter.  Okay, well thank you.  And you can make your reappearance then.

MS. MITCHELL:  Thank you, Your Honor, Elizabeth Mitchell on behalf of LA Alliance and here with me is also Paul Webster on behalf of LA Alliance as the Executive Director.

MS. MYERS:  Shayla Myers on behalf of the Intervenors.

MS. HASHMALL:  Mira Hashmall for the County of Los Angeles.

EXCEPTIONAL REPORTING SERVICES, INC

**4**

**MS. BRODY:** Lauren Brody for the County of Los Angeles.

**MS. HOANG:** Arlene Hoang, Deputy City Attorney for Defendant City of Los Angeles.

**MS. MARIANI:** Jessica Mariani, Deputy City Attorney for City of Los Angeles.

**MS. FLORES:** Valerie Flores, Chief Deputy City Attorney for the City of Los Angeles.

**THE COURT:** Once again, just the ability to verify that these fields are sufficient, are you able to do that?

**MS. MARIANI:** Your Honor, we spoke at the break and we think it would make sense for the County to provide an update on this first.

**THE COURT:** All right, sure. Follow up, please. Thank you.

Michelle.

**MS. HASHMALL:** Thank you, Your Honor. I just thought it might be helpful to put in context what HMIS is and how this issue relates to the County settlement agreement. So as the Court is aware, HUD-mandated funding has to be accounted for with regards to resources that are in a case management system. That's what HMIS is. It's in effect across the country and while local agencies have some discretion to customize it, it's really a matter of a system that captures how HUD funding is being utilized on the ground.

**EXCEPTIONAL REPORTING SERVICES, INC**

**5**

With regards to this issue, the County has a reporting obligation under its settlement agreement to account for referrals from city-funded outreach teams.  And as we got ready to do the last quarterly report, it became clear that there had been a disconnect in capturing those referrals.

And so the City, the County, LAHSA, folks that are really involved in this on a day-to-day basis got together and figured out, what can we do?  Is there a way that we can systemize those referrals, capture them so the County can provide the data that is called for for its reporting obligations and its own?

THE COURT:  Okay.

MS. HASHMALL:  HMIS system was customized and that was a work group of -- "work group" is probably too formal.

THE COURT:  Okay.

MS. HASHMALL:  I don't think it was that fancy but they put their heads together and they created a system where you can capture your referral.  An outreach -- a City-funded outreach worker can now identify where they're referring and which County department is obtaining the referral.  And then the County is going to be able to capture that data and as part of its reporting obligation, identify outcomes, dispositions.

Now, every report is a snapshot.  So the new fields which capture these referrals were the subject of trainings and they are available online.  Over 600 individuals sat through

**EXCEPTIONAL REPORTING SERVICES, INC**

**6**

these trainings and these are the outreach workers who are actually going to use it.  They are the individuals who really use it.

THE COURT:  Just a little slower.

MS. HASHMALL:  These are the individuals who really need to understand how the fields work and they went through the training and they're going to use them.

Now, there's going to be a second-quarter report and that report is now -- because of this new referral reference, is going to allow the County to provide information about the referrals and the disposition.  You'll see that, Your Honor, in the next report the County submits and that's going to, I think, not only satisfy our reporting obligation but really be an informative measure of the work the County is doing and the extensive services that are being provided in connection with the settlement agreement.

So we are happy on the progress of that.  It's up and running.  Departments and personnel and outreach workers participated in the training.  It's available online and it's going to have that data that allows us to report as required under our settlement agreement.

Does the Court have any questions for me?

THE COURT:  Are these fields sufficient?

MS. HASHMALL:  I think it is, Your Honor.

THE COURT:  Okay.

**EXCEPTIONAL REPORTING SERVICES, INC**

7

**MS. HASHMALL:** We're going to do this reporting on -- in July and if there are any glitches, if there's any utilization quirks, I think -- you can do the training, right? But these individuals are going to have to use it and as the real-time users identify concerns, you sort of have to get things up and running and then you can tweak them if it's not working as contemplated.

I believe there's been a lot of thought to this and I think it's going to work efficiently.

**THE COURT:** I'll ask the City if these fields are sufficient.

**MS. MARIANI:** Your Honor, to Ms. Hashmall's point, once they've submitted their quarterly report, which will show the actual reporting, how it plays out in the field and then the dispositions as well so that we can actually see from HMIS what is captured is -- as I understand it, it's as people enter in information, that's captured in HMIS but the actual dispositions are not.

So to actually see what is reported by the County, that's when we'll know if these fields have been sufficient.

**THE COURT:** Has the City received training in the HMIS field?

**MS. MARIANI:** My understanding is the outreach workers that are funded by the City have at least to some extent but what hasn't yet occurred is the people in this room

**EXCEPTIONAL REPORTING SERVICES, INC**

**8**

maybe have been trained yet.  I think there might be a specialized training that's going to occur but -- and they've also made available the training on the website.

THE COURT:  Yeah.  So what I'm absorbing is that we really haven't had the field training yet and -- is that correct?

MS. MARIANI:  Well, I think the outreach workers have been trained.  It's just the other City officials and non-outreach workers have not yet had that opportunity.

THE COURT:  And let me take public comment also but let me take comment first of all from the parties involved. I'd like to have -- LA Alliance, if you want to make any comments concerning this --

MS. MITCHELL:  Yes.

THE COURT:  -- and then share that on behalf of the Intervenors if you have any comments.

MS. MITCHELL:  Thank you, Your Honor.  Our question -- our main question is whether there's a loop-back to the outreach workers and/or City workers after information is inputted.  So after request for service or put in through HMIS, is there some mechanism by which those outreach workers or City workers or whomever can access that, see what these dispositions are on a real-time basis for individuals so that we -- the outreach workers know how to assist the individuals or how to follow up appropriately.

9

THE COURT:  So, Mira, on behalf of the County or the City, your response?

MS. HASHMALL:  I'm happy to speak on that, Your Honor.

THE COURT:  Please.

MS. HASHMALL:  So not everyone who works for the City of Los Angeles is going to be able to have access to HMIS. It's not a free-for-all.  It is a secure online data system that tracks personal patient information, HIPAA-protected information for people experiencing homelessness.

HUD sets standards that significantly restrict access to the disposition of some of these referrals and that is particularly true, Your Honor, in the context of substance use disorder.  The law truly restricts any information being shared about an individual's treatment relating to substance use disorder and other things and that's a matter of privacy and security.

So authorized users are trained on what they can or cannot see in HMIS.  The average employee isn't and that's not something the County can change.  That's a function of Federal law.

THE COURT:  City, any comment?

MS. MARIANI:  Not at this time, Your Honor.

THE COURT:  Okay.  All right.

MS. MITCHELL:  Your Honor, can I follow up with that?

EXCEPTIONAL REPORTING SERVICES, INC

**10**

**THE COURT:** Oh, please.

**MS. MITCHELL:** So I just want everyone to understand and I recognize that not everyone in the City has access and probably appropriately so but what about the outreach workers that specifically made those referrals? Can they then see what the disposition is so that they know, should I continue following up with this person, had they been accepted into a detox bed or something like that so that we have a full loop of communication and we can make sure individuals are getting helped appropriately?

**THE COURT:** Uh-huh. Yeah.

**MS. HASHMALL:** Your Honor, I'm not sure I understand the question. So you --

**THE COURT:** Could you repeat it a little bit more slowly for the court reporter?

**MS. MITCHELL:** Sure. So recognizing that not all City employees have access to it and probably appropriately so, what about the outreach workers that are making the referrals at least to the extent of understanding whether services are being provided, whether the individual has been accepted into a bed at some other facility so that we can make sure that individuals are being helped appropriately?

**MS. HASHMALL:** So after an outreach worker has inputted a referral, are they able to see an outcome? Is that your question?

EXCEPTIONAL REPORTING SERVICES, INC

**11**

MS. MITCHELL: Correct, ultimately.

MS. HASHMALL: Okay. So, ultimately, all of the outcomes are going to be reflected in the County's reporting relating to the referrals. Right. That is the reason that this HMIS was modified to capture those referrals so that we could report out under our settlement obligation the number of contacts, the result of those contacts, the types of service requests and the agency that provided services, the request per individual and their location where the request was made.

That is a provision of our settlement agreement. This data was not being provided to the County. So it couldn't comply with that part of the provisions. Now it can. Now, does that mean that Bob Outreach Worker on any given day can put in a person's name and find out where they happen? I don't know that it's going to have that type of individualized real-time access information but ultimately the reports are going to generate the conclusion of each referral.

MS. MITCHELL: So I recognize that the reports and particularly the County reporting that happens on a quarterly basis but those are -- that's kind of a macro-level, right, the high-level numbers as I understand it. And so if we're talking about help for individuals on the street, the outreach worker will not have an opportunity to access the outcomes or the disposition for their help request through HMIS. Is that --

MS. HASHMALL: So that sounds like an issue that's

**12**

not in our settlement agreement but I will ask our subject

matter experts and I'll get back to you about that question.

**THE COURT:** And let me come back to where I started

inartfully this morning about this whole area of substance

abuse, not recuperative care. That is a huge dollar item and

whether the estimate is 40 percent or 60 percent or a

combination of mental illness, there, once again, "Unless the

project funder requires documentation for

recordkeeping purposes, clients are not required to

provide documentation of the substance abuse

disorder," et cetera.

**MS. MARTINEZ:** This is on the HUD exchange.

**THE COURT:** Huh?

**MS. MARTINEZ:** This is on the HUD exchange.

**THE COURT:** Yeah, this is HUD. So the end result is

we are losing a huge amount of documentation and I'm just

wondering why we don't have the State at the table because this

duality of private providers not having to come into our HMIS

system billing Medi-Cal with LAHSA still having this person on

the book is really costly. So I leave that to all of you but

there's a missing party here. It's the State.

**MS. MITCHELL:** And we don't think that the Court is

wrong on that issue but we're concerned about really the

granular level, right, from -- when you have an outreach worker

who has 15 people that they've referred to substance use

**13**

disorder treatment --

THE COURT:  Right.

MS. MITCHELL:  -- and there is no loop-back so the outreach worker can understand what happened to that referral, there's no way to maintain accountability both for the outreach worker and for, frankly, the County and the service providers to make sure that someone is actually getting help on the street without that loop-back mechanism.

THE COURT:  So here's my proposal.  We all want to make this work.  We want to make it better.  Right?  Okay.  When do we come back and see how this is functioning rather than just having this conversation?  What's our tickle or report-back date where we see --

MS. MARTINEZ:  We need a suggestion for --

THE COURT:  Hold on.  Michelle is about to make a suggestion but she was going to whisper it to me.  So she can just -- transparency is the key.  Make your suggestion transparently.

MS. MARTINEZ:  No, I just -- I said I would make a suggestion since there are some pending questions that the Alliance has and, obviously, the City that maybe we can have a learning session as we did not too long ago with myself and Judge Birotte and be able to help facilitate and figure out the appropriate and best approach to help the County and LAHSA and have the City understand and the Alliance understand moving

**EXCEPTIONAL REPORTING SERVICES, INC**

**14**

forward, how can we better improve not just the system but the feedback loops and the communication between all parties.

THE COURT:  Okay.  Now, having said that, I want a definite date where there's pressure on people to get this done rather than the usual -- oh, sorry -- rather than drifting.

MS. MARTINEZ:  If I may --

THE COURT:  So I want you all to discuss a date rather than me arbitrarily imposing a date but I want to come back together and see how this is coming to fruition or not. So why don't you just have a conversation so I don't arbitrarily impose a time but we're going to reconvene.  I would suggest sometime in August.  I'll be here on some other cases anyway.

MS. HASHMALL:  Your Honor, I think August is probably a reasonable timeframe because I think --

THE COURT:  Well, talk to your colleagues.  Just -- I trying not to choose a date.  Kids are going back to school. Just give me a date.  Otherwise, I'm going to throw out a date and that's the end of it.

MS. HASHMALL:  Well, so our reporting obligation is the end --

THE COURT:  Ta, ta -- yes.  Would you walk towards Mira?  Some of you have been able to walk towards.  It's amazing.  It's called a quiet conference and just talk to each other.

EXCEPTIONAL REPORTING SERVICES, INC

**15**

MS. MYERS:  And, Your Honor, I assume the Intervenors will be involved as well.  Thank you.

THE COURT:  And just give a suggestion.  Don't --

Shayla, would you walk towards them also?

MS. MYERS:  Sure.

THE COURT:  Thank you.  All right, it's called "cooperation."  It'll save a lot of paperwork back and forth. Just come up with a date.

MS. MARTINEZ:  Just suggest your date and --

THE COURT:  Let them tell me the date.

Can you get the City involved?  Louis (phonetic), come on up, Louis.  Joint the family here and just give us a date so that we have something that we have to do on each occasion rather than just talking about the problem without results.

**(All attendees in discussion)**

MS. HASHMALL:  Your Honor, how does August 29th look on your calendar?

THE COURT:  It looks absolutely perfect.  If all of you are available, I'll be available.  Fair enough?

MS. HASHMALL:  Okay.  So if I may, before we move to other topics --

THE COURT:  And August 29th, what time?  9:00 o'clock?

MS. HASHMALL:  Yes, Your Honor.

**EXCEPTIONAL REPORTING SERVICES, INC**

**16**

THE COURT:  9:00 o'clock, folks?  9:00 o'clock.

MS. SPEAKER:  Thank you, Your Honor.

MS. HASHMALL:  I just -- before we move to a different topic and I'd like to, I just -- I want to reiterate that the County and LAHSA really worked with a coalition of partners in connection with rolling out this new HMIS field training and implementation.

THE COURT:  Right.

MS. HASHMALL:  It was the LAHSA Homeless Engagement teams, the City-funded MDTs, Council District's staff, Hope the Mission, the Downtown Women's Center, the Midnight Mission, Union Station, Volunteers of America, Union Rescue Mission, the Weingart Institute, PATH and many more.

THE COURT:  Okay.

MS. HASHMALL:  So we are really trying to bring all of the important stakeholders into this training and implementation process and I think it's -- we're excited to see how it rolls out.

Now, the other reason that we are here, I believe, is because the Court had questions about the County's website. And I just -- I want you to know that the County has been working intently to upload on almost like a weekly basis these invoices and we're committed to do it monthly but we are also hoping to beat that commitment on a regular basis.

And so the date of the invoices not necessarily

EXCEPTIONAL REPORTING SERVICES, INC

**275**

**17**

indicative of when it was reviewed for HIPAA issues, processed and uploaded and so we have actually done a tweak on the County's website.  So you can see without having to guess how recent the update has been and we think that helps with usability and we think it also helps with everyone understanding whether anything has changed since the last time they looked.

Our goal for this website is to make it clear and make it accessible.  And those invoices are going to be on different timelines just because the departments get their invoices on different timelines.  But, again, we're going to be uploading them on an ongoing basis.  And I think as it continues, it's going to continue to be refined based on user feedback.  So I'm encouraged about that and any suggestion that the County hadn't made progress on that since the last hearing is just not accurate.

THE COURT:  Okay.

MS. HASHMALL:  We have and we will continue to do so.

Now, the other thing that dovetails with that is the verification process.  The Court has expressed concern about how carefully we are scrutinizing the invoices.

THE COURT:  Uh-huh.

MS. HASHMALL:  Are we getting what we paid for --

THE COURT:  Uh-huh.

MS. HASHMALL:  -- I think is the Court's concern.

EXCEPTIONAL REPORTING SERVICES, INC

**18**

And so we really dug into that and I kind of want to talk about it on a macro-level and then if the Court has questions, I'm happy to drill down.

So the first thing is the contract requires them to do what they say they're going to do and to account for it with specific documentation.  Then beyond just their obligations under the agreements that the providers have with the County, there are department-specific billing practices.

So you do the work and then you submit the invoice. And the departments are getting real-time documentation and that's required and there are also verification systems that are in place tailored to, is it an interim-housing bed or is it a different type of resource?  There are accountability and transparency requirements built into the real-time use.

For example, DMH is not going to pay for a bed that's not being used for a DMH-referred client.  So there are systems in place to make sure that the providers are providing that data in real-time.

Then there's an additional layer of review and accountability.  The key departments that provide these resources through the County, DHS, DMH, they have what we call "contract management teams" in place.  DPH has it for SAPC as well.

And so these are teams that are specialized in testing compliance with the contract terms, verifying the

accuracy of the invoices that are provided.  I'm happy to go into more detail but this is -- these are highly trained individuals who are checking compliance beyond what is the real-time reporting on the vendors' side.

Then there's another layer.  The County's Auditor/Comptroller Department is, again, essentially the watchdog for the County's finances and so they have specialized teams that conduct audits, program audits, department-specific resource audits and that is a third layer on top of the real-time reporting and on top of the contract management teams that are embedded in the key departments.

And then, finally, there is a fourth layer and that's Federal and State law, Your Honor.  These contractors by contract and by law are subject to significant penalties if there's any fraudulent billing.  That's the Federal and State False Claims Act and other law that is sort of the ultimate check with very significant financial consequences.

So I'm happy to sort of walk through in more detail as to each department, how that accountability works but that's sort of it on the macro-level.

**THE COURT:**  Thank you.

**MS. HASHMALL:**  Thank you.

**THE COURT:**  Appreciate it.

All right.  Any more questions you'd like to ask, Ms. Mitchell?  If so, this is a good time.  I mean, we're all

getting together trying to make it better.

**MS. MITCHELL:** Your Honor, we still have significant issues with the report -- the County's report. We can talk about that today. We can continue meeting and conferring if that's helpful.

**THE COURT:** Yeah, why don't we come back to that in just a moment?

**MS. MITCHELL:** Thank you.

**THE COURT:** That's -- coming right back to that. I promise you.

On this issue with the HMIS fields.

**MS. MITCHELL:** I have no further questions on this issue, Your Honor.

**THE COURT:** All right. Shayla?

**MS. MYERS:** Yes, Your Honor. We have not actually seen the HMIS fields. I know at the last meeting -- we had a meeting here in chambers. We thought that we would get them. We have not seen them. So we would love to take a look at them and then obviously be involved in --

**THE COURT:** Now, how do you feel about that? This is a negotiation, quite frankly, between the County and the City. What about including Ms. Myers? Any concern?

**MS. HASHMALL:** So we can -- I will email to Ms. Myers personally a link to the implementation program and the training.

**EXCEPTIONAL REPORTING SERVICES, INC**

21

MS. MYERS:  Okay.

MS. HASHMALL:  And we'd love her input.

THE COURT:  Okay.  Okay, Shayla?

MS. MYERS:  Thank you.

THE COURT:  Have any more questions?

MS. MYERS:  No, that's it.

THE COURT:  All right.  Public comment then.  Anybody in the public, as you're eventually going to be the consumers of this especially as the HMIS feels and it's your money.  Anybody want to speak?

Yes, sir?

MR. WESTCOLL:  The boss is -- the people don't even want to take their bosses because the bosses are --

THE COURT:  Come on up for a moment.  We can't hear you.  I'm sorry.  My apologies.

MR. WESTCOLL:  See something, say something.  How are you doing, Judge Carter?

THE COURT:  Very good, sir.

MR. WESTCOLL:  All right.

THE COURT:  And what's your name?

MR. WESTCOLL:  My name is Ricardo Westcoll (phonetic) --

THE COURT:  Thank you.

MR. WESTCOLL:  -- known as Rick.

THE COURT:  Thank you.

EXCEPTIONAL REPORTING SERVICES, INC

**22**

MR. WESTCOLL: Okay, yes. Some of the people, they don't trust the vouchers. And some of the people in the street don't trust none of the entities that's passing out vouchers. Some people say they give their information to somebody else to become them in another city. Then also I'm seeing where they're talking about they're bringing vouchers out there. I don't see nobody coming around bringing no vouchers. I don't see nobody coming around talking about beds or none of that.

THE COURT: Section 8.

MR. WESTCOLL: And people are just not trusting LAHSA. People are concerned and they're missing -- they're saying they got ghost beds. Anybody know what a "guest bed" is? Whereas three people get in the bed in one day. How do you get in the bed three -- three people get in bed one day and I believe it's about $900 a whack. And I'm, like, where are all these people at? They're gone.

And then the building that they're in, they're mold infested. Who will want to stay in a brand new building where the water is running and there's no control over the water in the building? You call the police to do something and they can't do nothing because they're too busy. And that's okay.

I've been waiting 21 years for a Section 8 voucher. I started from Wall and Fifth Street.

THE COURT: Are you on Wall and Fifth?

MR. WESTCOLL: Yeah, that location they used to give

**EXCEPTIONAL REPORTING SERVICES, INC**

**23**

out boxes over there at the ward.

THE COURT:  I'll see you Sunday.  You'll be at Wall and Fifth?

MR. WESTCOLL:  I'm going to be at Wall and Fifth, too.

THE COURT:  See you Sunday.

MR. WESTCOLL:  San Pedro and Winston (phonetic) really.  So you can catch me on San Pedro and Winston.  But a lot of people are not trusting these people.  They're running from them because of people that are selling vouchers and they had other people -- and I live in apartments -- that was right along with lots of selling the vouchers, including the Police Department.

THE COURT:  Okay.  Sir, I want to thank you very much.

MR. WESTCOLL:  Thank you.

THE COURT:  Now -- okay.  Kevin, come on up.  And use the microphone.  Use the mike.

MR. CALL:  Kevin Call (phonetic), Skid Row's mayor.  You know, it's a shame that I live in a city that they look around and see that all these agencies is supposed to be out here helping the people and they ain't doing nothing to help the people.

You know, I got a lot of people in this courtroom here who spend a lot of their energy out here helping the

**EXCEPTIONAL REPORTING SERVICES, INC**

**24**

people who don't even get paid to help the people but they're out here on Skid Row.  I encourage the County, the State, the -- all of them to come out to Skid Row.  Put your boots on the ground.  I want you to come out to Skid Row and see what we do without no money.

Here is the people who get millions of dollars to do the job who just ain't doing the job.  They told him just to call Skid Row mayor, the manager at the City office.  So shall it be because I'm intending to expose those organizations that's supposed to be standing up for the people who ain't standing up for the people.  That mean the money is not hitting the streets here in Los Angeles.  It is not hitting the streets.

I'm at Skid Row every day, day and night.  So can't nobody come tell me, LAHSA is doing this.  LAHSA ain't doing nothing.  LAHSA is doing exactly what they say they doing, is making people a lot of promises when they ain't keeping none of them.  And if I continue to be at Skid Row as the Skid Row mayor, I'm intending to expose them until we can do some changing here in this city.

A lot of people are lining their pockets up but they ain't doing the job.  I mean, people are talking about it.  But I want the people that's going to do about it come to Skid Row.  Put your boots on the ground.  If you work for the City or the County, I want to see you down on Skid Row to show us that you

**EXCEPTIONAL REPORTING SERVICES, INC**

**25**

care. People that care show up. All the people that work for me, they're not getting a dime out of it but they show up because they care, not because they have to. People say, oh, I don't like Skid Row. There's a lot of stuff.

There sure is because I've been in Skid Row and I know what goes on in Skid Row. What the City tell me, Kevin, we're doing the best we can. I said, if this the best that the City can do, Los Angeles is in trouble. This is almost like a third-world country when you go to Skid Row. Makes me cry sometime, make me cry for the city to be like this.

How do we allow our kids to live on the Skid Row in any city? Not only in this city but in any other city across America? Children, infants living in tents, that's not too good for the City. But I will continue to expose it knowing this is happening. Somebody better be getting to do the work because I'm going to be watching and I'm not sleeping and I've got other people watching.

So with that today, I hope that we can get a handle on this thing and begin to get this thing right because something is happening. Somebody not doing the job. And you say you're going to the job, do the job. And I'm going to expose it. Know that I'm here at the City. I'm going to expose it so we can begin to do the work. The work need to be done. The people say, we care, but they're not caring.

We need the City to come out and see what's going on

**EXCEPTIONAL REPORTING SERVICES, INC**

**26**

so they can see that the people, their life is changing because of what we think it should be here in the City.  People talk about it but we want somebody going to be about it.  And that's who I am, the Skid Row mayor and I will be a Skid Row mayor from here on out.  So hopefully we can get ready to get the job done and, again, see what we can do to make this city a better city for people to live in.

THE COURT:  I didn't think I was going to show this today to all of you.  I was waiting but I am.

Terry, come on up.  And you have something to say?

MR. TERRY:  Excuse me.  Dewey Terry.

THE COURT:  No, use the mike.  Okay?

MR. TERRY:  I'm Dewey Terry.  I work on Skid Row.

THE COURT:  Terry, stand over towards the mike.

MR. TERRY:  I work on Skid Row.  I'm down there 5:00 in the morning, every morning, seven days a week.  Everybody got their phones in their hand.  They're not paying attention.  They got kids on the street.  You've turned your back on these kids.  I see them every day.  The town is a safety for women that be raped every night.  I see it.  Old women, they can't find no place to stay.

You asked where LAHSA at?  LAHSA don't come until the *LA Times* come.  Excuse me.

THE COURT:  That's okay.  It's government property.  We'll replace that.  Don't worry about it.

**EXCEPTIONAL REPORTING SERVICES, INC**

**MR. TERRY:** See, we sitting here and you're playing games with the paper game. That's not America. America is built on "We the people." When did you stop being, "We the people"? When did you stop doing civil rights? When did you start turning your back because you got a paycheck and you're just passing the buck on?

This man comes. We give out blankets like our donors. I don't get no money from the City. We give out blankets, socks, shoes. Donors give it, 900. I gave out 2,000 shoes. Blankets when it's raining. They're dying in front of the Midnight Mission. Hypothermia death, laying in the cold with the rats and everything else.

I have not seen the City down there unless there's a camera down there so they can take a photo. I don't see nobody want to be the mayor unless they want to be the mayor. That's the only time he going to come down there and give a 30-second commercial.

But we sitting here talking about money. I've got -- I had nine families. They all had children from El Salvador. That's where the bus came at. Yeah, you remember the bus from Texas? They was bringing them here and they was dropping them off in the Union Mission.

Then once they was in the Union Mission, guess what happened? They had to come out of there because they don't got no money to spend. So they come to the street. I had to make

Case 2:20-cv-02291-DOC-KES  Document 750  Filed 06/07/24  Page 28 of 82  Page ID #:21928

**28**

a place for them to be.  I had nine toddlers.  Here, I'll show you the pictures.  They're not just little kids.  They could be your kids, somebody you know.

But we sit here and we just talking about, well, that guy, he gave me a million dollars and, you know, where the money at?  They got a parking lot.  They ain't got nobody in it.  Cars are over there, safe thing.  There's nobody want to sit here and say, listen, Judge, you need an oversight for everything that you do because when you try to look out for them, there's ten other people that ain't looking out for nobody.

I'm down there every day.  I see it every day, 24 hours a day.  The community center, showers, bathroom, get your phone, get you some IDs.  Okay.  They got people down here working in the street.  Do you know how much trash they pick up every day?

**THE COURT:**  Uh-huh.

**MR. TERRY:**  7.5 tons of trash every day --

**THE COURT:**  Uh-huh.

**KEVIN:**  -- two times a day.  I know.  I was picking it up.

All right.  Then you turn around and you've got to give blankets out here.  Somebody is shaking like an old Chihuahua.  Right?  It ain't funny because it be women.  You are women.  You're supposed to stand up and make sure that a

**EXCEPTIONAL REPORTING SERVICES, INC**

women don't get raped down there.

I've got old people down there, old.  I have not seen one person other than jumping out of their car, take a picture, make a speech and take off.  You guys making 50, a hundred thousand dollars and you ain't been down there one time.  The only time you come down there, you -- whoever is in these districts need to come down there and walk down there without the police.  You ain't got -- you don't need the police.  Come down there and see what's going on.

But you're not doing it.  You're making pictures on the bridge on holidays.  And I don't see nobody down there.  I'm down there every day.  I see Rick Caruso.  Yes, I've seen him, talked to him, shook his hand.  Everybody that wanted to be a mayor, I shook their hands.  What you going to do?

Teens are -- they got teens at Urban Alchemy running around.  They're picking up trash.  They got crime stations just for to keep the people from -- look, we give out coffee, cocoa, water, blankets, socks, hats.  Whatever you need, we try to provide.  Right?  Start dealing with some of them groups down there that's really putting it out.  Come down there and talk to the real people, not the ones that want to put -- I just want an endorsement.  I just want some of your money.

I don't want nothing from you.  I want you to bring some trucks down there and then start doing it.  I want LAHSA -- don't come around there when they're tearing up the street

30

because that's the only time you come.  That's the only time they come.  I've got three families over there right now LAHSA been supposed to been put up.  They're still there.  I got a little bitty boy I just gave some toys to, like some shoes, too.  A little bitty boy -- I mean, a little bitty boy, your grandson, your son, you know, you young girls that got kids.

Come on now.  You've been in this place too long talking about the same old thing.  You put the blame game on this person, put the blame game on that -- but nobody is standing up and say, hey, this is enough.  We're in America. When did we stop -- when did you stop putting your hand out? Tell me that.  Tell him that.

Don't wait for the TV camera to come.  That little boy get hit on the street over there where I'm at.  Where was the mayor?  It ain't going to the mayor because that's a little boy.  We stopped -- you know, moral fiber?  Don't lose that moral fiber.  You know, God looks at a lot of things.  And I know don't nobody want to go to hell and everybody want to go to heaven.  You better fix this.  This has been 30 years of you not doing what you're supposed to do when they didn't have a problem in Los Angeles about homeless.

You turn your back, building buildings and turned your back on the street literally, mental people.  They got a bunch of them in there.  No doctors, no psych doctors.  You're putting them in these tiny homes.  They're trying to transfer

Case: 26-784, 02/09/2026, DktEntry: 3.1, Page 32 of 225
Case 2:20-cv-02291-DOC-KES   Document 750   Filed 06/07/24   Page 31 of 82   Page ID
#:21931

**31**

them out of the tiny homes.  Some people stay in them tiny homes for two to three years.  Why are they staying there?  Because you're building all these buildings.  By law, they've got to have some kind of -- what you say, for people that have no money to --

**THE COURT:**  Yeah.

**MR. TERRY:**  -- get in there.

**THE COURT:**  Terry --

**MR. TERRY:**  What are you going to do?

**THE COURT:**  -- I'm going to show -- I intend to show some pictures today. I'm going to go ahead and show some pictures and --

Don, come on up, Don.

And by the way, folks, listen.  What you're hearing is what I'm hearing on the streets.  It doesn't mean that we're bad people and not trying.  But there's a real disconnect between -- hundreds of people on the streets tell me the same thing and that is whatever we're doing in court trying hard for all of us, it's not hitting the streets.

And (indisc.) start with it.  And we have Kevin starting with it.  The community -- you walk down the street and I don't care what we're doing here.  And I have talked to hundreds of people.  They're not wrong.  It's not hitting the streets.  That's what we've got to cure, okay, together.  I think that most of us are trying to do that, okay.

**EXCEPTIONAL REPORTING SERVICES, INC**

Don, whatever you'd like to say.  And it's good for us all of us to hear it because most of you won't go down to the street --

**MR. GARZA:**  I've lived in Skid Row for 25 years. I've been down there since 1999 and let me tell you something. This is the same game that's been played all this time but now it's elevated to the point where it's hundreds of millions of dollars, not just non-profits gas-lighting the City and the County saying, this is what we're doing when they're not doing it.  Now it's LAHSA and the social service providers and the City and the County gas-lighting the community telling us that they're doing something when they're not doing anything.

And let me tell you something.  I used to do everything I could, get close to politicians, try to get them elected, you know, work with LACAN, work against LACAN.  Then they come back and help me.

Skid row is a community, and we have a mission.  And let me tell you what that mission is because you don't understand that mission.  And this is the mission that this man is doing right now.  And he's on that mission because he gives a shit.

Let me tell you something.  I'd rather stand with somebody that gives a shit than somebody that doesn't.  And I'm going to say it like that.

But let me tell you what.  We do -- this is what

**33**

these people do.  The man they're walking (inaudible) this is what they do.

And I used to say it because I had hope that one day something was going to happen, that somebody was going to come along and be the one that was going to rescue us because I am one of the weaker ones.

I don't drink, I don't smoke, I don't use drugs, I don't do all of those things.  But I still suffer with a mental illness.  I still have PTSD.  I still have bad days.  So I try to make my forward, I try to wake (sic) my way back.

But let me tell you what I used to sell people.  The reason we do what we do is to keep people alive long enough so that help does come.  And let me tell you something, help has not come.

Politics that I learned when I was in -- going to college -- and I got to sit on an advisory board -- I learned what politics was.  And this is what politics is.

Number one, only show them what you want them to see.  That's number one.

And, number two, fighting over other people's money.  That's what politics is.  All they do is fight over other people's money.

The money not coming to the streets anymore.  This cognitive dissonance, this dissonance that's been created over these years by politicians, by the nonprofit service providers

**34**

telling me that this is what we're doing -- and I see it every day.

I used to walk out of my building and I used to thank God. And I say, I'm blessed. I'm going to tell you why I say I'm blessed. Because when I would turn the corner onto San Julian, somebody would either be in hundred degree heat under a blanket or in a coat dying. There was always somebody dying in skid row.

Think about it, 1999, that's -- don't give me these numbers about, you know, just five a day or only 5,000 people have died. Let me tell you something. I'm going to be honest with you. I went to war.

And let me tell you something, I'm going to be -- tell you the facts. In the City of L.A., I've got to say over -- since I've been here, I'm going to say 30,000 people have died on these streets.

People have been evicted, people have committed suicide because they're afraid to be evicted. People have committed suicide, OD'd because they're homeless.

And the other thing is, and I'm going to say it because I live there and I see it every day and I see the game that's played. When it comes election time, everybody wants to start moving everybody from the west side as close to downtown L.A. as possible. That's the game.

And what happens is what I'm hearing right now is

EXCEPTIONAL REPORTING SERVICES, INC

**293**

**35**

that everybody wants to come in.  And what I'm hearing is that we don't want people to languish in the streets.

But let me tell you something.  In the back of their minds, skid row, let's keep it off limits because skid row, we'll just go and let them languish in the streets and let them die in the streets.

And this is what I also used to tell people.  If people are dying in the streets of skid row, guess what?  Then actually it's doing its job.  That is sick and disgusting.

The children, skid row people, did not tolerate children in the streets.  We never tolerated people in the streets.

We actually had a person by the name of Big Mama.  We would ask her -- and even and Andy (inaudible) call her. There's a -- we have word that there's a woman down here, she's got a kid in the tent, we need you to come down here and create a relationship, try to get her out of that tent, try to get the kid inside.

All of a sudden we've got hundreds of kids in the streets.  Why is that tolerated all of a sudden?  That is not to be tolerated.

Mr. Judge, Mr. Honorable Judge, we need help.  I've been feeding people.  I'm tired.  I'm exhausted.  My body hurts.  I'm diabetic.  I'm going to the gym, I'm doing what I can to be strong to support you, to support the people that are

**EXCEPTIONAL REPORTING SERVICES, INC**

**36**

doing this.

I'm exhausted.  We're exhausted.  We need -- we want to rescue ourselves.  We have our advocates.  But we need -- I'm tired of trying to stay alive and keep people alive long enough for help to come, and help does not come.

**THE COURT:**  I wasn't going to show you some pictures today.  I was going to wait until later on.  But what you're sharing today I promise you, if you hit the street, you could line up person after person after person after person, and I can't go on that would say exactly the same thing to us.

I didn't plan this.  I didn't know that this was going to happen.  I'm telling you straight up.  I'm glad it did today because if we're not going to the streets, at least we're hearing it.

And I hope it's taking me and I hope it takes you out of our comfort zone because I tell you I don't know what the auditors are going to do.  It is not hitting the streets.

And so the money's flowing, it's going someplace.  I don't know where.  It's our job to make it better.  We've got to make it better, okay?

So we're going to show a couple things I didn't expect.  Why don't we just start with -- and then we'll describe the shooting into the car with the five kids in a moment, you know.

Sir, I'll be right with you, okay?  I promise you.

**37**

But just flip up a couple.  We'll start with just the walk.

Now, first of all, let's just take some (inaudible) out there.  See, the game -- the way the game used to be played is I'm a hype (phonetic).  I'm not a hype, by the way.  But I'm a hype hypothetically.  And I want some pizza.  And you give me my medical card.  I'm a middle provider.  I run up the bill.

Let's say some less than scrupulous people who are happy to bill (inaudible) medical services.  And if the pizza didn't do it, right, Don, --

**MR. SPEAKER:**  Right.

**THE COURT:**  -- (inaudible) $20 because I'm a hype and for $20 because I need a fix.  You give me your Medi-Cal card, I give you the $20.  I get my fix, you run up the bill.  That has been going on for a long time.

And all you have to do is go down to skid row and talk to people.  And you can say, oh, the first person is lying to you.  But after you got down to the fifth or fourteenth or fiftieth person, they're not lying to you, folks.

And, number two, I don't know what the auditor's going to do.  But I can tell you straight going in people are (inaudible) there every single day.

And (inaudible) critics out there, and you're getting billed unfortunately over at LAHSA for a lot of double-counting going on.

EXCEPTIONAL REPORTING SERVICES, INC

Case 2:20-cv-02291-DOC-KES   Document 750   Filed 06/07/24   Page 38 of 82   Page ID #:21938

**38**

And just talk to the community, if they'll talk to you, and find that out.  And it's been going on a long time.

So with all of our virtue here, what I'm saying is we're living a different lifestyle, we're not exposing ourselves, so I thank God that we actually heard that today.

I'm almost stunned that I did because I'm going to hear it Sunday again.  And by the way, if you want to meet Big Mama, she'll be there.

Okay.  Let's just put up some street stuff because maybe we're not going to ask you for a Medi-Cal card for a change.

So, Michael, where are you?  Now just go over to the lectern again.  I don't want a long speech but let's just go through some of the things that we see.

Well we see gangrene down there.  I've shown that to you.  I've shown a woman crawling in the rain; women who rush up to you and say that they've been raped and accosted and please find me a shelter or any place to go.

**(Clerk/Judge confer.)**

**THE COURT:**  Oh, Michael, hi.  Say hi.

**MR. WRIGHT:**  Hi.  Michael Sean Wright, Director of Field Medicine --

**THE COURT:**  Okay.

**MR. WRIGHT:**  -- for Lestonnac Clinics, and founder of wound walk dot org.

**EXCEPTIONAL REPORTING SERVICES, INC**

**39**

THE COURT: And by the way, if you don't want to go down the street, Andy, would you stand up for a minute? And Victoria is not here today but we can call Dr. Patel, Amy, all these people handling out blankets, food, water, it's not coming from the City, it's not coming from LAHSA. It's not coming from government.

The people on the row get things. Folks, who are they from? Churches, communities, NGOs, Victoria, Big Mike, Amy. You'd be stunned that all that isn't translating somehow.

Now, we do have contracts, don't get me wrong. The City (inaudible) contracts, for instance with the, you know, what I call Urban Alchemy, for instance. Your contract -- the (inaudible) stop down there.

For basic things come in the summer, water, it's coming from a water drop. It's coming from UCLA, USC students distributing it. It's coming from volunteer doctors.

So let's just go through a couple of these. These are just the last couple days. Is this on the screen? Flip on your monitors. Can you see it?

MR. WRIGHT: Not yet.

THE COURT: Okay. Well, Carmen, we need your help. It doesn't do any good with -- and tell me when you can see it.

Michael, I didn't plan to show this today, okay?

MR. WRIGHT: Yes, sir.

(Judge/Clerk confer.)

EXCEPTIONAL REPORTING SERVICES, INC

**298**

**40**

**THE COURT:** We're just going to go on through quickly. I was going to save it for two or three weeks to see if we made any progress.

But in Vietnam, by the way, people got what's called gray foot. A lot of people (inaudible) other places with the rain, one of the major problems is you get your feet wet, you don't change your socks, the socks rot off your feet, you get gray foot, you get amputated, okay. Same thing as getting shot. Next one.

Here are kids. They're right back. And but for the Court raising it, frankly, and Doug Smith writing about it over at the L.A. Times, who's in the back, every time something happens --

**MR. WRIGHT:** There we go.

**THE COURT:** -- then there's a reaction. And I'll say this point blank, Mira, by LAHSA. But without that, there is no reaction. I'm telling you that.

And right now, we've got these kids sitting out on the street right now. And there's lots of them, including five kids in a car who -- Terry, come on up. Did they get shot at? What happened out there?

Five kinds in a car with a mom right by Victoria on the corner of San Pedro and town. Now, you listen to this story for a moment.

**MR. TERRY:** A family, this mother, she's got sons and

**EXCEPTIONAL REPORTING SERVICES, INC**

Case: 26-784, 02/09/2026, DktEntry: 3.1, Page 42 of 225
Case 2:20-cv-02291-DOC-KES   Document 750   Filed 06/07/24   Page 41 of 82   Page ID
#:21941

**41**

some daughters, driving a white Suburban ended up getting shot up.  Nobody got hit luckily, right.

But you got to remember something.  It's a element of people, and there's a lot of stuff going on down there, and it's in a confined area.  We confined them in a area and so you got a bunch of people.

At one time, in 2020, was 1500 tents.  And if you ever seen the moving "Z" (phonetic), they was walking across the street where you couldn't even get your car through, okay.

**THE COURT:**  The bottom line, Terry, is so you're on with this, the community cleaned that up.  The community took care of the kids quite frankly.  Now we've got the kids back.

And what happens with Urban Alchemy is that they're open 24 hours a day with coffee right across from (inaudible) stop.

So what happens is these families are clustering in that area because Urban Alchemy's guarding them and literally walking them to school.

Now, I want to give a shoutout to the women's (phonetic) club right around the corner because (inaudible) down there talking a look.  Where are they?  Any women's club folks here?  Well, a shoutout to you, congratulations.  You're actually on the street.  Next one.

**MR. TERRY:**  Your Honor, --

**THE COURT:**  Don't go away, Terry, hang on.  Don't go

**42**

away.

Okay.  Now this is free medical, okay, not pushing for anybody but this is free medical.  They're not asking for Medi-Cal cards this time, not going to run up a bill.  Next one.

I submit 40 to 50 percent of the folks down there, if you took off their clothing, have some severe wound or abrasion that needs to be treated right now.

**MR. WRIGHT:**  Yes, sir.

**THE COURT:**  Right now.

**MR. WRIGHT:**  Yes, sir.

**THE COURT:**  Michael, is that validated?

**MR. WRIGHT:**  That is correct, Your Honor.

**THE COURT:**  You take it from him.  Next one.  Same person.  It's the next one.

Now you sit down there at that tent, if you don't feel uncomfortable already, come on down Sunday and just sit and volunteer to take people's names in.

**MR. SPEAKER:**  (Inaudible)

**MR. WRIGHT:**  Yes, sir.

**THE COURT:**  Next one.  Next one.  Different people.  Next one.  Next one.  Next one.  Next one.  Next one.  Hit the next one.

**(Mr. Speaker/Judge confer.)**

Is this guy's back up there?

**EXCEPTIONAL REPORTING SERVICES, INC**

**301**

**43**

(Multiple unidentified speakers respond in the affirmative.)

MR. WRIGHT:  Yes, sir.

THE COURT:  Well this is what I'm going to do.  I'm going to put this on the court website.  I'm going to start making the public uncomfortable because if we're uncomfortable here, we should all be uncomfortable just watching this in this sacred courtroom, insulated.

You hit the streets and you see this and smell this and I'll tell you what, this will wake you up.  And you got to ask what the Hell are we doing when it's not hitting the street.  And it's not hitting the street.

Next one.  That's good enough.  Yeah, I think that's enough.

MR. WRIGHT:  Your Honor, just one point.  Our nurse practitioner and pediatric nurses, for the children that are out here, a lot of upper respiratory infections happening with the little ones because it's so damp and cold at night, they're -- the young ones can't handle that kind of exposure, sir.

THE COURT:  So 11:00 o'clock there'll be something called the water drop.  It won't be from LAHSA, it won't be from the City.  It'll be from private entities coming out and supplying water.

And so, Amy, mayor, you know, you see these wonderful kids from UCLA and USC come out and volunteer.  You'll see a

EXCEPTIONAL REPORTING SERVICES, INC

**302**

**44**

church group come out here, Boyle Heights, kids handing out 1500 sandwiches last week alone.

I don't know if that's our responsibility for feeding and clothing. But I am telling you, whatever we're doing is not hitting the streets.

Okay, Terry, thank you. I'll -- Michael, thank you. I didn't expect to show these today.

Take those down.

All right. I'm going to ask you a couple more questions. I'm going to go ahead and put these on the Court website. I'm going to take the chance that it's inappropriate and just let's make the public wiser.

I want to hear about our quarterly reports at the end of -- Michelle, have a seat next to me.

At the end of April, both the County and the City filed the status reports regarding their compliance with the settlement agreements.

And the June 6th I invited objections and feedback from the Plaintiffs, Intervenors, and the public regarding the adequacy of this report.

**(Judge/Clerk confer.)**

**THE COURT:** So I will lead off with the Plaintiffs. Then, Shayla, I'm going to go to you next. Normally I would go back to the City and the County but you're at the table now.

So, Ms. Mitchell.

**EXCEPTIONAL REPORTING SERVICES, INC**

**45**

**MS. MITCHELL:** Your Honor, we have a lot of issues with the report. I have to be frank, though. After I think the testimony or the statements that we just heard, after the pictures we just heard, these are very granular comments.

And so we could continue to meet and confer or I can -- you know, I can just spell them out if the Court wants to hear them now.

**THE COURT:** I think we've met and conferred ad nauseum, frankly. It's time to do something. Let's hear what the problems are.

**MS. MITCHELL:** Sure. So with the City reports, what we're seeing is we have in the sheltering and housing reports, we had locations and addresses. And so we actually have verifiable information.

The last report we got from the City only had numbers, and it was cumulative numbers, as I understand it, over the last year and a half. We don't have any addresses, locations. There is no way to verify this information is correct.

**THE COURT:** No way to spot-check, is there?

**MS. MITCHELL:** On the encampment reduction, apologize, on the encampment reduction piece, and so there's no way to spot-check, there's no way to verify these --

**THE COURT:** Right.

**MS. MITCHELL:** -- things occurred. So that's on the

**EXCEPTIONAL REPORTING SERVICES, INC**

**46**

City piece.

On the County, we don't have -- under 911 reporting obligations, they never reported the numbers of PEH accessing services.  We only see total beds.  And we see that services were commenced but no numbers of PEH accessing services.

And I think maybe to take a step back and make a larger point, what we've heard in the past, particularly regarding the freeway agreement, is that the -- when we received this statement, this public statement that services are commenced, but we're hearing both from providers and from the City directly that those services aren't real services, maybe it's a meeting with a case manager once a month or, you know, referral to mental health that shows up every three months, or something like that.

I obviously don't have any way of verifying that information.  But all I'm seeing is services were commenced.  And so I would like to hear from the City about whether those are actually sufficient services that are being provided both in the PSH and in the interim housing projects.

So we can take a break if you want to hear from the City or I can just keep going with my comments, Your Honor.

**THE COURT:**  I want you to keep going --

**MS. MITCHELL:**  Okay.

**THE COURT:**  -- and then I want to turn it over to either Paul and then Shayla.  I'm not limiting you to time.

**EXCEPTIONAL REPORTING SERVICES, INC**

**305**

**47**

**MS. MITCHELL:** Thank you.

So the -- on the high needs beds, we have the County making this conclusory statement that it's using reasonable best efforts to ensure access to high service need interim housing beds, provides no description about what these reasonable best efforts are.

Additionally, we saw that there were only 12 referrals in a single quarter from DMH. When we have something like 30,000 mental health situations on the street, 12 referrals seems very small.

**THE COURT:** Twelve.

**MS. MITCHELL:** And so that's kind of a concern. I would like some explanation as to why we only have 12 referrals to high service needs beds from DMH.

Additionally, on DHS I'm now being told actually from Michael from -- that they're in need of detox beds. I was previously told that there was an overabundance of detox beds in the County.

And on this report I have 69 DHS referrals pending placement, which means that I believe there have been referrals made. Department of Health Services have accepted. I believe these are appropriate placements but cannot yet place them.

So if I have 69 pending placements, to me that does not seem like reasonable best efforts to connect individuals with high needs beds.

EXCEPTIONAL REPORTING SERVICES, INC

**48**

On the mental health and substance use disorder beds we asked for a granular breakdown of which types of beds.  We did ultimately get that, thank you to the County.  And we were able to see the different breakdown in beds.

We would like that level of detail moving forwards, whether that's in the confidential report or in the public report, so that we can track it.

There were noted that eight of those beds that have been provided are urgent care beds, which are less than 24-hour services.  And I'm not sure that that counts as a bed.  I've never heard of an urgent care having a bed.  Perhaps it does.  But it's something of note.

I think another issue that we received -- and we've been hearing that some of these beds that are being provided by the County are beds that have already been in existence but are now being counted.

And one of the concerns that we have, if you look at the mental health and substance use disorder beds that are listed, there are multiple entries with a single bed at multiple locations.

**THE COURT:**  No, hold on for a minute.  Mira, --

**MS. MITCHELL:**  Yes.

**THE COURT:**  -- I don't know if that's correct or not or the City.  The end result is if you find that out, just correct it.  In other words, instead of me breathing fire or

**EXCEPTIONAL REPORTING SERVICES, INC**

**49**

damnation, just correct it, move forward, okay?  I don't know if that's true or not so just listen for a moment.

**MS. HASHMALL:**  Thank you, Your Honor.

**THE COURT:**  You're taking that in, okay?  Because I know you'll get up and believe you're doing a good job, and you may be.  I'm not questioning you.  I don't know that yet.  And I'm not going to make a ruling on that.

But if you find it, come forward and just say, you know what, yeah, it happened, let's get it corrected, okay?  Let's -- in other words, let's move forward in a positive way.  It's easy to tear it down.  Let's see if we can build on this, okay?

Keep going on this.  What else?

**MS. MITCHELL:**  Thank you, Your Honor.

We did receive a report that over 200 board and care subsidies, or ARFs, adult residential facilities, and rich residential care beds, those subsidies are being provided.

However, we have no information which we were supposed to receive about the number of referrals, name of referral sources, number of referrals accepted, etcetera.

And really I think the key here is those vouchers exist, so subsidies exist.  We want to make sure that they're actually getting used and people are using them.

And then finally on the home and MDT teams, we received no information about how many people experiencing

homelessness living with complex health and behavioral conditions have been connected to necessary services through these teams.

Now, on this last piece I do want to note there is nothing in the agreement that requires that report.

**THE COURT:** Right.

**MS. MITCHELL:** But on, you know, I think when we're talking about a duty to report and public transparency and faith that these services are actually being provided, I think that would be a good thing to note pursuant to this agreement to make sure that we're getting what we bargained for.

That's all I've got on these issues, Your Honor.

**THE COURT:** That's quite a -- okay. Shayla.

**MS. SPEAKER:** Paul.

**THE COURT:** Or, I'm sorry, Paul.

**MR. WEBSTER:** Thank you, Your Honor.

**THE COURT:** I'm sorry, Shayla, but come right back to you.

**MR. WEBSTER:** I think my comments when I received these quarterly reports and we had this conversation with the County, and I think it's true -- it's less true for the City because a lot of times we'll get these reports and we'll see --

**THE COURT:** Bring that microphone closer.

**MR. WEBSTER:** Absolutely.

We'll see cumulative data, which is nice.

**51**

I think one of the real challenges that we're having is that when we see these snapshots of what occurred in this quarter, it's out of context.  So we don't know if this is less.  I mean, I guess we could go back, you know, and do the math ourselves.

But I think for the public's perspective it would be nice to be able to say over the terms of this settlement agreement and over these quarterly reports, we're either making progress, --

**THE COURT:**  No.

**MR. WEBSTER:**  -- we're stagnant, or we're going behind.  For some reason in this quarter we went behind because the numbers are less than last quarter.

Now, as, you know, as Ms. Mitchell mentioned, you know, none of this is stipulated, required, you know, in detail in the settlement agreement.

But if we're trying to kind of get to the same thing, which is how are we improving, how are we serving more people, how are the commitments of the settlement agreement actually being performed, it's good to have some context.

And let me tell you, I know that the City has a lot to do.  And I heard what Matt Zabo (phonetic) said with respect to his small team.

And, you know, from the Alliance perspective, we're happy, you know, if there is a way that we could partner with

**EXCEPTIONAL REPORTING SERVICES, INC**

**310**

**52**

the City and the County to say, let us tell you how we think these report and this information could be reported so that maybe we could be kind of the first pass for the public to say, this is -- this passes the laugh test or the small test or whatever, we're happy to do that.

Anyway, I think that there needs to be some greater contextual and some greater continuity with respect to some of the data that we're receiving so that we can then say at a glance very easily, are things getting better, are things not getting better, or are things staying the same. That's all I have.

**MS. MITCHELL:** Yeah, and if I can add to that, Your Honor, I think obviously the Court knows, as we were working out these agreements, the entire purpose was for the City and the County to work together, to work better together so that the money does get to the streets, right, so we're not hearing these stories and people are actually getting helped and getting addressed.

And we are here to try to facilitate that. And as these reports come back, we're identifying these problems of, look, we're not getting the information, we're not getting the data, we're still not working well together, even though we claim that we are.

And our role here is to really poke holes in that and say, these are the problems, this is where things aren't

EXCEPTIONAL REPORTING SERVICES, INC

**311**

**53**

working, and to try to make that move a little smoother.

And so when we're identifying reports, it's not just to get people in trouble. But it is to say, this, what we're hearing, shouldn't keep happening. We shouldn't keep hearing this. People should actually respond.

We should try to identify what are the problems that we're seeing and how do we fix that instead of these are our strict obligations and this is how we're trying to move forward to try to bring all of this together on a -- both on a granular level and on a macular level.

**MR. WEBSTER:** And I would just add one last thing.

Thank you, Liz.

Because when we see these reports of something like, you know, for example high need beds, the County's reporting on a snapshot in time for this quarter, they made I think the number is 429 referrals, I look at that and I say, okay, 429 referrals, that's good.

How did those referrals result in some kind of a positive outcome? I need to suss that out with respect to the reporting. Some of it I can determine, some of it I can't.

But here's the real challenge for me and for us as the Alliance.

When we're looking at these reporting, the reporting numbers, and we're looking at metrics in the hundreds, okay, or with respect to some of these behavioral help that's in the

**EXCEPTIONAL REPORTING SERVICES, INC**

Case 2:20-cv-02291-DOC-KES  Document 750  Filed 06/07/24  Page 54 of 82  Page ID
#:21954

**54**

ones -- but we'll just kind of go past that -- when we're looking at these metrics in the hundreds and we understand that the need in Los Angeles is in the tens of thousands, the need -- the reason that we need this kind of contextual aggregate data is to say, how can we move from the hundreds to the ten thousands.

THE COURT:  Ten thousands.

Shayla.

MS. MYERS:  Thank you, Your Honor.  Obviously representing the Intervenors and unhoused folks.

We are significantly concerned about the City's representation related to encampment resolutions.

THE COURT:  A little slower, just a little louder. It's me, it's not you, Shayla.

MS. MYERS:  Sure, Your Honor.

We're very concerned about the City's representations related to encampment resolutions.  So the Exhibit B of their report this time included a significant number of encampments that were "resolved."

There is absolutely no information in that report about what it means for an encampment to be resolved.  It says that they have addressed tents, makeshift encampments, and RVs.

Cannot stress this enough; as the representative of Intervenors in this case who intervened because of our concern about the City's practices related to encampments, that tents,

EXCEPTIONAL REPORTING SERVICES, INC

**313**

**55**

RVs, and makeshift encampments actually belong to people that live on the streets in Los Angeles, and the suggestion that the City can simply resolve these encampments without any description of how those resolutions are occurring, is incredibly problematic to the Intervenors.

THE COURT:  I'm going to be transparent with you and get away from the conversations about -- let me say it a different way.

San Francisco has a homeless problem, correct?

MS. MYERS:  I believe San Francisco would agree, yes.

THE COURT:  Yeah.  And during the G7 conference, did they seem to have a homeless problem?  No.  They swept the streets.

I don't know what's going to happen with the Olympic games, but my guess is Los Angeles is going to look a lot cleaner as we present a nice, shiny image to the world.

If these cities could do this in their self-interest, like San Francisco -- so I pick on my hometown for a moment -- then why can't we do this for the citizens and the homeless community in Los Angeles in this interim period of time of three or four years before we hit the goodness cleaning button and people are swept off the streets.

And we saw the Academy Awards on a small scale

**EXCEPTIONAL REPORTING SERVICES, INC**

**56**

bluntly, couldn't find a homeless people driving down to the union.

Saw it for soccer.  You're going to see it again I promise you in every event where the City is pristine for a few blocks or area.

If we can do that in our own self-interest as politicians and citizens, why don't we do this for our common citizen for the three or four years while these events are coming up?  They're paying the tax dollar.

So I don't know what's happening on the encampment (inaudible) I'm going to get out there a lot more, okay.

**MS. MYERS:**  But --

**THE COURT:**  They're not inviting me sometimes to go out.

**MS. MYERS:**  I mean, Your Honor, we do want to just raise the concern that --

**THE COURT:**  I want you to speak whenever you want to, want you talk, say whatever you want to.

**MS. MYERS:**  From the quarter that's represented in the report, the City of Los Angeles opened 139 units and resolved 2,137 encampments.  There's no information, as I said, about what happened.  There's no definition in either the settlement agreement or the City's report.

We just want to stress again that the settlement agreement approved by this Court did not provide any obligation

**EXCEPTIONAL REPORTING SERVICES, INC**

**57**

for the City to resolve encampments.

THE COURT:  Right.

MS. MYERS:  That was a side negotiation between the City of Los Angeles and the L.A. Alliance to put in deadlines and put in expectations that were not part of the settlements to which we objected to which there was due process associated.

And now the City of Los Angeles is purporting to report back to this Court and to the Plaintiff about encampment resolutions, as if that was part of the agreement all along.

Our concern is that the encampment resolutions that are articulated here have nothing to do with people getting housed, despite obligations in the settlement agreement that people be offered shelter before they are moved from specific locations.

What does it mean to resolve an encampment?

THE COURT:  Okay.  Now I'm going to give you a statistic.

Terry, if you're there or some folks.  You gave me a statistic last weekend down on the row.  You told me -- come on up for a second -- about 1500 tents.  And, Urban Alchemy, you count them almost every day, remember?

MR. SPEAKER:  Yeah.

THE COURT:  Okay.  Get -- toss out so everybody can hear what your original count was and where we stand on the last count in terms of tents.

**EXCEPTIONAL REPORTING SERVICES, INC**

**58**

**MR. TERRY:** Okay. Two thousand and twenty was 15,000 tents.

**THE COURT:** And as of last week.

**MR. TERRY:** Last -- and now it is 300 and, what, 49, --

**THE COURT:** Okay.

**MR. TERRY:** -- 50, yeah.

**THE COURT:** Yeah. Now listen very closely. Fifteen hundred tents at one time, we got about 349 as of last Sunday, right?

**MR. TERRY:** Yeah. The --

**THE COURT:** Folks are going someplace. And if I'm sharing my concern about where they're going, are they just being scattered or are they going into the Mayfair Hotel or other hotels? Are they going back and couch surfing, etcetera?

So in some ways the row is looking better. I got to tell you, if you drive down there, you've got visually a cleaner look. I mean, there's -- there is progress going on. But we don't know what's happening to the people.

And it may be that they're getting housed, tiny homes, getting on a bus and going back to New York if they're from there, couch surfing, getting mental health. We don't know. But I tell you what, the row is looking better. It's turning some corner out there. Thank the mayor.

By the same token, these folks (inaudible) getting

**EXCEPTIONAL REPORTING SERVICES, INC**

**59**

scattered, don't know where they're going.

MS. MYERS:  Yes, Your Honor.  And to put an even more fine a point on it, the City of Los Angeles is not saying 2,137 people --

THE COURT:  That's right.

MS. MYERS:  -- are not on the streets.  They are saying their tents, their makeshift encampments, and their RVs, i.e., their property, is not on the streets of Los Angeles. And that is our concern.

THE COURT:  And remember the point in time count.  If we see a tent, do you folks know how many people we count inside that tent?

(No audible response.)

Any volunteers in the audience?

MS. MYERS:  It's approximately 1.7.

THE COURT:  (Inaudible) 1.7 but have City --

MS. MYERS:  It's a multiplier.

THE COURT:  -- count three and four.  I see count one.  That point in time, counsel, an interesting phenomenon because it depends upon what the criteria is, what city you're in.  It's a measurement but it's not a great measurement, okay.

MS. MYERS:  But also --

THE COURT:  All right, Terry, --

MS. MYERS:  -- Your Honor, --

THE COURT:  -- thank you very much, I'll be back with

**EXCEPTIONAL REPORTING SERVICES, INC**

Case 2:20-cv-02291-DOC-KES  Document 750  Filed 06/07/24  Page 60 of 82  Page ID #:21960

**60**

you.

MS. MYERS: And, Your Honor, just to continue to put the fine point on it, the City of Los Angeles is not saying in, for example, in counsel district one, when there's 125 tents, makeshift encampments or RVs that have been resolved, they're not saying 125 people. They're saying 125 --

THE COURT: Twenty-five --

MS. MYERS: -- tents, makeshift encampments, or RVs. So what we want to know is how were they resolved, did you throw away the tent, did you tow the RV, and what happened to the individual who was previously living in the tent or the makeshift encampment or living in the RV?

Because what we will say is in that same quarter the City of Los Angeles opened 139 new units. So what happened to the people? That's our concern, Your Honor.

And the fact is, is that this is being presented as an obligation in a settlement agreement that simply does not exist simply because the City of Los Angeles and the L.A. Alliance entered into an agreement that they would do a thing.

And so we're concerned about the lack of reporting of any information to the Court about anything and some suggestion that this is being done pursuant to this Court's authority where it wasn't part of the settlement agreement in the first place.

THE COURT: Now, I've had the following conversation

EXCEPTIONAL REPORTING SERVICES, INC

**319**

**61**

with Mayor Bass, and I don't think she would be concerned and, if so, Laura, stand up.

You're a relatively progressive city.

You've got a governor down in Texas putting people on busses. And if you're not, sit down on skid row and watch them get dropped off, go over to the mission and then coming out.

And I want to talk to you about *Boise* for a moment because the City took a position that *Boise* should get overturned.

First of all, that doesn't have anything to do with this Court because I've got a settlement with you. So whether *Boise*'s overturned or not makes no difference in the way I conduct myself or with you.

But watch out because every time I've been in this City, you've got more conservative cities around with their own police force and their own mayor, and they're happy to take the homeless, put them in a patrol car, and show them the border of their city.

And a progressive city like Los Angeles, if you haven't seen the inundation now, you wait. And if *Boise*'s overturned, you're going to get flooded.

And I heard that story four years ago when I came to this city from your city council explaining -- I won't say Culver City or Burbank or Glendale or etcetera. I won't mention those cities.

EXCEPTIONAL REPORTING SERVICES, INC

**62**

But you're going to get flooded with independent cities who have their own police force and their own mayors much more conservative, and they're going to push on this city just like Texas is right now.

I don't mean to make that a political statement but that's exactly what's happening on your street because the kids getting off this bus are from Venezuela, Colombia, Honduras; they're very Hispanic.  And that's our kids on the street right now.

So *Boise*'s overturned, I leave that to the City of Los Angeles.  (Inaudible), we've had that conversation.  You can verify that with the major or not.

And there's a great concern that the City with this generous heart and this generosity is about to be the recipient.

And you heard the accusation that this is coming from the west side of L.A. for a lot of years into the CD14 (phonetic).  I'll leave that to you to discover.  But that just might or might not be true.  Why don't you figure it out.

And the old signs from Santa Monica that used to point to the shelter down the street in L.A., down in Venice, if you haven't seen those signs, Santa Monica used to have a little sign that said shelter that way.

So I leave that to the City because sometimes, you know, humaneness, etcetera, hopefully is going to be rewarded.

Case 2:20-cv-02291-DOC-KES   Document 750   Filed 06/07/24   Page 63 of 82   Page ID
#:21963

**63**

But I'm worried about you.

Okay.  Lourdes, and by the way, is that a correct statement, did we have that conversation with the mayor?

**MS. RAMIREZ:**  I believe so.

**THE COURT:**  About *Boise*.

**MS. RAMIREZ:**  Yes, I believe so.

**THE COURT:**  Yeah, we did.  Okay.

Okay, folks, (inaudible) the City, welcome.  As your first appearance, aren't you have a great time?

(No audible response.)

That's the most transparent hearing you're ever going to be involved in.  Nothing taking place back there.  It's all any comments you want to make because I beat up on you a little bit, okay.  Don't worry about that.

Your job is to make this better,--

**MS. SPEAKER:**  Understood.

**THE COURT:**  -- okay?  (Inaudible) how do we move forward, okay?

(No audible response.)

You okay?  Want to come back next time or get a substitute?

**(Laughter)**

**MS. FLORES:**  I'll be back.

**THE COURT:**  Okay.  Mira, your turn.  Anything you want to stay (sic)?  And then the -- I've got a question to

**EXCEPTIONAL REPORTING SERVICES, INC**

**64**

answer.  Let me ask the question first.

MS. HASHMALL:  Sure, Your Honor.

THE COURT:  Yeah, and then I'll turn you loose, okay.

Look.  I've been reading everything I can, including last night when the City gave me this at the 6:00 o'clock drop.  And I'm worried that there's a history of slowness -- and I'm being transparent with you --, of slowness on the County's part responding to the City, who's out front first, building a shelter and then trying to get the services.  And that doesn't mean you're not supplying services or trying but I want to give you a couple of statistics.

I first saw it -- well, one of the times I saw it was the initial offer that I think all of you thought was in good faith with the 300 mental health spaces.  I didn't see how that could possibly work when Mayor Bass was trying to get 15,000 people into a shelter or housing.  We had 30 or 40 percent of our mental health substance abuse out there, okay?  I think you were gracious.  You came back and I think you genuinely believed a thousand was okay and I'm obstinate and I said no.

You came back with 3,000 and you've got my commendation for that, plus another 500, by the way, but I think we'd forgotten to mention for the elderly, et cetera, who could have issues.  And I thought that that was an appropriate number and it somewhat balanced out against the 15,000 and didn't want to turn down what I thought was reasonableness.

**65**

The first Measure H, in 2017 when the voters approved Measure H, the quota set Sales tax, the revenues were supposed to be used to create permanent support housing for people experiencing homelessness but there's this report that you authored through Tim Campbell?  Tim Campbell, I think.  I read that -- I've never talked to him or met him.  In fact I think last time I called him Tim Carpenter -- and these revenues weren't spent in significant amounts.  So I'd like all of you to check that out and if I'm wrong then in fiscal year 2021 to 2022, the County had a 302 million dollar net balance of Measure H funds.

Now remember this is a critical time.  We needed those mental health services out there, we needed substance abuse.  And in this crazy governance, we've actually pitted in some ways the City and the County, who didn't get along for years, into these two different buckets of trying to cooperate.

And so in the four years between 2018 and 2022, the County didn't spend over 200 million in Measure H funds.  Now part of that came at a critical time during the Covid crisis.

Now, I'm going to pick on Orange County because what the board did down there was that they chipmunked mental health funds down there and frankly I've accused them of it.  If I had my own investigative team I can prove it but they used the interest off of those Chipmunk Funds to help pay off the Orange County bankruptcy.  It didn't go back into mental health.

**EXCEPTIONAL REPORTING SERVICES, INC**

**324**

**66**

So having looked through that Rockey horror picture show, I come to your -- here with a certain amount of maybe bias in the past having had that experience.  And if these are invested monies, where are they going?  Are they going back into the homeless trough, are they going back into run the City.  I don't know.  I'm just going to raise that with you because another county -- yeah, I'm ashamed of them frankly.

So you created a one percent sales tax on people earning over a million dollars.  It's distributed to counties who are supposed to be in or on the mental health services for people experiencing homelessness but Los Angeles County --

Mira, you can check this out at your convenience.

 -- has received 7.65 billion in MHSA funds --

And when I read this I tried to independently corroborate that.

 -- since fiscal year 2019.  But I want you to check. I believe you've only spent approximately 3.4 billion of that. And I believe that there are approximately sitting, or at one time sitting, 4.2 billion surplus intended for private mental health.

Now I think there was a sea change with Janice Hahn. I'm going to give a big shot out to her.  When she was a member of the board I think she moved heaven and earth to try to reach settlements, you know, to get the County really cooperating along with Mayor Bass.  I think they had a really good relationship.  And therefore you have a compliment about that.

**67**

That never could have significantly decreased.

I could be wrong in that figure but just check that out and see what that distribution was because if not then whether we have an agreement or not, I just think it's a moral and ethical duty that the County is running right along step in lockstep with the Mayor and the City to get these services as quickly as possible to match the shelter or housing that's coming down the pike.

All right. Now, Mira, it's yours. You can say anything you want to and you've got unlimited time.

**MS. HASHMALL:** Thank you, Your Honor.

**THE COURT:** Pleasure.

**MS. HASHMALL:** I'm going to start by responding to your recent questions and then I think I'm going to step back a moment and talk about our successes under the settlement agreement.

This case is challenging, unprecedented. The Court has certainly shown a lot of courage in pushing the City and the County to do better.

I think it's also prompted a lot of self-reflection and the County is doing significant work to address this homelessness crisis, and it's really guided by the board of supervisors' commitment to a care-first approach.

**THE COURT:** And give a shot out back to Fesia also, okay? Would you? On our behalf? She's working hard.

**EXCEPTIONAL REPORTING SERVICES, INC**

**68**

**MS. HASHMALL:** Our CEO, Fesia Davenport, is a leader in this, along with the entire homeless initiative team, including Sheree Totaroff (phonetic) who is our subject matter expert on many of these issues.

The Court has prompted us and it has caused us to engage in a lot of self-reflection. And really scrutiny, what we're doing right, what can we do better because the board does believe this is a crisis.

But there are nuances and complexities that the average civilian just doesn't get by driving down the street or reading the paper.

**THE COURT:** Okay.

**MS. HASHMALL:** And I think what's dangerous is when we try to go to court based on rumor or hearsay and make that issues when it's not grounded in fact. And so just to kind of directly respond to the two things the Court has recently addressed, Measure H funds.

That is a voter sponsored new resource integral to funding the County's outreach and mainstream services in mental health, substance use disorder and other resources, not only just addressing issues with regards to people experiencing homelessness but trying to prevent individuals from falling into homelessness.

But as the Court also noted, we went through a pandemic and the County had the benefit of some very

**EXCEPTIONAL REPORTING SERVICES, INC**

**69**

unprecedented one-time funding sources from the State and the Federal Government in the same timeframe the Court's looking at.  So I won't pretend to know anywhere near what Fesia Davenport knows as our CEO but what I can tell you is when the County has one-time funding it has to spend --

        **THE COURT:**  Right.

        **MS. HASHMALL:**  -- it's going to prioritize that over recurring revenue streams.  And so that's why you might see shifts in spending.  If we've got other dollars, we're only going to get once and we spend it or we lose it, we're going to spend it if we can on important programs, and that might mean other funds that have a longer tail, less restriction, won't be used for the same resources.  Those are the kind of details that information and education require us to really understand. Soundbites don't really do it justice.

        The same with Measure -- with MHSA Funds.  That's a State-dictated program regarding very very specialized resources for mental health conditions and disorders.  You know, we all think we may be able to diagnose mental health crises but there are real rigid standards for those fundings. They go through a community board, a resource allocation process that's very much forward facing, it's in front of the community, and it's subject to review and scrutiny and State approval.  And so it's not a slush fund, it's subject to accounting, very public accounting as to what that money can be

**70**

used for and where and why it goes in certain places.

And then the other thing I would say, Your Honor -- and I've learned a lot from this court's prodding and our talking to our internal experts who really are boots on the ground -- money is one thing but you have to have a service provider, you have to have a resource that can be effective and so you've always got to calibrate those two things, right?  You need to be able to stand up something and have it be available as a resource and have it have longevity to serve its purpose.  So money is only part of the problem, right?  You have to have the teams and the staff to do the work.

And I say that all to say that while it's required a lot of reflection, it's always pushed us too.  And I think the County has not only met but exceeded the milestones under our settlement agreement.  We are in full compliance.  We have really shot out of the park some of the benchmarks in the settlement agreement.

We heard some concerns from the plaintiff and I think by their own admission, some of those concerns are about issues that are not subject to the reporting requirements in the settlement agreement.

We also heard some questions and so we got with them and we walked them through our exhibits and our documents so they could better understand it.  And I actually think that was helpful.  I think it resolved a lot of those questions.

71

Concerns?  Everybody has concerns.  Our focus is on very, very significant financial and resource commitments we've made and we have exceeded them.

As our status report shows, wrap-around services are being provided by DPSS, DHS and DMH, as well as DPH SAPC. There are reporting descriptions of the beds that are available to the County outreach teams.

There is and there will always be a spectrum of resources that come to bear.  We brought online over 900 new mental health and substance-use disorder beds.  That far exceeded the 600 that were required during this timeframe.

And they fit into categories.  Our expert understand what the sort of categories mean but we've taken the steps to really try to explain that so people understand resources have to be along the spectrum of care.

And while the beds are not exclusively reserved for City PEH, the majority of the people experiencing homelessness in the County of Los Angeles -- which our board is considered about -- is concerned about addressing this crisis for the County it serves, not just the City.  And the City does have the majority of the crisis.  And so the City is getting the majority of the resources as a result.

There has been some question as to what does greatest need mean?  Rightfully so, the settlement gives the County the discretion to decide what the greatest needs are.  And that's

**EXCEPTIONAL REPORTING SERVICES, INC**

Case: 26-784, 02/09/2026, DktEntry: 3.1, Page 73 of 225
Case 2:20-cv-02291-DOC-KES  Document 750  Filed 06/07/24  Page 72 of 82  Page ID
#:21972

**72**

the departments with the subject matter expertise are sort of
addressing the ratio of mental health beds versus substance-use
disorder beds.  They are majority mental health but it's going
to always be on that continuum of care because it needs to be.
We can't have a one-size-fits-all solution to this difficult
crisis.

And at the board's direction, the County is
constantly reassessing what should be the mix of beds and
resources that are available.  Highly acute specialized beds
are important but so are unlicensed beds because there are
individuals who may not have severe mental health, as the
diagnosis would be required in order to get access to other
resources, but do need help.  And so we've got those types of
resources available for that population as well.

The board and care subsidies, again this is something
where we have far exceeded the requirement.  To the Court's
point, these are resources for elderly and other individuals so
that they don't fall into homelessness.  It's a residential
setting and the idea is if we can give these folks a subsidy
and they can have a safe, healthy place to live, they will stay
out of homelessness and that's been an important resource and
the County has devoted significant funds to that resource.

We've got 34 MDT teams, 10 home teams.  They're
serving PEH in the City.  They're assigned across the City
based on the point and time count and the density of PEH in

**73**

those areas.

MDTs have a specialized mix of healthcare professionals, mental health specialists, in order to really have boots on the ground and give folks the help they need.

Home teams which are put up by DMH also have specialized mental health resources.  And we've increased those resources across the board in a significant way on a very accelerated timeframe and we're very proud of that at the County.

So again, you know, we have an open-door policy and we're happy to engage and answer questions.  I think we have answered questions and provided additional information offline in order to address some of the issues raised by the plaintiffs but we really want to do the work.  We don't want to continue sort of re-signing reports and refining reports.  We really want to be able to allow our teams to do this difficult job.

So unless the Court has any questions, I think that's all I'd add.

**THE COURT:**  I'd like the special master to give you an update and then I think enough for today.

Okay.  So Michelle?

**MS. MARTINEZ:**  Thank you, Your Honor.  I just will be giving a quick update.  I don't have all my notes here but on the progress that we've made with A&M, the independent consultant that is working with the Court and obviously the

EXCEPTIONAL REPORTING SERVICES, INC

**74**

parties.

So at this time, this is the following things that have been done and we will continue to move forward.

And the first thing is that A&M has submitted to both the City and County information that they need in regards to data requests and documentation.  And that has to be submitted by June 14th.  We are just waiting for the City to provide us a name and give them the link so they can upload that information.  LAHSA has responded and we have submitted that link to them.

The second thing that A&M is working on is current interviews with key stakeholders.  And the first round is with the mayor and city council and their chief of staffs and their homeless folks on the ground.  And they're moving forward with the CAO's, CLA, and others and also LAHSA staff.  So those interviews will start to move forward in the next two weeks with A&M.

Yesterday, which was June 5th, we had the kickoff with the advisory committee and so the next steps for us as we move forward of Your Honor is to ensure that we move in an expedited fashion to -- and hoping that A&M receives its documents and information by June 14th so that they can do their initial assessment.  And once that initial assessment is done, we will come back to the advisory committee to take a look at what has been presented.  And if any changes need to be

**75**

made to the scope of work, that conversation will be had and then be brought back to the Court and/or to the City.

So that's where we currently are at and we hope to have that update by August.  And so any concerns that the public may have or have interest in wanting to learn, they can always contact me as a special master.

And finally, we will also -- A&M will be doing interviews with unhoused and housed but that will -- I know it's taking place with judge Carter this Sunday out in Skid Row.  Ms. Myers did ask a very good and poised question to the A&M team about ensuring that unhoused and those that are now currently housed be interviewed.  But those interviews will happen on the street and that is to be determined in how that takes place.  And so if there's any recommendations from the advisory committee or the public as it pertains to how we go out into the street, we just we are not -- the court is not in the place to ask service providers, the City, the mayor's office, you know, for names of unhoused or housed people.  We want to make sure that we have an organic process and that the A&M team is able to select folks who are actually are out in the community and are facing challenges and they're able to do those interviews.  And those interviews will be done in a way that are done with integrity, with respect and dignity.

And so I want -- I do appreciate the advisory committee and appreciate the City and LAHSA for their continued

Case: 26-784, 02/09/2026, DktEntry: 3.1, Page 77 of 225
Case 2:20-cv-02291-DOC-KES  Document 750  Filed 06/07/24  Page 76 of 82  Page ID
#:21976

**76**

efforts and ensuring that they are replying in a timely fashion and because we cannot get this work done together if we don't do it collectively.  And I just want to share with you that we are moving in a very fast pace and everyone is cooperating.

**THE COURT:**  I think also the mayor from the beginning has tried to set a tone of cooperation and I think that that's been a benefit.  I think that the County has joined in that.

But there are those historical and traditional barriers that we've created and I want you just to think about the system that we have.  The mayor has no voting power.  Think about that.  So who do we go to?  The council?  Are they the center of authority here?  Well, in other words, where is our centralized authority here?  The mayor's the spokesperson.  The council votes the money.  We have the division historically with *LA Times* articles that go back in the 1980s about the fights going on between the City and the County.  Then we create LAHSA, which frankly has shielded both the City and County, from my opinion, from responsibility but they became the distributing entity.

I mean think about what we've created in terms of not having a centralized place to go and have to deal with all of these different wheels, none of which has the power in and of themselves to implement unless we all get onboard the same wagon.  And if we don't then the bickering is going to go on and that's why you're here, all of you, my concern and that is,

EXCEPTIONAL REPORTING SERVICES, INC

**77**

if this third party audit takes place and that's all we've got, then it's a place in time and what do we do in the future?  And that's why I want this website created from now on where you put the billings up from the City or the County, where there's a chance to spot verify whether they're good or not.  And we're not just relying upon data from providers who may be righteous and honest and who may not be frankly.  Or who may not be serving.  We need to get rid of those.

And if we can create that board going forward and make that understandable, then you can make data driven decisions because right now these decisions are political decisions driven by the loudest voice quite frankly and that's unfortunate.  It's harmful of the City.

And finally, if you're going to do this do it now.  Do it for the benefit of the citizens and the homeless and all your residential folks who are paying taxes out there.  Don't wait for the next great event in the city like the Olympic games to look like we've cleaned up this mess.  Do it now because it's the right thing to do.

Now, I'm going to schedule you back probably in August and I'm going to encourage you concerning the update on the status reports to work with Judge Birotte and Michele but I'll probably bring you back the second of August.  Okay?  I'll set a date.

Anything further by any of you folks?

EXCEPTIONAL REPORTING SERVICES, INC

**78**

MS. HASHMALL:  Nothing from the County, Your Honor.

THE COURT:  Okay.  Mira?  Okay.

City?  You okay?

MS. MARIANI:  Nothing further.

MS. HOANG:  Thank you, Your Honor.

THE COURT:  Liz?

MS. MITCHELL:  Nothing, Your Honor, thank you.

THE COURT:  Shayla?

MS. MYERS:  No, Your Honor, thank you.

THE COURT:  You folks in the community okay?  You all right?  Good.  We'll see you out there, all right?

You folks out there for the City okay?  Do you need to consult County?

Except there's one gentleman that I was rude to. Sir, come on up for just a moment and I apologize.  You wanted to speak and ...

MR. FERNANDEZ:  (indisc.).

THE COURT:  No.  Listen.  That was my fault.  You wanted to speak and I said you could and I --

MR. FERNANDEZ:  Yeah.

THE COURT:  Yeah.  What's your name, sir?

MR. FERNANDEZ:  My name is Alfred Fernandez (phonetic).  And I live in Skid Row.  I have for the last year and a half.  And before that I lived there about three years so but I live on the busiest corner of Skid Row which is Fifth and

EXCEPTIONAL REPORTING SERVICES, INC

79

Los Angeles.  And you can see anything go on there.  I have seen things that you would not believe on people getting dinged by cars.  Just last week there was a naked woman in the middle of the Fifth and Los Angeles --

**THE COURT:**  I know that.  We were out there --

**MR. FERNANDEZ:**  -- screaming and yelling and everything else.  I had to call 911.  They sent the police. They did not send anybody from psyche (phonetic) which had they done that, she probably would have been treated much better instead of being handcuffed and thrown away and that's basically what we feel like.

And being disabled is really difficult because I have a huge target on my back to get mugged so I don't carry a wallet, I carry a money clip.

And mental health is really something that -- I'm a retired LPT, licensed psyche tech.  And it used to be that if the police got called on somebody that's having a psychotic break or is just being looney -- sorry for the language but it is what it is -- and so it used to be they had to have an LPT, at least two LPTs along with the police and the LPTs would go in first so the patient did not or the client did not see the police at all.  So they weren't feeling threatened so the LPTs were able to go ahead and talk them down and then no police force was really needed.  So they went to the ER and then went through the process of being placed in you know either in an

**EXCEPTIONAL REPORTING SERVICES, INC**

80

acute unit or you know or something else of that nature.

And I see that needed downtown, especially on my corner.  I see everything on my corner, anything from crystal dealers to pot dealers to whatever, any drug you want it's there and it's there readily available.

And they were going ahead and power washing the tents off the street, off of Los Angeles Street and so that finally stopped and that was due to a friend of mine who ended up getting placed in a halfway house because she's kind of off but she went ahead and she went to the Historic Core and got them to stop doing that because it's not against the law to sleep on the street.  Unfortunately some people have to.

And I feel so blessed that I have my room that I live in, in the Baltimore hotel, I live basically in a prison cell. That's the size of my room.  I have to sidestep everywhere around my bed and I'm a real risk for a fall so.  And I've been working six months to get a larger room but it's not going to happen but like I say, I feel blessed I at least have a roof over my head and that's good.

THE COURT:  Okay, sir, thank you very much.  Nice meeting you.

MR. FERNANDEZ:  So that's all I really have to say.

THE COURT:  No, it's a pleasure meeting you.  Thank you.  And I'm sorry I said I'd get back to you and I almost didn't so thank you.

EXCEPTIONAL REPORTING SERVICES, INC

339

81

MR. FERNANDEZ:  That's okay.  No worries.  Thank you.

THE COURT:  Appreciate it.

All right.  Then folks, we're in recess.  Thank you.

(Proceeding adjourned at 3:26 p.m.)

EXCEPTIONAL REPORTING SERVICES, INC

340

82

## CERTIFICATION

    I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          June 7, 2024

        **Signed**                                   **Dated**


             *TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**

341

UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
mumhofer@umklaw.com
emitchell@umklaw.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, *et al.*,<br><br>Defendants. | Case No. 2:20-CV-02291-DOC-KES<br><br>Assigned to Judge David O. Carter<br><br>**MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE**<br><br>Before:  Hon. David O. Carter<br>Courtroom: 1<br>Hearing Date:  October 2, 2024<br>Hearing Time:  9:00 p.m. |

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

**342**

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE on the above date and time Plaintiffs will and hereby do move for an order compelling specific performance by the City of Los Angeles. This motion is set for hearing on October 2, 2024, at 9:00 a.m. before the Honorable David O. Carter in the United States District Court, Central District of California, Western Division, located at 350 West First Street, Courthouse 1, Los Angeles, California 90012.

The motion is made following the conference of counsel that has taken place numerous times, most recently on August 27, 2024 with Special Master Michele Martinez. This motion is based on this Notice, the accompanying Memorandum of Points and Authorities, the Declaration of Elizabeth A. Mitchell and exhibits attached thereto, the pleadings and records on file in this action, and any further oral or written documentation that may be provided to the Court as necessary or requested.

Dated: September 4, 2024                    Respectfully submitted,


                                            */s/ Elizabeth A. Mitchell*
                                            UMHOFER, MITCHELL & KING, LLP
                                            Matthew Donald Umhofer
                                            Elizabeth A. Mitchell

                                            *Attorneys for Plaintiffs*

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE*

343

## I.   INTRODUCTION

On January 31, 2024, after more than a year of being out of compliance with the Settlement Agreement, and only after the Alliance indicated its intent to file a motion for significant sanctions, the City finally provided a written plan for encampment reduction pursuant to Section 5.2 of the Settlement Agreement. (*See* Declaration of Elizabeth A. Mitchell, Ex. A, City of Los Angeles, LA Alliance Milestone Goals.) The City has since reported on the number of encampment resolutions, but has not reported on the location of those resolutions as requested by the Alliance in multiple meetings.  The City recently indicated it was ultimately unwilling to do so.

Identification of location of these encampments (whether by address, street, corner, or some other method) is crucial to maintain accountability to ensure that said reductions are occurring.  The concern on the part of the Alliance is that basic maintenance and sanitation work (such as regularly scheduled street cleanings) are being counted as "reductions" when no individuals are being offered shelter or housing but simply moved from one block to the next, only to move back to the same sidewalk after cleaning is over.  If this is the case, nothing is "reduced" other than trash which is within the City's standard operating procedure (and in fact separately called for as part of the agreement).

The entire purpose of bringing this lawsuit, and the intent behind the settlement agreements with the City and County is for housing and shelter to be built at scale, bringing thousands of desperate unhoused individuals inside and paired with necessary services and treatment, overall reducing unsheltered homelessness.  Simply cleaning areas without further engagement is not helping individuals come inside and does not reduce unsheltered homelessness—it is simply picking up trash.

Because the City has refused to provide the locations of these alleged Encampment Resolutions, the Alliance and the Court have no basis by which to confirm the work is actually being done as anticipated and required by the Settlement

1

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

Agreement.  The Alliance requests the Court order the City to provide details of Encampment Resolutions to maintain accountability and confirm compliance.

## II.    STATEMENT OF FACTS

The City and Plaintiffs entered into a Settlement Agreement on May 24, 2022 which was subsequently approved by the Court.  That Settlement Agreement in part required the City to provide milestones and deadlines for "encampment engagement, cleaning, and reduction" in each Council District and Citywide, and required the City to "employ its best efforts to comply with established plans, milestones, and deadlines." (Fully Executed [Proposed] Stipulated Order of Dismissal as to Defendant City of Los Angeles Only, Ex. 1, Settlement Agreement ("Settlement Agreement") § 5.2, May 24, 2022, ECF No. 426-1.) The City was in willful violation of that provision from November, 2022 until January 31, 2024 at which time it finally provided the requisite Milestones and Deadlines.  (Mitchell Decl. ¶ 1, Ex. A.)

The City, as of January 31, 2024, committed to 9,800 Encampment Resolutions by the end of Fiscal Year 2025-2026. (*Id*.) On April 15, 2024 the City provided its first status report of Encampment Resolutions, identifying 2,137 resolutions in the first quarter of 2024, which was nearly a quarter of the resolutions in a three-month period (a shockingly high number after representing capabilities of much lower during multiple meetings from November, 2022 to January, 2024). (Mitchell Decl. ¶ 2.) Thereafter, at a scheduled meeting between LA Alliance and the City of Los Angeles designed to address early concerns, the Alliance requested locations of these encampment reductions to confirm resolutions, given the disparity in representations and apparent performance. (*Id*.)  The City deferred response, having to internally confer. On July 11, 2024, at another scheduled meeting, the Alliance again raised this issue and the City again deferred response. (*Id*.)

On July 15, 2024, the City filed its second Encampment Resolutions report, identifying errors in the prior reporting, and reporting only 1,688 Resolutions from January 2024-June 2024 (inadvertently omitting tents and vehicles due to internal

2

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

error). (Mitchell Decl. ¶ 6.) To date the City does not appear to have an accurate number of Encampment Resolutions, or is possibly behind in Resolutions according to its Milestones and Deadlines.  This report was also devoid of any location information. (Mitchell Decl. ¶ 7.)

On August 16, 2024 LA Alliance served on the City a demand letter requesting, *inter alia*, commitment to providing the details of encampment resolutions. (Mitchell Decl. ¶ 8.) The City and LA Alliance met and conferred on August 21, 2024 wherein the City confirmed it was unwilling to provide location data.  The parties met with Special Master Michele Martinez the following week, on August 27, 2024, and no resolution was reached.  This issue is now ripe for Court adjudication. (Mitchell Decl. ¶ 9.)

## III.   INFORMATION REGARDING ENCAMPMENT RESOLUTION LOCATIONS IS NECESSARY TO PROVIDE ACCOUNTABILITY AND ENSURE WORK IS BEING COMPLETED.

This lawsuit was brought ultimately to bring unhoused individuals off the street where it is unsafe and unhealthy, and inside where they can have access to necessary services and treatment to help them stay housed and off the street.  Encampments are exceedingly dangerous and unsafe to both the people living in them and to the communities in which they reside.  Reducing these encampments has always been part of the Settlement Agreement and is a significant part of the benefit Plaintiffs bargained for in entering into the operative settlement agreement with the City. (Motion for Order re Settlement Agreement Compliance and Sanctions, Feb. 7, 2024, ECF No. 668.)

The City's reporting on Encampment Resolution has been confusing and inconsistent, first reporting 2,137 reductions in a three-month period, then admitting internal error and subsequently reporting 1,688 in a six-month period, not including vehicles and RVs.  Regardless of the true number, the Alliance is concerned that "Resolutions" are not being appropriately documented.

3

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

Many Alliance members report observing regularly scheduled cleanings ("CARE" and "CARE+") wherein unhoused individuals are asked to move their belongings to another area in order to dispose of trash and clean the area. If a person is not present and nobody moves the person's items for them, the tent and other personal valuables are trashed. Likewise, if tents or personal items are abandoned, they are disposed of. After the cleaning is finished, unhoused individuals are free to return to the area. There are no outreach workers present and nobody is offered housing or shelter during these clean-ups.

The Alliance is concerned that these regularly scheduled clean-ups are being counted as "resolutions" when in fact nothing is being resolved but instead people's items (or abandoned items) are being thrown away. The Alliance did not bring this lawsuit to encourage or facilitate destruction of personal items (though sanitation is very welcome), but rather to *bring people inside*. Cleaning an area, only to have unhoused individuals move back in without offers of shelter or housing, is not a "resolution" in the Alliance's view.

The locations where these Encampment Resolutions are taking place is necessary to maintain accountability and ensure these identified encampments are in fact being resolved/reduced rather than simply tracking sanitation routes. While Special Master Martinez has been instrumental in personally observing some projects and clean-ups, she has not been to each location at each time to observe progress and it is unreasonable for her to be expected to do so. Moreover, to the Alliance's understanding, she is not provided with each location, date, and time for personal observation.

The Alliance hereby requests that the Court order the City to report—either confidentially or publicly—the locations and dates of each Encampment Resolution reported to verify accuracy of reporting and ensure accountability.

4

*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

347

## IV.    CONCLUSION

No person in the City of Los Angeles should have to or be allowed to live outside where it is unsafe and unhealthy for both the individuals living on the streets and the surrounding communities.  The Alliance requests increased reporting on Encampment Reductions—specifically the locations and dates of Encampment Resolutions—to verify that people are actually being offered shelter or housing, and encampments are being permanently reduced, and not simply moved from one place to another.

Dated: September 4, 2024                    Respectfully submitted,

/s/ Elizabeth A. Mitchell
UMHOFER, MITCHELL & KING, LLP
Matthew Donald Umhofer
Elizabeth A. Mitchell

*Attorneys for Plaintiffs*

5
*MOTION FOR ORDER RE SETTLEMENT AGREEMENT COMPLIANCE AND SANCTIONS*

348

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) | CASE NO: 2:20-CV-02291-DOC-KESx |
| | ) | |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Tuesday, January 7, 2025 |
| CITY OF LOS ANGELES, ET AL., | ) | |
| | ) | (9:46 a.m. to  9:46 a.m.) |
| Defendants. | ) | (9:52 a.m. to 12:50 p.m.) |

STATUS CONFERENCE RE A&M AUDIT;

MOTION FOR ORDER FOR SETTLEMENT AGREEMENT COMPLIANCE
[DKT.NO.767]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:              SEE PAGE 2

Court Reporter:          Recorded; CourtSmart

Courtroom Deputy:        Karlen Dubon

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

For Plaintiffs:           ELIZABETH A. MITCHELL, ESQ.
                          Umhofer Mitchell & King
                          767 S. Alameda Street, Suite 270
                          Los Angeles, CA 90021
                          213-394-7979

For Defendants:           JENNIFER M. HASHMALL, ESQ.
                          Miller Barondess, LLP
                          1999 Avenue of the Stars, Suite 1000
                          Los Angeles, CA 90067
                          310-552-4400

                          LAUREN M. BRODY, ESQ.
                          Miller Barondess, LLP
                          1999 Avenue of the Stars, Suite 1000
                          Los Angeles, CA 90067
                          310-552-4400

                          ARLENE N. HOANG, ESQ.
                          JESSICA MARIANI, ESQ.
                          Los Angeles City Attorney's Office
                          200 N. Main Street, Room 675
                          Los Angeles, CA 90012
                          213-978-6952

For Intervenor:           SHAYLA R. MYERS, ESQ.
                          Legal Aid Foundation of LA
                          7000 S. Broadway
                          Los Angeles, CA 90003
                          213-640-3983

Special Master:           MICHELLE MARTINEZ
                          JUDGE JAY GANDHI

Also present:             HASAM ALKEN
                          LISA BROWN
                          KEVIN CALL
                          LAURA COLLIER
                          ERIN DUNKERLY
                          CHERYL GREY
                          DR. HOLLY HENDERSON
                          NICK KETTER
                          KENNETH MEJIA
                          DEVANG PANCHAL
                          DIANE RAFFERTY
                          SUZETTE SHAW

EXCEPTIONAL REPORTING SERVICES, INC

**350**

3

**APPEARANCES:**                    (CONTINUED)


Also present:            **MATT SZABO**
                         **JANINE TREJO**
                         **PAUL WEBSTER**
                         **MICHAEL SEAN WRIGHT**

**4**

**Los Angeles, CA; Tuesday, January 7, 2025; 9:46 a.m.**

--oOo--

THE COURT:  Counsel, on LA Alliance for Human Rights and City of Los Angeles, which is case 20-02291, why don't you come up and be seated.  I want just a few moments with the special masters.

**(Pause)**

THE COURT:  Before -- we're going to put up the order on the agenda that I'd like to cover today.  We have two copies we put on your table.  We also put one on the Elmo for you and the audience so you can follow.

And take just a moment to look at this agenda.  And I think we can be done before noon.  If we're not, would you give me permission to go right through the lunch hour so I'm not tying you up and we'll go on CourtSmart.  Would that be okay?  That way we're not taking an hour lunch and coming back at 1 or 2 o'clock.

MS. MITCHELL:  Yes, Your Honor.

THE COURT:  And so for the court reporter, you're going to have lunch and we'll go on CourtSmart if we need to at noon.  Okay?

We'll call the case to order.  It's LA Alliance for Human Rights versus the City of Los Angeles, 20-02291 and that should be et al.  And, counsel, if you'd just remain seated and begin with LA Alliance's appearance.

EXCEPTIONAL REPORTING SERVICES, INC

**5**

MS. MITCHELL: Thank you, Your Honor. Good morning. Elizabeth Mitchell Umhofer Mitchell and King on behalf of plaintiffs. With me is also executive director for LA Alliance, Paul Webster.

THE COURT: Okay. And City?

MS. HOANG: Good morning, Your Honor, Arlene Hoang, Deputy City Attorney for the City of Los Angeles.

THE COURT: Okay. Thank you.

MS. MARIANI: Good morning, Your Honor, Deputy City Attorney Jessica Mariani for the City of Los Angeles.

THE COURT: Thank you very much.

MS. HASHMALL: Good morning, Your Honor, Mira Hashmall here for the County of Los Angeles.

THE COURT: Good morning.

MS. BRODY: Lauren Brody also here for the County.

THE COURT: Okay.

MS. MYERS: Good morning, Your Honor, Shayla Myers on behalf of the intervenors.

THE COURT: First of all, I hope all of you had a good holiday season with you and your families and welcome back.

The first item I'd like to cover is an update from A&M. If you'd be kind enough and bring up any members of your staff you'd like to. And I'd like you to discuss the progress of the audit and acquiring the final data for the audit, any

**EXCEPTIONAL REPORTING SERVICES, INC**

**6**

issues or concerns encountered during the process, particularly focused on transparency and accessibility.

And I want to compliment both the City and start with a positive note, and the County for approving the additional amounts of $400,000 each concerning the audit without us getting into a disagreement over that.

Part of these increased costs were the under amounts approved up by the City Council when the estimates were 2.8 to 4.2 million and the Council, and I've said this before, arbitrarily came back and approved 2.2 million. I have no understanding of why that was done.

But also there have been delays in terms of information and following your e-mails back and forth, that have caused this, but now I'd like to hear from A&M and start to hear any corrective action if I need to get this audit completed.

**MS. COLLIER:** Good morning, Your Honor, Laura Collier with A&M. In terms of an update, we're just continuing to follow up with respect to parties City and LAHSA to begin finalizing our report and then conversations with the County of just confirming our engagement letter.

**THE COURT:** I saw the latest e-mail I think that came to you yesterday from LAHSA. And I read that this morning about 5 o'clock. Is this audit going to be completed in January or February?

**7**

**MS. RAFFERTY:**  So I think, to give a -- Diane Rafferty from Alvarez and Marsal, still working with the County on our understanding of what is health protected information and what their understanding is health protected information.

They have sent us data, but to our company, we cannot start working on that part of the engagement for the County until we have a signed engagement letter.  We can't -- we can never proceed with a client or any kind of work until we have a signed engagement letter.

The hold up on that right now is the indemnity clause, which I understand what the County's view is, it's saying if we give you information, we want to make sure that that information is protected and they want to be held harmless.

I think where we're stuck is the understanding of what we call PHI under the HIPAA rule.  Our understanding is very different than what the County's.  We're kind of at a roadblock because unless the County can tell us something different, they think an address counts as identifiable information.

So that would be like saying every hospital in Los Angeles can't produce their address.  I mean, I -- we would never be able to say if 14 people were referred to a certain location, we would have no way to identify that person in that location.

**EXCEPTIONAL REPORTING SERVICES, INC**

**8**

THE COURT:  And let's resolve this today.  First, each of you were able to resolve this type of issue when I threatened to bring you to my court in Orange County and to personally supervise this data.

MS. RAFFERTY:  Uh-huh.

THE COURT:  And I also represented that I was prepared to make those rulings and keep those issues, such as addresses or names under seal.

MS. RAFFERTY:  Uh-huh.

THE COURT:  There are many ways that a court can keep this information private.  And one of those is simply having that take place in my courthouse, making those rulings and placing this under seal, which gives you the data, but also protects HIPAA.

Now just a moment.

You seemed to reach a resolution very quickly because I don't think you wanted to journey down to my courthouse but that's what I'm prepared to do.

How are we going to work this out?  Because we're going to work this out.  Because if we don't, it's going to increase the costs of this audit, it's going to delay this audit and that's not a benefit to the County, to the City or to A&M.

And I've said again, my great fear is that this may be the only time that we have an audit because in the past the

EXCEPTIONAL REPORTING SERVICES, INC

**9**

City and Council have taken the position and so has Matt that if we take these programs under the auspices of the Mayor, then we can't have an audit.  Which seems to be a ridiculous situation after 30 years of not having any transparency or little.

Judge Gandhi is here.  He's eager.  Look at how eager he is.  He's going to resolve this for you today.  Correct?

**SPECIAL MASTER GANDHI:**  Correct.

**THE COURT:**  Correct.  So if you need to call counsel, give them a call, tell them to come down to court.  If you need somebody from the County or City, you know, besides yourself, I don't think you do, but if you do, just a courtesy, tell them to come to court, it'll be resolved today or tonight.

Okay.  Continue on.  Tell me how we're doing with our audit and what I'm particularly concerned about is some of the spot checks on the ten locations.

**MS. COLLIER:**  The field work in relation to the County I think we agreed to do permanent supportive housing and the high service need interim housing beds.

**THE COURT:**  Slow down, say that again.

**MS. COLLIER:**  Okay.  For the ten field work sites, in addition to the interim housing sites that I went to from -- that was funded by the City to do the permanent supportive housing and the high service need interim housing beds, that would fall under our engagement with the County.  So that falls

**10**

under what Ms. Rafferty was just discussing of needing a finalized engagement letter before --

THE COURT:  Okay.

MS. COLLIER:  -- we can begin with it.

MS. RAFFERTY:  And, Your Honor, as soon as the engagement letter is signed and agreed to, we'll go to work that day or the next day.  We're ready to go.  I don't want to speak for the County --

THE COURT:  Well don't.  We resolved it.  Judge Gandhi is going to resolve this for you today, tonight or tomorrow.

MS. RAFFERTY:  Okay.

THE COURT:  We're just in continuous section until it gets done.  So if you need counsel down here, you're stuck here with me until we get this resolved.

MS. RAFFERTY:  Okay.

THE COURT:  Because otherwise we're just delaying which seems to be an impediment.

Okay.  How else are we doing?  Any other input you want to give at the moment?

Jay, any comment?

SPECIAL MASTER GANDHI:  Those are two -- from A&M's position, those are the two issues, whether it addresses counsel to do a PHI and then the indemnity?

MS. RAFFERTY:  Correct.  And please know that we

EXCEPTIONAL REPORTING SERVICES, INC

**358**

don't -- like I would not speak for the County, I understand their concern. I mean, we're willing to do things like use SharePoint or an encrypted data site. We do not want PHI. There's no reason for us to have it, we don't want it.

I totally and my team respect a patient's privacy, especially for mental health treatment and substance use treatment, we don't want that. But we do want to know how someone gets referred and gets a service and we don't want to know if they're male or female, we don't want to know their age. That seems to be the wall that we can't get past right now.

**SPECIAL MASTER GANDHI:** In other words, we'll take up the respective positions a little bit later, but do you need counsel here to negotiate the engagement letter?

**MS. RAFFERTY:** No, I actually -- I can negotiate that. I have a -- if I have to call New York, I can call New York and get them on the line, but I have the authority to sign the engagement letter based on --

**THE COURT:** The problem is we're going to be in continuous session until it gets done.

**MS. RAFFERTY:** Okay.

**THE COURT:** So I don't want you -- I want to just alert you we're not going home with this problem and coming back in a week. I'm going to resolve it today.

**MS. RAFFERTY:** Thank you.

**EXCEPTIONAL REPORTING SERVICES, INC**

**THE COURT:** Or tonight or tomorrow or the next day or the next day or this weekend. Okay?

**MS. RAFFERTY:** Okay. Thank you.

**THE COURT:** Okay. Jay, more questions?

**SPECIAL MASTER GANDHI:** No. The County and --

**THE COURT:** We're going to go through the rest of the agenda, but then you're going to go back with Judge Gandhi, okay. Jay.

**SPECIAL MASTER GANDHI:** No, the County and A&M just have the latest version of the agreement and a red line. I highlight the two issues and then we're going to solve it, also check to see if the addresses or PHI under the Office of Civil Rights for HHS.

**THE COURT:** All right. Now, remember the Court went through this with you before and you seemed to have resolved it when I threatened to bring you down and none of you really wanted to come and visit me. I've got all ways, all sorts of ways of protecting privacy under seal, et cetera. And I don't see why -- well, I'll leave that to you, Judge Gandhi.

**MS. RAFFERTY:** And just one clarification --

**SPECIAL MASTER GANDHI:** We get engagement letters done all the time, so both of you just compromise and get it done today.

**MS. RAFFERTY:** Okay. And just for --

**SPECIAL MASTER GANDHI:** But I'm going to come down

EXCEPTIONAL REPORTING SERVICES, INC

**360**

and make that point personally.

**MS. RAFFERTY:** And the clarification, we don't want a person's address. We need the address of where the services are provided, not --

**THE COURT:** Ah. So you don't --

**MS. RAFFERTY:** Okay. Thank you.

**THE COURT:** -- need the individual's address, you need the location of the services.

**MS. RAFFERTY:** Right.

**MS. HASHMALL:** Well, I mean, but -- so to be clear, the County has been very supportive of the audit being conducted of the City programs and we actually provided the data that was requested weeks ago. We gave them an engagement agreement that was crafted on standard County language. Indemnity is very run of the mill in the context of public contracting and in particular when the information and the data that we have turned over is private and it's protected under state and federal law. And we appreciate the Court's protective order, but that -- what seems to be the rub is A&M is balking at provisions that provide assurances that their internal maintenance of this information will be private and secure and protected, which seems --

**SPECIAL MASTER GANDHI:** Not right now, Mira. We'll take it up. We'll take it up in private mediation and both of you plan to compromise on the language. I'm pretty familiar

**EXCEPTIONAL REPORTING SERVICES, INC**

**14**

with this.

MS. HASHMALL:  Okay.  Thank you, Your Honor.

SPECIAL MASTER GANDHI:  Thanks.

THE COURT:  Okay.  Any other input from A&M?  Any comments from LA Alliance, just stick around.  LA Alliance, any comments?

MS. MITCHELL:  No, Your Honor, thank you.

THE COURT:  City, comments?

MS. MARIANI:  No, Your Honor, thank you.

THE COURT:  County, comments, without getting into the merits of the --

MS. HASHMALL:  No, Your Honor.

THE COURT:  Okay.  Shayla?

MS. MYERS:  No, Your Honor.

THE COURT:  Okay.  The City controller's audit report, I requested the City controller -- I'm sorry? Fletcher, come on up.  To present an in depth review of the recent audit on the City's permanent housing programs.  And I'm hoping for summary of the findings and actionable recommendations so I can literally post that on a public web access page.

And I've asked you to identify some key points for me, but I'm going to give you carte blanche today and I want to compliment you and the City, I hoped for that cooperation when Matt Szabo came forward and said he would cooperate with the

**15**

auditor control -- controller.

First, the identification of factors contributing to the ineffectiveness of permanent supportive housing program. An examination of why the City's permanent housing funding primarily rests on time limited subsidies, with a focus on the implications of their expiration and I think your report came back, controller, with 21 percent. I think that was your number from memory.

An analysis of whether the recipients of these time limited subsidies are receiving support services from the County with details of the types of services provided. And underlying all of this, would you put up the County audit for a moment. And the critical question for the controller that I'm going to ask you and counsel for the City, and Matt Szabo in a few moments, so you're prepared is this, and the County and LAHSA.

And if you go to the -- you don't need to go to the summary, I think it's six and it's contractual. No, that's not it. To save time, you can just put it on the Elmo if you want to, Ellie.

Here, I've got it right here.

It's number 3. I'm sorry, Ellie. It's on page 3 of 16. And if you -- you got it, 3, now move it around. I'm going to assume for a moment that you as an auditor have done an excellent job in cooperation with the City so we're

**16**

positive.

Of getting data up from LAHSA and/or the County, on a certain number of contracts.  Eventually when you're done with your presentation today and some of the excellent work that's occurred, I want to know how many of these have been posted.

We have at least from the County's audit, that LAHSA is unable to produce an accurate list of all of their contracts in EGMS, specifically while LAHSA -- and where's LAHSA?  I know that they're here and you can make an appearance.  Come on up, folks, join me.  Come on, that's an order.  That's not a request, get up out of your seats and come up here.

**UNIDENTIFIED SPEAKER:**  Good morning.

**MS. DUNKERLY:**  Good morning, Your Honor, Erin Dunkerly, counsel for LAHSA.

**THE COURT:**  There you are.

**MS. DUNKERLY:**  Yes.

**THE COURT:**  Good.

**MS. DUNKERLY:**  And I have -- there's various representatives from LAHSA.

**THE COURT:**  Sure.  As a courtesy, just identify who you are.  I wasn't going to call on you, but I'm backtracking, but that saves --

**MS. HENDERSON:**  Good morning.  Dr. Henderson, director of risk management with LAHSA.

**THE COURT:**  Nice to see you.  And?

EXCEPTIONAL REPORTING SERVICES, INC

**364**

**17**

**MS. TREJO:**  Janine Trejo, CFO.

**THE COURT:**  Good seeing you, I appreciate you being here.

LAHSA provided five different contract listings from GGMS that identified varied contract totals ranging from 676 to 1,078.  The whole idea behind this is I don't understand, as the controller, or the City, or the County, or LAHSA, why when you send out an RFP and you get an eventual decision made about who's going to be the contractor, why this isn't publicly accessible and that's more of a question for the County and the City than it is you, and why bills are being paid without transparency to the public, because it would seem to me that I know we have HIPAA problems, et cetera, the Court can resolve that very quickly.  I can protect privacy.  How many of these are getting posted?  Are we 5 out of 676, are we 10 out of a thousand?

So eventually when you're done with your presentation, come back to me and help me because it appears to me that whatever money -- it's gone, it's gone, we're not going to get it back.  But going forward, I would think that the public has the right, and that's why I'm adamant about this website, to see what these bills are and what the services are that are being provided, and almost in real time, because the City and County are getting billed.

So your presentation and I'll be quiet.

**EXCEPTIONAL REPORTING SERVICES, INC**

**18**

MR. MEJIA:  Thank you, Your Honor, for having us here in your court.  I'm actually here today with our audit services division the ones who did the work in detail and they can answer a lot of your questions, but pretty much, Your Honor, this is Devang Panchal, he's our director of auditing --

THE COURT:  Pleasure.

MR. MEJIA:  -- so he oversees our audit division.  We have Nick Ketter (phonetic), our audit manager and we also have Hasam Alken (phonetic), the senior auditor --

THE COURT:  Thank you.

MR. MEJIA:  -- who lead the audit.  So I'll bring Devane, if you'd like.

THE COURT:  My compliments.  This is the first effort of transparency, so thank you for your presentation.

MR. PANCHAL:  Hi, good morning and thank you for the opportunity to be here today.

Like the controller said, you know, we recently issued an audit that explored the efficiency and effectiveness of the City's rehousing system.  And we launched this project because we wanted to determine whether people are getting the help they need and whether taxpayer dollars are being carefully spent.

And what we found unfortunately was we found significant deficiencies that really raised concerns about outcomes and how resources are being spent.

**19**

THE COURT: What were those findings?

MR. PANCHAL: We're going to provide a detailed walkthrough of the findings and recommendations on both the interim side as well as the permanent side.

THE COURT: Okay.

MR. PANCHAL: So we'll get right into those and we'll be happy to answer any questions after that.

THE COURT: Okay.

MR. MEJIA: Thank you for your time. We examined LAHSA's ability to move people from LA City shelters into permanent housing. This is a concept known as through put and through put is important, because the faster a person moves from a shelter into permanent housing, the faster that bed frees up for another person.

For this project, we reviewed LAHSA operations and data from FY 2019 through FY 2023. What we found is that LAHSA and its contractors have really been struggling to meet their goal of reaching 95 percent occupancy in shelters.

For our scope period, citywide occupancy rates across all shelters ranged from 64 percent to 78 percent. Based on the estimated shelter operating cost between 2019 and 2023, we estimate that the cost of those unused beds was more than $200 million.

With regard to the interim housing types that saw the highest occupancy rates, typically the hotel based shelters,

**20**

such as Project Home Key saw better occupancy rates than the traditional homeless shelters which have beds in communal living spaces.

We also found that contractors are typically paid the same amount, regardless of the occupancy rate.  And this means that strong oversight --

THE COURT:  Let me slow you down.  That means that if the bed is not filled in simple terms, the contractor is still paid.

MR. MEJIA:  Yeah.

THE COURT:  Okay.

MR. MEJIA:  And that's important, that means that active oversight of the shelter operators is incredibly important.  Unfortunately, LAHSA's contract monitoring focuses mostly on compliance issues, rather than those performance elements.

LAHSA generally is not going to take corrective action or intervene with a contractor fails to meet the performance targets in its contract.

THE COURT:  Just a moment.  Are there performance contract -- are there performance targets in the contract?

MR. MEJIA:  Yes, it sets a goal of typically 95 percent occupancy.

THE COURT:  Okay.  Please continue.

MR. MEJIA:  We also have concerns about filling beds.

EXCEPTIONAL REPORTING SERVICES, INC

**368**

**21**

It is possible that some of the beds go vacant for longer than needed due to some City imposed policies.  One example is that City offices can reserve beds in shelters for individuals in advance of clean-up operations for encampments.  Another issue the City has developed what are known as catchments, which are geographic zones that are generally tied to City Council districts.

An unhoused person, for the most part, cannot be placed in shelters that are outside of the catchment in which they reside.

**THE COURT:**  And the catchment does not correspond to the Council District, does it?

**MR. MEJIA:**  They're very close to the Council District boundaries, but not necessarily always exact.

**THE COURT:**  Right.  Okay.

**MR. MEJIA:**  Unfortunately, there are no formal documented procedures in place for these reservation protocols or the catchments and we believe that has real world operational impacts and can create potential barriers.

**THE COURT:**  Now, Matt, come on up here, because I know you were kind enough to participate in this.  So come on up.  Yeah, that's an order, that's not a request, come up here, saving me getting the Mayor, I think she's in Ghana though.

Okay.  Now, nothing yet, I just want you at the lectern.  Okay.  Finish your presentation here.

**EXCEPTIONAL REPORTING SERVICES, INC**

**369**

**22**

UNIDENTIFIED SPEAKER: Good morning, Your Honor, I'm just going to finish with the second half of the presentation.

So in addition to struggles with occupancy rates, LAHSA's ability to transition people from shelters to permanent housing remains limited. Housing navigation services are essential when it comes to moving people into permanent housing. Housing navigators help people secure benefits, apply for housing, and move people into permanent housing settings.

But right now, the agency can only enroll about 30 percent of the shelter residents into housing navigation, making permanent housing connections difficult. This challenge is compounded by the chronic shortage of affordable housing in Los Angles. And as a result, fewer than one in five people staying in shelters have secured permanent housing and most people in shelters return to homelessness or some other unknown destination.

THE COURT: Now, just a moment. Most people return. I don't know what that means in terms of percentage. It's a broad statement.

UNIDENTIFIED SPEAKER: So it's roughly about 70 to 80 percent returns to homelessness and we can give you specific percentages.

THE COURT: 70 to 80 percent? All right. Please continue.

UNIDENTIFIED SPEAKER: I'll circle back to the exact

EXCEPTIONAL REPORTING SERVICES, INC

**370**

Case: 26-784, 02/09/2026, DktEntry: 3.1, Page 113 of 225
Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 23 of 135   Page ID #:23329

**23**

percentage and I'll just continue with the presentation.

**MR. MEJIA:** And, Your Honor, this percentage is returning to homelessness or an unknown destination.

**THE COURT:** Okay.

**UNIDENTIFIED SPEAKER:** There are a variety of ways a person can secure a permanent housing, renting a unit with a voucher, finding their own housing without a subsidy or being connected to permanent supportive housing.

The most common permanent housing pathway for people in shelters was renting a unit using a time limited subsidy.

**THE COURT:** Slow down and say that again please.

**UNIDENTIFIED SPEAKER:** The most common permanent housing pathway for people in shelters was renting a unit using a time limited subsidy.

**THE COURT:** Okay.

**UNIDENTIFIED SPEAKER:** Time limited subsidies are a type of rapid rehousing voucher which helps people pay for permanent housing for a set period of time, usually two years. Unfortunately, these permanent housing placements are not always permanent. Around 12 percent of the time limited subsidy participants return to homelessness during the life of their subsidy and more tracking of data related to long term permanent housing outcomes is needed across all permanent housing destinations.

**THE COURT:** Now, just a moment.

**24**

Matt, my apologies, I called you up and that's inappropriate on my part.  Is David Michaelson here?  He represents the Mayor.  He was here before.  If he's around, would you just ask him to come in, Mack?  David, come on up here for a second.  You represent the Mayor, I want to make sure we're all hearing the same thing.

So, Matt, have a seat, my apologies.  You -- I got the wrong person.  You have my apologies.

**UNIDENTIFIED SPEAKER:**  So the least common permanent housing outcome is permanent supportive housing.  Around 13 percent of the permanent housing placements are for permanent supportive housing.

At the conclusion of the audit we made 17 recommendations.  LAHSA agreed or partially agreed with 15 of the 17 and disagreed with 2.

**THE COURT:**  Okay.

**UNIDENTIFIED SPEAKER:**  Some of the key recommendations include ensuring service providers are held accountable by implementing enhanced data management practices, new contract monitoring procedures and formal corrective action policies to address failures to meet performance targets.

Formalizing the City's bed reservation policies to ensure beds are not vacant for longer than needed and to ensure most in need of shelters are connected to available bed resources as timely as possible.

**EXCEPTIONAL REPORTING SERVICES, INC**

Case: 26-784  02/09/2026  DktEntry: 3.1  Page 115 of 225
Case 2:20-cv-02291-DOC-KES  Document 850  Filed 01/08/25  Page 25 of 135  Page ID #:23331

**25**

Considering adopting enhanced performance metrics and new performance based compensation models which create incentives for meeting shelter bed enrollment and permanent housing placement goals.

Expanding housing navigation capacity to increase the number of connections to permanent housing.  Expanding the rehousing systems key performance indicators including monitoring and related reporting to include long term outcomes relative to participant's stability in all permanent housing destinations and not just during the life of time limited subsidies and this is one of the recommendations that LAHSA had disagreed with.

**THE COURT:**  Okay.

**UNIDENTIFIED SPEAKER:**  Our office will continue to work with LAHSA to monitor the implementation of these recommendations.  And we look forward to corroborating with them to ensure implementation.

With that, Your Honor, this concludes our presentation.

**THE COURT:**  One question and then I'm going to ask Special Master Martinez or Judge Gandhi to ask questions.

When we have a time limited subsidy for two years, what happens when this is supposed to be, you know, permanent housing when that time limited subsidy runs its course, I'm homeless, what happens to me?

**26**

**UNIDENTIFIED SPEAKER:**  So at the conclusion of the two year subsidy, oh, was this a question for the controller's office, sir?  Okay.  At the conclusion of the two year subsidy, assuming that the person -- the individual did not fall back into homelessness or to unknown destinations, the subsidy expires and they are typically, based on what we learned from LAHSA, they're rolled into another subsidy called the shallow subsidy.

And that is basically -- it's a smaller subsidy than the time limited subsidy, but that's basically where they go.  Alternatively, they would fall back into homelessness because the subsidy would end.

**THE COURT:**  One more question and then I'll turn it over to you.  At the beginning, the County had what I thought was a very legitimate complaint about services and I think Skip Miller was representing the County at that time, the same office that Mira's involved in.  And one of the concerns was, on the County's part, why should we be paying a bill for bed spaces that we don't know are even occupied.

**UNIDENTIFIED SPEAKER:**  Now, we're just talking about occupancy now or beds not necessarily --

**THE COURT:**  We're talking about the County paying for services, you know, in a block amount, and a complaint on their part that, you know, we're paying for these services and we don't know if this bed's even occupied or not.  I think

**27**

Mr. Miller's position at the time was well taken and that is, we ought to have some accountability from the County's part for the services we're being asked to provide, because we have a huge or potentially huge amount of unoccupied bed space and we're still paying for it.

**SPECIAL MASTER MARTINEZ:** And this is during the three way agreement.

**THE COURT:** Yeah, yeah.

**SPECIAL MASTER MARTINEZ:** Just to say, this is during the three way agreement when the County provided lump sums of money, I think in the tune, when it's all said and done, a total of $350 million. Right? County counsel had asked, you know, wanting to ensure that if they were going to provide that lump sum that, you know, the City would fulfill its obligation on the other side.

**THE COURT:** Yeah, we had a big debate about this, about filled and unfilled spaces and it was actually County counsel and Skip.

**UNIDENTIFIED SPEAKER:** Right. So --

**THE COURT:** So, in other words, are we paying for unused bed spaces right now if we're the County?

**UNIDENTIFIED SPEAKER:** So what we focused on as a City controller's office was where the City as an entity places most of its funding and places most of its funding on beds. The County focuses its funding on services, which are aspects

**EXCEPTIONAL REPORTING SERVICES, INC**

**28**

that we focused less on.

But in general, through this audit and through another audit we've issued previously relative to bed availability for bed reservation systems, we continue to emphasize the importance of continuing to update the data consistently and reliably and on a perpetual basis so that we continue to as a City, as LAHSA and as the County and all the stakeholders continue to obtain the information that they need to ensure that the invested funds are used properly and in accordance with the taxpayer's expectations.

THE COURT: Okay. Thank you.

MR. MEJIA: And to answer your question, yes, the City is still paying for unused beds.

SPECIAL MASTER MARTINEZ: Thank you. In regards to time limited subsidies, you -- when did this program start? Did it start in 2019 because I know your audit was from 2019 to 2023, is time limited subsidies a fairly new program or has it been in existence since 2019?

UNIDENTIFIED SPEAKER: It's not a relatively new program. It's been rebranded. It was formerly known as rapid rehousing. I don't have the exact time frame of when the rebranding took place, but it is a program that's been around for quite some time and I failed to mention that one of the -- conceptually the way it's supposed to work is during that two year time frame, the case manager is expected to work with the

EXCEPTIONAL REPORTING SERVICES, INC

**376**

Case: 26-784, 02/09/2026, DktEntry: 3.1, Page 119 of 225
Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 29 of 135   Page
ID #:23335

29

participant to enhance their stability, boost their income, connect them to the programs that they need to be connected to and will refer them to be more stable and on their way -- and on their journey to permanent housing.

And at the end of the two year program, the expectation is that that person would be self-sufficient to rent a unit on their own or alternatively be rolled into another more permanent subsidy, such as Section 8.

SPECIAL MASTER MARTINEZ: Yes, and I apologize for my question and I didn't state it correctly. What I wanted to say is that at a certain point HUD had rapid rehousing under their program and so my question is, who's paying now for the rapid rehousing? Is that the City of Los Angeles paying directly from its own funds? Do we know where that funding is coming from?

UNIDENTIFIED SPEAKER: Ultimately we know, based on the reporting that we've received, that the City puts in, during that time, that five year time frame have put in about 18 percent.

Now where that money originally came from, whether it was, you know, pass through funding from HUD to the City, then to LAHSA, et cetera, that --

SPECIAL MASTER MARTINEZ: Or through a state program like Hap Funds, correct?

UNIDENTIFIED SPEAKER: Or through a state program,

**30**

that fact I don't have exactly --

**SPECIAL MASTER MARTINEZ:** Yes.

**UNIDENTIFIED SPEAKER:** -- but we know that from the City to LAHSA, 18 percent of the funds came.

**SPECIAL MASTER MARTINEZ:** Great. And that's an important question. As we move forward, you know, it's a bigger and larger picture. You did mention issues in regards to the reserve system for certain council districts, but if we look at the system as a whole, when you look at the CES system, right, that in itself is a system that doesn't function for the City of Los Angeles.

One, you have issues and, you know, we have a local queue, you have the County that is focused on high acuity for the CES system, they have their own systems when it comes to mental health and substance use that are not part of the CES system. And so in a nutshell, there's a lot of complexity here and when you're trying to grapple with who's responsible and you see all this funding and you're wondering why do these beds continue to be empty.

And this is, you know, at our last learning session this is one of the issues we talked about. And the need to get people into these beds, but we currently have systems in place that don't allow that to happen and you're making that recommendation. I'm glad that LAHSA is agreeing to that, but ultimately it's going to come from the policymakers. And I

EXCEPTIONAL REPORTING SERVICES, INC

**378**

want to reiterate that to Judge Carter and to, you know, all the parties here.

You know, this is an issue that has to be addressed when that much money is being spent on a bed and it continues to remain empty because you're waiting for somebody, you know, you have to contact them, they don't have a phone number, and then that person's in the queue based on their acuity, and then you have to go to the next person and now you're waiting several more days until you finally, finally, finally get someone. It could be three to four weeks. That's the system that you all currently have in place.

And we've talked about that. We need to figure out a resolution and solutions. And so I wanted to highlight that for the Judge, because it's not just about why it's being -- why all these dollars are being unspent and where it's coming from.

These are policy decisions that have to be made and we can't put the blame on LAHSA. LAHSA is following certain policies and systems from the federal, state and also local and county level and we need to identify what exactly works. And we can't say, hey, HUD forces us to do CES. The reality is that when you look at HUD's system in regards to CES, it's very flexible.

I have looked at systems in Ventura, Orange County, they don't have the same, you know, process and you guys are

**32**

partners with Orange County, you're partners with Riverside. And so I believe that we need to relook at how we're actually housing people and if it's truly a crisis, we need to understand that, yes, there are people that have high acuity, but there are also a lot of people that are waiting to get placed and they may not have that high acuity, but we're so focused on this documentation that sometimes these unhoused people are not going to give you all this information. They don't know you, they don't trust you, there's issues with the system and so we need to -- and these are things that we've heard out in various council districts.

We've had this discussion in our learning session a couple of months ago, from service providers highlighting some of the complexities and issues. This is not about fault here, this is about how do we look at a system that actually works for Los Angeles. Because ultimately what we are seeing here today with the city controller's report and then also the county controller's report, something is not working. And so we need to resolve that. And I just wanted again to highlight, Judge Carter, that this is more complex than just saying that these beds are being unused. It's ultimately going to have to be a decision of the policymakers.

THE COURT: I've got two questions for you. How many contracts do we have, LAHSA can enter into this, the County can? In other words, I've got 676 to 2,000 or 1,000 whatever,

EXCEPTIONAL REPORTING SERVICES, INC

**33**

I think it's by the County auditor, contracts total ranging from 676 to 1,078, LAHSA not tracking key data in EGMS or maintaining inaccurate data.

**UNIDENTIFIED SPEAKER:**  Sir, while we did receive --

**THE COURT:**  No, I'm sorry, how many contracts do we have?

**UNIDENTIFIED SPEAKER:**  While we did receive data relative to --

**THE COURT:**  I'm sorry.  How many contracts do we have?

**UNIDENTIFIED SPEAKER:**  I don't know that number off the top of my head.

**THE COURT:**  Okay.  Just say you don't know, simple as that.

**UNIDENTIFIED SPEAKER:**  Yes, Your Honor.

**THE COURT:**  Number two, how does this Court or the City get accuracy if the City Council has now voted to move from 25 percent of front loading money to providers.  And now they've moved to 40 percent or more of front loading money to the providers.

In other words, we're paying ahead.  We started off an RFP I assume, or have we?

**UNIDENTIFIED SPEAKER:**  Is that a question to the controller's office?

**THE COURT:**  In other words, I don't think we've even

**EXCEPTIONAL REPORTING SERVICES, INC**

sent out an RFP to the provider, but I'm not certain of that. In other words, we move from 25 percent front loading money with no milestone, I don't think we have an RFP, I may be wrong about that. So 25 to 40 percent of the outgoing money is almost non-accountable for, to the City, or the County, or the Court and if I'm wrong about that, I want you to tell me. Because it seems to me if we're putting up a transparent website going forward, we're only tracking those RFPs that have been, you know, with milestones, contracts, et cetera, payment that we can all get up regardless of HIPAA, but we got 25 to 40 percent that's still front loaded that I don't see any accountability. Now correct me if I'm wrong.

    **MR. MEJIA:** We would -- in terms of the advance, we would have to defer to I think the Council who made that decision on raising that amount or on why they did that.

    **THE COURT:** But you can take that back, it's a concern of the Court, it should be a concern of you, how do we track transparency here if we're going to front load 25 percent and I hear the providers complaining, but as they complain, I'd like my 50.8 million dollars back, just to start with, and maybe hundreds of millions, because I'm not going to let up on this, okay. Just so you and the Mayor -- counsel hears, where's that money. Okay?

    So when you claim you're broke, you're going to have a problem with this Court. You're not broke. No. You finish

Case: 26-784  02/09/2026  DktEntry: 3.1  Page 125 of 225
Case 2:20-cv-02291-DOC-KES  Document 850  Filed 01/08/25  Page 35 of 135  Page ID #:23341

35

your presentation and then I'll ask Michelle if she has any questions or Judge Gandhi.

Okay.  LA Alliance, do you have any questions of -- and then we'll turn to LAHSA.  Do you have any questions?

**MS. MITCHELL:**  No, my only question is whether this presentation will be posted on the docket.

**THE COURT:**  We will.

**MS. MITCHELL:**  Thank you, Your Honor.

**THE COURT:**  Okay.  Let me turn to LAHSA.  Do you have any comments you'd like to make?

**MS. DUNKERLY:**  No, Your Honor.

**THE COURT:**  Okay.  City?

**MS. TREJO:**  Excuse me, Your Honor, I apologize.

**THE COURT:**  Please.  By the way, it's good to see you and I appreciate you being here, and I appreciate your presentation last time it was very thorough.

**MS. TREJO:**  Thank you.

**THE COURT:**  I want to compliment you.

**MS. TREJO:**  Thank you.  I'd only like to clarify one thing and that's regards to the advanced payments that are for the service providers.  The City has not shifted over to the alternative payment model as of yet, so that is still 25 percent that is advanced.  LAHSA is in the process of reconciling those advances that have been issued to the service providers, to make sure that all the funds have been recouped

EXCEPTIONAL REPORTING SERVICES, INC

Case: 26-784  02/09/2026  DktEntry: 3.1  Page 126 of 225
Case 2:20-cv-02291-DOC-KES  Document 850  Filed 01/08/25  Page 36 of 135  Page
ID #:23342

**36**

before we shipped over to the new payment model.

The payment model for the County is 80 percent of the annual funding and the service providers only receive one-twelfth, so they receive an advance for one month and that is issued to them, so that this way they have the funding to provide the services that they need to for that month, and then they have to submit an invoice. And that invoice is reconciled against that advance that they were issued for that month. So there is an immediate reconciliation process that happens on a monthly basis. And that is reported to the County.

There are also, if the service providers are missing two invoices, that payment process stops and the service providers reverse back to the reimbursement process until they are caught up on their invoicing. So that this way, it establishes a check and balance and transparency and to ensure that the services are being rendered.

**THE COURT:** Why can't I get this up on a public website for the public to view?

**MS. TREJO:** We can -- I mean, we've given the reports to the County, so we can confer with the County and then share the information that has been getting shared out, which details the invoices that have been received from the service providers, any delinquency from the service providers and the advances that have been issued and the reconciliation of the recoupments.

Case: 26-784  02/09/2026  DktEntry: 3.1  Page 127 of 225
Case 2:20-cv-02291-DOC-KES  Document 850  Filed 01/08/25  Page 37 of 135  Page
ID #:23343

37

**THE COURT:** Questions? Jay, questions?

**SPECIAL MASTER GANDHI:** What were the two -- what was LAHSA's -- first of all, clarify what the two recommendations LAHSA wouldn't agree to and why.

**MS. TREJO:** I don't have that information in front of me and some of -- if the City controller can do that.

**UNIDENTIFIED SPEAKER:** Yeah. So two recommendations, the first one was related to consolidating contracts of housing navigation and interim housing services to eliminate diffusion of responsibilities among service providers, relative to housing placements.

They disagreed with it --

**THE COURT:** Pete, you might not want to go away.

**UNIDENTIFIED SPEAKER:** I'll be back.

**THE COURT:** Okay. Come on back, you might want to hear the rest.

**UNIDENTIFIED SPEAKER:** LAHSA disagreed on the basis that maintaining separate contracts allows LAHSA greater visibility into the operations of housing navigation, ensures specialized staff are dedicated to fulfilling those functions, and allows flexibility and quickly reallocating resources as new shelters are brought on line.

And while there are operational benefits to maintaining separate contracts, our recommendations intend was to eliminate any ambiguity as to which provider bears the

**EXCEPTIONAL REPORTING SERVICES, INC**

**38**

ultimate responsibility for the permanent housing placement metrics.

And then the second recommendation was relative to LAHSA disagreed with recommendations at 17 on the basis that they do track returns to homelessness, which was this the recommendation to track long term outcomes and returns to homelessness of people that were placed into permanent housing.

So they disagreed on the basis that they do track returns to homelessness for time limited subsidy recipients for two years post subsidy. And then in the response, they added a link to their dashboards.

And so our review of the dashboard found that the reported returns to homelessness of DLS recipients are limited to those occurring during the life of the subsidy and specifically within the first months of the subsidy, not post subsidy.

**SPECIAL MASTER GANDHI:** And expand a little bit about on -- did you say about 30 percent of those that are in the shelters are receiving housing navigators. Can you talk a little more about that?

**UNIDENTIFIED SPEAKER:** Yes. So at any given time, the -- out of everyone in the City funded shelters or the shelters that the City does fund, at any given time, only 30 percent of those participants that are staying in shelters can be connected to housing navigation at any given time due to

**EXCEPTIONAL REPORTING SERVICES, INC**

**39**

just the amount of resources that they're allocated.

SPECIAL MASTER GANDHI:  The shortage of navigators?

UNIDENTIFIED SPEAKER:  Correct.

SPECIAL MASTER GANDHI:  And then remind me, how many beds does the City fund in the shelters, is it about 16,000?

UNIDENTIFIED SPEAKER:  So in the City, there's about 16 and the way we counted our beds in our audit report defers a little bit than the annual count, which is typically performed.

We counted the beds based on the number of service nights available as a system.  So the total capacity.  And so as of FY 2023 we estimated that there's 7,000 beds of the 16,000 beds in the City are City funded.

SPECIAL MASTER GANDHI:  And so with a vacancy rate of 25 percent, how many beds are going unfilled tonight, roughly?

UNIDENTIFIED SPEAKER:  Do we have that number?

SPECIAL MASTER GANDHI:  It's a math question for the auditors.

UNIDENTIFIED SPEAKER:  No, we did the -- we had done the math on this.  So --

SPECIAL MASTER GANDHI:  About a couple of thousand?

UNIDENTIFIED SPEAKER:  In the five year period it was a 29 percent vacancy rate and that's about 1,200 beds a year, 1,200 to 1,400.

SPECIAL MASTER GANDHI:  Then follow me here, I'm curious about the 218 calculation on the 25 percent vacancy

**40**

rate.  What is it, is that just an allocation of how much the City overpaid because the beds went unfulfilled?

UNIDENTIFIED SPEAKER:  So the 25 percent is basically looking at the five year out of -- our entire capacity during that five year, 25 percent was empty throughout the five year. 25 percent and that does not include the 5 percent threshold that LAHSA deems as acceptable to be vacant.  So with that, it would be 29 percent.

SPECIAL MASTER GANDHI:  Now, I want you to do a hypothetical with me and see if I'm wrong.  Your 218 calculation is just on that 25 or 29 percent vacancy rate. What if you were to bake in the cost of police, fire, ER, want to take a guess at what that number would mushroom to, what the cost of those beds not being fulfilled is?

UNIDENTIFIED SPEAKER:  I can't --

THE COURT:  Oh, guess, this is getting fun.

UNIDENTIFIED SPEAKER:  Yeah, I'm sure it's a lot. Our estimates are strictly based on direct operational costs, not anything indirect, including police, fire.

SPECIAL MASTER GANDHI:  That's what I was getting at. I think you looked at just the contract, right, the sort of that, but if there were consequential numbers included, it would be significant.

UNIDENTIFIED SPEAKER:  Not to mention the human element aspect.

**41**

THE COURT: And that's why Shayla was adamant and I agree with her, not initially, but after listening to her, that she wanted the cost of the police minimally included, but she also wanted the cost of fire I believe included.

MS. MITCHELL: That was me, Your Honor.

THE COURT: Liz, I'll give Liz credit and, Shayla, you get some credit too.

The auditor is getting back to my special master saying we're having trouble getting accuracy from the police department. In terms of -- yeah. Now, hold on, I want to be sure of that.

How are doing with the cost of homelessness through the police department? Are you getting information from them?

MS. MITCHELL: The way they put their data.

THE COURT: Yeah. Their data? What are we getting from the police?

MS. BROWN: We did receive data, but it is only for overtime hours that are tracked separately for homelessness, it's not time during normal --

THE COURT: Okay. Just overtime. So if an officer responding to a homeless person during my duty hours, I'm not --

MS. BROWN: Correct.

MS. MITCHELL: They're not separated.

THE COURT: Okay. What is the cost of them, just

EXCEPTIONAL REPORTING SERVICES, INC

**42**

joking, of clearing the streets for the Academy Awards factored

in?  Never mind, you don't have to answer that.

All right.  Counsel.

**MS. MITCHELL:**  Just very quickly.

**THE COURT:**  Yeah, do you have any questions,

Michelle?

**MS. MITCHELL:**  Do you guys have a total of the

permanent supportive housing units in the City of Los Angeles?

**UNIDENTIFIED SPEAKER:**  Through this project, no.

**MS. MITCHELL:**  No.  Can the City answer how many

permanent supportive housing it actually has as of today?

**UNIDENTIFIED SPEAKER:**  Do you have it?

**MS. MITCHELL:**  Yeah, and the reason why I'm posing

that question is because when you look at the region as a whole

and what LAHSA states and what the County states of how much

permanent housing, the County under its program will say it has

8,168 but under H, it says that it housed 168,000 people into

permanent supportive housing and I may have that number a

little off, but I'll go back to my notes.  This is just off the

top of my head.

You know, as we're talking about permanent supportive

housing and we know that that is of great importance both to

the City and County, and how we're using these time limited

subsidies across the City, but as well, the County is using

that as well.  We know that, you know, rapid rehousing time

**EXCEPTIONAL REPORTING SERVICES, INC**

**43**

limited subsidy, whatever we want to call it, is not technically permanent supportive housing. That is a -- there is a sunset to that subsidy and a subset to the shallow subsidy and eventually if this person doesn't have a job, doesn't have other income, they will eventually in/out on the street.

But another big concern is, is that when the City is putting up permanent supportive housing, you need the wraparound services. That is key to keep people housed. And one of the big problems that the City of Los Angeles is experiencing, I can't speak for them, but just based on my reading -- me reviewing and watching Council meetings and watching the homeless and poverty housing and homeless committee meeting now, is the issue of people actually staying in those permanent supportive housing units, issues whether it's interim housing or permanent supportive housing have to do with a lot of either disciplinary issues or issues that have to deal with a lack of services.

And so my overall question here is for both the City and County, as we continue with learning sessions and observation sessions and highlighting the importance of permanent supportive housing, we have to recognize that if we're continuing to have these exits, that there are bigger problems that we have to ask ourselves.

And as we move towards, you know, some of the learning sessions that we will have, that is one of the issues

**EXCEPTIONAL REPORTING SERVICES, INC**

**44**

that we will address because what I will highlight and based on the City and County controller reports, yes, we have issues in regards to LAHSA in its documentation and it how it tracks and they're doing everything they can to make improvements, but they're just part of a system.  Right.  We have to look at the whole.

And the parts are the City, are the County, are the other players, the service providers and everyone else and so we just can't look at LAHSA, who is really at the end of the day is really the guardian of data that is helping, you know, get -- you know, providers paid and navigating all these systems.  But ultimately, you know, we've got to go back to who is fully responsible and that is the City and County.

And so I just want to state that to Judge Carter and everyone here that this goes beyond just LAHSA and what's being reported from the City controller, it's going to go back to the policymakers and how we address these issues head on.

**THE COURT:**  If you don't have anything else, I want to thank you and I want to thank Matt Szabo publicly on the record, because I believe that the website was a cooperative effort that you both agreed to.  Are you still getting along?  Are you cooperating?

**MR. MEJIA:**  Yes, and --

**THE COURT:**  Matt, are you cooperative?

**MR. SZABO:**  Yes.

Case: 26-784  02/09/2026, DktEntry: 3.1, Page 135 of 225
Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 45 of 135   Page
ID #:23351

**45**

THE COURT: You have my compliments. Okay. Let's end then on a positive note then. I'd ask you to have somebody stick around, we won't be in session that much longer, but I'd like your participation. I'd like you to be here, some member of the controller's office, because there's going to be a lot of information exchanged today. And I'm not sure after listening to the special master and watching these numerous meetings, that she has me watch at night, that you really are communicating with each other on occasion, so. If you'd have somebody remain.

MR. MEJIA: Sure, yes, Your Honor. Did you still want us to talk about the website? I know that was on the agenda, but if not, we don't have to.

THE COURT: Well, I just want to know how many contracts and the answer is we don't know. And I think you've answered my question about -- through LAHSA and I appreciate your input about this 25 percent, 40 percent fronting money. And ultimately I fail to understand, regardless of the HIPAA issues being raised, which this Court and Judge Gandhi could very easily resolve, why this isn't transparent.

So when we get our RFP and we get our contract in place, you have to make payments. You have to have some kind of milestones. How many of these contracts do we actually have up on our website? 5, 50? How many?

MR. MEJIA: We have the payment support for about,

EXCEPTIONAL REPORTING SERVICES, INC

**46**

maybe roughly around 30 to 40.

**THE COURT:** Okay. Now, hold on. I'm not criticizing that. That's excellent. It's a start. And I thought your presentation was excellent in terms of the website. In other words, what you got up, you've done an extraordinary job. I want that on the record. What I'm worried about is we've got 30 or 40 which you can't control or somebody needs to control out of anywhere from 676 to 1,078 contracts, do the math, we don't have most of these contracts going on a public website. We really don't have transparency. And this is not a criticism of you, quite the opposite, I want the City and County to hear this, we don't have transparency at all.

So going forward, after the audit with A&M is done, when's our next audit because the City's not going to consent to one unless there's pressure, nor will the County. This is it. So over the next 30 years, we're all going to be potentially in the dark and that's why the Court wants these documents to make -- to be public.

And if you're paying for it, I don't understand why we all aren't on the same page, that the public has a right to see these payments and what they're being paid for. So I'm at a loss why we have 30 or 40, other than complimenting you on having 30 or 40. Can someone explain that to me? David, can you explain that to me? Can the County explain this to me? Because otherwise, this website has 30 to 40 out of 600 to

**47**

1,000, that's not a sampling for the public.  We don't know what we're paying for.  Now help me.  City?

            **MS. MARIANI:**  I do not have an answer for that, Your Honor.  The only thing --

            **THE COURT:**  I'm not going to get off this, I'm telling you right now, look at me, I mean it.

            **MS. MARIANI:**  Understood.

            **THE COURT:**  Now, what am I going to do about that?  I'm not sure yet, but I'm really putting you on notice without growling or browbeating you, I have to do something about this unless you do.

            **MS. MARIANI:**  Understood, Your Honor?

            **THE COURT:**  Am I clear?

            **MS. MARIANI:**  Yes, very clear.  The only one point I wanted to make is that the number of contracts in the County auditor's audit may be the County's contracts as opposed to the City's.

            **THE COURT:**  Tell me the number of contracts you have and tell me if they're up on the website.

            **MS. MARIANI:**  Yeah, I'm not sure of the total number but we'll --

            **THE COURT:**  You don't know, do you?  Just --

            **MS. MARIANI:**  We understand.

            **THE COURT:**  But you see the overall point.  The overall point is, if the City is going to continue to take the

**EXCEPTIONAL REPORTING SERVICES, INC**

**48**

position, that we've sweeped all of these programs under the Mayor or the Council and we can't be audited, and the auditor has a different viewpoint about, you know, why are you functioning, except to freeze, et cetera, then how does the public ever get a look in terms of transparency with this huge amount of money because we already know, I can count $50 million, I think Michelle and I can count hundreds of millions of dollars that passed through this City with no accountability.

And I think we made a good record of that back in 2022 at a hearing. Now, Mira, you weren't there at that time, Skip was. Okay. But we raised this on the record, that hundreds of millions of dollars are going unaccounted for. Are we just going to continue down that road?

MS. MARIANI: The one thing I would say, Your Honor, is the charter -- as I believe has been explained before in this courtroom, the charter has a limitation on the controller's ability to do a performance audit, but not a financial audit. So financial audits certainly can be done even of programs under the Mayor's office or any elected office.

THE COURT: Are we going to get these contracts up on our website?

MS. MARIANI: I think that would be a question for the controller --

EXCEPTIONAL REPORTING SERVICES, INC

**49**

THE COURT:  No, the --

MS. MARIANI:  But, yes, we will certainly --

THE COURT:  I'll ask David.  I'll ask the controller, are we going to get --

MS. MARIANI:  -- work to get them up.

THE COURT:  -- these contracts -- Matt, are we going to get these contracts up on a website?  Not 30 or 40, but as you pay, you're paying out money.

MR. MEJIA:  I think just to distinguish, there's the initial contract with a service provider.

THE COURT:  Okay.

MR. MEJIA:  And then as time passes, we'll get like 20 invoices, 30 invoices under that same contract, right.

THE COURT:  Okay.

MR. MEJIA:  So what we're having trouble with even building this website is tying out the actual service provider support to the actual payment and that's the struggle --

THE COURT:  Then why are you paying the bills?

MR. MEJIA:  That's a great question because --

THE COURT:  No, let me ask again.  I think that's a great question.  Why are you paying the bills?

MR. MEJIA:  Because based on our conversations and what we had with the departments, we are contracted with LAHSA and they're the ones who are in charge of doing the oversight. So all they send us is a summarized bill and then we don't get

**EXCEPTIONAL REPORTING SERVICES, INC**

the details behind that.  And that's sufficient enough for us for the City to pay that.

THE COURT:  If you don't have the details, why are you paying the bills?

MR. MEJIA:  That's what -- you know, that's a question that we ask too, so.

THE COURT:  Well, time out, time out.  I'm not joking.  Where do we look for that answer?  Who's going to be the leader here, the Mayor, the chairman of the board, LAHSA, who is going to be the central authority that makes this decision so that the public has access?  Because right now, we've created the perfect political non-responsible position by dividing this out between the County, the City and LAHSA.  And Miguel Santano (phonetic) wrote some great -- and that committee did some great work on this that everybody ignored.

I mean, where do we go to get these websites transparent?  Help me with that.  Or do I eventually have to do something about this?

MR. MEJIA:  We've asked LAHSA, because as the controller, we can ask for the details and we wanted it going forward, but from our understanding it is a resource constraint issue for them to provide it.

THE COURT:  So we're paying bills.

MR. MEJIA:  Yes, we're cutting blank checks.

MS. TREJO:  May I be heard?

EXCEPTIONAL REPORTING SERVICES, INC

**51**

**THE COURT:** No, just a moment. We're cutting blank checks, it's as simple as that, isn't it?

**MR. MEJIA:** Yes, based on a summarized cash request from LAHSA.

**THE COURT:** It is self-evident, but thank you for being so credible. All right. Now, you can defend yourself, LAHSA.

**MS. TREJO:** LAHSA has pulled a hundred percent of the invoices for each one of the submissions to the -- to LAHD for the three programs and those have been made available. Part of this is, and I'm going to reiterate what I previously shared, is the learning curve of the auditor controller's office coming in and reviewing this for the first time.

And so LAHSA has gone through, we've had several meetings, we're walking through, we also are going through several different audits with limited resources and the staff are going through and providing detailed walk throughs to the auditor controller's office of how each one of the invoices are tying back. But we have made all of those invoices available.

**SPECIAL MASTER MARTINEZ:** I think one of the main issues it comes down to checks and balances. When it comes to, you know, LAHSA having full oversight but the City is not able -- the controller is not able to have really, to review of what you're submitting is actually accurate.

I know LAHD has the contract with you, but there's

**EXCEPTIONAL REPORTING SERVICES, INC**

**52**

obviously been issues on the county side in regards to contract management about LAHSA and some of the issues that they found. And, you know, we won't know what is going to happen on A&M side, but just to -- as we move forward, we have to figure out a pathway where there is checks and balances on LAHSA's side because of some of the issues that have been discussed in regards to the County controller's report and we will have to wait until we get A&M's to verify and/or help the City move forward with some positive recommendations and solutions, but to continue to partner with LAHSA.

I understand it's important for the controller to have that information. Obviously they are a new office, but at the same time, we need some kind of checks and balances and I think that's where the Judge is coming from.

**THE COURT:** And let's assume that all of this information is getting over to the City, et cetera, et cetera, et cetera. The next thing I'm going to hear in this, you know, catch 22 circle is, oh, we have HIPAA problems. We can resolve that very easily. I can have every contract if I want to be, you know, authoritarian, funnel through my court, roll you into my court and work on a daily basis until this is done. Now, I've chosen not to do this.

Now hold on, now you listen to me very carefully, you can take that up to the Ninth Circuit, but I can be onerous in that regard and so far I've desisted because before when I

Case: 26-784  02/09/2026  DktEntry: 3.1  Page 143 of 225
Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 53 of 135   Page
ID #:23359

**53**

threatened that, all of you got it resolved.

So if we've got HIPAA problems, it's the same problems Judge Gandhi is going to deal with and this contract between A&M, I've got numerous ways of placing this under seal. I won't have HIPAA issues at all and I'm waiting for you to solve it until I have to or unless I have to solve it.  Now, if you want to spend a lot of time with me, I've got a solution to this.

**MS. DUNKERLY:**  Your Honor, I understand that there are no HIPAA issues.

**THE COURT:**  Okay.  Then get this up on the website. Get these bills up on the website as you're paying them. What's our problem here?

**MR. MEJIA:**  Your Honor, just two points.  LAHSA has uploaded invoices and data dumps for our, what we want on the website, but we -- as Jeneane said, we are having difficulty. That's the tough part.

One thing I do ask and the second thing that I do ask of LAHSA is going forward, because we are continually making millions and millions and millions of dollars of payments, is that if they can attach the service provider back up --

**THE COURT:**  Yeah.

**MR. MEJIA:**  -- to these payments going forward so we can have to date.  And that was where the resource constraint does happen.  And so that's something that we would like to

**54**

ask, at least going forward, they can submit the service provider back up with the cash request summary going forward and we can still work on these hundreds of past payments to get it up on our website.

MS. TREJO: We can work through that. We have not had an issue with that. What I will say is, there have been conversations with LAHD and LAHD's ability to also receive the information. And so the auditor -- and so the invoices are submitted to LAHD that is to review the information. And then we make the information available to the auditor controller's office when they were asking for all of the information.

So we went and we pulled all back information, a hundred percent of it for the three programs and submitted that. So I think it's coordination that has to happen between LAHD and LAHSA on how to receive that and the repositories that they want to receive it through.

THE COURT: And that's what I'm afraid of. I'm afraid that each of our bureaucracies in a sense are may be well intentioned, but other than this little drama going on occasionally and exchange of brief information to my court, that there isn't a coordination going back and forth and that doesn't make you evil or incompetent, it just is a system quite frankly that isn't functioning.

MS. TREJO: And we do submit the documentation that is received for the inside safe program. So that is submitted

**55**

on a monthly basis to LAHD.  The back up documentation and the

invoices.

THE COURT:  And if I talked to each one of you

separately, you would be telling me what a good job you're

doing.  My bottom line is, I still don't see this documentation

and I don't know what we're paying for it nor does the public

until it goes on a website.  And I don't understand 30 to 40

contracts.  We're going to move on.

All right.  I'd ask somebody to stay from the

controller's office and I'm going to have you make a

presentation next time about some of the specifics, because

there was an excellent presentation last time, but with 30 to

40 contracts I would hope that we increase that rapidly.

All right.  I want to talk about the LA Alliance

motion for settlement agreement compliance, which is Docket

767.  And the settlement agreements outlined in that document

including any required actions or adjustments by the Court that

I need to make.

SPECIAL MASTER MARTINEZ:  LA Alliance?

THE COURT:  LA Alliance.

MS. MITCHELL:  Yes, Your Honor, we filed this I think

back in August.  We've been --

THE COURT:  You did.

MS. MITCHELL:  -- waiting for a Court ruling since

then.

**56**

We've had a couple of conversations with the City, the City has not been willing to modify its position.  And just to briefly summarize what is contained in the papers, it has come to LA Alliance's attention that, you know, part of the settlement agreement are that the City is required to use its best efforts to hit certain milestones and deadlines.  And those milestones and deadlines apply to the creation of beds, but also apply to encampment, engagement, cleaning and reduction.  And those are three separate delineated parts of the agreement.

The City has thus far provided raw numbers after we brought the motion back in January because none of this was happening.  The City has in the last several reports, provided raw numbers of encampment reductions, but it's our understanding, that those are being counted, it's like care plus reductions.  And care plus is not an encampment reduction.

An encampment reduction is engagement, getting people inside, resolving those encampments.  That's from the Alliance's perception what the reduction is.  The City appears to be counting care plus clean ups as quote/unquote reductions.  Therefore, we have requested additional information that the City report on the location of those reductions are happening, so that we can verify.  The City is refusing to provide that additional information, so we brought the motion on that limited issue at this time.

**EXCEPTIONAL REPORTING SERVICES, INC**

**57**

THE COURT: Okay. City?

MS. MARIANI: Thank you, Your Honor. The motion that the LA Alliance filed several months ago does not suggest any non-compliance with the City's obligation to use its best efforts to comply with milestones for encampment, engagement, cleaning and reduction. And the motion certainly does not provide any evidence of any non-compliance. Instead the motion was simply based on the plaintiff's desire to change the parties' agreement, to obtain what the plaintiffs labeled in their motion as increased reporting regarding the encampment reduction goals, that the plaintiffs never bargained for and the parties never agreed to.

Despite the LA Alliance's current effort to change the parties' agreement, what the parties' agreement actually called for was the removal of 9,800 tents, make shift shelters, RVs and vehicles from the public rights of way in the City over a four year span of time.

What LA Alliance is now seeking to obtain is different and increased reporting, including dates and addresses of reductions, which again the City never agreed to. And this is supposedly so the plaintiff can better verify the City's reporting months after the facts. However, as we stated in our papers, the City's reporting is already being accomplished by real time -- by verifying of the City's reporting is already being accomplished in real time by spot

**58**

checks, performed by the Court appointed special master and coupled with other reporting the City is doing.

I would add that the City is working with urgency to create new beds and bring as many people as possible indoors as quickly as possible, while also fulfilling its commitment to clean and reduce encampments in each Council district and citywide. But to add additional formal reporting requirements that weren't a) to verify the reported numbers is merely a redirection of resources and time of City employees that could be much better spent actually working to address the homelessness crisis.

Unless Your Honor has any questions, I would end there.

**THE COURT:** Or do you want me to decide this and the reason for that is I've consciously let this go for a while. I wanted to see this issue develop over a period of time. I wanted to be cautious in that regard and I was a little concerned about deciding this issue in September or October or November. I may be wrong on that, in other words. I also didn't know what the interplay would be between any audit by A&M, if it had any, you know, relationship to this at all, so I was extraordinarily cautious. That may be incorrect on my part. I'm prepared to resolve this issue. If you want additional argument or briefing on it, and I'm prepared to resolve it in a short period of time. Or I can wait. And I've

**EXCEPTIONAL REPORTING SERVICES, INC**

**59**

consciously been waiting not knowing and being conscious for the audit to come in.  It may not have any relationship to this issue, and I wanted to develop this encampment issue and see what the City was going to do or what, you know, informal conversations was.  When do you want me to decide this?

**MS. MITCHELL:**  Your Honor, we wanted the Court to decide this five months ago.

**THE COURT:**  Okay.

**MS. MITCHELL:**  So we're ready to move forward.  I recognize, obviously the audit is coming.  I also don't know if this issue is going to be addressed in the audit.

**THE COURT:**  I'm going to wait until February, okay, till after the audit.  Michelle.

**SPECIAL MASTER MARTINEZ:**  Thank you.  As the special master if I could just provide a suggestion and maybe the parties can have a conversation with me later on until the Judge decides what he's going to do on this matter.

And my suggestion is based on being out there and doing spot checks and speaking to various Council districts and your staff is possibly not being able to provide all the locations, but maybe provide what programs you're utilizing for the encampment reductions.

Because I know each Council district, you may have a care plus, you may have a care clean up, but also Council districts have their own programs that they're doing that are

**60**

not highlighted, right.  And then as well with the care and the care plus, those are, you know, we don't get those addresses to a day before, or sometimes those programs -- sometimes those clean ups are canceled for various reasons.

So that's just a suggestion.  I'm not sure if the LA Alliance would be satisfied with that or the City, but just my involvement out on the ground I know that there's more than just a care and care plus.  There's various programs within each of the Council districts and how they're addressing their reductions and also having the engagement and providing housing of -- for those who are getting dislocated at times, beyond the care and care plus, because we all know what the care and care plus, that's just for cleaning purposes.

That means that the unhoused folks get to come back to those locations.  And so I don't know what the definition that you all agreed upon, but that is not a resolution in regards to an encampment being cleared and remain cleared.  So that's just a suggestion that I would highlight to both of you to consider is maybe highlighting the programs that you guys are utilizing for these encampment reductions.

**MS. MITCHELL:**  If I may, Your Honor, on that issue and I appreciate that, Ms. Martinez, and we can talk about that more off line.  I think that that makes a lot of sense.  But fundamentally, the concern is exactly what you just identified, which is these are separately identified issues, right,

**61**

engagement and cleanup is important, absolutely, but reduction is also important. Engaging individuals and bringing individuals inside.

And care plus does not satisfy that part of the agreement. We requested the locations because we had those concerns. Those concerns have been verified that care plus clean ups are being utilized to count as those numbers of encampment clean ups. And so that is fundamentally and substantively our concern.

We can talk more off line if that would be helpful, but we do want a resolution on this issue, Your Honor, because we think it's important that we be able to track who is being engaged and coming inside, not by name, obviously, but the numbers, and so that we all look at the overall effectiveness of this program.

And what we're seeing right now from the City gives us no confidence that the substantive terms of the agreement are being complied with that. So with that, Your Honor, we're happy to wait until February when the audit comes in and talk to Ms. Martinez in the meantime.

**MS. MARIANI:** Your Honor, yes, if I may. First of all thank you very much, Special Master Martinez, for your input. I would like to respond to Ms. Mitchell's last point though.

If what LA Alliance wanted was to track who is going

Case: 26-784  02/09/2026, DktEntry: 3.1, Page 152 of 225
Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 62 of 135   Page ID #:23368

**62**

inside and wanted the City to report on the number of people receiving offers of shelter or the number of people accepting offers of shelters and going indoors, that is a different metric and it is not the same one as the number of tents, make shift shelters, and vehicles or RVs that are being removed from the streets, so.

THE COURT:  Okay.  What I'm going to do is I'll resolve it in February.  I'll have some additional -- I'm sorry, Shayla, but I will also have some additional argument from you at that time.

MS. MARIANI:  Appreciate it, Your Honor, thank you.

THE COURT:  Shayla, I'm sorry, please.

MS. MYERS:  Yeah, thank you, Your Honor.  I think us being heard on this issue is incredibly important, because I would like to note that we represent unhoused folks on this issue, and particularly the unhoused folks who own the tents, make shift shelters and RVs that the City is purporting to include as part of this settlement agreement, we'd like to strongly disagree with the City's representation about what is contained in the settlement agreement.

THE COURT:  Okay.

MS. MYERS:  The City and the LA Alliance may have made an off the record undisclosed agreement with the LA Alliance about what is contained in the settlement agreement to count 9,800 removals of unhoused people's belongings without

EXCEPTIONAL REPORTING SERVICES, INC

any representation about the rights of those unhoused people, without participation of unhoused people or their representatives in that process at all.

But that is not the settlement agreement that Your Honor signs, it is not the settlement agreement that was publicly disclosed, and it is not the settlement agreement that intervenors had a constitutional right to participate in in terms of raising objections.

Throughout this process we have strenuously objected to the City and the LA Alliance making this off the record ad hoc agreement about the removal of tents and RVs.  That was not part of the agreement that was put forth, Your Honor, for purposes of settlement approval.  It is not part of the order that Your Honor signed and that Your Honor has jurisdiction to enforce.

I think it's incredibly frustrating and incredibly demeaning to the unhoused people who live in these encampments, who live in these RVs, that the City is now saying that they have an obligation under the settlement agreement to remove.

Ms. Mitchell is correct if you look at the language of the settlement agreement that it talks about engagement and cleaning and reduction of encampments, but it only says that they have a plan, it doesn't say that they have to put forth a Court enforced deadline or obligations that were never vetted by anyone, including the intervenors who have participated, nor

**EXCEPTIONAL REPORTING SERVICES, INC**

**64**

was it ever approved by Your Honor.

And so we just want to strenuously object to the suggestion that there is an enforceable order here that can be called up for purposes of either the City's benefits, when it comes away to throwing unhoused people's belongings, or the LA Alliance's benefit when it comes to clearing the streets to make it quote safe for the business and residents that they're talking about.

**THE COURT:** February. You'll have an opportunity to bring -- I'm sorry, City.

**MS. MARIANI:** If I may just one point. The agreement was actually filed in a filed stipulation, which was to resolve a motion for sanctions brought by LA Alliance against the City.

**THE COURT:** Uh-huh.

**MS. MARIANI:** So Ms. Myers is correct that the language and the 9,800 number was not found in the settlement agreement, it was found in a stipulation that was filed publicly to resolve a motion that the LA Alliance brought against the City.

**THE COURT:** Okay. We'll have this thoroughly after the audit comes in from A&M and I'm just being cautious, okay.

**MS. MARIANI:** Thank you, Your Honor.

**THE COURT:** We're going to move along and that is, I'm looking for correction of the audit and the progress and input from you, as the parties, concerning any unresolved

**EXCEPTIONAL REPORTING SERVICES, INC**

**65**

issues, discrepancies, et cetera, ongoing challenges so that A&M and the Court hears this.  So let me turn to LA Alliance.  Any comments?

MS. MITCHELL:  Well, we haven't been involved in a lot of the discussions that occurred.  We're not included in the e-mails with the County, with the City, et cetera, so it's hard for us to opine in a vacuum.

THE COURT:  Okay.  Fair enough.

MS. MITCHELL:  Certainly this, what resulted as a stipulated sanction from the motion that was brought back in January and so we are very interested.  We are tracking to the extent that we can and I think if there is a draft report available to comment on or something prior to that, we're happy to participate.  But at this point, not being part of those conversations we have nothing else to add.

THE COURT:  City?

MS. MARIANI:  Your Honor, I would just say that the City is very much looking forward to reviewing what we hope will be a very comprehensive and beneficial audit report when A&M has it completed.

Similarly, we -- the City Attorney's Office has not been included on all of the communications.  So beyond that, I can't comment on the progress but we're looking forward to receiving it.

SPECIAL MASTER MARTINEZ:  Just let me state this.

EXCEPTIONAL REPORTING SERVICES, INC

**413**

Case: 26-784  02/09/2026  DktEntry: 3.1  Page 156 of 225
Case 2:20-cv-02291-DOC-KES  Document 850  Filed 01/08/25  Page 66 of 135  Page
ID #:23372

66

That we've had A&M come very month for the last past four months, provide comment and the issues have been raised here in court for that purpose so that we wouldn't go back and forth with the parties. So I want to be very clear, that you all have all the information that we have, because we've asked A&M to come and present all the issues that are pending or ongoing. So I just wanted to state that for the record.

THE COURT: Now, let me be clear --

MS. MARIANI: Understood.

THE COURT: -- with the Court also, so -- and with my special master. My concern was, without having these meetings and giving you the opportunity to participate and air and help the Court make this as complete as possible, that if any of you were gored in this report, you would then come back and say well, gee, along the way, we didn't have any chance for input.

You've had chances now for input on every one of these occasions. And I'm not going to countenance later on criticism of whatever this report is going to be by anybody hiding behind, we haven't had the opportunity to make known along the way what else might be needed or resolved.

Now, I'm going to go around the room again and I'm going to start with all of you again to give you another opportunity, but when this report comes out, don't complain to me that you haven't had a chance to give input. So I'm going to start off with LA Alliance again. And LAHSA --

**MS. MITCHELL:** Thank you, Your Honor. My reference was sort of the -- I haven't been part of these back and forth e-mails regarding PHI and internal contracts with the County, et cetera. But I think on a high level, what we are very interested in seeing and we stressed this from the beginning, is not just a financial audit, but also the performance piece of it, which we think is equal to or perhaps even more important than the financial audit because what we have seen, what we have seen particularly in the audits that have come out recently with the County and with the controller's office is that there have been almost no performance controls.

And I will note, since I have a moment, that my understanding is, there are -- during the LAHSA commission board meetings, there is almost no discussion about the financial piece, about the performance accountability piece, that the financial records are not being presented for board discussion at these meetings.

And so this fiscal transparency is so crucial and we're very --

**THE COURT:** Right.

**MS. MITCHELL:** -- excited to see both that piece of the fiscal transparency as well as performance.

But I think part of that, and I'm very grateful to A&M for bringing this up at the last hearing or the hearing before, is also the County's services piece. Because as we

**68**

have raised with the County, with the City, with A&M, with the Court, it has come to our attention over the last year or so as we have watched this unfold that there really seems to be at least anecdotally a real lack of services availability within these projects and we've heard this from service providers and we've heard this from individuals who are residents there as well.

And so I'm -- we're very grateful that the services piece is now being included in this audit, so that we can really understand the full picture of the Alliance program, the inside safe program, the road map program and how all of this is working together between the City, the County, and LAHSA.

THE COURT:  Okay.  City?

MS. MARIANI:  Your Honor, understanding what you said but I do need to say though that we have not been kept in the loop as is typical for an audit on all of the work that the auditors are doing.  We certainly haven't gotten any preview of any findings.  So the City would still reserve its right to comment at that time, once we do see a draft report.

SPECIAL MASTER MARTINEZ:  And you are absolutely correct, that will come in due time.

MS. MARIANI:  Thank you.

THE COURT:  Okay.  County?

MS. HASHMALL:  Thank you, Your Honor.  We touched on this a little bit earlier, but I just want to make sure we

EXCEPTIONAL REPORTING SERVICES, INC

circle back to that. So it was, I think, the August 29th hearing, Your Honor, when A&M expressed interest in getting information from the county in support of its audit of the three city programs.

And so we set up meetings right away to make sure we could have conversations about what type of information from the county would be helpful. They gave us data requests on about September 25th, and we did everything we could to make sure we understood what they were looking for, and to get the information that we could that was available.

There were sort of two major aspects of providing that information that were sort of front and center from the county's perspective. First is that the information regarding mainstream services does constitute PHI or PII, and that is, can't be lawfully produced without accounting for HIPAA and HUD regulations and other confidentiality rules.

THE COURT: Well, let's stop right there. I'm happy to accommodate you in terms of time. And we went through this before, and I threatened to bring you down to my court, not you, but threatened to bring the parties down when we had a dispute with the city, et cetera, and just work on the HIPAA issues. I have all the capability of maintaining privacy.

MS. HASHMALL: But, Your Honor, so just to kind of bring that issue to a head, we gave them --

THE COURT: Matt, don't go too far away. We're going

Case: 26-784, 02/09/2026, DktEntry: 3.1, Page 160 of 225
Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 70 of 135   Page
ID #:23376

70

to hunt for $50 million pretty soon.

**MS. HASHMALL:** So there were HIPAA concerns and confidentiality concerns. We have to comply with federal and state laws and regulations. We were very transparent about that. And then there was certain information that they requested of the County that the City needed to give us certain information so we could respond.

So, for example, if you're asking for services provided to individuals in city-funded shelter or housing, we have to have a list of who's there so we can run them against our system. And we went through that whole sort of discussion and back and forth and provided that data.

So my understanding, and I don't think it's in dispute, is that A&M has had all of the data requested from the County since November. And we've offered to sit down and walk them through it if they have questions, because some of this stuff is not obvious upon a first viewing. It does require some context and some expertise, and that they hadn't started.

The first hurdle was the confidentiality. The County took the laboring oar in preparing a proposed protective order. The Court was very, very expedient in considering those issues and entering it. But now it's come down to the engagement letter.

**THE COURT:** We're going to resolve that today.

**MS. HASHMALL:** We provided a very standard engagement

EXCEPTIONAL REPORTING SERVICES, INC

letter. We got comments back about six weeks later. And the two pieces that really were, I think, sticking points for A&M were, one, the privacy of the data. And, again, this is not a holdup to us giving them the data. This is just a contract provision that says that A&M is going to preserve that data and make sure it's secure in their house.

And I don't know why that's such a sticking point. I'm hoping Judge Gandhi can help us work through that. And then indemnification. Again, indemnification is standard when you're giving a vendor or a contracting party information that's sensitive. Indemnification is important if, for whatever horrible reason, personal information that's in their custody gets exploited or misused or somehow violates the rights of the privacy holder. So those are really the two issues.

You know, we haven't received any indication that there's any concerns about our provision of that data. They've had it now since November. So, you know, I think the County's been very, very expedient, it's very supportive, really wants to make sure that we have a fresh and helpful substantive analysis of these city programs.

THE COURT: Okay. Shayla?

MS. MYERS: Your Honor, we, like the other parties, have not been privy to a lot of what's going on in the audit. We've expressed our concern about ensuring that the audit

EXCEPTIONAL REPORTING SERVICES, INC

Case: 26-784, 02/09/2026, DktEntry: 3.1, Page 162 of 225
Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 72 of 135   Page
ID #:23378

**72**

covers specific areas.  You know, I think our primary concern

is ensuring that for purposes of the City's plans for beds,

that the beds have actually been created and what limitations

have been placed on those beds, those sorts of things which

we've had a chance to articulate to the audit.

We're also very concerned about the way in which the

LAPD data is being used and the scope of the audit related to

the LAPD and particularly the use of citations.  But again,

until we see the draft audit that Michele's talking about, I

don't think we will have anything more substantive.  Thank you.

**THE COURT:**  Okay.  LAHSA?

**MS. DUNKERLY:**  Your Honor, I understand that as of

yesterday, A&M has all of the documents.

**THE COURT:**  Yeah, I read the email.  I saw it about 5

o'clock this morning, as of yesterday.

**MS. DUNKERLY:**  Yes, and LAHSA stands by ready to

answer any follow-up questions that there may be.

**THE COURT:**  Well, I want to move on.  Any development

enhancement concerning this public access?  You know, I'm not

getting off this broken record.  I don't see how the public can

have accountability unless we have a public record of what's

being spent.  And the auditor said it the best.  Right now,

it's a blank check for a lot of the money that's going out.

Any improvements?

On the County side, any improvements?

**MS. HASHMALL:** Your Honor, the County has been posting invoices related to the freeway MOU, the roadmap agreement. But, of course, that does not reflect the entirety of County programs and services, but it is specific to the programs within the settlements in this case. The County's websites track an enormous amount of demographic and performance data, which is typically reported on a quarterly or annually basis.

Invoice processing timelines and procedures vary on departments. As you can imagine, some of the county departments get really, really detailed invoices that have a lot of personal information that require redaction, and others don't have that level of granular information that requires review.

Providers typically submit invoices within one to two months of completion of services, and they bill in arrears. And upon receipt of those invoices, the departments will review them for accuracy before issuing payment.

The County has been committed to uploading these invoices on a monthly basis to provide clarity. We've actually included an update in the website so you can tell just how fresh that data is when you look on it. We really welcome input about users' experience. If there are ways that we can make that website better, we'd like to. But it's up to date, and it's been updated very, very frequently during these

**74**

proceedings.

THE COURT: City?

MS. MARIANI: Your Honor, I think the Controller already spoke to some of this, but to echo the point made by County's counsel, the City is happy to hear any input and feedback and take that back and make any improvements that, you know, might make the experience better and more transparent.

THE COURT: Shayla? Shayla?

MS. MYERS: No, Your Honor.

THE COURT: Now, I want to turn back to LA Alliance and then LAHSA.

MS. MITCHELL: Your Honor, I personally have not spent a lot of time on the websites, but members of the Alliance have and have reported back to us their experience, and in general have found both websites to be very difficult.

Of the three websites that have been put up, it has been reported back to me that the Controller's website is the most user-friendly and easiest to understand, but the other two, the ones that the City and that the County have put up, are very difficult to understand, very difficult to access information, that most of the times the contracts themselves are not available, and so it's difficult to understand the metrics. Invoices aren't available and only a percentage of them are posted, and those that are posted are weeks to months late. And so I appreciate the county and the city representing

**75**

that they are amenable to feedback, and so what we can do is put together a comprehensive list and send that over to them so that they can take that back and hopefully make those improvements.

THE COURT:  Do that quickly because A&M may be proceeding with this.

MS. MITCHELL:  Yes, will do, Your Honor.  Thank you.

THE COURT:  LAHSA?

MS. MARIANI:  And may I make one suggestion?  When you referred to the Controller's and the City's websites as separate, as you've heard, the Controller and the CAO's office have been collaborating and working on the Controller's website now, so that is the website that you should look at going forward.  To avoid any confusion, the CAO's website will actually be removed.

THE COURT:  And we modified our order.  We put up one website, we didn't put up the other.  We've done that and put up both websites.

MS. MARIANI:  Exactly.  We appreciate it, Your Honor.

MS. MITCHELL:  Will do.  Thank you.

MS. DUNKERLY:  Your Honor, I have nothing to add to what I previously said.

THE COURT:  Okay.  All right.  The next is recoupment of the funds.  I want you to put up the list of providers, Allie or Maren on the Elmo.  I want to go down each one of

these, and I want to hear what payments have been made concerning the $50.8 million. I want to hear the City's position, and I hope I'm not hearing that this is going to be paid back with in-kind services, which are hard to measure.

But we've got $50.8 million minimally out there initially with about 4 million, and then an update about another 3 million. And I'm going to have you write, Allie, and we're going to keep track of this. I'm not backing down. Where the heck did this money go? And what are we going to do about it? Because that's $50 million. No milestones, no contracts, and everybody in this bureaucracy was going to let this slip by until the press picked this up. And then I'm going to open it up to comments from Kevin, Pete, anybody who wants to comment about the accuracy. But hold on. Not yet. Sit down.

But I want to talk to the press for a moment. How many of you are here from the press? Just raise your hand. I know Doug is. Yeah, I recognize two. No, you're not the press. This has to be, and I'll speak directly to you right now. On the record, this has to be for your benefit. You have to be able to look at this because you're the voice. You're my access to the public. And when all is said and done with this audit, which may occur every 30 years, the only way the public's going to have a way of looking at this, and a taxpayer, is if we get these websites up and we require these

**77**

government entities, counsel, board, LAHSA, to make this transparent and somewhat understandable.

So if you can't bring this up and easily work with it, I have no access from the Court on behalf of the public to get this information out. Now, it's improper, so I can't ask you how you would improve this. I don't want you entering into this dialogue. But I would love, in a perfect world, to sit down with you and see what your thoughts were about this accessibility, and if it's really helpful to you, or how we can improve it. I don't think I can ask that, okay? But I sure would like to sit down and talk to you members or have Michelle about how we can improve this because you are the access to the public needs. And regardless of this, I have no control.

So I think you're absolutely instrumental. Now, I'm going to go down this list and we're going to make some notations. I want to know who's paying up and who's not. $914,000 from Family Crisis Center. On July 8th, 2024, they paid back $60,000. They have an advance, no contract, no milestones, no nothing of $854,000. Have they paid back any of this money?

**MS. DUNKERLY:** Your Honor?

**THE COURT:** Have they paid back any of this money, yes or no, and how much if they have?

**MS. DUNKERLY:** Okay. I do have an updated chart, Your Honor.

THE COURT:  I'm going to go over each one.

MS. DUNKERLY:  Okay.

THE COURT:  Okay.  Put it up on the board.  We'll go down it quickly then.  What have they paid back?  What have they paid back?

MS. DUNKERLY:  Hold on, Your Honor.  I have a new chart.

THE COURT:  Okay.  Give us the new chart.  Better late than never.

MS. DUNKERLY:  I don't think it's that one.

THE COURT:  Put up the new chart.

MS. DUNKERLY:  Your Honor, LAHSA has prepared an update to what was attached to the order.

THE COURT:  Thank you.  What have they paid back?

MS. DUNKERLY:  As Exhibit 1.  For that particular line item.  Hold on a second.  I'm sorry, I need to compare it to the prior version.

THE COURT:  In other words, you know my statement.  This is not hitting the street.  This is hitting the provider.  And every input I get back from the community is that this is not robustly helping our homeless community with the amount of money being spent.  I want to know where this money went.

MS. DUNKERLY:  Okay.  Yes, so there's a total additional recoupment of 7 million 241 --

THE COURT:  No, no, I don't want the total.  I'm

**79**

doing it line by line.  Family.  You're going to cooperate with me now.

      **MS. DUNKERLY:**  Right.  So --

      **THE COURT:**  Family Crisis Center.  How much have they paid back of the 914,000?

      **MS. DUNKERLY:**  I understand that that line item has not changed, Your Honor.

      **THE COURT:**  You don't know, correct?

      **MS. DUNKERLY:**  It has not changed, Your Honor.

      **THE COURT:**  I can't hear you.

      **MS. DUNKERLY:**  They have not recouped any additional for that line.

      **THE COURT:**  None. What are you going to do about it? I don't know how to address that up in legal terms, so I'll just be vulgar.  What are you going to do about that?

      **MS. DUNKERLY:**  So, Your Honor, recoupment efforts were further detailed --

      **THE COURT:**  What are you going to do about that?

      **MS. DUNKERLY:**  -- in a letter that --

      **THE COURT:**  What are you going to do about that?

      **MS. DUNKERLY:**  So, as Measure H funding comes --

      **THE COURT:**  What are you going to do about this?

      **MS. DUNKERLY:**  -- to a close in April, that is when a number of these advances were intended to be recouped.  That is detailed in losses.

**EXCEPTIONAL REPORTING SERVICES, INC**

THE COURT:  Time out.  Did you send them a letter?

MS. DUNKERLY:  Excuse me?

THE COURT:  Did you send them a letter?

MS. DUNKERLY:  No -- I don't know yet, Your Honor.

THE COURT:  Have you notified them in any way that you would like about 800 or $900,000 back?

MS. DUNKERLY:  As general counsel for LAHSA, Your Honor, I don't know the particulars of each one.

THE COURT:  Do I have to drag your director in here?

MS. DUNKERLY:  Excuse me?

THE COURT:  Do I have to drag your director in here?

MS. DUNKERLY:  The head of LAHSA has submitted a letter to the Court about recoupment efforts.

THE COURT:  I'm not interested.  I want to know about this entity.  Now, you're going to bear with me.  You're going to answer the questions, or I'm going to get your director down here.

MS. DUNKERLY:  Sure.  Okay.  So --

THE COURT:  What are you going to do about this?

MS. DUNKERLY:  It's my understanding that letters seeking recoupment will go out, if they haven't already, to each one.

THE COURT:  Okay.  Time out.  Thank you.  In other words, we haven't done anything specifically in contacting this provider, but a letter will go out, and my next question will

be when?

I'm not dealing with $50 million.  You have to understand, I think I'm dealing with hundreds and hundreds of millions of dollars.

**MS. TREJO:**  I've got to take my glasses off.  Sorry.

So for 1736 Family Crisis Center, a letter was issued to the service provider on 12/18/2023.  That is the light green --

**THE COURT:**  Okay, Allie, write that -- just a moment.  Write that down.  12/18, a letter was issued.

**MS. TREJO:**  And that is the light green that is on the column.  You can see it says letter issued date.

**THE COURT:**  Well, I'm getting this for the first time.  You know, this didn't come to me until just now.

**MS. TREJO:**  This actually, we submitted in November that showed the letter issued date, the letter returned date, and date of additional recoupments through fiscal year '23-'24, and we've just added the blue columns on here, and those are showing the recent ones.

**THE COURT:**  Okay, now I have an outdated, because we didn't see this or docket it.  Who did you issue this to?  We're docketing everything that we get.  Who did you -- did you send this to the Court?

**MS. DUNKERLY:**  Your Honor, we're not a party for --

**THE COURT:**  No, right?  You didn't send this to the

EXCEPTIONAL REPORTING SERVICES, INC

**82**

Court, did you?

MS. DUNKERLY: We did not send this to the Court.

THE COURT: Okay. The end result is you issue a letter. What's their response? What's their response? What is their response? How did they respond to you from the Family Crisis Center?

MS. TREJO: They signed the letter for repayments on 1/5 of 2024. And I --

THE COURT: Okay, now hold on. That's like a year ago. Have they repaid you?

MS. TREJO: You can see in the --

THE COURT: No, have they repaid you?

MS. TREJO: They have made payments. So you can see in the column as of 7/8, there is 60,266 that has been repaid. Then on 6/4, there repaid $97,637. Then on 10/5, they repaid $97,637. And so their advance balance, their total advances issued was 914,000, which is in the gray column that is the third one that notes total advances issued, notes what the original amount is, and the last column notes what their advance balance is as of 12/31.

THE COURT: They owe you about 660,000.

MS. TREJO: They owe 659,000.

THE COURT: What's our plan in getting that back?

MS. TREJO: We're continuing to work with the service provider on that.

**EXCEPTIONAL REPORTING SERVICES, INC**

**83**

**THE COURT:** I need something more. In other words, a bureaucracy could outlast a court. We can sit around for years while you work on this. What's our plan?

**MS. TREJO:** The repayments are going to continue with the service provider, either through --

**THE COURT:** I don't believe -- I'm going to be blunt with you. I don't believe that. I believe you, but I don't believe your bureaucracy is going to get anything other than some kind of cooperation, but only because of the notoriety and pressure being put on them. So I'm going to come back. We let this drift from 2018 until now without many payments, $50.8 million. I don't believe in the good faith of the parties here. I'll put that on the record.

What is our plan for getting this back? Is there going to be an agreement concerning every month or three months that they pay back 100,000 or what? Or are we just depending upon the goodwill of the parties? Because that I'm not accepting.

**MS. TREJO:** LAHSA had met with the County and the service providers, as noted in the letter that was provided, the service providers had until the end of Measure H, which was 2027. That was the agreement between the service providers and LAHSA. So that is what -- but they are working on repayments. And so we have tried to demonstrate through the three columns here as to repayments that the service providers have been

**84**

making.

THE COURT: Thank you. LA County 211, 73,000. I want it on record. What have they paid back?

MS. TREJO: They have paid back 73,000. They do not owe anything else. It shows in the last column, advanced balance as of 12/31, it's zero.

THE COURT: Who's the director of that? I want to publicly comment and praise them. Who's our director?

MS. TREJO: I don't have the list of the directors.

THE COURT: Compliments of the Court to whoever that director is in that institution.

Coalition for Responsible Community Development, 268,000. What have they paid back?

MS. TREJO: They have paid about 68,000 back. They have a total remaining of $200,921.

THE COURT: So we're waiting for their goodwill. Have you sent them a letter January 4th?

MS. TREJO: Yes, the letter was sent on 12/18/2023. They signed the letter and returned it with their payment plan on 12/22 of 2024.

THE COURT: And they have a payment plan. Community Partners for Safe Place for Youth, 64,000. What have they paid back?

MS. TREJO: Community Partners owed $64,274. And they have paid back approximately 5,000 or 8,000. And they owe

EXCEPTIONAL REPORTING SERVICES, INC

**432**

**85**

55,349.

THE COURT:  Covenant House of California?

MS. TREJO:  Covenant House owed $491,468.

THE COURT:  What have they paid back?

MS. TREJO:  They have paid approximately $70,000. No, 70 -- they have paid approximately a little over $100,000. They have a remaining 354,000.

THE COURT:  First to Serve, 755,000.  What have they paid back?

MS. TREJO:  They have a remaining of $671,580.  So they've paid around 100,000 -- a little under 100,000.

THE COURT:  And once again, without being too repetitive, is there a payment plan or are we just depending upon their good faith and quite frankly, public notoriety and embarrassment?

MS. TREJO:  No, it notes in the columns the letter issued dates and the letter returned by the provider dates. And those were the repayment plans with the service providers.

THE COURT:  So how much are they paying?  In other words, what's their payment plan?

MS. TREJO:  Can you say that again?

THE COURT:  What's their payment plan?

MS. TREJO:  I don't have that document in front of me.  Can you hold on one second?

THE COURT:  I don't want to be blunt, but I want you

EXCEPTIONAL REPORTING SERVICES, INC

**86**

to listen very clearly.  I don't believe you.  I want to put that on the record.  I don't believe you have a payment plan.  I want you to show me that payment plan.

We'll cover the next one while you're gathering --

**MS. TREJO:**  We can share all of the letters with you.

**THE COURT:**  Well, I'm going to get this on the record for the public.  You're not just going to show them with me.  You're going to go through and show me these payment plans.  I want to know if they're paying every month, every three months, or is this just once again the goodwill unless we're publicly shamed?  Because I'm not depending upon your cooperation.

First to Serve, 755,000.  You know, I need a hard copy of this.  It's too hard for me to read at this last moment.  Give me a hard copy.  And we're going to go through this quickly.  How much have they paid?

**MS. TREJO:**  First to serve has a remaining $671,580, so they have paid about 80,000.

**THE COURT:**  Harbor Interim Faith Services, $2,230,000.  How much have they repaid?

**MS. TREJO:**  Harbor Interfaith has repaid approximately 300 -- about 320,000.  They owe a remaining of 1.9 million.

**THE COURT:**  Hathaway Sycamore Child and Family Services, 1.128 million.

**MS. TREJO:**  Hathaway Sycamore owed 1.1 million.  They

have paid approximately 270,000 -- no, about 290,000.  They owe a remaining of 840,000.

**THE COURT:**  Home of Last Community Development Corporation, 797,000.  What have they repaid?

**MS. TREJO:**  They were issued 797,000.  They have not made any repayments as of yet.

**THE COURT:**  Homeless Healthcare LA, 299,000.

**MS. TREJO:**  Homeless Healthcare LA is 299,000, and they have made payments of $5,344.  They owe 294,000.

**THE COURT:**  Hope of the Valley Rescue Mission, 68,000.

**MS. TREJO:**  They have paid about 30,000.  They owe 34,125.

**THE COURT:**  Jovens Inc., 449,000.

**MS. TREJO:**  They owe 449,000.  They have paid about 110,000, and they have a remaining of 355,000.

**THE COURT:**  LA Family Housing Corporation, 6,373,000.

**MS. TREJO:**  LA Family Housing was issued 6.3 million.  They have paid about 2 million, and they have a remaining balance of 4.5.

**THE COURT:**  That community, now The People Concern, 2,464,000.

**MS. TREJO:**  They repaid about 26,000, and have a remaining of 2.5 million -- I think that's wrong.

**THE COURT:**  Who's the director of that

EXCEPTIONAL REPORTING SERVICES, INC

**88**

organization?  Anybody know?

MS. MITCHELL:  John Maceri.

THE COURT:  Who?

MS. MITCHELL:  Isn't it John Maceri?

THE COURT:  Okay.  Who's the director of LA Family

Corporation?  Anybody know?

MS. MITCHELL:  Stephanie.

THE COURT:  Stephanie, all right.

MS. MITCHELL:  I don't remember her last name, Your

Honor.

THE COURT:  Okay.  National Health Foundation,

52,000.

MS. TREJO:  They had 52,000.  They repaid 52,000, and

they have fully repaid.

THE COURT:  Could you send my compliments to them

from the Court?  It's appreciated.

New Directions, Inc.

MS. TREJO:  34,000, and they still have 34,000

outstanding.

THE COURT:  Ocean Park Community Center, the People

Concern, 453,000.  Now, what's the difference between Line 17

and Line 14?

MS. TREJO:  They were a different entity at the time,

and they merged.

THE COURT:  So, really, I add the 453,000 initially

EXCEPTIONAL REPORTING SERVICES, INC

**436**

**89**

onto the $2,464,000.

MS. TREJO: It would be the LAMP, the Ocean Park, and the People Concern, those three lines are the outstanding balance.

THE COURT: All right. And what have they repaid on that line, 17?

MS. TREJO: They haven't repaid anything.

THE COURT: 18, People Assisting the Homeless, 8,274,000.

MS. TREJO: They had 8.2 million, and they have repaid about 40,000, and they still have 8.23 million remaining.

THE COURT: Who's the director of that organization? Anybody?

MS. MITCHELL: Jennifer Hark Dietz.

THE COURT: Thank you.

MS. MITCHELL: And, Your Honor, the director of LA Family Housing is Stephanie Klasky-Garner.

THE COURT: All right. Thank you. Rainbow Services, 116,000. I'm sorry, 118,000.

MS. TREJO: And they still owe 118,000.

THE COURT: Okay. Sanctuary of Hope?

MS. TREJO: 344,000 is what they started. They have repaid about 120,000, and they have a remaining 191,000.

THE COURT: All right, David, are you here on behalf

EXCEPTIONAL REPORTING SERVICES, INC

**437**

**90**

of the City?  Eventually, I'm going to ask you and the County if you have a plan for this recoupment, because eventually if you come to me and tell me you're broke, we're going to have an issue, okay?

MS. MARIANI:  Your Honor, I believe this is Measure H funds, so County funds.

THE COURT:  Thank you.  Special Services for Groups, Inc., 6,674,000.

MS. TREJO:  And they have paid back the full $6.6 million.

THE COURT:  Who's the director?  Who's the director?  Will somebody Google it?

MS. HENDERSON:  Herb is his first name.

THE COURT:  Use the microphone.

MS. HENDERSON:  Herb is his first name.  H, last name.  I don't know how to pronounce it, but I'll get exact names.

THE COURT:  I don't know how to convey this, but a deep appreciation on behalf of the Court and the public.

St. Ann's Maternity Home, 326,000.

MS. TREJO:  They owe approximately 243,000 and have repaid about 100,000.

THE COURT:  St. Joseph Center, 2,930,000, about 3 million.

MS. TREJO:  They have repaid approximately 400,000

EXCEPTIONAL REPORTING SERVICES, INC

**438**

and owe 2.5 million.

THE COURT:  Who's the director?  Google it.  Who's the director?  Put her on Court Smart.  Put her on Court Smart.

MS. MITCHELL:  I have the board chair, Your Honor.

THE COURT:  No, I want the director.  Who's the director?  The board is just a group of people, and they'll each point fingers at each other.  Who's the director?

MS. TREJO:  Dr. Ryan Smith.

THE COURT:  All right, thank you.  Testimonial Community Web Center.

MS. TREJO:  They were issued 388,000, and they still owe 388,000.

THE COURT:  The People Concern.  Now, that's lumped again with the other two People's Concern, right?  There's your other line item.  So we really need to add another 893 to about 400,000 to about 2.5 million.  So we're up with these three different entries.  All right, People's concern, 893,000.

MS. TREJO:  And so it would be added with the other payments that they have.  We can sum that up for you.

THE COURT:  Well, how much have they repaid?  That line.

MS. TREJO:  So it looks like the sum total when they were doing the advances repayments, there were repayments that were made against the other amounts also.  So it looks like their balance is down to 524,000.

Case: 26-784  02/09/2026  DktEntry: 3.1  Page 182 of 225
Case 2:20-cv-02291-DOC-KES  Document 850  Filed 01/08/25  Page 92 of 135  Page ID #:23398

**92**

THE COURT: Okay. So take line item 26 for $893,505. Take item number 17 for $453,868. Take line 14 for $2,464,714. All the same organization. So just in rough math, you've got about 2.4, about 2.8. You have about 3.7 million.

MS. TREJO: Yes.

THE COURT: 3.7 million to People's Concern. You just have it on different lines. Now, what's the payment from all those entities?

MS. TREJO: Looks to be about 650,000 or so.

THE COURT: Of 3.7 or whatever? All right.

MS. TREJO: I'm running across all the lines correctly. No, there's another --

THE COURT: The Village Family Services, 869,000.

MS. TREJO: $869,000. They have repaid about 130,000. They owe 709,000.

THE COURT: The Whole Child, 914,000.

MS. TREJO: They still owe 914,000.

THE COURT: Union Station Homeless Services, 2 million.

MS. TREJO: They have repaid 45,000. They owe 1.9.

THE COURT: United Friends of the Children, 783,000.

MS. TREJO: They have repaid about 130,000 and have a remaining balance of 652.

THE COURT: United Veterans Initiative, 229,000.

MS. TREJO: They have repaid 51,000 and owe 177,000.

**THE COURT:** Upper Bound House, 262,000.

**MS. TREJO:** They have repaid 56,000 and owe 205,000.

**THE COURT:** Valley Oasis, formerly Antelope Valley Domestic Violence Council, 2.684 million.

**MS. TREJO:** They have a remaining balance of 1.8 million, so they have paid approximately about 1.2 million.

**THE COURT:** Okay. So they're making an effort, good.

Volunteers of America of Los Angeles, 5,050,000.

**MS. TREJO:** They have a remaining balance of 3.5 million.

**THE COURT:** Hawaiian Gardens Center Association, 436,000.

**MS. TREJO:** They have a remaining balance of 436,000.

**THE COURT:** Whittier Area First Day Coalition?

**MS. TREJO:** They have repaid about 50,000 and they have a remaining balance of 155,000.

**THE COURT:** I want you to correct me, but it sounds like the letters that you may have sent out to one or more of these organizations depend on some voluntary compliance on their behalf. Now, when I'm being blunt, I don't believe that you have a payment plan with most of these entities. Do you have a payment plan specifically every three months or some period of time, or is this, once again, some good faith on their part?

**MS. TREJO:** It varies by service provider.

THE COURT:  That doesn't answer my question.

MS. TREJO:  It varies by service provider.  Some of the service providers would have until the end of the Measure H to make the repayment.

THE COURT:  And when we get to the end of Measure H, if I'm still alive, and if the public is still interested in this money, what happens when they haven't repaid?  Because, trust me, you're going to get a huge amount of these persons, and I'm going to speculate, who aren't going to repay unless there's pressure on them.

MS. DUNKERLY:  Your Honor, what happens at the end of Measure H was addressed in a letter provided to the Court last night.

THE COURT:  What do I do when the City comes to me and they say, if there is a violation of the settlement agreement, and David comes in front of me or the mayor and says, you know what, we ran out of money, then what position would the Court take seeing this kind of expenditure without accountability?  And, unfortunately, I'm starting to form the opinion that this is just the tip of the iceberg, that we've just uncovered a small portion that we were talking about in 2022, hundreds of millions of dollars.

MS. DUNKERLY:  Your Honor, these funds come from Measure H, which went to County only, not the City.

THE COURT:  Okay.  You're on notice, and so is the

**EXCEPTIONAL REPORTING SERVICES, INC**

City.  If you're coming to me, telling me you're broke in the future, and you're coming to me saying you can't comply with the settlement agreement, then bring into accountability minimally concerning this $50 million, okay, now I want you to have a seat.  Thank you very much.

**MS. MARIANI:**  Understood, Your Honor.  However, I do need to say again, these particular funds are Measure H funds, which, to my understanding, are County funds, not City funds.

**THE COURT:**  Okay.  I'll talk to the County then.

**MS. HASHMALL:**  Your Honor, the County has always been committed to providing strong homeless services delivery system.  The Board voluntarily called for a financial audit of LAHSA in February of 2024, and that audit was performed by the County's Auditor-Controller's Office.  The results confirmed that the County is willing to take a hard look at County funds, how they're being spent, where they're being spent, whether they're benefiting the people who need them most, and, to your point, whether the money is hitting the streets.

This audit is not part of any settlement or before the Court, but we know that you've taken interest in the ongoing recoupment efforts by LAHSA.  The auditor's findings were critical to what was perceived as a lack of documentation regarding agreements with providers.  The report did not express an opinion about the status of those recoupment efforts to date.  But this has to sort of be viewed in context.

**96**

The landscape of 2017, when these advances were made, Measure H had just been passed, and it really was a groundbreaking new source of resources to address this homelessness crisis. The County and LAHSA were looking for a dramatic scaling up of homeless services. The capital advancements were intended to support the providers at that critical time of start date and to be able to establish themselves so that they could be available to meet the growing need of the crisis.

There has been no finding or suggesting that the money didn't go towards that goal. But all of that is sort of illuminated by the Board's audit. LAHSA has already, as reflected here, engaged in recoupment efforts. And the County's goal was always to make sure that Measure H worked, and it worked fast, and it worked effectively. So that's really, really the context of where these advances came from.

**THE COURT:** I'll repeat. I think this is just the tip of the iceberg, unfortunately, this 50 million.

All right. I want to show you a video in just a moment. I'm going to digress from this, but I want to talk about the county public access. There's a special master's update. Why don't you update us, and then I want to show you a video for a moment. Then we'll be done.

SPECIAL MASTER MARTINEZ: Thank you, Your Honor. And I forgot that we have a new -- I'm Special Master Michele

Martinez.

On two fronts, let me start off with the City and give you just a quick report.  We had a meeting, conferred with the LA Alliance to discuss, you know, the pending issues that we've been discussing here in court.  Moving along, we have made a decision to continue learning sessions and observation sessions, in particular in regards to understand the partnership between the City and the County in regards to direct access services for service providers when they're out in the field.  But two, as well as trying to get an understanding of the services that are being provided for high-level service needs beds for the City.

I do want to take into account that the LA Alliance still has issue with the city as it pertains to what they should be reporting and how they should be reporting in their quarterly reports, Judge.  We've had the discussion about almost a year now.  I can't come up with a resolution, you know, whatever the city believes in regards to its best efforts and what the LA Alliance interprets what their best efforts should be.

It's something that we have been talking, but we, you know, there is no agreement thus far.  And so what I am going to ask is, you know, eventually, Judge, you will have to take on that issue as it pertains to how do we verify what the City is doing and also the issues that the County has as the LA

Case: 26-784 02/09/2026 DktEntry: 3.1 Page 188 of 225
Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 98 of 135   Page
ID #:23404

98

Alliance has as what they are supposed to report, how they're supposed to report, and how they can verify that information as well.

On the County side, very similar. We've come to a small resolution of having these learning sessions and an observation session that we do have scheduled for January 16th. We are working on a learning session that we hope to have sometime in February, and I'm working with the parties to coordinate these times.

The other pending issue, very similar to the City, as it pertains to how the County should be reporting and how we provide and how the County provides information to these quarterly reports. That discussion is still ongoing between the parties, and I have yet to have a resolution. So that is something, too, that will have to come before the Court if the LA Alliance chooses to move forward with a motion. But I can no longer help facilitate that. All I can help facilitate at this moment in time is having an understanding and collaborating and hoping that we're able to come together and learn how to improve, one, documentation, but also how to improve the systems out there in real time in the field and being able to provide that feedback.

And then just lastly, Your Honor, I am working on the special master report. I will not be releasing those until after the A&M audit or assessment just for purposes of being

neutral.  I don't want my report to come out and then folks saying, oh, well, you know, A&M read this report, so therefore, you know, they found these findings based on the special master's report.

So I will be holding off and probably will not be releasing those special master's reports until March.  And so those are my comments.  I'm not sure if Special Gandhi has any comments.

**THE COURT:**  Will the release of that special master's report in any way affect the request by LA Alliance to resolve Document 767?

**SPECIAL MASTER MARTINEZ:**  No, Your Honor.  This is why I provided my suggestions to them earlier regarding that issue, and that's to use the language in regards to the programs that each of the council districts are utilizing as it pertains to their encampment resolutions.

**THE COURT:**  Okay.  I think we're done with our agenda except for a couple things I'd like to show you.

And first, I want to compliment the daily workers and staff who are on the streets from many of these respective organizations.  I don't want the Court's concern with the leadership and the directors concerning these sums of money to reflect on the everyday person on the street.  I was able to attend your last workshop and was really struck by the dedication of these young people who are, quite frankly,

**EXCEPTIONAL REPORTING SERVICES, INC**

100

oftentimes underpaid, have very little to offer, going tent to tent and place to place in their dedication. They're making minimum wages out there, and I think that they deserve a big compliment in terms of the daily work that's taking place.

I'm not complimentary towards some of these directors and some of these organizations nor their leadership. And the message to all parties is, if the money is flowing to this extent and it is not hitting the street, don't come to me if there is a breach of these settlements and tell me you didn't have the money, because I firmly believe now that this is just the tip of the iceberg in terms of this $50 million, which isn't the focus. It's much broader.

Manage your fiscal responsibility going forward, and part of that is getting up a transparent website so the public can see what you're doing. Stop the secrecy.

All right, now I'm going to show you a tape today, and then I'm going to invite community input. I wish Pete was here. I don't see him, but if you can find Pete White, ask him to come on, because I'd love to have him speak, or any member of McCann.

But I want to show you a tape. Put up the video from this morning. First of all, I primarily focused on Skid Row, but we've been all over the city. Next focus, so you know, will be on Figueroa. It will be from Vernon down Figueroa. It's a complete mess. And MacArthur Park -- we'll

**101**

be in MacArthur Park. I won't tell you when, but we'll be in there early and out of there early.

Okay, this is this morning, so I waited. And, Kevin, I'm going to ask you or Pete or anybody in the community, what are you seeing out there? Come on up here and explain this trailer situation. And then, David, I want you to hear, and the mayor to hear, because you've got, you know, the whole city. I mean, you're trying to prioritize. I understand that, because you've got some trafficking, some dope sellers, but I'll have you hear from the community out there, now in the form of RVs. So, Kevin, please.

**MR. CALL:** Okay. What's happening out at Skid Row, I am the mayor of Skid Row downtown Los Angeles, which you guys know is like a third-world country downtown. If anybody's been down there that works for the County and the City, you'll see it looks like a disaster. That's the same thing I told the governor when I had a meeting with the governor here in Los Angeles.

Everybody's saying that their organization or the County or the City, it's everybody's fault. Everybody who works for the County or the City who's not doing the job that they've been hired to do here in this city.

I will begin to hold the people responsible in this city and the county for not doing what's necessary. Every time I've been in this court, everybody got excuses by, oh, that

**EXCEPTIONAL REPORTING SERVICES, INC**

**102**

don't belong to us, or that's not our fault.  We got homeless people that's losing here in this city.  When I look at the city every day, I'm in Skid Row.  Every day I'm in Skid Row.  When I go early in the morning and I go late night, I see that the people are suffering.  The people are suffering.

I have offered the county and the city, come down here, put your boots on the ground.

**THE COURT:**  Just a moment.  A shout-out to Kathryn Barger.

**MR. CALL:**  Oh, we got to always take our hat off to Kathryn Barger because she --

**THE COURT:**  Hold on.  Hold on.

**MR. CALL:**  -- made it her business.

**THE COURT:**  Kevin, just a moment.  I want you to hear this clearly.  When somebody's showing up to walk the streets, Kathryn Barger did.  Called down and asked to come into the community, very much appreciated.  Name the other politicians who's been down to the street other than the motorcade caravan.  Help me.  Who else has called the community and walked in?  Nobody.  Let's make that very clear.  Nobody.

Have any of you folks seen anybody down there?  No.  Hold on.  We'll be back to you.

My apologies, Kevin.  I want you to explain what you're seeing here and then I'm going to play a video.

**MR. CALL:**  What's happening is that we got the

**EXCEPTIONAL REPORTING SERVICES, INC**

**103**

people.  Not only that we got a homeless problem here in Los Angeles, but we got a migrate problem here in Los Angeles.  And they keep on telling me the numbers are getting better.  The numbers is not getting better.  We're still over 78,000 people homeless here in Los Angeles.

THE COURT:  Tell them about the kids and maybe -- let's name --

MR. CALL:  We got kids and women living on the streets in tents.  I asked Karen Bass, I said --

THE COURT:  Let me stop you for a moment.  Hold on.  Let me stop you from the input I'm getting and that is before on Skid Row, we didn't have this number of children.  The community somehow took care and the city and I think the county was doing a good job.  You've got a huge influx.  Central Americans, Venezuelans, Hispanic coming in.

And when you walk down the street and you talk to folks, the predominantly black community that unfortunately was in Skid Row will say, I'm a United States citizen.  And by the way, all of these other people coming in with kids and families, they're getting priority because they've got kids.  What about us?  That's going to eventually, folks, bluntly cause a conflict.

And so far Kevin and the community have been able to keep a lid on that because they're good hearted people and kept the community down in terms of understanding.  Let's help these

**104**

kids wherever they come from.  This is going to blow up in your face because the State of Texas, and I'll be blunt about it, is shipping people out here amongst others and dumping them on Los Angeles.  Now I can't be any more blunt about that.  And you've got kids running around out there that we never had before.  And you're not seeing it because you're sitting in my courtroom and not going down there now.  Now continue on.

**MR. CALL:**  So we got trailers on both sides of the streets downtown Los Angeles.  They got nowhere to clean their port-a-potties in these RVs and they're moving these RVs.  And that stuff is going all over the streets where they got kids living out on the streets.  Every day that I'm there --

**THE COURT:**  Tell me what these what these traders are doing in terms of feces, dope, trafficking.

**MR. CALL:**  You got feces out there.  You got you got these people selling drugs out of this thing.  And we got -- not only that, but we got the homeless health care passing out needles and cookers to the people.  And they're given people the stuff to continue to use dope.

**THE COURT:**  Now, just a moment.  All of these people aren't selling dope or trafficking.  In fact, some of these people in the trailers are seeking lodging, et cetera, out there.  What are we going to do about all these trailers?

Now, I'm just going to leave that for the City and the County, because this is a recently new phenomenon.  And

**EXCEPTIONAL REPORTING SERVICES, INC**

this is on Town Street and play the video for a moment. That's of this morning, so I waited. I'll leave this to you because it doesn't have an answer yet.

**(At 12:11 p.m.; video played)**

**THE COURT:** I'll come back to you. You're going to have all the time in the world. Just a moment. This is Town. And then there's another one. Keep going down. Now, the feces are getting dumped on the street.

**MR. CALL:** And the people is coming to me and asking me, you the Skid Row Mayor? I mean, what can you do to help fix this problem?

**THE COURT:** Now, hear that very clearly. This isn't coming from the Court. This is coming from the community that needs something done.

**MR. CALL:** So I have been out there on a daily basis, trying to make the needs of the people for humanity. I'm about the humanity of the people. It's not easy because, like he said, I got a whole bunch of people that's been born in this country, come to me and say, hey, why are you helping these people? I've been here. So only thing I can tell them is that how many kids you got? They say I ain't got no kids.

**THE COURT:** Just a moment. Just a minute. It's not right to start moving trailers around and, you know, cleansing the streets unless we have a place to put these. What do we have from the City and the County other than the safe parking

EXCEPTIONAL REPORTING SERVICES, INC

**453**

**106**

program that we had 453 spaces with the expenditure of tens of millions of dollars, and in one of our first hearings in 2021, it's not right just to move people.  Do we have any accommodation for these trailers?  Or are we just going to kind of sweep them off the street, you know, in this cleansing, so everything looks good.

And by the way, Skid Row has less tents.  But if you drive down a couple blocks, I'm not too sure you have less tents at all.  It's moved over to 7th Street.  So it doesn't have the concentration maybe on San Pedro or on 6th, but just move out of the area a little bit.

So as we count tents, and the city tells me, and thank you for your good faith.  By the way, a shout out to you.  The rest of the country went up over 20 percent in homelessness.  I want you to hear the Court understands you went down in terms of homelessness.  That's very positive.  It's the accountability of the money and how much we're spending and how much we can get out of this.  There's got to be something because the community is asking all these folks out here.

**SPECIAL MASTER MARTINEZ:**  I'm not sure people can hear me, but I'm glad that you're seeing these concerns.  But as of recent, you know, I have received calls and e-mails about this issue.  And I'm not sure if it has to do -- so I don't want to accuse anyone or so I don't want folks to take and say,

Case: 26-784, 02/09/2026, DktEntry: 3.1, Page 197 of 225
Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 107 of 135   Page
ID #:23413

107

oh, the special master said that this is a reason why it's happening.

I think because of recent programs, and as we're aware on the City side, right, the City took action sometime in December in regards to prohibit RV encampments around residences, schools, parks, and other areas. And then the County also, and specifically County District 2, Ms. Mitchell, created her own program through the homeless initiative program, which launched a pathway home RV interim housing pilot program at the Crenshaw parking lot to serve people living in recreational vehicles, where they want to provide services, provide opportunities for housing. But as we know, as these new programs have started, there are times where people don't feel comfortable, don't want rules, right? And so what's happening, there could be a potential of migration now coming here.

And so I'm not sure if that is the case or not, but that's something for us to go back and talk to the County and to the City and evaluate what's going on. But as of recent, there has been a lot more RVs. And I would encourage both the City and the County to take a look at this issue, because it's not only happening here, it's happening in other areas, specifically in CD9 and parts of CD10, which I was at last week.

I saw a huge increase of RVs. But again, these

**108**

programs are offering a place for these RVs to be, to provide discard. And so I don't want to make any accusations that people are moving to these locations, but I just want everyone to know that these two programs, as of December, did start.

THE COURT: I will. No, hold on. I will. We drove around Tracy Parks District after having breakfast with her nine months ago. Approximately how many RVs did we count? And how many RVs did we count up on Mar Vista around that park with out of state license plates on them, Don? What was our disclosure?

We had breakfast with Tracy Park, talked about her district, as many of your council people, took the liberty, because she was complaining, of just driving around for an hour out in Mar Vista area. We drove around that park area. It was astronomical, the number of Texas, Oklahoma, Arkansas license plates on all of these RVs being permanently parked.

Now, I can't do anything about it. I'm not a legislature. I just want to tell you about that.

Don? Approximately. And by the way, you've got those photos so we can show them. Use the microphone. You need a microphone.

UNIDENTIFIED SPEAKER: At least 14 to 20, just around that park was parked.

THE COURT: Just out of state license plates out of about 30 vehicles, about two-thirds.

EXCEPTIONAL REPORTING SERVICES, INC

**456**

**109**

**UNIDENTIFIED SPEAKER:** Yes.

**THE COURT:** Coming from out of state. Now, I'll leave that to you as legislature. So, I know, Shayla, you're chafing already. But the end result is you've got a huge influx of folks coming in here. And quite frankly, you're hearing from the community, or at least I'm hearing from the community. Kevin, how much time do we talk to the community? Probably once a day, once every other day. And that is, you've got a huge amount of people coming in who, quite frankly, are using resources. I leave that to you. I don't know what to do about that. And the license plates reflect that. And I'll call out Texas on that one, amongst other states, and Governor Abbott. Someone needs to be blunt about that. Okay? Kevin?

**MR. CALL:** So, what I'm still trying to do is since we've got a new council person in the 14th District downtown LA, I'm trying to work with the council lady and see what we can do to try to make Skid Row a better place. We don't know that it's going to get too much better, but I need to try to work with her to see what we can do to work together to try to get this done. It takes everybody to work together to get anything done. Can't nobody do it by themselves. It's not easy for me.

**THE COURT:** How many kids are out there? And what ethnicity are they?

EXCEPTIONAL REPORTING SERVICES, INC

**110**

**MR. CALL:** We're looking at about maybe 50 to 60 kids just living in a tent.

**THE COURT:** The community hasn't seen that before, and primarily Hispanic kids coming in now on buses. So, Diane, you were out there. Why don't you describe -- you were walking the streets with us. Why don't you describe the baby for a moment? And then we're going to be done.

**MS. RAFFERTY:** No, I agree. We witnessed that. We've been on Skid Row a couple of times with you. And I've been on Skid Row back in the '70s. And the change in the patient -- population, the young babies, I mean babies, and their moms are close to being babies too, have no idea where to go for resources. And also what's happening with that unnamed parent, they're trying to seek medical services and they may be discharged, which is called dumping, back onto Skid Row where there's no services for children that have medical needs, which is -- it is heartbreaking and it's criminal.

**THE COURT:** I want to compliment LAHSA also, Diane, for just a moment. And that is because of some of the notoriety by -- I think it was the LA Times primarily, LAHSA took action. Now, you may have taken action anyway, but kind of that public notoriety, I believe, quite frankly, drove you down to the street and we got some attention. But it was only because of some public press.

The Court's not going to show up every time. And the

**EXCEPTIONAL REPORTING SERVICES, INC**

Case 2:20-cv-02291-DOC-KES   Document 850   Filed 01/08/25   Page 111 of 135   Page ID #:23417

**111**

LA Times isn't going to write an article on every occasion. But thank God that they did because we finally got some action.  Well, I don't believe that we would have had any action down there.  And, Diane, why don't you describe that one baby?  I mean, you literally saved the baby's life for God's sake.

**MS. RAFFERTY:**  This was a child that was discharged from an unnamed hospital that had a feeding tube.  It was on low-level oxygen, had an IV port that was discharged to the street.  So I found -- the mother was gracious enough to give me the name of the hospital.

I contacted the hospital because that is actually illegal.  But the problem is it's kind of this population down there is like a forgotten community.  People go along with their daily lives and they forget that the impact is happening down there every single day.  And it is heartbreaking with the children because when they're discharged to the street, there is no follow-up care.  There's no provider down there to take care of these kids.

And even though there are some clinics, there's some free clinics, they don't take care of infants.  So it's just -- the population growth of the children is really -- it's heartbreaking, but it really is amazing.  It has really changed the population of Skid Row.

**THE COURT:**  Okay, Kevin, why don't you wrap that

EXCEPTIONAL REPORTING SERVICES, INC

**112**

up?  I want to give somebody else an opportunity.

MR. CALL:  I'm going to wrap it up right fast.  If you ever get a chance on the 28th of this month, you're going to see a movie.  I'm in the movie. It's called Homeless Americans With No Address.  It's about the homeless crisis, not only in Los Angeles, but across this country.  It's Homeless Without Address.  So if you get a chance to see that movie, it's going to give you a lot of light on what's going on.

THE COURT:  I'm going to give a brief audience.  The lady in the white.  No, I apologize.  Come on up here.  You've been very polite.  You've had your hand up.  It's nice to meet you.  I think I've met you a couple times before.

MS. SHAW:  You have indeed, sir.

THE COURT:  Use the microphone so we can hear you.

MS. SHAW:  Thank you.  Suzette Shaw, Skid Row resident.  I write, talk, and advocate Skid Row from a woman's perspective.

THE COURT:  It's nice meeting you.  I know who you are.

MS. SHAW:  Yes, yes, we have met before, and we actually have been quoted in some articles together.

Yeah, there are just a few things that I wanted to say.  One is we are currently planning a town hall with a newly elected CD14 councilwoman.  We had a meeting with her a couple of mornings ago.  That was a Skid Row 2040 coalition.

EXCEPTIONAL REPORTING SERVICES, INC

**113**

THE COURT:  Let me stop you.  Hold on.  Let me stop you.

MS. SHAW:  I'm sorry?

THE COURT:  Let me stop you.  Where did you have the meeting?  Was it on Skid Row or some other location?

MS. SHAW:  It was a Zoom meeting, sir.

THE COURT:  Where?

MS. SHAW:  It was a Zoom meeting that we had a couple of days ago.

THE COURT:  Time out.  I'm impressed with you.  I'm not impressed with that meeting.  I'm not impressed with anybody until they come down to Skid Row.  And the one thing I know about Mayor Bass is the first time I called her, or she called me actually after the election because I wanted to stay away, she wanted to meet.  Great story about her.  I said, I'll meet you at 6 o'clock at Skid Row.  You know what her response was?  7 o'clock.  Is that okay?  Guess what?  She showed up at Skid Row.

MS. SHAW:  Yes.

THE COURT:  That's exactly what we need from our politicians.

MS. SHAW:  Yes.  I actually toured Mayor Bass when she was a national representative with the Black Congressional Caucus through Skid Row a few years back.

I do also plan -- I'm working with LAHSA currently

EXCEPTIONAL REPORTING SERVICES, INC

**461**

to lead them and some of their leaders through Skid Row, as well as other county leaders next week. So we actually are planning a Skid Row tour if you'd like to join us. I'm happy to provide you with that information.

THE COURT: I may show up, but if I do, it's early in the morning, and I'm out of there pretty quick.

MS. SHAW: It's at 10:00 a.m. I think it's on the 17th, but I'm happy to share the information all the same.

THE COURT: Thank you. It's nice seeing you. It's nice meeting you.

MS. SHAW: Just a couple more things. I also just wanted to say that the GOP is intentionally sending busloads to Skid Row, like the man said earlier, like three busloads a day. They're sending them intentionally to Skid Row, and it's just literally like a whole political spin to it and why that's happening.

And, yes, a lot of resources are going towards, and that's, excuse me, if you can just give me a moment. Thank you. Yeah, I can't. I can't.

So that's part of one of the reasons why, you know, we are doing the tour in Skid Row next week, because it's also with the ARTI, the Black, the L.A. County Racial Equity Steering Committee, which I'm a part of, to really talk about the racial equity and disparities of dollars, of resources available, and why we continue to have black people

**115**

experiencing homelessness.

   **THE COURT:**  Okay.

   **MS. SHAW:**  And I also wanted to say one thing that's very important to me is that you named some of the different EDs from some of the different entities earlier, and I wanted to say that some of these EDs have since stepped down, retired, gone on to other positions.

   But what has happened in some of the cases that I want to stress is that oftentimes these EDs, when they retire and so forth, or they move on, they start consultancy businesses, they get grants, they get very, very luxurious consultancy roles and grant dollars as experts in the fields.  So I'm just saying that this is part of the perpetuation of the --

   **THE COURT:**  General Jeff Caldwell, the Homeless Industrial Complex.

   **MS. SHAW:**  That's what I was trying to say.  Thank you so much.

   **THE COURT:**  Okay, thank you.

   **MS. SHAW:**  All right, thank you for your time.

   **THE COURT:**  Folks, I want to hear -- so the lady in the first row, then the lady in the back with the two dogs, and then, you know, no particular order.  But also I want to hear from Michael, because you've got a situation.  I want the County to hear this.  You're handing out dope down there.  Let

**116**

me repeat it. You're handing out narcotics down there. That's going to be a policy decision of the City and the County. But I want this described to you, and I want the mayor and the Board to clearly hear what's happening in terms of the narcotics distribution down there. Please.

MS. GREY: Good morning, Your Honor. I'm here to share information that my husband and I are confident will provide further transparency that the Court seeks regarding the use of the public funds to support the unhoused in their quest to obtain permanent housing. My name is Ms. Cheryl Grey.

THE COURT: Nice meeting you.

MS. GREY: Likewise, Your Honor. My husband is Gregory Edward Grey.

THE COURT: Come on up.

MS. GREY: He is under doctor's care with restrictions, which is why I am speaking before the Court today.

You have asked for specific questions to be answered today. We read your docket, and one of those questions was what factors contribute to the ineffectiveness of the permanent supportive housing program. All that I assert is contained in more than 100 pages of documentation, and this is just from calendar years 2022 through June 2024. The balance of that is from June '24 through the present day, electronically.

All that I assert is contained in that documentation,

**117**

including a compilation of e-mail exchanges and other materials with LAHSA, its service providers, and other public entities, including but not limited to the Office of the Mayor, Los Angeles City Council, the County of Los Angeles, and HACLA.

We are residents of Los Angeles. We are both seniors. My husband has a documented disability, as do I.

**THE COURT:** Taylor, don't go away for a moment, because in case Michael -- excuse me. In case Michael wants to talk about the narcotics, I want to hear from the community. I'm sorry. Please.

**MS. GREY:** That's okay. In my husband's case, he is a post-stroke heart patient and diabetic under the care of physicians at UCLA Health. He has a team of experts that are world-renowned.

Countless news stories, and we've heard it over and over again, report on the state of homelessness in Los Angeles and throughout California. However, there are two things that are often missed. One, that the unhoused population is not a monolithic one. There are doctors. There are lawyers, other professionals, Ms. Martinez being one, my husband and I being others, who have experienced this crisis.

The second thing is this, and I get emotional when I talk about it, because for 27 months, I had to fight with my husband to keep him alive. As we go through a process of stops and starts, perpetual abuses go unchecked, verbal abuse of

**EXCEPTIONAL REPORTING SERVICES, INC**

clients by provider agency staff, refusal by agency staff to acknowledge clients' critical health needs, shifting rules of engagement for clients to obtain permanent housing, a constant turnover of caseworkers, client paperwork critical to applying for housing being either lost or, in my husband's case, literally falsified by service provider program staff, including the vital information that I've heard each entity in this room talk about that is contained in what is called the HMIS that is used across housing services community.

Finally, more often than not, there appears to be, from our point of view, a general atmosphere of overall indifference to the individual needs of each client. We have seen this happen to other senior citizens like us, one including a woman as old as 85 years old with medical challenges that included a heart condition, as well as military veterans with whom we reside today.

The list of egregious behavior by LAHSA and its service provider agencies is an infinite one, fueled by an apparent, in our view, top priority of LAHSA and its agencies to retain government and private funding for their operations at any cost. The results are that many clients, most of whom are fearful of retaliation for speaking out, are shoved through a proverbial revolving door that ultimately winds up putting them back onto the streets, and we heard it over and over again today.

119

They are replaced by a new set of clients whose fate is predictably the same. My husband and I have witnessed these occurrences multiple times. As I said before, we spent 27 months in interim housing, funded and operated by the County of Los Angeles and the City of Los Angeles through LAHSA, the Los Angeles Homeless Services Authority.

Throughout those 27 months, we engaged with the following LAHSA service providers: First to Serve, The Salvation Army, Weingart Center Association, and People Assisting the Homeless, also known as PATH. Last June, and only because LAHSA and one of these service providers, Weingart Center Association, found themselves in a predicament for leaving me and my husband in an extremely vulnerable state, perpetually ignoring my husband's medical challenges, falsifying information in my husband's HMIS housing and medical file, threatening to put my husband in a nursing home, threatening to prematurely exit us from interim housing with no permanent housing in place, trying to coerce us to transfer to an unsafe, unsanitary environment, did we finally, finally exit the interim housing revolving door, becoming residents of a new apartment building for which LAHSA is the master leaseholder.

You would think that would be the end of a very happy story after all that trauma that I have just described. It is anything but. When my husband and I were shown the building

EXCEPTIONAL REPORTING SERVICES, INC

**120**

last June, it was brand new.  It is funded through federal, state, and local dollars, and other benefits such as tax abatements and the like.  It was clean and orderly, with the promise of being a responsible member of the neighborhood.

Sadly, questionable behaviors and the resulting property destruction of a brand new building by some tenants, their guests, and trespassers, Your Honor, have severely compromised this building to the tune of roughly $1 million and counting, a brand new building less than six months old.  There is no other building on our avenue that would tolerate the kind of behavior and property destruction that my husband and I have seen and have been subjected to in this building.

And I have to be graphic here so you'll get the picture, sir.  It is not the dog feces and urine left at the front entrance, in the elevator, in the stairwell, in the carpeted hallways by irresponsible pet owners.  It's not the gang graffiti scribbled throughout the building and left for days at a time.  It's not the trash, the food scraps, and clothing items strewn outside and throughout the building.  It's not the stolen mail for which no one in building management can account.  It is wrong, yes, it is horribly wrong, but LAHSA, the leaseholder, the master leaseholder for this building to allow these behaviors to continue unchecked for what is now six months.

THE COURT:  I'm going to ask you at this point to

EXCEPTIONAL REPORTING SERVICES, INC

**468**

**121**

give some other speakers time.

          MS. GREY:  Yes sir.  Could I finish one last paragraph?

          THE COURT:  Absolutely.

          MS. GREY:  There's a more menacing problem.  We've reported to LAHSA, building management, and the Los Angeles Police Department information about trespassers, suspected gang activity, drug use, and trafficking, including the existence of this suspected activity on our floor.  The stress of these events is adversely affecting my husband's health.  We are extremely concerned for our safety and welfare, particularly because we have been confronted by retaliatory acts of stalking and harassment for making these reports.

          One blatant example, sir, and I'll close.  On New Year's Day, on New Year's Day, between 8:00 a.m. and 8:30 a.m., a total stranger came to our apartment door, ringing the doorbell several times.  When we didn't respond, the stranger began pounding on our door multiple times, with each knock growing louder.  Finally, the stranger became shaking the door handle.  We observed this through the peephole.  We observed the stranger looking through the peephole.  I called security.  I got voicemail.

          My next call, of course, was the LA Police Department.  We have reached out to the community policing division of our LA Police Department.  They did respond to us.

EXCEPTIONAL REPORTING SERVICES, INC

**469**

**122**

They have shared with us that they are doing something.  For obvious reasons, they are not able to tell us what.  But this is what is happening.  With the money that you are tracing, this is a squanderance of millions of dollars not being respected.  Property damage in six months' time of a brand new building.  We're grateful to be inside, but there are others who are not, and they demonstrate it by what they're doing to the building.

You may be our guest.  You can come see it for yourself, and it is horrific.  So with that said, thank you for your time, sir.

**THE COURT:**  No, thank you.

**MS. GREY:**  I have much more that I would like to share, but I want to be fair to other people and I respect other people's time.  Thank you very much.

**THE COURT:**  Thank you very much.

I'm going to ask Michael to come up and then Kevin once again, because I want the City and the County to hear that this is going to be your political decision, David.  You, the Mayor, Barger, et cetera.  But just describe what's happening in terms of the sanctioned -- well, you tell them what's happening on the street.

**MR. WRIGHT:**  Michael Sean Wright.  I'm the Director of Field Medicine for Lestonnac Clinics, founder of WoundWalk.org, the largest street medicine team in the

**123**

country.

Your Honor reached out to the community, asked the medical team to come in quite some time ago. One of the things we actively observe is the deliberate, intentional distribution of drug paraphernalia. Kevin was able to receive --

THE COURT: This is going to get you excited. I don't want you to disagree. So you can speak in a moment.

MR. WRIGHT: Kevin was able to obtain the kits which are being handed out, which includes burners for crack cocaine, pipes. These were outside of the purview of maybe the needle exchange programs that some communies advocated for.

We do understand today that this comes from the County through the Measure H program for one vendor in particular, and that's back to the tune of $300,000. I can tell you the issue that we have when you reached your settlement, you had 3,000 beds, special needs, high impact beds, mental health and substance use disorder. What we certainly don't need in the city of LA, the county of LA, and especially on Skid Row --

THE COURT: Just a moment. His opinion is related to the Court. This is not the Court's opinion. We're going to get into a whole discussion about particularly whether narcotics distribution helps curtail death, et cetera or whether it's feeding in the community. But I want you to hear the input I'm getting, and then you'll decide as politicians.

**124**

MR. WRIGHT: And so when the community is coming to us and saying, why are we flooding the zone with crack pipes, with cookers, with burners? It doesn't seem very helpful. From a medical standpoint, not helpful at all. Kevin, you did get these kits, and you've seen the distribution of these before.

MR. CALL: Well, when I actually approached the homeless health care, I asked them, how can we be helping the people when we're giving them stuff to continue to use drugs? It don't make too much sense to me for the City or the County or whoever paid for it to be spending money on something that the taxpayer is the one losing, because I don't think no taxpayer wants to be spending money on somebody to use dope. I don't think so.

So I say it's rough, but that's why we're here, so we can try to begin to do the work. We know what the problem is, but we've got to begin to do the work.

THE COURT: Okay, now --

MR. WRIGHT: And I do love the emphasis to reduce the harm, and we're big fans of that and looking forward to working with the County and the City.

THE COURT: Now, just a moment. That's a political decision that the Court chooses not to enter into. That's a decision in terms of how you feel about the narcotic distribution, including cocaine down there. You've got to see

**125**

it, but it's down there.

       **MR. CALL:** Well, see, they called it harm reduction.

       **THE COURT:** I know, well, I'll call it harm reduction, but I want you to hear the complaint about the community down there who wants the narcotics not induced by the County, and where some of this money is going, and you'll make that decision. Maybe harm reduction's good, saves lives. Maybe it's the distribution down there, but the community is concerned about it, or portions of the community are concerned about it.

       All right, now, there's going to be two more speakers, we're going to conclude, and then we're going to go into session and resolve this.

       Well, there's three more speakers then, but come on up, sir. My apologies. Nice to meet you.

       **UNIDENTIFIED SPEAKER:** How you doing, Your Honor?

       **THE COURT:** And your name?

       **UNIDENTIFIED SPEAKER:** My name is William. I'm grateful because two years ago, I was on the back street of Winston with Rick, and you asked LAHSA and them to houses. I appreciate you for that.

       Since that time, I've been in the housing. I signed my voucher. Let me see what it says. 12/14/22, I signed my housing voucher. Okay, been in my house all this time. One day, I get a letter saying that the program ended, but prior to

**126**

that, I was told that I would be transferred from the Alhambra office to the LA office. Never happened to this day.

I sent emails to the workers that I had, Mr. Quintero, Miguel, whatever his name, Martinez, just people, they never reached back. Some of them have voice messages from last year still on their phones, so I thought that was really strange, Your Honor.

**THE COURT:** Okay. Nice to meet you, and thank you.

Sir, and then the lady who's been very patient back there. Well, one of you come on up here, both of you, and then we're going to conclude and go into session and resolve this issue with A&M and the City.

**UNIDENTIFIED SPEAKER:** Good afternoon, Judge.

**THE COURT:** How are you doing?

**UNIDENTIFIED SPEAKER:** Thank you very much because you have a special heart and empathy for all the people, and I'm going to scold you, all of you guys, and you too.

I'm a County employee, and I have seen so much misfunction in the County because people get hired because of favoritism or cussing or this and that, and some of them, they do have qualifications. Others, they don't, and they don't care because there is no responsibility.

For us, the government, we are just only a number and a statistic that they can use to get some money, and that's not fair because we have the homeless. They're human beings, and

**EXCEPTIONAL REPORTING SERVICES, INC**

**127**

they are taken for granted, and it's heartbreaking to see that, that they don't have no desire for a better life. They don't have no -- how can I say, because it's hard. I have the video of that lady. Remember Diane, the little girl? I have the video, and it was heartbreaking to see. I got sick that day by walking through Skid Row.

I have gone several times because I live in Boyle Heights, but we have that problem. Not that much like this one, but it's sad, and you guys don't have empathy, and you don't know the changes life brings us because nobody knows what is our future. Nobody can say what is our destiny, and sometimes we pay. Karma exists because you have the power, and I do agree with the young lady up there that we need to change the policies. And I remember before the pandemic, at the customer fairs of the county, they used to have once a month meetings, and the community were allowed to come and complain, and I was told that we can put input for changing the laws, and that's time for them, you see government employees, to bring the community to change the rules because it's abuse of the system.

There is nobody who's making them accountable. How is this that came in here, they are giving checks, and they don't know what service they have rendered? Hello? Something wrong here, but we have human beings on the street.

I've seen the RVs dumping all the waste on the

**128**

streets.  I have called the police.  They don't go because they don't care, but yet, we -- when it dries up, the residents, we have to breathe that air, that pollution.  It's not acceptable. It's not acceptable the way that you guys are doing business.

So and I do thank you, Judge.  And I'm willing to help out to create policies, and I think we, the community, can help out to do policies because you guys have to change the way that you're doing.  Thank you very much.

**THE COURT:**  Thank you.  And then the last speaker, sir.

**UNIDENTIFIED SPEAKER:**  Good morning, everybody.  Good morning.

**THE COURT:**  Thank you for your patience.

**UNIDENTIFIED SPEAKER:**  Good morning, LAHSA and good morning, Judge Carter.

**THE COURT:**  Good morning.

**UNIDENTIFIED SPEAKER:**  I come straight to the point. For me, I said five million compounding.  I want the money.  You violated my rights all the way across the board. Pain and suffering, keep saying my voucher coming, it's coming, it's coming.  I want the money.  You give me the five million compounding that I'm asking for, I would help the homeless with that money.  I know how to flip it.

What I mean by that, I wouldn't buy a building and give somebody $1 million to buy a building and sell it back to

**129**

me for 100 million.  Something wrong with that policy there.  But one thing, like I'm saying, I want the money, and a lot of people that's out here, we can't get the help that we need because you've got foreigners getting housing before us.  And then also, I heard of a thing called GAP.

How do you get $1,200 a month and also get cars, finances, through the money that you're getting when you're a foreigner?  I don't comprehend that.  I really don't comprehend that.  How do they drive around like that?

And here it is, we're American like this lady here.  She probably need a car, Uber, or something.  I look at all what you've done, it's very crooked.  But, like I'm saying, the word needs to be out.  5 million compounded.  It's going to be very painful.  You've been instructed.  If you don't do it right, this is how it's going to feel.  I want the $5 million.  And a lot of people are going to settle for $75,000 with LA Alliance.  I'm not going with it, me.  I want the money, and I'm going to hurt you, me.  I'm going to hurt your pocket.

**THE COURT:**  Okay.  Thank you very much.

**UNIDENTIFIED SPEAKER:**  And then I want it with prejudice.  When you pay me, you can't disclose to the jury.  And when you do pay me, I want to make a book off of it.

**THE COURT:**  Yes, sir.  Thank you very much.

**UNIDENTIFIED SPEAKER:**  Have a good day.

**THE COURT:**  Okay, now I want to pay two compliments,

**EXCEPTIONAL REPORTING SERVICES, INC**

**130**

and then we're done.

First of all, I want to thank the Skid Row community. I want you to hear this clearly. You've been able, and you are a community. And what's so sad is I think that much of LA thinks of Skid Row as Skid Row. It is a potentially vital and vital community. And I know it's rough down there. But what you've been able to do as a community, coming together, you know, from Big Mama to all of you folks out there, is you've really kept a lid on, somehow, this influx of a lot of kids coming from out of state, hitting our streets.

And then our historic black ethnicity on Skid Row, looking at all these kids and primarily Hispanic families coming in and this tough balance between, hey, I'm an American citizen, and these folks are getting services coming from out of state because they've got kids. And the community turned around and really came together. And if you see this, you would really leave with a warm spot in your heart. The community has basically decided that those kids are first and foremost important. And it doesn't matter where they came from. And if they're going to take them, and I think the mayor and the City has taken that attitude also.

I don't know what you're going to do. I'm not a politician. But I don't know what you're going to do about this shipping in from out of state, but it is changing the community. And it is putting a huge number of children back on

**EXCEPTIONAL REPORTING SERVICES, INC**

**131**

the streets that this community didn't have before. I've got to leave that to you. You're much wiser. You have the power. I've got what I call negative power.

The second thing is I want to leave you with all of the good workers, although I'm very critical of some of these directors and organizations and the services or lack thereof that they're providing and unaccountability. The everyday person who's working on the street for these organizations is dedicated and incredible. And quite frankly, they deserve a raise.

And I'll say this to LAHSA because I've said it to you before. I will never set foot back in your building, and I've made a record of that for two reasons. I don't understand how you occupy one of the most expensive buildings in Los Angeles. And, frankly, I don't understand the salaries you're being paid. They're more than the President of the United States. And I'll be blunt about it. So I'll never go back inside that building.

Now we're going to go into session. And Judge Gandhi is going to preside over you. I've got a court hearing or court trial that started at 1 o'clock. You tell me what time you -- you know my hours. They're either coming to Orange County because I've got to go back or I'm coming back up here. You'll dictate the time. If they need to be in session tomorrow, you can let them go at 5 o'clock or you can ask me to

**132**

drive back at 8 or 9 o'clock tonight.

**SPECIAL MASTER GANDHI:** We'll meet you down in Orange County.

**THE COURT:** Meet me down in Orange County, okay? He's in charge. You're ordered to remain present and you're ordered to go into session with Judge Gandhi or Michele, and you're going to work out this nonsense. This could have been resolved a long time ago. And, frankly, I let you go over the Christmas and Jewish holidays so I didn't disturb your families. I regret that now. We should have resolved this a long time ago.

So you're ordered to remain. All of you. Understood? Now, do you need -- though, hold on, do you need LAHSA for this?

**SPECIAL MASTER GANDHI:** No.

**THE COURT:** Okay, on call. Do you need LA Alliance for this?

**SPECIAL MASTER GANDHI:** No.

**THE COURT:** Do you need the County for this?

**SPECIAL MASTER GANDHI:** Yes.

**THE COURT:** Do you need the City for this?

**SPECIAL MASTER GANDHI:** No.

**THE COURT:** Do you need Shayla for this?

**SPECIAL MASTER GANDHI:** No.

**THE COURT:** Okay. Those parties identified are

EXCEPTIONAL REPORTING SERVICES, INC

**133**

ordered to remain. All of you have a good day.

Now, the next session will be following. I will not hold another session until I see the report from A&M. Okay? When that comes out, then I'm going to be looking at the County, your report, all of this information. Then we'll decide what to do.

**MS. MITCHELL:** Your Honor --

**THE COURT:** No, no, I'm not done. One last thing.

**MS. MITCHELL:** On that briefly, Your Honor, my understanding is part of the HIPAA and PHI issues have to do with HUD regulations, because Mr. Webster here was with HUD for a period of time, he has special expertise and is willing to assist.

**THE COURT:** He might be very helpful. He was with HUD. Yeah, if he'd remain.

**SPECIAL MASTER GANDHI:** You're welcome to stay.

**MS. MITCHELL:** Thank you, Your Honor.

**THE COURT:** All right. Now, so far, we've growled a lot over 2024. I think this is going to be the year dedicated to action. Let me repeat that.

I think we've gone far enough with any warnings, you know, blustering, pontificating, and I think the federal court gets tired at some point of writing orders. And then from Dean Pregerson to this court, consent decrees, et cetera, that bureaucracies, quite frankly, don't honor and can outlast us

EXCEPTIONAL REPORTING SERVICES, INC

**134**

with.  I hope that I either have the idiocy or courage to act. And so if I say it now, that 2025 will be the year of action taken by the Court if needed, I want you to hear that so you're not complaining later on.  Gee, the Judge surprised us by X, Y, and Z.  This will be the year that unless we can get this functioning, Michele, through the City and the County and LAHSA getting together, and maybe Miguel Santana can help because his committee wrote an excellent report in terms of getting some functionality, then the Court will step in and I'll take the result of that from the Ninth Circuit, okay?  That's a promise, okay?

So 2025, I'm not saying February and I'm not saying December, but 2025 will be the year that unless you can get this functioning in these different institutions and come together, I will take some kind of action.  Now you can guess what that will be, okay?  All right, we're on recess.

**(Proceedings concluded at 12:50 p.m.)**

**EXCEPTIONAL REPORTING SERVICES, INC**

**482**

135

# CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>January 8, 2025</u>

**Signed**                                          **Dated**


*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**

483