No. _____

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE CITY OF LOS ANGELES

CITY OF LOS ANGELES,

*Petitioner,*

v.

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

*Respondent,*

LA ALLIANCE FOR HUMAN RIGHTS ET AL.,

*Real Parties in Interest.*

From the United States District Court
for the Central District of California
Case No. 2:20-cv-02291 | The Honorable David O. Carter

## APPENDIX TO PETITION FOR A WRIT OF MANDAMUS AND EMERGENCY MOTION FOR IMMEDIATE STAY UNDER CIRCUIT RULE 27-3 (VOLUME 4 OF 7)

Hydee Feldstein Soto
Valerie Flores
Arlene N. Hoang
Jessica Mariani
CITY ATTORNEY'S OFFICE
200 North Main Street
City Hall East, 6th Floor
Los Angeles, CA 90012
213.978.7508

Theane D. Evangelis
Marcellus McRae
Bradley J. Hamburger
Daniel R. Adler
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197
213.229.7000
tevangelis@gibsondunn.com

*Counsel for Petitioner City of Los Angeles*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| LA Alliance for Human Rights, et al.<br>Plaintiffs,<br><br>v.<br><br>City of Los Angeles, et al.<br>Defendants. | Case No. 2:20-cv-02291-DOC-KES<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR SETTLEMENT COMPLIANCE [767, 863] |

I. INTRODUCTION

This case stands at the intersection of law and life—where the limits of judicial power confront the urgency of human suffering.

For decades, the homelessness crisis in Los Angeles has been shaped by indifference, avoidance, and bureaucratic inertia. From Skid Row to suburban storefronts, the suffering is no longer isolated. It has become a defining feature of the City's daily life. With nearly seven unhoused individuals dying each day, what once passed as a policy debate has become a moral

-1-

**747**

reckoning. Communities bear the weight of it—businesses, schools, families, first responders—all impacted by a crisis that touches every corner of Los Angeles.

The agreements now before the Court represent a collective attempt to move beyond paralysis towards progress. Yet even these agreements reveal a deeper truth: that progress has been halting, fractured, and often too slow to meet the scale of suffering on the streets.

Plaintiffs in this case ask the Court to declare the system irreparably broken. They argue that only the imposition of a receivership can meet this moment. But the Court is not a policymaker. It cannot be. Its role is narrower, but no less vital: to uphold the promises made to the public, to enforce the agreements signed, and to ensure transparency and accountability in their execution.

In 2021, the Court warned that it could not idly bear witness to preventable deaths. That warning still echoes. But it must now be read alongside the Supreme Court's caution in *City of Grants Pass, Oregon v. Johnson,* 603 U.S. 520 (2024), that federal courts cannot substitute their judgment for the democratic will of a community grappling with complex and deeply human questions. 603 U.S. 520 (2024). As that Court recognized: "Homelessness is complex." *Id.* at 524. Its causes are many and so too must be its solutions.

But that complexity cannot serve as an excuse. Flexibility in how the City meets its obligations does not mean those obligations can be ignored. The Court cannot fix the system. But it can be sure the City is held to what it promised to repair.

This case is not a referendum on homelessness policy. It is a test of integrity, governmental accountability and whether, in the face of death and despair, the law can still serve life.

## II.    BACKGROUND

### A.  Initiation of the Present Litigation

The Plaintiffs in this case are the LA Alliance for Human Rights (the "Alliance"), a non-profit membership association, and its members who are business owners in the City of Los Angeles and residents of the City and County of Los Angeles (collectively, "Plaintiffs"). *See generally* Complaint ("Compl.") (Dkt. 1) and First Amended Complaint ("FAC") (Dkt. 361).

**748**

Plaintiffs sued the City of Los Angeles ("City") and the County of Los Angeles ("County") on March 10, 2020, for alleged violations of California law, the California Constitution, the Americans with Disabilities Act, the Rehabilitation Act, and the United States Constitution through 42 U.S.C. §1983. *See generally* Compl. Plaintiffs challenged the City and County's approach to the street homelessness crisis, including the lack of sufficient shelter and proliferation of encampments on public rights of way. *Id*. Plaintiffs sought immediate shelter for those living on the streets and the clearing of encampments. *Id*.

On March 18, 2020, the Court granted Los Angeles Catholic Worker ("LACW") and Los Angeles Community Action Network's ("LA CAN") Application to Intervene in this litigation, represented by the Legal Aid Foundation of Los Angeles and other counsel. Order Granting Intervenors' Ex Parte Application to Intervene as of Right (Dkt. 29). LA CAN is a grassroots, non-profit organization that has operated on Skid Row and throughout the City for decades to organize and advocate for the unhoused community. It intervened on behalf of hundreds of its members who are unhoused in the City. LACW is an unincorporated lay Catholic community which operates a soup kitchen and provides services on Skid Row. LACW and LA CAN (collectively "Intervenors") have been actively involved in the litigation since the Court granted intervention.

**B. Roadmap Agreement**

On May 15, 2020, this Court issued a Preliminary Injunction ("Preliminary Injunction") (Dkt. 108). This Preliminary Injunction directed the relocation of those individuals' experiencing homelessness and living under underpasses, and near freeway entrance and exit ramps. Preliminary Injunction at 1-2. Central to this directive was the Court's growing concern over the significant public health risks posed by living adjacent to freeways—particularly during the then-ongoing global Covid-19 pandemic. *Id.* at 2. Following drug overdose and heart disease, traffic-related injuries were the third leading cause of death among people experiencing homelessness.[1] Throughout this litigation, Intervenors repeatedly told this Court that people

---

[1] New Public Health Report Shows Sharp Rise in Mortality Among People Experiencing Homelessness, County of Los Angeles Public Health Media (May 12, 2023), https://lacounty.gov/2023/05/12/new-public-health-report-shows-sharp-rise-in-mortality-among-people-experiencing-homelessness/ (last visited June 23, 2025).

-3-

**749**

experiencing homelessness ("PEH") face a life expectancy more than twenty years shorter than the general population. The Court's Preliminary Injunction was informed by evidence that any plan which failed to reduce the number of unhoused individuals living near freeways or major road systems would only worsen this already devastating loss of life. The dangers are not abstract; they include fires beneath freeway overpasses, individuals falling from overpasses to their deaths, and people being struck by vehicles.

In recognition of the City and County's legislative and policy-making authority, the Court invited input from the Parties before the Preliminary Injunction took effect. *Id.* at 7. The Court in a later Order clarified that the Preliminary Injunction would remain in effect regardless of ongoing settlement discussions and ordered housing to be offered to relocate individuals residing within 500 feet of freeway infrastructure by September 1, 2020. *See* Minute Order and Preliminary Injunction ("Second Order re Preliminary Injunction") (Dkt. 123) at 5, 10. To ensure compliance, the Court required periodic status reports. *Id.* at 13.

In response to the Preliminary Injunction, the County filed a Joint Request for Order to Mediate (Dkt. 124), which the Court granted and appointed the Honorable André Birotte Jr. as the mediator. Order Appointing Mediator (Dkt. 125). As a result of mediation, the City and County reached an agreement that was memorialized in a "Binding Term Sheet *subject to the Court's approval.*" Joint Stipulation for Order Requesting Hearing to Approval Binding Term Sheet (Dkt. 134) at 2 (emphasis added). This Binding Term Sheet required the City to provide 6,700 beds within 18 months to house or shelter: (1) PEH residing within 500 feet of freeway overpasses, underpasses, and ramps within the City of Los Angeles; with priority given to (2) PEH aged 65 or older within the City, and (3) other vulnerable PEH within the City. Evidentiary Hearing Exhibit # 1 ("Ex. 1") ("Binding Term Sheet") (Dkt. 136) at 1.

In exchange for the Court vacating the Preliminary Injunction, the City and County agreed to execute all necessary documents to implement the Binding Term Sheet and stipulated that it was "*subject to court approval, monitoring, and enforcement.*" Joint Stipulation Requesting the Court Approve the Binding Term Sheet and Vacate the Preliminary Injunction (Dkt. 137) (emphasis added). At the Parties' request, on June 18, 2020, the Court approved the

**750**

Binding Term Sheet, retained jurisdiction to monitor and enforce, and vacated the Preliminary Injunction—subject to reinstatement if the Parties failed to comply. Order Re: Joint Stipulation for Order Requesting the Court Approve the Binding Term Sheet and Vacate the Preliminary Injunction (Dkt. 138).

After about four months of scheduling conferences and meditation sessions, Judge Birotte ordered the Parties to report on their progress towards the development of a Memorandum of Understanding ("MOU") to govern their Binding Term Sheet. Order for City and County of Los Angeles to Meet, Confer, and File a Joint Report Re: Status of MOU (Dkt. 183). On October 9, 2020, the City and County reached an agreement on a MOU. Evidentiary Hearing Exhibit # 2 ("Ex. 2") ("Roadmap MOU") (Dkt. 185-1). The Binding Term Sheet and Roadmap MOU have together been referred to as the "Roadmap Agreement."

According to the City and County, the Roadmap MOU clarified the historic agreement between the City and County to provide, within eighteen months, 6,700 beds and services for PEH within the City of Los Angeles. *See generally* Ex. 2. The Roadmap MOU, which incorporated the terms of the Binding Term Sheet, clarified the responsibilities of the City and County in further defining and implementing the terms of the Binding Term Sheet. *Id.* at 4. The Roadmap MOU is set to terminate on June 30, 2025. *Id.* at 1.

More specifically, under the terms of the Roadmap MOU, the City agreed to deliver a total of 6,700 beds—comprised of 6,000 "New Beds"[2] and 700 "Other Beds."[3] *Id.* at 4. Of these beds, the City committed to providing 5,300 New Beds within ten months of June 16, 2020, and an additional 700 New Beds within 18 months of June 16, 2020. *Id.* The 700 Other Beds were to be provided within the initial 10-month period. *Id.* The precise mix and location of New Beds and Other Beds was to be determined at the City's sole direction. *Id.* at 5.

---

[2] The Roadmap MOU explicitly defines "New Beds" as beds: "(i) not previously captured in any agreement or plan between the PARTIES, and (ii) opened on or after the date of the Binding Term Sheet (i.e., June 16, 2020). New Beds may include any combination of the following: (i) purchased and/or leased motel/ hotel rooms by the City; (ii) rental assistance, including rapid rehousing, but only for the duration of the assistance; (iii) sprung structures or tents; (iv) safe parking; (v) safe sleeping; (vi) scattered site or permanent supportive housing; (vii) ABH [A Bridge Home] beds; and (viii) other innovative modes of housing or shelter. Family reunification is not included as a New Bed under this MOU." *Id.* at 4.
[3] "Other Beds" are defined as beds that may be "previously captured in an agreement or plan between CITY and COUNTY." *Id.*

**751**

The County also pledged a one-time $8 million dollar incentive if the City opened and made occupiable 5,300 new beds within ten months from June 16, 2020—an incentive the City ultimately forfeited due to the County's inability to verify the existence of the City's beds. *Id.* at 5; Evidentiary Hearing Exhibit # 140 ("Ex. 140") ("Joint Status Report of Defendants Re: MOU") (Dkt. 373) at 4-5. Additionally, the County agreed to funding for the first year up to $53 million and up to $60 million annually for years two through five. Ex. 2 at 4.. The County also committed to offering a suite of "mainstream services" to PEH in City-established facilities. *Id.* at 6.

Pursuant to the Roadmap MOU, the City agreed to certain reporting requirements but stated that "if the Court requires different and more extensive reporting than what is set forth below, then the Parties agree to provide reporting as required by the Court and not in this MOU." *Id*. The first reporting requirement directed the City to submit a "Bed Plan" by August 1, 2020, describing how it would establish the specified New Beds and Other Beds. *Id*. Next, the City agreed to submit written quarterly status reports ("Roadmap Quarterly Reports"), beginning no later than October 15, 2020, detailing its progress in providing beds and services pursuant to the Roadmap Agreement. *Id.* at 7. The County, in turn, committed to reporting on funds disbursed and the delivery of services for PEH residing in facilities established by the City under the MOU. *Id.* at 7-8. The MOU explicitly states that it is "subject to enforcement by the Court" and that the City and County agreed to the submission of the Roadmap MOU to the Court. *Id.*

**C. LA Alliance Settlement Agreement**

Following extensive negotiations and numerous mediation sessions, Plaintiffs and the City reached a Settlement Agreement in May 2022, resolving only the claims against the City in Plaintiffs' First Amended Complaint. *See* Notice of Lodging, Settlement Agreement (Dkt. 429-1). This Settlement Agreement followed an earlier preliminary settlement between Plaintiffs and the City. *See* Notice of Preliminary Settlement Agreement and Stipulation to Stay Litigation (Dkt. 408). After holding a hearing on the Settlement Agreement, the Court approved the stipulated dismissal and proposed settlement between Plaintiffs and the City on June 14,

**752**

2022. Order Approving Stipulated Dismissal and Proposed Settlement (Dkt. 445). The Court dismissed the claims against the City with prejudice, incorporated the terms of the Settlement into its Order, retained jurisdiction for a period of five years to enforce the terms of the Agreement, and appointed Special Master Michele Martinez as the Monitor to "assist the Court in overseeing and enforcing this Agreement." *Id*. at 3. In its Order, the Court stated: "The Settlement Agreement creates a structure and enforcement mechanism for the City to create a substantial number of new beds for people experiencing homelessness. While this Agreement is not a solution to homelessness, it is a concrete step toward improving the lives of our neighbors who are currently suffering on the streets." *Id*. at 2.

One of the recitals in the Settlement Agreement states: "the purpose of this Agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles, and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles." Evidentiary Hearing Exhibit # 25 ("Ex. 25") ("Settlement Agreement") (Dkt. 429-1), at 2.

The Settlement Agreement required the City to "create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH within the City based on LAHSA's [Los Angeles Homeless Services Authority] 2022 Point in Time count." Ex. 25, § 3.1. Further, the City was required to calculate the "Required Number." *Id*. §5.1. The City met that obligation by calculating 12,915 as the Required Number in 2022. Evidentiary Hearing Transcript ("Tr."), 244, 252-253, May 28, 2025 (Dkt. 949).

The requirement that the City "create" 12,915 "housing or shelter solutions" is subject to the following term:

> the City may choose, at its sole discretion, any housing or shelter solution including but not limited to tiny homes, shared housing, purchased or master-leased apartments, hotels/motels, or other buildings, congregate shelters, permanent supportive housing, rental assistance/rapid rehousing, family reunification, sprung

**753**

structures or tents, safe parking, safe sleeping/camping, affordable housing, and interim housing (including A Bridge Home beds), as long as the Milestones are met.

Ex. 25, §3.2. Further, the "City agrees to implement an approach of equitably distributing housing and shelter solutions throughout the City." *Id*. §3.3.

> Section 5.2 of the Settlement Agreement provides:
> Thereafter the City will create plans and develop milestones and deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number; (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and (iv) the City's plan for encampment engagement, cleaning, and reduction in the City. The City will provide the plans, milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary. The City will provide a report setting forth the milestones and deadlines. The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines.

Ex. 25, § 5.2.

The City agreed to "provide quarterly status updates to the Court regarding its progress with this Agreement, including the number of housing or shelter opportunities created or otherwise obtained, the number of beds or opportunities offered, and the number of beds or opportunities currently available in each Council District." *Id*. §7.1. Further, the "Parties will engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement. The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding, if needed." *Id*. §7.2. The Agreement also provides that "Funding of housing and shelter opportunities created by the City shall be at the City's sole discretion." *Id*. §8.1.

> The Agreement provides an emergency term stating:
> In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council under the authority vested in them by

**754**

the Los Angeles City Charter and Los Angeles Administrative Code (or other applicable ordinances, resolutions, or laws), the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

*Id*. § 8.2.

The Agreement also states, "The Parties agree that the duration of the Agreement shall be five (5) years, during which point the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement." *Id*. § 2.

## D. Appointment of Special Master

The Court first appointed Judge James L. Smith (retired) as a Special Master in this case. The Court then appointed on a volunteer basis Michele Martinez as the Special Master on April 24, 2020. Order Appointing Special Master (Dkt. 79); *see also* Tr., 236-237, June 3, 2025 (Dkt. 969). Upon approving the Settlement Agreement with the City in 2022, the Court appointed Special Master Martinez as the Monitor to "assist the Court in overseeing and enforcing this Agreement." Order Approving Stipulated Dismissal and Proposed Settlement (Dkt. 445), at 3; *see also* Tr., 237, June 3, 2025. Special Master Martinez's role includes but is not limited to observing and monitoring in the field almost seven days a week, talking to the Parties, talking to unhoused people, meeting with homeless outreach workers and service providers, hosting learning sessions with the Parties, attending city council meetings, attending other city meetings on homelessness, and attending LAHSA meetings. Tr., 237-242, June 3, 2025.

Special Master Martinez has provided two reports to the Court and Parties regarding the Parties' compliance with the Settlement Agreement. The first report was filed on February 29, 2024, and covered the first year of the Settlement with the City from July 1, 2022, through December 31, 2023. Independent Monitoring Report Year One (Dkt. 674). The second report was filed on May 14, 2025, and covered the period from January 1, 2024, until December 31, 2024. Evidentiary Hearing Exhibit # 93 ("Ex. 93") ("Special Master Independent Monitoring Report and Recommendations No. 2") (Dkt. 904). In her most recent report, Special Master Martinez warned that funding shortfalls put the City at serious risk of not being able to meet its Settlement obligations in 2027. *Id*. at 29. Based on her observations and communications with

**755**

the Parties, she recommended that the Court require independent reviews for all city-reported bed/unit figures to ensure data accuracy, that the beds/units in process undergo immediate milestone verification to determine their status, and that quarterly compliance checks validate newly reported beds. *Id*. at 17. She also recommended that the Court appoint an independent fiduciary monitor to oversee the City's accounting procedures based on the concerning Alvarez and Marsal ("A&M") Assessment findings discussed below. *Id*. at 25. If significant progress was not made with the additional oversight, Special Master Martinez recommended "that the court

consider transitioning to full receivership." *Id*.

In addition to Special Masters Smith and Martinez, the Court and Parties have often worked with Judge Birotte to negotiate and facilitate compliance with the Settlement Agreement. Judge Birotte was first appointed as a mediator in this matter on May 29, 2020, upon the request of the City and County. Order Appointing Mediator (Dkt. 125). The Court also appointed the Honorable Jay C. Gandhi (retired) to monitor a separate settlement agreement, not at issue here, between Plaintiffs and the County. Order on Joint Submission of Second Addendum to Settlement Agreement and Stipulation for Voluntary Dismissal (Dkt. 646).

**E. History of Homelessness Audits in the City and County of Los Angeles**

The findings of the recent court-ordered A&M Assessment are not new—they are the latest entry in a decades-long record of systemic dysfunction. For nearly twenty years, oversight bodies have repeatedly identified the same fundamental failures: poor fiscal oversight, inadequate contract management, and a chronic inability to ensure accountability for public funds. Each report has reinforced a troubling pattern: that rather than taking accountability and making changes, the longstanding deficiencies have been left to persist and deepen.

Many of the reports, summarized below, center on LAHSA's operational shortcomings. LAHSA, a Joint Powers Authority formed in 1993 through an agreement between the City and County of Los Angeles, was created specifically to coordinate and implement the region's response to homelessness. *See* Evidentiary Hearing Exhibit # 56 ("Ex. 56") ("LAHSA JPA

**756**

Agreement, Feb. 28, 2001") (Dkt. 899-3). In addition to its local mandates, LAHSA is designated as the Continuum of Care ("CoC") for Los Angeles under federal law, which makes it responsible for administering a comprehensive homelessness response in accordance with U.S. Department of Housing and Urban Development ("HUD") regulations. HUD CoC Program Interim Rule, 24 CFR Part 578. Functionally, LAHSA is the primary entity responsible for implementing the funding provided by the City for homelessness-related services. On behalf of both the City and County, LAHSA manages resources and oversees the delivery of critical programs. To evaluate whether the City and County have fulfilled their obligations under the Roadmap Agreement or Settlement Agreement without examining LAHSA's performance is akin to trying to diagnose a stalled car without inspecting the engine.

The creation of LAHSA has, at times, enabled a cycle of blame-shifting. When data inconsistencies or compliance issues arise, the City points to LAHSA. In turn, LAHSA attributes its problems to a lack of information or cooperation from the City. This dynamic has fostered a system in which responsibility is routinely deflected, allowing both entities to evade accountability, with no single party willing to take responsibility.

Here, the Court provides a brief overview of prior public-facing audits to illustrate the depth and persistence of the systemic issues underscored by the recent A&M Assessment.

In 2001, a HUD audit of LAHSA's supportive housing program reviewed whether LAHSA operated a CoC grant in accordance with the approved application, HUD requirements, and other federal requirements. Evidentiary Hearing Exhibit # 82 ("Ex. 82") ("HUD Audit re LAHSA") at 1. This audit found that LAHSA violated grant agreements by failing to conduct onsite monitoring of service providers and failing to conduct any formal monitoring of subgrantees prior to awarding renewal grants. *See generally id.*

In 2007, HUD's Regional Inspector General audited LAHSA following allegations of mismanagement and misuse of HUD funds. *See generally* Evidentiary Hearing Exhibit # 83 ("Ex. 83") ("HUD Audit re LAHSA") (Dkt. 882-1, Exhibit A). The audit found that LAHSA failed to conduct on-site fiscal monitoring and did not perform the required 100% source documentation desk reviews for at least two project sponsors. *Id.* at 1. Of the two sponsors

**757**

reviewed, one sponsor charged ineligible expenses, while the other lacked documentation to support its cash match due to poor financial controls. *Id.* As a result, LAHSA failed to ensure HUD funds were used properly and effectively. *Id.* at 2. The 2007 audit thus recommended that LAHSA be required to comply with HUD regulations. *Id.*

In response to an April 10, 2018, directive from the Los Angeles County Board of Supervisors, the County Auditor-Controller issued a report evaluating LAHSA's fiscal operations and capacity to manage Measure H funds.[4] *See generally* Evidentiary Hearing Exhibit # 84 ("Ex. 84") ("LA County Auditor Follow Up Review of LAHSA"). This County audit provided sixteen recommendations aimed at improving accountability and operational efficiency. *See generally* Ex. 84. These were ranked from Priority 1 to Priority 3 based on the severity and likelihood of negative impact if left unaddressed. *Id.* at 1 n.1. Of these sixteen recommendations, eight were designated Priority 1 level of concern. *See generally id.* The issues ranked Priority 1 are summarized as follows:

- inadequate staffing levels to meet their workload
- retroactive contracting, which resulted in sub-recipients providing services without having an executed contract in place
- inadequate cash flow to pay sub-recipients, delaying payments to sub-recipients
- missing documentation verifying access to all eligible cash advances
- late reimbursement claims to funding sources
- aged receivables that were not followed up on promptly, causing cash request delays
- lack of management oversight in fiscal operations

*Id.* at 1-10. LAHSA responded to all eight Priority 1 findings with either "agree," "concur," or "partially concur," acknowledging the need for corrective action. *See id.* These specific issues—such as providing services without contracts, missing verifying documentation, and a lack of management oversight—not only reflected serious gaps in LAHSA's operations at the time, but would later resurface in subsequent reviews, signaling a persistent pattern of dysfunction.

---

[4] Measure H funds are derived from a quarter cent sales tax approved by Los Angeles County voters in 2017 to support homelessness-related services and housing initiatives.

**758**

In August of 2019, Los Angeles City Controller Ron Galperin issued a report and set of recommendations aimed at improving LAHSA's homelessness outreach program. Evidentiary Hearing Exhibit # 85 ("Ex. 85") ("LA County Auditor Follow Up Review of LAHSA") at 1. The report concluded that LAHSA failed to meet five City outreach goals for fiscal year 2018-2019. *Id.* at 6. This failure included housing placement rates as low as four percent (target was 10); substance abuse treatment rates of just six percent (target was 25); mental health treatment of just four percent (target was 25); placements from streets to shelter was 14 percent (goal was 20); and LAHSA did not report on the goal of data accuracy. *Id.* at 1-2. The Controller also found that LAHSA used unclear metrics to track outreach efforts and submitted reports with data quality issues and inconsistencies—raising concerns about the agency's ability to measure performance and accurately report result to stakeholders. *Id.* at 5. Ultimately, just as other reports concluded, this report found that LAHSA needed enhanced transparency and accountability. *Id.*

Again, in October of 2019, City Controller Ron Galperin released a report pursuant to Proposition HHH, a ballot measure that authorized the City to issue up to $1.2 billion in general obligation bonds to help subsidize and develop up to 10,000 supportive housing units for individuals and families experiencing homelessness. *See generally* Evidentiary Hearing Exhibit # 86 ("Ex. 86") ("LA City Controller Review of Proposition HHH"). Proposition HHH required the Controller to conduct financial audits of the program. *Id.* at 2, n.1. The audit revealed that high costs and slower-than-anticipated pre-development and construction timelines had significantly impeded the City's ability to fulfill the measure's goals. *Id.* Notably, the report found that the average costs of constructing HHH-funded units exceeded the median sale price of a market-rate condominium in the City of Los Angeles and even surpassed the cost of a single-family home in Los Angeles County. *Id.* at 5. A major contributing factor was the disproportionately high share of "soft costs," which accounted for approximately forty percent of total project costs—compared to just eleven percent for actual land costs. *Id.*

**759**

In 2021, the Committee for Greater Los Angeles[5] released a report stating, "[t]he road to this point is paved with broken promises and new initiatives that fill us with hope when adopted but fail to fully reach their objectives." Amended Order Re Documents Referenced by the Court (Dkt. 882-3, Exhibit C) ("2021 Committee for Greater LA Plan for Homelessness Governance in Los Angeles") at viii. The report further proposed a new governance structure to address homelessness in the region. *Id.* at 2. The report identified the core issue as the absence of a centralized authority capable of aligning fragmented efforts toward a unified mission, stating that Los Angeles lacks a central governance structure that can "draw our disparate best efforts to a common mission." *Id*. The report also found that while LAHSA's role and funding have expanded over time, the agency remains caught between the City and County—preventing it from effectively coordinating the region's overall homelessness response. *Id.* at 18. Finally, the report emphasized a lack of comprehensive, outcome-driven data, noting that decision-makers lack access to credible, shared information necessary to understand the full scope of the crisis. *Id.* at 22.

In 2022, the HUD Office of the Inspector General, conducted a review of LAHSA's administration of the Continuum of Care ("CoC") Program. *See* Evidentiary Hearing Exhibit # 88 ("Ex. 88") ("HUD Audit re LAHSA"). A CoC is an integrated system intended to guide homeless individuals and families through a comprehensive network of housing and services aimed at preventing and ultimately ending homelessness. *See id.* at 39. This report found that LAHSA failed to meet key goals and objectives under the program. *Id.* at 1. Specifically, it did not utilize $3.5 million in CoC grant funds, allowing the funds to expire; failed to adequately support costs related to the Homeless Management Information System (HMIS) and planning grants; and did not timely submit required annual performance reports. *Id.*

In 2021, the LA County Auditor-Controller released a series of four reports.[6] These reports identify unresolved issues previously stated in the past audits above. *See generally*

---

[5] The Committee for Greater LA assembled a group of fifteen (15) civic leaders in April 2020 to prioritize the recovery of LA County's most marginalized communities. The Committee worked in partnership with the UCLA Luskin School for Public Affairs and the USC Equity Research Institute to produce the *No Going Back* report.

[6] County of Los Angeles, Arlene Barrera, Auditor-Controller, Los Angeles Homeless Services Authority – Measure H – Contracting Operations Assessment Review (Report #X18703) – First Follow-Up Review (Feb. 5, 2021), https://file.lacounty.gov/SDSInter/bos/supdocs/148452.pdf ("County of Los Angeles 2021 Reports").

**760**

County of Los Angeles 2021 Reports. For example, they point to staffing and oversight issues, problems with paying providers late, failing to make reimbursement requests, and insufficient financial controls. *See generally id.* The reports identify as unresolved the same staffing and oversight issues previously identified. *See generally id.*

In 2023, Los Angeles City Controller Kenneth Mejia conducted an audit that examined LAHSA's management of interim housing data. *See generally* Evidentiary Hearing Exhibit # 89 ("LA City Controller Audit Interim Housing Bed Availability Data"). It found widespread data entry issues related to participant enrollments, exits, and bed attendance. *Id.* at 1. LAHSA also failed to follow up with providers regarding discrepancies in point-in-time sheltered homeless counts, and a significant number of shelters reporting low bed utilization rates. *Id.* Critically, LAHSA's bed availability tracking system was deemed so unreliable that the agency depended on daily census emails rather than its designated reservation system. *Id.* The audit noted that more than seven years after being tasked with developing such a system, LAHSA still had not implemented it. *Id.* at 6. This audit recommended that the City collaborate with LAHSA to take new steps to create a functioning shelter and bed availability system and improve the data quality that supports the existing shelter system. *Id.* at 2. This audit highlighted that the City currently lacks a centralized database that tracks interim housing availability and criteria for entry for interim housing sites. *Id.*

In 2024, City Controller Mejia conducted another audit focused on City-funded interim housing programs operating between 2019 and 2023, evaluating their performance and the outcomes of residents exiting these programs. *See generally* Evidentiary Hearing Exhibit # 92 ("Ex. 92") ("LA City Controller Homelessness Audit: Pathways to Permanent Housing") at 1. The findings were stark: fewer than 20% of people in interim housing transitioned to permanent housing, while over 50% returned to homelessness or exited to unknown destinations. *Id.* In addition, one in four interim beds (the gateway to permanent housing) went unused, costing taxpayers an estimated $218 million dollars. *Id.* The audit found severe data quality issues which made "meaningful evaluation of system performance difficult, impedes LAHSA's ability to hold underperforming service providers accountable, and prevents the City from making

**761**

informed decisions about where to direct future spending." *Id.* at 2. This audit concluded that LAHSA's poor project management, monitoring, and data quality required urgent remediation. *Id.*

In 2024, County Auditor-Controller Oscar Valdez conducted a review of LAHSA's finance, contracts, risk management, grants management, and compliance functions. Evidentiary Hearing Exhibit # 91 ("Ex. 91") ("County of Los Angeles LAHSA Audit") at 1. This report identified sixteen different issues. *See generally id.*

These sixteen issues are summarized below:

**1. LAHSA did not establish agreements for working capital advances**

o Between fiscal years 2017-18 and 2019-20, LA County advanced LAHSA $82.5 million in Measure H working capital advances to support Measure H operations, and LAHSA distributed $50.8 million to service providers. These funds were given without formal repayment agreements, and service providers were allowed to retain advances across fiscal years. LAHSA retained the remaining $31.7 million to support internal operations. As of July 2024, only $2.5 million (5%) has been recovered due to subrecipient cash flow issues and delayed recoupment efforts. Without formal agreements and stronger controls, there is a significant risk that LAHSA may not recover all funds or repay the County in full. *Id.* at 1-2.

**2. LAHSA did not recoup annual cash advances**

o LAHSA provides annual cash advances to service providers with the expectation of year-end repayment but has failed to consistently recover these funds. As of July 2024, $15 million in advances remain outstanding, with $8 million carried over from prior years—including $409,000 owed by service providers no longer under contract. This has created an $8 million cash deficit. While LAHSA tracks these amounts as receivables in their accounting records, the lack of effective recovery efforts and controls

**762**

increases the risk that these funds—originally intended for active programs—may never be recovered. *Id.* at 2-3.

### 3. LAHSA had inadequate contract data

o LAHSA uses the Enterprise Grants Management System (EGMS) to manage subrecipient contracts but cannot produce an accurate or consistent list of active contracts. As of May 2024, reported contract totals varied widely across five different EGMS listings, none of which matched the claimed total of 1,273 active contracts. LAHSA also failed to track key contract data, such as execution dates and accurate term dates, leading to discrepancies and retroactive contract issues. *Id.* at 3-4.

o The audit reviewed a sample of eight contracts and noted that: all contracts did not capture the date they were signed by the parties and executed, six of the contracts had terms and dates in EGMS that did not match the actual contract, and four of the contracts had dates in the contracts that were inaccurate which led to inaccurate reporting in EGMS. *Id.*

o This lack of reliable data hinders effective oversight and creates significant risks, including payment delays, service disruptions, administrative inefficiencies, and lack of stakeholder trust. *Id.*

### 4. LAHSA had inadequate controls over cash advances

o LAHSA lacked basic financial controls over cash advances. It did not use separate, interest-bearing accounts by funding sources, failed to assess service provider's repayment history before giving them more cash advances, did not reconcile advances quarterly, and lacked clear recoupment policies. Despite these deficiencies, LAHSA began implementing a new funding model involving larger and more frequent cash advances. As of September 2024, LAHSA received over $115 million in Measure H funds under this model. Without stronger controls, there is a heightened risk that funds may be misused or remain uncovered. *Id.* at 4-5.

**763**

**5. LAHSA inappropriately used funds**

- As a pass-through agency, LAHSA is generally required to wait for reimbursement from funders before paying service providers. However, in fiscal year 2023-24, LAHSA used funds from unrelated government sources to pay service providers before receiving reimbursement, including $126,168 for a HUD program and $31,770 for County program. This practice constitutes a misuse of funds, undermines financial controls, and risks cash flow issues and potential penalties from funders. LAHSA must stop using funds across programs to ensure compliance and protect the integrity of its financial operations. *Id.* at 5-6.

**6. LAHSA made late payments to service providers**

- Between July 2023 and May 2024, LAHSA failed to pay service providers on time in 38% of reviewed cases, despite having received the necessary funds. Some payments were delayed by over fifty business days even when Measure H or state advances were available. LASHA cited cash flow issues, but prior failures to recoup advances contributed to ongoing deficits. These delays violate LAHSA's own payment timelines (fifteen business days) and can disrupt critical services. Improved cash flow management is needed to ensure timely payments and program stability. *Id.* at 6-7.

**7. LAHSA had record-keeping deficiencies**

- LAHSA used internal reports to track Measure H working capital advances but failed to maintain accurate and complete records. A review of twelve service providers representing $34.6 million revealed that LAHSA understated advances by over $500,000 for two service providers and lacked supporting documentation for $5 million in disbursements. These deficiencies were attributed to staff turnover and system changes. Without

**764**

accurate accounting, LAHSA risks misusing funds and may struggle to recover all advances and repay the County in full. *Id.* at 7-8.

**8. LAHSA had retroactive contracts**

o In fiscal year 2023-24, the audit reviewed a sample of eight contracts and noted that seven were executed retroactively, with delays ranging from 23 to 170 days after the contract start date—an average delay of 73 days after the contract start date. While some delays stemmed from late funder approvals, many were due to avoidable internal inefficiencies at LAHSA, such as delays in creating contracts and finalizing budgets even after funding was approved. These delays increased the risk of liability, as service providers may provide services without formal agreements in place and can lead to delayed payments and operational disruptions. *Id.* at 8-9.

**9. LAHSA had an inadequate contract monitoring plan**

o LAHSA's fiscal year 2023-24 Contract Monitoring Plan lacked essential controls and processes needed for effective subrecipient oversight. While appropriate risk factors were identified, LAHSA did not use a documented or systematic method to assess overall risk, relying instead on informal institutional knowledge. The agency also failed to actively track the status of monitoring review, making it difficult to assess progress or evaluate performance. Additionally, LAHSA lacked procedures to promptly incorporate newly executed contracts into the plan and did not ensure that all service providers were monitored for programmatic compliance—over half (51%) of planned reviews omitted such checks. These deficiencies create gaps in oversight and increase the risk of undetected noncompliance, misuse of funds, and failure to deliver critical services. *Id.* at 9-10.

**765**

**10. LAHSA had a lack of contract monitoring standards**

- o   LAHSA's contract monitoring function lacks sufficient standards for conducting and documenting reviews. In a sample of ten contract monitoring reviews for fiscal year 2023–24, LAHSA failed to maintain adequate workpapers for any of the reviews—one review had no documentation at all, and the remaining nine lacked clear support for the conclusions drawn. Additionally, none of the reviews showed evidence of supervisory oversight. Without proper documentation and review, it is unclear whether service providers complied with contract terms. These deficiencies significantly increase the risk of undetected misuse of funds, unverified service delivery, and noncompliance with contract requirements. *Id.* at 11-12.

**11. LAHSA had delays with reimbursement claims**

- o   LAHSA's reimbursement and invoicing processes suffer from significant delays, impacting both their own operations and those of their service providers. Of the thirteen reimbursement claims reviewed, one was submitted to the County 214 days after the billing month—far exceeding the 30-day deadline in LAHSA's Operating Agreement—and another to HUD was delayed by 144 days. These delays were attributed to service provider's late invoicing and internal reconciliation lags. In a review of twenty monthly subrecipient invoices to LAHSA, 60% were not submitted on time, despite no external barriers. These delays jeopardize LAHSA's cash flow, complicate funder budget cycles, and risk underutilization of allocated funds. Strengthening invoice monitoring and addressing systemic failures is essential. *Id.* at 12-13.

**12. LAHSA did not complete planned audits**

- o   LAHSA failed to complete any of its planned internal audits in fiscal year 2022-23, and only began two of four in fiscal year 2023-24, both late in

**766**

the year. Despite claiming to follow internal audit standards, it did not notify leadership about these deviations as required. This lack of follow-through raises concerns about the effectiveness of LAHSA's internal audit function and increases the risk that errors, fraud, or operational issues go undetected. *Id.* at 13-14.

**13. LAHSA did not complete an internal audit risk assessment**

o LAHSA's Internal Audit Unit did not complete a required annual risk assessment to inform its FY 2023–24 audit plan, instead recycling the prior year's plan due to capacity issues. This failure violates internal audit standards and increases the risk that emerging or high-priority issues may be missed, potentially leading to misallocated audit resources. *Id.* at 14.

**14. LAHSA failed to have internal audit independence**

o LAHSA's Director of Risk Management also serves as Chief Audit Executive (CAE) and oversees multiple other functions, including legal operations and investigations. This dual role raises concerns about independence and objectivity, as required safeguards to prevent conflicts were not formally documented. Additionally, LAHSA's Internal Audit Charter, last updated in 2018, does not reflect the CAE's expanded responsibilities or the safeguards required under the new 2024 Global Internal Audit Standards. This creates a risk that the Internal Audit Unit may not operate with full impartiality. *Id.* at 14-15.

**15. LAHA had no quality assurance and improvement program**

o LAHSA did not have a Quality Assurance and Improvement Program (QAIP) in place for its Internal Audit Unit, as required by professional standards. Without this program—meant to ensure consistent quality through internal and external assessments—the internal audit function is at risk of underperformance and failing to meet industry standards. Although management stated they intend to establish a QAIP and complete

**767**

assessments in fiscal year 2024–25, the absence of one at the time of review undermines the credibility and effectiveness of the audit function. *Id.* at 15.

**16. LAHSA did not establish key performance indicators**

o LAHSA had not established key performance indicators (KPIs) for their Internal Audit Unit at the time of review, limiting their ability to measure and improve performance. However, in May 2024, LAHSA introduced a new policy for developing and implementing KPIs across all functions. Without KPIs currently in place, LAHSA's ability to assess whether it is effectively meeting its objectives is diminished. *Id.* at 15-16.

To summarize, the sixteen issues demonstrated significant deficiencies in LAHSA's fiscal oversight and internal controls. *See generally id.* Notably, LAHSA awarded $50.8 million in Measure H working capital cash advances to subrecipients without repayment agreements. *Id.* The agency also failed to recover annual advances as required. *Id.* at 1. Despite having sufficient funds, LAHSA did not pay subrecipients in a timely manner, failed to maintain adequate records for working capital advances, and was unable to produce comprehensive contract data to assess whether contracts were executed timely or retroactively. *Id.* at 2. Lastly, the audit found that LAHSA lacked a sufficient contract monitoring plan to provide effective oversight of its subrecipients. *Id.* at 9.

The Special Master in her testimony referenced a 2025 report authored by the Chief Legislative Analyst, Sharon M. Tso. Tr., 272-73, June 3, 2025. This report focused on the formation of a city homelessness governance structure and identified significant structural deficiencies[7]. Chief among them was the absence of centralized oversight—no single entity or office is tasked with developing and implementing homelessness policy. *See generally* CLA Report. Instead, responsibilities are scattered across numerous individuals and departments. *Id.* The report also noted the lack of a unified forum for policy and program development, leaving

---

[7] Sharon M. Tso, Chief Legislative Analyst, Formation of a City Homelessness Governance Structure (Apr. 22, 2025) (report on file with the Chief Legislative Analyst, City of Los Angeles) ("CLA Report").

**768**

even routine administrative issues without a clear resolution process. *See id.* at 9. For example, multiple City departments manage contracts with varying degrees of involvement, creating confusion and inconsistency. *See id.* at 10. This fragmentation extends to fiscal oversight and data management, where inconsistent documentation practices across departments further hinder coordination. *See id.* Most critically, the report underscored the absence of unified strategic leadership, despite persistent failures and evolving challenges. *See id.*

Taken together, these audits paint a consistent and deeply troubling picture of chronic operational failures in Los Angeles' approach to homelessness—failures which culminate in the most recent findings of the Alvarez and Marsal Assessment.

## F. Alvarez and Marsal ("A&M") Assessment

On February 7, 2024, Plaintiffs filed a Motion for Order Re Settlement Agreement Compliance and Sanctions ("Motion for Sanctions") seeking sanctions against the City for alleged non-compliance with the Settlement Agreement. Motion for Order for Settlement Agreement Compliance and Sanctions (Dkt. 668). The Court held an evidentiary hearing on the Motion for Sanctions beginning on March 7, 2024 (Dkt. 673, 677). Following several additional hearings on Plaintiffs' Motion for Sanctions in March 2024, Plaintiffs and the City agreed to a "comprehensive financial and performance audit of the City of Los Angeles's homelessness programs." Notice of Filing of Audit Scope (Dkt. 697). The Court adopted the proposed audit scope with revisions on March 22, 2024. Minutes of Motion to Enforce the Settlement Agreement and for Sanctions (Dkt. 698); *see also* Notice of Filing of Corrected Revised Audit Scope (Dkt. 700). Plaintiffs supplemented their Motion for Sanctions on April 1, 2024. Supplement to Motion for Order for Settlement Agreement Compliance and Sanctions (Dkt. 706).

On April 4, 2024, Plaintiffs and the City submitted a Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713). The Joint Stipulation provided that the City agreed to pay for the Court-ordered audit, the Parties would meet at least once a month about Settlement Agreement compliance, and the City

**769**

agreed to pay Plaintiffs' fees and costs.[8] Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713). The Parties and Court considered who would conduct the audit of the City's programs during hearings on April 4, 2024 (Dkt. 715) and April 5, 2024 (Dkt. 718). On April 8, 2024, the Court approved the Parties' Joint Stipulation to resolve Plaintiffs' Motion for Sanctions and selected A&M to conduct the audit (Dkt. 724). The City and Court signed an engagement letter with A&M which was filed with the Court on May 20, 2024. Updated Engagement Letter for Assessment of the City of Los Angeles's Homelessness Programs (Dkt. 743). The engagement letter was amended later in September 2024. City's Signed Copy of Amendment to Engagement Letter Between A&M and the Court (Dkt. 779). The County also signed an engagement letter with A&M to voluntarily provide data and support related to the A&M Assessment of the City's homelessness programs. County Engagement Letter with A&M (Dkt. 849).

The A&M financial and performance assessment of the City's homelessness assistance programs was limited in scope to June 1, 2020, through June 30, 2024 ("Lookback Period"). The Assessment focused on appropriation and expenditures of funds through the City under the Roadmap Program (pursuant to the Roadmap MOU), the Alliance Program (pursuant to the LA Alliance Settlement Agreement), and the Mayor's Inside Safe Program (collectively the "City Programs") during the Lookback Period. A draft of the assessment was released to the Parties on March 3, 2025, an amended draft released March 4, 2025, and a second amended draft released March 6, 2025 (Dkt. 866, 867, 870). The County filed a response to the second amended draft on March 21, 2025 (Dkt. 873). The Court held a hearing on that draft on March 27, 2025, at which the Parties commented on the draft (Dkt. 877). The Court then set a hearing for May 15, 2025, in order for the Parties to have ample time to raise issues or errors in the draft with A&M before it was finalized (Dkt. 880). During that time, there was extensive communication between Special Master Martinez, A&M, and the Parties about the A&M assessment. For example, A&M met with representatives from the City about findings in the draft assessment; however, the City failed to provide A&M with missing data which had been

---

[8] The Court informed Plaintiffs and the City that it was prepared to make a finding of bad faith on the part of the City if the Parties had not reached a Stipulation to resolve Plaintiffs' Motion for Sanctions. Tr., 17, March 8, 2024 (Dkt. 684).

**770**

requested to verify program spending and the existence of housing reported. Tr., 175-178, June 3, 2025 (Dkt. 969). On May 14, 2025, A&M's final assessment was released to the Parties. At the hearing on May 15, 2025, the Court adopted the assessment as final (Dkt. 906).

A&M found significant problems in its assessment of the City programs. Evidentiary Hearing Exhibit # 23 ("Ex. 23") ("A&M Independent Assessment of City-Funded Homelessness Assistance Programs" or "Assessment") (Dkt. 905), at 3. The findings included the following:

- Due to poor data quality and integration, A&M was unable to verify the number of beds the City reported under the Roadmap and Alliance Programs. *Id*. at 4.

- A&M identified about $2.3 billion of funding related to the City Programs during the Lookback Period but was unable to fully quantify the amount spent by the City based on the data provided by LAHSA and the City. *Id*.

- A&M found that distinct referral and data systems across the City, County, and LAHSA created a siloed continuum of care system that caused confusion and a lack of transparency. *Id*. at 5.

- A&M found that the City and LAHSA's financial oversight and performance monitoring of service provider contracts was extremely limited. For example, there was little to no verification of the quality or provision of services based on what was contracted for. *Id*.

- A&M's review of contracts between the City, LAHSA, and service providers revealed broad terms, conflicting responsibilities, and wide discretion afforded to service providers in spending. *Id*. at 5-6.

- A&M found significant variability between the costs and services provided by different service providers across the City Programs. *Id*. at 6-7.

- A&M found that the City did not reconcile actual spending or contractual obligations with its budget allocations and funding. *Id*. at 7.

Although the A&M Assessment was not a formal accounting audit, its findings were consistent with the decades of government audits and other reviews of the City and LAHSA's

**771**

homelessness spending and programs. A&M confirmed that the problems that had plagued the City's homelessness programs for years also extended to the programs overseen by this Court.

Of particular concern were A&M's findings related to the City's compliance reporting required by the Roadmap MOU and LA Alliance Settlement Agreement. A&M could not verify the City's reported number of time-limited subsidies ("TLS") under the Roadmap MOU because 70% of the TLS contracts provided by LAHSA did not report financial expenditures for fiscal year 2023-24. *Id*. at 64. A&M repeatedly requested more information from the City and LAHSA to verify TLS slots but did not receive it. Tr., 7-8, 19-21, May 28, 2025 (Dkt. 949). The TLS documentation provided to A&M was also missing many addresses and some TLS addresses overlapped with those reported as permanent supportive housing ("PSH") under the Alliance Settlement. Tr., 99, June 3, 2025. A&M also could not verify PSH sites reported under the Roadmap MOU and Alliance Settlement. Assessment, 114-116. About 20% of the PSH sites reported as open to the Court could not be found at all in LAHSA's Resource Management System ("RMS"). *Id*. at 114-115; Tr., 235-37, May 27, 2025 (Dkt. 947).

The City argues that the A&M Assessment is inadmissible hearsay. While the Court's findings and conclusions here do not rely solely on the Assessment, the Court is unquestionably permitted to consider the Assessment because it was a court-ordered report agreed to by the Parties, paid for by the City and County, based on data from the City, County, and LAHSA, and written in consultation with the Parties. Moreover, there was extensive testimony during the evidentiary hearing on the Assessment's findings by the authors of it.

**G. Systemic Change and Receivership Request**

Here Plaintiffs go beyond arguing that the City has breached its obligations under the Roadmap MOU and LA Alliance Settlement Agreement. Plaintiffs argue that the City has breached and is incapable of coming into compliance because of systemic failures in the homelessness system. Plaintiff's Response Re Issues Raised by the Court on March 27, 2025 ("Plaintiffs' Receivership Brief") (Dkt. 899). These failures are so egregious and pervasive, according to Plaintiffs, that the only path towards compliance is a receivership over the City's homelessness response and funding. *Id*. Plaintiffs insist that "the system is broken" and city

**772**

leadership is unwilling or incapable of fixing it. *Id*. Plaintiffs seek far more than enforcement of contractual obligations. They seek a complete overhaul of the system and transfer of power to a receiver. *Id*.

To support their receivership argument, Plaintiffs rely on the history of audits and the A&M Assessment discussed above. *Id*. at 13. Plaintiffs also rely on elected officials' public recognition that the system is broken and recent events to show that there are no solutions left short of a receivership. In a March 27, 2025 hearing, Mayor Bass said, "I ran because I knew the system was broken and I wanted to come here and I wanted to make a difference." Tr., 44-45, March 27, 2025 (Dkt. 878). County Supervisor Barger also stated, "The system is broken." *Id*. at 50. The County Board of Supervisors voted on April 1, 2025, to move more than $300 million in upcoming Measure A funds out of LAHSA to a new county agency set to open in July 2026, but Plaintiffs argue that the new agency will simply recreate LAHSA's "culture of unaccountability and lack of transparency." Plaintiffs' Receivership Brief at 22. Plaintiffs also highlight recent scandals involving the LAHSA CEO, her alleged favoritism in hiring, her relationship with Mayor Bass, funds given to her husband's non-profit, and her ultimate resignation in April 2025. *Id*.

Plaintiffs argue that the City has no plans to make changes and continues to fund the Mayor's Inside Safe program despite its significant expense compared to cheaper interim housing and shelter options. *Id*. at 23. They argue that no substantive changes are being made by the City Council. A recent City Chief Legislative Analyst report entitled "Formation of a City Homelessness Governance Structure" presents some options for consolidating the City's homelessness system, but no concrete actions have been taken on it so far. *Id*. at 24; *see also* CLA Report. Finally, Plaintiffs argue that the City is in crisis as evidenced by the increased number of people living on the streets and long record of mismanagement of resources. Plaintiffs' Receivership Brief at 24. In response to City and County proposals for change, they say, "It is unclear at this point whether any such efforts [to reform by the City and County] will be fruitful or whether they are just moving deck chairs around on the Titanic." *Id*.

**773**

> To solve the crisis, Plaintiffs recommend the following:
>
> The receiver's authority should at minimum include program management (including redirecting remaining HHH funds and City/grant funding into cost-effective solutions), financial oversight (including negotiating directly with County for funding), encampment resolution efforts, and streamlining collaboration between the City, County, and LAHSA (in whatever form it continues to exist) to accomplish the goals of the Settlement Agreement. Depending on the type and purpose of the receivership, establishment for a defined term (*e.g.*, 3–5 years) would be appropriate, with the goal of returning control to the City once compliance is achieved.

*Id*. at 28.

## H. Procedural History of the Present Motions

Plaintiffs filed their Motion for Order for Settlement Agreement Compliance on September 4, 2024 (Dkt. 767). The City filed its Opposition on September 11, 2024 (Dkt. 774) and Plaintiffs filed a Reply on September 18, 2024 (Dkt. 776). The Court held hearings on October 8 and October 16, 2024, on Plaintiffs' Motion. The Parties also engaged in extensive negotiation and mediation with Special Master Martinez and Judge Birotte. At the request of the Parties, the Court resolved Plaintiffs' Motion partially by clarifying the definition of encampment reduction in the LA Alliance Settlement Agreement on March 24, 2025 (Dkt. 874).

Plaintiffs filed a second Motion for Order for Settlement Agreement Compliance on February 20, 2025 (Dkt. 863). The City filed its Opposition on March 6, 2025 (Dkt. 871). Plaintiffs filed their Reply on March 13, 2025 (Dkt. 872) which raised for the first time a request for a receivership over the City. The Court heard oral argument regarding the Motion on March 27, 2025 (Dkt. 877). Plaintiffs filed additional briefing on their request for a receivership over the City on May 8, 2025 ("Plaintiffs' Receivership Brief") (Dkt. 899). The City filed objections to Plaintiffs' Receivership Brief on May 13, 2025 (Dkt. 903). The Court then held an evidentiary hearing on Plaintiffs' two Motions for Settlement Agreement Compliance from May 27 through June 4, 2025. Plaintiffs, the City, and Intervenors participated in the evidentiary hearing. The County was present throughout and able to participate but chose not to.

**774**

After the close of evidence, the Court requested specific data from the City, which was not provided during the hearing, to verify its reporting of TLS slots under the Roadmap MOU (Dkt. 967, 973). Plaintiffs filed their Opening Brief on the Evidentiary Hearing ("Plaintiffs' Brief") on June 9, 2025 (Dkt. 977). The City filed the data requested by the Court under seal on June 11, 2025 (Dkt. 980, 981). The City filed its Post-Evidentiary Hearing Brief ("City Brief") on June 13, 2025 (Dkt. 983). Plaintiffs filed their Reply ("Plaintiffs' Reply") on June 17, 2025 (Dkt. 984). Intervenors also filed their brief ("Intervenors' Brief") (Dkt. 985) and the County filed its brief ("County Brief") (Dkt. 986) on June 17, 2025.

## III.   LEGAL STANDARD

"[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)); *see also Knudsen v. C.I.R.*, 793 F.3d 1030, 1035 (9th Cir. 2015) ("A settlement is a contract, and its enforceability is governed by familiar principles of contract law.") (citation omitted). Here, both the LA Alliance Settlement Agreement and the Roadmap MOU state they are governed by California law. Ex. 2 § X; Ex. 25 § 23.

Under California law, the intent of the parties determines the meaning of the contract. Cal. Civ. Code §§ 1636, 1638. The relevant intent is "objective," meaning that it is manifested in the agreement and surrounding conduct, rather than parties' subjective beliefs. *United Com. Ins. Serv. Inc.*, 962 F.2d at 856; *Laws. Title Ins. Co. v. U.S. Fidelity & Guar. Co.*, 122 F.R.D. 567, 569 (N.D. Cal. 1988) (applying California law). Therefore, a party's unexpressed true intent is not relevant to interpretation. *United Com. Ins. Serv. Inc.*, 962 F.2d at 856; *Union Bank v. Winnebago Indus.*, 528 F.2d 95, 99 (9th Cir. 1975); *City of Mill Valley v. Transamerica Ins. Co.*, 98 Cal. App. 3d 595, 602–03 (1979).

The settlement should be interpreted "to give effect to the mutual intention of the parties." *Bank of the W. v. Superior Ct.*, 2 Cal. 4th 1254, 1265 (1992) (in bank). Additionally, the whole of the settlement "is to be taken together, so as to give effect to every part, if

**775**

reasonably practicable, each clause helping to interpret the other." Cal. Civ. Code § 1641; *see also Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 279 (9th Cir. 1992) ("specific provisions ordinarily qualify the meaning of the general provisions").

## IV.  DISCUSSION

Plaintiffs argue that the City is in breach of its obligations under the LA Alliance Settlement Agreement and Roadmap MOU.

### A.  Roadmap Agreement

One of the breaches alleged by Plaintiffs is missing beds under the Roadmap Agreement. Plaintiffs' Brief at 4. Specifically, Plaintiffs cite the A&M Assessment, which states that "A&M could not validate the reported number of TLS beds or the total expenses necessary to support those beds." Ex. 23 at 64. In response, the City argues that Plaintiffs are not entitled to any relief under the Roadmap MOU for three reasons: (1) Plaintiffs lack Article III standing to enforce the Roadmap MOU, (2) as a nonparty, Plaintiffs hold no rights under the MOU; and (3) the City has fully complied with its obligations. City Brief at 32-35.

### 1.  The Roadmap MOU is Enforceable by the Court

The City contends that Plaintiffs lack standing to enforce the Roadmap Agreement because Plaintiffs are not a signatory to it. That argument misunderstands the basis of this Court's continuing jurisdiction. Plaintiffs need not be a party to the Roadmap MOU in order for the Court to enforce it. The Binding Term Sheet was not a private contract entered into in isolation—it was a judicially sanctioned substitute for the ongoing Preliminary Injunction. In approving the Binding Term Sheet, the Court expressly stated and incorporated into an Order that the agreement was "subject to court approval, monitoring, and enforcement." Ex. 1 at 2. Moreover, when the Court vacated its Preliminary Injunction, it did so conditionally—specifically reserving the right to reinstate injunctive relief if the parties failed to fulfill their obligations under the Binding Term Sheet. Order re Joint Stipulation Requesting the Court Approve the Binding Term Sheet and Vacate the Preliminary Injunction (Dkt. 138). Thus, the Binding Term Sheet is subject to continuing judicial oversight and enforcement.

**776**

The same is true of the Roadmap MOU, which was the natural outgrowth of the Binding Term Sheet and delineated how the City and County would divide implementation responsibilities. The Roadmap MOU was filed "in accordance with the Court's authority to monitor the agreement reached between the parties." Order for City and County to Meet, Confer, and File a Joint Report re: status of MOU (Dkt. 183). Importantly, the MOU itself explicitly states: "[t]his MOU is subject to enforcement by the Court. Promptly upon execution, Parties agree to submit this MOU to the Court." Ex. 2 at 8.

Because both the Binding Term Sheet and Roadmap MOU were incorporated into judicial orders and submitted to this Court, any breach of their terms constitutes a violation of this Court's Orders and is therefore under this Court's jurisdiction. *See In re Bard IVC Filters Prod. Liab. Litig.,* 81 F.4th 897, 907 (9th Cir. 2023)(reasoning that a participation agreement between a law firm and a MDL plaintiff's steering committee was within the district court's ancillary jurisdiction because it was incorporated into a court order and a district court has jurisdiction to determine whether one of its orders has been violated); *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., and Prods. Liab. Litig.,* 975 F.3d 770,775 (9th Cir. 2020) (holding that because the district court expressly retained authority to "ensure compliance" with the settlement agreement's terms it is well within its jurisdiction to determine whether that agreement has been breached). And as the Ninth Circuit reaffirmed in *Cahill v. Insider, Inc.,* 131 F.4th 933, 938 (9th Cir. 2025), federal courts possess inherent powers to enforce their court orders and "correct that which has been wrongfully done by virtue of its process."

Accordingly, this Court has both the express and inherent authority to determine whether the City or County has breached the Roadmap Agreement, regardless of whether Plaintiff was a formal signatory or has standing.

### 2. Alleged Breach and Lack of Accountability in Roadmap Agreement

In determining whether the Roadmap Agreement has been breached, the Court begins by examining its governing terms and the extensive concerns surrounding data verification. The relevant provisions of the Binding Term Sheet and Roadmap MOU are set forth below.

**777**

### a. Number of Beds Required

Under the Roadmap Agreement, the City agreed to provide a total of 6,700 beds within 18 months. Ex. 1 at 1. The required schedule was as follows:

- 5,300 New Beds (not covered by existing agreements) within 10 months of June 16, 2020

- 700 additional New Beds within 18 months of June 16, 2020; and

- 700 Other Beds (already under existing agreements) within 10 months of June 16, 2020.

*Id.* In total, the City committed to establishing 6,700 beds under the Roadmap Agreement by the 18-month deadline. *Id.*

The Roadmap MOU further delineated the respective obligations of the City and County. It expressly states that the City is responsible for all costs—including capital, operating, and other related expenses—associated with the 6,000 New Beds and 700 Other Beds. Ex. 2 at 5. The precise mix and location of the beds however were left to the City's sole discretion. *Id.*

### b. Required City Status Reports

The Roadmap MOU also imposed clear reporting obligations on the City to ensure transparency and accountability in meeting its bed commitments. Specifically, the City was required to submit the following to both the County and the Court:

- Bed Plan (due August 1, 2020), outlining each Council District's plan for establishing the required New Beds and Other Beds;

- Quarterly Reports, beginning no later than October 15, 2020, detailing the City's progress over the preceding three months. Each report was due within 30 days of the quarter's end;

- Bed Count Reports, due at least 90 days prior to the annual payment dates for years two through five, specifying the number of existing beds and those projected to be open within 60 days of the payment date;

-32-

**778**

- Annual Reports, documenting the total City funding used to support services for New Beds during the prior fiscal year.

Ex. 2 at 6-8. The Roadmap MOU anticipated that the City and County were each to contribute approximately 50% of the average cost of providing services to PEH in the City-established New Beds. *Id*. at 6-7.

### c.  A&M Assessment Findings

The A&M Assessment reviewed four of the City's Roadmap Quarterly Reports, with the most recent report examined covering the quarter ending June 30, 2024.  Ex. 23 at 18. That report indicated 7,429 open and occupiable New Beds and 792 open and occupiable Other Beds under existing agreements. *Id.* (citing Dkt. 756-1). The City's latest Roadmap Quarterly Report, dated for the quarter ending March 31, 2025, reported an increased total of 7,624 open and occupiable New Beds and 792 open and occupiable Other Beds. Quarterly Status report of the City (Dkt. 891-1).

Based on these Roadmap Quarterly Reports, the A&M Assessment concluded that the City appeared to have met its obligations under the Roadmap Agreement. Ex. 23 at 18. The Assessment further found that the Roadmap Agreement facilitated the creation of a diverse mix of shelter and housing interventions, encompassing both long-term and short-term solutions. *Id.* at 33.

The Assessment highlighted that from the inception of the Roadmap Agreement through June 30, 2024, approximately $829 million had been appropriated to support the Roadmap Agreement's interim housing solutions. *Id*. at 50. Besides interim housing and TLS, the bed count also included sixteen PSH locations. *Id.* In total, $105.8 million in City funds were committed to PSH projects included under the Roadmap Agreement, with most of these funds sourced from Proposition HHH. *Id.*

But the A&M Assessment did identify general and significant inconsistencies in LAHSA's financial reports under the Roadmap Agreement. For example, LAHSA could not clearly identify all service provider contracts[9] and expenditures tied to the Roadmap

---

[9] Service providers deliver homelessness services funded by the City or County through contracts managed by LAHSA. *See* Ex. 23 at 47. The City and LAHSA established "named" contracts related to the Roadmap Agreement and Alliance

779

Agreement. *Id.* at 4. There were notable mismatches between LAHSA's financial data, and the separate files provided to A&M to identify service provider contracts. *Id.* at 64. This discrepancy made it difficult for A&M to determine which contracts were active and funded by the City, complicating efforts to accurately track expenditures. *Id.* at 4.

### d. Location of Beds under Roadmap Agreement

One dispute about the Roadmap Agreement concerns the location of beds reported. The Roadmap MOU states that the individuals to be housed under the MOU were to be "PEH within the City of Los Angeles." Ex. 2 at 1. As to the location of the beds provided, however, it expressly states that the "precise mix and location of New Beds and Other Beds will be determined at City's sole direction." *Id.* at 5.

Plaintiffs argue that at least 20% of the TLS beds appear to be located outside the City's geographic boundaries and contend that such placement suggests these are not City Beds, but actually part of a broader TLS system. Plaintiffs' Reply at 16. But Plaintiff has offered no evidence that the individuals placed in these beds were not originally unhoused persons within the City of Los Angeles. Nor have they identified any language that restricts the location of the beds themselves—only the origin of those being served.

There may be legitimate policy concerns about using City resources to house individuals in distant counties such as Kern, Riverside, or Orange. But those concerns fall outside the scope of the legal question presented. Under the plain terms of the MOU, the City retains sole discretion over bed placement. So long as the individuals served were unhoused within the City of Los Angeles, the physical location of the TLS beds—whether inside or outside City limits—does not constitute a breach.

### e. Overview of Time-Limited Subsidies (TLS) and the City's Lack of Verification

The heart of the Parties' dispute regarding the Roadmap Agreement is the verification and funding of TLS, previously known as Rapid Re-Housing. TLS provide participants with case management and financial assistance—including rental or leasing subsidies—for up to

---

Settlement, meaning contracts relevant to the Roadmap Program were named "Roadmap Program" to easily identify them. *Id*.

-34-

**780**

twenty-four months. Ex. 23 at 48. Unlike other housing options, TLS subsidies are generally not tied to a specific location. *Id.* Instead, TLS allows participants to work with case managers and Housing Navigators to secure and maintain stable housing in the private rental or affordable housing marking. *Id.* LAHSA characterizes TLS subsidies as designed to "fill the needs of people who do not need a deeper level of support that can be found in our other permanent housing programs such as Permanent Supportive Housing."[10] TLS programs are administered through service provider contracts managed by LAHSA. Ex. 23 at 48.

The A&M Assessment revealed that 55% of TLS funding came from non-Roadmap sources. *Id.* at 63. LAHSA acknowledged that it could not meaningfully distinguish TLS beds funded solely by the City from those supported by other fund sources or mixed funding streams. *Id.* at 63-64. LAHSA reported to A&M a total of 2,293 TLS "Scattered Site" beds as part of the Roadmap Agreement, yet approximately 70% of the related contracts for these TLS showed no financial activity in fiscal year 2023-24. *Id.* at 64. A&M requested documentation to reconcile these figures, but LAHSA only submitted a high-level memo lacking financial information or contract details. *See* Evidentiary Hearing Exhibit # 55 (Ex. 55) ("LAHSA Memo TLS Beds Open to Date and Clients Served in Roadmap Reports"). As a result, A&M could not verify the number of TLS participants or the corresponding expenditures. Ex. 23 at 64.

When pressed by the media, LAHSA eventually sent a spreadsheet showing that only 673 of the 2,293 TLS beds had City-subsidized costs—roughly 30%. *See generally* Evidentiary Hearing Exhibit # 141 (Ex. 141) ("LAist Article dated 5.15.25"). LAHSA tried to explain this funding by claiming that it expanded TLS by combining City funds with other funding sources. Plaintiffs contend that the language of the Roadmap MOU prohibits such "braiding" of funding. The language of the Roadmap MOU concerning funding states:

> Except as otherwise stated in this MOU, or to the extent COUNTY is responsible for costs in an agreement or plan between the PARTIES other than this MOU, CITY is responsible for all costs, including capital costs, operating costs, and/or other expenses associated with the 6,000 New Beds and 700 Other Beds described herein.

---

[10] LAHSA Time-Limited Subsidy (TLS) Programs, Los Angeles Homeless Servs. Auth. (Sept. 23, 2022, last updated Dec. 18, 2024), https://www.lahsa.org/news?article=896-lahsa-time-limited-subsidy-tls-programs.

-35-

**781**

Ex. 2 at 5.

Plaintiffs assert that this language obligates the City to fully fund each of the New Beds it reports. Plaintiffs' Reply at 15-16. They argue that the inclusion of 2,293 TLS beds in the Roadmap Report is misleading because financial records show that only a portion of those beds were funded by City dollars. *Id.* And they argue that this practice of combining or "braiding" City funds with other sources to count a bed as City-provided violates the express terms of the MOU and is false reporting. *Id.*

The City disputes Plaintiffs' interpretation, arguing that the term "provide" does not require the City to directly fund every bed, but simply to supply, furnish, or make them available. City Brief at 35. Rather, the City argues that arranging for the beds' availability through third-party or mixed funding sources satisfies this obligation under the Roadmap Agreement. *Id.* And it argues that the clause holding the City "responsible for all costs" merely defines the County's lack of financial responsibility and does not prohibit the City from leveraging external funding. *Id.* at 36.

In sum, the Parties fundamentally disagree over what it means to provide beds and the extent to which the City must directly fund each New Bed reported under the Roadmap Agreement.

The County opposes any extension of the Roadmap Agreement, arguing that it has fully complied with its obligations and that extending the Agreement would hinder its evolving efforts to address homelessness. County Brief at 2, 5. The County emphasizes that Plaintiffs have not alleged any breach of the Roadmap Agreement by the County. *Id.* at 5. Also, the County argues that the original terms of the Roadmap Agreement no longer reflect the current costs of operating interim housing. *Id.* And the County states that they have adopted a new strategy focused on stronger oversight, accountability, and alignment of homelessness services. *Id.* These strategies include: the creation of the Executive Committee on Regional Homeless Alignment (ERCHA) and Leadership Table on Regional Homeless Alignment; plans to streamline LAHSA and centralize services under a new County department launching in January 2026; and that the County Auditor-Controller's office is reviewing the City's reported

**782**

TLS data. *Id.* at 5-6. In sum, the County contends that the Roadmap Agreement should not be extended because it would bind the County to an outdated framework when it is actively implementing more effective solutions.

### f.   Analysis of Alleged Breach

At the heart of this evidentiary record lies a persistent problem: the inability to verify the City's reported data. Laura Frost, a Director at A&M who helped lead the A&M Assessment, testified that neither the City, nor LAHSA provided adequate documentation showing that the reported TLS beds were newly created. Tr., 18, June 3, 2025. She explained that approximately 70% of the contracts LAHSA initially identified as creating new beds lacked any associated spending details. *Id.* This was compounded by inconsistent internal contract data that failed to specify how many beds were authorized, created, or utilized. *Id.* at 19. Further, the reported address and site rosters failed to align with the number of beds reported; in some cases, the addresses even overlapped with those also being reported under the Alliance Settlement. *Id.* at 19, 99.

These verification issues are not new, in fact they were raised in open court months prior to the Evidentiary Hearing. During a hearing on March 27, 2025, these issues were openly discussed, and the Parties were invited to discuss the findings of the A&M Assessment with A&M or provide the missing data. *See* Tr., 108, March 27, 2025. But even after this hearing, the Chief Administrative Officer ("CAO") of Los Angeles still failed to provide A&M with the data necessary to confirm whether the TLS beds had been created under the Roadmap Agreement. Tr., 179, June 3, 2025. The evidentiary record also contains no testimony or exhibits from the City directly addressing or rebutting these concerns. Instead, the evidentiary record reflects a consistent lack of cooperation and responsiveness—an unwillingness to provide documentation unless compelled by court order or media scrutiny. And rather than spending taxpayer dollars on finding the missing data or striving to provide verification, the City fought with the findings and methods of the A&M Assessment, the same methods they agreed to and paid for.

**783**

A&M's findings are not isolated. During the Evidentiary Hearing, the October 2021 Audit by the Los Angeles County Auditor-Controller was entered into the record. Tr., 87, June 2, 2025. This audit, commissioned to determine whether the City had accurately reported New Beds to receive an $8 million incentive bonus from the County, similarly concluded that the City failed to accurately report beds in accordance with the Roadmap MOU. Evidentiary Hearing Exhibit # 140 ("Ex. 140") ("Joint Status Report of Defendants Re: MOU"). A sample review of 1,106 beds found that 28% of those beds were not actually open and occupiable, and the City could not provide documentation to confirm that another 24% were either. *See generally id.* These findings are also echoed by the Special Master's annual report, which likewise could not verify the existence of many beds the City claimed under the Roadmap. *See* Ex. 93 at 10. Despite all this, the City chose to put on no evidence during the seven-day hearing to substantiate its Roadmap reporting.

In an effort to preserve resources, the Court provided the City with one final opportunity to cure its evidentiary deficiencies. After the close of evidence, it issued an Order directing the City to produce a comprehensive spreadsheet containing key data for each of the 2,679 TLS slots and 130 scattered-site beds it claimed to have created under the Roadmap Agreement. Amended Order Requiring City Verification of TLS Reporting (Dkt. 967). This data—long requested by A&M but previously withheld—was finally produced only by Court Order. In disclosing this data, the City also came clean that there was some double counting or false reporting. *See* Declaration of Matthew W. Szabo re Court's Directive ("Szabo Decl.") (Dkt. 980) at 1-2. But even omitting these beds, there were still key data points given for the necessary amount of TLS slots. Thus, in light of this, the Court holds that there is not sufficient evidence to find a breach under the Roadmap Agreement.

The Court's primary concern is ensuring the creation of shelter or housing for PEH—not arbitrating disputes over financing strategies or the definition of terms. But the Court not finding a breach at this time does not equate to an acceptance of the City's lack of accountability and verification. To belabor litigation over the Roadmap Agreement any further

**784**

would only redirect resources away from urgently needed housing efforts and into sanctions or further litigation over receivership.

Yet even in making that finding, the Court expresses deep skepticism. The data produced was not proactively disclosed in the name of transparency but was instead submitted under pressure, and only after the threat of judicial remedy loomed. Without accurate data, the public is left to rely on the assurance of public officials who have already presided over repeated reporting failures.

Ultimately, the Court's decision not to declare a breach reflects judicial restraint, not confidence. The pattern is clear: documentation is withheld until exposure is imminent, public accountability is resisted until judicially mandated, and the truth of reported progress remains clouded by evasive recordkeeping. As the Court observed, these failures have undermined public trust and judicial trust alike. While the Court has accepted the City's latest data to avoid derailing housing efforts, it makes clear that such acceptance should not be mistaken for vindication. The City's compliance rests on shaky ground, upheld not by verifiable facts, but by the last-minute declarations of its own officials. If the Roadmap Agreement has taught us anything, it is that seeking accountability with the City of Los Angeles is like chasing the wind.

## B. LA Alliance Settlement Agreement

### 1. Overview

Plaintiffs argue that the City is in breach of its obligations under the Settlement Agreement in three ways. *See generally* Plaintiffs' Reply. First, the City has not met Section 5.2's obligation to create a bed plan. *Id*. at 2-4. Second, the City has failed to employ its best efforts to meet its bed creation milestones under Section 5.2. *Id*. at 4-10. Third, the City has failed to use best efforts to meet its encampment reduction milestones under Section 5.2. *Id*. at 10-13.

In response, the City contends that Plaintiffs' arguments are premature as it has until June 13, 2027, to provide 12,915 "housing or shelter solutions" and until June 30, 2026, to achieve 9,800 encampment "reductions." City Brief at 16. The City also argues that finding a breach is premature because Section 8.2, which provides for a pause of its obligations during

emergencies, was triggered by the Mayor's continued declaration of emergency during the January 2025 wildfires in the City. *Id*. at 13. Alternatively, the City argues that it has employed best efforts and is in full compliance with the Settlement Agreement. *Id*. at 19-31.

### 2. Interim Breaches of the LA Alliance Settlement Agreement

While the Court does not find at this time that the City has breached the Settlement Agreement as a whole, the City has failed to meet critical internal obligations under the Agreement. In order to ensure compliance moving forward and the City's success in 2027, the Court details the City's significant failures, clarifies the City's obligations, and institutes greater safeguards below. Transparency, accuracy, and accountability are essential to compliance.

### a. Outdated and Incomplete Bed Plan

The Settlement Agreement required the City to "create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH [persons experiencing homelessness] within the City based on LAHSA's 2022 Point in Time count." Ex. 25, §3.1. Further, the City was required to calculate the "Required Number." *Id*. §5.1. It is undisputed that the City met that obligation by calculating 12,915 as the Required Number in 2022. Tr., 244, 252-253, May 28, 2025 (Dkt. 949).

Plaintiffs argue that the City has failed to fulfill Section 5.2, which requires the City to "create plans" and "provide the plans" to Plaintiffs, because the City currently has no plan detailing how it intends to reach the 12,915 required shelter or housing solutions. Plaintiffs' Reply at 2-3.

Section 5.2 of the Settlement Agreement provides:

> "Thereafter the City will create plans and develop milestones and deadlines for: (i) the City's creation of shelter and housing solutions to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in each Council District as determined by the Required Number; (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District; (iii) the City's creation of shelter and/or housing to accommodate a minimum of 60% of unsheltered City Shelter Appropriate PEH in the City as determined by the Required Number; and (iv) the City's

**786**

plan for encampment engagement, cleaning, and reduction in the City. The City will provide the plans, milestones and deadlines to Plaintiffs, and the City and Plaintiffs agree to work together in good faith to resolve any concerns or disputes about the plans, milestones, and deadlines, and will consult with the Court for resolution, if necessary. The City will provide a report setting forth the milestones and deadlines. The Parties agree the City will promptly employ its best efforts to comply with established plans, milestones, and deadlines."

*Id*. §5.2.

In November 2022, the City provided a "bed plan" titled "Potential Project List as of 11/9/2022" that listed projects to partially fulfill its obligation to create 12,915 solutions under the Agreement. Evidentiary Hearing Exhibit # 114 ("Ex. 114") ("LA Alliance Milestones Potential Project List"); Tr., 88-93, May 29, 2025 (Dkt. 953). Matthew Szabo, the Chief Administrative Officer of the City, testified that the plan did not provide projects totaling 12,915 solutions. Tr., 88-93, May 29, 2025. The November 2022 plan includes about 8,000 shelter and housing solutions. Ex. 114.

On August 30, 2024, the Court ordered the City to provide a "detailed written version of the proposed bed plan" that had been discussed by Szabo in court the day prior. Order Re: Bed Plan (Dkt. 765). On September 12, 2024, the City submitted its proposed plan. Evidentiary Hearing Exhibit # 113 ("Ex. 113") ("City of Los Angeles Proposed Bed Plan") (Dkt. 775). The plan proposed transitioning 2,500 Roadmap MOU beds to count towards Alliance Settlement obligations once the Roadmap MOU expired in June 2025. *Id*. After meeting with the County, Special Master Martinez, and Judge Birotte, the City withdrew its September 2024 bed plan in October of that year. Tr., 119-120, May 29, 2025. Since then, no additional or updated bed plan has been produced to Plaintiffs or the Court. *Id*. at 120-121; *see also* Tr., 267, June 3, 2025 (Dkt. 969).

The City argues that it met its obligation by providing the November 2022 plan because the Settlement Agreement does not require that there be a single, complete plan to create 12,915 beds and no hard deadline to provide such a plan. The City maintains that it has ample time to provide an updated plan after the emergency "pause" under Section 8.2 ends, the Court

-41-

787

resolves disputes over the Agreement, and the City finalizes how it will create the remaining beds. City Brief at 19-20.

The Court agrees with the City that there may be multiple plans and they may be iterative. However, with only two years to go, the City must provide an updated bed plan detailing how it intends to meet its obligation to create 12,915 housing or shelter solutions by the end of the Settlement term. The City's reliance on an outdated and incomplete plan from November 2022 of only about 8,000 beds runs the risk that the City will not sufficiently plan to fund the beds.

The City seems to suggest that requiring a plan would unfairly commit it to a specific strategy. That is not so—the City may update the plan as needed. Because elected officials change and funding sources change, the plan will not be set in stone. Such flexibility was agreed to in Section 3.2 giving the City "sole discretion" to choose the type of housing or shelter solution. Requiring a plan now, even if it is later changed, is consistent with the Court's August 30, 2024 Order and the terms of the Settlement. It will also ensure that the City is successful in 2027. The City shall provide such a plan to Plaintiffs and the Court by October 3, 2025.

### b. Missing Shelter and Housing Solution Milestones

Plaintiffs argue that the City has not employed its "best efforts" to create the 12,915 required shelter or housing solutions and that it has consistently missed its own milestones for bed creation. Plaintiffs' Reply at 4. The City concedes that it "has fallen short of interim milestones" but maintains that it has used best efforts to create thousands of beds and is on track to exceed the required 12,915 beds by June 2027. City Brief at 21. The City's most recent quarterly report shows 6,724 beds were open as of March 31, 2025, and another 4,278 beds were "in process." Evidentiary Hearing Exhibit # 35 ("Ex. 35") (City Quarterly Status Report April 15, 2025") (Dkt. 892-1), at 6. Plaintiffs argue that the City has incorrectly prioritized investment in permanent supportive housing which is too slow and too expensive. Plaintiffs' Reply at 7. Plaintiffs, however, do not set the City's housing policy and the Settlement Agreement left the type of solution to the City's "sole discretion." Ex. 25, §3.2.

788

That being said, it is undisputed that the City did not meet the milestones for shelter and housing creation that it set for itself. The City provided Plaintiffs with a chart of "Alliance Milestones" for shelter and housing solution creation for each quarter of each fiscal year from fiscal year 2022-23, until 2026-27. Evidentiary Hearing Exhibit #24 ("Ex. 24") ("Housing-Shelter Alliance Milestones") (Dkt. 863-5). The City has consistently missed those milestones according to its quarterly reports. Each missed milestone inflicted material harm to the public and those living on the streets who were denied shelter or housing:

- January 17, 2023: The City reported 721 beds open as of the quarter ending December 31, 2022, short of its target of 1,622 (56% deficit). City Quarterly Status Report, Ex. A, at 7, Jan. 17, 2023 (Dkt. 516-1). **The City failed to shelter 901 Angelenos as promised.**

- April 21, 2023: The City reported 935 beds open as of the quarter ending March 31, 2023, out of a target of 2,482 (62% deficit). City Quarterly Status Report, Ex. A, at 7, Apr. 21, 2023 (Dkt. 539-1). **The City failed to shelter 1,547 Angelenos as promised.**

- July 17, 2023: The City reported 1,748 beds open as of the quarter ending June 30, 2023, out of a target of 3,700 (53% deficit). City Quarterly Status Report, Ex. A, at 8, July 17, 2023 (Dkt. 598-1). **The City failed to shelter 1,952 Angelenos as promised.**

- October 16, 2023: The City reported 2,347 beds open as of the quarter ending September 30, 2023, out of a target of 4,138 (43% deficit). City Quarterly Status Report, Ex. A, at 8, Oct. 16, 2023 (Dkt. 652-1). **The City failed to shelter 1,791 Angelenos as promised.**

- January 16, 2024: The City reported 2,810 beds open as of the quarter ending December 31, 2023, out of a target of 5,190 (46% deficit). City Quarterly Status Report, Ex. A, at 8, Jan. 16, 2024 (Dkt. 660-1). **The City failed to shelter 2,380 Angelenos as promised.**

-43-

**789**

- April 15, 2024: The City reported 3,018 beds open as of the quarter ending March 31, 2024, out of a target of 5,688 (47% deficit). City Quarterly Status Report, Ex. A, at 8, April 15, 2024 (Dkt. 728-1). **The City failed to shelter 2,670 Angelenos as promised.**

- July 15, 2024: The City reported 4,017 beds open as of the quarter ending June 30, 2024, out of a target of 5,950 (32% deficit). City Quarterly Status Report, Ex. A, at 8, July 15, 2024 (Dkt. 757-1). **The City failed to shelter 1,933 Angelenos as promised.**

- October 18, 2024: The City reported 4,455 beds open as of the quarter ending September 30, 2024, out of a target of 6,235 (29% deficit). City Quarterly Status Report, Ex. A, at 6, Oct. 18, 2024 (Dkt. 797-1). **The City failed to shelter 1,780 Angelenos as promised.**

- January 22, 2025: The City reported 4,815 beds open as of the quarter ending December 31, 2024, out of a target of 6,714 (nearly 30% deficit). City Quarterly Status Report, Ex. A, at 5, Jan. 22, 2025 (Dkt. 858-1). **The City failed to shelter 1,899 Angelenos as promised.**

- April 15, 2025: The City reported 6,724 beds open as of the quarter ending March 31, 2025, out of a target of 6,782 (1% deficit). Ex. 35 (Dkt. 892-1), at 6. **The City failed to shelter 58 Angelenos as promised.**

These milestones are not optional or aspirational. They are crucial benchmarks to ensure the City succeeds in 2027. If all of the City's shelter and housing solutions are backloaded and the City continues to miss its targets, the City runs the risk of rushing to create solutions and not meeting its obligations in 2027 at the cost of those waiting for shelter. Incremental progress and accountability are the key to mitigating that risk.

Additionally, each missed milestone represents a missed opportunity to shelter residents living and dying on the streets. Although the City reports that it has nearly reached its goal in the last status report due to the recent inclusion of Inside Safe beds, the City delayed creating shelter and housing solutions for thousands of people as promised from 2023 to 2025. The

**790**

suffering—from hypothermia to heat stroke, from gangrene leading to amputations to hepatitis, from scabies to insect infestation, and from sexual violence to rat bites—that resulted from that delay cannot be undone. Therefore, the City shall submit to the Court an updated milestones document that comports with its updated bed plan by October 3, 2025.

### c. Creation of Housing or Shelter Solutions

Section 3.1 requires the City to "create a Required Number of housing or shelter solutions" but the Settlement Agreement does not define what it means to "create" solutions. Ex. 25. During the evidentiary hearing, Intervenors raised this issue and questioned whether certain solutions in the City's compliance reporting had been "created" by the City. *See* Tr., 97-105, May 30, 2025 (Dkt. 955). CAO Szabo did not know what the status was of several buildings before the City purchased or master-leased them and included them in the City's compliance reporting. *Id*. For example, he did not know whether the Stuart Hotel was previously available to house homeless individuals before the City entered into an occupancy agreement to use it as interim housing. *Id*. at 99-102.

Intervenors argue that the City must clarify what role it plays in creating the shelter and housing solutions it is counting towards its obligations. Intervenors' Brief at 25. Further, Intervenors argue that the City must consider and identify whether units counted were already covenanted as affordable units because if they were, the City did not "create" them. *Id*. at 26.

Intervenors highlight that the City itself has already defined "create" in response to Intervenors' initial objections to the Settlement Agreement:

> The word 'create' indicates that the City will create new beds that are not already in existence. *See, e.g.*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/create ('create' means 'to bring into existence' and 'to produce or bring about by a course of action or behavior'; Black's Law Dictionary, 6th Ed. 1990 ('create' means 'to bring into being; to cause to exist; to produce'). Therefore, the Intervenors' concern 'that the City could count existing shelter beds or housing units towards the number of shelter beds needed to reach the 60% threshold' (ECF No. 434 at 22) is wrong.

City of Los Angeles' Reply to Objections to the Settlement Agreement (Dkt. 438), at 9 (emphasis in original).

**791**

Despite the City's own assertion that "create" means "new" beds, the City is currently counting numerous units that already existed before the Settlement Agreement. The question then is how the City caused those units to come into existence as housing or shelter solutions for people experiencing homelessness. The City's reporting does not answer this question and the City provided no clarification during the seven days of the evidentiary hearing.

For clarity moving forward, the Court holds that "create" means, as the City previously said, to bring into existence as a shelter or housing solution for people experiencing homelessness. Beginning in the quarterly report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use. For example, the City might explain that a hotel was formerly vacant or market rate until the City began master leasing rooms for people experiencing homelessness. Because the City was not able to provide any explanation for its counting of previously existing units during the evidentiary hearing and has not submitted any since, this further explanation is necessary to ensure compliance moving forward.

### d. Inside Safe Reporting

Plaintiffs argue that beds contracted through Inside Safe booking agreements should not be counted toward the City's Settlement obligations. Inside Safe is an interim housing program run through the Mayor's office. Inside Safe beds are contracted through either occupancy agreements, which entail the master leasing of an entire hotel, or booking agreements, which pay for a hotel room for individuals on an as needed basis. Tr., 97-99, 103, May 29, 2025 (Dkt. 953). Plaintiffs argue that beds contracted with booking agreements should not count because they are for an indeterminate amount of time and may not be contracted for through the Settlement Agreement's full term. Plaintiffs rely heavily on the fact that the City did not count Inside Safe beds contracted for through booking agreements, as opposed to occupancy agreements, until recently because they were not booked through June 2027.

Indeed, in the City's Housing and Homelessness Committee meeting earlier this year, the CAO's staff reported to the committee that it was not counting any Inside Safe beds that were not contracted through June of 2027. Tr., 106-108, May 29, 2025. But then, beginning in the City's most recent status report for the quarter ending March 31, 2025, the City began to report all of its Inside Safe beds toward its Alliance Settlement obligations regardless of the contract duration. Ex. 35. To be clear, the nearly 2,000 bed increase reported from the status report in January 22, 2025, to the status report in April 15, 2025, is due to the inclusion of more Inside Safe beds *not* the creation of new beds. To explain this, the City's decision to count all the Inside Safe beds, CAO Szabo testified that the Inside Safe program has matured and all Inside Safe beds are fully compliant with the Settlement. Tr., 106-107, May 29, 2025. He testified that it was never his office's position that they could not be counted, it was merely their decision not to count them. *Id*.

The terms of the Settlement allow the City to count Inside Safe beds whether they are contracted through occupancy or booking agreements and whether they are contracted for through June 2027 or not. The Settlement explicitly allows the City to count "hotels/motels" and leaves the type of housing or shelter solution to the City's "sole discretion." Ex. 25, §3.2. It has long been understood by both the Court and the Parties that the beds need not be static so long as 12,915 beds exist in June 2027. The City highlights that Plaintiffs made this point themselves in a December 29, 2023 email to the City:

> We have noted, several times, that while the City is required to increase and maintain its bed capacity through the first half of 2027, that does not mean that a specific bed created must stay available for the term of the settlement. Instead, should a specific bed no longer be available (i.e. an interim facility which is only leased for 12-36 months), the City may create at least another bed to maintain capacity and avoid bed reduction.

Evidentiary Hearing Exhibit # 216 ("Ex. 216") (Dkt. 964-10), at 4-5. This position is consistent with the Plaintiffs' continued demand that the City prioritize interim housing and shelter over permanent supportive housing.

While the City has flexibility in deciding which solutions to create, the Court is committed to ensuring that each of the 12,915 beds ultimately exists. CAO Szabo testified

**793**

about the Inside Safe booking agreements: "Of course, if they're temporary, if the beds come offline before June of 2027, our obligation would be to replace those beds, of course, because our understanding is that there's no obligation that the beds are static. We have to establish the total number of 12,915." Tr., 108, May 29, 2025. The Court will hold the City to this promise.

### e. Data Reporting and Verification

Special Master Martinez's reports and the A&M Assessment have shown that it is extremely difficult, if not impossible, to verify the housing and shelter solutions that are reported by the City to meet its obligations. The Court receives numbers of shelter and housing solutions created by the City in its quarterly reports with no documentation to substantiate the numbers. When errors are found in the data reported, the City has repeatedly ignored the errors or attacked the messenger instead of engaging with and correcting the issues. This pattern has persisted for years and is untenable if the City is to succeed in meeting its obligations by 2027.

The City's inability or unwillingness to verify its reporting or even explain how it counts and reports solutions was on stark display during the evidentiary hearing. At no point during the costly and time-intensive seven-day hearing did the City attempt to substantiate its reporting which had been called into question by Special Master Martinez, in addition to other witnesses, and which A&M had not been able to replicate.

Special Master Martinez's first report covering the period July 1, 2022, through December 31, 2023, put the City on notice that it needed to improve its data gathering and reporting to be successful. *See* Independent Monitoring Report Year One (Dkt. 674), at 21. Special Master Martinez reiterated this concern in her second report and highlighted her inability to verify the City's beds. For example, Special Master Martinez often performs spot checks on housing or shelter sites reported by the City. Tr., 257-258, June 3, 2025. She was unable to check twenty sites listed in the City's December 2024 report because they were not part of the HMIS system. *Id*. at 258; *see also* Ex. 93 at 21. After following up with LAHSA and the City about those sites, Martinez still has not received a response. Tr., 258-261, June 3, 2025.

**794**

After over a year of work by ten professionals, A&M was also not able to replicate the City's reporting to the Court. A&M concluded that "one of the primary obstacles was the inability to verify the number of beds the City reported under the Roadmap and Alliance Programs." Assessment at 4. By releasing multiple drafts of the A&M assessment and providing the Parties with over six weeks to meet with the A&M team before finalizing the Assessment, the Court gave the City ample time to correct A&M or substantiate its reporting. Instead of providing the specific data requested by A&M to verify reporting, the City did nothing. Again, during the evidentiary hearing, the City chose to dismiss A&M's findings and attempt to undermine A&M's credibility instead of simply providing the data or explaining its reporting to the Court. The City wasted significant time during the hearing berating A&M for not adhering to certain governmental accounting standards even though the City *agreed to* the standards used by A&M and *paid for* the Assessment to resolve Plaintiffs' previous sanctions motion. In short, the City has been on notice for years that its data collection and reporting is woefully insufficient but continues to ignore its responsibility to report accurate numbers to the Court.

The inability to verify the City's reporting is a serious roadblock to compliance. In addition to the recent evidentiary hearing, confusion over and inconsistencies within the reporting have led to dozens of informal conferences, mediation sessions, and hearings throughout this litigation. Significant time and resources have been spent by all the Parties in debating and litigating details of the City's reporting. Days of the evidentiary hearing in May and June could have been avoided if the City had simply provided the data requested of it or put on witnesses to explain its reporting. For this reason, the Court seeks to limit further confusion and pave a smoother road to compliance by requiring the Parties to choose a third party to monitor reporting as was originally agreed to in the Settlement.

The Settlement Agreement provides that the "Parties will engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement. The City shall be responsible for paying all fees, if any, or for obtaining grants or other private funding, if needed." Ex. 25, §7.2.

**795**

In Special Master Martinez's first monitoring report, she underscored the importance of Section 7.2. She reported that:

> Initial discussions were initiated with the City and the Alliance, yet it appears that a third party has not been hired to gather the crucial data required for this agreement. It is paramount that the City adheres to these vital provisions to ensure full compliance with all aspects of the agreement. While deadlines may not be specified, it is crucial for the City to disclose details about its existing data collection systems and make the data gathering, analysis, and feedback easily accessible for transparency and accountability purposes.

Independent Monitoring Report Year One (Dkt. 674), at 19-20. The Parties have never fulfilled Section 7.2.

To address verification failures, the Parties shall meet and confer on a third-party Monitor by August 22, 2025, and, subject to the Court's approval, select the Monitor by September 12, 2025. Subject to the Parties' input, the Monitor will at least be responsible for reviewing the City's data prior to publication of its quarterly reports, verifying the numbers reported, engaging with the Parties and LAHSA to resolve data issues, and providing public reports on data compliance. The Monitor shall have full access to the data that the City uses to create its reports to the Court. To streamline disputes over verification and compliance, the Court also orders that the Parties attend an in-person court hearing after the submission of each quarterly report. This accountability measure will ensure that disagreements are efficiently resolved as they arise.

Additionally, the Court reemphasizes the importance of public transparency which goes hand in hand with accountability and Settlement compliance. The Court has requested for years that the City and County maintain public websites with third-party service provider contracts and invoices for homelessness services. After creating such websites, the City and County have previously failed to keep them updated. *See* Order Setting Hearing for June 6, 2024 (Dkt. 744). Again, the Court requests that the City update its public website to include all service provider contracts and invoices particularly those tied to beds reported under the Settlement Agreement. The Monitor shall review and provide guidance on public accessibility to the contracts and invoices.

**796**

### f. Encampment Reduction Milestones

Section 5.2 requires the City to "create plans and develop milestones and deadlines for…(ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District…" Ex. 25, §5.2. In January 2024, the City and Plaintiffs agreed to the goal of 9,800 reductions of tents, makeshift shelters, cars, and RVs by June 30, 2026. Evidentiary Hearing Exhibit # 65 ("Ex. 65") (Dkt. 668-1), at 82–84; Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713), at 2–3. In the City's most recent quarterly report, the City had performed 6,129 encampment reductions as of March 31, 2025. Evidentiary Hearing Exhibit # 63 ("Ex. 63") ("Alliance Settlement Agreement Encampment Quarterly Reports") (Dkt. 892-2), at 2. Plaintiffs argue that the City is not meeting its encampment reduction milestones because it is improperly counting cleanings under Care and Care+ operations as reductions and that its reporting violates the Court's March 24, 2025, Order defining reductions. The City maintains that it is not required to make offers of shelter or housing as part of its encampment reduction plan.

In response to the Plaintiffs' Motions for Settlement Agreement compliance, the briefing on the Motions, and several hearings, the Court clarified on March 24, 2025, what may be counted as a reduction by the City. Evidentiary Hearing Exhibit # 52 ("Ex. 52") (Order re Plaintiff's Motion re Settlement Agreement Compliance") (Dkt. 874). The Court held the following:

> For clarity, the Court holds that per the terms of the Settlement Agreement there is a distinction in providing milestones and deadlines for encampment clean-ups and Encampment Reductions. The City may not report clean-ups from programs such as Care or Care+ as Reductions to prove compliance with the Settlement Agreement because they are not permanent in nature. The Court agrees with Plaintiff that cleaning an area, only to have unhoused individuals move back in without offers of shelter or housing, is not a "Resolution" or Encampment "Reduction" and shall not be reported as such. Thus, the City is only to report Encampment Reductions that have a more permanent meaning such that unhoused individuals are moved off of the street and given shelter or housing.

*Id*. (internal citations omitted).

**797**

The Court further stated that it would decide the details of encampment reduction reporting and the metrics necessary at a later date. *Id*.

The Court's Order was consistent with its express authority under Section 5.2 to resolve disputes about the plans, milestones, and deadlines and its authority to enforce the Settlement. Despite the Court's Order in March, the City never filed a motion for reconsideration or modification of the Settlement Agreement based on the clarification. The City merely orally objected to the Order at the March 27, 2025 hearing and then proceeded to ignore the Order. The City failed to amend its prior reports to the Court and willfully disobeyed the Order in its April 15, 2025 quarterly status report. Based on the evidence presented at the evidentiary hearing, the Court reaffirms its previous Order and again clarifies the following for the City.

To count encampment reductions under the Settlement Agreement, each reduction must be accompanied by an offer of shelter or housing to the individual or individuals whose tent, makeshift shelter, or vehicle is removed. Individuals need not accept the offer, but an offer of available shelter or housing must be made. If a tent, makeshift shelter, or vehicle is abandoned and the owner cannot be found, such an offer would be impracticable and is not required. It is also impracticable for the City to track whether the person offered shelter or housing remains housed indefinitely for the purposes of the Settlement Agreement.

This definition of reduction is consistent with the City's representations to the Plaintiffs throughout the litigation including the City's reliance on Inside Safe encampment resolutions and interchangeable use of the terms "resolution" and "reduction." The City's current position that reductions only consist of the removal of tents, makeshift shelters, and vehicles is new and flies in the face of its own plans and promises.

The Parties and this Court have used the term "encampment reduction" and "encampment resolution" interchangeably. The City's own quarterly reporting is titled "Encampment Resolution Data." *See e.g.*, Ex. 63. Special Master Martinez also testified that she has used "reduction" and "resolution" interchangeably, has observed the City doing the same in city council meetings and its reporting, and has not been corrected by the City for using the terms interchangeably. Tr., 137-139, June 4, 2025 (Dkt. 976).

**798**

Whether using reduction or resolution, the City has routinely defined the term consistent with the Parties' understanding of an encampment resolution which includes offers of shelter or housing. The City's October 3, 2023 plan submitted to the Plaintiffs titled "Encampment Engagement, Cleaning, and Resolution Plans and Milestones" explicitly includes matching available beds to encampment residents as part of encampment resolutions and reductions. Ex. 65, at 64-71. The City's eight-page plan details the City's "encampment resolution" process: "In order to resolve an encampment, the City must ensure there are beds available to match with encampment residents and that service providers have the capacity to provide case management and other services." *Id*. at 69. Each page of the plan has the heading "LA Alliance v. City of Los Angeles, 2:20-CV-02291-DOC" which confirms the City's intent to use this plan to comply with its agreement with the Plaintiffs to conduct 9,800 encampment reductions.

The City argues that the October 3, 2023 plan was just a proposal that was rejected by Plaintiffs. City Brief at 29. That is misleading. There is evidence that Plaintiffs rejected the number of reductions and the deadlines in the City's plan but not the mutual understanding of what an encampment reduction was and entailed. The City never corrected or changed its plan of how encampment reductions were defined and carried out so when the City and Plaintiffs reached their agreement on 9,800 reductions, the plan promised by the City remained intact and all Parties proceeded with that understanding.

During the evidentiary hearing, there was extensive testimony on the Mayor's Inside Safe program from CAO Szabo and Dr. Etsemaye Agonafer, the Deputy Mayor for Homelessness and Community Health. Under Inside Safe, an "encampment resolution" occurs when individuals living outside are offered interim housing and voluntarily accept it. Evidentiary Hearing Exhibit # 44 ("Ex. 44") (Dkt. 863-7), at 42-45. The Mayor's Office of Housing and Homelessness Solutions stated: "Following an encampment resolution, the same outreach teams monitor the original location for re-population, engage with new or old residents at the site, and offer housing as it becomes available." *Id*. at 44.

CAO Szabo testified that merely shifting encampments during cleanings under Care and Care+ is not counted as reductions but rather the reduction numbers reported represent tents,

**799**

makeshift shelters, and vehicles that are removed and taken into the City's custody. Tr., 145-146, May 30, 2025 (Dkt. 955). Szabo testified that the encampment reductions reported to the Court are based on Care, Care+, and Inside Safe operations. *Id*. at 147. Because Inside Safe's encampment resolutions necessarily entail offers of interim housing, at least some of the encampment reductions reported to the Court should have been accompanied by an offer of shelter or housing, but that number is unknown.

The City has consistently represented to Plaintiffs that encampment reductions and resolutions are the same thing and that both include offers of shelter or housing just as the Mayor's Inside Safe program does. The City's attempt to unilaterally change its definition of encampment reduction now ignores its past conduct and promises, the Court's prior Order, and the plain meaning of the Settlement Agreement. Based on the definition of encampment reduction articulated by the Court above, the City shall report its updated encampment reduction data beginning in the October 2025 quarterly status report.

The Monitor provided for in Section 7.2 will also be responsible for reviewing whether offers of shelter or housing were made to those whose belongings are counted as encampment reductions. It is expected that the City be able to provide the name of the shelter or housing that was offered and available for each encampment reduction, but the details of what documentation is required will be finalized by the Monitor in consultation with the Parties.

### 3.    Section 8.2 Emergency Provision

Section 8.2 of the Alliance Settlement Agreement states:

> In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council under the authority vested in them by the Los Angeles City Charter and Los Angeles Administrative Code (or other applicable ordinances, resolutions, or laws), the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations.

Ex. 25 at 10. The City invokes this clause, arguing that its obligations under the Settlement Agreement are currently paused due to the ongoing State of Emergency

**800**

declared by the Mayor in response to the 2025 wildfires. According to the City, because that emergency declaration has not been rescinded, the operative obligations are suspended. City Brief at 13.

Plaintiffs dispute this interpretation. They contend that any "pause" authorized under Section 8.2 was limited to the duration of the fires and that invoking the emergency clause beyond that time constitutes an attempt to "avoid the accountability the Settlement Agreement requires and demands." Plaintiffs' Reply at 18.

Further escalating the dispute, the City accuses Plaintiff of breaching the Agreement by failing to honor the required meet-and-confer process before seeking judicial enforcement. City Brief at 15. In support, the City points to email correspondence allegedly demonstrating Plaintiffs' unwillingness to engage in discussions. *Id.*

There is no question that the Palisades Fire and Eaton Fire were catastrophic events that profoundly affected many Angelenos. It is also not the Court's role to second-guess the City's emergency declarations absent clear evidence of bad faith. Here, Plaintiff has not offered sufficient evidence for the Court to find that the emergency declaration is no longer operative or was improperly invoked. As such, the Court must defer to the City's position that the Agreement's obligations are currently paused under Section 8.2 because of the state of emergency declaration.

That said, the Settlement Agreement also imposes a duty on both parties to meet and confer in good faith to determine the necessary adjustments during any such pause. The Court reiterates that this responsibility remains ongoing and mutual. Resorting to the Court for answers that should first be addressed collaboratively under the Agreement only undermines its purpose. The Parties are therefore expected to continue engaging in good faith to define the scope and terms of any pause moving forward.

It is important to note that the invocation of Section 8.2 does not excuse the City from its ongoing responsibilities—particularly with respect to accurate reporting and verification of beds. The pause provision is not a blanket exemption from compliance. The data verification issues predated both the January 2025 fires and the resulting

**801**

emergency declaration. Accordingly, the Court will not permit the City to use this emergency as a pretext to avoid its obligations under the Settlement Agreement. This pause only applies to obligations that are truly impacted by the emergency, not to longstanding failures in transparency, accountability, or compliance.

## C. Remedy for Breaches

The City breached the LA Alliance Settlement Agreement in four ways. The City failed to provide a plan for how it intends to create 12,915 shelter or housing solutions. For years, the City consistently missed its shelter and housing creation milestones. The City also improperly reported encampment reductions and disobeyed the Court's order on encampment reductions. Finally, the City flouted its reporting responsibilities by failing to substantiate its reporting and failing to provide accurate and comprehensive data when requested by the Court, Special Master Martinez, the Parties, and A&M.

To remedy the City's failures, each Party recommends a different solution. Special Master Martinez recommends an independent fiduciary monitor to track and oversee spending, manage contracting, and perform other oversight tasks. Ex. 93, at 25-27. The Plaintiffs demand a receivership and/or some combination of the following:

> (i) extension of Alliance and/or Roadmap Agreements for a minimum period of two years to ensure compliance and oversight; (ii) Appointment of Compliance and/or Fiduciary Monitor at the City's expense with full, immediate, and unfettered access to City and LAHSA data; (iii) Forensic Financial Audit; (iv) Forensic Data Quality Audit with mandate to adhere to recommendations; (v) orders to create a Skid Row plan, including immediate housing and sheltering of women, children, and families and ultimately extending to every unsheltered resident; (vi) City-funded investigation and report on data manipulation allegations; and (vii) an award of attorneys' fees both incurred in this matter to enforce the settlement agreement and prospectively for efforts related to the City's compliance with the Agreements.

Plaintiffs' Brief at 25. The Intervenors, on the other hand, advocate for "more robust incremental monitoring and verification." Intervenors' Brief at 28.

### 1. Reaffirming LA Alliance Settlement Obligations

The interim breaches of the LA Alliance Settlement Agreement committed by the City necessitate course correction now in order to avoid an overall breach of the Agreement in 2027.

**802**

To facilitate compliance and greater oversight, the City is ordered to do the following as previously detailed in each section above:

- Provide the Parties and the Court with an updated "bed plan" for how it intends to meet its obligation to create 12,915 shelter or housing solutions by October 3, 2025[11]

- Provide the Parties and the Court with updated bed creation milestones consistent with the updated bed plan by October 3, 2025

- Beginning in the quarterly status report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City "created" that unit, meaning contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use

- Meet and confer with Plaintiffs on selecting a third-party Monitor by August 22, 2025, and select this Monitor by September 12, 2025, subject to the Court's approval

- Attend in-person court hearings after the submission of each quarterly status report starting with the October 2025 quarterly report on November 12, 2025

- Report encampment reduction data consistent with the Court's definition beginning in the October 2025 quarterly report and provide accompanying data on shelter or housing offers to the Monitor

Notably, each of the above requirements are actions that the City was already under an obligation to do. Failure to comply with these orders may result in sanctions.

## 2. Attorney's Fees for Plaintiffs and Intervenors

The City's refusal to provide updated plans, meet its milestones, correct its encampment reduction numbers, and verify its reporting has unnecessarily and unfairly wasted the resources of the Parties and the Court. By consistently refusing to provide explanations and verification of its reporting, the City has forced Plaintiffs into the position of investigating and monitoring

---

[11] These deadlines are in recognition of the Los Angeles City Council's summer recess from July 2 through July 29, 2025.

803

the numbers reported. Special Master Martinez and A&M were appointed and paid to undertake that role, but the City has stalled and blocked them too from achieving meaningful review. The City blames its complex administrative structure and the added layer of LAHSA bureaucracy for its failures instead of complying and providing the required data. Days of the evidentiary hearing could have been avoided if the City had simply substantiated its own reports. The City refused to do so even during the seven-day hearing. Obfuscation and delay cannot be tolerated.

Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.,* 370 U.S. 626, 630-31 (1962). This authority includes the ability to "fashion an appropriate sanction for conduct that abuses the judicial process." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44-45 (1991). An assessment of attorney's fees is a "less severe sanction" that is "undoubtedly within a court's inherent power as well." *Id.* (citing *Hutto v. Finney,* 437 U.S. 678, 689, n.14 (1978)). This narrowly defined power can be exercised in certain circumstances. *Id.* (citation omitted). One such circumstance is assessing attorney's fees as a sanction for the "willful disobedience of a court order." *Id.* (citing *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 259 (1975)). Another circumstance is awarding attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46 (citation omitted). In this last instance, if a Court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party." *Id.* at 46 (citation omitted). This circumstance also extends to when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Id.*

The Supreme Court has made clear that such a sanction has to be compensatory in nature rather than punitive. *Goodyear Tire & Rubber Co. v. Haeger,* 581 U.S. 101, 102 (2017) (citing *Mine Workers v. Bagwell,* 512 U.S. 821, 826-30 (1994)); *see also Lake v. Gates,* 130 F.4th 1054, 1059 (9th Cir. 2025) (applying *Goodyear* when reviewing a district court's sanctions). Simply, this means the fee award can only redress the wronged party for losses sustained, it may not impose an additional amount as punishment for the sanctioned party's misbehavior. *Id.*

**804**

at 108 (citation omitted). Thus, this Court must track the compensation to the wrong and the loss resulting from that wrong. *Id.* A compensatory sanction must be "calibrated to the damages caused by the bad-faith acts on which it is based." *Id.* (citations and quotations omitted). This kind of causal connection is appropriately framed as a but-for test where the complaining party may recover "only the portion of his fees that he would not have paid for but the misconduct." *Id.* at 109 (citation omitted).

Unlike the Special Master and A&M, Plaintiffs are not paid to monitor the City's compliance. Plaintiffs have diligently and persistently raised important issues to the Court's attention. As a sanction for the City's noncompliance, including disobeying the Court's order on encampment reductions, Plaintiffs' efforts should be compensated. Based on Intervenors' active role in the evidentiary hearing and briefing, the Court will require that the City pay attorney's fees to both Plaintiffs and Intervenors if Plaintiffs and Intervenors are able to show how they have been harmed by the City's conduct and the resulting losses to them under the law. Under similar circumstances, the City previously agreed to pay Plaintiffs' fees and costs on the verge of the Court's finding of bad faith and sanctions. *See* Tr., 17, March 8, 2024 (Dkt. 684); Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713).

Plaintiffs and Intervenors may submit motions for attorney's fees by July 25, 2025, at 5 p.m. The City's opposition is due by 5 p.m. on August 15, 2025, and Plaintiffs' and Intervenors' replies are due by 5 p.m. on August 29, 2025.

### 3. Receivership

Appointment of a receiver over state or local government functions by a federal court is an extreme and "invasive equitable remedy" only available in limited situations. *Melendres v. Skinner*, 113 F.4th 1126, 1136 (9th Cir. 2024). Receivership is typically the last resort after all other less intrusive remedies have been exhausted. Before imposing a receivership, federal courts have favored a gradual approach incrementally ramping up compliance measures such as monthly status conferences, sanctions, appointment of a special master or monitor, and issuing general consent orders. *See Dixon v. Barry*, 967 F. Supp. 535, 554 (D.D.C. 1997); *see also*

**805**

*Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at \*26 (N.D. Cal. Oct. 3, 2005). Only then, if "nothing short of receivership" can remedy constitutional violations, courts turn to receivership. *Plata*, 2005 WL 2932253, at \*23.

Weighing all of the options, this is not the time for a receivership over the City's homelessness response system. Although democracies can be inefficient and even wasteful, only the voters of Los Angeles have the power to elect representatives to solve these problems. Public pressure has recently led the City and the County to begin to make structural reforms to the homelessness system including withdrawing funding from LAHSA and forming new agencies. Plaintiffs speculate that these impending, massive changes will not make a difference; but, the people and their elected officials have the right to try.

> The Supreme Court recently summarized this principle:
> Homelessness is complex. Its causes are many. So may be the public policy responses required to address it. … Almost 200 years ago, a visitor to this country remarked upon the 'extreme skill with which the inhabitants of the United States succeed in proposing a common object to the exertions of a great many men, and in getting them voluntarily to pursue it.' 2 A. de Tocqueville, Democracy in America 129 (H. Reeve transl. 1961). If the multitude of amicus briefs before us proves one thing, it is that the American people are still at it. Through their voluntary associations and charities, their elected representatives and appointed officials, their police officers and mental health professionals, they display that same energy and skill today in their efforts to address the complexities of the homelessness challenge facing the most vulnerable among us.
>
> Yes, people will disagree over which policy responses are best; they may experiment with one set of approaches only to find later another set works better; they may find certain responses more appropriate for some communities than others. But in our democracy, that is their right. Nor can a handful of federal judges begin to 'match' the collective wisdom the American people possess in deciding 'how best to handle' a pressing social question like homelessness.

*City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 560 (2024).

The multitude of solutions available to handle the homelessness crisis in Los Angeles and the Court's deference to voters and policymakers does not, however, excuse noncompliance by the City. Flexibility with how to meet its obligations does not mean the obligations are optional. The Court takes the City's commitments seriously and will not permit

**806**

noncompliance. The City voluntarily agreed to resolve claims and issues in this matter through a promise to create new housing and shelter solutions for those languishing on its streets. Nearly seven unhoused community members die each day in the County of Los Angeles. These deaths are preventable and represent a moral failure by all of us. The City's Settlement Agreement that this Court oversees is only one response, as the Supreme Court put it, to this complex problem. The Settlement Agreement is a critical step, nonetheless.

**D. Conclusion**

Every day, the people of Los Angeles wake up to the sight of human suffering in every part of the City—people sleeping on sidewalks, searching for safety, shelter, or just a place to use the bathroom. And every day, those living on the streets wake to another morning of uncertainty, exposed to danger, stripped of privacy, dignity, and hope.

Unhoused individuals hear about programs and promises. They hear that hundreds of millions are being spent, that homelessness is being addressed, that success is being claimed. Yet many still cannot find a bed, a bathroom, or a hot meal. Their lived reality does not match the headlines.

Angelenos, too, are asked to believe. They vote to tax themselves in hopes of helping their suffering neighbors. They give willingly because they want change. But every day, they see less money in their pockets for groceries and more suffering on the streets. This gap between sacrifice and visible results erodes public trust and deepens collective grief.

People turn to the Court, hoping it holds the solutions—that the law can bend to save lives. But if solving homelessness were as simple as issuing a ruling, it would have been solved long ago. So the Court must focus on what it can control: the promises made, and whether they are being kept. The agreements in this litigation were meant to be a turning point in this crisis. Yet a review of the record reveals missed milestones, neglected obligations, and a troubling lack of oversight. That neglect carries real consequences, borne most heavily by those with the least, by the people whose lives depend on those promises being fulfilled.

The remedies here are not punishment. They are progress. The Court institutes a monitor to oversee compliance and ask the hard questions on behalf of Angelenos. It mandates

**807**

quarterly, in-court hearings, beginning November 12, 2025, and continuing as needed, to ensure these commitments are honored.

The Court wants the City to succeed. Because when the system fails, people die. And when it works—even slowly—lives are saved.

## V.    DISPOSITION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motions for Settlement Agreement Compliance (Dkt. 767, 863).

DATED: June 24, 2025

_David O. Carter_

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE

**808**

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
  kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978.7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>                Plaintiff,<br><br>        v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>                Defendant. | CASE NO. 2:20-cv-02291 DOC (KES)<br><br>**NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES**<br><br>Honorable David O. Carter, United States District Judge<br><br>Action Filed:     March 10, 2020 |

NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

**809**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that Defendant City of Los Angeles hereby appeals to the United States Court of Appeals for the Ninth Circuit from this Court's order granting in part Plaintiffs' Motion for Settlement Compliance (Dkt. 991) filed in this case on June 24, 2025.

DATED: July 23, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Theane Evangelis*
Theane Evangelis

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
 tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
 mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
 kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
 bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
 akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
 pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978.7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

Gibson, Dunn &
Crutcher LLP

2
NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

810

# REPRESENTATION STATEMENT
Ninth Circuit Rule 3-2(b)

**Counsel for Defendant City of Los Angeles**

Theane Evangelis
   tevangelis@gibsondunn.com
Marcellus McRae
   mmcrae@gibsondunn.com
Kahn A. Scolnick
   kscolnick@gibsondunn.com
Bradley J. Hamburger
   bhamburger@gibsondunn.com
Daniel R. Adler
   dadler@gibsondunn.com
Patrick J. Fuster
   pfuster@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

Hydee Feldstein Soto
Valerie Flores
Arlene N. Hoang
Jessica Mariani
CITY ATTORNEY'S OFFICE
200 North Main Street
City Hall East, 6th Floor
Los Angeles, CA  90012
Telephone:  213.978.7508
Facsimile:  213.978.7011

**Counsel for Defendant County of Los Angeles**

Mira Hashmall
   mhashmall@millerbarondess.com
Jason H. Tokoro
   jtokoro@millerbarondess.com
Lauren M. Brody
   lbrody@millerbarondess.com
MILLER BARONDESS LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, CA  90067
Telephone:  310.552.4400
Facsimile:  310.552.8400

Gibson, Dunn &
Crutcher LLP

3

NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

811

**Counsel for Plaintiff LA Alliance for Human Rights**

Matthew Donald Umhofer
   mumhofer@umklaw.com
Elizabeth A. Mitchell
   emitchell@umklaw.com
UMHOFER, MITCHELL & KING LLP
767 South Alameda Street, Suite 221
Los Angeles, CA  90017
Telephone:  213.394.7979
Facsimile:   213.529.1027

**Counsel for Intervenors Orange County Catholic Worker, Los Angeles Catholic Worker, and Los Angeles Community Action Network**

Shayla R. Myers
   smyers@lafla.org
Isabelle M. Geczy
   igeczy@lafla.org
LEGAL AID FOUNDATION OF LOS ANGELES
1550 West 8th Street
Los Angeles, CA  90017
Telephone:  213.640.3983
                    323.801.7990

Carol A. Sobel
   carolsobel@aol.com
LAW OFFICE OF CAROL A. SOBEL
725 Arizona Avenue
Santa Monica, CA  90401
Telephone:  310.393.3055

Catherine Sweetser
   catherine.sdshhh@gmail.com
SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP
11543 West Olympic Boulevard
Los Angeles, CA  90064
Telephone:  310.396.0731

Brooke Weitzman
   bweitzman@eldrcenter.org
William Wise
   bwise@eldrcenter.org
ELDER LAW AND DISABILITY RIGHTS CENTER
1535 East 17th Street, Suite 110
Santa Ana, CA  92705
Telephone:  714.617.5353

Gibson, Dunn &
Crutcher LLP

4

NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

UMHOFER, MITCHELL & KING LLP
Matthew Donald Umhofer (SBN 206607)
Elizabeth A. Mitchell (SBN 251139)
767 S. Alameda St., Suite 221
Los Angeles, California 90017
Telephone: (213) 394-7979
Facsimile: (213) 529-1027
matthew@umklaw.com
elizabeth@umklaw.com

*Attorneys for Plaintiffs*

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
    tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
    mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
    kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
    bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
    akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
    pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

[*Additional Counsel on Following Page*]

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., | CASE NO. 2:20-cv-02291 DOC (KES) |
| Plaintiffs, | Honorable David O. Carter, United States District Judge |
| v. | **JOINT SUBMISSION RE: SELECTION OF THIRD-PARTY MONITOR** |
| CITY OF LOS ANGELES, a Municipal entity, et al., | |
| Defendant. | Action Filed:    March 10, 2020 |

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

JOINT SUBMISSION RE: SELECTION OF THIRD-PARTY MONITOR

**TO THE COURT, ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

The City of Los Angeles ("City") and Plaintiff LA Alliance for Human Rights ("LA Alliance") (collectively, the "Parties") have met and conferred on the selection of a third-party monitor pursuant to Section 7.2 of the Settlement Agreement [Dkt. 429-1] and the Court's order dated June 24, 2025 [Dkt. 991].  The Parties jointly propose that one of the following serve as the third-party monitor, subject to Court and City Council approval, subject to their willingness to serve as the monitor, and subject to the qualifications below:

1.  Ron Galperin, former City Controller; or

2.  McKinsey & Company.

The City expressly reserves the right to withdraw its agreement to any of the above names in the event City Council does not authorize their selection.  LA Alliance expressly reserves the right to withdraw its agreement to either potential monitor in the event a conflict of interest, or inability to perform the work, is established by disclosures from the potential monitors or independent investigation.

LA Alliance believes that the appointed monitor will need to be assisted by a team with the requisite data, technological, and infrastructure training, knowledge, and experience at the City's cost.  The City believes that it is premature to decide whether such a team will be necessary and that the need for such a team should be resolved in consultation with the monitor once approved by the Court and City Council.

JOINT SUBMISSION RE: SELECTION OF THIRD-PARTY MONITOR

8

DATED: September 12, 2025          UMHOFER, MITCHELL & KING LLP


                                   By: /s/ Elizabeth A. Mitchell
                                       Elizabeth A. Mitchell
                                       *Attorneys for Plaintiffs*


                                   GIBSON, DUNN & CRUTCHER LLP

DATED: September 12, 2025
                                   By: /s/ Theane Evangelis
                                       Theane Evangelis

                                   *Attorneys for Defendant*
                                   *CITY OF LOS ANGELES*

                          Local Rule 5-4.3.4 Attestation

    I attest that all counsel of record concur in this filing's content and have authorized the filing.

                              By:  /s/ Theane Evangelis
                                       Theane Evangelis

```
                    UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
                  (WESTERN DIVISION - LOS ANGELES)




LA ALLIANCE FOR HUMAN RIGHTS, ) CASE NO: 2:20-cv-02291-DOC-KESx
ET AL.,                        )
                               )                  CIVIL
              Plaintiffs,      )
                               )          Los Angeles, California
     vs.                       )
                               )       Tuesday, September 16, 2025
CITY OF LOS ANGELES, ET AL.,   )
                               )        (9:05 a.m. to 11:55 a.m.)
              Defendants.      )
```

STATUS CONFERENCE RE MONITOR SELECTION

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| APPEARANCES: | SEE PAGE 2 |
| Courtroom Deputy: | Karlen Dubon |
| Court Reporter: | Recorded; CourtSmart |
| Transcribed by: | Exceptional Reporting Services, Inc.<br>P.O. Box 8365<br>Corpus Christi, TX 78468<br>361 949-2988 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

817

2

**APPEARANCES:**

For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
MATTHEW UMHOFER, ESQ.
Umhofer Mitchell & King
767 S. Alameda Street, Suite 270
Los Angeles, CA 90021
213-394-7979

For Defendants:        JENNIFER M. HASHMALL, ESQ.
LAUREN M. BRODY, ESQ.
Miller Barondess, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
310-552-4400

JESSICA MARIANI, ESQ.
Los Angeles City Attorney's Office
200 N. Main Street, Room 675
Los Angeles, CA 90012
213-978-6952

KAHN A. SCOLNICK, ESQ.
BRADLEY J. HAMBURGER, ESQ.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071
213-299-7000

For Intervenor:       SHAYLA R. MYERS, ESQ.
Legal Aid Foundation of LA
7000 S. Broadway
Los Angeles, CA 90003
213-640-3983

Special Master:       MICHELLE MARTINEZ

Also present:         ASHLEY BENNETT
RON GALPERIN
DANIEL GARY
KENNETH MEJIA
ALEJANDRO PALMA
CHANDLER PARKER
MARIA ROSAS

818

**3**

<u>Los Angeles, California; Tuesday, September 16, 2025; 9:05 a.m.</u>

(Call to Order)

THE COURT:  First of all, good morning.

ALL:  Good morning.

THE COURT:  Counsel, are you ready to go into a session this morning?  Comfortable?

ALL:  Yes, Your Honor.

THE COURT:  Okay.  Then we're in session on Case No. 20-0229-1, LA Alliance for Human Rights versus City of Los Angeles, et al.  And, counsel, just remain seated.  Pretend you're like in state court, so make your appearance.

MR. UMHOFER:  Good morning, Your Honor, Matthew Umhofer for -- on behalf of the LA Alliance.  My colleague Ms. Mitchell will be here shortly.

THE COURT:  Okay.  Thank you very much, counsel. Mira, why don't we start with you.

MS. HASHMALL:  Good morning, Your Honor, Mira Hashmall here for the County of Los Angeles.

THE COURT:  Okay.

THE CLERK:  Oh, one more, one more.

MS. HASHMALL:  Good morning, Your Honor, Mira Hashmall here for the County of Los Angeles.

THE COURT:  Okay.  Great, thank you.

MS. BRODY:  Lauren Brody also here for the County.

THE COURT:  Nice seeing you.

EXCEPTIONAL REPORTING SERVICES, INC

**819**

**4**

MR. SCOLNICK: Morning, Your Honor, Kahn Scolnick for the City of Los Angeles.

THE COURT: Pleasure.

MR. HAMBURGER: Good morning, Your Honor, Bradley Hamburger on behalf of the City of Los Angeles.

THE COURT: Okay.

MS. MARIANI: Good morning, Your Honor, Jessica Mariani on behalf of the City.

THE COURT: Pleasure. It's nice seeing you.

MS. MYERS: Good morning, Your Honor, Shayla Myers on behalf of the intervenors.

THE COURT: My apologies, Shayla. Back to you.

First of all, I didn't realize the connection but I know your brother, you actually look alike, because I think it's President of the Federal Bar Association of Orange County. I wanted to disclose this to all of you. I just sat in a board meeting, but I want you to know that there was -- as an attendee and a member.

You brought two names to the table so far, the McKinsey Group and Ron Galperin. And I assume that you're in the same position today, this morning, and there's been no change in terms of any earlier conversations; is that correct?

MR. UMHOFER: What's reflected in -- sorry, Your Honor, I need to stay seated, but --

THE COURT: Okay. I'm not trying you, but you're in

**5**

the same position, correct.

MR. HAMBURGER: Old habits, yes.

THE COURT: Could I ask what the McKinsey Group is charging the City? Because in my limited knowledge, that's a relatively expensive undertaking.

MR. HAMBURGER: Yes, Your Honor. We haven't gotten that far down the road on McKinsey. What -- just to set some of the background how we came up with these names. We've started --

THE COURT: I'm going to get to that in a moment.

MR. HAMBURGER: Okay.

THE COURT: I'm just asking you a simple question.

MR. HAMBURGER: On that question, we haven't explored that yet, and we haven't, at least the City has not reached out to anybody specifically at McKinsey. We have contacted Mr. Galperin.

THE COURT: By the way, just have a seat. Be comfortable. I know it's uncomfortable for you, but you can use the lectern, I'm just trying during flu season to stop the cross-polonization. So if you --

MR. HAMBURGER: Yes, Your Honor.

THE COURT: -- want to use the lectern, please do so when it's appropriate. But otherwise, you're more than welcome to just be seated.

Any idea, and I'm going to tell you why in a moment,

**6**

okay, what criteria did you use in discussing the McKinsey

Group?  Can either side help me?  And I know that may be

confidential from your standpoint, but this isn't a settlement

conference --

        **MR. HAMBURGER:**  Yeah.

        **THE COURT:**  -- and I think that the adversarial

process isn't going to work very well and eventually selecting

a data monitor.

        **MR. HAMBURGER:**  So just to clarify, the proposal, at

least as the City understood it, was either -- not both

McKinsey and Mr. Galperin.  It was two options.  The way that

came about is we met and conferred extensively with the

Alliance.  We wanted to come with a joint proposal for Your

Honor's consideration.

        Many names were considered and proposed by both

sides.  Either the Alliance or the City had various objections

to various names.  I believe the Alliance proposed McKinsey and

had identified them as, you know, their consulting and

accounting firm that has, you know, substantial capabilities.

And I recognize they are quite expensive.

        And I believe Ms. Mitchell had identified that they

had done some work in the area homelessness and had at least

had something on their website about that.  But from the City's

perspective, I know you have questions about McKinsey, we

believe Mr. Galperin, he's our first choice and I think it

**EXCEPTIONAL REPORTING SERVICES, INC**

**7**

makes a lot of sense.  But I'll stop there and let the Alliance speak.

THE COURT:  Without inquiring too much further, what I'm concerned about also is if we met and agree -- if we reach an agreement here, there's another player involved.  The City Council's approval.  First, that takes some time.  And second, they could reject any sum and we went through that process with the appointment of A&M.  Originally we all knew it was 2.8 to 3.2, but the City came back with 2.2.

The Court was concerned at that time because I didn't want that limitation and I felt that was a limitation when everybody had chosen A&M and then we ran into budget problems.  And I don't want to see you folks reaching an agreement here in good faith, you know, try to work together, and then having the City Council reject this in a couple of weeks.  It's a waste of your time and I'm calling back into session going through the same.  So think about that for a while.

Is the City attorney here?

MR. HAMBURGER:  We have representatives from the City Attorney's office.  I do not believe the City Attorney herself is here.

THE COURT:  Who's the City attorney here?  Oh, of course, you are.

MS. MARIANI:  Good morning, Your Honor.

THE COURT:  If we reach an agreement, you know,

**8**

working together, how do we have some guarantee that that isn't wasted over two or three weeks or however long this gets to the Council with further delay?  What's your wisdom?  Help me.

         **MS. MARIANI:**  Your Honor, our office would certainly help to prioritize getting it on the agenda and making the recommendation and so we would hope to facilitate it in that manner.

         **THE COURT:**  So ultimately it'll be the person or party in the City Attorney's office that makes the recommendation to the Council.  Then, of course, it's in the Council's hands.

         **MS. MARIANI:**  It would then be in the Council's hands, yes, Your Honor.

         **THE COURT:**  Okay.  So this has to be frankly with your approval today.

         **MS. MARIANI:**  From my office, yes.

         **THE COURT:**  And do you have authority today to make that kind of representation?

         **MS. MARIANI:**  That we will certainly make the recommendation to Council and help to prioritize --

         **THE COURT:**  No, but do you have that --

         **MS. MARIANI:**  -- it.

         **THE COURT:**  -- authority today?  In other words, it's good faith --

         **MS. MARIANI:**  Yes, yes.

**9**

THE COURT:  -- if we all eventually landed with a person that we thought was agreeable.  Can you make that representation today that this is something or do you need to make a phone call?

MS. MARIANI:  I can make a representation as I think we did in the filing that was already submitted.

THE COURT:  Okay.  Let me talk to you for a moment about McKinsey and a couple of concerns that the Court might have and this isn't to -- while I'm curious about the criteria you used.  McKinsey as you know was an advisor on the Purdue Pharma litigation, which was the manufacturing of OxyContin.

And that was allegedly a major factor in escalating the opioid epidemic.  In 2013 McKinsey recommended strategies to turbocharge the sales of OxyContin, allegedly even while the public health crisis was becoming known.

There was a record settlement, as you know, in December of 2024 and McKinsey agreed to pay $650 million to the U.S. Department of Justice to resolve both the criminal and civil investigation into its actions after partner pleaded guilty to obstruction of justice.

Now, this isn't to criticize McKinsey as a group. It's a large organization, I understand that.  Also there has been a civil settlement of over a billion dollars.  The congressional reports found that there was a conflict involving Purdue Pharma and the U.S. Food and Drug Administration

EXCEPTIONAL REPORTING SERVICES, INC

concerning proper disclosure.

It's going to take three of us to come to an agreement, LA Alliance, the City and the Court. And I'm really uncomfortable with that recommendation. But as I read 7. -- no, you'll get all day. As I read 7.2, the Court, I read this, as I can't unilaterally impose my will or my choice on each of you, in fact, if each of you reach an agreement, it also requires my acceptance. But I'll work with you on that, if we get there. Fair enough?

**MR. HAMBURGER:** Yes.

**THE COURT:** The second concern I have is not a concern at all, in fact, a compliment because I'd worked with Ron Galperin before concerning his previous work that he's done for the City as the auditor/controller. He wrote some very interesting reports about the cost of housing first at the time and somewhat with those reports, the Court cited those reports in fact in its history concerning this litigation, along with HUD and a whole series of background requests for investigation.

But he also ran for a statewide office. I don't know if he's upwardly mobile, which good for him if he is. I don't know what his future looks like in terms of the City, because anybody who enters into this arena is going to come out, let's say, scathed, all of us are.

And I'm concerned that he lacks the technical

**11**

expertise.  So I'm going to ask what criteria you relied upon a few moments in discussing Galperin.  And let me say to you also in transparency that I've had an army of volunteers, up to the time of the appointment of the Special Master Michelle Martinez in this case, she had volunteered her time in Orange County, in Santa Barbara without a fee for over three and a half years.

She worked the first year and a half or two here without any pay.  That army included Mr. Los Angeles in the past, Councilman Tom LaBonge, Pastor Don, just a myriad of people who literally volunteered themselves.  And initially when I got involved in this journey, both in other counties and this county I wanted to surround myself with people who had nothing to do with any payment.  Not that receiving payment is non-virtuous, it's just that I knew that people were in it for only one reason.  They wanted to make the system better.

So you didn't see the, what I call in the name in lights coming forward with the Court.  And when we were walking the riverbed and other people, we were meeting -- or other locations, I think 27 encampments and 5,000 people initially, a lot more now, I started to meet on this incredible journey a goodness of a lot people who just wanted to make it better, not receiving any compensation, any public acclaim.  Literally had an army of them.  Okay?

That changed with the Special Master, which was the first paid position.  And so now I'm not leery, but I question

**12**

at any time payment and the information I'm receiving if there's a past intertwining with the City or with LA Alliance and on Ron Galperin I'm not sure where he stands now in the technical expertise.  And this is the way I initially define what is satisfactory to the Court.

The stated monitor needs to have experience with real time data auditing and timestamp validation.  In addition they need to have applied knowledge of data integrity and source attribution protocols.  This includes the ability to assess whether reported data is accurate, complete and traceable to its original source, whether it's through timestamp documentation, system logs or field level records.

The Court believes that the monitor should be fluent in protocols that distinguish verified data from estimates of placeholders and capable of validating that all figures are supported by primary evidence.  I think that this expertise is essential, not only for technical auditing, but for moving forward with public trust which we all want.  We need the taxpayers to vote for Measure A and other, we need them to have confidence in what we're doing.

So I think we're together on all of that.  It's not an adversarial issue.  I think it's essential not only for technical auditing but for maintaining this public trust.  And essentially what's required is a data analyst who has the capacity to not just collect data, which Michelle Martinez

**13**

could probably do with her present or another choice in this area.  And maintaining that that data collection is accurate.

And for example, is the data at issue best modulated or modeled by normal distribution or binomial distribution. And the monitor will need I think minimally to compute such metrics as the main variance and standard deviation to analyze the data for purposes of evaluating consistency across data sets.

And frankly I don't want to be burdened vetting technical experts.  We had what I call a beauty pageant when all parties agreed to A&M.  We actually had them come into court.  That was our best choice at the time by agreement of all parties.

And what I fear is that we won't reach an agreement between the two of you and then the Court is either forced to act unilaterally which I think is against 7.2 and not appropriate, or we reach a stalemate where the Court will act and just, you know, send it to the appeal amongst many issues, but have a record of the inability of counsel to come together and reach an agreement.  That's what I'd like to avoid.  Okay?

Next, this -- well, some examples I was thinking through is A&M because we all selected A&M to begin with, and I know the City probably is displeased because you've stated that with the eventual report, I understand that.  Daniel Gary (phonetic), who, Mira, you and I have worked with, but you've

**14**

forgotten -- you might have forgotten, but Mira in good faith represented that on behalf of her client, it would take a month to get certain systems on line. I can't disclosed too much, but I worked with him overseas at the highest levels of government, which I really don't want to discuss, with both administrations.

And I know his expertise on behalf of the country, in fact, he's either in Turkey or Barcelona right now. And so I was wondering, who possibly could be better than somebody like Daniel Gary who, Mira, remember you were kind enough to get the technical staff in right away, I want to thank you for that. All of you folks got together within three hours, we had an outline of how to get it up and running, it saved us a month of time. Okay? And he's available by phone.

I agree with LA Alliance when you say in your brief, quote, the appointed monitor will need to be assisted by a team with requisite data, technical -- technological and infrastructure training, knowledge and experience of the City's costs.

And I'm questioning why make the taxpayers pay more money when they need to, by not selecting a monitor, who has these qualities either he or she, themselves? Because by simply selecting a monitor we're going to go through another -- and, Coda (phonetic), I thank you for being here, I'll be right with you, we won't hold you up.

**15**

I don't want to go through another hearing where then we get into a debate about what the -- what this is about, because I'm just calling you into court every single week, okay. So I'd like to get that in a perfect world decided today and get that technical expertise. And I think A&M and/or Daniel Gary have that. Now I can't impose my ruling on you, but that's who I'm comfortable with right now.

But I'm at your beck and call. If you don't agree, I think 7.2 doesn't let me unilaterally oppose that. Now hold on, counsel, you're going to have all day, I promise you. You've got the rest of the day, I'll go get some coffee and you can have the whole day.

What criteria did you use and was this criteria discussed in putting forth these two names? Because I'm concerned about the lack of technical expertise with Galperin and I'm worried about any past entanglements with the City or future entanglements going forward and with the McKinsey Group, although I will put on the record is probably an outstanding record, just the past history of this I don't think is going to be acceptable to the Court.

Now, I'm going to take turns for whatever comments, so I'll start with plaintiff. I'll turn to the City. I'll turn to Ms. Myers on behalf of the intervenors.

**MS. MITCHELL:** Sure, thank you, Your Honor. I can say that the Alliance did propose both A&M and Daniel Gary and

**16**

the City was not amenable to either of those.

THE COURT: Okay. We'll discuss that again today. Who else did you propose?

MS. MITCHELL: Oh, I'd have to go back to my list. We had a --

THE COURT: Well, go get your list. Let's go down this list of folks because frankly I know that John Sheeran's (phonetic) out there and David Grunwald (phonetic) who applied for LAHSA and I understood did very well in the process with LAHSA, I think he was second to the appointee. There's a host of people out there who are literally willing to pitch in from mental health expertise to HMIS. And but for the City may see a tremendous amount of money. Maybe we could put in a team that far undercuts, you know, whatever McKinsey was going to charge. Okay?

MS. MITCHELL: So, Your Honor, I'm pulling it up right now. I can -- first before I get to that point, as I'm scrolling through to get the list, I can tell you that I did speak with McKinsey yesterday, with the McKinsey team yesterday. I do believe they have the technical and data capabilities.

THE COURT: Okay.

MS. MITCHELL: However, they as a policy of the organization will not serve as a monitor in terms of adjudicating compliance or non-compliance. That's a corporate

**17**

policy they have.  So they felt that they could participate in a supporting role, under somebody, to help but would not be able to serve as a high level monitor.

So if the City is amenable to that, we can talk about that and maybe they would serve as a supporting role to Ron Galperin, but that's a separate conversation.  I just wanted to let the Court know I did have a conversation.

THE COURT:  I'll let you discuss that.  But you know my reluctance in terms of the opiate settlement --

MS. MITCHELL:  Yes.

THE COURT:  -- and knowing that some of the City money that was received came from the opiate settlement.  You had about $250 million in reserve coming out of that settlement which since is no longer available.

MS. MITCHELL:  Yes, no, I understand that.

Some of the issue -- when we looked at, you know, who was capable and I have to be honest, Your Honor, the order I think was a little bit vague in terms of scope, so I did have a conversation with A&M.  They sent over to me a document.  They were interested in being a monitor, but because they spent ten months in the data, they felt like there was a lot of clarification needed and help for whomever the data monitor was going to be.  So I did have some conversations about that and what would be technically required.

THE COURT:  Have you shared that though with the City

EXCEPTIONAL REPORTING SERVICES, INC

thus far and Shayla?

MS. MITCHELL:  I have not.  I just got permission last night to share it, because it was labeled confidential. And so at that point, I didn't feel like I could.  I'm happy to e-mail that to them so they can take a look at it.

I share the Court's concerns about controller Galperin.  I have reached out, have not been able to contact with him.  However, based on my past experiences with him, based on the independence with which I believe he operated his organization when he was the city controller, I think that he would have the requisite level of independence.

THE COURT:  Who is he?

MS. MITCHELL:  Ron Galperin.  My concern is only on the technical expertise and I have not been able to connect with them.  And so to the extent that whomever the monitor is, I don't know that a single person could do this, Your Honor, even Daniel Gary.

So I do think that there needs to be a team in place, given the significant issues with data and infrastructure that we have seen.  So even with someone like Ron Galperin who I believe to be very good and very independent, I believe he would need a supportive team.  And I think that we can work with the City as far as what that looks like.

Now, obviously I would want to have a conversation with him to confirm the independence and the comfort level, but

**19**

I do think something like a Daniel Gary or an A&M and even McKinsey and I recognize the Court's concerns and those are valid concerns, but a data and technological team supporting Mr. Galperin I think is what is needed.

THE COURT:  Okay.

MS. MITCHELL:  I'm sorry, would the Court like me to share the names that we proposed?

THE COURT:  Yeah, I would.

MS. MITCHELL:  So we had previously, I think the City had proposed Rand that was the --

THE COURT:  Just a moment, Rand?

MS. MITCHELL:  Yes.

THE COURT:  All right.  Now, this has nothing to do with Rand, but full disclosure, just before I went to Vietnam Rand wrote a report for all of us young marines, it was interesting.  I won't say anything more.  So I have that personal experience with Rand, but a great amount of respect as an institution since that time.  Okay?  But I'm a little concerned about just my fairness in that regard, because it had some dramatic indicative problems with it.  Regardless Rand?

MS. MITCHELL:  Rand was one.  But the City raised --

THE COURT:  Okay.  And that has nothing to do with that past experience, but I wanted to disclose that to you.

MS. MITCHELL:  Thank you, Your Honor.  The Alliance was concerned because there were significant contracts between

**20**

Rand and the City that we didn't feel was appropriate in an independent context. Same with USC and UCLA. They have some phenomenal programs.

THE COURT: USC and UCLA, they're going to cooperate?

MS. MITCHELL: No. You were asking for the ones who were raised.

THE COURT: Okay. Now, USC. Who was suggested at USC?

MS. MITCHELL: There was a number of organizations at USC, not a single person. We were looking at departments but again, Your Honor, that was quickly dismissed because of the significant relationships that the City --

THE COURT: Okay. What about UCLA?

MS. MITCHELL: Same with UCLA. We looked at a number of departments but was quickly dismissed because of the --

THE COURT: One of those, the Luskin Institute?

MS. MITCHELL: I'm sorry?

THE COURT: Was one of those the Luskin?

MS. MITCHELL: Luskin was one, correct.

THE COURT: Okay.

MS. MITCHELL: Jan Perry was one that was raised.

THE COURT: She's the former councilman out in the 14th?

MS. MITCHELL: She was councilwoman of what ultimately became CD14. I think there was some redistricting

EXCEPTIONAL REPORTING SERVICES, INC

**21**

that happened.

THE COURT: Okay.

MS. MITCHELL: And she was actually, I think, until the end going to be on the list and then the city withdrew its agreement.

THE COURT: Okay.

MS. MITCHELL: But I think she -- I don't think that she has the data or technological capabilities, but I do think she has a tremendous amount of insight into the City but would need a team to help.

THE COURT: Okay.

MS. MITCHELL: And then Tim Campbell was one that was raised, but in full disclosure, he has worked with the Alliance in the past and I think that the City then didn't feel comfortable with Tim even though he does have the technical capabilities.

THE COURT: Sure.

MS. MITCHELL: The City raised EY, which was formerly Ernst & Young, which we were not comfortable with for the same contract reasons. We, the Alliance, raised Price Waterhouse Cooper, I think is the full PWC, but there is ongoing litigation with the City and PWC, so that was obviously not -- out.

THE COURT: Okay.

MS. MITCHELL: And I think that is the totality of --

**837**

**22**

oh, there was -- I'm sorry, Neil Gatnick.  Neil Gatnick, who has --

THE COURT:  Who?  I'm sorry.

MS. MITCHELL:  His name is Neil Gatnick.  He is an attorney in New York, so not local, but has served in a monitor capacity multiple times and reached out to us independently.

THE COURT:  Does he have the technical expertise though, because there I've got the windshield time without the benefit of the, well, okay.

MR. UMHOFER:  Your Honor, I believe he'd be in the same position as a Ron Galperin, which is that he has extensive monitorship experience federally and locally, but does not -- but would need a data team.

THE COURT:  Okay.  Well, thank you.

MS. MITCHELL:  Yeah.  I think that's the totality.

THE COURT:  Okay.  Let me turn to the City (indisc.) your thoughts.  The lectern is yours.

MR. HAMBURGER:  Thank you, Your Honor.  So just to give you some insight on why we landed on Ron Galperin, we, as you can tell, the parties proposed a lot of names.  Our first choice was a group at Rand.  There's Jason Ward at Rand, and he has a team, a lot of very capable people that have data expertise, are scientists, have technical backgrounds, yet also have the policy expertise.  So that was our first choice.

It became very clear early on that the Alliance was

**23**

going to veto any group that had some relationship with the City. And the problem there, from our perspective, was we're the second largest City in the country. There's all sorts of unrelated activities that the city is engaged in, but that is why we ended up -- why we proposed, you know, multiple organizations like UCLA, groups at USC, Rand of course, Ernst & Young. And the Alliance position was if there's any contracting between the City and those entities, that they were just not going to stipulate.

And what we were trying to do, Your Honor, is come with a unified joint proposal. The City would still be fine with Rand. That was our number one choice. We thought they had the right skill set. I understand the Court's comments, but we think the people that are working at RAND now on these issues would be well suited. It could kill --

**THE COURT:** By the way, I've overcome that. In other words -- but if I state it, then I can be fair.

**MR. HAMBURGER:** Yes.

**THE COURT:** It's when you hide something in even your own subconscious, and I just have to say that that has some tragic consequences. But this is a new era, new group. But I'm a little afraid of what I call the -- I want to call them McNamara whiz kids for want of a better term. I'm a little afraid of the people who aren't willing to get down on the streets, take a look, because then they're simply espousing a

**24**

position.  Okay?  And I'm going to need some boots on the ground.

MR. HAMBURGER:  Yeah, well, I think there are individuals at Rand who have studied these issues, and I can't testify about their experience going down on the ground --

THE COURT:  Time out.  I haven't seen them.

MR. HAMBURGER:  But yes.

THE COURT:  By the way, there's a murder today, two and a half hours ago over on 5th Street.  Young man stabbed numerous times, 26 years old.  So let's just start the case with -- day with some tragic news.

MR. HAMBURGER:  That's awful news.

THE COURT:  Yeah.

MR. HAMBURGER:  On Ron Galperin, we proposed Ron Galperin because we think he has unique knowledge of the City globally, which is a differential from Jan Perry, who her knowledge is focused on her district.

THE COURT:  Jan Perry or Ron Galperin, and here's my concern.  If it's linked with somebody like Daniel Gary or A&M, and I've got that technical expertise that I'm confident in, I'm going to buy in.  You're not going to have opposition from me.  But I'm not turning this over with my acquiescence to an entity like Rand or Luskin or anybody else and then having them get my technical expert who I have no experience with and no confidence in.  It's like subcontracting.  I have no barometer.

**840**

**25**

And this is more than just check a box.  I need this technical -- this person is critical to me.

So Jan Perry, I don't think is critical necessary. Galperin's not, but that technical expertise is critical in this.

**MR. HAMBURGER:**  Yeah, Your Honor, can I -- I think there may be a need for technical expertise at some level, but I also think there's a different level of expertise because this isn't just a -- but the problem, you know, here in terms of assessing the data isn't just about mathematical modeling or, you know, complex accounting things.  That may be a necessary component of this.  I also think that there's just the basics of knowing what programs are out there, where the data is.  We have multiple agencies, multiple entities.  You have LAHSA that controls most of the data.  And so our thinking was that Mr. Galperin, given his knowledge of the City generally, he knows how the City works, plus he has experience running an organization that is focused on auditing, knows numbers.  And it may be the case that he will say that he needs a team.  We think it would be most effective that if a technical team was selected, that it's somebody that he's, you know, is comfortable working with, somebody he's worked with perhaps in the past, or at least is open to working with.

And I'll just say the City attorney did reach out to Mr. Galperin.  He is interested in serving in this role.  We

**26**

wouldn't have proposed him if he wasn't.  But -- and we did give his contact information to the Alliance, but I guess they haven't been able to connect yet.

But in terms of, you know, what the City proposed, we had a lot of entities that we were open to.  We did have misgivings about A&M based on the -- what happened at the evidentiary hearing in the report previously.  I understand that in the past, the City did consent to A&M.  But I think now it would be better -- the City's position would be better to get a different entity.  And we did think that we shouldn't be ruling out entities like Rand or USC or UCLA merely because they do unrelated business with the City.

I mean, it'd be shocking if UCLA and USC and Rand, given they're based in the community, didn't have any connections on unrelated matters.  It would be one thing if it was a related matter, but unrelated matters, we think that is basically holding too high of a standard.  And so we would urge the Alliance to reconsider, in particular RAND, because we think that was something the City was number one choice.

THE COURT:  My guess is that you won't reconsider nor will the LA Alliance, but we'll get to that in just a moment.

MR. HAMBURGER:  Yes, Your Honor.

THE COURT:  Or we'll see if we can.  Ms. Myers, were you a part of this conversation between the City and the LA Alliance?

EXCEPTIONAL REPORTING SERVICES, INC

**27**

**MS. MYERS:** We were not, Your Honor.

**THE COURT:** Would you please come up to the lectern or just remain seated? I'd like to get your input. By the way, I want to thank you for your briefing on the record concerning the receivership issues.

**MS. MYERS:** Thank you, Your Honor.

**THE COURT:** Very insightful.

**MS. MYERS:** We're happy to address any of the issues that the Court feels like it would be important to make our appearance on.

**THE COURT:** No, I just want to get your input. Let me tell you my concerns. I really am pushing for some entity outside the Los Angeles area. I don't have the same confidence, the doubling up with the data monitor and what I call a more public figure is going to make me comfortable.

**MS. MYERS:** And Your Honor --

**THE COURT:** And so -- and I'm worried about the intertwining, and I know that regardless of the City's disagreement with A&M, that they were very independent, however they came out. I'm particularly interested in Daniel Gary because I know his expertise on behalf of the United States, far beyond and he's not local. He's got no connection with any of your folks, except with that one occasion when he was in court and he happened to be visiting on some other unrelated business. And when you called the technical people in, we got

EXCEPTIONAL REPORTING SERVICES, INC

**28**

that up and running in three and a half hours instead of a month, and I found good faith on both sides.

So I don't think I'm going to be signing off unless I can get somebody in the data monitoring field with this technical expertise. So I partially disagree with the City. I don't need just another figurehead. I would appreciate somebody who knows the community. I mean, maybe even Michelle can double up and do that. But if not, it may simply be too much. Maybe we need Ron Galperin, A&M, Jan Perry. I know Dr. Sheeran's (phonetic) interested. I know that -- I think the second in the LAHSA go-around, David was interested. You've got a huge army of people out there wanting to work at a discounted rate, quite frankly.

**MS. MYERS:** Your Honor, I think we share the perspective that this is the type of work that someone who is deeply invested in Los Angeles and the issues that are facing Los Angeles would be critical. And the reason why we say that is that these are complex issues, certainly. The homelessness delivery system is an incredibly complex system. But the issue facing the monitor is actually relatively straightforward in terms of ensuring the City's compliance with the settlement agreement. And one of the things that I would strongly urge the Court to consider is subject matter expertise related to homelessness and housing. I appreciate your perspective, Your Honor, related to data verification --

**29**

THE COURT: Why not both? In other words, I'm a little leery of turning this over to a large entity like RAND, Luskin, who I don't know who they're using, when I could combine a Jan Perry and a Daniel Gary or a Ron Galperin and a Daniel Gary or something where I've got both.

MS. MYERS: And, Your Honor, I think interveners do not share the concern related to an organization like RAND, USC, or UCLA. And in fact, I would strongly encourage Your Honor to consider one of those institutions. And the reason why we say that, and I think, Your Honor, you've pointed this out numerous times when you encouraged A&M to refer to Luskin and to reach out to some of the institutional knowledge that exists on the ground.

Los Angeles and right now what is happening in Los Angeles is fertile ground for research, and we have amazing institutions doing really powerful work on the impacts of homelessness. The entities that are doing that work are in a position to be able to monitor the discreet elements of the settlement agreement with a depth of knowledge that we think is necessary. Your Honor, one thing -- one concern that we have about A&M --

THE COURT: Let me break in right there for a moment though. Some of these institutes have taken different positions. For instance, the mayor has taken a more hybrid position from housing first and to also shelter. Okay. I

**30**

think that's had a tremendous benefit in terms of dealing with the tens of thousands of people on the street because when I first came to the city, it was a housing only model.  You and I had arguments about that, debates, et cetera, early on.  And I think with transparency, so we share with the group that our initial disagreement in the meeting was, unlike Boise, which might have 50 people and we could have a housing first approach, you and I disagreed because the Court was presented with a problem of thousands of people on the street and how do we get them into shelter with documentation, et cetera, but we had then a housing first model.

I think the mayor has successfully changed that into a more hybrid model with shelter because I can't have -- the Court can't face the problem of literally tens of thousands of people trying to find something better than a cardboard box if I was only dealing with housing first and the tremendous cost, because there I could serve, and the City could serve hundreds, maybe thousands, but a few thousand, and the rest were sitting on the street.  Now, you and I had a robust disagreement about that.  I respect your opinion.

You believe that housing first is something that should occur, and I respect that.  We just disagreed, so counsel know about that.  I might take a different position, by the way, if it was a smaller community in terms of housing first, but here with the tens of thousands of people, you and I

**EXCEPTIONAL REPORTING SERVICES, INC**

**31**

argued, if not over across the street years ago about that.

I've got some embedment, though, in Luskin, for instance. Luskin has some folks that were involved in the housing first model. I can name them, but I don't want to, because it was a good faith noble effort. Let me say that to begin with. And some of the folks that settled this early litigation, you know, going back to Jones, et cetera, were housing first advocates and were part of that containment policy. Hold on.

This Court is never going to allow, and at the chance of taking this to the circuit and being recused, going back to a containment policy that this City had, where we took minorities down to Skid Row and the rest of the districts, quite frankly, and I'll name them for you if you want, and some of the council people, literally have dumped in Council District 14. That's not going to happen again. And we've got some primary advocates over at Luskin that were part of that process.

Now, that's noble, let me say at the time. Do you want to go further? Happy to.

MS. MYERS: I mean, Your Honor, I would just say that, for example, council member Perry voted on numerous of the policies --

THE COURT: Exactly. I'm not saying --

MS. MYERS: So those kinds of policy decisions that

EXCEPTIONAL REPORTING SERVICES, INC

**847**

**32**

people have made in the past, if that's going to disqualify folks, then certainly that should disqualify council member Perry --

THE COURT: No.

MR. MYERS: -- certainly should disqualify council member Galperin.

THE COURT: No, but I'm not going to put somebody into office with just one perspective, like housing first only or shelter only. I need a cross, you know, cross-thinking about how the system's going to work in a functional way. So I don't want an advocate for all shelter or criminalization or housing first.

MS. MYERS: And then, Your Honor, I think that would certainly disqualify the politicians that have been put forward. And that is our concern --

THE COURT: It may.

MS. MYERS: -- is that the individuals that have been put forward, council member Perry, with all due respect, lodged some very significant votes that many people would consider detrimental or beneficial, but certainly weighed in on one side of these debates.

THE COURT: I want you involved in this discussion. As the intervener, I think you have greater responsibilities that maybe the Court in the past and the parties have placed with you. That doesn't mean, though, that your input is going

**33**

to be guided by the Court, right?

        **MS. MYERS:**  Sure.

        **THE COURT:**  Okay?  Be prepared for that.  But I think that that wisdom would be helpful in hearing from you. Eventually this -- the way 7.2 is drafted, the parties are actually the City and LA Alliance.  And if they do come to a meeting of the minds, I think I'm duty-bound to accept that, but how much confidence I have in that and how active I am or non-active in the future really depends upon whether we can meet this confidence level.  Otherwise, the federal court's going to be right back involved.  Okay?  And if I don't have confidence in this, so there's my misgiving, okay, about Luskin in particular, RAND, USC maybe, maybe something else at UCI or UCLA.  I don't know.  Berkeley's too far.  Stanford too far.  But I'm looking for a combination.

        As long as I get that technical, I'm not as concerned on the what I call the infrastructure.  Quite frankly, I've got free volunteers.  Don, raise your hand.  He knows the city just as well as Michelle does.  Okay?  I could get all the expertise I need in terms of HMIS, the whole system at any time.  I could save you a ton of money, quite frankly, a huge amount.  But that's up to you.  But I know one thing, McKenzie charges a lot, and if we're going down that road, if I'm the counsel, I'm not sure I'm approving that, and now we've just wasted time. So how are we going to resolve this?

**34**

MR. HAMBURGER: Yeah, so Your Honor, I think the Alliance -- I mean, I would urge the Alliance to reconsider its blanket position.

THE COURT: No, no, no, we're not going to do that because they would urge you to reconsider and we're back and forth.

MR. HAMBURGER: Okay. Well --

THE COURT: You know -- do that privately, please. Go have a conversation.

MR. HAMBURGER: I may do that privately.

THE COURT: We're not going to do that publicly and put them in the spot, and they're not going to put you in the spot.

MR. HAMBURGER: Well, I think the parties would benefit after hearing the Court's concerns and helpful suggestions, can we meet and confer?

THE COURT: Okay. Here's my concern. You give me Daniel Gary or A&M and I will give you the political, intuitive figure that you accept, because that way I think that that's going to be the most important flow of information and far different than what we've had to do in the past. And if I don't have that confidence, then you've got a third party not agreeing. So A&M or Daniel Gary and then pick Jan Perry or Ron Galperin or Dr. Sheeran, I'll get them on the phone or David Grumwald. I'll give you a list of names of people who want to

**850**

**35**

become involved.  In fact, they'll probably discount the rest.  Don, how much are you willing to work for?

> **UNIDENTIFIED SPEAKER:**  Zero.

> **THE COURT:**  Zero.  Now, hold on.  I just want to tell you, I never expected at my age to end the last part of my career on this incredible journey, and I want to leave on a positive note.  I have met incredible people who aren't even asking a cent to just get involved for the goodness of Los Angeles, and that's a really positive thing, isn't it, on this journey?  I mean, it's absolutely inspiring.

> I've witnessed -- I tell you stories about Skid Row and they've got 10,000 masks and they've distributed them during the fire and they all vote on the street down on -- with Kevin and Rick and half the people out here.  They hold a street meeting and deciding in West L.A. those folks up in the Palisades got burned out of homes.  Maybe they could use the mask.  So you've got the poorer communities, which is an incredible story about this City getting in a truck and driving it over to West L.A. to try to distribute it to people who got burned out of Palisades.  By the way, my daughter got burned out of Palisades.  She's doing fine.  So don't worry, but yeah, I mean, is that a good story about our city?  I mean, shouldn't we be proud of that?

> You give me the technical expertise of the people I have confidence in independent of Gary and A&M and I'll give

**36**

you whatever other choice you want to work with and let's narrow it and choose that people because I think we can save a ton of money if we do that. Okay? A lot of money. McKenzie's going to charge you, by the way.

MR. HAMBURGER: Yeah, we understand, Your Honor. We need to speak with our client.

THE COURT: Sure. I'm sitting right here. Go talk to him.

MR. HAMBURGER: Okay.

THE COURT: Yeah, we're not leaving today. I mean tonight. And by the way, I've quit inviting your clients. Okay? No problem, but they should be here. They should be in this room making decisions.

So why don't we take a recess, because I'd like to hear from the controller. You might want to stay or have one of your team stay or we can listen to the controller for a moment because I want you to be on your way in just a moment. I want to thank you for being here.

So Michelle, do you have anything to add? I can't hear you. You're going to have to use a microphone, Michelle.

SPECIAL MASTER MARTINEZ: Yes, Your Honor.

THE COURT: No, no, no come to the microphone. Yeah. We're not going to do that. Usually I have you up here with me.

SPECIAL MASTER MARTINEZ: Yes, Your Honor, if we

**37**

could have the controller because he does need to get back to work.

THE COURT: That's just what I said.

SPECIAL MASTER MARTINEZ: Great. Thank you. And he has a presentation.

THE COURT: Yeah, well, please come on up here and it's good to see you and thank you. Remember you're always invited. I'm never ordering you here. Okay?

And eventually I'm going to ask LAHSA, who's our LAHSA of representative again, thank you. Have a seat for a moment. I wish your director was here, but I'm not ordering that at the present time. I'd like to meet her.

And eventually, LAHSA, eventually I'm going to ask if the City's broke what we're doing with the $37 million we haven't recovered so far, and I want to be blunt about that, and I'm going to go over every name who hasn't paid. And I compliment you on these recently constructed contracts but they are an after-the-thought contract frankly, and I am concerned that there were no milestones met. There were no contractual obligations until the LA Times and this Court discovered it. I've got a concern that this money was just going to float.

So when you say you're broke, I'm going to ask where the $37 million is just to start with.

MR. UMHOFER: Could we get a little technical -- we just --

**38**

THE COURT: Well, I'm going get off the bench then so -- until you get that set up just so you're not pressed. Okay? Don't worry about that. So, counsel, if you want to take just five or ten minutes right now just to let them get set up technically for this presentation. Okay? Would you just call me back -- counsel, just tell me when that's ready to go.

(Recess taken at 9:51 a.m.; Reconvened at 9:58 a.m.)

THE COURT: Then all the parties are present, counsel, except A&M. Would somebody get them? Be kind enough. Michelle, could you help me? Could you ask A&M to come out?

SPECIAL MASTER MARTINEZ: I don't think we have A&M, Your Honor.

THE COURT: No, they're not here? Okay, could you ask the L.A. Alliance to come on out?

MS. MITCHELL: I'm right here, Your Honor.

THE COURT: Where are they? Oh, I didn't see you. I saw the controller. I'm sorry.

MS. MITCHELL: Oh, that's okay.

THE COURT: Okay, please. So we're back on the record. All the parties are present, and counsel?

MS. MITCHELL: Your Honor, before we get started, I did want to mention, I actually forgot, I did propose the current controller as well on the list, and that was not accepted.

EXCEPTIONAL REPORTING SERVICES, INC

**39**

THE COURT: Okay.

MS. MYERS: Your Honor, I just need to find a screen that I can see the screen that's actually working.

THE COURT: Okay, well, let's have the controller make his presentation. I know you're busy and have to get back to work.

MR. MEJIA: All right. Well, thank you, Your Honor, for having me. So, you know, our task in this is to create a website that is transparent to the public about how the City is spending their money in regards to the Alliance settlement, the freeway agreement roadmap, and Insight Safe. And so we've been tracking these payments since 2024, and so you can see so far how much funds we've been able to track. And this is in cooperation with the CAO and LAHD as they -- LAHD is the housing department -- as they provide us a list of these payments. And so you can just see the amount of spending. So --

THE COURT: Wait just a moment. Carla, could you help me with this screen? I want to turn the monitors towards counsel and the audience. And, Counsel, do you want one of these monitors turned around so you can see or are your screens working? I want to make sure.

MS. MITCHELL: They're working.

THE COURT: Just a moment. Counsel, are your screens working?

**40**

MS. MITCHELL: And, Your Honor, yes, ours are and the audience's.

THE COURT: Okay.

MS. MITCHELL: I think it's just the back ones that weren't.

THE COURT: Let me get this up. Just a moment. Michelle, are your screens working, Dawn? Okay. And remember, under 7.2, as long as you're talking, I don't think the Court has any authority, in other words, to impose anything on either party, L.A. Alliance or the City. So if you reach an accommodation, no matter what my thoughts are, that's going to be accepted by the Court. I think I read that very clearly. It's when we get into an impasse that I don't know quite where that leads us.

Okay. Okay, Counsel, thank you very much. Now it's on my screen also.

MR. MEJIA: Great. Great. So, you know, just going this over with you all again for those who haven't been here, basically this is the summary sheet so far. And we made this website with the idea that it is easy to use and easy to understand. So if you wanted to go down or click on a certain, you know, program, you could easily click on, you know, for example, Insight Safe, 119 million spent so far. You go here, you could see a breakdown of the service providers by, you know, through a pie chart. You could see it all here. And if

**41**

you scroll down even more, this is where you actually get into sort of the details.  You know, we made this payment on February 1st.  This was the sub-recipient.  This was the amount.  And then this is the reference.

And basically you could actually, if there is a hyperlink, you could actually click on each one.  And then this will actually show you the invoice details or what was provided as the backup support for that amount.  So anyone could go in and see what we are paying for.  In addition, if you click on this amount here, you could also see sort of a breakout of, you know, what district it was --

THE COURT:  Just a moment.  Let me interrupt you.

MR. MEJIA:  Sure.

THE COURT:  For counsel, I just made a statement that, once again, I read 7.2 that if each of you reach an agreement, then the Court has no jurisdiction nor ability to impose unilaterally anything on you.  So I want that very clear.  If you do reach an agreement, I'm duty bound to accept that.  Understood?

I'm just telling you transparently some of my concerns, but those could be easily overcome if each of you agree.  So let me finish with the assessor right now.  He needs to go back to work.

MR. MEJIA:  Thank you.

THE COURT:  Why don't you go back to the very

EXCEPTIONAL REPORTING SERVICES, INC

**42**

beginning.  I know you're speeding through this.

MR. MEJIA:  Sure, sure, sure.  No, and I have time, Your Honor, so.

THE COURT:  Let's go down to a summary again.

MR. MEJIA:  Sure.  So for everyone joining us, this is our homeless dashboard, and part of our homeless dashboard is we created a specific section, a website, that we were asked to create sort of a transparency website on homelessness spending, particularly related to the Alliance settlement, the Freeway Agreement, and Insight Safe for payments starting since 2024.

THE COURT:  Now, let's slow down.  Alliance Settlement Program, $6,715,826.  What does that represent?

MR. MEJIA:  So what you could actually do is if you want to know what that $6.7 million is, you could actually click, and it will take you to the details section when the payments were made, and you could actually click on the -- if there is a hyperlink, you could click on it, and you could see the invoice as to what was given to us, and then you can scroll down and see all the details if you wanted to.

We actually made it easier.  If you click on this right here on the amount, it's more of a high level if you didn't want to go into the details, but you could see the breakout on, you know, it's for PATH, it's for CD4, Highland Gardens, for the months of November to December, and this is

EXCEPTIONAL REPORTING SERVICES, INC

**43**

the breakdown on how much, you know, the money was split, so 53 percent rent, 20 percent security, and so on and so forth.

THE COURT:  Let's stop just a moment.  And if you go down again just a little bit.

MR. MEJIA:  Yeah, so if you scroll down a little bit.  So the top part breaks out the financial, you know, entries and the accounts, and then down here what we wanted to do was tie it to the performance metrics of that period that the payment covered, so that way you could tie the money to the performance and so you could see how many new enrollments there were.  By the way, all of these were provided by LAHSA, and we're making it, you know, accessible to the public.

THE COURT:  Thank you.  Would you take the second category then on the first slide?

MR. MEJIA:  The second category is --

THE COURT:  Insight Safe, $119,336,840.  Once again, slowly walk us through that.

MR. MEJIA:  Correct.  So I just clicked on it, and it took us to the Insight Safe portion.  And at the top, we created a high-level pie chart summary of the different sub-recipients or service providers, just so you all could see who the city is paying, servicing Insight Safe.  Please let me know if you want me to keep scrolling down or if you want me to stay here.

THE COURT:  Just stay there for just a moment.  And

EXCEPTIONAL REPORTING SERVICES, INC

**44**

now if you scroll down.

MR. MEJIA: And then if you scroll down, we get into the similar section where you saw, you know, more of the details on what we're paying for. So, you know, if I clicked on one, for example, if I click on this one, the amount here is the same thing. It will break out how much is, you know -- which location it was, what period did it cover, what was the breakdown of, you know, where it went to in terms of financials. And then on the bottom, we don't have metrics available on this one because I believe they didn't -- for 2024, it was not readily available at that time. But pretty much here, though, you could see the same thing that you saw up there.

The one thing that I do want to point out is if there is a link on the contract, you could actually click on it. I know one thing that the Court wanted and others wanted is you wanted the contract posted. So we actually post the contracts, if available, to match where that payment would fall under. So you could see it here. It's 400 pages long, but if you wanted to read it all, you could.

THE COURT: I see.

MR. MEJIA: So, you know, all together what we have is we have the invoice, we have the contract, and we have, you know, sort of a breakdown of what that amount gets down to.

THE COURT: Excellent. Could you turn back to the

**45**

master page again?

MR. MEJIA: Sure. So if we go back to here, next is this one.

THE COURT: So the freeway agreement, that's for the 6,700 -- $180,517,093.

MR. MEJIA: So if you click on it here, same thing. And for information that we do have, we try to fill it in. So you could click on each one. It will give you the invoice as well. If you wanted to see the details, it will show you everything you want. Click on the contract. It will give you the contract as well. These are pretty big files. Yeah, so this one was 540 pages. So you could just, you know, if you wanted to see the contract, and then obviously here if you click on this, it will show you the breakdown on, you know, where it was.

THE COURT: Take me down from salaries and wages. Take me right there. That's good enough. Just a moment. What's overhead allocation?

MR. MEJIA: That I would have to look into the actual invoice details to find out what they're including as overhead. I wouldn't know at the top of my head.

THE COURT: Thank you. All right. Take me back to the master page again, would you?

MR. MEJIA: Sure. And then I'll just show this real quick. Here are the performance metrics on the bottom.

**46**

THE COURT:  I see.

MR. MEJIA:  And then the last part is part of roadmap, but we broke it out because it sort of has its own, you know, little section, but it's the safe parking side of roadmap.  So this one, if I click on it, 1.5 million.  This one we actually have all the details for so far, but you could see the breakout on how much we've spent so far through May 2025 for safe parking.

THE COURT:  So consistently staff salaries and security are two of your primary expenses, aren't they?  Seems to be consistent across the board.

MR. MEJIA:  Uh-huh.

THE COURT:  Okay.  All right, thank you.  Please continue.

MR. MEJIA:  Great.  And same thing for safe parking. If you scroll down, we actually presented this one a little differently because there aren't that many, but you could go from side to side.  You could click on each month if you want to see the actual invoice and see the details on, you know, the backup.  Similar to what you all have seen over there.  Also provides performance metrics to how many spaces they have, how much space was utilized during that time.  So, you know, 48 percent, 34 percent of those spaces were utilized, things like that.  How many, you know, clients exited housing, the average length of stay.

EXCEPTIONAL REPORTING SERVICES, INC

**47**

So, you know, the whole idea of this website for everyone here is just so you all could see what the City is spending the money on and dig in for yourself.  The one thing, Your Honor, that I would like to spend a little bit of time on is just sort of discussing our progress and challenges with upkeeping this website, if that's okay.

THE COURT:  Please.

MR. MEJIA:  So a lot of this work that you see here, which is great, you know, our office loves doing this, but we are hitting some hurdles in developing this website because it does require a lot of manual work, a lot of, you know, making sure that the data, including sensitive data, confidentiality, and if you saw some of those examples, some of these invoices are like 200 pages.  Some of these contracts are 400 pages.  And so right now, we have a two-person team who is doing all of that and putting all this together.

THE COURT:  Why are we having to go through the issue concerning privacy?  Why isn't this being (indisc.) --

MR. MEJIA:  Yeah, so that was one thing we brought up to LAHSA.  If we can -- if they could actually, you know, black out those portions of the invoice, and I think the idea was everyone wanted full transparency.  And so they didn't want to be, and I don't want to speak for them unless they're here, but the idea was full transparency and we didn't want anything to be blacked out if, you know, there would be a concern that

EXCEPTIONAL REPORTING SERVICES, INC

**48**

something would be hidden and they didn't want that.

So we essentially get everything raw.  And so we have to make sure that when we post it up, it doesn't go down.

THE COURT:  There was a dispute initially between the parties and LAHSA and your office concerning transparency.  And I had requested all of the parties to come to my court, and we would sort that out quickly with guidelines.  All the parties then reached an agreement, and that's where the Court was left.  So I was never involved in trying to sort out those privacy issues, but certainly under HIPAA there are privacy issues.  But I'm wondering why your staff has to do all that work when LAHSA can do that work and deliver that to you if we had clearer guidelines.  So I leave that to the parties to consider because it's draining on your resources.

MR. MEJIA:  Right, and I think that's one of the -- so that's one piece of why this can take a long time is because we have to actually, when we do get the data, we have to go through it all and redact a lot.  In addition, there is a delay sometimes when we get the data, so some of this information may not be up to date because we are waiting.

But my team created a quick PowerPoint, if I could show it to you real quick, just so we could show you all the process in which we go through it.

THE COURT:  Please.

MR. MEJIA:  So I'm going to bring up our deputy

EXCEPTIONAL REPORTING SERVICES, INC

**864**

**49**

controller of finance and our director of homelessness, Ashley, as well to sort of give you all this quick presentation and just tell me when to --

        **MS. ROSAS:**  Good morning, everyone.  My name is Maria Rosas.

        **THE COURT:**  Good morning.  Let's move that microphone closer to you and make sure that you can be heard.

        **MS. ROSAS:**  So we just put together a quick financial process presentation on how we get the information and what our office is going through and the challenges that we're experiencing.

        So LAHD CAO provide a list of payments that are made by the City for these programs, and our team is in charge of looking through the transactions and getting further detail from our internal systems like FMS.  So we gather the payment backup documents that are provided by LAHSA, which will include both PDFs and their Excel mapping files that have information on service provider, encampment sites, contract numbers, and everything related to the cash request.

        From there, our team further extracts that from LAHSA's files and submits to them, this is the backup that we need for all of the service providers that were paid out through this cash request, and this is what this is pertaining to.  In addition, please also provide us the contracts.

        So this list is then sent to LAHSA again to provide,

**50**

one, the subcontractor service provider invoices that tie to the amounts paid and the related contracts.  So this is just an example of the list that we get from LAHD/the CAO, which is internal data that breaks down by program, what was paid out, when it was paid out, what the document ID number is for, our internal FMS system, which is the system that we use to have all of the payment information, accounts payable, accounts receivable, and all of that.

So this is the initial process of it, and this is quite fast because it is internal information that we have.  From here, I do take the document ID number, put it into FMS, pulled out the actual physical files that are in the backup, and then we go and create the next page, I think you can see.

**THE COURT:**  Let me stop.  With this labor-intensive effort, are you able to keep up with the information that LAHSA is giving you or are you constantly falling behind?  Because this is labor-intensive.  In fact, you're using Excel spreadsheets.

**MS. ROSAS:**  Correct.  There's a lot of manual work from our part and our team.  The biggest obstacle that we're coming across is LAHSA being able to provide us documents in a timely manner.  We actually do have data that's been outstanding for over nine months and they have not provided --

**THE COURT:**  Let me ask the City, the County, you, the interveners, anybody, the following.  One of the ideas behind

EXCEPTIONAL REPORTING SERVICES, INC

**51**

this was transparency, accountability, and keeping or gaining the public trust. And so when you send out a request for proposal, the hope for was that if that became a contract, that it was posted on the website so we could see the number of clients that were being serviced, what kind of services they were obtaining, and it gave better data to everyone to make good decisions.

If there's a nine-month delay potentially, that means that the public's not getting information in a timely fashion. And so therefore, by the time a decision-maker gets the process, the mayor, the council, the board, et cetera, they have a huge time lag in making an effort to make these good decisions. How is that speeded up between you and LAHSA? In other words, the only thing that I've been able to think of is the LAHSA might be doing their front-end work with clear guidelines on privacy, et cetera, HIPAA, and giving you that data in that form. But what else could be done?

**MS. ROSAS:** So one of the things that Controller Mejia and our team did propose to see if we can do this in the future is that when this information, meaning if you still get the backup right now, this is what is submitted by LAHSA, which is a cash request. This is the only thing submitted. They do not submit service provider invoices. So if we were to get the service provider invoices along with these cash requests, then it would make it easier for us to reconcile and have the

**52**

information off in the beginning.  So that is something that Controller Mejia can speak on.

**MR. MEJIA:**  So the idea is once LAHSA requests payment from the City, we tell them to include this up front with that.  So that way it's all tied together instead of us having to pull from this and then break it out and then send it to them again to send it to us separately, which, you know, could take nine months or so.  So include everything already in the payment request.

**THE COURT:**  I see.  Thank you.

**MS. ROSAS:**  So as I mentioned, this is the cash request that is submitted by LAHSA to the City for payment.  It does have information of the subcontractor, the original budget, the year-to-date expenditure, and what is currently being requested for payment, but you'll notice that it does not have information on the actual expenditures being paid out.  So that is why we pulled this and then request the service provider invoices.

This is a list of what our team prepares and sends back to LAHSA.  You'll see that it's a little cleaner and it's already in an Excel manner.  This is all manually done by us, so we'll break down the service provider, the encampment site, the contract number that is listed in the cash request, and the amount.  They then are supposed to provide us with both the contract, the service provider invoice that are tied to these

**53**

payments made.

So looking at the service provider invoices, I think Controller Mejia looked through some of them when he was showing you the site. In addition to that, there are -- when you look through the invoices, there are differences in what is being paid as funding sources. So we'll have like HHAP 3, 2, 4, and that is all broken down in the PDF file, but it's not necessarily broken down in any other way.

So for us to look -- every time we look at an invoice, we have to check the funding source and make sure that it's tying directly to what is being paid for that particular line item. And you'll see in the bottom an example of something that LAHSA does provide, which further gives us the city contract number, the cash request number, and any funding source that they may list out.

This is just an example of what a service provider invoice would look like. These are all PDFs, so our team does have to go in there and extract it. If we're able to extract easily to Excel format, then it makes it a little bit easier, but most of the time they are not, so it's all manually put into an Excel file.

So our team then reviews all of the information, makes sure that the amounts that are provided by the service provider, GL details tied to the cash request amount, that then ties to the mapping file that LAHSA provides, and only then can

**EXCEPTIONAL REPORTING SERVICES, INC**

Case 2:20-cv-02291-DOC-KES   Document 1034   Filed 09/17/25   Page 54 of 87   Page ID #:29819

**54**

we put that detailed information into our website, which is --
I put there an example of what it looks like on our website,
but that requires a lot of extensive work on our end, and it's
all manual.

This is an example of a mapping file that LAHSA
provides us.  So you'll see it's all Excel based.  They provide
a list of invoices, a list of the funding sources.  You'll see
in the bottom one it says Roadmap HHAP3, so our team goes
through every single invoice, makes sure it ties for that
particular month, and for the total amount that is being
requested for that line item, because it is important to note
that each line item will include sometimes six, seven, eight
months' worth of payments, so we have to look through all of
those invoices.

So just a brief overview on the reconciliation
process.  So for our team, we do have the information that we
have to have in order to even begin the reconciliation is the
payment made by the City, the cash request file that LAHSA
submits, the Excel mapping file that LAHSA is to provide to us.
They also should be providing a funding source Excel file for
us to further reconcile by the funding source, and the service
provider invoices.

Only once we've received all of this information can
we begin the reconciliation process, and everything does have
to match to one another.  And after all of this, this is when

**EXCEPTIONAL REPORTING SERVICES, INC**

**55**

we begin the process of looking through and redacting the invoices, and Ashley can speak to that front.

MS. BENNETT:  Good morning.  My name is Ashley Bennet.  I'm the Director of Homelessness at the Controller's Office.

THE COURT:  Good morning.

MS. BENNETT:  So after all of those previous steps comes one of the most time-consuming things in this process, which is the redaction of invoices, and I think Kenneth showed a brief example earlier, but these files range anything from 60 pages to like 1,500 pages.

THE COURT:  Just a little slower.

MS. BENNETT:  Oh, sorry.  They range from 60 pages to 1,500 pages, all with a lot of sensitive information about staff, about clients.  So we go through and we scrub this data, or scrub this sensitive information from these documents so it can be posted publicly.

And I have been the person that has been working on this, and just because of the time-consuming nature of the entire process thus far, when we were finally able to get to this point, it took a couple of months to get through all of these different invoices to get them ready to post publicly.  So that's just one of the things that we wanted to highlight --

THE COURT:  Just a little slower.

MS. BENNETT:  I'm so sorry.  That's something that we

**56**

just wanted to highlight is the time consuming nature of this entire process that we have to go through from beginning to end, from the financial piece to the contract piece.  I also handle the contracts piece, and that should be something that is relatively easy on the front end.  When we provide that Excel file to LAHSA to just send us the contracts that match the transactions, and that has been painstakingly difficult.

It took us about five months from the time that we sent those requests to get all the contracts that we needed matched up to those transactions.  So that is pretty much it for my part of the process, but we just wanted to highlight kind of the time-consuming nature of it all.

**THE COURT:**  Just thank you very much.  It's quite a learning process.  It's very much appreciated.

Do you have any questions on behalf of L.A. Alliance or the City or the County concerning this presentation?  So let me turn to L.A. Alliance.

**MS. MITCHELL:**  No, not at this time, Your Honor. Thank you.

**THE COURT:**  On behalf of the City?  Any questions you have?

**UNIDENTIFIED SPEAKER:**  No, Your Honor.

**THE COURT:**  On behalf of the County?

**UNIDENTIFIED SPEAKER:**  No questions, Your Honor.

**THE COURT:**  Has this been a cooperative effort?  I

**57**

know that we -- Ms. Myers, I just humbly apologize.  Ms. Myers, do you have questions?

**MS. MYERS:**  I do have a question, Your Honor.  I would just be interested to know if usage of the website is tracked.  Do you have any metrics about how frequently people are actually accessing this website?

**MR. MEJIA:**  Yeah, we could pull that data and provide an update, but yeah, we should be able to have tracking on how often people use it.  I just have to ask our tech team.

**THE COURT:**  Matt Szabo made a commitment on behalf of the City to cooperate.  You made a commitment in my presence to cooperate with the City when there was a little bit of friction.  Are the two of you cooperating?

**MR. MEJIA:**  Yeah, the CAO LAHD and us, we're good.

**THE COURT:**  Okay.

**MR. MEJIA:**  I think it's just -- we're -- it's external.  It's out of the city, you know.

**THE COURT:**  Okay.  Well, then let me pay a compliment to all of the folks involved.  This is the first website that the Court's aware of that seems to be starting to function on the public's behalf, and for accounting and transparency, you have my compliments.  I worry about the time delay because what it's going to do is continue to subject the City, potentially the County, LAHSA, you to the citizen who says, well, what's the value if it's nine months old?  In other words, always

**EXCEPTIONAL REPORTING SERVICES, INC**

**58**

subject to criticism in terms of (indisc.) that were paid and never the compliment being paid for making the effort.

So let me start with a compliment for making the effort, it's simple as that.  It would be extraordinarily helpful if you, the City, the County, LAHSA, whomever is able to shorten this process because then the public officials have the benefit of making time, data-driven decisions close in time to receiving this and to be able to respond in a positive way as elected officials.  So on one hand, I hope that you can shorten that time period, but it's not the Court's jurisdiction.  The Courts have been consistent, though, that accountability and transparency have to be at the foremost.  I think you've started down that road.

So do you have any questions?  If not, I'm going to move on.  Could you give a hard copy with this of this?

**MR. MEJIA:**  Of the PowerPoint?

**THE COURT:**  Could you -- yeah, could you -- your PowerPoint.  Just send it to us.  Would that be okay?  Michelle, do you have questions?  Yeah, Michelle may have some questions.

**SPECIAL MASTER MARTINEZ:**  So I had the opportunity to have a zoom meeting with the controller's office and I do believe that we do need some form of resolution and I know it's not within your jurisdiction, Your Honor, but I think I made it very clear to you.  They cannot continue on this path.  It is

**59**

overconsuming their office and they only have two people doing this.

THE COURT:  Okay.

SPECIAL MASTER MARTINEZ:  And so they need either LAHSA is going to participate and give them the data that they need.  They're going to redact the information in those contracts or those invoices to help the controller move forward with this process, or if not I just think at this point and I understand your accountability and transparency, they cannot continue.  They cannot sustain this.

So I want to be very clear.  And another point that I wanted to make under the L.A. Alliance and how much money has been spent and that the biggest piece under the L.A. Alliance is the permanent and supportive housing.  And there's not -- there's no data that it's even there.  That's just interim housing.

And so that other big piece you now have to deal with HACLA, you now need to deal with LA Housing Department and, you know, being able to get the different funding streams from Triple H, the different state and federal other funding mechanisms.

So when we're talking about specifically the LA Alliance case, it's imperative because the majority of the beds that have been created under the LA Alliance's 5,680 permanent supportive housing units.  The other interim housing is only

**60**

1,760.

So if we really focus on the LA Alliance we're really -- this is a drop in the bucket in to getting the appropriate data that we need of what money's being spent in regards to creating these beds.

THE COURT:  Thank you very much.

SPECIAL MASTER MARTINEZ:  You're welcome.

THE COURT:  I missed that.  I missed the interim versus permanent.  Ms. Myers, questions?

MS. MYERS:  I mean, Your Honor, I think it actually hits on even greater points to Michelle's point is that the interim housing that's listed is actually only 143 units at Highland Gardens that accounts for the 6,700,000 units.

And I'm concerned, Your Honor, I will say --

THE COURT:  Just a moment, 143 units 6 million?

MS. MYERS:  Yeah, that's the interim -- most of the data that is here for the Alliance settlement program goes to the Highland Gardens, which is an interim housing program for 143 units.

My concern, Your Honor, is when you look at the number, 6,700,000 that is a lot of money certainly, but if you don't know the nominator and I think we've been saying this of 143 units, you really don't know anything about what that money is.

THE COURT:  I see.

EXCEPTIONAL REPORTING SERVICES, INC

**61**

**MS. MYERS:**  And, Your Honor, I would just say as we're moving towards a different phase of settlement compliance and the appointment of a monitor, I would say perhaps that the monitoring of the settlement could be wrapped up in the public transparency and take some of the load off of the controller's office with this.

And the reason why I ask, Your Honor, about how often this website is visited, if very few people have access to this website, know it exists, or are going to use it in its current form, but a significant amount of the controller's resources are going to it as opposed to what the democratically elected controller would spend those resources on.  Your Honor, I'm concerned about that allocation of resources that it's actually -- it's pulling away from other transparent work of the City, when Your Honor is appointing a monitor whose job is to do this specific work and can put forward the work of transparency that everyone I think, this side of the table certainly fought for in the evidentiary hearing, that transparency.

The monitor could do that work, perhaps far better than the controller is being tasked with doing, with pulling two members of the controller's already small staff away to do this.  That -- I didn't speak to them in advance, I'm just advocating on their behalf related to this.

**THE COURT:**  But then does that transfer the cost what

Case: 26-784 02/09/2026 DktEntry: 5.1 Page 133 of 297
Case 2:20-cv-02291-DOC-KES Document 1034 Filed 09/17/25 Page 62 of 87 Page ID #:29827

**62**

the City would be paying to this monitor?  In other words, wouldn't it raise the expense to the City?  It would seem what we're doing because of the overwhelming nature of this to the controller with the present staff we're shifting costs to the data monitor or other monitor and the City should be aware of that.

MS. MYERS:  But, Your Honor, the City is already paying for the cost of this because we, taxpayers, pay for the controller's office.  Right.  So the City is already paying for it, we're just paying for it through allocating it to a specific office within the City was never tasked with settlement compliance.

THE COURT:  Okay.

MS. MYERS:  And, Your Honor, I would say that the citizens of Los Angeles also have a right to know the cost of this litigation and I think that's one of those things that has been -- that has come up a lot in the press, that the public is speaking about.  Your Honor has addressed it.  The cost of this litigation is very, very high.

THE COURT:  Uh-huh.

MS. MYERS:  But the public doesn't have any transparency about the costs, for example, to the controller's office of this litigation and effectively they're doing settlement monitoring and compliance work right now without the taxpayers being aware at all of that cost.

**63**

And I would say just on the duplication point, if the controller's office is doing monitoring work and the City is paying for an outside monitor, it's a duplication of cost that's not increasing transparency and could create conflicts, Your Honor, when if the controller comes up with a different position than for example the monitor does, then the controller's office is working outside of Your Honor's oversight outside of settlement compliance, oversight, that conflict doesn't help the public with its transparency issues. I think it actually undermines the legitimacy of these proceedings.

**MR. UMHOFER:** Your Honor, can I just add, I do think the monitor's going to be doing this work. The monitor is going to be doing this work anyway and so I don't know that there will be a duplication of effort. The monitor has to gather this information anyway to do its job well.

And so I tend to agree that the monitor might have to incur some additional expense to take over the website obligations, but the data that they're collecting is going to be this kind of data and so I don't anticipate there being -- if the monitor takes this over, that that would impose additional significant costs.

**THE COURT:** The Court has no jurisdiction over this issue. But it's a tremendous learning process because there is some overlap and related to the appointment of this data

**64**

monitor under 7.2.

So let's do this. We're all aware of this conversation. How you choose to convey that back to the head of LAHSA or the Mayor or the Council, I leave that to your wisdom or the Board.

But we've heard it and what's nice about this we've heard about it in the room, there's no solution today to it, but Michelle, I want to personally thank you. I missed the interim nature of that.

So let's do this. There's a hearing in November. I'm going to invite you again at that time to make the same presentation. That gives a little bit of time for discussion behind the scenes and see if this can be rectified. And it also plays into any duplication and hopefully saving some taxpayer money.

Is there any reason why we shouldn't thank the controller?

**MR. MEJIA:** So we have 312 visitors in the past 30 days. And then close to 4,000 in the past year.

**THE COURT:** Oh, that's good.

**MR. MEJIA:** So we --

**THE COURT:** That's an admirable start from --

**SPECIAL MASTER MARTINEZ:** I would say mostly.

**THE COURT:** -- a curtain to -- yeah.

**MR. MEJIA:** No, that's not true.

**65**

THE COURT:  Let the record reflect that --

MR. MEJIA:  Unique, unique.

THE COURT:  Yeah.

UNIDENTIFIED:  You've done a phenomenal job.  You've done a phenomenal job.  Really you really have.

MR. MEJIA:  Thank you.  And, Your Honor, I think, you know, to everyone here we don't mind doing this.  We just need help.  You know, we just need staff because we do this work, right.  We want to provide the transparency and accountability because we are independent.  And so, you know, we don't mind. It's just -- it just takes a long time and we need more staff and cooperation from the outside.

THE COURT:  And the parties need to hear that the Court's complimentary.  I've bore down on occasion, but for the City, Mr. Szabo was in an adversarial position with a controller, you've come together on this I think.  And I think that's admirable, okay.  The question is now how do we get these resources and increase this transparency.  And also, not real time, but get as close to real time so folks can make the best decision.  And I think it's an excellent start.  Let's leave it at that until November.

But I'm going to invite you back in November and make this presentation or another presentation and see what -- how this matriculates up the chain of command to the City, the County, LAHSA and you, okay?  Nothing will get resolved today

**66**

except I've gained a lot of wisdom.  I think we all have.

Okay.  All right.

Can the Court excuse the controller with our appreciation?

**MS. MITCHELL:**  Your Honor, just briefly.  They keep referring to cooperation from the outside and I just want to be clear that we're talking about LAHSA, am I right, like where they're having -- still having trouble getting data from LAHSA.

**MR. MEJIA:**  Correct.

**MS. MITCHELL:**  Which I again I think this is something that the data monitor hopefully can help address and can work closely with the controller's office.  And I also want to reference the briefing that we submitted earlier this year where we do believe the Court has jurisdiction over LAHSA.

So to the extent these issues are continuing and it does bring in the data monitor, et cetera, I think the Court does have jurisdiction.

**THE COURT:**  Well, I believe that also, pursuant to the original agreement and it was in 2000 and I displayed it the last time.  I can get the exhibit number out of a box, but we'll leave that for the present time.  Okay?

**MS. MITCHELL:**  Thank you, Your Honor.

**THE COURT:**  I want to thank you for being here.  It was an excellent presentation.  I want to thank your staff, I think on behalf of the public it's admirable.

**67**

MR. MEJIA:  Thank you.

THE COURT:  All right.  Now, let me go back for just a moment before I hear from LAHSA for the City, have you had any discussion?  Is there any potential resolution of this?

MR. HAMBURGER:  I think there is.  We've proposed to the Alliance that we would agree to Mr. Galperin with Mr. Gary.

THE COURT:  Okay.

MR. HAMBURGER:  Subject to Council approval.

THE COURT:  Absolutely.

MR. HAMBURGER:  Yes, but with the recommendation that we mentioned before.

THE COURT:  And maybe we can keep the costs down a little bit too.  I think Gary will be willing to negotiate with you.

MR. HAMBURGER:  So we proposed that.  We haven't heard back from them.

THE COURT:  Well, they're about to accept I think, aren't they?

MR. HAMBURGER:  I hope so.

MR. UMHOFER:  Your Honor, we have a preliminary good feeling about that.  We haven't talked to either of these individuals -- these folks and the City has, so we're going to need to talk to them.

THE COURT:  Okay.  Do you want me to get them on the phone?

**68**

MR. UMHOFER:  We can do that.

MS. MITCHELL:  That'd be great.

THE COURT:  I've got them right here.  In fact, I've got half the City right here.  Who do you want on the phone, the Mayor, the Council, Gary, who do you want?

MS. MITCHELL:  So, Your Honor --

THE COURT:  I've got all the numbers.

MS. MITCHELL:  Specifically I think we need to talk to Ron Galperin and Daniel Gary, that's who we need to speak to.  Call Ron Galperin, mobile.

THE COURT:  And you'll have that conversation private.  I just want to get ahold of him, make sure he's around, then talk to Daniel Gary.

MR. GALPERIN:  You must be mind reading because --

THE COURT:  No, hold on.  Ron, before you say anything, you're being recorded.  You know, I'm on a speakerphone and everybody is applauding, just kidding you.

Hey, listen, I want them to talk to you privately.  They may have come to an agreement concerning you being one of the primaries along with Daniel Gary.  I haven't had the two of you talk, I've kept that separately, but could you go have a separate conversation with them by phone out of my presence in just a moment?

MR. GALPERIN:  Yeah, I got a phone message this morning, which I didn't have a chance to call back on, but my

**69**

intent was to do so today.

THE COURT:  Well, I hadn't called you, so one of the parties must have.  I've been --

MR. GALPERIN:  It was one of the parties.

THE COURT:  Okay.  Yeah, they're going to call you in just a couple of minutes.  Do you have his mobile?  I don't want to say that on the record.  Do you have his number?

MS. MITCHELL:  I have a phone number.  I can talk to the --

THE COURT:  Ron, could you call somebody from the City or somebody from LA Alliance and just whoever.  You folks can set up that conversation with Ron, right?

MS. MITCHELL:  If -- Your Honor, if the Court is amenable to sharing his cell phone number --

THE COURT:  Nope, I'm not.  Not without his permission.

MR. GALPERIN:  I'm hearing in the background, I didn't hear the voice in the background.

THE COURT:  Well, that's --

MR. GALPERIN:  I can tell you that the call that I got was from Elizabeth Mitchell.

MS. MITCHELL:  Okay.  Then I do have his number and we connect separately.

MR. GALPERIN:  So that's who I'm supposed to call back.

**885**

**70**

THE COURT:  Yeah, they're going to call you back. Let both sides have some leeway, under 7.2 if they agree, then I agree, it's as simple as that.  Okay.  So they're going to call you in just a moment.  Okay?  Bye-bye.

MR. GALPERIN:  All right.  Thank you.

THE COURT:  Call Daniel Gary, mobile.  I'm going to short circuit, you know, going back to our office, because that way you can take it back to the City, getting an idea of what they're charging, et cetera.

MR. GARY:  Hey, Judge.

THE COURT:  Hold on.  Listen, you're in court on the record for a moment.  The City and the LA Alliance is here and they're prepared to accept you with the caveat, obviously both parties need to talk to you and I want that to be outside of my presence.

So I'm going to give the number to both parties, just so that they can reach you in about ten minutes to a half an hour.  Would that be acceptable?

MR. GARY:  Of course, Your Honor.

THE COURT:  Okay.  And you're out of the country still?

MR. GARY:  I'm still out of the country.

THE COURT:  Okay.  I don't want to know the location, okay.  Okay.  Well, listen, I'll get that to them, and then I'll reconvene after they've talked to you, and if there's an

**EXCEPTIONAL REPORTING SERVICES, INC**

**71**

agreement then we'll go forward.  Okay?

Okay.  Listen, I'm going to hang up now.  They'll be with you in 30 minutes.  Okay.

Why don't you both come up just informally.  Let me write this down and then destroy it, because -- we'll go off the record, I'm just giving counsel a phone number right now.

**(Pause)**

**THE COURT:**  Why don't we turn to counsel to make those phone calls, but I want to invite LAHSA up for just a moment and thank you for your courtesy in terms of being here.

By the way, I'd love to meet your director some time, your new director.

**MR. PARKER:**  Yes.

**THE COURT:**  Not a requirement, just a request, okay. And it's nice to see you.

**(Pause)**

**MR. PARKER:**  Good morning, Your Honor, Chandler Parker on behalf of LAHSA.  I am here also with Alejandro Palma --

**THE COURT:**  Pleasure, thank you, gentlemen. Appreciate it.

**MR. PARKER:**  He's the director of grant management and compliance, so.

**THE COURT:**  Okay.  Come up.

**MR. PARKER:**  And so we're here to answer any

questions the Court --

**THE COURT:** Now, you sent me an e-mail last night. I'm not certain -- it came into my chambers, I'm not certain if counsel were privy, so why don't you just read this documentation into the record and what you stated to the Court because I'm not sure when it came in last evening, if you were on that e-mail chain. I just can't remember. Did the City receive anything from LAHSA?

**MR. HAMBURGER:** We have a copy of it.

**THE COURT:** Okay. Did LA Alliance?

**MS. MITCHELL:** Yes, Your Honor.

**THE COURT:** Shayla, did you get anything?

**SPECIAL MASTER MARTINEZ:** No, Your Honor.

**THE COURT:** Well then we're going to -- County, did you get anything?

**MS. BRODY:** We did receive some -- an update on the LAHSA recoupment --

**THE COURT:** Right.

**MS. BRODY:** -- efforts yesterday evening if that's what you --

**THE COURT:** Okay. Well, let's just make sure. Why don't you make a record of this, okay.

**MR. PARKER:** Okay. Yes, we submitted --

**THE COURT:** It started with 50.8 then we collected about 13, then we collected 200,000 a little over, then we

**73**

collected 2.7.  So we have roughly $35 million out there.

MR. PARKER:  That's correct.  And we submitted an update, this is based on data as of September 2nd, 2025.  We --

MR. PALMA:  If I can --

MR. PARKER:  Yeah, go ahead.

MR. PALMA:  Your Honor, I'm going to try to give an overview.  The update we provided was an updated recoupment effort from the May submission.

THE COURT:  Right.

MR. PALMA:  So just to -- right, okay.  So we have a list of 34 service providers.  I'm not going to go into the list unless Your Honor requests us too, but just to give an overview.  Of the 34, we can confirm that 30 of these 34 have made a good faith effort.  They have recouped some amount of the outstanding balance.

So as Your Honor will recall, we do have 50.8 million roughly of Measure H working capital that was issued originally to 34 service providers.  In our last report we had presented a balance of 35.8 million.  The current balance we're presenting is 33.7 million.  This represents a recoupment effort of 2,000 -- a little over $2 million.

Now, this is the amount recouped from the May report that we issued to the Court.

THE COURT:  And that's in addition to the 13 approximately --

**74**

MR. PALMA:  Exactly.

THE COURT:  -- then the 200,000 between June and April --

MR. PALMA:  Right.

THE COURT:  -- I believe and then another 2 million.

MR. PALMA:  Exactly.

THE COURT:  About 2.4.

MR. PALMA:  Exactly.  And perhaps just to have -- if there are specific questions on service providers we would be happy to answer them, just to give perhaps a slight overview of the 34.  We do have 15 service providers that actually recouped in this period between May and September.  So service providers, 15 service providers actually sent in check or through electronic transfer.

12 service providers that had previously sent in an amount, again via check or electronic transfer didn't do so this time, we do note however, that the last reporting to the Court was in May, which represents the end of the fiscal year.  Some of these service providers, the staff is impacted, they're smaller and it's the start of the fiscal year.

And LAHSA's currently contracting, in the process of contracting out.  I'm not trying to justify that 12 service providers didn't --

THE COURT:  No, that's fine.

MR. PALMA:  -- but it does make sense in terms of the

EXCEPTIONAL REPORTING SERVICES, INC

**890**

**75**

period.

There are four service providers that we are working that haven't initiated yet their recoupment.  I would note that of the 34 we do have agreement letters of repayment for 33 of them.  The 34, there is one service provider that requested more time because for two reasons, one they were undergoing an audit and two they wanted to understand exactly the amounts, because these Measure H working capital amounts were issued years and years ago, 2018, 2019.

So they actually basically wanted to make sure that everything aligns with their records.  And we expect that letter to be signed with the service provider, which would be the last one by the end of this month.

**THE COURT:**  Thank you.  Let me get something out of this box behind me for just a moment.  Okay?

**(Pause)**

**THE COURT:**  First of all, let me start by thanking you for being here, okay.

Do you have any questions on behalf of LA Alliance?

**MR. UMHOFER:**  Not at this time, Your Honor.

**THE COURT:**  On behalf of the City?

**MR. HAMBURGER:**  No, Your Honor.

**THE COURT:**  On behalf of the County?

**MS. HASHMALL:**  No questions, Your Honor.

**THE COURT:**  Shayla?

**76**

**MS. MYERS:** No questions, Your Honor.

**THE COURT:** All right.

Are these actual cash return or are they in kind services they are counting?

**MR. PALMA:** I won't -- don't want to misspeak, but some I can confirm that some of these are actually electronic transfer and some of them are check. I would have to note if some of them are recoupments on active contracts. I could have -- we could have a response to that question --

**THE COURT:** Wait till November. I'm going to ask that in November.

**MR. PALMA:** Yeah, that's good to --

**THE COURT:** What is actually being returned and what are in kind payments or in kind, in like.

**MR. PALMA:** Your Honor, if I may, just to confirm in cases where the service provider says I can't, I opt to not send in a cash payment either electronically or a check, some of them do opt for the check, if they have an active contract and they submit invoices and those are appropriately, there is the last recourse of basically just saying, okay, well you're not going to receive cash payment from these invoices, because you have an outstanding Measure H working capital balance. So those would be the last effort.

If that happens, it wouldn't be that we're actually in service payments, we're basically just saying, LAHSA would

**EXCEPTIONAL REPORTING SERVICES, INC**

Case: 26-784  02/09/2026  DktEntry: 5.1  Page 148 of 297
Case 2:20-cv-02291-DOC-KES   Document 1034   Filed 09/17/25   Page 77 of 87   Page
ID #:29842

77

have reimbursed you X amount of dollars, but because you have an outstanding Measure H working capital, because you're not, for whatever reason and it's confirmed then we would say we're not going to reimburse you.

THE COURT:  Well, I'll leave that to you.  Once again the Court became concerned, because it didn't expect providers to ask these questions, because they're providers.  I didn't know if the City was going to ask these questions.  LAHSA certainly wasn't going to ask these questions, that's in good faith I understand.  And so it was left to ask these questions.

MR. PALMA:  Absolutely.

THE COURT:  And what attracted the Court was about the same time the Los Angeles Times was involved.  The Court had also discovered the $50.8 million, I think the Times was actually ahead of the Court in that regard.  And what was of concern at that time, which you gentlemen can't respond to, was the fact that this money was provided with no contract and no milestones.

Since then you represent that you have contracts now in place.  And the concern was overall, however you measure this money from Triple H to whatever funding source, it all goes towards homelessness.

And so it was the County's report that is in the opinion that I wrote, that really summarized a lot of these concerns.  And that report was on November 19th of 2024 and the

**78**

first finding was, that of the 82.5 million in Measure H working capital advances, in which LAHSA awarded $50.8 million to various subrecipients beginning in 2017 to 2018 to address the cash flow needs, the subrecipients were allowed to retain these advances across multiple fiscal years and were not required to pay the funds annually.

The County then went on in that report to state, however, LAHSA did not establish formal agreements with subrecipients to determine how and when the working capital advances would be repaid.

So the first question was, you know, was this simply going to go by the wayside for a period of time because there are no milestones, there's no accountability. And forgiven and forgotten, you know, ten years after this was provided to these providers. The recoupment at that time was only $2.5 million. So you've substantially increased that recoupment.

The second finding was that LAHSA specifically approved $15 million in outstanding cash advances, that money by and large had not been returned.

Third was that LAHSA was unable to produce accurate lists of all their contracts with EGMS, specifically while LAHSA indicated they had 1,273 active contracts as of May 2024, then you ran five different contract listings through EGMS and identified various contract totals ranging from 676 to 1,078.

At that time, you know, the Court expressed, I was

**79**

concern on the public that we even knew the number of contracts out there.  The finding by the County was that LAHSA was not tracking key data in EGMS or maintaining and then they were maintaining inaccurate data, all of the things that A&M was saying and HUD was saying was a whole history of saying the same thing starting in 2007.

And that's why A&M's report wasn't shocking to the Court.  Because almost every entity was saying the same thing, in fact, sometimes I wondered why we even had a performance evaluation of A&M because all this road marker saying exactly the same thing from the Blue Ribbon Commission to the County, to the Assessor, Controller.

What was of concern was in that finding in number 3, that all the contracts EGMS reports do not capture the dates. Now, you remember when I first became involved, I won't name the entity, but I saw one contract in 2022 where the provider just wrote, one line, $248,000, gave no dates and no information.

And every time Michelle and I touched or just delved into this initially we became very concerned about what happened to that 600 million in 2018, 2019 unaccounted for. Now, that doesn't mean fraud.  It doesn't mean services weren't provided, it's just -- of the six contracts, 75 percent the EGMS did not match the dates on the actual contract.  That's the finding by the County in number 3.

80

Four, the eight contracts, and remember they only monitored eight contracts, the term dates start -- dates actual contracts were adequately inaccurate.  Now, no criticism of you, okay, I know you're trying to make advances.

So the assessment by the County in their report was mirrored by A&M and HUD and the Blue Ribbon Committee headed by Miguel Santano (phonetic), yeah, all consistent before we ever got to the A&M report.  So the A&M report wasn't shocking.

And the statement is, do not have reliable and accurate information about fundamentally contracting merits, such as the quantity, timeliness in terms of their active contracts.  And so you've heard a discussion today about what the Court needs from the data monitor.

Number four was the inadequate controls over cash advances, LAHSA did not have other basic controls in place to ensure cash advances were appropriate properly accounted for and safeguarded.  As of September 6th, 2024 the County had already provided LAHSA with $115,658,400 in Measure H advances.

And number five, caused concern on everybody's part.  Number five was the inappropriate use of funds.  As a pass through government agency LAHSA submits reimbursement claims to its funders and must typically wait to be reimbursed before remitting payments to their subrecipients, unless other resources, such as cash advances are made available by the funders.

EXCEPTIONAL REPORTING SERVICES, INC

**896**

**81**

However, we noted instances where LAHSA paid the subrecipients prior to receiving reimbursement from funders, who did not provide cash advancements to make these payments, LAHSA used funds received from other government funders.

And the impact noted under number 5 was using funds received from one government funder to pay for services provided under another government funder's contract/grant constitutes the misuse of those funds. And it increases the risk that funder payments are not available for the purposes they were claimed to be received.

Now, I won't go on. There's other. I understand now that you have contracts in place; is that correct?

**MR. PALMA:** Yes, sir. Yes, Your Honor.

**THE COURT:** Okay. And will have a payment schedule that you believe will be met by I think 2027?

**MR. PALMA:** Yes, Your Honor.

**THE COURT:** And so therefore I think the public's entitled to know whether in-kind services versus cash reimbursement, everybody wants the providers to continue to provide so.

And under number seven, I'll finish this with the -- also the subrecipients, 36 recipients received this 34.6 million of the 50.8. But of the few entities that were monitored, the -- there was an understated amount of working capital advances to two subrecipients of $505,591 and did not

**82**

provide advanced request approval and disbursement documents to eight of the subrecipients of another 5 million.  And the impact is the increased use -- risk of misuse and/or misappropriation of funds if accounting records do not reflect actual amounts disbursed.  And working capital advances may hinder LAHSA's ability to accurately, effectively recover all the funds and fully repay the County.

I know there are different strengths.  I know, you know, Measure A obviously is coming on board, H, HHH, et cetera, but all this money goes into something called homelessness and trying to advance the wellbeing of the citizens including the homeless.

Let's leave this on the table.  I want to thank you for being present.  I'd love to meet your director at some time.  That can be informally or formally, it doesn't have to be here in court, but there's permission for that, okay?

**MR. PALMA:**  Thank you.

**THE COURT:**  And you can present if you want to.  All right.  Gentlemen, thank you very much for being here.

**MR. PARKER:**  Thank you, Your Honor.

**THE COURT:**  Let's leave this for November.  I'm going to request your presence once again.

Okay.  Counsel, I've finished the items that I wanted to talk to you about.  Do you have any new business to raise, otherwise I'll remain in session until you've talked to both

**83**

Ron and Daniel.

MR. UMHOFER:  Your Honor, I think Ms. Mitchell is out making those phone calls.

THE COURT:  Yeah, I'm just going to reconvene.  We'll just wait and I'll go through the lunch hour if needed to, so.

MR. UMHOFER:  That's fine with Alliance, Your Honor.

THE COURT:  Okay.

MR. SCHOLNICK:  Nothing else from us.

THE COURT:  I'll just be in the back room.  So I'd like to give you the afternoon free if we reach an agreement. I don't need lunch.  Do you need lunch?

So if we can, you know, if we can reach an agreement, let's free you up and get you back to your offices, okay?  Now, let me turn to the City.  Anything you'd like to state till we come back on the record?

MR. HAMBURGER:  No, nothing, Your Honor.  We'll make any calls that we need to make.

THE COURT:  Right.

MR. HAMBURGER:  We think we can get this done promptly.

THE COURT:  Okay.  And, Mira, how about you?

MS. HASHMALL:  Nothing to add, Your Honor.

THE COURT:  Shayla?

MS. MYERS:  Nothing to add, Your Honor.

THE COURT:  And I'm at your disposal.  I'm just in

EXCEPTIONAL REPORTING SERVICES, INC

**84**

the back, okay.

(Recessed at 11:05 a.m.; reconvened at 11:52 a.m.)

THE COURT:  Counsel, are you comfortable going back on the record?

MR. HAMBURGER:  Yes, Your Honor.

THE COURT:  If we need to, can we go into the lunch hour to give you the afternoon back?

MR. HAMBURGER:  Yes, Your Honor.

THE COURT:  I don't know how long this will take.

Now, we're back on the record in the LA Alliance for Human Rights versus the City of Los Angeles.  And, counsel, you have made your appearances, I'll turn the lectern over to each of the parties.

MS. MITCHELL:  Thank you, Your Honor.  I was able to speak with both Ron Galperin and Daniel Gary during the break. And we are from the Alliance perspective very comfortable with them.  I understand Daniel Gary has a good staff that can assist him with the technical and the data issues and I spoke to Mr. Galperin about kind of a partnership, and how I think that having somebody that's familiar with the issues in LA, the infrastructure, the homelessness response system, the budgets, all of that is important and how that can inform the data issues and vice versa.

So from the Alliance perspective, we're very comfortable with both of them.

EXCEPTIONAL REPORTING SERVICES, INC

**85**

THE COURT:  Okay.  Let me turn to the City.  Counsel?

MR. HAMBURGER:  Yeah, we're in agreement.  No objection.  We spoke with Mr. Gary and we've spoken with Mr. Galperin before.

THE COURT:  Well, I don't think that the County has --

MS. HASHMALL:  We have no position on this, Your Honor.

THE COURT:  Shayla?

MS. MYERS:  We were not involved in any of the conversations, so I don't have any further opinion.

THE COURT:  Okay.  All right.  Then I'm going to accept this and thank the parties for this good faith negotiation.  I want that on the record.  I think we can move forward and hopefully save a little bit of money as well. Okay?

MR. HAMBURGER:  And, Your Honor, just for the record I want to make clear again, it has to be subject to Council approval, from the City's perspective, but again what we've said before.

THE COURT:  And I'm hoping that the Council approves, because I don't know anymore cost effective way to get there. All these other entities from McKinsey on down are going to charge much more, but I'll leave that to the Council.  That's up to them.

EXCEPTIONAL REPORTING SERVICES, INC

**901**

**86**

MR. HAMBURGER: I just needed to state it for the record.

THE COURT: Well, do you have any time frame, because it takes a while to get on the Council record and I'm going to have the November hearing, and if we've reached this agreement, I don't want this to come up again in November.

MS. MARIANI: Understood, Your Honor. And as I represented before, our office will certainly work to prioritize getting this on the agenda.

THE COURT: Okay. Let's just leave that in good faith. Thank you very much.

MS. MARIANI: Thank you.

THE COURT: I just have one last thing. We had a Special Master's payment on the agenda for today. And going forward, I want to ensure the Special Masters and all the reported parties are paid on time. Okay?

MR. HAMBURGER: Yes, Your Honor.

THE COURT: Good afternoon. Thank you very much for your courtesy today.

**(Proceedings concluded at 11:54 a.m.)**

**\* \* \* \* \***

87

## CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          **September 17, 2025**

**Signed**                                         **Dated**


*TONI HUDSON, TRANSCRIBER*

**EXCEPTIONAL REPORTING SERVICES, INC**

903

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                     Date:  October 14, 2025

Title: LA ALLIANCE FOR HUMAN RIGHTS, ET AL., V. CITY OF LOS ANGELES, ET AL.

---

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Karlen Dubon | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

---

**PROCEEDINGS (IN CHAMBERS):   ORDER RESOLVING THIRD-PARTY MONITOR APPOINTMENT AND SCOPE OF WORK**

On October 10, 2025 the City of Los Angeles (the "City") and Plaintiffs LA Alliance for Human Rights et al. (the "Alliance") submitted a Joint Report (Dkt. 1045) "to update the Court regarding the status of the City Council's approval of the third-party Monitor" and "to request the Court's review and resolution of the issue pursuant to Section 24 of the Settlement Agreement." Joint Report at 1. As the Parties recognize, Section 24 of the Settlement Agreement (Dkt. 429-1) provides that:

> If a dispute arises between the Plaintiffs and the City regarding the interpretation, performance, or enforcement of this Agreement . . . [and] [i]n the event that the Parties are unable to resolve the dispute within a reasonable time after [] meeting Plaintiffs or the City may, pursuant to the Order, submit the matter to the Court for review and decision.

**904**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: October 14, 2025
                                                                    Page 2

Because the Parties have jointly requested the Court utilize its authority under Section 24 to resolve the Parties' dispute over the Monitor's appointment and scope of work, the Court now does so.

## I.    BACKGROUND

Section 7.2 of the Parties' Settlement Agreement provides that "[t]he Parties will engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of this Agreement."

On June 24, 2025, the Court ordered—with respect to this provision—that the City was to "[m]eet and confer with Plaintiffs on selecting a third-party Monitor by August 22, 2025, and select this Monitor by September 12, 2025, subject to the Court's approval." Order Granting in Part and Denying in Part Plaintiffs' Motions for Settlement Compliance (Dkt. 991) at 57. This Order is grounded in the agreements set forth by the parties in their Settlement Agreement (Section 7.2). *Id.* at 50. 54:

- The Monitor will "at least be" responsible for reviewing and verifying the city's data prior to publication, resolving data issues, and providing public reports on data compliance;
- The Monitor will have full access to the data the City uses to create its reports;
- The Monitor shall review and provide guidance on public accessibility to the City's contracts and invoices;
- The Monitor will confirm that shelter or housing offers were made with respect to the encampment reductions.

The Court then set a Status Conference regarding monitor selection for September 16, 2025 (the "Status Conference"). Order Setting Status Conference on Monitor Selection on September 16, 2025 (Dkt. 1026). Prior to the Status Conference, the Parties jointly proposed Ron Galperin or McKinsey & Company to serve as monitor, "subject to Court and City Council approval, subject to their willingness to serve as the monitor, and subject to [various technical] qualifications." Joint Submission Re: Selection of Third-Party Monitor (Dkt. 1033) at 1. Specifically, LA Alliance noted that it "believes that the appointed monitor will need to be assisted by a team with the requisite data, technological, and infrastructure training, knowledge, and experience at the City's cost." *Id.*

905

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                               Date: October 14, 2025
                                                                          Page 3

At the Status Conference, the Court rejected McKinsey & Company because of its prior role with respect to the marketing of OxyContin—a drug that has perpetuated the homeless crisis, and expressed reservations regarding Mr. Galperin because of his associations with the City and a lack of technical expertise qualifications. *See generally id.* The Court also restated and elaborated on the requisite criteria for the Monitor, *id.* at 12-13, including that:

- The need for "experience with real time data auditing and timestamp validation," along with "applied knowledge of data integrity and source attribution protocols. This includes the ability to assess whether reported data is accurate, complete and traceable to its original source, whether it's through timestamp documentation, system logs or field level records."
- The Monitor "should be fluent in protocols that distinguish verified data from estimates of placeholders and capable of validating that all figures are supported by primary evidence."
- The Monitor will need to be able to determine whether, for example, "the data at issue best modulated or modeled by normal distribution or binomial distribution [and] to compute such metrics as the main variance and standard deviation to analyze  the data for purposes of evaluating consistency across datasets."

In short, the Court noted that "essentially what's required is a data analyst who has the capacity to [do more than] just collect data." *Id.* at 12:24-25.

In light of this criteria, at the Status Conference "[b]y stipulation of the parties, Daniel Garrie and Ron Galperin [were] selected as the proposed Third Party Monitors pending Los Angeles City Council approval." Status Conference Re Monitor Selection (Dkt. 1036) at 1. Furthermore, the City of Los Angeles's counsel represented at that hearing that "our office would certainly help prioritize getting it on the agenda and making the recommendation [to the Council]." Status Conference Tr. (Dkt. 1034) at 8:4-6.

However, despite this stipulation and these representations, the City Council has repeatedly delayed the vote to confirm the Monitor appointment. Joint Status Report Regarding City Council Consideration of Proposed Third-Party Monitors (Dkt. 1041). Over a month has passed with three calendar dates with no action by the City. Special Master Statement (Dkt. 1042) at 4-5. The Alliance also protested that the City unfairly excluded it from negotiations with the Monitor regarding the scope of work for Mr.

**906**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: October 14, 2025
                                                                                Page 4

Galperin and Mr. Garrie. Joint Status Report (Dkt. 1041). Special Master Michele Martinez also provided an update regarding the continued delay in appointing the Monitor: "The parties have proposed multiple candidates, and the Court has articulated clear criteria for the Monitor's qualifications. While collaborative selection remains the intent of Section 7.2, the current delay—documented in the Joint Status Report and reflected in the transcript—has constrained the Court's ability to enforce the Agreement as contemplated." Special Master Statement at 6.

Now, the Court has been apprised that "the City Council was scheduled to vote on two proposed Monitors, Ron Galperin and Daniel Garrie, at its October 7, 2025 meeting," but that the Council did not vote at the meeting and instead referred the matter to the Housing and Homelessness Committee. Joint Report at 1. In fact, [t]he City is no longer amenable to having Mr. Garrie serve as a Monitor." Specifically, the City complains of Mr. Garrie's "unduly expansive and overly broad proposed scope of work, his unnecessarily large and expensive proposed team, and his refusal to provide a budget." *Id.* Now, the City instead proposes a combination of former City Controller Mr. Galperin and current City Controller Kenneth Mejia. *Id.*

In contrast, the Alliance claims that "[t]he City has since dragged its feet in submitting the [monitor] issue to City Council and has now continued the vote twice before sending the issue to committee—essentially a refusal to vote." *Id.* at 3. Instead, it "proposes that Mr. Daniel Garrie, Esq. be appointed as monitor with Ron Galperin in a supporting role to navigate the difficult systems within the City." *Id.* at 3. The Alliance also notes that the appointment suggested by the City is unnecessarily duplicative, and lacks a true neutral given the Controllers' affiliation with the City. *Id.* at 5-6.

The Parties also quibble over the scope of work that should attach to the appointment monitor and provide competing visions. *See id.* Exs. A-B. The City accuses the Alliance of adding superlative terms to the scope of work, while the Alliance maintains that its scope of work reflects what is actually needed for the Monitor to complete meet its goals. *Id.* at 6-10.

## II.    MONITOR APPOINTMENT

The Court appoints Daniel Garrie to the Monitor position. Kenneth Mejia, current Los Angelos City Controller, will support Mr. Garrie, without further cost to the City, in the execution of his role by facilitating data access and coordination, per Daniel Garrie's discretion. In addition, Mr. Mejia is currently the most knowledgeable person regarding

**907**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. 2:20-cv-02291-DOC-KES                          Date: October 14, 2025
                                                                      Page 5

the myriad and complex funding streams involved with the homelessness system—he would not require further payment either. Daniel Garrie and his team have the technical expertise and prior experience to review the City's data, as well as verify validity of that data.

The Court understands the City's concerns regarding Mr. Garrie's scope of work and expenses related to his position, but finds that Mr. Garrie remains the most viable option for Monitor. Without cooperation from the City, Mr. Garrie cannot provide a precise budget. The scope and effort of his work will be determined by the City's data, systems, and documentation. Rather than provide an imprecise estimate divorced from the realities on the ground, Mr. Garrie will provide an estimate upon review of the systems currently in place. The Court also finds that Mr. Garrie is the most economical choice of the options presented. His discounted rate of $750/hour[1] is the lowest compared to other candidates such as Ron Galperin who would charge $800/hour, plus fixed fees. *See* Special Master Statement at 13-14. Additionally, Mr. Garrie will not be charging for his travel time or travel expenses.

The Court acknowledges Mr. Galperin's distinguished public service and prior role as City Controller. His experience in public reporting and stakeholder engagement is commendable, and the Court appreciates his willingness to serve. The Monitor role under Section 7.2 is not ceremonial or advisory—it requires specialized technical expertise in timestamp validation, field-level data auditing, and real-time verification. The Court finds that Mr. Garrie's technical qualifications are better suited to fulfill the Monitor's independent verification duties.

Finally, the Court notes that appointing Mr. Garrie as a single, technically qualified Monitor—supported by City liaison Mr. Mejia—offers a more efficient and cost-effective structure for the City while preserving the independence and enforceability required under the Agreement.

While the Court appreciates the City's claims of being in a fiscal crisis, the webs of this crisis have been spinning for years and cannot be excused because there will always be a crisis. *See* Parties' Joint Report at 3-4 (noting that "if the City is concerned about budgetary issues [it is] surprising given its publicly disclosed $6 million spend on outside counsel in this case").

---

[1] Mr. Garrie notified the City and Special Master Martinez of his rate previously which remains unchanged.

**908**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: October 14, 2025
                                                                            Page 6

**III.    SCOPE OF WORK**

The Scope of Work was adequately set forth in the Court's Order Granting in Part and Denying in Part Plaintiff's Motion for Settlement Compliance (Dkt. 991) and further elaborated on at the September 16, 2025 Status Conference. The Court declines to rule further until, at a minimum, the Monitor has rendered an initial assessment.

The appointment of the Monitor shall take effect immediately upon the issuance of this order. This will allow the Monitor sufficient time to review and assess the October 15 quarterly report. The City must make arrangements with the Monitor so he can meet the forthcoming November 12, 2025 deadline for an initial assessment.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                    Initials of Deputy Clerk:
                                                                            kdu
CIVIL-GEN

**909**

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
   tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
   mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
   kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
   bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
   akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
   pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiff, <br><br> v. <br><br> CITY OF LOS ANGELES, a Municipal entity, et al., <br><br> Defendant. | CASE NO. 2:20-cv-02291 DOC (KES) <br><br> **NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES** <br><br> Honorable David O. Carter, United States District Judge <br><br> Action Filed:    March 10, 2020 |

Gibson, Dunn &
Crutcher LLP

910

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that Defendant City of Los Angeles hereby appeals to the United States Court of Appeals for the Ninth Circuit from (1) this Court's order dated October 14, 2025 appointing a third-party monitor and addressing the scope of the monitor's work (Dkt. 1048), and (2) this Court's order dated October 15, 2025 defining the duties of the special master (Dkt. 1050).

DATED: October 22, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Theane Evangelis
　　Theane Evangelis

*Attorneys for Defendant CITY OF LOS ANGELES*

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
　tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
　mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
　kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
　bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
　akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
　pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California 90012
Telephone: 213.978-7508
Facsimile: 213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant CITY OF LOS ANGELES*

Gibson, Dunn & Crutcher LLP

2

NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

911

# REPRESENTATION STATEMENT
### Ninth Circuit Rule 3-2(b)

**Counsel for Defendant City of Los Angeles**

Theane Evangelis
  tevangelis@gibsondunn.com
Marcellus McRae
  mmcrae@gibsondunn.com
Kahn A. Scolnick
  kscolnick@gibsondunn.com
Bradley J. Hamburger
  bhamburger@gibsondunn.com
Daniel R. Adler
  dadler@gibsondunn.com
Patrick J. Fuster
  pfuster@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile:   213.229.7520

Hydee Feldstein Soto
Valerie Flores
Arlene N. Hoang
Jessica Mariani
CITY ATTORNEY'S OFFICE
200 North Main Street
City Hall East, 6th Floor
Los Angeles, CA 90012
Telephone:  213.978.7508

**Counsel for Defendant County of Los Angeles**

Mira Hashmall
  mhashmall@millerbarondess.com
Jason H. Tokoro
  jtokoro@millerbarondess.com
Lauren M. Brody
  lbrody@millerbarondess.com
MILLER BARONDESS LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, CA 90067
Telephone:  310.552.4400
Facsimile:   310.552.8400

Gibson, Dunn &
Crutcher LLP

NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

912

**Counsel for Plaintiff LA Alliance for Human Rights**

Matthew Donald Umhofer
   mumhofer@umklaw.com
Elizabeth A. Mitchell
   emitchell@umklaw.com
UMHOFER, MITCHELL & KING LLP
767 South Alameda Street, Suite 221
Los Angeles, CA 90017
Telephone:  213.394.7979
Facsimile:   213.529.1027

**Counsel for Intervenors Orange County Catholic Worker, Los Angeles Catholic Worker, and Los Angeles Community Action Network**

Shayla R. Myers
   smyers@lafla.org
Isabelle M. Geczy
   igeczy@lala.org
LEGAL AID FOUNDATION OF LOS ANGELES
1550 West 8th Street
Los Angeles, CA 90017
Telephone:  213.640.3983
            323.801.7990

Carol A. Sobel
   carolsobel@aol.com
LAW OFFICE OF CAROL A. SOBEL
725 Arizona Avenue
Santa Monica, CA 90401
Telephone:  310.393.3055

Catherine Sweetser
   catherine.sdshhh@gmail.com
SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP
11543 Olympic Boulevard
Los Angeles, CA 90064
Telephone:  310.396.0731

Brooke Weitzman
   bweitzman@eldrcenter.org
William Wise
   bwise@eldrcenter.org
ELDER LAW AND DISABILITY RIGHTS CENTER
1535 East 17th Street, Suite 110
Santa Ana, CA 92705
Telephone:  714.617.5353

Gibson, Dunn &
Crutcher LLP

NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

913

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
  kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>Defendant. | CASE NO. 2:20-cv-02291 DOC (KES)<br><br>**DECLARATION OF KAHN A. SCOLNICK IN SUPPORT OF EX PARTE APPLICATION FOR STAY OF ORDER APPOINTING DANIEL GARRIE AS MONITOR PENDING APPEAL**<br><br>Honorable David O. Carter, United States District Judge<br><br>Action Filed:    March 10, 2020 |

DECLARATION OF KAHN A. SCOLNICK IN SUPPORT OF EX PARTE APPLICATION FOR
STAY OF ORDER APPOINTING DANIEL GARRIE AS MONITOR PENDING APPEAL

914

I, Kahn A. Scolnick, declare as follows:

1.      I am an attorney admitted to practice law in the State of California.  I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, and I am one of the attorneys representing the City of Los Angeles in the above-referenced action.  I submit this declaration in support of the City of Los Angeles's Ex Parte Application for a Stay Pending Appeal.  If called and sworn as a witness, I could and would testify competently to the following:

2.      On August 8, 2025, I participated in a meet and confer discussion with Matthew Umhofer, counsel for the Alliance.  Attached as **Exhibit A** is a true and correct copy of the certified transcript from that meet and confer discussion.

3.      On August 22, 2025, I participated in a second meet and confer discussion with Elizabeth Mitchell, counsel for the Alliance.  Attached as **Exhibit B** is a true and correct copy of the certified transcript from that meet and confer discussion.

4.      On September 16, 2025, I appeared on behalf of the City at a status conference to discuss the Court's approval of one of the two proposed monitors the parties had jointly proposed.  At the status conference, the Court called both Ron Galperin and Daniel Garrie on the record, and then instructed counsel for the parties to call Mr. Galperin and Mr. Garrie outside of the Court's presence to discuss potentially serving as a monitor.  As directed by the Court, during a break, I and other counsel for the City spoke briefly with Mr. Garrie to ask about the rates he and his team might charge for this work; during that call, Mr. Garrie told us that he had received a call from Judge Carter several days before the status conference about potentially serving in the monitor role.

5.      Attached as **Exhibit C** is a true and correct copy of an email I received from Daniel Garrie on September 28, 2025.

6.      Attached as **Exhibit D** is a true and correct copy of an email I received from Daniel Garrie on October 17, 2025.

7.      On October 22, 2025, I provided notice of this ex parte application to

Gibson, Dunn & Crutcher LLP

2

DECLARATION OF KAHN A. SCOLNICK IN SUPPORT OF EX PARTE APPLICATION FOR STAY OF ORDER APPOINTING DANIEL GARRIE AS MONITOR PENDING APPEAL

915

counsel for the Alliance, the County, and Intervenors via email, and I asked for their availability to discuss this on a telephone call.  Elizabeth Mitchell, counsel for the Alliance, responded to my email, indicated that the Alliance intended to oppose this ex parte application, and confirmed that the City had complied with its meet and confer obligations under Local Rule 7-19.1 without the need for any phone call.  Attached as **Exhibit E** is a true and correct copy of Ms. Mitchell's response to my October 22, 2025 email.

8.     Shayla R. Myers, counsel for Intervenors, responded to my email to state the Intervenors "do not intend to take a position on the *ex parte* but reserve the right to do so depending on the contents of the application."  And Lauren Brody, counsel for the County of Los Angeles, agreed with me that it wasn't necessary for the County to take a position on this ex parte.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I executed this Declaration in Los Angeles, California. Executed this 22nd day of October, 2025.

*/s/ Kahn A. Scolnick*
Kahn A. Scolnick

Gibson, Dunn & Crutcher LLP

3

DECLARATION OF KAHN A. SCOLNICK IN SUPPORT OF EX PARTE APPLICATION FOR STAY OF ORDER APPOINTING DANIEL GARRIE AS MONITOR PENDING APPEAL

916

LAW AND FORENSICS
DANIEL B. GARRIE
 *daniel@lawandforensics.com*
10665 Durland Ave NE
Seattle, Washington 98125
Telephone:  855.529.2466

*Monitor*

**F I L E D**
CLERK, U.S. DISTRICT COURT

11/3/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA Alliance for Human Rights, *et al.*,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>City of Los Angeles, *et al.*<br><br>                    Defendants. | Case No. 2:20-CV-02291-DOC-KES<br><br>Honorable David O. Carter<br>United States District Judge<br><br>**STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025**<br><br>Action Filed:        March 10, 2020 |

**917**

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to the Court's October 14, 2025 Order Resolving Third-Party Monitor Appointment and Scope of Work (Dkt. 1048) ("Order Appointing Monitor"), the Monitor submits this Status Report for October 2025 ("Status Report").

## I.    Overview

This interim Status Report updates the Court and the Parties on the Monitor's efforts to "provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of [the Parties' Settlement] Agreement" (Dkt. 421-1). The Court subsequently explained that the Monitor:

- will 'at least be' responsible for reviewing and verifying the [C]ity's data prior to publication, resolving data issues, and providing public reports on data compliance;
- will have full access to the data the City uses to create its reports;
- shall review and provide guidance on public accessibility to the City's contracts and invoices;
- will confirm that shelter or housing offers were made with respect to the encampment reductions

(Dkt. 1048 at 2, *citing* Dkt. 991 at 50) ("Monitor's Duties").

As detailed further below, in the almost three weeks since the Order Appointing Monitor, the Monitor has made an effort to fulfill the Monitor's Duties efficiently. However, the procedural process requested by counsel for the City ("City Counsel") has slowed progress. The City Counsel instructed the Monitor not to contact any City employees directly. Instead, all communications must pass through City Counsel in the first instance: City Counsel rejected the Monitor's proposed compromise to copy counsel. The necessary consequence of this restriction is an increase in the time and costs associated with executing the Monitor's Duties.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

**918**

At present, the Monitor has only been able to engage in the *scheduling* of scoping interviews with key City subject matter experts. No interviews have occurred. In addition, the Monitor's review of the publicly reported summary (*i.e.*, not source) "Intervention Data" in the City's quarterly reports indicated numerous data collection, definition, and reporting issues that must be addressed before any analysis can be performed.

Thus, despite his best efforts to streamline communications and effort, and notwithstanding the Court's directive that "[t]he City must make arrangements with the Monitor so he can meet the forthcoming November 12, 2025 deadline for an initial assessment" (Dkt. 1048, at 2), the Monitor does not anticipate being able to provide a substantive update to the Court at that hearing.

## II. Monitor's Efforts to Obtain Access to Staff and Information

Immediately after learning of the Court's appointment, the Monitor[1] initiated outreach to start the process of assessing the City's systems and data related to persons experiencing homelessness ("PEH"). The morning of October 15, 2025, the Monitor communicated with Special Master Michele Martinez ("Special Master"), who suggested that the Monitor reach out to City Controller Mejia ("Controller Mejia") to discuss the Order Appointing Monitor. The Monitor emailed Controller Mejia later that day seeking an introductory meeting.

The next day, on October 16, 2025, the Monitor engaged in a video conference call with Controller Mejia and his staff. The attendees discussed the Monitor's Duties and the Court's instruction that Controller Mejia "will support [the Monitor], without further cost to the City, in the execution of his role by facilitating data access and coordination." (Dkt. 1048, at 4). In addition to providing an overview of his office's efforts, Controller Mejia expressed his willingness to assist the Monitor, including helping to identify and connect the Monitor to relevant City subject matter

---

[1] References to the Monitor regarding communications are inclusive of his staff.

Page 2

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

919

experts.

On October 18, 2025, the Monitor emailed the City's Chief Administrative Officer, Matt Szabo ("CAO Szabo") after receiving his contact information from Controller Mejia. *See* **Exhibit 1**. The Monitor sought clarifying information regarding the Intervention Data in the City's Quarterly Report for the period ending September 2025 (Dkt. 1051) ("September 2025 Report"). *See* **Exhibit 1**. Specifically, the Monitor attached an Excel workbook that included the following tabs (*aka* worksheets): three (3) identical questions about each entry in the Intervention Data table; six (6) questions about the City's data systems; and ten (10) general questions. *Id.* In addition, the Monitor requested an interview the following week, on October 23, 2025, with CAO Szabo "or a member of your team who can answer these questions." *Id.*

On October 21, 2025, City Counsel Scolnick emailed the Monitor regarding the data and scheduling request to CAO Szabo, stating that the Monitor had "pos[ed] several hundred questions and request[ed] various in-person interviews." *See* **Exhibit 2**. Noting that "[t]he City is a represented party in this litigation," City Counsel wrote, "[p]lease do not contact City officials or employees directly. If you'd like to speak with City officials or employees, please make those requests through counsel, and we can coordinate." *Id.* City Counsel Scolnick also referenced the City's impending appeal of the Order Appointing Monitor and request for a stay pending appeal, stating "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." *Id.*

That same day, the Monitor responded to City Counsel Scolnick's email. *See* **Exhibit 3**. The Monitor agreed to "ask the court to clarify how it expects me to communicate with the City's staff: directly or through its attorneys." *Id.* Highlighting that the Order Appointing Monitor specifically directs the Monitor to collaborate with Controller Mejia, the Monitor asked City Counsel to confirm "which City officials and employees you represent and whether your representation

Page 3

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

**920**

extents to [Controller Mejia]." *Id.* The Monitor pointed out that he had sent CAO Szabo "twenty-four questions cover[ing] straightforward topics with which the City is intimately familiar and that it should be able to answer easily." *Id.* The Monitor closed the email by emphasizing the urgency of the request due to the demanding timeline set by the Court and stating that "[t]he City's prompt response to these questions will help us move forward collaboratively and efficiently." *Id.*

On October 22, 2025, City Counsel Scolnick responded. *See* **Exhibit 4**. First, he requested that City Counsel be notified if the Court "direct[s] you to engage in direct outreach and/or contact with City officials and employees <u>other than</u> <u>Controller Mejia</u>." *Id.* (emphasis in original). Second, while noting that "Controller Mejia . . . just like every other City official and employee" is "represented by the "City . . . and by Gibson Dunn in this litigation," City Counsel Scolnick "consent[ed] to" the Monitor's direct communication with him. *Id.* However, City Counsel stated that "we are not consenting to your direct communications with any other City official or employee." *Id.* Third, City Counsel Scolnick indicated that the City could not fully answer the Monitor's questions about the September Quarterly Report, questioning "whether this level of detail is actually required to verify the quarterly report data" and noting that "[t]he CAO also does not have all of the information readily available for each 'System / Dataset' Listed." *Id.* Finally, regarding setting an interview with CAO Szabo, City Counsel stated the interviewee would be out of the country until October 31, 2025, and requested pushing the meeting until the following week. *Id.*

On October 24, 2025, the Monitor and City Counsel Scolnick engaged in a volley of numerous emails regarding correspondence protocol (*e.g.*, who to copy on what emails, the City's objection to "*ex parte* communications with counsel for any of the parties," what to do if privileged communications are accidentally emailed, etc.). *See* **Exhibit 5** (email chain). In the final email related to that chain, Plaintiff's counsel stated that they "are happy to waive ex parte communications [involving the

Page 4

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

921

Monitor] . . . [because] [t]hat's how things have historically been done over the last five years." But since "the City's lawyers are now insisting on being involved in every communication, then we also need to be included." *See* **Exhibit 6**.

On October 27, 2025, City Counsel Scolnick emailed the Monitor "preliminary information in response to your various questions to the CAO's office" regarding the September Quarterly Report. *See* **Exhibit 7**. Noting the compressed time schedule, City Counsel Scolnick stated that "the City has not had sufficient time to fully evaluate these responses with all relevant stakeholders for completeness and accuracy." *Id.* He also wrote that the City "would appreciate being kept on communications with LAHSA as well." *Id.*

On October 28, 2025, Controller Mejia emailed City employee Edwin Gipson to facilitate a meeting between him and the Monitor. *See* **Exhibit 8**. Referencing the email protocol discussed in **Exhibit 7**, Controller Mejia included "all Alliance counsel (the City's, Alliance, intervenors) in th[e] email." *Id.* City Counsel Scolnick sent a response to the original recipients "[d]ropping Mr. Gipson from th[e] chain" and stating that all communications from the Monitor or Controller Mejia "should be made through the City's counsel and then we can coordinate." *See* **Exhibit 9**. The Monitor responded, apologizing for the inconvenience and noting that "it was [his] understanding that Mr. Mejia was permitted under the [Order Appointing Monitor] to coordinate the meetings with the City." *See* **Exhibit 10**. The Monitor stated that he "will seek immediate clarification from the Court regarding Mr. Mejia's involvement." *Id.*

In a separate branch of that email chain on the same day, the Monitor formally requested that City Counsel Scolnick "[p]lease work with . . . my team to co-ordinate the meeting" with Mr. Gipson. *See* **Exhibit 11**. City Counsel Scolnick responded "[w]ill do." *See* **Exhibit 12**.

On October 31, 2025, having not received a response from City Counsel Scolnick, the Monitor sent a follow-up email to schedule the meeting with Mr.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

922

Gipson. *See* **Exhibit 13**. City Counsel Scolnick responded "[y]es, I had been waiting to hear from you. Will check and get back to you." *See* **Exhibit 14**. Later that day, City Council emailed: "I learned that Mr. Gipson is out of the office until Monday, so we'll touch base with you as soon as we hear back from him on Monday." *See* **Exhibit 15**.

### III.   Information Gathering Efforts

As the above communications establish, the Monitor has encountered numerous issues in obtaining information from the City. The City has required that the Monitor funnel all requests for information or meetings through City Counsel. *See* **Exhibits 2-4**. The City extended this restriction to "any *ex parte* communications with counsel for any of the parties," *see* **Exhibit 5**, despite such communications being the *status quo* for the previous five years. *See* **Exhibit 6**. City Counsel also applied these limitations to Controller Mejia, notwithstanding the directive in the Court's Order Appointing Monitor that the Controller provide support "by facilitating data access and coordination." *See* **Exhibits 8-9**.

The City's procedural requirements have delayed the Monitor in his ability to perform Court-appointed duties. Channeling all requests through City Counsel necessarily introduces temporal lag and material inefficiencies. Therefore, the Monitor has yet to meet any City staff; the first meeting, with CAO Szabo, is scheduled for today, November 3, 2025.

In sum, the City, through its counsel, has delayed the Monitor's timely execution of his Court ordered responsibilities.[2]

### IV.   Data Concerns

A review of the summary Intervention Data that attend the City's quarterly reports raises several questions about the collection, definition, and reporting of the

---

[2] By requiring all communications to flow through counsel rather than permitting direct engagement with City staff, the City has delayed data collection, postponed interviews, and constrained the Monitor's ability to meet Court-imposed deadlines.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

**923**

underlying data.

The Monitor attempted to obtain answers to some of these questions in his first query to the City. *See* **Exhibit 1**. The City's "initial responses were prepared under a compressed scheduled" and without the benefit of "sufficient time to fully evaluate the[m] with all relevant stakeholders for completeness and accuracy." *See* **Exhibit 6**. Giving proper deference to this caveat, the responses are inadequate. For example, the Monitor asked the following regarding the entries on the Intervention Data table: "From which City system(s)/database(s) were the reported 'Units/Beds,' 'Status,' and 'Open & Occupiable Date' generated?" *See* **Exhibit 1** at 3-16. Rather than identify the underlying *system(s) or database(s)*, the City responded with statements regarding the *entity* that collected the data (*e.g.*, "The Los Angeles Housing Department provides the 'Units/Beds' and 'Status' information," "Data is confirmed quarterly by HACLA Asset Management staff," "CAO maintains records of the beds, status, and open and occupiable date," "Information was confirmed by the Community Investment for Families Department (CIFD)," etc.). *See* **Exhibit 6** at 24-25.

The Monitor also asked specific questions about ten (10) systems and datasets, including who the system owner was, how frequently the data is updated, and how data governance is handled. *See* **Exhibit 1** at 17-19. The City's responses were circumscribed and also deferred to a third-party data maintainer (*e.g.*, "LAHSA is the system owner") for key datasets like the Homeless Management Information System ("HMIS"). *See* **Exhibit 6** at 24-25. In addition, although the Monitor's questions sought information on each of the ten (10) systems identified, the City's responses to some of the questions regarding these systems was to not provide sufficient and/or appropriate technical details. *Id.*

Several of the Monitor's questions concerned the City's definition and count of PEH, in part because the September 2025 Report did not include data on "Total PEH Served." (Dkt. 1051, Exhibit A). Instead, the City's entry for this column of

Page 7

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

data was either "Pending" or blank (*i.e.*, an empty field). *Id.* By way of explaining the missing data, in Footnote 2 to Exhibit A of the September 2025 Report, the City wrote:

> This Quarterly Report does not include information regarding the number of persons experiencing homelessness served by the current intervention opportunities. The City has not been able to collect and verify that information in the time provided to complete this Report. The City is continuing to work to collect that information, and will supplement this Report when it is able to do so.

*Id.* at 10. However, the City's prior quarterly reports included PEH information.

One of the Monitor's questions about PEH inquired how the City defines the term. The City responded that it "uses HUD's definition of homelessness, which can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/." *See* **Exhibit 6** at 27. But the HUD link identifies four (4) categories of homelessness, not a definition of PEH. This distinction illustrates the problem with the City's response. For example, it is not clear how the City identified and counted the second HUD category, "Imminent Risk of Homelessness," which captures the risk of a future loss of a primary residence. Similarly, the City's referral to the third HUD category "Homeless Under Other Federal Statutes," requires the Monitor to perform an iterative search of federal law. Adding to the lack of definitional clarity, the HUD website notes that "HUD has not authorized any CoC to serve the homeless under Category 3."

More fundamentally, the City's responses highlight a core concern with the quarterly reports; they provide summary data on three quantitative measures (*i.e.*, "Units/Beds," "Status," and "Total PEH Served") that the City cannot readily define, provide basic information about, or confirm are treated consistently across reporting entities. For example, the City-provided definition of "Units/Beds" does not actually

Page 8

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

925

define either term, instead using the terms themselves in the "definition." **Exhibit 6** at 27 (Definition of Units/Beds: "Number of units/beds serving people experiencing homelessness counting toward Settlement requirements."). The utility of this definition, particularly its use of the phrase "*serving* people experiencing homelessness," is further called into question by the lack of any data in the "Total PEH Served" column of the September 2025 Report. (Dkt. 1051, Exhibit A). It begs the question of how a unit or bed can be counted as serving PEH if there are no data about the number of PEH being served.

**V.      Conclusion**

The Monitor has not yet interviewed any City staff and has been unable to gain sufficient data and/or information about the City's data collection, management, analysis, and reporting methods.[3] In short, the Monitor does not anticipate having sufficient information to give a substantive report at the upcoming November 12, 2025 hearing.

Dated:  November 3, 2025                     Respectfully submitted,

                                                                  /s/
                                                                  Daniel B. Garrie
                                                                  Law and Forensics
                                                                  *Data Monitor*

---

[3] There are also real-world impacts on the Monitor's ability to perform his duties efficiently and effectively that flow from the City's Ex Parte Application for Stay of Order Appointing Daniel Garrie as Monitor (Dkt. 1054) and the related appeal (Dkt. 1053). City Counsel Scolnick informed the Monitor that "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." See Exhibit 2. In other words, until the Court and the Ninth Circuit make a final determination, the City challenges both the validity of the Monitor's appointment and any interim fees that the Monitor incurs.

Page 9

# EXHIBIT 2

 Outlook

## RE: LA Alliance v. City of LA

**From:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Sent:** Tuesday, October 21, 2025 6:02 PM
**To:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>
**Subject:** LA Alliance v. City of LA

Mr. Garrie, we understand that you sent an email to Matt Szabo, the City Administrative Officer, posing several hundred questions and requesting various in-person interviews. The City is a represented party in this litigation; Gibson Dunn represents the City. Please do not contact City officials or employees directly. If you'd like to speak with City officials or employees, please make those requests through counsel, and we can coordinate. In the meantime, we'll have the CAO's office start looking into your written questions. As for an interview with Mr. Szabo, we will follow up with some dates/times when he and a member of the legal team would be available for an interview.

Finally, as I noted previously, the City reserves all rights regarding your work as a Monitor in this matter and any fees you may later seek to charge to the City. The City will be filing an appeal from the Approval Order this week and will ask Judge Carter (and if necessary, the Ninth Circuit) to stay the Approval Order pending the appeal. Thank you.

**Kahn A. Scolnick**

T: +1 213.229.7656
KScolnick@gibsondunn.com

### GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

**928**

# EXHIBIT 3

929

 **Outlook**

---

## RE: LA Alliance v. City of LA

---

**From:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Sent:** Tuesday, October 21, 2025 6:55 PM
**To:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Kenneth Mejia <kenneth.mejia@lacity.org>; Daniel B. Garrie <Daniel@lawandforensics.com>
**Subject:** Re: LA Alliance v. City of LA

---

Counsel,

Thank you for your email and your continued assistance in this matter.

At your suggestion, I will ask the court to clarify how it expects me to communicate with the City's staff: directly or through its attorneys.  To that end, it would be helpful if you could confirm which City officials and employees you represent and whether your representation extends to City Controller Kenneth Mejia, who the Court ruled will support "the execution of [my] role by facilitating data access and coordination, per [my] discretion."

Regarding my request for responses from the City, I want clarify that I sent a workbook with three worksheets:

- (1) Exhibit A of the City's most recent Quarterly Status Report, asking the same three questions for each property;

- (2) a list of the eleven City systems/databases of which I am aware, asking six identical questions for each; and

- (3) a short list of fifteen general questions to collect fundamental information about the City's data collection and reporting methodology.

These twenty-four questions cover straightforward topics with which the City is intimately familiar and that it should be able to answer easily.  As such, I hope that the City will provide its responses no later than this coming Monday, October 27, 2025.  If the city does not possess certain information, kindly indicate that fact in the response.  The City's prompt response to these questions will help us move forward collaboratively and efficiently.

**930**

Please also provide by the end of the day tomorrow, October 22, 2025, a few dates and times when City Administrative Officer ("CAO") Matt Szabo will be available for an interview? This will enable me to inform the Court that the City is cooperating and is working to meet the aggressive deadline that it set.

I understand that the timeline set by the Court is demanding, and I appreciate your efforts to expeditiously coordinate. With your support, I am confident that, together, we can meet the Court's expectations.

Thank you for your timely attention to these matters.  I look forward to your reply.

Thanks you.

Data Neutral Garrie

---

**From:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Sent:** Tuesday, October 21, 2025 6:02 PM
**To:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>
**Subject:** LA Alliance v. City of LA

Mr. Garrie, we understand that you sent an email to Matt Szabo, the City Administrative Officer, posing several hundred questions and requesting various in-person interviews.  The City is a represented party in this litigation; Gibson Dunn represents the City.  Please do not contact City officials or employees directly.  If you'd like to speak with City officials or employees, please make those requests through counsel, and we can coordinate.  In the meantime, we'll have the CAO's office start looking into your written questions.  As for an interview with Mr. Szabo, we will follow up with some dates/times when he and a member of the legal team would be available for an interview.
Finally, as I noted previously, the City reserves all rights regarding your work as a Monitor in this matter and any fees you may later seek to charge to the City.  The City will be filing an appeal from the Approval Order this week and will ask Judge Carter (and if necessary, the Ninth Circuit) to stay the Approval Order pending the appeal. Thank you.
**Kahn A. Scolnick**

T: +1 213.229.7656
KScolnick@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

**931**

**CAUTION:** This email originated from outside Law & Forensics's Email System. Please make sure you recognize the sender and know the content is safe before you click on any links or open any attachments.

**Notice:** Do not change any Wire Instructions without first checking with Law & Forensics by phone.

# EXHIBIT 4

 **Outlook**

---

## RE: LA Alliance v. City of LA

---

**From:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Sent:** Wednesday, October 22, 2025 8:15:07 PM
**To:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Kenneth Mejia <kenneth.mejia@lacity.org>
**Subject:** RE: LA Alliance v. City of LA

Thanks, Mr. Garrie. Running through each of the issues you raise below:

1. If Judge Carter directs you to engage in direct outreach and/or contact with City officials and employees <u>other than Controller Mejia</u>, without involving the City's legal counsel, we'd appreciate the courtesy of you letting us know that this is the Court's position.

2. As for Controller Mejia, he will communicate directly with you per the Court's Order. To be clear, Controller Mejia in his official capacity is, just like every other City official and employee, represented by the City Attorney's office and by Gibson Dunn in this litigation. But we are consenting to your direct communications with Controller Mejia for purposes of carrying out the Court's order, and we are not consenting to your direct communications with any other City official or employee.

3. As for your written questions in the spreadsheet, we've had a chance to connect with Mr. Szabo and his team, and they cannot answer all of them as currently phased by Monday. In particular:
   a. The information requested on the first tab—labeled "Questions Re October2025Report"— about the supporting documentation and funding sources by project will take time to gather and compile. We also question whether this level of detail is actually required to verify the quarterly report data, so perhaps we can discuss live why you believe this information is necessary when we speak with you and Mr. Szabo.
   b. The CAO also does not have all of the information readily available for each "System / Dataset" listed on the "Data-System Questions" section, and many are also not relevant for the City's quarterly reports (for example, LAHSA's Enterprise Grant Management System and the City's FMS and Workday systems).

   The CAO's office will nonetheless endeavor to provide more general information in response to your written questions by Monday, but again it will not be the level of detail currently requested, which is not practicable by Monday.

4. Finally, as for an interview with Mr. Szabo, he'll be out of the country next week and he gets back on Friday, 10/31. If it's critical to meet with him that afternoon, we can arrange it, but otherwise we'd prefer the following Monday or Tuesday (11/3 or 11/4). Please let us know.

   Thanks.

**934**

**Kahn A. Scolnick**

T: +1 213.229.7656
KScolnick@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

**From:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Sent:** Tuesday, October 21, 2025 6:55 PM
**To:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Kenneth Mejia <kenneth.mejia@lacity.org>; Daniel B. Garrie <Daniel@lawandforensics.com>
**Subject:** Re: LA Alliance v. City of LA

---

Counsel,

Thank you for your email and your continued assistance in this matter.

At your suggestion, I will ask the court to clarify how it expects me to communicate with the City's staff: directly or through its attorneys.  To that end, it would be helpful if you could confirm which City officials and employees you represent and whether your representation extends to City Controller Kenneth Mejia, who the Court ruled will support "the execution of [my] role by facilitating data access and coordination, per [my] discretion."

Regarding my request for responses from the City, I want clarify that I sent a workbook with three worksheets:

- (1) Exhibit A of the City's most recent Quarterly Status Report, asking the same three questions for each property;

- (2) a list of the eleven City systems/databases of which I am aware, asking six identical questions for each; and

- (3) a short list of fifteen general questions to collect fundamental information about the City's data collection and reporting methodology.

These twenty-four questions cover straightforward topics with which the City is intimately familiar and that it should be able to answer easily.  As such, I hope that the City will provide its responses no later than this coming Monday, October 27, 2025.  If the city does not possess certain information, kindly indicate that fact in the response.  The City's prompt response to these questions will help us move forward collaboratively and efficiently.

**935**

Please also provide by the end of the day tomorrow, October 22, 2025, a few dates and times when City Administrative Officer ("CAO") Matt Szabo will be available for an interview? This will enable me to inform the Court that the City is cooperating and is working to meet the aggressive deadline that it set.

I understand that the timeline set by the Court is demanding, and I appreciate your efforts to expeditiously coordinate. With your support, I am confident that, together, we can meet the Court's expectations.

Thank you for your timely attention to these matters.  I look forward to your reply.

Thanks you.

Data Neutral Garrie

---

**From:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Sent:** Tuesday, October 21, 2025 6:02 PM
**To:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>
**Subject:** LA Alliance v. City of LA

Mr. Garrie, we understand that you sent an email to Matt Szabo, the City Administrative Officer, posing several hundred questions and requesting various in-person interviews.  The City is a represented party in this litigation; Gibson Dunn represents the City.  Please do not contact City officials or employees directly.  If you'd like to speak with City officials or employees, please make those requests through counsel, and we can coordinate.  In the meantime, we'll have the CAO's office start looking into your written questions.  As for an interview with Mr. Szabo, we will follow up with some dates/times when he and a member of the legal team would be available for an interview.
Finally, as I noted previously, the City reserves all rights regarding your work as a Monitor in this matter and any fees you may later seek to charge to the City.  The City will be filing an appeal from the Approval Order this week and will ask Judge Carter (and if necessary, the Ninth Circuit) to stay the Approval Order pending the appeal. Thank you.
**Kahn A. Scolnick**

T: +1 213.229.7656
KScolnick@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

**936**

CAUTION: This email originated from outside Law & Forensics's Email System. Please make sure you recognize the sender and know the content is safe before you click on any links or open any attachments.

Notice: Do not change any Wire Instructions without first checking with Law & Forensics by phone.

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

Notice: Do not change any Wire Instructions without first checking with Law & Forensics by phone.

937

# EXHIBIT 7

 Outlook

---

## RE: LA Alliance v. City of LA

---

**From** Scolnick, Kahn A. <KScolnick@gibsondunn.com>

**Date** Mon 10/27/2025 9:27 PM

**To** Daniel B. Garrie <Daniel@lawandforensics.com>

**Cc** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Mariani Jessica <jessica.mariani@lacity.org>; Hoang Arlene <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Mejia Kenneth <kenneth.mejia@lacity.org>; Szabo Matt <matt.szabo@lacity.org>; Mitchell Elizabeth <elizabeth@umklaw.com>; Morgan Ward Doran <Morgan@lawandforensics.com>; R. Myers Shayla <SMyers@lafla.org>; M. Brody Lauren <lbrody@millerbarondess.com>

---

🔗 1 attachment (41 KB)

Questions RE October 2025 Report_10182025_10272025 City Responses.xlsx;

Some people who received this message don't often get email from kscolnick@gibsondunn.com. Learn why this is important

Mr. Garrie:   Apologies; I realized I neglected to respond to your email below re LAHSA.  We would appreciate being kept on communications with LAHSA as well.

Also, as requested, we're providing the attached preliminary information in response to your various questions to the CAO's office. Please understand that these initial responses were prepared by under a compressed schedule at your request, and the City has not had sufficient time to fully evaluate these responses with all relevant stakeholders for completeness and accuracy.  Accordingly, we reserve the right to update/supplement/correct these initial responses.  In the meantime, however, if you have any questions about anything provided in these initial responses, please let us know.

Finally, as for your request for an interview with Mr. Szabo, we can do 1:00-2:30 on the 3rd, or 4pm on the 4th (all pacific time).

Thanks.

**Kahn A. Scolnick**

T: +1 213.229.7656
KScolnick@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

**From:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Sent:** Friday, October 24, 2025 10:22 AM
**To:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Mariani Jessica <jessica.mariani@lacity.org>; Hoang Arlene <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Mejia Kenneth <kenneth.mejia@lacity.org>; Szabo Matt

**939**

<matt.szabo@lacity.org>; Mitchell Elizabeth <elizabeth@umklaw.com>; Morgan Ward <Morgan@lawandforensics.com>; R. Myers Shayla <SMyers@lafla.org>; M. Brody Lauren <lbrody@millerbarondess.com>
**Subject:** Re: LA Alliance v. City of LA

---

Counsel Scolnick,

Thanks for the clarification.  Can you please clarify if I communicate with LAHSA must I include all counsel identified below?

Neutral Garrie

---

**From:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Sent:** Friday, October 24, 2025 11:18 AM
**To:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Mariani Jessica <jessica.mariani@lacity.org>; Hoang Arlene <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Mejia Kenneth <kenneth.mejia@lacity.org>; Szabo Matt <matt.szabo@lacity.org>; Mitchell Elizabeth <elizabeth@umklaw.com>; Morgan Ward <Morgan@lawandforensics.com>; R. Myers Shayla <SMyers@lafla.org>; M. Brody Lauren <lbrody@millerbarondess.com>
**Subject:** Re: LA Alliance v. City of LA

Mr. Garrie:  the parties have conferred, and intervenors' counsel — Shayla Myers, copied — should be included on all correspondence.  Likewise, counsel for the County — Lauren Brody, copied — should also be included.  And if for whatever reason you ever have inquiries of County employees, please direct them to the County's counsel.

Finally, just so it's clear, the City also objects to you having any ex parte communications with counsel for any of the parties, without other counsel (or at least the City's counsel) included.

Thanks, enjoy the weekend.

> On Oct 24, 2025, at 8:57 AM, Daniel B. Garrie <Daniel@lawandforensics.com> wrote:

---

Counsel Scolnick,

I request that you meet and confer to determine who needs to be on what emails to avoid any issues going forward.  In the interim, I will cc the lawyers on this email and the Special Master as well.  In the alternative, please provide me a list of all individuals whom you believe should be on cc for our communications by EOD today.

Have a great weekend!

Neutral Garrie

---

**940**

**From:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Sent:** Friday, October 24, 2025 9:52 AM
**To:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Kenneth Mejia <kenneth.mejia@lacity.org>; Matt Szabo <matt.szabo@lacity.org>; Elizabeth Mitchell <elizabeth@umklaw.com>; Morgan Ward <Morgan@lawandforensics.com>
**Subject:** RE: LA Alliance v. City of LA

Got it, will pass that along to the CAO's office. And will do re copying opposing counsel (I hadn't included them in my outreach to you because you didn't include them in your emails to Mr. Szabo, but will do going forward). Should we also include counsel for Intervenors and/or the County?

And the City does not intend to share any privileged information or communications with you; if we inadvertently do so, that's not intended to be a waiver, and we reserve the right to claw it back.

Thanks.

**From:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Sent:** Friday, October 24, 2025 8:34 AM
**To:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Kenneth Mejia <kenneth.mejia@lacity.org>; Matt Szabo <matt.szabo@lacity.org>; Elizabeth Mitchell <elizabeth@umklaw.com>; Morgan Ward <Morgan@lawandforensics.com>
**Subject:** Re: LA Alliance v. City of LA

Counsel Scolnick,

Thank you for your response.

At this stage, the City should provide the information utilized to generate the previous reports. For systems deemed irrelevant, please identify them and offer a brief explanation as

**941**

to why.

Someone from my team will reach out to arrange a video conference with Mr. Szabo in November, which is expected to last at least 90 minutes.

Please cc the opposing counsel on all future communications unless you believe the information is privileged, and in accordance with the Judge's order I would request that you also cc the Special Master going forward (attached for your convenience).

Neutral Garrie

---

**From:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Sent:** Wednesday, October 22, 2025 6:15 PM
**To:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Kenneth Mejia <kenneth.mejia@lacity.org>
**Subject:** RE: LA Alliance v. City of LA

Thanks, Mr. Garrie.  Running through each of the issues you raise below:

1. If Judge Carter directs you to engage in direct outreach and/or contact with City officials and employees <u>other than Controller Mejia</u>, without involving the City's legal counsel, we'd appreciate the courtesy of you letting us know that this is the Court's position.

2. As for Controller Mejia, he will communicate directly with you per the Court's Order.  To be clear, Controller Mejia in his official capacity is, just like every other City official and employee, represented by the City Attorney's office and by Gibson Dunn in this litigation.  But we are consenting to your direct communications with Controller Mejia for purposes of carrying out the Court's order, and we are not consenting to your direct communications with any other City official or employee.

3. As for your written questions in the spreadsheet, we've had a chance to connect with Mr. Szabo and his team, and they cannot answer all of them as currently phased by Monday.  In particular:

    1. The information requested on the first tab—labeled "Questions Re October2025Report"— about the supporting documentation and funding sources by project will take time to gather and compile.  We also question whether this level of detail is actually required to verify the quarterly report data, so perhaps we can discuss live why you believe this information is necessary when we speak with you and Mr. Szabo.

**942**

2. The CAO also does not have all of the information readily available for each "System / Dataset" listed on the "Data-System Questions" section, and many are also not relevant for the City's quarterly reports (for example, LAHSA's Enterprise Grant Management System and the City's FMS and Workday systems).

The CAO's office will nonetheless endeavor to provide more general information in response to your written questions by Monday, but again it will not be the level of detail currently requested, which is not practicable by Monday.

4. Finally, as for an interview with Mr. Szabo, he'll be out of the country next week and he gets back on Friday, 10/31.  If it's critical to meet with him that afternoon, we can arrange it, but otherwise we'd prefer the following Monday or Tuesday (11/3 or 11/4).  Please let us know.

Thanks.

**Kahn A. Scolnick**

T: +1 213.229.7656
KScolnick@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

**From:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Sent:** Tuesday, October 21, 2025 6:55 PM
**To:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>; Michele <michele@michelecmartinez.com>; Kenneth Mejia <kenneth.mejia@lacity.org>; Daniel B. Garrie <Daniel@lawandforensics.com>
**Subject:** Re: LA Alliance v. City of LA

---

Counsel,

Thank you for your email and your continued assistance in this matter.

**943**

At your suggestion, I will ask the court to clarify how it expects me to communicate with the City's staff: directly or through its attorneys.  To that end, it would be helpful if you could confirm which City officials and employees you represent and whether your representation extends to City Controller Kenneth Mejia, who the Court ruled will support "the execution of [my] role by facilitating data access and coordination, per [my] discretion."

Regarding my request for responses from the City, I want clarify that I sent a workbook with three worksheets:

- (1) Exhibit A of the City's most recent Quarterly Status Report, asking the same three questions for each property;
- (2) a list of the eleven City systems/databases of which I am aware, asking six identical questions for each; and
- (3) a short list of fifteen general questions to collect fundamental information about the City's data collection and reporting methodology.

These twenty-four questions cover straightforward topics with which the City is intimately familiar and that it should be able to answer easily.  As such, I hope that the City will provide its responses no later than this coming Monday, October 27, 2025.  If the city does not possess certain information, kindly indicate that fact in the response.  The City's prompt response to these questions will help us move forward collaboratively and efficiently.

Please also provide by the end of the day tomorrow, October 22, 2025, a few dates and times when City Administrative Officer ("CAO") Matt Szabo will be available for an interview? This will enable me to inform the Court that the City is cooperating and is working to meet the aggressive deadline that it set.

I understand that the timeline set by the Court is demanding, and I appreciate your efforts to expeditiously coordinate. With your support, I am confident that, together, we can meet the Court's expectations.

Thank you for your timely attention to these matters.  I look forward to your reply.

Thanks you.

Data Neutral Garrie

**944**

**From:** Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Sent:** Tuesday, October 21, 2025 6:02 PM
**To:** Daniel B. Garrie <Daniel@lawandforensics.com>
**Cc:** Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Jessica Mariani <jessica.mariani@lacity.org>; Arlene Hoang <arlene.hoang@lacity.org>; Sonya Morgan <smorgan@lawandforensics.com>
**Subject:** LA Alliance v. City of LA

Mr. Garrie, we understand that you sent an email to Matt Szabo, the City Administrative Officer, posing several hundred questions and requesting various in-person interviews.  The City is a represented party in this litigation; Gibson Dunn represents the City.  Please do not contact City officials or employees directly.  If you'd like to speak with City officials or employees, please make those requests through counsel, and we can coordinate.  In the meantime, we'll have the CAO's office start looking into your written questions.  As for an interview with Mr. Szabo, we will follow up with some dates/times when he and a member of the legal team would be available for an interview.

Finally, as I noted previously, the City reserves all rights regarding your work as a Monitor in this matter and any fees you may later seek to charge to the City.  The City will be filing an appeal from the Approval Order this week and will ask Judge Carter (and if necessary, the Ninth Circuit) to stay the Approval Order pending the appeal.

Thank you.

**Kahn A. Scolnick**

T: +1 213.229.7656
KScolnick@gibsondunn.com

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

CAUTION: This email originated from outside Law & Forensics's Email System. Please make sure you recognize the sender and know the content is safe before you click on any links or open any attachments.

**945**

**Notice:** Do not change any Wire Instructions without first checking with Law & Forensics by phone.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

**CAUTION:** This email originated from outside Law & Forensics's Email System. Please make sure you recognize the sender and know the content is safe before you click on any links or open any attachments.

**Notice:** Do not change any Wire Instructions without first checking with Law & Forensics by phone.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

**CAUTION:** This email originated from outside Law & Forensics's Email System. Please make sure you recognize the sender and know the content is safe before you click on any links or open any attachments.

**Notice:** Do not change any Wire Instructions without first checking with Law & Forensics by phone.

**946**

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

CAUTION: This email originated from outside Law & Forensics's Email System. Please make sure you recognize the sender and know the content is safe before you click on any links or open any attachments.

---

Notice: Do not change any Wire Instructions without first checking with Law & Forensics by phone.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

**947**

| No. | Council District | Intervention Type | Project Type | Address / Location | Units/Beds (1) | Status | Open & Occupiable Date | Total PEH Served (2) | Monitor Garrie's Questions |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | PSH | Prop HHH | Washington View Apartments 720 W WASHINGTON BLVD Los Angeles, CA 90015 | 91 | Open | 6/30/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 2 | 10 | PSH | Non-Prop HHH | PATH Villas Montclair/Gramercy(Recap-Site 2 of 2) 3317 W WASHINGTON BLVD Los Angeles, CA 90018 | 16 | Open | 7/26/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 3 | 8 | PSH | Prop HHH | Chesterfield 4719 S NORMANDIE AVE Los Angeles, CA 90037 | 42 | Open | 8/3/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 4 | 13 | PSH | Prop HHH | HiFi Collective 3200 W TEMPLE ST Los Angeles, CA 90026 | 58 | Open | 8/17/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 5 | 10 | PSH | Prop HHH | Adams Terrace 4314 W ADAMS BLVD Los Angeles, CA 90018 4347 W ADAMS BLVD Los Angeles, CA 90018 | 43 | Open | 9/21/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 6 | 3 | PSH | Prop HHH | Bell Creek Apartments 6940 N OWENSMOUTH AVE Canoga Park, CA 91303 | 41 | Open | 9/23/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 7 | 14 | PSH | Non-Prop HHH | LAMP Lodge 660 S STANFORD AVE Los Angeles, CA 90021 | 81 | Open | 10/4/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 8 | 7 | PSH | Prop HHH | Silva Crossing (fka Link at Sylmar) 12667 SAN FERNANDO ROAD Sylmar, CA 91342 | 55 | Open | 10/11/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 9 | 10 | PSH | Prop HHH | Berendo Sage 1035 S BERENDO ST LOS ANGELES, CA 90006 | 21 | Open | 10/14/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 10 | 10 | PSH | Prop HHH | Amani Apartments (fka Pico) 4200 W PICO BLVD Los Angeles, CA 90019 | 53 | Open | 10/17/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 11 | 9 | PSH | Prop HHH | Hope on Broadway 5138 S BROADWAY Los Angeles, CA 90037 | 48 | Open | 11/1/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 12 | 8 | PSH | Homekey 2 | 6521 Brynhurst | 40 | Open | 11/14/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 13 | 1 | PSH | Homekey 2 | 740 Alvarado (14) | 74 | Open | 11/15/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 14 | 10 | PSH | Homekey 2 | 5050 Pico (15) | 76 | Open | 11/30/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 15 | 1 | PSH | Prop HHH | Firmin Court 418 N FIRMIN ST Los Angeles, CA 90026 | 45 | Open | 12/16/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 16 | 7 | PSH | Homekey 2 | 10150 Hillhaven (16) | 27 | Open | 12/20/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |

948

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 17 | 11 | PSH | Prop HHH | VA Building 207 11301 WILSHIRE BLVD #207 Los Angeles, CA 90025 | 59 | Open | 12/22/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 18 | 4 | IH | Interim Housing | Highland Gardens 7047 Franklin Ave Los Angeles, CA 90028 | 143 | Open | 12/27/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 19 | 3 | PSH | Prop HHH | Reseda Theater Senior Housing (Canby Woods West) 7221 N CANBY AVE Reseda, CA 91335 | 13 | Open | 12/30/2022 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 20 | 9 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Sahara Inn (5)(6) | 24 | Open | 1/5/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 21 | 7 | PSH | Prop HHH | Summit View Apartments 11800 W KAGEL CANYON ST Sylmar, CA 91342 | 48 | Open | 1/6/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 22 | 6 | PSH | Homekey 2 | 14949 Roscoe | 29 | Open | 1/15/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 23 | 9 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Deluxe Inn (5) | 19 | Open | 1/24/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 24 | 15 | PSH | Prop HHH | Watts Works 9500 S COMPTON AVE Los Angeles, CA 90002 | 24 | Open | 1/27/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 25 | 8 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Crenshaw Inn (5)(6) | 13 | Open | 1/30/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 26 | 13 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Las Palmas (5)(6) | 46 | Open | 1/31/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 27 | 9 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Lux Inn (5)(6) | 20 | Open | 2/6/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 28 | 8 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Budget Motel (5)(6) | 19 | Open | 2/13/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 29 | 13 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Hotel Silver Lake (5)(6) | 55 | Open | 2/14/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 30 | 8 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Hilltop Motor Inn (5)(6) | 21 | Open | 2/16/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 31 | 8 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Hyde Park Motel (5)(6) | 17 | Open | 2/21/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 32 | 8 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Atlas Motel (5)(6)(10) | 0 | Open | 2/28/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |

**949**

| # | | | | Address/Location | Units/Beds | Status | Open & Occupiable Date | | Questions |
|---|---|---|---|---|---|---|---|---|---|
| 33 | 9 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Top Hat Motel (5) | 26 | Open | 3/2/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 34 | 3 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Motel 6 (5) | 71 | Open | 3/9/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 35 | 9 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Park Motel (5)(6) | 11 | Open | 3/13/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 36 | 8 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Rosa Bell (5)(6) | 22 | Open | 3/13/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 37 | 14 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Highland Park Motel (5) | 25 | Open | 3/13/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 38 | 8 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Cornett Motel (5)(6) | 18 | Open | 3/16/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 39 | 8 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Full Moon Inn (5)(9) | 20 | Open | 3/20/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 40 | 5 | PSH | Prop HHH | 11010 Santa Monica 11010 W SANTA MONICA BLVD Los Angeles, CA 90025 | 50 | Open | 3/20/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 41 | 13 | PSH | Prop HHH | Ambrose (fka 1615 Montana St.) 1611 W MONTANA ST Los Angeles, CA 90026 | 63 | Open | 3/22/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 42 | 10 | PSH | Prop HHH | Vermont Corridor Apartments (fka 433 Vermont Apts) 433 S VERMONT AVE Los Angeles, CA 90020 | 36 | Open | 3/31/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 43 | 11 | PSH | Prop HHH | Building 205 11301 WILSHIRE BLVD Los Angeles, CA 90073 | 67 | Open | 4/10/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 44 | 8 | PSH | Prop HHH | Depot at Hyde Park 6527 S CRENSHAW BLVD Los Angeles, CA 90043 | 33 | Open | 4/10/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 45 | 1 | PSH | Prop HHH | Ingraham Villa Apartments 1218 INGRAHAM ST LOS ANGELES, CA 90017 | 90 | Open | 4/19/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 46 | 6 | PSH | Prop HHH | Talisa (fka 9502 Van Nuys Blvd) 9502 N VAN NUYS BLVD Panorama City, CA 91402 | 48 | Open | 4/19/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 47 | 11 | PSH | Prop HHH | Building 208 11301 WILSHIRE BLVD #208 LOS ANGELES, CA 90073 | 53 | Open | 4/21/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 48 | 9 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Jolly Motel (5)(6) | 12 | Open | 4/27/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |

950

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 49 | 9 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Central Inn (5) | 24 | Open | 4/27/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 50 | 8 | PSH | Prop HHH | Asante Apartments 11001 S BROADWAY Los Angeles, CA 90061 | 54 | Open | 5/18/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 51 | 8 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Paradise Inn (5)(6) | 19 | Open | 5/23/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 52 | 13 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Monterey Inn (5)(6)(10) | 0 | Open | 5/29/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 53 | 15 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Horizon Inn (5)(6) | 13 | Open | 5/30/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 54 | 8 | PSH | Prop HHH | West Terrace (fka Silver Star II) 6576 S WEST BLVD LOS ANGELES, CA 90043 | 56 | Open | 5/30/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 55 | 15 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Palm Motel (5)(6) | 15 | Open | 5/31/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 56 | 13 | PSH | Prop HHH | PATH Villas Hollywood 5627 W FERNWOOD AVE HOLLYWOOD, CA 90028 | 59 | Open | 6/2/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 57 | 9 | PSH | Prop HHH | Broadway Apartments 301 W 49TH ST 1-30 LOS ANGELES, CA 90037 | 34 | Open | 6/22/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 58 | 7 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Budget Sepulveda (5)(6) | 33 | Open | 7/3/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 59 | 8 | PSH | Prop HHH | Hope on Hyde Park - MP/TOC/PSH 6501 S CRENSHAW BLVD Los Angeles, CA 90043 | 97 | Open | 7/7/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 60 | 6 | PSH | Homekey 2 | 7639 Van Nuys (17) | 30 | Open | 7/13/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 61 | 10 | PSH | Prop HHH | Mariposa Lily 1055 S MARIPOSA AVE Los Angeles, CA 90006 | 20 | Open | 7/31/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 62 | 1 | PSH | Non-Prop HHH | West Third Apartments 1900 W 3RD ST Los Angeles, CA 90057 | 136 | Open | 8/7/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 63 | 2 | PSH | Prop HHH | Sun Commons 6329 N CLYBOURN AVE North Hollywood, CA 91606 | 51 | Open | 8/7/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 64 | 14 | PSH | Homekey 2 | 1044 Soto | 84 | Open | 9/5/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |

951

| # | | Type | Program | Address/Location | Units | Status | Date | Status | Questions |
|---|---|------|---------|------------------|-------|--------|------|---------|-----------|
| 65 | 6 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Palm Tree Inn (5)(6) | 39 | Open | 9/12/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 66 | 5 | PSH | Prop HHH | Pointe on La Brea 849 N LA BREA AVE CA 90038 | 49 | Open | 9/15/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 67 | 3 | PSH | Non-Prop HHH | Palm Vista Apartments 20116 W SHERMAN WAY Winnetka, CA 91306 | 44 | Open | 9/29/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 68 | 14 | PSH | Prop HHH | 6th and San Julian 401 E 6TH ST Los Angeles, CA 90014 | 93 | Open | 9/29/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 69 | 13 | PSH | Prop HHH | The Wilcox (fka 4906-4926 Santa Monica) 4912 W SANTA MONICA BLVD Los Angeles, CA 90029 | 61 | Open | 9/29/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 70 | 11 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Marina 7 Motel (5) | 21 | Open | 10/1/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 71 | 15 | PSH | Prop HHH | SagePointe (fka Deepwater) 1435 N EUBANK AVE LOS ANGELES, CA 90744 | 55 | Open | 10/4/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 72 | 8 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Travel Inn Motel (5)(6) | 20 | Open | 10/9/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 73 | 13 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Hollywood Inn Express North (5) | 24 | Open | 10/10/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 74 | 13 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Hollywood Inn Express South (5)(13) | 72 | Open | 10/10/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 75 | 4 | PSH | Prop HHH | Sherman Oaks Senior Housing 14536 W BURBANK BLVD VAN NUYS, CA 91411 | 54 | Open | 10/19/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 76 | 11 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Vista Motel (5)(6) | 25 | Open | 10/23/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 77 | 14 | PSH | Prop HHH | Colorado East 2451 W COLORADO BLVD Los Angeles, CA 90041 | 40 | Open | 11/1/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 78 | 9 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Ace Motel (5)(6) | 15 | Open | 11/14/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 79 | 8 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Universal Inn (5) | 29 | Open | 11/15/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 80 | 1 | PSH | Prop HHH | The Quincy (fka 2652 Pico) 2652 W PICO BLVD Los Angeles, CA 90006 | 53 | Open | 11/17/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |

952

| # | | | | Address/Location | Units/Beds | Status | Date | | Questions |
|---|---|---|---|---|---|---|---|---|---|
| 81 | 10 | PSH | Prop HHH | Serenity (fka 923-937 Kenmore Ave) 923 S KENMORE AVE Los Angeles, CA 90006 | 74 | Open | 11/27/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 82 | 8 | PSH | Permanent Supportive Housing (Master Lease) | 1200 Leighton Ave 90037 | 16 | Open | 12/1/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 83 | 8 | PSH | Permanent Supportive Housing (Master Lease) | 1203 Rolland Curtis Pl 90037 | 19 | Open | 12/1/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 84 | 8 | PSH | Permanent Supportive Housing (Master Lease) | 4222 Dalton Ave 90062 | 27 | Open | 12/1/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 85 | 9 | PSH | Permanent Supportive Housing (Master Lease) | 639 E 21 St 90011 | 21 | Open | 12/11/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 86 | 15 | PSH | Prop HHH | Beacon Landing (fka Beacon PSH) 319 N BEACON ST SAN PEDRO, CA 90731 | 88 | Open | 12/12/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 87 | 6 | PSH | Prop HHH | My Angel (fka The Angel) 8547 N SEPULVEDA BLVD North Hills, CA 91343 | 53 | Open | 12/19/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 88 | 6 | PSH | Prop HHH | Sun King Apartments 9190 N TELFAIR AVE LOS ANGELES, CA 91352 | 25 | Open | 12/27/2023 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 89 | 5 | IH | Interim Housing | 10864 Rochester Ave Los Angeles, CA 90024 (7) | 15 | Open | 1/4/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 90 | 11 | PSH | Prop HHH | The Iris (fka Barry Apartments) 2444 S BARRY AVE CA 90064 | 34 | Open | 1/22/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 91 | 1 | PSH | Prop HHH | The Lake House (fka Westlake Housing) 437 S WESTLAKE AVE Los Angeles, CA 90057 | 62 | Open | 2/13/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 92 | 14 | PSH | Prop HHH | La Veranda 2420 E CESAR E CHAVEZ AVE Los Angeles, CA 90033 | 38 | Open | 2/15/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 93 | 8 | PSH | Permanent Supportive Housing (Master Lease) | 1261 - 1269 Rolland Curtis Pl 90037 | 28 | Open | 2/22/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 94 | 1 | PSH | Non-Prop HHH | 619 Westlake (fka Westlake 619) 619 S WESTLAKE AVE Los Angeles, CA 90057 | 39 | Open | 3/1/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 95 | 13 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Olive Motel (5) | 26 | Open | 3/25/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 96 | 7 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Good Knight Inn (5)(6) | 21 | Open | 3/25/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |

| # | CD | Type | Program | Address/Location | Units | Status | Date | Review | Questions |
|---|---|---|---|---|---|---|---|---|---|
| 97 | 8 | PSH | Permanent Supportive Housing (Master Lease) | 1603 W 36th Pl 90018 | 81 | Open | 3/25/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 98 | 12 | PSH | Prop HHH | Lumina (fka Topanga Apartments) 10243 N TOPANGA CANYON BLVD Chatsworth, CA 91311 | 54 | Open | 4/5/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 99 | 15 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Hotel Dreamscape (5)(9) | 32 | Open | 4/11/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 100 | 2 | PSH | Prop HHH | NoHo 5050 5050 N BAKMAN AVE North Hollywood, CA 91601 | 32 | Open | 4/29/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 101 | 9 | PSH | Prop HHH | Marcella Gardens (68th & Main St.) 6722 S MAIN ST Los Angeles, CA 90003 | 59 | Open | 4/30/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 102 | 1 | IH | Interim Housing | Mayfair 1256 W 7th ST Los Angeles, CA 90017 | 294 | Open | 5/1/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 103 | 6 | PSH | Non-Prop HHH | Corazon del Valle I 14545 W LANARK ST CA 91402 | 49 | Open | 5/1/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 104 | 8 | PSH | Prop HHH | Isla de Los Angeles 283 W IMPERIAL HWY Los Angeles, CA 90061 | 53 | Open | 5/2/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 105 | 9 | PSH | Non-Prop HHH | La Prensa Libre - 4% 210 E WASHINGTON BLVD Los Angeles, CA 90015 | 25 | Open | 5/17/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 106 | 10 | PSH | Prop HHH | Washington Arts Collective 4615 W WASHINGTON BLVD Los Angeles, CA 90016 | 20 | Open | 5/20/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 107 | 14 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Antonio Motel (5)(12) | 48 | Open | 6/17/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 108 | 14 | PSH | Prop HHH | Weingart Tower A-134 (fkaWeingart Tower HHH PSH1A) 555 S CROCKER ST CA 90013 | 133 | Open | 6/17/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 109 | 14 | PSH | Prop HHH | Weingart Tower A-144 Lower (fkaWeingart TowerII1A) 555 S CROCKER ST CA 90013 | 142 | Open | 6/17/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 110 | 10 | PSH | Prop HHH | Solaris Apartments (fka 1141-1145 Crenshaw Blvd) 1141 S CRENSHAW BLVD Los Angeles, CA 90019 | 42 | Open | 6/18/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 111 | 1 | PSH | Prop HHH | Bryson II 2721 WILSHIRE BLVD LOS ANGELES, CA 90057 | 48 | Open | 6/20/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 112 | 14 | IH | Interim Housing (Hotel/Motel Booking Agreement) | Starlight Inn (5)(6) | 18 | Open | 6/21/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |

954

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 113 | 4 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Hollywood La Brea Inn (5)(8) | 41 | Open | 6/24/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 114 | 14 | PSH | Prop HHH | Whittier HHH (fka Whittier PSH) 3554 E WHITTIER BLVD Los Angeles, CA 90023 | 63 | Open | 6/27/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 115 | 9 | PSH | Prop HHH | Main Street Apartments 5501 S MAIN ST Los Angeles, CA 90037 | 56 | Open | 6/28/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 116 | 5 | PSH | Permanent Supportive Housing (Master Lease) | 920 S Gramercy Pl 90019 | 56 | Open | 6/30/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 117 | 13 | IH | Interim Housing | 4969 Sunset Blvd, Los Angeles, CA 90027 | 52 | Open | 7/1/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 118 | 14 | PSH | Permanent Supportive Housing (Master Lease) | 1317 S Grand Ave 90015 | 146 | Open | 7/1/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 119 | 9 | PSH | Permanent Supportive Housing (Master Lease) | 1343 W 40th Pl 90037 | 19 | Open | 7/1/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 120 | 15 | PSH | Prop HHH | The Banning (aka 841 N Banning) 841 N BANNING BLVD Wilmington, CA 90744 | 63 | Open | 7/10/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 121 | 14 | PSH | Prop HHH | Los Lirios Apartments 119 S SOTO ST Los Angeles, CA 90033 | 20 | Open | 7/29/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 122 | 11 | PSH | Prop HHH | The Journey (FKA Lincoln Apartments) 2467 S LINCOLN BLVD Venice, CA 90291 | 39 | Open | 8/1/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 123 | 3 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Canoga Hotel (5) | 39 | Open | 8/12/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 124 | 2 | PSH | Prop HHH | 11604 Vanowen (fka The Mahalia) 11604 VANOWEN ST LOS ANGELES, CA 91605 | 48 | Open | 8/13/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 125 | 6 | PSH | Non-Prop HHH | Corazon del Valle II 14545 W LANARK ST CA 91402 | 49 | Open | 8/15/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 126 | 9 | PSH | Permanent Supportive Housing (Master Lease) | 6501 S Broadway 90003 | 49 | Open | 8/19/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 127 | 13 | PSH | Homekey 3 | 4065 Oakwood (20) | 57 | Open | 8/26/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 128 | 15 | PSH | Prop HHH | Avalon 1355 1355 N AVALON BLVD CA 90744 | 53 | Open | 9/3/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |

| # | | Type | Program | Address/Location | Units | Status | Date | State | Questions |
|---|---|---|---|---|---|---|---|---|---|
| 129 | 9 | PSH | Prop HHH | Ruth Teague Homes (fka 67th & Main) 6706 S MAIN ST Los Angeles, CA 90003 | 26 | Open | 9/3/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 130 | 9 | PSH | Non-Prop HHH | Parkview Affordable Housing 4020 S COMPTON AVE CA 90011 | 31 | Open | 9/20/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 131 | 13 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Dusk Hotel | 41 | Open | 10/9/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 132 | 1 | PSH | Prop HHH | Oak Apartments (fka 2745-2759 Francis Ave) 2745 W FRANCIS AVE Los Angeles, CA 90005 | 63 | Open | 10/18/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 133 | 11 | PSH | Homekey 3 | 3705 McLaughlin (18) | 18 | Open | 10/21/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 134 | 4 | PSH | Homekey 3 | 4818 N Sepulveda Blvd (19) | 26 | Open | 10/21/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 135 | 11 | PSH | Prop HHH | Thatcher Yard Housing 3233 S THATCHER AVE Marina Del Rey, CA 90292 | 49 | Open | 10/23/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 136 | 1 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Stuart Hotel | 60 | Open | 10/30/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 137 | 2 | IH | Interim Housing Hotel/Motel Occupancy Agreement | Willow Tree Inn and Suites | 34 | Open | 11/7/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 138 | 15 | PSH | Prop HHH | Western Landing 25820 S WESTERN AVE CA 90710 | 80 | Open | 12/3/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 139 | 14 | PSH | Prop HHH | The Brine Residential 3016 N NORTH MAIN ST Los Angeles, CA 90031 | 49 | Open | 12/30/2024 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 140 | 9 | PSH | Prop HHH | The Azalea (fka 4507 Main St) 4505 S MAIN ST Los Angeles, CA 90037 | 31 | Open | 2/6/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 141 | 10 | IH | Interim Housing (DV Emergency Shelter) | Confidential (7)(11) | 25 | Open | 3/1/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 142 | 14 | PSH | Permanent Supportive Housing (Master Lease) | 1411 S Flower St 90015 | 220 | Open | 3/1/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 143 | 6 | PSH | Non-Prop HHH | Luna Vista Apartments 8767 N PARTHENIA PL 1-73 CA 91343 | 36 | Open | 3/4/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 144 | 9 | PSH | Prop HHH | Central Apartments 2106 S CENTRAL AVE Los Angeles, CA 90011 | 56 | Open | 3/7/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |

956

| # | CD | Type | Program | Address/Location | Units | Status | Open & Occupiable Date | Status | Questions |
|---|---|---|---|---|---|---|---|---|---|
| 145 | 13 | PSH | Prop HHH | Santa Monica & Vermont Apartments (Phases 1 & 2) 4718 W SANTA MONICA BLVD Los Angeles, CA 90029 | 94 | Open | 3/27/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 146 | 14 | PSH | Prop HHH | Lorena Plaza 3401 E 1ST ST Los Angeles, CA 90063 | 32 | Open | 4/4/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 147 | 8 | PSH | Prop HHH | Southside Seniors 1655 W MANCHESTER AVE Los Angeles, CA 90047 | 36 | Open | 4/4/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 148 | 8 | PSH | Non-Prop HHH | Vermont Manchester Family Transit Priority Project 8500 S VERMONT AVE CA 90044 | 58 | Open | 4/9/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 149 | 8 | PSH | Prop HHH | Vermont Manchester Senior 8400 S VERMONT AVE Los Angeles, CA 90044 | 60 | Open | 4/9/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 150 | 14 | IH | Interim Housing | 545 San Pedro (3) | 53 | Open | 4/24/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 151 | 8 | PSH | Homekey 2 | 1654 W Florence | 126 | Open | 4/30/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 152 | 13 | PSH | Prop HHH | Montecito II Senior Housing 6668 W FRANKLIN AVE HOLLYWOOD, CA 90028 | 32 | Open | 5/28/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 153 | 15 | PSH | Non-Prop HHH | Jordan Downs Phase S4 (TMO) 10110 S. Grape Street, Los Angeles, CA 90002, 10150 S. Grape Street, Los Angeles, CA 90002 (3)(4) | 17 | Open | 5/28/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 154 | 13 | PSH | Homekey 2 | 2812 Temple (2812 Temple/ 916 Alvarado) (22) | 41 | Open | 6/10/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 155 | 5 | IH | Interim Housing | 2377 Midvale Ave | 33 | Open | 6/30/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 156 | 14 | PSH | Non-Prop HHH | Crocker (Umeya) Apartments 411 S TOWNE AVE CA 90013 | 87 | Open | 7/30/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 157 | 14 | PSH | Non-Prop HHH | 600 S San Pedro St 1 Los Angeles, CA 90021 (4) | 147 | Open | 7/31/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 158 | 14 | PSH | Non-Prop HHH | 600 S San Pedro St 2 Los Angeles, CA 90021 (4) | 151 | Open | 7/31/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 159 | 2 | PSH | Prop HHH | Villa Vanowen fka Confianza 14142 W VANOWEN ST VAN NUYS, CA 91405 (4)(23) | 63 | Open | 9/3/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 160 | 12 | PSH | Prop HHH | 21300 Devonshire 21300 W DEVONSHIRE ST CA 91311 (4) | 99 | Open | 9/8/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |

957

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 161 | 1 | PSH | Non-Prop HHH | Miramar Gold<br>1434 W MIRAMAR ST CA 90026 (4) | 47 | Open | 9/9/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 162 | 3 | PSH | Homekey 2 | 21121 Vanowen (4)(21) | 92 | Open | 9/15/2025 | Pending | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 163 | 6 | PSH | Non-Prop HHH | Vista Terrace<br>8134 N VAN NUYS BLVD CA 91402 (4) | 24 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 164 | 13 | PSH | Homekey 2 | 916 Alvarado (2812 Temple/ 916 Alvarado) | 23 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 165 | 11 | PSH | Non-Prop HHH | Red Tail Crossing (FKA Kite Crossing) 8333 S AIRPORT BLVD CA 90045 | 40 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 166 | 13 | PSH | Prop HHH | Voltaire Villas (Enlightenment Plaza Ph III) 316 N JUANITA AVE Los Angeles, CA 90004 | 71 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 167 | 13 | PSH | Prop HHH | Rousseau Residences<br>316 N JUANITA AVE Los Angeles, CA 90004 | 51 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 168 | 4 | PSH | Homekey 2 | BLVD Hotel 2010 N. Highland | 61 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 169 | 10 | PSH | Prop HHH | McDaniel House (fka South Harvard)<br>1049 1/2 S HARVARD BLVD Los Angeles, CA 90006 | 46 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 170 | 13 | PSH | Non-Prop HHH | Alvarado Kent Apartments 707 N ALVARADO ST CA 90026 | 60 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 171 | 13 | PSH | Prop HHH | Montesquieu Manor<br>316 N JUANITA AVE CA 90004 | 52 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 172 | 3 | PSH | Homekey 2 | 20205 Ventura | 144 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 173 | 14 | PSH | Prop HHH | La Guadalupe (fka First and Boyle) 100 S BOYLE AVE Los Angeles, CA 90033 | 43 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 174 | 12 | PSH | Homekey 2 | 19325 Londelius | 115 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 175 | 5 | IH | Homekey 3 | The Weingart Shelby<br>3340 Shelby Dr, Los Angeles, CA 90034 | 78 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 176 | 8 | PSH | Prop HHH | Ambrosia Apartments<br>800 W 85TH ST Los Angeles, CA 90044 (24) | 89 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |

**958**

| # | CD | Type | Program | Address/Location | Units | Status | | | Questions |
|---|----|------|---------|------------------|-------|--------|---|---|-----------|
| 177 | 14 | PSH | Prop HHH | 803 E. 5th St 803 E 5TH ST Los Angeles, CA 90013 | 94 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 178 | 6 | PSH | Prop HHH | Oatsie's Place (fka Sherman Way) 16015 W SHERMAN WAY VAN NUYS, CA 91406 | 45 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 179 | 15 | PSH | Homekey 2 | 18602 Vermont | 134 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 180 | 1 | PSH | Non-Prop HHH | Third Thyme 1435 W 3RD ST CA 90017 | 52 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 181 | 12 | IH | Homekey 3 | Motel 6 – North Hills 15711 W. Roscoe Blvd, North Hills, CA 91343 | 111 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 182 | 11 | PSH | Homekey 2 | 6531 S Sepulveda | 118 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 183 | 10 | PSH | Non-Prop HHH | The Arlington 3322 W WASHINGTON BLVD CA 90018 | 20 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 184 | 8 | PSH | Prop HHH | Sunnyside (fka RETHINK Housing 62nd/1408 W. 62nd St) 1408 W 62ND ST Los Angeles, CA 90047 | 26 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 185 | 4 | IH | Homekey 3 | Oak Tree Inn 17448 Ventura Blvd, Encino CA 91316 (25) | 26 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 186 | 3 | PSH | Homekey 3 | 7625 Topanga Canyon Blvd Phase 2 | 24 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 187 | 13 | PSH | Prop HHH | Loma Verde (fka RETHINK Housing Westlake) 405 N WESTLAKE AVE Los Angeles, CA 90026 | 18 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 188 | 14 | PSH | Non-Prop HHH | First Street North- B (Go For Broke- S 9p) 128 N JUDGE JOHN AISO ST CA 90012 | 17 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 189 | 14 | PSH | Non-Prop HHH | First Street North-A (Go For Broke Apt N-4p) 200 N JUDGE JOHN AISO ST CA 90012 | 52 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 190 | 10 | PSH | Prop HHH | New Hampshire PSH 701 S NEW HAMPSHIRE AVE Los Angeles, CA 90005 | 93 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 191 | 1 | PSH | Prop HHH | Grandview Apartments 714 S GRAND VIEW ST Los Angeles, CA 90057 | 54 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 192 | 8 | PSH | Non-Prop HHH | The Carlton 5401 S WESTERN AVE Los Angeles, CA 90062 | 30 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated? 2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?" 3) What funding sources were used for this "Address/Location," and how was City participation verified? |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 193 | 9 | PSH | Non-Prop HHH | Central Avenue Apartments 8909 S CENTRAL AVE Los Angeles, CA 90002 | 30 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 194 | 3 | PSH | Prop HHH | 18722 Sherman Way, L.P. 18722 W SHERMAN WAY CA 91335 | 63 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 195 | 15 | PSH | Prop HHH | Safe Harbor II (fka Lagoon/PSH 5) 728 N LAGOON AVE Wilmington, CA 90744 | 39 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 196 | 15 | PSH | Prop HHH | Safe Harbor I (fka West Anaheim/PSH 3) 828 W ANAHEIM ST Wilmington, CA 90744 | 49 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 197 | 6 | PSH | Prop HHH | The Rigby 15314 W RAYEN ST North Hills, CA 91343 | 33 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 198 | 15 | IH | Interim Housing (Modular Units) | 600 E. 116th Place | 60 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 199 | 1 | IH | Interim Housing (Modular Units) | 503 San Fernando Rd. | 64 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 200 | 2 | IH | Interim Housing (THV) | Van Nuys Metrolink 7724 Van Nuys Blvd. | 100 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 201 | 6 | IH | Interim Housing (THV) | Sun Valley Metrolink Station 8358 San Fernando Rd. | 208 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 202 | 13 | IH | Interim Housing (THV) | 5301 Sierra Vista Ave | 51 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 203 | 6 | PSH | Homekey 1 | Pano (formerly Panorama Inn) 8209 Sepulveda Blvd. | 90 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 204 | 15 | PSH | Homekey 1 | Travelodge 18600 Normandie Ave. | 40 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 205 | 5 | IH | Interim Housing | 7253 Melrose (3) | 60 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 206 | 13 | PSH | Non-Prop HHH | Locke Lofts 345 N MADISON AVE CA 90004 (26) | 137 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 207 | 14 | PSH | Non-Prop HHH | osa's Place (fka Downtown Womens Center Campus Expansion 501 E 5TH ST Los Angeles, CA 90013 (26) | 97 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 208 | 14 | PSH | Prop HHH | Weingart Tower 1B - HHH PSH 554 S SAN PEDRO ST Los Angeles, CA 90013 (26) | 83 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?  2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"  3) What funding sources were used for this "Address/Location," and how was City participation verified? |

**960**

| 209 | Various | TLS | Time-Limited Subsidies | Time-Limited Subsidies (27) | 2,000 | In Process | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 210 | 1 | PSH | Non-Prop HHH | Grace Villas<br>216 S AVENUE 24 Los Angeles, CA 90031 (28) | 12 | Removed | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 211 | 1 | PSH | Non-Prop HHH | Menlo Ave Apartments 1216 S Menlo Ave CA 90006 (28) | 50 | Removed | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 212 | 6 | PSH | Prop HHH | The Main<br>15302 W RAYEN ST North Hills, CA 91343 (28) | 33 | Removed | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 213 | 15 | PSH | Prop HHH | Hope on 6th<br>576 W 6TH ST SAN PEDRO, CA 90731 (28) | 31 | Removed | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |
| 214 | 8 | PSH | Non-Prop HHH | Crenshaw and 50th<br>5002 S CRENSHAW BLVD Los Angeles, CA 90043 (28) | 15 | Removed | | | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (*e.g.*, contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? |

961

| Project Type | Question | Response |
|---|---|---|
| Prop HHH | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? | 1) The Los Angeles Housing Department provides the "Units/Beds" and "Status" information. The "Units/Beds" reported are Permanent Supportive Housing (PSH) units serving people experiencing homelessness. Note that information about these projects including the Supportive Housing unit count are available on LAHD's public dashboard: https://housing.lacity.gov/housing/hhh-progress-dashboard.<br><br>LAHD provides a "RFO" or "Ready for Occupancy" date, which typically aligns with the date the Temporary Certificate of Occupancy (TCO) or Certificate of Occupancy (COO) is issued from the Los Angeles Department of Building and Safety (LADBS). Most PSH sites have Project-Based Vouchers (PBVs), and participants cannot move in until a Housing Assistance Payments (HAP) contract is executed with the Housing Authority for the City of Los Angeles (HACLA) for the PBV units at the site. Therefore, CAO reports the HAP contract execution date, rather than LAHD's RFO date, for sites with PBVs. Once LAHD has provided the list of sites with new RFO dates in the reporting period quarter, CAO staff send the list to HACLA Section 8 Department staff. HACLA Section 8 staff confirm whether the sites have PBVs and, if so, the HAP contract effective date (or HAP contract still in process). For sites with an RFO date and HAP effective date, the later date (typically the HAP effective date) is reported as the Open & Occupiable date. Any sites with PBVs that do not yet have a HAP contract effective date are listed as "In Process" in the report. Note that data collection for HAP contract effective dates from HACLA began in October 2023. Prior to that, LAHD requested this information from HACLA on an as needed basis (typically for sites that had an RFO date in the most recent quarter but no occupancy yet).<br><br>2) The majority of the primary documents for each project are stored in LAHD's internal HIMS database, a proprietary database. Funded projects will have executed loan agreements with recorded covenants that memorialize the funding sources, location, and affordability requirements of each project.<br><br>3) All "Prop HHH" projects received some amount of Proposition HHH financing from the City. The City may have provided or assisted with other financing for the project as well. |
| Homekey 1, 2, or 3 (LAHD-managed) | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? | LAHD provides a "RFO" or "Ready for Occupancy" date, which typically aligns with the date the Temporary Certificate of Occupancy (TCO) or Certificate of Occupancy (COO) is issued from the Los Angeles Department of Building and Safety (LADBS). Most PSH sites have Project-Based Vouchers (PBVs), and participants cannot move in until a Housing Assistance Payments (HAP) contract is executed with the Housing Authority for the City of Los Angeles (HACLA) for the PBV units at the site. Therefore, CAO reports the HAP contract execution date, rather than LAHD's RFO date, for sites with PBVs. Once LAHD has provided the list of sites with new RFO dates in the reporting period quarter, CAO staff send the list to HACLA Section 8 Department staff. HACLA Section 8 staff confirm whether the sites have PBVs and, if so, the HAP contract effective date (or HAP contract still in process). For sites with an RFO date and HAP effective date, the later date (typically the HAP effective date) is reported as the Open & Occupiable date. Any sites with PBVs that do not yet have a HAP contract effective date are listed as "In Process" in the report. Note that data collection for HAP contract effective dates from HACLA began in October 2023. Prior to that, LAHD requested this information from HACLA on an as needed basis (typically for sites that had an RFO date in the most recent quarter but no occupancy yet).<br><br>2) The majority of the primary documents for each project are stored in LAHD's internal HIMS database, a proprietary database. Funded projects will have executed loan agreements with recorded covenants that memorialize the funding sources, location, and affordability requirements of each project.<br><br>3) All projects received State of California Homekey 1, 2, or 3 funding along with City matching funds.<br><br>See list of projects below:<br><br>No. 151, 1654 W Florence<br>No. 154, 2812 Temple (2812 Temple/ 916 Alvarado)<br>No. 162, 21121 Vanowen<br>No. 164, 916 Alvarado (2812 Temple/ 916 Alvarado)<br>No. 168, BLVD Hotel 2010 N. Highland<br>No. 172, 20205 Ventura<br>No. 174, 19325 Londelius<br>No. 175, The Weingart Shelby<br>No. 179, 18602 Vermont<br>No. 181, Motel 6 - North Hills<br>No. 182, 6531 S Sepulveda<br>No. 185, Oak Tree Inn |
| Homekey 2 or 3 (HACLA-managed) | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? | 1) Data is confirmed quarterly by HACLA Asset Management staff. Note: Data collection for Homekey 3 sites from HACLA began January 2024 (when these sites were added to the report). Data collection for Homekey 2 sites from HACLA began October 2024. Prior to that, the Homekey 2 data was requested from LAHD, who then requested from HACLA.<br><br>2) Public reports are available on the HACLA Board website. Information on projects receiving loans from LAHD are available in the City's Council File Management System. HACLA can provide additional documents as needed.<br><br>3) All projects received State of California Homekey 2 or 3 funding along with matching funds from HACLA. HACLA is formed under State law and headed by a City Commission, whose members are appointed by the Mayor and confirmed by the City Council. Several projects also received loans from the City.<br><br>See list of projects below:<br><br>No. 12, 6521 Brynhurst<br>No. 13, 740 Alvarado<br>No. 14, 5050 Pico<br>No. 16, 10150 Hillhaven<br>No. 22, 14949 Roscoe<br>No. 60, 7639 Van Nuys<br>No. 64, 1044 Soto<br>No. 127, 4065 Oakwood<br>No. 133, 3705 McLaughlin<br>No. 134, 4818 N Sepulveda Blvd<br>No. 186, 7625 Topanga Canyon Blvd Phase 2 |
| Interim Housing | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? | 1) CAO maintains records of the beds, status, and open and occupiable date. The number of beds and status can be confirmed in the City/LAHSA contracts and LAHSA/service provider contracts. Open and occupiable date is typically confirmed by the service provider and should align with the date of the first intake in HMIS.<br><br>2) Supporting documentation may include City funding reports, lease/sublease agreements, City contracts with LAHSA, LAHSA subcontracts with providers, PMP updates to State Department of General Services for THV/Modular projects.<br><br>3) Funding sources by site are listed below:<br>No. 18, Highland Gardens: City General Fund<br>No. 89, 10864 Rochester: Homeless Housing, Assistance and Prevention (HHAP) Grant funds<br>No. 102, Mayfair: City General Fund, Proposition HHH, Community Development Block Grant (CDBG) funds, and Municipal Housing Finance Funds<br>No. 117, 4969 Sunset Blvd: City General Fund, HHAP<br>No. 155: 2377 Midvale Ave: Behavioral Health Continuum Infrastructure Program - Emergency Stabilization Bed Grant funds (BHCIP - ESB), City General Fund, HHAP<br>No. 198: BHCIP-ESB, City General Fund, HHAP<br>No. 199: 503 San Fernando Rd: BHCIP-ESB<br>No. 200: Van Nuys Metrolink: BHCIP-ESB<br>No. 201: Sun Valley Metrolink Station: BHCIP-ESB, City General Fund<br>No. 202: 5301 Sierra Vista Ave: BHCIP-ESB, CIty General Fund<br>No. 205: 7253 Melrose: HHAP |
| Interim Housing (DV Emergency Shelter) | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? | 1) Information was confirmed by the Community Investment for Families Department (CIFD), which holds the contract with the service provider.<br><br>2) LAHD can provide documentation on Prop HHH funding provided for the facility. CIFD can provide service contracts for the service provider's emergency shelter program (of which this is one of two sites).<br><br>3) Prop HHH, City General Fund, CDBG (Community Development Block Grant funding) |
| Interim Housing (Hotel/Motel Booking/Occupancy) | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? | 1) Occupancy Agreement room numbers are based on the Occupancy Agreement contract with the hotel/motel. Administrative rooms, as noted in the invoices, are excluded from the total of available, occupiable rooms. Booking Agreement rooms are based on the highest room count for each site during the latest reporting quarter (e.g. 7/1/25 - 9/30/25) based on CAO invoice records. Thus, Booking Agreement rooms may fluctuate from quarter to quarter. Administrative rooms, as noted in the invoices, are excluded from the total of available, occupiable rooms. Sites are confirmed to be open based on active agreements (as well as invoices). Open and Occupiable date reported is the first invoice date for each hotel/motel, based on invoice records held by CAO.<br><br>2) Booking and occupancy agreements, invoices<br><br>3) City General Fund (Homeless Emergency Account) |
| Permanent Supportive Housing (Master Lease) | 1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?<br><br>2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"<br><br>3) What funding sources were used for this "Address/Location," and how was City participation verified? | 1) Information was provided by LAHSA's Master Lease strategy team. Only residential units serving people experiencing homelessness are included in the unit count (manager/admin units are excluded).<br><br>2) City funding report, City/LAHSA contract. Additional documentation can be provided by LAHSA.<br><br>3) City staff provided technical assistance to LAHSA for the development of the Master Leasing Strategy. In Fiscal Year (FY) 2025-26, the City is providing $5,212,743 in funding from the City's General Fund to support the overall Strategy and operations for LAHSA's Master Leasing portfolio. In addition, the portfolio is partly supported with Time-Limited Subsidies (TLS) funded by the City and Section 8 vouchers provided by the Housing Authority of the City of Los Angeles (HACLA). |

**962**

Non-Prop HHH

1) From which City system(s)/database(s) were the reported "Units/Beds," "Status," and "Open & Occupiable Date" generated?

2) What supporting documentation (e.g., contracts, invoices, permits, cost certifications, loan agreements etc.) is available for this "Address/Location?"

3) What funding sources were used for this "Address/Location," and how was City participation verified?

1) The Los Angeles Housing Department provides the "Units/Beds" and "Status" information. The "Units/Beds" reported are Permanent Supportive Housing (PSH) units serving people experiencing homelessness. Note that information about these projects including the Supportive Housing unit count are available on LAHD's public dashboard: https://housing.lacity.gov/housing/hhh-progress-dashboard.

LAHD provides a "RFO" or "Ready for Occupancy" date, which typically aligns with the date the Temporary Certificate of Occupancy (TCO) or Certificate of Occupancy (COO) is issued from the Los Angeles Department of Building and Safety (LADBS). Most PSH sites have Project-Based Vouchers (PBVs), and  participants cannot move in until a Housing Assistance Payments (HAP) contract is executed with the Housing Authority for the City of Los Angeles (HACLA) for the PBV units at the site. Therefore, CAO reports the HAP contract execution date, rather than LAHD's RFO date, for sites with PBVs. Once LAHD has provided the list of sites with new RFO dates in the reporting period quarter, CAO staff send the list to HACLA Section 8 Department staff. HACLA Section 8 staff confirm whether the sites have PBVs and, if so, the HAP contract effective date (or HAP contract still in process). For sites with an RFO date and HAP effective date, the later date (typically the HAP effective date) is reported as the Open & Occupiable date. Any sites with PBVs that do not yet have a HAP contract effective date are listed as "In Process" in the report. Note that data collection for HAP contract effective dates from HACLA began in October 2023. Prior to that, LAHD requested this information from HACLA on an as needed basis (typically for sites that had an RFO date in the most recent quarter but no occupancy yet).

2) The majority of the primary documents for each project are stored in LAHD's internal HIMS database, a proprietary database. Funded projects will have executed loan agreements with recorded covenants that memorialize the funding sources, location, and affordability requirements of each project.

3) Information is being compiled and will be provided as soon as possible.

**963**

| System / Dataset | City (LAHD, LAHSA, HACLA coordination) | Data Purpose | Key Questions / Clarifications | Responses |
|---|---|---|---|---|
| RMS (Resource Management System) | LAHSA | Tracks shelter & PSH unit inventory in real time | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verifies the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | LAHSA is the system owner. A response has been requested from LAHSA. To the City's knowledge, RMS is not used for the quarterly report data. |
| HMIS (Homeless Management Information System) | LAHSA | Client-level service and placement tracking | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | LAHSA is the system owner. A response has been requested from LAHSA. |
| LAHD Project Pipeline Data | LAHD | Tracks PSH pipeline and project-level data | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | LAHD is the system owner. Please see response below.<br><br>Who is the system owner (department and point of contact within the department) of this system?<br>The LAHD System's Division - HIMS Support team supports the system. For inquiries, contact Jeong Yi, the Senior Systems Analyst lead.<br><br>How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br>The system's data is mostly updated in real-time. Data updates are primarily performed by program staff who enter data directly into HIMS as part of their daily tasks. Some data may also be updated periodically from other integrated systems.<br><br>Yes, metadata is preserved for updates on significant data elements that require tracking. For these actions, the system tracks who created a record and who last modified it, along with the date and time of those actions.<br><br>How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br>For quality assurance, the accuracy of the data is verified by the program staff, who are the subject matter experts for their particular business areas. Change logs are maintained to monitor data modifications (as detailed in the audit trail response). Furthermore, any enhancements to the system go through a full software development life cycle, including requirement gathering, development, and various stages of testing.<br><br>Is there an audit trail for the system and, if so, what is it and can it be exported?<br>Yes, HIMS maintains an audit trail for data changes on events that are determined to be significant based on established decision criteria. For these tracked actions, the system records the user who created or modified the data, as well as the date and time the action occurred. This information is used to monitor data integrity.<br><br>Who verified the accuracy of the data before submission to the Court? How?<br>The accuracy of the data is verified by the program staff who are the experts in that particular business domain. They are responsible for reviewing the data to ensure it is accurate and consistent with program operations.<br><br>Is this system an aggregation of multiple databases, or a single database?<br>HIMS is an aggregation of multiple databases. Each database contains many tables and other database objects that support various program functions. |
| HACLA Voucher Data | HACLA | Administers vouchers and rental subsidies | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | Data on HACLA vouchers are not reported in the quarterly report.<br><br>HACLA maintains records documenting the execution dates of Housing Assistance Payments (HAP) contracts and will be able to provide the relevant reports or documentation as needed. |
| Inside Safe Records & Invoices | Mayor's Office / LAHSA | Hotel/motel interim housing agreements under Inside Safe | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | Inside Safe interim housing hotel/motel lease agreements and invoices are used to determine the number of rooms reported on the quarterly report. The invoice verification and payment process is described below.<br><br>1. CAO receives invoice packet from service provider via email<br>2. CAO performs intake (log key data points in "HEA Tracker" (Google Spreadsheet))<br>3. CAO verification team verifies Inside Safe enrollment in HMIS for participants on the billing and verifies invoice details (rates, dates, participants, etc) in "Inside Safe_CAO Motel Invoice Verification Tracker" (Google Spreadsheet)<br>4. CAO budget staff index and perform analysis on received invoices to determine the number of room nights being paid for and to ensure accurate billing rate per hotel invoice on "IS Metrics" worksheet (Google Spreadsheet). Any discrepancies are flagged for verification team staff.<br>5. Once verified, invoices are submitted through the approval process for payment.<br><br>Data in the quarterly report to the Court is based on invoices received for the reporting period (7/1/25 - 9/30/25) as of October 6, 2025. These invoices were at various stages of the verification/payment cycle. Data in the IS Metrics Google Sheet was used as the basis for the number of rooms.<br><br>Data is entered monthly into the IS Metrics Google Sheet. Google Sheets tracks updates made, date updates were made, and who made the updates. Versions are also saved by CAO budget staff on a monthly basis. |
| LAHSA Inventory Management System | LAHSA | Tracks real-time available, occupied, and offline beds | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | LAHSA is the system owner. A response has been requested from LAHSA. |
| CARE / CARE+ Encampment Data | Dept. of Sanitation / Mayor's Office | Field operation records for encampment clearances | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | LA Department of Sanitation is the system owner. Please see responses below.<br><br>1. Who is the system owner (department and point of contact within the department) of this system?<br><br>System owner: LSD (Livability Services Division)<br>POC for Geographic Information System (GIS): Rodell Zorilla, Lisa Gauthier<br>Operational Usage: Salvador Rosales<br><br>The system was created by the Livability Services Division (LSD) Geographic Information System (GIS) team within the LA Sanitation and Environment for the LSD's CARE/CARE+ Program. The system is powered by ESRI's ArcGIS Online system, and the applications used to collect the data are off-the-shelf. The survey-form application is ESRI's Survey123.<br><br>The GIS Supervisor is Rodell Zorilla and the GIS Specialist who developed the form used in the data collection is Lisa Gauthier. The system was developed using off-the-shelf ESRI products to digitalize the previously paper and manual data collection process. The system was implemented in October 2023, and the database is hosted in ESRI's ArcGIS Online cloud.<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>How frequently are the system's data updated?<br>The database is used in daily operations. Data updates are typically performed using a mobile application (Esri's Survey123) and ArcGIS Pro.<br>This is designed to be an editable database for staff, and submitted data can be edited daily. Only "adds" and "updates" are allowed; record deletion is disabled.<br>How are data updates performed?<br>Field staff can submit, recall, create data or edit data and resubmit their report using the Survey123 mobile application; field staff can edit only their own records.<br>Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br>The EditDate, Editor, Creator, and Creation date exist. However, the Edit Date and Editor Fields change and reflect the last editor and last edit date, i.e. the historical data in these fields are not preserved.<br>As the app evolves, the GIS team makes structural changes like adding new fields. For example, adding the "Makeshift Shelter" as a tracking metric was an operational-data collection change to respond to Alliance.<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)? |
| EGMS (Enterprise Grant Management System) | LAHSA | Tracks contracts, invoices, and fiscal grants | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | LAHSA is the system owner. A response has been requested from LAHSA. |
| City Financial Systems (FMS, Workday) | CAO / Controller | Fiscal oversight and payment systems | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | Not used for Quarterly Reports. |
| Public Document Portal | City of Los Angeles | Public access to compliance documentation | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | Not used for Quarterly Reports. The Controller's Office can provide additional information regarding the public website with service provider contracts and invoices related to the Settlement Agreement. |
| Cross-System Data Integration | Citywide | Ensures consistency across RMS, HMIS, LAHD, and HACLA systems | 1. Who is the system owner (department and point of contact within the department) of this system?<br><br>2. How frequently are the system's data updated? How are data updates performed? Is metadata preserved for the updates (e.g., update date, update personnel, upload date, uploader, etc.)?<br><br>3. How is data governance handled (e.g. quality assurance, change logs, version control, etc.)?<br><br>4. Is there an audit trail for the system and, if so, what is it and can it be exported?<br><br>5. Who verified the accuracy of the data before submission to the Court? How?<br><br>6. Is this system an aggregation of multiple databases, or a single database? | Not applicable - they are proprietary systems |

**964**

| Monitor Garrie's Questions | Answers |
|---|---|
| How are offline housing units, as indicated in the footnotes to Exhibit A, tracked and defined? | Offline units are those not currently available to be occupied (for example, a unit undergoing ADA rehabilitation). The Office of the CAO removed offline units brought to its attention in the quarterly report. |
| What methodology did the City use to define the "Created," "Open," and "In Process" options for the "Status" category?  Is it consistent across departments? | Items in the pipeline are reported as either "Open" or "In Process." "Open" projects are available to be occupied. "In Process" projects have received some sort of commitment/approval from the City but are not yet available to be occupied. |
| Given that the number of Unit/Beds for several of the Address/Location rows listed on Exhibit A may "fluctuate," how did the City determine which number to report?  Is it an average, a number based on a specific date, or some other method? | This footnotes specifically refers to hotel/motel booking agreements. A booking agreement confirms a fixed nightly rate, but motel rooms used may fluctuate based on the number of participants at a location and room availability. The number reported in the quarterly report represents the highest number of rooms invoiced during that particular quarter, minus any rooms used for administrative purposes. |
| How is the number of Unit/Beds for a given housing unit calculated if the contractual agreement type is "booking agreement" or "occupancy agreement?" | Please see the explanation above for booking agreements. An occupancy agreement includes a fixed nightly rate as well as a guaranteed number of rooms, regardless if they are filled or not. The number of rooms reported is based on the number of rooms contracted for under the occupancy agreement, minus any administrative rooms noted in the invoices for that quarter. |
| Are the housing units (i.e., the rows) in Exhibit A organized by address or project?  If the former, why does Exhibit A not include an address for each project?  For example, Row 2 has an Address of "PATH Villas Montclair/Gramercy (Recap-Site 2 of 2) 3317 W WASHINGTON BLVD Los Angeles, CA 90018," but the explanation on Exhibit B includes a second project at "4220 W. Montclair St," which is not otherwise included on Exhibit A. | Rows are primarily organized by site (address/location), but in some cases rows may include multiple related addresses (for example, Row 5)<br><br>With regard to Row 2, as explained in Exhibit B, only the Gramercy site is counting toward the Settlement, as the Montclair site opened prior to the Settlement start date. Therefore, only the address and PSH units for the Gramercy site are listed. |
| Please provide a definition for each column (e.g., "Address/Location," "Beds/Units," etc.) in the October 2025 report including, where applicable, a definition of the data entered (e.g., "In Process" and "Removed" for "Total PEH Served")? | Please see definitions tab |
| Are these definitions consistent across each housing unit and City department collecting the data? | Any differences in definition for various project types are noted |
| What is the City's definition of persons experiencing homelesness ("PEH"), and is that definition uniform across housing units and City departments? | The City uses HUD's definition of homelessness, which can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/ |
| How does the City collect and verify information regarding the number of PEH?  How does the City correlate the PEH date with the housing unit data? | Depending on the project, data is collected from the Los Angeles Housing Department (LAHD), the Housing Authority of the City of Los Angeles (HACLA), the Los Angeles Homeless Services Authority (LAHSA), or the Community Investment for Families Department (CIFD). The data requests are specific to the beds/units listed on the quarterly report. |
| How are errors or additional findings from prior reports tracked?  Are these errors corrected in subsequent quarters? If so, what is the process? | Any errors and/or updates brought to the attention of the Office of the CAO are corrected/updated in the subsequent quarterly report. Any such updates are noted in footnotes in the quarterly report. |

**965**

| Term | Definition |
|---|---|
| Council District | Council District where the site is located. In some cases, a site may be located adjacent to the Council District boundary (for example, on the West LA VA campus or in unincorporated LA County across the street from a Council District boundary), in which case the adjacent Council District is listed. |
| Intervention Type | PSH: Permanent Supportive Housing. A housing model that combines permanent, affordable housing with supportive services to help individuals and families achieve and maintain housing stability. Supportive services can include case management, mental health care, substance abuse treatment, job training, and other services that help individuals build independent living skills. https://www.lahsa.org/documents?id=9520-psh-glossary-of-terms.pdf |
| | IH: Interim Housing. An intervention that provides people experiencing homelessness with temporary housing intended to resolve their immediate experience of unsheltered homelessness, connect participants to permanent housing opportunities in their communities, and provide various other services. https://www.lahsa.org/documents?id=2618-interim-housing-practice-standards.pdf |
| | TLS: Time-Limited Subsidy: Permanent housing program that provides housing identification and attainment services, case management and financial assistance, typically for a period of up to twenty-four (24) months. https://www.lahsa.org/documents?id=8141-srs-time-limited-subsidy-tls-all-populations-fy-24-25.pdf |
| Project Type | Prop HHH: Permanent Supportive Housing receiving Proposition HHH financing |
| | Non-Prop HHH: Permanent Supportive Housing receiving financing that does not include Proposition HHH (e.g. 4% or 9% tax credit financing or other City participation) |
| | Homekey 1, 2, 3: Permanent Suportive Housing or Interim Housing receiving State of California Department of Housing and Community Development Homekey funding |
| | Interim Housing: See "Intervention Type" definition above. |
| | Interim Housing (Hotel/Motel Booking Agreement): Hotel/Motel used for interim housing. A booking agreement confirms a fixed nightly rate, but motel rooms used may fluctuate based on the number of participants at a location and room availability. |
| | Interim Housing (Hotel/Motel Occupancy Agreement): Hotel/Motel used for interim housing. An occupancy agreement includes a fixed nightly rate as well as a guaranteed number of rooms, regardless if they are filled or not. |
| | Interim Housing (DV Emergency Shelter): Confidential shelter providing emergency housing to survivors of domestic violence. The U.S. Department of Housing and Urban Development (HUD) definition of homelessness includes individuals and families fleeing/attempting to flee domestic violence: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/category-4/ |
| | Interim Housing (THV): Tiny Home Village (THV) interim housing typology. THV sites provide standalone sleeping units that accommodate a maximum of two participants, along with shared hygiene units, laundry facilities, and common areas. |
| | Interim Housing (Modular Units): Modular Residential Unit interim housing typology. Modular residential units are a similar interim housing typology to THVs, but differ with regard to their larger size, greater amenities, and longer lifespan. Such units may include features such as kitchenettes and bathrooms. These units must be State-certified and construction of these sites is regulated by the California Department of Housing and Community Development (HCD). |
| | Permanent Supportive Housing (Master Lease): Permanent housing typology in which an entire building is leased in order to provide permanent supportive housing for persons experiencing homelessness. |
| | Time-Limited Subsidies: See "Intervention Type" definition above. |
| Address/Location | Name and/or address of site counting toward Settlement requirements. |
| Units/beds | Number of units/beds serving people experiencing homelesness counting toward Settlement requirements, reported by type of project as follows: |
| | Permanent Supportive Housing projects are reported by unit |
| | Hotel/Motel Booking/Occupancy agreements are reported by unit |
| | All other interim housing typologies aside from hotel/motel booking/occupancy agreements are reported by bed |
| | Time-Limited Subsidies (in progress) are reported by subsidy. As subsidies are utilized, TLS will be reported as "open" by the number of people supported by the subsidies. |
| Status | Open: Units/beds are open and available to be occupied |
| | In process: Beds/units have received approval (e.g. funding or other formal approval from Council/Mayor, such as the approval of the City's bed plan with 2,000 new TLS) but are not yet open and occupiable |
| | Removed: Site/project removed from the list of projects counting toward the Settlement Agreement |
| Open & Occupiable Date | Date that site became open and available to be occupied |
| | Hotel/Motel Booking/Occupancy Agreements: Dated reported is the first invoice date for each hotel/motel, based on invoice records held by CAO |
| | Other Interim Housing sites: date of first intake |
| | For Permanent Supportive Housing sites, LAHD provides a "RFO" or "Ready for Occupancy" date, which typically aligns with the date the Temporary Certificate of Occupancy (TCO) or Certificate of Occupancy (COO) is issued from the Los Angeles Department of Building and Safety (LADBS). Most PSH sites have Project-Based Vouchers (PBVs), and participants cannot move in until a Housing Assistance Payments (HAP) contract is executed with the Housing Authority for the City of Los Angeles (HACLA) for the PBV units at the site. Therefore, CAO reports the HAP contract execution date, rather than LAHD's RFO date, for sites with PBVs. Once LAHD has provided the list of sites with new RFO dates in the reporting period quarter, CAO staff send the list to HACLA Section 8 Department staff. HACLA Section 8 staff confirm whether the sites have PBVs and, if so, the HAP contract effective date (or HAP contract still in process). For sites with an RFO date and HAP effective date, the later date (typically the HAP effective date) is reported as the Open & Occupiable date. Any sites with PBVs that do not yet have a HAP contract effective date are listed as "In Process" in the report. Note that data collection for HAP contract effective dates from HACLA began in October 2023. Prior to that, LAHD requested this information from HACLA on an as needed basis (typically for sites that had an RFO date in the most recent quarter but no occupancy yet). |

**966**

# EXHIBIT 8

 **Outlook**

---

## Meeting Request: Alliance Monitor & Ed Gipson

---

**From** Kenneth Mejia <kenneth.mejia@lacity.org>

**Date** Tue 10/28/2025 9:07 AM

**To** Edwin Gipson <edwin.gipson@lacity.org>

**Cc** Daniel B. Garrie <Daniel@lawandforensics.com>; Sonya Morgan <smorgan@lawandforensics.com>; Jane Nguyen <jane.nguyen@lacity.org>; Dinah Manning <dinah.manning@lacity.org>; Ashley Bennett <ashley.bennett@lacity.org>; Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Mariani Jessica <jessica.mariani@lacity.org>; Hoang Arlene <arlene.hoang@lacity.org>; Michele <michele@michelecmartinez.com>; Mejia Kenneth <kenneth.mejia@lacity.org>; Szabo Matt <matt.szabo@lacity.org>; Mitchell Elizabeth <elizabeth@umklaw.com>; Morgan Ward Doran <Morgan@lawandforensics.com>; R. Myers Shayla <SMyers@lafla.org>; M. Brody Lauren <lbrody@millerbarondess.com>; Kahn A. <KScolnick@gibsondunn.com>

> You don't often get email from kenneth.mejia@lacity.org. Learn why this is important

Ed,

The Alliance Monitor has reached out to request a meeting with you to discuss Alliance related matters. In accordance with my role, I am writing to link you with Monitor Garrie.

Based on communications between Counsel and Monitor Garrie, I am including all Alliance counsel (the City's, Alliance, Intervenors) in this email.

Thank you

Kenneth Mejia, CPA *(he/him)*
City Controller
LA City Controller
**https://controller.lacity.gov/**

**968**

# EXHIBIT 9

Outlook

## RE: Meeting Request: Alliance Monitor & Ed Gipson

**From** Scolnick, Kahn A. <KScolnick@gibsondunn.com>

**Date** Tue 10/28/2025 12:18 PM

**To** Kenneth Mejia <kenneth.mejia@lacity.org>

**Cc** Daniel B. Garrie <Daniel@lawandforensics.com>; Sonya Morgan <smorgan@lawandforensics.com>; Jane Nguyen <jane.nguyen@lacity.org>; Dinah Manning <dinah.manning@lacity.org>; Ashley Bennett <ashley.bennett@lacity.org>; Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Mariani Jessica <jessica.mariani@lacity.org>; Hoang Arlene <arlene.hoang@lacity.org>; Michele <michele@michelecmartinez.com>; Szabo Matt <matt.szabo@lacity.org>; Mitchell Elizabeth <elizabeth@umklaw.com>; Morgan Ward Doran <Morgan@lawandforensics.com>; R. Myers Shayla <SMyers@lafla.org>; M. Brody Lauren <lbrody@millerbarondess.com>

Hi Mr. Mejia.  Dropping Mr. Gipson from this chain.   We've requested that if Mr. Garrie (or you, on his behalf) would like to speak with or get information from any City official or employee (other than you) in his capacity as monitor in this litigation, the request should be made through the City's counsel and then we can coordinate.  Of course, if the Court has given a different instruction, please let us know.

Thanks.

**Kahn A. Scolnick**

T: +1 213.229.7656
KScolnick@gibsondunn.com

### GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197

---

**From:** Kenneth Mejia <kenneth.mejia@lacity.org>
**Sent:** Tuesday, October 28, 2025 9:06 AM
**To:** Edwin Gipson <edwin.gipson@lacity.org>
**Cc:** Daniel B. Garrie <Daniel@lawandforensics.com>; Sonya Morgan <smorgan@lawandforensics.com>; Jane Nguyen <jane.nguyen@lacity.org>; Dinah Manning <dinah.manning@lacity.org>; Ashley Bennett <ashley.bennett@lacity.org>; Hamburger, Bradley J. <BHamburger@gibsondunn.com>; Mariani Jessica <jessica.mariani@lacity.org>; Hoang Arlene <arlene.hoang@lacity.org>; Michele <michele@michelecmartinez.com>; Mejia Kenneth <kenneth.mejia@lacity.org>; Szabo Matt <matt.szabo@lacity.org>; Mitchell Elizabeth <elizabeth@umklaw.com>; Morgan Ward <Morgan@lawandforensics.com>; R. Myers Shayla <SMyers@lafla.org>; M. Brody Lauren <lbrody@millerbarondess.com>; Scolnick, Kahn A. <KScolnick@gibsondunn.com>
**Subject:** Meeting Request: Alliance Monitor & Ed Gipson

---

Ed,

The Alliance Monitor has reached out to request a meeting with you to discuss Alliance related matters. In accordance with my role, I am writing to link you with Monitor Garrie.

**970**

Based on communications between Counsel and Monitor Garrie, I am including all Alliance counsel (the City's, Alliance, Intervenors) in this email.

Thank you

Kenneth Mejia, CPA *(he/him)*
City Controller
LA City Controller
**https://controller.lacity.gov/**

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

971

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: November 7, 2025

Title: LA ALLIANCE FOR HUMAN RIGHTS, ET AL., V. CITY OF LOS ANGELES, ET AL.

PRESENT:      THE HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

| Karlen Dubon | Not Present |
|:---:|:---:|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|:---:|:---:|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):**    **OSC IN RE CONTEMPT – CITY OF LOS ANGELES**

Special Master Michele Martinez (Dkt. 1060) and Monitor Daniel B. Garrie (Dkt. 1063) each filed a status report, on October 31, 2025 and November 3, 2025 respectively, detailing delays in the City of Los Angeles's (the "City") implementation of its responsibilities under the Settlement Agreement and the June 24, 2025 order regarding settlement compliance (Dk. 991) ("Settlement Compliance Order"), and impedance of the Special Master and Monitor's responsibilities under the agreement and Settlement Compliance Order. The City responded (Dkts. 1064; 1065, Ex. B) to both requests, on November 5, 2025 and November 6, 2025. The Special Master issued a follow-up report on November 7, 2025 after the City's response (Dkt. 1065).[1]

The Court previously warned that "[f]ailure to comply with these orders may result in sanctions." Settlement Compliance Order (Dkt. 991) at 57. Accordingly, the City shall appear before United States District Judge David O. Carter in Courtroom One at the First Street Courthouse in Los Angeles, on November 12, 2025, at 9 a.m., to show cause why it should not be held in contempt for the issues raised in the Special Master's and Monitor's status reports.

The Court requests that Mayor Karen Bass and Council President Marqueece Harris-Dawson attend in-person.

The Clerk shall serve this minute order on the parties.

Initials of Deputy Clerk: kdu

---

[1] These status reports and the city's responses are attached as exhibits to this Order.

**972**

# EXHIBIT A

FILED
CLERK, U.S. DISTRICT COURT

10/31/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____kdu_____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al.

Plaintiff,

v.

CITY OF LOS ANGELES, et al.

Defendant.

Case No. LA CV 20-02291-DOC(KESx)

Judge: Hon. David O. Carter

**SPECIAL MASTERS REQUEST**

1

**974**

RE: REQUEST FOR UPDATES ON CITY OF LOS ANGELES QUARTERLY REPORT (Q3 2025)

TO THE COURT AND ALL PARTIES:

Please take notice that on October 30, 2025, the Special Master transmitted the attached formal request for updates to the City of Los Angeles and the Parties via email. The request pertains to the City's October 15, 2025 Quarterly Report, covering the reporting period ending September 30, 2025.The request seeks written responses by November 6, 2025 to support the Special Master's review of compliance, verification, and validation under the Settlement Agreement and Dkt. 991. A copy of the request is attached hereto as Exhibit A.

A copy of the request is attached hereto as Exhibit A.

Respectfully submitted,
Dated: October 31, 2025
Michele Martinez
Special Master

**975**

Exhibit A- Special Master's Request for Updates (October 30,2025)

**DATE:** October 30, 2025
**FROM:** Michele Martinez, Special Master
**RE:** Request for Updates – Q3 2025 Compliance Review
**Subject:** Request for Updates on Settlement Obligations – October 2025 Quarterly Report
**TO:** Counsel for the City of Los Angeles

Dear Counsel,

As I prepare to submit my Special Master's report reviewing the City's self-reported data for the third quarter of 2025 (reporting period ending September 30, 2025), I am requesting updates on several outstanding obligations under the Settlement Agreement and Dkt. 991.

Please provide written responses to each section below so I may accurately reflect the status of implementation and compliance.

I will need your response by **November 6, 2025**, as I will be submitting my report to the Court in advance of the **November 12th hearing**.

## I.      Section 7.1 – Reporting on PEH Served

The City's October 15, 2025 Quarterly Report is currently under review for compliance, verification, and validation pursuant to Dkt. 991 and the Settlement Agreement.

**The report states:**
"This Quarterly Report does not include information regarding the number of persons experiencing homelessness served by the current intervention opportunities. The City has not been able to collect and verify that information in the time provided to complete this Report."

**However, Section 7.1 of the Settlement Agreement requires quarterly updates on:**
- Housing or shelter opportunities created
- Opportunities offered
- Opportunities currently available
- Number of persons experiencing homelessness (PEH) served in each Council District

**Please confirm:**
- Whether the City has requested this data from LAHSA
- When the verified PEH served data will be submitted

**976**

## II.  Section F – Encampment Reduction Reporting (per <u>Dkt. 991</u>)

**In the City's July 15, 2025 Quarterly Report (<u>Dkt. 1011-1</u>), the City acknowledged:**
"The Court directed the City to 'report its updated encampment reduction data beginning in the October 2025 quarterly status report.' … The City thus is not including encampment-reduction data in this quarterly status report, but will endeavor to provide that information in the quarterly report slated for October 2025…"

Despite this commitment, the October 15, 2025 report does not include Q3 2025 data (July–September), nor does it explain why that data is missing. The Court's directive was issued on June 24, 2025, providing the City with a full quarter to begin tracking reductions consistent with the Court's definition.

The Monitor appointed under Section 7.2 will be responsible for reviewing whether offers of shelter or housing were made to individuals whose tents, makeshift shelters, or vehicles are counted as encampment reductions.

**The City is expected to:**
- Provide the name of the shelter or housing offered and available for each encampment reduction
- Support this with documentation, with specific requirements to be finalized by the Monitor in consultation with the Parties

**Please confirm:**
- When the City will submit Q3 2025 encampment reduction data consistent with the Court's definition
- Whether the City has prepared or intends to provide documentation of shelter or housing offers for each reported reduction
- Whether the City intends to provide the name of the shelter or housing offered for each reduction, as expected by the Court
- Whether the City has consulted with the Monitor or Plaintiffs regarding documentation protocols

## III. Section E – Verification and Validation (per <u>Dkt. 991</u> and October 14, 2025 Minute Order)

Section 7.2 of the Settlement Agreement requires the Parties to engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance. The City is responsible for funding this monitor.

977

**Dkt. 991** (June 24, 2025) states:

"To address verification failures, the parties shall meet and confer on a third-party Monitor by August 22, 2025, and subject to the Court's approval, select the Monitor by September 12, 2025, to oversee quarterly compliance checks and milestone validation." (Dkt. 991 at 50)

"Subject to the Parties' input, the Monitor will at least be responsible for reviewing the City's data prior to publication of its quarterly reports, verifying the numbers reported, engaging with the Parties and LAHSA to resolve data issues, and providing public reports on data compliance. The Monitor shall have full access to the data that the City uses to create its reports to the Court." (Dkt. 991 at 50)

"To streamline disputes over verification and compliance, the Court also orders that the Parties attend an in-person court hearing after the submission of each quarterly report. This accountability measure will ensure that disagreements are efficiently resolved as they arise." (Dkt. 991 at 50)

On October 14, 2025, the Court appointed **Daniel Garrie as the Monitor** and designated **Controller Kenneth Mejia as liaison**, without further cost to the City. Mr. Mejia is tasked with facilitating data access and coordination at Mr. Garrie's discretion. (Minute Order, Oct. 14, 2025, pp. 4–5)

**The Court reiterated that the Monitor's role is not ceremonial or advisory. It requires:**
- Real-time data auditing and timestamp validation
- Applied knowledge of data integrity and source attribution
- Verification that reported figures are supported by primary evidence
- Capacity to distinguish verified data from placeholders or estimates

On October 22, the City filed a notice of appeal and an ex parte application for a stay of that appointment (Dkt. 1054), asserting that the appointment was made without its consent or City Council approval. The City also cited concerns about cost, scope, and the independence of elected officials.

On October 23, 2025, Plaintiffs filed their opposition to the City's ex parte application for a stay (Dkt. 1055), arguing that the City had jointly submitted the dispute to the Court under Section 24 of the Settlement Agreement and that the Court acted within its authority in appointing the monitor.

**Please confirm:**
- Whether the City intends to provide requested data to Mr. Garrie and Controller Mejia upon receipt of specific requests

978

- Whether any verified data is expected to be available for review prior to the November 12 hearing
- Whether the City anticipates supporting an initial assessment from the monitors, even if full validation is not yet possible
- Whether the City has taken any steps to internally assess or verify the reported bed and unit figures, pending third-party validation
- Whether any milestone-related data has been reviewed or documented in a way that could support future validation efforts
- How the City is currently ensuring accuracy and transparency in its reported figures

As of this writing, Mr. Garrie has communicated with the city to meet with City staff and submitted preliminary questions, but no underlying data has been provided for verification or milestone validation. With the November 12 hearing approaching, it is unclear whether Mr. Garrie or Controller Mejia will receive the necessary data in time to conduct an initial assessment. As the Special Master, I will not be in a position to confirm verification and validation of the City's Q3 2025 reported figures under Section 7.2 unless the underlying data is provided and the monitor is able to conduct an initial review.

## IV. Section 8.2 – Emergency Pause and Meet-and-Confer Obligation

Section 8.2 of the Settlement Agreement allows for a pause in obligations during declared emergencies, provided the Parties meet and confer on any necessary and appropriate amendments:

"In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council… the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations." (Dkt. 429-1 § 8.2) This provision applies only to Sections 3, 4, and 5 — housing/shelter creation, engagement, and milestones. It does not apply to Section 7 (reporting) or Section 7.2 (monitor oversight).

**The Court reaffirmed this in Dkt. 991:**
"The Settlement Agreement also imposes a duty on both parties to meet and confer in good faith to determine the necessary adjustments during any such pause. The Court reiterates that this responsibility remains ongoing and mutual. Resorting to the Court for answers that should first be addressed collaboratively under the Agreement only undermines its purpose." (Dkt. 991 at 55)

**979**

**The Court further clarified:**

"The invocation of Section 8.2 does not excuse the City from its ongoing responsibilities—particularly with respect to accurate reporting and verification of beds. The pause provision is not a blanket exemption from compliance." (Dkt. 991 at 55)

**The City is required to:**

- Declare an emergency
- Meet-and-confer with Plaintiffs

While the City referenced Section 8.2 in its ex parte application for a stay (Dkt. 1054), citing wildfires, civil unrest, and a fiscal emergency, the October 15, 2025 Quarterly Report does not indicate that Section 8.2 has been formally invoked. No record of a meet-and-confer or proposed amendments has been shared with the Special Master or the Court.

**Please confirm for the record:**

- What date the City invoked Section 8.2
- Whether the City and Plaintiffs have met and conferred as required
- What adjustments, if any, are being proposed

Thank you for your attention to these matters. I look forward to your response by **November 6, 2025**.

Respectfully,
Michele Martinez
Special Master

Exhibit A

**980**

# EXHIBIT B

981

LAW AND FORENSICS
DANIEL B. GARRIE
  *daniel@lawandforensics.com*
10665 Durland Ave NE
Seattle, Washington 98125
Telephone:  855.529.2466

*Monitor*

**F I L E D**
CLERK, U.S. DISTRICT COURT

11/03/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA Alliance for Human Rights, *et al.*,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>City of Los Angeles, *et al.*<br><br>                    Defendants. | Case No. 2:20-CV-02291-DOC-KES<br><br>Honorable David O. Carter<br>United States District Judge<br><br>**STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025**<br><br>Action Filed:        March 10, 2020 |

**982**

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to the Court's October 14, 2025 Order Resolving Third-Party Monitor Appointment and Scope of Work (Dkt. 1048) ("Order Appointing Monitor"), the Monitor submits this Status Report for October 2025 ("Status Report").

**I.    Overview**

This interim Status Report updates the Court and the Parties on the Monitor's efforts to "provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of [the Parties' Settlement] Agreement" (Dkt. 421-1). The Court subsequently explained that the Monitor:

- will 'at least be' responsible for reviewing and verifying the [C]ity's data prior to publication, resolving data issues, and providing public reports on data compliance;
- will have full access to the data the City uses to create its reports;
- shall review and provide guidance on public accessibility to the City's contracts and invoices;
- will confirm that shelter or housing offers were made with respect to the encampment reductions

(Dkt. 1048 at 2, *citing* Dkt. 991 at 50) ("Monitor's Duties").

As detailed further below, in the almost three weeks since the Order Appointing Monitor, the Monitor has made an effort to fulfill the Monitor's Duties efficiently. However, the procedural process requested by counsel for the City ("City Counsel") has slowed progress. The City Counsel instructed the Monitor not to contact any City employees directly. Instead, all communications must pass through City Counsel in the first instance: City Counsel rejected the Monitor's proposed compromise to copy counsel. The necessary consequence of this restriction is an increase in the time and costs associated with executing the Monitor's Duties.

Page 1

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

**983**

At present, the Monitor has only been able to engage in the *scheduling* of scoping interviews with key City subject matter experts. No interviews have occurred. In addition, the Monitor's review of the publicly reported summary (*i.e.*, not source) "Intervention Data" in the City's quarterly reports indicated numerous data collection, definition, and reporting issues that must be addressed before any analysis can be performed.

Thus, despite his best efforts to streamline communications and effort, and notwithstanding the Court's directive that "[t]he City must make arrangements with the Monitor so he can meet the forthcoming November 12, 2025 deadline for an initial assessment" (Dkt. 1048, at 2), the Monitor does not anticipate being able to provide a substantive update to the Court at that hearing.

## II. Monitor's Efforts to Obtain Access to Staff and Information

Immediately after learning of the Court's appointment, the Monitor[1] initiated outreach to start the process of assessing the City's systems and data related to persons experiencing homelessness ("PEH"). The morning of October 15, 2025, the Monitor communicated with Special Master Michele Martinez ("Special Master"), who suggested that the Monitor reach out to City Controller Mejia ("Controller Mejia") to discuss the Order Appointing Monitor. The Monitor emailed Controller Mejia later that day seeking an introductory meeting.

The next day, on October 16, 2025, the Monitor engaged in a video conference call with Controller Mejia and his staff. The attendees discussed the Monitor's Duties and the Court's instruction that Controller Mejia "will support [the Monitor], without further cost to the City, in the execution of his role by facilitating data access and coordination." (Dkt. 1048, at 4). In addition to providing an overview of his office's efforts, Controller Mejia expressed his willingness to assist the Monitor, including helping to identify and connect the Monitor to relevant City subject matter

---

[1] References to the Monitor regarding communications are inclusive of his staff.

Page 2

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

**984**

experts.

On October 18, 2025, the Monitor emailed the City's Chief Administrative Officer, Matt Szabo ("CAO Szabo") after receiving his contact information from Controller Mejia. *See* **Exhibit 1**. The Monitor sought clarifying information regarding the Intervention Data in the City's Quarterly Report for the period ending September 2025 (Dkt. 1051) ("September 2025 Report"). *See* **Exhibit 1**. Specifically, the Monitor attached an Excel workbook that included the following tabs (*aka* worksheets): three (3) identical questions about each entry in the Intervention Data table; six (6) questions about the City's data systems; and ten (10) general questions. *Id.* In addition, the Monitor requested an interview the following week, on October 23, 2025, with CAO Szabo "or a member of your team who can answer these questions." *Id.*

On October 21, 2025, City Counsel Scolnick emailed the Monitor regarding the data and scheduling request to CAO Szabo, stating that the Monitor had "pos[ed] several hundred questions and request[ed] various in-person interviews." *See* **Exhibit 2**. Noting that "[t]he City is a represented party in this litigation," City Counsel wrote, "[p]lease do not contact City officials or employees directly. If you'd like to speak with City officials or employees, please make those requests through counsel, and we can coordinate." *Id.* City Counsel Scolnick also referenced the City's impending appeal of the Order Appointing Monitor and request for a stay pending appeal, stating "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." *Id.*

That same day, the Monitor responded to City Counsel Scolnick's email. *See* **Exhibit 3**. The Monitor agreed to "ask the court to clarify how it expects me to communicate with the City's staff: directly or through its attorneys." *Id.* Highlighting that the Order Appointing Monitor specifically directs the Monitor to collaborate with Controller Mejia, the Monitor asked City Counsel to confirm "which City officials and employees you represent and whether your representation

Page 3

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

**985**

extents to [Controller Mejia]." *Id.* The Monitor pointed out that he had sent CAO Szabo "twenty-four questions cover[ing] straightforward topics with which the City is intimately familiar and that it should be able to answer easily." *Id.* The Monitor closed the email by emphasizing the urgency of the request due to the demanding timeline set by the Court and stating that "[t]he City's prompt response to these questions will help us move forward collaboratively and efficiently." *Id.*

On October 22, 2025, City Counsel Scolnick responded. *See* **Exhibit 4**. First, he requested that City Counsel be notified if the Court "direct[s] you to engage in direct outreach and/or contact with City officials and employees other than Controller Mejia." *Id.* (emphasis in original). Second, while noting that "Controller Mejia . . . just like every other City official and employee" is "represented by the "City . . . and by Gibson Dunn in this litigation," City Counsel Scolnick "consent[ed] to" the Monitor's direct communication with him. *Id.* However, City Counsel stated that "we are not consenting to your direct communications with any other City official or employee." *Id.* Third, City Counsel Scolnick indicated that the City could not fully answer the Monitor's questions about the September Quarterly Report, questioning "whether this level of detail is actually required to verify the quarterly report data" and noting that "[t]he CAO also does not have all of the information readily available for each 'System / Dataset' Listed." *Id.* Finally, regarding setting an interview with CAO Szabo, City Counsel stated the interviewee would be out of the country until October 31, 2025, and requested pushing the meeting until the following week. *Id.*

On October 24, 2025, the Monitor and City Counsel Scolnick engaged in a volley of numerous emails regarding correspondence protocol (*e.g.*, who to copy on what emails, the City's objection to "*ex parte* communications with counsel for any of the parties," what to do if privileged communications are accidentally emailed, etc.). *See* **Exhibit 5** (email chain). In the final email related to that chain, Plaintiff's counsel stated that they "are happy to waive ex parte communications [involving the

Page 4

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

986

Monitor] . . . [because] [t]hat's how things have historically been done over the last five years." But since "the City's lawyers are now insisting on being involved in every communication, then we also need to be included." *See* **Exhibit 6**.

On October 27, 2025, City Counsel Scolnick emailed the Monitor "preliminary information in response to your various questions to the CAO's office" regarding the September Quarterly Report. *See* **Exhibit 7**. Noting the compressed time schedule, City Counsel Scolnick stated that "the City has not had sufficient time to fully evaluate these responses with all relevant stakeholders for completeness and accuracy." *Id.* He also wrote that the City "would appreciate being kept on communications with LAHSA as well." *Id.*

On October 28, 2025, Controller Mejia emailed City employee Edwin Gipson to facilitate a meeting between him and the Monitor. *See* **Exhibit 8**. Referencing the email protocol discussed in **Exhibit 7**, Controller Mejia included "all Alliance counsel (the City's, Alliance, intervenors) in th[e] email." *Id.* City Counsel Scolnick sent a response to the original recipients "[d]ropping Mr. Gipson from th[e] chain" and stating that all communications from the Monitor or Controller Mejia "should be made through the City's counsel and then we can coordinate." *See* **Exhibit 9**. The Monitor responded, apologizing for the inconvenience and noting that "it was [his] understanding that Mr. Mejia was permitted under the [Order Appointing Monitor] to coordinate the meetings with the City." *See* **Exhibit 10**. The Monitor stated that he "will seek immediate clarification from the Court regarding Mr. Mejia's involvement." *Id.*

In a separate branch of that email chain on the same day, the Monitor formally requested that City Counsel Scolnick "[p]lease work with . . . my team to co-ordinate the meeting" with Mr. Gipson. *See* **Exhibit 11**. City Counsel Scolnick responded "[w]ill do." *See* **Exhibit 12**.

On October 31, 2025, having not received a response from City Counsel Scolnick, the Monitor sent a follow-up email to schedule the meeting with Mr.

Page 5

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

987

Gipson. *See* **Exhibit 13**. City Counsel Scolnick responded "[y]es, I had been waiting to hear from you. Will check and get back to you." *See* **Exhibit 14**. Later that day, City Council emailed: "I learned that Mr. Gipson is out of the office until Monday, so we'll touch base with you as soon as we hear back from him on Monday." *See* **Exhibit 15**.

### III.    Information Gathering Efforts

As the above communications establish, the Monitor has encountered numerous issues in obtaining information from the City. The City has required that the Monitor funnel all requests for information or meetings through City Counsel. *See* **Exhibits 2-4**. The City extended this restriction to "any *ex parte* communications with counsel for any of the parties," *see* **Exhibit 5**, despite such communications being the *status quo* for the previous five years. *See* **Exhibit 6**. City Counsel also applied these limitations to Controller Mejia, notwithstanding the directive in the Court's Order Appointing Monitor that the Controller provide support "by facilitating data access and coordination." *See* **Exhibits 8-9**.

The City's procedural requirements have delayed the Monitor in his ability to perform Court-appointed duties. Channeling all requests through City Counsel necessarily introduces temporal lag and material inefficiencies. Therefore, the Monitor has yet to meet any City staff; the first meeting, with CAO Szabo, is scheduled for today, November 3, 2025.

In sum, the City, through its counsel, has delayed the Monitor's timely execution of his Court ordered responsibilities.[2]

### IV.    Data Concerns

A review of the summary Intervention Data that attend the City's quarterly reports raises several questions about the collection, definition, and reporting of the

---

[2] By requiring all communications to flow through counsel rather than permitting direct engagement with City staff, the City has delayed data collection, postponed interviews, and constrained the Monitor's ability to meet Court-imposed deadlines.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

**988**

underlying data.

The Monitor attempted to obtain answers to some of these questions in his first query to the City. *See* **Exhibit 1**. The City's "initial responses were prepared under a compressed scheduled" and without the benefit of "sufficient time to fully evaluate the[m] with all relevant stakeholders for completeness and accuracy." *See* **Exhibit 6**. Giving proper deference to this caveat, the responses are inadequate. For example, the Monitor asked the following regarding the entries on the Intervention Data table: "From which City system(s)/database(s) were the reported 'Units/Beds,' 'Status,' and 'Open & Occupiable Date' generated?" *See* **Exhibit 1** at 3-16. Rather than identify the underlying *system(s) or database(s)*, the City responded with statements regarding the *entity* that collected the data (*e.g.*, "The Los Angeles Housing Department provides the 'Units/Beds' and 'Status' information," "Data is confirmed quarterly by HACLA Asset Management staff," "CAO maintains records of the beds, status, and open and occupiable date," "Information was confirmed by the Community Investment for Families Department (CIFD)," etc.). *See* **Exhibit 6** at 24-25.

The Monitor also asked specific questions about ten (10) systems and datasets, including who the system owner was, how frequently the data is updated, and how data governance is handled. *See* **Exhibit 1** at 17-19. The City's responses were circumscribed and also deferred to a third-party data maintainer (*e.g.*, "LAHSA is the system owner") for key datasets like the Homeless Management Information System ("HMIS"). *See* **Exhibit 6** at 24-25. In addition, although the Monitor's questions sought information on each of the ten (10) systems identified, the City's responses to some of the questions regarding these systems was to not provide sufficient and/or appropriate technical details. *Id.*

Several of the Monitor's questions concerned the City's definition and count of PEH, in part because the September 2025 Report did not include data on "Total PEH Served." (Dkt. 1051, Exhibit A). Instead, the City's entry for this column of

Page 7

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

**989**

data was either "Pending" or blank (*i.e.*, an empty field). *Id.* By way of explaining the missing data, in Footnote 2 to Exhibit A of the September 2025 Report, the City wrote:

> This Quarterly Report does not include information regarding the number of persons experiencing homelessness served by the current intervention opportunities. The City has not been able to collect and verify that information in the time provided to complete this Report. The City is continuing to work to collect that information, and will supplement this Report when it is able to do so.

*Id.* at 10. However, the City's prior quarterly reports included PEH information.

One of the Monitor's questions about PEH inquired how the City defines the term. The City responded that it "uses HUD's definition of homelessness, which can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/." *See* **Exhibit 6** at 27. But the HUD link identifies four (4) categories of homelessness, not a definition of PEH. This distinction illustrates the problem with the City's response. For example, it is not clear how the City identified and counted the second HUD category, "Imminent Risk of Homelessness," which captures the risk of a future loss of a primary residence. Similarly, the City's referral to the third HUD category "Homeless Under Other Federal Statutes," requires the Monitor to perform an iterative search of federal law. Adding to the lack of definitional clarity, the HUD website notes that "HUD has not authorized any CoC to serve the homeless under Category 3."

More fundamentally, the City's responses highlight a core concern with the quarterly reports; they provide summary data on three quantitative measures (*i.e.*, "Units/Beds," "Status," and "Total PEH Served") that the City cannot readily define, provide basic information about, or confirm are treated consistently across reporting entities. For example, the City-provided definition of "Units/Beds" does not actually

Page 8

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

define either term, instead using the terms themselves in the "definition." **Exhibit 6** at 27 (Definition of Units/Beds: "Number of units/beds serving people experiencing homelessness counting toward Settlement requirements."). The utility of this definition, particularly its use of the phrase "*serving* people experiencing homelessness," is further called into question by the lack of any data in the "Total PEH Served" column of the September 2025 Report. (Dkt. 1051, Exhibit A). It begs the question of how a unit or bed can be counted as serving PEH if there are no data about the number of PEH being served.

**V.     Conclusion**

The Monitor has not yet interviewed any City staff and has been unable to gain sufficient data and/or information about the City's data collection, management, analysis, and reporting methods.[3] In short, the Monitor does not anticipate having sufficient information to give a substantive report at the upcoming November 12, 2025 hearing.

Dated:  November 3, 2025              Respectfully submitted,

/s/
Daniel B. Garrie
Law and Forensics
*Data Monitor*

---

[3] There are also real-world impacts on the Monitor's ability to perform his duties efficiently and effectively that flow from the City's Ex Parte Application for Stay of Order Appointing Daniel Garrie as Monitor (Dkt. 1054) and the related appeal (Dkt. 1053). City Counsel Scolnick informed the Monitor that "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." See Exhibit 2. In other words, until the Court and the Ninth Circuit make a final determination, the City challenges both the validity of the Monitor's appointment and any interim fees that the Monitor incurs.

Page 9

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

991

# EXHIBIT C

992

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
  kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:   213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>       Defendant. | CASE NO. 2:20-cv-02291 DOC (KES)<br><br>Honorable David O. Carter,<br>United States District Judge<br><br>**DEFENDANT CITY OF LOS ANGELES'S RESPONSE TO STATUS REPORT OF MONITOR DANIEL B. GARRIE (DKT. 1062, 1063)**<br><br>Action Filed:    March 10, 2020 |

DEFENDANT'S RESPONSE TO STATUS REPORT OF MONITOR DANIEL B. GARRIE
2:20-cv-02291 DOC (KES)

**993**

Daniel Garrie's November 3, 2025 Status Report (Dkt. 1062, 1063) is riddled with mischaracterizations that accuse the City of delaying and impeding the progress of the Monitor and increasing the cost of that work.  The City files this response to correct the record.

Mr. Garrie takes issue with the "procedural process" the City has requested.  But the City has simply asked that Mr. Garrie direct any requests for information from City officials or employees to the City's counsel, rather than directly contacting those officials or employees without involving the City's counsel (as Mr. Garrie had attempted to do initially with City Administrative Officer Matt Szabo).  There is nothing improper or unusual about the City's request.  Because the City is a represented party in this litigation, City officials and employees are represented by counsel in connection with this case.  Therefore, it is entirely appropriate to expect that if Mr. Garrie wants information from the City—including information from any specific City official or employee—he should direct his inquiry to the City's counsel to facilitate the request.

More importantly, Mr. Garrie's status report provides zero evidence of any delay, inability to obtain information, or added cost resulting from the City's request.  To the contrary, the documents attached to Mr. Garrie's status report show that the City's counsel has responded promptly and professionally to his requests for information and taken steps to facilitate interviews with the City officials and employees that Mr. Garrie has requested.  *See* Ex. 4 (Oct. 22 Email from K. Scolnick offering dates for interview of Mr. Szabo); Exhibit 7 (Oct. 27 Email from K. Scolnick offering additional dates for interview of Mr. Szabo).  If anything, having the City's counsel involved should lead to better coordination and efficiency—giving Mr. Garrie and his staff a single point of contact for making requests to City officials and employees.

Finally, the City's reservation of its rights, appeal, and pending ex parte application to stay Mr. Garrie's appointment are an appropriate exercise of the City's rights, and similarly not a cause of any unwarranted delay, as Mr. Garrie wrongly suggests.  Dkt. 1063 at 9 n.3.  And while the City maintains that the Court's appointment

Gibson, Dunn &
Crutcher LLP

DEFENDANT'S RESPONSE TO STATUS REPORT OF MONITOR DANIEL B. GARRIE
2:20-cv-02291 DOC (KES)

994

order should be stayed, it has cooperated with Mr. Garrie in the interim and will continue to do so unless there is a stay by this Court or the Ninth Circuit.

DATED: November 5, 2025    Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: _/s/ Kahn A. Scolnick_
   Kahn A. Scolnick

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

Gibson, Dunn &
Crutcher LLP

2

DEFENDANT'S RESPONSE TO STATUS REPORT OF MONITOR
2:20-cv-02291 DOC (KES)

**995**

# EXHIBIT D

# GIBSON DUNN

November 6, 2025

Michele Martinez
Special Master

Re:    LA Alliance v. City of Los Angeles, Case N. 2:20-cv-2291-DOC
Response to October 30, 2025 Request from Special Master

Dear Special Master Martinez:

Please see below responses to the questions raised in your October 30, 2025 correspondence.

**I.    Section 7.1 – Reporting on PEH Served**

- **Whether the City has requested this data from LAHSA**

Yes, the City has requested this data.  Representatives from the City Administrative Office met with LAHSA this week.

- **When the verified PEH served data will be submitted**

Verified PEH served data will be submitted once the City has received the data it needs to verify those numbers and has verified that data.

**II.    Section F – Encampment Reduction Reporting**

- **When the City will submit Q3 2025 encampment reduction data consistent with the Court's definition**

Encampment reduction data for July 1 through September 20, 2025 consistent with the Court's definition was submitted with the City's last quarterly report.  Dkt. 1051-3.

- **Whether the City has prepared or intends to provide documentation of shelter or housing offers for each reported reduction**

As contemplated by the Court's June 24, 2025 order, Dkt. 991 at 54, the City intends to work with Mr. Garrie to provide available data on this topic (unless his appointment is stayed by Judge Carter or the Ninth Circuit).

**Gibson, Dunn & Crutcher LLP**

333 South Grand Avenue  |  Los Angeles, CA 90071-3197  |  gibsondunn.com

**997**

# GIBSON DUNN

Michele Martinez

November 6, 2025
Page 2

- **Whether the City intends to provide the name of the shelter or housing offered for each reduction, as expected by the Court**

As contemplated by the Court's June 24, 2025 order, Dkt. 991 at 54, the City intends to work with Mr. Garrie to provide available data on this topic (unless his appointment is stayed by Judge Carter or the Ninth Circuit).

- **Whether the City has consulted with the Monitor or Plaintiffs regarding documentation protocols**

The City has not yet had discussions with Mr. Garrie or Plaintiffs regarding this topic.

III.     **Section E – Verification and Validation**

- **Whether the City intends to provide requested data to Mr. Garrie and Controller Mejia upon receipt of specific requests**

Unless the order appointing Mr. Garrie and Controller Mejia is stayed by Judge Carter or the Ninth Circuit, the City intends to provide available data that it has in its possession in response to appropriate requests from Mr. Garrie and Controller Mejia.

- **Whether any verified data is expected to be available for review prior to the November 12 hearing**

The City does not know what you mean by "verified data" in this context.  In any event, the City has not received any requests from Mr. Garrie to provide any "verified data" prior to the November 12 hearing.  To the extent such a request is received, the City will work in good faith to understand exactly what is being requested and to provide responsive data that it has in its possession.

- **Whether the City anticipates supporting an initial assessment from the monitors, even if full validation is not yet possible**

The City does not know what you mean by "initial assessment," "full validation," or "supporting." To the extent you are asking about Mr. Garrie's initial efforts, the City has already and will continue to respond to requests from Mr. Garrie unless his appointment is stayed by Judge Carter or the Ninth Circuit.

- **Whether the City has taken any steps to internally assess or verify the reported bed and unit figures, pending third-party validation**

All bed and unit data are confirmed by the responsible agency or City department using the agency's/department's protocols before being added to the list for quarterly reporting.  CAO routinely reviews and checks the reported bed and unit figures before that information is reported to the Court.  CAO staff cross reference data provided using available documents resources and confirm information with the responsible agency or City department as needed (the relevant

**998**

## GIBSON DUNN

Michele Martinez                                                    November 6, 2025
                                                                         Page 3

agencies or departments are Los Angeles Housing Department (LAHD), Housing Authority of the City of Los Angeles (HACLA), Los Angeles Homeless Services Authority (LAHSA), and Community Investment for Families Department (CIFD)).  CAO staff also review invoices for hotel/motel booking agreement sites to confirm the number of rooms used for interim housing at the sites during the quarterly reporting period, and also review invoices for hotel/motel occupancy sites to confirm the number of contracted rooms used for interim housing as opposed to administrative purposes.  Any updates to bed/unit numbers from prior quarterly reports are noted using footnotes.

Documents reflecting City funding approvals and other Council actions are available on the Council File Management System https://cityclerk.lacity.org/lacityclerkconnect/). In addition, the Prop HHH Progress Report Dashboard on the Los Angeles Housing Department website provides public reporting on many of the Permanent Supportive Housing sites (https://housing.lacity.gov/housing/hhh-progress-dashboard).

- **Whether any milestone-related data has been reviewed or documented in a way that could support future validation efforts**

The City does not know what you mean by "milestone-related data" or "future validation efforts," and accordingly cannot respond to this question without further explanation.

- **How the City is currently ensuring accuracy and transparency in its reported figures**

Please see the above response regarding the City's validation process.

**IV.    Section 8.2 – Emergency Plans and Meet-and-Confer Obligation**

- **What date the City invoked Section 8.2.**

Nothing in the Settlement Agreement requires the City to "invoke" Section 8.2.  Rather, Section 8.2 provides that in the event of any of the enumerated events, "the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement *shall* be paused." (Emphasis added.)  Three events sufficient to trigger Section 8.2 have occurred this year, with the Palisades Fire in January 2025, the City's response to the large-scale civil disturbances in June 2025, and the declared fiscal emergency in July 2025.  The City has repeatedly raised with Plaintiffs' counsel the obligations under Section 8.2, the implication of the emergencies, and proposed modifications to the Settlement Agreement since at least February 2025.

- **Whether the City and Plaintiffs have met and conferred as required.**

The City and Plaintiffs have met and conferred on at least three occasions regarding the emergencies triggering Section 8.2 and the resulting need to modify the Settlement Agreement. While the City has made a reasonable proposal for modification of the Settlement Agreement, Plaintiffs have refused to consider it or to propose any alternative reasonable modifications.

**999**

# GIBSON DUNN

Michele Martinez                                                        November 6, 2025
                                                                              Page 4

- **What adjustments, if any, are being proposed**

The City has proposed that the encampment reduction obligation in the Settlement Agreement be modified such that (a) all 6,129 reductions the City reported through March 31, 2025 count towards the total number of reductions required, and (b) the City would satisfy the remaining encampment reduction obligation by completing 400 additional encampment reductions consistent with the Court's interpretation of the Settlement Agreement by the current completion deadline. The City has not requested, nor does it need, any modification of the current shelter creating obligation. Plaintiffs have rejected that proposal, dispute that any of the emergencies the City has identified warrant any modification to the Settlement Agreement, and have not proposed any reasonable alternative modifications.

**1000**

# EXHIBIT E

Case 2:20-cv-02291-DOC-KES Document 10665 Filed 11/07/25 Page 31 of 36 Page ID #:306317

**F I L E D**

CLERK, U.S. DISTRICT COURT

11/7/2025

CENTRAL DISTRICT OF CALIFORNIA

BY: _____ kdu _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al. <br><br> Plaintiff, <br><br> v. <br><br> CITY OF LOS ANGELES, et al. <br><br><br> Defendant. | Case No. LA CV 20-02291-DOC(KESx) <br><br> Judge: Hon. David O. Carter <br><br> **SPECIAL MASTER'S REPORT** |

1

**1002**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al.,
Plaintiffs,
v.
CITY OF LOS ANGELES, et al.,
Defendants.

Case No. 2:20-cv-02291-DOC-KES
Assigned to: Hon. David O. Carter
Referred to: Special Master Michele Martinez


Submitted by: Michele Martinez, Special Master
Date: November 10, 2025


RE: INTERIM ASSESSMENT OF CITY COMPLIANCE UNDER DKT. 991 AND
SETTLEMENT AGREEMENT


The attached Interim Assessment of City Compliance under Dkt. 991 is respectfully submitted by
Special Master Michele Martinez to inform the Court of the City of Los Angeles's response to the
October 30, 2025 inquiry. This update documents procedural and substantive deficiencies ahead
of the November 12 hearing and is not a final compliance determination. The Special Master's full
Quarter 3 report will be submitted by November 12, 2025 in accordance with the reporting
schedule under Dkt. 991.

This assessment is grounded in the City's obligations under both the Court's enforcement order
(Dkt. 991) and the Settlement Agreement, which together define the requirements for verified data,
milestone validation, and oversight cooperation. The submission is intended solely for judicial
review.

Respectfully submitted,
Michele Martinez
Special Master

**1003**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al.,
Plaintiffs,
v.
CITY OF LOS ANGELES, et al.,
Defendants.

Case No. 2:20-cv-02291-DOC-KES
Assigned to: Hon. David O. Carter
Referred to: Special Master Michele Martinez


INTERIM ASSESSMENT OF CITY COMPLIANCE UNDER DKT. 991 AND SETTLEMENT
AGREEMENT

Submitted by: Michele Martinez, Special Master
Date: November 10, 2025

**Purpose of Submission**

This interim assessment is submitted to inform the Court of the City of Los Angeles's response to
the Special Master's October 30, 2025 inquiry. It outlines procedural and substantive deficiencies
that currently prevent the Special Master and Data Monitor from verifying the City's self-reported
compliance under Dkt. 991 and the Settlement Agreement. This is not a final compliance
determination.

The Special Master's final Q3 report will be submitted by November 12, 2025, in accordance with
the Court's reporting schedule.

**Summary of Findings**
The City submitted a written response on November 6, 2025 at 8:47 p.m. PST. While procedurally
responsive, the submission was neither timely nor substantively adequate. It arrived a full week
after the Special Master's inquiry and failed to provide the verified data, milestone documentation,
or validation necessary for oversight.
As a result:
• The Special Master can complete portions of the Q3 compliance assessment, but several sections
will remain incomplete due to missing documentation and lack of verification
• The Data Monitor cannot validate the City's reported progress without access to underlying data
and milestone materials
• The Court lacks the full evidentiary record needed to determine substantive compliance under
Dkt. 991 and the Settlement Agreement

**1004**

**Oversight Limitations**

Despite procedural engagement, the City has not provided the materials required to fulfill its obligations under Dkt. 991 and the Settlement Agreement. Specifically:

• No verified PEH data by Council District
• No documentation linking shelter/housing offers to encampment reductions
• No milestone validation materials
• No timeline for submission of missing data

These omissions directly impede the Special Master's ability to assess compliance and the Data Monitor's ability to validate reported outcomes.

**Procedural Posture vs. Substantive Cooperation**

Monitor Daniel B. Garrie's November 3, 2025 Status Report identified barriers to access and cooperation. In response, the City:

• Defended its procedural routing through counsel
• Asserted no obstruction
• Cited its pending ex parte application to stay the Monitor's appointment
• Claimed ongoing cooperation

However, the Monitor has not received the data or access needed to perform his duties.

Monitor's Statement and City's Response (Dkt. 1064)
The City's response reflects a pattern of procedural acknowledgment without substantive delivery. Examples include:
• Conditional cooperation ("if Monitor appointment is not stayed")
• Deflection on key terms ("unclear what 'milestone validation' means")
• Routing all Monitor inquiries through counsel
• Lack of engagement with oversight officers

This posture has delayed verification, increased costs, and obstructed oversight.

**Procedural Timeline**
• Quarterly Report Submitted: October 15, 2025
• Special Master Inquiry Issued: October 30, 2025
• Monitor Garrie Status Report Submitted: November 3, 2025
• City Response to Monitor (Dkt. 1064) Submitted: November 4, 2025
• City Response to Special Master Inquiry Submitted: November 6, 2025 at 8:47 p.m. PST
• Court Hearing Scheduled: November 12, 2025
• Final Special Master Report for Q3 to be submitted by November 12, 2025

**Unanswered Questions**

**1005**

The Special Master's October 30 inquiry included six questions. The City's response did not provide:

1. Verified PEH data (Section 7.1)
2. Documentation of shelter/housing offers (Section F)
3. Milestone validation materials (Section 7.2)
4. Clarification on "created" units in Exhibit B
5. Status of coordination with LAHSA
6. Timeline for submission of missing data

These gaps prevent oversight officers from completing their reviews.

**Verification Challenges**
The City's quarterly report submitted on October 15, 2025 was incomplete. It lacked critical data required under Dkt. 991 and the Settlement Agreement, including verified PEH counts, milestone documentation, and shelter offer tracking. These omissions directly triggered the Special Master's formal inquiry on October 30, 2025.

As stated in Monitor Daniel Garrie's November 3, 2025 Status Report, the Monitor has not received the underlying data necessary to validate the City's reported progress. He noted:

"The City has not provided the raw data or milestone documentation required to validate its quarterly report."

This absence of source data prevents the Monitor from confirming whether shelter placements, encampment reductions, or unit creation figures are accurate. The Monitor also reported delays in access and procedural barriers that have increased costs and impeded oversight.

While the City may argue that the Monitor did not formally request specific datasets, the obligation to provide verifiable documentation is embedded in Dkt. 991 and the Settlement Agreement. The Monitor's filing makes clear that the lack of access is not due to omission on his part, but due to the City's failure to produce the necessary materials.

Without verified data, the Special Master and Data Monitor cannot confirm compliance, and the Court lacks the evidentiary record required to assess the City's progress.

The City has had several months since the June 2025 order to coordinate with LAHSA and validate its figures. The absence of verified data and documentation constitutes a substantive failure to comply.

**1006**

**Exhibits**

To support this assessment, the following documents are attached:

• Exhibit A – Special Master's October 30, 2025 inquiry to the City of Los Angeles
• Exhibit B – City of Los Angeles's written response, submitted November 6, 2025 at 8:47 p.m. PST
• Exhibit C – Monitor Daniel B. Garrie's Status Report dated November 3, 2025
• Exhibit D – City of Los Angeles's response to Monitor Garrie's report (Dkt. 1064)


These exhibits provide the factual basis for the findings outlined above and reflect the current limitations in oversight and verification.


**Final Note**

This assessment is submitted to assist the Court in evaluating the completeness and integrity of the City's response. The Special Master and Data Monitor remain unable to perform their oversight roles due to missing documentation, lack of verified data, and absence of milestone validation.

The City's procedural posture has not translated into substantive cooperation. The Special Master's questions remain unanswered, and the oversight process remains stalled.

This submission is intended solely to inform the Court's oversight and does not constitute a recommendation for relief or enforcement.

Respectfully submitted,
Michele Martinez
Special Master

**1007**

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
  kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978.7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., | CASE NO. 2:20-cv-02291 DOC (KES) |
| Plaintiffs, | Honorable David O. Carter, United States District Judge |
| v. | **DEFENDANT CITY OF LOS ANGELES'S REQUEST FOR CLARIFICATION REGARDING NOVEMBER 19, 2025 EVIDENTIARY HEARING** |
| CITY OF LOS ANGELES, a Municipal entity, et al., | |
| Defendant. | |
| | Action Filed:    March 10, 2020 |

Gibson, Dunn & Crutcher LLP

**1008**

During today's hearing, the Court set an evidentiary hearing for November 19, 2025, for potential contempt sanctions against Defendant the City of Los Angeles. Counsel for the City inquired multiple times during the hearing today about the scope of the hearing on November 19—namely, the issues to be addressed and the bases for any potential contempt sanctions. The Court invited the City to make that request in writing.

Accordingly, the City respectfully requests that the Court provide clarification regarding the issues to be addressed at the evidentiary hearing scheduled for November 19. Establishing civil contempt requires proof by "clear and convincing evidence" of "a party's disobedience to a *specific and definite court order* by failure to take all reasonable steps within the party's power to comply." *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 683, 695 (9th Cir. 1993) (emphasis added). Given that the Court has stated that the evidentiary hearing concerns potential contempt sanctions, the City is entitled at a minimum to know which order(s) the Court believes that the City has failed to comply with, as well as which specific parts of those order(s), so that it may prepare its defense in advance of the evidentiary hearing. Due process likewise "requires that there be an opportunity to present every available defense," *Lindsey v. Normet*, 405 U.S. 56, 66 (1972), and that cannot be done unless the City knows specifically what issues are to be addressed at the evidentiary hearing.

DATED: November 12, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Theane Evangelis*
Theane Evangelis

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

Gibson, Dunn &
Crutcher LLP

1

DEFENDANT CITY OF LOS ANGELES'S REQUEST FOR CLARIFICATION REGARDING NOVEMBER 19, 2025 EVIDENTIARY HEARING

**1009**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No: <u>LA CV 20-02291-DOC(KESx)</u>                    Date: <u>November 12, 2025</u>

Title:   <u>LA ALLIANCE FOR HUMAN RIGHTS, et al. v. CITY OF LOS ANGELES, et al.</u>

PRESENT:   <u>THE HONORABLE DAVID O. CARTER, UNITED STATES DISTRICT JUDGE</u>

| Karlen Dubon | Court Smart |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| Elizabeth Mitchell, Matthew Umhofer | **City:** |
| **Intervenors:** | Jessica Mariani, Brad Hamberger |
| Shayla Myers, Isabelle Geczy | Kahn Scolnick, Tim Biche |
| | **County:** |
| | Mira Hashmall, Lauren Brody |

PROCEEDINGS:    **STATUS CONFERENCE RE QUARTERLY REPORT [1061]**
**ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES [1066]**
**MOTION FOR ATTORNEYS' FEES [1022]**
**APPLICATION TO STAY [1054]**
*(Evidentiary Hearing held at Los Angeles First Street)*

Also present, Special Master Michele Martinez, Data Monitor Daniel Gerrie, and L.A. City Controller Kenneth Mejia.

The Court hears arguments re Motion for Attorney Fees [1022].

The Court receives the following exhibits:
  Exhibit A - *Los Angeles Times* article by David Zahniser, published September 17, 2025;
  Exhibit B - *LAist* article by Aaron Schrank, published August 27, 2025;
  Exhibit C - *Los Angeles Times* article by Doug Smith published April 16, 2024;
  Exhibit D - *Daily Journal* article by Skyler Romero, published November 11, 2025.

**1010**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. LA CV 20-02291-DOC (KESx)                          Date: November 12, 2025
                                                                                   Page 2

Acting City Attorneys Gibson Dunn are ordered to file all documents re fee agreements between the City of Los Angeles and Gibson Dunn by Thursday, November 13, 2025 at 12:00 PM.

Motion for Attorneys' Fees [1022] is taken under submission.

Hearing re Quarterly Report [1061], Order to Show Cause re Contempt City of Los Angeles [1066], and Application to Stay [1054] is **CONTINUED** November 19, 2025 at 9:00 AM.

The Court orders the transcript of this hearing designated as the official court record and the transcript for the hearing on November 12, 2025 be made available and open to the public on CM / PACER forthwith.

The Court further orders the transcript be produced at Government expense, billed at the daily rate.

The transcript will also be available to download on the Court's Cases of Interest web page, located here: https://www.cacd.uscourts.gov/newsworthy/cases-of-interest.

cc:      CourtRecording_CACD@cacd.uscourts.gov
         Transcripts_CACD@cacd.uscourts.gov
         Reporter_CACD@cacd.uscourts.gov

                                                              3      :      35
                                                        Initials of Deputy Clerk: kdu

**1011**

# EXHIBIT A

CALIFORNIA

# Lawyers who hit L.A. City with whopping bill on homeless case to get millions more



Los Angeles City Atty. Hydee Feldstein Soto had sought a major increase to the city's contract with the law firm Gibson, Dunn & Crutcher.  (Carlin Stiehl / Los Angeles Times)

**By David Zahniser**
Staff Writer  |  X Follow

Sept. 17, 2025 3:50 PM PT

The Los Angeles City Council on Wednesday approved a <u>fivefold increase</u> to its contract with a law firm that drew heated criticism for the invoices it submitted in a high-stakes

**1013**

homelessness case.

Three months ago, Gibson, Dunn & Crutcher billed the city $1.8 million for two weeks of legal work, with 15 of its attorneys billing nearly $1,300 per hour. By Aug. 8, the cost of the firm's work had jumped to $3.2 million.

The price tag infuriated some on the council, who pointed out that they had approved a three-year contract capped at $900,000 — and specifically had asked for regular updates on the case.

Despite those concerns, the council voted 10 to 3 Wednesday to increase the firm's contract to nearly $5 million for the current fiscal year, which ends in June 2026. Councilmember Katy Yaroslavsky supported the move, saying Gibson Dunn's work has been "essential to protecting the city's interests."

"At the same time, we put new oversight in place to ensure any additional funding requests come back to council before more money is allocated," said Yaroslavsky, who heads the council's budget committee.



**CALIFORNIA**

**Law firm in L.A. homelessness case bills the city $1.8 million for two weeks' work**

Aug. 10, 2025

Councilmembers Tim McOsker, Adrin Nazarian and Nithya Raman voted against the contract increase.

McOsker, who also sits on the budget committee, said he was not satisfied with Gibson Dunn's effort to scale back the amount it is charging the city. After the council asked for the cost to be reduced, the firm shaved $210,000 off of the bill, he said.

1014

"I think Gibson should have given up more, and should have been pressed to give up more," McOsker said after the vote.

A Gibson Dunn attorney who heads up the team that represents the city did not immediately respond to a request for comment. Meanwhile, an aide to City Atty. Hydee Feldstein Soto welcomed the council's vote.

"We are pleased that the City Council recognizes and appreciates the strong legal representation that Gibson, Dunn & Crutcher has provided and continues to provide to the city," Karen Richardson, a spokesperson for Feldstein Soto, said in a statement.

Gibson Dunn was retained by the city in mid-May, one week before a major hearing in the case filed by the L.A. Alliance for Human Rights, a nonprofit group that has been at odds with the city over its handling of the homelessness crisis since 2020.

The city reached a settlement with the L.A. Alliance in 2022, agreeing to create 12,915 homeless shelter beds or other housing opportunities. Since then, the L.A. Alliance has repeatedly accused the city of failing to comply with the terms of the settlement agreement.

In May, a federal judge overseeing the settlement called a seven-day hearing to determine whether he should take authority over the city's homelessness programs from Mayor Karen Bass and the City Council, and hand them over to a third party. Alliance lawyers said during those proceedings that they wanted to call Bass and two council members to testify.

In the run-up to that hearing, the city hired Gibson Dunn, a powerhouse law firm that secured a landmark Supreme Court ruling that upheld laws prohibiting homeless people from camping in public spaces.

**1015**



CALIFORNIA

**Law firm that sent L.A. a big bill in homeless case wants $5 million more for its work**

Aug. 26, 2025

---

Feldstein Soto has praised Gibson Dunn's work in the L.A. Alliance case, saying the firm helped the city retain control over its homelessness programs, while also keeping Bass and the two council members off the stand. She commended the firm for getting up to speed on the settlement, mastering a complex set of policy matters within a week.

Feldstein Soto initially hoped to increase the size of the Gibson Dunn contract to nearly $6 million through 2027 — only to be rebuffed by council members unhappy with the billing situation. On Wednesday, at the recommendation of the council's budget committee, the council signed off on nearly $5 million over one year.

A portion of that money will likely go toward the filing of an appeal of a federal judge's order in the L.A. Alliance case, Feldstein Soto said in a memo.

Faced with lingering criticism from council members, Feldstein Soto agreed to help with the cost of the Gibson Dunn contract, committing $1 million from her office's budget. The council also tapped $4 million from the city's "unappropriated balance," an account for funds that have not yet been allocated.

By transferring the money to the Gibson Dunn contract, the council depleted much of the funding that would have gone to outside law firms over the current budget year, said McOsker, who called the move "bad fiscal management."

Raman, who heads the council's homelessness committee, said her dissenting vote wasn't about the price of the services charged by Gibson Dunn, but rather the fact that so much was spent without council approval.

**1016**

"As someone who is watching that money very closely, I was frustrated," she said. "So my 'no' vote was based on that frustration."

## More to Read

**L.A. City Council balks at $5-million request for law firm in homelessness case**

Aug. 27, 2025



**Trash fees will spike for many L.A. residents in aftermath of city's fiscal crisis**

Oct. 7, 2025



**L.A. marijuana businesses will pay higher fees as industry struggles**

Aug. 5, 2025





## Sign up for Essential California

The most important California stories and recommendations in your inbox every morning.

**Sign Me Up**

   **David Zahniser**

David Zahniser covers Los Angeles City Hall for the Los Angeles Times.

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

**1018**

# EXHIBIT B

1019



Audience-funded
nonprofit news


**DONATE**

((•)) LISTEN



# LA council delays decision on $5M more for law firm in homelessness lawsuit



[Aaron Schrank](#) has been on the ground, reporting on homelessness and other issues in L.A. for more than a decade.

Published Aug 27, 2025 3:13 PM

L.A. City Attorney Hydee Feldstein Soto, seen at a recent news conference, originally asked council for $900,000 for outside legal fees. In late August, she requested $5.9 million instead.

(Carlin Stiehl / Los Angeles Times / Getty Images)

*With our free press under threat and federal funding for public media gone, your support matters more than ever. Help keep the LAist newsroom strong, become a monthly member or increase your support today.*

The Los Angeles City Council decided Wednesday to delay its decision on a request to pay $5 million more to a big law firm representing the city in a long-running federal legal settlement over its response to the region's homelessness crisis.

Instead, the Council referred the request from L.A. City Attorney Hydee Feldstein Soto to the city's Budget and Finance Committee for further consideration.

"My colleagues and I want to ensure we address it in a way that protects taxpayers and establishes a thoughtful, long-term strategy for managing outside legal expenses," said Councilmember Katy Yaroslavsky, who chairs the budget committee, in a statement to LAist.

The city agreed in May to pay $900,000 to Gibson, Dunn & Crutcher over a two-year period. Since then, the city has racked up more than $2 million in legal bills beyond what the council had originally authorized without telling the councilmembers.

The firm has 15 attorneys working on the case, each of whom is billing the city $1,295 an hour. The original $900,000 approved by the City Council covered the first few days of work.

---

**Trending on LAist**



**The LA Olympics schedule is out. Here's a breakdown**

**California schools now offer free preschool for 4-year-olds. Here's what kids really learn in it**

**1021**



**You don't need to steal art from the Getty to have it at home. The museum is giving it away**

Councilmember Monica Rodriguez told LAist said she was "enraged" by how much money was being spent on a settlement reached years ago between the city and a group of downtown business owners and residents called the LA Alliance for Human Rights.

"The city should be more focused on becoming compliant and housing individuals," Rodriguez said. "There are people in L.A. who know how to stretch $1,300 for longer than an hour."



0:44

**LA council delays decision on $5M more for law firm in homelessness lawsuit**

And Councilmember Bob Blumenfield said sending the request back to committee was meant to send a message.

"My hope is that the City Attorney and reasonable folks at Gibson will sit down and figure out an alternative bill, " he said in a statement. "We must pursue appropriate cost review based on the fact that this is the public's money, that every dime spent on lawyers is one less dime spent on homeless interventions, as well as the fact that they exceeded the limits without authorization."

The L.A. City Attorney's Office did not respond to LAist's request for comment Wednesday.

The city's massive legal bills come as L.A. faces a $1 billion budget deficit and cuts to some homeless services.

**1022**

## Massive legal bills

The law firm billed the city about $1.8 million for two weeks of work in May — double the amount approved for the entire two-year contract, according to a May invoice LAist obtained through a public records request. Altogether, the city has been invoiced for $3.2 million under the contract as of Aug. 8, according to a memo written by Feldstein Soto and obtained by the L.A. Times .

When the council members approved the original contract, they required the city attorney to keep them updated.

But two councilmembers on the city's budget committee, Blumenfield and Tim McOsker, said they didn't know the $900,000 had been exceeded until after LAist reached out to them for comment earlier this month.

Blumenfield said he was "not happy" about it.

During the meeting Wednesday, some members of the public criticized the city for legal bills they said were out of control.

"This is a disgrace and I am begging this council to oppose spending $6 million on litigation instead of on solutions," said Susan Collins in public comment Wednesday. "Wasteful spending cannot possibly get any more repugnant than this."

On the city's online public comment system, Sue Kohl asked: "Why are we not using those funds for actual food and shelter for homeless individuals and families?

## Why does LA want legal help?

In 2020, The LA Alliance for Human Rights sued the city and county for failing to adequately address L.A.'s homelessness crisis.

**1023**

When settling the case in 2022, the city agreed to open nearly 13,000 new shelter beds by June 2027. But the federal judge overseeing the settlement said the city consistently has failed to meet its obligations under the agreement.

The city hired Gibson Dunn in May, as U.S. District Judge David O. Carter was considering a request by The LA Alliance for Human Rights to hand the city's homelessness programs over to a third-party receiver.

In June, Carter decided against receivership but ruled the city of L.A. had partially breached the settlement agreement because it had not provided a plan for creating thousands of new shelter beds. Carter also ordered quarterly hearings and additional oversight by a court-appointed monitor.

The city has said it plans to appeal that ruling, with Gibson Dunn's help. The firm did not immediately respond to LAist's request for comment.

## City attorney's role

Before May, the L.A. City Attorney's Office had been handling the case itself, without the help of outside counsel.

Feldstein Soto has defended Gibson Dunn's work. City attorney spokesperson Ivor Pine told LAist the "firm and its lawyers exceeded our expectations and delivered exceptional results."

LAist asked the City Attorney's Office to release additional invoices from the law firm, but it declined.

There is no evidence Gibson Dunn has been paid for its efforts yet. The L.A. City Controller's Office said it would not authorize the payments until the costs are approved by the City Council.

**1024**

The city of L.A.'s charter requires outside counsel work, like the Gibson Dunn contract, to stay within the allocated dollar amount.

The firm's attorneys have handled many high-profile proceedings. Last summer, they represented the city of Grants Pass, Ore., before the U.S. Supreme Court in a landmark case that expanded cities' ability to enforce camping bans against unhoused people.

Councilmembers who oppose increasing the city's outside legal budget said the city should be spending its dollars more wisely.

"We have targets to meet, and we should be investing our very precious limited dollars in fulfilling those obligations and being compliant with this settlement agreement so that we can be done with it in 2027," Rodriguez said.

# Keep up with LAist.

If you're enjoying this article, you'll love our daily newsletter, The LA Report. Each weekday, catch up on the 5 most pressing stories to start your morning in 3 minutes or less.

Email

SUBSCRIBE

At LAist, we believe in journalism without censorship and the right of a free press to speak truth to those in power. Our hard-hitting watchdog reporting on local government, climate, and the ongoing housing and homelessness crisis is trustworthy, independent and freely accessible to everyone thanks to the support of readers like you.

*But the game has changed:* Congress voted to eliminate funding for public media across the country. Here at LAist that means a loss of $1.7 million in our budget every year. We want to assure you that despite growing threats to free press and free speech, LAist will remain a voice you know and trust. Speaking frankly, the amount of reader support we receive will help determine how

**1025**

strong of a newsroom we are going forward to cover the important news in our community.

**We're asking you to stand up for independent reporting that will not be silenced.** With more individuals like you supporting this public service, we can continue to provide essential coverage for Southern Californians that you can't find anywhere else. **Become a monthly member today to help sustain this mission.**

Thank you for your generous support and belief in the value of independent news.



**Megan Garvey**

**Senior Vice President News, Editor in Chief**

# Chip in now to fund your local journalism

| Monthly | One time |
|---------|----------|

| $60 | $180 | $360 | $ other |
|-----|------|------|---------|

SUPPORT NOW

 Pay    PayPal    VISA    mastercard

🔒 Secure Payment

---

## Trending on LAist

**1026**



HOUSING & HOMELESSNESS

## How did an 'implausible' claim about jobs created by LA's 'mansion tax' get cited by watchdogs?



NEWS

## LA Memorial Coliseum to host the 2028 Olympic closing ceremony, dropping SoFi Stadium



NEWS

## LAPD refuses to release crime map records, says data could lead to 'public panic'



EDUCATION

## The Trump administration canceled a top education award. This LA school is celebrating anyway

# The Brief

## LA rent reforms

Council votes to alter 40-year-old rent hike rules

53 minutes ago

## Brace for heavy rain

As much as 6 inches could fall in upcoming storm

1 hour ago

## RV impound policy

LA looks to remove more RVs from streets

1 hour ago

## Lucas Museum opening date

The art museum is set to open September

2 hours ago

## Cleto Escobedo III

Jimmy Kimmel's house band leader dies

5 hours ago

**1029**

# Keep up with our local independent news

The L.A. Report newsletter is your daily morning update on the biggest stories in the Los Angeles region.

Email

**SUBSCRIBE**

    

| | |
|---|---|
| About LAist | Newsletters |
| Editorial Staff | Contact Us |
| Careers | Support Us |
| Sponsorship | Ethics & Guidelines |
| | Public Information |



LAist is an independent, nonprofit newsroom that is also home to L.A.'s largest NPR station broadcasting at 89.3 FM. We center our coverage around people and communities, not institutions or policies. We hold power to account. We are unapologetically L.A.

 

© 2025 Southern California Public Radio - All Rights Reserved
Terms of Service        Privacy Policy

# EXHIBIT C

CALIFORNIA

# A federal judge has found that L.A. city officials doctored records in a case over homeless camp cleanups



Members of a cleanup crew dismantle tents at a homeless encampment along San Vicente Boulevard outside the West Los Angeles Veterans Affairs campus in Los Angeles in 2021.  (Al Seib / Los Angeles Times)

**By Doug Smith**
Senior Writer  |  𝕏 Follow

April 16, 2024 3 AM PT

A federal judge has found that Los Angeles city officials altered evidence to support the city's defense against allegations that it illegally seized and destroyed homeless people's

**1032**

property.

Warning that the city will likely face sanctions following a forensic examination, U.S. District Judge Dale S. Fischer wrote in an order that the city had not only "altered, modified, and created documents relevant to Plaintiff's claims" but had also failed to produce legitimately requested documents.

"Suffice it to say that the City's credibility has been damaged significantly," she wrote.

According to court filings, records documenting what was taken during cleanups and the legal authorization for the seizure were altered or created up to two years after the cleanup occurred and in some instances just days before they were turned over to the plaintiffs.

In some records, the word "bulky items" was replaced by "health hazards" or "contaminated," after Fischer had ruled the city's law prohibiting bulky items unconstitutional.

In a court filing, Shayla R. Myers, an attorney with the Legal Aid Foundation of Los Angeles who is representing the eight plaintiffs, described the changes as so significant "they rise to the level of fraud on the court."

"In our view this isn't just about altering or creating evidence, it's about misleading the court and the public about the existence of safeguards to ensure the city isn't illegally throwing away unhoused people's belongings," Myers said in an interview.

"They argue that they have processes in place to ensure they aren't violating unhoused people's rights. ... And those are the very documents that the court found to be altered or fabricated."

1033



CALIFORNIA

### Are L.A.'s anti-camping laws failing? We went to 25 sites to find the truth

March 7, 2024

A spokesman for the Los Angeles city attorney declined to answer The Times' questions about the case, saying the office does not comment on pending litigation. The alleged doctoring occurred during Mayor Eric Garcetti's administration, Myers said, although delays in producing documents have continued since Karen Bass became mayor.

The plaintiffs, seven homeless people and the group Ktown for All, allege that the city violated their rights by destroying their belongings in camp cleanups in 2018 and 2019. Among the items taken, they allege, were tents, chairs, work supplies, a laptop computer, a chest containing clothes and hygiene goods, a dog kennel, medications and personal identification.

The five-year-old lawsuit alleges that the city's practice of seizing and disposing of property violates the 4th Amendment's protection against illegal search and seizure and the 14th Amendment's guarantee of due process.

It describes property used by lead plaintiff Janet Garcia for her work as a domestic cleaner being seized and destroyed when she was not present. Other plaintiffs weren't given time to collect personal items before they were seized, it alleges.

Ktown for All, a group that advocates for and assists homeless people, was harmed by having to expend resources replenishing the seized items, it alleges.

The plaintiffs seek compensation for the destroyed property and pain and suffering as well as a declaration that the city's policies and practices violate the California and U.S. constitutions.

**1034**

Early in the case, Fischer issued a preliminary injunction barring the city from enforcing the municipal code that prohibits bulky items. Because of that ruling, the plaintiffs would have essentially already won their case involving any property taken under the bulky item law, but would have retained a defense for items taken under a health standard, Myers said.

Fischer subsequently held the city in contempt after the plaintiff's attorney introduced evidence that city workers continued to post signs in some locations prohibiting bulky items.

Since then the case has dragged on over disputes about the accuracy of the city's records.

According to court filings, the city responded to the discovery request for the documents by converting printouts of the original Microsoft Word documents into PDFs. The process eliminated the date stamps that recorded when the originals were created and last modified.

When the original of one of those records was attached to an email the plaintiffs obtained in discovery, Myers found that it had been extensively revised before the conversion to PDF.

After Myers presented evidence of the altered documents in a 2022 hearing, Fischer took the unusual step of appointing a neutral third-party forensic examiner to determine if the city had "spoliated" records, a legal term meaning intentionally or negligently altering or destroying.

The examiner's preliminary report said he obtained some of the original documents but was unable to obtain others. Manually comparing originals with the PDFs, Myers' team found more than 100 revisions in some documents. Among them, bulky was changed to "ADA violation," a reference to the Americans With Disabilities Act, and "Property left

**1035**

behind by encampment" was changed to "Contaminated Items Surrendered or Left Behind by Resident."

In February, Fischer issued a finding that the city had altered records and sharply rebuked the city's arguments that the revisions were insignificant.

"The City's contention that material changes to documents such as the reason for seizing and destroying personal property — sometimes to match the City's litigation position — are 'administrative' is also untenable," she wrote.

"The City's conduct cannot be excused as 'imperfect document management;' ... its 'explanation' for its admitted spoliation is unconvincing to say the least."

In a follow-up order on April 1, she found that "the full extent of the city's spoliation has not yet been determined" and set an April 8 deadline for the city to turn over all relevant documents to the forensic examiner.

"Any delays by the City will not be tolerated," she wrote.

Fischer said she would deem any relevant records that the city fails to produce as "spoliated."

The city turned over a Google drive, which is being evaluated, but no additional documents, Myers said.

Myers said she has not determined what sanctions to propose and will do so after the forensic examination is complete, in a month or two.

A trial, stayed for the forensic examination, has still not been set.

1036

"This case would have been resolved years ago but for the need for the court to investigate the city's conduct, delaying a public reckoning about the legality of these sweeps," Myers said.

## More to Read

FOR SUBSCRIBERS

### The real story of how L.A. became the epicenter of America's homeless crisis

July 10, 2025



### Judge declines to take power over L.A. homeless programs away from city leaders

June 25, 2025



### L.A. vowed to remove 9,800 encampments. But are homeless people getting housed?

July 9, 2025





## Sign up for Essential California

The most important California stories and recommendations in your inbox every morning.

**Sign Me Up**



**Doug Smith**

Los Angeles Times senior writer Doug Smith scouts Los Angeles for the ragged edges where public policy meets real people, combining data analysis and gumshoe reporting to tell L.A. stories through his more than 50 years of experience covering the city.

**1037**

Copyright © 2025, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

1038

# EXHIBIT D

1039

Constitutional Law

Nov. 11, 2025

# Judge threatens to summon LA mayor over discovery in encampment suit

**U.S. District Judge Dale Fischer on Monday blasted Los Angeles city leaders over alleged discovery abuses in a homeless encampment case. She was the second federal judge in three days to make the threat.**



Share   Bookmark



*U.S. District Judge Dale Fischer*

A federal judge castigated counsel for the City of Los Angeles on Monday over alleged discovery violations in a long-running case involving an ordinance that allows confiscation of belongings left on the streets and sidewalks by homeless people.

U.S. District Judge Dale S. Fischer threatened to call the city attorney, mayor and city council into court for answers.

Fischer's warning came three days after her bench colleague, U.S. District Judge David O. Carter, called Mayor Karen Bass and City Council President Marqueece Harris-Dawson into his Orange County courtroom in connection with a contempt notice related to the city's landmark homelessness settlement.

Fischer called the city's conduct "egregious," demanding a clear answer as to whether it is willing to stipulate to liability for potential constitutional violations under the U.S. Supreme Court decision in *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978).

**1040**

"Pretty soon I'm going to order in the city attorney itself, or the mayor, or the city council," Fischer said. "I don't want to do that, but I want an answer as to whether the city is willing to stipulate to Monell liability."

Bass and Harris-Dawson are set to appear in Carter's court to address alleged noncompliance in the city's settlement with homelessness advocates on Wednesday. *LA Alliance for Human Rights et al. v. City of Los Angeles et al.*, 2:20-cv-02291 (C.D. Cal., filed March 10, 2020).

Carter ordered the city officials to explain why they should not be held in contempt after he heard that a special master and a data monitor reported Los Angeles is not meeting deadlines to provide shelter beds it agreed to in the settlement. The special master's report also filed on Friday found that the city's response to a status request "It arrived a full week after the special master's inquiry and failed to provide the verified data, milestone documentation, or validation necessary for oversight."

Monday's proceedings before Fischer focused on claims that Los Angeles Municipal Code § 56.11--which allows city employees known as Environmental Compliance Inspectors (ECIs) to seize and summarily destroy belongings during encampment cleanups--violates the state and federal Constitutions. *Garcia et al. v. City of Los Angeles et al.*, 2:19-cv-06182 (C.D. Cal, filed July 18, 2019).

"Rather than investing in solutions like bathrooms, handwashing stations, and trash cans, which would both meet the real and immediate public health needs of the thousands of unhoused residents in the city, and in turn, would also address many residents' complaints, the city has responded instead by seizing and destroying homeless people's belongings," read the plaintiffs' second amended complaint filed in March 2020.

The plaintiffs' motions for sanctions related to findings in January 2024 by a neutral forensic examiner of significant evidence of spoliation, fabrication, and the withholding of thousands of responsive documents by the city.

The central allegation is that the city materially altered and fabricated key evidentiary documents, including Health Hazard Assessment Reports (HHARs) and related checklists, which were intended to document the cleanups.

1041

Plaintiffs further alleged the city actively concealed its misconduct by erasing metadata, submitting altered documents as PDFs to hide the changes, and misrepresenting the record.

Appearing on behalf of the plaintiffs on Monday, Shayla R. Myers of Legal Aid Foundation of Los Angeles argued that the spoliation caused "significant prejudice" against her clients.

"It is not simply the spoliation of evidence. I think the city has consistently pointed to the documents and said, 'We could simply not make reference to those documents,'" Myers said. "Your honor, these are the lead documents that the city themselves identified that are critical to how plaintiffs have built their case for six years."

Emerson H. Kim of the city attorney's office argued that the spoliation was unintentional.

"To state that this was a pattern and practice of defying the court's order of misleading plaintiffs is absolutely wrong, your honor," Kim said, "And frankly, if you look at the evidence, not looking at broad strokes, specifically what's at play here, we're talking about a handful of individual incidents concerning specific plaintiffs."

Fischer pushed back on the city's explanation for the creation of cleanup reports after the fact, noting that the city also altered documents in response to court proceedings.

"That's only one aspect of it," Fischer said. "The city changed the language to something that directly related to my order and what the topic was to something that wasn't right."

In response, Kim said that the process for ECIs to create a health hazard report involves a review by a senior inspector.

"This back-and-forth provision, frankly, is what got caught up as part of this discovery," Kim said.

"I would say it got 'caught,' not 'caught up,'" Fischer responded.

Fischer declined to rule immediately on the sanctions motions, noting that the 9th Circuit Court of Appeal creates a "high bar" for terminating sanctions.

Instead, Fischer admonished the parties to re-enter settlement talks in the hopes of bringing the long-running case to a close.

#388497

**Skyler Romero**
Daily Journal Staff Writer
skyler_romero@dailyjournal.com

**For reprint rights or to order a copy of your photo:**
Email Jeremy_Ellis@dailyjournal.com for prices.
Direct dial: 213-229-5424

**Send a letter to the editor:**
Email: letters@dailyjournal.com

**1042**