No. _____

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE CITY OF LOS ANGELES

CITY OF LOS ANGELES,

*Petitioner,*

v.

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA,

*Respondent*,

LA ALLIANCE FOR HUMAN RIGHTS ET AL.,

*Real Parties in Interest.*

From the United States District Court
for the Central District of California
Case No. 2:20-cv-02291 | The Honorable David O. Carter

## APPENDIX TO PETITION FOR A WRIT OF MANDAMUS AND EMERGENCY MOTION FOR IMMEDIATE STAY UNDER CIRCUIT RULE 27-3 (VOLUME 5 OF 7)

Hydee Feldstein Soto
Valerie Flores
Arlene N. Hoang
Jessica Mariani
CITY ATTORNEY'S OFFICE
200 North Main Street
City Hall East, 6th Floor
Los Angeles, CA 90012
213.978.7508

Theane D. Evangelis
Marcellus McRae
Bradley J. Hamburger
Daniel R. Adler
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197
213.229.7000
tevangelis@gibsondunn.com

*Counsel for Petitioner City of Los Angeles*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | CASE NO: 2:20-cv-02291-DOC-KESx |
| Plaintiffs, | CIVIL |
| | Los Angeles, California |
| vs. | |
| | Wednesday, November 12, 2025 |
| CITY OF LOS ANGELES, ET AL., | ( 9:01 a.m. to 10:44 a.m.) |
| | (11:12 a.m. to 12:26 p.m.) |
| Defendants. | ( 1:41 p.m. to  2:10 p.m.) |
| | ( 2:14 p.m. to  2:21 p.m.) |

HEARING RE:

STATUS CONFERENCE RE QUARTERLY REPORT [DKT.NO.1061];

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066];

MOTION FOR ATTORNEYS' FEES [DKT.NO.1022];

APPLICATION TO STAY [DKT.NO.1054]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

APPEARANCES:              SEE PAGE 2

Courtroom Deputy:         Karlen Dubon

Court Reporter:           Recorded; CourtSmart

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
MATTHEW UMHOFER, ESQ.
Umhofer Mitchell & King
767 S. Alameda Street, Suite 270
Los Angeles, CA 90021
213-394-7979

For Defendants:         JENNIFER M. HASHMALL, ESQ.
Miller Barondess, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, CA 90067
310-552-4400

JESSICA MARIANI, ESQ.
Los Angeles City Attorney's Office
200 N. Main Street, Room 675
Los Angeles, CA 90012
213-978-6952

KAHN A. SCOLNICK, ESQ.
BRADLEY J. HAMBURGER, ESQ.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, CA 90071
213-299-7000

For Intervenor:         SHAYLA R. MYERS, ESQ.
ISABELLE GECZY, ESQ.
Legal Aid Foundation of LA
7000 S. Broadway
Los Angeles, CA 90003
213-640-3983

Special Master:         MICHELLE MARTINEZ
JUSTICE TOM GOETHALS

Also present:           DANIEL GARY
ARLENE HOANG
KENNETH MEJIA

EXCEPTIONAL REPORTING SERVICES, INC

**1044**

3

**(Call to Order)**

THE COURT:  Thank you for your courtesy, if you'd be seated.  We'll call this case to order.  I hope all of you had a good weekend and a good Veterans Day.  And I'd like to have your appearances beginning with the LA Alliance, please.

MS. MITCHELL:  Good morning, Your Honor.  Elizabeth Mitchell, Umhofer, Mitchell and King, on behalf of LA Alliance for Human Rights and plaintiffs.  With me is also my partner, Matthew Umhofer.

THE COURT:  Why, thank you.  And let's start with the City, please.

MR. SCOLNICK:  Good morning, Your Honor.  Kahn Scolnick for the City of Los Angeles.

MR. HAMBURGER:  Good morning, Your Honor.  Brad Hamburger, also on behalf of the City of Los Angeles.

THE COURT:  Thank you.

MS. MARIANI:  Good morning, Your Honor.  Jessica Mariani on behalf of the City of Los Angeles.

THE COURT:  Okay, thank you very much.  And on behalf of the County.

MS. HASHMALL:  Good morning, Your Honor.  Mira Hashmall here for the County.

THE COURT:  And on behalf of the intervenors.

MS. MYERS:   Good morning, Your Honor.  Shayla Myers

**4**

on behalf of the intervenors.

**MS. GECZY:** Good morning, Your Honor. Isabelle Geczy on behalf of the intervenors.

**THE COURT:** Nice meeting you. Let me introduce the persons in the jury box, if you haven't met them. Daniel Gary is here as the monitor, and he's available to you, of course, at any time. Michelle Martinez is the special master. Justice Tom Goethals is with us, having joined us after Judge Gandhi, I believe he had a conflict.

I'd like to cover the following items today in this order: the attorney's fees, issues that have been briefed, the October quarterly report, the order to show cause in re: contempt of the City of Los Angeles, and the motion to stay. We're going to start this morning with the attorney's fees.

And before this Court is LA Alliance's and Intervenor, the Legal Aid Foundation of Los Angeles, respective motions for attorney's fees based on this Court's June 24th order. The parties have had a chance to brief the Court on the papers, and now I'd like to hear oral arguments. And in these oral arguments, I'd like them complete. There's no time limit, and there'll be two rounds. So it doesn't matter who starts, and I'll ask who would like to begin and who would like to end, but there'll be two rounds.

**MS. MITCHELL:** Thank you, Your Honor. Mr. Umhofer is

**5**

handling the argument on behalf of plaintiffs.  So we would ask

the intervenors could go ahead and start, and we will go

second, if that's okay.

        THE COURT:  All right.

        MS. MITCHELL:  Thank you.

        THE COURT:  If there's anything, though, that wasn't

raised in the papers, and you're bringing up it now for the

first time, you're more than welcome to do so, but would you

alert me that this was not in your papers, that this is

something that you didn't have a chance to brief or a new

argument?  And I find no fault with that.

        MS. MITCHELL:  Thank you, Your Honor.

        THE COURT:  Hopefully everything in your oral

arguments is founded in your papers, and if you do want to

bring up something new, I'm not going to foreclose that.  I

want to continually repeat that.  You've told me that you'd

like to begin with the intervenors or the City.  Who'd like to

-- in other words, who'd like to -- since there's two rounds,

who'd like to begin the arguments concerning attorney's fees?

        MR. UMHOFER:  Your Honor, I think we started this, so

I'm happy to begin on behalf of the plaintiff, LA Alliance for

Human Rights.  Your Honor, we have set things forth, I think,

in great detail.  The City has briefed it.  We've replied.

        THE COURT:  I'm not interested.  I'm interested in a

complete and thorough oral argument.

6

MR. UMHOFER:  Of course, Your Honor.

THE COURT:  So I want you to pretend that I haven't read your briefing, which I have.

MR. UMHOFER:  Of course, Your Honor.  Your Honor, we are the prevailing party.  We have been the prevailing party at least three times now.  The City has paid attorney's fees to us twice already, and so there's no question that on our motion to enforce the settlement agreement, following the hearing, the Court issued an order that found the City in violation, violations that we claimed, the Court found in our favor and found four separate violations with several different subcategories that render us the prevailing party under 1983 and 1988.

We think that that is all the Court needs to do, read its own order, conclude we're the prevailing party, and award us fees.  So in terms of entitlement, yes or no to fees, the answer is found in your order and 1983, 1988, and the case law that establishes that a prevailing party, which includes, and let me make this very clear, includes a party that is monitoring compliance with a settlement agreement, that makes you a -- and when you do so successfully, in fact, I think there's some question in the law as to whether you need to be successful.  As long as you're monitoring compliance with a settlement agreement or consent decree, then you are a prevailing party.

**7**

We, in the course of seeking to monitor compliance, successfully proved multiple violations by the City, and the court issued an order on those lines.  That follows a whole slew of litigation that proceeded in which the City agreed to pay us $700,000 as attorney's fees when the City utterly failed and acted in bad faith, as noted by the court on the record, concerning encampment reductions.  And by the way, we're still here on that issue.

So very simple, the Court's order, which the Court is intimately familiar with, it found in our favor we did prevail on four different issues.  The City even admits in public comments that we did prevail.  The only thing it says is we didn't prevail on everything.  We didn't get the receivership we wanted.  Well, that doesn't make us a not prevailing party. We did prevail in proving the violations, and we did prevail in acquiring significant additional measures and additional monitoring efforts, and we find ourselves now with a data monitor that we didn't have previously, and we find ourselves with the Court seeking additional compliance measures all arising out of the settlement agreement that the City entered into willingly.

So there's no question that we're a prevailing party, and there's no question that prevailing parties are entitled under 1983 and 1988.  I'm going to put aside -- I'm going to get to the amount in a moment, Your Honor.  The Court also, in

**8**

its order, invited us to brief --

THE COURT:  I just want to -- I'm sorry for the interruption.  And the comptroller -- Mr. McHugh, the comptroller has joined us also.  Thank you.  And his staff. Please continue.

MR. UMHOFER:  The Court also noted in its order the possibility of awarding fees as a sanction.  We believe that there's ample record to do that here, but for the reasons that we set forth in our brief, which I'll explain now, I want to give you a complete argument.  We don't think that that's the best path.  The Court, I think, took great care to issue an order that required no more than the City comply with the agreement it entered into.  It is, by definition, a non-appealable order.  We have filed with the Court our motion to dismiss the appeal because that order found several violations, but simply intensified the Court's oversight into compliance with the existing obligations under the agreement.

There's nothing new in the Court's order other than a more focused effort to ensure the City complies with the agreement.  That's non-appealable, but it's also, I think, very straightforward in the approach, and so because that order is not appealable, if the Court were to go down the path of the additional sanction, which the Court hasn't imposed yet, the Court has imposed no sanctions on the City yet, especially arising out of our motion for compliance with the order and our

EXCEPTIONAL REPORTING SERVICES, INC

**9**

hearing, to award attorney's fees as a sanction opens up, plays right into the City's delay and obfuscate and try to defeat this settlement agreement strategy through appellate efforts and through slow-rolling things.

We now have two appeals that have been filed from non-final orders already by the City, and arising out of this order to show cause, there will probably be a third, if the Court were to make any order, that the City didn't like. So we have the City playing a delay game. They are clearly under instructions from the City. These are very good lawyers over at Gibson Dunn. They're just doing what they're being asked to do. But they are clearly under a new set of instructions.

Before, we had incompetence bordering on bad faith that led to the original sanctions order arising out of the encampment reduction and the $700,000 attorney's fees payment, because, again, the City recognized then we were the prevailing party on that issue. We had shown that the City had failed to do what it promised to do on encampment reductions. But when this evidentiary hearing came on board and we got a new set of very, very good attorneys in, and the City started paying exorbitant amounts for those attorneys, they deserve every penny, but it's a lot for a City that's claiming to be under fiscal crisis, we saw a new strategy. And that new strategy is to object hundreds of times, slow things down, feign compliance, especially after that hearing and the Court's

**1051**

order.

And so what we're seeing right now is, and appeal, and appeal, and seek to stay, which is something the Court has in front of it as well, an effort to stay, part of the Court's orders around this. So you see the game. And awarding sanctions, attorney's fees as sanctions, plays into the City's hands of, let's go up on appeal, and not only let's appeal the amount of attorney's fees or what have you, but let's get into the findings of the Court, which they're very eager to do, around the violations and get the Ninth Circuit looking at those. If the Court goes with prevailing party, the court of appeals won't be looking at the underlying question of whether -- the detailed underlying questions of whether there's violations. The court of appeals would only be looking at, are these guys, the plaintiffs, the interveners prevailing parties or not? And they clearly are.

It's a binary question that is answered clearly by your order. And the Ninth Circuit wouldn't, in that circumstance, have license to go into questions about details about the violations that the City wants to get into. So awarding attorney's fees under a prevailing party status, as opposed to with sanctions, we believe is perfectly warranted and avoids the City's efforts to continue to delay things. And I would say that part of that delay is, you've got a small firm, you've got a public interest firm, they're not on one

**11**

side or the other, I don't mean to suggest that they are, but they're seeking attorney's fees as well, on behalf of the interveners, and you've got one of the biggest firms in the country.  And we are absolutely outgunned, Your Honor.

And an appellate process that allows them to drag out and dig into your findings, which again, didn't change anything about their obligations.  It just reaffirmed their obligations. We think we're going to win the motion to dismiss the appeal. If they want to appeal on the basis of, are we a prevailing party or not, it's a binary choice, we'll get a mem dispo.  I'm not concerned at all about the appellate risk around that, but I am concerned about playing into the City's appellate game with an order for attorney's fees arising for historical attorney's fees requests that arises out of sanctions and is based on sanctions.

We also have the issue of prospective attorney's fees that we've put forward support for.  We can do this a couple of different ways, Your Honor.  We can keep coming back on attorney's fees and asking for attorney's fees again and again. We're fine doing that.  We can do it on a monthly basis.  If they're concerned about prospective attorney's fees, that's fine.  We'll submit requests for attorney's fees on a regular basis going forward.  But let me be very clear.  We thought when we entered into this settlement agreement, we'd have a City that planned on compliance with that agreement.  And as we

**EXCEPTIONAL REPORTING SERVICES, INC**

**12**

well know from just reading the history of the Court's order, knowing the history of this case, the City started not complying immediately. And so my small firm has to bear the burden uncompensated of policing the City on homelessness. It is an immense burden. It takes 10 lawyers on their side to defend what they're doing. So it is an immense burden, and it is unexpected and uncalled for.

And so if we're going to be expected to do that, we darn well should be getting attorney's fees, because we keep prevailing. We keep showing that they're not doing what they need to be doing. So that deals with our entitlement, yes or no, to attorney's fees. And then it just becomes a question of reasonableness.

We put forward a number that is based on our hourly rates, which are a discount off of our top rates. The City loves to point out that we sought fees in another case at historical rates that are lower, but we regularly charge the rates that we have asked for, which is, by the way, happens to be the blended rate that the City is paying Gibson Dunn. And at that rate, it's $1.6 million over, I think, a year and a half.

Now, the City spent $1.8 million, more than that, in 10 days getting ready for the hearing and participating in the hearing. So, by contrast, our fee request at 1.6 is reasonable, and the rates that we are asking for are

**13**

reasonable.  They are the rates we charge other clients, and they are the rates that we can get in the market, and there are cases that hold those rates to be reasonable.

The next question, then, is do we -- is there a multiplier?  And we think there should be, Your Honor, because we're being asked to do something extraordinary.  As I said, we're being asked in the face of massive resistance by both a City bureaucracy and a very, very good law firm, and a lot of people from that law firm billing a lot on this case, a lot more than we are, in order to ensure that the City just does what it promised it would do, what its elected leaders voted to promise to do.

Its elected leaders voted for this agreement, and now the City has spent years undermining it in all the ways the Court laid out and the ways that still play out today, with a special master and a data monitor just struggling to get basic documents from the City, basic information to be able to do their jobs, and they're compensated, and we're not.  They should be compensated.  I know that there are some issues there, but at least the City has agreed to pay them.

So we are looking for a multiplier because of the extraordinary burden that we're asked to undertake, the extraordinary results that we have achieved.  The City says it's trying to meet its obligations.  Imagine if this agreement didn't exist, what would the City be doing?  Would the City

**1055**

**14**

really be reducing the encampments that they're reducing? Absolutely not. This case is dragging the City along toward compliance and toward doing the floor, as the Court has always said, of what it should be doing on homelessness, the floor, and it can barely get to the floor. And so the multiplier we're asking for, Your Honor, I want to confess that we're backing into it. The multipliers can be anywhere from one to four is a fair range under the law. The Ninth Circuit is blessed one to four X multipliers.

The City is paying a private law firm, despite the fact that they have very capable City attorneys who have worked this case for years. The City has decided, made a decision, to pay very good lawyers a lot more money. That amount is about $6 million. If you take 1.6 and you multiply it by 3.75, that gets us to 6 million. We're asking for attorney's fees that are commensurate with what the City is paying its attorneys to oppose us. We are outmanned and outgunned. We need the ability to put in the work that's necessary to deal with what the City is doing. The City is not operating on a blank slate. The City is operating on a history of problematic conduct in this case. We're going to have to keep doing this, but we have done it remarkably for a very long time.

And so if they're going to take multiple appeals and they're going to force us to defend multiple appeals, which is their right, where we've prevailed, and they're going to fight

**15**

us at everything and fail to respond to email after email about compliance as we get into this, yeah, we're going to need a lot to be able to deal with this onslaught.  And the only way that we're up against a very large army here, we're a very small army, and the only way we can do that is if we are compensated for the work that we do.  And so what we're asking for is a 3.75 multiplier, which puts us at 6 million, 3.75 times the 1.6 we billed.  That puts us on equal footing with what the City has chosen to pay the very good attorneys on the other side of this case, and they'll prove they're very good over the course of this hearing, I'm sure, but we're entitled to that.

And as far as prospective, I am happy to just take that off the table as a proposal.  I don't want to ask for prospective fees.  What I want there to be is a mechanism established for us to continue to come back as a prevailing party, monitoring this agreement and seek attorney's fees on a regular basis going forward.  The City can look at that.  There will be motion practice around it.  There will be a reasonableness exercise around that that we're happy to engage in because I don't want to give the City more strings to pull out here.

So while I think we're entitled to prospective fees, I think the better course here is to award us the multiplier that we're asking for, which will replenish our stock, our munitions, and allow us to fight the battle that we're fighting

**EXCEPTIONAL REPORTING SERVICES, INC**

**16**

and winning on a regular basis as a prevailing party, and that
we are afforded the opportunity to every 60 days, every 90
days, to seek additional attorney's fees on a going forward
basis.

Again, I hope I don't have to do it, but it's clear
I'm going to have to.  It's clear this firm is going to have
to, given the City's conduct here that we're going to be
getting into.  Your Honor, I'll take any questions, but that's
the sum and substance of the argument.

**THE COURT:**  All right, why don't you check with your
colleague for just one moment?

**(Pause)**

**MR. UMHOFER:**  The only other thing I'd say, I've
mentioned appeals a couple times, Your Honor, and if and when
we prevail on appeal, we'll seek attorney's fees in that
context.  We're not going to be seeking attorney's fees for the
appeal.  I will say also, we're not afraid of an appeal around
any of this stuff.  We think the Court made very clear
findings.  We think we proved our case as far as the violations
are concerned, but what we're concerned about is the delay
associated with that.  And a prevailing party appeal is a very
different appeal than a sanctions appeal that the Ninth Circuit
gets into in a different way.  And so we believe that should
the City choose to appeal any -- if the Court orders fees and
if the City chooses to appeal, it's a very different appellate

**EXCEPTIONAL REPORTING SERVICES, INC**

**17**

process, and it's shorter and more efficient, and we'll be able to get what we're up, what we're entitled to, should the Court award fees and continue to move forward and continue to defend the settlement against the City's onslaught.

Thank you, Your Honor.

**THE COURT:** All right, thank you. Was the City going to argue next or the intervenors?

**MR. HAMBURGER:** I'd be happy to argue, and then maybe we can deal with the intervenors, but --

**MS. MYERS:** I mean, it may be more straightforward for intervenors to go, and then the City can respond, but I mean, I don't --

**MR. HAMBURGER:** That's fine.

**THE COURT:** The intervenors, thank you.

**MS. MYERS:** Yes. Shayla Myers on behalf of the intervenors, and I'm with the Legal Aid Foundation of Los Angeles. Our argument is fairly straightforward. The amount of fees that we're seeking at this Court's invitation is obviously significantly more straightforward than the plaintiff's. The intervenors are primarily seeking sanctions -- seeking attorney's fees in the amount of approximately $250,000 as a sanction for the City's misconduct. And when we say the City's misconduct, we refer to the willful disobedience and bad faith that this Court already found in the order, and we think the issue before the Court is relatively straightforward.

**EXCEPTIONAL REPORTING SERVICES, INC**

**18**

The Court found, after a significant evidentiary hearing, that the City willfully disobeyed its court order. We also believe that there's substantial evidence to support a finding of bad faith relative to the City's compliance with the settlement agreement, which we would remind the Court and the City is actually a court order. That's an issue that has been briefed and discussed, and this court has ruled on. The settlement agreement as it is is a court order. The Court entered it at the request of plaintiffs and the City in order for the Court to retain jurisdiction and authority to enforce its own order.

That's what the parties asked for, and that's what the Court did after significant consideration, after objections from intervenors, after a significant briefing on the particular issue and thoughtfulness from the Court, the Court entered an order. And the sanctions motion that was before the Court in June was about the City's compliance with that order, as well as subsequent orders related to compliance with the settlement order. And that's what Your Honor found.

The Court found that the City disobeyed that order, and so the Court entered an order accordingly. And as part of that order, the Court issued a suggestion to intervenors and plaintiffs that we would be entitled to fees if we could prove that the City's misconduct in violating those orders harmed intervenors. That was the task before the intervenors and the

**19**

plaintiffs, and we put that forward in our moving papers.  We spelled out the harm to the intervenors, which was a significant drain on the very limited resources that are afforded to intervenors in the form of attorney resources.

Your Honor, attorneys' fees as a sanction is relatively straightforward.  As Your Honor mentioned in the order, it is a generally understood and less severe sanction as a result of a party's misconduct, because it's a recognition that the party's misconduct causes harm to the parties who are forced to come into court to help the Court enforce that order.  That's what attorney's fees are in this court, and that is amply supported by the order that you issued and the briefing by the plaintiffs and the intervenors.

We think sanctions is the right approach for this, and a lot has been talked about in appellate review, I think, perhaps not surprisingly, because of the City's change in approach by bringing issues to the Ninth Circuit.  They're certainly entitled to do that, but we would say that the sanctions orders are subject to abuse of discretion, and the record fully supports any sanctions order and the terms of fees that the Court wishes to order.

I would just address the specific issue of willful disobedience that the City raises.  Your Honor, the Court found that the City willfully disobeyed the Court's order related to the encampment reduction, and I raise that because the City has

EXCEPTIONAL REPORTING SERVICES, INC

conceded that that was the area where the Court's order on sanctions is most clear, related to willful disobedience.  The City attempts to get out of the Court's finding of willful disobedience by saying they simply didn't have enough time to abide by the Court's order when they filed their status report that directly violated the Court's order previously.  But, Your Honor, the record is clear that the City intended to violate the March 24th order when they filed that report.  The City had ample opportunity to address the Court's order, to ask for reconsideration, to state that they disagreed with it, that they were having a hard time complying with it.  The City did none of that.  They simply violated the order and submitted a report that went against the Court's order.

They're objecting because the Court called them out on that violation quickly.  That's about duration of the City's violation, not the extent of that violation.  And the reason why I raise that is because I think it continues to support and suggest all of the continued violations that we are seeing from the City related to the Court's orders and monitoring.  The Court's order is also replete with references to the types of bad faith and delay related to settlement compliance that supports the Court's award of attorney's fees.

There are consistent instances supported in the record of the City's delay related to compliance with the settlement order in this court, and that forms the basis of the

Case: 26-784, 02/09/2026, DktEntry: 6.1, Page 22 of 263
Case 2:20-cv-02291-DOC-KES   Document 1076   Filed 11/13/25   Page 21 of 146   Page
ID #:30912

**21**

need for the evidentiary hearing as well.  The City raises issues with interveners asking for attorney's fees at the Court's invitation with the suggestion that interveners are here voluntarily.  Well, I would go back to the Court's original 2020 order related to this case and the Court's reasoning for allowing interveners to participate in the case.

It was mandatory intervention, Your Honor, because this Court sought to undermine and violate, because the actions in this case had the potential to undermine and violate unhoused people's rights, which is why interveners have participated in this case, as you well know, uncompensated since March of 2020.  Interveners will continue to participate in this case uncompensated because that is our obligation as community organizations whose members are deeply impacted by this, and here as the lawyers, as their lawyers, that is our role.

But what we are not expected to do, Your Honor, and I think this is what your attorney's fees order recognizes, is we are not required to participate in evidentiary hearings that shouldn't have had to happen in the first place, but for the City's misconduct.  That's why, Your Honor, sanction is appropriate.  It is under the Goodyear standard articulated by the Supreme Court that this Court is well within its authority and its inherent power to issue as a sanction attorney's fees to parties who have to participate in long, arduous, seven-day

**22**

evidentiary hearings to prove misconduct that the City has already found, to re-litigate issues that this Court has already ruled on.  That is why, Your Honor, we believe offered the interveners the opportunity to seek fees, and that's what we're doing here.

There is more than evidence to support Your Honor's ruling of willful disobedience, and the fees that we are seeking in the amount of roughly $250,000, particularly in light of the amount of fees that are being paid across the board in this case, are more than reasonable.  We would note that the City does not contest either the reasonableness of the amount of the fees that we are seeking, the number that we are seeking, in terms of the reasonableness of the amount of time that was expended, and also the City has not contested the issue that Your Honor asked the parties to brief, which was harm to the interveners.

That's the issue that Your Honor asked us to brief, that's the issue that we briefed and addressed in our moving papers.  The City did not contest that.

And the last point that I would make is that the City made a number of arguments related to the types of fees that we were entitled to seek, in particular the issue of fees on fees. Your Honor, the rulings that the City relies on were all cases that came out before the Supreme Court's decision in Goodyear, in which the Supreme Court made it very, very clear that the

**23**

court had the inherent authority to issue any fees that are the but-for cause of the City's -- of the party's misconduct when it comes to sanctions, and that's what fees on fees would be in this case. The interveners would not have had to brief the issue of attorney's fees had the City not engaged in the misconduct. And any of the earlier rulings that they're relying on stem from earlier versions of Rule 11, the sanctions ruling.

The Supreme Court in Goodyear was very clear what the standard is. We met that standard in our request for fees, and we believe that they directly stem from the City's misconduct, which is why we're seeking them here. Thank you. And if Your Honor has any questions, I'm happy to answer them, or can come back.

THE COURT: I'll hear the first round.

MS. MYERS: Thank you, Your Honor.

THE COURT: Thank you very much. Why don't you check with your colleague for just a moment, make certain you've covered the areas you'd like to.

MS. MYERS: We're good. Thank you, Your Honor.

THE COURT: All right. Thank you. Would the City then argue next, please? Thank you.

MR. HAMBURGER: Thank you, Your Honor. Bradley Hamburger on behalf of the City. The Alliance here is seeking millions of dollars. It's expanded, actually, today, its

EXCEPTIONAL REPORTING SERVICES, INC

**24**

request by $2.5 million.  It is seeking $6 million that it wants paid by the taxpayers on top of the millions of dollars they have already received.  But that request does not follow at all from what this Court instructed them to do, and from this Court's order in June, which they did not seek reconsideration of.

I want to start with the Court's order, because I think that really solves most of the issues here that counsel for the Alliance raised.  So the Court's order was very, very clear about what the Court was contemplating.  It's on page 59, Docket 991.  It ordered -- it invited, rather, plaintiffs and the intervenors, and I will agree the intervenors did follow this part of the order, and unlike the Alliance, said, after a discussion on the previous page of the Chambers v. Nasco case and the Goodyear Tire case from the Supreme Court, which Ms. Myers mentioned, the Court was very specific.  Based on intervenors' active role in the evidentiary hearing and briefing, the Court will require the City to pay attorney fees to both plaintiffs and intervenors if plaintiffs and intervenors are able to show how they have been harmed by the City's conduct and the resulting losses to them under the law.

That's the legal test the Court identified.  That was the task that the Alliance -- we expected the Alliance to, and I assume the Court expected the Alliance to follow.  They did not like that standard.  They don't want fees under the

Goodyear standard, which requires them to show specific harms related to specific willful disobedience or bad faith. And remember, this is all under a civil contempt arrangement, a theory, which needs to be proven by clear and convincing evidence. They do not want to have to fit themselves within the constraints of the Goodyear case. They do not want to fit themselves within the constraints of civil contempt. Instead, they -- instead of following what the court asked for, they wanted all of their fees, all of them, including for unsuccessful efforts to obtain a receivership, which the Court rejected, unsuccessful efforts to have the mayor and members of the City council forced to testify at the evidentiary hearing, they want all of that included.

And even more, they wanted prospective fees, which I'm glad to hear my friend has now taken off the table and they wanted a 2.5 multiplier, which now today, for the first time, they've increased to a 3.7 multiplier on a completely arbitrary basis.

My colleague spent more time talking about the fees of my firm and the actions of my firm and the lawyers representing the City than it did their own today. That's because they didn't -- in neither briefing nor today, can they actually do what the Court asked them to do, which is to trace specific expenses that the Alliance incurred and tie it to specific rulings that the Court made. And the Court made it

**26**

very clear what it was contemplating, said it right on page 58 and 59, and specifically identified a particular order, the encampment reduction order, the March interpretation of that obligation.

So the backdrop to all of this is the Court's order. So I want to start with the Court's order. So what do the plaintiffs do? What does Alliance do instead of following what the Court was expecting and what the Court outlined? It instead says that the proper rubric here, the proper test is awarding prevailing party fees under Section 1988. The problem for the Alliance is there's a very recent Supreme Court case, which is there's one case on this issue that I commend to the Court would be the Lackey decision from just last term, 2025, 604 U.S. 192.

And I will admit that there are Ninth Circuit case law before this decision may have some, which is almost I think all the cases that the Alliance cites on this issue, may have been some lack of clarity. But I think Lackey really clarifies the issue. The specific issue there was does get -- obtaining a preliminary injunction, does that allow, make you a prevailing party if the end result of the preliminary injunction is that the government defendant changes their behavior? The Supreme Court said no. Preliminary injunction is not enough, but they said more than that. I'm quoting from page 203 and 204. Very clear.

**27**

A plaintiff prevails under the statute when a court conclusively resolves a claim by granting enduring judicial relief on the merits that materially alters the legal relationship between the parties.  We didn't have that here.  We didn't have a trial.  This was a settlement with no admission of liability.

Now, the Court does go on to say, and we acknowledge this, that a consent decree can also count and make somebody a prevailing party.  But the difference here is, and this is I think a significant clarification, a consent decree and a settlement are not the same thing.  Our position is that while the parties did agree to allow the Court to have super continuing jurisdiction to enforce the settlement agreement, we did not agree to a consent decree, which is a distinct thing, and the Court previously in the -- Supreme Court in the Buchanan decision distinguished between settlement agreements generally and settlement agreements that resulted in specifically a consent decree.  That's not what we have here.

I recognize that the settlement agreement was memorialized in a court order and that the parties agreed to have the Court retain jurisdiction, but it's not a consent decree.  So under the Lackey decision, we would submit the request for prevailing party fees under 1988 is a nonstarter.  And to the extent that the Court is going to rely on earlier Ninth Circuit's decisions, I would really recommend that the

**28**

Court look at the Lackey decision and the Buchanan decision and look at how the Ninth Circuit had previously interpreted the Buchanan decision in a way that is contrary to how Lackey interpreted it, specifically on page 207 of the Lackey decision where it reaffirms what Buchanan said, which is identify two scenarios, an actual final judgment on the merits or specifically a settlement that results in a consent decree, which is not what we have here.

So that takes 1988 off the table, and that's almost all of what counsel argued in the motion, and it's almost all of what counsel argued today. That is what would eliminate a multiplier, this multiplier concept. That's not a concept you get under the Goodyear compensatory damages. It would obviously take away any prospective fees, which I think is improper in any event.

So then what is the test? What should the Court be looking at? Well, we did the work that the Alliance refused to do, which is what we tried to do is we tried to identify, based on the billing records that they submitted, which there were many redactions and there's significant block billing, what we did the best we could, we spent a decent amount of time doing this, we tried to say, we don't think it was our obligation, but we tried to identify what portion of the massive amount of fees, basically all the time they were working for months and months and months, what could be tied to something specific

**29**

under the Goodyear standard?  What but-for loss could they prove?  We did that in our brief, we outlined it.  It is significantly lower than the 3.5 million.  It's significantly lower than that 6 million, and it's tied to a specific order that the Court, we disagree with this, but we respect the Court's decision, it's tied to the encampment reduction order and the purported violation of that order.

If you focus on that, you get down to a maximum, and we outlined this in our brief, so I won't go over it too much, around $98,413.  That is what we could tie using reasonable estimates to specific loss to a specific order.  So we think at most, the Court should award that amount and not these 3.5 million or the 6 million that they have requested, which would be unreasonable without any legal basis and would fly in the face of the Goodyear standard that both we and the intervenors and the Court had previously said applied.

So on the Goodyear standard, I just want to, the Goodyear case, which the Court cites, it says, this is the holding of the Supreme Court, the but-for causation standard generally demands that a district court assess and allocate specific litigation expenses, and you have to tie them to the specific things that the Court is finding that were done in bad faith and then the expenses that resulted from that bad faith or willful disobedience of a court order.

Now, we don't think -- our position is that the Court

**30**

did not find, we believe the Court -- we agree that the Court found breaches of the settlement agreement, but the Court's order does not purport to apply a contempt standard, does not purport to apply a clear and convincing evidence standard, and so we believe that there hasn't been a showing, and Alliance hasn't made that showing. But I'm happy to go through, and I think I will now, because the Court asked for full argument, go through the specific bases that potentially could give rise to a contempt sanction, could potentially be the basis for compensatory damages or compensatory sanction under the Goodyear case.

I think the main one, the only one in our view that even gets close to being in that category is the report that was filed after the March 2025 encampment reduction order, and that's the only order that the Court specifically identifies, identified on page 59 of Docket 991. In March, in late March, I believe it was March 24th, the Court held that the City could not report mere encampment cleanups as reductions. But even after that ruling, I would submit that the City's obligations remained unclear. In fact, the Court elaborated on and provided additional guidance in its June order, and so at the time, right after the March 2025 order was entered, the City did not have a full understanding of what that order required. For example, one specific example is that the Court later clarified in its June order that the City could count abandoned

Case: 26-784, 02/09/2026, DktEntry: 6.1, Page 32 of 263
Case 2:20-cv-02291-DOC-KES  Document 1076  Filed 11/13/25  Page 31 of 146  Page
ID #:30922

**31**

tents. That counted under the Court's framework, even if there's no offer of shelter because nobody is there.

But even assuming -- so our position is that that order was not sufficiently definite, at least to rise to the standard that you need for contempt, which is a very high standard, at least for the standard that you need for bad faith misconduct. We're talking about serious violations of orders.

We think that the City's approach to that order was substantially justified in light of all the circumstances. The encampment cleanup data the City reported was collected from January 1st, 2024 to March 31st, 2025. So it was just a week after, most of the data was before the Court's order. Only seven days after the Court's order, we had to then report on that data.

Now, I understand the Court believes our interpretation of the encampment reduction was wrong. We had testimony at the hearing. I know the Court's heard it from Mr. Szabo. The City, in good faith, believed that it had not agreed to an encampment reduction that needed -- offers a shelter paired with each tent, makeshift shelter, vehicle that was removed. But the mere fact of a disagreement about that issue does not rise to the level of willful disobedience or bad faith.

The City had received the Court's instruction, and -- but did not have the data to meet the Court's order because it

**32**

had been collecting data based on what it understood the obligation to be. Now, I understand the Court found that to be a violation of its order, but you can find a violation of the order without it rising the level of contempt and without it being willful, without it being not substantially justified.

Under the circumstances here, you get an order, and then you have data that doesn't comply with the order, which would take time to get to reconstruct, and we've tried to do it now. We can't really do it. We've tried our best to reconstruct it. And you've seen in our latest quarterly report, which we'll talk about later today, the information we have shows a lower number of reductions because the goalposts have been moved, in our opinion. But in any event, that order cannot, in our opinion, cannot justify contempt sanctions under the standards under Chambers v. Nasco.

And so the Court should not issue any sanctions with respect to that order. But even if I'm wrong about everything I said, that is the only order that's clear and definite that could possibly be a basis for a contempt sanction and awarding fees. And we've done the math, and it works out to a much lower amount than the $6 million that my friend has asked for here today.

There are four other violations, or three other violations to the court, and the Court's familiar with this, so I won't go through them in that much detail. But I would

**33**

submit, and I think it's important, I think there's a reason why the Court didn't identify them specifically when it talked about attorney's fees, because none of these are of the sort of willful violations of specific and definite court orders. None of these are bad faith.

Regarding the bed plan, nothing in the agreement says that the existing bed plan expires. There wasn't any deadline to submit an updated bed plan. We've now submitted another bed plan pursuant to the Court's order. I will also note that Section 8.2, in our view, and I think the Court has recognized Section 8.2 was in effect at minimum because of the fires. We believe there's been two other events that have triggered it, as we've briefed in our papers. So the bed plan obligation, there's no basis to find us in contempt and order fees under the inherent power for the bed plan.

For sheltering and housing milestones, the agreement required the City use best efforts to hit the milestones. The City disputes that missing a milestone is a breach of the agreement. But even if missing milestones was a breach, that doesn't rise to the level of contempt. And in fact, there has been substantial progress to hit these milestones. The City is, as you heard from Matt Szabo, the City is committed to fulfilling its obligations under this agreement and creating the housing and shelter solutions.

There was no evidence of deliberate disobeying of

**1075**

**34**

this order.  Alliance doesn't point to any of such evidence.  At minimum, this was a situation of substantial compliance, at most negligence.  That is not what justifies sanctions under the <u>Chambers</u> standard and under the <u>Goodyear</u> standard.

Data reporting verification, very similar arguments. There's no specific order that the Court identified with respect to data reporting violations.  The City has provided substantial data in this case.  Many of the issues with data reporting, specifically that A&M found, were with LAHSA, which is not the City, and punishing the City for third-party conduct would violate basic due process rights and fundamental principles of fairness.

So of the four violations, which is really what the Court's analysis should focus on, we think none of them rise to the level of civil contempt.  And I know the court knows this, but I'll just remind the Court.  The standard for civil contempt, and this is from the Ninth Circuit's decision in <u>Dual-deck Video Cassette</u>.  One, violation of a court order. Two, beyond substantial compliance.  Three, not based on a good faith and reasonable interpretation of the order.  And four, by clear and convincing evidence.

That is a high standard.  Of the breaches that the court found in its June order, at best, the encampment reduction order is the only basis that could even potentially

**1076**

**35**

satisfy the Dual-deck standard, the standard for contempt, and even on that, I think in light of the circumstances, in light of the issuance of the order in March 24th, 2025, seven days before the end of the quarter, the fact that the City continued reporting based on its own understanding, its prior understanding, what it believes is its correct understanding of the encampment reduction obligation, does not rise to the level of contempt.  It was based on a good faith and reasonable interpretation of the order in light of the circumstances.  It was at minimum substantial compliance, and I don't know how it harmed the Alliance, especially now that we have reported consistent with the Court's further interpretation of the encampment reduction obligation, which occurred only in the June order, which provides substantial clarity on that issue.

We think that it would be an abuse of discretion and reversible error to order a fees as a contempt sanction, just like it would be to order fees under a prevailing party standard in light of the Lackey case.

I'll talk very briefly because I don't think it's very relevant, but I want to address that.  I don't want to leave it unaddressed.  Very briefly about counsel for the Alliance's references to our appeals and his suggestions, I guess, on strategy to avoid you -- Your Honor creating an appealable order.

First of all, counsel called this a game, that we are

engaged in a game. We are not engaged in a game. We are in a court of law. We, the city, is exercising its rights to appeal. And my friend is just wrong about the appellate jurisdiction issues, which we've explained in the Ninth Circuit, and they really are not for this court. But I want to explain just briefly their position on the appellate jurisdictional issues.

Their position is we never get to appeal. Never. You can issue all sorts of orders and never do we get to appeal. They're wrong about that. They keep ignoring an essential case. And I know this is really far beyond the attorney's fees, but it was a significant part of counsel's presentation. So I just want to inform the court. And if the court is interested, we filed a full opposition to their motion to dismiss in the Ninth Circuit that the Court could review. But they keep ignoring an essential Ninth Circuit case. And it's ironic they ignore it because they cite two earlier decisions from the case. It's the Flores v. Garland case. It's 3 F.4th 1145.

And it outlines why -- in the post-judgment context, that when you have an order that has real-world significance and resolves an issue with real-world significance, that you can take an appeal of that order. We believe that your June order did that. We believe that your order appointing Mr. Gary has done that, which is why we filed these appeals. These are

**37**

not frivolous appeals. They are not a delay tactic. They are an exercise of the City's rights to due process and to seek appellate review.

I don't know what this has to do with attorney's fees, but I didn't want to leave this unaddressed. This is not a strategy of delay. This is the City availing itself of its right to appeal.

I think counsel suggested it was relevant because he believes that if you award fees under 1988, we wouldn't be able to appeal that. Counsel's wrong. I think that no matter what the Court does, if the Court awards fees, it would be an appealable order. It resolves that issue. It has real-world significance. The Flores case -- that's the language from the Flores case.

The real-world significance is we'd have to send money, taxpayer dollars, to the Alliance. So that would be an appealable order. And we think it would be part and parcel of the appeal that we've already taken of the June order.

Just briefly on the interveners, we explained this in our brief. The interveners, they follow the Court's order in some sense in that they try to apply the Goodyear standard. They try to identify conduct. But their focus is largely on proving bad faith and not disobedience of an order. I think it's almost exclusively that, as we point out in our opposition.

**EXCEPTIONAL REPORTING SERVICES, INC**

**38**

I would just note to the Court that bad faith is a very, very high standard. And there's simply no evidence of bad faith, let alone clear and convincing evidence of bad faith, to justify an award of sanctions. What we have here is a City that is attempting to comply with the settlement. And we have a plaintiff that is looking at every turn to poke holes in compliance, raise technicalities, as they did earlier this week.

In any event, there's no evidence that there has been a scheme or some sort of attempt to raise clearly frivolous arguments, legally unreasonable, and without any legal foundation. We did not do that. We have not done that. We had a lengthy evidentiary hearing. We had substantial briefing. The court heard significant amounts of argument. We have not been engaged in frivolous conduct. We have not been raising legally unreasonable or without foundation positions in this case. We have been not engaged in an improper purpose. And these are the tests for bad faith.

Under the Primus Auto case from the Ninth Circuit, which we cited in our brief, 115 F.3d 644. And it's really important. I mentioned this before. This isn't just a recklessness standard. It's not a negligent standard. Bad faith requires something more egregious, and we don't have that here. And the Court's order does not find that. But if it did, at most it's for the encampment reduction order, which

**39**

with due respect, we do not believe there was a violation of. But the Court -- I understand the Court disagrees, at most, you should -- like with the Alliance, you should only award the intervener's fees specifically tied to that. That is the only ruling that comports with the Goodyear standard. It's the only ruling that would award but for compensatory fees, which is what Goodyear requires.

So unless the Court has any questions.

THE COURT: Why don't you check with your colleagues and make sure you're satisfied with your argument.

MR. HAMBURGER: Thank you, Your Honor.

THE COURT: All right. Now, counsel, would you like a break or would you like to continue on and finish the issue concerning attorney's fees?

MR. UMHOFER: Continue, Your Honor.

THE COURT: All right. Please.

Oh, I'm sorry. I don't think the county would have anything to argue, but I wanted to make certain for the record.

MS. HASHMALL: No, Your Honor, nothing from the County.

THE COURT: I don't think this is your dispute.

Okay. All right. Thank you very much.

And would you identify yourself for the record one more time just because we're on CourtSmart.

MR. UMHOFER: Matthew Umhofer on behalf of the LA

**1081**

**40**

Alliance.

The pattern is clear, documentation is withheld until exposure is imminent, public accountability is resisted until judicially mandated, and the truth of reported progress remains clouded by evasive recordkeeping.  These failures have undermined public trust and judicial trust alike.

That's bad faith and that's what this Court found in the order.  That's on page 39 of this Court's order.  My colleague appears to have missed that part of this Court's order and also page 57 of the Court's order, where the Court gets into attorney's fees and starts in this manner.

The City's refusal to provide updated plans, meet its milestones, correct its encampment reduction numbers and verify its reporting has unnecessarily and unfairly wasted the resources of the parties and the Court.

By consistently refusing to provide explanations and verification of its reporting, the City has forced the plaintiffs into the position of investigating and monitoring the numbers reported.  That's what this Court has held.

Now, if you look at the Ninth Circuit's decision, which I know my colleague would rather avoid the Ninth Circuit's rulings on the issue of 1988 and 1983, in Prison Legal News v Schwarzenegger, the Ninth Circuit held Section 1988 authorizes plaintiff to recover attorney's fees for monitoring state official's compliance with the parties'

**41**

settlement agreement.  We didn't hear that from counsel.

That case hasn't been overruled by Lackey, it hasn't been overruled by Buchanan, which I'm glad to hear counsel's moved away from after attempting to defend it, even though the Ninth Circuit has rejected their interpretation of Buchanan.

By the way, Prison Legal News v Schwarzenegger also said although this case involves a settlement agreement, not a consent decree, the difference is immaterial, not overruled by Lackey.

In both contexts monitoring serves the same purpose, causing defendants to fulfill their obligations more speedily and readily and that's why under Section 1988 we're entitled to attorney's fees, under the Ninth Circuit clear standard in Prison Legal News v Schwarzenegger.

Now, counsel suggested we haven't complied with the Court's order by attempting to meet the good year standard.  I think counsel missed page 5 to 7 of our motion and pages 7 to 9 of a reply in which we actually do explain why all the things the Court held, this litany of violations the Court set forth justifies and is a but for cause of everything we've had to do.

We wouldn't have had to do none of the work that resulted in $1.6 million worth of billing that counsel went through and tried to parse.  That's not how it works under attorney's fees by the way.  It's all part of an effort to deal with the City's obfuscation and delay which the Court found.

**EXCEPTIONAL REPORTING SERVICES, INC**

**42**

But for that obfuscation and delay none of those bills get generated. None of those hours get spent. We have set forth our obligation. We embrace the good year standard in our briefing and we've met it. We don't think the Court has to go there, the Court can belt and suspenders it if it wants. My colleague Ms. Myers is probably right, that the standards are just as clear, but the Court has found bad faith. The Court has found delay and obfuscation. We're already there under its agreement.

All the Court would have to do is announce that those things were proved during the hearing, which they were by clear and convincing evidence, and then it would be reviewed under an abuse of discretion standard. Of course, the City has appeal, of course, the City has a right to appeal. Of course, the City had a right to put the parties through a lengthy evidentiary hearing. But as the Court noted in its hearing, the evidentiary hearing would have been unnecessary had the Court (sic) just done what it was supposed to do and not require the intervenors and the plaintiffs to spend an extraordinary amount of time over the last year and a half and in the intervenor's case, in the last five years, policing the City's compliance with this agreement.

Your Honor, we have been in this courtroom since COVID trying to get the City to do the right thing by the city in the street. The City points to numbers that it cannot back

**43**

up. And that we have serious doubts about it.

This is not a game, but the City is gaming things, just read the Special Master's report. Just read the report of Daniel Gary, just read the e-mail the City send Daniel Gary last night, refusing to give access to systems that are -- that he needs access to to verify this data, that the City keeps putting forward without supporting.

Your Honor, Mr. Hamburger did a remarkable job under very difficult circumstances to make it look like the City's complying, but we all know it's not. The Court already found that. It continues to not comply. This effort that we are engaged in will continue and it costs me and my firm an extraordinary amount of time and energy uncompensated.

If the Court thinks we only deserve $1.6 million when they're getting 6 million to defend, fine. Your Honor, it sounds remarkable for counsel to argue that we're not entitled to fees when we are clearly a prevailing party, but we are and we will continue to fight, even if the Court zeroes us out from this request, because we're trying to get the City to do what it otherwise wouldn't do. And we wouldn't be here if the City would just do what it agreed to do. Thank you, Your Honor.

THE COURT: Would you check with your colleague please?

(Pause)

MR. UMHOFER: We're good, Your Honor, thank you.

**44**

THE COURT: And to the intervenors, please, and once again because we're on CourtSmart, would you just reidentify yourself.

MS. MYERS: Yes, Your Honor.

Thank you, Your Honor, Shalya Myers with the Legal Aid Foundation of Los Angeles on behalf of the intervenors.

I just want to address a few of the points and I'll address some of the arguments that were made towards the plaintiffs, just to the extent that they apply to intervenor's arguments as well.

First of all, and I think we adequately addressed this in the papers, but since Mr. Hamburger raised it, I'll just say it here, his attempts to relegate intervenor's arguments to simply an argument about bad faith rather than the entirety of the City's misconduct is putting far too a point on the tasks that was given to intervenors.

Mr. Hamburger acknowledges that the Court asked intervenors to demonstrate harm and that's what was required of us. So the suggestion that we abandoned an argument about willful disobedience, ignores the task in front of the intervenors.

There's no question, Your Honor, and I think they've acknowledged it that the Court found willful disobedience, but also made reference to a significant amount of other misconduct.

**45**

Intervenor's motion refers throughout to that misconduct. Using bad faith as a shorthand rather than the standard because the path in front of intervenors was not to identify support for finding of willful disobedience, the Court already did that.

And I think the City's attempts yet again and to get another bite at the apple to not accept the Court's rulings and to argue again and again about those underlying orders is exactly why we are here. And exactly what constitutes the City's willful disobedience with regards to the encampment reduction plan.

Your Honor makes rulings. The City doesn't like them and they attempt to reargue them and they attempt to force the parties to reargue them, rather than abiding by them and doing what the City is now doing, which is seeking appellate review. Completely appropriate, as it would have been to seek a reconsideration of Your Honor's orders, but that's not what the City did with regard to the encampment resolution.

So the City's attempts to pigeon hole intervenor's arguments should not be well taken. It's not the task at hand. I'm glad the City recognizes that we stuck to Your Honor's order in briefing on these particular issues.

I want to talk just briefly about the willful disobedience and the City's attempt to get out of its violation of the encampment reduction plan by suggesting that it's April

**46**

2025 report, which completely ignored this Court's March order with anything other than willful disobedience.

Your Honor, the City makes reference to the <u>Dual Deck</u> standard and the substantial compliance with the Court order. Your Honor, the City interpreted the encampment reduction plan in a way that was untenable. It was not supported by any evidence in the record. It was not supported by the parties' intent or the plain language of anything that was submitted to the Court related to the encampment reduction plan.

But that's what the City used for months in submitting the encampment -- its reports related to the encampment reduction plan. And if the Court had found the City in violation of the settlement agreement by it's -- relying on that interpretation, then perhaps they would have an argument under <u>Dual Deck</u>, that they were not willfully disobeying a court order.

That's not what happened, Your Honor. The City abided by a definition that was untenable, that LA Alliance called them out, intervenors made arguments. The Court ruled that the City's interpretation was incorrect and rather than adopting the Court order, the City simply flouted that order and relied on its ongoing interpretation without making any consideration whatsoever to the Court's ruling.

And again, Your Honor, the fact that the evidentiary hearing came shortly thereafter and that was the mechanism by

EXCEPTIONAL REPORTING SERVICES, INC

**47**

which the Court found the City's willful disobedience, that they weren't allowed to violate the court order for a long time, and only a short amount of time had to do with timing of the evidentiary hearing, not the City's willfulness in disobeying that court order.

The City also repeatedly points to the fact that they were not acting in bad faith related to all of the other actions that the Court pointed to in its order related to bad faith. And, Your Honor, part of the standard related to bad faith is delay of the enforcement of the court order, and I think the City's misconduct related to its treatment of the audit, related to representations by the City's attorneys with regards to specific issues that intervenors raised, for example, about what it means to create.

Intervenors asked those questions. The City's attorneys represented that they would provide responses and never did. The record is replete with those kinds of delays that require the evidentiary hearing to get to the bottom of what the data issues were.

Your Honor, the Court required a seven day hearing to cut through the types of delays and enforcement of the court order and that is exactly the types of bad faith and the types of misconduct that courts have relied on to issue the less severe sanction of attorney's fees.

Because of the but for causation standard in

**48**

Goodyear, but for the City's delay, but for the City's conduct related to all of the other attempts by this Court to ensure enforcement of its settlement -- of the settlement order, the Court would not have required an evidentiary hearing, the extreme remedy of an evidentiary hearing to cut through. And that's why Your Honor has offered the less severe sanction of attorney's fees to intervenor and the plaintiff.

Finally, Your Honor, with regards to the misconduct, the City consistently points to LAHSA as a third party and I just want to make this point. While LAHSA is a joint powers entity and a third party as it stands, the joint powers entity of the County and the City, the City decided that it would relegate the data collection that was necessary for settlement compliance to LAHSA.

Assuming for purposes of this that LAHSA would be construed as a third party, it doesn't matter that the third party is not fulfilling its obligations, because LAHSA didn't enter into a settlement agreement with plaintiffs and an enforceable order by this Court, the City did. And if the City is relying on a third party, the City doesn't simply get to pay that the third party failure to comply should absolve it of its obligations. It is the City's obligations that they failed to fulfill.

And finally, Your Honor, the Court relies on Goodyear to argue that the City should cut intervenor's fees and simply

**1090**

**49**

points to just the encampment resolution plan for the basis of the fees.

Your Honor, even if the Court decides to grant the attorney fees based on the violation of the encampment reduction plan and the clear willful disobedience by the City in its reporting, the Court doesn't have to, as the City suggests, take such a fine point on it as to relegate fees for the evidentiary hearing only to the part of the evidentiary hearing that related to the encampment reduction plan.  And that's particularly salient, Your Honor, for intervenor's participation.

Your Honor, I think it's clear that intervenor's participation in this case relates substantially to the City's seizure and destruction of its members belongings through the encampment reduction plan.  And the intervenor's participation related to the evidentiary hearing was about ensuring that the City is abiding by its obligations and not continuing to violate on house people's rights and that was entirely the City's -- the intervenor's participation in the underlying evidentiary hearing, as well as the other types of data violations.

Your Honor, I don't think that the Court took a -- made such fine points in making the rulings that it did.  The Court looked at, as the Court does, the entirety of the City's conduct and Good Year does not, by any stretch of the

**50**

imagination require the type of auditing of the records that Mr. Hamburger said that his firm did, related to our records, but rather requires a sense of rough justice, as the Court in Good Year says.

The Court is given the ability to look at the overall sense of the suit and what is required.  Your Honor, it is the City's misconduct overall that led to the evidentiary hearing, because the evidentiary hearing and the intervenor's requirement to participate is the but for cause of all of the fees that were incurred here, which is why we are seeking and only seeking fees for the evidentiary hearing.

THE COURT:  Why don't you check with your colleague just for a moment, to make sure you're satisfied with your argument.

MS. MYERS:  Thank you, Your Honor.

THE COURT:  All right.  City.

MR. HAMBURGER:  Thank you, Your Honor, just a brief points.  First on the request for 1988 fees.  Counsel referenced pre-Lackey Ninth Circuit decisions, our position is as we explained in our briefing is that Lackey did effectively overrule those decisions, to the extent they could be read as authorizing fees for all work performed in connection with a settlement of a 1983 claim, that did not result in a consent decree which is the scenario we have here.

We believe that an order granting them 1988 fees

**51**

would violate the Supreme Court's latest word on this issue and its interpretation of its prior precedent.  So on that one -- and it would also as I began my argument, it would go beyond the scope of what the Court was contemplating in the June order.

Counsel said they did make an attempt to apply the Good Year standard.  Their result is completely contrary to that standard.  The result is they get all of their fees.

Ms. Myers was quoting from the Good Year test and she notes correctly that it is a -- the Court says it's basically to do rough justice.  But the Court was very clear that the approach that the City employed in its opposition briefs is the right kind of approach.

The Court said a district court, you know, can look at a category of expenses, that's what we did, we tried to find expenses that were related to the encampment reduction order as an alternative basis, as opposed to all of the fees for everything, including unsuccessful things, including a substantial part of that, as the Court knows, a substantial part of the evidentiary agreement was at all about the Alliance agreement, but was about the other agreement that was expiring at the end of the evidentiary hearing, at the end of June. They want all of it.  They've made no attempt to parse anything out.

And so we agree it's a rough justice standard, but it

**52**

has to be tied to specific categories and what we have -- we did was we even explained our reasoning, we used a percentage approach that we think comes out to an award that comports with Good Year.

Good Year also said that's only in a very exceptional case you can award all fees under the but for test. And it gave an example, it gave the Chambers case versus a NASPA (phonetic) cases as an illustration of a case where you can award all fees as the Alliance is requesting.

And there they said, they could award such a fee because literally everything the defendant did, his entire course of conduct throughout, and indeed proceeding the litigation was part of a sword scheme to dispute a valid claim.

Now Your Honor ruled on the face of the order, their motion was granted in part and denied in significant part. As everybody knows, the main request in their briefing and at the hearing was an unprecedent receivership, the Court correctly refused to enter that remedy.

So the idea that everything that was done in the case from the perspective of the City with respect to the evidentiary, every single thing, including substantial amounts of litigation that had nothing to do with the Alliance settlement agreement, all of it should be what was the but for -- to satisfy the but for test under Good Year. I submit it does not.

**1094**

**53**

The standard here is a standard that is an exacting standard. These are sanctions and the Alliance didn't want to do the work. They want fees under 1988, they want a multiplier, they want $6 million. And they were very clear about why they wanted that.

They want ammunition. That's not the point of compensatory sanctions under the <u>Chambers</u>' standard, they want ammunition. The people on the street, there's a reference to the people on the street, that's what we're all here about, right. This is about solving a critical problem. They are not helped by enriching counsel for the Alliance. Sending millions of taxpayer dollars is -- does not help anybody get housing. It doesn't help solve the problem, and it's not what the Court was contemplating. It was contemplating a surgical award of specific fees.

And we would submit that the Court was contemplating award of fees particularly related to the encampment reduction order and I will just briefly because Ms. Myers raised it, I'll just point out two things about the March order and in the subsequent order in June.

So the Court did rule in March and on March 24th that it agreed with the plaintiffs, that cleaning an area and have unhoused individuals move back in without offers of shelter or housing is not a resolution or encampment reduction and shall not be reported as such. And it -- the Court said, the City's

**54**

only to report reduction with a more permanent meaning. That's what the Court said.

But it also took everything else -- the rest of the motion under submission and it didn't just in the June order just say I'm not revisiting this issue, I'm not saying anything more about this issue.

The Court -- and we appreciate the Court providing additional guidance, this is on page 52 of Document 991, where the Court specifically clarifies and provides additional guidance that's found nowhere in the March order. Specifically, the Court goes on to say that individuals need not accept an offer of shelter, that was not in the March order.

The Court says, they can't make shift shelter or a vehicle that is abandoned and the owner cannot be found, it would be impractical to make an offer. And so it's not required to make an offer of shelter.

And then the Court also said the City's under no obligation to ensure that a person where a shelter offer has been made and accepted is housed indefinitely. So the Court clarified significantly the encampment reduction obligation.

Now, Your Honor knows the City still disagrees with the Court's interpretation of it. And we think it's contrary to the intent of the parties as Matt Szabo testified at the evidentiary hearing. But the Court did not fully resolve this

**55**

issue about the meaning of an encampment reductions order until June.

And so at least under a contempt standard, where we're talking about willful disobedience, not substantial compliance, I would submit under circumstances here where you have an initial order and then a clarification order in June, that the interim report from the City does not rise to the level of contempt and that none of the conduct rises to the level of bad faith within the meaning of the contempt case law, much less has been proven by clear and convincing evidence, which is the standard.

So with that, unless the Court has any questions, I'd submit.

**THE COURT:** Why don't you check with your colleagues please.

**MR. HAMBURGER:** I think we're good, Your Honor.

**THE COURT:** All right.

What are the attorney's fees charged by Gibson Dunn and how are those broken out between your associates and your partners?

**MR. HAMBURGER:** Your Honor, we have an agreement that is a blended rate for all attorneys involved.

**THE COURT:** What are your -- is that agreement?

**MR. HAMBURGER:** It's $1,295 per hour.

**THE COURT:** Is that for your associates as well?

EXCEPTIONAL REPORTING SERVICES, INC

**56**

MR. HAMBURGER:  Yes.

THE COURT:  Is that rate also for an associate who is out of law school, let's say a year or two or three?  In other words, are you seeing your partners billing at $1,295 per hour and you're also billing an associate at the same rate?

MR. HAMBURGER:  Under this agreement, it's a blended rate, so all attorneys working on the matter with the agreement with the City are being charged the same amount.

THE COURT:  I'm sorry.  Blended rate means that a partner could be charging 1,750, a blended rate it could be --

MR. HAMBURGER:  No.

THE COURT:  So that's not correct.  So once again I'm going to ask a very simple question.  Are all of the 10 or 15 lawyers involved billing at $1,295 per hour, yes or no?

MR. HAMBURGER:  Yes.

THE COURT:  All right.  Thank you.

Now, would you put up the LAist article to begin with?  All right.

When I'm deciding rates versus when Ms. Myers requests $1,025.

MS. MYERS:  Yes, Your Honor.

THE COURT:  And LA Alliance requests -- just a moment.

MR. UMHOFER:  Your Honor, it's the same 1,295 rate that Gibson --

**1098**

**57**

THE COURT: Yeah, 1,295.

It was reported in LAist on August 27th of 2025 by Aaron Shrake (phonetic) quote and I'll put the quote up for you in just a moment, because I don't want to rely on a prior newspaper article but I do want to have rates charged by various counsel.

Quote, that the City agreed in May to pay $900,000 over a two year period but racked up more than $2 million in legal fees beyond what Council had originally authorized without telling Council members, end of quote. LAist also reported, quote, the firm had 15 attorneys working on the case, each of whom is billing the City $1,295 an hour.

Is it on the screen? All right.

And that quote is on the screen in the bottom paragraph. The initial $90,000 covered the first few days of work, end of quote. LAist also reported that the budget committee did not know the initial $900,000 had been exceeded until LAist reached out to them for comment.

Would you put up the Los Angeles Times article?

You can put it up on the Elmo if you want to.

**(Pause)**

THE COURT: All right. The Los Angeles Times article by David Zahniser states that quote -- the Los Angeles -- strike that. That the Council approved a fivefold increase after Gibson Dunn billed the City $1.8 million for two weeks of

EXCEPTIONAL REPORTING SERVICES, INC

**1099**

**58**

legal work with 15 of its attorneys billing nearly $1,300 per hour. This contract for an additional $5 million is only the current fiscal year, which ends in 2026.

In the LAist article they stated that they obtained this information through a Freedom of Information Act. Do you have that contract with you today?

MR. HAMBURGER: I do not have that contract with me.

THE COURT: Where is that contract?

MS. MITCHELL: Your Honor, I believe it was attached to Mr. Umhofer's declaration filed with the --

THE COURT: I saw that, but I want to verify this. They're the party. Is this the correct attachment to Mr. Umhofer's documents? Because I don't want to rely upon a newspaper article, but I think that in looking at reasonable rates between counsel, that --

MR. HAMBURGER: Which exhibit was it?

THE COURT: Let's see if you can two stipulate to that, otherwise I'll want your contract and want you to produce it.

MR. HAMBURGER: We've made no evidentiary objections.

THE COURT: I'm sorry, did you hear my question?

MR. HAMBURGER: You want -- no, I did not, Your Honor.

MS. MITCHELL: Exhibit E. Would you like --

MR. HAMBURGER: I have it.

**1100**

**59**

MS. MITCHELL: It's Exhibit E to Mr. Umhofer's declaration, filed on July 25th of 2025.

THE COURT: Let's see if you can stipulate to that, if not, I'm going to order you to produce your contract.

MR. HAMBURGER: Yeah. We can -- this -- we can agree that this is the document it purports to be.

THE COURT: Are you stipulating that this is your contract?

MR. HAMBURGER: I don't know if it is the only contract, but I can stipulate that this is an agreement between the City and Gibson Dunn.

THE COURT: Are there 15 attorneys billing? Are there 15 attorneys billing through your firm?

MR. HAMBURGER: Right now?

THE COURT: No, at any time during this case?

MR. HAMBURGER: There may have been at times, that number of attorneys that have billed to this matter, yes.

THE COURT: All right. And once again to confirm, then your two senior partners, who initially argued at the evidentiary hearing, they're billing at 1,295 per hour.

MR. HAMBURGER: Correct. Yeah, that's on page --

THE COURT: And an associate with your firm for a small period of time would also be billing $1,295 per hour?

MR. HAMBURGER: Yes, there's one rate applied to all attorneys under the agreement.

**THE COURT:** I understand that. Answer my question, please. Did you hear my question?

**MR. HAMBURGER:** Yes.

**THE COURT:** What was my question?

**MR. HAMBURGER:** Would a young attorney be billing that $1,295 rate, and yes, every attorney including first year associate, second year associate to the most senior partner is billing at the same rate of $1,295.

**THE COURT:** If the Court awarded attorney's fees in this matter, why wouldn't Ms. Myers have the same rate as minimally lead counsel for either LA Alliance at 1,295 or an associate at your firm? She's billing $1,025. Why wouldn't the Court find that they should be minimally $1,295 for Ms. Myers?

**MR. HAMBURGER:** Well, I think the main reason is that's the rate that she requested.

**THE COURT:** Okay.

**MR. HAMBURGER:** Second, I would just say that the blended discounted hourly rate is -- sets one rate for all attorneys, but with the understanding that it represents a significant discount for almost all of the attorneys working on the matter. And that's laid out on page 23 of Exhibit E to counsel's declaration.

**THE COURT:** Well, I haven't decided anything, but I'm very curious about the attorney's fees and the rates and the

tragedy of this is that quite a bit could have occurred on behalf of the homeless and the citizens of this City with the $5.9 million you're charging for one year and whatever attorney's fees I award if I award attorney fees for LA Alliance and the intervenors.

So for one year, we're potentially 8 to $10 million, aren't we?  How much good, without you responding to me, could have been accomplished on the public's behalf with compliance by the Court's orders?  And certainly saving lives and for the benefit of our general public.

All right.  For LA Alliance I've got a question for you and you're going to have to look at a couple of documents. I want you to look at Document 1015 if you can pull that up. And if not, I can read it to you.  It will be page 6 of 28. And I think that, Ian, we can do that for them and pull up that document so all of you can read that for a moment.

But I'll say to you that on line 21 of that document it reads as follows, plaintiff's counsel's hours yield a total of 1,092 -- I'm sorry, strike that, $1,392,818 in attorney's fees.  Just a moment, let me get this document pulled up.  And while we're pulling up that document, along with $44,257.21 in costs.

Now, this initial request before your multiply is about 20 percent of what -- and I'm simply going to refer to you from now as the City attorney.  You're acting on the City

**62**

attorney's behalf.  You're basically the City attorney making these decisions.  So this has been relegated to you.

On Document 1027 -- let them catch up, let's pull this up first.  1015.  Okay?  And I want you to go to page 6 of 28.  Yeah.  And you can see on line 21 that $1,392,818.  Can all of you follow that?

MR. UMHOFER:  Yes, Your Honor.

THE COURT:  Okay.  And I want you to turn to Document 1027.  And let's pull that up.  And, Ian, would you go to page 6 of 30?

And down to line -- well, 21 through 23.  There on August 29th the request is for $1,600,633 in fees and $45,467.21 in costs.  What was the increase between the approximate $1.392 million and the $1.6 million and what was the increase in the costs, which are de minimis?

So I understand how you're getting to 1.6 initially in your argument from the initial 1.3 and it may be self-evident, but I want to get a record of it.

MR. UMHOFER:  Yes, Your Honor.  The difference is in the work that's been done in the interim.  And so if I'm looking at -- I apologize, I am in document -- I'm not on the same page.  I'm at Document 1027, page 6 and there's no reference to 1.6 million there, so I just want to get to the same page as the Court where you're reading off the 1.6 number.

UNIDENTIFIED:  Page 1.

**63**

MR. UMHOFER:  It's page 1?

THE COURT:  It's page 1?

UNIDENTIFIED:  One of the three.

THE COURT:  On the filing document, it's 6 of 30.

MR. UMHOFER:  Got it, yes, Your Honor.

THE COURT:  And go down to line 22.

MR. UMHOFER:  So the difference is laid out -- the difference is simply the additional work that we've done.

THE COURT:  So when I look at your original request in Document 1015 filed on July 25th --

MR. UMHOFER:  Yes, Your Honor.

THE COURT:  -- that 1.392 has increased to 1.6.  In Document 1027 August 29th, because of that month, additional work; is that correct?

MR. UMHOFER:  Several months of additional work, Your Honor.

THE COURT:  All right.  The next question for the parties --

MS. MITCHELL:  Your Honor, if I can just add to that because my colleague didn't do the reply, I did.  The original motion was only for work through June 30th.  The fees submitted was through June 30th.  And so in the reply we added the additional both July and August to the motion, thank you.

THE COURT:  You previously argued for a multiplier before today's presentation that was less than the multiplier

**64**

than I'm hearing today in court.  Tell me the reasoning.

MR. UMHOFER:  Your Honor, we set forth the permissive range and we suggested a multiplier of 2.5 previously.  I think there's a couple of different reasons, I think part of it touches on what the Court just covered, which is the additional information that has come out since about how much money the City is spending.  And we think that that establishes a reasonableness, so the test under 1988 is reasonableness.

And so the additional information that's come out, the Court, you know, put up and we put forward through the LAist and others about how much the money is spending on this, alters the reasonable calculus at the time.  We wrote a motion I believe, we were at 1.8 million that the City had spent over 13 days.  We were at 1.6 for over 18 months, but now we have this additional information.

We're also, to be frank, in terms of dealing with, you know, the reasons for a multiplier, which is the extraordinary effort and the extraordinary results that are being obtained, we're being required, what has happened in the interim also is that the City has adopted a new strategy of feigned compliance but fail to comply.

And that -- and so we're going to have to push through that and I'm not anticipating at this moment any future awards.  So what we're trying to do is be compensated for the work we're doing and the multiplier we think, the factors under

**EXCEPTIONAL REPORTING SERVICES, INC**

Case: 26-784, 02/09/2026, DktEntry: 6.1, Page 66 of 263
Case 2:20-cv-02291-DOC-KES  Document 1076  Filed 11/13/25  Page 65 of 146  Page
ID #:30956

**65**

the multiplier warrant the -- and the new information about what the City is spending warrants -- I mean, the City could avoid all this if they'd just comply, right.  Wouldn't have to spend a single cent on Gibson or us, but if the City's not going to comply and continue to engage in the delay game that the Court has identified in its order, we think the multiplier is appropriate.  But again, it's in the Court's discretion so we defer to the Court.

**THE COURT:**  Today and the arguments before the Court is you've somewhat walked away from the perspective, fees that you noted in your briefing, and relied more upon a multiplier. I'm going to ask both of you, and I'll ask the City, does your fee arrangement of additionally $900,000 and then quickly going beyond that without Council approval, aren't you incentivizing litigation because if there was cooperation, much of these fees would not be necessary.

And what I'm concerned about when I looked at your papers asking for perspective fees, if the City hasn't done exactly the same thing in terms of a $5.9 million one year fee agreement with the City's attorney, hasn't this simply incentivized and curtailed any opportunity here to reach an accommodation between the parties and to decrease these extraordinary costs.

I'm going to address that to the City.

**MR. HAMBURGER:**  Your Honor, we -- the numbers that

**66**

you've been talking about are not flat rates that we get no matter what we do.  They are essentially a cap, a budget.  We hope that there -- we do not have to spend that many -- that number of fees and --

THE COURT:  Where would I -- counsel, where would I verify that?  In other words, I have an exhibit in front of me, so therefore it may be appropriate that I order all of your fee arrangements produced with the City, they would be available under the Freedom of Information Act and there's no reason that the press should have to chase those.

Are you willing to do that voluntarily or should I make an order?

MR. HAMBURGER:  If they are publicly available -- if they're available through -- we'd have to ask the City attorney.

THE COURT:  Well call her.  I'll wait.  I'm waiting.  You are the City attorney right now, this has been relegated to you by the City attorney and I want to know if Gibson Dunn is making these decisions or the City attorney.  Where is she?

Counsel, I'm going to take a recess.  That's an order, call her.  Get an answer.

**(Recessed at 10:44 a.m.; reconvened at 11:12 a.m.)**

THE COURT:  We're back on the record.  All counsel are present.

MS. MYERS:  Your Honor, we're having a technical

**1108**

**67**

issue so we're just going to move over there to avoid it, if that's okay.

MS. SPEAKER: She's going to come join us, Your Honor.

THE COURT: All right. Fine. All right.

My assumption, since you're acting as the City Attorney, is the city attorney is aware of these proceedings, the mayor is aware of these proceedings, and I'm going to find that the counsel present is aware of the proceedings, so I don't hear in the future that there's any lack of communication with any of these entities; am I clear?

(No audible response.)

Am I clear?

MR. SCOLNICK: You're clear, Your Honor.

THE COURT: All right. Thank you very much.

What's your response to turning over all of the agreements now? Because there seemed to be some intimation that there were other agreements

MR. SCOLNICK: Your Honor, we've spoken with our client. We are willing to turn over -- there's two agreements is my --

THE COURT: Will you? Just a moment. Two agreements. I said all agreements.

MR. SCOLNICK: The two agreements is all agreements, Your Honor.

**1109**

THE COURT: So all agreements are two agreements. So in the future, if this goes up on appellate review, there's not any new document submitted that wasn't before the Court.

MR. SCOLNICK: That is correct.

THE COURT: Thank you very much.

MR. SCOLNICK: Thank you. And, Your Honor, for the record --

THE COURT: When will that occur?

MR. SCOLNICK: Pardon me?

THE COURT: When will that occur?

MR. SCOLNICK: As soon as today.

THE COURT: Okay. Thank you.

MR. SCOLNICK: Your Honor, and just for the record, I am not acting as city attorney. The city attorney is an elected official in Los Angeles. I --

THE COURT: I don't see her.

MR. SCOLNICK: -- am outside counsel --

THE COURT: I don't see her. You are the city attorney. They've delegated this to you and, therefore, --

MR. SCOLNICK: Well, --

THE COURT: -- it gives a now segment and the city attorney will not claim that they didn't have information and acting on the city's behalf; am I clear?

MR. SCOLNICK: Correct, we will --

THE COURT: Thank you very much.

**69**

**MR. SCOLNICK:** -- inform our client of --

**THE COURT:** Counsel, you may --

**MR. SCOLNICK:** -- these proceedings --

**THE COURT:** -- be seated, thank you.

**MR. SCOLNICK:** Thank you.

**THE COURT:** Now, I'm going to receive both the LA Council delay decision on the $5 million more from *LAIst* and the *LA Times* article that I refer to for the record.

But I want it very clear, I'm not relying on these for any findings or issues that I resolve in the future. I have a stipulation between the parties concerning Exhibit E.

And now I have a representation by the city attorney that all agreements will be produced. And that way we'll negate any freedom of information acts in the future.

I'll take this matter under submission concerning attorneys' fees.

I want to turn to the quarterly report and take up that issue. This Court's concern has always been that accurate data is essential to ensure that services are being provided in accordance with the settlement agreement and this Court's orders, and to ensure that the services are reaching people who truly need them.

Every day homeless people are dying because they're unable to access essential services. And this Court's goal has always been to try to make a positive difference and try to

**70**

help these people get more of these services and help our public as well, the Los Angeles citizens.

And the data that comes in these quarterly reports is essential to see that these services are being provided. I'm very comfortable as a court making the connection that every day that there is delay in getting accurate information, there are people dying as a result of this delay.

And every day this delay goes on, the deprivation may seem as small as one person failing to receive one bed, one housing opportunity. But this person's now at risk and in danger that would not have occurred with accurate and timely reporting.

So I'm very comfortable stating that there is a human cost to this delay.

My goal is always to help people. And it's unfortunate that the instant strategy seems to be delay, delay, delay. It's going to kill people that the city could have helped.

And the Court had hoped this would be a more collaborative effort. But it's not too late because all the parties' goals should be really aligned here. And we'll get into that and the third statement when we discuss the contempt proceedings and how we're going to proceed, if at all.

So let's turn to the quarterly report. I think we need to hear from the city and the county here. And also I

want the monitor to be heard to the extent that there may be input.  And Mr. Mejia, who I appreciate your attendance.

I also assume LA Alliance wants to be heard on this issue.

And so I want to go back to a filing in just a moment.  And, Ian, I'll need you again to help me with this probably.

So we need to cover a few things.  I've reviewed all the filings once again.  And there's some things we need to touch on.

The city's requirement that all communications be funneled through its outside counsel and whether that requirement is delaying access to essential information; the delays in the monitor's ability to schedule interviews with key personnel; the city's failure to identify systems or databases that is the source of the unit bed status and open and occupiable date metrics; a lack of key information regarding the ten, I believe it's now 11 systems, and databases that the monitor inquired with the city about; the city's lack of reporting total PEH served; the lack of definition of units, beds, status, and total PEH served; the lack of documentation or shelter housing offers for encampment reductions; issues with milestone-related data; and whether an emergency has been invoked under 8.2 of this settlement agreement and what affect it's had on the obligations.

**72**

My understanding is that that emergency has recently been lifted by the mayor.  So those issues and more should be touched upon.

But -- yeah, have pull up 1034.  And just a moment.  No, no, we're going to pull up first 850, document -- counsel, I'm going to refer you to document 850.

And I'll slow down because I've spent hours with this, as well as you have.  So 850, if you'd be kind enough to pull that up.

Do you have it?

**MR. SCOLNICK:**  I don't, Your Honor.  What is the 850?

**THE COURT:**  Well, it's a transcript.

**MR. SCOLNICK:**  If you give me -- well, --

**MS. SPEAKER:**  I can --

**THE COURT:**  January 8th, 2025.

**MR. SCOLNICK:**  Thank you.  I have it now, Your Honor.

**THE COURT:**  Okay.  Thank you very much.

Counsel, do you have it with LA Alliance?

**MS. MITCHELL:**  Yes, Your Honor.

**THE COURT:**  Ms. Myers, do you have it?

**MS. MYERS:**  Yes, Your Honor.

**THE COURT:**  Okay.  One of the most interesting revelations that the Court has was the auditor controller's position where initially it was argued that the auditor controller could not -- strike that, it's controller, my

apologies -- could not examine the city because of the charter.

The Court had pointed out at that time that for 35 years that this city -- or more this city has never had a forensic audit.

And the reason for that is that any mayor could sweep this under his or her pants or skirts and, as such, shield any outside audit or any look at finances.

I'll read to you -- I could read to you incessantly, but I'll start at page 50, line seven:

"THE COURT:  Well, time out, time out.  I'm not joking.  Where do we look for that answer?  Who's going to be the leader here, the mayor, chairman of the board, LAHSA, who's going to be the central authority that makes this decision so that the public has access?

"Because right now we've created the perfect political non-responsible position by dividing this out between the county, the city, and LAHSA.

"And Miguel Santano wrote some great -- that committee did some great work on this that everybody ignored.

"I mean, where do we get these websites transparent?  Help me with that.  Or do I eventually have to do something about this.

"MR. MEJIA:  We've asked LAHSA because as the

**74**

controller, we can ask for the details and we wanted it going forward. But from my understanding, it's a resource constraint issue for them to provide it.

"THE COURT: So we're paying bills.

"MR. MEJIA: Yes. We're cutting blank checks."

Now, that's only a portion of this discussion finds the controller in a very unenviable position of coming forth stating that he would like to do a forensic audit of Inside Safe and other programs.

If you then turn to document 1034, it's another transcript. And I'll only read a portion of this. I'll read from Ms. Bennett and then --

**(Judge/Mr. Speaker confer.)**

**THE COURT:** Just give me one moment. Yeah.

And if you recall, although he was the city attorney, now Gibbs and Dunn, weren't present, what we were trying to do was get a transparent website.

And the reason for that was that it was hard for this Court to understand how providers were bringing information to LAHSA in a non-uniform nature literally with, one, I won't name them, one line, no date, a request for $248,000. That's your documentation that the city paid out.

Also facing us at the time was a county audit where we didn't know even the number of contracts. Five iterations had been run. The number of contracts allegedly came back

EXCEPTIONAL REPORTING SERVICES, INC

**75**

between 600 and 1200, someplace in that range.  We didn't even know the number of contracts.

At the same time, one of the newspapers had discovered a $50.8 million amount paid to providers with no timetable for repayment, no milestones, no contracts.  Those have been subsequently produced, and I believe only through the pressure of this litigation.

The lack of uniformity in reporting to LAHSA alone, let alone this constant refrain that the city somehow is trifurcated or bifurcated from LAHSA when the mayor sits on the LAHSA board, completely intertwined, has led this Court to make the finding that the city is the responsible person here as the entity that will or will not be accountable.

All right.  Now, go to page -- on page 55, no, bottom.  Mr. Bennett, line 25:  "I'm sorry that something" -- and this is up on the board.  Can you read it?

**MR. SPEAKER:**  No.

**THE COURT:**  All right.

**(Mr. Speaker/Judge confer.)**

**THE COURT:**  I'm sorry.  That's something that we just wanted to highlight is the time-consuming nature of this entire process that we have to go through from beginning to end from the financial piece to the contract piece.

I also handle the contract piece that should be something that is relatively easy on the frontend.  When we

EXCEPTIONAL REPORTING SERVICES, INC

**76**

provide that Excel file to LAHSA to just send us the contracts that match the transactions, that has been painstakingly difficult.

Now, what the auditor controller had testified to previously -- and I'll let him speak today about his prior concern in having to write blank checks -- was that all of us seem to be in accord.

And, frankly, before your entry that we wanted to work together in terms of transparency, and we wanted to get, when the request for proposal was completed, the contracts up on the board.

And the reason is that those contracts that turn from a request for a proposal now had milestones and who was to be serviced. And everybody was on board.

I'll give you Szabo's testimony if you like. Until your entry.

So apparently you've received additional instructions from someone, the mayor or the council, and you're now acting as the city attorney. It's not too late.

The public should minimally have these contracts when they return a request for proposal immediately publishable on a public website. Politicians should be able to see if these milestones are being met.

And that's not just for the homeless. That's for the entire population of Los Angeles, so people can see with

**77**

transparency how their money is being spent.  That has changed

significantly unfortunately.

I'll say to you as the acting city attorney in this

matter, it's not too late.  But that'll be your choice.

Now, I'm going to invite the city controller to make

whatever statements you like to.  And I welcome your presence

here today.

I previously complimented you on making a tremendous

effort in terms of getting this documentation up.  But I know

your staff has been severely cut.  You've already made that

representation.

And remember you both agreed when you reached the

dispute resolution was -- just a moment.  You both finally came

to me after a significant period of time with a joint

statement, which I'll put up on the board, that you could not

resolve the choice of the monitor.  And I'll display that for

you.  That calls into question then sections 24.

And the reasonableness of the city going through

three city council meetings in over a month and then referring

this back to a subcommittee, which is delay and unreasonable.

So, therefore, when you argue to the Court that the

city has to agree, that has to be reasonable.  And that month-

delay and three council meetings and then referral back to a

subcommittee does not appear to be reasonable, especially after

representations to the Court.

**78**

So put up the third party monitor, okay.  Can you see this on your screens?

**MR. SCOLNICK:**  I cannot, Your Honor.

Can you see it?

**MR. SCOLNICK:**  No, Your Honor.

**THE COURT:**  No.  Technology then.

**MR. SCOLNICK:**  Now I think it's coming up.

**THE COURT:**  We'll take our time.  I want this to go up on the screen.

**MR. SCOLNICK:**  We can see it now.

**THE COURT:**  Can you now?

**MR. SCOLNICK:**  Yes.

**THE COURT:**  LA Alliance?

**MR. SPEAKER:**  Yes.

**MS. SPEAKER:**  Yes, Your Honor.

**THE COURT:**  Let's go back to that document where it was.

**(Judge/Mr. Speaker confer.)**

**THE COURT:**  Plaintiffs LA Alliance for Human Rights and the City of Los Angeles submit this joint report to update the Court regarding the status of the city council's approval of the third party monitor, contemplated by Section 7.2 of the settlement agreement, and the Court's June 25th -- strike that -- June, 2025 order, and to request the Court's review and resolution of the issue pursuant to Section 24 of the

**79**

settlement agreement.

Keep going.

And then we went through a -- the city's amenable to considering instead of having former city controller Galperin and current controller Mejia to serve as monitors, and current -- the city is amenable to considering instead of having former city controller Galperin and current city controller Mejia to serve as monitors, subject to the city council approval.

And then go back.  No, I'm sorry.  Thank you very much, Ian.  I appreciate it.  Can you go out?

And then LA Alliance proposed Daniel Gary be appointed as monitor with Ron Galperin in supporting role to navigate the difficult systems within the city agreed to on September 16th.  However, the city's concerned about budgetary issues.

So the Court tried to take that into account.

Remember, at one time before you were involved, we had a discussion about a law firm that's very prestigious acting as the special master in this matter.

That law firm was charging your rates.  So the Court tried to hold the cost down, as it did here, and Mejia seemed to be a good person who understood the systems, etcetera, to gather the information for the data monitor.

Now keep going back up this way.  No, no.  Thanks a lot, Ian, appreciate it, very much appreciate it.  I need this.

**80**

Just a minute.

Give me one moment, counsel.  I've got boxes of material.  I'll be right with you.

Well, counsel, both of you -- no.  Counsel, you're going to help the Court just because the volume of material I have on my desk.

Find the documents where you came to the Court -- it's up in the upper portion of the latter page where you simply say that you can't reach a resolution in this matter.

    **(Pause)**

    **MR. HAMBURGER:**  I believe it's the first page of this document.

    **THE COURT:**  No, no, there's others, counsel.  You're very clear about it.  You came to the Court.  And I'll make a record of this when I write if I need to.  But I've got two boxes in back of me.

    **(Judge/Mr. Speaker confer.)**

    **THE COURT:**  Well, that's one of the places, counsel.  But you mentioned it again.  That's all right.  I'll write about it.  For my record, that's sufficient.  I can find the latter portion in another document.

    **(Pause)**

    **MS. MITCHELL:**  Your Honor, looking at docket 1045, the -- at the very top the parties "request the Court's review and resolution of the issue."  Is that what the Court is

**1122**

**81**

referring to?

THE COURT: Yes. But there's another section also which I'll find later on. I don't want to take any more of your time.

So auditor -- or the controller, Mr. Mejia, you have the lectern if there's anything you'd like to say, other than the Court appreciates your appearance today.

MR. MEJIA: Thank you very much, Your Honor.

You know, I just wanted -- oh, my name is Kenneth Mejia, City Controller of Los Angeles.

Thank you, Your Honor, for having me.

You know, I've been coming to this courtroom for over a year already.

THE COURT: Yeah.

MR. MEJIA: And I think to your point mentioned the, you know, an hour ago, my role in this role as an elected official, as a independent controller auditor is to make sure that at the end of the day, we are helping our unhoused community, people experiencing homelessness.

And I want to assure you that is why we always volunteered ourself. Any time you asked if, you know, who could be the auditor, who could be the monitor, who could create this website, my office has always said, yes, we could do it.

And we have always been willing to because, like I

EXCEPTIONAL REPORTING SERVICES, INC

**1123**

Case: 26-784, 02/09/2026, DktEntry: 6.1, Page 83 of 263
Case 2:20-cv-02291-DOC-KES   Document 1076   Filed 11/13/25   Page 82 of 146   Page
ID #:30973

**82**

said, we want to help people.

And in my role as the controller, I could see where those tax dollars are going. And that's why I really wanted to really get involved here.

And so, you know, recently in your order two months ago, you made us be the liaison for the third party monitor.

And we have -- as city controller, we have been doing our role the best as we can trying to facilitate, you know, data collection, doing our best to facilitate meetings that -- because that's what we're doing.

I know when you talk to monitor Gary, you know, you could ask him. We've been doing our best as city controller to facilitate this monitoring work.

And, you know, there -- from my point of view from what we've seen is, yes, there -- we are running into some hiccups, right.

Even when I tried to facilitate meetings, I -- and, I mean, if everyone's seen the emails, we have to go through a bunch of people, a bunch of lawyers and everything just to do my role as liaison.

So I want you to know that for me, I'm taking my role seriously.

As the person who sees all this data, who's done two audits already on homelessness, which touches on homelessness data, you know, we're here to continue to do this work and to

**83**

assist, whether it's as the liaison to monitor Gary or if, you know, the city makes the decision to fund us to help take on this role as monitor. We'd be willing to do that because we do this work, we are independent.

The point I'm trying to make is I'm dedicated to do this, and my staff is dedicated to do this. And so we're here to just make sure at the end of the day all this work we're doing can ultimately have a benefit to the unhoused community.

**THE COURT:** You probably know the systems and the money streams in a sense better than anyone as the present controller, certainly better than the past controller. And both sides have agreed to you.

We're depend upon you getting that information for Mr. Gary, gathering that stream, if you will, because as recently as last night, I received information about ten going to maybe 11 streams. But I'll let Mr. Gary speak to that in a few moments.

Would you remain just a moment? Do you have anything else you'd like to say, other than the Court's appreciation?

And I think the city's appreciation also because this portion doesn't cost the taxpayer any money. And that's a benefit to the city. And I think the public should be very appreciative of that.

Is there anything else you'd like to say?

**MR. MEJIA:** No, Your Honor.

**84**

THE COURT:  Thank you.  Would --

MR. MEJIA:  That's pretty much --

THE COURT:  -- you remain a few moments, okay?

Mr. Gary, let me introduce you to your colleagues here.  He's come out from New York.  He of course as you know has donated his windshield time.  In other words, he's not charging flying out here.  But I'm going to order him to charge from this point forward if there's any further delay.

So, Mr. Gary, the lectern's yours for whatever you'd like to say.

MR. GARY:  So Daniel Gary.

So first I want to thank Kenneth --

THE COURT:  Use the mic.  We can't hear.

MR. GARY:  First, I'd like to thank Kenneth Mejia and his team helping us figure out the right people and the hiccups aside has been an invaluable resource in trying to navigate.

Frankly, all -- I'm neutral.  I'm a third party.  All I'm trying to do is validate the data that's going into these reports.

I asked several simple questions to figure out what systems the city's -- is using.  And last night we got an email clarifying some systems and the like.

So I don't know if it's 11, four, five, six.  But before I can give an estimate or provide any real things, we need to know what actual systems are being used to actually

EXCEPTIONAL REPORTING SERVICES, INC

**85**

calculate the data that is being reported on.

THE COURT: Right.

MR. GARY: And from where I sit, it looks like on top of that, there's a -- I don't know if it's a disconnect or how you want to describe it. But the city tells me to talk to LAHSA. LAHSA -- but LAHSA isn't an actual party.

What we need is the actual access to the source data to validate the information going in to the report for the city.

I want to credit the -- there's been some hiccups, but we're -- I think we're figuring it out.

I think it would be -- I haven't had honestly a chance to review all the information I got in the last ten or 12 hours.

But at the end of the day, all we're looking for as an initial outlay is what systems are used, how are they built and designed, so we can then determine what data is being used to calculate and provide the numbers that are being reported to the city. And then from there we can figure out the other pieces of it.

And we've subsequently tried several times. Due to scheduling issues with the city, individuals, and the likes, we've just finally made headway into -- and I haven't read the email in full disclosure, to I think narrowing what are the systems, and then waiting on further information from the city

86

as to who the actual owners are for the specific systems on the call list, if they're new systems.

If there aren't new systems, then I think the city's identified the individuals. I just got an email last night, I don't know, like 12 hours ago or something like that. So I'm not exactly sure.

But the takeaway being is that we are trying to make forward progress, but it is proving to be a bit heady, headwinds. But I think we're, you know, on our way.

THE COURT: All right. Would you remain for just a moment? I've got a couple questions I'm going to --

MR. GARY: Of course.

THE COURT: -- ask the parties in just a moment --

MR. GARY: Okay.

THE COURT: -- to try to move this along --

MR. GARY: Okay.

THE COURT: -- because I thought up to recently this was a cooperative effort, until I made the findings after our last hearing. So if you'd stay with us for just a moment.

MR. GARY: Sure.

THE COURT: All right.

MR. GARY: Can I go back or you want me to stay here?

THE COURT: Well, I would just have a seat right there for a moment, --

MR. GARY: All right. Sounds --

EXCEPTIONAL REPORTING SERVICES, INC

**87**

THE COURT:  -- save you some time.

So first I'm going to ask if you would look at the docket number 1051-1 filed October 15th, 1051-1 filed October 15th.

And we're going to put that up.  And I can take any of the pages, so why don't we take page two of seven.  Why was the past information that has been provided on all of the past quarterly reports in this effort that show total PEH served in the last column removed from the October quarterly report?

As of yesterday, this is the document submitted to the Court concerning pending.  And yet in all prior reports the Court had a number.

And I'll show you that because last -- yesterday you finally submitted suddenly after the OSC in re contempt was issued by the Court the next document, which causes me concern that you're simply reacting to pressure being applied.

This is the document submitted recently.  Why?

MR. SCOLNICK:  The timing of the supplemental document filed last night had absolutely zero to do with the OSC, Your Honor.

The information was listed as pending when we filed the reports.  Both Plaintiff and Special Martinez had followed up with us promptly and asked what's going on.

And we told them that there was additional verification going on by the CAO's office.  That process was

**88**

complete yesterday.  We filed this as soon as we got it.  But so that's what happened.

      **THE COURT:**  Why the sudden change?  I received this information in the past.

      **MR. SCOLNICK:**  Because there's -- the information changes.  There's --

      **THE COURT:**  Because you're redefining.

      **MR. SCOLNICK:**  No, no, no, Your Honor.  The PEH number changes from report to report.  And the CAO's office needed to verify the number before reporting it in this last report.

      **THE COURT:**  Then would you turn to the next page for just a moment, these questions.  And put that up, please.

      All right, 7.1, a year and a half or more into this agreement, and LA Alliance, the intervenors, all parties have been waiting for this information which would appear from their perspective to be an absolute violation of the settlement agreement.

      Other than your argument that you have to consult with LAHSA, I'm directly asking you, one, the number of beds, opportunities offered as opposed to obtained, do you have that information, yes or no?

      **MR. SCOLNICK:**  Your Honor, we believe it's on the report.

      **THE COURT:**  Show us.

**EXCEPTIONAL REPORTING SERVICES, INC**

**89**

MR. SCOLNICK:  The -- it's the last page of the report or the penultimate page of these reports lists a total for units beds open to date.

THE COURT:  I'll let the parties respond to that.  So your answer is yes.

MR. SCOLNICK:  Yes.

THE COURT:  Okay.  Two, the number of beds or opportunities currently available in each council district. That comes from 7.1.  Do you have that information?

MR. SCOLNICK:  It is on the report, Your Honor.  Each address is listed by council district, and the total number of units and beds open are on the report.

THE COURT:  So I could check that yes.

MR. SCOLNICK:  That's a yes.

THE COURT:  Three, the number of PEH engaged; do you have that information, yes or no?

MR. SCOLNICK:  Your Honor, the number of PEH served we believe is a proxy for engaged.  The report does list the PEH served.

THE COURT:  I can check that yes.

MR. SCOLNICK:  Yes, as I explained.

THE COURT:  Four, the number of PEH who have accepted offers of shelter or housing; do you have that information?

MR. SCOLNICK:  I -- let me just -- one moment, Your Honor.  Your Honor, in 7.1 that is listed as to the extent

EXCEPTIONAL REPORTING SERVICES, INC

**1131**

possible.  And we do not have that information.

THE COURT:  Have you made an inquiry --

MR. HAMBURGER:  I would -- Your Honor, can I just add on that?  The PEH served number, obviously in order to be served you have to have accepted an offer.  So that provides some of that information.

So both three and four in your chart are we believe may be subsumed within the PEH served number.  But it is also part of the agreement that it is to the extent possible.  And the --

THE COURT:  And since we've had a --

MR. HAMBURGER:  -- obligation was to work with LAHSA.

THE COURT:  And, counsel, since we've had a year and a half to comply with this, --

MS. SPEAKER:  Two and a half years.

THE COURT:  -- to the extent possible over a year and a half.

MR. HAMBURGER:  We have reached -- the city has reached out to LAHSA and had discussions, including --

THE COURT:  No, you are LAHSA, counsel.  The city is responsible for this.  Quit segmenting out LAHSA.

MR. HAMBURGER:  I disagree as a legal matter but I understand the Court's position.

THE COURT:  Then answer my question.

MR. HAMBURGER:  We have not reported that data other

**91**

than as I said --

        THE COURT:  What efforts did you make and when did you make them to obtain this information?  We've been waiting a year and a half.

        MR. HAMBURGER:  My understanding is there've been multiple discussions with LAHSA to obtain this information --

        THE COURT:  Who and when?

        MR. HAMBURGER:  I was not a party to those discussions.  My understanding --

        THE COURT:  And how do you make that representation?

        MR. HAMBURGER:  I can tell you, Your Honor, I have been on -- I want to be careful because it may be privileged. But I can tell the Court that the -- and I believe we told Special Master Martinez --

        THE COURT:  Now, counsel, this is not privileged. Who gave you this information and who reached out to LAHSA?

        MR. HAMBURGER:  The CAO, city administrative office, --

        THE COURT:  Who?  That's a big office.

        MR. HAMBURGER:  I don't know who specifically was involved in those meetings.

        THE COURT:  So you don't know, do you?  You have some representation from somebody we can't verify about some reach out to somebody in LAHSA.  All right.  Thank you, counsel.

        The number of PEH who have rejected offers of shelter

**92**

or housing and why offers were rejected, number five.

MR. HAMBURGER: We don't have that.

MR. SCOLNICK: It's the same answer. We don't have that, Your Honor.

THE COURT: All right. Well, thank you.

And the number of encampments in each council district.

MR. SCOLNICK: We do not have that, Your Honor.

THE COURT: All right.

THE COURT: Why don't --

MR. HAMBURGER: I will note for the record, Your Honor, on four, I don't believe the no is -- there's been an "X" placed on the no.

And I believe that as I said, the PEH served is a proxy for acceptance of offers because you cannot have been served unless you accepted an offer.

THE COURT: All right. Thank you, counsel.

This rolls into the discussion about the OSC in re contempt. I keep saying to you it's not too late. But I've made my findings concerning obstruction, delay, willfulness in my order. That will go up to the circuit.

But remember we have A and M making virtually the same representations to the Court. We have a history of documents that we went through.

So before we begin this discussion concerning the OSC

EXCEPTIONAL REPORTING SERVICES, INC

**1134**

re contempt, I'd like to remind that all parties that I haven't made up my mind, but I'm extraordinarily concerned now.

This isn't going to be just another settlement agreement. I'm going to ask for oral arguments today on this OSC in re contempt because I want to understand better what's hindering compliance.

And you can also respond to counsel's representation, if you'd like to, in those six questions I've asked, Ms. Myer (sic) or LA Alliance.

And issues this Court's concerned with is both the special master and the data monitor are facing some challenges surrounding noncompliance and impedance of the special master and monitor's responsibility under the agreement and settlement compliance order, which the city's already on notice of for my settlement compliance order in document 991 from June.

And many of the issues, including a lack of data transparency, go back much longer to the same complaints from A and M. And they may be in this court once again as witnesses subject to our discussion today.

I made further observations and findings after the seven-day evidentiary hearing in June in docket 991.

And I stated:

"The pattern is clear. Documentation is withheld until exposure is imminent. Public accountability is resisted until judicially mandated. And the truth of

EXCEPTIONAL REPORTING SERVICES, INC

1135

**94**

reported progress remains clouded by evasive recordkeeping.

"As this Court has observed, these failures have undermined public trust and judicial trust alike. When errors are found in the data reported, the Court has repeatedly" -- sorry. "The city has repeatedly ignored the errors or attacked the messenger instead of engaging with and correcting the issues.

"This pattern has persisted for years, and it's untenable if the city is to succeed in meeting its obligations by 2027.

"The city's inability or unwillingness to verify its reporting or even explain how it counts and reports solutions was on stark display during the evidentiary hearing.

"At no point during the costly and time-intensive seven-day hearing did the city attempt to substantiate its reporting which had been called into question by Special Master Martinez, in addition to other witnesses, and which A and M had not been able to replicate.

"In short, the city has been on notice for years that its data collection and reporting is woefully insufficient, but continues to ignore its responsibility to report accurate numbers to this

Court.

"The inability to verify the city's reporting is a serious roadblock to compliance.  In addition to the recent evidentiary hearing, confusion over, and inconsistencies within the reporting have led to dozens of informal conferences, mediation sessions, and hearings throughout this litigation.

"Finally, the city flouted its reporting responsibility by failing to substantiate its reporting and failing to provide accurate, comprehensive data when requested by the Court, by Special Master Martinez, the parties, and A and M."

And on November 7th, I've issued an OSC in re contempt.

Now, playing into all this -- and I'm not sure yet -- on November 11th, believe in the *Daily Journal* I note that Judge Fischer is going through some type of proceeding in this -- in her matter.

And I haven't reached out to her.  But I'm going to take judicial notice, and I want to read that transcript.  And the reason for that is that I will refer back to a *Los Angeles Times* article, Doug Smith, April 16, 2024.  If you will pull that up.

And this is not evidence yet but we may be going through a very stringent hearing.

**96**

And I've also told you, and you as city attorney may not be aware of this, but Dean Pregerson and I have had discussions prior to your involvement, and it's on the record, concerning his having to issue an OSC in re contempt during -- for the jail issues. And now Judge Fischer is involved in some action.

And so up on the screen, if you would go to the underlying -- go right here. I'll read the entire paragraph.

While a federal judge has found that Los Angeles city officials altered evidence to support the city's defense against allegations that it illegally seized and destroyed homeless people's warning, that the city will likely face sanctions following a forensic examination, U.S. District Court Judge Dale Fischer wrote in an order that the city had not only altered, modified, or created documents relevant to the city's claim -- but this is what I've underlined. But it also failed to produce legitimately requested documents.

I sincerely hope that this is not a pattern. But I think a hearing may be needed.

And if you'd go to the next -- alleged doctoring occurred during Mayor Eric Gardy's (sic) administration, Myers said, although delays in producing documents have continued since Karen Bass became mayor.

One of the allegations here and a constant refrain and the findings by this Court previously with A and M is the

EXCEPTIONAL REPORTING SERVICES, INC

Case: 26-784, 02/09/2026, DktEntry: 6.1, Page 98 of 263
Case 2:20-cv-02291-DOC-KES   Document 1076   Filed 11/13/25   Page 97 of 146   Page
ID #:30988

97

city did delay, did so willfully and obstructed.

I'm proposing that we have a hearing for a couple reasons. And then you two can discuss this out of my presence for a few moments.

First, I don't think due process has taken place, nor should you be ready on either side today.

Number two, you should have time to subpoena whoever witnesses you want, A and M to the mayor. And we'll go through the apex doctrine again if we need to.

Number three, it gives the city a chance to come into compliance.

Last warning. You can produce these documents or say that you don't have them, and then we start a new leaf.

But delay will no longer be countenanced.

And by setting this hearing for as early as next Wednesday, you'll have a very limited period of time to produce these documents that should have been available to you over the last year and a half.

It may negate that hearing. If you don't have them, say you don't have them and we can turn a new leaf. But if you've got them, then produce them.

And here's why. I could do the following. I could take LA Alliance's request and simply set another date two or three weeks from now for you to produce documents.

But after walking through this with A and M, I'm

EXCEPTIONAL REPORTING SERVICES, INC

**98**

afraid that we'll reach once again further delay. And by setting a hearing, it will give you a definite time period to produce these or say you don't have them. And maybe we can move forward.

But otherwise I'm suggesting a hearing as of early as next Wednesday. And I want you to meet and confer for a moment in the back of the court.

I'm going to sit here and wait to see if you two can come up with any better idea because this hearing would involve OSC in re contempt, those specific obligations that have been alleged you haven't fulfilled, and also the delay that is apparently trying to be brought to the Court's attention.

Now, I'm going to turn this over to Ms. Myer, LA Alliance, to argue anything that the city has stated concerning the six questions or any representations. I'll turn back to the city after that.

**MS. MITCHELL:** Thank you, Your Honor.

The Court keeps saying it's been a year and a half. It's actually been three and a half years that we have not had this information.

So looking at the settlement agreement, which was an order by this Court, Section 7.1 calls for the city to report the number of housing or shelter opportunities created or otherwise obtained, which I would say it has to the extent that the data can be relied upon.

**99**

But then it separately calls for the number of beds or opportunities offered.  These are two separately delineated items separated by a comma.  They cannot be combined into a single item as we have been stating over and over.

And then the number of beds or opportunities currently available would be the ones that are open and unoccupied, meaning they are by the dictionary definition of the term available.

And neither of those second two things have ever been reported, the number of beds or opportunities offered and the number of beds or opportunities currently available in the council district.  That is not reliant on LAHSA within the agreement.

Separately, the agreement states the city will work with LAHSA to include in the quarterly status updates to the extent possible, not to the extent reasonable, not to the extent we have one meeting and see what happens, but to the extent possible a number of delineated things, the number of PEH engaged, which is a separately delineated item from the number of PEH who have accepted offers of shelter or housing, which is separately delineated from the number of PEH who have rejected offers of shelter or housing, and why offers were rejected.

And then finally, the number of encampments in each district, which of course has never been reported and has been

Case: 26-784  02/09/2026  DktEntry: 6.1  Page 101 of 263
Case 2:20-cv-02291-DOC-KES   Document 1076   Filed 11/13/25   Page 100 of 146
Page ID #:30991

100

the subject of much discussion in this court because the city has never done what it's supposed to do.

So these are separately delineated items.

And I will also state we just want this.  We just want the data, Your Honor.  We just want the city to do what it is obligated to do.  And we have been asking for this I mean frankly since this settlement agreement was entered into in May of 2022.

We raised this issue again in July of 2025.  And three months later we still don't have any progress updates on what's going on.

Multiple emails, multiple inquiries have gone ignored.  This is what we're talking about, Your Honor.  This is the delay, delay, delay.

And it does seem as if the city has shifted tactics intentionally.  A year ago it was not this.  A year ago there was at least cooperation and engagement and discussions about how to move forward on these issues.  That's not happening.

I can't even get a response to basic inquiries on these issues.  The most I have gotten, I think two days ago I was told that they met with -- the city met with LAHSA last week.  That's the most I've gotten.  I don't know anything else.  I'm not getting any interaction at all.

And so I recognize, you know, that counsel has a difficult client.  I get that.  I previously had the same

**101**

client, Your Honor.  I understand the issues that are involved, and it is complicated, it involves meetings.

But there has been a shift in tactics to lack -- complete lack of cooperation in what we have seen in the last year.

And the lack of data, the lack of information, the lack of cooperation, the delay, the non-responsiveness, the avoidance has been experienced now by myself, by A and M, by Special Master Martinez, and now by Mr. Gary; although he may be making some progress in that regard.

This is untenable.  It is three and a half years into this agreement and we're still fighting over these really basic things.

So I wholeheartedly disagree with counsel that some of these are being reported.

I agree that the number of housing or shelter opportunities created or otherwise obtained is being reported to the extent that the data is reliable.

And I recognize there are some changes that are happening.  And I would suggest that the changes that are happening in the numbers being reported are because we are now looking closely at the data because Mr. Gary has been appointed, right.

If the Court looks at the numbers -- one moment, Your Honor.  If the Court looks at the report that was filed on July

Case: 26-784  02/09/2026  DktEntry: 6.1  Page 103 of 263
Case 2:20-cv-02291-DOC-KES  Document 1076  Filed 11/13/25  Page 102 of 146
Page ID #:30993

**102**

15th by the city, specifically I am looking at docket 1011-1. That's Exhibit A, reporting the quarter ending June 30th of 2025.  Just line one they reported 91 beds with 91 PEH served.

Looking at the updated report from October, docket 1072, the total PEH served has dropped to 86.  And that historically has been a total report, right, meaning the PEH served in its entirety, and now suddenly those number are changing.

Same with suddenly the units and beds are changing.

And I would suspect that's because these number are now being looked at closely and being reported probably more accurately --

**THE COURT:**  Sure.

**MS. MITCHELL:**  -- than they were before.  And I want to give the city credit for doing their due diligence in looking at them, which perhaps hasn't been done before.

**THE COURT:**  Sure.

**MS. MITCHELL:**  But the numbers have changed as a result of inquiring on the data.

I think going back to Section 7.1, Your Honor, these are separately negotiated for and delineated items which the city has always had an obligation to report.

The city is not reporting them by very definition. The city has never reported them.  And every attempt to get the city to engage on this issue has been met with delay and

EXCEPTIONAL REPORTING SERVICES, INC

**103**

obfuscation.

So for that reason we are asking for the Court, "A," to resolve this issue under Section 24, and also set an OSC re contempt for the delay and obfuscation that we have experienced.

I'm happy to answer additional questions that the Court has.

**THE COURT:** I want to hear from Ms. Myer next. And I'll say to each of you, to the extent and -- help me, counsel. To the extent your argument to the Court has been to the extent -- I want the exact wording. You're working with LAHSA. It's in 7.1. Can you pull that up and just read it to me?

**MR. SCOLNICK:** Oh, yes. I think it's to the --

**THE COURT:** To the extent --

**MR. SCOLNICK:** -- extent possible.

**THE COURT:** Yeah. So let's find out. Let's get some witnesses in from LAHSA and see what that extent -- it's been over the last year and a half.

And therefore if LAHSA's involved or the city's involved, then the city's at fault. You're responsible, not LAHSA.

**MS. MITCHELL:** And, Your Honor, one additional note. The items negotiated for in 7.1 of what was intended to be reported is consistent with the parties' original intent --

**THE COURT:** I know.

**104**

**MS. MITCHELL:** -- entering into this agreement in 2022 of beds going up, significant outreach is happening, people are moving into these beds and off of the street.

And we maintained that from the beginning, which was consistent with the encampment reduction requirements, etcetera.

So you can see from 7.1 all of this has always been intended to tie into together. The city has shifted it to an entirety differently direction.

**THE COURT:** Okay.

**MS. MITCHELL:** Thank you.

**THE COURT:** Ms. Myer.

**MS. MYERS:** Thank you, Your Honor.

And I just want to echo the Plaintiffs' concern related to this.

And I'm a little bit shocked at Mr. Hamburger's representations about what data is being reported because it -- what the city has been reporting is quite frankly not what was requested.

I think to Ms. Mitchell's point, it's very clear that the data that should be reported under the plain language of 7.1 is about people.

And the data that's being reported primarily by the City of Los Angeles in the data reports are about the beds that were created. That makes sense given the city's obligations of

**105**

12,915 beds.

But for purposes of accountability, those beds being filled and also in terms of accountability related to capacity, Your Honor, having this additional information under 7.1 is critical.

There are a number of additional issues related to how they're interpreting the data that I just want to flag because I think it will become even more clear how the city's representation that it has presented this data is simply not accurate.

So Ms. Mitchell pointed out that the number that is being presented as the total number of people being served, that number has typically been the number of people that are being served, the total number that -- of people that have been served over time for each of those beds.

That is a very different number than the number of people who are offered shelter, who accept shelter, and who reject shelter in a single quarter, Your Honor.

The -- what was negotiated for in terms of quarterly reports is that that information would be broken down by quarter.

And I stress this, Your Honor, because the issue of people moving through these shelter beds has been an incredibly important aspect of how we think about addressing the homelessness crisis.

**1147**

**106**

And so if the Court, Plaintiffs, got the benefit of the bargain here, what we would be able to see in terms of the number of people who were being offered shelter beds would be an indication of how often people are cycling through those beds, right.

So if there are 91 shelter beds and we know the number of people who were offered shelter beds, right, and then we see the number of people who were actually served by those shelter beds, we can derive more information about how that -- how those shelter beds are being used.

But the way the city is presenting it, there's no way to actually break down that data.

And I think this comes back to the significant issues here of obfuscation where data is negotiated for, data is expected, data is asked for, something different is given, and then there's a representation that the data that's given somehow can replace the data that was bargained for and requested.

So similarly the number of people engaged, Your Honor, is not the same as the number of people served. The number of people engaged is an outreach issue.

And that's been presented throughout when the city has talked about both the city and -- both the city's outreach workers. So that datapoint is very significant and very different than the number of people served.

**107**

Likewise, the number of people who have offered -- who have accepted offers of shelter and housing, I understand, Your Honor, that the city would like the number of people offered and accepted shelter to be the same as the number of people who are served by that housing.

I can appreciate from the outside why that may seem to be the same number. But they're in fact very, very different numbers because an individual can be offered shelter and never actually move into that shelter.

And that issue is incredibly significant given Your Honor's interpretation of the encampment reduction plan which relates to offers of shelter.

So the city can take the position that every person who is offered shelter received that shelter and is served by it. But unless the city is presenting both of those numbers, we will never know.

Likewise, the number of people who rejected offers of shelter and why those offers are rejected, I think we can all indicate are different numbers.

But it's problematic, Your Honor, that the city is suggesting that the number of people served, actually in those beds is the same as offered or accepted.

And we raise that because we are -- from the outside, as third parties, to the extent that we are third parties to this, we're increasingly concerned about the ways in which the

**1149**

**108**

city's has represented that beds exist that don't actually exist.

And the point of the monitor is to dig in.  If the city doesn't acknowledge the differences in the data, then we are never going to get to the heart of those particular issues.

And, Your Honor, I have a very significant concern related to the encampment reduction plan and the city's report that I'd like to raise now because I think it's appropriate.

**THE COURT:**  Please.

**MS. MYERS:**  Your Honor, the Court and -- was very, very clear that the city could count tents, RVs, and makeshift encampments that were abandoned.  That's not what the city is counting, Your Honor.

The city is counting tents, makeshift shelters, and RVs that are unattended, Your Honor.  Those numbers are fundamentally different from every way you could possibly count.

And yet despite this Court's clear order that the city could count abandoned tents and nothing else, which Mr. Hamburger has specifically referenced twice this morning in talking about your order, despite that explicitly clear order by your -- by the Court, the city's quarterly report says it is continuing to account for tents, RVs, and makeshift encampments that are unattended.

And, Your Honor, I cannot stress more strongly the

**109**

difference between unattended and abandoned.  Abandoned means a person has given up a possessory interest in that tent and it has been discarded.

Unattended means a person simply isn't there.  And the city knows this.  The city's been subject to litigation about this particular point for decades and subject to court orders on this issue for decades, Your Honor.

And if you look at 1051.3 and the footnote that they provided, which tells us what they're counting, that they are counting unattended when removed, meaning the person was present with the personal property who asserted or claimed interest over the personal property.

They're saying that the person simply wasn't there.

And, Your Honor, I think I raise this with the strength that I am raising this because it is so directly contrary to your order and is exactly what the city was doing previously that I think we are -- quate frankly we're shocked that the city continues to engage in this kind of conduct related to its reporting, and specifically related to the encampment reduction plan.  There is simply no justification for the city counting unattended.

And, Your Honor, we would also stress that this definition of unattended means that somebody has a tent, and they come to your court to watch the court proceeding.  And they tell their neighbor, hey, neighbor, watch my tent, I'm

**110**

going to court, right.

That tent is unattended because the person isn't there to claim a possessory interest over it.

Now, if the city throws away that tent, they get to count it. They are counting it as an encampment reduction plan. That definition is part of Los Angeles Municipal Code 5611. It is part of ongoing litigation in another courtroom, Your Honor.

So they know the difference between abandoned and unattended. And so I wanted to raise that here, Your Honor, because I think that it does bring up issues, and it's specifically related to the Court's -- or to the annual -- or to the quarterly report.

I'm happy to answer any questions about either of those issues but thank you.

THE COURT: The city, please.

MR. SCOLNICK: Thank you, Your Honor.

We're talking about a few different things here. I know nothing of judge -- I truly know nothing about Judge Fischer's case. I know that there's been a history about A and M, and the court has made findings about that.

As I understand today's proceeding and the OSC, it is about working with the monitor, working with Mr. Gary and --

THE COURT: Are you willing to do so?

MR. SCOLNICK: Yes, we have been, Your Honor. And

**111**

that's a fundamental misimpression.

I think I'm encouraged by Mr. Gary's statements today that he sees progress.

To be clear, I'll say it very plainly, there are no documents that anybody has asked for that we have not turned over.

Mr. Gary has asked about some fundamental structure questions and big picture questions. I cannot snap my finger and get answers to that. But we've timely and promptly responded.

I can tell you personally I've spent a lot of time in the last three weeks chasing down answers, trying to set up interviews.

Mr. Gary has gotten a bunch of initial information, and he's had multiple interviews now with Mr. Szabo, over an hour of his time.

He's got another one tomorrow. He's got another one set up tomorrow, it's with a different person from the CAO's office. We are trying our best to facilitate this.

I just reject the proposition that the strategy here is delay. I know there's a history here, and the Court has made findings about it.

But we are trying to do everything we can short of just having the monitor, you know, go into city hall and start taking over systems to understand what he wants and to get him

**1153**

**112**

what he wants.

And, again, I think we're on the right path, Your Honor, I really do.  Okay.

With respect to the 7.1 issues, again, that was not the purpose of today's proceeding.  We talked to you about how the -- our interpretation has been.  These are new issues raised that have not been raised until a brief filed on Monday.

We've had a couple years of this and nobody's ever taken issue with these things.  So we will look into them, we'll have a conversation about what's available.

With respect to the issue Ms. Myers just raised about abandonment versus the abandoned tents, my understanding is that there's notice.

At all times -- the only ones we count are the ones that there's notice posted that these will be removed.  And then there's some period of time, and I cannot represent to the Court exactly what that time is.  I can find out.

But there -- this is not just randomly someone goes to the -- a court hearing or someone goes to lunch and their tent is gone.  This is a process where there's notice posted, some period of time, and that is considered abandoned.

I think that's it unless there's something else to address, Your Honor.

Again, I just fundamentally take issue with the notion that we have been intentionally delaying the monitor's

**113**

work.  I'm acting as a lawyer for the --

THE COURT:  Counsel, I've already made those findings in a prior order.  This is a new proceeding.

MR. SCOLNICK:  Yes.

THE COURT:  But that prior order is pretty indicative to the city with specific findings about delay and obstruction quite frankly, and willfully doing so.  I hope that this is not a pattern.

But I think the proceedings next week, let's take the evidence, let's see what occurs.

MR. SCOLNICK:  Understood --

THE COURT:  Now I'm going to propose to all of you the following as you go to lunch.

I tentatively am prepared to set and begin the OSC in re contempt proceedings next Wednesday.  That will give the city time, if they choose, to come into compliance if they believe that they're out of compliance or to take the present position that they have.  Let's see what that evidence presents.  But that will give seven days.

I can slow those proceedings down if there's difficulty getting different people in here from LAHSA, etcetera.

But what I'm fearful of now after a year and a half or two years is setting another deadline with another problem or another redefinition and two or three weeks have gone by and

**1155**

**114**

now we find ourselves constantly regurgitating quite frankly what should have been accomplished a long time ago.

This can be resolved cost effectively.

Mr. Gary has already donated hours to fly out here. Mr. Mejia, as the controller, is a freebee.  Thank you.

The Court's done everything it can to decrease the cost to the city, although the city doesn't seem to be of the same mind.

The other concern I have is the city's representations, so you're on notice, that there have been reach-outs to LAHSA.

I'm going to be very curious about those witnesses and what they have to say when they occurred, and why when those reach-outs have occurred over this last two years, this information hasn't been disclosed.  So you're on notice about that.  And I want witnesses on the stand and under oath.

Now, that's going to require you to serve summons. And trust me, people will be here.  I have a way of getting them here very quickly.  Am I clear?

(No audible response.)

Am I clear?

**MR. SCOLNICK:**  Yes, Your Honor.

**THE COURT:**  Am I clear?

**MR. SCOLNICK:**  We --

**MR. HAMBURGER:**  Your Honor, can I inquire about --

**115**

THE COURT: No, you can't. Am I clear?

MR. HAMBURGER: On that --

THE COURT: I can get people here.

MR. HAMBURGER: -- point, yes, you are.

THE COURT: There's two ways to come to court: voluntarily or involuntarily.

When we start these proceedings, you have these witnesses available so we're not wasting your time and my time.

Now, we may have to slow down over Thanksgiving. We're not going to disturb people.

But I tentatively am prepared to start this proceeding because I think now it would be a benefit after hearing representations by all counsel to get a clear record of what conversations are taking place, with who. And we may be going through the whole apex doctrine again. I hope not.

But, all right, I'm going to take the stay up after lunch. And I want to wish you a best of lunch. And if it's agreeable with you, you need at least an hour, so can we reconvene at 1:30; would that be acceptable?

MS. MITCHELL: Yes, Your Honor.

THE COURT: Acceptable. Thank you very much.

Then, Mr. Hamburger, if you'd like to address the Court at that time, or if you'd like to do that now, I didn't mean to cut you off but you were cutting me off.

MR. HAMBURGER: Your Honor, I know you're -- we're

**116**

about to break, but -- and maybe we can take this up at the beginning, but I am -- just would like clarity about the subject of the evidentiary hearing that you're proposing.

THE COURT: I will be very clear about that after lunch.

MR. HAMBURGER: Okay. Thank you, Your Honor.

THE COURT: And I'm asking you to meet and confer -- in fact, I'm ordering you to meet and confer and have a discussion about this so you can set the parameters. And maybe you can agree. But this evidentiary hearing will be going forward, counsel. Thank you.

MR. SCOLNICK: Thank you.

(Court in recess at 12:26 p.m.; reconvened at 1:41 p.m.)

THE COURT: Be seated and thank you very much for your courtesy. And I'm going to turn on the microphone.

All right. There's just a few other items that I want to address and then I'll turn the lectern back to any of you who wish to address the Court.

Counsel for the City represented that 7.1 obligations were not raised or were only raised for the first time today. I reference counsel to Document 674, which I've had pulled because my memory is very good about this, filed on February 29th, 2024, Special Master's first report.

Quote, the City is missing other key progress areas that must be reported to the Court and the public quarterly.

**117**

The City has yet to provide the Court with the following information:  The number of PEH who have accepted offers of shelter or housing; the number of PEH who have rejected offers of shelter or housing and why offers were rejected, the number of encampments in each council district.

Counsel, do you wish to correct?

MR. SCOLNICK:  I do, Your Honor.  I --

THE COURT:  Nice and loud now.

MR. SCOLNICK:  Sorry.  I spoke with Special Master Martinez over the break and she reminded me that that was in the record.  I misspoke.  I was referring to the filing --

THE COURT:  All right.  Thank you very much.

MR. SCOLNICK:  -- this week.  That's all I'm referring to.

THE COURT:  Now, I'm going to take the stay under submission because I want to hear more about the hearing which will commence next Wednesday.  And I wanted to then call to your attention some of the concerns you have about special master's duties.  And her monitoring that you've raised with the Court and the payment of her approximately $100 per hour.

One of your complaints was that when Special Master Martinez under her duties for the road map agreement, when monitoring different locations to try to get verification, which we're trying to get here, Alvarez & Marsal represented to the Special Master that there were allegedly a documented 88

**EXCEPTIONAL REPORTING SERVICES, INC**

**118**

spaces at a particular location and Special Master Martinez has those e-mails.

It was related to Alvarez & Marsal and subsequently to Special Master that half of the slots were empty and it had been empty since April.  Ms. Martinez was told that half of those slots had not only been shut down in April at the order of the City and LAHSA.

But the City continued to pay full amounts for all 84 slots, so do the math, that's 5,000, $300 per slot per month, 45 extra spaces not occupied, about $238,000.  Is the City's position when the Special Master notes obvious fraud and that the documents don't match, that you are bringing forth to this Court that Ms. Martinez should disregard that and not report this to the Court when you try to curtail her monitoring activities?  And if so, I want to get the City Attorney in here immediately.

**MR. SCOLNICK:**  That is not the City's position?

**THE COURT:**  What is your position then because your e-mails disclose quite a difference?  Would you like those read into the record?

Ms. Martinez, read those e-mails into the record.

And I'm going to ask you again, are you counting this as fraud?

**MR. SCOLNICK:**  Understood, Your Honor.

**SPECIAL MASTER MARTINEZ:**  Your Honor, do you mean the

Case: 26-784, 02/09/2026, DktEntry: 6.1, Page 120 of 263
Case 2:20-cv-02291-DOC-KES    Document 1076    Filed 11/13/25    Page 119 of 146
Page ID #:31010

**119**

(inaudible)?

**THE COURT:** Yeah, I want the return e-mail where Gibson & Dunn makes the following position which I've gone back and looked at, but I'd rather have you read it into the record. And the question will be, when obvious fraud is available, is this your response on behalf of the City Attorney and the City of Los Angeles?

**MR. SCOLNICK:** I'm certain it's not, but I'd like to hear the e-mail.

**THE COURT:** You're going to.

**SPECIAL MASTER MARTINEZ:** This is just the e-mail regarding my invoice, Your Honor, I'm kind of -- I need some clarity. Which e-mail are you speaking of?

**THE COURT:** During the recess you called to my attention the response from Gibson & Dunn and that response was the notice that the City has complained -- was -- just a moment. The City has taken the position, quote, and I wrote this down, that the City monitor or monitors that the Special Master has no authority or basis to review or provide any assessment of the City's compliance with the City and County road map MOU. That the City's responses to the Special Master inquiry regarding sites under the road map MOU should be viewed to waive any and all -- and if you'd just read that verbatim.

**SPECIAL MASTER MARTINEZ:** I just want to clarify that for the record, that did not come from Gibson & Dunn. You

**120**

asked me for an example of some of the duties and I read into the -- I gave you the e-mail that was provided by the City Attorney Arlene Hoang --

THE COURT:  I'm sorry.

SPECIAL MASTER MARTINEZ:  -- over this specific issue.

THE COURT:  My apologies, counsel, this is from the City attorney.  This is not your e-mail.  This is from Arlene Hoang, the City Attorney.  So I want you to hear this response from the city attorney when you weren't involved in the case.

MR. SCOLNICK:  Understood.

THE COURT:  All right.  And then let's get the city attorney in here and see if this is her statement.  Why don't you read that verbatim from the city attorney about your position in terms of non-monitoring and reporting these empty bed spaces.

And, counsel, be patient.  This is quite an e-mail chain.  It took me most of the lunch hour.  So for the record, is not Gibson Dunn.  But you are the City now.

MR. SCOLNICK:  I'm the City's counsel, Your Honor.

THE COURT:  You are City counsel now, that's right.

MR. SCOLNICK:  I'm not the City counsel, the City attorney now.

THE COURT:  You are City counsel, thank you.

SPECIAL MASTER MARTINEZ:  I can't see with my

**121**

glasses.

THE COURT: Take your time.

SPECIAL MASTER MARTINEZ: I'm sorry, I'm having a difficult time with my glasses on.

THE COURT: Because your position on behalf of Gibson Dunn is the monitor should be limited and you've complained about her efforts to verify, so we're going to have a discussion about that in just a moment, because she's operating under my direction.

MR. SCOLNICK: Understood. And we're talking --

THE COURT: So this is discussions between Gibson Dunn, the City attorney, and me.

MR. SCOLNICK: I'm happy to have that discussion, Your Honor.

THE COURT: And she will report fraud, counsel. But I want you to hear the response from the City.

(Pause)

SPECIAL MASTER MARTINEZ: Here it is. My apologies. It's actually from Jessica --

THE COURT: No, this for the record is not Gibson Dunn --

SPECIAL MASTER MARTINEZ: Yeah, it was on --

THE COURT: -- so you have my apologies on the record. This is the city attorney, but you're acting in the City Attorney's place today. So here is the response from

**1163**

**122**

Ms. Hoang on behalf of the City Attorney when this empty bed spaces are discovered about $250,000 a month.

**SPECIAL MASTER MARTINEZ:** Good afternoon. The City maintains --

**THE COURT:** No, just -- nice and slow and louder.

**SPECIAL MASTER MARTINEZ:** Good afternoon. The City maintains that the Special Master has no authority or basis to review or provide any assessments of the City's compliance with the City/County Road Map MOU and the City's response to the Special Master inquiries regarding sites included in the City's reporting under the City/County Road Map MOU.

**THE COURT:** A little bit slower please.

**SPECIAL MASTER MARTINEZ:** The City and County Road Map MOU should not be viewed to waive any rights held by the City, specifically the City does not intend to waive and expressly reserves all rights with respect to the scope of inquiries by the Special Master which do not pertain to the settlement agreement between the City and the plaintiffs. With that said, we are still looking into your questions about the safe -- the site, but can confirm that the hours of operations for those -- they provide hours the City currently -- I don't want to disclose the site.

**THE COURT:** No, don't disclose who gave you that information. We'll turn that over to some other authorities.

**MR. SCOLNICK:** Would you like me to respond, Your

123

Honor?

THE COURT:  She's not going to -- no, not yet.  She's not going to disclose the source.

MR. SCOLNICK:  Okay.

THE COURT:  That'll go to other authorities.

MR. SCOLNICK:  I'm sorry, what was the question?

THE COURT:  You've taken the position that my monitor is inappropriately monitoring these sites when the City is not. I'd like to hear your position on that and especially when fraud is discovered, if she's to close her eyes to this, because this is by order of the Court and it appears to me that you're trying to limit her duties, which quite frankly would be contemptuous.

MR. SCOLNICK:  Understood, Your Honor.  As Your Honor noted, that is not an e-mail I wrote, so I don't know what the thinking behind it was.

THE COURT:  You are the City.  I can wait till the City Attorney gets here.  Why don't you call her.

MR. SCOLNICK:  That wasn't the City Attorney who wrote that either, Your Honor.

THE COURT:  Who's Arlene Hoang?

MR. SCOLNICK:  It was someone who works for the City Attorney's Office.

THE COURT:  Oh, okay.

MR. SCOLNICK:  Okay.  But, I mean, the distinction,

EXCEPTIONAL REPORTING SERVICES, INC

**124**

the City Attorney is an elected official.

THE COURT:  Well, do you want to get Arlene Hoang in here then and find out who she talked to about this?  This is an obvious limitation on the Court's authority.  This smacks directly at my authority and my special master will not be limited in terms of fraud.

UNIDENTIFIED:  Your Honor --

THE COURT:  No, counsel, I'm speaking to him now.

MR. SCOLNICK:  This is Arlene Hoang, Your Honor.

THE COURT:  Arlene?  What is this all about?  Well, welcome to the club, what is this all about, because they're trying to limit my special monitor or my special master.  She operates on my authority and it appears, and I'll put you under oath, it appears that this is a limitation and I did not include this originally in the A&M assessment, although I was tempted to because it came at the last moment.  What is all this about?

MR. SCOLNICK:  I apologize, Your Honor, this is not -- sorry, this is Jessica.  Sorry.

THE COURT:  Absolutely, this is not Arlene Hoang.

MR. SCOLNICK:  Understand.  Understand.

THE COURT:  I know who Arlene Hoang is and this is not Arlene Hoang and Arlene Hoang works for the City Attorney's office.

MR. SCOLNICK:  Correct, Your Honor.

**125**

THE COURT: All right. Then I have nothing to say to you. I'll put Arlene Hoang under oath.

MS. HOANG: Your Honor, I believe Special Master Martinez actually said the e-mail came from me. I don't remember it in detail without seeing a copy.

THE COURT: Well, go over and look at it. No, go over look at it --

MS. HOANG: Okay. I certain can.

THE COURT: -- because this -- no, go over and look at it. That's an order.

MS. HOANG: The one thing --

THE COURT: Get up out of your seat. That's an order. Go over and look at it and refresh your recollection.

MS. HOANG: Okay.

THE COURT: Because what this involves is a continuation now of Gibson & Dunn City Attorney trying to limit my special monitor or my special master from monitoring obvious fraud. And we're going to have a real discussion about this and my authority. And you can go through each complaint you have, and by the way, she hasn't been paid since September and I've ordered her to prepare a report about the lateness of the City up to 83 days of non-payment. I want to hear why.

MS. HOANG: Your Honor, it -- the e-mail does reflect the City's position that --

THE COURT: I'm sorry, I can't hear you.

EXCEPTIONAL REPORTING SERVICES, INC

**1167**

**126**

**MS. HOANG:** Your Honor, the e-mail does reflect the City's position that the special master was -- her role was to look into compliance with the settlement agreement as opposed to the MOU road map agreement. That's what the first part of the e-mail pertained to.

The second part, which was not entirely read into the record did provide much of the information that was requested by the special master and it also indicated that we were looking into the issue, because of course, this is a discrepancy --

**THE COURT:** How have you done looking into that?

**MS. HOANG:** -- we do want to know about it.

**THE COURT:** No, just a moment. How have you done looking into this? How have you done? What have you done to look into this?

**MS. HOANG:** Well, I mean --

**THE COURT:** No, just a moment. We're looking into it. What have you done to look into this?

**MS. HOANG:** The issue --

**THE COURT:** What have you done to look into this? Do I need to repeat it?

**MS. HOANG:** Conferring with our client, which I --

**THE COURT:** Who?

**MS. HOANG:** -- you know, to a certain extent would be privileged and I'm concerned to be in any sense to be waiving

EXCEPTIONAL REPORTING SERVICES, INC

**127**

that.

THE COURT:  Have you taken any action concerning these $250,000 a month payments to dead slots not being used?

MS. HOANG:  Of course, that is part of the inquiry.

THE COURT:  Where -- I'll put you under oath in just a moment.  Who made the inquiry?  In other words, don't get in too deep.

MS. HOANG:  Your Honor, all I can say is that I know that we certainly take --

THE COURT:  You don't know if there's been an inquiry made, do you?

MS. HOANG:  There has been --

THE COURT:  Be very careful.  Who?

MS. HOANG:  My understanding is that there has been follow up.  I don't know the extent to which and who precisely did any inquiries.

THE COURT:  All right.  Now, let's deal with the special master.  She has devoted four years, if you don't know that, without pay until this special master position came open.  Originally Hueston Hennigan was going to be the firm that took this on at about $1,000 an hour.  The City came to this Court, if you don't know, and wanted to save costs.  So instead of Hueston Hennigan hiring Special Master Martinez at $1,000 an hour, she undertook this at $100 an hour.  She worked for free initially for four years as most of the people around me have,

**128**

and I told you before I had virtual around me from Mr. LA, Tom Lavonne (phonetic), a rapt of people out here, who out of the goodness of their heart didn't accept money.

It appears initially that you're trying to limit my special master in terms of inquiry and I want to hear now the specific complaints you have against her and her efforts and why she hasn't been paid for September and October. And why you're constantly late as much as 87 days and now you are the City.

**MR. SCOLNICK:** Your Honor, I -- with due respect am not the City. I do not cut the checks. I do not know the answer. Special Master Martinez --

**THE COURT:** Okay. I have patience. Why don't we call the city attorney then.

**MR. SCOLNICK:** May I answer the question, Your Honor?

**THE COURT:** Certainly.

**MR. SCOLNICK:** Special Master Martinez e-mailed us I believe last week and said she had not been paid, that the payment was late. I said I'd look into it. I looked into it, I promptly got back to her and I was told that the check had been cut and it was on the way. If it has not been received yet, that is news to me today. I -- it -- I could ask the Special Master if she has not been paid.

**THE COURT:** Why are you constantly late? Why are you so much as to 87 to 83 days late in your payments?

EXCEPTIONAL REPORTING SERVICES, INC

**1170**

**129**

MR. SCOLNICK: I do not, Your Honor.

THE COURT: Well, who do I inquire of?

MR. SCOLNICK: You can ask me and I'll find out.

THE COURT: Go make a call. I'll be sitting here. In other words, I don't want to go through this again. It was promised to me before that this was resolved when she wasn't being paid in August or whatever the date was and now we're right back around with you making a series of demands, including my conversations with her. Those are privileged, counsel.

If you want to open them up and Mayor Bass coming in here and having her conversations, I'm happy to do with that, and I'll put Special Master Martinez with full disclosure.

MR. SCOLNICK: I don't believe we're asking about the substance of any of your conversations.

THE COURT: Why don't you read out what your concerns are on the record.

MR. SCOLNICK: I believe we just asked for detail on the bills.

THE COURT: No, no. Ms. Martinez, would you read out their concerns?

SPECIAL MASTER MARTINEZ: Yes.

This is not from Mr. Scolnick, it's actually from Mr. Hamburger.

THE COURT: Okay. Mr. Hamburger. Are these your

**EXCEPTIONAL REPORTING SERVICES, INC**

**130**

concerns, Mr. Hamburger?

SPECIAL MASTER MARTINEZ:  It was on November 5th.

THE COURT:  Just a moment.  Are these your concerns?

MR. HAMBURGER:  These are the concerns of my client.

THE COURT:  But you wrote them.  And who gave you direction to write these concerns?

MR. HAMBURGER:  It was -- well, it's privileged, but my client.

THE COURT:  The Mayor?

MR. HAMBURGER:  The Mayor did not direct -- well, I don't want to get into privilege, but I did not have a discussion with the Mayor --

THE COURT:  President of the City Council?

MR. HAMBURGER:  -- about this.

I did not have a discussion with the President of the City Council.

THE COURT:  The City Attorney?

MR. HAMBURGER:  Not the City Attorney, elected city attorney, members of the City Attorney's Office.

THE COURT:  Who?  Well, let's read out the demands you're making for a moment.

SPECIAL MASTER MARTINEZ:  Do you just want --

THE COURT:  Let's get a clear record instead of all these e-mails flying back and forth.

SPECIAL MASTER MARTINEZ:  Number one, for time spent

EXCEPTIONAL REPORTING SERVICES, INC

**1172**

Case: 26-784  02/09/2026  DktEntry: 6.1  Page 132 of 263
Case 2:20-cv-02291-DOC-KES  Document 1076  Filed 11/13/25  Page 131 of 146
Page ID #:31022

**131**

monitoring homeless sites, please identify the sites you monitored, how much time you spent at each site and what specifically you did to monitor those sites.

Number two, for community --

**THE COURT:**  Just a little bit slower.  Mr. Hamburger, what's your concern here?

**MR. HAMBURGER:**  Our client wanted additional details.

**THE COURT:**  Who's your client?

**MR. HAMBURGER:**  The City and specifically the City Attorney's Office.

**THE COURT:**  Who in the City?  Yeah, big bureaucracy, who?  Who are you speaking to?

**MR. HAMBURGER:**  Who am I speaking to?

**THE COURT:**  Yes, who are you speaking to?

**MR. HAMBURGER:**  Primarily Valerie Flores.

**THE COURT:**  Okay.

**MR. HAMBURGER:**  At the City Attorney's Office.

**THE COURT:**  And how high up is she in the City Attorney's Office?

**MR. HAMBURGER:**  She's -- to my understanding, she's fairly high up in the City Attorney's Office.

**THE COURT:**  Right.  Must have talked to the City Attorney.

**MR. HAMBURGER:**  I don't believe I had a discussion with the City Attorney about this specific e-mail.

**EXCEPTIONAL REPORTING SERVICES, INC**

**132**

THE COURT:  Okay.  Now, do you have any future concerns about her monitoring?

MR. HAMBURGER:  We don't have concerns about her monitoring, the question was the detail on her invoice, like what sites she was monitoring.

THE COURT:  What are you concerned about at $100 an hour, what are you concerned about the detail on her invoice that's missing?

MR. HAMBURGER:  It's exactly what's said in the e-mail.

THE COURT:  What are you concerned about?  You wrote this.

MR. HAMBURGER:  My client was concerned about --

THE COURT:  No, you, what are you concerned about, you wrote this?

MR. HAMBURGER:  I -- well, my client, I represent a client in this case.  We were interested we -- what -- if you look at the invoice it just says monitoring homelessness sites, homeless sites.  We were interested in which sites she's going to.

THE COURT:  She's not going to disclose those sites to you certainly before she goes to them.  Is that understood?

MR. HAMBURGER:  Yeah, we weren't talking about in advance.  We were talking about it on invoices that are for the previous month.  But, Your Honor.

**1174**

**133**

THE COURT:  Well, we're going to go through each one of these now because this could be viewed as a limitation or an attempted limitation on the City's part.

The second request that they have, Ms. Martinez.

SPECIAL MASTER MARTINEZ:  For communications with Judge Carter or communications with Judge Carter and clerks, please identify the subject matter of the communication with Judge Carter and the nature of the communications --

THE COURT:  What would you --

SPECIAL MASTER MARTINEZ:  -- verbal, written, and et cetera.

THE COURT:  Just a moment.  What would you like to ask me?  Do you want my communication with my special master? What are you interested in?

MR. HAMBURGER:  No, we wanted -- we're asking for details of the work performed.

THE COURT:  No, you're not, you're asking for communication.

MR. HAMBURGER:  That is what she's billing for, the City for, taxpayers, not me, the taxpayers.

THE COURT:  Well, just a moment and who's -- what's her name again?  What's -- you say my client and you say a lady.  What's the lady's name again?

MR. HAMBURGER:  Are you talking about who is in the City Attorney's Office that we talked with?

134

THE COURT: Yeah, who's asking about my communications, you, the City Attorney, who?

MR. HAMBURGER: This was a communication -- this e-mail was sent on behalf of the City of Los Angeles --

THE COURT: No, no, that's a big entity. Who?

MR. HAMBURGER: This was approved by the City Attorney's office.

THE COURT: So the City Attorney of Los Angeles approved this?

MR. HAMBURGER: I don't believe she approved this directly.

THE COURT: Well, indirectly?

MR. HAMBURGER: It was done with -- in consultation with attorneys that work for the City Attorney's office and I do worry about privilege and so I want to be very careful here.

THE COURT: And I worry about any act on your part that has any limitation on a direct order from this Court and my monitor and my special master. Am I clear?

MR. HAMBURGER: You're very clear, Your Honor. That was not the intent of this e-mail. The intent was to ask for further detail about work that was performed in the past.

THE COURT: That is not a communication between the special master and the Court.

MR. HAMBURGER: That is what she billed us for.

THE COURT: So she billed it for, so you just did it,

EXCEPTIONAL REPORTING SERVICES, INC

**1176**

**135**

because she --

MR. HAMBURGER:  All we were asking for, Your Honor,
was and just to be clear, we weren't saying she couldn't do
those things.

THE COURT:  She's going to do those things.

MR. HAMBURGER:  Understood, Your Honor.  That is not
what we were asking for.

THE COURT:  And she's going to report obvious fraud.
Am I clear about that?

MR. HAMBURGER:  That is a hundred percent fine, Your
Honor.  We're not suggesting otherwise.

THE COURT:  And so far it appears on the road map
agreement that the City took the position to not have this come
forward, on the road map agreement, and I have this reported,
we've got some other e-mails for you.  We spent a lot of time
on this.  What's your third request, Mr. Hamburger?

MR. HAMBURGER:  We asked for -- there's
communications with the data monitoring team that are being
billed to the City.

THE COURT:  Say that again slowly please.

MR. HAMBURGER:  For the items in the invoice that
said communications with data monitor team, we just were asking
for additional details, including the subject matter of the
communications and the nature of the communications.  Were they
e-mails, were they phone calls --

**EXCEPTIONAL REPORTING SERVICES, INC**

**1177**

**136**

THE COURT:  It's interesting --

MR. HAMBURGER:  -- were they meetings.

THE COURT:  Mr. Hamburger, it's interesting to me that my special master told me that you went back through three years of all of her reports.  And all of those reports come to the Court with my signature.  I look at each of those personally.  And in the last three years, what three years ago or two years ago, there was an overage paid by the City of about what $6,000?

SPECIAL MASTER MARTINEZ:  I think it was -- yeah.

THE COURT:  In other words, your office or somebody in the City Attorney's Office decided and I applaud it, to meticulously go through all of the records that Special Master of this Court and through the fault of the City, you actually paid her an overage of $6,000.  You called that to her attention immediately.  She repaid that willingly, no problem.  And yet you're not wanting to undertake a forensic audit of the City.  Doesn't that strike you as odd that we would monitor a special master to this degree, and have the City take the position that we're not going to take a look at the hundreds of millions of dollars being spent?

Now, I can ask that of the Mayor if I want to and I can ask that of your City Attorney.  I choose not today.  But I think we need to reach an accommodation very quickly about the role of my special master and she will not only monitor this,

EXCEPTIONAL REPORTING SERVICES, INC

**1178**

**137**

she will report fraud immediately to this Court.

MR. HAMBURGER: We --

THE COURT: Do we have any disagreement with that?

MR. HAMBURGER: None at all, Your Honor.

THE COURT: Do you have any disagreement with that?

MR. SCOLNICK: No, not at all, Your Honor.

THE COURT: Thank you. And I presume that the City Attorney is not going to have any disagreement with reporting fraud to this Court?

MR. HAMBURGER: Of course not, Your Honor.

THE COURT: I am ordering you to continue on with your monitoring duties. Am I clear?

SPECIAL MASTER MARTINEZ: Yes, Your Honor.

THE COURT: And any interference by the City or any communication is to be directed to me? Am I clear? Not to my special master.

MR. SCOLNICK: Yes, Your Honor.

THE COURT: You will directly communicate with me if you have a complaint concerning any of her performance and I will resolve that here in court with you.

MR. SCOLNICK: And not performance, but about the invoices. Do I direct that to the Court too?

THE COURT: Absolutely.

MR. SCOLNICK: Understood.

THE COURT: Now, tell me what's wrong with her

**138**

invoices again?

MR. HAMBURGER: Your Honor, it --

THE COURT: Because I would love to have the same scrutiny of the City. So whatever we lay down for the special monitor, let's lay down for the City in just a moment.

MR. HAMBURGER: I don't know exactly what you mean by that, Your Honor, but --

THE COURT: Well, I can be very clear.

MR. HAMBURGER: Okay. The e-mail was simply inquiring for entries that were -- such as monitoring homeless sites and talked generally about communications. We were simply asking could she provide more details.

Your Honor, I understand you're not going to order that. We withdraw the request.

THE COURT: Okay. Fair enough, withdrawn, understood.

MR. HAMBURGER: And in terms of the invoices --

THE COURT: Now pay her.

MR. HAMBURGER: Yes. And --

THE COURT: Today.

MR. HAMBURGER: I will talk with the --

THE COURT: Today. This has gone on long enough, you're not delaying payments any longer. You're not waiting 83 days, you're not going to try any intimidation or anything concerning my special master. That's a direct affront to this

**139**

Court.  You will pay her immediately.

Now, I'm going to sit here, go cut the check.

MR. HAMBURGER:  Your Honor, I'm not in charge --

THE COURT:  Go cut the check.

MR. HAMBURGER:  I can't, Your Honor.

THE COURT:  Mr. Mejia, can you cut a check?

Good.  I'm tired of waiting 83 days.  I'm tired of having people who are working at $100 an hour, have a silent message through some of your e-mails that could be perceived as intimidating.  Now, I'll stop this inquiry if you're withdrawing this.

MR. HAMBURGER:  We're withdrawing it, Your Honor.

MR. SCOLNICK:  We're withdrawing it.

THE COURT:  Okay.  That is withdrawn.  Forgiven and forgotten.  Don't do that again.

MR. HAMBURGER:  Understood, Your Honor.

THE COURT:  Understood?

MR. SCOLNICK:  Understood, Your Honor, and --

THE COURT:  Understood, yes or no?

MR. HAMBURGER:  Yes, Your Honor.

THE COURT:  All right.  Thank you very much.  Now I'll wait.  I'll come back as soon as we cut that check.  We're in recess.

(Recessed at 2:10 p.m.; reconvened at 2:14 p.m.)

THE COURT:  Okay.  Then we're back in session,

EXCEPTIONAL REPORTING SERVICES, INC

**140**

counsel, and it was related to me informally, Mr. Mejia, that the checks are being cut; is that correct?  Controller Mejia, that the checks were being cut?

**MR. MEJIA:**  Yes.

**THE COURT:**  Then I don't think it's necessary to remain until 5 o'clock, without representation I think we've resolved that matter.

All right.  I'm going to be open for input, but the only input is, first of all, we will be proceeding on this contempt hearing next Wednesday.  If you have input about the way you'd like that conducted, further notice, et cetera, I'm happy to hear and entertain that.  So, counsel.

**MR. SCOLNICK:**  Ms. Mitchell is going to address one of these issues first.

**MS. MITCHELL:**  Your Honor, pursuant to the Court's recommendation we met and conferred in the back of the courtroom over lunch time --

**THE COURT:**  Okay.

**MS. MITCHELL:**  -- and I am going to be meeting with the CAO's office and LAHSA regarding the 7.1 obligations no later than Tuesday.  Because of that, I don't know that for our purpose, for the OSC Re 7.1 issues that an evidentiary hearing on that issue is required.

I think what we can do -- and I want to be clear that that issue, the 7.1 issue in the OSC Re sanctions on 7.1 is

**141**

different obviously than what the Court ordered.  Those are two separate things.

THE COURT:  Those are the six issues that I put up on the board.

MS. MITCHELL:  Correct.  And so regarding the 7.1 my suggestion is that we go forward with the meeting.  I will meet with -- I know at minimum, Matt Szabo will be there and Gita O'Neill, interim CEO of LAHSA will be present as well as any individuals that are necessary to resolve the 7.1 issues.  That'll happen no later than Tuesday.

So my suggestion is that I report back to the Court on that issue and that we table that part of the OSC until I'm able to meet with them and report to the Court.

THE COURT:  I'm going to decline to do that and the reason for this is, this has gone on for a year and a half.  Mr. Szabo can meet with you if he wants tonight.  But you'll go forward on the 7.1 issues next Wednesday.

MS. MITCHELL:  Okay.

THE COURT:  If you resolve them, report that to me immediately and I can vacate the hearing.

MS. MITCHELL:  Okay.

THE COURT:  But what I'm not going to do is set this over again because I think during Thanksgiving week if these hearings start, we're not going to finish.  And so I want to give you folks your Thanksgiving off with your family that

**142**

week, I don't know if you're catching a plane, you know, do no harm, if you don't have to do harm, you've got kids, et cetera, and airplanes are a little expensive these days if they're even up and flying.

So we're going to start that hearing. Now, if you represent to me the two parties, that you've resolved the 7.1, I don't need to make a further inquiry. I normally trust my counsel, okay, I --

**MS. MITCHELL:** We have not resolved it.

**THE COURT:** -- don't need to know the particulars, but I need a sign off from the City and LA Alliance that 7.1's been resolved, otherwise you go forward.

**MS. MITCHELL:** Thank you, Your Honor.

**THE COURT:** Now, there's another contempt out there though, that is this consistent delay.

**MS. MITCHELL:** Correct.

**THE COURT:** All right. Going forward, counsel --

**MS. MITCHELL:** Thank you, Your Honor.

**THE COURT:** -- thank you very much. Now, what time would you like, 9 o'clock?

**MR. SCOLNICK:** For the --

**THE COURT:** And get your subpoenas out there. These subpoenas will be argued and now you're on the Court's time. I'm done waiting for politicians frankly. And I'm done waiting for LAHSA. When you schedule these people, have them here.

**EXCEPTIONAL REPORTING SERVICES, INC**

**1184**

**143**

**MR. SCOLNICK:** This is the monitor issue, Your Honor?

**THE COURT:** No.

**MR. SCOLNICK:** What are we talking about, I'm sorry?

**THE COURT:** This is OSC and Re contempt concerning delay and obstruction, counsel.

**MR. SCOLNICK:** Delay as to what though, Your Honor? I believe we're talking about the issues that the special master and the monitor filed in their reports. That was the basis I understood. Is there more than that?

**THE COURT:** No, counsel.

**MR. SCOLNICK:** Okay. That's what I'd like clarity on, Your Honor.

**THE COURT:** All right. Thank you very much.

**MR. SCOLNICK:** Sure.

**THE COURT:** It's self-evident. This is what the Court has been talking about consistently with we can reach an agreement, we were previously cooperating before you entered this case frankly, I thought we were making headway, the City has now taken a different position and what we're not going to have now is agreements reached, I want a full hearing of these contacts with LAHSA, who we're talking to, your inability to make communication, and by you, I mean the City over two years, all this has been delayed.

So conduct yourselves as you want. I think our notice is rather clear. I don't think I need to define it and

EXCEPTIONAL REPORTING SERVICES, INC

**1185**

**144**

I'm not going to keep redefining it, so.  Now, is there anything further?  That way, if you resolve it by the way, I'll call off the hearing, I'll trust you.

      **MR. HAMBURGER:**  Your Honor, can I just ask for clarity for the record?

      **THE COURT:**  No, you can't, counsel, thank you very much.  You can put that in writing and I'll give you clarity in writing from now on.

      **MR. HAMBURGER:**  Thank you.

      **MR. SCOLNICK:**  Thank you.

      **THE COURT:**  All right.  But do that tonight --

      **MR. SCOLNICK:**  Yes.

      **THE COURT:**  -- and I'll be back to you probably tonight.

      **MR. SCOLNICK:**  Thank you.

      **THE COURT:**  All right.  Ms. Mitchell.

      **MS. MITCHELL:**  No, Your Honor, we would like the ex parte Re resolved today if possible.

      **THE COURT:**  I'm not going to do that, I need more information.  I haven't decided that issue in terms of the merits yet.  A lot of this has to do with attorney's fees, if I find willfulness here, then I might be finding willfulness over on the contempt side.  It's too early.

      On the stay, I want to keep an open mind about this contempt.  There's certain things that have caused me great

**EXCEPTIONAL REPORTING SERVICES, INC**

**145**

concern, but I want to hear evidence, and I want to hear witnesses under oath.

MS. MITCHELL: Thank you, Your Honor.

THE COURT: And that includes now politicians potentially.

Okay. Counsel, anything further on behalf of intervenors?

Counsel, Mr. Hamburger, you look stunned.

MR. HAMBURGER: Yeah. I want to be clear, we filed an ex parte application to stay your order appointing the monitor pending our appeal of that order.

THE COURT: That's right.

MR. HAMBURGER: And that has been fully briefed now.

THE COURT: That's right. I'm delaying that.

MR. HAMBURGER: You're delaying that. So you're --

THE COURT: Yes, I am.

MR. HAMBURGER: -- not issuing a stay?

THE COURT: I'm not issuing a stay at this present time, no, I'm waiting to see more evidence about whether a stay is necessary or not. I want more information and that'll come out partially during the hearing.

Any further questions?

All right. Thank you very much, we're in recess. 9 o'clock nest Wednesday.

**(Proceedings concluded at 2:21 p.m.)**

EXCEPTIONAL REPORTING SERVICES, INC

146

## CERTIFICATION


I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings in the
above-entitled matter.




_____                    November 13, 2025

         **Signed**                                          **Dated**



*TONI HUDSON, TRANSCRIBER*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date:  November 14, 2025

Title: LA ALLIANCE FOR HUMAN RIGHTS, ET AL., V. CITY OF LOS ANGELES, ET AL.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Karlen Dubon | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):**    **ORDER RESPONDING TO CITY'S REQUEST FOR CLARIFICATION [1074]**

On November 7, 2025 this Court issued an Order (the "OSC in re Contempt) (Dkt. 1066) setting a contempt hearing and ordering the City of Los Angeles (the "City") to show cause whether it should be held in contempt. On November 12, 2025, the City requested clarification on the OSC in re Contempt (Dkt. 1074). In addition to the scope announced in the original OSC in re Contempt, which is attached as Exhibit 1, the Court elaborates as follows.

Special Master Michele Martinez and Monitor Daniel Garrie's reports (the "Reports") (Dkt. 1066, Exs. A-B, E) document recent instances of delay by the City with respect to its obligations arising from the Court's orders. The Court is concerned that the City has demonstrated a continuous pattern of delay stretching back in time far further than the issues raised in the Special Master and Monitor's Reports. Indeed, the Court's concerns regarding a pattern of delay previously led the Court to make the following finding in the prior contempt proceedings in 2024: "I've already also indicated to the Mayor that I've already reached the decision that the Plaintiffs were misled. This is bad

**1189**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date: November 14, 2025

Page 2

faith." March 8, 2024 Tr. at 12:11-13 (Dkt. 684). The facts that led to the Court's finding of bad faith were stipulated to by the City and are not in dispute. *Id.* at 17:3-6.

The Stipulated Facts (Dkt. 678) that led to the Court's finding of bad faith in the prior contempt proceeding are attached as Exhibit 2. With respect to the Stipulated Facts the Court warned that "I'm telling you that based upon that stipulation, I'm going to find bad faith. If you want to present additional evidence, if you want to call witnesses, if you want to call Mercedes Marquez, you're welcome to do that." March 8, 2024 Tr. at 17:15-19 (Dkt. 684).

The Court is concerned the City has demonstrated a consistent pattern of delay, and that the delay continues to this day as documented in the Special Master and Monitor's Reports. As such, at the forthcoming hearing on November 19, 2025, the Court will consider these past instances of delay in complying with the Court's orders as a basis for holding the City in contempt.

The Court requests the Parties subpoena and have present at the November 19, 2025 hearing: Mercedes Marquez, Paul Webster, Daniel Conway, and any other percipient witnesses with respect to the Stipulated Facts.

The Court also notes that, as stated previously, the upcoming November 19, 2025 hearing will cover whether the City has complied with the obligations of Section 7.1 of the Settlement Agreement which is excerpted below:

> 7.1. The City will provide quarterly status updates to the Court regarding its progress with this Agreement, including the number of housing or shelter opportunities created or otherwise obtained, the number of beds or opportunities offered, and the number of beds or opportunities currently available in each Council District. The City will work with LAHSA to include in the quarterly status updates, to the extent possible: the number of PEH engaged, the number of PEH who have accepted offers of shelter or housing, the number of PEH who have rejected offers of shelter or housing and why offers were rejected, and the number of encampments in each Council District.

Specifically, the Court expects to hear testimony regarding whether the City worked with LAHSA *"to the extent possible"* to provide: the number of PEH engaged,

**1190**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                                   Date: November 14, 2025

                                                                                        Page 3

the number of PEH who have accepted offers of shelter or housing, the number of PEH
who have rejected offers of shelter or housing and why offers were rejected, and the
number of encampments in each Council District.

       The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                          Initials of Deputy Clerk: kdu

CIVIL-GEN

**1191**

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

### CIVIL MINUTES – GENERAL

Case No. 2:20-cv-02291-DOC-KES                       Date:  November 7, 2025

Title: LA ALLIANCE FOR HUMAN RIGHTS, ET AL., V. CITY OF LOS ANGELES, ET AL.

---

PRESENT:        THE HONORABLE DAVID O. CARTER, U.S. DISTRICT JUDGE

|  Karlen Dubon  |  Not Present  |
|:---:|:---:|
| Courtroom Clerk | Court Reporter |
| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
| None Present | None Present |

---

**PROCEEDINGS (IN CHAMBERS):   OSC IN RE CONTEMPT – CITY OF LOS ANGELES**

Special Master Michele Martinez (Dkt. 1060) and Monitor Daniel B. Garrie (Dkt. 1063) each filed a status report, on October 31, 2025 and November 3, 2025 respectively, detailing delays in the City of Los Angeles's (the "City") implementation of its responsibilities under the Settlement Agreement and the June 24, 2025 order regarding settlement compliance (Dk. 991) ("Settlement Compliance Order"), and impedance of the Special Master and Monitor's responsibilities under the agreement and Settlement Compliance Order. The City responded (Dkts. 1064; 1065, Ex. B) to both requests, on November 5, 2025 and November 6, 2025. The Special Master issued a follow-up report on November 7, 2025 after the City's response (Dkt. 1065).[1]

The Court previously warned that "[f]ailure to comply with these orders may result in sanctions." Settlement Compliance Order (Dkt. 991) at 57. Accordingly, the City shall appear before United States District Judge David O. Carter in Courtroom One at the First Street Courthouse in Los Angeles, on November 12, 2025, at 9 a.m., to show cause why it should not be held in contempt for the issues raised in the Special Master's and Monitor's status reports.

The Court requests that Mayor Karen Bass and Council President Marqueece Harris-Dawson attend in-person.

The Clerk shall serve this minute order on the parties.

Initials of Deputy Clerk: kdu

---

[1] These status reports and the city's responses are attached as exhibits to this Order.

1193

# EXHIBIT A

F I L E D
CLERK, U.S. DISTRICT COURT

10/31/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al. | Case No. LA CV 20-02291-DOC(KESx) |
| Plaintiff, | Judge:  Hon. David O. Carter |
| v. | **SPECIAL MASTERS REQUEST** |
| CITY OF LOS ANGELES, et al. | |
| Defendant. | |

1

**1195**

RE: REQUEST FOR UPDATES ON CITY OF LOS ANGELES QUARTERLY REPORT (Q3 2025)

TO THE COURT AND ALL PARTIES:

Please take notice that on October 30, 2025, the Special Master transmitted the attached formal request for updates to the City of Los Angeles and the Parties via email. The request pertains to the City's October 15, 2025 Quarterly Report, covering the reporting period ending September 30, 2025.The request seeks written responses by November 6, 2025 to support the Special Master's review of compliance, verification, and validation under the Settlement Agreement and Dkt. 991. A copy of the request is attached hereto as Exhibit A.

A copy of the request is attached hereto as Exhibit A.

Respectfully submitted,
Dated: October 31, 2025
Michele Martinez
Special Master

1196

Exhibit A- Special Master's Request for Updates (October 30,2025)

**DATE:** October 30, 2025
**FROM:** Michele Martinez, Special Master
**RE:** Request for Updates – Q3 2025 Compliance Review
**Subject:** Request for Updates on Settlement Obligations – October 2025 Quarterly Report
**TO:** Counsel for the City of Los Angeles

Dear Counsel,

As I prepare to submit my Special Master's report reviewing the City's self-reported data for the third quarter of 2025 (reporting period ending September 30, 2025), I am requesting updates on several outstanding obligations under the Settlement Agreement and <u>Dkt. 991</u>.

Please provide written responses to each section below so I may accurately reflect the status of implementation and compliance.

I will need your response by **November 6, 2025**, as I will be submitting my report to the Court in advance of the **November 12th hearing**.

## I.        Section 7.1 – Reporting on PEH Served

The City's October 15, 2025 Quarterly Report is currently under review for compliance, verification, and validation pursuant to <u>Dkt. 991</u> and the Settlement Agreement.

**The report states:**
"This Quarterly Report does not include information regarding the number of persons experiencing homelessness served by the current intervention opportunities. The City has not been able to collect and verify that information in the time provided to complete this Report."

**However, Section 7.1 of the Settlement Agreement requires quarterly updates on:**
- Housing or shelter opportunities created
- Opportunities offered
- Opportunities currently available
- Number of persons experiencing homelessness (PEH) served in each Council District

**Please confirm:**
- Whether the City has requested this data from LAHSA
- When the verified PEH served data will be submitted

**1197**

## II.     Section F – Encampment Reduction Reporting (per Dkt. 991)

**In the City's July 15, 2025 Quarterly Report (Dkt. 1011-1), the City acknowledged:**
"The Court directed the City to 'report its updated encampment reduction data beginning in the October 2025 quarterly status report.' … The City thus is not including encampment-reduction data in this quarterly status report, but will endeavor to provide that information in the quarterly report slated for October 2025…"

Despite this commitment, the October 15, 2025 report does not include Q3 2025 data (July–September), nor does it explain why that data is missing. The Court's directive was issued on June 24, 2025, providing the City with a full quarter to begin tracking reductions consistent with the Court's definition.

The Monitor appointed under Section 7.2 will be responsible for reviewing whether offers of shelter or housing were made to individuals whose tents, makeshift shelters, or vehicles are counted as encampment reductions.

**The City is expected to:**
- Provide the name of the shelter or housing offered and available for each encampment reduction
- Support this with documentation, with specific requirements to be finalized by the Monitor in consultation with the Parties

**Please confirm:**
- When the City will submit Q3 2025 encampment reduction data consistent with the Court's definition
- Whether the City has prepared or intends to provide documentation of shelter or housing offers for each reported reduction
- Whether the City intends to provide the name of the shelter or housing offered for each reduction, as expected by the Court
- Whether the City has consulted with the Monitor or Plaintiffs regarding documentation protocols

## III. Section E – Verification and Validation (per Dkt. 991 and October 14, 2025 Minute Order)

Section 7.2 of the Settlement Agreement requires the Parties to engage a mutually agreed-upon third party to provide data collection, analysis, comments, and regular public reports on the City's compliance. The City is responsible for funding this monitor.

1198

**Dkt. 991** (June 24, 2025) states:

"To address verification failures, the parties shall meet and confer on a third-party Monitor by August 22, 2025, and subject to the Court's approval, select the Monitor by September 12, 2025, to oversee quarterly compliance checks and milestone validation." (Dkt. 991 at 50)

"Subject to the Parties' input, the Monitor will at least be responsible for reviewing the City's data prior to publication of its quarterly reports, verifying the numbers reported, engaging with the Parties and LAHSA to resolve data issues, and providing public reports on data compliance. The Monitor shall have full access to the data that the City uses to create its reports to the Court." (Dkt. 991 at 50)

"To streamline disputes over verification and compliance, the Court also orders that the Parties attend an in-person court hearing after the submission of each quarterly report. This accountability measure will ensure that disagreements are efficiently resolved as they arise." (Dkt. 991 at 50)

On October 14, 2025, the Court appointed **Daniel Garrie as the Monitor** and designated **Controller Kenneth Mejia as liaison**, without further cost to the City. Mr. Mejia is tasked with facilitating data access and coordination at Mr. Garrie's discretion. (Minute Order, Oct. 14, 2025, pp. 4–5)

**The Court reiterated that the Monitor's role is not ceremonial or advisory. It requires:**
- Real-time data auditing and timestamp validation
- Applied knowledge of data integrity and source attribution
- Verification that reported figures are supported by primary evidence
- Capacity to distinguish verified data from placeholders or estimates

On October 22, the City filed a notice of appeal and an ex parte application for a stay of that appointment (Dkt. 1054), asserting that the appointment was made without its consent or City Council approval. The City also cited concerns about cost, scope, and the independence of elected officials.

On October 23, 2025, Plaintiffs filed their opposition to the City's ex parte application for a stay (Dkt. 1055), arguing that the City had jointly submitted the dispute to the Court under Section 24 of the Settlement Agreement and that the Court acted within its authority in appointing the monitor.

**Please confirm:**
- Whether the City intends to provide requested data to Mr. Garrie and Controller Mejia upon receipt of specific requests

**1199**

- Whether any verified data is expected to be available for review prior to the November 12 hearing
- Whether the City anticipates supporting an initial assessment from the monitors, even if full validation is not yet possible
- Whether the City has taken any steps to internally assess or verify the reported bed and unit figures, pending third-party validation
- Whether any milestone-related data has been reviewed or documented in a way that could support future validation efforts
- How the City is currently ensuring accuracy and transparency in its reported figures

As of this writing, Mr. Garrie has communicated with the city to meet with City staff and submitted preliminary questions, but no underlying data has been provided for verification or milestone validation. With the November 12 hearing approaching, it is unclear whether Mr. Garrie or Controller Mejia will receive the necessary data in time to conduct an initial assessment. As the Special Master, I will not be in a position to confirm verification and validation of the City's Q3 2025 reported figures under Section 7.2 unless the underlying data is provided and the monitor is able to conduct an initial review.

## IV. Section 8.2 – Emergency Pause and Meet-and-Confer Obligation

Section 8.2 of the Settlement Agreement allows for a pause in obligations during declared emergencies, provided the Parties meet and confer on any necessary and appropriate amendments:

"In the event of fires, floods, earthquakes, epidemics, quarantine restrictions, or other natural catastrophic occurrences; terrorist acts, insurrections or other large scale civil disturbances; or any local or fiscal emergency declared by the Mayor of Los Angeles and the Los Angeles City Council… the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement shall be paused, and the Parties agree to meet and confer on any necessary and appropriate amendments to those obligations." (Dkt. 429-1 § 8.2) This provision applies only to Sections 3, 4, and 5 — housing/shelter creation, engagement, and milestones. It does not apply to Section 7 (reporting) or Section 7.2 (monitor oversight).

**The Court reaffirmed this in Dkt. 991:**
"The Settlement Agreement also imposes a duty on both parties to meet and confer in good faith to determine the necessary adjustments during any such pause. The Court reiterates that this responsibility remains ongoing and mutual. Resorting to the Court for answers that should first be addressed collaboratively under the Agreement only undermines its purpose." (Dkt. 991 at 55)

1200

**The Court further clarified:**

"The invocation of Section 8.2 does not excuse the City from its ongoing responsibilities—particularly with respect to accurate reporting and verification of beds. The pause provision is not a blanket exemption from compliance." (Dkt. 991 at 55)

**The City is required to:**
- Declare an emergency
- Meet-and-confer with Plaintiffs

While the City referenced Section 8.2 in its ex parte application for a stay (Dkt. 1054), citing wildfires, civil unrest, and a fiscal emergency, the October 15, 2025 Quarterly Report does not indicate that Section 8.2 has been formally invoked. No record of a meet-and-confer or proposed amendments has been shared with the Special Master or the Court.

**Please confirm for the record:**
- What date the City invoked Section 8.2
- Whether the City and Plaintiffs have met and conferred as required
- What adjustments, if any, are being proposed

Thank you for your attention to these matters. I look forward to your response by **November 6, 2025**.

Respectfully,
Michele Martinez
Special Master

Exhibit A

1201

# EXHIBIT B

LAW AND FORENSICS
DANIEL B. GARRIE
  daniel@lawandforensics.com
10665 Durland Ave NE
Seattle, Washington 98125
Telephone: 855.529.2466

*Monitor*

**FILED**
CLERK, U.S. DISTRICT COURT

11/03/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

LA Alliance for Human Rights, *et al.*,

Plaintiffs,

vs.

City of Los Angeles, *et al.*

Defendants.

Case No. 2:20-CV-02291-DOC-KES

Honorable David O. Carter
United States District Judge

**STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025**

Action Filed:        March 10, 2020

1203

TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to the Court's October 14, 2025 Order Resolving Third-Party Monitor Appointment and Scope of Work (Dkt. 1048) ("Order Appointing Monitor"), the Monitor submits this Status Report for October 2025 ("Status Report").

**I.    Overview**

This interim Status Report updates the Court and the Parties on the Monitor's efforts to "provide data collection, analysis, comments, and regular public reports on the City's compliance with the terms of [the Parties' Settlement] Agreement" (Dkt. 421-1). The Court subsequently explained that the Monitor:

- will 'at least be' responsible for reviewing and verifying the [C]ity's data prior to publication, resolving data issues, and providing public reports on data compliance;
- will have full access to the data the City uses to create its reports;
- shall review and provide guidance on public accessibility to the City's contracts and invoices;
- will confirm that shelter or housing offers were made with respect to the encampment reductions

(Dkt. 1048 at 2, *citing* Dkt. 991 at 50) ("Monitor's Duties").

As detailed further below, in the almost three weeks since the Order Appointing Monitor, the Monitor has made an effort to fulfill the Monitor's Duties efficiently. However, the procedural process requested by counsel for the City ("City Counsel") has slowed progress. The City Counsel instructed the Monitor not to contact any City employees directly. Instead, all communications must pass through City Counsel in the first instance: City Counsel rejected the Monitor's proposed compromise to copy counsel. The necessary consequence of this restriction is an increase in the time and costs associated with executing the Monitor's Duties.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

1204

At present, the Monitor has only been able to engage in the *scheduling* of scoping interviews with key City subject matter experts. No interviews have occurred. In addition, the Monitor's review of the publicly reported summary (*i.e.*, not source) "Intervention Data" in the City's quarterly reports indicated numerous data collection, definition, and reporting issues that must be addressed before any analysis can be performed.

Thus, despite his best efforts to streamline communications and effort, and notwithstanding the Court's directive that "[t]he City must make arrangements with the Monitor so he can meet the forthcoming November 12, 2025 deadline for an initial assessment" (Dkt. 1048, at 2), the Monitor does not anticipate being able to provide a substantive update to the Court at that hearing.

## II.    Monitor's Efforts to Obtain Access to Staff and Information

Immediately after learning of the Court's appointment, the Monitor[1] initiated outreach to start the process of assessing the City's systems and data related to persons experiencing homelessness ("PEH"). The morning of October 15, 2025, the Monitor communicated with Special Master Michele Martinez ("Special Master"), who suggested that the Monitor reach out to City Controller Mejia ("Controller Mejia") to discuss the Order Appointing Monitor. The Monitor emailed Controller Mejia later that day seeking an introductory meeting.

The next day, on October 16, 2025, the Monitor engaged in a video conference call with Controller Mejia and his staff. The attendees discussed the Monitor's Duties and the Court's instruction that Controller Mejia "will support [the Monitor], without further cost to the City, in the execution of his role by facilitating data access and coordination." (Dkt. 1048, at 4). In addition to providing an overview of his office's efforts, Controller Mejia expressed his willingness to assist the Monitor, including helping to identify and connect the Monitor to relevant City subject matter

---

[1] References to the Monitor regarding communications are inclusive of his staff.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

1205

experts.

On October 18, 2025, the Monitor emailed the City's Chief Administrative Officer, Matt Szabo ("CAO Szabo") after receiving his contact information from Controller Mejia. *See* **Exhibit 1**. The Monitor sought clarifying information regarding the Intervention Data in the City's Quarterly Report for the period ending September 2025 (Dkt. 1051) ("September 2025 Report"). *See* **Exhibit 1**. Specifically, the Monitor attached an Excel workbook that included the following tabs (*aka* worksheets): three (3) identical questions about each entry in the Intervention Data table; six (6) questions about the City's data systems; and ten (10) general questions. *Id.* In addition, the Monitor requested an interview the following week, on October 23, 2025, with CAO Szabo "or a member of your team who can answer these questions." *Id.*

On October 21, 2025, City Counsel Scolnick emailed the Monitor regarding the data and scheduling request to CAO Szabo, stating that the Monitor had "pos[ed] several hundred questions and request[ed] various in-person interviews." *See* **Exhibit 2**. Noting that "[t]he City is a represented party in this litigation," City Counsel wrote, "[p]lease do not contact City officials or employees directly. If you'd like to speak with City officials or employees, please make those requests through counsel, and we can coordinate." *Id.* City Counsel Scolnick also referenced the City's impending appeal of the Order Appointing Monitor and request for a stay pending appeal, stating "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." *Id.*

That same day, the Monitor responded to City Counsel Scolnick's email. *See* **Exhibit 3**. The Monitor agreed to "ask the court to clarify how it expects me to communicate with the City's staff: directly or through its attorneys." *Id.* Highlighting that the Order Appointing Monitor specifically directs the Monitor to collaborate with Controller Mejia, the Monitor asked City Counsel to confirm "which City officials and employees you represent and whether your representation

Page 3

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

1206

extents to [Controller Mejia]." *Id.* The Monitor pointed out that he had sent CAO Szabo "twenty-four questions cover[ing] straightforward topics with which the City is intimately familiar and that it should be able to answer easily." *Id.* The Monitor closed the email by emphasizing the urgency of the request due to the demanding timeline set by the Court and stating that "[t]he City's prompt response to these questions will help us move forward collaboratively and efficiently." *Id.*

On October 22, 2025, City Counsel Scolnick responded. *See* **Exhibit 4**. First, he requested that City Counsel be notified if the Court "direct[s] you to engage in direct outreach and/or contact with City officials and employees other than Controller Mejia." *Id.* (emphasis in original). Second, while noting that "Controller Mejia . . . just like every other City official and employee" is "represented by the "City . . . and by Gibson Dunn in this litigation," City Counsel Scolnick "consent[ed] to" the Monitor's direct communication with him. *Id.* However, City Counsel stated that "we are not consenting to your direct communications with any other City official or employee." *Id.* Third, City Counsel Scolnick indicated that the City could not fully answer the Monitor's questions about the September Quarterly Report, questioning "whether this level of detail is actually required to verify the quarterly report data" and noting that "[t]he CAO also does not have all of the information readily available for each 'System / Dataset' Listed." *Id.* Finally, regarding setting an interview with CAO Szabo, City Counsel stated the interviewee would be out of the country until October 31, 2025, and requested pushing the meeting until the following week. *Id.*

On October 24, 2025, the Monitor and City Counsel Scolnick engaged in a volley of numerous emails regarding correspondence protocol (*e.g.*, who to copy on what emails, the City's objection to "*ex parte* communications with counsel for any of the parties," what to do if privileged communications are accidentally emailed, etc.). *See* **Exhibit 5** (email chain). In the final email related to that chain, Plaintiff's counsel stated that they "are happy to waive ex parte communications [involving the

Page 4

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

1207

Monitor] . . . [because] [t]hat's how things have historically been done over the last five years." But since "the City's lawyers are now insisting on being involved in every communication, then we also need to be included." *See* **Exhibit 6**.

On October 27, 2025, City Counsel Scolnick emailed the Monitor "preliminary information in response to your various questions to the CAO's office" regarding the September Quarterly Report. *See* **Exhibit 7**. Noting the compressed time schedule, City Counsel Scolnick stated that "the City has not had sufficient time to fully evaluate these responses with all relevant stakeholders for completeness and accuracy." *Id.* He also wrote that the City "would appreciate being kept on communications with LAHSA as well." *Id.*

On October 28, 2025, Controller Mejia emailed City employee Edwin Gipson to facilitate a meeting between him and the Monitor. *See* **Exhibit 8**. Referencing the email protocol discussed in **Exhibit 7**, Controller Mejia included "all Alliance counsel (the City's, Alliance, intervenors) in th[e] email." *Id.* City Counsel Scolnick sent a response to the original recipients "[d]ropping Mr. Gipson from th[e] chain" and stating that all communications from the Monitor or Controller Mejia "should be made through the City's counsel and then we can coordinate." *See* **Exhibit 9**. The Monitor responded, apologizing for the inconvenience and noting that "it was [his] understanding that Mr. Mejia was permitted under the [Order Appointing Monitor] to coordinate the meetings with the City." *See* **Exhibit 10**. The Monitor stated that he "will seek immediate clarification from the Court regarding Mr. Mejia's involvement." *Id.*

In a separate branch of that email chain on the same day, the Monitor formally requested that City Counsel Scolnick "[p]lease work with . . . my team to co-ordinate the meeting" with Mr. Gipson. *See* **Exhibit 11**. City Counsel Scolnick responded "[w]ill do." *See* **Exhibit 12**.

On October 31, 2025, having not received a response from City Counsel Scolnick, the Monitor sent a follow-up email to schedule the meeting with Mr.

Page 5

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

1208

Gipson. *See* **Exhibit 13**. City Counsel Scolnick responded "[y]es, I had been waiting to hear from you. Will check and get back to you." *See* **Exhibit 14**. Later that day, City Council emailed: "I learned that Mr. Gipson is out of the office until Monday, so we'll touch base with you as soon as we hear back from him on Monday." *See* **Exhibit 15**.

## III.    Information Gathering Efforts

As the above communications establish, the Monitor has encountered numerous issues in obtaining information from the City. The City has required that the Monitor funnel all requests for information or meetings through City Counsel. *See* **Exhibits 2-4**. The City extended this restriction to "any *ex parte* communications with counsel for any of the parties," *see* **Exhibit 5**, despite such communications being the *status quo* for the previous five years. *See* **Exhibit 6**. City Counsel also applied these limitations to Controller Mejia, notwithstanding the directive in the Court's Order Appointing Monitor that the Controller provide support "by facilitating data access and coordination." *See* **Exhibits 8-9**.

The City's procedural requirements have delayed the Monitor in his ability to perform Court-appointed duties. Channeling all requests through City Counsel necessarily introduces temporal lag and material inefficiencies. Therefore, the Monitor has yet to meet any City staff; the first meeting, with CAO Szabo, is scheduled for today, November 3, 2025.

In sum, the City, through its counsel, has delayed the Monitor's timely execution of his Court ordered responsibilities.[2]

## IV.    Data Concerns

A review of the summary Intervention Data that attend the City's quarterly reports raises several questions about the collection, definition, and reporting of the

---

[2] By requiring all communications to flow through counsel rather than permitting direct engagement with City staff, the City has delayed data collection, postponed interviews, and constrained the Monitor's ability to meet Court-imposed deadlines.

Page 6

underlying data.

The Monitor attempted to obtain answers to some of these questions in his first query to the City. *See* **Exhibit 1**. The City's "initial responses were prepared under a compressed scheduled" and without the benefit of "sufficient time to fully evaluate the[m] with all relevant stakeholders for completeness and accuracy." *See* **Exhibit 6**. Giving proper deference to this caveat, the responses are inadequate. For example, the Monitor asked the following regarding the entries on the Intervention Data table: "From which City system(s)/database(s) were the reported 'Units/Beds,' 'Status,' and 'Open & Occupiable Date' generated?" *See* **Exhibit 1** at 3-16. Rather than identify the underlying *system(s) or database(s)*, the City responded with statements regarding the *entity* that collected the data (*e.g.*, "The Los Angeles Housing Department provides the 'Units/Beds' and 'Status' information," "Data is confirmed quarterly by HACLA Asset Management staff," "CAO maintains records of the beds, status, and open and occupiable date," "Information was confirmed by the Community Investment for Families Department (CIFD)," etc.). *See* **Exhibit 6** at 24-25.

The Monitor also asked specific questions about ten (10) systems and datasets, including who the system owner was, how frequently the data is updated, and how data governance is handled. *See* **Exhibit 1** at 17-19. The City's responses were circumscribed and also deferred to a third-party data maintainer (*e.g.*, "LAHSA is the system owner") for key datasets like the Homeless Management Information System ("HMIS"). *See* **Exhibit 6** at 24-25. In addition, although the Monitor's questions sought information on each of the ten (10) systems identified, the City's responses to some of the questions regarding these systems was to not provide sufficient and/or appropriate technical details. *Id.*

Several of the Monitor's questions concerned the City's definition and count of PEH, in part because the September 2025 Report did not include data on "Total PEH Served." (Dkt. 1051, Exhibit A). Instead, the City's entry for this column of

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

1210

data was either "Pending" or blank (*i.e.*, an empty field). *Id.* By way of explaining the missing data, in Footnote 2 to Exhibit A of the September 2025 Report, the City wrote:

> This Quarterly Report does not include information regarding the number of persons experiencing homelessness served by the current intervention opportunities. The City has not been able to collect and verify that information in the time provided to complete this Report. The City is continuing to work to collect that information, and will supplement this Report when it is able to do so.

*Id.* at 10. However, the City's prior quarterly reports included PEH information.

One of the Monitor's questions about PEH inquired how the City defines the term. The City responded that it "uses HUD's definition of homelessness, which can be found here: https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/." *See* **Exhibit 6** at 27. But the HUD link identifies four (4) categories of homelessness, not a definition of PEH. This distinction illustrates the problem with the City's response. For example, it is not clear how the City identified and counted the second HUD category, "Imminent Risk of Homelessness," which captures the risk of a future loss of a primary residence. Similarly, the City's referral to the third HUD category "Homeless Under Other Federal Statutes," requires the Monitor to perform an iterative search of federal law. Adding to the lack of definitional clarity, the HUD website notes that "HUD has not authorized any CoC to serve the homeless under Category 3."

More fundamentally, the City's responses highlight a core concern with the quarterly reports; they provide summary data on three quantitative measures (*i.e.*, "Units/Beds," "Status," and "Total PEH Served") that the City cannot readily define, provide basic information about, or confirm are treated consistently across reporting entities. For example, the City-provided definition of "Units/Beds" does not actually

Page 8

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

1211

define either term, instead using the terms themselves in the "definition." **Exhibit 6** at 27 (Definition of Units/Beds: "Number of units/beds serving people experiencing homelessness counting toward Settlement requirements."). The utility of this definition, particularly its use of the phrase "*serving* people experiencing homelessness," is further called into question by the lack of any data in the "Total PEH Served" column of the September 2025 Report. (Dkt. 1051, Exhibit A). It begs the question of how a unit or bed can be counted as serving PEH if there are no data about the number of PEH being served.

**V.      Conclusion**

The Monitor has not yet interviewed any City staff and has been unable to gain sufficient data and/or information about the City's data collection, management, analysis, and reporting methods.[3] In short, the Monitor does not anticipate having sufficient information to give a substantive report at the upcoming November 12, 2025 hearing.

Dated:  November 3, 2025              Respectfully submitted,

                                     /s/
                                     Daniel B. Garrie
                                     Law and Forensics
                                     *Data Monitor*

---

[3] There are also real-world impacts on the Monitor's ability to perform his duties efficiently and effectively that flow from the City's Ex Parte Application for Stay of Order Appointing Daniel Garrie as Monitor (Dkt. 1054) and the related appeal (Dkt. 1053). City Counsel Scolnick informed the Monitor that "[t]he City reserves all rights regarding your work as a Monitor and any fees you may later seek to charge the City." See Exhibit 2. In other words, until the Court and the Ninth Circuit make a final determination, the City challenges both the validity of the Monitor's appointment and any interim fees that the Monitor incurs.

STATUS REPORT OF MONITOR DANIEL B. GARRIE FOR OCTOBER 2025

1212

# EXHIBIT C

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
  kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>        Defendant. | CASE NO. 2:20-cv-02291 DOC (KES)<br><br>Honorable David O. Carter,<br>United States District Judge<br><br>**DEFENDANT CITY OF LOS ANGELES'S RESPONSE TO STATUS REPORT OF MONITOR DANIEL B. GARRIE (DKT. 1062, 1063)**<br><br>Action Filed:    March 10, 2020 |

Gibson, Dunn &
Crutcher LLP

Daniel Garrie's November 3, 2025 Status Report (Dkt. 1062, 1063) is riddled with mischaracterizations that accuse the City of delaying and impeding the progress of the Monitor and increasing the cost of that work.  The City files this response to correct the record.

Mr. Garrie takes issue with the "procedural process" the City has requested.  But the City has simply asked that Mr. Garrie direct any requests for information from City officials or employees to the City's counsel, rather than directly contacting those officials or employees without involving the City's counsel (as Mr. Garrie had attempted to do initially with City Administrative Officer Matt Szabo).  There is nothing improper or unusual about the City's request.  Because the City is a represented party in this litigation, City officials and employees are represented by counsel in connection with this case.  Therefore, it is entirely appropriate to expect that if Mr. Garrie wants information from the City—including information from any specific City official or employee—he should direct his inquiry to the City's counsel to facilitate the request.

More importantly, Mr. Garrie's status report provides zero evidence of any delay, inability to obtain information, or added cost resulting from the City's request.  To the contrary, the documents attached to Mr. Garrie's status report show that the City's counsel has responded promptly and professionally to his requests for information and taken steps to facilitate interviews with the City officials and employees that Mr. Garrie has requested.  *See* Ex. 4 (Oct. 22 Email from K. Scolnick offering dates for interview of Mr. Szabo); Exhibit 7 (Oct. 27 Email from K. Scolnick offering additional dates for interview of Mr. Szabo).  If anything, having the City's counsel involved should lead to better coordination and efficiency—giving Mr. Garrie and his staff a single point of contact for making requests to City officials and employees.

Finally, the City's reservation of its rights, appeal, and pending ex parte application to stay Mr. Garrie's appointment are an appropriate exercise of the City's rights, and similarly not a cause of any unwarranted delay, as Mr. Garrie wrongly suggests.  Dkt. 1063 at 9 n.3.  And while the City maintains that the Court's appointment

Gibson, Dunn & Crutcher LLP

DEFENDANT'S RESPONSE TO STATUS REPORT OF MONITOR DANIEL B. GARRIE
2:20-cv-02291 DOC (KES)

order should be stayed, it has cooperated with Mr. Garrie in the interim and will continue to do so unless there is a stay by this Court or the Ninth Circuit.

DATED: November 5, 2025          Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: _/s/ Kahn A. Scolnick_____
Kahn A. Scolnick

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

# EXHIBIT D

# GIBSON DUNN

November 6, 2025

Michele Martinez
Special Master

Re:     LA Alliance v. City of Los Angeles, Case N. 2:20-cv-2291-DOC
Response to October 30, 2025 Request from Special Master

Dear Special Master Martinez:

Please see below responses to the questions raised in your October 30, 2025 correspondence.

**I.      Section 7.1 – Reporting on PEH Served**

- **Whether the City has requested this data from LAHSA**

Yes, the City has requested this data.  Representatives from the City Administrative Office met with LAHSA this week.

- **When the verified PEH served data will be submitted**

Verified PEH served data will be submitted once the City has received the data it needs to verify those numbers and has verified that data.

**II.     Section F – Encampment Reduction Reporting**

- **When the City will submit Q3 2025 encampment reduction data consistent with the Court's definition**

Encampment reduction data for July 1 through September 20, 2025 consistent with the Court's definition was submitted with the City's last quarterly report.  Dkt. 1051-3.

- **Whether the City has prepared or intends to provide documentation of shelter or housing offers for each reported reduction**

As contemplated by the Court's June 24, 2025 order, Dkt. 991 at 54, the City intends to work with Mr. Garrie to provide available data on this topic (unless his appointment is stayed by Judge Carter or the Ninth Circuit).

**Gibson, Dunn & Crutcher LLP**
333 South Grand Avenue  |  Los Angeles, CA 90071-3197  |  gibsondunn.com

**1218**

# GIBSON DUNN

Michele Martinez

November 6, 2025
Page 2

- **Whether the City intends to provide the name of the shelter or housing offered for each reduction, as expected by the Court**

As contemplated by the Court's June 24, 2025 order, Dkt. 991 at 54, the City intends to work with Mr. Garrie to provide available data on this topic (unless his appointment is stayed by Judge Carter or the Ninth Circuit).

- **Whether the City has consulted with the Monitor or Plaintiffs regarding documentation protocols**

The City has not yet had discussions with Mr. Garrie or Plaintiffs regarding this topic.

## III.   Section E – Verification and Validation

- **Whether the City intends to provide requested data to Mr. Garrie and Controller Mejia upon receipt of specific requests**

Unless the order appointing Mr. Garrie and Controller Mejia is stayed by Judge Carter or the Ninth Circuit, the City intends to provide available data that it has in its possession in response to appropriate requests from Mr. Garrie and Controller Mejia.

- **Whether any verified data is expected to be available for review prior to the November 12 hearing**

The City does not know what you mean by "verified data" in this context.  In any event, the City has not received any requests from Mr. Garrie to provide any "verified data" prior to the November 12 hearing.  To the extent such a request is received, the City will work in good faith to understand exactly what is being requested and to provide responsive data that it has in its possession.

- **Whether the City anticipates supporting an initial assessment from the monitors, even if full validation is not yet possible**

The City does not know what you mean by "initial assessment," "full validation," or "supporting." To the extent you are asking about Mr. Garrie's initial efforts, the City has already and will continue to respond to requests from Mr. Garrie unless his appointment is stayed by Judge Carter or the Ninth Circuit.

- **Whether the City has taken any steps to internally assess or verify the reported bed and unit figures, pending third-party validation**

All bed and unit data are confirmed by the responsible agency or City department using the agency's/department's protocols before being added to the list for quarterly reporting.  CAO routinely reviews and checks the reported bed and unit figures before that information is reported to the Court.  CAO staff cross reference data provided using available documents resources and confirm information with the responsible agency or City department as needed (the relevant

**1219**

**GIBSON DUNN**

Michele Martinez                                                      November 6, 2025
                                                                           Page 3

agencies or departments are Los Angeles Housing Department (LAHD), Housing Authority of the City of Los Angeles (HACLA), Los Angeles Homeless Services Authority (LAHSA), and Community Investment for Families Department (CIFD)).  CAO staff also review invoices for hotel/motel booking agreement sites to confirm the number of rooms used for interim housing at the sites during the quarterly reporting period, and also review invoices for hotel/motel occupancy sites to confirm the number of contracted rooms used for interim housing as opposed to administrative purposes.  Any updates to bed/unit numbers from prior quarterly reports are noted using footnotes.

Documents reflecting City funding approvals and other Council actions are available on the Council File Management System https://cityclerk.lacity.org/lacityclerkconnect/). In addition, the Prop HHH Progress Report Dashboard on the Los Angeles Housing Department website provides public reporting on many of the Permanent Supportive Housing sites (https://housing.lacity.gov/housing/hhh-progress-dashboard).

- **Whether any milestone-related data has been reviewed or documented in a way that could support future validation efforts**

The City does not know what you mean by "milestone-related data" or "future validation efforts," and accordingly cannot respond to this question without further explanation.

- **How the City is currently ensuring accuracy and transparency in its reported figures**

Please see the above response regarding the City's validation process.

**IV.    Section 8.2 – Emergency Plans and Meet-and-Confer Obligation**

- **What date the City invoked Section 8.2.**

Nothing in the Settlement Agreement requires the City to "invoke" Section 8.2.  Rather, Section 8.2 provides that in the event of any of the enumerated events, "the obligations of the City as set forth in Sections 3, 4, and 5 of this Agreement *shall* be paused." (Emphasis added.)  Three events sufficient to trigger Section 8.2 have occurred this year, with the Palisades Fire in January 2025, the City's response to the large-scale civil disturbances in June 2025, and the declared fiscal emergency in July 2025.  The City has repeatedly raised with Plaintiffs' counsel the obligations under Section 8.2, the implication of the emergencies, and proposed modifications to the Settlement Agreement since at least February 2025.

- **Whether the City and Plaintiffs have met and conferred as required.**

The City and Plaintiffs have met and conferred on at least three occasions regarding the emergencies triggering Section 8.2 and the resulting need to modify the Settlement Agreement. While the City has made a reasonable proposal for modification of the Settlement Agreement, Plaintiffs have refused to consider it or to propose any alternative reasonable modifications.

**1220**

# GIBSON DUNN

Michele Martinez                                                November 6, 2025
                                                                        Page 4

- **What adjustments, if any, are being proposed**

The City has proposed that the encampment reduction obligation in the Settlement Agreement be modified such that (a) all 6,129 reductions the City reported through March 31, 2025 count towards the total number of reductions required, and (b) the City would satisfy the remaining encampment reduction obligation by completing 400 additional encampment reductions consistent with the Court's interpretation of the Settlement Agreement by the current completion deadline. The City has not requested, nor does it need, any modification of the current shelter creating obligation. Plaintiffs have rejected that proposal, dispute that any of the emergencies the City has identified warrant any modification to the Settlement Agreement, and have not proposed any reasonable alternative modifications.

**1221**

# EXHIBIT E

F I L E D
CLERK, U.S. DISTRICT COURT

11/7/2025

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES, et al.<br><br><br>Defendant. | Case No. LA CV 20-02291-DOC(KESx)<br><br>Judge: Hon. David O. Carter<br><br>**SPECIAL MASTER'S REPORT** |

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al.,
Plaintiffs,
v.
CITY OF LOS ANGELES, et al.,
Defendants.

Case No. 2:20-cv-02291-DOC-KES
Assigned to: Hon. David O. Carter
Referred to: Special Master Michele Martinez

Submitted by: Michele Martinez, Special Master
Date: November 10, 2025

RE: INTERIM ASSESSMENT OF CITY COMPLIANCE UNDER DKT. 991 AND
SETTLEMENT AGREEMENT

The attached Interim Assessment of City Compliance under Dkt. 991 is respectfully submitted by
Special Master Michele Martinez to inform the Court of the City of Los Angeles's response to the
October 30, 2025 inquiry. This update documents procedural and substantive deficiencies ahead
of the November 12 hearing and is not a final compliance determination. The Special Master's full
Quarter 3 report will be submitted by November 12, 2025 in accordance with the reporting
schedule under Dkt. 991.

This assessment is grounded in the City's obligations under both the Court's enforcement order
(Dkt. 991) and the Settlement Agreement, which together define the requirements for verified data,
milestone validation, and oversight cooperation. The submission is intended solely for judicial
review.

Respectfully submitted,
Michele Martinez
Special Master

**1224**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

LA ALLIANCE FOR HUMAN RIGHTS, et al.,
Plaintiffs,
v.
CITY OF LOS ANGELES, et al.,
Defendants.

Case No. 2:20-cv-02291-DOC-KES
Assigned to: Hon. David O. Carter
Referred to: Special Master Michele Martinez

INTERIM ASSESSMENT OF CITY COMPLIANCE UNDER DKT. 991 AND SETTLEMENT
AGREEMENT

Submitted by: Michele Martinez, Special Master
Date: November 10, 2025

**Purpose of Submission**

This interim assessment is submitted to inform the Court of the City of Los Angeles's response to
the Special Master's October 30, 2025 inquiry. It outlines procedural and substantive deficiencies
that currently prevent the Special Master and Data Monitor from verifying the City's self-reported
compliance under Dkt. 991 and the Settlement Agreement. This is not a final compliance
determination.

The Special Master's final Q3 report will be submitted by November 12, 2025, in accordance with
the Court's reporting schedule.

**Summary of Findings**
The City submitted a written response on November 6, 2025 at 8:47 p.m. PST. While procedurally
responsive, the submission was neither timely nor substantively adequate. It arrived a full week
after the Special Master's inquiry and failed to provide the verified data, milestone documentation,
or validation necessary for oversight.
As a result:
• The Special Master can complete portions of the Q3 compliance assessment, but several sections
will remain incomplete due to missing documentation and lack of verification
• The Data Monitor cannot validate the City's reported progress without access to underlying data
and milestone materials
• The Court lacks the full evidentiary record needed to determine substantive compliance under
Dkt. 991 and the Settlement Agreement

**1225**

**Oversight Limitations**

Despite procedural engagement, the City has not provided the materials required to fulfill its obligations under Dkt. 991 and the Settlement Agreement. Specifically:

• No verified PEH data by Council District
• No documentation linking shelter/housing offers to encampment reductions
• No milestone validation materials
• No timeline for submission of missing data

These omissions directly impede the Special Master's ability to assess compliance and the Data Monitor's ability to validate reported outcomes.

**Procedural Posture vs. Substantive Cooperation**

Monitor Daniel B. Garrie's November 3, 2025 Status Report identified barriers to access and cooperation. In response, the City:

• Defended its procedural routing through counsel
• Asserted no obstruction
• Cited its pending ex parte application to stay the Monitor's appointment
• Claimed ongoing cooperation

However, the Monitor has not received the data or access needed to perform his duties.

Monitor's Statement and City's Response (Dkt. 1064)
The City's response reflects a pattern of procedural acknowledgment without substantive delivery. Examples include:
• Conditional cooperation ("if Monitor appointment is not stayed")
• Deflection on key terms ("unclear what 'milestone validation' means")
• Routing all Monitor inquiries through counsel
• Lack of engagement with oversight officers

This posture has delayed verification, increased costs, and obstructed oversight.

**Procedural Timeline**
• Quarterly Report Submitted: October 15, 2025
• Special Master Inquiry Issued: October 30, 2025
• Monitor Garrie Status Report Submitted: November 3, 2025
• City Response to Monitor (Dkt. 1064) Submitted: November 4, 2025
• City Response to Special Master Inquiry Submitted: November 6, 2025 at 8:47 p.m. PST
• Court Hearing Scheduled: November 12, 2025
• Final Special Master Report for Q3 to be submitted by November 12, 2025

**Unanswered Questions**

1226

The Special Master's October 30 inquiry included six questions. The City's response did not provide:

1. Verified PEH data (Section 7.1)
2. Documentation of shelter/housing offers (Section F)
3. Milestone validation materials (Section 7.2)
4. Clarification on "created" units in Exhibit B
5. Status of coordination with LAHSA
6. Timeline for submission of missing data

These gaps prevent oversight officers from completing their reviews.

**Verification Challenges**

The City's quarterly report submitted on October 15, 2025 was incomplete. It lacked critical data required under Dkt. 991 and the Settlement Agreement, including verified PEH counts, milestone documentation, and shelter offer tracking. These omissions directly triggered the Special Master's formal inquiry on October 30, 2025.

As stated in Monitor Daniel Garrie's November 3, 2025 Status Report, the Monitor has not received the underlying data necessary to validate the City's reported progress. He noted:

"The City has not provided the raw data or milestone documentation required to validate its quarterly report."

This absence of source data prevents the Monitor from confirming whether shelter placements, encampment reductions, or unit creation figures are accurate. The Monitor also reported delays in access and procedural barriers that have increased costs and impeded oversight.

While the City may argue that the Monitor did not formally request specific datasets, the obligation to provide verifiable documentation is embedded in Dkt. 991 and the Settlement Agreement. The Monitor's filing makes clear that the lack of access is not due to omission on his part, but due to the City's failure to produce the necessary materials.

Without verified data, the Special Master and Data Monitor cannot confirm compliance, and the Court lacks the evidentiary record required to assess the City's progress.

The City has had several months since the June 2025 order to coordinate with LAHSA and validate its figures. The absence of verified data and documentation constitutes a substantive failure to comply.

**1227**

**Exhibits**

To support this assessment, the following documents are attached:

• Exhibit A – Special Master's October 30, 2025 inquiry to the City of Los Angeles
• Exhibit B – City of Los Angeles's written response, submitted November 6, 2025 at 8:47 p.m.
PST
• Exhibit C – Monitor Daniel B. Garrie's Status Report dated November 3, 2025
• Exhibit D – City of Los Angeles's response to Monitor Garrie's report (Dkt. 1064)

These exhibits provide the factual basis for the findings outlined above and reflect the current limitations in oversight and verification.

**Final Note**

This assessment is submitted to assist the Court in evaluating the completeness and integrity of the City's response. The Special Master and Data Monitor remain unable to perform their oversight roles due to missing documentation, lack of verified data, and absence of milestone validation.

The City's procedural posture has not translated into substantive cooperation. The Special Master's questions remain unanswered, and the oversight process remains stalled.

This submission is intended solely to inform the Court's oversight and does not constitute a recommendation for relief or enforcement.

Respectfully submitted,
Michele Martinez
Special Master

1228

# EXHIBIT 2

**FILED**
CLERK, U.S. DISTRICT COURT

03/07/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ kdu _____ DEPUTY

<u>Stipulated Facts re: RFQ Agreement (3/15/23)</u>

1.      LA Alliance, represented by Elizabeth Mitchell and Daniel Conway, met with the City (represented by Scott Marcus, David Michaelson, and Mercedes Marquez) on March 8 and again March 15, 2023 to discuss the City's non-compliance with the Agreement.  On March 15, 2023, the City—through then-Chief Housing and Homelessness Officer Mercedes Marquez—claimed that the City had significant plans intended to come into compliance with Section 5.2(ii) and (iv).  Specifically, Marquez stated that the City had already put out an RFQ (Request For Quote or Request for Qualification) for service/outreach providers, would be "fully staffed" with an assigned service/outreach provider for each district by July 1, 2023, and would "have each district fully assessed" (which was described as identifying the numbers of unsheltered PEH, plus a description of the needs of various groups, including an estimate of the number of individuals with serious mental illness and substance use disorder, in each district) by September 30, 2023.  Ms. Marquez promised that once that effort was complete, the City would then provide the Alliance its proposed encampment milestones and deadlines by October 1, 2023.

2.      Elizabeth Mitchell summarized the meeting in an email thereafter, directed to Scott Marcus, Mercedes Marquez, and David Michaelson:

> In our last meeting we talked about the RFQ that the City has put out for a list of qualified service/outreach providers, and that the City expects to be fully staffed with the District's chosen providers by July 1 . . . . We also discussed that the City could commit to having each district fully assessed and get us a list of proposed milestones and deadlines within 3 months thereafter (October 1).

**1230**

3. Relying upon the promises of the new mayor's representative, and extending a good faith opportunity to a new administration, LA Alliance agreed to the extension. Mr. Marcus, on behalf of the City, confirmed the request for extension and agreed the City would provide district-specific encampment milestones by October 1, 2023.

4. The City did not complete the RFQ process as represented to LA Alliance, and did not have each district fully assessed to help establish appropriate milestones as the City had committed to on March 15, 2023. Two days after October 1, the City emailed its "Encampment Engagement, Cleaning, and Resolution" proposal … that contained no proposed district by district deadlines or milestones at all.

So stipulated:

_____

Elizabeth Mitchell,
on behalf of Plaintiff LA Alliance for Human Rights

_____

Scott Marcus,
on behalf of Defendant City of Los Angeles

1231

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
    tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
    mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
    kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
    bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
    akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
    pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978.7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF LOS ANGELES, a Municipal entity, et al., <br><br> Defendant. | CASE NO. 2:20-cv-02291 DOC (KES) <br><br> Honorable David O. Carter, United States District Judge <br><br> **DEFENDANT CITY OF LOS ANGELES'S REQUEST FOR FURTHER CLARIFICATION RE NOVEMBER 19 HEARING** <br><br> Date:      November 19, 2025 <br> Time:      9:00 a.m. <br><br> Action Filed:      March 10, 2020 |

Gibson, Dunn &
Crutcher LLP

1232

The Court issued an order yesterday clarifying the scope of the evidentiary hearing currently scheduled for November 19.  Dkt. 1079.  The Court explained that the hearing would cover three topics:  (1) "The Stipulated Facts (Dkt. 678)" filed in March 2024 "that led to the Court's finding of bad faith in the prior contempt proceeding," (2) claims of "delay" that purportedly "continues to this day as documented in the Special Master and Monitor's Reports," and (3) "whether the City has complied with the obligations of Section 7.1 of the Settlement Agreement."  Three hours later, in an order attached here, the Ninth Circuit stayed this Court's order appointing Daniel Garrie as the monitor.  The City respectfully submits that these two orders, one from this Court and one from the Ninth Circuit, call for further clarification of the scope of the hearing currently scheduled for November 19.

First, while the monitor-appointment order is stayed, there is no basis for compelling compliance with that order.  The Supreme Court recently held as much, explaining that it is impermissible "to enforce an injunction that [a higher court's] stay rendered unenforceable" using "civil contempt."  *DHS v. D.V.D.*, 145 S. Ct. 2627, 2629 (2025).  The City respectfully submits it had been working diligently to comply with Mr. Garrie's various requests—right up until the moment the Ninth Circuit stayed his appointment yesterday.  Nevertheless, there is now no reason to adjudicate whether the City is complying with the monitor-appointment order, unless and until the Ninth Circuit terminates the stay.

Second, the City submits that the Court may not impose civil contempt sanctions on the basis of past conduct, as the Court's clarification order suggests it is contemplating.  *See* Dkt. 1079 at 2 ("[A]t the forthcoming hearing on November 19, 2025, the Court will consider these past instances of delay in complying with the Court's orders *as a basis for* holding the City in contempt." (emphasis added)).  Civil contempt serves "two separate and independent purposes."  *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016).  It can be a sanction to compensate a wronged party "'for losses sustained.'"  *Mine Workers v. Bagwell*, 512 U.S. 821, 829 (1994).  It

DEFENDANT CITY OF LOS ANGELES'S REQUEST
FOR FURTHER CLARIFICATION RE NOVEMBER 19 HEARING

1233

can also "coerce[]" a party "into compliance with" a court order. *Id.* When contempt is coercive, "the contemnor is able to purge the contempt . . . by committing an affirmative act, and thus carries the keys of his prison in his own pocket." *Id.* at 828 (cleaned up).

Here, the Alliance has already been compensated for the past conduct identified in the Court's order. In fact, after the Alliance filed its first motion for settlement compliance in February 2024, Dkt. 668, the City agreed to pay $725,000 to cover "the LA Alliance's fees and costs," Dkt. 713 at 3. (And that was on top of the millions more the City ended up paying for the Alvarez & Marsal assessment.) The Alliance has therefore already been compensated for the past noncompliance it alleged in that February 2024 motion. Any additional sanction for past conduct would allow the City no "opportunity to purge" and thus would be a form of criminal contempt that would require a jury trial and proof of a violation beyond a reasonable doubt. *Bagwell*, 512 U.S. at 829, 833–34.

Third, at most the November 19 hearing should cover only the third topic this Court identified in yesterday's order—the City's efforts to comply with Section 7.1 of the Settlement Agreement—but any evidentiary hearing on this issue is premature. The City, including representatives from the Office of the City Administrative Officer, is meeting with the Alliance, Intervenors, LAHSA, and Special Master Martinez on November 17 to address Section 7.1. It is the City's hope that this meeting, and ongoing cooperation among the parties and LAHSA after the meeting, will obviate the need for the hearing on November 19. *See* Dkt. 1076 at 141:14–20 (explaining that the Court "can vacate the hearing" if the parties resolve "the 7.1 issues").

Given these developments, the City respectfully requests that the Court vacate the November 19 contempt evidentiary hearing or, at a minimum, further clarify the issues to be addressed.

DATED: November 15, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Bradley J. Hamburger
　　　Bradley J. Hamburger

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

3
DEFENDANT CITY OF LOS ANGELES'S REQUEST
FOR FURTHER CLARIFICATION RE NOVEMBER 19 HEARING

1235

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

NOV 14 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

LA ALLIANCE FOR HUMAN RIGHTS,

　　　Plaintiff - Appellee,

　v.

ORANGE COUNTY CATHOLIC
WORKER; et al.,

　　　Intervenors - Appellees,

CITY OF LOS ANGELES,

　　　Defendant - Appellant.

No. 25-6760

D.C. No.
2:20-cv-02291-DOC-KES
Central District of California,
Los Angeles

ORDER

Before: SILVERMAN, TALLMAN, BUMATAY, Circuit Judges.

The court has received the emergency motion for a stay pending appeal.  Dkt.
7.  The request for an administrative stay is granted in part and denied in part.  An
administrative stay "is only intended to preserve the status quo until the substantive
motion for a stay pending appeal can be considered on the merits, and does not
constitute in any way a decision as to the merits of the motion for stay pending
appeal."  *Doe #1 v. Trump*, 944 F.3d 1222, 1223 (9th Cir. 2019).

The district court's October 14, 2025, appointment order is temporarily stayed
pending further order.  *Id.*  To the extent that Defendant-Appellant requests an
administrative stay of contempt proceedings scheduled for November 19, 2025, that

**1236**

request is denied.  The district court is free to proceed with that hearing.

The response to the emergency motion is due November 24, 2025.  The optional reply in support of the motion is due December 1, 2025.  Fed. R. App. P. 27(a)(3).

**Administrative Stay GRANTED IN PART AND DENIED IN PART.**

2                                                                    25-6760

**1237**

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
  kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
  akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978.7508
Facsimile:  213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| LA ALLIANCE FOR HUMAN RIGHTS, et al., | CASE NO. 2:20-cv-02291 DOC (KES) |
|---|---|
| Plaintiffs, | Honorable David O. Carter, United States District Judge |
| v. | **DEFENDANT CITY OF LOS ANGELES'S OBJECTION TO ANTICIPATED SCOPE OF EVIDENTIARY HEARING** |
| CITY OF LOS ANGELES, a Municipal entity, et al., | |
| Defendant. | Date:      November 19, 2025<br>Time:      9:00 a.m. |
| | Action Filed:    March 10, 2020 |

Gibson, Dunn &
Crutcher LLP

**1238**

On November 14, 2025, the Court issued an order stating that the evidentiary hearing scheduled for November 19 will cover three topics: (1) stipulated facts from March 2024, Dkt. 678; (2) alleged delays in the City's responses to monitor Daniel Garrie's requests; and (3) the City's compliance with Section 7.1 of the parties' Settlement Agreement. *See* Dkt. 1079. The City respectfully submits that if the hearing moves forward, it should concern at most the City's compliance with Section 7.1. The Court should not permit litigation over stipulated facts from nearly two years ago because the City has already compensated the Alliance for any claimed harm. And evaluating the City's cooperation with Mr. Garrie would be inappropriate in light of the Ninth Circuit's recent stay of the order appointing him as the monitor. Neither issue could possibly be relevant to any purported ongoing contempt, and thus should not be the subject of any contempt-related evidentiary hearing. The City therefore submits this formal objection to the extent that the evidentiary hearing addresses any topic beyond the City's compliance with Section 7.1.[1]

**1.** The Court signaled that it would "consider" the City's "past instances of delay in complying with the Court's orders *as a basis* for holding the City in contempt." Dkt. 1079 at 2 (emphasis added). The City objects to the theory that undefined concerns about "delay," unattached to specific orders or obligations, could serve as a lawful predicate for a finding of civil contempt. The Alliance must prove that the City has willfully disobeyed court orders that required action by a certain time; it is not enough to question, in general terms, the manner of the City's performance under the parties' agreement.

The Court did note one specific instance of past conduct that it suggested could be a basis for sanctions: delays that were documented through a stipulation of the parties in 2024. Dkt. 1079 at 2. The facts addressed in that stipulation should not be the basis

---

[1] On November 15, the City filed a request for further clarification on the scope of the evidentiary hearing in light of the Court's November 14 order and the Ninth Circuit's stay order. *See* Dkt. 1080. Out of an abundance of caution, and because the Court has not responded to that request, the City submits this formal objection to reserve its rights.

of further litigation and cannot serve as a predicate for contempt sanctions.

Civil contempt sanctions must either compensate a wronged party or coerce a recalcitrant party into compliance. *Mine Workers v. Bagwell*, 512 U.S. 821, 829 (1994). When a sanction neither "compensate[s] the complainant for losses sustained" nor "coerce[s] the defendant into compliance with the court's order," it becomes criminal in nature. *Id.* (quoting *United States v. Mine Workers*, 330 U.S. 258, 303–04 (1947)). And no criminal sanction may be imposed without affording the defendant a right to a jury trial and requiring proof beyond a reasonable doubt. *Coleman v. Newsom*, 131 F.4th 948, 962 (9th Cir. 2025).

The City compensated the Alliance in connection with the noncompliance documented in the stipulated facts in 2024 when it agreed to pay $725,000 to the Alliance in fees and costs, as well as submit to and fund in significant part the Alvarez & Marsal assessment. Dkts. 713 at 3, 720 at 9–14, 743 at 3. Because compensatory sanctions have already been imposed, any additional civil contempt sanctions involving the stipulated facts from the 2024 contempt proceedings must be coercive in nature. But fines "imposed retrospectively for a 'completed act of disobedience'" would punish rather than coerce, thus removing them from the realm of civil penalties. *Bagwell*, 512 U.S. at 828.

Coercion can be accomplished through the imposition of fines directed to *future* violations of court orders, but they cannot be used to punish past conduct. Consider, for example, *Coleman v. Newsom*, which involved a years-long judicial effort to get the State of California to comply with a court-ordered remedial program. After multiple enforcement proceedings that did not result in compliance, the court "set a schedule of prospective fines" that would accumulate at the end of the following month but only if "the State failed to comply for a three-month period." 131 F.4th at 955. The Ninth Circuit held that the sanctions were civil because they were "forward-looking" and "conditional," as opposed to "'fixed, determinate, [and] retrospective.'" *Id.* at 963. In

Gibson, Dunn &
Crutcher LLP

2

DEFENDANT CITY OF LOS ANGELES'S OBJECTION TO ANTICIPATED SCOPE OF EVIDENTIARY HEARING

**1240**

other words, the State had an opportunity to purge itself of contempt because the fines applied only to theoretical future breaches—not previous noncompliance.

To be clear, the City is confident that its recent efforts towards fulfilling its settlement agreement obligations confirm that there is no reason to threaten sanctions to coerce future compliance. But the point remains that any civil contempt sanctions can be used only to coerce *future* compliance, not to punish the City for "'completed act[s] of disobedience'" that it has no opportunity to correct. *Bagwell*, 512 U.S. at 828. For this reason, the City objects to any attempt to use the 2024 stipulated facts as a basis for civil contempt sanctions.

**2.** The City also objects to these proceedings to the extent the Court seeks to enforce its now-stayed October 14 order appointing Mr. Garrie as monitor. *See* Dkt. 1048. Stays operate "either by halting or postponing some portion of the proceeding, or by temporarily divesting an order of enforceability." *Nken v. Holder*, 556 U.S. 418, 428 (2009). Accordingly, as the Supreme Court made clear just this year, a district court may not "enforce an injunction that [a higher court's] stay rendered unenforceable" using "civil contempt." *DHS v. D.V.D.*, 145 S.Ct. 2627, 2629 (2025). Without a basis to enforce the order, there is no reason to adjudicate compliance unless and until the Ninth Circuit terminates the stay.

The Alliance doesn't dispute this general principle. Dkt. 1082 at 1 n.1. But the Alliance nevertheless seeks to circumvent this rule by seeking contempt sanctions for the City's "delay[ed]" response to the monitor-appointment order, insisting that the City's response is relevant to the broader question of the City's compliance with the Settlement Agreement. *Id.* That suggestion is an impermissible attempt to smuggle through the back door what can't come in through the front. No aspect of compliance with a stayed order can be the subject of a coercive civil contempt sanction. The Ninth Circuit's stay order raises the possibility that the monitor-appointment order will be vacated—and the reality that the order is not currently enforceable. Until that situation

Gibson, Dunn &
Crutcher LLP

3

DEFENDANT CITY OF LOS ANGELES'S OBJECTION TO ANTICIPATED SCOPE OF
EVIDENTIARY HEARING

**1241**

changes, the City cannot be held in contempt for either the substance or the manner of its compliance with the order.

DATED: November 18, 2025              Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: /s/ Theane Evangelis
        Theane Evangelis

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

DEFENDANT CITY OF LOS ANGELES'S OBJECTION TO ANTICIPATED SCOPE OF EVIDENTIARY HEARING

Gibson, Dunn & Crutcher LLP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| LA Alliance for Human Rights, et al.<br>    Plaintiffs,<br><br>        v.<br><br>City of Los Angeles, et al.<br>    Defendants. | **Case No. 2:20-cv-02291-DOC-KES**<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES [1015] AND GRANTING INTERVENORS' MOTION FOR ATTORNEYS' FEES [1022]** |

-1-

1243

Before the Court is Plaintiff LA Alliance for Human Rights' Motion for Attorneys' Fees (the "Alliance's Motion" or "All.'s Mot.") (Dkt. 1015) and Intervenors Los Angeles Community Action Network and LA Catholic Worker's Motion for Attorneys' Fees ("Intervenors' Motion" or "Ints.' Mot.") (Dkt. 1022) (collectively, with Alliance's Motion, the "Motions"). The City of Los Angeles opposes both Motions. For the reasons below, the Court **GRANTS IN PART** Alliance's Motion (Dkt. 1015) and **GRANTS** Intervenors' Motion (Dkt. 1022).

Plaintiff negotiated a legally enforceable settlement with the City and County of Los Angeles that the Court has been monitoring. This agreement requires the City to actually address the homelessness pandemic at its doorstop. The Court found in its June 2025 order that the City breached its agreement in four ways:

The City failed to provide a plan for how it intends to create 12,915 shelter or housing solutions. For years, the City consistently missed its shelter and housing creation milestones. The City also improperly reported encampment reductions and disobeyed the Court's order on encampment reductions. Finally, the City flouted its reporting responsibilities by failing to substantiate its reporting and failing to provide accurate and comprehensive data when requested by the Court, Special Master Martinez, the Parties, and A&M.

Settlement Compliance Order (Dkt. 991) at 56.

Plaintiff and Intervenors' advocacy to enforce the settlement agreement and their vigilance and tenacity in alerting the Court to breaches of the agreement has caused this Court to conclude Plaintiffs are the prevailing party.

-2-

**1244**

Therefore, The Intervenors, Los Angeles Community Action Network and LA Catholic Worker are awarded $201,182.50 in fees and $160.00 in costs. Plaintiff is awarded $1,600,633.00 in attorney's fees and $5,067.21 in costs.[1]

## I.  INTRODUCTION

### A.      Present Litigation

The Plaintiff in this case is the LA Alliance for Human Rights (the "Alliance" or "Plaintiff"), a non-profit membership association, whose members are business owners in the City of Los Angeles and residents of the City and County of Los Angeles. *See generally* Complaint ("Compl.") (Dkt. 1); First Amended Complaint ("FAC") (Dkt. 361). Plaintiff sued the City of Los Angeles ("City") and the County of Los Angeles ("County") on March 10, 2020, for alleged violations of California law, the California Constitution, the Americans with Disabilities Act, the Rehabilitation Act, and the United States Constitution through 42 U.S.C. §1983. *See generally* Compl. The Alliance filed suit against the City and County because of the street homelessness crisis and sought immediate shelter for those living on the streets and the clearing of encampments. *Id*.

On March 18, 2020, the Court granted Los Angeles Catholic Worker ("LACW") and Los Angeles Community Action Network's ("LA CAN") Application to Intervene in this litigation, represented by the Legal Aid Foundation of Los Angeles and other counsel. Order Granting Intervenors' Ex Parte Application to Intervene as of Right (Dkt. 29). LACW is an unincorporated lay Catholic community which operates a soup kitchen and provides services on Skid Row. LA CAN is a grassroots, non-profit organization that has operated on Skid Row and throughout the City for decades to organize and advocate for the unhoused community. LACW

---

[1] The Court finds these fees reasonable as explained below. Initially, Gibson Dunn charged the City $900,000 which within two weeks expanded to $1.8 million, and then again to $3.2 million. David Zahniser, *Lawyers who hit L.A. City with whopping bill on homeless case to get millions more*, L.A. Times (Sept. 17, 2025 3:50 p.m. PT), https://www.latimes.com/california/story/2025-09-17/gibson-dunn-crutcher-los-angeles-homeless. Fifteen attorneys worked at a rate of $1,295 for weeks. Aaron Schrank, *LA council delays decision on $5M more for law firm in homelessness lawsuit*, LAist (Aug. 27, 2025 3:13 p.m.), https://laist.com/news/housing-homelessness/gibson-dunn-legal-bills-city-homelessness-millions-city-council. Subsequently, the latest agreement is for $5.9 million dollars (Dkt. 1073). These limited efforts by Gibson Dunn in no way compare to the months and years spent by a small law firm and a legal nonprofit.

**1245**

and LA CAN (collectively "Intervenors") have been actively involved in the litigation since the Court granted intervention.

**B.** **The Importance Of The City's Reporting And Monitoring Compliance**

The City has committed to taking steps to resolve the homelessness crisis both in this case and in other arenas.[2] The City attempts to explain its difficulties in addressing the crisis as a simple byproduct of the bureaucratic and segmented processes of the City. However, the City's activities with regard to homelessness can too often be viewed via the lens of lack of oversite and corruption. In 2021, this Court wrote the following:

> The disconnect between politicians' public statements about the severity of this [homelessness] crisis and the actual efforts made to fund effective solutions is growing. Recent investigations into City-funded housing projects for the homeless demonstrate that a lack of government oversight has allowed the proliferation of corruption. In at least two separate instances with two different developers, reports indicate that developers of taxpayer-funded affordable housing projects have purchased properties before turning around and reselling those properties to themselves at higher prices in order to artificially inflate their project budgets and, in turn, the amount of public money that they receive.
>
> These cases, of which there are almost certainly more to be discovered, indicate that the City has turned a blind eye to corruption as money is being siphoned off from funds that taxpayers voted to allocate to the homeless population.

Preliminary Injunction Order (Dkt. 277) at 42.[3]

---

[2] *See, e.g.*, *Mayor Bass Appoints Herself To LAHSA Commission*, LAHSA (Oct. 13, 2023), https://www.lahsa.org/news?article=938-mayor-bass-appoints-herself-to-lahsa-commission.

[3] This Order cites to several news articles on the subject. *See* Preliminary Injunction Order at 41-43 (citing Anna Scott, *How a City - Funded Homeless Housing Project Became a Sink Hole for Public Money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/news/shows/greater-la/hhh-motel-george-gascon/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la; David Zahniser, Emily Alpert Reyes, & Joel Rubin, *L.A. City Councilman Jose Huizar charged in federal corruption probe*, L.A. Times (June 23, 2020) https://www.latimes.com/california/story/2020-06-23/jose-huizar-arrest-corruption-city-hall-fbi-investigation; Donna Evans, *$3.7 Million Plan Proposed to Clean Up Skid Row*, DT News (Apr. 8, 2014)

**1246**

The Court went on to write that "[t]he improper relationship between City Hall and real estate developers is neither isolated nor new" and that "[t]he FBI has been investigating possible corruption in City Hall since 2017, a probe that has led to the prosecution of real estate consultants, political fundraisers, and even, most notably, former Councilmember Jose Huizar, whose council district included Skid Row."[4] Specifically, "[i]n June 2020, Huizar was arrested by federal agents for using his position to cover up illegal activities such as accepting bribes from real estate developers,"[5] and the Los Angeles Times reported that "[i]nvestigators said Huizar reduced the amount of affordable housing required inside the development after receiving key financial benefits . . . ."[6]

Unfortunately, it appears that the City's problems have not ceased in the succeeding years. A recent news article concluded that the Weingart Center, "[o]ne of L.A.'s biggest homeless service providers has been awarded over $100 million in taxpayer funds while failing to comply with federal audit mandates."[7] The Weingart Center was also at the center of a real estate deal in 2023 in which "Brentwood landlord and developer Steven Taylor, bought [a] property on Shelby Drive in 2023 for $11.2 million."[8] However, "[a]t the time of his purchase, a company owned by Taylor was already in escrow to sell the complex to Weingart Center, a major homeless housing provider, for more than double what he paid."[9] In fact, "[t]he $27.3

---

[4] http://www.ladowntownnews.com/news/3-7-million-plan-proposed-to-clean-up-skid-row/article_e25e730a-bf51-11e3-ac54-0019bb2963f4.html).

[4] Preliminary Injunction Order (Dkt. 277) at 42.

[5] *Id.* at 42-43 (citing Libby Denkmann, *Timeline: Follow The FBI's Sweeping LA City Hall Corruption Investigation Through The Years*, LAist (May 18, 2020), https://laist.com/2020/05/18/los-angeles-city-hall-fbi-corruption-investigation-timeline-englander-huizar.php).

[6] Preliminary Injunction Order (Dkt. 277) at 43 (quoting David Zahniser, *Downtown Developer Will Pay $1.2 Million in L.A. City Hall Corruption Case*, L.A. Times (Jan. 7, 2021), https://www.latimes.com/california/story/2021-01-07/downtown-developer-will-pay-1-2-million-in-l-a-city-hall-corruption-case).

[7] Nick Gerda, *LA nonprofit got over $100 million from taxpayers despite failing audit requirements*, LAist (Nov. 26, 205 5:00 a.m.), https://laist.com/news/housing-homelessness/la-homelessness-nonprofit-got-over-100-million-from-taxpayers-despite-failing-audit-requirements.

[8] Nick Gerda, *Inside a secretive $27M property deal to add unhoused beds that's now under federal investigation*, LAist (Nov. 26, 2025 5:00 a.m.), https://laist.com/news/housing-homelessness/secretive-27-million-property-deal-to-add-homeless-beds-now-under-federal-investigation.

[9] *Id.*

**1247**

million to pay for that acquisition came from taxpayer grant funds authorized by city and state officials."[10] Taylor has since been indicted.[11]

In another recent arrest, "Cody Holmes, 31, a Beverly Hills man who was the CFO of affordable housing developer Shangri-La" was accused of several instances of illicit activity.[12] Specifically, "[p]rosecutors said Holmes and Shangri-La submitted fake balance sheets to the state" and used grant funds "to pay credit card bills for American Express accounts associated with Holmes."[13] In a state court lawsuit, Holmes was also accused of "embezzling housing money and spending it on personal extravagances, including tickets to the Coachella Valley Music and Arts Festival, jewelry, and rent for a Beverly Hills mansion."[14]

Unfortunately, Shangri-La is a name that is very familiar to the City and this Court.[15] Last year, in this Court's companion case dealing with Los Angeles's VA campus, the Court wrote that, "Shangri-La was the leaseholder and developer for [VA] buildings 205, 208, and 209" and had "come under [increased] public scrutiny after a recent civil suit brought by the Attorney General of California."[16] This increased scrutiny was long overdue. Back in 2018, Shangri-La participated in a scheme where developers for a facility for homeless veterans in LA's Westlake neighborhood purchased and resold the property in the same day to "artificially inflate their project budget[] and, in turn, the amount of public money that they receive."[17] KCRW uncovered this unscrupulous activity two years later in 2020 and found that "most of the more than $30 million pumped into the renovation of this rundown motel has gone to its

---

[10] *Id.*

[11] Andrew Khouri, Alene Tchekmedyian, and Doug Smith, *DOJ accuses real estate executives of fraud in homeless funding*, L.A. Times (Oct 16, 2025 2:11 p.m.), https://www.latimes.com/california/story/2025-10-16/doj-accuses-people-of-fraud-in-homeless-funding.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *See Powers v. McDonough*, 748 F. Supp. 3d 842, 858 (C.D. Cal. 2024), *aff'd in part, vacated in part, remanded,* No. 24-6338, 2025 WL 3718737 (9th Cir. Dec. 23, 2025).

[16] *Id.*

[17] Preliminary Injunction Order (Dkt. 277) at 42 (citing Steve Chiotakis, *How a city-funded homeless housing project became a sink hole for public money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/shows/greater-la/stories/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la).

**1248**

former owners, who, right before the sale, were sued by public interest attorneys for illegally evicting tenants."[18]

Despite the public notoriety of Shangri-La's fraudulent activity, it continued to receive public funding. For example in April 2020, the VA Building 208 project was "issued $18.5 million in tax-exempt bonds and another $2.075 million in 2023, supplemented by $11.66 million from Proposition HHH funds" by the City. [19] Further, "the city of Thousand Oaks and Shangri-La won a $26.7 million Homekey grant in 2022 to convert a Quality Inn to 77 units of permanent housing."[20] California Attorney General Rob Bonta's filed suit in 2024 where he sought to "claw back $114 million in state grants that Shangri-La Industries received during the pandemic from the [state's] celebrated Homekey program."[21]

The fact that Shangri-La's self-dealing activities were able to continue unabated for so long with public funding is symptomatic of the fact that all too often the City has turned a blind eye to problems and issues in its homeless programs. And yet, the City continues to count these tainted units towards its commitments.

The City's own recent reports in this litigation also reveal inconsistencies and variances that justify the Court's concern about the reliability of the data it has received. For example, in recent testimony the City Administrative Officer, Matthew Szabo, opined that permanent supportive housing facilities should report fairly stable levels of Persons Experiencing Homelessness ("PEH") served because they are permanent by definition and the number reported is the number of units leased: "…it should, unless there are units that are taken out of service for one reason or the other, renovations, et cetera." Dec. 18, 2025 Hearing Tr. (Dkt. 1020) at 253:25-254:5, 255:19-256:1. During the same hearing he also testified that interim housing types report the cumulative number of PEH Served and that thus the number "should

---

[18] Preliminary Injunction Order (Dkt. 277) at 42 (quoting Steve Chiotakis, *How a city-funded homeless housing project became a sink hole for public money*, KCRW (Dec. 10, 2020), https://www.kcrw.com/shows/greater-la/stories/30-million-motel-homeless-shelter-prop-hhh-taxpayer-oversight-la).

[19] Cece Woods, *The Shangri-La Scandal: How LA's Homeless Crisis Fueled a Political Payoff Pipeline*, The Current Report (Oct. 17, 2025), https://thecurrentreport.com/shangri-la-political-pay-off-scandal/.

[20] Jeanne Kuang, *California housing projects for homeless on hold as developer defaults*, CalMatters (updated Jan. 12, 2024), https://calmatters.org/housing/homelessness/2023/12/california-homeless-developer-investigation/.

[21] Jeanne Kuang, *California sues homeless housing developer for $114 million*, CalMatters (Jan. 12, 2024), https://calmatters.org/housing/2024/01/california-homeless-housing-lawsuit/ (citing *Cal. Dep't of Hous. & Urb. Cmty. Dev. v. Shangri-La Indus. LLC*, Case No. 24STCV00629 (L.A. Sup. Ct . Jan. 9, 2024)).

**1249**

only go up." *Id.* at 254:5-11, 255:14-18. Despite this, the City reports demonstrate unusual discrepancies for both interim housing facilities and permanent supportive housing facilities. Several permanent supportive housing types were reported as going from full occupancy, to a pending occupancy number, and then to less than full occupancy:

- VA Building 207 went from reported full occupancy of 59 (Dkts. 858-1, 892-1, 1011-1) to pending (Dkt. 1051-1) to a reported occupancy of 31 (Dkt. 1072-1).
- Washington View Apartments went from reported full occupancy of 91 (Dkts. 858-1, 892-1, 1011-1) to pending (Dkt. 1051-1) to a reported occupancy of 86 (Dkt. 1072-1).
- Chesterfield went from reported full occupancy of 42 (Dkts. 858-1, 892-1, 1011-1) to pending (Dkt. 1051-1) to a reported occupancy of 34 (Dkt. 1072-1).

Similarly, interim housing types reported a drop in the reported cumulative number of PEH served, despite the fact that this number as Szabo said, "should only go up." Dec. 18, 2025 Hearing Tr. (Dkt. 1020) at 254:5-11, 255:14-18.:

- Highland Gardens reported an increase in its reported cumulative numbers from 396 for the quarter ending December 31, 2024 (Dkt. 858-1) to 412 for the quarter ending March 31, 2025 (Dkt. 892-1) to 425 for the quarter ending June 30, 2025 (Dkt. 1011-1), before reporting pending (Dkt. 1051-1) and then a drop to 422 for the quarter ending September 30, 2025 (Dkt. 1072-1).[22]
- Highland Park Motel reported cumulative numbers from 24 for the quarter ending March 31, 2025 (Dkt. 892-1) to 48 for the quarter ending June 30, 2025 (Dkt. 1011-1), before reporting pending (Dkt. 1051-1) and then a drop to 32 for the quarter ending September 30, 2025 (Dkt. 1072-1).
- Hotel Silver Lake reported cumulative numbers from 63 for the quarter ending March 31, 2025 (Dkt. 892-1) to 83 for the quarter ending June 30, 2025 (Dkt. 1011-1), before reporting pending (Dkt. 1051-1) and then a drop to 66 for the quarter ending September 30, 2025 (Dkt. 1072-1).

---

[22] The Court notes that this drop is significant because the cumulative numbers should have continued their pattern of increase from 425, but instead experienced a drop.

**1250**

Given that these issues were addressed for the first time in the recent October quarterly report, it appears that the verification problems are not going away. Accordingly, the Court continues to view the City's reported numbers skeptically.

It is worth noting that the City's unreliability when it comes to documents and reports extends beyond this case. In 2024, Judge Dale Fischer "found that Los Angeles City officials altered evidence to support the City's defense against allegations that it illegally seized and destroyed homeless people's property."[23] Specifically, "records documenting what was taken during cleanups and the legal authorization for the seizure were altered or created up to two years after the cleanup occurred and in some instances just days before they were turned over to the plaintiffs."[24] The City's alleged misconduct in that case stretches to "erasing metadata, submitting altered documents as PDFs to hide the changes, and misrepresenting the record."[25] As a result, this means that Plaintiff and Intervenors have had to play the role of watchdog in this case. Their attorneys deserve to be compensated for having to fulfill this role.

**C.      The Agreements At Issue[26]**

Plaintiff's and Intervenors' Motions concern transparency and accountability in three critical areas:

1. The Roadmap Agreement

2. The Settlement Agreement

3. Inside Safe

The Court summarized each of these agreements in its Settlement Compliance Order that serves as the basis for the Motions.

**1.      The Roadmap Agreement**

On May 15, 2020, this Court issued a Preliminary Injunction ("Preliminary Injunction") (Dkt. 108). This Preliminary Injunction directed the relocation of those individuals

---

[23] Doug Smith, *A federal judge has found that L.A. city officials doctored records in a case over homeless camp cleanups*, L.A. Times (April 16, 2024 3:00 a.m. PT), https://www.latimes.com/california/story/2024-04-16/a-federal-judge-has-found-that-l-a-city-officials-doctored-evidence-in-a-case-over-homeless-camp-cleanups.
[24] *Id.*
[25] Skylar Romero, *Judge threatens to summon LA mayor over discovery in encampment suit*, Daily Journal (Nov. 11, 2025), https://www.dailyjournal.com/article/388497-judge-threatens-to-summon-la-mayor-over-discovery-in-encampment-suit.
[26] The summaries of these agreements are abridged versions of those given in the Court's Settlement Compliance Order (Dkt. 991), at 3-9.

**1251**

experiencing homelessness and living under underpasses, as well as near freeway entrance and exit ramps. Preliminary Injunction at 1-2. Central to this directive was the Court's growing concern over the significant public health risks posed by living adjacent to freeways—particularly during the then-ongoing global Covid-19 pandemic. *Id.* at 2. At the time, traffic-related injuries were the third leading cause of death among people experiencing homelessness.[27] After more than four months of scheduling conferences and mediation sessions, Judge Birotte ordered the Parties to report on their progress towards the development of a Memorandum of Understanding ("MOU") to govern their Binding Term Sheet. Order for City and County of Los Angeles to Meet, Confer, and File a Joint Report Re: Status of MOU (Dkt. 183). On October 9, 2020, the City and County finally reached an agreement on a MOU. Evidentiary Hearing Exhibit # 2 ("Roadmap MOU") (Dkt. 185-1). The Binding Term Sheet and Roadmap MOU have together been referred to as the "Roadmap Agreement."

According to the City and County, the Roadmap MOU clarified the historic agreement between the City and County to provide, within eighteen months, 6,700 beds and services for PEH within the City of Los Angeles. *See generally* Ex. 2. More specifically, under the terms of the Roadmap MOU, the City agreed to deliver a total of 6,700 beds—comprised of 6,000 "New Beds" and 700 "Other Beds." *Id.* at 4.

Pursuant to the Roadmap MOU, the City agreed to certain reporting requirements but stated that "if the Court requires different and more extensive reporting than what is set forth below, then the Parties agree to provide reporting as required by the Court and not in this MOU." *Id.* The first reporting requirement directed the City to submit a "Bed Plan" by August 1, 2020, describing how it would establish the specified New Beds and Other Beds. *Id.* Next, the City agreed to submit written quarterly status reports ("Roadmap Quarterly Reports"), beginning no later than October 15, 2020, detailing its progress in providing beds and services pursuant to the Roadmap Agreement. *Id.* at 7. The County, in turn, committed to reporting on

---

[27] *New Public Health Report Shows Sharp Rise in Mortality Among People Experiencing Homelessness*, County of Los Angeles Public Health Media (May 12, 2023), https://lacounty.gov/2023/05/12/new-public-health-report-shows-sharp-rise-in-mortality-among-people-experiencing-homelessness/.

1252

funds disbursed and the delivery of services for PEH residing in facilities established under the MOU. *Id.* at 7-8.

### 2.     The Settlement Agreement

Following extensive negotiations and numerous mediation sessions, Plaintiff and the City reached a Settlement Agreement in May 2022, resolving only the claims against the City in Plaintiffs' First Amended Complaint. *See* Notice of Lodging, Settlement Agreement (Dkt. 429-1). The Court approved the stipulated dismissal and proposed settlement between Plaintiffs and the City on June 14, 2022. Order Approving Stipulated Dismissal and Proposed Settlement (Dkt. 445).

One of the recitals in the Settlement Agreement states: "the purpose of this Agreement is to substantially increase the number of housing and shelter opportunities in the City of Los Angeles, and to address the needs of everyone who shares public spaces and rights of way in the City of Los Angeles, including both housed and unhoused Angelenos, to achieve a substantial and meaningful reduction in unsheltered homelessness in the City of Los Angeles." Evidentiary Hearing Exhibit # 25 ("Settlement Agreement") (Dkt. 429-1), at 2.

The Settlement Agreement required the City to "create a Required Number of housing or shelter solutions, which is equal to, but (in the City's discretion) may be greater than, the shelter and/or housing capacity needed to accommodate sixty percent (60%) of unsheltered City Shelter Appropriate PEH within the City based on LAHSA's [Los Angeles Homeless Services Authority] 2022 Point in Time count." Ex. 25, § 3.1. Further, the City was required to calculate the "Required Number." *Id*. §5.1. The City calculated 12,915 as the Required Number in 2022. Evidentiary Hearing Transcript ("Tr."), 244, 252-253, May 28, 2025 (Dkt. 949).

The Agreement also states, "The Parties agree that the duration of the Agreement shall be five (5) years, during which point the Court shall have continuing jurisdiction to oversee and enforce this Settlement Agreement." *Id*. § 2.

### 3.     Inside Safe

Inside Safe is a housed within the Mayor's Office, in contrast to the City's other programs which are cross-agency and interface directly with LAHSA. *See Inside Safe*, City of

**1253**

Los Angeles: Mayor's Office, https://mayor.lacity.gov/InsideSafe. Under Inside Safe, the "Mayor's Field Intervention Team (FIT), a multidisciplinary team with backgrounds in lived-experience of homelessness, policy, public health, community advocacy, and substance-use recovery" engages with those in "designated encampment[s]" and places them into interim housing solutions with the goal of an ultimate transition to permanent housing. *See id.* The program has numerous deficiencies and transparency issues, which are detailed below.

### D.      The A&M Audit[28]

On February 7, 2024, the Alliance filed a Motion for Order Re Settlement Agreement Compliance and Sanctions (Dkt. 668) seeking sanctions against the City for alleged non-compliance with the Settlement Agreement. Following several hearings and briefing on this issue, Plaintiff and the City agreed to a "comprehensive financial and performance audit of the City of Los Angeles's homelessness programs." Notice of Filing of Audit Scope (Dkt. 697). The City also agreed to pay for the Court-ordered audit, meet at least once a month about Settlement Agreement compliance, and pay Plaintiff's fees and costs. Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713). Alvarez and Marsal ("A&M") was selected as the auditor. City's Signed Copy of Amendment to Engagement Letter Between A&M and the Court (Dkt. 779).

A&M's audit was limited in scope to June 1, 2020, through June 30, 2024 ("Lookback Period"). The Assessment focused on appropriation and expenditures of funds through the City under the Roadmap Program (pursuant to the Roadmap MOU), the Alliance Program (pursuant to the LA Alliance Settlement Agreement), and the Mayor's Inside Safe Program (collectively the "City Programs") during the Lookback Period.

A&M's assessment went through several drafts and all Parties, including the City, were given time to raise any issues or errors. *See generally* (Dkts. 866, 867, 870, 873, 877). However, the City failed to provide A&M with missing data which had been requested to verify program spending and the existence of housing reported. June 3, 2025 Hearing Tr. (Dkt. 969) at 175-178. On May 15, 2025, the Court adopted the final assessment (Dkt. 906).

---

[28] The summary of the A&M audit is also an abridged version of what was contained the Settlement Compliance Order, at 23-26.

**1254**

A&M's assessment found significant issues with the City's homelessness programs. Evidentiary Hearing Exhibit # 23 ("Ex. 23" or "A&M Independent Assessment of City-Funded Homelessness Assistance Programs" or "Assessment") (Dkt. 905), at 3. Specifically, A&M found that: it could not verify the City's reporting of the number of beds under the Roadmap and Alliance Programs due to poor data quality and integration; it could not fully quantify the City's spending of the $2.3 billion in funding that it received during the Lookback Period; the siloed continuum of care system caused confusion and a lack of transparency; the City and LAHSA's financial oversight and performance monitoring of service provider contracts was extremely limited; these service provider contracts did not have uniform terms or scope; there was wide variance costs and services between different service providers; and the City did not reconcile actual spending or contractual obligations with its budget allocations and funding. *Id.* at 3-7.

Of particular concern were A&M's findings related to the City's compliance reporting required by the Roadmap MOU, LA Alliance Settlement Agreement, and Inside Safe. A&M could not verify the City's reported number of time-limited subsidies ("TLS") under the Roadmap MOU because 70% of the TLS contracts provided by LAHSA did not report financial expenditures for fiscal year 2023-24. *Id.* at 64. A&M repeatedly requested more information from the City and LAHSA to verify TLS slots but did not receive it. Tr., 7-8, 19-21, May 28, 2025 (Dkt. 949). The TLS documentation provided to A&M was also missing many addresses and some TLS addresses overlapped with those reported as permanent supportive housing ("PSH") under the Alliance Settlement. Tr., 99, June 3, 2025. A&M also could not verify PSH sites reported under the Roadmap MOU and Alliance Settlement. Assessment, 114-116. About 20% of the PSH sites reported as open to the Court could not be found at all in LAHSA's Resource Management System ("RMS"). *Id.* at 114-115; Tr., 235-37, May 27, 2025 (Dkt. 947).

A&M also identified specific issues with the Mayor's Inside Safe program. For example, "due to the nature of the Inside Safe Program and its operations, it was not possible to calculate an enrollment rate given the lack of clarity regarding the total number of beds served by these

-13-

**1255**

contracts." A&M Independent Assessment of City-Funded Homelessness Assistance Programs (Dkt. 905), at 3

A&M's findings were consistent with previous audits performed of the City, LAHSA, and their associated programs and entities. *See* Settlement Compliance Order at 10-23.[29] Of note, these audits uncovered significant and substantial issues with LAHSA's management of its finances and issues with its record-keeping. *Id.* In short, A&M's audit was consistent with a plethora of previous audits and assessments of the City and LAHSA dating back decades. Thus, A&M's audit was not the unveiling of hitherto unforeseen issues, but rather yet another finding that long identified issues still remain ever present and ongoing. The need for change is clear and, unfortunately in the instant case it has fallen to the Alliance and Intervenors to be the force for such change.

### E.     Settlement Compliance Briefing

The Court's Settlement Compliance Order followed numerous iterations of briefing seeking different relief and pointing out various issues with the City's undertakings under the Agreements. The first Motion for Settlement Compliance was filed on September 4, 2024 by the Alliance. The City filed its Opposition on September 11, 2024 (Dkt. 774) and the Alliance filed a Reply on September 18, 2024 (Dkt. 776). The Court held hearings on October 8 and October 16, 2024. The Parties also engaged in extensive negotiation and mediation with Special Master Martinez and Judge Birotte. At the request of the Parties, the Court resolved the Motion partially by clarifying the definition of encampment reduction in the LA Alliance Settlement Agreement on March 24, 2025 (Dkt. 874).

This did not resolve all the issues however, and the Alliance filed a second Motion for Settlement Compliance on February 20, 2025 (Dkt. 863). The City filed its Opposition on March 6, 2025 (Dkt. 871). The Alliance filed its Reply on March 13, 2025 (Dkt. 872). In this

---

[29] For these numerous and substantial audit findings, a fulsome summary can be found in the Settlement Compliance Order (Dkt. 991) at pages 10-23. These audits include: a 2001 HUD audit, *id.* at 11; a 2007 audit by HUD's Regional Inspector General, *id.* at 11-12; a 2018 audit by the County Auditor-Controller, *id.* at 12; an August 2019 report by Los Angeles City Controller Ron Galperin, *id.* at 13; an October 2019 report by City Controller Ron Galperin, *id.* at 13; four reports by the LA County Auditor-Controller in 2021, *id.* at 14-15; a 2021 report by the Committee for Greater Los Angeles, *id.* at 13; a 2022 review by the HUD Office of the Inspector General, *id.* at 14; a 2023 audit by Los Angeles City Controller Kenneth Mejia, *id.* at 15; a 2024 audit by City Controller Mejia, *id.* at 15-16; a 2024 review by County Auditor-Controller Oscar Valdez, *id.* at 16-23.

-14-

1256

Reply, the Alliance requested for the first time that the Court implement the severe remedy of appointing a receiver to manage the City. The Court heard oral arguments regarding the Motion on March 27, 2025 (Dkt. 877) and the Alliance filed additional briefing regarding their request for a receivership over the City on May 8, 2025 ("Receivership Brief") (Dkt. 899). The City filed objections to the Receivership Brief on May 13, 2025 (Dkt. 903). The Court then held an evidentiary hearing on the two Motions for Settlement Compliance from May 27 through June 4, 2025. The Alliance, the City, and Intervenors participated in the evidentiary hearing, but the County only appeared and did not argue.

### F.    Resolution Of Settlement Compliance Issues

#### 1.    Roadmap Agreement Issues

The Roadmap Agreement called for the creation of 6,700 beds. Settlement Compliance Order at 32. The Alliance alleged that there are missing beds under the agreement. Settlement Compliance Order at 30. Specifically, they pointed to the A&M Assessment, which states that "A&M could not validate the reported number of TLS beds or the total expenses necessary to support those beds." *Id.* (quoting Assessment at 64).

Central to the dispute was the inability to verify the City's data to confirm that the reported TLS beds were newly created. *Id.* at 37. Despite numerous requests and opportunities, the City failed to provide the necessary data for these TLS beds to demonstrate that they met the requirements under the Roadmap Agreement. *Id.* "Instead, the evidentiary record reflect[ed] a consistent lack of cooperation and responsiveness—an unwillingness to provide documentation unless compelled by court order or media scrutiny." *Id.* Indeed, "rather than spend[] taxpayer dollars on finding the missing data or striving to provide verification, the City fought with the findings and methods of the A&M Assessment, the same methods they agreed to and paid for." *Id.* A report entered into the record during the June 2, 2025 evidentiary hearing also showed that the City failed to report beds as required by the Roadmap Agreement. *Id.* at 38.

Eventually, the Court "issued an Order directing the City to produce a comprehensive spreadsheet containing key data for each of the 2,679 TLS slots and 130 scattered-site beds the

-15-

**1257**

City claimed to have created under the Roadmap Agreement." *Id.* at 38 (quoting Amended Order Requiring City Verification of TLS Reporting (Dkt. 967)). In response to this directive, the City finally produced the sought TLS data. Settlement Compliance Order at 38. In finally revealing this data, the City "came clean that there was some double counting or false reporting." *Id.* (citing Declaration of Matthew W. Szabo re Court's Directive (Dkt. 980) at 1-2). However, even omitting these beds, there was still enough data to substantiate the required TLS slots. Settlement Compliance Order at 38. Thus, the Court "h[eld] that there is not sufficient evidence to find a breach under the Roadmap Agreement." *Id.*

But the Court did not excuse the City for its lack of substantiation:

> The Court's primary concern is ensuring the creation of shelter or housing for PEH—not arbitrating disputes over financing strategies or the definition of terms. But the Court not finding a breach at this time does not equate to an acceptance of the City's lack of accountability and verification. To belabor litigation over the Roadmap Agreement any further would only redirect resources away from urgently needed housing efforts and into sanctions or further litigation over receivership.

*Id.* at 38-39.

## 2. Settlement Agreement Issue: Bed Plan

The first alleged issue with respect to the Settlement Agreement dealt with the City's reporting obligations under Section 5.2 of the Agreement. The Alliance argued that "the City has failed to fulfill Section 5.2, which requires the City to 'create plans' and 'provide the plans' to Plaintiffs, because the City currently has no plan detailing how it intends to reach the 12,915 required shelter or housing solutions." Settlement Compliance Order at 40. By the time of the Settlement Compliance Order, the City had only submitted a "bed plan" in November 2022, which included about 8,000 shelter and housing solutions. *Id.* at 41. The City also produced a supplemental bed plan on September 12, 2024, but then withdrew this bed plan. *Id.* Thus, for two years, the City did not provide any bed plan showing how it intended to fulfill its

-16-

**1258**

obligations. The City argued that it was not under an obligation to produce a single, comprehensive bed plan and could simply provide an updated plan in the future. *Id.* at 41-42.

The Court held that the City may use iterative plans to fulfill its obligations under Section 5.2 and that "the City may update the plan as needed," but that "the City's reliance on an outdated and incomplete plan from [over two years ago in] November 2022 of only about 8,000 beds runs the risk that the City will not sufficiently plan to fund the beds." *Id.* at 42. As such, the Court ordered the City to provide an updated bed plan by October 3, 2025. *Id.*

The City submitted its Updated Bed Plan on October 3, 2025 (Dkt. 1040), three years after its last submission. Given that the Updated Bed Plan relies on TLS slots—and the aforementioned verification issues with TLS beds in other areas—the Court also ordered that "because of the difficulties inherent to verifying and documenting TLS slots, the Special Master will need to facilitate the verification of TLS bed usage. Therefore, the Monitor is **ORDERED** to verify the City's compliance regarding its use of the TLS slots, with assistance as needed from the Special Master" (Dkt. 1052).

### 3.    Settlement Agreement Issue: Milestones

Next, the Alliance submitted that the City has not employed "best efforts" to create the 12,915 housing and shelter solutions, and that it frequently failed to meet its own milestones. Settlement Compliance Order at 42. In contrast, the City argued that it has used "best efforts" and despite the missed milestones was on track to satisfy the required 12,915 new beds and housing solutions. *Id.* The Court then summarized how "it is undisputed that the City did not meet the milestones for shelter and housing creation that it set for itself" and "has consistently missed those milestones according to its quarterly reports." *Id.* at 43. Despite the City making progress and getting closer to hitting each of its set milestones, "[e]ach missed milestone inflicted material harm to the public and those living on the streets who were denied shelter or housing." *Id.* As such, the Court concluded that "[t]hese milestones are not optional or aspirational" and that if "the City continues to miss its targets, the City runs the risk of rushing to create solutions and not meeting its obligations in 2027 at the cost of those waiting for shelter." *Id.* at 44. Because "each missed milestone [also] represents a missed opportunity to

**1259**

shelter residents living and dying on the streets" the Court ordered the City to submit an updated milestones document by October 3, 2025.

The City eventually submitted its Updated Milestones on October 3, 2025 (Dkt. 1040). The Court also expressed concern over the usage of TLS slots and ordered the City "to specifically document the usage of TLS slots in its submission regarding the milestones. The City's milestone submissions must reflect not only the cumulative number of TLS slots but also the timing of their creation and deployment" (Dkt. 1052).

### 4.    Settlement Agreement Issue: "Create"

The next issue raised to the Court is that Section 3.1 requires the City to "create a Required Number of housing or shelter solutions," but the Settlement Agreement does not define what it means to "create" solutions. "Intervenors argue[d] that the City must consider and identify whether units counted were already covenanted as affordable units because if they were, the City did not 'create' them." Settlement Compliance Order at 45. The Court also concluded that the City's reporting did not demonstrate how the City "created" units that physically existed before the Settlement Agreement. *Id.* at 46. As such, the Court ordered that "[b]eginning in the quarterly report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use." *Id.*

The City submitted explanations in its October quarterly report that it filed (Dkt. 1051). However, until the Monitor can verify these explanations they are provisional and unverified.

### 5.    Settlement Agreement Issue: Inside Safe Reporting

Plaintiff next put forth that the beds contracted through Inside Safe booking arrangements should not be counted toward the City's obligations under the Settlement Agreement. The "mayor's office administers the [Inside Safe] program." May 29, 2025 Hearing Tr. (Dkt. 953) at 112:13-20; *see* December 2, 2025 Hearing Tr. (Dkt. 1100) at 73:13 ("The Inside Safe sites are matched by the mayor's office.") Inside Safe beds are an interim housing solution that contracts through either occupancy agreements, which entail the master leasing of

**1260**

an entire hotel, or booking agreements, which pay for a hotel room for individuals on an as needed basis. May 29, 2025 Hearing Tr. (Dkt. 953) at 97:15-99:10; 103:1-18.

The Inside Safe program was not previously included in the City's quarterly reports, but the City began including these beds beginning with its "status report for the quarter ending March 31, 2025." Settlement Compliance Order at 47. As such, "the nearly 2,000 bed increase reported from the status report in January 22, 2025, to the status report in April 15, 2025, is due to the inclusion of more Inside Safe beds *not* the creation of new beds." *Id.*

The Court acknowledged that the Inside Safe beds may be included in the City's obligations under the Settlement Agreement, but that "the Court is committed to ensuring that each of the 12,915 beds ultimately exists," including Inside Safe beds. If an Inside Safe bed comes offline before the end of the settlement term then it is the City's obligation to replace those beds. *Id.* at 47-48.

### 6. Settlement Agreement Issue: Data Verification

The Court turned to the issues with validating and verifying the City's reported data. The Court first determined that "it is extremely difficult, if not impossible, to verify the housing and shelter solutions that are reported by the City to meet its obligations" and that this issue has been well-documented by Special Master Michele Martinez's reports and the A&M assessment. Settlement Compliance Order at 48. Indeed, "[t]he Court receives numbers of shelter and housing solutions created by the City in its quarterly reports with no documentation to substantiate the numbers." *Id.* And "[w]hen errors are found in the data reported, the City has repeatedly ignored the errors or attacked the messenger instead of engaging with and correcting the issues. This pattern has persisted for years and is untenable if the City is to succeed in meeting its obligations by 2027." *Id.* In fact, the City had been put "on notice" of its data verification deficiencies since "Special Master Martinez's first report covering the period July 1, 2022, through December 31, 2023." *Id.*

The Court would also note the importance of getting verified data for purposes of the Settlement Agreement:

**1261**

> The inability to verify the City's reporting is a serious roadblock to compliance. In addition to the recent evidentiary hearing, confusion over and inconsistencies within the reporting have led to dozens of informal conferences, mediation sessions, and hearings throughout this litigation. Significant time and resources have been spent by all the Parties in debating and litigating details of the City's reporting. Days of the evidentiary hearing in May and June could have been avoided if the City had simply provided the data requested of it or put on witnesses to explain its reporting. For this reason, the Court seeks to limit further confusion and pave a smoother road to compliance by requiring the Parties to choose a third party to monitor reporting as was originally agreed to in the Settlement.

*Id.*

The Alliance and City filed a Joint Report on October 10, 2025 "to update the Court regarding the status of the City Council's approval of the third-party Monitor" and "to request the Court's review and resolution of the issue pursuant to Section 24 of the Settlement Agreement." *Id.* at 1 (quoting Joint Report (Dkt. 1045) at 1). Specifically, the Parties stated that they were at an impasse and could not agree on a Monitor. Order Resolving Third-Party Monitor Appointment and Scope of Work (Dkt. 1048) at 1-4. The Court resolved the Parties' dispute under Section 24 and appointed Daniel Garrie to the Monitor position with Kenneth Mejia, current Los Angeles City Controller, assisting "by facilitating data access and coordination, per Daniel Garrie's discretion." *Id.*

The Court's Order appointing Daniel Garrie and Kenneth Mejia is currently on appeal before the Ninth Circuit and the appointments are stayed pending that appeal.

### 7. Settlement Agreement Issue: Encampment Reductions

The next issue before the Court was the City's responsibilities with respect to the encampment reductions. Section 5.2 of the Settlement Agreement requires the City to "create plans and develop milestones and deadlines for . . . (ii) the City's plan for encampment engagement, cleaning, and reduction in each Council District . . . ." Pursuant to this provision,

**1262**

the City and the Alliance agreed to the goal of 9,800 reductions of tents, makeshift shelters, cars, and RVs by June 30, 2026. Evidentiary Hearing Exhibit # 65 (Dkt. 668-1), at 82–84; Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713), at 2–3. However, the Alliance argued that the City was not "meeting its encampment reduction milestones because it is improperly counting cleanings under Care and Care+ operations as reductions and that its reporting violates the Court's March 24, 2025, Order defining reductions." Settlement Compliance Order at 51. Conversely, "[t]he City maintain[ed] that it is not required to make offers of shelter or housing as part of its encampment reduction plan."

However, at the time of the Settlement Compliance Order, the Court had already defined previously what is required to qualify as an encampment reduction. "In response to the Plaintiffs' Motions for Settlement Agreement compliance, the briefing on the Motions, and several hearings, the Court clarified on March 24, 2025, what may be counted as a reduction by the City." *Id.* (quoting Evidentiary Hearing Exhibit # 52 ("Order re Plaintiff's Motion re Settlement Agreement Compliance") (Dkt. 874).

The Court also determined that "[t]his definition of reduction is consistent with the City's representations to the Plaintiffs throughout the litigation including the City's reliance on Inside Safe encampment resolutions and interchangeable use of the terms 'resolution' and 'reduction.'" *Id.* In fact, the City's then-current "position . . . fl[ew] in the face of its own plans and promises." *Id.* The Court also concluded that "encampment reductions" and "encampment resolutions" are the same thing, and that the terminology used was of no import. *Id.* at 52-54. In short, "[t]he City's attempt to unilaterally change its definition of encampment reduction now ignores its past conduct and promises, the Court's prior Order, and the plain meaning of the Settlement Agreement." *Id.* at 54.

**G.    Material Benefits Brought About By Plaintiff and Intervenors**

The Court summed up the above findings as follows:

The City breached the LA Alliance Settlement Agreement in four ways.

The City failed to provide a plan for how it intends to create 12,915 shelter

**1263**

or housing solutions. For years, the City consistently missed its shelter and housing creation milestones. The City also improperly reported encampment reductions and disobeyed the Court's order on encampment reductions. Finally, the City flouted its reporting responsibilities by failing to substantiate its reporting and failing to provide accurate and comprehensive data when requested by the Court, Special Master Martinez, the Parties, and A&M.

Settlement Compliance Order at 56.

The Court then determined that the Alliance's request for a receivership was not the appropriate remedy because "[w]eighing all of the options, this is not the time for a receivership over the City's homelessness response system." *Id.* at 60. However, the Court did order that the City would be required to take a number of specific steps to course correct from the breaches it identified. *Id.* at 56-57. The Court ordered the City to do following:

- Provide the Parties and the Court with an updated "bed plan" for how it intends to meet its obligation to create 12,915 shelter or housing solutions by October 3, 2025
- Provide the Parties and the Court with updated bed creation milestones consistent with the updated bed plan by October 3, 2025
- Beginning in the quarterly status report slated for October 2025, the City shall include an explanation for each unit that already physically existed prior to the Settlement Agreement of how the City "created" that unit, meaning contributed to bringing that unit into existence as a shelter or housing solution for people experiencing homelessness as opposed to its prior use
- Meet and confer with Plaintiffs on selecting a third-party Monitor by August 22, 2025, and select this Monitor by September 12, 2025, subject to the Court's approval
- Attend in-person court hearings after the submission of each quarterly status report starting with the October 2025 quarterly report on November 12, 2025
- Report encampment reduction data consistent with the Court's definition beginning in the October 2025 quarterly report and provide accompanying data on shelter or housing offers to the Monitor

-22-

**1264**

Settlement Compliance Order at 57.

The Court also determined that the Alliance and Intervenors should be justly compensated for their efforts in bringing about compliance by the City if they could demonstrate that such payment was justified. *Id.* at 57-59. Therefore, the Court ordered the Parties to file briefing on attorneys' fees.

The Alliance and Intervenors' unyielding advocacy brought about significant and material benefits to the Los Angeles community. Specifically, as a result of their work the following has occurred:

- The City finally submitted an updated bed plan.
- The City finally submitted updated milestones.
- Confusion over the meaning of the term "create" in the Settlement Agreement has been resolved and the City has begun to explain in its quarterly reports how it is "creating" housing that physically existed before the Settlement Agreement.
- The Court set hard deadlines and appointed a data monitor to verify the City's data in its submission. This appointment is currently stayed by the Ninth Circuit.
- The City's willful disobeyance of the Court's March 24, 2025 order defining "encampment reductions" was pointed out and this definition was reaffirmed. The City began to report updated encampment reduction numbers.

The Alliance and Intervenors "have diligently and persistently raised important issues to the Court's attention." Settlement Compliance Order at 59. As a result, they deserve to be compensated. Indeed, the City previously agreed to pay Plaintiffs' fees and costs under similar circumstances. *See* March 8, 2024 Hearing Tr. (Dkt. 684); Joint Stipulation to Resolve Plaintiffs' Motion for Order Re: Settlement Agreement Compliance and Sanctions (Dkt. 713).

Perhaps, the entire "evidentiary hearing in May and June could have been avoided if the City had simply provided the data requested of it or put on witnesses to explain its reporting." *Id.* at 49. The City's continued obfuscation required the Court to order the City to show cause why it should not be held in contempt and resulted in the current evidentiary hearing.[30]

---

[30] It goes without saying that the fees in this Order are in no way connected to the ongoing evidentiary hearing. The Court is denying Plaintiff's request for prospective fees.

1265

## II. ATTORNEYS' FEES BRIEFING

On June 24, 2025, the Court issued its Settlement Compliance Order (Dkt. 991). In this order, the Court asked the Alliance and Intervenors to submit motions for attorneys' fees and the Court set a briefing schedule. Settlement Compliance Order at 59. On July 21, 2025, the Court granted the Parties' stipulation defining a separate briefing schedule for Intervenors' Motion (Dkt. 1013).

The Court heard oral argument on the Motions on November 12, 2025.

## III.   LEGAL STANDARD

### A.   42 U.S.C. § 1988

In an action brought pursuant to 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988(b). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437; *see also Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013) ("The prevailing party has the burden of submitting billing records to establish that the number of hours it has requested are reasonable."); *Carson v. Billings Police Dep't*, 470 F.3d 889, 891 (9th Cir. 2006). "The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397–98 (9th Cir. 1992)).

"The Supreme Court has stated that the lodestar is the 'guiding light' of its fee-shifting jurisprudence, a standard that is the fundamental starting point in determining a reasonable attorney's fee." *Van Skike v. Dir., Off. of Workers' Comp. Programs*, 557 F.3d 1041, 1048 (9th Cir. 2009) (quoting *City of Burlingtion v. Dague*, 505 U.S. 557, 562 (1992)); *see also Hensley*, 461 U.S. at 433. Accordingly, a district court is required "to calculate an award of attorneys' fees by first calculating the 'lodestar' before departing from it." *Camacho*, 523 F.3d at 982

**1266**

(quoting *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1028 (9th Cir. 2000), *as amended* (Nov. 2, 2000)). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Camacho*, 523 F.3d at 978 (quoting *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001)); *see also Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) ("The number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client."); *Caudle*, 224 F.3d at 1028; *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996), *opinion amended on denial of reh'g*, 108 F.3d 981 (9th Cir. 1997). Applying these standards, "a district court should exclude from the lodestar amount hours that are not reasonably expended because they are 'excessive, redundant, or otherwise unnecessary.'" *Seachris v. Brady-Hamilton Stevedore Co.*, 994 F.3d 1066, 1083 (9th Cir. 2021) (internal citation and quotation marks omitted). A district court "has a great deal of discretion in determining the reasonableness of the fee." *In re Smith*, 586 F.3d 1169, 1173 (9th Cir. 2009) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992)). Where "a voluminous fee application is filed in exercising its billing judgment the district court is not required to set forth an hour-by-hour analysis of the fee request." *Gates*, 987 F.2d at 1399. In those instances, "the district court has the authority to make across-the-board percentage cuts. . . in the number of hours claimed. . . as a practical means of trimming the fat from a fee application." *In re Smith*, 586 F.3d at 1174 (quoting *Gates*, 987 F.2d at 1399).

### B.   Contempt Sanctions

As the Court previously mentioned in its June 2024 ruling (Dkt. 991):

> Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962). This authority includes the ability to "fashion an appropriate sanction for conduct that abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). An assessment of attorney's fees is a "less severe sanction" that is "undoubtedly within a court's inherent

**1267**

power as well." *Id.* (citing *Hutto v. Finney*, 437 U.S. 678, 689, n.14 (1978)). This narrowly defined power can be exercised in certain circumstances. *Id.* (citation omitted). One such circumstance is assessing attorney's fees as a sanction for the "willful disobedience of a court order." *Id.* (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 (1975)). Another circumstance is awarding attorney's fees when a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46 (citation omitted). In this last instance, if a Court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party." *Id.* at 46 (citation omitted). This circumstance also extends to when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order." *Id*

The Supreme Court has made clear that such a sanction has to be compensatory in nature rather than punitive. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 102 (2017) (citing *Mine Workers v. Bagwell*, 512 U.S. 821, 826-30 (1994)); see also *Lake v. Gates*, 130 F.4th 1054, 1059 (9th Cir. 2025) (applying *Goodyear* when reviewing a district court's sanctions). Simply, this means the fee award can only redress the wronged party for losses sustained, it may not impose an additional amount as punishment for the sanctioned party's misbehavior. *Id.* at 108 (citation omitted). Thus, this Court must track the compensation to the wrong and the loss resulting from that wrong. *Id.* A compensatory sanction must be "calibrated to the damages caused by the bad-faith acts on which it is based." *Id.* (citations and quotations omitted). This kind of causal connection is appropriately framed as a but-for test where the complaining party may recover "only the

**1268**

portion of his fees that he would not have paid for but the misconduct." *Id.* at 109 (citation omitted).

The Court now turns to the burden of proof required for a finding of bad faith or willful disobedience of a court order. The Ninth Circuit has not yet expounded on the burden of proof required for a finding of bad faith and sanctions. *Lahiri v. Universal Music & Video Distrib. Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010). Even if the burden of proof lies closer to the standard of clear and convincing evidence, there could be such a finding in the present matter. The civil contempt standard for establishing willful disobedience of a court order is clear and convincing evidence. *Kelly v. Wengler*, 979 F. Supp. 2d 1104, 1108 (D. Idaho 2013) (citing *Battaglia v. United States*, 653 F.2d 419, 422 (9th Cir. 1981).

## IV. DISCUSSION

Plaintiff requests $1,600,633.00 in fees and $45,467.21 in costs. (Dkt. 1027 at 24).  The Court will conduct a prevailing party analysis first and then determine the lodestar amount.

### A.    Prevailing Party

The Court concludes that Plaintiff is the prevailing party. A prevailing party is one who succeeds on any significant issue in the litigation, resulting in a "material alteration of the legal relationship of the parties." *Tex. State Tchrs. Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782, 792–93 (1989). The Ninth Circuit has found that a party can "prevail" where the party enters into a legally enforceable private settlement agreement against Defendants." *Richard S. v. Dep't of Developmental Servs. Of State of California*, 317 F.3d 1080, 1086 (9th Cir. 2003) (citing *Barrios v. California Interscholastic Fed'n*, 277 F.3d 1128, 1134 (9th Cir. 2002)). Here, Plaintiff is entitled to attorney's fees for monitoring Defendant's compliance with the settlement agreement. *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 451 (9th Cir. 2010).  The Court has summarized all the benefits brought about by the motions for settlement compliance above. *See* Section I.H.

Plaintiff and Intervenors' advocacy in alerting the Court to breaches of the settlement agreement "meaningfully alters the legal relationship between [the] parties . . . [because] it allows one party to require the other party 'to do something it otherwise would not be required

**1269**

to do.'" *Jankey*, 537 F.3d at 1130 (quoting *Fischer*, 214 F.3d at 1118). Therefore, Plaintiff and Intervenors are the prevailing party.

Defendant argues that there is no entitlement to attorneys' fees because the Alliance dismissed their § 1983 claims with prejudice and entered into a settlement agreement, pointing to caselaw allowing attorney's fees only for consent agreements. All. Opp'n (Dkt. 1023) at 22. Citing *Lackey v. Stinnie*, Defendants argue that stipulation to dismissal of § 1983 claims precludes Plaintiff from being the prevailing party. *Id.* at 20. However, at issue in *Lackey* was whether a preliminary injunction can conclusively resolve the rights of parties on the merits and can confer prevailing party status as a result. *Lackey v. Stinnie*, 604 U.S. 192, 201 (2025). The Supreme Court ultimately found that the trial court's preliminary injunction did not qualify plaintiffs as the prevailing party because the preliminary injunction represented only "temporary success at an intermediary stage of the suit." *Id.* at 668-69. In sharp contrast is the present case where Plaintiff achieved a legally enforceable settlement agreement that the Court has been monitoring. This settlement agreement requires the City to actually address the homelessness pandemic on its doorstep and is not only an interim step in the litigation.

Additionally, the Court finds unpersuasive Defendant's argument that settlement agreements do not convey prevailing party status given guidance from the Ninth Circuit finding the contrary. In *Prison Legal News v. Schwarzenegger*, the Court found the differences between a settlement agreement and consent decree "immaterial" under Section 1988 because both lead to defendants fulfilling their obligations 'more speedily and reliably.' *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 451 (9th Cir. 2010). Here, Plaintiff and Intervenors have been monitoring the City's breaches of the settlement agreement and have been instrumental in holding the City accountable to the very settlement agreement it signed. The Court reiterated this in its opinion following the seven-day evidentiary hearing held in May 2025, where it found that "by consistently refusing to provide explanations and verification of its reporting, the City has forced Plaintiff into the position of investigating and monitoring" and spending hundreds of hours litigating the City's many failings. Settlement Compliance Order at 57-58.

**1270**

**B.     Lodestar**

Plaintiff seeks a total fee amount based on its calculated lodestar. Defendants dispute the fee amount, arguing that Plaintiff's hourly rates are excessive, that Plaintiff utilizes block billing, that Plaintiff's billing entries are too heavily redacted, and that as such, the lodestar should also be reduced. *See generally* All. Opp'n. Defendants also argue that Plaintiff's ask for attorney's fees are too expansive because their billing entries include events that occurred before the Court issued its Settlement Compliance Order (Dkt. 991). *Id.* at 14.

The Court first turns to Plaintiff's hourly rates and billing entries. Then the Court turns to Plaintiff's counsels' hours and whether any further lodestar adjustments need to be made.

### 1.  Plaintiff's Billing Rates

A "reasonable hourly rate" for purposes of determining the appropriate lodestar figure "is ordinarily the 'prevailing market rate in the relevant community.'" *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016) (citation omitted). The Ninth Circuit has "repeatedly held that the determination of a reasonable hourly rate is not made by reference to the rates actually charged to the prevailing party." *Welch v. Metro Life Ins. Co.*, 480 F.3d 942, 946 (9th Cir. 2007). "Rather, billing rates 'should be established by reference to the fees that private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of similar complexity.'" *Id.*

Plaintiff requests an hourly rate of $1295 for their counsel. All. Reply at 16. The Court finds these rates reasonable. Plaintiff's counsel has extensive experience working on complex civil litigation matters in federal court. All. Mot. at 9. Their requested rate of $1295 falls within the range of what their firm—Umhofer, Mitchell & King—charges for partners. *Id.* at 9. The firm's standard rate for partners in 2025 was $1250 per hour, with present matters ranging from $700 to $1450 for partners. Declaration of Matthew K. Umhofer ("Umhofer Decl.") (Dkt. 1015-1) ¶ 15. As a direct comparison, Defendant's counsel is also being paid a blended rate of $1295 for this matter, which they characterized as a discount. Nov. 12, 2025 Hearing Tr. (Dkt. 1076) at 59:18-60:23. Therefore, the Court finds that Plaintiff's request for $1295 per hour is reasonable.

## 2.     Plaintiff's Billing Entries

In the Ninth Circuit, "[t]he number of hours to be compensated is calculated by considering whether, in light of the circumstances, the time could reasonably have been billed to a private client." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). Compensation can be awarded for expenses arising from the ligation of attorney's fees. *Kinney v. Int'l Bhd. of Elec. Workers*, 939 F.2d 690, 694 (9th Cir. 1991). A district court should exclude hours that are "excessive, redundant, or otherwise unnecessary." *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1203 (9th Cir. 2013). "[W]hen faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure 'as a practical means of trimming the fat from a fee application.'" *Gates v. Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992).

Defendants argue that the Court should make across the board cuts to Plaintiff's request because Plaintiff is asking for compensation on matters they did not prevail on or are unrelated to the May 2025 hearing. All. Opp'n at 17. The Court finds this argument unpersuasive because Plaintiff is entitled to attorney's fees and costs for related claims that involve "a common core of facts," even if these claims were unsuccessful. *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986). The test for making this determination is whether the relief sought under the unsuccessful claim "is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." *Id.* Defendants cite to Plaintiff's unsuccessful request for a receivership and withdrawal of subpoenas for Mayor Bass and Councilmembers Rodriguez and Park as failed claims with no relation to the relief granted by this Court. All. Opp'n at 23. Even though Plaintiff was not ultimately successful in every single claim, their advocacy during these hearings and push for transparency brought to light the City's deficiencies in fulfilling the promises it made to both its residents and this Court.

Defendants further argue that Plaintiff's block billing and redacted entries make it difficult to understand exactly what work Plaintiff's attorneys preformed. All. Opp'n at 14. "Block billing is the time-keeping method by which each lawyer and legal assistant enters the

total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945 n. 2 (9th Cir. 2007). The fee applicant bears the burden to document the time for which compensation is requested. *Id.* at 945–46. A district court may therefore impose reductions if it is unable to attribute hours to one or another task because of, for example, block billing. *Id.* at 948. The Court does not find reductions necessary in this matter. The City does not point to any specific entries that they deem to be block billed or too heavily redacted. The Court having reviewed Plaintiff's entries also does not find examples of expansive block billing by Plaintiff.

### 3.    Lodestar Multiplier

Plaintiff is asking for a lodestar multiplier of 2.5. All. Mot. at 19. Multipliers are awarded for factors not already accounted for in the lodestar calculation. *Perdue v. Kenny A.*, 559 U.S. 542, 553 (2010). Plaintiff cites to factors such as "(5) the customary fee, . . . (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases" as not being accounted for in the lodestar calculations. " *Kelly 1*, 7 F. Supp. 3d at 1081.

Plaintiff's counsel has persevered through prolonged litigation. And Plaintiff's counsel has had to advance costs, with no guarantee of success, for the City's repeated noncompliance and refusal to commit to transparency regarding its efforts to combat homelessness. While acknowledging these factors, the Court will not be applying a multiplier at this time. Plaintiff's counsel should be justly compensated for the significant time and labor they have dedicated to this case and the Court finds that the lodestar calculation, absent a multiplier, adequately does so.

### 4.    Prospective Fees

Plaintiff asks the Court for prospective fees they anticipate accumulating as they continue to hold the City accountable for the commitments it made in the Settlement Agreement. All. Mot. at 19. While acknowledging significant noncompliance by the City in the

**1273**

past, and the expenses associated with monitoring (that the City could have reduced through its compliance) the Court declines to award prospective fees.

The Court believes that future compliance is possible. The City can choose to adhere to the agreement it made with Plaintiff. Should Plaintiff incur future attorney' fees and expenses in monitoring compliance, it may file another motion for attorney's fees.

### 5.      Fees Award for Paul Webster

Paul Webster is the part-time executive director for LA Alliance and Plaintiff is seeking fees for his time. All. Mot. at 10. Mr. Webster has previous experience working as Senior Policy Advisor at the U.S. Department of Housing and Urban Development and has prior experience working on homelessness policy on the local, state, and federal levels. *Id.* The Court understands that Mr. Webster has spent significant time monitoring City compliance and assisting counsel in enforcing the Settlement Agreement. *Id.* However, the Court declines to exercise its discretion at this time to award consulting fees for Mr. Webster as a sanction. *See Barnes v. Dalton*, 158 F.3d 1212, 1215 (11th Cir. 1998).

### 6.      Lodestar Calculation

The Court now moves to the lodestar calculation. The lodestar figure submitted by Counsel is $1,600,633.00 for attorney's fees and $45,467.21 for costs. This lodestar includes the time Plaintiff spent litigating their request for attorney's fees, and the sought costs include fees for Mr. Webster. *See* Declaration of Matthew Donald Umhofer (Dkt. 1015-1), Ex. A; Declaration of Elizabeth Mitchell (Dkt. 1027-1), Ex. A.[31] For lodestar calculation purposes, the Court finds these amounts are reasonable.

---

[31] The Court has combined the two tables provided by the Alliance for ease of reference.

-32-

**1274**

| Name | Title | Rate Billed | Total Amount Billed | Total Time Billed |
|---|---|---|---|---|
| Elizabeth Mitchell | Partner | $1,295.00 | $988,473.50 | 763.3 |
| Matthew Umhofer | Partner | $1,295.00 | $300,440.00 | 232 |
| Diane Bang | Counsel | $1,295.00 | $67,372.00 | 52 |
| Eugene Lim | Associate | $1,295.00 | $42,217.00 | 32.6 |
| Adam Snyder | Associate | $1,295.00 | $7,381.50 | 5.7 |
| Madeline Matson | Paralegal | $500.00 | $78,750.00 | 157.9 |
| Jon Powell | Paralegal | $500.00 | $51,850.00 | 103.7 |
| Patrick Nitchman | Paralegal | $500.00 | $41,750.00 | 83.5 |
| Jennifer Mitchell | Paralegal | $500.00 | $2,500.00 | 5 |
| Ingrid Nitchman | Admin | $150.00 | $8,430.00 | 56.2 |
| Omid Rahimdel | Law Clerk | $150.00 | $11,625.00 | 77.5 |
| **Grand Total** | | | $1,600,633.00 | 1,564.30 |

### C.    Costs

Plaintiff seeks $45,467.21 in costs. (Dkt. 1027 at 1). Prevailing parties are entitled to having their cost reimbursed. *Dawson v. City of Seattle*, 435 F.3d 1054, 1070 (9th Cir. 2006). Having reviewed Plaintiff's submission, the Court approves these costs, absent compensation

**1275**

for Mr. Webster as discussed above. Therefore, the total amount of costs awarded is $5067.21.[32]

### D. Intervenors

The Intervenors, Los Angeles Community Action Network and LA Catholic Worker, seek $201,182.50 in fees and $160.00 in costs. Ints.' Mot. at 7. They have been active and invaluable participants in the proceedings, especially those for post-settlement compliance. Intervenors directly represent unhoused people on Skid Row and have connected the lived experiences of their clients to the proceedings, focusing the proceedings to the reality on the ground. Their expertise and commitment to serving Los Angeles' unhoused population, demonstrated by their participation in every hearing over the last five years, deserves compensation.

Intervenors are asking for fees and costs associated with the May 2025 evidentiary hearing, Intervenors' brief in support of sanctions, and the present fees motion, including subsequent replies. Ints.' Mot. at 8. Under 42 U.S.C. § 1988, the Court awards Intervenors their sought $201,182.50 in attorneys' fees. Like Plaintiff, Intervenors have devoted substantial time and effort to this litigation, as well as in settlement monitoring. As such, Intervenors are entitled to attorneys' fees as well. *See Seattle Sch. Dist. No. 1 v. State of Wash.*, 633 F.2d 1338, 1350 (9th Cir. 1980).

Defendant argue that Intervenors are not entitled to fees under § 1988 for the same reasons they cited for Plaintiff. Int. Opp'n at 3. Additionally, Defendants argue that Intervenors did not prove a violation of the Settlement Agreement or the resolution of a § 1983 claim in their favor, resulting in to prevailing-party status. *Id.* For the reasons stated above when discussing Plaintiff, the Court disagrees. Intervenors' extensive evidence and advocacy during hearings have played a significant role in holding the City accountable to its commitments and the Court relied on Intervenors' briefing for its June 2025 opinion.

Intervenors seek an hourly rate of $1025 for Ms. Myers and an hourly rate of $600 for Ms. Geczy. Ints.' Mot. at 14-15. These rates are entirely reasonable. Indeed, these proposed

---

[32] Plaintiff submitted that they had $3,847.21 in costs between October 2024 and June 2025. All. Mot., Ex. C. Plaintiffs further submitted they had $1,220 in costs from July 2025 to August 2025. All. Reply, Ex. C.

1276

rates are less than the blended rate for the City of Los Angeles's outside counsel, as well as the counsel for LA Alliance. Therefore, having reviewed the line items submitted by Intervenors, the Court grants $201,182.50 in fees and $160.00 in costs.

### E.    Inherent Powers Legal Analysis

Though Intervenors and Plaintiffs are entitled to attorney's fees under 42 U.S.C. § 1988, attorneys' fees can also alternatively be awarded on the basis of the court's inherent authority to fashion attorney's fees as sanctions. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). The Court can assess attorney's fees for the 'willful disobedience of a court order'" or for litigation conduct undertaken "'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 258–59 (1975). The Court finds that attorney's fees should be assessed in both instances in the present matter.

Defendants argue that the Court should not issue attorney's fees as sanctions, mistakenly interpreting the Court's June 2025 order, where the Court stated, "As a sanction for the City's noncompliance, including disobeying the Court's order on encampment reductions, Plaintiffs' efforts should be compensated." Settlement Compliance Order at 59. The question before the Court is not whether sanctions are warranted, because that was extensively opined upon in the Settlement Compliance Order. Rather, Plaintiff and Intervenors were tasked by the Court to "show how they have been harmed by the City's conduct and the resulting losses to them under the law." Settlement Compliance Order at 59. Both Plaintiff and Intervenors have successfully fulfilled this burden. Therefore, the Court will only briefly address Defendant's arguments that sanctions cannot be issued.

Plaintiff and Intervenors demonstrated that attorney's fees should be awarded because the City displayed both a willful disobedience of two court orders and acted in bad faith, vexatiously, wantonly, or for oppressive reasons. The two court orders the City defied are the Settlement Agreement (Dkt. 429-1) and the March 24, 2025 Order (Dkt. 874). The Court found in its Settlement Compliance Order, which Plaintiff further points to, demonstrations on how the City acted in bad faith, vexatiously, wantonly, or for oppressive reasons, All. Reply (Dkt. 1027) at 9-10:

**1277**

- "The pattern is clear: documentation is withheld until exposure is imminent, public accountability is resisted until judicially mandated, and the truth of reported progress remains clouded by evasive recordkeeping. As the Court observed, these failures have undermined public trust and judicial trust alike." Settlement Compliance Order at 39.

- "[T]he City has repeatedly ignored the [data] errors or attacked the messenger instead of engaging with and correcting the issues. This pattern has persisted for years and is untenable . . . . The City's inability or unwillingness to verify its reporting . . . was on stark display during the evidentiary hearing. At no point during the costly and time-intensive seven-day hearing did the City attempt to substantiate its reporting which had been called into question by Special Master Martinez, in addition to other witnesses, and which A&M had not been able to replicate." *Id.* at 48.

The City's bad faith in complying with the Settlement Order has caused significant costs to Plaintiff and Intervenor. This bad faith played a substantial role in the May 2025 evidentiary hearing that both Plaintiffs and Intervenors spent time and effort litigating. But this bad faith predates the evidentiary hearing. The City's repeated bad faith noncompliance is the but for cause in both the Plaintiff's and Intervenors' efforts to hold the City accountable in multiple prior hearings. *See generally* Settlement Compliance Order. The City's bad faith is clear and sanctions are warranted.

Additionally, the Court also finds assessing attorney's fees as a sanction appropriate due to the City's willful disobedience of multiple court orders. First, the settlement agreement is itself is a court order, having been incorporated into the Court's dismissal order under *Kokkonen. Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994). As the Court already found in its June 2025 order, the settlement agreement was violated in four ways:

> The City failed to provide a plan for how it intends to create 12,915 shelter or housing solutions. For years, the City consistently missed its shelter and housing creation milestones. The City also improperly reported encampment reductions and disobeyed the Court's order on

**1278**

encampment reductions. Finally, the City flouted its reporting responsibilities by failing to substantiate its reporting and failing to provide accurate and comprehensive data when requested by the Court, Special Master Martinez, the Parties, and A&M.

Settlement Compliance Order at 56.

The Court found these breaches applying a clear and convincing standard. *See generally id*. But for the City's breaches, the Court would need not have conducted its seven-day evidentiary hearing in May 2025. Further, the City refused to verify its compliance data submitted to the Court, as required by the Settlement Agreement. But for this noncompliance, Plaintiff and Intervenors would not have spent resources trying to bring the City into compliance.

The Court has already found that the City defied the Court's March 24, 2025 Order (Dkt. 874). In its Settlement Compliance Order, the Court said "The City's attempt to unilaterally change its definition of encampment reduction now ignores its past conduct and promises, the Court's prior Order, and the plain meaning of the Settlement Agreement." Settlement Compliance Order at 54. The City's defiance of the March 24, 2025 Order was a but for cause of much of the evidentiary hearing in May 2025. The hearing revealed clear and convincing evidence that the City willfully ignored the March 2025 Order. Having fulfilled their burden, the Court therefore awards, on an alternative basis to § 1988, Intervenors and Plaintiff attorney's fees due to the City's sanctionable conduct.

## V. CONCLUSION

The $1,600,633.00 million and $201,182.50 the Court awards to Plaintiff and Intervenors respectively is reasonable, especially in light of the approximately $5.9 million that the City's outside counsel is charging. This is the same case, and the fees the Court awards are well within the realm of reasonableness. Accordingly, the Court **GRANTS IN PART** Plaintiff's Motion and **GRANTS** Intervenors' Motion.

**1279**

As the Court noted above, this case is about far more than the reporting of metrics. Quite simply, it is about providing housing and shelter to unhoused people and getting them off the street. As laid out above, there have been numerous instances of fraud and corruption proliferating unabated within the homelessness-industrial complex. Without accurate data and reporting, the Court must take the City at its word. The Court declines to do so.

"[B]y consistently refusing to provide explanations and verification of its reporting, the City has forced Plaintiff into the position of investigating and monitoring" and spending hundreds of hours litigating the City's many failings. Settlement Compliance Order at 57-58. It has fallen to Plaintiff, Intervenors, and journalists to point out the deficiencies in the City's reporting. Plaintiff and Intervenors must be compensated for this.

DATED:      January 6, 2026

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE

**1280**

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
   tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
   mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
   kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
   bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
   akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
   pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>                    Plaintiff,<br><br>         v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>                    Defendant. | CASE NO. 2:20-cv-02291 DOC (KES)<br><br>**NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES**<br><br>Honorable David O. Carter, United States District Judge<br><br>Action Filed:     March 10, 2020 |

Gibson, Dunn &
Crutcher LLP

NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

**1281**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**NOTICE IS HEREBY GIVEN** that Defendant City of Los Angeles hereby appeals to the United States Court of Appeals for the Ninth Circuit from this Court's order dated January 6, 2026, awarding $1,600,633.00 in attorneys' fees and $5,067.21 in costs to Plaintiff, and $201,182.50 in attorneys' fees and $160.00 in costs to Intervenors (Dkt. 1127).

DATED: January 8, 2026

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _/s/ Theane Evangelis_
　　　Theane Evangelis

_Attorneys for Defendant CITY OF LOS ANGELES_

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
　tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
　mmcrae@gibsondunn.com
KAHN A. SCOLNICK, SBN 228686
　kscolnick@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
　bhamburger@gibsondunn.com
ANGELIQUE KAOUNIS, SBN 209833
　akaounis@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
　pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

_Attorneys for Defendant_
_CITY OF LOS ANGELES_

Gibson, Dunn &
Crutcher LLP

2

NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

1282

# REPRESENTATION STATEMENT
## Ninth Circuit Rule 3-2(b)

**Counsel for Defendant City of Los Angeles**

Theane Evangelis
 tevangelis@gibsondunn.com
Marcellus McRae
 mmcrae@gibsondunn.com
Kahn A. Scolnick
 kscolnick@gibsondunn.com
Bradley J. Hamburger
 bhamburger@gibsondunn.com
Daniel R. Adler
 dadler@gibsondunn.com
Patrick J. Fuster
 pfuster@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:   213.229.7000
Facsimile:    213.229.7520

Hydee Feldstein Soto
Valerie Flores
Arlene N. Hoang
Jessica Mariani
CITY ATTORNEY'S OFFICE
200 North Main Street
City Hall East, 6th Floor
Los Angeles, CA 90012
Telephone:   213.978.7508

**Counsel for Defendant County of Los Angeles**

Mira Hashmall
 mhashmall@millerbarondess.com
Jason H. Tokoro
 jtokoro@millerbarondess.com
Lauren M. Brody
 lbrody@millerbarondess.com
MILLER BARONDESS LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, CA 90067
Telephone:   310.552.4400
Facsimile:    310.552.8400

Gibson, Dunn &
Crutcher LLP

3

1283

**Counsel for Plaintiff LA Alliance for Human Rights**

Matthew Donald Umhofer
   mumhofer@umklaw.com
Elizabeth A. Mitchell
   emitchell@umklaw.com
UMHOFER, MITCHELL & KING LLP
767 South Alameda Street, Suite 221
Los Angeles, CA 90017
Telephone:   213.394.7979
Facsimile:   213.529.1027

**Counsel for Intervenors Orange County Catholic Worker, Los Angeles Catholic Worker, and Los Angeles Community Action Network**

Shayla R. Myers
   smyers@lafla.org
Isabelle M. Geczy
   igeczy@lala.org
LEGAL AID FOUNDATION OF LOS ANGELES
1550 West 8th Street
Los Angeles, CA 90017
Telephone:   213.640.3983
               323.801.7990

Carol A. Sobel
   carolsobel@aol.com
LAW OFFICE OF CAROL A. SOBEL
725 Arizona Avenue
Santa Monica, CA 90401
Telephone:   310.393.3055

Catherine Sweetser
   catherine.sdshhh@gmail.com
SCHONBRUN SEPLOW HARRIS & HOFFMAN, LLP
11543 Olympic Boulevard
Los Angeles, CA 90064
Telephone:   310.396.0731

Brooke Weitzman
   bweitzman@eldrcenter.org
William Wise
   bwise@eldrcenter.org
ELDER LAW AND DISABILITY RIGHTS CENTER
1535 East 17th Street, Suite 110
Santa Ana, CA 92705
Telephone:   714.617.5353

Gibson, Dunn &
Crutcher LLP

NOTICE OF APPEAL OF DEFENDANT CITY OF LOS ANGELES
2:20-cv-02291 DOC (KES)

1284

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                    Date:  January 14, 2026

Title: LA ALLIANCE FOR HUMAN RIGHTS, ET AL., V. CITY OF LOS ANGELES, ET AL.

PRESENT:

THE HONORABLE DAVID O. CARTER, JUDGE

| Karlen Dubon | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):   SUPPLEMENTAL NOTICE TO OSC IN RE CONTEMPT – CITY OF LOS ANGELES**

On November 7, 2025, this Court filed and served an OSC In Re Contempt on the City of Los Angeles arising out of its alleged misconduct related to the 2022 settlement agreement in this matter. In that OSC notice this Court ordered the City of Los Angeles to appear before it on November 12, 2025 "to show cause why it should not be held in contempt."

Later in November 2025, in response to a request for clarification by the City of Los Angeles, this Court filed its Order Responding to City's Request for Clarification.

On November 12, 2025, this Court began to hear testimony related to the allegations contained in the notice and clarification. That contempt hearing continues.

Based upon newly reported information, there is reason to believe that the City of Los Angeles may have engaged in additional, previously unknown misconduct related to the 2022 settlement agreement when the City knowingly, willfully and intentionally misrepresented material facts to the Court.

Specifically, the Court is concerned that a vote may have been taken by the City Council in violation of the Brown Act. This Court is also concerned about the City's representation that

1285

the City Council had passed the homeless encampment reduction plan that was a critical and material issue before the Court. The Court has recently become aware of reports published in the mainstream media that suggest the City Council never voted to pass such a resolution. This Court has received and reviewed a ruling written and filed by Judge Curtis Kin who sits on the Los Angeles County Superior Court. In his ruling, Judge Kin found that in January of 2024 the City of Los Angeles violated the state of California's well-established Brown Act as it considered and took action on the homeless encampment reduction resolution that is at issue here.

Since the current contempt hearing is in recess, rather than initiate a new OSC proceeding against the City of Los Angeles, in the interest of judicial economy, the Court elects to supplement its prior notice to add this new factual allegation to the current OSC proceeding.

The Parties are **ORDERED** to preserve all evidence in this matter. The Parties are also **ORDERED** to lodge a copy of Judge Kin's briefing schedule in this matter by Wednesday, January 21, 2026 at 12:00 p.m.

It is therefore ordered that the City of Los Angeles shall appear before this Court at a time and place to be determined by the Court that will afford the City of Los Angeles an adequate opportunity to prepare itself to respond to this new allegation.

This Court again invites Mayor Karen Bass and Council President Marqueece Harris-Dawson to be present for these proceedings.

Judge Kin's ruling is attached to this Order as Exhibit A. A Los Angeles Times article covering this issue is attached as Exhibit B.

The Clerk shall serve this minute order on the parties.

Initials of Deputy Clerk: kdu

**1286**

# EXHIBIT A

**FILED**
Superior Court of California
County of Los Angeles

JAN 05 2026

David W. Slayton, Executive Officer/Clerk of Court
By: M. Mort, Deputy

**Superior Court of California**
**County of Los Angeles**

|  |  |
|---|---|
| CANGRESS, | Case No.   25STCP00261 |
| Petitioner, | |
| vs. | **RULING ON VERIFIED PETITION FOR WRIT OF MANDATE** |
| CITY OF LOS ANGELES, | Dept. 86 (Hon. Curtis A. Kin) |
| Respondent. | |

Petitioner CANGESS, dba Los Angeles Community Action Network, petitions for a writ of mandate declaring that respondent City of Los Angeles ("City") violated the Ralph M. Brown Act ("Brown Act") during its January 31, 2024 and May 1, 2024 meetings and ordering that City disclose certain information pertaining to those meetings. For the reasons that follow, the Court finds that the City violated the Brown Act.

## I.   BACKGROUND

### A.   The LA Alliance Federal Litigation

In response to growing homelessness impacting City, in March 2020, a group of business and property owners in Skid Row, as well as individual property owners and residents, initiated a federal lawsuit against the City and the County of Los Angeles ("County"), *LA Alliance for Human Rights v. City of Los Angeles*, No. 2:20-cv-02291 (C.D. Cal. Mar. 16, 2020) ("*LA Alliance* Action"). Plaintiffs in the *LA Alliance* Action alleged that the City and County failed to take necessary steps to clear homeless encampments and sought an injunction that would compel the clearing of those encampments. (AR 920-30.) Petitioner intervened in the *LA Alliance* Action in order to protect the interests of its unhoused members and avoid them being criminalized and losing their belongings. (AR 1010-17.) The district court granted petitioner intervention as a matter of right, reasoning that the *LA Alliance* Action

1

**1288**

could undermine a settlement petitioner had reached with the City in a prior federal action.[1] (AR 1013-15.)

Following the Ninth Circuit's reversal of the district court's "sweeping preliminary injunction" in the *LA Alliance* Action (*see LA Alliance for Human Rights*, 14 F.4th 947), LA Alliance amended its complaint, adding several different causes of actions against the City and the County. (AR 1329.) After the City and County moved to dismiss the amended complaint (AR 1515), the district court ordered the parties to engage in mandatory settlement talks. (AR 1517-18.) Through these efforts, the City reached a preliminary settlement agreement with LA Alliance in spring 2022. (AR 1019.) By June 2022, the district court approved this settlement. (AR 1027, 1520, 1522.) In return for dismissal from the *LA Alliance* Action (AR 1027), the City agreed to "create and develop milestones and deadlines" over a five-year period for (1) the City's creation of 12,915 shelter and housing units and (2) "the City's plan for encampment engagement, cleaning, and reduction in each Council District" and in the City. (Opp. at 7:19-22; AR 1026-29, 1312.) Per the agreement, the district court retained jurisdiction to oversee and enforce the agreement, and the City was required to submit quarterly updates to the court. (AR 1308, 1313.)

The County was not a party to the settlement between LA Alliance and the City, but, in September 2022, the County entered into a preliminary agreement with the City to work together to address homeless services and develop a memorandum of understanding between them toward that end. (AR 817, 1314-16.)

Months later, the County and LA Alliance reached their own settlement, which the district court initially rejected in April 2023. (AR 1374-75, 1400-01, 1525-32.) By September 2023, those parties reached a new settlement agreement. (AR 1031-38, 1533, 1537, 1544.) In that agreement, "the County expressly agreed to support the settlement agreement between LA Alliance and the City. The County agreed to provide access to County health care data; to dedicate or prioritize various types of County beds for the homeless in the City; to increase homeless outreach teams; to work with the City to create new housing on publicly owned land; and to fund, in an amount to be determined by the City and County, supportive services for those in City housing under the City's settlement." (Opp. at pg. 9:4-9; AR 1035, 1042–43.) On September 29, 2023, pursuant to the settlement and stipulation between LA Alliance and the County, the district court dismissed the remainder of

---

[1]     In *Mitchell v. City of Los Angeles*, No. 2:16-cv-01750 (C.D. Cal.), petitioner alleged that City was violating the U.S. Constitution through its practice of clearing the homeless and their property. "The *Mitchell* settlement, [applied] for three years to certain blocks in the Skid Row area, limit[ed] the City's ability to clear or destroy the property of unhoused people and requires notice of any cleanups." (*LA Alliance for Human Rights v. City of Los Angeles* (9th Cir. 2021) 14 F.4th 947, 953.)

2

1289

the *LA Alliance* Action. (AR 1077-79, 1078.)  The district court agreed to retain jurisdiction to oversee and enforce their settlement agreement. (AR 1079.)

## B.   Closed Sessions Following Settlement in *LA Alliance* Action

Following dismissal of the City from the *LA Alliance* Action, the City Council has met eleven times in closed sessions in connection with that federal action. (AR 179-82.)

### 1.   *January 31, 2024 Closed Session*

By January 2024, LA Alliance had threatened to move for sanctions against the City due to the City's purported failure to meet certain obligations under the settlement agreement. (AR 1111-14.) LA Alliance demanded City agree to pay $1 million and accept its encampment reduction plans. (AR 1111-14.) On January 31, 2024, City Council held a closed session pursuant to Government Code § 54956.9(d)(1) for the stated purpose of "confer[ring] with its legal counsel" regarding the *LA Alliance* Action. (AR 306.) Following the meeting, no actions were reported. (AR 173 at ¶ 10, 179-82, 328.)

On February 2, 2024, LA Alliance filed a motion for sanctions as it had threatened. (AR 1546, 1084-86.) On April 4, 2024, LA Alliance and the City filed a joint stipulation indicating their resolution of the sanctions motion.  In that joint stipulation, the parties stated: "The 9,800 encampment reduction plan and milestones were presented to the City Council on January 31, 2024, which approved them without delay." (AR 1178.) The City also agreed to pay LA Alliance's attorney's fees and costs and pay for a Court-ordered audit of the homelessness programs. (AR 1178, 1549.)

When petitioner subsequently requested from the City Clerk's Office details regarding the January 31, 2024 closed session and approval of the encampment reduction plan ("ERP"), the City did not respond. (AR 172 ¶¶ 4-6 & 9.)

### 2.   *May 1, 2024 Closed Session*

In the September 2022 preliminary agreement between the City and County, the County agreed to provide support for various obligations the City had undertaken as part of its settlement agreement with LA Alliance. (AR 818-21.) The City and County also indicated that their preliminary agreement would be used to "inform the development of a Memorandum of Understanding (MOU) between the City and the County, which will be submitted to the City Council and Mayor, and the Count Board of Supervisors, for approval." (AR 818.)

On May 1, 2024, the City Council held a closed session, citing Government Code § 54956.9(d)(1) as the basis for "confer[ring] with its legal counsel" regarding the *LA Alliance* Action. (AR 429-30.) Following this meeting, nothing was immediately reported. (AR 173 at ¶ 11, 179-82, 450-51.)

3

**1290**

One day later, during a May 2, 2024 hearing before the district court in the *LA Alliance* Action, counsel for the City confirmed that an MOU had been entered into between the City and County. (AR 1183.) An inter-departmental correspondence from the City's Chief Administrative Office to the City Council, dated May 31, 2024, recounts that his office "met with Council over the course of several closed sessions to discuss the negotiations with the County over the final terms of the MOU" and that "[t]he MOU was executed on May 2, 2024." (AR 823.) The approved MOU was filed in a separate City Council file, but no votes were registered. (AR 172, 178.)

Under the MOU (AR 852-66), the County agreed to the following: (1) "reimburse the City for the interim housing beds created under the City's settlement and [ ] provide public assistance and mental health services to the individuals using those beds"; (2) "contract for and fund similar services for the permanent supportive housing units that the City was establishing under the City's settlement, and [ ] prioritize referrals to County-funded or County-operated units"; (3) "assign[] the exact number of outreach and multi-disciplinary teams for the City's use, just as the City's settlement had requested"; and (4) "give the City access to County-funded high service need beds and priority access to beds meant for those with mental health and substance use disorders, consistent with the City's settlement." (Opp. at 10:10-18.) The MOU will expire based on the timeline set forth in the City's settlement with LA Alliance and caps the County's funding for certain obligations at $259 million. (*Ibid.*)

### C.   The Petition for Writ of Mandamus

On January 24, 2025, petitioner filed its verified petition for writ of mandate. On March 17, 2025, respondent filed its answer. On September 23, 2025, petitioner filed its opening brief and appendix of evidence. On October 21, 2025, respondent filed its opposition brief and its own appendix of evidence. On November 5, 2025, petitioner filed its reply and supplemental appendix of evidence.

## II.   RELEVANT LAW

### A.   CCP § 1085

Petitioner seeks a traditional writ of mandamus pursuant to CCP § 1085. (Pet. at 2:5-7.) "There are two essential requirements to the issuance of a traditional writ of mandate: (1) a clear, present and usually ministerial duty on the part of the respondent, and (2) a clear, present and beneficial right on the part of the petitioner to the performance of that duty." (*California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 704.) "An action in ordinary mandamus is proper where...the claim is that an agency has failed to act as required by law." (*Id.* at 705.)

4

An agency is presumed to have regularly performed its official duties. (Evid. Code § 664.) "The petitioner always bears the burden of proof in a mandate proceeding brought under Code of Civil Procedure section 1085." (*California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1154.)

## B.    The Brown Act

The purpose of the Brown Act is to ensure the public's right to attend public meetings, facilitate public participation in all phases of local government decision making, and curb misuse of the democratic process by secret legislation of public bodies. (*Chaffee v. San Francisco Library Commission*, (2004) 115 Cal.App.4th 461, 469; *Sacramento Newspaper Guild v. Sacramento County Bd. of Supervisors* (1968) 263 Cal.App.2d 41, 50.) The Brown Act "is a remedial statute that must be construed liberally so as to accomplish its purpose." (*Shapiro v. Board of Directors*, (2005) 134 Cal.App.4th 170, 181 [citing *Epstein v. Hollywood Entertainment Dist. II Bus. Improvement Dist.*, (2001) 87 Cal.App.4th 862, 869].)

To implement the legislative purpose of the Brown Act, section 54953 provides for open meetings, stating: "All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency, except as otherwise provided by this chapter." (Gov. Code § 54953(a); *see Los Angeles Times Communications v. Los Angeles County Bd. of Supervisors* (2003) 112 Cal.App.4th 1313, 1321.) The City is a "local agency" under the Brown Act.  (Gov. Code § 54951.) The Brown Act "requires the meetings of such bodies to be open to the public, held on a regular schedule, and conducted in accordance with an agenda available in advance of the meeting." (*Olson v. Hornbrook Community Services Dist.* (2019) 33 Cal.App.5th 502, 514; *see* Gov. Code §§ 54950-54954.)

The Brown Act does not prevent a legislative body from holding a closed session to confer with legal counsel regarding pending litigation. The legislative body of a local agency is permitted to hold closed sessions during a regular or special meeting to confer with, or receive advice from, its legal counsel regarding pending litigation "when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation." (Gov Code § 54956.9(a).) Litigation is considered pending when formal litigation proceedings have been initiated, there is significant exposure to litigation, or the legislative body is deciding whether to initiate litigation. (Gov. Code § 54956.9(d).) Prior to holding a closed session pursuant to section 54956.9, the legislative body must identify on the agenda the litigation that will be discussed, unless doing so would jeopardize the agency's ability to effectuate service of process or conclude existing settlement negotiations. (Gov. Code § 54956.9(g).)

5

**1292**

Other than what is provided for in section 54956.9, all other expressions of the lawyer-client privilege are abrogated with respect to public meetings under the Brown Act. (Gov. Code § 54956.9(b).) Section 54956.9(a) is the exclusive expression of the lawyer-client privilege for purposes of conducting closed-session meetings. (*Id.*) Section 54956.9 was added to the Brown Act in 1984 to close a case law loophole that permitted a local legislative body to confer in closed session with counsel exempt from the Brown Act. (*The Brown Act: Open Meetings for Local Legislative Bodies*, (Cal. Atty. Gen. 2003) p. 37.)

## III. DISCUSSION

### A. Evidentiary Objections

City objects to Exhibits A through I in petitioner's appendix of evidence on the grounds that they constitute hearsay and have not been properly authenticated. (City Objections at 3.) The Court OVERRULES these objections, as petitioner does not submit the articles contained in Exhibits A through I for the truth of their contents; rather, they are submitted to demonstrate the public interest associated with respondent's encampment reduction plan. Furthermore, these exhibits are sufficiently authenticated through Samantha Lachman's declaration. (*See* Lachman Decl. ¶¶ 2-10.)

### B. Merits

It is undisputed that City is permitted to confer with its counsel during closed meetings to discuss litigation strategy or settlement positions. (*See* Reply at 5 [acknowledging City Council is not barred "from conferring with its counsel in closed session about subjects like litigation strategy or settlement positions"].) However, what the City cannot do under the Brown Act is formulate and approve policy decisions in a closed session outside the public eye merely because such decisions are in furtherance of a settlement agreement.

Government Code § 54950 is unmistakably clear that "[i]t is the intent of the law that [local legislative bodies'] actions be taken openly and that their deliberations be conducted openly." Notwithstanding this intent, Government Code § 54956.9 provides that local legislative agencies are exempt from holding a public meeting in situations where they need to confer with legal counsel regarding pending litigation "when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation." (Gov. Code § 54956.9(a).) "Conferring with counsel on these matters necessarily includes deciding on a course of action and instructing or authorizing counsel to pursue it." (*Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 799.)

The "pending litigation" exemption of section 54956.9 does not explicitly provide for entry into or approval of settlements in closed session, but it has been construed as allowing a city council to do so. (*Trancas Property Owners Assn. v. City*

*of Malibu* (2006) 138 Cal.App.4th 172, 186.)  However, like all Brown Act open-meeting exemptions, "this implied exemption is subject to narrow construction." (*Ibid.*; *see Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 917 ["Statutory exceptions authorizing closed sessions of legislative bodies are construed narrowly and the Brown Act 'sunshine law' is construed liberally in favor of openness in conducting public business"].)  "[A]s 'emphasized' in the Attorney General's manual on the Brown Act, 'the purpose of [section 54956.9] is to permit the body to receive legal advice and make litigation decisions only; *it is not to be used as a subterfuge to reach nonlitigation oriented policy decisions.*' (Cal. Dept. of Justice, Off. of Atty. Gen., The Brown Act (2003), p. 40.)" (*Trancas,* 138 Cal.App.4th at 186, emphasis added.)

As explained by the Court of Appeals in *Trancas*, there are narrow limits to the section 54956.9 pending litigation exemption relating to settlements such that a city council cannot meet in closed session merely because the business at hand relates to a settlement:

> [T]he exemption cannot be construed to empower a city council to take or agree to take, as part of a non-publicly-ratified litigation settlement, action that by substantive law may not be taken without a public hearing and an opportunity for the public to be heard. As a matter of legislative intention and policy, a statute that is part of a law enacted to assure public decision-making, except in narrow circumstances, may not be read to authorize circumvention and indeed violation of other laws requiring that decisions be preceded by public hearings, simply because the means and object of the violation are settlement of a lawsuit.

(*Ibid..*)  The *Trancas* court thus held:

> [U]nder section 54956.9, governing bodies may discuss with their counsel, in closed session, any settlement proposals or terms they deem worthy of consideration. And they generally may agree to such terms and settlements in closed session. What they may not do is decide upon or adopt in closed session a settlement that accomplishes or provides for action for which a public hearing is required by law, without such a hearing.

(*Id* at 187.)

City unconvincingly argues that *Trancas* undermines petitioner's position because the *Trancas* court concluded that the closed-session approval of the settlement agreement in that case was void because "*other* laws" provided that the land use entitlements in the settlement were required to be approved by public zoning hearings. (Opp. at 15.) To begin with, City ignores the fact that *Trancas* held "the Brown Act violation arises independently" from

7

**1294**

the violation of "extrinsic laws requiring public hearings" in that case. (*Trancas,* 138 Cal.App.4th at 186.) Further, while *Trancas* adopted the plaintiff's view that the section 54956.9 exemption did not apply to the adoption of a settlement agreement that includes "decisions intrinsically required by law to e made after public hearings (*e.g.,* grant of a zoning variance)," the *Trancas* court expressed no view on the plaintiff's other argument that the exemption also does not apply to adoption of a settlement agreement with "provisions for action that would ordinarily be subject to the Brown Act's meeting requirements (*e.g.,* rescission of the final map disapproval)" (*id.* at 185), which resembles the situation here.

What is instructive for this Court's analysis is that *Trancas* counsels that the pending litigation exemption should be read narrowly and that such "narrow construction" of the section 54956.9 exemption means closed session discussions and actions with respect to settlement are to allow for confidential legal advice to "make litigation decisions *only*" and not to reach non-litigation, policy decisions. (*Trancas*, 138 Cal.App.4th at 186 [citing Cal. Dept. of Justice, Off. of Atty. Gen., The Brown Act (2003), p.40], emphasis added.) Indeed, it is noteworthy that the *Trancas* court applied the exemption so narrowly that it concluded even a litigation decision to accept a certain settlement agreement falls outside the exemption where terms of the settlement are required by law to be subject to public hearing. Surely then, mere discussion and action relating to a settlement but not involving litigation decisions is insufficient to invoke the pending litigation exemption for settlement in accord with *Trancas*.

Here, the Court does not find that the types of actions and decisions that occurred during the closed sessions on January 31, 2024, and May 1, 2024 are of the type that fall within the narrowly construed pending litigation exemption to the Brown Act, even though both related to the settlement of the *LA Alliance* Action. As discussed above, the City has admitted that the City Council approved a 9,800 encampment reduction plan (ERP) on January 31, 2024 and approved an MOU with the County in a closed session prior to May 2, 2024.[2] (AR 1178, 1183; *see also* AR 823.) While it is true these actions arise from obligations undertaken pursuant to the City's settlement agreement in the *LA Alliance* Action (*see* AR 1312 [Settlement Agreement § 5.2]; 1314-16 [Settlement Agreement § 9]), they are ultimately nonlitigation oriented policy decisions about how to effectuate the City's settlement obligations. They are not litigation decisions concerning the *LA Alliance* Action that depend on the advice of counsel and evaluation of the strength or weakness of the City's litigation position. Indeed, such actions by the City are far afield from the types of closed session litigation decisions recognized in an Attorney General opinion as falling within section 54956.9's exception, such as whether to file a lawsuit, add or

---

[2]     In its briefing, City does not contest that it took such actions during the City Council closed sessions on January 31, 2024, and May 1, 2024.

8

delete causes of action, file a cross complaint, or advance a particular affirmative defense, which are "decisions to be made based upon the advice of counsel and the strength and weakness of the particular case." (*See* 75 Ops. Cal. Atty. Gen. 14 (1992), 1992 WL 469698.)

In fact, the MOU itself disavows that it is part of any litigation decision, stating that it "does not arise from a legal obligation and does not resolve any litigation." (AR 853.) Furthermore, as stated by City's counsel to the district court in the *LA Alliance* Action, the MOU was not part of the case and did not require the Court's approval. (AR 1183, 1190.)  It is also hard to credit City's contention that approval of the ERP and MOU here implicated the need for consultation with counsel that the pending litigation exemption was meant to safeguard, as the City has since held a public meeting to make the nonlitigation oriented policy decision to approve a bed plan, which was also an obligation the City had undertaken pursuant to its settlement obligations in the *LA Alliance* Action.  (*See generally*, Supp. Appendix Exs. 57-61.)

The Court is likewise unpersuaded by City's attempt to characterize its January 31, 2024 closed-session approval of the ERP as protected consultation with counsel to settle LA Alliance's threat of sanctions in the *LA Alliance* Action.  As discussed above, approving the ERP was, at its core, a nonlitigation oriented policy decision on how to meet City's obligation to develop a "plan for encampment engagement, cleaning, and reduction" per its settlement agreement. (AR 1312.) While failure to adopt an ERP certainly bore risks of breaching the agreement and potential sanctions for so doing, the decision over what ERP to adopt was not a litigation decision involving evaluation of the strengths and weaknesses of either LA Alliance's or the City's positions or need for advice of counsel concerning litigation of the *LA Alliance* Action. Moreover, if one were to adopt City's view that adoption of the ERP during the January 31, 2024 closed session was permissible to approve a settlement under section 54956.9, then the City's closed session action still runs afoul of the Brown Act due to failure to disclose the ERP and its substance as required by Government Code § 54957.1, which requires that "[t]he legislative body of any local agency *shall publicly report* any action taken in closed session and the vote or abstention on that action of every member present" for any approval given for settlement of pending litigation.  (Government Code § 54957.1(a)(3), emphasis added.) It is undisputed that City made no such required public report.  (AR 173 at ¶¶ 10-11.)

Accordingly, for all the foregoing reasons, the Court finds that the City's approval of the ERP and MOU during closed sessions on January 31, 2024, and May 1, 2024 violated the Brown Act, as such actions do not fall within the limited exemption to the Brown Act under section 54956.9 for closed-session discussion and approval of settlements for pending litigation.

9

**1296**

## IV.  CONCLUSION

The petition is GRANTED. Pursuant to Local Rule 3.231(n), petitioner shall prepare, serve, and ultimately file a proposed judgment and form of writ in accordance with this ruling.

Date:  January 5, 2026

_____
HON. CURTIS A. KIN

10

**1297**

# EXHIBIT B

# Los Angeles Times

CALIFORNIA

# L.A. violated open meeting law with plan to clear homeless encampments, judge rules



Los Angeles City Atty. Hydee Feldstein Soto speaks at Will Rogers State Beach in April. (Carlin Stiehl/Los Angeles Times)



**By David Zahniser**
Staff Writer | ✕ Follow

Jan. 10, 2026 3 AM PT

- A Superior Court judge said the city ran afoul of the Ralph M. Brown Act by approving a plan for removing 9,800 homeless encampments behind closed doors.

- The encampment plan was part of a larger effort to comply with a 2022 legal settlement with the L.A. Alliance for Human Rights.

The city of Los Angeles violated the state's open meeting law when council members took up a plan to clear 9,800 homeless encampments behind closed doors, a judge ruled this week.

In a 10-page decision, L.A. County Superior Court Judge Curtis Kin said the City Council ran afoul of the Ralph M. Brown Act by approving the encampment strategy during a Jan. 31, 2024, closed session.

The encampment plan was part of a larger effort by the city to comply with a legal settlement with the L.A. Alliance for Human Rights, which had sued over the city's handling of the homelessness crisis.

Kin, in his ruling, said the city is allowed under the Brown Act to confer with its attorneys in closed-door meetings to discuss legal strategy.

"However, what the City cannot do under the Brown Act is formulate and approve policy decisions in a closed session outside the public eye merely because such decisions are in furtherance of a settlement agreement," Kin wrote.

Karen Richardson, a spokesperson for City Atty. Hydee Feldstein Soto, said her office had no comment on the decision, which was issued earlier this week.

The ruling delivered a victory to the Los Angeles Community Action Network, which advocates for homeless residents and had sued the city over the closed-door deliberations.

1300



**CALIFORNIA**

**Homeless advocates sue L.A., saying city leaders violated the state's open meeting law**

Aug. 30, 2025

Lawyers for LA CAN have warned that the city's goal of removing 9,800 encampments over four years has created a quota system that could make sanitation workers more likely to violate the property rights of unhoused residents. Under the agreement, the city must reach its encampment removal target this summer.

"The City Council approved an extremely controversial plan to clear almost 10,000 encampments entirely in secret," said Shayla Myers, the group's attorney. "They never disclosed the plan before they voted on it, or even after, and the only one they disclosed the plan to was the business community."

Lawyers for the city have offered contradictory explanations for what transpired during the Jan. 31, 2024, meeting. Now, LA CAN is seeking a court order requiring that the city produce all records — including audio of the closed-door deliberations — to show what transpired.

The city's strategy for clearing 9,800 encampments has become a major sticking point in its long-running legal battle with the LA Alliance. U.S. District Court Judge David O. Carter ruled that a tent discarded by sanitation workers can only count toward the city's numerical goal if its owner has been offered housing or shelter first.

Feldstein Soto's legal team, in a memo to the council, said later that the judge had "reinterpreted" some of the city's settlement obligations.

In this week's ruling, Kin found that the city violated the Brown Act a second time in May 2024, when the council went behind closed doors to take up another agreement — this one between the city and L.A. County on the delivery of homeless services.

**1301**

The LA Alliance first sued the city and county in 2020, alleging that too little was being done to address the homelessness crisis, particularly in Skid Row. The city settled the case two years later, agreeing to create 12,915 new shelter beds or other housing opportunities by June 2027.

After that deal was struck, the city began negotiating an accompanying agreement with the LA Alliance to reduce the number of street encampments. Those talks dragged on for more than a year.



**CALIFORNIA**

### A federal judge weighs turning L.A. city's homelessness programs over to a receiver

**June 16, 2025**

The LA Alliance ran out of patience, telling Judge Carter in February 2024 that the city was 447 days late in finalizing its plan and should be sanctioned. The group submitted to the court a copy of the encampment removal plan, saying it had been approved by the City Council on Jan. 31, 2024.

Video from that day's meeting shows that council members went behind closed doors to discuss the LA Alliance case. When they returned, Deputy City Atty. Jonathan Groat said there was nothing to report from the closed session.

LA CAN demanded that the city produce any vote tally on the encampment plan. The city declined to do so, saying there was no vote.

"To this day, [we] still don't know who voted for it, or even if a vote was taken at all," Myers said.

Lawyers for the city have argued that they were not required to issue any report from that closed session meeting. They also have said that the Brown Act allowed the two

**1302**

agreements — the one on encampment removals and the other with the county — to be discussed behind closed doors.

Carter ruled last year that the city had failed to comply with the terms of its settlement agreement with the L.A. Alliance. On Tuesday, he ordered the city to pay $1.6 million to cover the group's legal fees.

The judge also instructed the city to pay about $201,000 for fees incurred by LA CAN and the LA Catholic Worker, which have intervened in the LA Alliance case.

On Thursday, lawyers for the city notified the court that they intend to appeal the order to pay the various groups.

---

## More to Read

**L.A. city told the court there were 88 beds at a homeless shelter, but 44 of them were missing**

Nov. 14, 2025



**L.A. vowed to remove 9,800 encampments. But are homeless people getting housed?**

July 9, 2025



**Judge declines to take power over L.A. homeless programs away from city leaders**

June 25, 2025



---

   **David Zahniser**

David Zahniser covers Los Angeles City Hall for the Los Angeles Times.

1303

Copyright © 2026, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information