EXHIBIT A

THOMAS A. WILLIS, State Bar No. 160989
KRISTEN MAH ROGERS, State Bar No. 274672
ERIC LEE, State Bar No. 337815
EMILY A. UCHIDA, State Bar No. 357130
OLSON REMCHO, LLP
1901 Harrison Street, Suite 1550
Oakland, CA 94612
Phone: (510) 346-6200
Email: twillis@olsonremcho.com
       krogers@olsonremcho.com
       elee@olsonremcho.com
       euchida@olsonremcho.com

Attorneys for Defendant and Respondent
City of Los Angeles

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| CANGRESS dba LOS ANGELES COMMUNITY ACTION NETWORK,<br><br>Plaintiff and Petitioner,<br><br>vs.<br><br>CITY OF LOS ANGELES,<br><br>Defendant and Respondent. | No.: 25STCP00261<br><br>Assigned for All Purposes to:<br>The Honorable Curtis A. Kin, Department 86<br><br>Action Filed: January 24, 2025<br><br>**OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE, INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE RALPH M. BROWN ACT**<br><br>**No Fee:**<br>**Cal. Gov't Code § 6103** |

1

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE,
INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE
RALPH M. BROWN ACT

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ..................................................................................................... 3

INTRODUCTION .................................................................................................................... 5

STATEMENT OF FACTS ....................................................................................................... 5

      A.     LA Alliance Sues The City In Federal Court Over Homeless Encampments.................... 5

      B.     The Federal Court Retains Jurisdiction To Oversee The Settlement Between LA Alliance And The City. ..................................................................................................... 7

      C.     The County Settles And Agrees To Support The City's Settlement With LA Alliance. ................................................................................................................ 8

      D.     LA Alliance's Motion For Sanctions And The City's January 31, 2024 Closed Session.................................................................................................................... 9

      E.     The City-County Memorandum Of Understanding And The May 1, 2024 Closed Session.................................................................................................................... 9

      F.     This Lawsuit Commences While Litigation In *LA Alliance* Continues. ......................... 10

ARGUMENT ........................................................................................................................... 11

I.     THE CITY COUNCIL PROPERLY CONVENED ITS CLOSED SESSIONS BECAUSE THE *LA ALLIANCE* LITIGATION REMAINS PENDING. ................................. 11

II.     THE CITY COUNCIL DID NOT OTHERWISE VIOLATE THE BROWN ACT.................... 13

      A.     The City Council Convened Closed Sessions To Confer With Its Attorney About The Pending Litigation............................................................................................. 13

      B.     The City Council Was Not Required To Disclose What Occurred In Closed Session Because It Took No Reportable Actions............................................................................ 18

CONCLUSION ......................................................................................................................... 19

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE,
INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE
RALPH M. BROWN ACT

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*City of Grants Pass v. Johnson,*
     603 U.S. 520 (2024) ......................................................................................................5, 6, 16

*DiCampli-Mintz v. County of Santa Clara*,
     55 Cal. 4th 983, 992 (2012)........................................................................................12

*Gillespie v. S.F. Pub. Libr. Comm'n,*
     67 Cal. App. 4th 1165, 1175 (1998)...........................................................................19

*J.M. v. Huntington Beach Union High Sch. Dist.*,
     2 Cal. 5th 648, 655 (2017).........................................................................................18

*Kleitman v. Superior Court*,
     74 Cal. App. 4th 324 (1999).............................................................11, 12, 13, 18, 19

*LA All. for Hum. Rts. v. City of L.A.*,
     2025 U.S. Dist. LEXIS 144474, at *53-54 (C.D. Cal. June 24, 2025)......................11

*LA Alliance for Human Rights v. City of Los Angeles,*
     14 F.4th 947 (9th Cir. 2021)....................................................................................6, 14

*Lake v. Reed,*
     16 Cal. 4th 448, 466 (1997).......................................................................................19

*Lucas v. Bd. of Trs.*,
     18 Cal. App. 3d 988, 991 (1971) ...............................................................................13

*Mitchell v. City of Los Angeles*,
     2019 U.S. Dist. LEXIS 240471 (C.D. Cal. Aug. 27, 2019) .........................................6

*Page v. MiraCosta Community College District,*
     180 Cal. App. 4th 471 (2009)....................................................................................16

*Roberts v. City of Palmdale,*
     5 Cal. 4th 363 (1993)...........................................................................5, 11, 17, 18

*S. Cal. Edison Co. v. Peevey*,
     31 Cal. 4th 781, 799 (2003).................................................................................14, 15

*Sacramento Newspaper Guild v. Sacramento Cnty. Bd. of Supervisors,*
     263 Cal. App. 2d 41, 56 (1968) .........................................................................11, 12, 17

*Trancas Property Owners Association v. City of Malibu*,
     138 Cal. App. 4th 172 (2006)...............................................................................15, 16

3

**CALIFORNIA STATUTES:**

§ 2030.300 ...............................................................................................................8

§ 2033.290 ...............................................................................................................8

§ 1858 .......................................................................................................................9

Government Code:

§ 54952.2 ...............................................................................................................17

§ 54954.5 ..........................................................................................................12, 13

§ 54956.9 .................................................................................................5, 11, 12, 13

§ 54957.1 ..........................................................................................................13, 18, 19

§ 54957.7 ...............................................................................................................18

§ 54962 ..................................................................................................................11

§ 54963 ......................................................................................................11, 17, 18

Welfare and Institutions Code:

§ 5600.3 ................................................................................................................14

§ 5892 ...................................................................................................................14

§ 10000 .................................................................................................................14

§ 14184 .................................................................................................................14

§ 17000 .................................................................................................................14

**OTHER AUTHORITIES:**

75 Ops. Cal. Atty. Gen. 14 (1992)........................................................................12

80 Ops. Cal. Atty. Gen. 231 (1997), ....................................................................14

Black's Law Dictionary,
12th ed. 2024 ...................................................................................................13

4

**INTRODUCTION**

"A city council needs freedom to confer with its lawyers confidentially in order to obtain adequate advice," just as private parties do. *Roberts v. City of Palmdale*, 5 Cal. 4th 363, 380 (1993). To ensure this equal footing, the Brown Act permits municipalities like the City to privately "confer with, or receive advice from, its legal counsel regarding pending litigation" when public discussion "would prejudice" it in the litigation. Gov't Code § 54956.9(a).

Petitioner LA CAN advances untenable interpretations of the Brown Act that would permanently undermine a public entity's ability to pursue, manage, and defend its interests in pending litigation. Petitioner, an active litigant against the City in a pending federal case, has filed this matter in a transparent attempt to deny the City its right to privately confer with its legal counsel in that case going forward. But both the Brown Act's text and controlling case law, which Petitioner ignores in its opening brief, preclude this result.

First, the City Council properly convened its closed sessions because the federal case remains active to this day. Petitioner's claims depend on its assertion that the federal case is no longer actively litigated, a contention that does not square with the facts or the law. Second, the Brown Act allows the City Council to keep the details of its closed sessions confidential. Unhappy with the City's substantive legal positions in the federal case, Petitioner asserts that the City was required to reach those positions in public view. But the Brown Act does not compel the City Council to provide litigation adversaries "ringside seats" to its discussions of the litigation. Finally, localities are not required to make a public report whenever they have acted in closed session. Instead, the Brown Act limits such reports to a few circumstances, none of which, as Petitioner concedes, occurred here.

**STATEMENT OF FACTS**

**A.     LA Alliance Sues The City In Federal Court Over Homeless Encampments.**

Many localities "across the American West face a homelessness crisis." *City of Grants Pass v. Johnson*, 603 U.S. 520, 525 (2024). In Los Angeles County, how localities should address "tent encampments," "lack of sufficient services," and "lack of pathways to permanent housing" have

"repeatedly been the subject of litigation." *LA Alliance for Human Rights v. City of Los Angeles*, 14 F.4th 947, 952 (9th Cir. 2021); *see Grants Pass*, 603 U.S. at 559 (noting that "unavoidable questions" about encampments "have plunged courts and cities across the Ninth Circuit into waves of litigation").

LA Alliance for Human Rights is a coalition of businesses and residents in and near Skid Row, a Los Angeles neighborhood with a large unhoused population and many encampments. *LA Alliance*, 14 F.4th at 951-53. In 2019, LA Alliance sought to intervene in and object to the settlement in *Mitchell v. City of Los Angeles*, a case brought by Petitioner. *Id.* at 953. In *Mitchell*, Petitioner alleged that the City's practice of clearing Skid Row of unhoused people and their property violated the U.S. Constitution, and the case settled after several years of litigation. LA Alliance argued its intervention was necessary because the settlement, which limited the City's ability to clean up Skid Row, was harming its members. The court there denied the motion for lack of jurisdiction, but it suggested that LA Alliance could file its own lawsuit to vindicate its interests. *See Mitchell v. City of Los Angeles*, 2019 U.S. Dist. LEXIS 240471, at *2, 8-9, 13-14 (C.D. Cal. Aug. 27, 2019).

Soon after, in March 2020, LA Alliance sued both the City and the County, arguing their "failures to curb rising homelessness, combined with various settlements and court orders protecting the rights of homeless individuals, have resulted in violent crime, the deterioration of public order, unsanitary conditions, needless death, the usurpation of public sidewalks, and damage to the natural environment." *LA Alliance*, 14 F.4th at 953. Because the court believed that the lawsuit could undermine the *Mitchell* settlement, the court allowed Petitioner to intervene. *Id.* at 953; AR-1013–15.

The LA Alliance litigation was stayed "for nearly a year while the district court devoted an extraordinary amount of time and effort" to broker a settlement. *LA Alliance*, 14 F.4th at 952. After "extensive negotiations failed," the district court ordered briefing on the "outer limit of the Court's structural equitable remedy power." *Id.* at 952, 954. LA Alliance responded by seeking a preliminary injunction, which both the City and County opposed. *Id.* at 954.

In April 2021, the district court issued a "sweeping preliminary injunction," after concluding that "structural racism … [was] the driving force" behind homelessness in the region. *Id.* at 952. The

6

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE, INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE RALPH M. BROWN ACT

injunction compelled far-reaching and unprecedented policy relief, including ceasing public land and property transfers County- and City-wide, mandating a plan to ensure "the uplifting and enhancement of Skid Row without involuntarily displacing current residents," and requiring the City to place $1 billion in escrow to address homelessness. *Id.* at 954-56.

Several months later, the Ninth Circuit reversed. The Ninth Circuit explained that the district court had abused its authority by granting relief based on claims and novel theories that LA Alliance did not plead or argue, and on materials that were nearly all outside the record. *Id.* at 957.

In November 2021, LA Alliance filed an amended complaint. AR-1329. The complaint alleged negligence, violation of mandated statutory duties of indigent care, nuisance, disability rights, property rights, and constitutional claims against the City, the County, or both. *Id.* The City and the County moved to dismiss the complaint. AR-1515. While the motions remained pending, the court ordered the parties to attend mandatory mediation and settlement conferences. AR-1517–18. In the spring of 2022, LA Alliance and the City announced a preliminary settlement agreement. AR-1019.

**B.** **The Federal Court Retains Jurisdiction To Oversee The Settlement Between LA Alliance And The City.**

In June 2022, after conducting a settlement conference where the parties and the public could submit comment and objections, the court approved the settlement between LA Alliance and the City. AR-1520; AR-1522; AR-1027. Under that agreement, LA Alliance agreed to dismiss their claims against the City. AR-1027. In return, the City agreed, over a five-year period, to "create and develop milestones and deadlines" for (1) the City's creation of 12,915 shelter and housing units[1] and (2) "the City's plan for encampment engagement, cleaning, and reduction in each Council District" and in the City. AR-1312. The parties agreed to work together to resolve "any concerns or disputes about the plans, milestones, and deadlines," and to "consult with the Court for resolution, if necessary." *Id.* In

---

[1] The settlement agreement stated the City needed to create "shelter and housing solutions to accommodate" 60% of the homeless population that the City could assist, *i.e.,* generally those that did not have severe mental illness, a substance use disorder, or a chronic disability, as determined by the then-ongoing point-in-time count of the homeless population. AR-1312. That number was later determined to be 12,915. *See* Compl. ¶ 19.

7

fact, the agreement granted the court continuing oversight and enforcement jurisdiction, and the City was required to provide quarterly updates. AR-1308; AR-1313.

The settlement agreement expressly recognized that the County, while not a party to the agreement, had numerous legal obligations in this area and the parties agreed to cooperate to ensure that the County would fulfill them. AR-1314–16. Those "responsibilities include[d], but [were] not limited to": (1) funding and providing numerous health care and specialized services for the homeless in City housing and shelter; (2) providing housing and treatment services for those with severe mental illness, a substance use disorder, or a chronic disability; (3) increasing the number of outreach teams; (4) providing access to and increasing the number of County-funded beds; (5) providing access to County health care data; (6) making County property available for homeless housing; and (7) connecting individuals to federal, state, and county entitlement programs. *Id.*

In approving the settlement, the court noted that the City and LA Alliance "have been aggressively litigating this case for over two years," generating a "voluminous record," and that the agreement was "the result of long and deliberate good-faith negotiations." AR-1028. The court dismissed the claims against the City but retained jurisdiction and authorized one of the existing special masters to assist in overseeing the settlement agreement. AR-1488.[2]

**C.      The County Settles And Agrees To Support The City's Settlement With LA Alliance.**

Shortly after settling with the City, LA Alliance filed a second amended complaint against the County only. AR-1524. Months later, the parties reached a settlement. AR-1525. In April 2023, after criticizing the settlement during several court conferences, including urging the County to provide more resources, the court refused to approve the settlement because it did not grant the court authority to oversee the County's compliance. AR-1526–32; AR-1374–75; AR-1400–01.

In September 2023, after further litigation, LA Alliance and the County reached a new settlement. AR-1533; AR-1537; AR-1539; AR-1544; AR-1031. This time, the court approved it, as it

---

[2] Petitioner objected to the settlement and appealed its approval to the Ninth Circuit. After full briefing but before oral argument, Petitioner filed a stipulated motion to withdraw the appeal, which the Ninth Circuit granted. *See* AR-1522; AR-1524; AR-1545; AR-1081.

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE,
INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE
RALPH M. BROWN ACT

granted the court enforcement jurisdiction. AR-1079. As part of the approval process, the County acknowledged that it served as the "safety net," and in response, the court required the County to agree that the settlement was merely "a floor, not a ceiling." AR-1068; AR-1436.

In the settlement, the County expressly agreed to support the settlement agreement between LA Alliance and the City. The County agreed to provide access to County health care data; to dedicate or prioritize various types of County beds for the homeless in the City; to increase homeless outreach teams; to work with the City to create new housing on publicly owned land; and to fund, in an amount to be determined by the City and County, supportive services for those in City housing under the City's settlement. AR-1042–43.

**D.** **LA Alliance's Motion For Sanctions And The City's January 31, 2024 Closed Session.**

In early January 2024, after participating in several party-led and court-supervised conferences, LA Alliance threatened more litigation, unless the City agreed to pay LA Alliance $1 million and accept the organization's specific encampment reduction plans and milestones. AR-1111–14. Later that same month, on January 31, 2024, the City Council met in closed session, citing pending litigation and naming the *LA Alliance* case. AR-306.

Within days of the January 31 closed session, LA Alliance filed a motion for sanctions, arguing that the City took too long to comply with its obligation under the settlement to create encampment milestones (reducing 9,800 encampments over four years, with a district-by-district breakdown) and that a monetary penalty was necessary. AR-1546. In April 2024, after briefing and a hearing, the parties settled the sanctions motion by stipulation. AR-1175. The stipulation stated that "[t]he 9,800 encampment reduction plan and milestones were presented to the City Council on January 31, 2024, which approved them without delay." AR-1178. The City agreed to pay for LA Alliance's fees and costs and a Court-ordered audit of the City's homelessness programs. *Id.*; AR-1549.

**E.** **The City-County Memorandum Of Understanding And The May 1, 2024 Closed Session.**

Because the City's settlement obligations hinged on County funding, the City promptly worked to secure the County's agreement to cover costs of those obligations. In September 2022, the County agreed to cover costs for certain obligations in the City's settlement agreement, recognizing that it was

9

responsible for providing some of those services under state and federal law, including a responsibility to provide services to City/County residents suffering from serious mental illness or substance use disorders. AR-818-821. On May 1, 2024, the City Council met in closed session, citing the *LA Alliance* case. AR-429–30. The City and County later signed an MOU, as contemplated in and superseding their 2022 agreement, that required the County to assist the City in funding and expanding housing, outreach, and supportive services, as required under the City's settlement agreement with LA Alliance. AR-823; AR-818. The MOU was later filed on the *LA Alliance* docket. AR-1549.

The MOU repeatedly referenced both the County's and City's settlements with LA Alliance and required the County to cooperate with the City and to support the City's obligations under its settlement. AR-852–65. The County agreed to: (1) reimburse the City for the interim housing beds created under the City's settlement and (2) provide public assistance and mental health services to the individuals using those beds. *Id.* The County also agreed to: (1) contract for and fund similar services for the permanent supportive housing units that the City was establishing under the City's settlement, and (2) to prioritize referrals to County-funded or County-operated units. *Id.* The County assigned the exact number of outreach and multi-disciplinary teams for the City's use, just as the City's settlement had requested. *Id.* And the County agreed to give the City access to County-funded high service need beds and priority access to beds meant for those with mental health and substance use disorders, consistent with the City's settlement. *Id.* Finally, the parties set the MOU to expire on the same timeline as the City's settlement with LA Alliance; capped the County's funding for certain obligations to $259 million; and made the City responsible for ensuring that the beds governed by the MOU would comply with the terms of its settlement with LA Alliance. *Id.*

**F.**     **This Lawsuit Commences While Litigation In *LA Alliance* Continues.**

Petitioner filed this lawsuit in January 2025. Petitioner propounded interrogatories and requests for admissions demanding to know what the City Council had discussed in closed sessions about the *LA Alliance* case, how the City Council discussed it, and who participated in the discussions. AR-1237–63. When Petitioner threatened to file a motion to compel because it found the City's responses unsatisfactory, the City explained that under the Brown Act and controlling precedent,

10

*Kleitman v. Superior Court*, 74 Cal. App. 4th 324 (1999), the information they sought was privileged. AR-1465–68; AR-1470–75. Petitioner never responded nor acted on its threat, and its time to do so has long since expired. *See* Code Civ. Proc. §§ 2030.300(c), 2033.290(c).

Before and after this case was filed, LA Alliance filed motions in the federal case, alleging that the City was failing to perform under the settlement agreement and that sanctions, including receivership, were necessary. *See LA All. for Hum. Rts. v. City of L.A.*, 2025 U.S. Dist. LEXIS 144474, at *53-54 (C.D. Cal. June 24, 2025). In June, after an evidentiary hearing, the federal court found that the City had committed "interim breaches" of the settlement agreement and to ensure "greater oversight," ordered the City to, among other things: (1) provide an updated plan for creating 12,915 shelter or housing solutions; (2) work with LA Alliance to select a third-party monitor of its efforts; and (3) report encampment reduction data consistent with the Court's instructions.[3] *See id.* at *107. Petitioner actively participated in the hearing, and it now seeks attorney's fees from the City. AR-1577. To this day, LA Alliance, the City, Petitioner, and the County actively litigate the federal case through motion practice, ongoing compliance and monitoring, and updates to the court.

## ARGUMENT

I. **THE CITY COUNCIL PROPERLY CONVENED ITS CLOSED SESSIONS BECAUSE THE *LA ALLIANCE* LITIGATION REMAINS PENDING**

Although local legislative bodies generally must meet in public, the Brown Act expressly authorizes a body to confer confidentially, *i.e.*, in closed session, with legal counsel regarding pending litigation. Gov't Code §§ 54956.9(a), 54962, 54963(a). The reason, as courts have explained, is "obvious." *Sacramento Newspaper Guild v. Sacramento Cnty. Bd. of Supervisors*, 263 Cal. App. 2d 41, 56 (1968). "Effective aid is impossible if opportunity for confidential legal advice is banned." *Id.*

The Brown Act thus "broadly preserv[es] the attorney-client privilege for local governing bodies" because "public entities need confidential legal advice to the same extent as do private clients." *Roberts*, 5 Cal. 4th 363, 373-74 (1993). "Settlement and avoidance of litigation are

---

[3] The City has appealed this order to the Ninth Circuit, and briefing is expected to be completed by the end of this year. AR-1576; Ninth Circuit Case No. 25-4623.

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE,
INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE
RALPH M. BROWN ACT

particularly sensitive activities, whose conduct would be grossly confounded, often made impossible, by undiscriminating insistence on open lawyer-client conferences." *Sacramento Newspaper Guild*, 263 Cal. App. 2d at 56. "If the public's 'right to know' compelled admission of an audience, the ringside seats would be occupied by the government's adversary, delighted to capitalize on every revelation of weakness." *Id.* Courts know that a city's "adversary in litigation" can "wrap himself in the banner of the public's right to know," abusing the Brown Act to gain an edge. *Id.* at 56 n.13.

A litigation is "pending" under the Act if it is an "adjudicatory proceeding" before a court, "to which the local agency is a party, [that] has been initiated formally." Gov't Code § 54956.9(c), (d)(1). That describes the *LA Alliance* litigation to a tee. And as Petitioner concedes (Pet. Mem. 15), the Council properly noticed the closed sessions on its agendas and the reason for doing so each time. *Id.* § 54954.5(c) (agenda need only list the name of the existing litigation alongside the agenda item). As a result, the City Council properly met in closed session to confer with its attorneys. "Nothing" in the Act "prevent[ed]" the City Council from confidentially conferring with its attorneys because discussing the case openly "would [have] prejudice[d]" the City in the litigation. *Id.* § 54956.9(a).

This case, brought by a City adversary in the *LA Alliance* litigation, falters at the starting gate. First, Petitioner insists, without any support in the case law, that because the City and LA Alliance entered into a settlement agreement in 2022, the case is no longer pending (Pet. Mem. 15-16). This argument ignores reality. There are more docket entries *after* the City's settlement than before it, and the case is now headed to the Ninth Circuit for the third time. AR-1523–79; AR-1576. The district court has retained jurisdiction precisely because the City and LA Alliance understood that their settlement, which imposes ongoing obligations on the City, would not end the case. AR-1029. The City, LA Alliance, and even Petitioner are still actively litigating those obligations now. AR-1576–79.

Petitioner asserts that "pending litigation" should be interpreted narrowly (Pet. Mem. 16), but courts may not rewrite laws under the guise of interpreting them. *See, e.g.*, *DiCampli-Mintz v. County of Santa Clara*, 55 Cal. 4th 983, 992 (2012); Code Civ. Proc. § 1858. Nor may courts interpret the Act's closed session provisions to "thwart or frustrate the Legislature's purpose in establishing" them. 80 Ops. Cal. Atty. Gen. 231 (1997); *Kleitman*, 74 Cal. App. 4th at 334-36 (concluding the City

12

could refuse to disclose details about a closed session because the information was privileged under the Evidence Code and the Brown Act, even if it meant the alleged violation could not be proven). To state the obvious, pending litigation is a case that has begun but remains unresolved. *See Pending*, Black's Law Dictionary (12th ed. 2024) ("Throughout the continuance of; during"). Petitioner's position would have hamstrung the City's ability to formulate a defense strategy against LA Alliance's sanctions threats, which the federal court has been willing to consider, over the past three years. This defies the Act's text, case law, and common sense.

## II. THE CITY COUNCIL DID NOT OTHERWISE VIOLATE THE BROWN ACT

Essentially conceding that the LA Alliance litigation remains pending and was therefore a proper basis for the City Council's closed sessions, Petitioner alternatively argues that the Council's approval of the encampment milestones and the MOU in 2024, and the lack of a public report of those actions, violated the Brown Act. This argument is equally meritless.

### A. The City Council Convened Closed Sessions To Confer With Its Attorneys About The Pending Litigation.

The Brown Act does not prohibit City Council discussion or approval of the encampment reduction milestones and the MOU in closed session. By Petitioner's telling, because the Brown Act does not enumerate the myriad of potential actions that could be taken during closed sessions with legal counsel (*e.g.*, providing direction to legal counsel by consensus, authorizing counsel to file a motion, requesting counsel consider alternative litigation strategies), doing so in closed session is prohibited (Pet. Mem. 16-21). But courts have never adopted such a cramped view. Instead, they have interpreted the Act reasonably to ensure that public agencies are on par with private parties while defending litigation. *See infra* pp. 13-15; *see also Kleitman*, 74 Cal. App. 4th at 332 (the Act precludes the "disclosure of closed session information," even though the Act "does not expressly [so] provide"); *Lucas v. Bd. of Trs.*, 18 Cal. App. 3d 988, 991 (1971) (interpreting the Act to permit local bodies to act on personnel matters during closed session, even though the text did not say so expressly); Gov't Code §§ 54956.9(a), 54957.1(a)(2).

The Act "recognizes the need at times [for local bodies] to both deliberate and act in private when necessary due to important policy considerations." 75 Ops. Cal. Atty. Gen. 14 (1992). "[C]onsultation with counsel in the course of litigation often focuses on possible action." *S. Cal. Edison Co. v. Peevey*, 31 Cal. 4th 781, 799 (2003). Conferring with counsel thus "necessarily includes deciding on a course of action and instructing or authorizing counsel to pursue it." *Id.*

Here, no one disputes it was an "explicit requirement" of the settlement for the City to develop the milestones (Pet. Mem. 17). Nor is there any dispute that leading up to the January 31 closed session, LA Alliance had threatened to seek sanctions over the City's alleged failure to do so, and immediately after the closed session, acted on that threat. AR-662; AR-732–34. The City Council was thus entitled to convene a closed session to consult with counsel and formulate a response. Petitioner's argument—that the City Council may obtain private legal advice to settle, but not on how to minimize legal exposure in complying with that settlement during pending litigation, even in the face of a strong threat of sanctions—does not withstand scrutiny (Pet. Mem. 16-17).

There is also no dispute that although the City and County are both defendants in the *LA Alliance* case, it is the County—as LA Alliance has alleged from the start—who must serve as the provider of last resort for "all incompetent, poor, indigent persons" and who is responsible for their mental health and related needs. *See, e.g.*, *LA Alliance*, 14 F.4th at 954; Welf. & Inst. Code §§ 5600.3, 5892, 10000, 17000, 14184; AR-1434–36. Thus, as part of their settlement, LA Alliance and the City expressly "agree[d] to cooperate in ensuring the county meets its obligations" to homeless individuals, including but "not limited to," funding and providing various housing options, supportive services, and outreach teams. AR-1314–16; *see also* AR-820 (County acknowledging that it has "certain responsibilities under state and federal law" relevant to the City's settlement agreement obligations).

In short, the City and the County have adverse interests in the pending litigation. The City's settlement contractually obligated it (and LA Alliance) to hold the County accountable, or risk being left responsible for costs the County did not cover. As a result, the City's ability to meet its own obligations in the LA Alliance case—and thus, its degree of exposure to sanctions and judicial enforcement—rested on the City/County MOU which, before May 2, 2024, had not been finalized. To

14

reduce its legal exposure in the federal case, the City Council was entitled to candid, privileged advice from its attorneys while evaluating what it should agree to and the attendant legal risks.

Petitioner's false formalism (the City never sued the County) overlooks this simple fact. It also makes no sense. The City should not be forced to sue a co-defendant to avoid losing the right to obtain attorney advice concerning legal strategies related to that co-defendant in pending litigation. "[A]voidance of litigation" is just as much a reason to confer privately with counsel. *Peevey*, 31 Cal. 4th at 810. The City, like any other litigant, was entitled to receive legal advice about the MOU.

The MOU's boilerplate disclaimers do not suggest the City is "hav[ing] it both ways" (Pet. Mem. 20). The MOU repeatedly recognizes that the County would assume a variety of obligations and cover related costs, worth over a quarter trillion dollars, necessitated by the City's settlement agreement with LA Alliance. AR-857–62. And all three parties agree that the City's ability to meet its obligations depended on County support. AR-1042–43, AR01314–16. The disclaimers simply make clear that the County's assumption of obligations under the MOU is not a legal concession about, say, what the Welfare and Institutions Code in fact requires. That, however, is irrelevant to the question here: whether the City could evaluate, in closed sessions, the degree to which the MOU would impact the City's obligations (or liabilities) under its settlement agreement with LA Alliance.

*Trancas Property Owners Association v. City of Malibu*, 138 Cal. App. 4th 172 (2006), undermines, rather than supports, Petitioner's argument (Pet. Mem. 16-17). There, after holding that a settlement agreement was already legally invalid, the court separately concluded that the locality's approval of the agreement in closed session was void because *other* laws independently provided that the land use actions, the basis of the settlement, were subject to required public zoning hearings. That is not this case. Petitioner cites no law that required the City, during pending litigation, to publicly confer with its attorneys about its compliance with its settlement obligations with LA Alliance or how its compliance could be impacted by the County, especially while a threat of sanctions loomed overhead. Given the clear tie between the MOU and the City's defense of the *LA Alliance* case, coupled with ongoing judicial oversight, Petitioners' argument that the City's closed sessions were

15

"subterfuge to reach nonlitigation oriented policy decisions" strains credulity.[4] *Id.* at 186. Only through closed sessions could the City "receive legal advice and make litigation decisions" about settlement obligations and thereby avoid legal risk. *Id.*

*Page v. MiraCosta Community College District*, 180 Cal. App. 4th 471 (2009) is immaterial as well (Pet. Mem. 17, 21). There, in closed session and with the assistance of a private mediator, a public entity directly negotiated with a party who had threatened litigation (and the party's lawyer). *Id.* at 501-502. Here, the City did not negotiate with the County in closed session, but discussed its approach toward meeting its settlement obligations in active litigation, which as a matter of law, hinged on obtaining millions of funding and support from the County.[5]

Petitioner evidently believes that because the *LA Alliance* case implicates homelessness policy, the City Council cannot privately confer with its attorneys even though the parties, including Petitioner, continue to litigate in the federal case (Pet. Mem. 17-22). But under the Brown Act, a public body's right to confidential legal counsel does not hinge on the nature of the legal claims—a matter outside of the City's control—but on whether litigation is pending. Many cases against public agencies, most notably impact litigation, inherently raise policy issues. That is all the more so with cases about the "complex" and "pressing social question [of] homelessness." *Grants Pass*, 603 U.S. at 560. The encampment reduction milestones and the MOU were not a product of general policymaking, dictated by a free hand. Instead, they were designed to settle or clarify specific liabilities in an ongoing case, under judicial oversight and within the constraints of litigation. Discussing them in closed session was necessary to inform and receive instruction from the client about litigation risk and strategies.

---

[4] The intense litigation between the City and LA Alliance for more than five years also belies Petitioner's insinuation that the City is colluding with LA Alliance to use the case as pretext to dictate policy (Compl. 5-6).

[5] *Shapiro v. Bd. of Directors*, 134 Cal. App. 4th 170 (2005), is even further afield (Pet. Mem. 15, 21). The court held that the right to hold a closed session belonged to the public agency, not the non-profit the agency had created. *Id.* at 182-83.

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE,
INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE
RALPH M. BROWN ACT

To hamper a public body's right to legal counsel in such cases would rewrite the Brown Act and permanently tilt the rules in favor of opponents, like Petitioner, that bring impact litigation. And to do so here—in a collateral case brought by a party in an active federal case—would not only contravene the Act, but also set a dangerous precedent for local entities statewide facing any complex litigation. No "lawyer worth his salt" would convey legal advice about an active case publicly, forcing public entities to forgo such deliberations entirely (the Brown Act prohibits collective action through a series of one-on-one conversations) or risk a derivative Brown Act lawsuit, with their private discussions revealed and used against them. *Sacramento Newspaper Guild*, 263 Cal. App. 2d at 56; Gov't Code § 54952.2(b)(1). "Government should have no advantage in legal strife; neither should it be a second-class citizen." *Roberts*, 5 Cal. 4th at 374.[6]

Protecting a public entity's attorney-client privilege is "vital to the effective administration of justice" and serves the "public interest" because "it permits local government agencies to seek advice that may prevent the agency from becoming embroiled in litigation," or "avoid unnecessary controversy with various members of the public." *Id.* at 380-81. The Legislature has decided that when faced with pending litigation, a public agency must be able to have "full and frank

---

[6] Petitioner informed the City last week that it plans to introduce (presumably with its reply brief) new evidence, namely, that on September 30, 2025, the City Council held an open session where it (1) approved an updated plan to achieve 2,130 beds required by its settlement agreement with LA Alliance; (2) approved the repurposing of $16.2 million; and (3) instructed the City Administrative Officer, who advises the City Council on the fiscal condition, financial status, and future needs of the City, to take actions to "operationalize" the beds. To Petitioner, this public session undermines how the City Council handled the encampment reduction milestones in the January 2024 closed session.

But this latest anticipated argument misses the mark on multiple grounds. First, the Brown Act does not *require* local entities to conduct closed sessions. As long as conditions for a closed session exist, the choice to conduct one rests with the local body, just as it can always choose to authorize the disclosure of what occurred in a closed session. Gov't Code § 54963(a). Petitioner's arguments here, however, would effectively eliminate that right entirely. Second, this open session shows that the City is *not* abusing the pending litigation provisions, but making appropriate judgment calls on when to convene a closed session. Notably, this recent open session, marked under a separate Council File (23-1022-S18), concerned how the City would implement, in granular detail, a specific number of beds. By contrast, the City Council's meeting in January 2024 followed threats of a sanctions motion, as LA Alliance and the City were still negotiating what constituted compliance with the settlement agreement. That closed session, like all the others Petitioner challenges in this case, were held under a different Council File (20-0263), which began right before LA Alliance filed suit and that the City has identified for litigation closed sessions relating to the federal case. AR-180–82.

---

17

communication[s]" with its attorneys. *Id.* at 380. Petitioner offers no basis to upend the Legislature's judgment here.

### B. The City Council Was Not Required To Disclose What Occurred In Closed Session Because It Took No Reportable Actions.

Finally, the City Council did not fail to make a required public report after the January and May 2024 closed sessions (Pet. Mem. 14-15, 21-22). The Act "prohibit[s] [the] disclosure" of closed sessions, "except as provided by the Act." *Kleitman*, 74 Cal. App. 4th at 335 n.9; *see also* Gov't Code § 54963(a) (prohibiting the disclosure of confidential information "acquired by being present in a closed session . . . unless the legislative body authorizes disclosure"). The Act lists just seven actions, commonly known as "reportable actions," that must be publicly reported after a closed session "as follows," *i.e.*, in a specific way. Gov't Code § 54957.1(a). Only two of them govern pending litigation closed sessions. *Id.* § 54957.1(a)(2) & (3). Because neither applies here—a fact Petitioner concedes because it has not argued otherwise—the City Council did not need to publicly report on its closed sessions. *See* Gov't Code § 54957.7(b) (requiring disclosure if "required by Section 54957.1").

Petitioner ignores all of this, instead plucking the Act's definition of "action taken" out of context, asserting that public bodies need to publicly report *any* action taken in closed session (Pet. Mem. 14-15). But Petitioner's interpretation violates "a cardinal rule of statutory construction": that "related [statutory] provisions" should not be rendered "nugatory." *J.M. v. Huntington Beach Union High Sch. Dist.*, 2 Cal. 5th 648, 655 (2017). If every "action" taken must be reported, there would be no need for the Act to specify that disclosure of a litigation settlement is a reportable action, but necessary only *after* it is "final," which the Act precisely defines, and *only* in certain situations, e.g., "upon inquiry." Gov't Code § 54957.1(a)(3).[7] Nor would the Act specify, regarding the other reportable action for pending litigation, that a public body "need not identify the action, the defendants, or other particulars" of a case it has filed until *after* the case has commenced, *if* there is an inquiry, and

---

[7] This is why even if any approval of the milestones or the MOU is considered a settlement of pending litigation, no public report was necessary because neither approval would have been "final" at the closed session. Gov't Code § 54957.1(a)(3).

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE,
INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE
RALPH M. BROWN ACT

*only* where doing so would not jeopardize service of process or settlement negotiations. *Id.* § 54957.1(a)(2).

Because a public body's general direction to legal counsel on the conduct of litigation does not fit within the specified closed session report-out provisions in Section 54957.1, it is not a reportable action under the Brown Act. *See Gillespie v. S.F. Pub. Libr. Comm'n*, 67 Cal. App. 4th 1165, 1175 (1998) (no public report required, as the Act did not specify the action was reportable); *Lake v. Reed*, 16 Cal. 4th 448, 466 (1997) (applying the maxim that expression of some things in a statute necessarily means the exclusion of other things not expressed). To conclude otherwise, forcing the disclosure of any and all actions taken in closed session, would "necessarily destroy[] the closed session confidentiality" that is "inherent" in the Act. *Kleitman*, 74 Cal. App. 4th at 334.[8] No statute, much less the Brown Act, should ever be interpreted in such a self-defeating manner.

**CONCLUSION**

For the foregoing reasons, the Petition should be denied.

Dated: October 21, 2025

Respectfully submitted,

OLSON REMCHO, LLP

By: _____
Kristen M. Rogers

Attorneys for Defendant and Respondent
City of Los Angeles

---

[8] Petitioner's last-ditch theory about the City Charter and City Council Rules, mentioned nowhere in its Complaint, is a red herring (Pet. Mem. 18-19). The Brown Act provides no basis for parties to sue over alleged violations of local legislative procedural rules.

19

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE,
INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE
RALPH M. BROWN ACT

## PROOF OF SERVICE

I, the undersigned, declare under penalty of perjury that:

I am a citizen of the United States, over the age of 18, and not a party to the within cause of action. My business address is 555 Capitol Mall, Suite 400, Sacramento, CA 95814.

On October 21, 2025 I served a true copy of the following document(s):

**Opposition To Verified Petition For Writ Of Mandate, Injunctive And Declaratory Relief For Violations Of The Ralph M. Brown Act**

on the following party(ies) in said action:

| | |
|---|---|
| Jonathan L. Segal<br>Samantha Lachman<br>Davis Wright Tremaine LLP<br>350 South Grand Avenue, 27th Floor<br>Los Angeles, CA 90071<br>Phone: (213) 633-6800<br>Email: jonathansegal@dwt.com<br>samlachman@dwt.com | *Attorneys for Plaintiff and Petitioner*<br>*Cangress dba Los Angeles Community Action*<br>*Network* |
| Shayla Myers<br>Isabelle M. Geczy<br>Legal Aid Foundation of Los Angeles<br>1550 W. 8th Street<br>Los Angeles, CA 90013<br>Phone: (213) 640-3983<br>Email: smyers@lafla.org<br>igeczy@lafla.org | *Attorneys for Plaintiff and Petitioner*<br>*Cangress dba Los Angeles Community Action*<br>*Network* |

☐ **BY UNITED STATES MAIL:** By enclosing the document(s) in a sealed envelope or package addressed to the person(s) at the address above and

☐ depositing the sealed envelope with the United States Postal Service, with the postage fully prepaid.

☐ placing the sealed envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, located in Sacramento, California, in a sealed envelope with postage fully prepaid.

☐ **BY OVERNIGHT DELIVERY:** By enclosing the document(s) in a sealed envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses listed. I placed the sealed envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

20

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE,
INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE
RALPH M. BROWN ACT

☐ **BY MESSENGER SERVICE:** By placing the document(s) in a sealed envelope or package addressed to the persons at the addresses listed and providing them to a professional messenger service for service.

☐ **BY FACSIMILE TRANSMISSION:** By faxing the document(s) to the persons at the fax numbers listed based on an agreement of the parties to accept service by fax transmission. No error was reported by the fax machine used. A copy of the fax transmission is maintained in our files.

☒ **BY EMAIL TRANSMISSION (ONE LEGAL):** By electronically submitting for filing and service the document(s) listed above through One Legal, an electronic filing vendor approved by this Court. The name of the vendor and the transaction receipt I.D. are given in the vendor's emailed Notification of Service.

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on October 21, 2025, in Sacramento, California.

_Thuy Le_
Thuy Le

(2,092,480)

---

21

OPPOSITION TO VERIFIED PETITION FOR WRIT OF MANDATE, INJUNCTIVE AND DECLARATORY RELIEF FOR VIOLATIONS OF THE RALPH M. BROWN ACT