No. 26-784

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

IN RE CITY OF LOS ANGELES

CITY OF LOS ANGELES,

*Petitioner*,

v.

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA,

*Respondent*,

LA ALLIANCE FOR HUMAN RIGHTS ET AL.,

*Real Parties in Interest*.

From the United States District Court
for the Central District of California
Case No. 2:20-cv-02291 | The Honorable David O. Carter

## REPLY IN SUPPORT OF PETITION FOR A WRIT OF MANDAMUS

| | |
|---|---|
| Hydee Feldstein Soto | Theane D. Evangelis |
| Valerie Flores | Marcellus McRae |
| Arlene N. Hoang | Bradley J. Hamburger |
| Jessica Mariani | Daniel R. Adler |
| CITY ATTORNEY'S OFFICE | Patrick J. Fuster |
| 200 North Main Street | GIBSON, DUNN & CRUTCHER LLP |
| City Hall East, 6th Floor | 333 S. Grand Avenue |
| Los Angeles, CA 90012 | Los Angeles, CA 90071-3197 |
| 213.978.7508 | 213.229.7000 |
| | tevangelis@gibsondunn.com |

*Counsel for Petitioner City of Los Angeles*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 1

UPDATE TO STATEMENT OF THE CASE................................................. 3

REASONS FOR GRANTING WRIT RELIEF ............................................ 8

I.    The district court lacks authority to police the City Council's
      approval of the encampment-reduction plan. .................................. 8

II.   Even if the district court had the power to adjudicate the
      propriety of the City Council's approval, the contempt
      proceeding would still interfere with pending state-court
      litigation.................................................................................. 13

III.  The proceeding has and will continue to put witnesses in an
      impossible position..................................................................... 15

IV.   The district court's erratic track record confirms that this
      Court should stay the hearing before the City suffers
      irreversible harm. ...................................................................... 19

CONCLUSION.................................................................................. 21

CERTIFICATE OF COMPLIANCE ......................................................... 23

CERTIFICATE OF SERVICE................................................................ 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cheney v. U.S. Dist. Court for D.C.*,
542 U.S. 367 (2004)..................................................................... 10

*Clark v. Sweeney*,
607 U.S. 7 (2025)......................................................................... 20

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994)..................................................................... 10

*LA Alliance for Human Rights v. County of Los Angeles*,
14 F.4th 947 (9th Cir. 2021)....................................................... 20

*Lake Luciana, LLC v. County of Napa*,
2009 WL 3707110 (N.D. Cal. Nov. 4, 2009) ........................................ 14

*New York v. United States*,
505 U.S. 144 (1992)..................................................................... 10

*Pennhurst State School & Hospital v. Halderman*,
465 U.S. 89 (1984)....................................................................... 10

*In re Philippine Nat'l Bank*,
397 F.3d 768 (9th Cir. 2005)....................................................... 17

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*,
745 F.3d 343 (9th Cir. 2014).................................................17, 18

*Rodriguez v. Seabreeze Jetlev LLC*,
620 F. Supp. 3d 1009 (N.D. Cal. 2022) ..................................... 18

*In re Van Dusen*,
654 F.3d 838 (9th Cir. 2011)....................................................... 12

*Younger v. Harris*,
401 U.S. 37 (1971)....................................................................... 14

**Constitutional Provisions**

U.S. Const. Amend. X.............................................................................. 10

**Other Authorities**

L.A. City Charter Art. II, § 244............................................................... 11

L.A. City Charter Art. II, § 272............................................................... 12

L.A. City Council Rules ch. VIII, rule 49 .................................................. 12

iii

## INTRODUCTION

When it filed its petition, the City was in the dark about the district court's theory of contempt after multiple ignored requests for clarity. The contempt charge has now come into the light, and it has only confirmed the grave risk to the City's rights and the impropriety of the district court's adjudication of issues of California municipal law that have nothing to do with the parties' settlement agreement. The court has used the City's truthful representation that the City Council approved an encampment-reduction plan during a January 31, 2024 closed session as a springboard to inquire into *how* the City Council approved the plan, even though the California courts are in the process of deciding whether the session should have been closed and whether the session involved privileged discussions with counsel. The district court is also exploring whether the Council approved the plan in conformance with the City Charter and its own rules—issues far beyond the proper scope of any federal action.

No good can come from continuing this contempt proceeding, which has already seen two City lawyers forced to testify under oath and numerous attempts to inquire into what happened during a closed session

of the City Council. The settlement agreement does not grant the district court jurisdiction to sit in judgment of the City Council's approval process. The Constitution forbids that interference. Abstention principles confirm that the court should have stayed its hand, given the ongoing state-court proceeding addressing overlapping issues. And the City's privileges hang in the balance each day that its lawyers are interrogated about confidential deliberations relating to the plan's undisputed approval.

The district court is set to resume the contempt hearing in mid-March. SuppApp144. Across two days, the proceeding has already teetered on gutting the City's right to appeal in the Brown Act litigation and exposing privileged information. This Court should not allow a third day of privilege grenades to be lobbed at the City's witnesses, who have already been forced to choose between disclosing confidential and privileged information or disobeying a direction to answer from the district court. Before the hearing resumes, this Court should either issue a writ of mandamus vacating the orders expanding the contempt charges into this perilous space or at least issue a stay while the Court considers the petition.

**UPDATE TO STATEMENT OF THE CASE**

The day after the City filed its mandamus petition, the district court held a contempt hearing focused on "possible misrepresentations made by representatives of the City, related to the approval of the encampment reduction plan in January of 2024." SuppApp5. Consistent with the district court's request, 6App1493, First Assistant U.S. Attorney Bill Essayli and District Attorney Nathan Hochman attended the hearing, SuppApp54.

At the hearing, the district court explained that "[t]he issue regarding potential misrepresentations made by the City to this Court initially arose when the City attorney seemed to represent to this Court that a vote had been taken in closed session by the City Council on the encampment reduction plan on January 31st of 2024," which supposedly contradicts the City's "subsequent testimony" that no vote was taken. SuppApp5. The court also opined that investigating the issue was critical because "democracy depends upon transparency." SuppApp123.

The City renewed its objections that the district court could not conduct that inquiry "without completely nullifying the city's rights in the state court proceeding" over potential violations of the Brown Act and

3

invading the attorney-client privilege, deliberative-process privilege, legislative-process privilege, and official-information privilege because the only way for the City to defend itself would be to divulge what happened in the closed session. SuppApp7, SuppApp120. Intervenors acknowledged that they "don't disagree with the City's position that we should leave the Brown Act litigation to itself," but maintained the court should "interrogat[e] the veracity" of the City's representations regarding the approval of the encampment-reduction plan. SuppApp16. Although Intervenors conceded that "the City did not say and the City Attorney's Office did not represent that a vote was taken," they insisted that, "when the City Attorney's Office states that the City Council approved without delay a plan, it is implicit . . . that was done consistent with the City charter." SuppApp17-18.

Despite the City's objections, the district court allowed testimony to proceed because it "tentatively believe[d]" the issue could be resolved "without intruding on the State Brown Act litigation." SuppApp47. Shortly before the first witness testified, the court finally clarified what it believed the City's misrepresentations were—"facts signed by the Chief Assistant City Attorney, Scott Marcus, then counsel of record for the City

4

of Los Angeles" stating that "the 9,800 encampment reduction plan and milestones were presented to the city council on January 31st 2024, which approved them without delay" and City Administrative Officer Matthew Szabo's testimony that the plan was approved. SuppApp46-47.

Before hearing testimony, the district court played for the court-room parts of a YouTube video of the "rather lengthy" January 31, 2024 City Council meeting. SuppApp42. The court had never mentioned this video before, and no party had brought it to the attention of the court. The court paused the video to identify City Council members and Mr. Marcus. SuppApp44. The court then pointed out when the City Council proceeded to a closed session and when the closed session ended. SuppApp45. At that point in the video, an unidentified speaker asks, "Mr. City Attorney, is there anything to report from the closed session," and another speaker responds, "There is not." *Id.*

The district court then heard testimony from Mr. Marcus, a City lawyer who was counsel of record in this action for several years. Inter-venors and the Alliance repeatedly asked questions that Mr. Marcus could not answer without divulging privileged and confidential infor-mation about the closed session:

- Intervenors asked Mr. Marcus, "How did the city council approve the plan?" and "What process did the city council use to approve the plan if it did not use a voting process?" SuppApp73-74. The City objected, and the court took the objections under submission. *Id.*

- Intervenors asked Mr. Marcus, "When you stated in this declaration to the Court that the city council approved that the milestones were presented to the city council on January 31st, which approved them without delay, what did you mean by the term approved?" SuppApp74. The Court overruled the City's objection. SuppApp75.

- The Alliance asked Mr. Marcus why he submitted the encampment-reduction plan to the City Council for approval. SuppApp102. The Court overruled the City's objection, and Mr. Marcus refused to answer the question because doing so would invade privilege. *Id.*

- Intervenors asked Mr. Marcus what factors determine what constitutes approval by the City Council. SuppApp119. The court again overruled the City's objection, and Mr. Marcus again

6

declined to answer the question because it would invade attorney-client privilege. *Id.*

- Intervenors asked Mr. Marcus, "What facts support your testimony that you observed—that you believed that the City Council approved the encampment reduction plan?" SuppApp126. Despite the City's objection, the court told Mr. Marcus "you can answer," but he again declined. SuppApp126-27.

The City's counsel informed the district court that they represent the City, not Mr. Marcus, and that he was being placed in "an untenable situation where he needs separate advice about whether or not he should follow the Court's order." SuppApp125. Counsel also asked the court for a stay and an opportunity to brief this issue and for Mr. Marcus to consult separate counsel. *Id.* The court did not grant those requests, but it suggested that it wanted to put the witness testimony "in a package" for this Court to decide the issue. SuppApp131.

Following the hearing, the City filed a renewed objection to the expanded contempt proceeding. The City explained that the questions of the Alliance and Intervenors "confirm that this proceeding intrudes on

7

multiple privileges" and is on a "collision course" with Brown Act litigation in state court. SuppApp137.

The court resumed the proceeding the following week. SuppApp152. The court heard testimony from Assistant City Attorney Strefan Fauble. SuppApp179. The questioning of Mr. Fauble generally focused on the City Charter and City Rules. The City objected to questioning that called for Mr. Fauble to divulge the contents of closed sessions. SuppApp191. At the end of the hearing, the court continued the proceeding to March to give the parties time to mediate unrelated issues. SuppApp260-61. The court suggested it "may be inclined to hold this matter in abeyance to see if there can be cooperation on other issues," including the selection of a monitor. SuppApp254-255.

## REASONS FOR GRANTING WRIT RELIEF

**I. The district court lacks authority to police the City Council's approval of the encampment-reduction plan.**

After long refusing even to identify any supposed misrepresentation, the district court finally pointed at the February 10 hearing to the City's statement in an April 2024 stipulation that "[t]he 9,800 encampment reduction plan and milestones were presented to the City Council on January 31, 2024, which approved them without delay" and

Mr. Szabo's testimony that the plan was approved. 1App259; SuppApp46-47. The district court mused that "the City attorney seemed to represent to this Court that a vote had been taken," which supposedly contradicts "subsequent testimony before this Court that, in fact, no vote was taken." SuppApp5. Because the City did *not* state that a vote had been taken, the district court has now revealed (as Intervenors confirm) that the theory of contempt is that the City *implicitly* represented that the plan was approved "via a vote of the City Council" because a roll-call vote supposedly is "the only process outlined in the City Charter and City Council rules." Intervenors Ans. 19.

That clarification leaves no doubt about the district court's lack of jurisdiction over the contempt proceeding. Everyone agrees the City Council *did* approve the encampment-reduction plan—just as the April 2024 stipulation states. Intervenors also admit (Ans. 12) that no party is trying to invalidate that plan. So the theory of contempt turns exclusively not on any factual misrepresentation, but instead on the district court's legal intuitions about how the City Council *should* have considered the plan. But in this post-dismissal context, the court has ancillary jurisdiction only to enforce the terms of the parties' settlement

9

agreement. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380 (1994). Nothing in the pertinent provision of the settlement agreement (§ 5.2) dictates the process by which the City Council must approve plans to implement that provision. 1App152. Because a truthful representation about the City Council's approval could not unlock the doors for a highly intrusive exploration of the Council's approval process, mandamus is the proper remedy to restrain the district court to the "lawful exercise of its prescribed jurisdiction." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004).

Even if ancillary jurisdiction under the settlement agreement permitted review of the City's compliance with its own approval procedures, the district court would have no power to instruct the City that the plan must be approved in any particular manner. The Tenth Amendment prevents federal courts from commandeering the local legislative process. *New York v. United States*, 505 U.S. 144, 161 (1992). And any attempt to determine whether the City Council approved the plan through the process required by local law would undermine "principles of federalism" that the settlement agreement could not override. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 106 (1984).

10

What's more, this entire contempt proceeding rests on a blatant misunderstanding of the rules that govern the City Council's proceedings—which only underscores why federal courts do not intrude on this process to begin with. The City Charter and Council Rules catalog numerous instances in which no formal vote is required, particularly in the context of litigation. As Mr. Marcus testified, the City Council "can approve things by a vote, they can approve things on unanimous consent. They can approve things via consensus. They can approve things via discussion." SuppApp104. And as Mr. Fauble testified, approval can happen by "unanimous approval" or a "generalized agreement." SuppApp215.

Intervenors misread the City Charter in arguing (Ans. 18) that the City Council could approve the encampment-reduction plan only by a vote. As Mr. Fauble explained, the Charter is a document of limitation—not authorization—so the City Council possesses inherent authority except as limited by the Charter. SuppApp194. Although City Charter § 244 generally requires the Council to take certain acts through voting, that provision is subject to exceptions "otherwise provided in the Charter." L.A. City Charter Art. II, § 244. One such exception is § 272, which

11

establishes an attorney-client relationship between the City Attorney—a separately elected official—and the Council. *Id.* Art. II, § 272 ("The City Attorney shall manage all litigation of the City, subject to client direction in accordance with this section, and subject to the City Attorney's duty to act in the best interests of the City and to conform to professional and ethical obligations."). When the Council acts in its capacity as a client in litigation (not as a legislative body), § 272 does not require the Council to take a formal vote to "direct[]" litigation. *Id.*

The City Council Rules further undercut the district court's misimpression (shared by Intervenors) that the City Council could approve the plan only through a roll-call vote. City Council Rule 49 provides that, while certain inapplicable enumerated activities require roll-call votes, "[o]n other matters, if opportunity is given and no objection is raised, the Presiding Officer may announce a unanimous approval of an item under consideration." L.A. City Council Rules ch. VIII, rule 49.

Clarification thus confirmed rather than cured the "clear error" that mars the contempt charges. *In re Van Dusen*, 654 F.3d 838, 841 (9th Cir. 2011). The district court has no jurisdiction to probe the processes by which the City Council approved the encampment-reduction plan.

12

And its charge of misrepresentation rests on a clearly erroneous premise that the Council could approve the plan only by a vote.

## II. Even if the district court had the power to adjudicate the propriety of the City Council's approval, the contempt proceeding would still interfere with pending state-court litigation.

The second clear error here is the contempt hearing's inevitable collision with the *CANGRESS* litigation in California court. Pet. 29-32. As Intervenors see things, the district court averted any conflict by supposedly abandoning any focus on the alleged Brown Act violation in its February 9 order. Ans. 11-12. But Intervenors cannot put daylight between the Brown Act litigation and the supposed misrepresentation concerning the closed session because the two are inextricably intertwined—not "wholly separate and distinct." *Id.* at 10.

This Court need only see what happened the *next day* at the February 10 hearing when Mr. Marcus was barraged with questions about the events that took place during the City Council's closed session. Intervenors and the Alliance repeatedly asked Mr. Marcus to divulge what occurred during the closed session. *See supra*, at 5-7. They asked those questions because Intervenors see the key "issue at the evidentiary hearing" as whether "the [encampment-reduction plan] actually was

13

approved" by the City Council during its closed session on January 31, 2024. Ans. 18. Intervenors never explain how the City could prove that the Council approved the plan without explaining *what* it did during the closed session—information whose confidentiality and privileged status is currently being litigated in the California courts, which is the proper forum for Brown Act disputes.

For much the same reason, the Alliance blinks reality in asserting (Ans. 9) that the contempt hearing "will have zero impact on the" Brown Act litigation in state court. The case for abstention no longer rests on a mere "*potential* for conflict" (*id.*)—the February 10 hearing put any doubts to rest on mere potential. Because Intervenors and the Alliance are questioning the City's lawyers about the contents of the Council's closed session as the California courts consider whether those contents should remain confidential, this proceeding risks destroying the City's appellate rights before the trial court has even entered a final judgment in *CANGRESS*. The vital state interest in compliance with the Brown Act requires abstention under *Younger v. Harris*, 401 U.S. 37 (1971). *See, e.g.*, *Lake Luciana, LLC v. County of Napa*, 2009 WL 3707110 (N.D. Cal. Nov. 4, 2009).

The district court all but admitted an intent to overtake the Brown Act litigation in declaring at the February 10 hearing that "democracy depends on transparency." SuppApp123. The City wholly agrees that transparency is an important democratic value—one that the Legislature has carefully balanced against competing considerations in the Brown Act. But democracy is not advanced by a federal court's imposition of its *own* preferences for even broader transparency by forcing witnesses to disclose information from closed sessions in direct violation of that Act. That is quite literally the opposite of democracy.

Intervenors and the Alliance cannot mask the reality that this proceeding is on an inevitable collision course with the Brown Act and the *CANGRESS* litigation, which is ongoing, has not resulted in a final judgment, and will be subject to appellate review. This Court's intervention is regrettably necessary to avoid irreparable harm to the City that will result from the district court's clear legal error.

## III. The proceeding has and will continue to put witnesses in an impossible position.

The City's privileges are now in a more precarious state than ever, as their protection lies in the hands of three people—two City attorneys and one high-ranking City official—who have and will continue to be

forced to choose between disclosing confidential and privileged information that the Brown Act (and, for the City's lawyers, the Rules of Professional Conduct) prohibit them from revealing, or refusing the Court's direction to answer questions that would require such disclosures.

On February 10, after taking under submission numerous City objections to questions to Mr. Marcus from the Alliance and Intervenors, the district court instructed Mr. Marcus to answer four of those questions but then waffled on enforcing his instruction when he still refused to answer. SuppApp96, SuppApp102, SuppApp119, SuppApp126-27. The only reason this privileged information wasn't revealed in open court is because Mr. Marcus refused to answer at great personal and professional risk. And the district court has shown the exact opposite of a "cautious, respectful-of-the-privilege approach." Alliance Ans. 6. The arbitrary pattern of daring witnesses to disclose privileged information while declining to impose a sanction that would expose the privilege rulings to appellate review only underscores the need for mandamus relief.

The Alliance suggests (Ans. 7) the City should simply "appeal [any] sanctions" imposed "if the district court imposes consequences for any City refusals to answer" similar questions. But the Alliance never

16

explains how the City might prevent or even mitigate the harm of privileged information being revealed if witnesses choose to answer questions under court order instead of risking a contempt sanction. Even if a witness could force appellate review by being held in contempt, this Court has never tolerated forcing litigants or witnesses to "'choose between being in contempt of court and violating [the] law'"—here, the Brown Act. *In re Philippine Nat'l Bank*, 397 F.3d 768, 774 (9th Cir. 2005).

Intervenors attempt to justify this unacceptable state of affairs on the theory that the City "opened the door to questions about the approval of the" encampment-reduction plan (Ans. 20) and has purportedly used privilege as both a sword and shield (*id.* at 22). But Intervenors' sword-and-shield argument would apply only if the City "affirmatively place[d] its attorney-client communications at issue," "implicitly waiv[ing] the privilege." *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 353 (9th Cir. 2014). To use privilege as a sword and shield, the City would need to rely on privileged communications and then refuse to disclose them.

That's not what happened here. The City didn't put privileged communications at issue by announcing that the Council had approved the

17

plan any more than an attorney puts privileged discussions about strategy at issue by announcing the *unprivileged* information that a client, after those discussions, has agreed to accept a settlement offer or voluntarily dismiss its claims. *Rodriguez v. Seabreeze Jetlev LLC*, 620 F. Supp. 3d 1009, 1021 (N.D. Cal. 2022).

Even Intervenors recognize (Ans. 21) that the City hasn't put at issue privileged "communications between the City Attorneys' office and the City Council, but rather, the process by which the City Council approved the" encampment-reduction plan. The *district court's* unsupported skepticism about the accuracy of the City's representation of this non-privileged approval does not amount to the *City's* waiver of privilege. *Cf. Rock River Commc'ns, Inc.*, 745 F.3d at 353 (a plaintiff's assertion of the sham exception to a defendant's *Noerr-Pennington* defense did not amount to the defendant's waiver of privilege).

In short, there's no basis in fact or law to find any waiver of privilege here. The district court's contention that disclosure is necessary because the "door was opened" and privileged was "used as a sword and shield," SuppApp126, amounts to clear legal error. This Court should not hesitate to redirect the district court's focus to the terms of the settlement

18

agreement and provide guidance regarding appropriate guardrails to prevent interference with the Brown Act proceeding. At a minimum, this Court should correct the district court's mistaken understanding that merely announcing the City Council's approval amounted to a waiver of privilege, particularly in light of the district court's desire to send these issues "up to the circuit in a package" so that the district court "can be corrected by the circuit" if its privilege rulings are incorrect. Supp-App130-131.

## IV. The district court's erratic track record confirms that this Court should stay the hearing before the City suffers irreversible harm.

With little to say in defense of a contempt proceeding that has veered off course from the settlement agreement into municipal-law issues that the district court has no authority decide, the Alliance takes aim (Ans. 11-14) at the City's request in a *different* brief that this Court reassign the case to a new judge on remand from the consolidated appeals. No. 25-4623 Dkt. 21.1 at 89-106. The Alliance spins (Ans. 12) a sanitized account in which Judge Carter simply "read[] in the newspaper about another court decision and set[] an evidentiary hearing to examine

19

a potential misrepresentation in his own courtroom about a key settlement issue."

Far from griping about a "pesky judge" who is concerned about settlement compliance, Alliance Ans. 11, the City strenuously objects to the manner in which the district judge has shed the role of neutral adjudicator. The judge has proclaimed himself the Mayor's "worst nightmare," threatened to make the City's officials' "lives miserable" or their careers "dead politically," and frankly announced that "I don't trust you as an institution" in seeking to expand his authority beyond the settlement agreement. No. 25-4623 Dkt. 21.1 at 94-95, 98. He has persisted in flouting the party-presentation principle, under which "courts 'call balls and strikes'; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curium); *see LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 953 (9th Cir. 2021). The judge has also reminisced about his numerous past ex parte interactions with City leaders (before the City registered its objection to them), and the time when the former Mayor proclaimed his "membership in the Judge Carter fan club Los Angeles chapter." SuppApp175-176. And he has strayed far beyond the terms of the settlement agreement. This proceeding is a perfect example:

20

The parties are now a million miles away from anything that the settlement agreement commits to the district court's authority, with the evidentiary hearing focused on the City Charter, the City Council's Rules, the Brown Act, and the City's privileges.

To be clear, this petition does not raise the City's reassignment request, which is an issue for another day in the consolidated appeals. But this Court should not blind itself to the way that the district judge has conducted this case for the past six years. By the next filing in this Court, it may very well be too late for this Court to do anything about the dangerous game of privilege roulette being played below.

## CONCLUSION

This Court should issue a writ of mandamus directing the district court to vacate its January 14, February 4, and February 9 orders expanding the scope of the contempt hearing. If the Court has not ruled on the petition by the time that the hearing resumes in mid-March, the Court should stay any further proceedings.

Dated: February 20, 2026        Respectfully submitted,

/s/ *Theane D. Evangelis*
Theane D. Evangelis

*Counsel for Petitioner*
*City of Los Angeles*

22

# CERTIFICATE OF COMPLIANCE

This reply complies with Federal Rules of Appellate Procedure 21(d)(1) and 32(g) and Circuit Rules 21-2(c) and 32-3(2) because it contains 4,091 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

The reply's type size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because the reply has been presented in 14-point New Century Schoolbook type.

Dated: February 20, 2026          /s/ *Theane D. Evangelis*_____
                                        Theane D. Evangelis

                                        *Counsel for Petitioner*
                                        *City of Los Angeles*

23

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, I electronically filed the foregoing reply with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system.

I also caused the reply to be hand-delivered to the district court in Courtroom 10A, 411 West 4th Street, in Santa Ana.

Dated: February 20, 2026                    Respectfully submitted,

/s/ *Theane D. Evangelis*_____
Theane D. Evangelis

*Counsel for Petitioner*
*City of Los Angeles*

24