No. 26-784

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

IN RE CITY OF LOS ANGELES

CITY OF LOS ANGELES,

*Petitioner*,

v.

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA,

*Respondent*,

LA ALLIANCE FOR HUMAN RIGHTS ET AL.,

*Real Parties in Interest*.

From the United States District Court
for the Central District of California
Case No. 2:20-cv-02291 | The Honorable David O. Carter

**SUPPLEMENTAL APPENDIX TO REPLY IN SUPPORT OF
PETITION FOR A WRIT OF MANDAMUS
(VOLUME 1 OF 1)**

Hydee Feldstein Soto
Valerie Flores
Arlene N. Hoang
Jessica Mariani
CITY ATTORNEY'S OFFICE
200 North Main Street
City Hall East, 6th Floor
Los Angeles, CA 90012
213.978.7508

Theane D. Evangelis
Marcellus McRae
Bradley J. Hamburger
Daniel R. Adler
Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197
213.229.7000
tevangelis@gibsondunn.com

*Counsel for Petitioner City of Los Angeles*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) |
| Plaintiffs, | ) CIVIL |
| | ) |
| | ) Los Angeles, California |
| vs. | ) |
| | ) Tuesday, February 10, 2026 |
| CITY OF LOS ANGELES, ET AL., | ) ( 9:02 a.m. to 11:32 a.m.) |
| | ) ( 1:02 p.m. to  3:00 p.m.) |
| Defendants. | ) |

HEARING RE:

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066];

MOTION TO ENFORCE A TERM OF THE PARTIES' SETTLEMENT AGREEMENT
[DKT.NO.1122]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**            SEE PAGE 2

**Courtroom Deputy:**       Karlen Dubon

**Court Reporter:**         Recorded; CourtSmart

**Transcribed by:**         Exceptional Reporting Services, Inc.
                            20079 Stone Oak Pkwy.
                            Ste 1105-237
                            San Antonio, TX 78258
                            361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

1

2

**APPEARANCES:**

| | |
|---|---|
| For Plaintiffs: | ELIZABETH A. MITCHELL, ESQ. |
| | MATTHEW UMHOFER, ESQ. |
| | Umhofer Mitchell & King |
| | 767 S. Alameda Street, Suite 270 |
| | Los Angeles, CA 90021 |
| | 213-394-7979 |
| | |
| For Defendants: | MARCELLUS A. MCRAE, ESQ. |
| | BRADLEY J. HAMBURGER, ESQ. |
| | POONAM KUMAR, ESQ. |
| | Gibson Dunn & Crutcher |
| | 333 South Grand Avenue |
| | Los Angeles, CA 90071 |
| | 213-299-7000 |
| | |
| | THEANO EVANGELIS, ESQ. |
| | Gibson Dunn & Crutcher |
| | 333 S. Grand Ave. |
| | Los Angeles, CA 90071 |
| | 213-229-7726 |
| | |
| | JENNIFER MIRA HASHMALL, ESQ. |
| | Miller Barondess |
| | 2121 Avenue of the Stars |
| | Suite 2600 |
| | Los Angeles, CA 90067 |
| | 310-552-4400 |
| | |
| For Intervenor: | SHAYLA R. MYERS, ESQ. |
| | Legal Aid Foundation of LA |
| | 7000 S. Broadway |
| | Los Angeles, CA 90003 |
| | 213-640-3983 |
| | |
| Special Master: | MICHELLE MARTINEZ |

**EXCEPTIONAL REPORTING SERVICES, INC**

2

3

## INDEX

| INTERVENORS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SCOTT MARCUS | | | | |
| BY MS. MYERS | 64 | | 110/125 | |
| BY MS. MITCHELL | | 93 | | -- |
| BY MS. KUMAR | | 103 | | -- |

3

**4**

**Los Angeles, California; Tuesday, February 10, 2026; 9:02 a.m.**

--oOo--

THE COURT: And we're back in session on the LA Alliance matter. And, counsel, would you make your appearances beginning with the LA Alliance, then the City, then the intervenors please, and then the County.

MS. MITCHELL: Good morning, Your Honor, Elizabeth Mitchell, Umhofer Mitchell & King on behalf of plaintiff LA Alliance. My partner Matthew Umhofer will be here shortly.

THE COURT: All right. Thank you. Counsel.

MS. EVANGELIS: Good morning, Your Honor, Theano Evangelis on behalf of the City.

THE COURT: Morning.

MR. MCRAE: Good morning, Your Honor, Marcellus McRae on behalf of the City.

THE COURT: Good morning.

MS. KUMAR: Good morning, Your Honor, Poonam Kumar on behalf of the City.

THE COURT: Good morning.

MR. HAMBURGER: Good morning, Your Honor, Bradley Hamburger on behalf of the City.

THE COURT: Good morning.

MS. MYERS: Good morning, Your Honor, Shayla Myers on behalf of the intervenors.

THE COURT: Morning.

**MS. HASHMALL:** Good morning, Your Honor, Mira Hashmall here for the County of Los Angeles.

**THE COURT:** Good morning.

Just to recap where we are today, the Court's become concerned about possible misrepresentations made by representatives of the City, related to the approval of the encampment reduction plan in January of 2024. This issue is separate and distinct from the issue being decided by Judge Kin in the state court. And after considering the briefing filed by counsel, this Court's inclined to believe it can resolve this issue without intruding on the state Brown Act litigation, pending before my colleague Judge Kin or the jurisdiction of the state court.

The issue regarding potential misrepresentations made by the City to this Court initially arose when the City attorney seemed to represent to this Court that a vote had been taken in closed session by the City Council on the encampment reduction plan on January 31st of 2024.

This representation was seemingly soon contradicted when the City attorney represented that there was nothing to report from the City Council's closed session that occurred that day.

There's been subsequent testimony before this Court that, in fact, no vote was taken. These contradictions and others lead to this inquiry about whether a vote was, in fact,

**6**

taken concerning the encampment reduction plan in closed

session on January 31st, 2024.

I want to ensure that all parties and intervenors are

provided with due process and the opportunity to be heard.  So,

counsel, I want to hear your thoughts and if it's acceptable to

the parties, I'll begin with the City, moving to the

intervenors or LA Alliance, your decision, and then a rebuttal

round, a short rebuttal round by everyone after you've heard

your respective positions.

So, counsel on behalf of the City.

**MS. EVANGELIS:**  Good morning, Your Honor, Theane

Evangelis on behalf of the City of Los Angeles and I appreciate

the opportunity to be heard.

Your Honor, the City objects to this entire line of

questioning.  We've made our objections known to the Court.

We've also filed a petition for relief from the Ninth Circuit.

And the Ninth Circuit is considering that and has ordered

briefing on it, which will be complete next week.

So we would ask the Court, if the Court is inclined

to continue down this path, and especially if the Court wishes

to hear witness testimony if that's what's on the table right

now, we would ask at a minimum that we not proceed that far

until we've heard from the Ninth Circuit.

We would also ask that the Court please specify what

was the specific statement.  So Your Honor has mentioned the

**7**

representation and I believe the Court said that the City seemed to represent that a vote was taken.  Your Honor, we never represented that a vote was taken.  So we will start there and just please ask the Court to point to what representation was made, because we've asked and we still have not gotten the who, what, when, where so that we can adequately respond to this issue.

So I would like to go through our objections, but as I've said, they are all presented to the Ninth Circuit and we would ask the Court to reserve ruling because, Your Honor, we respectfully disagree that this proceeding, that this inquiry can happen without completely nullifying the city's rights in the state court proceeding.

The two proceedings will be on a collision course.  The only way to defend ourselves and to respond to the Court's concerns about what happened in that closed session, would be to discuss what happened in that closed session, which we cannot do.

We've explained that for a number of reasons.  The Brown Act, attorney/client privilege, deliberative process privilege, legislative process privilege, and so forth.  All of those issues are squarely presented in the state court proceeding.

But, Your Honor, I want to take a step back here and just express our bewilderment why this is a concern because

**EXCEPTIONAL REPORTING SERVICES, INC**

nobody is challenging the encampment reduction plan, nobody, not the City, not intervenors, not the Alliance, everyone agrees that that was a valid and binding plan. We're actually here on the 8.2 motion which is all about compliance with that plan. We've never taken the position that somehow that wasn't validly approved, that somehow that doesn't apply or that there's any infirmity with the encampment reduction plan. We might disagree about what it entails, but that's about the interpretation of it, not the validity of it.

So as an initial matter, there is nothing about the Cangress litigation in state court that could affect that. It's off the table.

So, Your Honor, I'll go back to what are the Court's concerns. There --

**THE COURT:** Counsel, would you mind for just one moment.

Sir, there's no photographs allowed in the federal court, so the CSO speak to the gentleman in the brown who's been taking photographs, please, and if necessary, remove him. Thank you. I apologize, counsel, there's no photographs and it has nothing to do with your presentation but it was distracting.

**MS. EVANGELIS:** Thank you, Your Honor.

So I'd like to go back to what was the --

**THE COURT:** No, no, it's the -- I'm sorry, I

**9**

apologize.  It's the gentleman behind him, right there.  Thank you very much.  The CSO is going to see you, sir, thank you very much.  And, counsel, I apologize for the interruption.

MS. EVANGELIS:  Thank you, Your Honor.

THE COURT:  Just a moment.  If you'd take the gentleman outside so we're not distracted it would be appreciated.  And, counsel, would you give us one moment, please.

And, sir, you're welcome to return once we're assured you have -- aren't taking anymore photographs.  Thank you very much.

(Pause)

THE COURT:  And, counsel, if you'd like to start at any place because of the interruption.

MS. EVANGELIS:  Thank you, Your Honor.  I'd like to go back to where the Court began here.  Because there is no representation in the record about a vote.  So that's the entire premise for this hearing, without that, there is really no reason for us to be having this proceeding so we're just still in the dark about where in the record that supposed representation was.

So we haven't found one.  We -- it's our position we never made any representation about a vote.  Our best guess was a joint stipulation that was filed on April 4th, 2024 which, of course, the Court is familiar with where the parties said that

Case: 26-784, 02/20/2026, DktEntry: 18.2, Page 11 of 263
Case 2:20-cv-02291-DOC-KES Document 1159 Filed 02/11/26 Page 10 of 135 Page ID #:33131

10

9,800 -- the 9,800 encampment resolution plan and milestones was presented to the City Council on January 31st, 2024 which approved them without delay.

There's nothing about that statement that's untrue. It doesn't say whether a vote happened, whether a vote didn't happen, says nothing about a vote. Doesn't say anything about how approval happened, just says it was approved and it was and we can perceive there's no question that that plan is valid and binding.

So it's just not true that approval equals vote, there's no basis for that anywhere. No one said anything about a vote. Of course, Your Honor, when we're talking about closed sessions, just as a general matter, that's when the City Council receives advice from its -- from the City Attorney's Office, when legal advice is discussed, those are privileged communications, of course, lots of actions can be considered, discussed and approved through a lot of different ways, it doesn't mean there's a formal roll call vote like in a regular budget session of the City Council.

So -- and, Your Honor, how it was approved, what the contours of that was, who said what, none of that is properly before this Court, because actually that is subject to all of the privileges that have been raised by the City in the state court proceeding.

And, Your Honor, this is a classic case of -- for

Younger (phonetic) abstention.  This is a situation where there is a parallel state court proceeding that is ongoing, it implicates legitimate important state interests, maybe some of the most important state interests that there are, governance, what rules, legislative bodies abide by.

The legislature's -- the City Council's ability to prescribe its own rules, the state's interests in all of that, the Tenth Amendment concerns implicated by all this are very concerning to the City.

And so we take issue with intruding into that.  And if this Court proceeds down the path of inquiring into what happened, who said what, and all of that, that will have the effect of an injunction really of enjoining the state court proceeding of imposing something on the state court proceeding.

Judge Kin right now has not even issued a final judgment in that action.  There have been objections filed. The parties are briefing it.  If, in fact, he orders the proceedings of that closed session to be disclosed, that would be a mandatory injunction.  The City has already indicated it will appeal.  Under state law, there's an automatic stay pending all appeals for mandatory injunctions.

So we are really a long time away from a final ruling in the state court matter.  So there is nothing to do here and, Your Honor, there's nothing to see here, because again I go back to the fact that no one's questioning the encampment

**12**

reduction plan.

So the -- all of this is really irrelevant.  But, Your Honor, we're very concerned that the Court in your order yesterday said that you're concerned about a willful misrepresentation.  That is very serious stuff.  And we take it seriously.  But there is no evidence in this record whatsoever that any representative of the City said anything that that representative thought was untrue or knew was untrue.

The encampment reduction plan was approved.  Full stop.  That's all that was said.  And that's true.  So it didn't say anything about it was approved according to certain procedures or in a particular way, it said nothing about a vote, it said nothing about any of that.

So, Your Honor, to the extent that we start probing all of those questions, we have serious, serious concerns.  Again, we're running head long into the Cangress litigation.  And so this is very important that we proceed carefully and there is no reason to hurry here.  There is no urgency, there is no emergency, but if we begin asking witnesses questions about what was said in a closed session with counsel, with the City attorney representatives that were there, we are destroying all of these privileges.  We are eviscerating the City's right to an appeal, all of its rights will be gone the minute a witness gets up on the stand and then is ordered to answer a question that will eviscerate all of those privileges.

**EXCEPTIONAL REPORTING SERVICES, INC**

And, Your Honor, it's a violation of state law for City employees and others to disclose the contents of a closed session.  So not only are we talking about the City's privileges, we're talking about personal jeopardy for a witness who comes in to this courtroom to start testifying.  I don't want to put anyone in that position.

For the Court to put someone in that position right now seems unnecessary, seems we should proceed with caution. We should really not rush into this.

So I'll again say that nobody has ordered disclosure of anything that happened in that session and that will be litigated, that is being litigated right now.  And so in light of all of those privileges and concerns, we think we should proceed cautiously.

And, Your Honor, we have not had an opportunity to even brief these questions.  So intervenors yesterday mentioned the city charter.  Well, we think that the city charter actually doesn't say what they think it says in Section 2782 for example that talks about when the city attorney is managing litigation and it does so at the direction of the City Council and how that all plays out.  There's no mention of a vote.  But let us brief that question, Your Honor, we haven't had a chance to brief these privileges.

This is all just innuendo and assumptions and we don't even know what's at issue.  We really don't have a clear

**14**

target to even shoot at here.

So we think that it would be wise, Your Honor, at least to wait for the Ninth Circuit, at least to allow us to brief this question, at least to point out where in the record there's evidence of a misrepresentation, let us have an opportunity to truly defend ourselves.

And we really appreciate that we have the opportunity to be heard today, but there's no need for a compressed schedule. There's no need respectfully, Your Honor, for us to move quickly within the next week to do things, to ring bells that can't be unrung. This is the classic example of that problem so let's proceed cautiously.

So I also want to address the point that intervenors mentioned yesterday. They said the City has already disclosed what occurred in session. That -- nothing could be further from the truth than that statement, Your Honor, that's just wrong. That's absolutely wrong.

To say that a client, we're all lawyers here, to say that a client approved a course of action doesn't disclose what you discussed with your client. To say that a client didn't approve an action or didn't authorize someone to make a settlement or -- and so forth. None of that discloses the substance of the communication. This is serious stuff. This is the core of attorney client privilege and no one has waived that. We have not, we will not, Your Honor, waive that.

**EXCEPTIONAL REPORTING SERVICES, INC**

Case: 26-784, 02/20/2026, DktEntry: 18.2, Page 16 of 263
Case 2:20-cv-02291-DOC-KES   Document 1159   Filed 02/11/26   Page 15 of 135   Page
ID #:33136

**15**

So we haven't disclosed any of that.  No one said what happened in that closed session and no one can say what happened in that closed session.  So, Your Honor, that waiver argument is just really -- there's no basis for it whatsoever.

So I would welcome any questions the Court has in and an opportunity to respond to intervenors, the Alliance, and anyone else who will be heard today, but Your Honor, I just want to again highlight that if we go down this path, we will be eviscerating all of the City's privileges, we will be destroying the City's right to appeal the state court proceeding.  We will be effectively enjoining Judge Kin from his decision in that case and from proceeding in the normal course.

So that litigation is ongoing, let's have an opportunity to brief this.  Let's pause for a minute.  Thank you.

**THE COURT:**  Counsel, I saw some notes being passed, why don't you consult with your colleagues for just a moment --

**MS. EVANGELIS:**  Thank you.

**THE COURT:**  -- as a courtesy, so you're certain you've covered the arguments in your opening.

**(Pause)**

**MS. EVANGELIS:**  Thank you.

**THE COURT:**  Thank you.  Then LA Alliance or intervenors, who would prefer to present next.

**16**

**MS. MYERS:**  That's what I think, so you got up, so.

**MR. UMHOFER:**  I know.

**MS. MYERS:**  Thank you, Your Honor.  Shayla Myers on behalf of the intervenor, LACAN.  I think it's important to note, Your Honor, that the Los Angeles Community Action Network who is an intervenor in this case and has been in this case since the beginning brought the Cangress litigation not as an intervenor in this case, but rather a member of the public that is extremely committed to the issue of transparency and particularly the issue of transparency when it comes to clearing 10,000 almost encampments from the street and ensuring that the politicians and the City are accountable for the decisions that they make.  That is the position that they took when they brought this Brown Act litigation, separate and apart from this case.

Certainly, Your Honor, the intervenors knew about the Brown Act violation as a result of this litigation, but their status as a petitioner in that case is separate and apart.  And as we noted in our filing yesterday, we don't disagree with the City's position that we should leave the Brown Act litigation to itself.

But, Your Honor, that does not mean that this Court does not have a role in interrogating the veracity of statements made by the City to this Court for purposes of resolving sanctions motions pending before the Court.

Your Honor, in the course of defending against a sanctions motion and a motion for settlement enforcement, the City of Los Angeles, through its -- the Assistant City Attorney Scott Marcus represented that the City Council approved the encampment reduction plan.  That statement and the stipulation that was submitted to this Court that resulted in the resolution of the settlement compliance motion and was a part of the resolution of that, that representation could not be more clear.  The City Council approved the encampment reduction plan without delay.

Your Honor, words have meaning.  The word approve means something.  When Scott Marcus from the City Attorney's Office represented to this Court that the City Council approved it, that meant without a doubt, that the City Council did it consistent with the City's obligations under its charter to approve actions.

And, Your Honor, I would point the City -- I would point the Court to the City charter, which states that as except as otherwise provided in the charter, action by the Council shall be taken by a majority vote of the entire membership of the Council.

And so, Your Honor, while the City did not say and the City Attorney's Office did not represent that a vote was taken, when the City Attorney's Office states that the City Council approved without delay a plan, it is implicit and

**18**

important that the Court can understand the respect that that was done consistent with the City charter.

And that, Your Honor, is the problem that we are having with the City of Los Angeles and that I think Your Honor has raised in the course of these contempt proceedings.  Is that the City of Los Angeles says things, and then when they are held to account for those representations, they inform the Court and the plaintiff and the intervenors and the public that the words they say mean something else.

Well, Your Honor, that's why we're here today is to ask that question, if the City Attorney's Office when they said that the City Council approved it meant something else, then we get to ask, what else did they mean.  Because the charter is very clear that approval means a vote.

And, Your Honor, the City absolutely should be held to account to answer that fundamental question.  When you said approved, what did you mean?  And, Your Honor, that does not need to impede into the privileges that the City continues to assert in the Brown Act litigation related to those closed -- that closed session.  That is about what the City Attorney's Office represented to this Court, what they meant when they said that they approved the encampment reduction plan.

And, Your Honor, I think it is important to note while the City's attorneys can say that the intervenors are wrong when we say they opened the door, the City Attorney's

**19**

Office represented what occurred during closed session.  The City Attorney's Office represented that the encampment reduction plan was approved in closed session.  And Your Honor is well within the authority of the Court to interrogate then what the City meant when it says those words and that can be done, Your Honor, without asking the question what was said in closed session.

If the City Attorney's Office can point to a process by which the encampment reduction plan was approved, it is separate and apart from the confines of the charter, then certainly they can do so.  And if they do so, then it's up to Your Honor to determine whether it was a misrepresentation to the Court that a vote occurred.

Your Honor, this issue arose because in the course of the Brown Act litigation, the Cangress asked for a disclosure of the vote.  And in response to the question, what was the vote, because that's how the charter says, actions have to be taken by the City Council and the City represented that an action was taken by the City Council, the City Attorney's Office represented that no vote was taken.

Your Honor, City Attorney's Office represented no vote was taken, which means, Your Honor, not only did they disclose that an approval was given, but they included details about how that approval was given, or in this case, how the approval was not given, Your Honor.  And that too is another

instance in which the City, when it is convenient for them, are opening the door to what occurred during that closed session.

Likewise, Your Honor, in the course of the litigation and in the course of the hearing, Matt Szabo testified that the encampment reduction plan was approved by the City Council. Your Honor, this is not just one instance or two instances, this is multiple instances in which the City when it supports their position is allowed to testify about what occurred or put forward evidence or represents about what occurred during that closed session, but when called to account about contradictory statements about what occurred during that closed session, the City claims that they can't disclose anything about that.

Your Honor, we are very clear about what the confines of the Brown Act case is about, you know, I have the honor of being counsel of record in both of these proceedings, and we would do nothing to interfere with the sovereignty of Judge Kin in those proceedings. That case was brought for a very specific reason because it implicates as Ms. Evangelis says, very important state interests.

But those interests are not implicated by the very important federal interests at issue here, which is the sanctity and integrity of these court proceedings. The City of Los Angeles should not be allowed to make material representations and contradict those material representations in other instances and not be held to account, or at least,

**21**

Your Honor, to question about what the City intended, what it meant when it said actions were taken.

Your Honor, these proceedings have gone on for months and I think the Court has recognized, I think all of the parties have recognized that much of what we are fighting about are what words mean.  That when the City makes representations and we attempt to hold them to account, the definitions shift like the winds as the court proceedings go.

The charter is very clear about the process by which the City Council can take actions.  And when the City Attorney's Office represents that those actions are taken, it is not on us as the parties opposing the City or Your Honor as the judge in these proceedings, to in those instances clarify every single question.  Words have to be given meaning and when the City comes back and says, words have different meanings, then it's well within Your Honor's authority and obligation to the sanctity of these proceedings to actually ask those questions what do those words mean when they say them.

Your Honor, again we completely agree that these are important issues.  We also agree, though, that these are issues that the Court is well within its authority and responsibility to be interrogating.

In terms of the timing of it, we don't take a position about whether or not the Court should wait for the Ninth Circuit related to this.  This issue has been outstanding

**22**

for quite a bit of time because there's not been a process by which to raise these issues.  We don't object to allowing the Ninth Circuit to rule on these particular issues, because of the potential concern that the City raises.  That said, we don't think that there's any merit whatsoever to the City's position.  And if the Court does choose to go forward, we do have specific questions and we would represent that we don't intend to ask questions specifically about what was said in closed session, what -- or those sorts of things.  We're simply asking for clarification about the inconsistencies related to the City's position and what it means for purposes of the City's representations in these proceedings.  Thank you.

**THE COURT:**  The same courtesy.  If you have anyone here --

**MS. MYERS:**  No one's asked, Your Honor.

**THE COURT:**  All right.  Thank you very much.  Now turn to LA Alliance.

**MR. UMHOFER:**  Thank you, Your Honor.  I just want to run through --

**THE COURT:**  And would you also once again state your name for the record.

**MR. UMHOFER:**  I'm sorry, Matthew Umhofer on behalf of the LA Alliance and thank you for hearing us on this issue.  I just want to run through the arguments that were made by the City.  None of them work.

The City pretends to be confused about what this is about. This Court has issued multiple orders specifically identifying its concern about whether a representation, a misrepresentation was made to the Court about the encampment reduction plan.

The City's known about this issue already because it's involved in the Cangress action, the Brown Act litigation, but it also knows because on January 14th, the Court issued an order about this. The City has had plenty of time and notice about what's going on here and about what the concern is.

And, of course, the City pretended to guess at what the representation was, but it knows exactly what the representation was. It was made in Docket No. 713 at paragraph 8, a stipulation that the City entered into to resolve one of its many, many failures to comply with the settlement agreement in this case.

And in paragraph 8, the 9,800 encampment reduction plan and milestones were presented to the City Council on January 31st, 2024, which approved them without delay. They said what happened.

The Court is concerned, the plaintiffs are concerned and the intervenors are concerned about whether that was true. Nobody's made a decision about that. We need to find the facts. The City wants to prevent this Court from inquiring into the facts that they put at issue. That's remarkable.

**24**

The City wants to both say what happened, but not say what happened.  They want to make representations to the Court, but be unable to back them up or explain them when asked questions about them.  It's a remarkable amount of hubris that the City thinks it's immune from questions around this kind of thing.  Immune from simply fact finding around this issue.

So the idea that they are confused about what's at issue here just doesn't stand up to the record here.  They know exactly what they're -- what this hearing is about and why the Court is concerned.  And it is their -- it is in the manner in which they've approved this, their last minute briefings, their runs to the Ninth Circuit that exposes their nervousness about this issue and fact finding into it.

So the next thing, next argument -- so the first argument was we're confused, Your Honor, we don't know what this is about.  They do, the Court has given adequate notice and they've had plenty of time to assess this issue and I don't believe they need more, but they are certainly asking for more and they're asking for more in two categories.

One, wait for the Ninth Circuit.  The Ninth Circuit already spoke.  The Ninth -- they asked to stop this hearing.  And last night the Ninth Circuit issued an order not granting that and simply -- and denying the administrative stay they requested, so the Ninth Circuit has spoken about whether a hearing should be stopped today.  We have an answer on that.

**EXCEPTIONAL REPORTING SERVICES, INC**

And so the next question is, should we wait for the Ninth Circuit to make a decision about their request, which is to stop this hearing and extraordinarily remove this Court from these proceedings. The Ninth Circuit has set briefing days from now, we'll brief it, but the Ninth Circuit has spoken about whether this hearing can go forward.

They asked, the Ninth Circuit did not grant a stay of this hearing. So this hearing, this fact finding alone can move forward.

They also asked, second, that we wait until the entirety, I think including appeals of the Brown Act litigation is concluded. If we wait that long, Your Honor, through appeals, the settlement agreement will expire. That is unacceptable.

The notion that we should wait until the Brown Act litigation is complete seems to be rooted in arguments based on Younger. And you heard the reach, Your Honor, in the argument by the City. The reach was, this is essentially going to enjoin what's happening in the Brown Act litigation to just ask questions about representations made in this Court and the truthfulness of it. Essentially enjoining is what I heard, or words to that effect. That's the reach, Your Honor, because it's not an injunction.

And the reason why they're putting it that way is because that's what's required to get Younger abstention. To

get Younger abstention, they would have to show that the contemplated fact finding that would happen here would enjoin the state proceeding or have the practical effect of doing so. But let's be clear about what that hearing -- what the Brown Act litigation is about.

The Brown Act litigation is about whether the City violated the Brown Act by doing things in closed session. That question is not before the Court. The question before the Court is, what is the truth of the representations that the City has made, both in a stipulation filed with this Court which was pretty darned important to resolving a series of misleading statements by the City and which the Court relied on in resolving that issue. And then Mr. Szabo also took the stand during the proceedings and talked about how the City Council had voted on -- had approved the encampment reduction plan, his words were approved.

And so if we go to those statements, those can be found on Docket No. 555 -- excuse me 955, page 132 of 304. And he is asked,

"So this chart constitutes the encampment reduction plan that was approved by City Council, correct?"

Objections, overruled.

"I believe so, yes."

So we have a representation both in the stipulation

**27**

and in testimony and those are the two places that we've identified thus far. The Court has certainly relied on the representation that the representations, and by the way, the questioning goes on by Ms. Myers and the answers continue concerning the approval of the encampment reduction plan on page 132 and 133.

And so we have these representations. They are separate from the question of whether they should have -- whether what happened, this approval should have happened in closed session or open session. The question here is, the City made a representation. Was it true? And that matters.

Look, Your Honor, I -- the one thing that I was happy to hear from the City is that they're not backing away from their commitments under the encampment reduction plan, although they actually are, because they've been trying to reduce encampment reduction obligations in this action and we have been pushing back on that. They can't meet those numbers. They're way under where they need to be on that. They are terrified of that 9,800 number, that commitment that they made in writing to this Court because they can't meet it.

So I'm glad to hear they're sticking with it, I'm glad to hear they're not backing off of it, but we are very concerned any representation that's been made by the City about that because it's such a critical piece.

We've entered into this agreement. Let's create some

**EXCEPTIONAL REPORTING SERVICES, INC**

Case: 26-784, 02/20/2026, DktEntry: 18.2, Page 29 of 263
Case 2:20-cv-02291-DOC-KES Document 1159 Filed 02/11/26 Page 28 of 135 Page ID #:33149

**28**

beds. Let's reduce encampments humanely and let's do it right and let's get people out of encampments and into beds. That's the point. And a misrepresentation about one of those pieces is critically important to what we're trying to accomplish here.

And I would echo the arguments by Ms. Myers as well and submit to any questions by the Court. If there are none, I'll sit down.

THE COURT: On behalf of the County?

MS. SOBEL: The County has no position on these issues, Your Honor.

THE COURT: Rebuttal by the City?

MS. EVANGELIS: Your Honor, may we have three minutes?

THE COURT: Certainly.

MS. EVANGELIS: Thank you.

(Pause)

THE COURT: Okay. We're back on the record. And, counsel, this is the rebuttal by the City. State your name again.

MS. EVANGELIS: Thank you, Your Honor, Theane Evangelis on behalf of --

THE COURT: Thank you.

MS. EVANGELIS: -- the City.

Your Honor, I'd like to talk about the big reach

**29**

here.  We heard about a reach.  The biggest reach of all is the notion that the City made any representation about a vote. What you just heard was nothing to substantiate that.  In fact, Ms. Myers said that it was implicit that there was a vote. Implicit is not a willfulness representation.  It's not a misrepresentation at all.

So why are we here?  Nobody can point to any statement about a vote.  And, Your Honor, the notion that we are not on a collision course with state court is just absolutely untrue.  I mean, it is demonstrably false on what we just heard.  Ms. Myers said we need to interrogate the veracity of the City's statements about what happened in closed session. They need to back up their statements said Mr. Umhof (sic), explain their statements.

How in the world can the City explain and defend itself that its statements about what Council approved in that closed session, how can it defend itself against the allegation that it misrepresented that without disclosing what happened in that closed session?

How could anyone say I didn't lie about this.  I'll tell you what really happened, I didn't lie.  I mean, that is absolutely ridiculous.  The notion that we could defend ourselves without disclosing what happened in that closed session.

And, Your Honor, that's exactly what Ms. Myers is

EXCEPTIONAL REPORTING SERVICES, INC

seeking as a remedy before Judge Kin. That's the very remedy at issue that's being briefed. She wants there to be full disclosure of everything that happened. So that is exactly the remedy being sought in state court and it's exactly what we would need to do to defend ourselves.

And, Your Honor, to be ridiculed for guessing what statement is at issue here, I'm really offended by that. Because no one has told us the statement. So, Your Honor, the only statement that we've identified is that the City Council approved the encampment reduction plan.

So this shell game about what representation was made about approval or about votes and hiding the ball, why hide the ball. We're just really trying to understand here what the allegations are so we can defend ourselves. And still nobody has pointed to a single representation about a vote having happened.

There is no way to thread the needle of somehow walking the line between the state court proceeding and misrepresentations about the state court proceeding in federal court and the City charter, let's talk about that for a minute, Your Honor. We've never had an opportunity to brief it.

Those are core state law issues, state interests. And, Your Honor, the city charter only requires a vote when the City Council's approval is required by law. And no City Council approval was required by law of the encampment

reduction plan.

So this is all just again improper. And so we heard that there was just sheer speculation that approval is -- it's implicit. It means a vote. No, actually it doesn't. People can approve things in lots of different ways, it can approve of things, they can disapprove of them, they don't have to take votes. And that is certainly contemplated by the charter and by the way the City operates.

So it is really a fallacy and that fallacy is the basis for a potential inquiry into the heart of attorney/client privileged communications. No one here is hiding anything. Your Honor, we are protecting the privilege. There is nothing more sacrosanct in our system of justice than the communications between a client and their counsel. And so, yes, we will stand up for that because that is so important. And that's our job here. We have to.

So, Your Honor, the fact that we may have disclosed the result that a client approved of a course of conduct does not waive the privilege over the conversations that went into that decision. Of course, it didn't. That never is the case.

So also saying something didn't happen doesn't waive the substantive communications that went into considering whether it would happen. This is all just so far afield.

And compliance with the City charter and with local laws, ordinances, state laws, none of those are federal

questions.  None of those are questions that we should be probing right now when there's a state court action that is probing the very same thing.  And, yes, that is exactly the case for a <u>Younger</u> abstention.  And Your Honor recited the perfect case about Brown Act violations in fact, it was <u>Lake Luciana v County of Napa</u>.  It was from the Northern District of California in 2009.  We cited it in our papers.

And in that decision there was no injunction by the district court, but there was the effective injunction, the effective derailing of a state court proceeding because it was asking the same questions and answering them in a way that would intrude on the prerogatives of a separate sovereign.  So that is exactly what <u>Younger</u> abstention requires.

So also, Your Honor, the first I heard about Mr. Szabo's testimony being at issue here was just now.  Nobody has said that was at issue.  Nobody put that in front of us and said, here's a misrepresentation.  We didn't have notice of that.  We're -- it wasn't a misrepresentation.  Again it was consistent, it was City Council approved.

But the notion that we knew what this was all about is just false.  So, Your Honor, we haven't had plenty of time, we just filed objections and we just got an order from the Court today, respectfully still not answering our questions about what the representations were.

And all of these questions, these are thorny legal

**33**

questions about state law, local city procedures, what's required, all of those again are the subject of tons of briefing and hearings and proceedings in state court, but we even haven't had even so much as a chance to brief them here, so why are we going to rush ahead to judgment, put witnesses on the stand and force them to answer questions that would divulge all of these -- the contents of a closed session, destroy these privileges, eviscerate our appellate rights.

So the only questions that would be asked, Your Honor, are questions about what happened in that closed session. Because how else could the City defend itself. I'll go back to that. Because as I stand here today, I can think of no other way that we could defend ourselves than to say what actually happened and why that constituted approval and, of course, we cannot do that. So this is an impossible position for us to be in.

So, Your Honor, this exactly what is going to be decided by the state court, and yes, we should wait, we should wait. And, Your Honor, no one misrepresented anything to this Court. There's absolutely no representation about a vote, innuendo, implicit statements, coded language, none of that amounts to proof or even an indication of a misrepresentation, not even a hint.

So we think this really should all be improper and out of bounds for this proceeding. But, Your Honor, we would

**EXCEPTIONAL REPORTING SERVICES, INC**

**34**

ask for a minimum to brief it.  We can brief if simultaneously while the Ninth Circuit is considering it.  But let's all proceed with caution.  Thank you.

**THE COURT:**  And why don't you check with your colleagues for just a moment to make certain you've covered all of your arguments.

**(Pause)**

**MS. EVANGELIS:**  Thank you.

**THE COURT:**  Have you covered your arguments?  Thank you very much.  Ms. Myers.

**MS. MYERS:**  Thank you, Your Honor.  Shayla Myers on behalf of the intervenors.  Just a quick point of clarification related to one of the representations.

Actually, we did identify Mr. Szabo's testimony on page 7, including reference to the transcript by page citation. So that was very clearly represented to the City of Los Angeles related to this in the filing that we submitted to the Court, which you referenced many times.

**MS. EVANGELIS:**  Yesterday?

**MS. MYERS:**  Yes.  But, Your Honor, I think the issue before the Court is not about innuendo.  The issue before the Court is not what was intimated to the Court.  It's what was said to the Court.  Your Honor, the City Attorney's Office represented that the city council approved the Encampment Reduction Plan.  And, Your Honor, I do think it is very clear

and has been clear throughout the course of the past few days, certainly, if not longer, that that was what was at issue here. And I think your order is very clear that the issue is the City's representation about what occurred related to the approval of the Encampment Reduction Plan and the representation by the City that the city council approved the Encampment Reduction Plan.

And the question comes down to whether or not the city council approved the Encampment Reduction Plan. And there is potentially, as the City wants to now argue, a question about whether a vote was required or not. But the question remains, how did the city council approve the Encampment Reduction Plan? That is the question before the Court for purposes of determining whether or not the city council actually approved it. What was the process that was used? It's not about the conversation that the city council had with the City Attorney's Office. It's not about why they chose the course of conduct that they chose. It's about what course of conduct did the city council use to approve the Encampment Reduction Plan.

And then, Your Honor, is the question about whether that was sufficient for legal purposes to constitute an approval. Your Honor, if the City wants to go down that path and argue that they could have engaged in a different process rather than what the charter requires, i.e., a vote, then the

**36**

City can make that argument.  But the City needs to disclose what process it used to approve the Encampment Reduction Plan. The City made the representation that it approved the Encampment Reduction Plan.  That did not come out in the course of any forced disclosure related to anything that is unrelated to whether or not the City was properly in a closed session related to the Brown Act.  The City made a representation in a sanctions proceeding in order to get out of a sanctions order by this Court.  They made a representation.  They chose to make that representation of their own volition.

And Your Honor has then the ability to test the veracity of that statement.  And that's what is at issue here, is the veracity of the statement that the city council approved it.  And the City cannot hide behind the Brown Act or Brown Act litigation and avoid an inquiry into whether or not the City actually did what it said to this Court that it did.  It would be premature to brief the issue of whether or not the City's process is sufficient under the city charter unless we know what that process actually was.  We know what it wasn't, because the City freely, when put to the test and questioned, disclosed what it didn't do.  And that's the problem, Your Honor, is the City is engaging in selective disclosure about what occurred.  And when the selective disclosure contradicts other selective disclosures about what occurs, the City wants to then argue that Your Honor's hands are tied.

Case: 26-784, 02/20/2026, DktEntry: 18.2, Page 38 of 263
Case 2:20-cv-02291-DOC-KES Document 1159 Filed 02/11/26 Page 37 of 135 Page
ID #:33158

37

There is no question that attorney-client privilege is incredibly important. But, Your Honor, the suggestion that the sanctity of the federal court and the City's representations and the truthfulness of the City's representations is any less important is ridiculous. If the City makes a representation of its own accord, to serve its own purpose, and there is contradictory evidence about the veracity of that statement, the suggestion that this Court's hands are tied about asking questions about what occurred to satisfy itself about what actually occurred is a complete abrogation of this Court's responsibility if the Court takes that into account.

The Court needs to know that when the City says -- when the City makes representations, that those statements are true. After years of these courts' proceedings, we have had ample reason to be suspect about those representations. And particularly in instances like this, when what appears to be at issue is the City applying its own definition about what it means for the city council to approve it.

The City wants to apply its own definition, Your Honor, about what it means to approve the Encampment Reduction Plan, then all we are asking, Your Honor, is an opportunity to ask that question. If the City didn't mean that it approved it consistent with its obligations under the charter, then what did it mean when it said that it approved the Encampment

Reduction Plan?  That's what we need for purposes of continuing these proceedings.  That's what we are seeking for purposes of witness testimony today.  And that's what we believe is well within this Court's authority and does not impede in the state court proceedings.  Thank you.

**THE COURT:**  And you have no one else there that you need to consult with, correct?

**MS. MYERS:**  No, Your Honor.

**THE COURT:**  As a courtesy, then, back to LA Alliance, please.  Rebuttal.

**MR. UMHOFER:**  Thank you, Your Honor.  Matthew Umhofer again on behalf of the Alliance.

The message from the City is, trust us, there was no misrepresentation.  That's the message that was said.  Your Honor, there was no misrepresentation.  Let's find some facts, Your Honor.  Let's find some facts.

Now, the City wants to prevent that, and they have posed two sort of hurdles.  One is the privilege, and the privilege is important.  There's some very interesting questions about privilege raised by the fact that the City actually represented not just the outcome, but what happened in the room approved.  So in the context of the attorney-client privilege, if I say what happened in a room with my client and I say the client approved something, that is a disclosure, that is potentially a waiver.  But let's take this step-by-step,

**39**

Your Honor.  Let's get some fact-finding going.

They can assert the privilege and answer the questions.  If the Court concludes that there's waiver, the Court wants more briefing, we can do it at that point or after the witness is questioned.  So we can take it step-by-step. Let's get witnesses in here.  Let's find some facts.  They can assert the privilege.  If the Court orders people to answer over an assertion of privilege, then they have an opportunity for that witness to refuse, to bear the consequences of that, and to take it up to the Ninth Circuit.  That's the proper procedure, not to run to the Ninth Circuit before anything has happened.  There may be a way for us to navigate these hearings without intruding upon the privilege.  There may be a way for us to find those facts.

Counsel has already suggested one of those ways.  They can say what didn't happen.  There are many ways for us to navigate this, but finding a fact is something the City should not be afraid of, but they really seem to be.  I want to come back to Younger because it is at the core of their argument about why this Court shouldn't go any further and should wait for the Ninth Circuit and, indeed, wait for the entirety of the state proceedings, which conveniently would fall to conclude, including appeals, which would conveniently fall after this Court has lost jurisdiction over this case.

So I talked about one reason why under Younger that

EXCEPTIONAL REPORTING SERVICES, INC

**40**

they can't meet the requirements. The Ninth Circuit has made it clear you've got to meet all four requirements. And the last requirement imposed by the Ninth Circuit was, of course, that there would have to be essentially that proceeding here would be an injunction. And that's not the case. The Court is not considering enjoining any conduct right now. The Court is considering whether the City misrepresented facts. But another aspect of the Younger abstention, which I think is important here, is it's a federalism issue. And the Ninth Circuit has specifically said that duplication, potential for duplication in federal court and state court, is not alone enough to prevent a federal court from proceeding.

And this is what the court said in Green v. City of Tucson, 255 F.3d 1086. Since the possibility of duplicative litigation is the price of federalism, federal and state courts, the prospect of such duplication without more does not constitute interference with state court proceedings justifying a federal court's dismissal of a case properly brought within its jurisdiction or in this case, a federal court's contempt proceedings.

So all they have and their core argument is you might be deciding something. There might be a duplicative ruling in this court and there, and the Ninth Circuit said that isn't enough alone. The Ninth Circuit has gone on to say that there must be a vital interest at stake in the state proceeding.

**EXCEPTIONAL REPORTING SERVICES, INC**

**41**

It's beyond the norm.  The vital interest can't just be the state's judicial functions.  It can't be a state's generic interest in the resolution of a case.  It has to be specific. It has to be of such universal value that the prompt resolution of the case is not cognizable for Younger abstention.  Rather, the interest at stake must go to the core of the administration of the state's judicial system and its importance must be measured by considering its significance broadly.  That's the Ninth Circuit speaking about that.

They haven't even tried to identify a vital interest other than the state court's proceedings, which is not enough, according to the Ninth Circuit.  So, Your Honor, neither the privilege nor Younger poses a burden or an obstacle to proceeding with fact-finding here.  They can assert their privileges.  We can work it through.  But what they can't do is prevent this Court from even engaging in fact-finding.

Let's find some facts, Your Honor, and if they're right that no misrepresentation was made, let's move forward together.  But given the history of this case, I think it's highly likely that there was a misrepresentation made.  And that's important, Your Honor.  And the Court has an independent obligation and right to inquire into candor to this Court.  And I would submit on that, Your Honor.

**THE COURT:**  On behalf of the County.

**MS. SOBEL:**  No position, Your Honor.

Case 2:20-cv-02291-DOC-KES   Document 1159   Filed 02/11/26   Page 42 of 135   Page ID #:33163

**42**

(Pause)

**THE COURT:** Counsel, I'll have a decision with you or for you shortly, and we'll give everyone a chance for a brief recess. But before we take that recess, perhaps it's best to go back, so we're all on the same page, to the January 31st, 2024 session. And I'm going to take judicial notice of that session. And Anne or Megan, would you put up that session? And it will have the opening that will show January 31st of 2024. And we'll show the recess to -- of this item, either item 21 or 22. And then we'll show whatever representations were made, so that we have no disagreement about what was said that day. And this will be brief, so that we all have the same genesis that's caused the Court's concern.

**(Pause)**

**MR. MCRAE:** Your Honor, is this a statement that was made to the Court?

**THE COURT:** Counsel, this will be so evident in just a moment.

**(Pause)**

**THE COURT:** All right, Counsel, the first image that will come up on the screen is Los Angeles City Council agenda for January 31st, 2024, which you're viewing at this time. You'll have adequate time for any objections or comments in just a moment. And, Counsel, this is a rather lengthy meeting by the council. And unless there's objection, I'll take

**EXCEPTIONAL REPORTING SERVICES, INC**

**43**

judicial notice of it.  But can you see this on the screens in front of you?

          **SPEAKER:**  Yes, Your Honor.

          **THE COURT:**  I want to make sure the screens are functioning.

          **MR. UMHOFER:**  Yes, Your Honor, we can.

          **THE COURT:**  Can you?  Okay.

    **(Pause)**

    **(At 10:11 a.m., video played)**

          **"SPEAKER:  --** says we've already met about it in committee, so we can go ahead and vote.  But at that moment, the public is not heard, typically.  And that's the problem, because there's a substantial change when you do announce, we're going to spend $50 billion filling a hole that Blumenfield created by overlooking the bicycle lobby or something.  But when that information comes out, the public has a right to say nay, yay, or hooray.  But it's not acceptable the way you do it now, so I'm going to have to -- I've said this to Corcoran before.  He doesn't seem to care, because he's, as he said the other day, his best-by date is approaching very quickly.  But this is not a system that works.  We showed you that the special meeting rules that you were breaking didn't work.  I encourage you to do the appropriate thing,

**44**

and like you should be doing with some of these recounts, mediate a resolution.

"SPEAKER:  Mr. Patton, your time has expired.

"SPEAKER:  Thank you very much. That'll close public comment on all agenda items and close general public --"

THE COURT:  Let's stop this tape for just a moment. You obviously recognize different council members.  Mr. Marcus of the City Attorney's Office is the gentleman to my right, to your left, standing by the door in a blue suit, red tie, and white shirt with his hand in his pocket.  Would you please continue now?  We're trying to identify the location where the counsel goes into closed session.

(At 10:13 a.m., video played)

"SPEAKER:  Mr. Clerk, what's now before us?

"SPEAKER:  Mr. President, the council may now vote on items 12 through 21.

"SPEAKER:  Okay.  12 through 21 are before us, members.  I see no members wishing to be heard, so let's go ahead and open the roll, close the roll, and tabulate the votes.

"SPEAKER:  Twelve ayes.

"SPEAKER:  Very good.  Is there any other business that can be taken up in open session?

"SPEAKER:  Not at this time, sir.  The council may

now proceed to closed session item 22.

"**SPEAKER:** All right, let's go ahead and prepare the chambers for closed session, please."

**THE COURT:** Now, there's a period of time in closed session. You'll see this on the tape. But instead of belaboring the time spent, we'll go to the end when the council comes out of closed session, so we all have the beginning of this issue before the Court.

**(At 10:14 a.m., video played)**

"**SPEAKER:** All right, after a lengthy closed session discussion, the council is back now in open session. Mr. City Attorney, is there anything to report from the closed session?

"**SPEAKER:** There is not.

"**SPEAKER:** And if I may, Mr. President, I'll call roll.

"**SPEAKER:** Oh, thank you very much. Let's call the roll, please, Mr. Clerk.

"**SPEAKER:** Thank you, Mr. President. Blumenfield, De Leon, Harris-Dawson, Hernandez, Hutt, Krekorian, Lee, McOsker, Padilla, Park, Price, Raman, Rodriguez, Soto-Martinez, Yaroslavsky. Eleven members present in our quorum, Mr. President.

"**SPEAKER:** Thank you very much. Mr. City Attorney, again, is there any actionable

**46**

item that needs to be reported from closed session?

"**SPEAKER:** No, Mr. President. There is nothing to report out of closed session.

"**SPEAKER:** Very good. With that, Mr. Clerk, what's next before us?

"**SPEAKER:** Council has motions for posting and referral."

**MR. MCRAE:** Your Honor, did you want our objections now?

**THE COURT:** Counsel, just one moment, please.

**(Pause)**

**THE COURT:** Each of you have cited or referred to document 668-1, which was the declaration in support of the motion wherein the -- I'm sorry, Docket 713, my apologies -- where the statement of facts signed by the Chief Assistant City Attorney, Scott Marcus, then counsel of record for the City of Los Angeles in a joint stipulation stated, quote, that the 9,800 encampment reduction plan and milestones were presented to the city council on January 31st, 2024, which approved them without delay, and much of the argument today has centered around the word approved.

Upon further inquiry, in a response from the City of Los Angeles on November 27th of 2024, a contraposition was taken by Strefan Fauble on page 2 of document 1152-1, that regarding the January 31st, 2024 closed session, no settlement

**EXCEPTIONAL REPORTING SERVICES, INC**

**46**

or agreement was voted on or approved.  In fact, no vote was taken.  That's also found in document 668.  Strike that.  Once again, in document 773, page 3 and 4.

Subsequent to that, the Court had received a direct testimony, and could I have the -- well, document 955, if counsel would turn to that.  You've already referenced the statement by Matt Szabo that a vote was taken.

**SPEAKER:**  Your Honor, did you just say --

**THE COURT:**  Counsel, I'm sorry.  Please let me finish, and then I'll pay you all the courtesy and the time, okay, all the time you need without interruption.

And, Megan, if you'd help me again with this transcript.  I think I can find it.  And I refer you to page 126 of 955, where Mr. Szabo states in line 25 it was approved.  And this is referred to in lines 11 through 13.  Okay, and so then the Encampment Reduction Plan, you said that was approved by the city council, and Mr. Szabo, 25 answers, it was approved.  I want to think about your arguments concerning Younger obsession for a few moments, and certainly courtesy to the circuit.  So I want a little bit of time for reflection.

This has raised the issue of whether, in fact, a vote was even taken.  I tentatively believe that this can be resolved without intruding on the State Brown Act litigation pending before Judge Kin, but I very much appreciate your oral

**EXCEPTIONAL REPORTING SERVICES, INC**

**48**

arguments today, and I want to reflect on that once again after your arguments to the Court today.

And what's caused this concern is the potential misrepresentations by the City that once again initially arose with these contradictory statements, this Court needs to ensure due process and your opportunity to be heard, which is why I've opened this up for oral argument today.  And, in fact, I want time to tentatively consider that and come back to you in probably 20 minutes to half an hour.

I want due process.  I want to make certain that there's no confidentiality breach by the City, as you've alluded to, and whether the parties simply wish to rest on the state of this record or if we did proceed forward, who in fact would be called.  And in the briefing that I received in document 1152 on page 9, lines 7 through 12 or 7 through 10, it states that the intervenors have requested that Matt Szabo, Scott Marcus, Strefan Fauble appear at the hearing on February 10th.  The City has informed intervenors that Mr. Szabo is not available, but Mr. Marcus and Mr. Fauble are available.  And in footnote 3 that the City indicated it would object to the testimony of these witnesses.

You mentioned that the circuit was presented with a requested stay.  Was that yesterday or last evening you said?

**MS. EVANGELIS:**  Yes, Your Honor and --

**THE COURT:**  And what was the holding?  In other

**49**

words, I'd like to see what the circuit stated regardless of your representations on either side.

MS. EVANGELIS: Yes.

THE COURT: So that -- has the circuit stayed this proceeding?

MS. EVANGELIS: Your Honor, we requested a stay and the Ninth Circuit did not grant an administrative stay, but it did call for briefing and the brief -- the response to our petition is due in seven days, and then we have three days for a reply thereafter.

THE COURT: So the circuit has not stayed this proceeding, but it's called for briefing.

MS. EVANGELIS: That's correct.

THE COURT: Okay. Fair enough. Is there any disagreement that this is a portion at least that's been played in court of the January 31st, 2024, council meeting?

MR. MCRAE: Your Honor, respectfully, we didn't have any notice of this. We need to confer with our client and review this in full context --

THE COURT: Why don't you confer?

MR. MCRAE: -- to answer the Court's question as to whether we have an objection, as opposed to having a snippet.

THE COURT: All right. Sure. Well, why don't you do that? Then we'll take a recess and I think this is common counsel. It's -- every one of the city council meetings are

Case: 26-784, 02/20/2026, DktEntry: 18.2, Page 51 of 263
Case 2:20-cv-02291-DOC-KES   Document 1159   Filed 02/11/26   Page 50 of 135   Page
ID #:33171

**50**

viewable by the public and why don't you call your client and see if they're objecting to this.

MR. MCRAE:  We can do that.  Can we state our other objections, though?

THE COURT:  Oh, absolutely.

MR. MCRAE:  Okay.  So for starters as I just indicated, we have filed at least two different requests to get a basic understanding not by deduction, not by us guessing. That's not what due process is, but by asking the Court what exactly is the misrepresentation?  When was it made?  By whom? Why does the Court think it's a misrepresentation?  And what is the legal and factual basis that's going to inform the landscape of the hearing?

We shouldn't have to get up here and be mocked because we have to guess at the answer to those questions and as we're sitting here now, we're hearing snippets out of documents.  We're hearing references to other people's testimony from briefs that were filed yesterday.  What -- why? Why is there this shroud of mystery around this?  Give us an opportunity to fully digest whatever it is that is the source of concern for the Court and then set a briefing schedule to proceed in a logical, linear progression, starting with is there a legal basis to say that a vote must be taken for there to be approval?  Starting point.

If you don't have the answer to that question

**51**

legally, why are you even proceeding?  Because you're basically operating into assumption that there is a misrepresentation, when you haven't determined that the statement made could not be factually correct.  That's number one.

And then going beyond that, judicial notice as the Court knows is a vehicle only to take notice of the fact that something exists, not for the truth.  That's the point of judicial notice.  So if the Court is relying on whatever that was as a basis to make some decision, obviously we object, because it has an evidentiary limitation that's built into the doctrine of judicial notice.

Also, we had no idea who was speaking and as the Court started with its statement, this is a rather long proceeding.  Well, we clearly didn't have a chance to ingest all of that and to distill it to make a quick statement on whether we object to it, whether it's completely out of context, and more to the point, how many different items were the source of that meeting?  Meaning if the Court is trying to draw some type of deduction that something that it heard must mean that there's an inconsistency with something that was said, the -- one of the first questions is was any statement that was played in that snippet inexorably limited to a singular issue or maybe there were multiple issues where different courses of action could or could not have been taken.

**52**

Again, it's speculation and assumption because it cannot overcome the cognitive dissonance that you can defend a misrepresentation without disclosing speech. The -- we're literally -- after playing all of that in the exact same position of no one has answered the question other than uttering abstractions, how is the City to defend an alleged misrepresentation regarding what happened in a closed session without talking about what happened in the closed session? And we could start with, you know what, there are more than one ways to have approval, but who are we kidding? That's not going to satisfy the people pressing on this because it'll be then well, no, but how, and when, and what was said, meaning you are essentially making a distinction without a difference and asking for the content of that information.

I think the other point is the Court made reference to maybe it was inconsistency or seeming inconsistency. There are two statements that the Court made reference to. Matt Szabo saying approved and a letter from Mr. Fauble saying approved. How is that inconsistent with the stipulation? All three of them say approved.

I go back to Ms. Evangelis's question, where is the statement that someone made a misrepresentation? Also, where did someone say there was a vote? Now, here's what appears to be happening. You could try to fashion an inconsistency if you were to -- if you were to inject the statement approval that it

**53**

means vote, but if you're doing that, you're not actually properly determining whether or not there's an inconsistency or misrepresentation. You're creating a misrepresentation by operating on a factual assumption about what a word means and determining in advance, without the benefit of legal briefing, that it could only mean a vote. That's not a searching inquiry in terms of a factual basis for inconsistency or misrepresentation. Again, it's trying to basically create one for whatever reason, which is not really clear.

And so as far as -- you know, this whole point about you know, what is the -- how this connects to this? I asked the Court earlier. Was whatever we just saw, was that a representation to the Court? Because as I understood the impetus of the Court's concern was a misrepresentation to the Court. One would think that that would mean a misrepresentation to the Court. This is something that was said to the -- in the general public. And again, the full context we don't have the benefit of, so how is it even relevant to what was said to the Court or what wasn't said to the Court? And how many questions would we have to answer about the very thing that we all saw was in closed session to distill whether or not it indeed contains any probative information for this proceeding.

And so I -- we could not object more strenuously to

**54**

whatever that was that was just played.  Also, we object to why didn't we have notice of all of this before we came in here?  We've asked multiple times for it and I concur and join in everything that Ms. Evangelis said about can we please, as opposed to deciding whether somebody has to testify to something, have briefing.  This -- why is this any different than anything else where you determine issues to be decided?

Let's start with framing the legal landscape.  What is the salient and applicable law that governs this question?  How procedurally can we go about doing it?  Then we can ask do we even need evidence?  And if so, how do we do that while protecting appellate rights and rights to appeal?  Can we do that first?  And if we do that, then we can get to the question of whether or not we ever come to a point about taking evidence.  So those are our objections.

**THE COURT:**  Thank you.  I want to pay the other parties any opportunity to respond if you'd like to.

**MR. UMHOFER:**  Before I respond to that, Your Honor, I -- this is again Matthew Umhofer on behalf of the LA Alliance.  I do want to note that we have two people who were invited by the Court to attend, at least two.  I believe the first Assistant United States Attorney is here, Mr. Saley, and Mr. Hockman are -- is also here.  And I know we're focused on these arguments, but I do want to be respectful of their time.

**THE COURT:**  I want to thank you.  And also I believe

LAHSA is here as well.  And if you'd just identify yourself with the Court's appreciation.

MS. O'NEILL:  Sure, Your Honor.  Interim CEO, Gita O'Neill.

THE COURT:  Thank you very much.  It'll stop a lot of the misinformation.  You're here to personally hear firsthand about these proceedings, so I appreciate your presence.  And also, while you're here, I'd like to say to the County, I appreciate, and I think the public appreciates, your last notice to the Court concerning the attempted recovery of the $50.8 million that was distributed in 2018-19 with no milestones and no contracts.

And I think you've endeavored to bring the Court up to date about the attempts to recover those monies.  And from memory, I had noticed that there was initially about $2 million that had been recovered in some form when the Court took notice of this.  That's subsequently been reduced into the 40 million, 37 million, and it's represented about $30 million is still outstanding.  I'd ask if you'd be so kind to break that down into those in-kind contributions versus the cash contributions that have been recovered.  And I'm using contributions, and it was represented by another LAHSA official here two or three hearings ago.  I'd have to go back that they would attempt to do so, but in the last couple of hearings, we've moved on to other subjects.

**56**

And so I haven't come back to that, but if you could help the Court and the public in terms of whether those are in-kind repayments by providers or whether they're cash repayments, I'd appreciate that. But other than that, I appreciate the County's efforts in that regard.

**MS. HASHMALL:** Thank you, Your Honor. I'll convey that to my client.

**THE COURT:** All right, now, Mr. Umhofer, why don't you finish, and I'll turn to Ms. Myers.

**MR. UMHOFER:** Yes, Your Honor. I think two questions. I think the central question posed by the post was, I think, an objection to the video. Let's start with relevance. Is it relevant what happened before the city council in and around this apparent approval? Yes, it's absolutely relevant. The suggestion that this isn't even relevant is highly questionable.

The second question that sort of, I think I gleaned from counsel's passionate presentation was, shouldn't we start with briefing? And that's not typically how evidentiary hearings work. We do evidentiary hearings, and then we have briefing. They're complaining about notice. We think it's clear. It's up to the Court to determine whether they've had enough notice. We think they have. The Court's issued several orders. There's no mystery here.

The suggestion that the City would be surprised by a

city council meeting video seems a little bit far afield.  We think the video is acceptable as a subject of judicial notice.  The City will have time to process that because we won't finish this hearing today, and they will be able to brief it after.  The notion that we need rounds of briefing before, and then an evidentiary hearing, and then rounds of briefing after, I think, doesn't square with the proper procedure here.  So we would submit that evidence could be taken today from the two witnesses who are available.  The City can have time to process the video that the City owns and already has.  And we can proceed with this hearing, and then briefing can come after.  But there's no reason to stop this hearing from proceeding.

I would also note that, and I can read the text of the Ninth Circuit's decision last night.  I apologize, I mistakenly believe that this Court received decisions by the Ninth Circuit, and that is our fault for not notifying this court of decisions by the Ninth Circuit.  But what I can represent, we will get copies of that, of both the briefing that was submitted to the Ninth Circuit by the City.  We didn't have time, and we're not permitted to submit an opposing brief.  Then the Ninth Circuit issued its order last night, expressly denying an administrative stay of this hearing.  So we'll get that to the Court during the break.

**THE COURT:**  All right.  Thank you.  Ms. Myers?

**58**

**MS. MYERS:** Thank you, Your Honor. Cognizant that Your Honor wanted to take some time to review this, I'll just say one point about the statements by the City of Los Angeles, and sort of the shocking statement that I think sums up the issues that have been before the Court for the last few months. Is asking whether the Court can make a factual assumption about what a word means. Your Honor, we consistently have this fight in this court. The factual assumptions that underlie what a word means.

Mr. Marcus represented that the city council approved the encampment reduction plan. What we are here today, what our inquiry would be focused on, is what Mr. Marcus meant when he said the city council approved the encampment reduction plan. We can brief what the charter means, and I quoted the charter, but certainly what is at issue is what the city council did when it approved the encampment reduction plan. And with that on the table, Your Honor, then we can brief the question about whether or not that was sufficient for purposes of the charter to constitute approval. But without that information, then we lack the factual assumption about what a word means.

Your Honor, words do not exist in a vacuum. They exist within the legal confines, the plain understanding of those words. When the City says that the city council did something, i.e. approves something, and we have to be able to

**59**

rest assured that the City is relying on a reasonable

interpretation of that word.  We have to know what the City

meant, and that's what we would like to ask today.  And after

that, then we can proceed with briefing.  Thank you, Your

Honor.

       **THE COURT:**  All right.  Well, I thank all of you.

We'll be in recess for half an hour, please.  Thank you.

       **(Recessed at 10:39 a.m.; to reconvene at 11:29 a.m.)**

       **THE COURT:**  We're back on the record.  All counsel

are present.  After thoughtful deliberation and consideration,

this Court still believes it can resolve the misrepresentation

issue without intruding into the State Brown Act litigation if

the testimony in this Court is focused and limited and

respectful of any applicable privilege claim.

       So let's have Scott Marcus and Strefan Faubel, who

the parties represented were available over this afternoon,

have everyone go to lunch.  It's 11:30 now and let's extend

that, but ordered to be back and present at 1:00 p.m. for their

testimony.  And we'll hear very limited testimony on the issue

of whether a vote was taken and what the word approval means if

it was used.  We're going to get the facts out on this limited

issue, but what's really an issue here is a very narrow issue

that I've said repeatedly can be resolved quickly and is

separate and distinct from the state court proceedings, that

privileges can be protected by focusing on this very narrow

**60**

issue.

So I'd like to hear the facts on this issue, and we'll follow the evidence to find the truth in this matter. And once we have the facts, then we can have briefing on the legal effects of those facts and discuss the timing of that.  So counsel, we'll be in recess until 1 o'clock.  Thank you very much.

MR. MCRAE:  Your Honor, may I make one correction to something I said?  I would appreciate it because I want the record to be clear.  I need to correct something very briefly.

THE COURT:  Certainly.

MR. MCRAE:  When I was talking about the statement made by Mr. Fauble, the correction I need to make is that what he actually said, and I believe this is the letter that the court was referring to, that regarding the January 31st 2024 closed session, no settlement or agreement was voted on or approved.  And then it says in fact no vote was taken, therefore there could be -- excuse me, therefore, there could not be anything to report out of the January 31st, 2024, closed session.

So when I was responding to the snippet that we saw earlier, I believe I said that Mr. Fauble had said that the referring to the encampment reduction was approved.  That is not correct, at least as far as I'm seeing in this letter.  I want to be very clear.  I've read what he said and obviously

**61**

the City's position is the same, which is that that statement that no settlement or agreement was voted on or approved is not inconsistent with saying that the encampment reduction plan was approved.  Thank you, Your Honor.

**THE COURT:**  I expect that this document may become a part of the record, so there won't be any issue.  I want to thank you for being here.  We're going to have a hearing this afternoon.  I don't know if LAHSA's presence is needed or required.  You're always welcome, so you have first-hand knowledge, okay?  And for any of the other parties, the United States Attorney Nathan Hockman was here, et cetera.  If you choose to be, so be it, but otherwise, thank you for your courtesy, as well as LAHSA.  Thank you.

**(Recessed at 11:32 a.m.; reconvened at 1:02 p.m.)**

**THE COURT:**  All right, then we're back on the record.  All counsel are present.  The parties I believe are present.  And, counsel, who's present?

**MS. MITCHELL:**  I'm sorry, Your Honor?

**THE COURT:**  Who's present to testify?

**MS. MITCHELL:**  So I believe that Ms. Myers is going to be calling witnesses.

**MS. MYERS:**  Yes, for a change of pace, Your Honor, I'll be going first today.

**THE COURT:**  All right.

**MS. MYERS:**  We'll call Scott Marcus.

**EXCEPTIONAL REPORTING SERVICES, INC**

**62**

THE COURT: Thank you very much. Mr. Marcus, would you come forward, please. And, sir, would you be kind enough to raise your right hand, please?

**SCOTT MARCUS, INTERVENORS' WITNESS, SWORN**

THE COURT: Thank you, sir. Would you please be seated? And after you're seated, would you state your full name, please?

THE WITNESS: Scott Marcus.

THE COURT: Would you spell your last name, sir?

THE WITNESS: M-A-R-C-U-S.

THE COURT: Direct examination, please.

MS. KUMAR: Your Honor, may I just be heard?

THE COURT: Please.

MS. KUMAR: Your Honor, again, obviously, it's --

THE COURT: Would you use the microphone, though, or go to the lectern so we can hear you.

MS. KUMAR: Your Honor, just for the record, the City, of course, repeats its objections to any witnesses being called for all of the reasons that were discussed at length this morning, including but not limited to the fact that this threatens the Brown Act protections, of course, as well as the protections of the attorney-client privilege, the deliberative process privilege, the legislative privilege, and the official information privilege, as well as the other reasons set forth by my colleagues, Ms. Evangelis and Mr. McRae.

We'd also, Your Honor, just state for the record that we object to the Court's use of introduction sua sponte of the courts -- of the city council meeting that took place on January 31st, 2024. Of course, that was not previously introduced by any party to the City's knowledge, and it was the Court seemingly doing its own investigation, finding that video and showing it, and suggesting that that was a basis for a possible contradiction and for a contempt finding or willful misrepresentation finding.

So, Your Honor, we just state those objections for the record.

**THE COURT:** Let's take the last issue first concerning due process. The Court can move slowly in this matter, but the January 31st, 2024 video speaks for itself, but I won't receive it if there's an objection at this time. You can have a further foundation. Second, acts are not privileged. Confidential communications may be privileged, and the Court will be very careful in that arena. And finally, the record that I've made will suffice concerning the Brown Act, and the Court will pay deference and follow the law thoughtfully so that there's no interference with my colleague, Judge Kin, in the Superior Court. Counsel.

**MS. MYERS:** Thank you, Your Honor. Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of the intervenors.

Marcus - Direct / By Ms. Myers                    **64**

**DIRECT EXAMINATION**

**BY MS. MYERS:**

Q    Good afternoon, Mr. Marcus.  Thank you for being here today.

A    Good afternoon.

Q    Are you currently employed by the City of Los Angeles?

A    Yes.

Q    And what is your job title?

A    My title is chief of the criminal branch.

Q    Is that within the City Attorney's Office?

A    Yes.

Q    Okay.  You were previously counsel of record in this case, correct?

A    I was one of the counsels of record in this case, yes.

Q    Do you know the dates where you were counsel of record?

A    I believe the case was filed sometime in February or March of 2000, and I continued in that role until roughly April or so of 2024.

Q    Just to clarify, do you mean 2020?

A    Yes.

Q    Okay.  Were you counsel of record when this case settled?

A    Yes.

Q    And were you involved in the settlement?

A    Yes.

Q    And so are you familiar with the settlement agreement in

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                    **65**

this case?

A    Yes.

Q    Did you sign the settlement agreement?

A    I may have, I don't recall.

Q    Just give me one second.  I'm going to show you what's been previously marked as Exhibit 25.  You can just take a minute to look at this, starting here on page 6 of the document.  Is this a settlement agreement that you previously referred to?

A    Yes, it appears to be.

Q    Okay.  So I'm going to show you Section 5.2 of the settlement agreement.  This is under Section Milestones and Deadlines.  Are you familiar with this paragraph?

A    Yes.

Q    With regards to Section 5.2, where it says, thereafter the City will create plans and develop milestones and --

        **THE COURT:**  Just a little slower, counsel.

        **MS. MYERS:**  Sure.

**BY MS. MYERS:**

Q    Where it says, thereafter the City will create plans and develop milestones and deadlines, are you familiar with this paragraph?

A    Yes.

Q    To the best of your knowledge, did the City of Los Angeles create the plans and develop milestones related to this

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                    **66**

provision?

A    Yes, I believe we did.

Q    And so specifically with regards to Section 5.2.2 and 4, those plans that it refers to refer to the City's plans for encampment engagement, cleaning and reduction, correct?

A    That's what it says, yes.

Q    And did the City create those plans and develop milestones and deadlines related to those two provisions of the settlement agreement?

        **MS. KUMAR:**  Objection, Your Honor.  It lacks personal knowledge.  I would just ask to the extent that this witness knows and can speak to that point.

        **THE COURT:**  Overruled.  You can answer the question.

        **THE WITNESS:**  I don't believe deadlines is included.

**BY MS. MYERS:**

Q    You don't believe deadlines were included in what the City created?

A    I don't believe deadlines are included in what was required under Paragraph 5.2.

Q    Where it says, thereafter, the City will create plans and develop milestones and deadlines?

A    I see that now.  Thank you.

Q    Okay.  So does that change your testimony about whether deadlines are included?

        **THE COURT:**  Counsel, just one moment.  A little bit

Marcus - Direct / By Ms. Myers                              **67**

slower.  I can see already that it's too quick to record.

Q    So does that change your testimony about whether deadlines are included?

A    Yes.

Q    Okay.  So did the City create plans, develop milestones and deadlines consistent with the requirement under 5.2?

A    I believe we did, yes.

Q    Okay.  Do you know when the City created those plans?

A    We created and proposed different plans at different times.  I don't recall when the final plan was agreed to by the Alliance.

Q    Okay.  Were you counsel of record in this case on January 31st, 2024?

A    I was one of the counsels of record, yes.

Q    Was there a meeting of the Los Angeles City Council on that date?

A    Yes.

Q    Did you attend that meeting?

A    Yes.

Q    Did the city council meet in closed session to discuss the LA Alliance case during that meeting?

A    Yes.

Q    Were you present in the closed session meeting?

A    Yes.

Q    And were you there in your capacity as an attorney for the

Marcus - Direct / By Ms. Myers                    **68**

City of Los Angeles in this matter?

A    Yes.

Q    Following that closed session meeting, the plaintiffs in this case filed a motion for settlement compliance against the City of Los Angeles, correct?

A    I recall the plaintiffs filing many motions for compliance.  I believe there was one in February of 2024, if that's the one you're referring to.

Q    Yes.  And if you know, was part of the sanctions motion that was filed in February of 2024 after that closed session meeting, based on what the LA Alliance perceived as a delay in approving the milestones and dates and deadlines in compliance with the settlement agreement?

A    Again, there were many motions that were filed.  I would have to look at the motion to see what was included and what wasn't.

Q    In terms of resolving one of the motions for settlement -- or for compliance, do you recall submitting a stipulation of facts to the court?

A    Yes.

Q    And that stipulation of facts was along with Ms. Mitchell, the counsel for the plaintiffs, correct?

A    Yes.

Q    And I'm going to show you what was previously marked as Exhibit 326.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                **69**

THE COURT:  Can we put that up on the screen?

MS. MYERS:  Is it not up on the screen?

MS. MITCHELL:  It's on our screen, Your Honor.

THE COURT:  Do you have it?

THE WITNESS:  I have it, yes.

THE COURT:  All right.  Thank you.

BY MS. MYERS:

Q    And this is Docket 713 filed in this case.  Is this the stipulation that you were referring to?

A    It appears to be, yes.

Q    And I apologize, I have it in front of me.  I'm happy to scroll through if you need to, if you need to look at any other part of it to ensure that this is stipulation you're referring to.

THE COURT:  Counsel, would you repeat that just a little bit?

MS. MYERS:  Just offering to scroll through for Mr. Marcus to ensure that this is the stipulation that he was referring to.

BY MS. MYERS:

Q    Do you want me to scroll through?

A    I'm good.

Q    So this is the stipulation that you were referring to?

A    It appears to be, yes.

Q    So I want to refer to paragraph 7.  If you can just read

EXCEPTIONAL REPORTING SERVICES, INC

Marcus - Direct / By Ms. Myers                **70**

paragraph 7 to yourself, starting with the parties met on January 4th.

A     Okay.

Q     Just backing up a minute.  When you prepared this stipulation of facts, were you familiar with the facts that you were stipulating to?

            **MS. KUMAR:**  Objection, Your Honor.  Privilege.

            **MS. MYERS:**  I can go fact by fact, Your Honor, if that would be helpful.

            **THE COURT:**  Would you restate that question?

            **MS. MYERS:**  Mr. Marcus, were you -- do you have personal knowledge of the facts that you stipulated to in this declaration?

            **THE WITNESS:**  Yes.

            **THE COURT:**  He can answer the question.

**BY MS. MYERS:**

Q     So paragraph 7 says, two days after this meeting, the City proposed encampment milestones of 9,800, agreeing to and rounding up from the LA Alliance's proposed number of 9,782.  Do you have personal knowledge of that fact?

A     Yes.

Q     Did that occur?

A     Yes.

Q     And then later on in the paragraph it says, on January 10th, 2024, the City agreed to LA Alliance's demand for 9,800

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                    **71**

encampment reductions, including district-by-district

milestones over four years, and rejected LA Alliance's other

demands.  Is that correct?

A    Yes.

Q    So is it accurate then that the City and the LA Alliance

agreed to the reduction plans and milestones on January 10th,

2024?

A    I believe this describes the process of the negotiations

that were ongoing at the time.  I don't recall if we reached

final agreement on all the terms by January 10th.

Q    Okay.  But with regards to when it says the City agreed to

LA Alliance's demand for 9,800 encampment reductions, is that

accurate?

A    Yes.  We agreed to the number, but we rejected other

demands that they made at the time.

Q    Okay.  And so paragraph 8 of the declaration states, 9,800

encampment reduction plan and milestones were presented to the

city council on January 31st, 2024.  Is that statement

accurate?

A    Yes.

Q    And were you present when the plan was presented to the

city council?

A    Yes.

Q    And then it says that the plan was approved without --

which approved them without delay, that the city council

Marcus - Direct / By Ms. Myers **72**

approved the plan and milestones without delay?

A    Yes.

Q    And did that approval occur on January 31st, 2024?

A    Yes.

Q    And the plan that was approved, the plan and milestones that you're referring to, is this what the LA Alliance and the City agreed to on January 10th, 2024?

A    Again, I can't recall if we reached agreement on all of the terms on January 10th.

Q    So I'm asking only about the plan and milestones that was approved by the city council on January 31st.

A    What was presented to council and approved by council was agreed to by the Alliance and the City.  Yes.

Q    On January 10th.

A    I don't recall if that -- I don't recall if we reached full agreement by the 10th or not.

Q    Okay.  And so the next statement where it says on February 1st, 2024, the milestones and deadlines agreed to on January 10th, 2024, were sent to plaintiff's counsel.  Does that refresh your recollection about whether or not the plan and milestone that we agreed to by the city council were agreed to on January 10th?

A    No, it does not.

Q    Okay.  So where it says that the 2020, the milestones and deadlines agreed to on January 10th were sent to plaintiff's

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                        **73**

counsel, is it possible that that plan is different than the one that was approved by the city council?

A    No.

Q    Okay.  So the plan that was sent on February 1st was the plan that was approved by the city council on January 31st, 2024.  Is that correct?

A    Yes.

Q    Okay.  So then it would follow then that if both of these statements are true then, that the plan that was approved by the city council on January 31st is the milestones and deadlines that were agreed to on January 10th.  Is that correct?

A    It appears to be yes.

Q    So you have no reason to doubt the accuracy of this at this point?

A    Of the stipulation?  No.

Q    Okay.  And you have personal knowledge as to the facts of the stipulation?

A    Yes.

Q    Did the city council vote to approve the encampment reduction plan?

A    There was no vote.

Q    There was no vote.  So the city council did not vote to approve the plan.  How did the city council approve the plan?

         **MS. KUMAR:**  Objection, Your Honor.  I would instruct

Marcus - Direct / By Ms. Myers                    **74**

the witness not to answer to the extent the answer to that

question --

**THE COURT:**  I'm not going to sustain it, but I'm

going to take that under submission.  You don't have to answer

that at the present time.  I want to think about that question.

**BY MS. MYERS:**

Q    What process --

**THE COURT:**  Can you mark that for the court reporter

so I can see that question during the recess?  Thank you.

Q    What process did the city council use to approve the plan

if it did not use a voting process?

**MS. KUMAR:**  Objection, Your Honor.  I would instruct

the witness not to answer for the same reasons.

**THE COURT:**  I'm going to ask you not to answer that

question for the present time until I have some time to think

about this.

**BY MS. MYERS:**

Q    When you stated in this declaration to the Court that the

city council approved that the milestones were presented to the

city council on January 31st, which approved them without

delay, what did you mean by the term approved?

**MS. KUMAR:**  Objection, Your Honor.  I would instruct

the witness to answer only to the extent he can answer without

revealing any information about what occurred in the closed

session and without revealing and waiving any of the privileges

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                **75**

for which he does not have authority to waive at this time.

THE COURT:  I want to be very careful about any disclosure of any communications, but an act is substantially different.  And when this question is asked, I'm going to limit your answer to your subjective or your meaning or mindset about what approval meant.  I want to be very careful that your answer doesn't involve communication with members of the council.  Is that clear?  And if not, I'll restate that.

THE WITNESS:  No, that's clear.

THE COURT:  Thank you.  Then you can respond.

THE WITNESS:  I meant it was approved.

THE COURT:  I'm sorry, I didn't hear the answer.

THE WITNESS:  I meant it was approved.

**BY MS. MYERS:**

Q   And what did you mean by the term approved?

MS. KUMAR:  Objection, Your Honor. I would again instruct the witness not to answer to the extent doing so would disclose anything that occurred in closed sessions, actions or statements that occurred in closed sessions which were protected by the Brown Act and otherwise covered by all of the aforementioned privileges.

THE COURT:  This will be limited to what your subjective mindset was concerning the word approved and what it meant.

MS. KUMAR:  Your Honor, I would also object to the

Marcus - Direct / By Ms. Myers                    **76**

extent that that's work product or otherwise privileged because

Mr. Marcus, at the time we're asking what was in his mind, was

and remains counsel to the city.

**THE COURT:**  Overruled.  Counsel, you can answer, sir.

**THE WITNESS:**  I stand by the stipulation.

Q    That was my question, Mr. Marcus.

A    That is my answer, Ms. Myers.

Q    Well, that's not an answer to the question.  So what did

you mean when you said approved?

A    I meant approved.

Q    Okay.  When you submitted this stipulation to the Court,

were you aware that the city council had not voted to approve

the encampment reduction plan?

**MS. KUMAR:**  Objection, Your Honor.  Asked and

answered.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes.

**BY MS. MYERS:**

Q    Are you familiar with the city council rules for the Los

Angeles City Council?

A    Not particularly.

Q    I'm going to show you what I've marked as Exhibit 576.

**MS. KUMAR:**  Objection, Your Honor.  Witness just said

he wasn't familiar with these.

**MS. MYERS:**  Yeah, so I'm going to show them to him.

Marcus - Direct / By Ms. Myers                    **77**

**THE COURT:** Overruled.

Q    So when you testified that the city council approved the encampment reduction plan, you were not familiar with the rules of the Los Angeles City Council.

**MS. KUMAR:** Objection, Your Honor.  Misstates the witness's testimony.

**THE COURT:** It was asked slightly differently or different than the first question.  Which question are you asking?  Just re-ask it.

Q    When you submitted the stipulation saying that the city council approved the encampment reduction plan, as the counsel of record for the City of Los Angeles, is it your testimony then that you are not familiar with the rules of the Los Angeles City Council?

A    I am familiar with some rules more than others.

Q    Let's go then to Rule 25.  I'm going to show you Rule 25.  Are you familiar with what the asterisk means for purposes of the city council rules?

A    I'm not.

Q    So we're clear.  So this is page 1 of the rules, which the asterisk below says, rules marked with an asterisk may not be suspended.  That's what it says, correct?

A    That's what it says, yes.

Q    I know you're familiar with that rule.

A    I wasn't until now, no.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers          **78**

Q    So I'm going to show you Rule 25.  It says ten members of the council shall constitute a quorum for the transaction of business, but a smaller number may adjourn from time to time until a quorum is present --

THE COURT:  Counsel, would you repeat that more slowly and start again, please?  It's too quick.

**BY MS. MYERS:**

Q    Ten members of the council shall constitute a quorum for the transaction of business, but a smaller number may adjourn from time to time until a quorum is present and may compel the attendance of the absentees.  Except as otherwise required by the Charter or other law or by these rules, where not inconsistent therewith, action by the council shall be taken by a majority vote of the entire membership of the council.  Are you familiar with that rule?

A    I see that rule.

Q    Were you familiar with that rule before I just read it to you?

A    I believe I was familiar with the general concept of the rule, maybe not the specific wording of the rule.

Q    Okay.  Do you know if you were familiar with that rule on January 31st, 2024?

A    The basic contours of the rule, yes.

Q    So that would mean that when you submitted the stipulation to the Court, you were familiar with the general contours of

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                    **79**

this rule, correct?

A     Yes.

Q     So when you attested that the city council approved the encampment resolution plan, were you relying on any other specific council rule to support your statement that the city council approved the encampment reduction plan?

          **MS. KUMAR:**  Objection, Your Honor.  It's argumentative, and also there's no mention of city council rules anywhere in the stipulation.  It merely uses the word approved.

          **THE COURT:**  Overruled.  Overruled, you can answer the question, sir.

          **THE WITNESS:**  I did not have any city council rule particularly in mind when I filed the stipulation.

**BY MS. MYERS:**

Q     Okay.  Are you familiar with the Los Angeles City Charter?

A     Somewhat.

Q     Are you familiar with Charter Section 244?

A     Not by number.

Q     This is the section of the Charter that states, except as otherwise provided in the Charter, actions by the council shall be taken by a majority vote of the entire membership of the city council.  Are you familiar with that provision?

A     I'm familiar with the concept of that provision, yes.

Q     So when you attested that the city council approved the

Marcus - Direct / By Ms. Myers                    **80**

encampment resolution plan, were you relying on Section 244 to

attest that the city council had approved the encampment

resolution plan?

A    I'm sorry, did you say attempted?

Q    When you attested.

A    I did not have any particular council rule in mind in

filing the stipulation.

Q    How about provision of the city council Charter?

A    As counsel for the City, my actions are somewhat guided by

provisions of the Charter as they relate to the City Attorney's

Office and the handling of litigation.  And I think those are

always in the back of our minds when we are conducting

ourselves as counsel for the City.

Q    You attested in your stipulation that the city council

approved the encampment reduction plan, correct?

A    Yes.

Q    So when you attested, when you stipulated that the city

council approved the encampment reduction plan, were you making

that statement in consideration of the City Charter?

         **MS. KUMAR:**  Objection, Your Honor.  Privilege, work

product, and all of the previous --

         **THE COURT:**  Overruled.  You can answer the question.

         **THE WITNESS:**  I'm not sure how to answer that

question.  Can you repeat it?

//

Marcus - Direct / By Ms. Myers                    **81**

**BY MS. MYERS:**

Q    Sure.  When you attested that the city council approved the encampment reduction plan, was your statement, was that in consideration of the provisions of the City Charter related to council approval?

A    Nothing in the stipulation is inconsistent with the Charter or the council rules.

THE COURT:  I'm sorry, would you repeat that?

THE WITNESS:  Sure.  Nothing in the stipulation is inconsistent with the Charter or the council rules.

Q    Okay, can you tell me which council rules you relied on to support that testimony?

A    By number, no.

Q    Would you like the rules?  Would you like to take a look at them so you can tell us which rules the stipulation is consistent with?

MS. KUMAR:  Objection, Your Honor.  This is simply not relevant.  Mr. Marcus is here to testify about whether the fact in the stipulation was true.  He has testified that it was.  Whether or not it complied with some sort of city council rule or City Charter is irrelevant as to whether this statement was true or not, which is the purported scope of this inquiry.

THE COURT:  Overruled.  You can answer that question as to the reliance.  You can answer the question, sir.

THE WITNESS:  Can you repeat the question?

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                              **82**

**BY MS. MYERS:**

Q    Sure.  When you testified just now that nothing was inconsistent with the city council rules in the stipulation, can you tell me what provisions of the council rules you were acting consistently with with regards to that provision of the stipulation?

A    I believe I was acting consistent with all of them.

Q    So can you point specifically to the ones that are relevant for purposes of your testimony?

        **MS. KUMAR:**  Objection, Your Honor.  Same objection.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Again, it was consistent with all of them.  I don't believe it was inconsistent with any of them. It's a better way to say it.

**BY MS. MYERS:**

Q    Okay.  So you're testifying then that it was consistent with a requirement that actions by the council shall be taken by a majority vote of the entire membership of the council.

        **MS. KUMAR:**  Objection, Your Honor.  Misstates the witness's testimony.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.

Q    Okay.  But no vote was taken.

A    Correct.

Q    And at this point, you're refusing to answer any questions

Marcus - Direct / By Ms. Myers                          **83**

about the process by which the city council approved the

Encampment Reduction Plan.

**MS. KUMAR:**  Your Honor, objection.  Argumentative.  I

have made the objection at the request of counsel.

**THE COURT:**  It's argumentative at the present time.

You can restate the -- it's a proper area, counsel.  You can

re-ask the question.

Q    Is it your position today that you refuse to answer any

questions related to the process by which the city council

approved the Encampment Reduction Plan?

**MS. KUMAR:**  Objection, Your Honor.  Argumentative.

Trying to impugn this witness's character when at the direction

of counsel, his not answering the question is inappropriate.

**THE COURT:**  No, you can --

**MS. MYERS:**  I'm simply asking if he's following his

counsel's instructions.

**THE COURT:**  I'm sorry, both of you.  Thank you very

much.  No, you can answer the question, sir.  Overruled.

**THE WITNESS:**  I haven't refused to answer anything

yet.  The Court put those question on hold.

**BY MS. MYERS:**

Q    Okay.  So with regards to the City Charter, are there

specific provisions that you were relying on in the City

Charter related to the Encampment Reduction Plan when you

testified -- when you stated that the Encampment Reduction Plan

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                    **84**

was approved by the city council?

A     I don't believe that the stipulation is inconsistent with any of the provisions of the Charter.

Q     That wasn't my question, Mr. Marcus.  So my question was, when you attested that the city council approved the Encampment Reduction Plan, were you informed by or relying on any specific provisions of the Charter to inform your testimony that the city council approved the Encampment Reduction Plan?

A     No specific provision comes to mind.

Q     So there wasn't a specific provision or process in the Charter that provides for the approval of the Encampment Reduction Plan such that it informed your testimony that the city council approved the ERP?

        **MS. KUMAR:**  Objection, Your Honor.  Misstates witness's testimony, and compound.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Approval of the Encampment Reduction Plan isn't required by or covered by the Charter.

**BY MS. MYERS:**

Q     Is it required by or covered -- so it's your testimony then that approval of the Encampment Reduction Plan is not required by or covered by the Charter.  Is that correct?  Is that your testimony?

A     Yes, in the context that you are asking it, yes.

Q     I'm asking in the context of a federal court proceeding.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                    **85**

I'm not so -- I'm not sure what you mean by that as a qualification.  Is it your testimony that the approval of the Encampment Reduction Plan is not required by the city council Charter.

            **MS. KUMAR:**  Objection.  Calls for a legal conclusion.

            **THE COURT:**  Overruled.

            **THE WITNESS:**  The approval of the Encampment Plan did not require a vote as that is defined in the Charter of the council rules.

Q    Why not?

A    Because it is not an action taken as that term is used in the council rule you have in front of me.

            **THE COURT:**  I'm sorry.  You dropped your voice. There's not an action taken --

            **THE WITNESS:**  By the council -- it's not an action by the council as that term is being used in the Council Rule No. 25 that I see in front of me.

**BY MS. MYERS:**

Q    So it's your testimony that the city council approval of the Encampment Reduction Plan is not an action taken by the city council for purposes of the city council rule?

            **MS. KUMAR:**  Objection, Your Honor.  Misstates the witness's assessment.

            **THE COURT:**  Overruled.  Can you answer the question, sir.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                    **86**

THE WITNESS:  Yes, I believe that's correct.

Q    What would an action taken by the city council be that would be required by Rule 25 for purposes of this to get to your understanding of what you testified to?

MS. KUMAR:  Objection, Your Honor.  Relevance.

THE COURT:  If you have an example, you can state it.

THE WITNESS:  One example would be approval of a settlement agreement itself to resolve litigation.  Settlement agreements themselves within certain parameters need to be approved by the city council by action.

Q    So it's your testimony that -- back up on that.  So it's your testimony that the city council approval of the Encampment Reduction Plan was not an action by the city council for purposes of the city council rules, is that correct?

MS. KUMAR:  Objection, Your Honor.  Calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  Yes.

**BY MS. MYERS:**

Q    And for purposes of the City Charter, is it also your testimony that it was not an action, that the approval of the Encampment Reduction Plan was not an action by the city council?

MS. KUMAR:  Same objection, Your Honor.

THE COURT:  Overruled.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers          **87**

**THE WITNESS:**  It was not an action requiring a vote by the city council, correct?

Q   That's not what I asked.  So I asked if it was an action by the city council.

A   An action by definition can only be taken by a vote of the council, so the answer is no.  It was not an action requiring a vote.

Q   It's not an action requiring a vote because the city council didn't vote, is that your testimony?

A   No, it was not -- the approval of the Encampment Plan was not an action that required a vote.

Q   Why not?

A   Because it wasn't necessary.

Q   Why not?

**MS. KUMAR:**  Objection, Your Honor.  Calls for a legal conclusion and relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  The Encampment Reduction Plan was a step being taken by the CAO's office and the City Attorney's Office to negotiate compliance with the settlement agreement.

**BY MS. MYERS:**

Q   And so the city council didn't need to approve it, is that correct?

A   In my opinion, no.  They did not need to approve it under the Charter or the council rules.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                        **88**

Q    But you testified in your stipulation that they did approve it, correct?

A    Yes.

Q    And so, but as you sit here, you're not -- you will not testify as to what process was used to approve it.

         **MS. KUMAR:**  Objection, Your Honor.  Same objection, asked and answered, argumentative.  The Court is the one that took those questions --

         **THE COURT:**  Well, this is from his opinion, his objective mindset.

         **THE WITNESS:**  Well, I believe her question was, I'm refusing to testify to something and those questions haven't been put to me in that manner.  The Court has taken them under submission.

**BY MS. MYERS:**

Q    So as you sit here today, is it your testimony that the city council approved the Encampment Reduction Plan in this closed session on January 31st, 2024?

A    Yes, that's what's in the stipulation.

Q    That's not what I asked.  So I asked if it was your testimony today that the city council approved the Encampment Reduction Plan in closed session on January 31st, 2024.

A    Yes.

Q    The city council did not, however, take a vote on the Encampment Reduction Plan related to -- did not take a vote

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers          **89**

during the closed session, correct?

MS. KUMAR: Objection, Your Honor. Asked and answered, I think, now twice or three times.

THE COURT: Overruled. You can answer the question, sir.

THE WITNESS: There was no vote.

Q   And there's no provision of the charter that you can point to that provides for the approval of the encampment reduction, that provides for the approval outside of through a vote, correct?

MS. KUMAR: Objection, Your Honor. Calls for a legal conclusion, relevance.

THE COURT: This is for your mindset. You can answer the question, sir.

THE WITNESS: I didn't understand the question.

THE COURT: All right. Just please repeat, Counsel.

**BY MS. MYERS:**

Q   Sure. So when you said that the city council approved the Encampment Reduction Plan, you were not referring to any specific provision of the charter that provided for the approval by any other way other than a vote, is that correct?

A   That question presumes that approval can only be done by a vote, and I am disagreeing with that presumption.

Q   I'm not making that presumption, Mr. Marcus. I'm simply asking if it is your testimony that there are no other

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                    **90**

provisions of the charter upon which you were basing your

statement that the city council approved the Encampment

Reduction Plan.

A    I still didn't get that.

Q    So the charter provides various ways the city council must

conduct its business, correct?

A    I believe so, yes.

Q    And Section 244 provides a mechanism by which the city

council can approve things, correct?

A    I believe it's actions is what it says.

Q    Okay, so can take actions pursuant to a vote, correct?

A    Yes.

Q    And so there's no other provision in the charter that you

are relying on when you testify that the city council approved

the Encampment Reduction Plan?

A    The provisions refer to actions by the council, yes, and

this approval was not an action requiring a vote by the

council.

Q    So we're not talking about a vote, Mr. Marcus, and I know

you keep wanting to come back to a vote.  I'm not asking that.

I'm asking about whether or not there are any other provisions

in the city charter that you were relying on when you made the

statement that the city council approved the Encampment

Reduction Plan.

**MS. KUMAR:**  Objection, Your Honor, assumes that there

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Direct / By Ms. Myers                **91**

was any reliance on any city council rule or City charter.
She's testifying for the witness.

      **THE COURT:**  Overruled.  Overruled.  You can answer
the question, sir.

      **THE WITNESS:**  Again, I don't believe there was any
specific provision in mind other than my general adherence to
charter provisions and city council provisions and my role as
counsel for the City.

**BY MS. MYERS:**

Q   And are there any provisions that you can point to that
you relied on in determining, for purposes of this stipulation,
that the city council approved the Encampment Reduction Plan?

      **MS. KUMAR:**  Objection, Your Honor.  Calls for a legal
conclusion and calls for privilege.

      **THE COURT:**  This is his mindset.  You can answer the
question, sir.

      **THE WITNESS:**  If there is a provision you believe was
violated, that might help.

**BY MS. MYERS:**

Q   I'm not asking about what I believe or even what your
counsel believes.  I'm asking what you believed when you
submitted a stipulation to the federal court saying that it was
approved, whether you were relying on any provisions of the
city charter to support your testimony that the city council
approved the ERP.

**EXCEPTIONAL REPORTING SERVICES, INC**

**91**

Marcus - Direct / By Ms. Myers                    **92**

A    Again, no specific provision.

Q    Were you relying on any specific council rule to support your statement that the city council approved the ERP?

A    No.

**MS. MYERS:**  No further questions at this time. Obviously, we reserve --

**THE COURT:**  The cross-examination would turn to LA Alliance, if it's acceptable, and then back to the City.

**MS. MYERS:**  Your Honor, we reserve, obviously, the right to call Mr. Marcus back once you've issued your ruling on those questions.

**THE COURT:**  I'm sorry?

**MS. MYERS:**  We reserve the right to call Mr. Marcus back once you've ruled on the specific questions.

**THE COURT:**  Well, I'm going to also take a recess with the court reporter.  There's a couple of questions answered that I'd like to later ruling on.  Counsel, your cross-examination.

**MS. MITCHELL:**  Thank you, Your Honor.  Good afternoon, Mr. Marcus.

**THE COURT:**  Would you state your name for the record?

**MS. MITCHELL:**  Yes, thank you.  Elizabeth Mitchell on behalf of the Alliance.

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Cross / By Ms. Mitchell                    **93**

**CROSS EXAMINATION**

**BY MS. MITCHELL:**

Q    What are the different ways the city council can approve something?

A    Council can approve things by a vote.  They can also approve things on unanimous consent.  They can approve things by consensus.

Q    And what is -- oh, I'm sorry.  Anything else?

A    That's what comes to mind.

Q    Okay.  What is unanimous consent?

A    There's a, I believe, actually a council rule that talks about what it is, or maybe it's a Roger (phonetic) rule of procedure, one of those things.  It's a way of doing business without taking formal votes.

Q    And what is consensus?  When city council approves something by consensus, what does that mean?

A    It means, in general, there's a discussion and an agreement how to move forward.

Q    And how does that happen without a vote?  How is there an agreement to move forward on something without a vote?

A    There can be an agreement to move forward without a vote.  It's a consensus discussion.

Q    What types of things have you seen city council approve without a vote?

             **MS. KUMAR:**  Objection, Your Honor.  I would direct

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Cross / By Ms. Mitchell                    **94**

the witness to only answer to those that have no reference to

anything in the closed session.

       **THE COURT:**  Overruled.

       **THE WITNESS:**  Sorry, can you ask the question again,

please?

**BY MS. MITCHELL:**

Q   Sure.  What types of things have you seen city council

approve without a vote?

       **MS. KUMAR:**  Same objection, Your Honor.

       **THE COURT:**  I'm going to take that under submission.

I want some time to think about that question, counsel.

       **MS. MITCHELL:**  Okay.

       **THE COURT:**  Whether it gets into communication versus

act.  Okay.  Could the court reporter mark that for me?  Thank

you.

       **MS. MITCHELL:**  Thank you, Your Honor.

**BY MS. MITCHELL:**

Q   Let me try to ask it maybe a different way.  Without

revealing communications that you have had in closed session or

outside of the public view, have you seen city council approve

anything without a vote?

A   Yes.

Q   And again, only referring to the public actions, what

types of things have you seen city council approve without a

vote?

Marcus - Cross / By Ms. Mitchell                    **95**

A     The encampment reduction plan.

Q     Okay.  Anything else?

A     Nothing else comes to mind.

          **THE COURT:**  Just one moment, please.  Thank you.
Please continue.

Q     Are you still in the position of advising city council?

          **MS. KUMAR:**  Objection, Your Honor.  Relevance.

          **THE COURT:**  What's the relevance, counsel?

          **MS. MITCHELL:**  Well, my question essentially is how
long was he in the position of advising city council?

          **THE COURT:**  Okay.  You can ask the question.

Q     So I'll ask that question, Mr. Marcus.  How long were you
in that position of advising city council if, in fact, that was
part of your role?

A     I served as counsel representing the City from 2016
through 2024, and during that time in various litigation
matters, I would advise council.

Q     And no other -- I don't want to call it an action because
I think that's a term of art that you're using, but there's
nothing else that you can think of where you saw city council
approve something either by unanimous consent or by consensus
without a vote?

          **MS. KUMAR:**  Objection, Your Honor.  I direct the
witness not to answer anything about anything he's observed in
any closed session.  He just referred to litigation.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Cross / By Ms. Mitchell                    **96**

**THE COURT:**  Both of you are way too quick for the record.  Would you restate that more slowly and then your objection more slowly?

**MS. MITCHELL:**  Sure.

**THE COURT:**  Repeat the question, please.

**MS. MITCHELL:**  Sure.  My question is in that time in those eight years, there's nothing that you can think of where you witnessed city council do something by unanimous consent or by consensus, i.e. without a vote?

**THE COURT:**  We're talking about the act, not the communication.

**MS. KUMAR:**  Your Honor, I would direct the witness not to answer about any circumstances in which he participated in a closed session.  Revealing those closed sessions not only violates the privilege but also subjects Mr. Marcus to discipline under the Brown Act.

**THE COURT:**  Overruled.  You can answer the question.  This pertains to an act, not any communication.

**THE WITNESS:**  So I have observed city council in open session approve things by unanimous consent and by consensus.  I think an answer with respect to any closed session would invade attorney-client privilege, and I refuse to answer on closed sessions.

//

//

Marcus - Cross / By Ms. Mitchell                    **97**

**BY MS. MITCHELL:**

Q    Okay.  So specifically referring to open session matters, what types of items have you seen the city council approve without a vote?

A    It happens all the time.  I couldn't give you one example over another, but I've seen it happen.

Q    Okay.  Now, when something is approved by unanimous consent or by consensus, isn't that considered a unanimous vote when city council does that?

          **MS. KUMAR:**  Objection, Your Honor.  Calls for a legal conclusion.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I don't believe so, no.

Q    It doesn't go into the minutes as a unanimous vote?

A    I don't take the minutes.  I don't know how it's recorded.

Q    So I'm going to try to ask this very specifically.  Without disclosing any communications that happened in closed session, can you tell us what action was taken to cause you to believe that the encampment reduction plan was approved?

          **MS. KUMAR:**  Objection, Your Honor.  I direct the witness not to answer anything about what occurred during the closed session for fear of Brown Act and all of the privileges that we've previously objected on the basis for.  I direct him not to answer the question.

Marcus - Cross / By Ms. Mitchell                **98**

THE COURT:  I'd like the court reporter to mark that question for the Court, please.

MS. MITCHELL:  Thank you, Your Honor.

BY MS. MITCHELL:

Q    Now, Mr. Marcus, your testimony is that approval of the encampment reduction plan was not required by the city charter or city council rules.  Is that right?

A    Sorry, can you say that again?

Q    Yeah.  Your testimony was that approval of the encampment reduction plan in question was not required by the city charter or by the city council rules.  Is that right?

A    That's my understanding, yes.

Q    And your understanding is based on what?

A    Based on my familiarity with the charter and the rules and my years serving as counsel for the city.

Q    What actions require a vote by city council to approve?

MS. KUMAR:  Objection, Your Honor.  Asks -- calls for a legal conclusion.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I couldn't give you a list of all of them.

BY MS. MITCHELL:

Q    Then how do you know that the encampment reduction plan was not one of them?

A    It was not because it was a step being taken by counsel

EXCEPTIONAL REPORTING SERVICES, INC

Marcus - Cross / By Ms. Mitchell          **99**

for the City and the CAO's office in compliance with a settlement agreement.

Q    If the city council was not required to approve it, why did you submit it to city council for approval?

         **MS. KUMAR:**  Objection, Your Honor.  I order the witness not to answer to the extent it would reveal any privilege or his communications with his client, the City.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  One of the reasons it was submitted to council was because the LA. Alliance demanded it be so before they would agree to it.

Q    And in what context did the LA Alliance demand it to be so before the Alliance would agree to it?

A    I don't recall if it was a letter or an email or a conversation.

Q    With me, correct?

A    I believe it was with you, yes.

Q    And the LA Alliance required or informed you that city council was required, in the Alliance's view, to approve it before the Alliance would agree to it.  Is that right?

         **MS. KUMAR:**  Objection, Your Honor.  Hearsay.  Relevance as to the Alliance's thinking of what was required and not.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  Could you repeat the question?

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Cross / By Ms. Mitchell          **100**

**BY MS. MITCHELL:**

Q    Yeah, it was actually a bad question.  Let me re-ask that.  You were informed by me that the LA Alliance would not agree to the encampment reduction plan unless the city council approved it.  Is that true?

A    I don't recall the precise words, but generally, yes.

Q    Okay.  And so that is the reason that you caused the encampment reduction plan to be submitted to city council for approval.  Is that true?

A    I would say that was a reason, yes.

Q    And so when you reported back to me that the city council had approved it, did you ever communicate that that was not done by vote?

        **MS. KUMAR:**  Objection, Your Honor.  Relevance as to what this witness told Ms. Mitchell.  It's not relevant.  It doesn't have anything to do with her purported misrepresentation to this Court.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Can you repeat the question?

**BY MS. MITCHELL:**

Q    Yeah.  When you reported back to the Alliance that the city council had approved the proposed encampment reduction plan, did you report back to the Alliance that that was not done by a vote?

        **MS. KUMAR:**  Objection.  Relevance, hearsay,

**EXCEPTIONAL REPORTING SERVICES, INC**

**100**

Marcus - Cross / By Ms. Mitchell                    **101**

argumentative.

THE COURT:  Overruled.

THE WITNESS:  I don't recall.

Q    Did you at any point inform the Court that the approval was not done by vote by the city council?

A    The stipulation we filed said that it was approved.  The approval wasn't required to be done by a vote, but we did not mention the word vote in the stipulation, I do not believe.

MS. MITCHELL:  Okay.  May I have a moment, Your Honor?

THE COURT:  You may.

(Pause)

BY MS. MITCHELL:

Q    Mr. Marcus, you mentioned that because the LA Alliance asked for City Council approval of the encampment reduction plan prior to agreeing to it, that was one of the reasons that you submitted it to City Council for approval.  What are the other reasons?

MS. KUMAR:  Objection.  I direct the witness not to answer to the extent it will reveal any privileged conversations he had with his client, the City.

THE COURT:  I'm concerned whether that overlaps into any communication and please don't answer that.  Mark that, counsel, and I'm concerned that the question is broad and therefore it might invoke a communication.  Can you narrow that

Marcus - Cross / By Ms. Mitchell                    **102**

question?

      **MS. MITCHELL:**  Sure.

Q   Without revealing any communications that you may have with your client, specifically my question is, other than reflecting on communications with your client, are there any other reasons why you submitted the encampment reduction plan to City Council for approval?

      **THE COURT:**  And this is limited to your mindset.

      **MS. KUMAR:**  Objection, Your Honor, and also object to things related to his mindset as he's counsel, so anything he's thinking is necessarily work product and privileged.

      **THE COURT:**  Overruled.

      **THE WITNESS:**  Any answer to that question would evade the privilege and I decline to answer.

      **MS. MITCHELL:**  Okay.  Your Honor, we'll submit at this time, subject to reopening and being able to ask those questions that the Court is still considering.

      **THE COURT:**  All right.  Thank you.  And then on behalf of the City please.  Just a moment.  I had assumed something.  Does the County have any questions?

      **MS. BRODY:**  No, Your Honor, thank you.

      **THE COURT:**  My apologies.  The City, please, and would you once again state your name.

      **MS. KUMAR:**  Yes, Your Honor, thank you, Poonam Kumar on behalf of the City.

Marcus - Cross / By Ms. Kumar                          **103**

**CROSS EXAMINATION**

**BY MS. KUMAR:**

Q    Good afternoon, Mr. Marcus.

Mr. Marcus, we've gone through some of this, but just so that we're clear, you were present in the closed session of the City Council on January 31st, 2024; is that correct?

A    Yes.

Q    And based on what you observed, you understood that the encampment reduction plan was approved by the City Council; is that right?

A    Yes.

Q    In your role as counsel working in the City Attorney's Office have you observed other City Council sessions?

A    Yes.

Q    How many would you say?

A    Dozens.

Q    Okay.  Have you observed and participated in other closed sessions?  Now, I didn't want to hear what happened, but just whether you have, in fact, participated in or observed other closed sessions.

A    Yes.

Q    And how many closed sessions have you observed or participated in?

A    Dozens.

Q    Based on your employment with the City -- in the City

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Cross / By Ms. Kumar                    **104**

Attorney's Office and your observations in these sessions and without reference to any particular session or meeting, can you describe to us some of the ways that the City Council can approve something in your understanding.

A    It's -- yes.  What I mentioned before, they can approve things by a vote, they can approve things on unanimous consent.  They can approve things via consensus.  They can approve things via discussion.

Q    Okay.  To your knowledge, Ms. Myers showed you Section 5.2 of the settlement agreement.  Do you recall that?

A    Yes.

Q    And I can show it to you if you need but, Mr. Marcus, do you recall anything in Section 5.2 of the settlement agreement requiring that there be City Council approval for the encampment reduction plan?

A    No.

Q    Do you recall anything in Section 5.2 of the settlement agreement that required there be a vote by the City Council?

A    No.

          **MS. KUMAR:**  Excuse me, Your Honor.

     **(Pause)**

**BY MS. KUMAR:**

Q    Mr. Marcus, you were shown a stipulation that was filed and that you signed in April of 2024 by Ms. Myers.  Do you recall that?

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Cross / By Ms. Kumar                    **105**

A    I recall seeing the stipulation, I don't recall the specific date.

Q    Okay.  Fair enough.  I'm just going to bring it up on the screen.  Let me show you the first page.  Does this look like the stipulation that Ms. Myers showed you?

A    It appears to be, yes.

Q    Okay.  And for the record, that is Exhibit 326, Docket entry 713.  If I turn your attention, Mr. Marcus, to paragraph 8 of that -- well, let me first show you the signature.  Do you see that you signed that stipulation on behalf of the City?

A    Yes.

Q    I show you paragraph 8 and that first sentence.  Do you see where it reads, which approved them without delay, do you see that?

A    Yes.

Q    Mr. Marcus, in anywhere in that stipulation does it state that the City Council approved the encampment reduction plan with a vote?

A    I don't believe so, no.

Q    Is there any statement in paragraph 8 of this stipulation that specifies the manner in which the City Council approved the encampment reduction plan?

A    No.

Q    Is there any indication here, any reference to the City Council rules in this paragraph?

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Cross / By Ms. Kumar                    **106**

A    No.

Q    Any reference to any definitions within the City Council rules referenced?

A    No.

Q    Is there any reference to the City charter in paragraph 8?

A    No.

Q    Any reference to any definitions contained within the City charter in paragraph 8?

A    No.

Q    Ms. Marcus -- excuse me, Ms. Myers asked you about the City Council charter and she specifically asked you about Section 244.  Do you recall that?

A    Yes.

Q    Are you also familiar and I'm going to put this before you and I don't know what exhibit number we're on.

        **MS. KUMAR:**  I will come back to Your Honor on the exhibit number, because I don't recall where we left off.

Q    Do you see before you Section 272 control of litigation before you?

A    Yes.

Q    Do you see that -- do you recognize that as a part of the City charter?

A    Yes.

Q    And does it say at the outset, Mr. Marcus, that in the second sentence, the City Attorney shall defend the City in

EXCEPTIONAL REPORTING SERVICES, INC

**106**

Marcus - Cross / By Ms. Kumar                    **107**

litigation.  Do you see that?

      **THE COURT:**  Counsel, would you read that again,

closer to the microphone.

      **MS. KUMAR:**  Sure.

**BY MS. KUMAR:**

Q    In the second sentence it says, the City Attorney shall

defend the City in litigation.  Do you see that, Mr. Marcus?

A    Yes.

Q    Okay.  And if we go through a few sentences later, it

says, the City Attorney shall manage all litigation of the

City, subject to client direction in accordance with this

section and subject to the City Attorney's duty to act in the

best interests of the City and to conform to professional and

ethical obligations.  Did I read that correctly?

A    Yes.

Q    Does it say there, subject to City Council vote?

A    It does not say that.

Q    And, in fact, do you see the word vote anywhere in Section

272?

A    I do not.

Q    Now, Mr. Marquez, you referenced in your cross-examination

by Ms. Myers that a settlement or an agreement may be something

that would require a vote; is that right?

A    Yes.

Q    And that is specifically laid out in Section 273 of the

                **EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Cross / By Ms. Kumar                    **108**

charter; isn't that right?

A    I'd have to see the section in front of me, but that could be.

Q    If I have it.  I don't, but we'll come back to that, Mr. Marcus.  Ms. Myers also referenced the City Council rules.  Do you remember that?

A    Yes.

Q    She pointed you out to City Council Rule 25, if memory serves.

A    Yes.

Q    Let me show you -- first, I'll show you the cover page.  Do you see the rules of the Los Angeles City Council as amended, do you see that, Mr. Marcus?

A    Yes.

Q    I'm going to turn your attention to, excuse me, oops, Chapter 7 -- oh, no, that's not it.  There we go.  Chapter 8, voting.  Do you see that?

A    Yes.

Q    And I'd like to direct your attention specifically to Section 49 -- Rule 49.  Do you see that?

A    I see it on the screen.

Q    It says roll calls are required and then it has a long list of items.  Do you see that?

A    Yes.

Q    Do you see an encampment resolution plan listed there?

EXCEPTIONAL REPORTING SERVICES, INC

Marcus - Cross / By Ms. Kumar                    **109**

A    No.

Q    And, in fact, this is a list of things where a vote is required; isn't that right, Mr. Marcus?

       **MS. MYERS:**  Objection, misstates the document.

       **THE COURT:**  Overruled, you can answer the question.

       **THE WITNESS:**  It appears to be.

**BY MS. KUMAR:**

Q    So by extension, there are things where a vote is not required?

       **MS. MYERS:**  Objection, misstates the document and is testifying for the witness.

       **THE COURT:**  Well, counsel, there will be redirect/recross.  You can answer the question, sir.

       **THE WITNESS:**  Can you repeat the question?

Q    By extension, if these are the items in which there has to be a vote, is it inferable that there are items in which no votes is necessary?

A    I think that's a reasonable inference, yes.

       **THE COURT:**  Just a moment.  Would you put the document back up for just a minute?

       **MS. KUMAR:**  Sure.

       **THE COURT:**  I didn't have time to read it.

       Counsel, thank you.

       **MS. KUMAR:**  Nothing else at this time, Your Honor.

       **THE COURT:**  Why don't you check with your team.  You

Marcus - Redirect / By Ms. Myers                **110**

have --

MS. KUMAR:  I did already, Your Honor, thank you.

THE COURT:  Then, counsel, would be this redirect I believe.

MS. MYERS:  Yes, thank you, Your Honor.

THE COURT:  Ms. Myers, once again, would you state your name for the record.

**(Pause)**

**REDIRECT EXAMINATION**

**BY MS. MYERS:**

Q   Okay.  I'm just going to start where your counsel left off, which is Section -- Chapter 8, voting, which is the section we were just referring to.  Section 49.  Do you understand the difference between -- what do you understand a roll call to be?

A   A roll call vote, I would believe, is when they just that, have a roll call vote so that every person's vote is registered.

Q   So is it your understanding that if a roll call is not conducted then a vote is not conducted?

MS. KUMAR:  Objection, Your Honor, calls for a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  I don't know if -- I'm not familiar enough with the rules to know if there are other ways of

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Redirect / By Ms. Myers                          **111**

voting, that Council can vote.

Q    If you look at Rule 49 where it says, on other matters, if opportunity is given and no objection is raised, the presiding officer may announce a unanimous approval of an item under consideration and the clerk so record.  Does that give you an indication of when else a vote may be taken that does not include a roll call?

A    I interpret that sentence to refer to the unanimous consent.

Q    So when you were testifying about unanimous consent, this is the provision of the rules that you were referring to?

A    I don't know that I was referring to a specific provision when I was testifying, but looking at this sentence in front of me now, this is what I would infer to mean unanimous consent.

Q    Okay.  So when there's a unanimous approval of an item under consideration that is what you were referring to as unanimous consent; is that correct?

          **MS. KUMAR:**  Objection, Your Honor, misstates the witness' testimony --

          **THE COURT:**  Overruled.

          **MS. KUMAR:**  -- he just said it wasn't.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I think unanimous consent can apply both to items under consideration and approvals and other forms.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Redirect / By Ms. Myers          **112**

**BY MS. MYERS:**

Q    So what I'm asking about is you testified about unanimous consent.  So I'm -- is what you -- when you referred to unanimous consent in the rules is this provision in the rules that you were referring to, is this unanimous approval provision?

A    Again, I wasn't referring to a specific provision when I mentioned unanimous consent earlier.  But this sentence does seem to apply to unanimous consent, yes.

Q    Okay.  So unanimous consent in your mind is the same as unanimous approval of an item under consideration?

          **MS. KUMAR:**  Objection, Your Honor, misstates the witness' testimony.

          **THE COURT:**  Overruled.

          **THE WITNESS:**  I don't know if I would say it is exactly the same, but this sentence does seem to refer to unanimous consent.

**BY MS. MYERS:**

Q    Okay.  Are there other provisions in the City Council rules that refer to unanimous consent?

A    I don't know.

Q    Okay.  You testified that the City Council can give approval via unanimous consent; is that correct?

A    I believe it can, yes.

Q    And that may be what is referred to here as unanimous

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Redirect / By Ms. Myers          **113**

approval; is that correct?

A     Yes.

Q     And it's your testimony that when the City Council gives unanimous approval they are not voting?

A     I wouldn't consider unanimous consent a vote, no.

Q     How is it recorded, do you know, by the city clerk?

A     I don't.

Q     Because it says, the clerk shall so record.

A     That's what this sentence says, yes.

Q     But you don't understand that to be recording a unanimous vote?

          **MS. KUMAR:**  Objection, Your Honor, lacks personal knowledge.  This witness just said he didn't know.

          **THE WITNESS:**  I don't work at the clerk's office, so I don't know how they record things.

**BY MS. MYERS:**

Q     Tell me what you mean by consensus, Mr. Marcus.  You testified that the City Council can approve things via consensus; is that correct?

A     In certain circumstances, yes.

Q     What are those circumstances?

A     Again, I think the answer to that question would cause me to disclose matters from closed sessions, so I don't believe I can answer that.

Q     Consensus to you is different than unanimous approval of

Marcus - Redirect / By Ms. Myers                    **114**

an item?

A     Yes.

Q     And how is it different?

          MS. KUMAR:  Objection, calls for a legal conclusion.

          THE COURT:  Overruled.

          THE WITNESS:  I think there is a difference between City Council approving items on an agenda and counsel approving or providing guidance in a closed session.

**BY MS. MYERS:**

Q     And what is the difference?

A     Approval of items on an agenda in open session is governed by various rules and closed session is just that, it is a closed session discussion between the City and its counsel.

Q     And so that doesn't require a following the rules related to votes that are taken in open session, is that your testimony?

          MS. KUMAR:  Objection, Your Honor, misstates the testimony and argumentative.

          THE COURT:  Would you restate that question?

Q     So is it your testimony that these discussions in closed session are not governed by the same rules as decisions made in open session?

          MS. KUMAR:  Objection, Your Honor, calls for a legal conclusion, relevance, and argumentative.

          THE COURT:  Overruled.

**EXCEPTIONAL REPORTING SERVICES, INC**

**114**

Marcus - Redirect / By Ms. Myers                              **115**

**THE WITNESS:** I would say that what happens in a closed session sometimes requires a vote or other action in open session and sometimes does not.

**BY MS. MYERS:**

Q    That wasn't my question.  So you testified that the -- that actions taken in closed session are different for purposes of the rules than actions taken in open session.

A    If you're using action in the sense that the word action is used in the charter and the Council rules, I think we need to be careful what word you're using.  Actions by the City Council need to be taken by a vote, you showed me that earlier. That's different than things that happened in closed session, discussions and the results of those discussions in closed session do sometimes require votes and other actions in open session, based on the rules, and sometimes do not.

Q    And who decides whether things that happen in closed session need to occur in open session?

**MS. KUMAR:** Objection, lack of personal knowledge, foundation.

**THE COURT:** Overruled.

**THE WITNESS:** It's governed by the charter and by the rules.

**BY MS. MYERS:**

Q    Okay.  So the charter and the rules define when things that happen in closed session need to occur in open session.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Redirect / By Ms. Myers                        **116**

A    I can't speak to that, I don't know off the top of my head a charter provision or Council rule that's specific to closed sessions.

Q    What types of things, we'll use your language, what types of things can the City approve by discussion?

        **MS. KUMAR:**  Objection, Your Honor, I direct the witness not to answer any question that would divulge privileged information or other information protected by the Brown Act.

        **THE COURT:**  I don't believe that that question is going to get into communication.  You can answer that question, sir.

        **THE WITNESS:**  Can you ask it again, please?

**BY MS. MYERS:**

Q    What types of things, to your use your language, can be decided by the City Council through discussion?

A    Guidance in litigation, for example.

Q    What else?

A    I'm sure there's others, that's the one that comes to mind.

Q    And where do you base your understanding that things can be decided by discussion?

        **MS. KUMAR:**  Objection, Your Honor, relevance.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  As an attorney working for the City we

Marcus - Redirect / By Ms. Myers                    **117**

sometimes seek guidance or instruction from our client.  Those

conversations take place in closed sessions.

Q    Yes, that's not what I was asking.  So I'm asking when you

said that things can be decided by discussion, I'm asking where

you're grounding your understanding that the City of Los

Angeles and the City Council can decide things by discussion.

A    That's the purpose of having a closed session.

Q    So that the City Council decide things by discussion.

A    Within the context of a litigation, yes.

Q    Okay.  I'm asking for purposes of -- so before I showed

you Rule 25, which says that actions taken by the City Council

have to be done by vote, is there a City Council rule or a

charter provision that provides that the City Council can

decide things by discussion?

        **MS. KUMAR:**  Objection, Your Honor, calls for a legal

conclusion.

        **THE COURT:**  Do you understand the question?

        **THE WITNESS:**  I do.  It's not every decision by the

City Council is an action requiring a vote.  It's just that

simple.

**BY MS. MYERS:**

Q    That's not my question.  My question is, you testified

that the City Council can decide things by discussion and I'm

asking you if there's a City Council rule or a provision of the

charter that guides you in your understanding of that?  Is it

**EXCEPTIONAL REPORTING SERVICES, INC**

**117**

Marcus - Redirect / By Ms. Myers                    **118**

grounded in a City Council rule or charter provision?

A    Not -- there's no single provision or rule that comes to mind.  It is how the City and its counsel communicate with each other.

Q    Okay.  And so this deciding things by discussion is limited only to litigation.  Is that -- to guidance and litigation; is that correct?

A    I can't say that.  That is certainly my personal understanding because that is my role or was my role as counsel for the City.  Whether it occurs in other contexts, I couldn't speak to.

Q    So as counsel for the City, you leave open the possibility that other things could be decided by the City Council by discussion?

A    Again I can't speak to what's beyond my experience.

Q    Things that are decided by discussion, would those be considered approval by the City Council in your mind?

        **MS. KUMAR:**  Objection, Your Honor, vague and beyond the scope of this witness' knowledge.

        **THE COURT:**  Counsel, would you repeat that, I missed the question, I'm sorry.

**BY MS. MYERS:**

Q    You said things are decided by discussion, would that be considered in your mind approval by the City Council if the City Council decided something by discussion?

**EXCEPTIONAL REPORTING SERVICES, INC**

**118**

Marcus - Redirect / By Ms. Myers **119**

A    It could be.

Q    And what would be the factors that you would look to to determine whether a thing that was decided by discussion constituted approval for purposes of the City Council?

**MS. KUMAR:**  Objection, Your Honor, this is work product and asking this witness to testify in the abstract about a hypothetical without any reference to specifics.  I don't see its relevance.

**THE COURT:**  And repeat that question one more time, counsel.

**MS. MYERS:**  Sure, Your Honor.

**BY MS. MYERS:**

Q    So if you have things that are decided by discussion, what factors would go into your determination that constituted approval by the City Council?

**MS. KUMAR:**  Same objection, Your Honor.

**THE COURT:**  Overruled.  You can answer the question, sir.

**THE WITNESS:**  Again, I think the question invades the attorney/client privilege in discussions that take place in closed session, so I don't think I can answer that.

Q    Okay.  You testified in response to a question from your attorney that you believed that the City Council approved the encampment resolution plan, correct?

A    Yes.

Marcus - Redirect / By Ms. Myers                    **120**

Q    And what factors -- what facts support your testimony that the City Council approved the encampment reduction plan?

**MS. KUMAR:** Objection, Your Honor, I direct the witness not to answer the question to the extent it would reveal anything that occurred in closed session and otherwise covered by the attorney/client privilege, the lawyer privilege, the legislative privileges, any official information.

**THE COURT:** And that's specific to the encampment reduction plan?

**MS. MYERS:** Yes, Your Honor.

**THE COURT:** I'll have that marked by the clerk.

**MS. MYERS:** And I'd like to be heard on this particular point.

**THE COURT:** Please.

**MS. MYERS:** Your Honor, the City asked Mr. Marcus to testify about his view of what occurred during the meeting, specifically testifying about his view that the City Council had approved the encampment reduction plan.  The City can't now object to us asking the facts that support his opinion and his view of what happened.  They opened the door to this specific question.

If they did not want this line of questioning asked here, Your Honor, they simply should not have asked Mr. Marcus to testify to that.  This is -- they opened the door.

**MS. KUMAR:** Your Honor, Ms. Myers asked the

**121**

question --

THE COURT:  Just a moment, both of you --

MS. MYERS:  -- immediately.

THE COURT:  -- I want to make sure you've finished your argument and then I'll turn to the City.  Have you concluded?

MS. MYERS:  Your Honor, whether -- if we asked the question, that's fine, but the City asked the question and he was allowed to testify on that point.  When I asked the question, the City objected, then they went forward and asked that question and he testified, Your Honor.  If they don't want this line of questioning, they need to not ask him and allow him to testify in support of their position.  That's our whole argument, Your Honor, this morning.

MS. KUMAR:  Your Honor, this is the central problem --

THE COURT:  Just a moment, have you finished.  I'm going to turn to the City in just a moment.

MS. MYERS:  Yes, Your Honor.

THE COURT:  Counsel, on behalf of the City.

MS. KUMAR:  This is the quintessential example of the problem with this hearing, Your Honor.  The City is being asked to defend itself against questioning by Ms. Myers and Ms. Mitchell about what happened and what goes into that stipulation.

**122**

Then subject to the City's objections we stated all this morning and at the outset of the questioning of the witnesses and again throughout the testimony, because the City asked the same question that Ms. Myers and Ms. Mitchell asked, the City is somehow waiving its privilege or sometimes using it as a sword and a shield. The City can't be expected to defend itself with both hands tied behind its back, Your Honor, that is entirely inappropriate.

They asked the question. The Court asked the question. And over objection, we're still here having this witness testify.

**MS. MYERS:** But when we ask the questions, Your Honor, they object to it and say he shouldn't be allowed to testify and again, this is what has happened time and again, Your Honor, in these proceedings. Is that we ask questions, the City objects, but when those questions benefit the City then they ask the questions and their witnesses are allowed to testify. This is exactly what occurred, Your Honor, in which Mr. Marcus testified in his stipulation about what occurred in closed session. And then when we ask questions about what occurred, he's not allowed to testify about it. Exactly the same as the issues related to the vote.

We asked questions about the procedure and they refuse to answer questions. But when it benefits them, then they are -- then they put it forward. This is exactly the

**123**

definition of waiver, Your Honor, is that the City is not allowed to condition its privileges whenever it wants to. They asked Mr. Marcus this question. We are allowed to interrogate the facts that support his testimony, Your Honor.

THE COURT: Okay. Counsel, on behalf of the City.

MS. KUMAR: Your Honor, I cannot more strenuously object. The idea that the entire morning we spent talking about the City's objection to this very testimony. The Court assured the City that it would be narrow, still over the City's objection we proceeded.

Ms. Myers and Ms. Mitchell asked questions about this very paragraph in the stipulation. We objected to that, the Court overruled, and he was ordered to testify. So then I'm not allowed to ask any questions in an attempt to try to protect the City from a ruling that this Court is going to do on an incomplete record.

Your Honor, I have to say this is the central problem with this hearing and proceeding in this fashion. If the Court is inclined to direct Mr. Marcus to answer that question, several things are going to have to happen and I won't go there unless the Court is inclined to do that, but I would like to be heard if the Court is going to do that.

THE COURT: I want to thank you both. We're going to take a recess in just a moment, but broadly speaking a democracy depends upon transparency. And that means the

**EXCEPTIONAL REPORTING SERVICES, INC**

**124**

ability of the public to participate, to give their input to Council, to give different viewpoints. And on one hand, I'm going to be extraordinarily careful in terms of communication. On the other hand, these questions seem to evolve around the criteria being used to make these decisions and what you or the City, in particular you relied upon.

So let me take a few moments for reflection and give each of you a break for a moment.

MS. KUMAR: Your Honor, can I be heard on one more point?

THE COURT: No, not right now, counsel. I think it's time to take a break and when we come back you certainly can. Okay? All right. We're in recess for about 20 minutes, counsel. You may step down, sir, thank you.

**(Recessed at 2:21 p.m.; reconvened at 2:40 p.m.)**

THE COURT: The witness is returned to the stand, Ms. Myers and counsel, all parties are present.

This is being used as a sword and a shield. You're allowed to answer these questions. So, Ms. Myers, if you'd continue please.

MS. KUMAR: Your Honor, I have to reiterate our objection. I would ask the Court to stay its decision until we can seek relief from the Ninth Circuit. You're asking -- deciding on the spot whether or not the City can maintain its privileges without an adequate basis. We'd at least ask for

EXCEPTIONAL REPORTING SERVICES, INC

**124**

Marcus - Redirect / By Ms. Myers                    **125**

briefing on the topic before that's done, and I -- you know,

and I also -- Your Honor, at this point if the Court is going

to order Mr. Marcus to testify over the objection and direction

of counsel, I mean, Mr. Marcus -- we don't represent Mr. Marcus

individually.  We represent the City.  So we're in an untenable

situation where he needs separate advice about whether or not

he should follow the Court's order.

          THE COURT:  All right.  Thank you.  Counsel, your

question please.

                    **REDIRECT EXAMINATION (CONTINUED)**

**BY MS. MYERS:**

Q    So you previously testified that you believed based on

your observations during the City Council meeting that the City

Council had approved the encampment reduction plan; is that

fair?

A    Yes.

Q    And what were the facts that supported your determination

that the City Council approved the encampment reduction plan?

          **MS. KUMAR:**  Your Honor, I repeat my objection and ask

for a stay and ask for an opportunity to brief this question

and ask the opportunity for Mr. Marcus to consult separate

counsel.

          **THE COURT:**  This is mindset, counsel, it's not a

communication.  You can answer the question.

          **THE WITNESS:**  Has anyone denied that the Council

Marcus - Redirect / By Ms. Myers                      **126**

approved the plan?

        **MS. MYERS:**  Your Honor --

        **THE WITNESS:**  Is there anyone denying that the City Council approved the plan?

        **MS. MYERS:**  Your Honor, would you instruct Mr. Marcus to answer.  That's -- obviously that's not an answer to the question that I posed.

        **THE COURT:**  Repose the question, please.

**BY MS. MYERS:**

Q    What facts support your testimony that you observed -- that you believed that the City Council approved the encampment reduction plan?

        **MS. KUMAR:**  Same objections, Your Honor, she's asking for facts, not acts necessarily involves communications.

        **THE COURT:**  Just rephrase that, counsel.

Q    You testified that based on your observations, the City Council approved the encampment reduction plan.  So I'm asking what you observed that informed your opinion that the City Council approved the encampment reduction plan.

        **MS. KUMAR:**  Objection, same objection, Your Honor, observations include communications and include acts that are privileged.

        **THE COURT:**  Overruled.  This door was opened, counsel.  It can't be used as a sword and a shield, you can answer, sir.

**EXCEPTIONAL REPORTING SERVICES, INC**

Marcus - Redirect / By Ms. Myers                    **127**

**THE WITNESS:** That question would require me to invade the attorney/client privilege and I decline to answer it.

**MS. MYERS:** I'd ask for an instruction from the Court to answer the question, they're not going to answer the question.

**THE COURT:** Pardon me?

**MS. MYERS:** The witness is declining to answer the question.

**THE COURT:** I'll leave the record as it is, counsel.

**MS. MYERS:** Your Honor, we have a number of additional questions outstanding that the Court has not yet ruled on, is the Court prepared to make a ruling on those? Should I ask those questions again or is the Court going to refer to those questions?

**THE COURT:** I wanted to look at those questions and I didn't want to do that haphazardly during the recess.

**MS. MYERS:** Sure.

**THE COURT:** It was only 20 minutes and I want to be careful with this. You've asked that the gentleman be available for return, you've also requested Mr. Szabo be present. I don't know what that date would be yet. We have another witness in the audience, I think we ought to be polite to and have on the stand today.

**MS. KUMAR:** Your Honor, can I just advise that per

EXCEPTIONAL REPORTING SERVICES, INC

**127**

Marcus - Redirect / By Ms. Myers          **128**

discussions I've had with Ms. Myers Mr. Fogel has a conflict at

3, we've had these conversations.

**THE COURT:**  At 3 o'clock?  Okay.

**MS. MYERS:**  I understood it was 3:30, is it 3?

**MS. KUMAR:**  3.

**THE COURT:**  Well, we can be in continuous session and

I'm not going to inquire about the conflict, but we can

certainly come back tomorrow.  Counsel.

**BY MS. MYERS:**

Q    So at this point, you are declining to answer questions

related to the basis of your testimony that you observed that

the City Council -- that you believed that the City Council

approved the encampment reduction plan.

**MS. KUMAR:**  Same objections, Your Honor, and

argumentative.

**THE COURT:**  Counsel, you can answer the question.

**THE WITNESS:**  The question you just asked me I

believe would require me to invade the attorney/client

privilege in order to answer it and I'm declining to answer

that question.

**MS. MYERS:**  If I can just have one moment, Your

Honor.

**THE COURT:**  Surely.

**MS. MYERS:**  I do not have any further questions for

this witness at this time, but obviously I would defer pending

**129**

a ruling on the additional questions.

THE COURT:  Back to LA Alliance, please.

MS. MITCHELL:  Again, we have no further questions subject to the questions that the Court is taking under consideration.  Thank you.

THE COURT:  All right.  And back to the City.  I'm sorry, to the County, pardon me.

MS. BRODY:  Nothing from the County, Your Honor.

THE COURT:  And the City?

MS. KUMAR:  And nothing further, Your Honor, pending further questioning obviously so if we could let Mr. Marcus go.  And then, of course, as I advised Mr. Coble -- Foble (phonetic) has a conflict at 3.

THE COURT:  Okay.  And the clerk was kind enough to mark those questions and I can go over those with you this evening.  And what's the next available date for Mr. Strobel (phonetic)?

MS. KUMAR:  I can find out, if you give me a moment, Your Honor.

MS. MYERS:  Your Honor, I only have a couple of questions, but it's -- I mean, I'm happy to come back but I only have a few questions.

THE COURT:  Well, I don't know if 15 minutes we're going to accomplish -- I just don't know what your questions are.  I'd rather hear it continuously.

**130**

MS. MYERS:  Thank you, Your Honor.

(Pause)

THE COURT:  And, counsel, we're back on the record. And it'll be difficult for all of us to get one calendared event.  All of you are busy.

I'd like to hear again the briefing schedule from the Ninth Circuit, the dates.

MR. HAMBURGER:  Yes, Your Honor, the Ninth Circuit yesterday set a seven day deadline for a response for the real parties in interest to file a response and invited the Court to file a response, so that was seven days from yesterday.  So six days from today.  And then a reply is due three days after that.

THE COURT:  Do you know the schedule concerning my colleague Judge Kin and when his next hearing date is?

MS. MYERS:  Your Honor, the parties -- sorry about that, Your Honor.  The parties are meeting and conferring and we expect that the Court will set an OSC regarding the issuance of the judgment, so at this point it's not clear what the Court's briefing schedule will be.

THE COURT:  One consideration is that there's been testimony concerning privileges and other issues that the Circuit could examine and if the Court's correct can proceed in trying to make these rulings.  The other is if the Court's incorrect, the Court can be corrected by the Circuit.

EXCEPTIONAL REPORTING SERVICES, INC

**130**

**131**

I'd hoped to get both the testimony today, as I reflected over the recess of both Mr. Strobel and at least the present witness up to the circuit in a package.  But I didn't know when Mr. Szabo was available.  I can go back into session literally any time.  But --

MS. KUMAR:  He's unavailable, Your Honor, until next week.

THE COURT:  Until next week?

MS. KUMAR:  Yeah.

THE COURT:  What day next week?

MS. KUMAR:  He can be available beginning Tuesday.

THE COURT:  On Tuesday.  All right.  Just a moment.

MS. KUMAR:  And I believe Mr. Foble and Mr. Marcus are also available on Tuesday.  At some point during the day Mr. -- you know, there may be appointments but we can confer with counsel.

THE COURT:  Well, first of all, Mr. Strobel, you're in the audience, you have a 3 o'clock, why don't you go about whatever that personal obligation is.  And we can inform you about the date, so as we discuss those dates, you're not sitting waiting, okay.

And I know your representation is short, but I don't think that in 10 to 15 minutes all of you are going to conclude no matter how short the questions are and I'd rather hear that in a block of time.

So a number of factors, courtesy to the Circuit, availability of the witnesses, trying to get the Court's decisions to the Circuit to reflect upon, try to take into account my colleague in the state court system, but somewhat setting a tenor also of the parameters that I've drawn trying to narrow this to X, they're not privileged versus confidential communications that may be privileged.

What's your suggestion, counsel?  In other words, when should the Court reconvene?

**MS. KUMAR:**  May we have a moment for discussion?

**THE COURT:**  Well, I know from the City probably never, just joking, but you know --

**MS. KUMAR:**  I don't want to repeat myself, Your Honor, but at the conclusion of --

**THE COURT:**  No, I understand --

**MS. KUMAR:**  -- the Cangress litigation.

**THE COURT:**  -- your position is, but it's, you know.

**MS. MITCHELL:**  May we have a moment to discuss?

**THE COURT:**  Yeah, why don't you.

**MS. MITCHELL:**  Exchange schedules?  Thank you.

**THE COURT:**  Now, I can't make it convenient for everyone, but I'd like to pay that courtesy to all of those from the Circuit to the litigants and --

**(Pause)**

**THE COURT:**  Counsel, I have a suggestion for all of

**133**

you because -- counsel.  My suggestion is this, it's next Wednesday for a couple of reasons.  First of all, Monday is a holiday.  The Court has a huge calendar which is why I had to move you from the request by the City to have this on Monday to this Tuesday.  I had to move that one day just because we had so many cases on our calendar.  We also have a huge calendar set for next Tuesday, so I'm going to request next Wednesday. And I can be here at 7:30, I can stay as late as late as Judge Gee will let me.

**MS. MITCHELL:**  Wednesday works for us, Your Honor.

**MS. MYERS:**  That's fine, Your Honor.

**MS. KUMAR:**  Your Honor, I just need to confer with -- I mean I did not ask that one day with Mr. --

**THE COURT:**  Yeah, well I'm smiling at all of you which means it's probably next Wednesday.

**MS. KUMAR:**  Yeah, understood.  I just wanted to make sure the witness --

**THE COURT:**  So why don't you talk very quickly and communicate.  Mr. Szabo should be available, Mr. Strobel should be available and that way I can examine the questions, Mr. Marcus, that I've delayed and --

**MS. KUMAR:**  And is the City's 2.8 motion be heard that day?

**THE COURT:**  Are there any more questions at least at this time of Mr. Marcus?

**134**

MS. MITCHELL:  Not at this time, not from the Alliance, Your Honor.

THE COURT:  At least at this time.

MS. KUMAR:  And nothing else from the City, Your Honor.

THE COURT:  Let me ask that you be available, but we'll be courteous.  We'll try to fit into your schedule next Wednesday also and give you plenty of due notice, but if you're needed back.  Okay?

THE WITNESS:  Understood.

THE COURT:  Thank you very much, sir, if you'd step down.

Then next Wednesday what time would you like to reconvene?  Is 9 o'clock acceptable, would you like 8 o'clock or 7:30?

MS. KUMAR:  9 o'clock sounds great, Your Honor.

THE COURT:  9 o'clock good?

MS. MITCHELL:  That's fine, Your Honor.

THE COURT:  9 o'clock?

MS. MYERS:  That's fine, Your Honor.

THE COURT:  All right.  And I'd like to be apprised of the schedule of Judge Kin, if possible.

MS. MYERS:  As soon as we have an update, Your Honor, we will let you know.

THE COURT:  Okay.  Thank you very much.  Counsel,

135

have a nice week and we'll see you next Wednesday at 9 o'clock.

We're in recess.

(Proceedings concluded at 3:00 p.m.)

* * * * *


CERTIFICATION


I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in the

above-entitled matter.



_____                    February 11, 2026

          Signed                                     Dated



                    *TONI HUDSON, TRANSCRIBER*

135

GIBSON, DUNN & CRUTCHER LLP
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MARCELLUS MCRAE, SBN 140308
  mmcrae@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
POONAM G. KUMAR, SBN 270802
  pkumar@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
333 South Grand Avenue
Los Angeles, California  90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

HYDEE FELDSTEIN SOTO, SBN 106866
VALERIE L. FLORES, SBN 138572
ARLENE N. HOANG, SBN 193395
JESSICA MARIANI, SBN 280748
200 North Main Street, City Hall East, 6th Floor
Los Angeles, California  90012
Telephone:  213.978-7508
Facsimile:   213.978.7011
Email: arlene.hoang@lacity.org

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES, a Municipal entity, et al.,<br><br>Defendant. | CASE NO. 2:20-cv-02291 DOC (KES)<br><br>Honorable David O. Carter, United States District Judge<br><br>**DEFENDANT CITY OF LOS ANGELES'S RENEWED OBJECTION REGARDING EXPANDED CONTEMPT HEARING**<br><br>Action Filed:     March 10, 2020 |

Gibson, Dunn & Crutcher LLP

RENEWED OBJECTION REGARDING CONTEMPT HEARING

136

Based on the February 10, 2025 hearing, the City renews its objection to this Court's expansion of the contempt proceeding into whether the City misrepresented that the City Council approved the encampment reduction plan. *See* Dkts. 1140, 1151. No one disputes that the encampment reduction plan was approved on January 31, 2024. Yet the Court has sua sponte launched a probe into the circumstances of its approval. The questions asked at Tuesday's hearing by Intervenors and the Alliance confirm that this proceeding intrudes on multiple privileges, including the attorney-client privilege and the deliberative process privilege, and is now on an unnecessary collision course with the Brown Act and the *CANGRESS* litigation pending before Judge Kin in the Los Angeles County Superior Court—proceedings that are ongoing, have not resulted in a final judgment, and will be subject to appellate review. Indeed, an attorney for the City, who was formerly counsel of record in this case for many years, was called to the stand and repeatedly asked under oath to disclose confidential and privileged information from a closed session of the City Council. *See, e.g.*, Dkt. 1159 at 97:18–20 ("[C]an you tell us what action was taken to cause you to believe that the encampment reduction plan was approved?"); *id.* at 126:16–19 ("I'm asking what you observed that informed your opinion that the City Council approved the encampment reduction plan.").

Simply put, there is no way to proceed with an evidentiary hearing about what occurred at a closed session of the City Council without placing the City's employees in an impossible situation where they are potentially forced to choose between disclosing confidential and privileged information that the Brown Act (and, for the City's lawyers, the Rules of Professional Conduct) prohibit them from revealing, or refusing the Court's direction to answer questions that would require such disclosures. There is no reason for the Court to continue down this path, particularly given that (1) the Court has not clarified the basis for its assertion that the City's statements regarding the Council's "approval" of the encampment reduction plan may have been willful misrepresentations; (2) the Court's insistence that a formal vote is required for approval runs counter to the Tenth Amendment and the City's own legislative procedures; (3) the *CANGRESS*

Gibson, Dunn &
Crutcher LLP

1
RENEWED OBJECTION REGARDING CONTEMPT HEARING

**137**

litigation is ongoing; and (4) the City's representation that the plan was approved did not waive privilege.

1.    At the February 10 hearing, the Court explained that "the City attorney seemed to represent to this Court that a vote had been taken," which supposedly contradicts "subsequent testimony before this Court that, in fact, no vote was taken."  Dkt. 1159 at 5:15–24.  But although the Court identified two statements allegedly at issue in the expanded contempt proceeding, neither statement involved a representation about a vote.  The statement in the April 4, 2024 joint stipulation simply explains that "The 9,800 encampment reduction plan and milestones were presented to the City Council on January 31, 2024, which approved them without delay."  Dkt. 713 ¶ 8.  And the testimony of City Administrative Officer Matthew Szabo on May 30, 2025 that the plan was "approved" similarly does not describe any vote.  Dkt. 955 at 133:25–134:1.

In short, the Court has failed to identify any objective or reasonable basis for its stated belief that either of these statements may have been a misrepresentation, much less one that was willful.  No party has suggested that the encampment reduction plan was not actually approved by the City Council on January 31, 2024, much less presented any evidence that it was not approved, and no party is contesting that the plan remains in force.  In other words, the Court's basis for "concern[] that an authorized representative of the City of Los Angeles may have willfully misrepresented a material fact or facts to this Court concerning action taken by the Los Angeles City Council on or about January 31, 202[4]," Dkt. 1153 at 1, is not supported by any evidence—or even an allegation from one of the parties—that the encampment reduction plan was not actually approved.

2.    To the extent the Court's concern is that the City Council could only have "approved" the plan through a formal vote, the testimony of Scott Marcus should have put that concern to rest.  As Mr. Marcus testified, there are multiple ways that the City Council can approve something:  "[T]hey can approve things by a vote, they can approve things on unanimous consent.  They can approve things via consensus.  They can

Gibson, Dunn & Crutcher LLP

2

RENEWED OBJECTION REGARDING CONTEMPT HEARING

**138**

approve things via discussion." Dkt. 1159 at 104:5–8. While it appears that Intervenors and the Alliance may disagree that all of these things legally constitute approval based on their own flawed reading of the Los Angeles City Charter and the Rules of the Los Angeles City Council, any exploration of that question of California municipal law goes far beyond this Court's limited jurisdiction to enforce the terms of the Settlement Agreement. And to the extent the Court were to rule that the only permissible way for the City Council to have approved the encampment reduction plan was via a formal vote, such a ruling would run headlong into the Tenth Amendment's prohibition on the commandeering of the local legislative process. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 161 (1992). The Constitution simply does not permit this Court to dictate to the City Council the procedure that it must follow for it to approve of litigation decisions like the encampment reduction plan.

In fact, the City Council Rules and City Charter provide numerous instances in which a formal vote is not required, particularly in the context of litigation. City Council Rule 49 requires roll call votes for certain enumerated activities, but explicitly provides that "[o]n other matters, if opportunity is given and no objection is raised, the Presiding Officer may announce a unanimous approval of an item under consideration." L.A. City Council Rules ch. VIII, rule 49. And although City Charter section 244 generally requires Council votes, that provision is subject to exceptions "otherwise provided in the Charter." Los Angeles City Charter art. II § 244. Section 272 is one such exception. Section 272 establishes an attorney-client relationship between the City Attorney—a separately elected official—and the Council. *See id.* art. II, § 272 ("The City Attorney shall manage all litigation of the City, subject to client direction in accordance with this section, and subject to the City Attorney's duty to act in the best interests of the City and to conform to professional and ethical obligations."). Noticeably absent from section 272 is any requirement that the Council, when acting as the City Attorney's client, take a formal vote to "direct[]" litigation. *Id.*

The YouTube video that the Court played at the February 10 hearing of the City

Gibson, Dunn &
Crutcher LLP

3

RENEWED OBJECTION REGARDING CONTEMPT HEARING

139

Council returning from closed session on January 31, 2024 does not establish otherwise. As the Brown Act makes clear, specifically California Government Code section 54957.1(a), only certain enumerated actions taken during a closed session must be publicly reported. Approval of a plan to implement an already-existing settlement is not among the listed items under section 54957.1(a), which explains why no action was publicly reported on the YouTube video of the January 31, 2024 session.

**3.** The Court stated at the hearing that "democracy depends upon transparency." Dkt. 1159 at 123:25. The City wholly agrees that transparency is an important democratic value, but the California Legislature enacted the Brown Act to balance the ideal of transparency with the reality that municipal legislatures must conduct certain business—such as discussions with legal counsel regarding pending litigation—in closed sessions. *See, e.g.*, Cal. Gov. Code § 54956.9(a) (permitting "a closed session to confer with, or receive advice from, its legal counsel regarding pending litigation when discussion in open session concerning those matters would prejudice the position of the local agency in the litigation."). While the petitioner in the *CANGRESS* litigation has challenged the City's decision to hold a closed session relating to this action, it is not the role of this Court to intrude upon that ongoing litigation. This is particularly true considering that Angelenos have elected the City Attorney to represent the City's litigation interests.

Democracy is not advanced by a federal court upsetting the carefully crafted provisions of the Brown Act, and forcing witnesses to disclose information from closed sessions in direct violation of that Act. *See* Cal. Gov. Code § 54963(a) ("A person may not disclose confidential information that has been acquired by being present in a closed session authorized by Section 54956.7, 54956.8, 54956.86, 54956.87, 54956.9, 54957, 54957.6, 54957.8, or 54957.10 to a person not entitled to receive it, unless the legislative body authorizes disclosure of that confidential information."). And it is certainly not advanced under the circumstances here, where the Brown Act issues are being litigated in the *CANGRESS* litigation and multiple serious privileges are at stake.

Gibson, Dunn & Crutcher LLP

4

RENEWED OBJECTION REGARDING CONTEMPT HEARING

**140**

**4.** The Court suggested that the City sought to use privilege "as a sword and a shield" because it asserted that the encampment reduction plan was approved but objected to the Alliance's and Intervenors' attempts to probe into privileged discussions that resulted in that approval. Dkt. 1159 at 124:18–19. But the sword-and-shield argument involves "[a] party who affirmatively places its attorney-client communications at issue." *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 353 (9th Cir. 2014). A party cannot, for example, assert an advice-of-counsel defense "while at the same time refusing to answer questions regarding relevant communications with counsel." *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001). By contrast, the City has not put conversations with counsel at issue—it merely represented that the encampment reduction plan "was approved without delay." The City's representations of its client's approval are no more of a waiver of privilege than an attorney's announcement that her client has accepted a settlement offer or agreed to voluntarily dismiss their claims. In neither instance could a court probe into underlying conversations between the attorney and client regarding how the client arrived at the final decision. Any attempt to curtail that inquiry would be a proper invocation of the attorney-client privilege—not an attempt to use privilege as a sword and shield.

\* \* \*

For these reasons, the City once again strenuously objects to the expanded contempt proceeding and urges the Court to reconsider its decision to expand the contempt proceeding, or at least stay the expansion until the *CANGRESS* litigation, including any appeals, has fully concluded. At a minimum, the City requests that the Court stay any ruling that would direct witnesses to disclose confidential and privileged information acquired at the January 31, 2024 closed session of the City Council until the Ninth Circuit resolves the City's pending writ petition.

Gibson, Dunn &
Crutcher LLP

5
RENEWED OBJECTION REGARDING CONTEMPT HEARING

**141**

DATED:  February 13, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Theane Evangelis*
Theane Evangelis

*Attorneys for Defendant*
*CITY OF LOS ANGELES*

Gibson, Dunn &
Crutcher LLP

RENEWED OBJECTION REGARDING CONTEMPT HEARING

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**<u>CIVIL MINUTES – GENERAL</u>**

Case No. 2:20-cv-02291-DOC-KES                    Date:  February 18, 2026

Title: LA ALLIANCE FOR HUMAN RIGHTS, ET AL., V. CITY OF LOS ANGELES, ET AL.

PRESENT:

<u>THE HONORABLE DAVID O. CARTER, JUDGE</u>

| <u>Karlen Dubon</u> | <u>Not Present</u> |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):   SUPPLEMENTAL MINUTES FOR FEBRUARY 18, 2026 HEARING**

After the City's Chief Administrative Officer, Matthew Szabo, was recalled to testify, the Court indicated that it was interested in moving the case forward with respect to accountability and transparency, and out of concern about the cost to the public and people experiencing homelessness of these hearings. The Court noted that the Parties agreed in Section 7.2 of the 2022 Settlement Agreement to the appointment of a data monitor. Three and a half years after the Settlement Agreement was signed by the parties, the Court observed that there is still not a data monitor in place.

The Court then indicated to the Parties that it was within their power to determine who the data monitor would be pursuant to Section 7.2 of the Settlement Agreement. The Court directed the Parties and CAO Matthew Szabo to immediately meet and confer to determine whether they could agree on who should serve as the data monitor. The Court then recessed for the Parties and Matthew Szabo to meet and confer.

**143**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 2:20-cv-02291-DOC-KES                Date: February 18, 2026

                                                                Page 2

The Parties later indicated to the Court that they were ready to discuss the matter on the record. When the Court went back into session the Parties represented to the Court that they had made significant progress on the monitor issue. They then requested that the Court recess to allow them to continue discussions on the issue, indicating that they have a mediation session scheduled on Tuesday, February 24, 2025, with Judge Andre Birotte who is serving as the Court's mediator on this case, to discuss the monitor issue. At the request of the parties, the Court then went into recess without considering additional argument or evidence.

Counsel indicated to the Court that they were not available to resume the contempt hearing until the third week in March of 2026. The Court asked them to confirm their availability and the Court will notify the Parties and counsel of the date the hearing will resume, likely in mid-March 2026.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                Initials of Deputy Clerk: kdu

CIVIL-GEN

**144**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | | |
|---|---|---|
| LA ALLIANCE FOR HUMAN RIGHTS, ET AL., | ) | CASE NO: 2:20-cv-02291-DOC-KESx |
| | ) | CIVIL |
| Plaintiffs, | ) | |
| | ) | Los Angeles, California |
| vs. | ) | |
| | ) | Wednesday, February 18, 2026 |
| CITY OF LOS ANGELES, ET AL., | ) | ( 9:01 a.m. to 10:19 a.m.) |
| | ) | (10:38 a.m. to 10:50 a.m.) |
| Defendants. | ) | (11:00 a.m. to 11:46 a.m.) |
| | | ( 1:04 p.m. to  1:14 p.m.) |
| | | ( 2:51 p.m. to  2:57 p.m.) |

HEARING RE:

ORDER TO SHOW CAUSE RE CONTEMPT CITY OF LOS ANGELES
[DKT.NO.1066];

MOTION TO ENFORCE A TERM OF THE PARTIES' SETTLEMENT AGREEMENT
[DKT.NO.1122]

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE

**APPEARANCES:**              SEE PAGE 2

Courtroom Deputy:       Karlen Dubon

Court Reporter:         Recorded; CourtSmart

Transcribed by:         Exceptional Reporting Services, Inc.
                        20079 Stone Oak Pkwy.
                        Ste 1105-237
                        San Antonio, TX 78258
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES:**

For Plaintiffs:          ELIZABETH A. MITCHELL, ESQ.
                         Umhofer Mitchell & King
                         767 S. Alameda Street, Suite 270
                         Los Angeles, CA 90021
                         213-394-7979

For Defendants:          BRADLEY J. HAMBURGER, ESQ.
                         POONAM KUMAR, ESQ.
                         Gibson Dunn & Crutcher
                         333 South Grand Avenue
                         Los Angeles, CA 90071
                         213-299-7000

                         THEANO EVANGELIS, ESQ.
                         TIMOTHY DANIEL BICHE, ESQ.
                         Gibson Dunn & Crutcher
                         333 S. Grand Ave.
                         Los Angeles, CA 90071
                         213-229-7726

                         LAUREN MARIE BRODY, ESQ.
                         JASON H. TOKORO, ESQ.
                         Miller Barondess
                         2121 Avenue of the Stars
                         Suite 2600
                         Los Angeles, CA 90067
                         310-552-4400

For Intervenor:          SHAYLA R. MYERS, ESQ.
                         Legal Aid Foundation of LA
                         7000 S. Broadway
                         Los Angeles, CA 90003
                         213-640-3983

Special Master:          MICHELLE MARTINEZ

**146**

3

INDEX

| INTERVENORS' WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STREFAN FAUBLE | | | | |
| BY MS. MYERS | 35/60 | | 84 | |
| BY MS. KUMAR | | 71 | | 101 |

| EXHIBIT | MARKED | RECEIVED |
|---|---|---|
| 575 | 84 (PREV) | |
| 577 | 72 (PREV) | |
| 581 | | 84 |
| 590 | 60 | |
| 591 | 65 | |
| 592 | 68 | |
| 593 | 85 | |

EXCEPTIONAL REPORTING SERVICES, INC

**4**

<u>Los Angeles, CA; Wednesday, February 18, 2026; 9:01 a.m.</u>

--oOo--

THE COURT:  All right.  Counsel, we're on the record in the LA Alliance case.  If you'd be kind enough because we're on CourtSmart to make your appearances today.

MS. MITCHELL:  Good morning, Your Honor, Elizabeth Mitchell on behalf of plaintiffs here today.

THE COURT:  All right.  Thank you.

MS. EVANGELIS:  Good morning, Your Honor, Theano Evangelis on behalf of the City.

THE COURT:  Morning.

MR. BICHE:  Good morning, Your Honor, Timothy Biche on behalf of the City.

THE COURT:  Thank you.

MS. KUMAR:  Good morning, Your Honor, Poonam Kumar on behalf of the City and our partner Brad Hamburger is also here, who just stepped out of the courtroom.

THE COURT:  All right.  Thank you.

MS. BRODY:  Lauren Brody for the County of Los Angeles.  I'm going to be joined today by my colleague Jason Tokoro.

MS. MYERS:  Shayla Myers on behalf of the intervenors.

THE COURT:  Let me start first of all by welcoming you back.  And, counsel, when all of you have filed pleadings

**5**

either in this court or with the Ninth Circuit I read them. And reading what you've recently filed a couple of things have occurred to me, but is there anything else that you'd like to add to any of the documents that you've filed?  Beginning with the LA Alliance?

         **MS. MITCHELL:**  Not anything to the documents.  We have not responded to the City's most recent response, but I was in the case law over the weekend, Your Honor, looking at kind of how other courts have dealt with closed session privileged objections.

         And what I have found and I can pull the cites and send them to Court and counsel if helpful, is that what is frequently done in an in camera review of the recording of closed session, if it exists.  An alternative might be if a recording doesn't exist, like a factual determination in camera with a sealed transcript or something like that, if that's something the City is interested in.

         And I say that because, you know, there is a legitimate public policy interest in protecting closed session privilege and there is no doubt about that.  But I think there's also a legitimate public policy and certainly core interests in determining whether there was a misrepresentation made.

         And I think an in camera or under seal review of these issues might be the right balance to strike here, such

**EXCEPTIONAL REPORTING SERVICES, INC**

that it's not public information, but I think that the heart of the issues could be evaluated. So that is something that I would like the Court and the parties to consider and I'm happy to forward those cites if helpful.

THE COURT: All right. Thank you. Now, turning to Ms. Myers then before I turn back to the City.

MS. MYERS: Your Honor, we have nothing more to add beyond what we've added in our pleadings.

THE COURT: Are you joining in this request by LA Alliance concerning an in camera process concerning the audio or this hearing session?

MS. MYERS: Your Honor, we think that there are significant public policy issues at stake related to the transparency of these proceedings. Also that's my client's position in the Brown Act litigation which is separate and apart from this.

In terms of the Court's review of what occurred, we would be open to an in camera review, our concern though is that the public would not have access to the Court's determination related to this and we think that there's a significant public policy issue at stake related to the Court -- the public understanding what is happening in these proceedings which is our concern related to an in camera review.

But certainly if the Court viewed an in camera review

**7**

as an appropriate way forward, we do think that would certainly resolve this particular issue, this narrow issue that we think is before the Court.

THE COURT:  You're counsel in Judge Kin's court?

MS. MYERS:  Yes, Your Honor.

THE COURT:  Let me come back to the City.

MS. KUMAR:  Thank you, Your Honor, Poonam Kumar on behalf of the City.  To address Ms. Myers' point first, Your Honor, in terms of the public's access that is not at issue here.  That's an issue in the Cangress litigation and we have -- as we have said repeatedly do not believe that the appropriate purview of this Court in any way, shape or form.

The Brown Act governs what the public has access to and the transparency of city meetings and so that should govern and Judge Kin has not decided on the appropriate remedy in that litigation.  So that case, for all of the reasons we said, including the fact that this Court should not be meddling in what's happening in a state court proceeding should not be relevant today.

To the question of an in camera review of the Court, I'd first note for the record, of course, we have not seen these cases, counsel never advised us that they were requesting this, so this is completely on the spot for us notwithstanding her representation she did this over the weekend.

I would say to Your Honor that there's no basis for

EXCEPTIONAL REPORTING SERVICES, INC

Case: 26-784 02/20/2026 DktEntry: 18.2 Page 153 of 263
Case 2:20-cv-02291-DOC-KES Document 1170 Filed 02/19/26 Page 8 of 118 Page
ID #:33372

**8**

an in camera review. I suspect, I would look at the cases, that in those cases there was some reason to believe that an in camera review would further something. I would repeat here for the Court that the purported scope of this hearing is two purported misrepresentations.

First, a stipulation in which a City -- an officer of this Court, an attorney for the City represented the City Council approved the encampment reduction plan.

The second purported misrepresentation is the testimony by Mr. Szabo that the encampment reduction plan was approved. Neither statement said anything about a vote, all that was said that it was approved.

So the -- and then what we saw -- and I am aware of not a single witness that either side has proposed that is going to walk into this courtroom and testify that it wasn't approved. Not a single witness. All of the witnesses I will proffer to you will say that it was approved.

So why are we here and what would be the basis for this Court to invade the City Council's privilege that has been mandated by the state legislature is applicable and interfere with the Cangress litigation and review those recordings in camera. There is no reason to do that because there's no good faith basis to believe that there was any willful misrepresentation.

At best, the intervenors and the Alliance, at best,

they are pointing to some sort of procedural defect, the City maintains there was no such procedural defect, but some sort of procedural defect as to whether or not the approval could have only come in the form of the vote.  That has no impact whatsoever.

And so whether there was a willful misrepresentation to this Court by an officer of the Court and by the city administrative officer, there's no reason to believe that anyone walked in this courtroom and lied.  In fact, no one did.

And in order to understand whether, even though there's no basis to look behind and see what it is, to -- this is essentially a fishing expedition.  Your Honor, when I -- I was a federal prosecutor in this courthouse for seven and a half years.  When a defense attorney represents that they've spoken to their counsel and they're going to plead guilty, they've been informed they're going to pled guilty, this Court, nor court inquires as to how that got into that basis, what was the basis of that representation, because there's no reason to.  Just like there's no reason to do that in this particular case.

So, Your Honor, we just don't think there's any reason to have this hearing and we certainly don't believe there's any reason to invade the Court's -- the City Council's privileges to look at attorney/client privileged material, invade the Brown Act protections and review that recording and there's no reason to interrogate whether there was a

**10**

willfulness misrepresentation where there is no basis to believe so.

Lastly, Your Honor, I would point out that the Brown Act, Section 54960 does not contemplate in camera review.  We can brief this issue, Your Honor, once counsel provides us these case citations.  But between the Brown Act, the attorney/client privilege, the deliberative process privilege, the legislative privilege, and the official information privilege, this Court should not be invading those privileges and doing an in camera review to satisfy a representation we had no idea where it's coming from when there's no basis to believe there was a misrepresentation.

No one will be walking into this courtroom and saying it wasn't approved, not a single person, no witness, no document, nothing.  So to do that would be a serious injury to the City Council and to the City.  And we would strenuously object and request the ability to brief this and actually confront the objection with the case law that counsel cited.

**MS. MITCHELL:**  Your Honor, if I may, California Government Code Section 54960 specifically permits in camera or even calls for in camera review by the Court if there is an alleged violation of the Brown Act.  Now, that's certainly in a different context because we're not talking about a violation of the Brown Act, but it does explicitly permit in camera review of recordings of closed sessions by this Court under

**11**

that section.  So I just wanted to correct the record on that.

MS. KUMAR:  Your Honor --

THE COURT:  Just a moment, counsel.  Let me turn to intervenors next and we'll come back to the City so we have a process.

MS. MYERS:  Thank you, Your Honor.  First just to clarify the position from the City related to the intervenor's position about the public transparency at issue here.  That has to do not with the issues related to the Brown Act proceeding, not related to the issues of whether or not the City should have properly engaged in approving or not the encampment reduction plan, but rather the veracity of the City's statements to this Court.  That is a significant issue of public concern when the City of Los Angeles is making representations and there are questions about the veracity that the public has a right to know what its city attorneys are saying, what its politicians are saying, what its representatives are saying.

We are a time right now where the City of Los Angeles' integrity has to be pressure tested by the Court, Your Honor, and I would say this is exactly that circumstance.

Your Honor, and I think the City's consistent focus on the Brown Act misses the point completely.  The City of Los Angeles through its attorney made a representation that the City Council approved the encampment reduction plan without

delay and then when asked in a separate court proceeding what the vote tally was, said there was no vote.

And so, Your Honor, it is a reasonable, very straight forward, and very basic question, what was the process used by the City Council then to approve it. The intervenors have consistently pointed to the City Charter as well as the City rules that provide only that the City Council may approve, may take actions through a vote. And that did not occur here.

And so all we are asking, and all we are suggesting that is in the Court's purview then, how did the City Council approve it. We do not believe that the Court needs to interrogate what actually occurred in that meeting vis a vis discussions with Council, vis a vis the City's deliberations, that issue will be resolved through the Brown Act, that proceedings in front of Judge Kin. That issue will be involved through the Court of Appeals or the Court of Appeal if that's how the City chooses to move forward.

But, Your Honor, the question of the process used by the City Council to approve the encampment reduction plan will not be addressed by the Brown Act. If it's not interrogated here, it will not be interrogated anywhere. The City's made that clear in the Brown Act proceedings, that that is a red herring, that that issue is not before the Court and that is absolutely the case, it is not before the Court, before Judge Kin, whether or not the City Council approved the encampment

**13**

reduction plan.

And, Your Honor, I would go back to why we are standing here, why we have been in front of Your Honor for weeks in numerous proceedings since June of last year. The City of Los Angeles makes statements. They use plain language, they say the City Council approved things and expect that we will understand that to mean that the City Council went through the normal processes, approved it consistent with the charter and the rules. They approved it. That was a representation by the City Attorney's Office.

Your Honor, the stipulation didn't have to say vote, because Your Honor is allowed to read into the City Attorney's plain language, the legal context in which that statement was made.

When the City Attorney's Office said that the City Council approved something, you would expect, Your Honor, and this is a fair expectation for you, for the public, for the plaintiffs, for intervenors to expect that the City Attorney's Office represents that the City Council approved something, that they did so consistent with their own rules and the City Charter.

And when in subsequent proceedings the City Attorney's office represents that they did not, in fact, use the normal course to approve it, it is a very basic and very fundamental question what the City Attorney's Office meant

**14**

then, when they said, the City Council approved it.

Full stop, Your Honor, that's what these proceedings are about.  The fact that the City is hiding behind the Brown Act proceeding is frustrating to say the least.

No one asked the City or the City Attorney's Office to represent to this Court what occurred during the January 31st, 2024 meeting.  The City Attorney's Office and the City did that on their own.  They said, despite the fact that it occurred in closed session, they said that the ERP, the encampment reduction plan was approved by the City Council. They opened that door, Your Honor.

And subsequently when they were asked in another forum whether -- what the vote tally was, a very basic and very fundamental question that one would ask when it's represented that the City Council approved something, they opened the door further, Your Honor.  And they said that no vote was taken.

So they discussed to Your Honor or to the intervenors and the petitioner in that case, they discussed aspects of the process.  Your Honor, that is quintessentially what it means to open the door to basic questions about what that process was, and we know it wasn't a vote.

And how do we know it wasn't a vote, Your Honor? Because the City said it wasn't.  And they don't get to tell us what they want to tell us and then refuse to answer questions when the Court takes it upon itself using its inherent

**EXCEPTIONAL REPORTING SERVICES, INC**

**15**

authority to ask fundamental questions to preserve the sanctity of this Court.

And that's what's at issue here, it's not about the Brown Act. That, Your Honor, is a complete red herring, it is about simply asking basic questions about what the City meant when the City put forward on its own that it approved the encampment reduction plan.

And, Your Honor, in terms of an in camera review, I would say on further reflection that an in camera review would open the door to a significant interference with the closed session, which we are somewhat concerned about. We think it probably goes beyond what the Court actually needs to interrogate for purposes of answering this question, right, which is simply what the process was. And if the City would answer that question, then I think we could move on and we could do the briefing if the Court desires the parties to do so, we could do the briefing that the City -- that the counsel for the City last week represented would be helpful, which is whether or not that approval was consistent with the rules in the charter.

We just have to know what happened, Your Honor, and that's what we're asking for. Thank you.

**THE COURT:** The City please.

**MS. KUMAR:** Your Honor, just as -- I mean, it sounds like Ms. Myers is in agreement that no in camera review is

**16**

appropriate here, but to address Ms. Mitchell's point about the Brown Act, it allows for in camera review in a proceeding related to a Brown Act violation, which this is decidedly not. It does not allow for any court anywhere to review in camera recordings protected by the Brown Act because of some other unrelated purpose that has nothing to do with the Brown Act, so we don't believe that justifies this question.

But to address Ms. Myers' last statements regarding the need for the public to know and that the need for the City's integrity to be pressure tested, first of all, Your Honor, that's not the appropriate purview of this Court to just generally interrogate the integrity of the City of Los Angeles.

Particularly where here there is no basis to do so. The City hid nothing. If you listen to Ms. Myers' statements, what she said was, we both hid everything but then we disclosed enough to waive everything. I mean, it is candidly a little bit confusing.

The City is going its best to balance the needs between the Brown Act and its desire to be transparent. So as a result of that, it disclosed that it did, in fact, approve the encampment reduction plan, it being the City Council approved the encampment reduction plan. That is transparency.

Now, the fact that Ms. Myers and the Alliance want to know how was it approved, is irrelevant to this hearing, because no one's saying that it wasn't approved. No one is

**17**

looking to back away from the encampment reduction plan.  It continues to be a valid plan.  The City has said that repeatedly.  It is -- no one is seeking to unwind the plan.  Ms. Myers could have sought that in the Cangress litigation, declined to do so.  It is a valid plan, it continues to be the plan that this City proposed in conjunction with this settlement agreement.

Your Honor, as to whether or not it was properly done per City Council and City Charter rules, Mr. Marcus answered that.  We are prepared to brief that question, but I will tell you, Your Honor, to the extent this hearing devolves into whether the City followed its own rules in approving the plan, that is outside of the purview of this Court.

The scope of this hearing is a purported willful misrepresentation, which again I would repeat no one is saying occurred.  But for this Court to now delve into whether the City Council charter and the City Council rules allowed for approval to happen, short of a vote, that is running right into a state and local proceeding that this Court has no authority to do.

More importantly, they are wrong.  The City Council can approve things or act in ways short of a vote.  Mr. Marcus' testimony establishes that.  And again I point out, Your Honor, that no witness I am aware of is going to walk into this courtroom and say that that can't happen.

**18**

So it's not the appropriate purview of this Court, but even if it were, they're wrong. So why are we in this courtroom interrogating a purported misrepresentation that no one is saying is, in fact, a misrepresentation.

Again, Your Honor, I point us back to every time that counsel in this courtroom makes a representation that this client authorized a proceeding or my client authorized -- is prepared to plead guilty, has that attorney waived what that lawyer -- what their client told them? If I stand here before you as a defense attorney and say, and you ask if my client is prepared to plead guilty and I say, yes, Your Honor, have I now waived what that client told me? I think we would be upending our principles of attorney/client privilege to say that that is what would happen.

Simply saying that something was approved does not waive what actually happened behind that, nor does any witness have the ability to waive what happened in the closed session on behalf of the City and violate the Brown Act. They're subjecting themselves to discipline by doing so. They also do not have the authority to waive the attorney/client privilege or any of these privileges that are at issue here.

Ms. Myers says we're using it as a sword and a shield. That's particularly ironic, Your Honor, because we never called this hearing. A sword and a shield is when the City is putting forth something, so that it can advocate

**19**

something, so that it can advocate a position.

The classic example that this Court is well familiar with is an attorney -- a device of counsel defense in any sort of proceeding.  You can't say my lawyer told me to do this and then not reveal what the basis for that is.  That's the classic sword/shield example.  That is not what happened here.

The City answered the question that it was approved.  Simple.  We do that day in and day out, nor do we waive what happened underneath that by doing so.  The idea that we're using this as a sword and a shield when it's the City that is being threatened to be held in contempt, it's -- Your Honor, it's just not tenable, it's just not a tenable position to take.

It's not -- we're not wielding some sort of sword.  We're trying to defend ourselves against a contempt proceeding and may I remind Your Honor that we vociferously objected, asked for this to be held over so that we were not put in a position where we would have to discuss what happened in those closed sessions.

We have maintained that line, no one has done so.  I anticipate that will continue today, but there's no reason to look behind the veil when no one is saying what was represented to this Court is untrue, and I would point out that Ms. Myers in her statements doesn't make any representation as to why she believes it wasn't approved, other than her belief that it

**20**

wasn't approved in accordance with the City Charter or the City Council's rules. That's not saying there was a willful misrepresentation.

The fact that this Court could read in that there was a vote, well I mean, I don't know why that would happen, it didn't say there was a vote. It said approved. And, you know, as I would have said before it's incorrect to believe that the City Council can only act by vote. And we can brief that issue if the Court desires.

But, Your Honor, again I would point out there's -- the City is not using it as a sword and a shield, it's not hiding anything. The California legislature passed a statute that called for instances in which things can happen in closed session. That is not the City hiding behind anything. It is entitled as a municipal body to maintain its attorney/client privilege and to act in accordance with the Brown Act. In fact, it's required to.

So, Your Honor, I -- there's no reason to continue with this hearing and certainly no reason for an in camera review of the recordings related to this meeting. Thank you, Your Honor.

**THE COURT:** Check with your team. You have a number of attorneys here today, make sure you've covered all of your arguments.

**(Pause)**

**21**

MS. KUMAR: Nothing further at this time, Your Honor.

THE COURT: Okay. Anyone else? I want to make certain that if there's anything that any other party wants to add, you're more than welcome to.

MS. MYERS: Thank you, Your Honor. I'd just like to point out the sword that the City of Los Angeles used. That was when they represented that the City Council approved the encampment reduction plan, I would just point the Court back to the reason why the City made that representation. That was in response to a settlement enforcement action that the plaintiffs had filed.

So it is patently false to suggest that the City did not use that as a sword. Mr. Marcus made that representation as part of a stipulation to resolve the settlement enforcement action against the City of Los Angeles, when at issue, Your Honor, was the fact that the City Council had not approved an encampment reduction plan before January 31st, 2024. There's a reason, Your Honor, why Mr. Marcus made that representation to the Court at the time that he did.

Second of all, Your Honor, with regards to the vote tally and the vote was not taken, Your Honor, that was absolutely used as a sword in the underlying Brown Act proceeding because the City of Los Angeles made that representation that the -- a vote tally, like a vote did not have to be disclosed because no vote was taken.

**22**

And I understand the City is going to jump up here and they're going to say, and Your Honor, that's why we can't move forward with this, because that was related to the Brown Act. But, Your Honor, we're not talking about the vote tally as a sword in these proceedings. We're talking about what gives rise to the skepticism of the City's representation that the City Council approved the encampment reduction plan.

Your Honor, the City says we're not calling any witnesses who are going to attest that the encampment reduction plan was not approved. Your Honor, that's because no one from the City will get up here and testify about what happened during the January 31st, 2024 meeting. They're not going to testify that it wasn't approved, nor are they going to testify that it was approved -- well, I mean, they will testify that it was approved because the City will allow them to testify that it was approved.

But when asked about the process, when asked about what gave rise to that approval, they won't testify to it. They will -- I submit that they will do exactly what Mr. Marcus did, that despite an order from this Court that the City had waived attorney/client privilege, Mr. Marcus continued to assert attorney/client privilege in spite of Your Honor's ruling.

This suggestion, Your Honor, that the City has not waived anything by representing to the Court numerous aspects

**23**

of what occurred in the closed session completely ignores the City's position and the ways in which they are skirting the line relative to that position. Either, Your Honor, the City doesn't have to testify or either the Brown Act prevents disclosure of anything, Your Honor, and that bell has already been rung or Your Honor is well within his authority to ask questions about the process related to that.

And, Your Honor, I think the City's position that the Brown Act prevents them from disclosing what occurs, the City of Los Angeles has disclosed what occurred during that meeting. The City Council's position is the Brown Act does not allow the disclosure of anything that occurred during the January 31st meeting. And yet on numerous occasions in this court and in other proceedings the City has, in fact, represented what occurred during those proceedings.

So to the extent that the City is claiming that it would subject them to misdemeanors and prosecution, Your Honor, then Mr. Marcus made that representation in violation of the Brown Act then. And, Your Honor, that's exactly the position that we're in here.

So that's what we would say, the City is, in fact, using these representations as a sword and has used them in these proceedings as a sword, and now they are using the Brown Act to shield or they're using the Brown Act and attorney/client privilege to shield themselves from any sort of

**EXCEPTIONAL REPORTING SERVICES, INC**

**24**

interrogation and to the very, very basic question about what process the City of Los Angeles used.

And the last point that I will make, Your Honor, is that while Mr. Marcus made representations that the City could approve things, the City Council could approve things by a discussion or unanimous consent and the suggestion that unanimous consent does not equal a vote, the City has not pointed to, nor could Mr. Marcus point to anything in the City Council charter or the rules that supported his position. That was his opinion related to that, but the City has not come forward with any sort of representation that that is actually the case. So thank you, Your Honor.

**MS. MITCHELL:** May I be heard briefly, Your Honor?

**THE COURT:** Certainly.

**MS. MITCHELL:** As to Ms. Myers' last point, when there is a consent vote in City Council, that is recorded by the clerk as a unanimous vote. So the minutes reflect a unanimous vote, so they do reflect a vote.

So any time something is placed on the consent calendar, again that's recorded by the clerk as a unanimous vote and that's reflected in any of the minutes that are reviewed.

But I think separately regarding the in camera review process, counsel is absolutely right, that the California cases addressing the in camera review of a closed session recording

EXCEPTIONAL REPORTING SERVICES, INC

**25**

or interrogation of the facts is all in the Brown Act context. But I think it is relevant here to bring up because an in camera review is something that federal courts frequently do when there are conflicting interests, particularly regarding privilege.  And it is a way to maintain and acknowledge and respect to the privilege while still getting to the truth of the matter.

It's commonly done, for example, when there's -- in civil litigation when there's a work product or an attorney/client privilege claim over a document and the other side says I think that we're entitled to it.  Oftentimes, courts will do an in camera review to determine privilege.

And I do think that that is an appropriate balanced solution here to the Court's consideration.  Thank you.

**THE COURT:**  City.

**MS. KUMAR:**  Thank you, Your Honor.  I will endeavor to be brief and respond.

Ms. Myers' position is that by saying that the encampment reduction plan was approved by the City Council, the City has waived.  Your Honor, we've already given examples of a criminal plea and what we do day in and day out as lawyers, but I would point the Court also to the Brown Act.

The Brown Act does provide that under certain circumstances, which are not applicable here, but under certain circumstances that the City Council must report out actions

EXCEPTIONAL REPORTING SERVICES, INC

**26**

taken after a closed session has been completed.

Under Ms. Myers' theory reporting on a reportable action as is required by California law, would be waiving what happened in the closed session in every instance.  That is like -- it's just absurd, Your Honor.

The idea that the representation of what happened, general conclusion as this Court said, not discussions, but facts, that is not a waiver.  It is not a tenable position, Your Honor.

She also said that the reason that no one's going to walk into this courtroom and contradict the purported misrepresentation is that no one's being allowed to testify to it.  False.  Mr. Marcus already testified that it was approved. I can represent to the Court that the two remaining witnesses will also testify that it was approved.  No one is walking into this courtroom and saying it wasn't approved.

Instead what we're hearing is a procedural argument, contorting ourselves into various shapes to try to argue under City Council charter -- the City charter and the City Council rules that it had to have happened by a vote, and that otherwise it's somehow procedurally defective.

First of all, it doesn't make the representation false even if Ms. Myers is right.  More importantly, she is not right.  Mr. Marcus testified to that.  I anticipate if the Court insists there will be more testimony to that and we can

**27**

brief the question.

But most importantly, the Court shouldn't be inquiring into the City municipality -- like deciding whether things were done according to the City charter and the City Council rules.  It's running right into the abstention doctrine.  You should not -- the Court should not be doing that, Your Honor.  It's not appropriate and more importantly it's irrelevant because there's no basis to believe there was a misrepresentation.  There was none.

Your Honor, again, and to the question if we're going to go down to there has to be a vote, I point the Court to what Mr. Marcus said which is Section 272 of the City charter that specifically calls for a discussion of litigation, no mention of vote, mention of client direction, no mention of a vote, no requirement of a vote.

And the portion that Ms. Myers constantly wants to refer to is Section 244, which says, except as otherwise provided by this charter, as otherwise provided, for example, although there are others, Section 272 which provides for client direction and no requirement of a vote.

Your Honor, on that I would submit.

THE COURT:  All right.  Anyone want to respond?

MS. MYERS:  I'd just like to make one quick point about the Brown Act, Your Honor.

THE COURT:  Please.  I want to make sure all of

**28**

you've had as much time as you need for your arguments.

MS. MYERS:  Your Honor, we would be more than open to briefing on the issue of how the City -- whether the City properly approved the encampment reduction plan if the City would just tell the Court how the City approved the encampment reduction plan.  Otherwise it's entirely hypothetical and there is nothing to brief.  I think that's what's frustrating about all of this colloquy going back and forth, about whether -- about how the -- how it was approved.  There's nothing to brief, Your Honor, if we don't know how it was actually approved, that's the very straight forward problem.

Also I would just say, Your Honor, that the back and forth related to the Brown Act in these court proceedings it is misrepresenting what the Brown Act actually says, left and right, Your Honor.  The Brown Act says that certain things have to be disclosed.  Your Honor, whether or not this is the type of thing has to be disclosed is actually an issue that was litigated in the Brown Act case and the Court found that it was something that would have to be disclosed, Your Honor, but that is separate and apart from this.

I just didn't want to let the City's representation about what the Brown Act says and what it requires to stand because it's simply inaccurate both in terms of the facts, the law and Judge Kin's ruling on this particular issue.

But, Your Honor, you don't have to go down that path.

**EXCEPTIONAL REPORTING SERVICES, INC**

We do not have to go down the path of the Brown Act. We can simply focus on the very straight forward issue of how the City Council approved it. And again, we would be more than open to briefing on the issue if the City would simply represent what the process was, and then we can brief it if Your Honor finds it necessary about whether that process is consistent with the charter.

And the last point that I will make is the provision that the City wants to keep pointing to which is direction and litigation is not what this was. This -- the City did not represent to the Court that they instructed the City Attorney's Office to enter into an agreement. They represented that the City Council approved it.

And if the representation had been that the City Council instructed counsel as to a litigation issue, then perhaps the provision of the charter would apply. But that's not the representation that was before the Court. The representation before the Court was that the City Council itself approved the plan and that is what has opened this entire proceeding to interrogating that particular point.

**THE COURT:** Are all counsel satisfied with their arguments?

**MS. KUMAR:** Yes, Your Honor.

**THE COURT:** Counsel?

All right. I want to share with you some thoughts

**EXCEPTIONAL REPORTING SERVICES, INC**

**30**

I've had since last week and first, the City is continuing to object to me broadening the scope of this contempt hearing and this objection seems to be largely based on the City's belief that this hearing somehow interferes with Judge Kin's case over in the Superior Court.  And I don't think so because Judge Kin and I are concerned about two different things.

I know that Judge Kin will deal with the potential Brown Act violation in his own time and make whatever rulings he believes are warranted, but I've asked counsel to keep me apprised of Judge Kin's proceedings.

The Brown Act is not my concern in this contempt hearing.  My concern here is that the possibility that an unauthorized representative -- strike that.  That an authorized, I'm sorry, that an authorized representative of the City of Los Angeles may have made an intentional misrepresentation of a material fact to this Court.  Those are two very different things.

I'm confident that we can answer that question without intruding into Judge Kin's jurisdiction and I think the only way I can figure out what happened is to hear testimony about it.  So we'll continue with that process today.

Next, I think I need to remind everyone about the extraordinary history of this case, which dates back six years to 2020.  Some of you were not with us back then.  And in 2020, the COVID pandemic had just begun and there was a different

administration in City Hall, that administration was Mayor Garcetti's administration.

Our work in this case was just beginning and on March 19th of 2020, I presided over an unusual hearing, I believe in this courtroom. Attending that hearing included the Mayor of Los Angeles at the time, his counsel, members of the Los Angeles City Council, and their counsel and the President of that Council, members of the Board of Supervisors, it actually also included Los Angeles District Attorney at the time and the Fire Chief.

There were mayors of different cities present, but we had to limit the attendance because of COVID, we were separated by six feet. And we had to restrict this to 50 attendees at the time or this place would have literally overflowed with mayors, council people, not just throughout the city, but Los Angeles, we actually had to restrict the attendance.

There's a transcript of that hearing that you all can read and I'll docket it today. In open court and on the record we discussed my involvement in this case and the fact that I felt that I needed the flexibility to have ex parte communications with various people as the case moved forward.

And thereafter as I said in open court many times, I've spoken to hundreds and hundreds of people. There were no objections. No one objected. No elected officials, no counsel, and to the contrary at one point Mayor Garcetti said,

**EXCEPTIONAL REPORTING SERVICES, INC**

**32**

it's great to be here at the first convening of the Judge Carter fan club Los Angeles chapter and we all laughed.

The -- later, however, I had said, if you get rid of me, it's no problem at all. The Mayor replied we don't want that and so it went back and forth. I also had multiple meetings with every member of the Los Angeles City Council. Almost every member of the Los Angeles Board of Supervisors, I was transparent with that throughout the record as counsel, Ms. Myers, you were here, Carol Sobel was here, Brook Weitzman were here, Ms. Mitchell, you were here. Mr. Marcus who's in the back was here.

And we reached out, while every member of the City Council and the Board of Supervisors reached out to this Court. I've been transparent at all times about those meetings. Everyone knew about them and I even have the personal cell phones of past mayor, present mayor, they have my personal cell phone. This is all described throughout the record.

When Mayor Bass came in after Mayor Garcetti there were a few new Council members at the time. They also reached out to this Court and the Special Master initially and we've met on a multitude of occasions, not every one of them, there were a couple of folks we didn't meet.

In fact, my first meeting was actually with Mayor Bass, your client and it was on skid row and I've eluded to that at least two or three different times on the record, and I

**33**

also eluded to the fact that we met at the Biltmore Hotel,

Denny's Restaurant, and different coffee shops on a multitude

of occasions, including your new Council members.

This also occurred not only with your Council

members, with the Governor and I've stated that on the record

also, who came by to see this Court.  No one ever objected.

This was never an issue.

It's clear to me that the parties wanted me to be

involved in this case, and as a result they agreed that I could

do certain things that otherwise might not have been

permissible, absent that agreement.  And some of the arguments

the City is currently making to this Court and the Circuit

might be warranted, but in light of the City's agreement and

the continued ex parte conversations in what is absolutely an

extraordinary case, I know of no other case like this, there's

no past precedent or guideline for this case, I don't think any

of those objections are well taken.

So with that in mind, we're going to continue and if

you'd call your witness who's been very polite and I think he

had a 3 o'clock appointment on the other day.  I think it's

Mr. Fauble.  Is this the next witness, counsel, I believe who's

going to be called?

**MS. KUMAR:**  Yes, I believe Ms. Myers is calling

Mr. Fauble, the City is --

**THE COURT:**  Sir, if you'd be kind enough to step

**EXCEPTIONAL REPORTING SERVICES, INC**

**177**

**34**

forward.  Thank you for your courtesy.  And hopefully you made your 3 o'clock appointment Friday or last Wednesday.

MR. FAUBLE:  I did make it, thank you.

THE COURT:  Thank you.  If you'd raise your right hand, sir.

**STREFAN FAUBLE, INTERVENOR'S WITNESS, SWORN**

THE COURT:  Thank you, sir.  Would you please be seated here in this box.

MS. MYERS:  Thank you, Your Honor.  If I can have just a minute to get the technology set up.

THE COURT:  Be careful.  There's a slight indentation.

THE WITNESS:  Thank you, sir.

THE COURT:  And, sir, after being seated would you face the parties and state your full name please.  Sir, would you state your full name please.

THE WITNESS:  Oh, Strefan Fauble.

THE COURT:  And would you spell your last name, sir?

THE WITNESS:  F-A-U-B-L-E.

THE COURT:  Just one moment, please.  Would you spell your first name for me also?

THE WITNESS:  S-T-R-E-F-A-N.

THE COURT:  Thank you.  Counsel, direct examination.

MS. MYERS:  Yes, Your Honor.  If I can have just one moment to get the technology set up.  Thank you.

Fauble - Direct / By Ms. Myers                          **35**

     **(Pause)**

                        **DIRECT EXAMINATION**

**BY MS. MYERS:**

Q    Good morning.  Shayla Myers on behalf of the
intervenors.  Thank you, Mr. Fauble for coming this
morning.  Can you tell us what your position is?  First of all,
are you employed by the City of Los Angeles?

A    Yes.

Q    Can you tell us what your position is?

A    I'm an assistant city attorney.

Q    And how long have you worked in the City Attorney's
Office?

A    11 years.

Q    And what is your primary position within the City
Attorney's Office?  Is there a specific department that you're
in?

A    So I'm the compliance branch chief.

Q    And what does the compliance branch chief do?

A    I oversee a number of different aspects of the City
Attorney's Office under several other people.  I deal with city
council and Brown Act, Public Records Act, investigations, and
recently the administrative citation enforcement program.

Q    And how long have you had that position?

A    Approximately a year.

Q    And prior to obtaining this position, what position did

Fauble - Direct / By Ms. Myers                    **36**

you have within the City Attorney's Office?

A    So I was -- prior to becoming the branch chief, I was

still an assistant city attorney and my primary assignment was

both the Public Records Act and staffing and advising the city

council.

Q    Can you tell us what you mean by staffing and advising the

city council?

A    So as you -- I believe you saw a video of one of the

meetings before, there's typically somebody sitting in a chair

that has a sign, city attorney, in front of him or her.  That

person is providing legal advice and to some degree guiding the

administration of the meeting, as well as providing Brown Act

advice and other advice as may be appropriate.  Or connecting

people, connecting the members or the chair to other experts if

there are specific issues.

Q    So when you're providing legal advice to the city, to the

city council, is that during the city council meetings?

A    Yes, but not exclusively.

Q    Okay.  During the city council meetings when you're

providing that legal advice, is that in the open session?

A    It's sometimes an open session.

Q    Okay.  And so then you as the attorney for the city of Los

Angeles are providing that legal advice in the course of an

open session related to issues that may arise in the course of

that meeting, correct?

Fauble - Direct / By Ms. Myers                    **37**

A    Sometimes, yes.

Q    And what kinds of issues have you dealt with over the past 11 years in that?  Well, first of all, how long have you been  -- were you in that particular position?

A    So I think I was in that position for at least nine years. I'm not sure how much longer than that it was.  So examples, it could be issues relating to the Brown Act.  That would be very common.  It could be any of a number of matters.  I don't claim to be a subject matter expert on most issues because the city deals with myriad things, but certain baby questions in other areas I'll answer.  But if you delve too deeply, for example, into CEQA, what I'm probably going to do is find somebody who knows more than I do.

Q    Fair.  We're not going to get into CEQA here.  But how about the city council rules?  Are you familiar with the rules of the Los Angeles City Council?

A    Yes, I'm familiar with them.

Q    And is part of your job then to advise the city council about the operative city council rules in the course of meetings?

A    Yes, not exclusively, but yes.

Q    And are you familiar with the Los Angeles City Charter?

A    Yes.

Q    And is part of your job then to advise the city council of the applicable charter provisions in the course of meetings?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                **38**

A     In the course of meetings, yes.

Q     And that advice often comes up in open meetings, correct?

A     Often, yes.

Q     Okay.  And under what circumstances -- well, never mind.  I will strike that.  Were you the -- were you in this position in January of 2024?

A     In January -- well, tell me what you mean by this position.

Q     In the position of advising the city council related to compliance with the various provisions that we've talked about.

A     Yes.

Q     And were you in that position in May of 2024?

A     Yes.

Q     Okay.  When the city convenes in closed session and you are the -- you are the city attorney that is staffing a city council meeting, are you in that closed session?

A     If I'm staffing it, definitely.

Q     Do you know if you were staffing a city council meeting on January 31st, 2024?

A     I was not.

Q     Okay.  Do you know if you were staffing a city council meeting on May 2nd, 2024?

A     I do not know.

Q     Okay.  Do you know who had the role that you frequently take up on January 31st, 2024?

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Direct / By Ms. Myers                 **39**

A    Yes.

Q    Who was that?

A    Jonathan Groat.

          **THE COURT:**  I'm sorry, Jonathan what?

          **THE WITNESS:**  Groat, G-R-O-A-T.

          **THE COURT:**  I'm sorry.  Would you spell that more slowly?

          **THE WITNESS:**  Yes.  G-R-O-A-T.

          **THE COURT:**  Thank you.

**BY MS. MYERS:**

Q    How many individuals in the city council -- in the City Attorney's Office have that particular position that you had in terms of staffing city council meetings?

A    There are, with rare exceptions, only three of us that would be doing that.

Q    Are you familiar with the term a roll call?

A    Yes.

Q    What is a roll call?

A    It's a type of vote.

Q    And can you describe what that type of vote is?

A    Yes.  So it's -- during the actual vote, be it oral or otherwise, it's taking the name of the member and then indicating whether that member is voting yay or nay on the matter before him or her.

Q    And so it's an individual identification of the specific

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **40**

vote by council member; is that fair to say?

A    Yes.  While the vote's going on.

Q    Okay.  And it's specific while the vote is going on?

A    Yes.

Q    Okay.  Are you familiar with unanimous -- the term
unanimous consent?

A    Yes.

Q    What does unanimous consent mean to you?

A    So I see you scrolling through the rules right now.

Q    Let me find you.

A    Yeah.  If you find rule 49, I think.

Q    Yes.  Getting there.

A    You'll find that it uses the phrase unanimous approval.

Q    Yes.  I'm asking specifically about the term unanimous
consent.  So I'll get to unanimous approval in a minute.  But
can you -- are you familiar with the term unanimous consent?

A    Yes.

Q    What does that mean to you?

A    It's a form of voting in which there is typically in order
for the chair saying, does anybody object to the following
proposed action?  And if there's sufficient time to object and
nobody does, then eyes are spread across the roles on the
members, but it's not a roll call vote.

Q    What's the difference between then the unanimous consent
and a roll call vote?

EXCEPTIONAL REPORTING SERVICES, INC

**184**

Fauble - Direct / By Ms. Myers                        **41**

A    I think the roll call vote is while the vote is going on, we ascribe a yay or nay to each person.  Whereas unanimous consent is if there is no sufficient objection, it's deemed that everybody has voted yes.

Q    Okay.  So in that case, it's a form of voting that just simply does not require the individual tabulation of each of the council members votes, correct?

A    While the vote is going on.  Yes.

Q    Okay.  And so if there is an action by the city council that does not require a roll call vote, how else could a vote be taken?

A    So, well, a vote, I think, could only be taken as far as I'm aware, by a roll call vote or by unanimous consent.

Q    And you mentioned unanimous approval.

A    Yes.

Q    And that's a phrase that appears in Section 49, which is the these are the -- are you familiar with these -- the document in front of you?

A    Yes.

Q    And can you tell the Court what this document is?

A    Sure.  It's the -- I assume it's the current edition, but an addition of the rules of the Los Angeles City Council.

Q    Are you familiar with prior versions of the city council rules?

A    Some of them to some degree.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **42**

Q    Do you know when the last time the city council rules were
changed?

A    Oh, gosh, I think it was a couple of years ago.

Q    Okay.

A    If you go to the beginning of the document, it would
refresh my memory and I could tell you for sure.

Q    Are you aware of what the change was the last time the
rules were changed?

A    So I believe the last change was regarding use of certain
racial and other epithets in the council rules.

Q    And are you aware of any changes that were made to Chapter
8 before you, the voting?

A    Chapter -- I don't recall there being any.

Q    Okay.  Okay.  So going back to number 49, which is in
front of you, where it says the last line, it says on other
matters, if opportunity is given and no objection is raised,
the presiding officer may announce a unanimous approval of an
item under consideration and the clerk shall so record.  And
that particular line where it says unanimous approval, is that
the same to you as unanimous consent?

A    I believe it is.

Q    Are you aware of the term unanimous consent appearing in
the charter other than -- well, first, are you aware of the
term unanimous consent appearing in the charter?

A    Not that I recall.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                **43**

Q    Okay.  And are there any other provisions that you're

aware of that discuss this unanimous approval voting process?

A    Not that I recall.

Q    Okay.  Are there other provisions of the city rules that

you recall that discuss how the city council can approve items?

A    Yes.

Q    What provisions are those?

A    Well, Rule 25 comes to mind.

Q    Let's go to Rule 25.  Okay.  So this is Rule 25 of the

city council rules.  And it says ten members of the city

council shall constitute a quorum.  Is this the provision that

you were just -- that you just identified?

A    Yes.

Q    And what is your understanding of what this -- when this

provision applies?

A    When it applies, it applies whenever.  Well, there are

different parts of this provision.  So the first sentence talks

about a quorum for transaction of business.  So that tells you

when there's a quorum.  Right.  And when business can be

transacted.  Second sentence says that except as otherwise

required by the charter or other law or by these rules, we're

not inconsistent therewith, action by the council shall be

taken by a majority vote of the entire membership, which I

think is fairly self-explanatory, or at least I shouldn't say

that.  That's what it says.  Right?  It says a majority vote

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                          **44**

for action is required.

Q    And when is your understanding that this provision applies?

A    Whenever council takes an action by a vote, it requires a majority of the membership, which would be eight votes.

Q    And when -- are there times when the city council can take actions without a vote?

A    An action?  No, I don't believe so.

Q    When you use the term action, what do you understand that term to mean?

A    I think it's -- I'm not sure that I can define it.  I think it's a legal term of art.  I don't think it's equivalent to the council doing something.  Right.  So it -- I hesitate to characterize it more than that because I don't think I have a definition at my fingertips.

Q    When you say that the council can do something other than taking an action, what are those some things that the council can do?

A    Well, I don't know that I have an exhaustive list, but it can instruct somebody.  It can express agreement or approbation to a plan, for example.  So those are two -- two things it does.

Q    So tell me about instructing.  Who can the city council instruct?

A    Well, the one that comes to mind, unsurprisingly, given my

**EXCEPTIONAL REPORTING SERVICES, INC**

**188**

Fauble - Direct / By Ms. Myers                    **45**

job is it can instruct the city attorney.

Q    And what do you mean by instruct the city attorney?

A    I mean, instruct the city attorney.  I'm not quite sure how else to explain it.  Giving us indications of what it would like us to do.

Q    And when the city council does that, is it your position that the city council does not have to vote on that?

A    It does not have to.  That's correct.

Q    Why is that your position?

A    Why is it my position?  Because I think nothing prevents them from instructing us.  And indeed, one of the council rules actually talks about instructing the city attorney or the charter, I should say.

Q    Do you know what provision of the charter that is?

A    I don't remember offhand.  I suspect you do.

Q    Does it specifically say that the city council can instruct the city attorney without a vote?

A    It does not say that.  It says it may instruct the city attorney.

Q    And what does it mean for the city council to instruct the city?  I know we're getting into -- we're getting into very specifics here, but I want to understand when you say the city council can instruct, how many members of the city council are there?

A    Fifteen.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **46**

Q    Okay.  So when you say that the city council can instruct the city attorney, how would the city council instruct the city attorney to take a particular action without a vote of the body?

A    So without referring to any particular closed session, there could be a discussion and it could be just very clear that the council wants us to do thus and such.  It's the same way if you were talking to a group of -- a client that had multi members and you talk to them and you go away understanding perfectly what they've instructed you to do, but there's no vote.

Q    And when that happens, how would that -- you would understand that to be an instruction to the City Attorney's Office, correct?

A    Yes.

Q    And that's -- that is the verb.  It would be an instruction to the city attorney to do something, correct?

        **MS. KUMAR:**  Objection, Your Honor.  Mischaracterizes, argumentative.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Can you ask the question again, please?

**BY MS. MYERS:**

Q    Sure.  When you were discussing this process, the city council coming to an agreement, the verb that you would use then is you instruct the city attorney to take a particular

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                          **47**

action, correct?

A     I might use that verb.  I don't know.

Q     What other verbs would you use?

A     Told us.  For example.

Q     Okay.

        **THE COURT:**  I'm sorry, the word?

        **THE WITNESS:**  Told us.  A very common English word.

**BY MS. MYERS:**

Q     And then the understanding is then that would be then the
City Attorney's Office or the city's lawyers would then take a
subsequent action, correct?

A     Presumably.

Q     Okay.  And you just said you said approbation of a plan.
What do you mean by that?

A     Expressing liking of it.  Right.

Q     But what circumstances would the city council like express
like of a plan?

        **MS. KUMAR:**  Objection, Your Honor.  I direct the
witness not to answer to the extent it's any specifics.  He can
speak in generalities, but he can't obviously reveal what
happens in closed sessions or is otherwise protected by the
attorney/client privilege.

        **THE COURT:**  Overruled.  You can answer that question.

        **THE WITNESS:**  Okay.  And I -- indeed, I think the
question is answerable.  It's sort of a hypothetical in

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **48**

generalities.

So perhaps I can give you an example.  Again, this would be a hypothetical.  But imagine that the head librarian from the city is in front of city council and he's presenting his plans at what he's going to do with the library and what kind of services he's going to provide.  And it's clear during the course of the discussion that the -- clearly, certainly a majority of the council members are expressing approbation or liking of what he's planning to do.  Right.  So they're clearly approving of what he's suggesting through discussion.  There's no vote.

**BY MS. MYERS:**

Q    And under that -- under those circumstances in which the members of the city council like what is being presented to them, in your example, it is the head librarian that is taking a particular action, correct?

A    That was my example.

Q    Okay.  Are there real world instances that you can recall from your 11 years of staffing city council meetings in which the city council liked something that was presented to them?

**MS. KUMAR:**  Objection, Your Honor.  Same objection.  Nothing -- only as to open session can the witness respond?

**THE COURT:**  Overruled.

**THE WITNESS:**  So the answer is, I can't think of a particular case, but I know that it happens, you know, not

Fauble - Direct / By Ms. Myers                    **49**

infrequently.  Right.  It's not unusual at all.

Q    And it's not unusual at all that the city council likes things that are presented to them and expresses that like through discussion.  Is that your testimony?

A    That's what I said.  Yes.

Q    Okay.  And you would consider that -- would you consider that to be an action taken by the city council?

A    No.  Not in the sense of Charter Section 25.

Q    Okay.  What other examples do you -- can you give us any other examples of the city council liking something and expressing their like of someone presenting to them taking a particular action?

A    So as I've told you, I really can't think of any specific examples where they've -- there was clearly an expression of, you know, approbation of what was being suggested.  But again, it's not unusual.  This would be a lot like if you asked me to dredge up a memory of buying celery at the market.  I know I've done it many times.  I can't think of a specific instance.

Q    And so how would the -- would the expressing like through discussion be recorded anywhere as an official action of the city council?

A    I don't think so.

Q    And how would the public know that the full city council liked something?

        **MS. KUMAR:**  Objection, Your Honor.  Relevance.

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Direct / By Ms. Myers                    **50**

THE COURT:  Overruled.

THE WITNESS:  So if it were -- if this occurred in open session, a member of the public could watch the video or listen to it and understand perfectly well what occurred.

BY MS. MYERS:

Q    Okay.  And where in the city charter does the approbation of a plan occur?  Or where in the city charter does it refer to that process of liking something through discussion?

A    So it doesn't -- it's not referenced in the charter.  I'm worried that you may be misunderstanding the nature of the charter, however.

THE COURT:  So like is not mentioned in the city charter?

THE WITNESS:  It's not.  But the confusion that I think -- I suspect where Ms. Myers is going is that she's suggesting that if something is not called out as allowed in the charter, we don't have authority to do it.  That's to misunderstand the nature of the charter.  The charter is not a document of authorization.  It's a document of limitation.

And so I would point, for example, to charter Section 25, where it says actions are taken unless otherwise, you know, exempted are taken by a vote.  That doesn't mean that anything that the charter -- that the council does, which isn't an action, you actually use the word official action at one point, requires a vote.  I just think otherwise would be

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers          **51**

misunderstanding what the kind of -- what the charter is.

**BY MS. MYERS:**

Q    So just to clarify, you said charter.  I believe you mean Council Rule 25?

A    Yeah.  Sorry.  Council rule.  There's a similar charter section.

Q    Yeah.  So you're referring to Council Rule 25.

A    Yeah.  Thank you.

Q    So the charter is about limiting the power of the city council, correct?  That's your testimony?

A    Yes.

Q    And is it about limiting the power of the city council to take actions pursuant to specific procedural requirements?

A    So if there's a procedural requirement in it, I think that would be telling us how we have to do it, to put it that way.  And if it doesn't say how we have to do something, then we're allowed to do it under the charter.

Q    So when you say, and I'm going to go to the city council Rule 25 that I think you were referring to.  So where it says, except as otherwise required by the charter or other law or by these rules, where not consistent therewith, action by the city council shall be taken by a majority vote of the entire membership of the council, are you suggesting that there are other ways that are not outlined in these rules, the charter or applicable law that would allow the city to take actions?  Is

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers **52**

that what you're representing about the city council rules?

A    So insofar as you're talking about an action, other than possibly unanimous consent, because I'm not sure whether rule 25 is talking about a roll call vote, I would say no.

Q    You previously testified that a roll call vote and unanimous consent are two ways to achieve a vote, correct?

A    That's right.  So maybe in light of what you said, maybe the answer to the question is no.  Council can't take an action outside of a majority vote or if a higher percentage is required, of course.

Q    And so then the question rests on what an action is then.

A    Yes.

Q    And so it's your testimony -- again, what do you understand an action to be?

A    So I don't think I have a definition.  You used the phrase official action at one point, which I don't know that's in the rules or the charter anywhere, but maybe captures the idea.  So I can give you a non-exhaustive list.  Voting on an ordinance is an action.  Voting on a resolution is an action.  Voting on the budget is an action.  I can probably give you a non-exhaustive list of non-actions, instructing the city attorney, expressing approbation or disapprobation to a planned course of action.  So those are some examples.  But I'm not prepared and it's very difficult to create definitions for fairly common English words on the spot.  I don't think I can do it.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **53**

Q    Perhaps hit on what's happening here is questions about specific words and what they mean.  But your job is to interpret the rules and advise the city council related to those rules, correct?

A    Part of my job.

Q    Yeah.  And so the city council routinely approves reports from committees, correct?

A    Yes.

Q    And is that an action taken by the council?

A    Well, actually, it votes on them.  So, yes, I'm quite sure.  And they have recommendations in the reports, usually, that are very specific.  I can give you hypothetical examples if you want.

Q    So if there was a report from the Transportation Committee that went in front of the city council, the city council would vote on that to express approbation, liking that report, correct?

A    I think to say that they vote to express approbation is a very strange phrase.  I wouldn't use that.

Q    Neither would I.

A    A vote is a performative act, and they vote on the recommendations in the report.

Q    Yes.  And they frequently use the votes in that vote to instruct specific departments to take actions, correct?

A    Yes.

Fauble - Direct / By Ms. Myers                    **54**

Q    And that is, in fact, a large part of what the city

council does, right, is that they instruct various city

departments to take specific actions, correct?

A    So they tend to  -- so I'm not quite sure that's right.

They instruct departments through, usually, maybe entirely,

passing ordinances.  Other than that, it's usually a

departmental report or recommendations where the department is

asking for something.  For example, please approve this

contract that's for five years, and then the council votes to

approve the contract.

Q    So it's your position that the city council does not

routinely instruct departments to take specific actions through

voting to approve reports?

A    I think the answer is -- I think that's what I'm

saying.  I think they instruct departments through

ordinances.  I'm trying to think of examples.

Q    Sure.

A    And the ones that are coming to mind are usually --

something that you would think of is not an ordinance where

maybe you're characterizing as instruction.  The department

sends a report in, and, for example, it would say, you know,

we'd like to enter into this contract for a five-year period

for this building project and to have the controller transfer

funds.  I suppose the controller instructions are instructions

of the controller, and council votes on that.  So if you have

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **55**

specific examples, it may help me.

Q    Sure.  We'll come back to that, specific instructions of the city council instructing departments to take specific actions.

A    Thank you.

Q    I'm going to go back to the -- I'm going to show you what --

A    Actually, can I add to the previous testimony?  I think there are examples.  I'm trying to think of examples.  I think they're examples of instructions as I'm thinking through many past agendas.  But if you had examples, that would help.  Anyway, sorry, continue.

Q    And what you're now saying you are aware of, and those would be city council actions, the purpose of which is to instruct city departments, other entities to take specific actions, correct?

A    I think that's right.  But, again, if you have examples at your fingertips, that would help me.

Q    Sure.  We'll come back to that in just a minute.  And in those instances, the city council votes on it, correct?

A    Yes.

Q    And a vote is recorded?

A    At least in some cases, maybe all cases.

Q    And how would you be able to distinguish some cases versus all cases?  What instances can you imagine the city council

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **56**

instruct the department to take action?

A    Well, again, the simplest example, which I'm very familiar with, is they instruct the city attorney to do something.

Q    Okay.  We'll come back to why the city council feels it can do that without a vote.  I'm going to go to Section 244. First of all, are you familiar with this document?

A    It's the charter of the City of Los Angeles.

Q    Okay.  And what is the charter of the City of Los Angeles?

A    It's the main governing document.  It's a bit like a constitution for the city.

Q    And so, as you previously testified, it limits the authority of various entities within the city, correct?

A    Yes.

Q    Okay.  And it's one of those entities that it limits the city council?

A    Yes.

Q    Okay.  So I'm going to show you Section 244.  And then -- so I'm going to tell you where it's in the middle of the paragraph.  It starts where it says, except.  Except as otherwise provided in the charter, action by this council shall be taken by a majority vote of the entire membership of the council.  Are you familiar with that particular provision?

A    Yes.

Q    And is it your understanding that that's where the rule for the city council is derived from, is this provision of the

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **57**

charter?

A    I don't know if it's derived from it.  It mirrors it.

Q    Okay.  Were there other provisions of the charter that,
it's your testimony, dictate how the city council can take
specific actions other than through a vote?

A    I haven't testified to that.  No.

Q    So as you sit here, you're testifying then that you're not
aware of any other provisions that dictate how the city council
can take actions.

A    That's all that's coming to mind right now.

Q    Okay.  Are you familiar with any other provisions of the
city charter that allow for approbation through discussion?

A    Well, again, the city attorney can be instructed.  And I
don't think that requires an action or a vote.  So yes.

Q    And so when you're referring to the city council's
instruction to the city attorney, do you know what provision
you're referring to?

A    I don't remember the number.

Q    If I showed you, would you know what that provision is?
Let me just show you Section --

A    Yeah, I think it's 272 now that you have that there.

Q    Yeah.  Is this the provision that you're referring to?

A    I believe so.

Q    And where does it say that the city council can instruct
the city attorney without a vote?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **58**

A    Oh, I'll have to read it.  Let's see.

Q    Okay.  Tell me if you need me to scroll.

A    Yes, please.  If you direct me to the sentence, that may speed us along.

Q    No, I'm asking you.

A    Okay.  Right.  So the third sentence, I think, the city attorney shall manage all litigation of the city subject to client direction in accordance with this section.  That, for example.

Q    So that's the provision that says that the city council can instruct the city attorney without a vote?

A    And can you scroll down, please?

Q    Sure.

A    Make sure there's nothing else.  I believe that's it.

Q    So that's the provision that you're referring to that gives rise to your understanding that the city council can instruct the city attorney without a vote?

A    Yes.  Although, again, it's a document of limitation.  Or excuse me, the charter is a document of limitation, so I don't -- your question seems to have a false premise in it, which is that we can't do it unless you find a provision here that says that we can.

Q    That like, for example, that says, unless otherwise authorized, the city shall -- the city council shall take a particular action, like that?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                          **59**

A     For example.

Q     For example.  Okay.

          **MS. MYERS:**  Your Honor, would it be possible to take just a short recess?

          **THE COURT:**  Absolutely.

          **MS. MYERS:**  Thank you.

          **THE COURT:**  So, counsel, about 15, 20 minutes.  Okay? Thank you very much.  Have a good recess.  Sir, you may step down.  Thank you.  Then we're in recess.

     **(Recessed at 10:19 a.m.; reconvened at 10:38 a.m.)**

          **THE COURT:**  Thank you for your courtesy, if you'd be seated, we're back in session, all counsel are present.  This is continued direct examination by Ms. Myers on behalf of the intervenors.

          **MS. MYERS:**  Thank you, Your Honor, for your courtesy for a recess, I'm going to go over a couple of documents.  I think we're on Exhibit 577, is that correct, do we know?

          **THE COURT:**  Why don't you put it up and let's see if we all agree, 577.

          **MS. MYERS:**  Okay, that sound right?

          **MS. KUMAR:**  It may be, but -- could you go?

          **MS. MYERS:**  Let's go 580, how about that, is that safe enough?

          **MS. KUMAR:**  Could we do 590?

          **MS. MYERS:**  590, sure, yeah, 100 percent we will do.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers          **60**

We can go 600 if you want, that's fine.  Okay, we'll go with 590 then.

                    **DIRECT EXAMINATION (CONTINUED)**

**BY MS. MYERS:**

Q    Okay, Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of the intervenors.  Before we broke for a recess, you said -- you asked if there were examples that I could give related to instructions, and so are you familiar with this document?

A    It appears to be an agenda for the LA City Council from February 17th, 2026.

Q    And when is February 17th relative to today?

A    I think it was yesterday.

Q    Okay, so based on this document, is it fair to say this is the City Council agenda for the meeting yesterday?

A    It looks like it.

Q    Okay, and I'm going to mark this as Exhibit 590.

          **THE COURT:**  590, not 577?

          **MS. MYERS:**  No, 590, Your Honor.

          **THE COURT:**  590, thank you.

     **(Exhibit Number 590 marked for identification)**

**BY MS. MYERS:**

Q    Are you familiar with city council agendas?

A    Yes.

Q    And what's the purpose of a city council agenda?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                                    **61**

A    It's to provide notice to the public of what is going to be discussed or acted on or whatever.

Q    And the city council agenda lists items that are to be voted on by the city council, correct?

A    Among other things, yes.

Q    Okay.  So I'm going to show you what is the agenda from yesterday's city council meeting.  So it is a 65-page document, so we're not going to walk through the entire thing.

A    Thank you.

Q    Apologies for that.  Not sure what just happened.  Okay. So items noticed for public hearing.  What is an item noticed for public hearing on the agenda?

        **MS. KUMAR:**  Objection, Your Honor.  I'm going to object to relevance to the relevance of a February 17th, 2026 city council meeting.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  It's exactly what it suggests, which is there are certain items which had been -- notices had been sent out, and they are separated out from other parts of the agenda.

**BY MS. MYERS:**

Q    Okay.  And so on the agenda, then, it lists items that the city council is going to be considering, correct?

A    Yes, among other things.

Q    And then it also lists actions for the city council to take; is that correct?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **62**

A    Yes, among other things.

Q    Okay.  And part of when listing the actions that the city council can take, those actions require a vote, correct?

A    The actions require a vote.

Q    Okay.  So looking at item number one on the city council agenda from yesterday, it says recommendations for council action, correct?

A    Yes.

Q    Okay.  And so then it says number one is to acknowledge, correct?

A    Yes.

Q    Okay.  Number two is review and consider.

A    Yes.

Q    Number three is find.

A    Yes.

Q    Number four is concur.

A    Yep.

Q    Five and six, seven, eight, nine, ten are find.

A    Yes.

Q    Eleven is adopt.

A    Yes.

Q    Twelve is authorize.  And those are the actions when the city council voted on this item, those were the actions that the city council was voting on taking, correct?

A    I assume so.  I wasn't at the meeting.  Unless this was

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **63**

amended, yes.

Q    Okay.  So I'm going to go down to item number three, which

is a motion and resolution relative to the issuing of bonds.

The recommendation for council action subject to approval of

the Mayor, number one is to consider, correct?

A    Correct.

Q    Number two is to adopt?

A    Yes.

Q    So when the city council approved that item, if they did,

then the actions they were taking were considering and

adopting, correct?

        **MS. KUMAR:**  Objection, Your Honor.  Calls for a legal

conclusion, relevance.

        **THE COURT:**  Overruled.  Overruled.

        **THE WITNESS:**  Yes.

**BY MS. MYERS:**

Q    Okay.  So I'm going to go down to number six.  And this is

Council File 26-0054.  So recommendation for council action

subject to the approval of the Mayor, same question.  What's

listed are the actions that the city council is to take,

correct?

A    Yes.  Or what's being presented to them for possible

action, yes.

Q    And to take these actions, they would vote on that,

correct?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                          **64**

**MS. KUMAR:** Objection, Your Honor.  Speculation, calls for a legal conclusion.

**THE COURT:**  Overruled.

**THE WITNESS:**  Yes, they would typically vote on these.

Q    Okay.  So number one is to adopt?

A    Yes.

Q    Number two is to approve?

A    Yes.

Q    Number three is to present and adopt?

A    Yes.

Q    So when the city council voted on this item, that is what they were -- those are the actions they were voting to take, correct?

A    Assuming they voted on it, yes.

Q    Okay.  And then you asked for a specific example of an instance in which the council was instructing the Department. So I'm going to show you Council File 25-1257, documents from that council file.  What is your understanding of what a council file is?

A    Oh, gosh.

**MS. KUMAR:** Objection, Your Honor.  Relevance.

**THE COURT:**  Overruled.

**THE WITNESS:**  So a council file is a bit like the name suggests.  It's a file that has usually a number of

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Direct / By Ms. Myers                    **65**

documents, not always, it could be one, related to a specific

item that is potentially coming to the city council.

**BY MS. MYERS:**

Q    And that council file is assigned by the Clerk's Office,

is that correct?

A    Yes.

Q    And it's just a way to identify the documents that are

related to a specific action by the city council, correct?

A  I think that's a fair characterization.

Q    Okay. And are you familiar with council files?

A    Yes.

Q    And that's part of your, in the course of your work over

the last 11 years in compliance with the City Attorney's

Office, correct?

A    Yes.

Q    Okay.  I'm going to show you what I will mark as Exhibit

591.

     **(Exhibit Number 591 marked for identification)**

          At the top of the document it says File Number 25-

1257.  Is that the structure of a council file as you

understand it to be?

A    So this is -- well, it's not the structure of a council

file.  What's in front of me appears to be a report.

Q    Let me just clarify.  I trailed off.  The structure of a

council file number.

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Direct / By Ms. Myers                    **66**

A     Oh, yes.

Q     Apologies.

A     Thank you.

Q     That is on me.  Okay.

          **THE COURT:**  Just a moment.  That's the 25-1257, correct?

          **MS. MYERS:**  Yes.

**BY MS. MYERS:**

Q     So I'm showing you what is a document from Council File Number 25-1257.  Are you familiar with this particular document?

A     No.

Q     Okay.  Are you familiar with documents of this type?

A     Yes.

Q     What is this, as you review it?  What is your understanding of what this is?

A     It appears to be a report which would be drafted by the Clerk's Office of a Public Safety Committee meeting.

Q     And that would be a Public Safety Committee of the city council, is that correct?

A     That's correct.

Q     And so this is a report that would have been passed by the Public Safety Committee, is that correct?

A     The report isn't passed by it.  This is the Clerk's summary of the meetings and the recommendations going from the

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **67**

committee to the council, which would be agendized, presumably,

for a later council meeting.

Q    Okay.  And out of that city council committee came a,

based on this council file that you're looking at, and this

specific report prepared by the Clerk, out of that Public

Safety Committee came a recommendation for council action, is

that correct?

A    It appears to be the case, yes.

Q    Okay.  And what does the third paragraph say?

A    And this is a very useful example.  Yes, instruct the, and

I'll summarize, CAO in coordination with the Department of

Transportation, Police Department, and the City Attorney to

implement an assembly bill, which I assume was passed.

Q    And so the operative action there is to instruct a

specific city department to take a specific action, correct?

A    Yes.  Thank you very much for the example.

Q    No problem.  Okay.  So I'm going to show you another

document from the same council file.  And this is City, it says

City of Los Angeles, California, has the City seal at the top,

and I'm going to mark this as Exhibit 591.

        **THE COURT:**  The last exhibit was --

        **MS. MYERS:**  592.  Thank you.

        **THE COURT:**  -- 591, is this 5 --

        **MS. MYERS:**  It's the number I had in my head.

        **THE COURT:**  Just a moment, counsel, 59 what?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Direct / By Ms. Myers                    **68**

**MS. MYERS:**  592, Your Honor.

**THE COURT:**  592, okay, thank you.

**(Exhibit Number 592 marked for identification)**

**MS. MYERS:**  Thank you.

**BY MS. MYERS:**

Q    And so here this lists Council File Number 25-1257.
That's the same council file as the Public Safety Report we
just saw, correct?

A    Yes.

Q    Okay.  And so this -- what is this document, if you're
familiar with these types of documents?

A    So it appears to be, I'll call it a report, of the -- by
the City Clerk, recording the action of the city council on
this particular council file on a particular date.

Q    And based on this document, it appears that the city
council adopted the Public Safety Committee report, correct?

A    Yes, it does.

Q    Okay, and so does that mean that the city council then --
the action from the city council, was then to instruct --

A    Yes.

Q    -- the CAO's office?

A    Correct.

Q    And then at the bottom it says a council vote.

A    Yes, that's a roll call vote.  Yes.

Q    Okay, and so this would be an example of a roll call vote,

Fauble - Direct / By Ms. Myers          **69**

correct?

A    Yes.

Q    And it's a -- you know it's a roll call vote, how?

A    Well, so I -- well, I know it has to be a roll call vote because Council President Harris-Dawson has marked as a no.  So it couldn't have been unanimous approval.  So it was, as I would have suspected, voted on during the meeting.

Q    Just to clarify for the record for Council President Harris-Dawson, I believe it's Council Member Hernandez.

A    Okay, you are correct.  Thank you.  Thank you.

Q    And so Council Member Hernandez is voted -- is approved -- is listed as voting no, as is Council Member Soto Martinez.

A    Thank you.  Just those two, it appears.  Yes.

Q    But because there were no votes, that's how you know that there was a roll call, correct?

A    Correct.

Q    And if it had been a unanimous vote, through unanimous approval, what would be -- it would still list out all of the council members, correct?

A    Yes.

         **MS. KUMAR:**  Objection, Your Honor, relevance.  This has nothing to do with the January 2024 session.

         **THE COURT:**  Overruled.

         **THE WITNESS:**  Yes.

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Case 2:20-cv-02291-DOC-KES  Document 1170  Filed 02/19/26  Page 70 of 118  Page ID #:33434

Fauble - Direct / By Ms. Myers          **70**

**BY MS. MYERS:**

Q    And that would -- it would still record those as votes.  It would just be that all of them would be yes votes, correct?

A    I believe that's correct.

Q    Okay.

MS. MYERS:  Okay.  I have no other questions for this witness at this time, Your Honor.

THE COURT:  Counsel, do you want me to turn to LA Alliance next?

MS. KUMAR:  I have no questions, Your Honor.

THE COURT:  Then back to the City, please.

MS. MITCHELL:  Your Honor, can we just take a few minutes so I can confer with my colleagues?

THE COURT:  Certainly, please.  Take your time. Would you like -- so you're not rushed, why don't I get off the bench?

MS. MITCHELL:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.

(Recessed at 10:50 a.m.; reconvened at 11:00 a.m.)

THE COURT:  Counsel, we're back on the record and the City's cross-examination.

MS. KUMAR:  Thank you, Your Honor.  Poonam Kumar on behalf of the City.

//

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Cross / By Ms. Kumar                    **71**

**CROSS EXAMINATION**

**BY MS. KUMAR:**

Q    Mr. Fauble, as part of your employment with the City Attorney's Office it has become clear, but if you could repeat for us, have you sat in on City Council meetings?

A    Yes.

Q    How many would you estimate?

A    Thousands.

Q    And have you sat in on or participated in closed sessions of the City Council?

A    Yes.

Q    Without reference to any particular session or meeting, how many would you approximate you've sat in on or participated in?

A    At least many dozens, probably into the hundreds.

Q    Based on your personal experience and your experience and employment in the City Attorney's Office and in participating in these sessions and meetings and without reference to any particular session or meeting, could you describe to us the ways that the City Council can approve something?

A    Sure.  So I don't know if this is an exhaustive list, but without reference to any particular meeting, there could be a vote, there could be unanimous approval, there could be sort of generalized agreement what I've called approbation to what's being proposed.  There could be -- well, that would be

Fauble - Cross / By Ms. Kumar                **72**

approval.  So I -- those are the ones that are coming to mind

off hand.

Q    In your experience, does the City Council only approve

things by vote?

A    No.

Q    And in your experience, is it unusual for the City Council

to approve things not by vote?

A    It's not unusual.

Q    Ms. Myers in her questioning of you seemed to imply that

the City Council must take a vote every time it does anything.

Do you believe that to be accurate?

A    I do not.

Q    I'd like to direct your attention to the City Charter,

we'll mark that Exhibit 577 unless it's been marked previously.

          **MS. MYERS:**  It was.

          **MS. KUMAR:**  Was it.

          **THE WITNESS:**  I believe there was specific

provisions.  No, these are the specific provisions.

          **MS. KUMAR:**  Oh, okay, these are the specific

provisions.  So maybe we can get that in, is that okay?

          **MS. MYERS:**  That was marked the whole charter but --

          **MS. KUMAR:**  Okay.

     **(Exhibit Number 577 previously marked for identification)**

//

//

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Cross / By Ms. Kumar                    **73**

**BY MS. KUMAR:**

Q    We can mark the entire charter as Exhibit 577, but I'll direct your attention to Section 244 which is on the screen before you.  Do you see that, Mr. Fauble?

A    I do, yes.

Q    Okay.  And this is the same provision that Ms. Myers directed you to during her direct examination; is that right?

A    That's correct.

Q    I'm going to direct your attention to the third sentence, which reads, except as otherwise provided in the charter, action by this Council shall be taken by a majority vote of the entire membership of the Council.  Do you see that?

A    I do.

Q    What do you understand that to mean?

A    It means that except as otherwise provided, so possible exceptions, the Council takes an action by a majority vote and the entire membership being 15, means that it needs to be a vote of 8, unless for example, this would be the except part, a higher percentage is required.

Q    Okay.  And when you earlier testified that action is a term of art, a legal term of art, I know that you said it was difficult to define, but when you say it was a legal term of art, what do you mean by that?

A    I don't mean that -- I think it's narrow or different in meaning from the way people sometimes use action in other

**EXCEPTIONAL REPORTING SERVICES, INC**

contexts.  So, for example -- it's not an example.  I think people sometimes use action as synonymous when anything happens or anything is done.  I don't know anything -- I don't think everything that Council does is an action for purposes of this section.

Q    Okay.  So there could be things that the Council does that are short of action as it is used in this section; is that right?

A    That's correct.

Q    And if it is something short of what is referred to in this section, does that mean in your opinion, that whatever Council did didn't actually happen?

A    No, not at all.  And again I --

Q    Okay.  Does it mean that the thing that Council did was somehow invalid?

A    No.

Q    Do you believe that this provision means that the City Council can only do anything by vote?

A    No, I believe contrary to that.

Q    Now, you described that the charter was a limiting document.  Could you just explain that a little bit more?

A    Yes.  So can you imagine two kinds of documents.  One is a document of authorization.  It says, you're allowed to do the following things in only the following ways.  And if we don't provide for it here, you're not allowed to do it.

Fauble - Cross / By Ms. Kumar                    **75**

A document of limitation would be something where the understanding is that subject to state or federal law, you have plenary authority to do anything.  And what we've got in this document is telling you what you can't do, so it's a document of limitation.

Q   Okay.  I'd now like to direct your attention to Section 272 of the City Charter.  This is the section entitled control of litigation, this was also shown to you by Ms. Myers.  Do you recall that?

A   Yes, I do.

Q   Okay.  So in the third sentence it says the City Attorney shall manage all litigation of the City subject to client direction in accordance with this section.  Do you see that?

A   I do.

Q   It doesn't use the word action, does it?

A   No.

Q   It uses the word direction, correct?

A   Correct, correct.

Q   And it says that direction -- does it say anywhere that direction must happen by vote?

A   No.

Q   Now, there are certain things that the City Attorney may bring to the attention of the City Council in the course of litigation that do require a vote; isn't that right, Mr. Fauble?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Cross / By Ms. Kumar **76**

A    Yes.

Q    So, for example, the approval of a settlement.

A    That would require a vote.

Q    Okay.  And just to be clear, this -- the City Attorney's Office, that's your office; isn't that right?

A    That's correct.

Q    And you frequently have meetings with the City Council that are pursuant to these -- this particular section; isn't that right?

A    Yes.

Q    And when it says client direction, that could refer to the City Council; is that right?

A    Yes, in this context I think it does, okay.

Q    Okay.  And it could also refer to the Mayor or other constituencies of the City; is that right?

A    That's correct.

Q    Okay.  Speaking generally without reference to any particular meeting or session, have you, as an employee as a City Attorney received direction from the City Council with regard to litigation?

A    Yes.

Q    And without reference to a specific meeting or session, does that direction always come in the form of a vote?

A    Definitely not.

Q    Okay.  Now I'd like to direct your attention to Exhibit

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Cross / By Ms. Kumar                    **77**

580 if we can.

            **MS. KUMAR:**  If we could turn to the second page.

Q    Do you recognize this document, Mr. Fauble?

A    Yes.

Q    What is it?

A    It's the City Council agenda for January 31st, 2024.

Q    Okay.  And -- I'm sorry, before we go to this, Mr. Fauble, Ms. Myers showed you a number of -- a different agenda for February 17th, 2026.  Do you recall that?

A    I do.

Q    And do you recall that there were certain other things she showed you that had various verbs, adopt, recommend, et cetera, do you see?

A    Yes.

Q    Does the fact that someone was -- something was taken to the City Council for a vote mean that a vote was actually necessarily required?

A    No, it would depend upon what the item is.

Q    Okay.  So there could be instances in which the City Council is asked to vote on some things that may not have been required under the City Charter for a vote; is that right?

A    That's correct.

Q    So this is the agenda for January 31st, 2024.  If we could turn to item 22 in this agenda.  Do you see that there, Mr. Fauble?

Fauble - Cross / By Ms. Kumar                78

A    I do.

Q    Okay.  And it says here, the City Council may recess to
closed session pursuant to Government Code Section 54956.9,
Subsection D, Subsection 1 to confer with its legal counsel
relative to the case, the Alliance case here.  Did I read that
correctly?

A    Yes.

Q    Okay.  Are you familiar with Government Code Section
54956.9?

A    I am.

Q    Okay.  And what is that, generally speaking, what is that
code refer to?

A    It refers to some of the bases under which we can go into
closed session.

Q    Okay.

A    Pursuant to the Brown Act.

Q    Okay.  So it's the Brown Act, right?

A    Yeah, uh-huh.

Q    And it allows for certain instances in which a closed
session is permissible; is that right?

A    That's right.

Q    And the Brown Act was -- is a statute; is that right?

A    Yes.

Q    Passed by the California legislature.

A    Correct.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Cross / By Ms. Kumar                79

Q    And D-1, do you recall off hand what that exception refers to?

A    Oh, it refers to being a party to litigation.  So it's saying, in effect, you can go into closed session, you, the Council members can go into closed session with -- to confer with your legal counsel regarding litigation in this case, it named the litigation.

Q    And so this would, for example -- this is about litigation and we saw the City Charter reference Section 272 also dealing with litigation; is that right?

A    Yes.

Q    Mr. Fauble, could you just tell us what is the purpose of a closed session?

A    Well, it can have various purposes, but if you want -- let me give you two examples and then I'll give you a more abstract statement.

So, for example, we can go into closed session to -- we, meaning the City Council, to instruct negotiators in real estate discussions.  We can go into closed session to give directions to or seek advice from the City Attorney.  All of those -- those are two examples.  The purpose then is more abstractly, there are cases in which in order to conduct business in the best interests of the City, it's important that certain kinds of discussions not be open to the public.

You can imagine what would happen if there were an open

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Cross / By Ms. Kumar                    **80**

session in which we had to reveal what our final offer was

going to be on a purchase of a piece of property, we get a bad

deal.  And the state legislature has struck the balance through

the Brown Act as to when it's important enough to be able to go

into closed session.

Q    Thank you, Mr. Fauble.  I'd like to now direct your

attention to Exhibit 581, which is a You Tube video that this

Court identified on its own at the last hearing and showed the

parties.  If we could bring up 581 will be the entirety --

       **(Video played)**

       **MS. KUMAR:**  Sorry.  This is the video of the January

31st, 2024 meeting.

Q    Just for the record, Mr. Fauble, you stated that you

didn't staff this meeting.  Were you present at the meeting?

A    I was.

Q    Okay.  I'd like to direct your attention to hour 2 minute

3 second 18, if we can.

       **(Video played)**

Q    Mr. Fauble, we saw earlier the agenda was item 22 was the

one listed as the Alliance litigation; is that right?

A    Correct.

Q    Do you believe based on what you saw that to be the

reference that they were talking about in that clip?

A    Yes, that's right.

Q    So what was happening in that clip?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Cross / By Ms. Kumar                    **81**

A    So the then Council President Krekorian was saying to the members and the people in the room, we're going to go into closed session, which will then trigger a number of things. The Council sergeants will clear the room of the public, non-essential personnel will leave.  The people, for example, the City Attorney who are relevant to the discussion will probably move to the table to speak to the Council and that would be the beginning of the closed session.

So I assume either where you cut it off are very shortly thereafter, the video of the live meeting at that point ended and then we were in closed session.

Q    But then the video continues usually with like some sort of blue screen, talking about things the City is doing?

A    Yeah, it's like promo stuff for the City and with a little something running along the bottom saying the Council is in closed session, so that the public knows the meeting isn't over, they're in closed session.

Q    Okay.  I'd now like to direct your attention to hour 4, minute 32, second 19 of that same video.

**(Video played)**

**MS. KUMAR:**  We can pause that there.

Q    Mr. Fauble, when the City Council adjourned to closed session on this January 31st, 2024 meeting, were you present in the closed session?

A    Yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Cross / By Ms. Kumar                  **82**

Q    And when they came back, you heard Mr. Krekorian, who was

then City Council President say, after a lengthy closed session

discussion.  Did you hear that?

A    I did.

Q    Okay.  And then he had a colloquy with the City Attorney,

the person who was sitting at the City Attorney --

A    Yeah.

Q    -- marker.  Could you describe to us what was happening?

A    So the Council President was asking whether there was

any -- whether any action occurred in the closed session that

pursuant to the Brown Act would have to be reported out.  The

City Attorney said no.  Then it's clear that the Council

President realized he had to do the roll call to make sure

there was a quorum there, he did that, and then he asked again

and he got the same answer.

Q    And so when Mr. Krekorian, the City Council President

asked if there was anything to report from the closed session,

you said that was pursuant to the Brown Act.  Could you explain

that?

A    Yes.  So there's a section of the Brown Act that explains

the circumstances under which actions that occur in closed

session need to be reported out.  And if it's not listed there,

I don't think you need to report it out.

Q    And so that is -- let's talk about -- let's show you

Exhibit 582, Section 54957.1, is that the section of the Brown

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Cross / By Ms. Kumar                    **83**

Act you're talking about?

A    Yes, it is.

Q    Okay.  So if the City Attorney on the video saw that there was no reportable action coming out of the City Council meeting, does that mean nothing happened?

A    No, not at all.

Q    Okay.  It just means that something that needed to be reported according to this didn't happen; is that right?

A    That's correct.

        **MS. KUMAR:**  Hold on one second, Your Honor.

        Nothing further at this time, Your Honor.

        **THE COURT:**  Thank you.  Redirect?

        Well, first of all, is there any further objection to this exhibit?  There was an objection by the City, to its introduction on the last occasion.  I didn't want to take the time to have Mr. Marcus look at the three or four hours of this.

        **MS. KUMAR:**  Your Honor, just for the purposes of explaining what we think the Court's misunderstanding of that was, that's why we did the video --

        **THE COURT:**  Well, counsel --

        **MS. KUMAR:**  -- since it's in the record.

        **THE COURT:**  -- that's a speaking objection.  Let's do this again, okay?  Let's do this properly.  Is there any objection foundationally to this exhibit being received?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers                    **84**

MS. KUMAR:  No, not to foundation, Your Honor.

THE COURT:  All right.  Thank you very much.

This is received.  And did you want this then marked as -- I believe it was 581; is that correct?

MS. KUMAR:  Yes, 581.

THE COURT:  Then 581 is received, there's no objection concerning foundation any longer, counsel.

**(Exhibit Number 581 received in evidence)**

MS. MYERS:  Apologies, Your Honor, it's not -- there we go.  Okay.

**REDIRECT EXAMINATION**

**BY MS. MYERS:**

Q    I'm going to show you what was previously -- Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of the intervenors.

I'm going to show you what was previously marked as Exhibit 575.

**(Exhibit Number 575 previously marked for identification)**

Are you familiar with this document?

A    I believe so.  Would you scroll to the bottom please?

Q    Sure.

A    Yes.

Q    And is this your signature on the document?

A    Yes.

Q    Did you write this letter?

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Redirect / By Ms. Myers                    **85**

A     Yes.

Q     Did you -- so you wrote the statement that says the -- under the heading post closed session disclosure requirements regarding the January 31st, 2024 closed session, no settlement or agreement was voted on or approved.  Did you write that statement?

A     Yes.

Q     And you were present at the closed session.

A     Yes.

Q     And so this was a representation of your observations about what occurred during that closed session; is that correct?

A     Yes.

Q     Okay.  And when you said, in fact, no vote was taken, is that a representation of what occurred during that closed session?

A     Yes.

Q     Okay.  And then I'm going to show you really quickly, I'm going to mark this as --

          **MS. MYERS:**  Are we at 593?

          **MS. KUMAR:**  Yes.

          **THE COURT:**  And this is exhibit what, counsel?

          **MS. MYERS:**  593, Your Honor.

          **THE COURT:**  593, thank you.

          **(Exhibit Number 593 marked for identification)**

Fauble - Redirect / By Ms. Myers                    **86**

**BY MS. MYERS:**

Q    First of all, you testified in response to the City's

questions that there are things that the City can do, that the

City Council can do that don't require votes, correct?

A    Yes.

Q    What are those -- can you give us examples of those

things?

A    Well, it can instruct someone to do something.  It can

express approval of something.  It can express disapproval of

it.  So those are some examples.

Q    And so it's your position and those are things the City

can do, the City Council can do without Council vote?

A    Yes.

Q    Those are -- the City Council can instruct individuals to

do things without a Council vote?

A    I think so, yes.

Q    And what is the basis of your representation that the City

Council can instruct departments and other entities to do

things without a Council vote?

A    Well, again I feel like I'm retestifying over the same

material.  So I gave an example, using the city librarian

before, which could be an example of there's no vote, but the

Council members are clearly in favor of something that he's

proposing or maybe they want to change to what he's proposing

and there's clear agreement, there's no vote, but it's obvious,

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Redirect / By Ms. Myers                    **87**

let's say everyone is in favor of it.  And again, this is a

hypothetical, the Council President could say something like,

okay, do you understand where we are with this and the

librarian could say, yeah, I do, thank you.  And I think that

would be using -- a competent English speaker would describe

that as an instruction.

Q    And that is -- so an action like that or I'm sorry a thing

like that, to use the Council's term, a thing like that, that

instruction, would that appear on an agenda?

A    So what would probably be on the agenda would be something

like, again this is a hypothetical, report from, you know,

librarian on services available at the Central Library.  Again,

I'm making this up.

Q    Uh-huh.

A    On the Central -- if this were an oral report, the city

librarian would be at the table in front of the Council

describing what he's planning to do in the library and the

programs he has and the Council members could be asking

questions and expressing views on it, and again, what I as a

competent English speaker would describe as instructing the

librarian on something, or giving them approval of something.

There's no vote there.

Q    So that instruction, for which there is no vote, would

that appear as on an agenda?

A    No.  The general item of business which would be report,

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers                    **88**

you know again I'm going to make this up, but you know, report by city librarian on, you know, planned services available to Central Library.  So that would be what's on the agenda, for example.

Q    And so the instruction would not be on the agenda, the approval would not be on the agenda, but the City Council would instruct and approve --

A    Yes.

Q    -- even though it's not on the agenda?

A    It might not be on the agenda.

Q    Okay.

A    Right.

Q    If it's on the agenda, though, you testified that that would be voted on, correct?

A    It could be voted on, yes.  So there could be a recommendation, for example, from the librarian that would be on the agenda.  I would expect that would probably be voted on unless there's a motion to amend it.

Q    But if it's on the agenda and it says instruct, it was previously your testimony that that would be voted on by the City Council, correct?

A    I think you may be -- so, yes, but I think you're misconstruing my testimony.  Right --

Q    The record will certainly speak for itself, but --

          **MS. KUMAR:**  Objection, Your Honor, if the witness

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Redirect / By Ms. Myers                    **89**

could finish his answer.

**THE COURT:**  Finish your answer, sir.

**THE WITNESS:**  So I think, Ms. Myers, you're creating the impression that unless it's on the agenda -- that any instruction has to be on the agenda and voted on.

**BY MS. MYERS:**

Q    Yes.

A    That was not my testimony and it is not my testimony.

Q    So it's your -- just so we're clear, it is your testimony that the City Council can instruct and approve things even though they don't appear on the agenda without a vote?

A    Correct.

Q    Okay.  Where in the charter is that allowed?

**MS. KUMAR:**  Objection, Your Honor, asked and answered several times now.

**THE COURT:**  Overruled.

**THE WITNESS:**  So again I would point for example to Section, I think it's 244 of the charter that says actions require a vote, and then I would again point out to you that the charter is a document of limitation, so it's telling you that things that require, in your characterization, official, you know, approvals require a vote.  But that doesn't mean that everything does.

//

//

**EXCEPTIONAL REPORTING SERVICES, INC**

**233**

Fauble - Redirect / By Ms. Myers                    **90**

**BY MS. MYERS:**

Q    Yeah.  And putting aside your use of the term official, not that I concede that I use that, let's take the word official out of the records, since we're not using the word official, it doesn't appear in the charter, we're talking about actions, right, we're talking about actions by the City Council, correct?

A    Yes.

Q    Yes, okay.  And so it's your position that there are things the City Council does, like instruct and approve that do not appear on the agenda and do not require a vote but are instructions and approvals by Council; is that correct?

A    So the -- I don't think I can give you a simple yes or no to that because there's a little bit of nuance.  Except for -- the Brown Act allows for certain things to be taken up that are not on the agenda.  So put those to the side.

     Everything else is on the agenda, whether the specific approval of a plan say is on their called out, it may not be.  That doesn't mean that the general item of business isn't.  So again, my example was the head librarian is on the agenda, is plans for services at the Central Library.  The -- it doesn't call out on the agenda what the specific services would be, but the head -- but it's sufficient for Brown Act purposes that the head librarian could talk about those.  And the City Council could approve of what he's suggesting.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers                    **91**

Q    And they would do that -- they would express approval how?

A    Through discussion.

Q    Okay.

A    Right, the same way if you get together with a group of people and you're discussing something, you without a vote, can understand perfectly well they've approved what you're proposing.  It's normal human communication.

Q    And that's allowed under the charter, it's your testimony that's --

A    Yes, my testimony is that --

Q    -- allowed?

A    -- normal human communication is allowed under the charter.

Q    Well, that's not what I'm asking, Mr. Fauble.  Let's just be clear here what I'm asking.  Under the charter of the City of Los Angeles it is your testimony as you sit here today as a representative of the City Attorney's Office, that it is allowed for the City Council to instruct and approve things via discussion.

A    Some things, yes, those that don't require a vote.

Q    And how do we know what requires a vote?

A    So I don't know if I have a perfect answer for you. There's certain things that are called out on the charter that require votes, ordinances, resolutions.

Q    Actions?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers                    **92**

A    Actions require a vote, but the question here is what's an action I think is what you're getting at.  Certain kinds of findings are required under state law, so you need to make CEQA findings for example.  So I don't think I can give you a formula.  I'd have to go through and see whether there's an actual obligation to vote on a particular issue.

Q    Okay.  And your job duty is to instruct the City Council about the Brown Act, correct?

A    I advise the City Council on the Brown Act, among other things.

Q    And the City Charter, correct?

A    Yes, depending on what the section is, there are parts of it that other people know far better than I do.

Q    But compliance with the City Charter.

A    Yes.

Q    And compliance with the city rules.

A    Yes.  Again, depends upon the particular circumstance, but yes.

Q    Okay.  And you've been doing that for 11 years?

A    Approximately, well not quite, but at least nine.

Q    Okay.  So I'm going to show you what is marked as Exhibit 593.  This is a submission to this Court, Document 1040, filed 10/3, 2025.  This was a notice of submission of the defendant City of Los Angeles' updated bed plan.  Are you familiar with this?  Are you familiar with the City's updated bed plan and

Fauble - Redirect / By Ms. Myers                      **93**

milestones?

A    I know of it.  I don't really know it in any detail.

Q    Okay.  I'm going to ask you specifically about the Council approval process.  So I'm going to show you page 2 of 19 of the documentary, which is a report from Matthew Szabo to the City Council, it's -- the subject is the Alliance settlement agreement ASAP, which is the bed plan and strategy.

What is a report like this, as you understand it, for purposes of the Council file?

**MS. KUMAR:**  Objection, Your Honor, this postdates the meeting at issue and this has no relevance on to the purported misrepresentation that the Court is reviewing.

**THE COURT:**  Overruled.

**THE WITNESS:**  Well, it appears to me to be a -- I mean, it's titled interim departmental correspondence, I think in effect it's a letter from Matt Szabo, the CAO to the City Council.

**BY MS. MYERS:**

Q    Okay.  And it has a Council file number on it, right, 23-1022-S18?

A    Correct.

Q    And the S18, what does the S stand for?

A    It's a subfile.

Q    So is it sub or supplement?

A    So I thought -- I think it's a sub file 18, but I won't

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers                    **94**

swear to that.

Q    Okay.  I'm going to show you now -- I'm going to scroll

down and apologies for moving the documents so fast.  I'm going

to show you page -- which is Exhibit B, it's Document 10040-2

and this is file -- same Council file, correct?

A    Yes.

Q    And you know that because of the Council number on the

top?

A    Yep.

Q    And this has the same structure as the previous Council

file that you -- Council file report that you identified,

correct?

A    This appears to be a -- I assume it's a clerk document,

it's a report from Housing and Homelessness Committee.

Q    And so you previously testified that these reports are

prepared by the City Clerk but they -- to memorialize actions

taken by the specific committees, correct?

A    Yes.

Q    Okay.  And so the second line of this, I'm sorry the

second paragraph says, recommendations for Council action,

subject to the approval of the Mayor, correct?

        **MS. KUMAR:**  Objection, Your Honor, the witness

already said he doesn't know this document, isn't familiar with

it, asking him to testify would be inappropriate, lacks

personal knowledge, foundation.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers                    **95**

**THE COURT:**  Overruled.

**THE WITNESS:**  That's what the document says.

**BY MS. MYERS:**

Q    And the first item is to approve the proposed bed plan for 2,130 beds for the Alliance settlement agreement, correct?

A    It says approve the proposed bed plan, specifies the number of beds or units for the Alliance settlement agreement as detailed by the CAO and a date.

Q    Yeah.

A    And it's attached.  So that's -- but all I'm doing is I'm reading it, I don't know anything other than what it says on the paper.

Q    But you're -- but you have familiarity with these types of Council -- City Council reports as evidenced by your prior testimony, correct?

A    Yes.

Q    And you had previously asked for examples of the types of documents that are in front of the City Council, correct?

A    Yes.

Q    Okay.  And so this specific Council file, then the recommendations for Council action include 1, approve, right; 2, approve; 3, instruct; 4, instruct; 5, 6, 7, 8, 9, there's a lot of instructions going on, 9, 10, 11, 12, 13, right, are instructions, correct?

A    I believe they were all instructions, yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers          **96**

Q    Okay.

A    Or the recommendation rather.  Let me be more precise. According to the City Clerk's report, the -- what came -- what the Housing and Homeless Committee did was recommend the following potential actions by the City Council.

Q    And those are to instruct and to approve, correct?

A    Correct.

Q    And, in fact, approve the bed plan for this case, correct?

A    You'd have to move back up for me to see that.

Q    Sure.

A    Yep.

Q    Okay.  And then the last one, note and file, what does it mean to note and file something?

A    It basically means we've accepted it, we're really not doing anything with this, thank you very much for the paper, we're putting it in the file.

Q    And when it says the Council action, note and file, note and file is a Council action, correct?

A    Yes.

Q    And that requires a vote, correct?

A    Yes.

Q    Okay.  And, in fact -- okay, I'm just going to show you the last thing which is Exhibit C, which is the official Council action.  Official action of the Los Angeles City Council?

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers                    **97**

A    Yes, it appears to be.

Q    Okay.  And what does this represent to you that the City Council did?

        **MS. KUMAR:**  Objection, Your Honor, lacks personal knowledge, foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  So it appears to be a report by the clerk indicating the action by the Housing -- action by Council on a certain date on a Housing and Homeless Committee report.

**BY MS. MYERS:**

Q    And that would be this Housing and Homeless Committee report, correct?

A    I think, I'm not sure, I think so.

Q    Okay.  And it indicates that there was a vote taken, correct?

A    Yes, that's what it says.

Q    And you know that there was a vote taken, because it says Council vote and then it lists the 15 members of the City Council and what their vote was?

        **MS. KUMAR:**  Objection, Your Honor, lacks personal knowledge and foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  Yes.

Q    And this is a vote tally, correct?

A    That's what it appears to be, yes.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers                    **98**

Q    I mean, based on your knowledge as working in the City
Council -- for the City Council for the last 11 years --

A    Yes.

Q    -- this is a vote tally, correct?

A    Yes.

Q    Okay.  Is this the kind of vote tally that would have been
a unanimous vote tally, unanimous?

A    I don't --

        **MS. KUMAR:**  Objection, Your Honor, lacks personal
knowledge, foundation.

        **THE COURT:**  Overruled.

        **THE WITNESS:**  I don't think I can tell from this.

**BY MS. MYERS:**

Q    And why can't you tell?

A    Well, relating back to the prior discussion, there are no
no votes on this, so there was only person who appeared to be
absent, the rest are yeses, so I can't tell whether a roll call
vote was taken or this was unanimous consent based on this
document.

Q    Uh-huh.  Unanimous consent vote?

A    I don't know.

Q    And with unanimous consent vote, it would be recorded the
same way though, correct?

A    I believe so.  You'd have to ask the clerk and I really
should say unanimous approval because that's the language in

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers                    **99**

the rule.

Q   And there's no such thing as unanimous consent, correct?

A   I don't believe the Council rules refer to that.  I think they say unanimous approval.

Q   Okay.  Are there any other -- we talked about the charter and we talked about the Council rules, are there any other documents that the Court or the parties should be looking at to dictate how the City Council conducts its business?

A   Well, state law.

Q   Sure.

A   Right.

Q   Sure.  Other than that?

A   Other than -- well, federal law, state law, including constitutions, the charter, Council rules, I think that's it.

Q   Okay.  You previously testified that the approval of the settlement requires a vote.

A   Yes.

Q   And why is that?

A   I mean, I should say so settlements that require Council approval require a vote, because it specifically says I believe in the charter that a vote is required, Council action has to -- is required.

Q   And where in the charter does it say that?

A   I don't remember the number.

Q   Is it 272, is that provision related to the City

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Redirect / By Ms. Myers        **100**

Attorney's Office?

A     Might be.

Q     We'll pull that up, just so we're clear about this.
Apologies.  Okay.

A     Why don't --

Q     So where in the -- is this the provision you're referring
to?

A     I think so.  So move up a little bit to see what section
we're in.

Q     Okay.

A     So we appear to be in charter Section 273.

Q     Uh-huh.

A     Right.  And then this calls out who has authority to
settle cases and let's see if we go down to B.3.

Q     Uh-huh.

A     I believe it says, the Council shall have authority to
approve or reject settlement of litigation, falls only the
payment of or receipt of money damages and it goes on.

Q     Uh-huh.

A     So this appears to be at least one provision that calls
out the authority of the Council to approve or reject
litigation settlements.

Q     Yes.  Where does it require the City Council to vote on
that approval?

A     I don't know.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Recross / By Ms. Kumar          **101**

Q    Take your time, feel free.  This is in front of you, take your time, read it, tell me where it says in the charter that the City Council must approve a settlement by vote.

A    Well, it says, the Council shall have the authority to approve right there.

Q    Yes.  And so approval, your understanding, is that's by vote?

A    So I don't think it generally means that.  I've always understood it to require a vote.

Q    Okay.

          **MS. MYERS:**  I don't have any further questions.

          **THE COURT:**  Thank you.  LA Alliance?

          **MS. MITCHELL:**  No questions, Your Honor.

          **THE COURT:**  And back to the City.

          **MS. KUMAR:**  One minute, Your Honor.

     **(Pause)**

                    **RECROSS EXAMINATION**

**BY MS. KUMAR:**

Q    Okay.  Mr. Fauble, I want to just review some of the things Ms. Myers did in her questioning.

          **MS. KUMAR:**  If we could bring up Mr. Fauble's letter that Ms. Myers marked as Exhibit 575, it may be something else. It would be 584 in our records, Todd, but for the record it's Exhibit 575.  Oh, sorry.

          If we could scroll down.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Recross / By Ms. Kumar                **102**

Q    Mr. Fauble, does that letter the same letter that Ms. Myers showed you, as far as you can tell?

A    Yes, it appears to be.

Q    Okay.  If we could turn to -- and this was a letter you wrote in connection with the separate litigation pending in state court; is that right?

A    I believe that's right.

Q    Before the litigation was filed I believe.

A    I think so.  I think this was in response to a cease --

         **THE COURT:**  Was this in Judge Kin's court?

         **MS. KUMAR:**  Yes, Your Honor.

         **THE COURT:**  All right.  Thank you.

**BY MS. KUMAR:**

Q    And this -- so this was before that action was filed, but based on the same topic, as far as you understand it?

A    I believe that's right, yes.

         **MS. KUMAR:**  If we could turn to page 2 of this letter and -- oh, sorry, it's page 3 of the exhibit, page 2 of the letter.

Q    And if we could look at the section under post closed session disclosure requirements, that was the section Ms. Myers referred you to, Mr. Fauble.

A    Yes.

Q    In the second paragraph it says, regarding the January 31st, 2024 closed session no settlement or agreement was voted

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Recross / By Ms. Kumar                          **103**

on or approved.  Do you see that?

A     Yes.

Q     Is that -- that is a statement of what didn't happen at the meeting; is that right?

A     That's correct.

Q     And if a settlement or agreement had been voted on or approved, would that have been something that would have been reported out under the Brown Act?

A     So if -- it depends.  So if the settlement were -- if the Council were the final approval authority of the settlement, so in other words, the other side had already signed the document, once Council approves it, it's done.  Then per the Brown Act we would report it out.

     If the settlement were subject to further approvals by other parties, we wouldn't be required to.

Q     Okay.  But if it fell into that first category it would have been reported out as part of the Council's actions, correct?

A     That's right.

Q     And then the second sentence says, in fact, no vote was taken.  Do you see that?

A     I do.

Q     Okay.  So that also is describing what didn't happen; is that right?

A     That's correct.

**EXCEPTIONAL REPORTING SERVICES, INC**

Fauble - Recross / By Ms. Kumar                     **104**

Q    And then in the third sentence it says, therefore, there could not be anything to report out of the January 31st, 2024 closed session; is that right?

A    That's right.

Q    And again, we're talking about reporting out under the Brown Act; is that right?

A    That's correct.

Q    Okay.  Does that mean nothing happened in the meeting?

A    No.

Q    If we could look at Exhibit 593 marked by Ms. Myers.

        **MS. KUMAR:**  Do we have that?

    **(Counsel confer)**

        **MS. KUMAR:**  593.  Is it 1040?  Okay.  Yeah, yeah, yeah.

Q    So we're going to direct Exhibit 593, which is Docket entry 1040, okay.  Do you see that document in front of you, Mr. Fauble?

A    I do.

Q    And you're -- you are not counsel of record in the Alliance case; is that correct?

A    Correct.

Q    Okay.  And so you were not involved in preparing this document; is that fair?

A    That is correct.

Q    Okay.  So if we could go to -- so you saw this is a

Fauble - Recross / By Ms. Kumar          **105**

portion that Ms. Myers -- one portion, it's a letter from Mr. Szabo. Do you see that?

A    I do, yes.

Q    Okay.

MS. KUMAR: And then if we could go to Exhibit B, page 21, which is 1040-2 on the Docket, still part of Exhibit 593. If we go to the second page.

Q    Now again, you're not familiar with this particular report, are you?

A    I'm not sure I'd seen it before Ms. Myers showed it to me.

Q    Okay. And this is a report relative to the Alliance settlement agreement; is that right?

A    That's what it appears to be.

Q    Just if we can scan quickly, do you see any mention of an encampment reduction plan in this document?

A    So based on Palma (phonetic) scanning before I didn't.

Q    Okay. So that -- and then separately if the City Council votes on something, does that necessarily mean that the vote was required under the City Council rules or the City Charter?

A    It does not mean that.

Q    Okay. If the City Council reported out that it approved something, does that mean that the only way it could approve things is to report out that it did report something -- approve something?

A    Sorry, can you reask that question, it was complicated.

EXCEPTIONAL REPORTING SERVICES, INC

Fauble - Recross / By Ms. Kumar                    **106**

Q    Yeah, sure.  If we go to the top of this page, number 1,

approve the proposed bed plan.  Do you see that?

A    I do.

Q    Now, Ms. -- does the fact that the City Council stated

that it was -- the recommendation for the Housing and

Homelessness Committee was to approve the proposed bed plan,

first of all does that mean that the City Council was required

to approve it necessarily?

A    No, they're not required to approve it.

Q    Okay.  Your understanding is they were not required to

approve this?

A    I don't think they're required to approve anything.

Q    Okay.  And so they -- but the fact that they said it,

right, doesn't mean that it was necessarily required; is that

fair?

A    Yes.

Q    Okay.  And so the -- and in your experience, the City

Council can approve things in manner short of a vote, right?

A    Yes.

Q    And your experience would include attending thousands of

City Council meetings; is that right?

A    Yes.

          **MS. KUMAR:**  Nothing further at this time, Your Honor.

          **THE COURT:**  All right.  Any other questions by any

other counsel?

**EXCEPTIONAL REPORTING SERVICES, INC**

**107**

MS. MYERS:  No, Your Honor.

MS. MITCHELL:  No, Your Honor, thank you.

THE COURT:  All right.  Sir, I'm going to ask you to remain available, sir, until this portion concludes.

THE WITNESS:  Thank you.

THE COURT:  Thank you very much, you may step down.

And, counsel, why don't we go to lunch.  Will 1 o'clock be okay for a return?

MS. KUMAR:  Mr. Szabo's here, Your Honor.  He does have a hard stop at 3:30.

THE COURT:  Okay.

MS. KUMAR:  So I'm fine with going to lunch as long as we can all endeavor to get him off the stand today.

THE COURT:  Oh, that's fair warning.  But 1 o'clock, thank you, have a good lunch.

MS. MITCHELL:  Thank you, Your Honor.

**(Recessed at 11:46 a.m.; reconvened at 1:04 p.m.)**

THE COURT:  Counsel, good afternoon.  We're back on the record.  I'm sorry.  Good afternoon.  We're back on the record.  Counsel, your next witness, please.

MS. MYERS:  The intervenors call Matt Szabo to the stand.

THE COURT:  Thank you.  Mr. Szabo, if you'd please return to the stand.  I don't think it's necessary, but you recall the oath that was administered to you previously; is

**251**

**108**

that correct?

        **MR. SZABO:**  Yes.

        **THE COURT:**  Thank you, sir.  If you'd please be seated and watch this small --

        **MATT SZABO, INTERVENOR'S WITNESS, PREVIOUSLY SWORN**

        **THE COURT:**  Mr. Szabo, welcome back.  Counsel, for just a moment, with Mr. Szabo present, I've been thinking about how this case can move forward for the public good.  I think we all want that, especially with respect to accountability and transparency.  And you know that I've been calling for that a long time.  The settlement that all of you agreed to was enacted in 2022 and it expires in 2027, correct?

        **MS. KUMAR:**  Yes.

        **THE COURT:**  Yes.

        **MS. KUMAR:**  Yes, Your Honor.

        **THE COURT:**  In fact, is it June or October?  It's June, isn't it?

        **MS. KUMAR:**  June, I believe, Your Honor.

        **THE COURT:**  It's June.  Section 7.2 of the settlement agreement calls for the appointment of a data monitor and specifically, it says, quote, the parties will engage a mutually agreed upon third party to provide data collection, analysis, comments, regular public reports on the City's compliance with the terms of this agreement.  The City shall be responsible for paying all fees, if any, or for obtaining

**EXCEPTIONAL REPORTING SERVICES, INC**

**109**

grants or other private funding if needed.

You as the parties have presented your disagreement to the Court concerning the appointment of a monitor, and it's reflected once again in Document 1045, and I'll read the literal language from that.  Quote, Plaintiffs' LA Alliance for Human Rights, et al., the Alliance, and the City of Los Angeles submit this joint report to update the Court regarding the status of the City Council's approval of the third party monitor contemplated by Section 7.2 of the settlement agreement and the Court's June 2025 order, and to request the Court's review and resolution of the issue pursuant to Section 24 of the settlement agreement.  End of quote.

Pursuant to Section 24, I resolved these disagreements on October 14th, 2025, by appointing City Comptroller Kenneth Mejia and Daniel Garrie as the data monitors.  Mr. Skolnick, representing the City, and Ms. Mitchell, representing LA Alliance, agreed to this appointment subject to approval by the City Council.  A representative of the City Attorney's Office was present on that day, and assured the Court that it would have a quick response.

For almost a month thereafter, we waited.  There were two agendized motions before the City Council to consider the appointment of the monitor.  It became apparent that the City Council would not act anytime soon.  The Council then referred

EXCEPTIONAL REPORTING SERVICES, INC

110

this matter to the Homeless and Housing Subcommittee.  I think all of us could recognize the immense amount of time that would be taken by any such referral and any subsequent action by the Council.

We're now three-and-a-half years into this settlement agreement.  Let me repeat that, three-and-a-half years.  The provision that requires accountability, transparency, and accuracy cannot be enforced without a data monitor.  It is impossible to verify the accuracy of the City's data without a monitor.  And you know Michelle Martinez's report came in last week, saying basically there's procedural noncompliance regardless of any substantive non-compliance.

This dispute between the parties is harmful to the public and to the public good.  You can break this impasse, so I'm going to ask the parties to go to the back of the courtroom in just a moment with Mr. Szabo, you're here.  You're the highest representative other than the Mayor and the President of the Council.  And under 7.2, you can control by agreement who the monitor will be.  If you can agree on this, it may bring a new fresh start to goodwill between all of you, which has been hard to come by.  And this would be for the public good.  The Court, depending upon your answer and appointing a monitor, may be inclined to hold this matter in abeyance to see if there can be cooperation on other issues, because there are other issues pending.

**EXCEPTIONAL REPORTING SERVICES, INC**

Case 2:20-cv-02291-DOC-KES    Document 1170    Filed 02/19/26    Page 111 of 118
Case: 26-784, 02/20/2026, DktEntry: 18.2, Page 256 of 263
Page ID #:33475

111

The public needs the accountability and transparency envisioned in the settlement. That's an agreement you both entered into. If we can agree on a monitor, then perhaps there will be an ability to move forward in so many different areas on behalf of our public. I think our time is spent now.

Mr. Szabo, before we get into more of your testimony, if we can understand each of your respective positions about this monitor. And I want to ask each of you individually, when you come back, what your respective positions are. My duty right now, I think, is to try to break this impasse if possible. So, Mr. Szabo, for just a few moments, I think it's time well spent. I know also and point out to counsel that this is unending amounts of money being spent, and it's only going to increase.

MS. MITCHELL: Your Honor, may I just update the Court on the ongoing discussions between the parties? Because there have been regular meetings and consistent discussions between the parties on this exact issue with Judge Birotte. And I think I --

THE COURT: I walled myself off completely.

MS. MITCHELL: I understand that, Your Honor. It's directly relevant to the Court's instruction.

THE COURT: If all of you are together at the lectern at the same time, that's a good sign.

MS. KUMAR: Your Honor, I don't think we're revealing

**112**

what we talked about.  We just want to advise the court that this is an issue that the parties are meeting regularly in good faith about and we have another meeting scheduled --

THE COURT:  I'm asking for a decision now.  You have the ability to break at least the monitor, and I have to be bound by it.

MS. KUMAR:  Your Honor, I don't believe we do --

THE COURT:  Hold on.  Just a moment.  A couple minutes doesn't hurt.

MS. KUMAR:  Certainly not, Your Honor.

THE COURT:  I mean, this is time well spent.  This meter's going up to the public detriment, quite frankly, in trying to resolve issues, and this isn't going to be the last of the hearing or the last of the appeal.  This money is better spent on the public good, quite frankly.

So if you would have reached this, you can tell me.  Maybe that discussion has led you to an agreement.  But you've had months now, and I'm three and a half years in, and I don't know what's happening with Judge Birotte, and I'm not going to go any further with that.  You can resolve this literally in a couple minutes.

MS. KUMAR:  Your Honor, I would just note for the record we don't believe we can.

THE COURT:  Thank you very much.  I'm going to go into recess.  I'm going to ask you in a moment.  I'm going to

EXCEPTIONAL REPORTING SERVICES, INC

113

be polite about this, but I have to be satisfied that I've made the effort to break this. And I'm trying to humbly make that effort on behalf of the public. And if I don't have some response about when this would occur, then why would I hold this in abeyance? In other words, I'm going forward, and this might be a fresh start in some of these areas at least, to take some of the sharpness off that. So that's my humble attempt, okay?

And if you come back and you tell me, Judge, that's it, then I'll go forward today with Mr. Szabo or whatever you'd like. But I'd really like to know just the fact that you gathered for a moment and made the attempt. And then I would, obvious question, with all these months, why haven't you been able to agree upon a monitor? Because I'm bound by that. If you both agree, I'm bound. So that seems to be the first step to maybe breaking the logjam because that's what's caused a part of the quagmire. And part of this repetition, part of this concern has been when we referred it back to the counsel, Mr. Szabo, two agendized items, and then they put it to a subcommittee.

MR. SZABO: Understood.

THE COURT: Without responding. That is a large part of possibly the pattern of practice here that the Court was concerned about, okay? So humbly, I'm the one asking, very humbly, on behalf of the public, go make the effort. And if

EXCEPTIONAL REPORTING SERVICES, INC

**114**

you haven't decided, then if you want me to go forward, I'm going forward with this hearing.  That's why we're here.  I'll certainly decide 8.2, by the way.  In other words, we'll hear that no matter what.  But if we're going forward on the contempt and the other matters, this is burning up a lot of public money, quite frankly, that can go to much better uses.

So all I'm asking you is to go back to the back.  I'm asking why you can't reach a resolution.  Mr. Szabo, why don't you step down?

**MS. MITCHELL:**  Thank you, Your Honor.

**THE COURT:**  Thank you.  And by the way, if we need Judge Birotte, I'll call him down.

**MS. MITCHELL:**  No, Your Honor.

**(Recessed at 1:14 p.m.; reconvened at 2:51 p.m.)**

**THE COURT:**  I'm sorry, we're back on the record.  All counsel are present.  Mr. Szabo, why don't you come up and join us, sir?  If you would retake the stand, I'd appreciate it.  Mr. Szabo is present, all counsel are present.

**MS. KUMAR:**  Good afternoon, Your Honor.  Poonam Kumar on behalf of the City.  The parties have met and discussed.  We all collectively believe we've made very good progress in our sessions before Judge Birotte.  We are on several outstanding issues, including the issue of the data monitor.  We are hopeful we can get to an agreement.  We have another session scheduled for Tuesday before Judge Birotte.  We are hopeful,

**115**

and they'll correct me, but I vetted this with them, we're hopeful that we can get to an agreement.

If we reach an agreement, what I can represent is it will be agendized quickly to obviate the Court's concern about what happened the last time. It will be agendized quickly before the city council because obviously it is our position that their approval should be sought and received. And I can also attest that Mr. Szabo spoke with the council president at the break and received a similar --

**THE COURT:** Thank you. I was going to ask if you'd speak with the mayor and/or the council president or both just to know an opportunity for a fresh start.

**MS. KUMAR:** Yes. And that that if we reach an agreement with the parties, the intervenors and the Alliance that the council president agreed same, which is what I've already said, which is that it would be agendized quickly after.

**THE COURT:** Okay. Yeah, I just want to thank all of you. I've been really mulling this over actually for quite a while as we got deeper in this and I just wanted to make sure that the mayor and the council were aware of our conversation today through you and just hopefully an opportunity to save a huge amount of money that we could devote back. I know the City's got some financial issues, homeless citizens and maybe just a fresh start for transparency.

**116**

And this is the one issue I focused on for one reason. This is the issue that you control. In other words, unlike some of the other portions, this -- I'm uniquely at your pleasure if you agree. So, all right now, when do we reconvene? Because if there's a good faith effort, which I'm hearing there is, then the best thing I could do is give you some latitude and some time and your meeting is next Tuesday?

MS. KUMAR: Yes, Your Honor.

THE COURT: Okay. The week after or the early part of the next week, what is all your schedules look like? We've been here quite a while. And so as long as there's a lot of thought that goes into this, I don't want to rush in terms of time with your contact with the council or the mayor. I really do believe this could be an opportunity just for the citizens of the homeless and everyone. And I say that humbly.

Can I check my calendar also, get back to you with some dates, give you two or three dates, but I'm thinking probably the second week in March because we were going to reconvene anyway. I'm going to hold off Mr. Garrie, assuming we may not be going forward, having him fly in and out. And if it's acceptable, then do you want me to leave the table set just as it is today and recess? Do you want me to go forward with anything else today and why don't you two discuss?

MS. KUMAR: We've already discussed that, Your Honor. And I believe I can say that the parties would agree

EXCEPTIONAL REPORTING SERVICES, INC

**117**

that if we could recess and you could schedule it for the second week of March, then we hopefully would have more of a report then.

MS. MYERS:  That's fine, Your Honor.  I have a -- I have a conflict the second week -- the entire second week of March that I can't get out of.

THE COURT:  So about the first part of the third week?

MS. MYERS:  That's great for me, Your honor.  Apologies.

THE COURT:  Generally speaking, I'll make sure that I'm available and try to fit in all of your folks.  So Matt, okay.  Let's see how we can do.

Okay.  Listen, we'll be in recess.  We'll get ahold of you next week with some suggested dates.  Ms. Mitchell, okay?

MS. MITCHELL:  Yes.  That works for us, Your Honor.  Thank you.

THE COURT:  Counsel?  Ms. Myers?

MS. MYERS:  Thank you, Your Honor.

THE COURT:  All right.  Let's see if we can get a fresh start then.  Thanks a lot.  Have a good day.

**(Proceeding concluded at 2:57 p.m.)**

118

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____          <u>February 19, 2026</u>

            **Signed**                              **Dated**


*TONI HUDSON, TRANSCRIBER*